1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

VALVE CORPORATION,

10

Plaintiff,

11

v.

12

THOMAS ABBRUZZESE, ZAID
ABUWANDI, CODY ACKLEY, STEPHEN
ADAMS, RYAN ADREANI, ZACHARY
ALETHEIA, YOUSIF ALSAQLAWI, ERIC
ALSPAUGH, JONAH ANDERS, DAVID
ANTOLIC, JOSE ARANDA, JACOB
ARCHER, RYAN ARDITO, FABIAN
AREVALO, MEAGAN ARGO, STEVEN
ARMANT, DANIEL ARMSTRONG, DAVID
ARROYO, JACOB ARTHUR, GARRETT
ATHAY, ANGEL AYALA, EDWIN
AYALA, CHRISTIEN AYSON, CADE
AZARCON, NOAH BABINCSAK STYZEN,
MATTHEW BAER, GAVIN BAKER,
CARTER BAKER, ABED BALBAKY,
MATTHEW BALDWIN, ROB BALDWIN,
CODY BARKER, JACOB BARNHILL,
STEPHEN BARR, BRIAN BASKOVICH,
CHRIS BASSFORD, RILEY BAXTER,
MICHAEL BAZZELL, ANTHONY
BENNETT, ADAM BERNAL,
SHOUNTASIA BEVINS, ALEC
BIRENBAUM, TAI BISHOP,
CHRISTOPHER BITTLE, MICHAEL
BLANCO, STEPHANIE BLOMSTROM,
LEO BLONDEL, KILEY BORBA, GAVIN
BORCHERS, RYAN BOREK, JOSHUA
BOSMAN, X. B.-P., MICHAEL BREWER,
AARON BRIGGS, TIMOTHY
BROUGHTON, VINCENT BROWN,

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

No. 2:24-CV-1717-JNW

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

28

COMPLAINT – 1
No. 2:24-CV-1717-JNW

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

ETHAN BROWN, KENSHAD BROWN,
ALEXANDER BRUMLEY, ERIC BUCK,
NED BUDD, NOAH BURCH, PAUL
BURNETT, KEVIN BURNETT, ZACHARY
BURRY, JASE BUSBY, NICOLAAS BUSH,
JOHNATHON BUSH, ANDREW BUTLER,
OWEN BUTTERWORTH, GRIFFIN BYER,
THOMAS BYRD, MICHAEL CALLONI,
RICH CAMBERN, BENJAMIN
CAMENKER, HARRISON CARLOW,
JONATHAN CARLTON, STEVEN
CARMIENCKE, ADAM CARROLL, NICK
CARTER, JEFFREY CASSICK, AARON
CASTANEDA, MAURICE CASTRO,
CLYDE CHAFFEE, RILEY CHAPMAN,
ERIC CHASTAIN, IAN CHENEY,
BRANDAN CHRISTNER, PETER CILA,
ROCCO CIPOLLA, JASON CLARK, JAMES
CLARKE, JACK CLEARY, CORY CLERI,
MITCHELL COBURN, MYLES COFFMAN,
BRENNAN COLEMAN, BENJAMIN
CONRAD, CHRISTOPHER CONRAD,
MASON COON, ALEXANDER COREN,
DUWAYNE COUNTS, JASON COURTER,
CHASE COUZENS, ETHAN COWAN-
WRIGHT, MARCUS CROWLEY, JULIO
CRUZ, MATEUS CUNHA, SYDNEY
CUTLER-GILBERT, KEVIN DAHLKE,
AJAY DALAL, MICHAEL DAUGHERTY,
ANDREW DAVIDSON, JORDAN DAVIS,
JOHN DAVIS, JAMES DAVIS, DREVAYNE
DAWKINS, JACOB DEEGAN, MANFRED
DENTICE, JOSHUA DEPALMA, RACIEL
DIAZ, JEREMIAH DIEUJUSTE,
ELIZABETH DINGMAN, SEAN DOLLE,
LOGAN DOOSE, CURTIS
DROMMERHAUSEN, DENVER
DUBHORN, DANIEL DUCOS, WILLIAM
DUDLEY, MICHAEL DUFOUR,
ABRAHAM DUMAN, DANIEL DUNCAN,
GABRIEL DURBIN, SPENCER DUZANT,
MICHAEL EASTMAN, CORBIN
ECHEVARRIA, TAYLOR EDWARDS,
JOHNATHON EIMER, NATHAN ENGOLS,
JOSIAH EREDIA, HALEY ESKRIDGE,
SCOTT ESKRIDGE, KEELAN ESQUIVEL,
NICO ESTEBANEZ, COLLIN EVANS,
MICHAEL EWING, RANDALL FARLEY,
MASON FIELD, NATALIE FIELDS, ZACK
FINFROCK, ROBERT FISCHER, TRABER
FISCHER, GREG FISH, JAKE FLAHERTY,
DYLAN FLECKENSTEIN, BRETT FLINN,

COMPLAINT – 2
No. 2:24-CV-1717-JNW

JEREMY FLIPPO, JACOB FORD, JOHN FORREST, NICHOLAS FOSTER, ALEXANDER FOWLER, MATTHEW FOWLER, TYLER FRANCESCONI, JON FRANCISCO, NEIL ANDREW FRANCISCO, TYLER FREEHILL, ADRIAN FRITZLEY, CHASE FROELICH, ANTHONY GALATOLO, JAMES GALLANT, PAOLO GALUPO, RAYMOND GARAY, JULIAN GARIBA, THOMAS GARRETT, ALEJANDRO GARRIDO, BRANDON GARWELL, LIAM GAUME-WAKEFIELD, ANTHONY GAZZO, NELS GEARY, JOSEPH GENTRY, AUGUSTUS GERBO, JASON GIBBS, ROBERT GIBSON, TYLER GILBERT, CHARLES GILL, VIRGIL GLISSON, DONALD GOLDSMITH, TASHA GOLDSMITH, RALPH GONZALES, GUIDO GONZALEZ, IAN GOVEA, CHRISTIAN GRABER, DAVID GRAHAM, EVAN GRANT, JACOB GRAVES, ROBERT GRESCOWLE, WILLIAM GRIFFIN, ELI GROFF, ALEXANDER GROW, DANIEL GUADARRAMA, MICHAEL GUALTIERI, DON "DOC" GUGER, BASHARI GUIDRY, MATTHEW HABURSKY, COLE HAGAN, SACHA HAGHIGHI, BRADYN HAMEL, JARED HARDISON, DANIEL HARLEY, DEVIN HARVEY, MIKEL HATCHER, ROB HAUSER, JACKSON HEATH, BRODERICK HEBERT, DAVID HEDRICK, ANN HEFNER, ADAM HENCHEN, MARK HENLEY, AUSTIN HENRY, LOGAN HERALD, RENNY HERBERT, MARTIN HERNANDEZ, ALECK HERNANDEZ, ANDRES HERNANDEZ, MIKE HESPEL, TRAVIS HICKEY, BRAXTEN HIEB, KASANDRA HILEY, JONATHAN HILLMAN, JON HOKE, PHILIPJOHN HOLLAND, WILLIAM HOLMES, SUPYO HONG, CHRISTIAN HORAZECK, RICKY HORNE, SHAUN HOWE, NICHOLAS HOWELL, JAYSON HUBER, GORDON HUCKABY, JARED HUGGETT, CHANDLIN HUSAIN HUSAIN, MATTHEW HUSAR, CHRIS HUSS, ALEX HYER, JENNIFER JACKS, WILLIAM JACKSON, BAYLEN JAMES, CHRIS JAUS, STEVEN JENNETT, ITIEL JIMENEZ, MAXWELL JOHNSON, MAX JOHNSON, JARED JOHNSON, TIMOTHY JOHNSON, JUSTIN

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

JONES, MATTHEW JONES, DANE
JORDAN, JURELL JORDAN, BENJAMIN
JORDAN, RYAN JURADO, SHANE
KACHMAN, GREGORY KAIN, TIMOTHY
KAISERLIK, VINCENT KEEGAN, GRANT
KEGLEY, NICHOLAS KEITH, ODIS
KENDRICK, PAUL KIERNAN, BRANDON
KIMPEL, JEREMY KIRKWOOD,
NICHOLAS KIRSE, JOHN KNIRR,
ANDREW KOSKO, JOSHUA KRANZ,
DEREK KRAUSE, PATRICK KULLER,
MAX KURTZ, MICHAEL KUTNER, DERIC
LANDERS, AJ LANE, TREVOR
LATURNER, NICK LAUDER, CORINNE
LEE, ETHAN LEFEBVRE, JUSTIN
LEFFERT, MARK LEGG, CAMERON
LESTER, JOSHUA LEWIS, TALON LEWIS,
JONATHAN LEWIS, SETH LEWIS, SCOTT
LEWIS, ROBERT LEWIS, MICHAEL
LINARES, SAM LOMAX, ALEXANDER
LOPEZ, ALAN LOPEZ, JONATHAN
LOPEZ, KOLBY LOUKS, JEREMY LUCAS,
RICHARD LUNDSGAARD, AMY LUTES,
KYLE LYNCH, CLAYTON LYNN,
ANDREW M EVENSON, JORDAN MACK,
THOMAS MAGERA, PANAYIOTIS
MANISCALCO, WILLIAM MARCELLUS,
JOHN MARCOTTE, ROGER MARICLE,
ALICIA MARSHALL, ROSS MARTIKKE,
ARMANDO MARTINEZ, NICHOLAS
MASTRIACO, PAUL MAYER, KYLE
MAYFIELD, TRAVIS MAYNARD,
HUNTER MCBRAYER, BRIDGETTE
MCBRIDE, JASON MCCALL, NATASHA
MCCARTHY, EZEKIEL MCCRACKEN,
JAMES MCDONALD, BRODEN
MCDUFFEE, GRAYSEN MCGILLIGAN,
JAMES MCINERNY, AUSTIN MCMILLAN,
THOMAS MCSWEENEY, MARK
MENDEL, MARTIN MENDEZ, TRAVIS
MICHELETTI, ALICE MILLAGE, RAY
MILLER, CARY MILLER, ALEXANDER
MISHKEVICH, ANDREW MITCHELL,
SEAN MITCHELL, ANTHONY
MITTASCH, MAX MOAKLEY, JODEE
LYNN MOLINA, ADRIAN MONTER,
KEVIN MONTES, MALAKYE MOODY,
RYAN MOORE, NATHANIEL MOORE,
JARED MORENO, BARRY MORGANTI,
DANIEL MORRIS, CONOR MOSCHELLA,
YURI MOTRUK, GAVIN MOYE,
MICHAEL MRGICH, MAXWELL MUCHA,

COMPLAINT – 4
No. 2:24-CV-1717-JNW

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

RICKY MULLINS, TREY MUNDELL,
BONNIE MURPHY, DEVON MUSTO,
JARED MYERS, JACOB NAQUIN, COLE
NELSON, JENNIFER A NELSON, JORDAN
NEWBY, JAVIER NIETO, CHARLES
NILES, LUKE NINEMIRE, RICHARD
NOBLE, GARLAND NOEL, CALEB
ORELLA, JONATHAN ORTIZ, ANDREW
OSBORNE, MICHAEL OWENS,
ALEXANDER PACHNICKI, MICHAEL
PACHOLCZAK, JOSHUA PAGE,
MITCHELL PAKOSZ, GARY PALMATIER,
HARLEY PALMER, MITCHELL
PAPENDORF, WESLEY PARMER,
ZACHARY PARSLEY, ERIC PARTLOW,
HARSH PATEL, ALEX PATRAO,
MICHAEL PATTERSON, ERIC PATTON,
BRADY PAUL, COLLIN PEACOCK,
AARON PEARSON, SHAWN PECK, ELIEL
PEDRO, JEFF PELLEGRIN, MIKE PENA,
TIMOTHY PABLO PENARANDA, JESSE
PERLAZA, NOAH PERRY, JARED PERRY,
JONATHAN PERRY, BLAKE PETERSEN,
AARON PETERSON, DEVEN PETERSON,
MARCUS PETTWAY, DUSTIN PHELPS,
ALYSSA PHILLIPS, JACOB PHILLIPS,
HUGH PHILLIPS, EVAN PIEPHO,
CORTLAND PINNICK, NATHAN PIPPIN,
NIKO PITINII, CARSON PLAISANCE,
MATEO PLATERO, SKYLAR POND,
PHARAUN POTTS, MATTHEW POWELL,
CHRISTOPHER PRATO-SHEIN, STEVEN
PRESCOTT, JAMES PRUITT, JACOB
PULLEN, JOHN QUARNSTROM,
ABRAHIM RAMADAN, JEFF RAMIREZ
OCHOA, KEVIN RAMOS, ISAAC RAMOS,
QUINN RASMUSSEN, BRADLEY
RATLIFF, JOSEPH RAY, CRISTIAN
RAYNES, VINCENT REBOKUS, DAVID
REED, JOHN REEVES, JAMES
REYNOLDS, ROBERT RICHARDS,
TRACY RICHARDSON, ROBERT
RICHELSON, DAVID RICHEY, JOE RIOS,
JOSEPH RISI, JULIUS ROBERTS, SAMUEL
ROBERTS, JOSHUA ROBERTS, STEPHEN
ROBERTSON, CHRIS ROBINSON, ETHAN
RODABAUGH, GABRIEL RODRIGUES,
ALEXANDER RODRIGUEZ, JOSHUA
RODRIGUEZ, THOMAS ROLANDO,
ALLEN ROMAN, VICTOR ROMO,
ANDREW ROSSON, ANTHONY RUBINO,
NICHOLAS RUGAMA, ROBERT RULE,

COMPLAINT – 5
No. 2:24-CV-1717-JNW

TREVOR RUPEL, MORGAN RUSHING,
TYLER SALYER, JOSHUA SAMMONS,
ETHAN SAMS, LEONARD SANDERS,
JOEL SANDKAMP, ANDRE SANTANA,
GABRIEL SANTANA, SALVATORE
SARDISCO, SIMON SAVLAS, JOSHUA
SAYLES, AUSTIN SCHAU, ROBERT
SCHINDLER, ALEXANDER SCHLOSSER,
JOHN SCHWEIZER II, ETHAN SCIFERS,
ISAAC SELLERS, RAMON SERRANO,
ZACKERY SESSIONS, RYAN SHELINE,
JOSEPH SHELLEY, BRIAN SHERWOOD,
MICHAEL SHINGLETON, JAKE SIGAL,
ANTHONY SIMONI, ZACHARY SMITH,
DANIEL SMITH, GREG SMITH, JASON
SMITH, RYAN SMITH, IAN SMITH,
DYLAN SMYERS, AARON SOLOMON,
NORM SOMERS, LUIS SOTILLET ROJAS,
DECKER SPENCER, PATRICK SQUIRE,
DARIAN STARK, HOLDEN STENDER,
MATTHEW STENGEL, CHRISTOPHER
STEPHAN, DILLON STETTLER, SAMUEL
STEVENS, ROBERT STILLMAN,
NICHOLAS STONE, MITCHELL STRANG,
TYLER STRENGE, IAN STUBBS, STEVEN
STUCKER, TYLER STULZ, NICKY SUN,
KALEB SWAIM, MATTHEW SWEENEY,
JOHN TADDEI, ISAIAH TAYLOR, KEVIN
TAYLOR, ZACHARY TAYLOR,
ALEXANDER THOMAS, LUCIAN
THOMPSON, XZAVIER TIMMONS,
MERRICK TIPTON, PATRICK
TITTERNESS, LEIF TOLLEFSON, AMBER
TONEY, IAN TREFREN, KAI TROBAUGH,
DEVON TRUJILLO, MAISIE TURNER,
RYAN TUTOR, LAUREN TYNER,
NICHOLAS TYNES, KATIE UCCELLO,
MARC URA, JACK UTEG, VEDA VALLES,
AARON VAUGHN, CHRISTOPHER
VEIGA, MATTHEW VENTURES, LANCE
VICENTE, BERNARD VIGNALI, KEVIN
VILORIA, KENNETH WALKER, JACOB
WALKER, LLOYD WALKER, JAMES
WALTERS, DOMINIQUE WARD, JONAH
WARNER, CODY WARREN, JOSEPH
WASIELEWSKI-WALSH, TRISTEN
WATSON, JOSHUA WEBB, SETH WEBER,
MARK WENDT, DANIEL WEST, JONAH
WHITE, JOSHUA WHITEACRE, LUTHER
WILLIAMS, MARK WILLIAMS JR, BRAD
WILSON, DANIEL WIRTH, THMOAS
WISEMAN, ROBERT WOOLF, RANDY

COMPLAINT – 6
No. 2:24-CV-1717-JNW

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1  WOZNIAK, AMIR WRIGHT, J DEREK
   WRIGHT, TYLER WRIGHT, MASON
2  WRIGHT, MICHAEL WU, JAKE
   WUEBKER, JOSHUA WYANT, ZACHARY
3  YAHOLA, XENIA YEE, BRIAN YEH,
   JOHNATHAN YI, JACOB ZIDE, ADAM
4  ZUNIGA and JOHN ZWICK,

5              Defendants.

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

## INTRODUCTION

1.      Valve brings this complaint to enjoin Defendants from continuing to pursue arbitrations before the American Arbitration Association ("AAA") because there is no agreement to arbitrate between the parties. Valve's request for relief does not leave Defendants without a way to pursue their claims. It merely asks the Court to answer a simple legal question: Whether Defendants may arbitrate their claims—even though there is no arbitration agreement between the parties—or must resolve their claims in court.

2.      Valve is forced to bring this action by the actions of Bucher Law PLLC ("Bucher Law"). Bucher Law is a small law firm founded by William Ward Bucher IV after he was fired by another law firm, which is now suing him for (among other things) alleged misappropriation, aiding and abetting fraud, and interference with client relationships. Looking to build its business—and generate substantial attorney fees—Bucher Law engaged in a widespread marketing campaign to convince Steam users to bring antitrust claims against Valve related to its Steam gaming platform. The strategy was to "weaponize[]" an arbitration provision in the user agreement between Valve and Steam users to leverage a settlement from Valve so it could avoid the enormous costs it would face in arbitrating thousands of user claims. Mr. Bucher believed that "[a]ggregating claims makes [Valve's] entrance fee to just defend [arbitrations] prohibitively expensive."

3.      Steam users were merely pawns in this scheme; Mr. Bucher's presentation to a prospective investor promised huge returns for a litigation funder willing to front the costs of convincing users to bring claims against Valve, reducing each Steam user to an "acquisition" cost.[1] The presentation estimated "spend of $3.75 million to recruit 75,000 clients at $50 an acquisition" and enticed a potential funder with an estimated "1874% ROI on $6.5 million investment." The plan was simple: Convince tens of thousands of Steam users they needed to bring claims against Valve, then use their numbers to extort a windfall settlement by threatening Valve with thousands of arbitrations that would cause Valve to incur substantial arbitration fees.

---

[1] Mr. Bucher's complete presentation is publicly available as an exhibit in a lawsuit Mr. Bucher's former law firm brought against him. *See* https://fingfx.thomsonreuters.com/gfx/legaldocs/xmvjlawjrvr/frankel-valvevzaiger--massarbpowerpoint.pdf.

COMPLAINT – 8
No. 2:24-CV-1717-JNW

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

4. Some Steam users noted on public posts that Mr. Bucher was engaged in a "scam." Others appear to have been misled about what they had signed up for, believing it was a class action or class action settlement that didn't exist. And some Steam users who were induced to sign up after being bombarded with harassing video ads later tried to rescind their participation.

5. Meanwhile, after tens of thousands of Steam users apparently (and perhaps unwittingly) retained Bucher Law to bring claims against Valve, Bucher Law launched several thousand arbitrations against Valve, invoking the arbitration agreement in the Steam Subscriber Agreement ("SSA") between Valve and Steam users that was in effect at the time.[2] An arbitrator in four of those arbitrations ruled that the SSA's arbitration agreement was not enforceable. Based on those rulings, Bucher Law filed a putative nationwide class action against Valve in this Court based on the premise that Valve's arbitration agreement was unenforceable as to the entire class of all Steam users in the United States, **including Defendants here**. *See* Complaint, *Elliott v. Valve Corp.*, No. 2:24-cv-01218 (W.D. Wash. filed Aug. 9, 2024).

6. In light of all of the circumstances, Valve removed the arbitration agreement and class action waiver from the SSA.[3] Now, the current SSA (the "Current SSA") provides that all claims and disputes between Valve and Steam users must proceed in court, including claims and disputes that arose before Valve implemented the Current SSA.

7. Numerous Steam users quickly accepted the Current SSA—including the large majority of Defendants. All others did so as of November 1, 2024, through their continued use of Steam and, in many cases, through subsequent purchases on Steam.

8. Despite basing a nationwide class action on the argument that the arbitration agreement in Valve's prior SSA was **not** enforceable, Bucher Law continued to push forward with Defendants' previously-filed arbitrations, **including for those Defendants who agreed with Valve in the Current SSA that their claims would be pursued only in court**. Bucher Law argued in those arbitrations that the

---

[2] A number of these users presumably had second thoughts and withdrew their claims after Bucher Law filed arbitration demands on their behalf.

[3] The prior version of the SSA that included an arbitration agreement and class action waiver is referred to herein as the "Superseded SSA."

COMPLAINT – 9
No. 2:24-CV-1717-JNW

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1   old arbitration agreement from the Superseded SSA remains enforceable for the claimants in those

2   arbitrations and asked arbitrators to rule those claimants may proceed in arbitration on that basis.[4]

3       9.      As the Supreme Court held in a unanimous decision just last year, the question of which of

4   two agreements governing dispute resolution applies is a question that only a court may decide. *See*

5   *Coinbase, Inc. v. Suski*, 602 U.S. 143, 152 (2024). As the Court observed, "[a]rbitration is a matter of

6   contract and consent, and we have long held that disputes are subject to arbitration if, and only if, the

7   parties actually agreed to arbitrate those disputes." *Id.* at 145.

8       10.     As there is no longer an arbitration agreement, Defendants should be enjoined from

9   pursuing their arbitrations. Defendants will remain free to prosecute their claims in court, in the putative

10  class action, *In re Valve Antitrust Litigation*, No. 2:21-cv-00563-JNW ("*Wolfire*"), that Bucher Law has

11  described as "overlapping" with its arbitrations and includes among the putative class all Defendants, or

12  otherwise.

13  ## NATURE OF THE ACTION

14      11.     William Ward Bucher IV is the founder and sole partner of Bucher Law. In July 2022,

15  before Mr. Bucher founded Bucher Law, the law firm Zaiger LLC ("Zaiger") hired Mr. Bucher "to lead

16  [the] development and pursuit of mass arbitration strategies" at Zaiger. While at Zaiger, Mr. Bucher made

17  a presentation to a litigation funder setting out his plan to exploit the arbitration agreement in the

18  Superseded SSA to bring mass arbitrations against Valve. (Ex. 1.) This was purely a business proposition

19  with no discussion of the merits of any claims against Valve. Instead, the presentation promised huge

20  returns for a litigation funder willing to front the costs of convincing users to sue Valve, reducing each

21  Steam user to a mere "acquisition" cost. (*Id.* at 5.) The presentation estimated "spend of $3.75 million to

22  recruit 75,000 clients at $50 an acquisition" and enticed a potential funder with an estimated "1874% ROI

23  on $6.5 million investment" in funding the proposed mass arbitrations. (*Id.* at 5, 9.) The plan was simple:

24  Convince tens of thousands of Steam users they needed to sue Valve, then use their numbers to extort a

25

26      [4] References to "claimants" are to the individuals on whose behalf Bucher Law has asserted claims
    in arbitration with the AAA against Valve. Some claimants do not have pending arbitrations before

27  arbitrators (or are deceased) and are therefore not Defendants in this action.

28

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

windfall settlement by threatening Valve with thousands of arbitrations that would cause Valve to incur substantial arbitration fees.

12.    Zaiger subsequently terminated Mr. Bucher, allegedly on account of a disagreement over arbitration strategy. Zaiger then sued Mr. Bucher alleging, among other things, that Mr. Bucher stole client files in connection with threatened arbitrations against Valve. *See* Complaint, *Zaiger LLC v. Bucher Law PLLC*, No. 154124-2023 (N.Y. Sup. Ct. filed May 9, 2023) (Ex. 2).[5] The lawsuit alleges that Mr. Bucher "snuck into [Zaiger's] client database" and "tried to access and download names, addresses, email addresses, and mobile phone numbers of about 48,000 [Zaiger clients] whose information was stored on the Firm Database." *Id.* ¶ 3. Mr. Bucher allegedly used the information he stole to "barrage those [Zaiger clients] with false and deceptive emails and text messages," falsely implying that the clients must sign up with Mr. Bucher's firm to continue pursuing their mass arbitration claims against Valve. *Id.* ¶ 5.

13.    After his termination from Zaiger, Mr. Bucher formed Bucher Law.

14.    In 2023, Bucher Law commenced its mass arbitration strategy against Valve, which was designed—in Mr. Bucher's own words—to "weaponize[]" an arbitration agreement between Valve and Defendants. (Ex. 1 at 3.) At that time, Valve's SSA included an arbitration agreement that required claims and disputes to be brought in arbitration before the AAA.

15.    Bucher Law has received litigation funding from Bench Walk 22m, L.P., an affiliate of Bench Walk Advisors LLC (collectively, "Bench Walk"), to pursue Bucher Law's mass arbitration strategy.[6] It is not apparent that Bucher Law advised Defendants or any other claimants that Bucher Law was bankrolled by a litigation funder who may have motivations that are not aligned with Defendants or

---

[5] The complaint is available at https://fingfx.thomsonreuters.com/gfx/legaldocs/znvnzwglqvl/frankel-valvevzaiger--zaigercomplaintvbucher.pdf.

[6] On April 6, 2023, Bench Walk filed a UCC Financing Statement naming Bucher Law as debtor. The collateral includes all proceeds Bucher Law receives from all "Claims," which are defined so as to capture, among other things, "any and all claims asserted or to be asserted by the Debtor on behalf of the Clients against Valve Corporation." The UCC statement references a Litigation Funding Agreement, dated as of April 5, 2023, by and between Bucher Law and Bench Walk. Bench Walk filed an SEC Form D Notice of Exempt Offering of Securities providing that Bench Walk's total offering amount was $10,129,000. Bench Walk made the offering starting on May 9, 2023.

COMPLAINT – 11
No. 2:24-CV-1717-JNW

other claimants.[7] To the contrary, Bucher Law's retainer nowhere mentions Bench Walk or litigation funding, and several claimants in arbitration proceedings have testified under oath that they were not aware of the funding.

16.    In a marketing video used as part of his online marketing blitz to recruit claimants, Mr. Bucher stated that arbitration was preferable to a class action. Mr. Bucher tried to convince Steam users to join his arbitration plan by stating that it was "good news" that Valve had an arbitration agreement because "on average consumers in arbitration recover hundreds of times more than in a class action." After threatening arbitrations asserting antitrust claims on behalf of thousands of claimants, Bucher Law made an outrageous settlement demand to Valve that far exceeded any conceivable recovery; indeed, the threatened claims are meritless.[8]

17.    Valve did not acquiesce to Bucher Law's demand. Bucher Law then filed thousands of arbitrations with the AAA. The 572 Defendants in this action are among the claimants in those arbitrations, comprising (i) 548 claimants whose arbitrations are pending and assigned to merits arbitrators (excluding four deceased claimants) and (ii) 24 claimants whose arbitrations were assigned to a merits arbitrator who was disqualified.

18.    Bucher Law also filed thousands of other arbitrations with the AAA that have not been assigned to merits arbitrators. The claimants in these arbitrations include at least seven individuals who are deceased; at least 218 individuals who are represented by other law firms pursuing the same claims; and at least 19 individuals who were at the time of this action's filing in active bankruptcy proceedings. (And, of course, all of the claimants are putative class members in *Wolfire*.)

---

[7] New York Rule of Professional Conduct 1.8(f) prohibits lawyers from using third-party financing without informed consent from their clients and requires lawyers to ensure their judgment remains independent. *See* Roy D. Simon, *Simon's NY Rules of Prof. Conduct*, § 1.8:79 (2024) ("The concern [of New York Rule 1.8(f)] is the old adage, 'He who pays the piper calls the tune.'"). Mr. Bucher is admitted to practice in New York and Bucher Law has an office in Albany, New York.

[8] Bucher Law asserts claims under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. Bucher Law alleges that Valve has monopolized the so-called "PC Game Transaction Platforms Market" by imposing a "Platform Most-Favored Nations" policy ("PMFN") in which Valve has allegedly prohibited game developers from selling games on rival storefronts at lower prices than on Steam. These claims are false, as Valve is demonstrating in related litigation in this Court in *Wolfire*.

---

19.     At the time Valve initially filed this action on October 18, 2024, most of the arbitrations pending before arbitrators were at preliminary stages: The parties had not completed their information exchange in any arbitration and no evidentiary hearings or any final merits hearings had been held in any arbitration. This remains true as of the date of this filing with respect to the overwhelming majority of pending arbitrations. In a number of other arbitrations, the parties have completed information exchange; in several, the parties have proceeded to a final merits hearing; and in four, a final merits hearing is complete but the arbitrator has not entered a final award.[9]

20.     In May 2024, Bucher Law filed motions in four arbitrations pending before one arbitrator seeking a ruling that the arbitration agreement in Valve's now superseded SSA was unenforceable. Bucher Law did not file this motion in the 21 other arbitrations against Valve pending before that same arbitrator. Nor did Bucher Law file this motion before any of the other 34 arbitrators presiding over Bucher Law's arbitrations at the time.

21.     On July 8, 2024, the arbitrator in those four proceedings granted Bucher Law's motions, holding that the arbitration agreement in the Superseded SSA was unenforceable and dismissing those arbitrations.

22.     On August 9, 2024, Bucher Law and its co-counsel Hagens Berman Sobol Shapiro LLP ("Hagens") filed a putative class action against Valve in this Court captioned *Elliott v. Valve Corporation*, No. 2:24-cv-01218 (W.D. Wash.). The plaintiffs in that action are the four individuals on whose behalf Bucher Law obtained arbitral rulings that the arbitration agreement in the Superseded SSA was unenforceable.

23.     Bucher Law and Hagens's complaint in *Elliott* asserted all of the claims and sought all of the relief Bucher Law seeks on behalf of Defendants and other claimants in arbitrations pending before the AAA. Bucher Law and Hagens sought to represent a putative nationwide class that included Defendants and all other claimants on whose behalf Bucher Law is prosecuting arbitrations before the

---

[9] Valve prevailed in all 25 arbitrations in which arbitrators have rendered final awards. A King County Superior Court has confirmed 22 of those awards. Petitions to confirm remain pending for the remaining three awards.

COMPLAINT – 13
No. 2:24-CV-1717-JNW

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

AAA. Although this Court denied Bucher Law and Hagens's motion to be appointed interim lead counsel, Hagens remains involved as plaintiffs' counsel in the case (Bucher Law is still listed as counsel to four plaintiffs on the docket and may remain involved behind the scenes).[10]

24.    The arbitration agreement in the SSA at the time Bucher and Hagens filed *Elliott* provided that the claims be arbitrated before the AAA. But Bucher Law and Hagens asserted that their claims belonged in court because Bucher Law had "**won binding decisions from arbitrators rendering Valve's arbitration provision unenforceable**." Complaint ¶ 13, *Elliott* (Dkt. 1).

25.    Although Mr. Bucher told potential claimants in his marketing video that arbitration was superior to a class action, Bucher Law and Hagens represented in *Elliott* that the opposite was true. The complaint alleged that the putative class action is "superior to any other method for the fair and efficient adjudication of this legal dispute." Complaint ¶ 177, *Elliott* (Dkt. 1).

26.    Valve did not challenge the rulings of the arbitrator that the arbitration agreement in its Superseded SSA is unenforceable, nor will it do so. Instead, on September 26, 2024, Valve implemented the Current SSA to remove the arbitration agreement and class action waiver.

27.    The Current SSA requires that all claims, including claims that arose before the new agreement, must proceed in court:

> You and Valve agree that disputes and claims between you and Valve (including any dispute or claim that arose before the existence of this or any prior agreement) shall be commenced and maintained exclusively in any state or federal court located in King County, Washington, having subject matter jurisdiction.

28.    The Current SSA also provides that it "constitutes and contains the entire agreement between the parties with respect to the subject matter hereof and supersedes any prior oral or written agreements."

---

[10] Hagens remains involved despite this Court's statement in its order appointing Cohen Milstein as interim lead counsel that Hagens's "recent conduct in an unrelated class action gives the Court pause." Order at 8, *Wolfire* (Dkt. 441).

29.     Under well-settled law, these provisions in the Current SSA cover all of the arbitrations Bucher Law is prosecuting on behalf of Defendants and other claimants in arbitration and requires their claims to proceed in court.

30.     All Defendants were sent notice of the Current SSA by email, and, if they opened the Steam client, a pop-up notification. The Current SSA has also been continuously posted online on a public website since September 26, 2024, in numerous languages, with a prominent header calling out the new agreement and advising users that "the new dispute resolution provisions in Section 10 require that all disputes and claims proceed in court and not in arbitration." *See* https://store.steampowered.com/subscriber_agreement/. Users must accept the Current SSA every time they fund their Steam Wallet or make a purchase on Steam itself[11] after September 26, 2024.

31.     454 of the 572 Defendants affirmatively accepted the Current SSA by (i) checking a box next to the text "I agree to the Updated Steam Subscriber Agreement" then clicking a button labeled "Accept Updated SSA" under a notification regarding the updates, before November 1, 2024; (ii) checking a box stating their agreement to the new SSA when making a purchase on Steam before November 1, 2024; or (iii) performing both of those actions before November 1, 2024. The remaining 118 Defendants accepted the Current SSA because they did not delete or discontinue use of their account before November 1, 2024.[12] Among these 118 Defendants, 76 also subsequently affirmatively accepted the Current SSA by checking a box stating their agreement to the new SSA when making a purchase on Steam after November 1, 2024.

32.     Bucher Law and Hagens asserted in *Elliott* that the Current SSA and its forum selection provision apply to all Steam users, including these Defendants. On October 2, 2024, Bucher Law and Hagens moved to be appointed interim co-lead class counsel in *Elliott*. In that motion, Bucher Law and Hagens (together, "Proposed Class Counsel") represented that they had "prompted Valve to remove the arbitration provision from its terms of use, along with the associated class action waiver. **As a result,**

---

[11] As opposed to a purchase made using Steam Wallet funds from within a game launched through Steam.

[12] Valve will only delete a user's account if and when that user requests deletion.

**Valve consumers are authorized to proceed in federal court and seek collective relief through the class action vehicle.**" Plaintiffs' Motion to Appoint Hagens Berman Sobol Shapiro LLP and Bucher Law PLLC as Interim Co-Lead Class Counsel at 8, *Elliott* (Dkt. 25). "Valve consumers" include Defendants and the thousands of other claimants in the arbitrations that Bucher Law is prosecuting before the AAA.

33.    Notwithstanding Proposed Class Counsel's statement to this Court that the Current SSA applies to all Defendants, Bucher Law is taking the opposite position in Defendants' arbitrations before the AAA and in an action filed in California state court.

34.    First, Bucher Law continues to prosecute hundreds of arbitrations before the AAA on behalf of Defendants. Valve asked the AAA to administratively close the arbitrations for lack of jurisdiction. Bucher Law opposed Valve's request, arguing that Valve's implementation of the Current SSA was a "unilateral and legally infirm terms of use modification." The AAA declined to close the arbitrations, leaving to a court or 34 merits arbitrators the question whether the arbitrations may proceed. But which agreement applies to Defendants' claims—the Superseded SSA with an arbitration agreement or the Current SSA that provides for resolution of disputes in court (and to which most Defendants have affirmatively agreed)—is a question that, under *Coinbase*, only a court may resolve.

35.    Second, Bucher Law filed a petition in California state court seeking to reinstate a disqualified arbitrator who was previously assigned to 24 of the Defendants' arbitrations, so that Bucher Law can go forward in those arbitrations with its preferred arbitrator. *See Beer v. Valve Corp.*, No. 24STCP03209 (Cal. Super. Ct., L.A. Cnty. filed Oct. 4, 2024). Bucher Law's petition is based on the premise that the arbitration agreement in Valve's Superseded SSA **is** enforceable and applies to those Defendants' claims—exactly opposite Bucher Law's position in the *Elliott* class action, which is based on the premise the arbitration agreement in Valve's Superseded SSA **is not** enforceable. The court dismissed the petition in *Beer* because the petitioner did "not identify any authority permitting [the] court to effectively overturn AAA's administrative decision" to remove the arbitrator. *Beer v. Valve Corp.*, No. 24STCP03209, slip op. at 4 (Cal. Super. Ct., L.A. Cnty. Jan. 8, 2025).[13]

---

[13] The decision is on appeal.

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

36.     Bucher Law has conceded to arbitrators that the firm was forum shopping by prosecuting separate actions—the arbitrations and a putative class action—on behalf of the same Defendants in two different forums (AAA, federal court).[14]

37.     Bucher Law also stated to arbitrators that Defendants may withdraw their arbitrations and proceed in court if Bucher Law is dissatisfied with any arbitral ruling at any point up until a final award. In fact, Bucher Law has withdrawn or requested "stays" of arbitrations, numerous of which on the eve of final merits hearings. In one extreme case, Bucher Law announced, during a conference with the arbitrator, a request to withdraw an arbitration just three business days before the start of the final merits hearing. Bucher Law made this announcement just moments after the arbitrator stated that she would sanction Bucher Law for submitting a letter brief riddled with authority fabricated by artificial intelligence.[15] Bucher Law also attempted to withdraw another claimant's claim less than 24 hours before the start of the final merits hearing.

38.     And Bucher Law represented to arbitrators that Bucher Law intends to use information obtained in the arbitrations in furtherance of Proposed Class Counsel's putative class action.

39.     The arbitrations Bucher Law is prosecuting on behalf of Defendants impose enormous burdens on the parties. This time and expense incurred is entirely wasted: any final arbitral award issued in any of those arbitrations would be subject to vacatur because there is no arbitration agreement between the parties.

40.     It is not apparent that Bucher Law advised Defendants that (i) Bucher Law sought and obtained orders ruling that the arbitration agreement in the SSA was unenforceable; (ii) Bucher Law and Hagens filed a putative class action on behalf of Defendants as putative class members; (iii) there is a pending putative class action seeking relief on their behalf; (iv) Bucher Law engaged in forum shopping, including by (a) pursuing claims in arbitration and through the putative class action and (b) demanding

---

[14] Bucher Law has also forum shopped in arbitrations. Bucher Law submitted no fewer than 315 challenges seeking to disqualify a total of 22 arbitrators.

[15] The arbitrator ultimately sanctioned Mr. Bucher and his associate.

COMPLAINT – 17
No. 2:24-CV-1717-JNW

arbitrations in California on behalf of hundreds of Defendants who do not reside in California, despite the terms of the Superseded SSA providing that arbitration hearings were to take place in the county in which the Defendant resides; (v) Bucher Law used Defendants' arbitrations as leverage in furtherance of Proposed Class Counsel's putative class action; (vi) this dispute has arisen as to which agreement applies to their claims as between the Superseded SSA and the Current SSA; or (vii) Bucher Law is financing the pursuit of Defendants' claims through third-party litigation funding.

41.     The circumstances suggest that Bucher Law has not advised many Defendants of these facts or other basic aspects of their arbitrations, such as the nature of their claims against Valve or even the fact that Bucher Law filed those claims.

42.     Indeed, after Valve served Defendants with process in this action, numerous Defendants reached out to Valve expressing that they were confused, did not know they had filed an arbitration, or wanted to end their arbitration.[16] The following are quotations from communications Valve received from Defendants:

- "I . . . appear to have been misled about what [I] signed up for, believing it was a class action or class action settlement that did not exist."
- "I was misinformed and it was not my interest to file any kind of lawsuit against Valve."
- "I really realized it was a scam."

43.     Some Defendants also stated that Bucher Law told them that they must pay Bucher Law (or another firm) substantial legal fees to terminate their arbitration and end their involvement in this action. For example, one Defendant stated: "I have reached out to Will Bucher and he says if I drop my arbitration claim now then I'll need to hire another lawyer at my own expense to negotiate with you to remove me from the federal action, or I can pay him a bunch of money to do it."[17]

---

[16] Bucher Law told Defendants that Valve personally served them with process to intimidate them. That is false. Bucher Law refused to accept service on behalf of any Defendant.

[17] Bucher Law has not withdrawn this claimant's arbitration. The claimant is a Defendant in this action.

COMPLAINT – 18
No. 2:24-CV-1717-JNW

44.     The statements Bucher apparently made to these Defendants were not true. Valve expressly told Bucher that it would dismiss this action as to any Defendant who voluntarily withdraws from arbitration. (*See* Dkt. 12 at 3-4 (*ex parte* motion).) That stands to reason: the only relief Valve seeks in this action is to enjoin unauthorized arbitrations. If a Defendant is no longer a claimant in an arbitration Valve would no longer need to seek relief as to that claimant.

45.     Valve did not respond to any of the communications it received, but filed a motion seeking leave to provide a court-approved statement to those Defendants informing them of the nature of the action. (Dkt. 12; Dkt. 39.)[18]

46.     Claimants, including Defendants in this action, have also offered sworn testimony during final merits hearings before arbitrators confirming that they were (i) confused as to the fact that they are participants in an arbitration, and (ii) not informed of the class actions filed on their behalf.

47.     Notably, Bucher Law advised this Court on June 4, 2025, that it represented all Defendants in this action. (Dkt. 64.) Yet Defendants do not even appear to be aware of that fact. One Defendant who Bucher Law claims to represent in this action testified in a hearing nearly two weeks later, on June 16, 2025, that he did not retain Bucher Law for any engagement other than his arbitration.

48.     Even worse, three of the individuals Bucher Law claimed to represent in this action on June 4, 2025, died before Valve commenced the action.[19] Bucher Law could not possibly represent these individuals.[20]

49.     In short, Defendants (or their counsel) are attempting to proceed with arbitrations under an old arbitration agreement that was found unenforceable and that has since been removed from the Current SSA. All Defendants agreed to the Current SSA. The AAA therefore lacks jurisdiction to adjudicate

---

[18] On May 14, 2025, the Court ordered Valve to provide Bucher Law with the names of all claimants who had communicated with Valve (Dkt. 58), and on May 21, 2025, Valve provided that list to Bucher Law. On August 1, 2025, the Court denied Valve's renewed motion as moot. (Dkt. 76.)

[19] Valve discovered and verified that these individuals were deceased only after filing this action.

[20] Another individual Bucher Law claimed to represent is a minor. Valve discovered and verified that this individual was a minor only after filing this action.

COMPLAINT – 19
No. 2:24-CV-1717-JNW

Defendants' disputes. Accordingly, Valve respectfully requests an order enjoining the arbitrations Defendants are prosecuting before the AAA.

## THE PARTIES

50.     Plaintiff Valve is a corporation organized under the laws of Washington state, with its principal place of business in King County, Washington.

51.     Defendants are 572 individuals represented by Bucher Law in arbitrations pending before arbitrators with the AAA (or that were assigned to an arbitrator who has since been disqualified).[21]

## JURISDICTION AND VENUE

52.     This Court has jurisdiction under 9 U.S.C. § 4 and 28 U.S.C. §§ 1331 and 1367 because the underlying controversy involves claims arising under the laws of the United States—the Sherman Act, 15 U.S.C. §§ 1, 2. *See* Dkt. 76 at 1 ("[T]he Court finds that it has subject-matter jurisdiction.").

53.     Venue is appropriate in this Court because Section 10 of the agreement between the parties, the Current SSA, provides:

> You and Valve agree that all disputes and claims between you and Valve (including any dispute or claim that arose before the existence of this or any prior agreement) shall be commenced and maintained exclusively in any state or federal court located in King County, Washington, having subject matter jurisdiction. You and Valve hereby consent to the exclusive jurisdiction of such courts and waive any objections as to personal jurisdiction or venue in such courts.[22]

(Ex. 3 § 10.)

54.     This court has personal jurisdiction over all Defendants because Section 10 of the agreement between the parties, the Current SSA, provides:

> You and Valve agree that all disputes and claims between you and Valve (including any dispute or claim that arose before the existence of this or any prior agreement) shall be commenced and maintained exclusively in any state or federal court located in King County, Washington, having subject matter jurisdiction. You and Valve hereby consent to the exclusive

---

[21] The claims of 24 Defendants were assigned to Arbitrator Martin D. Katz, who was disqualified by the AAA.

[22] The Superseded SSA likewise required that disputes brought in court must proceed in any state or federal court located in King County, Washington, having subject matter jurisdiction.

COMPLAINT – 20
No. 2:24-CV-1717-JNW

jurisdiction of such courts and waive any objections as to personal jurisdiction or venue in such courts.

(Ex. 3 § 10.)

## SUMMARY OF FACTS

### A.    Valve, Steam, and the SSA

55.    Valve is a video game developer, publisher, and digital distribution company. Valve offers an online platform called Steam, where consumers can purchase, play, discuss, and interact with their friends about video games.

56.    For an individual to create a Steam account and become a Steam user, they must first agree to the SSA.

57.    Valve has periodically modified the SSA since it was first implemented in 2003.

58.    In 2012, Valve added to the SSA an arbitration agreement providing that, with limited exceptions, users and Valve "agree to resolve all disputes and claims between us in individual binding arbitration" with the AAA.[23]

59.    On September 26, 2024, Valve launched the Current SSA removing the arbitration agreement and class action waiver.

### B.    The *Wolfire* Class Action

60.    On April 27, 2021, a video game developer named Wolfire Games LLC ("Wolfire") and two individual consumer plaintiffs filed a putative antitrust class action in this Court against Valve on behalf of a putative class of "[a]ll persons and entities who . . . purchased or sold a PC game on the Steam Store in the United States from January 28, 2017." Complaint ¶ 231, *Wolfire Games LLC v. Valve Corp.*, No 2:21-cv-00563-JCC (W.D. Wash. filed Apr. 27, 2021) (Dkt. 1).

61.    There were seven individual consumer plaintiffs in the consolidated *Wolfire* action (the "*Wolfire* Consumer Plaintiffs").

---

[23] In the five years between 2017 and 2022, there were only two instances where Valve and a Steam user could not resolve that user's issue and proceeded to arbitration. Both of those arbitrations were resolved on the merits in Valve's favor.

COMPLAINT – 21
No. 2:24-CV-1717-JNW

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

62.    None of the *Wolfire* Consumer Plaintiffs are Defendants in this action.

**C.    This Court in Wolfire Compels Arbitration as to
Seven Individual Plaintiffs and Does Not Address Enforceability**

63.    On June 23, 2021, Valve moved to compel the *Wolfire* Consumer Plaintiffs to arbitrate in accordance with the provisions of a prior version of the Superseded SSA, which was then in effect.

64.    At that time, the SSA to which the Consumer Plaintiffs had agreed—the Superseded SSA—contained a class action waiver and a clause requiring arbitration of all disputes and claims, with limited exceptions not applicable to the *Wolfire* Consumer Plaintiffs' claims.

65.    This Court granted Valve's motion to compel and compelled arbitration only as to the *Wolfire* Consumer Plaintiffs. *See Wolfire Games, LLC v. Valve Corp.*, No 2:21-cv-00563-JCC, 2021 WL 4952220, at *1 (W.D. Wash. Oct. 25, 2021).

66.    This Court declined to rule on the enforceability of the arbitration agreement in the Superseded SSA. As this Court explained, "the Court must enforce the parties' agreement to have an arbitrator decide the broader question of whether the arbitration clause itself is unconscionable." *See Wolfire*, 2021 WL 4952220, at *2. "Accordingly, the question of unconscionability should be determined in arbitration." *Id.*

67.    This Court stayed the seven *Wolfire* Consumer Plaintiffs' claims pending arbitration. *Wolfire*, 2021 WL 4952220, at *3.[24] However, in light of the removal of the arbitration agreement from the Current SSA, six of the seven *Wolfire* Consumer Plaintiffs moved to lift the stay and proceed with Steam user claims in *Wolfire*.[25] On February 19, 2025, this Court lifted the stay as to all Consumer Plaintiffs except Ryan Lally. Order, *Wolfire* (Dkt. 428).

---

[24] On July 22, 2022, this Court consolidated *Wolfire Games, LLC v. Valve Corp.*, No 2:21-cv-00563-JCC (W.D. Wash. filed Apr. 27, 2021), with a related action, *Dark Catt Studios et al. v. Valve Corporation*, No. 2:21-cv-00872-JCC (W.D. Wash. filed June 28, 2021), and recaptioned the consolidated action "*In re Valve Antitrust Litigation*." This Court subsequently consolidated several related consumer actions, including *Elliott*, into *In re Valve Antitrust Litigation, i.e., Wolfire*. Order, *Wolfire* (Dkt. 394).

[25] The seventh *Wolfire* Consumer Plaintiff, Ryan Lally, has filed a claim with the AAA and contends that he wants to pursue arbitration. *See* Defendant Valve Corporation's Opposition to Plaintiff Ryan Lally's Motion for Sanctions, *Wolfire* (Dkt. 470). Yet Mr. Lally asked the AAA not to issue the invoice that would permit his claim to proceed. *Id.* at 1.

COMPLAINT - 22
No. 2:24-CV-1717-JNW

**Corr Cronin LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1    68.    The *Wolfire* action has since proceeded with respect to the putative video game developer

2    class. The court granted plaintiffs' motion for class certification as to that class, Order, *Wolfire* (Dkt. 391),

3    and the parties are in the process of briefing Valve's motion for summary judgment and the parties'

4    *Daubert* motions.

5    **D.    Bucher Law and the Genesis of Its Mass Arbitration Against Valve**

6    69.    Bucher Law is a law firm founded by William Ward Bucher IV.

7    70.    Prior to founding Bucher Law, the law firm Zaiger hired Mr. Bucher "to lead [the]

8    development and pursuit of mass arbitration strategies" at Zaiger. Complaint Ex. A (Offer of

9    Employment), *Zaiger LLC v. Bucher Law PLLC*, No. 154124-2023 (N.Y. Sup. Ct. filed May 9, 2023).

10    71.    While at Zaiger, Mr. Bucher authored a presentation made to a potential litigation funder

11    seeking funding for Mr. Bucher's mass arbitration plans. The presentation explained that Mr. Bucher

12    intended to "weaponize[]" the arbitration agreement between Valve and Steam users for the benefit of

13    Mr. Bucher and his funder. (Ex. 1 at 3, 9.)

14    72.    On March 1, 2023, Zaiger terminated Mr. Bucher. Mr. Bucher thereafter formed his law

15    firm, Bucher Law.

16    73.    On May 9, 2023, Zaiger filed a lawsuit against Mr. Bucher in the Supreme Court for the

17    State of New York, New York County, alleging, among other things, that Mr. Bucher engaged in

18    misconduct in connection with threatened—and now pending—arbitrations against Valve.

19    Complaint ¶¶ 1-13, *Zaiger LLC v. Bucher Law PLLC*, No. 154124-2023 (N.Y. Sup. Ct. filed May 9, 2023)

20    (Ex. 2).

21    74.    On July 1, 2024, the Supreme Court for the State of New York denied Mr. Bucher's motion

22    to dismiss Zaiger's claims. *Zaiger LLC v. Bucher Law PLLC*, No. 154124/2023, 2024 WL 3276809, at

23    *6-10 (N.Y. Sup. Ct. July 1, 2024), *aff'd*, 238 A.D.3d 687 (N.Y. App. Div. 2025). On May 29, 2025, the

24    Appellate Division denied Mr. Bucher's appeal of that decision. *Zaiger LLC v. Bucher Law PLLC*, 238

25    A.D.3d 687 (N.Y. App. Div. 2025).

26

27

28    COMPLAINT – 23
      No. 2:24-CV-1717-JNW

**E.    More than Two Years After This Court in *Wolfire* Grants Valve's Motion To Compel Arbitration, Bucher Law Commences Arbitrations**

75.    On July 12, 2023, Bucher Law sent Valve a letter threatening to bring purported antitrust claims on behalf of 44,903 individuals. The allegations contained in Bucher Law's letter were apparently modeled on those made on behalf of the seven consumers in the *Wolfire* action.

76.    On October 2, 2023, Bucher Law submitted 997 demands for arbitration against Valve to the AAA and threatened Valve with filing 18,204 more such demands.

77.    In November and December of 2023, Bucher Law submitted thousands of additional demands for arbitration against Valve to the AAA.

78.    Bucher Law is currently pursuing arbitrations against Valve before the AAA on behalf of 4,991 claimants.

79.    Among these claimants are the 572 Defendants, comprising (i) 548 claimants with claims assigned to merits arbitrators in pending arbitrations (excluding four deceased claimants) and (ii) 24 claimants with claims that were assigned to Arbitrator Martin D. Katz before he was disqualified by the AAA.

80.    On September 27, 2024, Bucher Law attempted to file an additional 42,000 arbitration claims with the AAA. The AAA refused to administer these arbitrations. The AAA noted that the claimants could proceed with their claims in court. All of these claimants are members of the putative class in *Wolfire*.

**F.    Bucher Law Seeks and Obtains Rulings from an Arbitrator That the Superseded SSA's Arbitration Clause Is Unenforceable**

81.    The AAA assigned the claims of 25 claimants to Arbitrator Jeffrey H. Dasteel.

82.    On May 22, 2024, Bucher Law moved to dismiss arbitrations on behalf of four of the 25 claimants with arbitrations pending before Arbitrator Dasteel. Bucher Law moved to dismiss on the ground that the arbitration agreement in the Superseded SSA (which was then current) was unenforceable.

83.    On July 8, 2024, Arbitrator Dasteel granted the four motions. The arbitrator held that the arbitration agreement in the Superseded SSA was unenforceable.

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

84.    Arbitrator Dasteel dismissed all four arbitrations on this basis. The arbitrator held that the four claimants' claims must be adjudicated in court.

85.    The four claimants whose arbitrations Arbitrator Dasteel dismissed are not Defendants in this action; they became named plaintiffs in *Elliott*.

86.    Mr. Bucher has represented in an arbitration hearing that Bucher Law could have sought and obtained the same unenforceability ruling from Arbitrator Dasteel with respect to the other 21 Defendants whose claims are still pending before Arbitrator Dasteel.

87.    Valve did not challenge Arbitrator Dasteel's orders on unenforceability.

88.    Valve did not file a petition to vacate Arbitrator Dasteel's orders under the Federal Arbitration Act and the time to do so has now expired. *See* 9 U.S.C. § 12.

**G.    Proposed Class Counsel Commence a Putative Nationwide Class Action in This Court**

89.    On August 9, 2024, Proposed Class Counsel filed the *Elliott* putative nationwide class action against Valve in this Court.

90.    Proposed Class Counsel named as plaintiffs the four claimants on whose behalf Bucher Law had sought and obtained orders before Arbitrator Dasteel that the arbitration agreement in the Superseded SSA was unenforceable. *See* Complaint ¶¶ 13, 16-19, *Elliott* (Dkt. 1).

91.    The complaint in *Elliott* included all of the claims and relief sought in the arbitrations Bucher Law is prosecuting on behalf of claimants, including Defendants.

92.    Proposed Class Counsel sought in *Elliott* to represent a class of consumers that included all Defendants and all other claimants in the arbitrations Bucher Law is prosecuting against Valve. The proposed class was defined as: "All persons and entities who, directly or through an agent, purchased a PC game on the Steam Store, or purchased an in-game product from a game distributed on the Steam Store, in the United States and its territories." Complaint ¶ 167, *Elliott* (Dkt. 1).

93.    Proposed Class Counsel represented in the *Elliott* complaint that "[t]he prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for [Valve]." Complaint ¶ 176, *Elliott* (Dkt. 1).

COMPLAINT – 25
No. 2:24-CV-1717-JNW

94.     Bucher Law is prosecuting separate actions in arbitrations before the AAA on behalf of individual Class members, including Defendants.

95.     Bucher Law conceded in many letters to arbitrators that *Elliott* is "overlapping" with Defendants' arbitrations.

96.     At the time Proposed Class Counsel filed *Elliott*, Valve's SSA—the Superseded SSA—contained substantively the same arbitration agreement under which this Court compelled the *Wolfire* Consumer Plaintiffs to arbitration in 2021.

97.     Even though the Superseded SSA in effect at the time *Elliott* was filed included an arbitration agreement, Proposed Class Counsel alleged in *Elliott* that they could pursue a class action on behalf of a nationwide class in court because Proposed Class Counsel had "won binding decisions from arbitrators rendering Valve's arbitration provision unenforceable." Those "binding decisions" are the decisions rendered by Arbitrator Dasteel on July 8, 2024. In short, the *Elliott* case is entirely premised on the Superseded SSA's arbitration agreement being unenforceable as to all Steam users.

98.     This Court observed that Bucher Law "successfully challeng[ed] the enforceability of Valve's arbitration provision in four separate arbitration proceedings" and that "these efforts ultimately enabled class litigation to proceed." Order at 2, 6, *Wolfire* (Dkt. 441).

99.     Proposed Class Counsel alleged in the *Elliott* complaint that the putative class action is "superior to any other method for the fair and efficient adjudication of this legal dispute."

100.    Bucher Law previously told potential arbitration claimants the opposite: Bucher Law represented to potential claimants in marketing materials that **arbitration** was the superior venue for obtaining maximum recovery.

101.    In a marketing video Mr. Bucher widely circulated on YouTube, he represented: "Judge Coughenour . . . ruled [in *Wolfire*] that [consumers'] claims should be filed through a process called arbitration. **Now that's good news for PC gamers. Because . . . on average, consumers in arbitration recover hundreds of times more than in a class action**."[26]

---

[26] https://www.youtube.com/watch?v=3w_PbejgGn8.

**H.    Bucher Law Continues To Prosecute Arbitrations on Behalf of Defendants and Other Members of the *Elliott* Putative Class**

102.    After filing the *Elliott* action, Bucher Law continued to prosecute arbitrations before the AAA on behalf of Defendants and thousands of other claimants, all of whom were included in the putative *Elliott* class and remain in the putative consumer class in the consolidated action, *Wolfire*.

103.    Mr. Bucher brazenly conceded in arbitration hearings, and at least one arbitrator has found, that he is pursuing arbitrations and a parallel class action as a "forum shopping" exercise.

104.    Mr. Bucher also put this forum shopping in concrete terms. He represented in arbitration hearings that if Defendants do not like the decisions of an arbitrator at any point up until a merits determination they might withdraw from the arbitrations and participate in the class action. Based on this admission, an arbitrator has found that Mr. Bucher was engaged in "bet hedging."

105.    True to his word, Mr. Bucher has withdrawn or attempted to withdraw or "stay" claims on the eve of final merits hearings—after Valve expended substantial resources and time briefing pre-hearing motions, engaging in information exchange, and participating in numerous pre-hearing conferences. (Valve participated in these arbitrations at all times under a reservation of rights on the grounds that the arbitrations must be closed because the parties have no agreement to arbitrate.)

106.    In one arbitration, Bucher Law attempted to withdraw a claim less than 24 hours before the start of the final merits hearing.

107.    In another arbitration, Bucher Law requested to withdraw a claim in a pre-hearing conference just three days before the start of the final merits hearing. During the pre-hearing conference, the arbitrator stated that she intended to sanction Bucher Law for submitting a letter brief that Mr. Bucher conceded was replete with "inaccurate" and "fictitious" citations to legal authority.[27] Moments after the

---

[27] Among the twelve cases Bucher Law cited in his four-and-a-half-page letter brief, **two** did not exist; **five** did not contain the quotation ascribed to the case; and **two** others were entirely inapposite and did not stand for the proposition cited. Bucher Law's letter brief also purported to quote from a single Rule of the AAA Consumer Arbitration Rules. Yet that rule does not contain the language Bucher Law purported to quote. Bucher Law relied on this fake authority to persuade the arbitrator to issue five subpoenas. And Bucher succeeded: The arbitrator issued the subpoenas Bucher Law requested only "[a]fter consideration of all arguments presented," including the arguments raised by Bucher premised on fabricated case law. When Valve sought sanctions from the arbitrator, rather than take personal

*(cont'd)*

COMPLAINT – 27
No. 2:24-CV-1717-JNW

**Corr Cronin LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1    arbitrator stated this intention—following more than an hour of argument regarding Valve's sanctions

2    request—Bucher Law announced for the first time that the sole claimant whose arbitration was the subject

3    of the conference would withdraw his claim.[28]

4          108.    In addition to the foregoing, Bucher Law engaged in forum shopping before the AAA by

5    demanding arbitration proceedings in California on behalf of nearly 400 Defendants who do not reside in

6    California. The Superseded SSA did not permit this unilateral forum choice. It provided that arbitrations

7    must proceed "in the county where [the claimant] live[s]" unless the parties agreed otherwise. (Ex. 4

8    § 11(c).) Bucher Law has since erroneously argued that California law should apply to these arbitrations

9    because, as a result of Bucher Law's own forum-shopping, the AAA assigned claims of non-California

10   residents to arbitrators based in California.[29]

11         109.    Bucher Law also requested a "stay" of arbitrations in several of Defendants' arbitrations

12   just minutes before the start of their final merits hearing.

13         110.    In addition, Mr. Bucher admitted that he used Defendants' arbitrations as leverage to

14   further his class action. Indeed, Mr. Bucher represented in arbitration hearings that he intended to use

15   information learned from arbitration proceedings to support his prosecution of the *Elliott* action. An

16   arbitrator found on these facts that Mr. Bucher "hopes to use discovery and arbitral decisions to further its

17   new class action." That arbitrator further held that "it is inefficient and wasteful to force respondent to

18   arbitrate and litigate simultaneously in multiple fora." That arbitrator also held that Bucher Law "has

19   engaged in . . . gamesmanship."

20   _____

21   responsibility, Mr. Bucher blamed the only other attorney at his firm at the time: an associate who had
     practiced law for just three years. Despite this "serious oversight" (in Mr. Bucher's words), Mr. Bucher

22   made further misstatements to the tribunal and to Valve to downplay his misconduct. Ultimately, the
     arbitrator sanctioned Mr. Bucher and his associate for what she described as "willful" and "shocking"

23   misconduct the likes of which she had never seen in her 50 years of legal practice. She also chastised
     Bucher for attempting to "minimize" the misconduct.

24         [28] Valve discovered that the claimant was in fact a minor on whose behalf Bucher Law could not
     have had authority to prosecute an arbitration. This is not an isolated incident: Bucher Law withdrew the

25   claim of another claimant after discovering—more than a year after filing a claim on the claimant's
     behalf—that he was a minor.

26         [29] Even if the Superseded SSA controlled (and it does not), that agreement provided that the FAA

27   governs arbitration and Washington law governs claims between the parties. (Ex. 4 § 10.)

28   COMPLAINT - 28
     No. 2:24-CV-1717-JNW

111.    Although this Court declined to appoint Bucher Law as interim lead counsel (discussed below), Bucher Law's co-counsel, Hagens, remains on the consolidated pleading filed after the Court issued its order appointing Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein") interim lead counsel. *See* Consolidated Amended Class Action Complaint, *Wolfire* (Dkt. 473).

## I.    Valve Removes the Arbitration Agreement

112.    Valve accepted Arbitrator Dasteel's determination that the arbitration agreement in the Superseded SSA was unenforceable.

113.    On September 26, 2024, Valve removed the arbitration agreement and class action waiver from the SSA.

114.    When Valve launched the Current SSA, Valve inserted a banner at the top of the agreement prominently announcing: "Valve has updated the Steam Subscriber Agreement. The updates affect your legal rights, including how disputes and claims between you and Valve are resolved. Among other things, the new dispute resolution provisions in Section 10 require that all disputes and claims proceed in court and not in arbitration. Please review carefully." The banner is set forth below.



115.    In addition to the banner displayed above the Current SSA, Valve provided notice of the change to the SSA to Steam users in three other ways.

116.    First, beginning on September 26, 2024, Valve provided email notice to all U.S. Steam users of the new SSA (the "Email Notice"), sending the notice to the email address of record for their

COMPLAINT – 29
No. 2:24-CV-1717-JNW

Steam accounts. The Email Notice specifically called out changes to the dispute resolution provision, providing:



> **Hello**
>
> **We have updated the Steam Subscriber Agreement**
>
> We've updated the Steam Subscriber Agreement. The updates affect your legal rights. They include changes to how disputes and claims between you and Valve are resolved. The updated dispute resolution provisions are in Section 10 and require all claims and disputes to proceed in court and not in arbitration. We've also removed the class action waiver and cost and fee-shifting provisions. Please carefully review the updated Steam Subscriber Agreement here.
>
> This updated Steam Subscriber Agreement will become effective immediately when you agree to it, including when you make most purchases, fund your Steam wallet, or otherwise accept it. Otherwise, the updated Steam Subscriber Agreement will become effective on November 1, 2024, unless you delete or discontinue use of your Steam account before then. If you would like to delete your Steam account, you can learn more about account deletion here.
>
> This notification has been sent to the email address associated with your Steam account.

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

117.    The Email Notice included multiple links to the full text of the Current SSA, shown in the blue text above.

118.    Second, beginning on September 26, 2024, Valve provided notice of the new agreement through an in-app pop-up that appeared when users opened the Steam client (the "Pop-Up Notice"). The Pop-Up Notice provided:



119.    In addition to calling out the changes to the dispute resolution provision, the Pop-Up Notice included multiple links to the full text of the Current SSA, shown in blue text above.

120.    The Pop-Up Notice enabled users to agree to the Current SSA by checking a box stating: "I Agree to the Updated Steam Subscriber Agreement" then clicking "Accept Updated SSA."

COMPLAINT – 31
No. 2:24-CV-1717-JNW

121.    Alternatively, users could close the Pop-Up Notice without agreeing to the Current SSA, as indicated by the "X" at the top right corner of the pop-up.

122.    Third, beginning on September 26, 2024, Valve published a blog post on the Steam platform providing notice of the new SSA (the "Blog Post"), *available at* https://store.steampowered.com/news/app/593110/view/4696781406111167991. The Blog Post provided:



123.    The Blog Post included multiple links to the full text of the Current SSA, shown in blue text above.

124.    The Email Notice and Pop-Up Notice explained: "This updated Steam Subscriber Agreement will become effective immediately when you agree to it, including when you make most purchases, fund your Steam Wallet, or otherwise accept it."

COMPLAINT – 32
No. 2:24-CV-1717-JNW

125.    The Email Notice and Pop-Up Notice further provided: "Otherwise, the updated Steam Subscriber Agreement will become effective on November 1, 2024, unless you delete or discontinue use of your Steam account before then."

126.    The Email Notice and Pop-Up Notice explained how users could delete their Steam account.

127.    Consistent with the Email Notice and Pop-Up Notice, when a user buys a game on Steam, the user is presented with an unchecked box requiring the user to accept the Current SSA, which is hyperlinked to the words "Steam Subscriber Agreement" shown below:



CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

128.    All Steam users have a "Steam Wallet" containing funds that may be used for the purchase of any game on Steam or within a game that supports Steam transactions.

129.    Consistent with the Email Notice and Pop-Up Notice, when a user funds a Steam Wallet, the user is presented with an unchecked box requiring the user to accept the Current SSA, which is hyperlinked to the words "Steam Subscriber Agreement" shown below:



130.    454 of the 572 Defendants have affirmatively accepted the Current SSA by (i) checking the check box affirming "I Agree to the Updated Steam Subscriber Agreement" and clicking "Accept

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Updated SSA" through the Pop-Up Notice before November 1, 2024; (ii) making a purchase and agreeing to the Current SSA by checking "I agree to the terms of the Steam Subscriber Agreement (last updated Sep 26, 2024)" and clicking the "Purchase" button before November 1, 2024; or (iii) performing both of those actions before November 1, 2024. (App'x A.)

131.    The remaining 118 Defendants are bound by the Current SSA pursuant to the terms of the Email Notice and Pop-Up Notice because none deleted or discontinued use of their Steam accounts by November 1, 2024. To the contrary, all of these Defendants have logged into their Steam accounts on or after November 1, 2024. Among these Defendants, 76 also affirmatively accepted the Current SSA through a purchase after November 1, 2024, by checking "I agree to the terms of the Steam Subscriber Agreement (last updated Sep 26, 2024)" and clicking the "Purchase" button.

132.    The Current SSA does not contain an arbitration agreement.

133.    The Current SSA provides that all claims and disputes, including claims and disputes that arose before the effective date of the Current SSA, must proceed in court in Washington:

> You and Valve agree that all disputes and claims between you and Valve (including any dispute or claim that arose before the existence of this or any prior agreement) shall be commenced and maintained exclusively in any state or federal court located in King County, Washington, having subject matter jurisdiction.

(*See* Ex. 3 § 10 (*available at* https://store.steampowered.com/subscriber_agreement/).)

134.    The Current SSA contains a merger clause providing as follows:

> This Agreement, including any Subscription Terms, Rules of Use, the Valve Privacy Policy, and the Valve Hardware Limited Warranty Policy, constitutes and contains the entire agreement between the parties with respect to the subject matter hereof and supersedes any prior oral or written agreements.

(*See* Ex. 3 § 11 (*available at* https://store.steampowered.com/subscriber_agreement/).)

**J.    Valve Advises This Court in *Wolfire* of the Update to the SSA Removing the Arbitration Agreement and the Plaintiffs in *Wolfire* Move to Lift the Stay**

135.    On September 27, 2024, Valve filed a status report in the *Wolfire* action notifying this Court that Valve had removed the arbitration agreement from the SSA. Valve Corporation's Status Report re Order (Dkt. 66), *Wolfire* (Dkt. 362).

COMPLAINT – 35
No. 2:24-CV-1717-JNW

136.    On October 3, 2024, the plaintiffs in the *Wolfire* action moved to lift the stay of six of the seven *Wolfire* Consumer Plaintiffs' claims. Consumer Plaintiffs' Motion to Lift Stay, *Wolfire* (Dkt. 366). The plaintiffs in *Wolfire* reasoned that "the changes to Section 10 of the SSA now require all disputes and claims of subscribers outside of the European Union and United Kingdom to be 'commenced and maintained exclusively in any state or federal court located in King County, Washington, having subject matter jurisdiction.'" *Id.* at 2. "This includes 'any dispute or claim that arose before the existence of this or any prior agreement.'" *Id.*

137.    On October 4, 2024, the consumer plaintiffs in the *Wolfire* action moved to consolidate the *Wolfire* and *Elliott* actions and for the appointment of Vorys, Sater, Seymour and Pease LLP ("Vorys") as interim lead class counsel in the consolidated actions. Consumer Plaintiffs' Motion to Consolidate and Appoint Vorys, Sater, Seymour and Pease LLP as Interim Lead Class Counsel, *Wolfire* (Dkt. 373). In their motion, the plaintiffs in *Wolfire* accused Proposed Class Counsel of filing a "copycat" action and taking a "'passive approach'" to pursuing claims of the class. *Id.* at 6.

138.    On October 17, 2024, the consumer plaintiffs in the *Wolfire* action opposed Proposed Class Counsel's motion to be appointed interim co-lead counsel. *Elliott* (Dkt. 36). In their opposition, the *Wolfire* consumer plaintiffs reiterated that "[a] concerning amount of [Proposed Class Counsel's] Class Action Complaint repeats—word for word—allegations from the Consolidated Amended Class Action Complaint in [*Wolfire*] authored by Vorys and co-counsel." *Id.* at 5. The *Wolfire* consumer plaintiffs identified "forty examples of the *Elliott* Complaint parroting the exact same language used in the [*Wolfire*] Complaint." *Id.*

**K.    Bucher Law and Co-Counsel File a Motion in Elliott To Be Appointed Interim Co-Lead Counsel Asserting That the Current SSA Applies to All Claimants**

139.    On October 2, 2024, Proposed Class Counsel filed a motion to be appointed as interim co-lead class counsel in *Elliott*. Plaintiffs' Motion to Appoint Hagens Berman Sobol Shapiro LLP and Bucher Law PLLC as Interim Co-Lead Class Counsel, *Elliott* (Dkt. 25).

140.    In that motion, Proposed Class Counsel represented to this Court that Valve had "remove[d] the arbitration provision from its terms of use, along with the associated class action waiver." *Id.* at 5. In the next sentence, Proposed Class Counsel represented: "**As a result, Valve consumers are**

COMPLAINT – 36
No. 2:24-CV-1717-JNW

1 **authorized to proceed in federal court and seek collective relief through the class action vehicle.**" *Id.*
2 (emphasis added).

3     141.    Proposed Class Counsel therefore represented to this Court that the Current SSA applies to
4 all Valve consumers, including Defendants and all other claimants in the arbitrations Bucher Law is
5 prosecuting before the AAA.

6     142.    On October 17, 2024, Valve filed a response to Proposed Class Counsel's motion to be
7 appointed interim co-lead counsel. *Elliott* (Dkt. 32). In its response, Valve explained that Proposed Class
8 Counsel have an irreconcilable conflict that prevents them from serving as counsel to the putative class
9 while prosecuting arbitrations on behalf of Defendant and other claimants.

10     143.    On December 20, 2024, Proposed Class Counsel and several other plaintiffs' firms filed
11 motions or renewed motions to be appointed interim class counsel.

12     144.    On May 2, 2025, this Court denied Proposed Class Counsel's motion to be appointed
13 interim lead class counsel and granted Cohen Milstein's motion. *See* Order, *Wolfire* (Dkt. 441). This Court
14 concluded that "Bucher's continued representation of individual consumers in arbitration against Valve
15 creates concerns about divided interests." *Id.* at 7. This Court reasoned that "Bucher's simultaneous pursuit
16 of individual arbitrations and class litigation has required it to take positions that could undermine its
17 argument that a class action is 'superior to other available methods for fairly and efficiently adjudicating
18 the controversy' under Rule 23(b)(3)." *Id.* Ultimately, this Court decided that "*Elliott* Counsel's
19 conflicting positions on arbitration versus class action superiority [and] ongoing representation of
20 individual arbitration claimants render them less suitable than other applicants to represent the Consumer
21 Class." *Id.* at 9.

22     145.    This Court also stated that "Bucher's proposed partnership with Hagens Berman does not
23 put the Court's mind at ease." Order at 8, *Wolfire* (Dkt. 441). As the Court explained: "[Hagens'] recent
24 conduct in an unrelated class action gives the Court pause. *See Floyd v. Amazon.com Inc.*, No. C22-1599-
25 KKE, 2025 WL 1094391, at *2–4 (W.D. Wash. Apr. 10, 2025) (finding counsel 'misrepresented'
26 communications with their client and failed to 'candidly and/or accurately describe their client's

28 COMPLAINT – 37
No. 2:24-CV-1717-JNW

1    intentions' to opposing counsel and the court); *see also* 1 Newberg and Rubenstein on Class Actions § 3:78

2    (6th ed.) ('[C]ounsel's integrity and professionalism' are properly considered when evaluating

3    adequacy.)." Order at 8, *Wolfire* (Dkt. 441).

4    **L.      Bucher Law Continues To Prosecute Arbitrations
             and To Argue Before the AAA and Arbitrators That
5            the Current SSA Does Not Apply to Valve Customers**

6            146.    Bucher Law represented to this Court in *Elliott* that the Current SSA applied to all Valve

7    consumers, including Defendants and all other claimants Bucher Law represents in pending arbitrations.

8    Bucher Law took the opposite position in arbitration proceedings on behalf of Defendants and other

9    claimants Bucher Law represents.

10           147.    In arbitration proceedings before the AAA, Bucher Law has stridently asserted that the

11   arbitration agreement in the Superseded SSA is enforceable and the Current SSA is invalid.

12           148.    Indeed, on September 27, 2024, just a day after Valve removed the arbitration agreement

13   from the SSA, Bucher Law attempted to file with the AAA 42,000 **new** consumer arbitrations based on

14   the same allegations as in Defendants' arbitrations and pursuant to the arbitration agreement in the

15   Superseded SSA.

16           149.    Bucher Law could not attempt to file new consumer arbitrations unless its position was that

17   the Current SSA did not apply to these consumers.

18           150.    In an arbitration hearing on October 2, 2024, Mr. Bucher represented: "These reported

19   changes of terms, which appear to be an attempted unilateral modification, . . . under black-letter contract

20   law, [are] not permitted."

21           151.    In a letter to the AAA dated October 6, 2024, Bucher Law represented that Valve's

22   "purported recent, unilateral amendment of its contract with the claimants (deleting the arbitration

23   agreement)" was without effect and did not mandate that the arbitrations be closed. Bucher Law described

24   Valve's update to the SSA as a "unilateral and legally infirm terms of use modification."

25           152.    Bucher Law has doubled down on this position in submissions to arbitrators. For example,

26   in a letter dated October 14, 2024, Bucher Law asserted that "[t]he Federal Arbitration Act's mandate that

27

28   COMPLAINT – 38
     No. 2:24-CV-1717-JNW

arbitration agreements are 'irrevocable' prevents Valve Corporation from revoking their arbitration agreement." Bucher Law further argued that the Current SSA is a "[u]nilateral modification[]" that is "unconscionable and therefore unenforceable." Bucher Law also contended that Valve's "unilateral modification to the terms . . . violates the implied covenant of good faith and fair dealing, making the purported new terms unenforceable." These positions are all incorrect as a matter of law. They are also directly contrary to what Proposed Class Counsel has represented to this Court in the *Elliott* action.

153.    Bucher Law does not deny that it took inconsistent positions to this Court in *Elliott* (where Bucher Law argues that the Current SSA applies to all members of the putative class) and to arbitrators and the AAA in arbitrations (where Bucher Law argues that the Current SSA does **not** apply to Defendants or other claimants who are members of the putative class).

154.    Bucher Law has sought to justify this inconsistency on the ground that it is not speaking on behalf of the putative class in the arbitrations.

155.    Bucher Law's co-counsel in the arbitrations has stated in an arbitration hearing on behalf of certain Defendants: "Yeah, I won't deny that [Mr. Bucher] made those [inconsistent] representations on behalf of those clients [in *Elliott*]. But he has not made that argument for these three clients nor have I.  And, you know, black letter law, lawyers are allowed to make different arguments for different clients, and that's -- we all do that, you know, for whatever reasons."

**M.    Bucher Law Asserts in California State Court
That the Current SSA Does Not Apply to a Valve Customer**

156.    Bucher Law represented to this Court in *Elliott* that the Current SSA applied to all Valve consumers, including Defendants and all other claimants in pending arbitrations. Bucher Law took the opposite position in a petition filed in California state court.

157.    On August 27, 2024, AAA disqualified Arbitrator Martin D. Katz.

158.    On October 4, 2024, Bucher Law filed a petition in the Superior Court of the State of California, Los Angeles County, on behalf of an individual claimant and Defendant in this action to vacate the AAA's disqualification of Arbitrator Katz.

COMPLAINT – 39
No. 2:24-CV-1717-JNW

159.    There would be no reason for Bucher Law to seek reinstatement of Arbitrator Katz if the Current SSA applied because under the Current SSA, Valve and Defendants' claims must proceed in court.

160.    Bucher Law's petition therefore assumes that the Current SSA does not apply to the petitioner and Defendant in this action.

**N.    Valve Requests That the AAA Administratively Close Claimants' Arbitrations**

161.    On September 27, 2024, Valve notified the AAA that (i) an arbitrator ruled that the arbitration agreement in the Superseded SSA was unenforceable and (ii) Valve then removed the arbitration agreement from the SSA that was the basis for jurisdiction with the AAA. Valve therefore requested that the AAA administratively close the arbitrations Bucher Law was prosecuting on behalf of Valve customers.

162.    In response, Bucher Law argued that Valve's request should be denied because the Superseded SSA's arbitration agreement remains valid and enforceable and the AAA is an administrative body that cannot make legal determinations. Despite the *Elliott* case being premised on the Superseded SSA being unenforceable, Bucher Law described Valve's implementation of the Current SSA as a "unilateral and legally infirm terms of use modification."

163.    On October 7, 2024, the AAA notified Valve and Claimants' Counsel that it would not administratively close Defendants' arbitration proceedings. The AAA stated that, "in the absence of an agreement by the parties **or a court order staying or closing these matters**, we will proceed with administration."

164.    The AAA notified Valve that it would leave it to a court or the then-34 merits arbitrators presiding over then-601 pending cases, including all 572 of Defendants' cases (and additional cases involving, among others, deceased claimants and claimants who have withdrawn), to address what the AAA described as "issues of arbitrability and disputes surrounding the applicable contract."

COMPLAINT – 40
No. 2:24-CV-1717-JNW

**O.    A Court Must Resolve the Parties' Dispute as to Whether the Superseded SSA or the Current SSA Applies to Defendants' Claims**

165.    The Supreme Court held in a unanimous decision issued in May 2024 that a dispute as to whether an earlier arbitration agreement or a subsequent agreement applies to a claimant's claim must be decided by a court and not an arbitrator. *See Coinbase, Inc. v. Suski*, 602 U.S. 143, 152 (2024). The Court explained that "disputes are subject to arbitration if, and only if, the parties actually agreed to arbitrate those disputes." *Id.* at 145. Consequently, "a court needs to decide what the parties have agreed to—*i.e.*, which contract controls." *Id.* The Court came to this conclusion even though the prior agreement in *Coinbase* delegated questions of enforceability to the arbitrator.

166.    *Coinbase* is directly on point here and requires that the court resolve the parties' dispute as to which arbitration agreement applies as between the Superseded SSA and the Current SSA.

**P.    All Defendants Are Bound by the Current SSA**

**(a)    All Defendants Received Notice of the SSA Update**

167.    Between September 26, 2024, and September 27, 2024, Valve sent the Email Notice to every Defendant providing notice of the new SSA.

168.    Every Defendant who has logged into his or her account on the Steam client between September 27, 2024, and the present also received the Pop-Up Notice providing notice of the new SSA.

169.    The Blog Post has also been published on the Steam platform and available to Defendants continuously between September 26, 2024, and the present.[30]

170.    The Current SSA has been available online from September 26, 2024, to the present, in 10 languages, through https://store.steampowered.com/subscriber_agreement/.

**(b)    454 Defendants Affirmatively Agreed to the Current SSA Prior To November 1, 2024**

171.    454 of the 572 Defendants have affirmatively accepted the Current SSA prior to November 1, 2024.

---

[30] https://store.steampowered.com/news/app/593110/view/4696781406111167991.

COMPLAINT – 41
No. 2:24-CV-1717-JNW

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

172.    The Superseded SSA provided that Valve and users may mutually amend the agreement. It provided: "This Agreement may at any time be mutually amended by your explicit consent to changes proposed by Valve."

173.    454 Defendants affirmatively accepted the Current SSA prior to November 1, 2024, by (i) checking the check box affirming "I Agree to the Updated Steam Subscriber Agreement" and clicking "Accept Updated SSA" through the Pop-Up Notice or (ii) making a purchase and agreeing to the Current SSA by checking "I agree to the terms of the Steam Subscriber Agreement (last updated Sep 26, 2024)" and clicking the "Purchase" button. Among these 454 Defendants, 417 also subsequently re-affirmed their acceptance to the Current SSA by making a purchase and agreeing to the Current SSA by checking "I agree to the terms of the Steam Subscriber Agreement (last updated Sep 26, 2024)" and clicking the "Purchase" button after November 1, 2024.

(c)    **The Remaining 118 Defendants Agreed to the Current SSA Because They Did Not Delete or Discontinue Use of Their Accounts By November 1, 2024**

174.    The remaining 118 Defendants are bound by the Current SSA as set forth in the Email Notice and Pop-Up Notice because they did not delete or discontinue use of their accounts by November 1, 2024.

175.    Among these 118 Defendants, 76 also subsequently affirmatively accepted the Current SSA by making a purchase and agreeing to the Current SSA by checking "I agree to the terms of the Steam Subscriber Agreement (last updated Sep 26, 2024)" and clicking the "Purchase" button.

176.    The Superseded SSA provided that Valve may unilaterally amend the agreement. It provided:

> Valve may amend this Agreement (including any Subscription Terms or Rules of Use) unilaterally at any time in its sole discretion. In this case, you will be notified by e-mail of any amendment to this Agreement made by Valve at least 30 (30) days before the effective date of the amendment. You can view the Agreement at any time at http://www.steampowered.com/. Your failure to cancel your Account prior to the effective date of the amendment will constitute your acceptance of the amended terms. If you don't agree to the amendments or to any of the terms in this Agreement, your only remedy is to cancel your Account or to cease use of the affected Subscription(s). Valve shall not have any obligation to refund any fees that may have accrued to your Account before cancellation of your Account or

COMPLAINT – 42
No. 2:24-CV-1717-JNW

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

cessation of use of any Subscription, nor shall Valve have any obligation to prorate any fees in such circumstances.

(Ex. 4 § 8(B).)

177.    All Defendants received the Email Notice.

178.    The Email Notice provided: "This updated Steam Subscriber Agreement will become effective immediately when you agree to it, including when you make most purchases, fund your Steam Wallet, or otherwise accept it. **Otherwise, the updated Steam Subscriber Agreement will become effective on November 1, 2024, unless you delete or discontinue use of your Steam account before then.**"

179.    The Pop-Up Notice provided: "This updated Steam Subscriber Agreement will become effective immediately when you agree to it, including when you make most purchases, fund your Steam Wallet, or otherwise accept it. **Otherwise, the updated Steam Subscriber Agreement will become effective on November 1, 2024, unless you delete or discontinue use of your Steam account before then.**"

180.    Continued use of a service after the service provider implements new terms of service and provides notice of the new terms constitutes affirmative acceptance of those terms.

181.    A Defendant's failure to delete or discontinue use of Steam after Valve implemented the Current SSA constitutes affirmative acceptance of the Current SSA as a matter of law and in accordance with the modification procedure to which they agreed in the Superseded SSA.

182.    No Defendant deleted or requested to delete his or her Steam account before November 1, 2024.

183.    All 118 Defendants who did not affirmatively accept the Current SSA by November 1, 2024, have logged into Steam on or after November 1, 2024.

**Q.    Defendants' Claims Must Proceed in Court Under the Current SSA**

184.    Defendants' claims must proceed in court in Washington pursuant to the Current SSA.

185.    The Current SSA provides that all claims and disputes, including claims and disputes that arose before the Current SSA, must proceed in court in Washington:

COMPLAINT – 43
No. 2:24-CV-1717-JNW

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

> You and Valve agree that all disputes and claims between you and Valve (including any dispute or claim that arose before the existence of this or any prior agreement) shall be commenced and maintained exclusively in any state or federal court located in King County, Washington, having subject matter jurisdiction.

(*See* Ex. 3 § 10 (*available at* https://store.steampowered.com/subscriber_agreement/english/#10).)

186.    The plain language of this clause states that it applies to all disputes or claims that arose before the existence of the Current SSA, which includes Defendants' claims in pending arbitrations before the AAA.

187.    Under well-settled law, a forum selection clause applies to accrued claims, including pending claims, where, as here, the clause expressly provides for retroactive effect. *See, e.g.*, *Dasher v. RBC Bank (USA)*, 745 F.3d 1111, 1127 (11th Cir. 2014) (new agreement without arbitration clause superseded and applied retroactively to foreclose arbitration under a prior agreement containing an arbitration clause where claim was originally asserted when defendant had arbitration clause); *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, No. ML15-2668 PSG (JEMx), 2021 WL 2350814, at *4 (C.D. Cal. Apr. 20, 2021) (enforcing agreement revised two years after suit filed); *Laster v. T-Mobile USA, Inc.*, No. 05cv1167 DMS (AJB), 2008 WL 5216255, at *6 (S.D. Cal. Aug. 11, 2008) (holding that agreement that "retrospectively modif[ied] the original service contract after the present litigation had already begun" nonetheless applied), *aff'd sub nom. Laster v. AT & T Mobility LLC*, 584 F.3d 849 (9th Cir. 2009), *rev'd on other grounds sub nom. AT & T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011).

**R.    Allowing the Bucher Law Arbitrations on Behalf of Defendants To Proceed Would Interfere with the Jurisdiction of This Court in *Wolfire* in Violation of the All Writs Act**

188.    Bucher Law is prosecuting arbitrations before the AAA on behalf of Defendants.

189.    There is also a parallel putative class action in this Court, the *Wolfire* action, brought on behalf of a putative class that includes Defendants and encompasses all of the claims and relief sought in Defendants' arbitrations.

COMPLAINT – 44
No. 2:24-CV-1717-JNW

190.    It would threaten the jurisdiction of this Court and any judgment of this Court in *Wolfire* for arbitrations prosecuted by Bucher Law on behalf of Defendants to proceed because the arbitrations could result in rulings inconsistent with the rulings of this Court.

**S.    Valve Is Suffering and Will Continue To Suffer Irreparable Harm**

191.    Valve is suffering, and absent an order enjoining Defendants' arbitrations, will continue to suffer irreparable harm if the arbitrations Bucher Law is prosecuting on behalf of Defendants proceed.

192.    Absent an injunction, arbitrations with respect to the claims of Defendants will proceed before the AAA.

193.    Although Valve has requested that the AAA close the arbitrations administratively for lack of jurisdiction, the AAA determined that a court or the merits arbitrators must resolve that question.

194.    The arbitrators cannot decide the parties' dispute as to whether the Superseded SSA or the Current SSA governs Defendants' arbitrations.

195.    Under *Coinbase*, this Court must make that determination.

196.    Nonetheless, arbitrators in several of Defendants' arbitrations before the AAA have held—despite not having the legal capacity to do so—that the arbitrations may proceed. Other arbitrators have stayed proceedings, although arbitrators are beginning to lift stays previously entered based on the pendency of this action because it remains pending and unresolved.

197.    Specifically, while 224 of Defendants' arbitrations are currently stayed before 17 arbitrators, in just the last month, three arbitrators either lifted stays they had previously entered or indicated they may do so shortly. Another 324 of Defendants' arbitrations are proceeding before 15 different arbitrators. Among these arbitrations, there are 149 before eight arbitrators with dates for final merits hearings already in place. 52 other arbitrations[31]—including arbitrations of 28 Defendants—have proceeded to final merits hearings before seven different arbitrators, for a total of 46 days of hearings.

198.    Absent an injunction, Valve will continue to expend time and resources defending against Defendants' claims in arbitration, none of which are arbitrable. (Valve is participating and will continue

---

[31] The arbitrators in 25 of these 52 arbitrations have issued final awards. All of those awards are in Valve's favor.

COMPLAINT – 45
No. 2:24-CV-1717-JNW

1  to participate in these arbitrations at all times under a reservation of rights on the grounds that the

2  arbitrations must be closed because the parties have no agreement to arbitrate.)

3      199.    This time and expense incurred will be substantial. Each arbitrator holds separate hearings,

4  requires the parties to brief and argue issues separately, and issues separate orders on exchange of

5  information and myriad other procedural and substantive issues.

6      200.    Valve has devoted substantial time and resources towards defending arbitrations

7  Defendants had no right to pursue in the first place. Absent an injunction, these costs will continue to

8  grow exponentially.

9      201.    Bucher Law has amplified these costs through wasteful and at times vexatious litigation

10  tactics.

11      202.    Bucher Law has repeatedly sought duplicative and unnecessary testimony from Valve

12  employees in arbitration proceedings. Bucher Law has demanded **more than 60 subpoenas** of more than

13  a dozen Valve employees before 11 arbitrators for arbitration proceedings where Defendants request on

14  average only a few thousand dollars each. In one set of arbitrations before the same arbitrator, Bucher

15  Law requested 15 subpoenas to Valve employees. And it did so even though 10 of its own claimants in

16  that proceeding—Defendants in this action—**refused to appear to testify themselves in support of their**

17  **own claims**.

18      203.    Although some arbitrators have correctly declined to issue subpoenas, others have not. As

19  a result, Valve's employees—and its Chief Operating Officer—have been and continue to be subjected to

20  dozens of hours of duplicative testimony across multiple merits hearings. Consider the numbers: Valve

21  employees have been issued subpoenas to testify and have appeared, in total, 25 times before five different

22  arbitrators. Cumulatively, these witnesses have testified for **more than 76 hours**. One member of the

23  Steam business team has testified for more than 21 hours across four final merits hearings.

24      204.    Valve's employees have lost, and will continue to lose, considerable time in preparing for

25  and attending these hearings.

26

27

28  COMPLAINT – 46
   No. 2:24-CV-1717-JNW

205.    What is more, much of the testimony sought by Bucher Law has been duplicative and thus completely unnecessary. Bucher Law has requested dozens of subpoenas—and is continuing to request such subpoenas—to elicit testimony that has already been given in prior arbitrations. In one arbitration, Bucher Law has even characterized calling these witnesses as offering the same evidence as it had previously put before another arbitrator. And, in another arbitration, Bucher Law's co-counsel informed a witness—a Valve employee—that counsel would be asking her the exact questions he posed to her in a prior arbitration.

206.    Bucher Law has additionally sought pre-hearing depositions of multiple Valve employees and its Chief Operating Officer.

207.    Valve is also incurring significant cost and expending significant time engaged in briefing on issues arising from Bucher Law's improper vetting of arbitration claimants—and what appears to be lack of authorization to proceed on their behalf. *See supra* pp. 17–19. Bucher Law has pursued claims on behalf of deceased individuals and minors in multiple arbitrations. In one arbitration, Bucher Law withdrew the claim of a minor on whose behalf Bucher Law could not have had authorization to prosecute an arbitration just days before the start of the final merits hearing, after Valve had incurred substantial expense and devoted considerable resources preparing for the hearing.

208.    Mr. Bucher has also withdrawn, attempted to withdraw, or requested a "stay" of claims on the eve of final merits hearings—after Valve expended substantial resources and time briefing pre-hearing motions, engaging in information exchange, and participating in numerous pre-hearing conferences. In one set of arbitrations before the same arbitrator, Bucher Law attempted to withdraw the claim of one claimant **less than 24 hours** before the start of the final merits hearing, and requested stays (without basis or explanation) for three other claimants just **20 minutes** before this same hearing was set to commence.

209.    In addition, to date, Claimants' counsel has failed to produce no fewer than 20 (out of 52) claimants to testify to establish their claims in their own arbitrations that have proceeded to final merits hearings. This pattern has resulted in incredible inefficiencies and entire hearing days being unused.

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1    210.    Bucher Law has also failed to produce certifications on behalf of Defendants affirming that

2  they intended to proceed in arbitration or providing basic information about their video game purchase

3  and use history. This is further indication that Bucher Law is prosecuting arbitrations without

4  authorization.

5    211.    For example, in one set of arbitrations, the arbitrator directed Bucher Law to provide

6  certifications by a certain date that 20 claimants before the arbitrator—all but one of whom are Defendants

7  in this action—intended to proceed in arbitration.[32] In response, Bucher Law submitted purported

8  "affidavits" with respect to just 14 of the claimants. The purported affidavits merely provided boilerplate

9  representations about the claimant's address, Steam account, and past statements relating to their

10 arbitration. (Testimony later revealed that these purported affidavits were riddled with errors, even as to

11 basic factual matters.[33]) None of the purported affidavits addressed the arbitrator's concern about whether

12 claimants actually wished to proceed in arbitration rather than court. And Bucher Law submitted **nothing**

13 with respect to six of the 20 claimants.

14    212.    Bucher Law has also repeatedly sought—and continues to seek—orders from arbitrators

15 requiring Valve to produce documents that third parties produced and marked as Confidential or Highly

16 Confidential in *Wolfire*. Bucher Law has made these requests even though producing these documents

17 would cause Valve to violate the protective order this Court entered in *Wolfire*. Valve has been required

18 to brief this issue—and has done so successfully—before numerous arbitrators. Bucher Law continues to

19

---

20    [32] In hearings before another arbitrator, Bucher Law questioned multiple claimants at length about details in purported affidavits, yet Bucher Law had not produced those purported affidavits to Valve or to

21 the arbitrator. In fact, Bucher Law has not provided purported affidavits for at least 23 of the 25 claimants proceeding before that arbitrator.

22    [33] This is a recurring theme. In two arbitrations proceeding before another arbitrator, each claimant submitted three successive purported affidavits. The third, final purported affidavits stated that the

23 statements made in the prior two purported affidavits should be "disregarded." During Valve's cross-examination of the claimants in the final merits hearing, both testified that the third, "final" purported

24 affidavits nonetheless contained additional errors—providing incorrect dates for purchases and incorrectly stating that claimants purchased games on Steam that they in fact purchased from entirely different

25 platforms. Both claimants testified that the purported affidavits were written for them by Bucher Law. In another arbitration before a different arbitrator, a claimant stated in his pre-hearing purported affidavit

26 that he spent just $10 on game purchases from non-Steam platforms. During his testimony before the arbitrator, the claimant clarified that his purported affidavit "overlooked" other non-Steam purchases, to

27 the tune of between $300-$400 on PC game purchases made on alternative platforms.

---

28  COMPLAINT - 48
    No. 2:24-CV-1717-JNW

1   seek this impermissible disclosure from arbitrators. Valve continues to be required to oppose these

2   meritless requests.

3       213.    All this magnifies the time and resources Valve must expend arbitrating claims the parties

4   did not agree to arbitrate.

5       214.    Absent an injunction, Valve will incur needless expenses vacating arbitral awards in

6   arbitrations that Defendants had no right to pursue.

7       215.    Any arbitral decisions, orders, or awards may also conflict with rulings of this Court in

8   *Wolfire* presiding over putative class actions that include Defendants as putative class members and the

9   claims and relief sought in Defendants' duplicative arbitrations. Indeed, Bucher Law conceded as much

10  in the *Elliott* complaint, averring, "[t]he prosecution of separate actions by individual Class members

11  would create a risk of inconsistent or varying adjudications, establishing incompatible standards of

12  conduct for [Valve]." Complaint ¶ 176, *Elliott* (Dkt. 1).

13  **T.    The Balance of Equities Favors Valve**

14      216.    The balance of equities supports an injunction.

15      217.    Forcing Valve to engage in arbitration where Defendants are not bound to arbitrate and

16  instead must pursue their claims in court under the Current SSA serves no equitable purpose.

17      218.    On the contrary, Valve has been and will continue to be subject to harassing and vexatious

18  proceedings that Bucher Law on behalf of Defendants has no right to pursue.

19      219.    Indeed, Bucher Law targeted Valve and Steam users, including Defendants, to

20  "weaponize[]" Valve and Defendants' now superseded SSA. (Ex. 1 at 3.)

21      220.    Bucher Law stated that "[a]ggregating claims makes [the] entrance fee to just defend

22  prohibitively expensive," providing leverage for immediate settlements. (Ex. 1 at 3.)

23      221.    To effectuate this strategy, Bucher Law commenced thousands of arbitrations, apparently

24  without conducting any investigation: it filed arbitrations on behalf of at least eleven individuals who

25  appear to be deceased (most of whom were deceased at the time of filing and others on whose behalf

26  Bucher Law continued to file submissions with the AAA after the claimant died); at least 218 individuals

27

28  COMPLAINT – 49
    No. 2:24-CV-1717-JNW

1    who are represented by other law firms asserting substantively identical arbitration claims, and at least

2    19 individuals who were at the time of this action's filing in active bankruptcy proceedings.[34]

3        222.    Bucher Law has conceded that it intended to forum shop by prosecuting a class action in

4    *Elliott* and individual actions on behalf of putative class members in arbitration. Nor do Defendants receive

5    any benefit from proceeding with arbitration. Valve has prevailed in all 25 arbitrations in which arbitrators

6    have rendered final awards.[35] Defendants will waste time and energy pursuing arbitrations at Bucher

7    Law's behest that cannot proceed and where any arbitral award will be subject to vacatur.

8        223.    Defendants will also suffer no prejudice from an injunction. Defendants may pursue their

9    claims in court.

10       224.    In fact, there is already a putative class action in court, the *Wolfire* action (which was filed

11   in 2021, well before Bucher Law filed its arbitrations, and has since been consolidated with *Elliott* and

12   other actions), asserting overlapping claims on behalf of Defendants and other members of a putative

13   nationwide class.

14   **U.**    **The Public Interest Favors an Injunction**

15       225.    There is no public interest in requiring Valve and Defendants to arbitrate disputes that must

16   proceed in court and where any arbitral award will be subject to potential vacatur.

17       226.    Permitting arbitrations and parallel actions, including the *Wolfire* putative class action, to

18   proceed would be a manifest waste of judicial resources.

19   **V.**    **This Is Not a Class Action**

20       227.    This is not a class action.

21       228.    Valve does not seek relief against a defendant "class" or class certification under the

22   Federal Rules of Civil Procedure.

23

24       [34] These statistics do not include the additional 42,000 claimants on whose behalf Bucher Law

25   attempted unsuccessfully to file arbitrations.

26       [35] An arbitrator in four other arbitrations has issued an Interim Award that is partially in the claimants' favor and partially in Valve's favor. Valve intends to file a petition to vacate the Final Awards

27   in these arbitrations once issued.

28   COMPLAINT – 50
     No. 2:24-CV-1717-JNW

229.    Valve asserts this action against each separately named Defendant.

## FIRST CAUSE OF ACTION

### DECLARATORY JUDGMENT THAT THE CURRENT
### SSA IS VALID AND ENFORCEABLE AND BINDS EACH DEFENDANT

230.    Valve realleges and incorporates by reference the allegations in Paragraphs 1 through 229 as if fully set forth herein.

231.    Each Defendant has received notice of the Current SSA.

232.    Valve and each Defendant have assented to the Current SSA.

233.    Valve seeks a declaration pursuant to 28 U.S.C. § 2201 that (i) the Current SSA is valid and enforceable as to each Defendant and (ii) Valve and each Defendant have entered into the Current SSA.

## SECOND CAUSE OF ACTION

### BREACH OF CONTRACT

234.    Valve realleges and incorporates by reference the allegations in Paragraphs 1 through 229 as if fully set forth herein.

235.    Valve and each Defendant have entered into the Current SSA.

236.    Under the Current SSA, all claims and disputes between Valve and each Defendant, including claims subject to the pending arbitrations Bucher Law is prosecuting on behalf of Defendants in arbitration, must proceed in court.

237.    Section 10 of the Current SSA provides that "disputes and claims between you and Valve (including any dispute or claim that arose before the existence of this or any prior agreement) shall be commenced and maintained exclusively in any state or federal court located in King County, Washington, having subject matter jurisdiction." (Ex. 3 § 10.)

238.    Because Bucher Law is prosecuting arbitrations on behalf of Defendants, each Defendant is breaching the Current SSA.

239.    The breaches caused by Bucher Law on behalf of Defendants has caused and will continue to cause Valve to incur damages.

COMPLAINT – 51
No. 2:24-CV-1717-JNW

240.    Valve does not seek money damages through this action.

## THIRD CAUSE OF ACTION

### DECLARATORY JUDGMENT THAT EACH DEFENDANT MUST PURSUE THEIR CLAIMS IN COURT AND INJUNCTIVE RELIEF

241.    Valve realleges and incorporates by reference the allegations in Paragraphs 1 through 229 as if fully set forth herein.

242.    Valve and each Defendant have entered into the Current SSA.

243.    Under the Current SSA, all claims and disputes between Valve and each Defendant, including claims subject to the pending arbitrations Bucher Law is prosecuting on behalf of Defendants in arbitration, must proceed in court.

244.    Section 10 of the Current SSA provides that "disputes and claims between you and Valve (including any dispute or claim that arose before the existence of this or any prior agreement) shall be commenced and maintained exclusively in any state or federal court located in King County, Washington, having subject matter jurisdiction." (Ex. 3 § 10.)

245.    Bucher Law is prosecuting arbitrations on behalf of each Defendant in arbitrations before the AAA.

246.    Valve seeks (i) a declaration pursuant to 28 U.S.C. § 2201 that each Defendant must pursue in court their claims that Bucher Law is prosecuting on their behalf in arbitrations before the AAA and (ii) an order pursuant to 28 U.S.C. §§ 2201-02 enjoining each Defendant's arbitration before the AAA that Bucher Law is prosecuting on each Defendant's behalf.

## FOURTH CAUSE OF ACTION

### INJUNCTIVE RELIEF UNDER THE ALL WRITS ACT

247.    Valve realleges and incorporates by reference the allegations in Paragraphs 1 through 229 as if fully set forth herein.

248.    Bucher Law is prosecuting arbitrations on behalf of each Defendant in arbitrations before the AAA.

COMPLAINT – 52
No. 2:24-CV-1717-JNW

249.    There is also a putative class action pending in this Court, the *Wolfire* action, brought on behalf of a putative class that includes each Defendant and encompasses all of the claims and relief sought in Defendants' arbitrations.

250.    It would threaten the jurisdiction of this Court and any judgment of this Court in *Wolfire* for arbitrations prosecuted by Bucher Law on behalf of Defendants to proceed because the arbitrations could result in rulings inconsistent with the rulings of this Court.

251.    Valve seeks an order pursuant to 28 U.S.C. § 1651(a) enjoining each Defendant's arbitrations before the AAA that Bucher Law is prosecuting on Defendants' behalf.

## PRAYER FOR RELIEF

**WHEREFORE, Valve respectfully requests that this Court award the following relief:**

(a)    A declaration pursuant to 28 U.S.C. § 2201 that the Current SSA is valid and enforceable as to each Defendant.

(b)    A declaration pursuant to 28 U.S.C. § 2201 that the Current SSA, including Section 10 of the Current SSA, applies to all disputes and claims between Valve and its users regardless of when they arose, including all claims in pending arbitrations.

(c)    A declaration pursuant to 28 U.S.C. § 2201 that each Defendant has entered into the Current SSA and are bound by the Current SSA.

(d)    An order pursuant to 9 U.S.C. § 4, 28 U.S.C. §§ 2201-02, and 28 U.S.C. § 1651(a), enjoining each Defendant's arbitrations before the AAA that Bucher Law is prosecuting on Defendants' behalf.

(e)    Any other relief that the Court deems just and appropriate.

COMPLAINT – 53
No. 2:24-CV-1717-JNW

1    DATED this 21st day of August 2025.

2

3                                            *s/ Blake Marks-Dias*
                                             Blake Marks-Dias, WSBA No. 28169
4                                            CORR CRONIN LLP
                                             1015 Second Avenue, Floor 10
5                                            Seattle, Washington 98104-1001
                                             (206) 625-8600 Phone
6                                            (206) 625-0900 Fax
                                             bmarksdias@corrcronin.com
7
                                             Michael W. McTigue Jr., *Admitted Pro Hac Vice*
8                                            Meredith Slawe, *Admitted Pro Hac Vice*
                                             SKADDEN, ARPS, SLATE, MEAGHER & FLOM
9                                            LLP One Manhattan West
                                             New York, NY 10001
10                                           michael.mctigue@skadden.com
                                             meredith.slawe@skadden.com
11
                                             *Attorneys for Plaintiff Valve Corporation*
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   COMPLAINT – 54
     No. 2:24-CV-1717-JNW

# APPENDIX A

| Defendant First Name | Defendant Last Name[1] | Case Number | Arbitrator | Accepted By Pop-Up or Purchase Before Nov. 1, 2024 | Accepted By Continued Use After Nov. 1, 2024 | Purchase On or After Nov. 1, 2024 |
|---|---|---|---|---|---|---|
| Ryan | Ardito | 12300053635 | Badal | | X | |
| Riley | Baxter | 12300053643 | Badal | X | | X |
| Michael | Brewer | 12300053651 | Badal | X | | X |
| Owen | Butterworth | 12300053641 | Badal | X | | |
| Jonathan | Carlton | 12300053626 | Badal | | X | |
| Michael | Eastman | 12300053631 | Badal | | X | X |
| Brandon | Garwell | 12300053628 | Badal | X | | X |
| Liam | Gaume-wakefield | 12300053650 | Badal | X | | X |
| Ian | Govea | 12300053634 | Badal | X | | X |
| Evan | Grant | 12300053632 | Badal | X | | X |
| Ricky | Horne | 12300053630 | Badal | X | | X |
| Dane | Jordan | 12300053652 | Badal | | X | X |
| Nicholas | Keith | 12300053648 | Badal | X | | X |
| Aj | Lane | 12300053636 | Badal | | X | X |
| Max | Moakley | 12300053627 | Badal | X | | X |
| Malakye | Moody | 12300053644 | Badal | X | | X |
| Harley | Palmer | 12300053637 | Badal | X | | X |
| Mitchell | Papendorf | 12300053646 | Badal | X | | X |
| Alex | Patrao | 12300053625 | Badal | X | | X |
| Eric | Patton | 12300053639 | Badal | X | | X |
| Anthony | Rubino | 12300053647 | Badal | X | | X |
| Zachary | Smith | 12300053642 | Badal | X | | X |
| Isaiah | Taylor | 12300053633 | Badal | X | | X |
| Cody | Warren | 12300053640 | Badal | X | | X |
| Brian | Yeh | 12300053629 | Badal | X | | X |
| Jacob | Archer | 12300053080 | Brooks | X | | X |
| Eric | Buck | 12300053195 | Brooks | X | | X |
| Paul | Burnett | 12300053051 | Brooks | | X | |
| Harrison | Carlow | 12300052857 | Brooks | X | | X |
| Spencer | Duzant | 12300053604 | Brooks | X | | X |
| Robert | Fischer | 12300053152 | Brooks | X | | X |
| Matthew | Habursky | 12300053000 | Brooks | | X | X |
| Daniel | Harley | 12300053112 | Brooks | | X | |
| Logan | Herald | 12300053211 | Brooks | X | | X |
| Philipjohn | Holland | 12300057450 | Brooks | X | | X |
| Matthew | Husar | 12300053200 | Brooks | | X | |

[1] Names based on information provided by Bucher Law PLLC.

1

| Defendant First Name | Defendant Last Name[1] | Case Number | Arbitrator | Accepted By Pop-Up or Purchase Before Nov. 1, 2024 | Accepted By Continued Use After Nov. 1, 2024 | Purchase On or After Nov. 1, 2024 |
|---|---|---|---|---|---|---|
| Nick | Lauder | 12300053351 | Brooks | X | | X |
| Sam | Lomax | 12300053448 | Brooks | X | | X |
| Panayiotis | Maniscalco | 12300052879 | Brooks | X | | X |
| Ross | Martikke | 12300053423 | Brooks | X | | X |
| Luke | Ninemire | 12300053816 | Brooks | X | | X |
| Joseph | Risi | 12300053838 | Brooks | X | | X |
| Joshua | Sayles | 12300052851 | Brooks | | X | X |
| Jake | Sigal | 12300053654 | Brooks | X | | X |
| Holden | Stender | 12300053807 | Brooks | X | | X |
| Tyler | Strenge | 12300052865 | Brooks | X | | X |
| Jonah | Warner | 12300053348 | Brooks | X | | X |
| Eric | Alspaugh | 12300053672 | Coher | X | | X |
| Noah | Babincsak Styzen | 12300053666 | Coher | X | | X |
| Stephen | Barr | 12300053653 | Coher | X | | X |
| Michael | Bazzell | 12300053662 | Coher | X | | X |
| Anthony | Bennett | 12300053674 | Coher | X | | X |
| Ethan | Brown | 12300053682 | Coher | X | | X |
| Vincent | Brown | 12300053663 | Coher | X | | X |
| Ned | Budd | 12300053665 | Coher | X | | X |
| Benjamin | Camenker | 12300053669 | Coher | | X | X |
| Traber | Fischer | 12300053680 | Coher | X | | X |
| Mikel | Hatcher | 12300053676 | Coher | X | | X |
| Michael | Kutner | 12300053673 | Coher | X | | X |
| Jonathan | Lewis | 12300053668 | Coher | X | | X |
| Joshua | Lewis | 12300053664 | Coher | X | | X |
| Talon | Lewis | 12300053667 | Coher | X | | X |
| Thomas | Magera | 12300053661 | Coher | | X | X |
| Kyle | Mayfield | 12300053679 | Coher | X | | X |
| Hunter | Mcbrayer | 12300053670 | Coher | | X | X |
| Trey | Mundell | 12300053657 | Coher | X | | X |
| Harsh | Patel | 12300053659 | Coher | X | | X |
| Noah | Perry | 12300053675 | Coher | X | | X |
| Aaron | Peterson | 12300053677 | Coher | X | | X |
| Tristen | Watson | 12300053655 | Coher | X | | X |
| Amir | Wright | 12300038815 | Coher | X | | X |
| Jonah | Anders | 12300053368 | Collins | X | | X |
| Daniel | Armstrong | 12300053486 | Collins | X | | X |
| Michael | Blanco | 12300053525 | Collins | X | | X |

2

| Defendant First Name | Defendant Last Name[1] | Case Number | Arbitrator | Accepted By Pop-Up or Purchase Before Nov. 1, 2024 | Accepted By Continued Use After Nov. 1, 2024 | Purchase On or After Nov. 1, 2024 |
|---|---|---|---|---|---|---|
| Jason | Courter | 12300053312 | Collins | X | | X |
| Drevayne | Dawkins | 12300057461 | Collins | X | | X |
| John | Forrest | 12300052880 | Collins | X | | X |
| Donald | Goldsmith | 12300057449 | Collins | X | | X |
| Eli | Groff | 12300052990 | Collins | X | | X |
| Christian | Horazeck | 12300053527 | Collins | X | | X |
| Odis | Kendrick | 12300052856 | Collins | X | | X |
| Mark | Legg | 12300053004 | Collins | | X | X |
| Kyle | Lynch | 12300057462 | Collins | | X | X |
| Clayton | Lynn | 12300053808 | Collins | | X | X |
| Yuri | Motruk | 12300053738 | Collins | X | | X |
| Collin | Peacock | 12300057453 | Collins | X | | X |
| Deven | Peterson | 12300053275 | Collins | X | | X |
| John | Quarnstrom | 12300053316 | Collins | X | | X |
| Tracy | Richardson | 12300053361 | Collins | X | | X |
| Julius | Roberts | 12300053247 | Collins | X | | X |
| Chris | Robinson | 12300053649 | Collins | X | | X |
| Robert | Rule | 12300052881 | Collins | X | | X |
| Robert | Schindler | 12300053084 | Collins | X | | X |
| Daniel | Smith | 12300052869 | Collins | X | | X |
| J Derek | Wright | 12300057442 | Collins | X | | X |
| Thomas | Abbruzzese | 12300053479 | Dasteel | X | | X |
| David | Antolic | 12300053498 | Dasteel | X | | X |
| Jose | Aranda | 12300053494 | Dasteel | X | | X |
| Carter | Baker | 12300053490 | Dasteel | X | | |
| Gavin | Baker | 12300052868 | Dasteel | | X | X |
| Stephanie | Blomstrom | 12300052896 | Dasteel | X | | X |
| Kiley | Borba | 12300052889 | Dasteel | | X | |
| Gavin | Borchers | 12300053481 | Dasteel | X | | X |
| Alexander | Brumley | 12300053501 | Dasteel | | X | X |
| Andrew | Butler | 12300052900 | Dasteel | X | | X |
| Maurice | Castro | 12300052890 | Dasteel | | X | X |
| Riley | Chapman | 12300052898 | Dasteel | X | | X |
| James | Davis | 12300053499 | Dasteel | X | | X |
| Manfred | Dentice | 12300052901 | Dasteel | | X | X |
| Raciel | Diaz | 12300052872 | Dasteel | X | | X |
| Jeremiah | Dieujuste | 12300052884 | Dasteel | X | | X |
| Collin | Evans | 12300053493 | Dasteel | X | | X |

| Defendant First Name | Defendant Last Name[1] | Case Number | Arbitrator | Accepted By Pop-Up or Purchase Before Nov. 1, 2024 | Accepted By Continued Use After Nov. 1, 2024 | Purchase On or After Nov. 1, 2024 |
|---|---|---|---|---|---|---|
| Anthony | Galatolo | 12300053491 | Dasteel | X | | |
| Gordon | Huckaby | 12300052861 | Dasteel | | X | |
| Vincent | Keegan | 12300053504 | Dasteel | X | | X |
| Jeremy | Kirkwood | 12300053480 | Dasteel | X | | X |
| Robert | Lewis | 12300053488 | Dasteel | X | | X |
| Bridgette | Mcbride | 12300052892 | Dasteel | X | | X |
| James | McDonald | 12300052888 | Dasteel | | X | X |
| Kevin | Montes | 12300053487 | Dasteel | | X | X |
| Jared | Myers | 12300053500 | Dasteel | X | | X |
| Caleb | Orella | 12300053492 | Dasteel | X | | X |
| Timothy | Pablo Penaranda | 12300053503 | Dasteel | X | | X |
| Mitchell | Pakosz | 12300052853 | Dasteel | | X | X |
| Zachary | Parsley | 12300053485 | Dasteel | | X | |
| Michael | Patterson | 12300052860 | Dasteel | X | | |
| Brady | Paul | 12300053478 | Dasteel | X | | X |
| Hugh | Phillips | 12300053496 | Dasteel | X | | |
| Carson | Plaisance | 12300053489 | Dasteel | X | | X |
| Pharaun | Potts | 12300052859 | Dasteel | X | | X |
| Jeff | Ramirez Ochoa | 12300053483 | Dasteel | | X | |
| Joe | Rios | 12300052850 | Dasteel | | X | |
| Samuel | Roberts | 12300052893 | Dasteel | X | | X |
| Simon | Savlas | 12300053484 | Dasteel | X | | |
| Alexander | Schlosser | 12300053505 | Dasteel | X | | X |
| Greg | Smith | 12300052882 | Dasteel | X | | X |
| Luis | Sotillet Rojas | 12300052883 | Dasteel | X | | X |
| Nicholas | Tynes | 12300053502 | Dasteel | X | | X |
| Mark | Williams Jr | 12300052870 | Dasteel | X | | X |
| Jacob | Zide | 12300052854 | Dasteel | X | | X |
| Cody | Ackley | 12300053336 | Gaglione | X | | X |
| Christien | Ayson | 12300053334 | Gaglione | | X | X |
| Matthew | Baldwin | 12300053347 | Gaglione | X | | X |
| Ryan | Borek | 12300053360 | Gaglione | X | | X |
| Mitchell | Coburn | 12300053343 | Gaglione | X | | X |
| Michael | Daugherty | 12300053357 | Gaglione | X | | X |
| Gabriel | Durbin | 12300053335 | Gaglione | X | | X |
| Mason | Field | 12300053355 | Gaglione | X | | X |
| Tyler | Francesconi | 12300053338 | Gaglione | X | | X |
| Thomas | Garrett | 12300053353 | Gaglione | | X | X |

4

| Defendant First Name | Defendant Last Name[1] | Case Number | Arbitrator | Accepted By Pop-Up or Purchase Before Nov. 1, 2024 | Accepted By Continued Use After Nov. 1, 2024 | Purchase On or After Nov. 1, 2024 |
|---|---|---|---|---|---|---|
| Robert | Grescowle | 12300053333 | Gaglione | X | | |
| Rob | Hauser | 12300053345 | Gaglione | X | | X |
| Ann | Hefner | 12300053340 | Gaglione | | X | X |
| Kasandra | Hiley | 12300053346 | Gaglione | | X | X |
| Patrick | Kuller | 12300053356 | Gaglione | X | | X |
| Richard | Lundsgaard | 12300053358 | Gaglione | X | | X |
| Jordan | Newby | 12300053359 | Gaglione | X | | X |
| Christopher | Prato-shein | 12300053342 | Gaglione | X | | X |
| Bradley | Ratliff | 12300053341 | Gaglione | X | | X |
| Andre | Santana | 12300053362 | Gaglione | X | | X |
| John | Taddei | 12300053339 | Gaglione | | X | X |
| Xzavier | Timmons | 12300053349 | Gaglione | | X | X |
| Merrick | Tipton | 12300053354 | Gaglione | X | | X |
| Katie | Uccello | 12300053363 | Gaglione | X | | X |
| Michael | Wu | 12300053337 | Gaglione | X | | X |
| Greg | Fish | 12300053288 | Goins | X | | X |
| Christian | Graber | 12300053702 | Goins | | X | X |
| Ethan | Lefebvre | 12300057452 | Goins | X | | X |
| Jeremy | Lucas | 12300053823 | Goins | X | | X |
| Zachary | Aletheia | 12300053259 | Gruber | X | | X |
| Angel | Ayala | 12300053273 | Gruber | X | | X |
| Kevin | Burnett | 12300053268 | Gruber | X | | X |
| Eric | Chastain | 12300053058 | Gruber | | X | |
| Rocco | Cipolla | 12300053066 | Gruber | X | | X |
| Julio | Cruz | 12300053266 | Gruber | X | | X |
| Kevin | Dahlke | 12300053264 | Gruber | X | | X |
| Jon | Francisco | 12300053265 | Gruber | X | | X |
| Robert | Gibson | 12300053271 | Gruber | X | | X |
| Tyler | Gilbert | 12300053270 | Gruber | | X | X |
| Supyo | Hong | 12300053054 | Gruber | X | | X |
| Jayson | Huber | 12300053060 | Gruber | X | | X |
| Maxwell | Johnson | 12300053061 | Gruber | X | | X |
| Nicholas | Kirse | 12300053065 | Gruber | X | | X |
| Jordan | Mack | 12300053269 | Gruber | X | | X |
| Jason | Mccall | 12300053274 | Gruber | | X | X |
| Ricky | Mullins | 12300053056 | Gruber | X | | X |
| Jacob | Naquin | 12300053262 | Gruber | X | | X |
| Jonathan | Ortiz | 12300053272 | Gruber | X | | X |

| Defendant First Name | Defendant Last Name[1] | Case Number | Arbitrator | Accepted By Pop-Up or Purchase Before Nov. 1, 2024 | Accepted By Continued Use After Nov. 1, 2024 | Purchase On or After Nov. 1, 2024 |
|---|---|---|---|---|---|---|
| Skylar | Pond | 12300053261 | Gruber | X | | X |
| David | Reed | 12300053062 | Gruber | X | | X |
| Allen | Roman | 12300053260 | Gruber | X | | X |
| Trevor | Rupel | 12300053053 | Gruber | | X | X |
| Ryan | Sheline | 12300053059 | Gruber | X | | X |
| Patrick | Squire | 12300053064 | Gruber | X | | |
| Patrick | Titterness | 12300053267 | Gruber | | X | X |
| Kenneth | Walker | 12300053055 | Gruber | | X | X |
| Joshua | Wyant | 12300053063 | Gruber | X | | X |
| Tai | Bishop | 12300053074 | Jossen | X | | |
| Cory | Cleri | 12300053092 | Jossen | X | | X |
| Elizabeth | Dingman | 12300053071 | Jossen | X | | X |
| Don "doc" | Guger | 12300053068 | Jossen | X | | |
| Jacob | Ford | 12300053075 | Jossen | X | | X |
| Joseph | Gentry | 12300053076 | Jossen | | X | |
| Jason | Gibbs | 12300053089 | Jossen | X | | |
| Jackson | Heath | 12300053081 | Jossen | X | | |
| Adam | Henchen | 12300053093 | Jossen | X | | X |
| Nicholas | Howell | 12300053090 | Jossen | X | | X |
| Ryan | Jurado | 12300053072 | Jossen | X | | X |
| Amy | Lutes | 12300053077 | Jossen | X | | |
| Javier | Nieto | 12300053082 | Jossen | | X | X |
| Richard | Noble | 12300053083 | Jossen | X | | X |
| Wesley | Parmer | 12300053091 | Jossen | | X | |
| Mike | Pena | 12300053078 | Jossen | | X | |
| Andrew | Rosson | 12300053069 | Jossen | | X | X |
| Leonard | Sanders | 12300053088 | Jossen | X | | X |
| Austin | Schau | 12300053086 | Jossen | | X | X |
| Joseph | Shelley | 12300053087 | Jossen | | X | |
| Kevin | Taylor | 12300053070 | Jossen | X | | X |
| Leif | Tollefson | 12300053073 | Jossen | X | | X |
| Tyler | Wright | 12300053067 | Jossen | X | | X |
| Johnathan | Yi | 12300053079 | Jossen | X | | X |
| John | Zwick | 12300053085 | Jossen | X | | X |
| Yousif | Alsaqlawi | 12300053450 | Katz | X | | X |
| Rich | Cambern | 12300053462 | Katz | | X | X |
| Steven | Carmiencke | 12300053459 | Katz | X | | X |
| Adam | Carroll | 12300053461 | Katz | X | | X |

| Defendant First Name | Defendant Last Name[1] | Case Number | Arbitrator | Accepted By Pop-Up or Purchase Before Nov. 1, 2024 | Accepted By Continued Use After Nov. 1, 2024 | Purchase On or After Nov. 1, 2024 |
|---|---|---|---|---|---|---|
| Nick | Carter | 12300053472 | Katz | X | | |
| Jason | Clark | 12300053469 | Katz | X | | X |
| Daniel | Duncan | 12300053456 | Katz | X | | |
| Haley | Eskridge | 12300053454 | Katz | X | | X |
| Jake | Flaherty | 12300053476 | Katz | X | | X |
| Mike | Hespel | 12300053474 | Katz | | X | X |
| Braxten | Hieb | 12300053463 | Katz | X | | X |
| Timothy | Kaiserlik | 12300053458 | Katz | X | | X |
| Alexander | Lopez | 12300053460 | Katz | X | | X |
| Travis | Micheletti | 12300053467 | Katz | | X | X |
| Maxwell | Mucha | 12300053471 | Katz | X | | X |
| Jared | Perry | 12300053477 | Katz | X | | X |
| Blake | Petersen | 12300053455 | Katz | X | | X |
| Kevin | Ramos | 12300053465 | Katz | | X | |
| Ethan | Rodabaugh | 12300053470 | Katz | X | | X |
| Christopher | Stephan | 12300053453 | Katz | X | | X |
| Dillon | Stettler | 12300053457 | Katz | X | | X |
| Amber | Toney | 12300053473 | Katz | X | | X |
| Christopher | Veiga | 12300053475 | Katz | X | | X |
| Jonah | White | 12300053452 | Katz | X | | X |
| Cody | Barker | 12300053417 | Kingsley | | X | X |
| Jacob | Deegan | 12300053400 | Kingsley | X | | X |
| Logan | Doose | 12300053394 | Kingsley | X | | X |
| Abraham | Duman | 12300053399 | Kingsley | X | | X |
| Taylor | Edwards | 12300053395 | Kingsley | X | | |
| Nathan | Engols | 12300053413 | Kingsley | | X | X |
| Sacha | Haghighi | 12300053398 | Kingsley | | X | X |
| Broderick | Hebert | 12300053393 | Kingsley | X | | X |
| Max | Johnson | 12300053401 | Kingsley | X | | X |
| Justin | Jones | 12300053410 | Kingsley | X | | |
| Gregory | Kain | 12300053414 | Kingsley | X | | X |
| Seth | Lewis | 12300053418 | Kingsley | | X | X |
| Michael | Linares | 12300053404 | Kingsley | | X | |
| Roger | Maricle | 12300053402 | Kingsley | X | | X |
| Jodee Lynn | Molina | 12300053403 | Kingsley | X | | X |
| Devon | Musto | 12300053411 | Kingsley | X | | X |
| Joshua | Roberts | 12300053396 | Kingsley | X | | X |
| Jason | Smith | 12300053408 | Kingsley | X | | X |

| Defendant First Name | Defendant Last Name[1] | Case Number | Arbitrator | Accepted By Pop-Up or Purchase Before Nov. 1, 2024 | Accepted By Continued Use After Nov. 1, 2024 | Purchase On or After Nov. 1, 2024 |
|---|---|---|---|---|---|---|
| Samuel | Stevens | 12300053392 | Kingsley | X | | X |
| Kaleb | Swaim | 12300053412 | Kingsley | X | | X |
| Dominique | Ward | 12300053405 | Kingsley | X | | X |
| Mason | Wright | 12300053397 | Kingsley | X | | X |
| Anthony | Gazzo | 12300053009 | Larkin | | X | X |
| Nicholas | Mastriaco | 12300053532 | Larkin | X | | X |
| Marc | Ura | 12300053407 | Larkin | X | | X |
| Timothy | Broughton | 12300053331 | Levy | | X | |
| Nicolaas | Bush | 12300053319 | Levy | X | | X |
| Duwayne | Counts | 12300053325 | Levy | X | | X |
| Andrew | Davidson | 12300053330 | Levy | | X | |
| Josiah | Eredia | 12300053323 | Levy | X | | X |
| Keelan | Esquivel | 12300053332 | Levy | X | | X |
| Nico | Estebanez | 12300053311 | Levy | | X | |
| Michael | Ewing | 12300053308 | Levy | X | | X |
| Alexander | Fowler | 12300053320 | Levy | X | | X |
| Adrian | Fritzley | 12300053309 | Levy | | X | X |
| David | Hedrick | 12300053324 | Levy | X | | X |
| Martin | Hernandez | 12300053321 | Levy | | X | |
| Jon | Hoke | 12300053328 | Levy | X | | X |
| Shawn | Peck | 12300053306 | Levy | X | | X |
| Jonathan | Perry | 12300053310 | Levy | X | | X |
| Niko | Pitinii | 12300053313 | Levy | X | | X |
| Isaac | Ramos | 12300053307 | Levy | X | | X |
| Joseph | Ray | 12300053304 | Levy | | X | |
| John | Reeves | 12300053326 | Levy | X | | X |
| Victor | Romo | 12300053327 | Levy | X | | |
| Mitchell | Strang | 12300053315 | Levy | | X | |
| James | Walters | 12300053305 | Levy | X | | X |
| Xenia | Yee | 12300053329 | Levy | X | | X |
| Jacob | Arthur | 12300053560 | Mainland | X | | X |
| Aaron | Castaneda | 12300053539 | Mainland | X | | X |
| Clyde | Chaffee | 12300053548 | Mainland | X | | X |
| Ian | Cheney | 12300053544 | Mainland | X | | X |
| James | Clarke | 12300053537 | Mainland | X | | X |
| Chase | Couzens | 12300053546 | Mainland | X | | X |
| Curtis | Drommerhausen | 12300053556 | Mainland | | X | X |
| Zack | Finfrock | 12300053562 | Mainland | X | | X |

| Defendant First Name | Defendant Last Name[1] | Case Number | Arbitrator | Accepted By Pop-Up or Purchase Before Nov. 1, 2024 | Accepted By Continued Use After Nov. 1, 2024 | Purchase On or After Nov. 1, 2024 |
|---|---|---|---|---|---|---|
| Julian | Gariba | 12300053551 | Mainland | X | | X |
| Alejandro | Garrido | 12300053538 | Mainland | X | | X |
| Chris | Huss | 12300053559 | Mainland | X | | X |
| Justin | Leffert | 12300053547 | Mainland | X | | X |
| Travis | Maynard | 12300053550 | Mainland | X | | X |
| James | Mcinerny | 12300053536 | Mainland | X | | X |
| Charles | Niles | 12300053555 | Mainland | | X | |
| Michael | Pacholczak | 12300053557 | Mainland | X | | |
| Jesse | Perlaza | 12300053561 | Mainland | X | | X |
| James | Reynolds | 12300053540 | Mainland | X | | X |
| Salvatore | Sardisco | 12300053543 | Mainland | X | | |
| Michael | Shingleton | 12300053554 | Mainland | X | | X |
| Adam | Zuniga | 12300053552 | Mainland | X | | X |
| Meagan | Argo | 12300052915 | McNamara | X | | X |
| Seth | Weber | 12300053581 | McNamara | | X | X |
| Abed | Balbaky | 12300053314 | McSorley | X | | X |
| Alec | Birenbaum | 12300053145 | McSorley | | X | X |
| Kenshad | Brown | 12300052886 | McSorley | X | | X |
| Mateus | Cunha | 12300053542 | McSorley | X | | X |
| Ajay | Dalal | 12300053696 | McSorley | X | | X |
| Joshua | Depalma | 12300053802 | McSorley | | X | X |
| Corbin | Echevarria | 12300053238 | McSorley | X | | X |
| Brett | Flinn | 12300053173 | McSorley | X | | X |
| Cole | Hagan | 12300053175 | McSorley | X | | X |
| Aleck | Hernandez | 12300053225 | McSorley | X | | X |
| Armando | Martinez | 12300053106 | McSorley | X | | X |
| Paul | Mayer | 12300053433 | McSorley | X | | X |
| Mark | Mendel | 12300053517 | McSorley | X | | X |
| Alexander | Mishkevich | 12300053344 | McSorley | X | | X |
| Anthony | Mittasch | 12300053698 | McSorley | | X | X |
| Conor | Moschella | 12300053762 | McSorley | X | | X |
| Robert | Richelson | 12300052936 | McSorley | X | | X |
| Gabriel | Rodrigues | 12300053105 | McSorley | X | | X |
| Matthew | Ventures | 12300053681 | McSorley | | X | |
| Lance | Vicente | 12300053352 | McSorley | | X | X |
| Bernard | Vignali | 12300052957 | McSorley | X | | X |
| Robert | Woolf | 12300053590 | McSorley | X | | X |
| Jake | Wuebker | 12300053219 | McSorley | X | | X |

| Defendant First Name | Defendant Last Name[1] | Case Number | Arbitrator | Accepted By Pop-Up or Purchase Before Nov. 1, 2024 | Accepted By Continued Use After Nov. 1, 2024 | Purchase On or After Nov. 1, 2024 |
|---|---|---|---|---|---|---|
| Jeffrey | Cassick | 12300052934 | Morrill | X | | X |
| Nicholas | Foster | 12300052940 | Morrill | X | | X |
| Charles | Gill | 12300052933 | Morrill | X | | X |
| Bashari | Guidry | 12300052935 | Morrill | X | | X |
| Bradyn | Hamel | 12300052942 | Morrill | | X | X |
| Baylen | James | 12300052947 | Morrill | X | | X |
| Itiel | Jimenez | 12300052954 | Morrill | | X | |
| Jared | Johnson | 12300052946 | Morrill | X | | X |
| Thomas | Mcsweeney | 12300052938 | Morrill | X | | X |
| Alice | Millage | 12300052944 | Morrill | | X | |
| Alexander | Pachnicki | 12300052953 | Morrill | X | | X |
| Joshua | Page | 12300052941 | Morrill | X | | X |
| Jeff | Pellegrin | 12300052929 | Morrill | X | | X |
| Dustin | Phelps | 12300052930 | Morrill | X | | X |
| Mateo | Platero | 12300052937 | Morrill | | X | X |
| Steven | Prescott | 12300052943 | Morrill | | X | |
| Thomas | Rolando | 12300052939 | Morrill | X | | X |
| John | Schweizer li | 12300052945 | Morrill | | X | X |
| Ian | Stubbs | 12300052932 | Morrill | X | | X |
| Nicky | Sun | 12300052950 | Morrill | X | | X |
| Matthew | Sweeney | 12300052948 | Morrill | X | | X |
| Maisie | Turner | 12300052949 | Morrill | X | | X |
| Joseph | Wasielewski-walsh | 12300052931 | Morrill | X | | X |
| Zachary | Yahola | 12300052952 | Morrill | X | | X |
| Fabian | Arevalo | 12300053034 | Ohashi | X | | X |
| Noah | Burch | 12300053033 | Ohashi | X | | X |
| Chase | Froelich | 12300053015 | Ohashi | X | | X |
| Tasha | Goldsmith | 12300053036 | Ohashi | X | | X |
| Daniel | Guadarrama | 12300053031 | Ohashi | | X | |
| Trevor | Laturner | 12300053024 | Ohashi | X | | X |
| Corinne | Lee | 12300053035 | Ohashi | | X | |
| Broden | Mcduffee | 12300053037 | Ohashi | X | | X |
| Barry | Morganti | 12300053032 | Ohashi | | X | X |
| Cole | Nelson | 12300053017 | Ohashi | X | | X |
| Michael | Owens | 12300053019 | Ohashi | X | | X |
| Eliel | Pedro | 12300053025 | Ohashi | X | | X |
| Alyssa | Phillips | 12300053028 | Ohashi | X | | X |

| Defendant First Name | Defendant Last Name[1] | Case Number | Arbitrator | Accepted By Pop-Up or Purchase Before Nov. 1, 2024 | Accepted By Continued Use After Nov. 1, 2024 | Purchase On or After Nov. 1, 2024 |
|---|---|---|---|---|---|---|
| Cortland | Pinnick | 12300053027 | Ohashi | X | | X |
| Matthew | Powell | 12300053018 | Ohashi | X | | |
| Quinn | Rasmussen | 12300053022 | Ohashi | X | | X |
| Nicholas | Rugama | 12300053023 | Ohashi | X | | X |
| Ethan | Sams | 12300053016 | Ohashi | X | | X |
| Anthony | Simoni | 12300053026 | Ohashi | X | | X |
| Ryan | Smith | 12300053030 | Ohashi | X | | X |
| Norm | Somers | 12300053021 | Ohashi | X | | X |
| Tyler | Stulz | 12300053020 | Ohashi | X | | |
| Lucian | Thompson | 12300053029 | Ohashi | | X | X |
| Kevin | Viloria | 12300053039 | Ohashi | X | | X |
| Luther | Williams | 12300053038 | Ohashi | X | | |
| Ryan | Adreani | 12300053645 | Palomo | X | | X |
| Matthew | Baer | 12300053169 | Palomo | X | | X |
| Raymond | Garay | 12300052907 | Palomo | X | | X |
| Virgil | Glisson | 12300052877 | Palomo | X | | |
| Devin | Harvey | 12300053177 | Palomo | X | | X |
| Jurell | Jordan | 12300052866 | Palomo | X | | |
| Derek | Krause | 12300057458 | Palomo | X | | X |
| Deric | Landers | 12300053014 | Palomo | X | | X |
| Ezekiel | Mccracken | 12300052897 | Palomo | X | | X |
| Adrian | Monter | 12300053131 | Palomo | X | | X |
| Nathaniel | Moore | 12300053597 | Palomo | X | | X |
| Ryan | Moore | 12300052978 | Palomo | X | | X |
| Bonnie | Murphy | 12300053777 | Palomo | X | | X |
| Garland | Noel | 12300053256 | Palomo | X | | X |
| Gary | Palmatier | 12300052858 | Palomo | X | | X |
| Robert | Richards | 12300053224 | Palomo | X | | X |
| Alexander | Rodriguez | 12300054464 | Palomo | X | | X |
| Joshua | Sammons | 12300053549 | Palomo | X | | X |
| Ramon | Serrano | 12300052873 | Palomo | X | | X |
| Dylan | Smyers | 12300052871 | Palomo | X | | X |
| Decker | Spencer | 12300053318 | Palomo | X | | X |
| Matthew | Stengel | 12300053101 | Palomo | X | | X |
| Randy | Wozniak | 12300053245 | Palomo | X | | |
| Christopher | Bittle | 12300053241 | Pope | X | | X |
| Griffin | Byer | 12300053237 | Pope | | X | X |
| Myles | Coffman | 12300053214 | Pope | | X | X |

11

| Defendant First Name | Defendant Last Name[1] | Case Number | Arbitrator | Accepted By Pop-Up or Purchase Before Nov. 1, 2024 | Accepted By Continued Use After Nov. 1, 2024 | Purchase On or After Nov. 1, 2024 |
|---|---|---|---|---|---|---|
| Mason | Coon | 12300053232 | Pope | X | | X |
| Jordan | Davis | 12300053216 | Pope | X | | X |
| Daniel | Ducos | 12300053215 | Pope | X | | X |
| Jeremy | Flippo | 12300053218 | Pope | X | | X |
| Guido | Gonzalez | 12300053239 | Pope | X | | X |
| William | Griffin | 12300053223 | Pope | X | | X |
| William | Holmes | 12300053217 | Pope | X | | X |
| Chandlin | Husain | 12300053240 | Pope | X | | X |
| Timothy | Johnson | 12300053242 | Pope | X | | |
| Matthew | Jones | 12300053227 | Pope | | X | X |
| Benjamin | Jordan | 12300053243 | Pope | X | | X |
| John | Knirr | 12300053228 | Pope | X | | |
| Austin | Mcmillan | 12300053235 | Pope | X | | X |
| Aaron | Pearson | 12300053231 | Pope | X | | X |
| Vincent | Rebokus | 12300053222 | Pope | X | | X |
| Stephen | Robertson | 12300053230 | Pope | | X | X |
| Gabriel | Santana | 12300053234 | Pope | X | | X |
| Ian | Smith | 12300053233 | Pope | X | | X |
| Aaron | Solomon | 12300053221 | Pope | X | | |
| Zachary | Taylor | 12300053220 | Pope | X | | X |
| Joshua | Whiteacre | 12300053244 | Pope | X | | X |
| Benjamin | Conrad | 12300053129 | Quintanilla | | X | X |
| Randall | Farley | 12300053134 | Quintanilla | X | | X |
| Neil Andrew | Francisco | 12300053127 | Quintanilla | X | | X |
| Austin | Henry | 12300053128 | Quintanilla | X | | X |
| Steven | Jennett | 12300053126 | Quintanilla | X | | X |
| Alicia | Marshall | 12300053133 | Quintanilla | | X | |
| Jacob | Phillips | 12300053135 | Quintanilla | X | | X |
| Abrahim | Ramadan | 12300053132 | Quintanilla | X | | X |
| Ethan | Scifers | 12300053125 | Quintanilla | X | | X |
| Thmoas | Wiseman | 12300053130 | Quintanilla | X | | X |
| Zaid | Abuwandi | 12300053286 | R. Brown | X | | X |
| Steven | Armant | 12300053279 | R. Brown | X | | X |
| Adam | Bernal | 12300053303 | R. Brown | | X | X |
| Shountasia | Bevins | 12300053283 | R. Brown | X | | X |
| X. | B. – P. | 12300053278 | R. Brown | X | | X |
| Zachary | Burry | 12300053277 | R. Brown | X | | X |
| Denver | Dubhorn | 12300053295 | R. Brown | X | | X |

| Defendant First Name | Defendant Last Name[1] | Case Number | Arbitrator | Accepted By Pop-Up or Purchase Before Nov. 1, 2024 | Accepted By Continued Use After Nov. 1, 2024 | Purchase On or After Nov. 1, 2024 |
|---|---|---|---|---|---|---|
| Andrew M. | Evenson | 12300053282 | R. Brown | X | | X |
| David | Graham | 12300053284 | R. Brown | X | | X |
| Alexander | Grow | 12300053298 | R. Brown | X | | X |
| Shane | Kachman | 12300053301 | R. Brown | X | | X |
| Grant | Kegley | 12300053293 | R. Brown | | X | |
| Paul | Kiernan | 12300053290 | R. Brown | X | | |
| Brandon | Kimpel | 12300053296 | R. Brown | X | | X |
| Jared | Moreno | 12300053302 | R. Brown | X | | X |
| Jacob | Pullen | 12300053292 | R. Brown | X | | X |
| David | Richey | 12300053299 | R. Brown | X | | X |
| Tyler | Salyer | 12300053280 | R. Brown | X | | X |
| Robert | Stillman | 12300053291 | R. Brown | X | | X |
| Nicholas | Stone | 12300053287 | R. Brown | X | | X |
| Devon | Trujillo | 12300053300 | R. Brown | | X | |
| Jacob | Walker | 12300053289 | R. Brown | X | | X |
| Joshua | Webb | 12300053281 | R. Brown | | X | X |
| Daniel | West | 12300053294 | R. Brown | X | | X |
| Chris | Bassford | 12300053186 | Radford | X | | X |
| Jase | Busby | 12300053187 | Radford | X | | X |
| Christopher | Conrad | 12300053213 | Radford | | X | |
| Alexander | Coren | 12300053204 | Radford | X | | X |
| John | Davis | 12300053193 | Radford | X | | |
| William | Dudley | 12300053184 | Radford | X | | X |
| Matthew | Fowler | 12300053196 | Radford | X | | X |
| Nels | Geary | 12300053208 | Radford | X | | X |
| Renny | Herbert | 12300053205 | Radford | | X | X |
| Shaun | Howe | 12300053185 | Radford | X | | X |
| Alex | Hyer | 12300053203 | Radford | X | | X |
| Jennifer | Jacks | 12300053212 | Radford | X | | X |
| Chris | Jaus | 12300053202 | Radford | | X | X |
| Andrew | Kosko | 12300053209 | Radford | X | | X |
| Joshua | Kranz | 12300053199 | Radford | | X | X |
| Alan | Lopez | 12300053188 | Radford | X | | X |
| Jonathan | Lopez | 12300053210 | Radford | X | | X |
| Natasha | Mccarthy | 12300053190 | Radford | X | | X |
| Andrew | Mitchell | 12300053198 | Radford | X | | |
| Michael | Mrgich | 12300053207 | Radford | | X | X |
| Darian | Stark | 12300053194 | Radford | X | | X |

13

| Defendant First Name | Defendant Last Name[1] | Case Number | Arbitrator | Accepted By Pop-Up or Purchase Before Nov. 1, 2024 | Accepted By Continued Use After Nov. 1, 2024 | Purchase On or After Nov. 1, 2024 |
|---|---|---|---|---|---|---|
| Lauren | Tyner | 12300053183 | Radford | X | | X |
| Lloyd | Walker | 12300053192 | Radford | X | | X |
| Mark | Wendt | 12300053189 | Radford | X | | X |
| Thomas | Byrd | 12300053796 | Reid | X | | X |
| James | Pruitt | 12300053236 | Reid | X | | X |
| Brian | Baskovich | 12300053047 | Rubin | X | | X |
| Jack | Cleary | 12300053042 | Rubin | | X | |
| Brennan | Coleman | 12300053049 | Rubin | X | | X |
| Max | Kurtz | 12300053041 | Rubin | | X | X |
| Scott | Lewis | 12300053048 | Rubin | X | | |
| Graysen | Mcgilligan | 12300053045 | Rubin | X | | X |
| Gavin | Moye | 12300053046 | Rubin | X | | X |
| Nathan | Pippin | 12300053050 | Rubin | X | | X |
| Cristian | Raynes | 12300053043 | Rubin | X | | X |
| Joshua | Rodriguez | 12300053044 | Rubin | X | | X |
| Aaron | Vaughn | 12300053040 | Rubin | X | | X |
| Daniel | Wirth | 12300053052 | Rubin | X | | X |
| Jacob | Barnhill | 12300053449 | Rundle | X | | X |
| Joshua | Bosman | 12300053252 | Rundle | | X | X |
| Michael | Calloni | 12300053439 | Rundle | X | | X |
| Peter | Cila | 12300053438 | Rundle | X | | X |
| Marcus | Crowley | 12300053255 | Rundle | | X | |
| Sean | Dolle | 12300053251 | Rundle | X | | X |
| Michael | Dufour | 12300053253 | Rundle | X | | |
| Paolo | Galupo | 12300053435 | Rundle | X | | X |
| Augustus | Gerbo | 12300053250 | Rundle | X | | X |
| Jared | Hardison | 12300053447 | Rundle | | X | X |
| Mark | Henley | 12300053432 | Rundle | X | | X |
| Jonathan | Hillman | 12300053258 | Rundle | X | | X |
| William | Jackson | 12300053429 | Rundle | X | | X |
| Kolby | Louks | 12300053443 | Rundle | X | | X |
| Martin | Mendez | 12300053441 | Rundle | | X | |
| Ray | Miller | 12300053440 | Rundle | X | | X |
| Jennifer A. | Nelson | 12300053436 | Rundle | | X | X |
| Andrew | Osborne | 12300053442 | Rundle | X | | X |
| Eric | Partlow | 12300053445 | Rundle | X | | |
| Morgan | Rushing | 12300053444 | Rundle | | X | X |
| Kai | Trobaugh | 12300053428 | Rundle | | X | |

| Defendant First Name | Defendant Last Name[1] | Case Number | Arbitrator | Accepted By Pop-Up or Purchase Before Nov. 1, 2024 | Accepted By Continued Use After Nov. 1, 2024 | Purchase On or After Nov. 1, 2024 |
|---|---|---|---|---|---|---|
| Jack | Uteg | 12300053431 | Rundle | | X | X |
| Veda | Valles | 12300053446 | Rundle | X | | |
| Brad | Wilson | 12300053434 | Rundle | X | | X |
| Stephen | Adams | 12300053378 | Samas | X | | X |
| David | Arroyo | 12300053371 | Samas | X | | X |
| Garrett | Athay | 12300053391 | Samas | X | | X |
| Edwin | Ayala | 12300053387 | Samas | X | | X |
| Brandan | Christner | 12300053366 | Samas | X | | X |
| Ethan | Cowan-wright | 12300053390 | Samas | X | | X |
| Sydney | Cutler-gilbert | 12300053377 | Samas | X | | X |
| Dylan | Fleckenstein | 12300053388 | Samas | X | | X |
| Tyler | Freehill | 12300053379 | Samas | X | | X |
| James | Gallant | 12300053385 | Samas | X | | X |
| Ralph | Gonzales | 12300053364 | Samas | X | | |
| Jacob | Graves | 12300053367 | Samas | X | | X |
| Andres | Hernandez | 12300053381 | Samas | X | | X |
| Travis | Hickey | 12300053382 | Samas | X | | X |
| Jared | Huggett | 12300053384 | Samas | X | | X |
| John | Marcotte | 12300053386 | Samas | X | | X |
| Sean | Mitchell | 12300053365 | Samas | X | | X |
| Daniel | Morris | 12300053369 | Samas | X | | X |
| Marcus | Pettway | 12300053374 | Samas | X | | X |
| Joel | Sandkamp | 12300053373 | Samas | X | | X |
| Zackery | Sessions | 12300053376 | Samas | | X | X |
| Brian | Sherwood | 12300053372 | Samas | X | | X |
| Alexander | Thomas | 12300053389 | Samas | X | | X |
| Ryan | Tutor | 12300053375 | Samas | | X | |
| Cade | Azarcon | 12300052876 | Schmitz | X | | X |
| Rob | Baldwin | 12300053514 | Schmitz | | X | X |
| Aaron | Briggs | 12300052874 | Schmitz | | X | X |
| Johnathon | Eimer | 12300052852 | Schmitz | | X | X |
| Natalie | Fields | 12300057456 | Schmitz | | X | X |
| Cameron | Lester | 12300052988 | Schmitz | X | | X |
| Ian | Trefren | 12300052864 | Schmitz | X | | X |
| Cary | Miller | 12300053005 | Silak | | X | |
| Leo | Blondel | 12300053602 | T. Brown | | X | X |
| Johnathon | Bush | 12300053599 | T. Brown | X | | X |
| Scott | Eskridge | 12300053598 | T. Brown | X | | X |

| Defendant First Name | Defendant Last Name[1] | Case Number | Arbitrator | Accepted By Pop-Up or Purchase Before Nov. 1, 2024 | Accepted By Continued Use After Nov. 1, 2024 | Purchase On or After Nov. 1, 2024 |
|---|---|---|---|---|---|---|
| Michael | Gualtieri | 12300053595 | T. Brown | X | | X |
| Evan | Piepho | 12300053600 | T. Brown | X | | X |
| Steven | Stucker | 12300053594 | T. Brown | | X | |
| William | Marcellus | 12300053350 | Thompson | X | | X |
| Isaac | Sellers | 12300053482 | Thompson | | X | |

# EXHIBIT 1

# MASS ARBITRATION STRATEGY AND INVESTMENT OPPORTUNITY

CONFIDENTIAL
PRESENTATION

1

# Mass Arbitration: Background

- In 2011, the Supreme Court held that contracts requiring mandatory arbitration and prohibiting class relief were permissible, provided they are not unconscionable. This ruling was reaffirmed in a 2013 decision.

- Many companies incorporated such clauses into their agreements believing it minimized exposure given the damages generally at stake for individual claimants.

- In an effort to avoid being deemed unconscionable, arbitration clauses adopted by companies seeking to avoid class actions routinely require the Company to pay all arbitration fees, limit circumstances where the Company can recover attorneys' fees, and allow the consumer to choose the manner of arbitration.

- Most arbitration providers — including the American Arbitration Association ("AAA") — charge a minimum of approximately $3,000 a case.

2

# Use of Mass Arbitration

- Over the past few years, a handful of firms — led by Keller Lenkner (now Keller Postman) — have weaponized consumer and employer arbitration clauses with favorable terms by aggregating thousands of claims through targeted advertising campaigns.

- Aggregating claims makes entrance fee to just defend prohibitively expensive and the vast majority of such fees are non-refundable under recent precedent.

- For example, if 75,000 demands for arbitration are filed with the AAA, the Company has 30-days to pay a largely non-refundable fee of $225 million as the cost of admission.

- Claimants' counsel will offer a settlement slightly less than the AAA charge — $2,900 per claim or so — attempting to induce a quick resolution.

3

# The Technique and Typical Results

- In a mass arbitration against Uber, Keller Postman brought ~60k claims claiming drivers were misclassified as contractors rather than employees.

- Uber's challenge to paying AAA fees was unsuccessful, requiring Uber to pay the ~$180 million upfront if it wished to defend the claims.

- With an upcoming IPO, Uber declined to engage in protracted litigation and settled the ~60k claims early for $146mm.

- Uber Eats was targeted in the past two years and sought to enjoin the AAA from requiring what it called "astronomical" fees. A New York appeals court recently denied the challenge finding that "[Uber] made the business decision to preclude class, collective, or representative claims in its arbitration agreement with consumers and AAA's fees are directly attributable to those decisions."

- In another case, Judge Breyer stated to Intuit "You knew what the rules of arbitration were. You knew all these things. And you elected to go to arbitration. . . . you are being hoisted by your own petard."

4

# Lifecycle of Investment

- **Stage 1 - Infrastructure:** $500,000 for software development, advertising and agreement templates, ethics opinions, hardware, marketing and survey consultants, and claim identification.

- **Stage 2 - Client Recruitment:** $2 to $150 advertising cost per client to recruit. Estimated spend of $3.75 million to recruit 75,000 clients at $50 an acquisition.

- **Stage 3 - Filing Cases:** Filing cost of $25,000 plus $50.02 a case, for an estimated filing cost of $3,776,500. (Never expended if an early settlement can be reached.)

- **Stage 4 - Active Arbitration:** Zaiger LLC litigates the first 20 cases, developing templates and models for use on additional cases. $12,000 a case after that to hire contract attorneys managed by Zaiger LLC to litigate disputes using templates and strategies. Most completed arbitrations seen to-date is 160, so total cost likely less than $1.7 million

5

# Target and Claim Identification

- **<u>Active Approach</u>:** Identifying 25 to 50 ripe targets, monitor news, and brainstorm claims.

  Identifying favorable arbitration terms including guaranteed refund of $50 filing fee, use of the AAA as an arbitration provider, application of California law, and language that suggests non-mutual collateral estoppel would apply.

  Ideal targets: (1) have valuation of ~$10 billion – high enough so they aren't judgment proof and can settle for hundreds of millions of dollars, but low enough that $200 million+ in arbitration fees creates an existential crisis forcing a quick settlement; and (2) a likely IPO or potential acquisition that will make carrying litigation risk unpalatable.

- **<u>Automated/Passive Supplemental Approach</u>:** Monitor court dockets for motions to compel class actions to arbitration, and copycat existing legal theories with potentially better advertising approach.

6

# Example Target: Valve Corporation

- Valve is an $11 billion company that dominates the market for digital PC game sales. Valve has over a billion customers with accounts. Valve's arbitration is administered by the AAA and specifies all filing fees will be reimbursed for claims under $10,000.

- In April 2021, game developers and consumers filed a putative class action claiming antitrust violations against Valve in the U.S District Court for the Western District of Washington.

- On October 25, 2021, Judge John Coughenor compelled the consumer claims to arbitration while retaining the developer claims. On May 5, 2022, Judge Coughenor denied (in part) Valve's motion to dismiss the developer plaintiffs' antitrust claims.

- If the proposed infrastructure were in place, today, we could immediately begin recruiting claimants to pursue the claims a federal judge has now ruled are well plead and potentially viable but for which *a billion* customers have been compelled to arbitration.

7

# New Merits-Based Approach

- The legal principles of non-mutual collateral estoppel prevent a company from relitigating a legal issue they have previously and unsuccessfully argued in another forum.

- This puts a company facing an arbitration in a situation where prevailing on the relevant legal issue is critical the first time it is argued, as a failure to prevail in that first case opens the door to preclusion in later cases.

- Rather than filing tens of thousands of cases at once, as is Keller's practice, a plaintiffs' firm could locate the strongest plaintiff from its pool, and file that case, and only that case, first.

- If that first, handpicked claim succeeds, all legal and factual issues that were inherent to the defendant should be resolved against them with respect to all other litigations, massively increasing the potential settlement value.

8

# Potential Returns

- Based on estimated costs of bundling claims, the initial Uber case would have cost Black Diamond ~$6.5 million and returned $43.8 million in less than a year (574% ROI).

- We believe a merits-based leverage approach — which can be implemented flexibly if a particularly strong claim presents itself — increases potential for even higher returns.

**Assumptions**:

> There is a 50% chance of winning the first case.
> The expected win, if there is one, is for a $10,000 judgment.
> A loss results in an average of a 25% reduction in claim settlement value.

- That results in an expected settlement value of $427.7 million. Black Diamond's recovery for funding at 30% would be ~$128.3 million (1874% ROI on $6.5 million investment).

9

# Stage 1 Infrastructure Calculations

- **Will Bucher Fixed Compensation:** $150,000/year.

- **Software Engineer:** Est. $20,000/month full-time cost for 3 months, followed by $10,000/month part-time cost thereafter. $150,000 first-year spend.

- **Ethics Opinion/Consulting:** Est. $25,000 first-year ($700/hour as needed thereafter).

- **Marketing Part-time Employee or Consultant:** Est. $50,000/year.

- **Survey Design Consulting:** Est. $25,000/year.

- **Paralegal Support:** Managing claims dockets and answering calls. Possible need to scale up and hire additional support as clients are recruited. Est. $50,000 first-year spend.

- **Hardware and Software**: Computer hardware, Bloomberg and PACER alerts, additional Westlaw seat(s). Est. $8,000/yearly, plus $2,000 in hardware expenses year-one.

# Stage 2 Client Recruitment Calculations

- Most difficult to predict because it would vary per case based on the claim and how common users of the relevant product or service were.

- Present estimates are based on the following:

  - A Partner at a Bay Area law firm specializing in plaintiffs-side mass employment litigation — who has handled more than 60,000 employment arbitrations — said costs were between $2 and $150 a case, depending on the pool of plaintiffs and the case.

  - In "Bitter End" litigation, attorneys at Keller took the position that their lawyer group would be losing money if they accepted any settlement below $675 a case. Based on their retainer agreement, Troxel LLC, who was responsible for bundling the claims, received 4% of the settlement value. That implies an acquisition cost of no more than $27 a claim.

  - Facebook advertising costs around $1.00 per click. If it takes an average of two clicked-on ads to recruit a plaintiff, that's $2.00 a claim. If it takes 150 ads, that's $150.

11

# Stage 3 Filing Calculations

- **AAA Fees:** $100 a case for the first 500 cases, than $50 a case. Functional cost of $50 a case plus $25,000.

- **Zaiger LLC Server Costs:** $0.02 a client in server expenses to maintain client database and case files.

12

# Stage 4 Active Arbitrations Calculations

- In the "Bitter End" litigation, 160 cases were litigated to a conclusion. That is most cases ever fully litigated in a mass arbitration based on the 9 examples we are aware of. Plaintiffs' requests for fees in those arbitrations showed that Quinn Emanuel spent between 80 and 160 hours litigating each case. That litigation was surprisingly bespoke, with every briefing including one or more new, revised, or redacted arguments.

- If a Zaiger LLC target engages in a "Bitter End" strategy, the first 20 cases could be litigated by the Firm creating templates for use on additional cases. We expect a contract attorney working off Zaiger LLC prepared templates could litigate a case in 80 hours.

- We estimate that contract attorneys of sufficient caliber to arbitrate individual cases charge $100 to $125/hour. A performance bonus of $2000 for successful arbitrations could also be used to incentivize quality and results.

- Staffing with contract attorneys comes out to between $8,000 and $12,000 a case. Given the most completed arbitrations seen to date is 160, total cost is likely less than $1.7 million. There is flexibility in how we could "staff up" if needed too.

13

# Uber Settlement Calculations

- **Costs**: $50 recruitment (assumed) and $50 filing for 60,000 claims, plus $500,000 infrastructure costs. Total costs $6.5 million
- Settlement of $146 million. Hypothetical 30% return to Black Diamond of $43.8 million. Profit of $37.3 million. (574% ROI in less than a year).
- Merits Approach Assumptions:
    - 50% chance of winning the first claim;
    - A win on the first claim increases the settlement value of each claim by $10,000;
        - For 60,000 claims, that's a $600 million increase in total settlement value.
    - A loss on the first claim reduces the settlement value of each remaining claim by 0% to 50%, depending on how the arbitrator rules and on what grounds, with an average reduction of 25%. The reduction is the result of <u>perceptions</u> by a defendant of likely liability, not due to the creation of precedent. Plaintiffs are <u>not</u> bound by outcome, so there is little, if any, formal legal risk from the loss.
- Predicted, merits based outcome: spend $6,500,000. Upon a win, settlement value would increase to $746 million. Upon a loss, the settlement value would shift to an average of $109.5 million. That results in an expected settlement value of $427.75 million.
- 30% of $427.75 million is $128.325 million. $121.825 million profit (1874% ROI).

14

# EXHIBIT 2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------x
ZAIGER LLC,                                                 Index. No.

                     Plaintiff,

     -against-                                              **COMPLAINT**

BUCHER LAW PLLC,
                   Defendant.
-------------------------------------------------------------------x

      Plaintiff Zaiger LLC ("**Zaiger**" or the "**Firm**") by its undersigned counsel, alleges against

defendant Bucher Law PLLC ("**Bucher Law**") as follows:

## OVERVIEW

      1.     This is an action for intentional interference with contractual relationships, unfair

competition, misappropriation, unjust enrichment, and aiding and abetting a breach of the duty of

loyalty and fraud, arising from the ongoing efforts of William Ward Bucher IV ("**Bucher**"), a

former employee who was terminated for cause, and his newly-created single-member law firm to

trick Firm clients into terminating their attorney-client relationship with Zaiger through a deceptive

and misleading campaign.

      2.     Defendant's deceptive campaign was made possible *only* by Bucher's (i)

misappropriation of confidential Firm files and (ii) perjury, when, before leaving the Firm, he

falsely attested that he did not possess any materials associated with his employment.

      3.     On February 28, 2023, Zaiger's Managing Principal, Jeffrey Zaiger, learned that

Bucher had snuck into the Firm's client database ("**Firm Database**") and removed Mr. Zaiger's

ability to control Firm employees' (including Bucher's) access rights without authorization. The

same day, Bucher tried to access and download names, addresses, email addresses, and mobile

phone numbers of about 48,000 Firm clients whose information was stored on the Firm Database.

INDEX NO. 154124/2023
RECEIVED NYSCEF: 05/09/2023

4.      Zaiger terminated Bucher for cause the next day for his actions and instructed him to turn over his laptop and all materials relating to his employment with the Firm. Bucher swore, under penalty of perjury, that he had turned over all such materials.

5.      Bucher's sworn declaration was false. At a minimum, Bucher retained a list he had downloaded with the personal information of nearly 34,000 Firm clients. Bucher is now using this list to barrage those Firm Clients with false and deceptive emails and text messages to lure them away from Zaiger to Bucher Law.

6.      Bucher Law's messages were both confusing and blatantly deceptive. They stated that there was "Action Required," that Bucher had been lead counsel responsible for their case while at Zaiger, and that if the clients still wished to seek compensation, they would need to answer a survey and confirm that they wanted their file transferred to Bucher Law. The messages implied that the clients' claims would not be pursued if their files remained with the Firm.

7.      On April 21, 2023, after learning that Bucher Law was sending repeated harassing and misleading email and text messages to the Firm's clients, Zaiger provided notice to those clients it understood Bucher Law had solicited. Zaiger explained (i) that it was aware of the communications from Bucher, (ii) that no action was required, and (iii) that, while choice of counsel was <u>absolutely</u> in their discretion, that they should know that Jeff Zaiger has been, and remains, the lead counsel on the cases together with its co-counsel, a highly regarded antitrust group led by an antitrust specialist with decades of experience.

8.      Upon learning that there was not, in fact, "Action Required" to continue being represented by Zaiger LLC and its co-counsel — as Defendant's messaging deceptively implied — droves of clients relayed that they felt tricked into believing they had to retain Defendant in order to continue being represented. Many of them also explained that they believed that Bucher's

2

conduct was unethical and breached their privacy.

9.      Bucher and Bucher Law have compounded the confusion caused by their "Action Required" messaging by including false and misleading information about Bucher's biography in the body of the messages and on his website.

10.      The messages stated, falsely, that Bucher "led the development and pursuit of mass arbitrations at Zaiger LLC, including your case," when, in fact, Bucher had worked almost exclusively on social media outreach and technical aspects of the mass arbitration strategies. Bucher performed very little substantive legal work at the Firm and had not personally filed or pursued a single mass arbitration before his termination for cause.

11.      Bucher also astoundingly claimed to have personally "won or settled over 70,000 consumer arbitrations during [his] career." Clients who contacted him were directed to his firm website, which boasted that he "litigated over 160 arbitrations that reached a final decision on the merits," and that he (in other words, Bucher himself) had "won them all." Bucher makes no reference to the fact that he was an associate working at a large firm as part of a team under the supervision of more senior lawyers. In fact, when Bucher sought employment at the Firm, his resume disclosed that he only drafted "20 final merits submissions" in those consumer arbitrations, and he claimed only to have "won . . . or secured an unconditional withdrawal with prejudice, in 40 arbitrations." Other work experience disclosed on Bucher's resume about his short tenure at his prior firm included drafting a single motion and advising one client on litigation risk.

12.      None of this was disclosed in Bucher's barrage of messages to the Firm's clients.

13.      Defendant's harassing, misleading and unethical solicitations must end. Plaintiff brings this action to recover damages including the substantial sums it spent marketing for the clients that Bucher Law has lured away with its campaign of deception, and any profits earned by

Defendant as a result of its wrongful acts. Plaintiff also seeks an injunction to end Defendant's impermissible deceptive messaging that, among other things, violates the New York Rules of Professional Conduct and has caused, and will cause further, irreparable harm to the Firm.

## PARTIES

14.     Zaiger LLC is a New York Limited Liability Company.

15.     Bucher Law PLLC is New York Professional Service Limited Liability Company with offices registered at 350 Northern Blvd, Ste 324-1519, Albany, NY 12204.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over the Defendant under CPLR §§ 301 and 302, as Defendant does business in New York and committed tortious acts causing injury in New York.

17.     Venue is proper in this Court under CPLR § 503, as Plaintiff is registered and maintains offices in New York County

## FACTUAL ALLEGATIONS

### Early Discussions and the Inception of the Firm's Mass Arbitration Practice

18.     In late 2021, a recruiter presented Bucher as a candidate for an associate position at Zaiger.

19.     In January 2022, Jeff Zaiger and his Partner, Judd Linden, interviewed Bucher to be a litigation associate.

20.     The next day, Bucher asked for a follow-up video conference with Mr. Zaiger. During that conference, Bucher explained the mass arbitration defenses he was part of as an associate at his then law firm — Fenwick & West LLP ("**Fenwick**") — and said he would like to take what he had learned at Fenwick and switch to the plaintiff's side of these mass arbitrations.

21.     Mr. Zaiger — having had extensive experience representing some of the nation's

4

Case 2:24-cv-01717-JNW    Document 78    Filed 08/21/25    Page 92 of 131

largest class action law firms in complex professional liability cases — became interested in mass arbitration practice as a way to combat large companies' ability to effectively insulate liability by using class action waivers in click agreements, a tactic endorsed by the U.S. Supreme Court's decisions in *AT&T Mobility LLC v. Conception*, 563 U.S. 333 (2011) and *American Express Co. v. Italian Colors Restaurant*, 570 U.S. 228 (2013).

22.     Bucher and Mr. Zaiger discussed the concept of the Firm starting a mass arbitration practice over several months.

23.     Much of Mr. Zaiger and Bucher's discussions involved whether Zaiger's primary client for whom the Firm serves as "Special Litigation Counsel" — a registered asset manager called Black Diamond Capital Management LLP ("**Black Diamond**") — would be interested in financing the mass arbitration strategy.

**Bucher's Offer of Employment and Work with the Firm**

24.     After confirming that Black Diamond was interested in potentially financing a mass arbitration practice, Zaiger extended Bucher an offer of employment on July 27, 2022, to "(i) lead the Firm's development and pursuit of mass arbitration strategies (the 'Strategies'), and (ii) work on [the Firm's] general litigation matters, as needed, at an hourly rate [of $220 per hour] to be paid on a quarterly basis."  (*See* **Ex. A**). To be clear, this did not mean that Bucher would serve as lead *counsel* on any Firm matter, including matters pursued as part of the Strategies. All matters at the Firm are prosecuted and defended under the direct supervision of Jeff Zaiger.

25.     Bucher's Offer Letter states:

This letter does not create any right to continued employment for any period of time. If you accept this offer, your employment with the Firm at all times will be "at will." This means that either you or the Firm may end your employment at any time for any reason or no reason, except that: (i) if the Firm terminates your employment, without cause, you will be entitled to compensation outlined in Compensation Section 1(b) for services rendered and work performed on cases pursued pursuant to the Strategies while employed,

5

on a *quantum meruit* basis, even if applicable revenue is received from such cases after termination, and (ii) if you elect to terminate your employment with the Firm, without cause, then you shall forfeit the right to compensation outlined in Compensation Section 1(b); *provided however*, that good faith discussions regarding resolution of any payment of compensation outlined in Compensation Section 1(b) shall occur in the event of either party terminating employment.

26.    Bucher began working at Zaiger LLC on August 15, 2022.

**The Valve Mass Arbitration Cases**

27.    Among the potential targets Mr. Zaiger and Bucher discussed in the months just before Bucher's hiring was a case against Valve Corporation ("**Valve**") arising from Valve's alleged anticompetitive practices relating to its PC Gaming platform called Steam.

28.    In the early days of Bucher's employment at the Firm, Mr. Zaiger directed him to a third-party company providing a cloud-based repository for managing many clients in mass arbitrations. The Firm engaged this third party to set up the Firm Database.

29.    Among the benefits of the Firm Database is its encrypted security for storing all client information, and the ability it provides to communicate with a large number of clients and provide case updates consistent with ethical obligations of the Firm's lawyers.

30.    The Firm used reasonable efforts to maintain the security of the identity and contact information of its clients. The Firm Database runs on a secure, isolated private cloud on Amazon Web Services with all Firm data encrypted both in transit and at rest. The CTO was specifically tasked with, among other things, ensuring the security of the database. While Bucher was employed at the Firm, only 5 people had access to the Firm Database. Further, even Bucher lacked the technical means to download a complete list of the Firm's clients prior to his departure. This is why, on the day before his termination, Bucher needed to ask the CTO for assistance in obtaining a full list of the firm's clients.

6

Case 2:24-cv-01717-JNW    Document 78    Filed 08/21/25    Page 94 of 131

31.     In late September 2022, Zaiger began retaining a small number of clients to bring individual arbitrations against Valve ("**Valve Arbitrations**") on to test the feasibility and cost of such cases.

32.     As part of its outreach to potential clients in the Valve Arbitrations, the Firm developed a retainer agreement for clients to sign and engage the Firm for representation in the Valve Arbitrations.[1]  Because this was the Firm's first mass arbitration case, the Firm's retainer agreement was developed at a substantial expense to the Firm, and the Firm spent many hours explaining the terms of its retainer agreement to prospective clients before they agreed to sign it. It also spent significant time discussing and negotiating terms of the agreement for specific clients before they agreed to sign.

33.     Bucher's principal task in the Valve Actions was in the Firm's digital outreach efforts; *e.g.*, paid advertisements on social media platforms ("**Firm Digital Outreach Efforts**") and the technical aspects to onboard clients. The Firm Digital Outreach Efforts and onboarding quickly grew and Messrs. Zaiger and Bucher began fielding questions from current and prospective clients. Given that Mr. Zaiger's office and cell phone numbers are listed on the Firm's website, he personally received hundreds of these calls and made a habit of fielding all calls that came in to address any questions or concerns from clients or prospective clients.

34.     As part of the Firm Digital Outreach Efforts, Bucher appeared in a few of the Firm's video advertisements, introducing himself as "Will, from Zaiger LLC." All of the marketing videos that Bucher appeared in stated that the video was an attorney advertisement by "Jeff Zaiger of Zaiger LLC."

---

[1]     The Firm has modified this agreement in various respects over time, but the vast majority of the agreement remains the same for all of the Firm's clients.

35.     During his tenure at Zaiger, Bucher did little legal work on the Valve Actions, and he did not file claims on behalf of any client in the Valve Actions.

**Staffing and Financing of the Valve Actions**

36.     Given the quick success of the Firm Digital Outreach Efforts and client retention rate, Mr. Zaiger was keenly focused on properly staffing the Valve Actions and finalizing financing for them. It was during this process that differences in Mr. Zaiger and Bucher's philosophies came into sharp relief.

37.     **Discussions With Potential Co-Counsel.** Since the inception of the Firm in 2019, Zaiger has routinely worked as co-counsel with some of the best trial lawyers in the country, and Mr. Zaiger believed that a similar approach should be used in the Valve Actions. To that end, Mr. Zaiger had many discussions with a partner and friend at a preeminent antitrust firm about potentially serving as co-counsel on the Valve Actions. Mr. Zaiger had worked previously with this firm, values the firm's work, and believed it could add tremendous value to the cases.

38.     Mr. Zaiger included Bucher in certain discussions with this partner, and this eventually led to a rough proposal of a payment structure for a co-counsel relationship. Bucher's view was that the firm's ask to serve as co-counsel was too high, and that Zaiger should not give up so much potential upside.

39.     At this time, Bucher had also grown increasingly frustrated with ongoing efforts to secure financing for the Valve Actions, and Mr. Zaiger elected to table the issue of co-counsel while he continued to devote significant time to addressing financing for the Valve Actions.

40.     **Discussions Regarding Financing.** Bucher became an employee of the Firm knowing that the mass arbitration strategies were being developed with the anticipation that Black Diamond would participate in financing.

8

41.    As Black Diamond's "Special Litigation Counsel," the Firm has offices within Black Diamond, and works on many litigation matters for Black Diamond, its managed funds, portfolio companies, affiliates and investment partners.

42.    Prior to being hired, Bucher met with several Black Diamond employees, and Mr. Zaiger and Bucher discussed Black Diamond's potential role as financers many times before his hiring.

43.    In the fall of 2022, securing financing was critical for Zaiger given that, at this point in time, the Firm, and not Bucher, had paid hundreds of thousands of dollars towards the mass arbitration strategies and Valve Actions including for, among other things, (i) the Firm Digital Outreach Efforts, (ii) Bucher's annual salary of $150,000.00, (iii) a recruiter fee of $30,000 in connection with Bucher's placement, (iv) Bucher's monthly health care expenses, (v) additional overhead for the Firm's research subscriptions, document management platform, timekeeping software, and daily lunches provided for Bucher, and (vi) monthly costs for the Firm Database.

44.    Mr. Zaiger agreed to speak to other potential sources of alternative financing but made clear to Bucher that he would keep Black Diamond informed of these efforts and would give them an opportunity to participate in funding. From the beginning of Bucher's employment, Mr. Zaiger was clear that he did not want the Firm to be exclusively a contingency-based model. And so it was critical not to alienate one of the Firm's largest clients.

**Alternative Financing and Bucher's Alienation of an Important Firm Client**

45.    Black Diamond is an important Firm client and a sophisticated consumer of legal services with decades of hiring and working with some of the most prominent litigators and law firms in the country. During his short tenure at the Firm, Bucher managed to alienate Black Diamond. As a relatively inexperienced litigator (with only 8 years of experience as an associate

9

at two large law firms), Bucher would regularly express views in meetings and conversations with Black Diamond principals with what can only be described as a degree of arrogance and bravado that were not matched by his skills. Over time, it became clear to Zaiger that Bucher's advice was not well received.

46.    While Mr. Zaiger and Bucher were in discussions with alternative financing sources, Black Diamond's principals told Zaiger that they did not trust Bucher, lacked confidence in his abilities as a lawyer, and thought he was brash and arrogant for a 33-year-old and inexperienced lawyer. It became clear that Bucher's attitude was threatening the Firm's relationship with Black Diamond, and that Black Diamond was not inclined to continue working with the Firm if Bucher was one of its attorneys.

47.    On the morning of February 27, 2023, Mr. Zaiger and Linden met with Bucher and explained that they intended to preserve their relationship with Black Diamond but could explore a path forward involving the Firm continuing to provide legal services to Black Diamond with Bucher remaining an attorney at the Firm.

**Events of February 28 and March 1, 2023**

48.    Throughout the day on February 28, 2023, Mr. Zaiger spoke to several Black Diamond principals and its General Counsel to try to work out a structure where it was comfortable with the Firm continuing as Special Litigation Counsel with Bucher remaining at the Firm.

49.    At or about 7:30 p.m. on February 28, 2023, Messrs. Linden and Bucher spoke by telephone. Bucher insisted to know what was going on, adding that if he didn't have a future at Zaiger LLC that he "need[s] to plan for how to take the clients with me." Mr. Linden relayed Bucher's comments to Mr. Zaiger after this call.

50.    Concerned with what Mr. Linden had just told him, Mr. Zaiger logged in to the

Firm Database and discovered that his permissions had been surreptitiously changed: he no longer had control over the permissions settings and could not alter Bucher's access rights. Mr. Zaiger immediately called the Chief Technology Officer for the Firm Database to determine why his permissions were not working, but he did not get through to him.

51.     Mr. Zaiger then called and confronted Bucher about his comments to Mr. Linden. Bucher said that Mr. Linden must have misunderstood. Bucher claimed that he meant that he wanted to help the Firm identify new billable clients aside from Black Diamond. Bucher insisted on hearing that Mr. Zaiger believe he was telling the truth.

52.     Mr. Zaiger had been working all day to find a way for Bucher to stay at the Firm. His conduct and behavior, however, had become deeply troubling. During this discussion, Mr. Zaiger indicated that the parties should begin negotiating a separation.  Bucher asked for an in-person meeting at his apartment to discuss the matter.

53.     Around 9:00 p.m. on February 28, 2023, Messrs. Zaiger and Linden met with Bucher. During that discussion, Mr. Zaiger told Bucher that the Firm wished to discuss a professional and amicable separation with him. Mr. Zaiger said he would reach out the next day to Bucher to start discussions over the terms. Bucher was not terminated on February 28 — the parties discussed negotiating a separation and that Mr. Zaiger wanted it to be professional and amicable — but if Bucher had been terminated, the Firm had more than sufficient grounds to terminate him for cause.

54.     Following the meeting, Mr. Zaiger returned to his office and received a call from the Chief Technology Officer for the Firm Database. The CTO confirmed two things: (1) Bucher had changed Mr. Zaiger's administration permission settings without authorization so that Bucher was the only person at the Firm with full access rights to the Firm Database; and (2) around

11

mid-day Bucher had emailed the CTO to help him export an Excel file of all Zaiger's current clients in the Valve Actions including details of about 48,000 individuals.

55.    Upon hearing this, Mr. Zaiger instructed the CTO to terminate Mr. Bucher's access to the Firm Database immediately. The CTO did so.

56.    Mr. Zaiger confronted Bucher with what he learned shortly thereafter. While at first Bucher tried to defend his actions, he later called Mr. Zaiger on his drive home to apologize. Bucher admitted that he should not have manipulated the access rights but said he was "freaking out and trying to think of something to do."

57.    Learning that Bucher had, only a few hours earlier, outright lied to Mr. Zaiger, multiple times, was the last straw.

## March 1, 2023, Termination for Cause and Bucher's Perjurious Declaration

58.    On the morning of March 1, 2023, Messrs. Zaiger and Linden met with Bucher and gave him a letter terminating him for cause. *See* **Ex. B**.

59.    Bucher was asked to return "all Firm property, information, work product, files, [his] Firm-issued laptop, any and all hard drives, thumb drives, files, folders, tangible and intangible property of the Firm and all similar information belonging to the Firm or arising out of or related [to his] prior employment with the Firm in [his] possession custody or control." Bucher "declared until penalty of perjury" that he returned all such material to Mr. Zaiger on March 1, 2023. *See* **Ex. C** ("**Declaration**").

## Zaiger Brings on Co-Counsel and Secures Financing for Valve Actions

60.    After Bucher's termination, Mr. Zaiger focused on finding top tier co-counsel to work with on the Valve Actions and securing financing. Mr. Zaiger accomplished both in just weeks.

12

61.    Zaiger engaged a renowned antitrust group from an international law firm led by one of the nation's leading antitrust lawyers to serve as co-counsel on the Valve Actions. On March 24, 2023, Zaiger advised its clients of this co-counsel relationship while also informing them simply that Bucher was no longer practicing at the Firm.

62.    On March 24, 2023, Zaiger and its co-counsel put Valve on notice of claims for its clients triggering a required good faith negotiating window.

63.    The next week, Zaiger finalized financing for the Valve Actions.

**The Zaiger Firm Notifies Clients of Bucher's Departure**

64.    In the three weeks following Bucher's termination, the Firm and Bucher had several communications regarding his separation from the Firm.  At no time during any of these discussions did Bucher indicate any intention to attempt to independently represent any clients in the Valve Actions.  Bucher did not have a law firm and to the Firm's knowledge had no funding. During this time period, he never requested a client list or asked to communicate with any Firm clients.

65.    On March 24-25, 2023, consistent with its obligations under Rule 1.4 of the New York and Connecticut Rules of Professional Conduct, the Firm advised its clients about new developments in the Valve Cases. In that client notice, the Firm notified all clients of Bucher's departure in a in a neutral, professional way, stating that "attorney William Bucher is no longer practicing at Zaiger LLC."  Upon receiving this communication, no client requested contact information for Bucher or asked to transfer their file to Bucher.

**Bucher Demands Client Contact Information for 48,000 Firm Clients**

66.    On March 26, 2023 — nearly a month after his termination from the Firm — Bucher, through letter from his counsel, for the first time purported to "demand" a list of the Firm's

13

Case 2:24-cv-01717-JNW    Document 78    Filed 08/21/25    Page 101 of 131

48,000 clients as of the date of Bucher's termination. Bucher claimed he had an "unconditional right to it and because the clients have an unconditional right to make an informed choice about who will represent them." The letter called for the list to be provided by close of business the next day and, if not provided, Bucher would "conclude that Zaiger LLC and Mr. Zaiger are actively thwarting Mr. Bucher's duty and right to communicate with these clients, in dereliction of their own ethical duties." *See* **Ex. D**.

67.     On March 29, 2023, counsel for Zaiger responded to Bucher's lawyer that, among other things, Bucher was in no position to make a demand given his serious breach of legal obligations and fiduciary duties resulting in his termination. The March 29 letter also clarified that Bucher's suggestion — that he had the duty and right to contact 48,000 Firm clients — was not grounded in Rule 1.4. That Rule suggests that there be a notice from a departing lawyer when the departure is in the ordinary course and the departing lawyer had significant contact and a direct professional relationship with *specific* clients.[2] Zaiger invited Bucher to identify the names of any clients with whom he played a significant personal role in the Firm's delivery of legal services on the Valve Actions and agreed that it would work with Bucher to jointly communicate to any such clients. *See* **Ex. E**.

68.     Zaiger's offer to communicate with any such clients was met with silence.

---

[2]     *See* ABA Formal Opinion 489, *Obligations Related to Notice Where Lawyers Change Firms* (2019) ("Departing lawyers should communicate with all <u>clients with whom the departing lawyer has had significant client contact</u> that the lawyer intends to change firms.") (emphasis added); ABA Formal Opinion 99-414, *Ethical Obligations When a Lawyer Changes Firms* (1999) (addressing "[t]he <u>impending</u> departure of a lawyer <u>who is responsible for the client's representation or who plays a principal role in the law firm's delivery of legal services currently in a matter</u> (i.e., the lawyer's current clients), is information that may affect the status of a client's matter as contemplated by Rule 1.4.") (emphasis added).

14

**Bucher Launches a Misleading Campaign to Trick Firm Clients to Switch Firms**

69.     Zaiger did not know that Bucher's sworn Declaration (*see* Ex. C) was false. Bucher, in fact, retained a list with names, addresses, email addresses, and cell phone numbers of 33,335 Firm clients, despite swearing under oath that he had not.

70.     On or about April 10, 2023, Bucher filed a meritless lawsuit against Zaiger, Black Diamond, and Black Diamond's principal which, among other things, purports to disclose confidential internal Firm discussions and strategy about the Valve Actions in blatant disregard of the confidences of clients he says he represented.

71.     After filing a lawsuit, Bucher Law sent the following email to Firm clients on the list Bucher retained:

**To:** [Client Name]
**Subject: Your Case Against Valve – Action Required**
**Reply-To:** Will Bucher william@bucherlawfirm.com

[Client Name],

I am Will Bucher, and until recently, I led the development and pursuit of mass arbitrations at Zaiger LLC, including your case against Valve for their anticompetitive conduct on the Steam platform. I have recently departed Zaiger LLC, and, having been engaged as your counsel while at Zaiger LLC, you have a choice to stay with Zaiger LLC or for me to continue representing you in your claim against Valve. You can make your selection by clicking here.

My new firm, Bucher Law PLLC, is devoted solely to pursuing consumer arbitrations like yours. I have extensive experience working on such cases, having won or settled over 70,000 consumer arbitrations during my career. As chair of the Digital Games & New Media chapter of the American Bar Association, an active member of the Video Game Bar Association, and long-time Steam user myself, I understand the factual and legal issues relevant to the case, and would be honored to continue serving as your attorney in my new role at Bucher Law PLLC.

In addition, I have also engaged the law firm of AFN Law PLLC, who has represented millions of consumers in class actions, as my co-counsel in any arbitrations I bring against Valve, including yours should you choose to stay with me as counsel.

As the client, it is your decision whether to provide authorization for Zaiger LLC to retain your file or for Will Bucher to continue representing you at Bucher Law PLLC. Please indicate your decision by clicking this link.

15

If you have any questions or would like additional information, you can reply to this email.

Best regards,
Will Bucher
Bucher Law PLLC
350 Northern Blvd
STE 324 -1519
Albany, NY 12204-1000
Admitted to Practice in New York

72.    The survey linked to Bucher's email provided these options, with the default

option pre-selected:



*See* **Ex. F**.

73.    Bucher Law also sent text messages to each Firm client on the list Bucher retained

regarding the supposed "Action Required."

74.    Bucher Law's emails and survey were misleading and deceptive. Among things:

- The subject line states that there is "Action Required" implying that Zaiger's representation, or the clients' cases, would cease if they did not fill out the survey;

- It falsely claims that the clients engaged Bucher personally as counsel when all client engagement agreements were with Zaiger LLC;

- It misleadingly claims that Bucher personally won or settled over 70,000 consumer arbitrations during his career without any clarification that he was an associate on a team

16

defending such cases at Fenwick;

- It characterizes the client's choice as "provid[ing] authorization for Zaiger LLC to *retain your file* or for Will Bucher to *continue representing you*";

- Bucher Law's ballot ("Choice of Counsel") misleadingly steers the client to Bucher's desired option, describing the default option as: "I want Will Bucher to continue to *seek compensation* for me as my lawyer" and, in contrast, the option to continue with Zaiger makes no mention of compensation.

75. What's more, Zaiger learned that Bucher Law followed up its misleading and deceptive messaging by circulating a transition agreement purporting to authorize Bucher Law to terminate the attorney-client relationship with the Firm (notwithstanding that the Firm's engagement letter includes a specific procedure for clients to terminate).[3] Bucher Law did not even bother to generate its own retainer agreement. Instead, it took Zaiger's. Rather than require the Firm's clients to enter into a *new* retainer agreement with Bucher Law, Defendant sent each client that selected that he or she wished for Bucher to "continue to seek compensation for me" a letter to sign:

> This document serves as an agreement to continue your representation in [the Valve] case on the same terms as under your agreement with Zaiger LLC, which is hereby incorporated by reference, except that Bucher Law PLLC will be the attorneys instead of Zaiger LLC.

*See* **Ex. G** (Defendant's Transition Agreement).

76. So after stealing the Firm's client list to improperly solicit the Firm's clients, Bucher Law is attempting to reap the benefits of the time and expense of the Firm's development

---

[3] The Firm's engagement letter provides for the following procedure for clients who wish to terminate: "You may terminate attorneys at any time by emailing steamclaims@zaigerllc.com from the email you provided starting the subject line with ATTORNEY TERMINATION followed by your name. If you do, you agree that the attorneys are entitled to a reasonable fee and reimbursement of costs for the work performed prior to termination." In practice, the Firm honors any reasonable manifestation of a client's intent to terminate the Firm received directly from the client.

17

Case 2:24-cv-01717-JNW    Document 78    Filed 08/21/25    Page 105 of 131

of its retainer agreement — and the countless hours it spent (a) working with ethics counsel in preparing the agreement (b) explaining the terms of its agreement to prospective clients before they agreed to sign it; (c) *amending* its retainer agreement for prospective clients who requested changes to the agreement before signing; and (d) following up with prospective clients with reminders to sign the retainer agreement.

77.    Bucher Law also directed Firm clients to its new website, which includes yet more misleading and deceptive comments that violate Rule 7.1 of the New York Rules of Professional Conduct and General Business Law §§ 349 and 350. For example, it claims Bucher "has handled over 70,000 consumer arbitrations," that Bucher "has also litigated over 160 arbitrations that reached a final decision on the merits," and that "Will Bucher won them all."[4] There is no mention that Bucher worked under senior members of Fenwick's team on these cases that he takes sole credit for or that he only led the so-called "strike team" with respect to a fraction of the arbitrations that were litigated — omissions making his statements materially misleading.

78.    On April 14, 2023, Bucher emailed Mr. Zaiger a spreadsheet described as "a list of clients who have competed the ballot election and have elected to continue with me at Bucher Law PLLC" and requested that the Zaiger "transfer" the "files and data" of about 9,100 Firm clients to Bucher Law's database.

79.    On April 18, 2023, Zaiger advised Defendant's counsel that the Firm could not comply with its request given, among other things, the lack of any *affirmative manifestation* — delivered directly to the Firm — of the client's wish to terminate his or her engagement with the Firm and affirmative direction to transfer the client's file somewhere else. The same letter also noted that the wording of Bucher Law's solicitation message and survey was so misleading and

---

[4]    *See* https://www.bucherlawfirm.com/ (last visited April 23, 2023).

18

Case 2:24-cv-01717-JNW    Document 78    Filed 08/21/25    Page 106 of 131

slanted that it casts doubt on whether any election was fully informed.

80.     Given the misleading and deceptive nature of Bucher Law's communications to Firm clients, Zaiger initiated its own survey to find out whether the approximately 9,100 Firm clients had provided informed consent to terminate their attorney-client relationship with the Firm and authorize the transfer of their files to Bucher Law.

81.     Only about a third of the clients provided on Bucher's list (of supposedly consenting clients) responded that they, in fact, wished to terminate the attorney-client relationship with Zaiger LLC and transition their files to Bucher Law.

**Defendant Persists in Its Misleading Campaign to Trick Firm Clients to Switch Firms**

82.     Despite Plaintiff putting Bucher Law on notice of the misleading and deceptive nature of its email and text messages to Firm clients, over the next several days, Bucher Law kept sending the same misleading follow-up emails and text messages claiming that there was "Action Required."

83.     Upon learning about Defendant's ongoing deceptive messaging, Zaiger sent a message to the approximately 25,000 clients — the 34,000 on the list in Bucher's possession less the 9,100 that Bucher had previously communicated had asked for their files to be transferred to Bucher Law — explaining that choice of counsel was absolutely in their control, but that no action was, in fact, required if they wished for the Firm and its co-counsel to continue representing them.

84.     Since Bucher began his campaign, well over a hundred clients have reached out to Zaiger to complain that they were misled and deceived by Bucher's solicitation and/or felt Bucher's emails were a breach of their privacy and grossly unethical.[5] Bucher knows that these

---

[5]     Any Firm clients who have provided a clear direction to terminate their attorney-client relationship and transition to Bucher have been transferred over to Bucher Law. Others who

Case 2:24-cv-01717-JNW    Document 78    Filed 08/21/25    Page 107 of 131

clients are (at best) confused or (at worst) deceived. Yet Bucher continues to send the same "Action Required" messages.

85.     As of April 23, 2023, Bucher claims that about 10,000 Firm clients have authorized him to terminate the attorney-client relationship with the Firm and transition the files to him.

86.     In sum, during his short tenure at Zaiger, Bucher alienated one of the Firm's major clients, retained a list with 34,000 Firm clients' personal information and then lied about having such a list in a declaration "under penalty of perjury," and he and his new law firm proceeded to mislead and confuse Firm clients into purportedly terminating their engagement with Zaiger. They continue to do so. Defendant's deception and unethical conduct has created hopeless confusion as to whether Firm clients have provided informed consent to transfer files or were misled by Defendant. The Firm's damages continue to grow as Bucher Law's campaign continues.

**FIRST CAUSE OF ACTION**
**(Tortious Interference With Contractual Relations)**

87.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth at length herein.

88.     Zaiger has or had valid and enforceable contracts with its clients ("**Clients**").

89.     Defendant knew Zaiger has or had valid and enforceable contacts with the Clients.

90.     Bucher Law induced the Clients to breach the contracts using wrongful means, including but not limited to:

   a.    retaining a list of the Clients after Bucher swore under penalty of perjury that he returned all property "arising out of or related [to his] prior employment with the Firm in [his] possession custody or control."

_____

Defendant provided a transfer authorization form have also been transferred, but the true intent of many of these clients remains in doubt given Defendant's misleading messaging.

20

    b.  sending the Clients repeated automated emails and text messages with the subject "Action Required" implying that representation would cease absent an election.

    c.  falsely claiming that Bucher, and not the Firm, was the clients' lawyer.

    d.  misrepresenting Bucher's experience to the Clients, including by stating that he "has handled over 70,000 consumer arbitrations," that he "has also litigated over 160 arbitrations that reached a final decision on the merits," and that "Will Bucher won them all."

    e.  misleading the Clients into filling out a survey that suggested that their claims would be pursued only if they elected to transfer their files to Bucher Law.

91.    As a result of this conduct, Zaiger lost its representation of *at least* over 9,100 clients who provided direction in some manner to terminate their attorney-client relationship with the Firm as a direct and proximate cause of Defendant's deceitful campaign. This includes the loss of potential contingency fees as well as costs, disbursements and expenditures incurred to date.

92.    As a result of Defendant's conduct in conspiring to procure the Clients' breach of their retainer agreements, Zaiger has been damaged in an amount to be determined at trial.

93.    As a result of Defendant's wanton, knowing and willful conduct alleged herein, Zaiger seeks all damages which would flow from such conduct, including, but not limited to, punitive damages.

## SECOND CAUSE OF ACTION
### (Unfair Competition)

94.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth at length herein.

95.    By the conduct alleged herein, Bucher Law has intentionally, knowingly and

Case 2:24-cv-01717-JNW    Document 78    Filed 08/21/25    Page 109 of 131

maliciously competed unfairly with Zaiger, and continues to do so.

96.    By improperly soliciting Zaiger's clients, Bucher Law has misappropriated Zaiger's labors, skills, expenditures and goodwill, and has done so in bad faith.

97.    As a result of Bucher Law's conduct in improperly soliciting Zaiger's clients, Zaiger has been damaged in an amount to be determined at trial.

98.    As a result of Bucher Law's wanton, knowing and willful conduct alleged herein, Zaiger seeks all damages which would flow from such conduct, including, but not limited to, punitive damages.

## THIRD CAUSE OF ACTION
### (Aiding and Abetting Breach of the Duty of Loyalty)

99.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth at length herein.

100.    As an employee of Zaiger, Bucher owed the Firm a duty of utmost loyalty in all dealings with the Firm and its clients.

101.    Through the foregoing conduct, which began when Bucher was still in the Firm's employ, Bucher breached that duty by acting directly against Zaiger's interests and improperly competing with Zaiger while he was still employed by Zaiger.

102.    Bucher Law aided and abetted Bucher's breach of fiduciary duty by knowingly accepting Bucher's confidential information taken from Zaiger while in its employ, and using it to unfairly compete with Zaiger with misleading and deceptive attempts to solicit Zaiger's Clients.

103.    Bucher Law's aiding and abetting Bucher's breach of the duty of loyalty has damaged Zaiger in an amount to be determined at trial.

104.    As a result of Bucher Law's wanton, knowing and willful conduct alleged herein, Zaiger seeks all damages which would flow from such conduct, including, but not limited to,

22

punitive damages.

## FOURTH CAUSE OF ACTION
### (Aiding and Abetting Fraud)

105.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth at length herein.

106.    On March 1, 2023, Bucher was terminated for cause for his actions and instructed to turn over "all Firm property, information, work product, files, [his] Firm-issued laptop, any and all hard drives, thumb drives, files, folders, tangible and intangible property of the Firm and all similar information belonging to the Firm  or arising out of or related [to his] prior employment with the Firm in [his] possession custody or control." Bucher "declared under penalty of perjury" that he returned all such material to Mr. Zaiger.

107.    Mr. Bucher made that representation in a sworn declaration dated March 1, 2023.

108.    Zaiger relied on this representation in electing not to take further efforts to prevent Bucher from soliciting the Firm's clients.

109.    Unbeknownst to the Firm, Bucher's representation was knowingly false, as Mr. Bucher retained a list of about 34,000 of the Firm's clients. Bucher's misrepresentation was intended to induce the Firm not to take further efforts to prevent Bucher from soliciting the Firm's clients.

110.    As a direct and proximate cause of Bucher's misrepresentation, Bucher managed to carry out his deceptive campaign to trick the Firm's clients into terminating their attorney-client relationship with Zaiger.

111.    Bucher Law aided and abetted Bucher's fraud by knowingly accepting Bucher's confidential information taken from Zaiger while in its employ, and using it to unfairly compete with Zaiger with misleading and deceptive attempts to solicit Zaiger's clients.

23

112.    As a result of Bucher's breach, Zaiger has been damaged in an amount to be determined at trial.

113.    As a result of Bucher's wanton, knowing and willful conduct alleged herein, Zaiger seeks all damages which would flow from such conduct, including, but not limited to, punitive damages.

## FIFTH CAUSE OF ACTION
### (Misappropriation)

114.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth at length herein.

115.    The Firm's client list, which includes the contact information of its clients, is confidential.

116.    The Firm expended significant time and expense to develop and safeguard the client list, as the mass arbitration strategy depends on amassing a large number of individual clients.

117.    Through its conduct, Defendant unlawfully misappropriated the Firm's client list. They did so through improper means, including through Bucher's false declaration "until penalty of perjury" that he returned all materials "arising out of or related [to his] prior employment with the Firm in [his] possession custody or control."

118.    Defendant's conduct was willful.

119.    As a direct and proximate result of Defendant's unlawful actions, Zaiger has been damaged in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION
### (Unjust Enrichment)

120.    Plaintiff repeats and realleges each and every allegation contained in the foregoing

24

Case 2:24-cv-01717-JNW    Document 78    Filed 08/21/25    Page 112 of 131

paragraphs as if set forth at length herein.

121.  As alleged herein, Defendant has been enriched by reaping the benefits of the Firm's extraordinary efforts and costs to retain the Clients.

122.  Having, through deceitful means, entered into fee agreements with many of the Firm's clients, Defendant has been, and are likely to be, unjustly enriched thereby.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

1.  On all Plaintiff's Cause of Action, damages in an amount to be determined at trial, plus statutory interest;

2.  Temporary, preliminary, and permanent injunctive relief;

3.  Recognition of Plaintiff's lien(s) with respect to clients transferred to Defendant pursuant to New York Judiciary Law § 475, the Firm's retainer letters, as well as any other applicable statutes or common law; and,

4.  Such other relief as this Court may deem just and proper.

Dated:  New York, NY
        May 9, 2023

Respectfully submitted,

**TUTTLE YICK LLP**

By:  /s/ Gregory O. Tuttle
     Gregory O. Tuttle
     Alex Banzhaf
     352 Seventh Avenue, 14th Floor
     New York, New York 10001
     (646) 606-2409

     *Attorneys for Plaintiff*

25

# EXHIBIT 3



Install Steam     login     |     language

**STORE**   COMMUNITY   ABOUT   SUPPORT

Home

# Steam Subscriber Agreement



---

## STEAM® SUBSCRIBER AGREEMENT

Table of contents:

1. Registration as a subscriber; application of terms to you; your account; conclusion of agreements
2. Licenses
3. Billing, payment and other subscriptions
4. Online conduct, cheating and illegal behavior
5. Third-party content
6. User generated content
7. Disclaimers; limitation of liability; no guarantees; limited warranty & agreement
8. Amendments to this agreement
9. Term and termination
10. Applicable law/jurisdiction
11. Miscellaneous

This Steam Subscriber Agreement ("Agreement") is a legal document that explains your rights and obligations as a subscriber of Steam from Valve Corporation, a corporation under the laws of the State of Washington, with its registered office at 10400 NE 4th St., Bellevue, WA 98004, United States, registered with the Washington Secretary of State under number 60 22 90 773, VAT ID No. EU 8260 00671 ("Valve"). Please read it carefully.

1. REGISTRATION AS A SUBSCRIBER; APPLICATION OF TERMS TO YOU; YOUR ACCOUNT, ACCEPTANCE OF AGREEMENTS ▲

Steam is an online service offered by Valve.

You become a subscriber of Steam ("Subscriber") by completing the registration of a Steam user account. This Agreement takes effect as soon as you indicate your acceptance of these terms. You may not become a Subscriber if you are under the age of 13. Steam is not intended for children under 13 and Valve will not knowingly collect personal information from children under the age of 13. Additional age restrictions may apply in your country.

A. Contracting Party

For any interaction with Steam your contractual relationship is with Valve. Except as otherwise indicated herein or at the time of the transaction (such as in the case of purchases from another Subscriber in a Subscription Marketplace), any transactions for Subscriptions (as defined below) you make on Steam are being made from Valve.

B. Hardware, Subscriptions; Content and Services

As a Subscriber you may obtain access to certain services, software and content available to Subscribers or purchase certain Hardware (as defined below) on Steam. The Steam client software and any other software, content, and updates you download or access via Steam, including but not limited to Valve or third-party video games and in-game content, software associated with Hardware and any virtual items you trade, sell or purchase in a Steam Subscription Marketplace are referred to in this Agreement as "Content and Services;" the rights to access and/or use any Content and Services accessible through Steam are referred to in this Agreement as "Subscriptions."

Each Subscription allows you to access particular Content and Services. Some Subscriptions may impose additional terms specific to that Subscription ("Subscription Terms") (for example, an end user license agreement specific to a particular game, or terms of use specific to a particular product or feature of Steam). Also, additional terms (for example, payment and billing procedures) may be posted on http://www.steampowered.com or within the Steam service ("Rules of Use"). Rules of Use include the Steam Online Conduct Rules http://steampowered.com/index.php?area=online_conduct and the Steam Refund Policy http://store.steampowered.com/steam_refunds. The Subscription Terms, the Rules of Use, and the Valve Privacy Policy (which can be found at http://www.valvesoftware.com/privacy.htm) are binding on you once you indicate your acceptance of them or of this Agreement, or otherwise become bound by them as described in Section 8 (Amendments to this Agreement).

C. Your Account

When you complete Steam's registration process, you create a Steam account ("Account"). Your Account may also include billing information you provide to Valve for transactions concerning Subscriptions, Content and Services and the purchase of any physical goods through Steam ("Hardware"). You may not reveal, share or otherwise allow others to use your password or Account except as otherwise specifically authorized by Valve. You are responsible for the confidentiality of your login and password and for the security of your computer system. Valve is not responsible for the use of your password and Account or for all of the communication and activity on Steam that results from use of your login name and password by you, or by any person to whom you may have intentionally or by negligence disclosed your login and/or password in violation of this confidentiality provision. Unless it results from Valve's negligence or fault, Valve is not responsible for the use of your Account by a person who fraudulently used your login and password without your permission. If you believe that the confidentiality of your login and/or password may have been compromised, you must notify Valve via the support form (https://support.steampowered.com/newticket.php) without any delay.

Your Account, including any information pertaining to it (e.g.: contact information, billing information, Account history and Subscriptions, etc.), is strictly personal. You may therefore not sell or charge others for the right to use your Account, or otherwise transfer your Account, nor may you sell, charge others for the right to use, or transfer any Subscriptions other than if and as expressly permitted by this Agreement (including any Subscription Terms or Rules of Use) or as otherwise specifically permitted by Valve.

D. Acceptance of Agreements

Your order through Steam is an offer to Valve to agree on the delivery of the ordered Subscriptions, Content and Services and/or Hardware (the "Product(s)") in exchange for the listed price.

When you place an order on Steam, we will send you a message confirming receipt of your order and containing the details of your order (the "Order Confirmation"). The Order Confirmation is acknowledgement that we have received your order and does not confirm acceptance of your offer to enter into an agreement.

In the case of Content and Services, we accept your offer, and conclude the agreement with you, by confirming the transaction and making the Content and Services available to you or, in the case of pre-orders, only by confirming the transaction to you and deducting the applicable price from your payment method.

In the case of Hardware, we only accept your offer, and conclude the transaction for an item ordered by you, when we dispatch the Hardware to you and send e-mail confirming to you that we've dispatched the Hardware to you (the "Dispatch Confirmation"). If your order is dispatched in more than one package, you may receive a separate Dispatch Confirmation for each package, and each Dispatch Confirmation and corresponding dispatch will conclude a separate contract of sale between us for the Hardware specified in that Dispatch Confirmation. Any Hardware delivered to you remains property of Valve until payment has been fully made.

You consent to receiving sales invoices electronically.

E. Payment Processing

Payment processing related to Content and Services and/or Hardware purchased on Steam is performed by either Valve Corporation directly or by Valve's fully owned subsidiary Valve GmbH on behalf of Valve Corporation depending on the type of payment method used. If your card was issued outside the United States, your payment may be processed via a European acquirer by Valve GmbH on behalf of Valve Corporation. For any other type of purchases, payment will be collected by Valve Corporation directly. In any case, delivery of Content and Services as well as Hardware is performed by Valve Corporation.

2. LICENSES ▲

A. General Content and Services License

Steam and your Subscription(s) require the download and installation of Content and Services onto your computer. Valve hereby grants, and you accept, a non-exclusive license and right, to use the Content and Services for your personal, non-commercial use (except where commercial use is expressly allowed herein or in the applicable Subscription Terms). This license ends upon termination of (a) this Agreement or (b) a Subscription that includes the license. The Content and Services are licensed, not sold. Your license confers no title or ownership in the Content and Services. To make use of the Content and Services, you must have a Steam Account and you may be required to be running the Steam client and maintaining a connection to the Internet.

For reasons that include, without limitation, system security, stability, and multiplayer interoperability, Valve may need to automatically update, pre-load, create new versions of or otherwise enhance the Content and Services and accordingly, the system requirements to use the Content and Services may change over time.

You consent to such automatic updating. You understand that this Agreement (including applicable Subscription Terms) does not entitle you to future updates (unless to the extent required by applicable law), new versions or other enhancements of the Content and Services associated with a particular Subscription, although Valve may choose to provide such updates, etc. in its sole discretion.

B. Beta Software License

Valve may from time to time make software accessible to you via Steam prior to the general commercial release of such software ("Beta Software"). You are not required to use Beta Software, but if Valve offers it, you may elect to use it under the following terms. Beta Software will be deemed to consist of Content and Services, and each item of Beta Software provided will be deemed a Subscription for such Beta Software, with the following provisions specific to Beta Software:

- Your right to use the Beta Software may be limited in time, and may be subject to additional Subscription Terms;

- Valve or any Valve affiliate may request or require that you provide suggestions, feedback, or data regarding your use of the Beta Software, which will be deemed User Generated Content under Section 6 (User Generated Content) below; and

- In addition to the waivers and limitations of liability for all Software under Section 7 (Disclaimers; Limitations on Liability; No Guarantees; Limited Warranty & Agreement) below as applicable, you specifically acknowledge that Beta Software is only released for testing and improvement purposes, in particular to provide Valve with feedback on the quality and usability of the Beta Software, and therefore contains errors and is not final. If you decide to install and/or use Beta Software, you shall only use it in compliance with its purposes, i.e. for testing and improvement purposes, in compliance with system requirements specifically intended for each Beta Software and in any case not on a system or for purposes where the malfunction of the Beta Software can cause any kind of damage. In particular, maintain full backups of any system that you choose to install Beta Software on.

C. License to Use Valve Developer Tools

Your Subscription(s) may include access to various Valve tools that can be used to create content ("Developer Tools"). Some examples include: the Valve software development kit (the "SDK") for a version of the computer game engine known as "Source" (the "Source Engine") and the associated Valve Hammer editor, The Source® Filmmaker Software, or in-game tools through which you can edit or create derivative works of a Valve game. Particular Developer Tools (for example, The Source® Filmmaker Software) may be distributed with separate Subscription Terms that are different from the rules set forth in this Section. Except as set forth in any separate Subscription Terms applicable to the use of a particular Developer Tool, you may use the Developer Tools, and you may use, reproduce, publish, perform, display and distribute any content you create using the Developer Tools, however you wish, but solely on a non-commercial basis.

If you would like to use the Source Engine SDK or other Valve Developer Tools for commercial use, please contact Valve at sourceengine@valvesoftware.com.

D. License to Use Valve Game Content in Fan Art.

Valve appreciates the community of Subscribers that creates fan art, fan fiction, and audio-visual works that reference Valve games ("Fan Art"). You may incorporate content from Valve games into your Fan Art. Except as otherwise set forth in this Section or in any Subscription Terms, you may use, reproduce, publish, perform, display and distribute Fan Art that incorporates content from Valve games however you wish, but solely on a non-commercial basis.

If you incorporate any third-party content in any Fan Art, you must be sure to obtain all necessary rights from the owner of that content.

Commercial use of some Valve game content is permitted via features such as Steam Workshop or a Steam Subscription Marketplace. Terms applicable to that use are set forth in Sections 3.D. and 6.B. below and in any Subscription Terms provided for those features.

To view the Valve video policy containing additional terms covering the use of audio-visual works incorporating Valve intellectual property or created with The Source® Filmmaker Software, please click here: http://www.valvesoftware.com/videopolicy.html

E. License to Use Valve Dedicated Server Software

Your Subscription(s) may contain access to the Valve Dedicated Server Software. If so, you may use the Valve Dedicated Server Software on an unlimited number of computers for the purpose of hosting online multiplayer games of Valve products. If you wish to operate the Valve Dedicated Server Software, you will be solely responsible for procuring any Internet access, bandwidth, or hardware for such activities and will bear all costs associated with your use.

F. Ownership of Content and Services

All title, ownership rights and intellectual property rights in and to the Content and Services and any and all copies thereof, are owned by Valve and/or its or its affiliates' licensors. All rights are reserved, except as expressly stated herein. The Content and Services are protected by copyright laws, international copyright treaties and conventions and other laws. The Content and Services contain certain licensed materials and Valve's and its affiliates' licensors may protect their rights in the event of any violation of this Agreement.

G. Restrictions on Use of Content and Services

You may not use the Content and Services for any purpose other than the permitted access to Steam and your Subscriptions, and to make personal, non-commercial use of your Subscriptions, except as otherwise permitted by this Agreement or applicable Subscription Terms. Except as otherwise permitted under this Agreement (including any Subscription Terms or Rules of Use), or under applicable law notwithstanding these restrictions, you may not, in whole or in part, copy, photocopy, reproduce, publish, distribute, translate, reverse engineer, derive source code from, modify, disassemble, decompile, create derivative works based on, or remove any proprietary notices or labels from the Content and Services or any software accessed via Steam without the prior consent, in writing, of Valve.

You are entitled to use the Content and Services for your own personal use, but you are not entitled to: (i) sell, grant a security interest in or transfer reproductions of the Content and Services to other parties in any way, nor to rent, lease or license the Content and Services to others without the prior written consent of Valve, except to the extent expressly permitted elsewhere in this Agreement (including any Subscription Terms or Rules of Use); (ii) host or provide matchmaking services for the Content and Services or emulate or redirect the communication protocols used by Valve in any network feature of the Content and Services, through protocol emulation, tunneling, modifying or adding components to the Content and Services, use of a utility program or any other techniques now known or hereafter developed, for any purpose including, but not limited to network play over the Internet, network play utilizing commercial or non-commercial gaming networks or as part of content aggregation networks, websites or services, without the prior written consent of Valve; or (iii) exploit the Content and Services or any of its parts for any commercial purpose, except as expressly permitted elsewhere in this Agreement (including any Subscription Terms or Rules of Use).

3. BILLING, PAYMENT AND OTHER SUBSCRIPTIONS ▲

All charges incurred on Steam, and all purchases made with the Steam Wallet, are payable in advance and final, except as described in Sections 3.I and 7 below.

A. Payment Authorization

When you provide payment information to Valve or to one of its payment processors, you represent to Valve that you are the authorized user of the card, PIN, key or account associated with that payment, and you authorize Valve to charge your credit card or to process your payment with the chosen third-party payment processor for any Subscription, Steam Wallet funds, Hardware or other fees incurred by you.

For Subscriptions ordered based on an agreed usage period, where recurring payments are made in exchange for continued use ("Recurring Payment Subscriptions"), by continuing to use the Recurring Payment Subscription you agree and reaffirm that Valve is authorized to charge your credit card (or your Steam Wallet, if funded), or to process your payment with any other applicable third-party payment processor, for any applicable recurring payment amounts. If you have ordered any Recurring Payment Subscriptions, you agree to notify Valve promptly of any changes to your credit card account number, its expiration date and/or your billing address, or your PayPal or other payment account number, and you agree to notify Valve promptly if your credit card or PayPal or other payment account expires or is cancelled for any reason.

If your use of Steam or your purchase of Hardware on Steam is subject to any type of use or sales tax, then Valve may also charge you for those taxes, in addition to the Subscription or other fees published in the Rules of Use. All fees on Steam in the European Union and the United Kingdom include the EU or UK VAT ("VAT") tax. VAT amounts collected by Valve reflect VAT due on the value of any Content and Services, Hardware or Subscription.

You agree that you will not use IP proxying or other methods to disguise the place of your residence, whether to circumvent geographical restrictions on game content, to order or purchase at pricing not applicable to your geography, or for any other purpose. If you do this, Valve may terminate your access to your Account.

B. Responsibility for Charges Associated With Your Account

As the Account holder, you are responsible for all charges incurred, including applicable taxes, and all orders or purchases made by you or anyone that uses your Account, including your family or friends. If you cancel your Account, Valve reserves the right to collect fees, surcharges or costs incurred before cancellation. Any delinquent or unpaid Accounts must be settled before Valve will allow you to register again.

C. Steam Wallet

Steam may make available an account balance associated with your Account (the "Steam Wallet"). The Steam Wallet is neither a bank account nor any kind of payment instrument. It functions as a prepaid balance to order Content and Services. You may place funds in your Steam Wallet up to a maximum amount determined by Valve, by credit card, prepaid card, promotional code, or any other payment method accepted by Valve. Within any twenty-four (24) hour period, the total amount stored in your Steam Wallet plus the total amount

spent out of your Steam Wallet, in the aggregate, may not exceed US$2,000 or its equivalent in your applicable local currency -- attempted deposits into your Steam Wallet that exceed this threshold may not be credited to your Steam Wallet until your activity falls below this threshold. Valve may change or impose different Steam Wallet balance and usage limits from time to time.

You will be notified by e-mail of any change to the Steam Wallet balance and usage limits within sixty (60) calendar days before the entry into force of the change. Your continued use of your Steam Account more than thirty (30) calendar days after the entry into force of the changes will constitute your acceptance of the changes. If you don't agree to the changes, your only remedy is to terminate your Steam Account or to cease use of your Steam Wallet. Valve shall not have any obligation to refund any credits remaining on your Steam Wallet in this case.

You may use Steam Wallet funds to order Subscriptions, including by making in-game orders where Steam Wallet transactions are enabled, and purchase Hardware. Subject to Section 3.I, funds added to the Steam Wallet are non-refundable and non-transferable. Steam Wallet funds do not constitute a personal property right, have no value outside Steam and can only be used to order Subscriptions and related content via Steam (including but not limited to games and other applications offered through the Steam Store, or in a Steam Subscription Marketplace) and Hardware. Steam Wallet funds have no cash value and are not exchangeable for cash. Steam Wallet funds that are deemed unclaimed property may be turned over to the applicable authority.

D. Trading and Transactions of Subscriptions Between Subscribers

Steam may include one or more features or sites that allow Subscribers to trade, offer or order certain types of Subscriptions (for example, license rights to virtual items) with, to or from other Subscribers ("Subscription Marketplaces"). An example of a Subscription Marketplace is the Steam Community Market. By using or participating in Subscription Marketplaces, you authorize Valve, on its own behalf or as an agent or licensee of any third-party creator or publisher of the applicable Subscriptions in your Account, to transfer those Subscriptions from your Account in order to give effect to any trade or sale you make.

Valve may charge a fee for trades or sales in a Subscription Marketplace. Any fees will be disclosed to you prior to the completion of the trade or sale.

If you complete a trade, sale or order in a Subscription Marketplace, you acknowledge and agree that you are responsible for taxes, if any, which may be due with respect to your transactions, including sales or use taxes, and for compliance with applicable tax laws. Proceeds from sales you make in a Subscription Marketplace may be considered income to you for income tax purposes. You should consult with a tax specialist to determine your tax liability in connection with your activities in any Subscription Marketplace.

You understand and acknowledge that Valve does not have any obligation to provide or maintain any Subscription Marketplace. Valve may decide to cease operation of any Subscription Marketplace, change the fees that it charges or change the terms or features of the Steam Subscription Marketplace. You will be notified of any substantial change to the terms or availability of the Subscription Marketplace in a timely fashion before the entry into force of the change, except in cases of force majeure, Subscriber's fault or third party event outside of Valve's control.

You also understand and acknowledge that Subscriptions traded, sold or ordered in any Subscription Marketplace are license rights, that you have no ownership interest in such Subscriptions, and that Valve does not recognize any transfers of Subscriptions (including transfers by operation of law) that are made outside of Steam.

E. Retail Purchase

Valve may offer or require a Subscription for purchasers of retail packaged product versions or OEM versions of Valve products. The "CD-Key" or "Product Key" accompanying such versions is used to activate your Subscription. Further instructions will be provided along with the respective product.

F. Steam Authorized Resellers

You may order a Subscription through an authorized reseller of Valve. The "Product Key" accompanying such order will be used to activate your Subscription. Further instructions will be provided along with the respective product. If you order a Subscription from an authorized reseller of Valve, you agree to direct all questions regarding the Product Key to that reseller.

G. Free Subscriptions

In some cases, Valve may offer a free Subscription to certain Content and Services. As with all Subscriptions, you are always responsible for any Internet service provider, telephone, and other connection fees that you may incur when using Steam, even when Valve offers a free Subscription.

H. Third-Party Sites

Steam may provide links to other third-party sites. Some of these sites may charge separate fees, which are not included in and are in addition to any Subscription or other fees that you may pay to Valve. Steam may also provide access to third-party vendors, who provide content, goods and/or services on Steam or the Internet. Any separate charges or obligations you incur in your dealings with these third parties are your responsibility. Valve makes no representations or warranties, either express or implied, regarding any third party site. In particular, Valve makes no representation or warranty that any service or subscription offered via third-party vendors will not change or be suspended or terminated.

I. Refunds and Right of Withdrawal

Without prejudice to any statutory rights you may have, you can request a refund for your orders or purchases on Steam in accordance with the terms of Valve's Refund Policy http://store.steampowered.com/steam_refunds/.

For European Union and United Kingdom consumers:

EU and UK law provides a statutory right to withdraw from certain contracts for physical merchandise and for the order of digital content. You can find more information about the extent of your statutory right to withdraw and the ways you can exercise it on this page: https://support.steampowered.com/kb_article.php?ref=8620-QYAL-4516.

4. ONLINE CONDUCT, CHEATING AND PROCESS TAMPERING ▲

Your online conduct and interaction with other Subscribers must comply with the Steam Online Conduct Rules, to be found at http://steampowered.com/index.php?area=online_conduct. Depending on terms of use imposed by third parties who host particular games or other services, additional requirements may also be provided in the Subscription Terms applicable to a particular Subscription.

Steam and the Content and Services may include functionality designed to identify software or hardware processes or functionality that may give a player an unfair competitive advantage when playing multiplayer versions of any Content and Services or modifications of Content and Services ("Cheats"). You agree that you will not create Cheats or assist third parties in any way to create or use Cheats.

Steam Subscriber Agreement

You agree that you will not directly or indirectly disable, circumvent, or otherwise interfere with the operation of software designed to prevent or report the use of Cheats.

You agree that you will not tamper with the execution of Steam or Content and Services unless otherwise authorized by Valve. You acknowledge and agree that either Valve or any host of an online multiplayer game distributed through Steam ("External Host") may refuse to allow you to participate in certain online multiplayer games if you use Cheats or tamper with the execution of Steam or the Content and Services.

Further, you acknowledge and agree that External Hosts may report your use of Cheats or unauthorized process tampering to Valve, and Valve may communicate your history of use thereof to External Hosts within the boundaries of the Steam Privacy Policy.

Valve may restrict or terminate your Account or a particular Subscription for any conduct or activity that is illegal, constitutes a Cheat, or breaches the Steam Online Conduct Rules. You acknowledge that Valve is not required to provide you notice before terminating your Subscription(s) and/or Account.

You may not use Cheats, automation software (bots), mods, hacks, or any other unauthorized third-party software, to modify or automate any Subscription Marketplace process, the process of Steam account creation or otherwise in interacting with or controlling the processes or user interface of Steam, except to the degree expressly permitted.

## 5. THIRD-PARTY CONTENT ▲

In regard to all Subscriptions, Content and Services that are not authored by Valve, Valve does not screen such third-party content available on Steam or through other sources. Valve assumes no responsibility or liability for such third party content, unless to the extent provided by mandatory law. Some third-party application software is capable of being used by businesses for business purposes - however, you may only acquire such software via Steam for private personal use.

## 6. USER GENERATED CONTENT ▲

### A. General Provisions

Steam provides interfaces and tools for you to be able to generate content and make it available to other users and/or to Valve at your sole discretion. "User Generated Content" means any content you make available to other users through your use of multi-user features of Steam, or to Valve or its affiliates through your use of the Content and Services or otherwise.

When you upload your content to Steam to make it available to other users and/or to Valve, you grant Valve and its affiliates the worldwide, non-exclusive right to use, reproduce, modify, create derivative works from, distribute, transmit, transcode, translate, broadcast, and otherwise communicate, and publicly display and publicly perform, your User Generated Content, and derivative works of your User Generated Content, for the purpose of the operation, distribution, incorporation as part of and promotion of the Steam service, Steam games or other Steam offerings, including Subscriptions. This license is granted to Valve as the content is uploaded on Steam for the entire duration of the intellectual property rights. It may be terminated if Valve is in breach of the license and has not cured such breach within fourteen (14) days from receiving notice from you sent to the attention of the Valve Legal Department at the applicable Valve address noted on this Privacy Policy page. The termination of said license does not affect the rights of any sub-licensees pursuant to any sub-license granted by Valve prior to termination of the license. Valve is the sole owner of the derivative works created by Valve from your User Generated Content, and is therefore entitled to grant licenses on these derivative works. If you use Valve cloud storage, you grant us a license to store your information as part of that service. Valve may place limits on the amount of storage you may use.

If you provide Valve with any feedback or suggestions about Steam, the Content and Services, or any Valve products, Hardware or services, Valve is free to use the feedback or suggestions however it chooses, without any obligation to account to you.

You agree that the User Generated Content you upload on Steam through the interfaces and tools provided by Valve is given significant exposure and that you share it for your enjoyment and for the recognition you may receive from other Subscribers. Consequently, you grant this license to Valve and its affiliates for free, notwithstanding any other contrary terms provided in App-Specific Terms, as defined under Section 6.B below.

### B. Content Uploaded to the Steam Workshop

Some games or applications available on Steam ("Workshop-Enabled Apps") allow you to create User Generated Content based on or using the Workshop-Enabled App, and to submit that User Generated Content (a "Workshop Contribution") to one or more Steam Workshop web pages. Workshop Contributions can be viewed by the Steam community, and for some categories of Workshop Contributions users may be able to interact with, download or purchase the Workshop Contribution. In some cases, Workshop Contributions may be considered for incorporation by Valve or a third-party developer into a game or into a Subscription Marketplace.

You understand and agree that Valve is not obligated to use, distribute, or continue to distribute copies of any Workshop Contribution and reserves the right, but not the obligation, to restrict or remove Workshop Contributions for any reason.

Specific Workshop-Enabled Apps or Workshop web pages may contain special terms ("App-Specific Terms") that supplement or change the terms set out in this Section to reflect the individual requirements of the Workshop-Enabled App in question.

Under Section 6.A, Workshop Contributions are in principle made available to Subscribers for free. By way of exception, they may be made available to Subscribers for a fee. In that case, the way the revenues generated may be shared, and in particular, the compensation you may receive as a result of this making available, are defined in the App-Specific Terms and not by this Agreement. Unless otherwise specified in App-Specific Terms (if any), the following general rules apply to Workshop Contributions.

- Workshop Contributions are Subscriptions, and therefore you agree that any Subscriber receiving distribution of your Workshop Contribution will have the same rights to use your Workshop Contribution (and will be subject to the same restrictions) as are set out in this Agreement for any other Subscriptions.

- Notwithstanding the license described in Section 6.A, Valve will only have the right to modify including to create derivative works from your Workshop Contribution in the following cases: (a) Valve may make modifications necessary to make your Contribution compatible with Steam and the Workshop functionality or user interface, and (b) Valve or the applicable developer may make modifications to Workshop Contributions that are accepted for in-Application distribution as it deems necessary or desirable to enhance gameplay or make it compatible with the Workshop-Enabled App. Under Section 6.A, you grant for free to Valve and its affiliates the right to modify, including to create derivative works from, your Workshop Contribution. As a result, you are not entitled to any compensation from Valve as a result of Valve's modifications.

- You may, in your sole discretion, choose to remove a Workshop Contribution from the applicable Workshop pages. If you do so, Valve will no longer have the right to use, distribute, transmit, communicate, publicly display or publicly perform the Workshop Contribution, except that (a) Valve may continue to exercise these rights for any Workshop Contribution that is accepted for

distribution in-game or distributed in a manner that allows it to be used in-game, and (b) your removal will not affect the rights of any Subscriber who has already obtained access to a copy of the Workshop Contribution.

C. Promotions and Endorsements

If you use Steam services (e.g. the Steam Curators' Lists or the Steam Broadcasting service) to promote or endorse a product, service or event in return for any kind of consideration from a third party (including non-monetary rewards such as free games), you must clearly indicate the source of such consideration to your audience.

D. Representations and Warranties

You represent and warrant to us that you have sufficient rights in all User Generated Content to grant Valve and other affected parties the licenses described under A. and B. above or in any license terms specific to the applicable Workshop-Enabled App or Workshop page. This includes, without limitation, any kind of intellectual property rights or other proprietary or personal rights affected by or included in the User Generated Content. In particular, with respect to Workshop Contributions, you represent and warrant that the Workshop Contribution was originally created by you (or, with respect to a Workshop Contribution to which others contributed besides you, by you and the other contributors, and in such case that you have the right to submit such Workshop Contribution on behalf of those other contributors).

You furthermore represent and warrant that the User Generated Content, your submission of that Content, and your granting of rights in that Content does not violate any applicable contract, law or regulation.

7. DISCLAIMERS; LIMITATION OF LIABILITY; NO GUARANTEES; LIMITED WARRANTY & AGREEMENT ▲

THIS SECTION 7 DOES NOT APPLY TO EU OR UK SUBSCRIBERS.

- FOR AUSTRALIAN SUBSCRIBERS, THIS SECTION 7 DOES NOT EXCLUDE, RESTRICT OR MODIFY THE APPLICATION OF ANY GUARANTEE, RIGHT OR REMEDY THAT CANNOT BE SO EXCLUDED, RESTRICTED OR MODIFIED, INCLUDING THOSE CONFERRED BY THE AUSTRALIAN CONSUMER LAW (ACL). UNDER THE ACL, GOODS COME WITH GUARANTEES INCLUDING A GUARANTEE THAT GOODS ARE OF ACCEPTABLE QUALITY. IF THERE IS A FAILURE OF THIS GUARANTEE, YOU ARE ENTITLED TO A REMEDY (WHICH MAY INCLUDE HAVING THE GOODS REPAIRED OR REPLACED OR A REFUND). IF A REPAIR OR REPLACEMENT CANNOT BE PROVIDED OR THERE IS A MAJOR FAILURE, YOU ARE ENTITLED TO A REFUND.

- FOR NEW ZEALAND SUBSCRIBERS, THIS SECTION 7 DOES NOT EXCLUDE, RESTRICT OR MODIFY THE APPLICATION OF ANY RIGHT OR REMEDY THAT CANNOT BE SO EXCLUDED, RESTRICTED OR MODIFIED INCLUDING THOSE CONFERRED BY THE NEW ZEALAND CONSUMER GUARANTEES ACT 1993. UNDER THIS ACT ARE GUARANTEES WHICH INCLUDE THAT GOODS AND SERVICES ARE OF ACCEPTABLE QUALITY. IF THIS GUARANTEE IS NOT MET THERE ARE ENTITLEMENTS TO HAVE THE SOFTWARE REMEDIED (WHICH MAY INCLUDE REPAIR, REPLACEMENT OR REFUND). IF A REMEDY CANNOT BE PROVIDED OR THE FAILURE IS OF A SUBSTANTIAL CHARACTER, THE ACT PROVIDES FOR A REFUND.

Prior to acquiring a Subscription, you should consult the product information made available on Steam, including Subscription description, minimum technical requirements, and user reviews.

A. DISCLAIMERS

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, VALVE AND ITS AFFILIATES AND SERVICE PROVIDERS EXPRESSLY DISCLAIM (I) ANY WARRANTY FOR STEAM, THE CONTENT AND SERVICES, AND THE SUBSCRIPTIONS, AND (II) ANY COMMON LAW DUTIES WITH REGARD TO STEAM, THE CONTENT AND SERVICES, AND THE SUBSCRIPTIONS, INCLUDING DUTIES OF LACK OF NEGLIGENCE AND LACK OF WORKMANLIKE EFFORT. STEAM, THE CONTENT AND SERVICES, THE SUBSCRIPTIONS, AND ANY INFORMATION AVAILABLE IN CONNECTION THEREWITH ARE PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS, "WITH ALL FAULTS" AND WITHOUT WARRANTY OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NONINFRINGEMENT. ANY WARRANTY AGAINST INFRINGEMENT THAT MAY BE PROVIDED IN SECTION 2-312 OF THE UNITED STATES UNIFORM COMMERCIAL CODE AND/OR IN ANY OTHER COMPARABLE STATE STATUTE IS EXPRESSLY DISCLAIMED. ALSO, THERE IS NO WARRANTY OF TITLE, NON-INTERFERENCE WITH YOUR ENJOYMENT, OR AUTHORITY IN CONNECTION WITH STEAM, THE CONTENT AND SERVICES, THE SUBSCRIPTIONS, OR INFORMATION AVAILABLE IN CONNECTION THEREWITH.

ANY WARRANTY AGAINST INFRINGEMENT THAT MAY BE PROVIDED IN SECTION 2-312 OF THE UNITED STATES UNIFORM COMMERCIAL CODE IS EXPRESSLY DISCLAIMED.

B. LIMITATION OF LIABILITY

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NEITHER VALVE, ITS LICENSORS, NOR THEIR AFFILIATES, NOR ANY OF VALVE'S SERVICE PROVIDERS, SHALL BE LIABLE IN ANY WAY FOR LOSS OR DAMAGE OF ANY KIND RESULTING FROM THE USE OR INABILITY TO USE STEAM, YOUR ACCOUNT, YOUR SUBSCRIPTIONS AND THE CONTENT AND SERVICES INCLUDING, BUT NOT LIMITED TO, LOSS OF GOODWILL, WORK STOPPAGE, COMPUTER FAILURE OR MALFUNCTION, OR ANY AND ALL OTHER COMMERCIAL DAMAGES OR LOSSES. IN NO EVENT WILL VALVE BE LIABLE FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES, OR ANY OTHER DAMAGES ARISING OUT OF OR IN ANY WAY CONNECTED WITH STEAM, THE CONTENT AND SERVICES, THE SUBSCRIPTIONS, AND ANY INFORMATION AVAILABLE IN CONNECTION THEREWITH, OR THE DELAY OR INABILITY TO USE THE CONTENT AND SERVICES, SUBSCRIPTIONS OR ANY INFORMATION, EVEN IN THE EVENT OF VALVE'S OR ITS AFFILIATES' FAULT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, OR BREACH OF VALVE'S WARRANTY AND EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THESE LIMITATIONS AND LIABILITY EXCLUSIONS APPLY EVEN IF ANY REMEDY FAILS TO PROVIDE ADEQUATE RECOMPENSE.

BECAUSE SOME STATES OR JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR THE LIMITATION OF LIABILITY FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES, IN SUCH STATES OR JURISDICTIONS, EACH OF VALVE, ITS LICENSORS, AND ITS AFFILIATES' LIABILITY SHALL BE LIMITED TO THE FULL EXTENT PERMITTED BY LAW.

C. NO GUARANTEES

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NEITHER VALVE NOR ITS AFFILIATES GUARANTEE CONTINUOUS, ERROR-FREE, VIRUS-FREE OR SECURE OPERATION AND ACCESS TO STEAM, THE CONTENT AND SERVICES, YOUR ACCOUNT AND/OR YOUR SUBSCRIPTION(S) OR ANY INFORMATION AVAILABLE IN CONNECTION THEREWITH.

D. LIMITED WARRANTY & AGREEMENT

CERTAIN HARDWARE PURCHASED FROM VALVE IS SUBJECT TO A LIMITED WARRANTY & AGREEMENT, [OR DEPENDING ON YOUR LOCATION, A STATUTORY WARRANTY] WHICH IS DESCRIBED IN DETAIL HERE.

8. AMENDMENTS TO THIS AGREEMENT ▲

PLEASE NOTE: If you are a consumer with place of residence in Germany, a different version of Section 8 applies to you, which is available here.

A. Mutual Amendment

This Agreement may at any time be mutually amended by your explicit consent to changes proposed by Valve.

B. Unilateral Amendment

Furthermore, Valve may amend this Agreement (including any Subscription Terms or Rules of Use) unilaterally at any time in its sole discretion. In this case, you will be notified by e-mail of any amendment to this Agreement made by Valve at least 30 (30) days before the effective date of the amendment. You can view the Agreement at any time at http://www.steampowered.com/. Your failure to cancel your Account prior to the effective date of the amendment will constitute your acceptance of the amended terms. If you don't agree to the amendments or to any of the terms in this Agreement, your only remedy is to cancel your Account or to cease use of the affected Subscription(s). Valve shall not have any obligation to refund any fees that may have accrued to your Account before cancellation of your Account or cessation of use of any Subscription, nor shall Valve have any obligation to prorate any fees in such circumstances.

9. TERM AND TERMINATION ▲

A. Term

The term of this Agreement (the "Term") commences on the date you first indicate your acceptance of these terms, and will continue in effect until otherwise terminated in accordance with this Agreement.

B. Termination by You

You may cancel your Account at any time. You may cease use of a Subscription at any time or, if you choose, you may request that Valve terminate your access to a Subscription. However, Subscriptions are not transferable, and even if your access to a Subscription for a particular game or application is terminated, the original activation key will not be able to be registered to any other account, even if the Subscription was obtained in a retail store. Access to Subscriptions ordered as a part of a pack or bundle cannot be terminated individually, termination of access to one game within the bundle will result in termination of access to all games ordered in the pack. Your cancellation of an Account, or your cessation of use of any Subscription or request that access to a Subscription be terminated, will not entitle you to any refund, including of any Subscription fees. Valve reserves the right to collect fees, surcharges or costs incurred prior to the cancellation of your Account or termination of your access to a particular Subscription. In addition, you are responsible for any charges incurred to third-party vendors or content providers before your cancellation.

C. Termination by Valve

Valve may restrict or cancel your Account or any particular Subscription(s) at any time in the event that (a) Valve ceases providing such Subscriptions to similarly situated Subscribers generally, or (b) you breach any terms of this Agreement (including any Subscription Terms or Rules of Use). In the event that your Account or a particular Subscription is restricted or terminated or cancelled by Valve for a violation of this Agreement or improper or illegal activity, no refund, including of any Subscription fees or of any unused funds in your Steam Wallet, will be granted.

D. Survival of Terms

Sections 2.C., 2.D., 2.F., 2.G., 3.A., 3.B., 3.D., 3.H., and 5 - 11 will survive any expiration or termination of this Agreement.

10. APPLICABLE LAW/JURISDICTION ▲

Most user concerns can be resolved by use of our Steam support site at https://support.steampowered.com/. If Valve is unable to resolve your concerns and a dispute remains between you and Valve, this Section explains how the parties have agreed to resolve it.

For All Subscribers Outside the European Union and United Kingdom:

You and Valve agree that this Agreement shall be deemed to have been made and executed in the State of Washington, U.S.A., and Washington law, excluding conflict of laws principles and the Convention on Contracts for the International Sale of Goods, governs all disputes and claims arising out of or relating to: (i) any aspect of the relationship between us; (ii) this Agreement; or (iii) your use of Steam, your Account or the Content and Services. You and Valve agree that all disputes and claims between you and Valve (including any dispute or claim that arose before the existence of this or any prior agreement) shall be commenced and maintained exclusively in any state or federal court located in King County, Washington, having subject matter jurisdiction. You and Valve hereby consent to the exclusive jurisdiction of such courts and waive any objections as to personal jurisdiction or venue in such courts.

If the laws where you live mandate alternative dispute resolution options, you may seek a remedy under those options. If you are a consumer who lives in Russia, you may also seek a remedy with local Russian state courts.

For EU and UK Subscribers:

This Agreement is governed by the law of the country where you have your habitual residence.

In the event of a dispute relating to the interpretation, the performance or the validity of the Subscriber Agreement, an amicable solution may be sought before any legal action. You can file your complaint at http://help.steampowered.com. The European Commission provides an Online Dispute Resolution website for EU consumers at https://ec.europa.eu/consumers/odr. Participation in this website is not available to US companies, which is why Valve is not registered there. However, insofar as your complaint concerns the behavior of Valve's data protection representative Valve GmbH you can file your complaint there.

In the event that an Alternative Dispute Resolution Procedure fails, or if either Valve or you prefer not to resort to Alternative Dispute Resolution, you may bring proceedings in the courts of the place where you are domiciled.

11. MISCELLANEOUS ▲

In the event that any provision of this Agreement is held by a court to be invalid or unenforceable, such provision will be deemed severable and the remaining provisions of this Agreement shall remain in full force and effect.

This Agreement, including any Subscription Terms, Rules of Use, the Valve Privacy Policy, and the Valve Hardware Limited Warranty Policy, constitutes and contains the entire agreement between the parties with respect to the subject matter hereof and supersedes any prior oral or written agreements. You agree that this Agreement is not intended to confer and does not confer any rights or remedies upon any person other than the parties to this Agreement.

Valve's obligations are subject to existing laws and legal process and Valve may comply with law enforcement or regulatory requests or requirements notwithstanding any contrary term.

You agree to comply with all applicable import/export laws and regulations. You agree not to export the Content and Services or Hardware or allow use of your Account by individuals of any terrorist supporting countries to which encryption exports are at the time of exportation restricted by the U.S. Bureau of Export Administration. You represent and warrant that you are not located in, under the control of, or a national or resident of any such prohibited country.

This Agreement was last updated on September 26, 2024 ("Revision Date"). If you were a Subscriber before the Revision Date, it replaces and supersedes your existing agreement with Valve or Valve SARL on the day that it becomes effective according to Section 8 above.

Privacy Feedback



© 2025 Valve Corporation. All rights reserved. All trademarks are property of their respective owners in the US and other countries. VAT included in all prices where applicable.   Privacy Policy  |  Legal  |  Steam Subscriber Agreement  |  Refunds  |  Cookies



About Valve | Jobs | Steamworks | Steam Distribution | Support | Recycling | Gift Cards

# EXHIBIT 4

Steam Subscriber Agreement



Install Steam    login    | language

**STORE**    COMMUNITY    ABOUT    SUPPORT

Home

# Steam Subscriber Agreement



## STEAM® SUBSCRIBER AGREEMENT

Table of contents:

1. Registration as a subscriber; application of terms to you; your account; conclusion of agreements
2. Licenses
3. Billing, payment and other subscriptions
4. Online conduct, cheating and illegal behavior
5. Third-party content
6. User generated content
7. Disclaimers; limitation of liability; no guarantees; limited warranty & agreement
8. Amendments to this agreement
9. Term and termination
10. Applicable law/mediation/jurisdiction/attorney's fees
11. Dispute resolution/binding arbitration/class action waiver
12. Miscellaneous

This Steam Subscriber Agreement ("Agreement") is a legal document that explains your rights and obligations as a subscriber of Steam from Valve Corporation, a corporation under the laws of the State of Washington, with its registered office at 10400 NE 4th St., Bellevue, WA 98004, United States, registered with the Washington Secretary of State under number 60 22 90 773, VAT ID No. EU 8260 00671 ("Valve"). Please read it carefully.

SECTION 11 CONTAINS A BINDING ARBITRATION AGREEMENT AND CLASS ACTION WAIVER. IT AFFECTS HOW DISPUTES ARE RESOLVED. PLEASE READ IT. IF YOU ARE A CONSUMER AND LIVE IN THE PROVINCE OF QUEBEC (CANADA), THE EUROPEAN UNION, OR THE UNITED KINGDOM, SECTION 11 DOES NOT APPLY TO YOU.

1. REGISTRATION AS A SUBSCRIBER; APPLICATION OF TERMS TO YOU; YOUR ACCOUNT; ACCEPTANCE OF AGREEMENTS ⌃

Steam is an online service offered by Valve.

You become a subscriber of Steam ("Subscriber") by completing the registration of a Steam user account. This Agreement takes effect as soon as you indicate your acceptance of these terms. You may not become a Subscriber if you are under the age of 13. Steam is not intended for children under 13 and Valve will not knowingly collect personal information from children under the age of 13. Additional age restrictions may apply in your country.

A. Contracting Party

For any interaction with Steam your contractual relationship is with Valve. Except as otherwise indicated herein or at the time of the transaction (such as in the case of purchases from another Subscriber in a Subscription Marketplace), any transactions for Subscriptions (as defined below) you make on Steam are being made from Valve.

B. Hardware, Subscriptions; Content and Services

As a Subscriber you may obtain access to certain services, software and content available to Subscribers or purchase certain Hardware (as defined below) on Steam. The Steam client software and any other software, content, and updates you download or access via Steam, including but not limited to Valve or third-party video games and in-game content, software associated with Hardware and any virtual items you trade, sell or purchase in a Steam Subscription Marketplace are referred to in this Agreement as "Content and Services;" the rights to access and/or use any Content and Services accessible through Steam are referred to in this Agreement as "Subscriptions."

Each Subscription allows you to access particular Content and Services. Some Subscriptions may impose additional terms specific to that Subscription ("Subscription Terms") (for example, an end user license agreement specific to a particular game, or terms of use specific to a particular product or feature of Steam). Also, additional terms (for example, payment and billing procedures) may be posted on http://www.steampowered.com or within the Steam service ("Rules of Use"). Rules of Use include the Steam Online Conduct Rules http://steampowered.com/index.php?area=online_conduct and the Steam Refund Policy http://store.steampowered.com/steam_refunds. The Subscription Terms, the Rules of Use, and the Valve Privacy Policy (which can be found at http://www.valvesoftware.com/privacy.htm) are binding on you once you indicate your acceptance of them or of this Agreement, or otherwise become bound by them as described in Section 8 (Amendments to this Agreement).

C. Your Account

When you complete Steam's registration process, you create a Steam account ("Account"). Your Account may also include billing information you provide to Valve for transactions concerning Subscriptions, Content and Services and the purchase of any physical goods through Steam ("Hardware"). You may not reveal, share or otherwise allow others to use your password or Account except as otherwise specifically authorized by Valve. You are responsible for the confidentiality of your login and password and for the security of your computer system. Valve is not responsible for the use of your password and Account or for all of the communication and activity on Steam that results from use of your login name and password by you, or by any person to whom you may have intentionally or by negligence disclosed your login and/or password in violation of this confidentiality provision. Unless it results from Valve's negligence or

fault, Valve is not responsible for the use of your Account by a person who fraudulently used your login and password without your permission. If you believe that the confidentiality of your login and/or password may have been compromised, you must notify Valve via the support form (https://support.steampowered.com/newticket.php) without any delay.

Your Account, including any information pertaining to it (e.g.: contact information, billing information, Account history and Subscriptions, etc.), is strictly personal. You may therefore not sell or charge others for the right to use your Account, or otherwise transfer your Account, nor may you sell, charge others for the right to use, or transfer any Subscriptions other than if and as expressly permitted by this Agreement (including any Subscription Terms or Rules of Use) or as otherwise specifically permitted by Valve.

D. Acceptance of Agreements

Your order through Steam is an offer to Valve to agree on the delivery of the ordered Subscriptions, Content and Services and/or Hardware (the "Product(s)") in exchange for the listed price.

When you place an order on Steam, we will send you a message confirming receipt of your order and containing the details of your order (the "Order Confirmation"). The Order Confirmation is acknowledgement that we have received your order and does not confirm acceptance of your offer to enter into an agreement.

In the case of Content and Services, we accept your offer, and conclude the agreement with you, by confirming the transaction and making the Content and Services available to you or, in the case of pre-orders, only by confirming the transaction to you and deducting the applicable price from your payment method.

In the case of Hardware, we only accept your offer, and conclude the transaction for an item ordered by you, when we dispatch the Hardware to you and send e-mail confirming to you that we've dispatched the Hardware to you (the "Dispatch Confirmation"). If your order is dispatched in more than one package, you may receive a separate Dispatch Confirmation for each package, and each Dispatch Confirmation and corresponding dispatch will conclude a separate contract of sale between us for the Hardware specified in that Dispatch Confirmation. Any Hardware delivered to you remains property of Valve until payment has been fully made.

You consent to receiving sales invoices electronically.

E. Payment Processing

Payment processing related to Content and Services and/or Hardware purchased on Steam is performed by either Valve Corporation directly or by Valve's fully owned subsidiary Valve GmbH on behalf of Valve Corporation depending on the type of payment method used. If your card was issued outside the United States, your payment may be processed via a European acquirer by Valve GmbH on behalf of Valve Corporation. For any other type of purchases, payment will be collected by Valve Corporation directly. In any case, delivery of Content and Services as well as Hardware is performed by Valve Corporation.

2. LICENSES ▲

A. General Content and Services License

Steam and your Subscription(s) require the download and installation of Content and Services onto your computer. Valve hereby grants, and you accept, a non-exclusive license and right, to use the Content and Services for your personal, non-commercial use (except where commercial use is expressly allowed herein or in the applicable Subscription Terms). This license ends upon termination of (a) this Agreement or (b) a Subscription that includes the license. The Content and Services are licensed, not sold. Your license confers no title or ownership in the Content and Services. To make use of the Content and Services, you must have a Steam Account and you may be required to be running the Steam client and maintaining a connection to the Internet.

For reasons that include, without limitation, system security, stability, and multiplayer interoperability, Valve may need to automatically update, pre-load, create new versions of or otherwise enhance the Content and Services and accordingly, the system requirements to use the Content and Services may change over time.

You consent to such automatic updating. You understand that this Agreement (including applicable Subscription Terms) does not entitle you to future updates (unless to the extent required by applicable law), new versions or other enhancements of the Content and Services associated with a particular Subscription, although Valve may choose to provide such updates, etc. in its sole discretion.

B. Beta Software License

Valve may from time to time make software accessible to you via Steam prior to the general commercial release of such software ("Beta Software"). You are not required to use Beta Software, but if Valve offers it, you may elect to use it under the following terms. Beta Software will be deemed to consist of Content and Services, and each item of Beta Software provided will be deemed a Subscription for such Beta Software, with the following provisions specific to Beta Software:

- Your right to use the Beta Software may be limited in time, and may be subject to additional Subscription Terms;

- Valve or any Valve affiliate may request or require that you provide suggestions, feedback, or data regarding your use of the Beta Software, which will be deemed User Generated Content under Section 6 (User Generated Content) below; and

- In addition to the waivers and limitations of liability for all Software under Section 7 (Disclaimers; Limitations on Liability; No Guarantees; Limited Warranty & Agreement) below as applicable, you specifically acknowledge that Beta Software is only released for testing and improvement purposes, in particular to provide Valve with feedback on the quality and usability of the Beta Software, and therefore contains errors and is not final. If you decide to install and/or use Beta Software, you shall only use it in compliance with its purposes, i.e. for testing and improvement purposes, in compliance with system requirements specifically intended for each Beta Software and in any case not on a system or for purposes where the malfunction of the Beta Software can cause any kind of damage. In particular, maintain full backups of any system that you choose to install Beta Software on.

C. License to Use Valve Developer Tools

Your Subscription(s) may include access to various Valve tools that can be used to create content ("Developer Tools"). Some examples include: the Valve software development kit (the "SDK") for a version of the computer game engine known as "Source" (the "Source Engine") and the associated Valve Hammer editor, The Source® Filmmaker Software, or in-game tools through which you can edit or create derivative works of a Valve game. Particular Developer Tools (for example, The Source® Filmmaker Software) may be distributed with separate Subscription Terms that are different from the rules set forth in this Section. Except as set forth in any separate Subscription Terms applicable to the use of a particular Developer Tool, you may use the Developer Tools, and you may use, reproduce, publish, perform, display and distribute any content you create using the Developer Tools, however you wish, but solely on a non-commercial basis.

If you would like to use the Source Engine SDK or other Valve Developer Tools for commercial use, please contact Valve at sourceengine@valvesoftware.com.

D. License to Use Valve Game Content in Fan Art.

Valve appreciates the community of Subscribers that creates fan art, fan fiction, and audio-visual works that reference Valve games ("Fan Art"). You may incorporate content from Valve games into your Fan Art. Except as otherwise set forth in this Section or in any Subscription Terms, you may use, reproduce, publish, perform, display and distribute Fan Art that incorporates content from Valve games however you wish, but solely on a non-commercial basis.

If you incorporate any third-party content in any Fan Art, you must be sure to obtain all necessary rights from the owner of that content.

Commercial use of some Valve game content is permitted via features such as Steam Workshop or a Steam Subscription Marketplace. Terms applicable to that use are set forth in Sections 3.D. and 6.B. below and in any Subscription Terms provided for those features.

To view the Valve video policy containing additional terms covering the use of audio-visual works incorporating Valve intellectual property or created with The Source® Filmmaker Software, please click here: http://www.valvesoftware.com/videopolicy.html

E. License to Use Valve Dedicated Server Software

Your Subscription(s) may contain access to the Valve Dedicated Server Software. If so, you may use the Valve Dedicated Server Software on an unlimited number of computers for the purpose of hosting online multiplayer games of Valve products. If you wish to operate the Valve Dedicated Server Software, you will be solely responsible for procuring any Internet access, bandwidth, or hardware for such activities and will bear all costs associated with your use.

F. Ownership of Content and Services

All title, ownership rights and intellectual property rights in and to the Content and Services and any and all copies thereof, are owned by Valve and/or its or its affiliates' licensors. All rights are reserved, except as expressly stated herein. The Content and Services are protected by copyright laws, international copyright treaties and conventions and other laws. The Content and Services contain certain licensed materials and Valve's and its affiliates' licensors may protect their rights in the event of any violation of this Agreement.

G. Restrictions on Use of Content and Services

You may not use the Content and Services for any purpose other than the permitted access to Steam and your Subscriptions, and to make personal, non-commercial use of your Subscriptions, except as otherwise permitted by this Agreement or applicable Subscription Terms. Except as otherwise permitted under this Agreement (including any Subscription Terms or Rules of Use), or under applicable law notwithstanding these restrictions, you may not, in whole or in part, copy, photocopy, reproduce, publish, distribute, translate, reverse engineer, derive source code from, modify, disassemble, decompile, create derivative works based on, or remove any proprietary notices or labels from the Content and Services or any software accessed via Steam without the prior consent, in writing, of Valve.

You are entitled to use the Content and Services for your own personal use, but you are not entitled to: (i) sell, grant a security interest in or transfer reproductions of the Content and Services to other parties in any way, nor to rent, lease or license the Content and Services to others without the prior written consent of Valve, except to the extent expressly permitted elsewhere in this Agreement (including any Subscription Terms or Rules of Use); (ii) host or provide matchmaking services for the Content and Services or emulate or redirect the communication protocols used by Valve in any network feature of the Content and Services, through protocol emulation, tunneling, modifying or adding components to the Content and Services, use of a utility program or any other techniques now known or hereafter developed, for any purpose including, but not limited to network play over the Internet, network play utilizing commercial or non-commercial gaming networks or as part of content aggregation networks, websites or services, without the prior written consent of Valve; or (iii) exploit the Content and Services or any of its parts for any commercial purpose, except as expressly permitted elsewhere in this Agreement (including any Subscription Terms or Rules of Use).

3. BILLING, PAYMENT AND OTHER SUBSCRIPTIONS ▲

All charges incurred on Steam, and all purchases made with the Steam Wallet, are payable in advance and final, except as described in Sections 3.I and 7 below.

A. Payment Authorization

When you provide payment information to Valve or to one of its payment processors, you represent to Valve that you are the authorized user of the card, PIN, key or account associated with that payment, and you authorize Valve to charge your credit card or to process your payment with the chosen third-party payment processor for any Subscription, Steam Wallet funds, Hardware or other fees incurred by you.

For Subscriptions ordered based on an agreed usage period, where recurring payments are made in exchange for continued use ("Recurring Payment Subscriptions"), by continuing to use the Recurring Payment Subscription you agree and reaffirm that Valve is authorized to charge your credit card (or your Steam Wallet, if funded), or to process your payment with any other applicable third-party payment processor, for any applicable recurring payment amounts. If you have ordered any Recurring Payment Subscriptions, you agree to notify Valve promptly of any changes to your credit card account number, its expiration date and/or your billing address, or your PayPal or other payment account number, and you agree to notify Valve promptly if your credit card or PayPal or other payment account expires or is cancelled for any reason.

If your use of Steam or your purchase of Hardware on Steam is subject to any type of use or sales tax, then Valve may also charge you for those taxes, in addition to the Subscription or other fees published in the Rules of Use. All fees on Steam in the European Union and the United Kingdom include the EU or UK VAT ("VAT") tax. VAT amounts collected by Valve reflect VAT due on the value of any Content and Services, Hardware or Subscription.

You agree that you will not use IP proxying or other methods to disguise the place of your residence, whether to circumvent geographical restrictions on game content, to order or purchase at pricing not applicable to your geography, or for any other purpose. If you do this, Valve may terminate your access to your Account.

B. Responsibility for Charges Associated With Your Account

As the Account holder, you are responsible for all charges incurred, including applicable taxes, and all orders or purchases made by you or anyone that uses your Account, including your family or friends. If you cancel your Account, Valve reserves the right to collect fees, surcharges or costs incurred before cancellation. Any delinquent or unpaid Accounts must be settled before Valve will allow you to register again.

C. Steam Wallet

Steam may make available an account balance associated with your Account (the "Steam Wallet"). The Steam Wallet is neither a bank account nor any kind of payment instrument. It functions as a prepaid balance to order Content and Services. You may place funds in your Steam Wallet up to a maximum amount determined by Valve, by credit card, prepaid card, promotional code, or any other payment

method accepted by Steam. Within any twenty-four (24) hour period, the total amount stored in your Steam Wallet plus the total amount spent out of your Steam Wallet, in the aggregate, may not exceed US$2,000 or its equivalent in your applicable local currency -- attempted deposits into your Steam Wallet that exceed this threshold may not be credited to your Steam Wallet until your activity falls below this threshold. Valve may change or impose different Steam Wallet balance and usage limits from time to time.

You will be notified by e-mail of any change to the Steam Wallet balance and usage limits within sixty (60) calendar days before the entry into force of the change. Your continued use of your Steam Account more than thirty (30) calendar days after the entry into force of the changes will constitute your acceptance of the changes. If you don't agree to the changes, your only remedy is to terminate your Steam Account or to cease use of your Steam Wallet. Valve shall not have any obligation to refund any credits remaining on your Steam Wallet in this case.

You may use Steam Wallet funds to order Subscriptions, including by making in-game orders where Steam Wallet transactions are enabled, and purchase Hardware. Subject to Section 3.I, funds added to the Steam Wallet are non-refundable and non-transferable. Steam Wallet funds do not constitute a personal property right, have no value outside Steam and can only be used to order Subscriptions and related content via Steam (including but not limited to games and other applications offered through the Steam Store, or in a Steam Subscription Marketplace) and Hardware. Steam Wallet funds have no cash value and are not exchangeable for cash. Steam Wallet funds that are deemed unclaimed property may be turned over to the applicable authority.

D. Trading and Transactions of Subscriptions Between Subscribers

Steam may include one or more features or sites that allow Subscribers to trade, offer or order certain types of Subscriptions (for example, license rights to virtual items) with, to or from other Subscribers ("Subscription Marketplaces"). An example of a Subscription Marketplace is the Steam Community Market. By using or participating in Subscription Marketplaces, you authorize Valve, on its own behalf or as an agent or licensee of any third-party creator or publisher of the applicable Subscriptions in your Account, to transfer those Subscriptions from your Account in order to give effect to any trade or sale you make.

Valve may charge a fee for trades or sales in a Subscription Marketplace. Any fees will be disclosed to you prior to the completion of the trade or sale.

If you complete a trade, sale or order in a Subscription Marketplace, you acknowledge and agree that you are responsible for taxes, if any, which may be due with respect to your transactions, including sales or use taxes, and for compliance with applicable tax laws. Proceeds from sales you make in a Subscription Marketplace may be considered income to you for income tax purposes. You should consult with a tax specialist to determine your tax liability in connection with your activities in any Subscription Marketplace.

You understand and acknowledge that Valve does not have any obligation to provide or maintain any Subscription Marketplace. Valve may decide to cease operation of any Subscription Marketplace, change the fees that it charges or change the terms or features of the Steam Subscription Marketplace. You will be notified of any substantial change to the terms or availability of the Subscription Marketplace in a timely fashion before the entry into force of the change, except in cases of force majeure, Subscriber's fault or third party event outside of Valve's control.

You also understand and acknowledge that Subscriptions traded, sold or ordered in any Subscription Marketplace are license rights, that you have no ownership interest in such Subscriptions, and that Valve does not recognize any transfers of Subscriptions (including transfers by operation of law) that are made outside of Steam.

E. Retail Purchase

Valve may offer or require a Subscription for purchasers of retail packaged product versions or OEM versions of Valve products. The "CD-Key" or "Product Key" accompanying such versions is used to activate your Subscription. Further instructions will be provided along with the respective product.

F. Steam Authorized Resellers

You may order a Subscription through an authorized reseller of Valve. The "Product Key" accompanying such order will be used to activate your Subscription. Further instructions will be provided along with the respective product. If you order a Subscription from an authorized reseller of Valve, you agree to direct all questions regarding the Product Key to that reseller.

G. Free Subscriptions

In some cases, Valve may offer a free Subscription to certain Content and Services. As with all Subscriptions, you are always responsible for any Internet service provider, telephone, and other connection fees that you may incur when using Steam, even when Valve offers a free Subscription.

H. Third-Party Sites

Steam may provide links to other third-party sites. Some of these sites may charge separate fees, which are not included in and are in addition to any Subscription or other fees that you may pay to Valve. Steam may also provide access to third-party vendors, who provide content, goods and/or services on Steam or the Internet. Any separate charges or obligations you incur in your dealings with these third parties are your responsibility. Valve makes no representations or warranties, either express or implied, regarding any third party site. In particular, Valve makes no representation or warranty that any service or subscription offered via third-party vendors will not change or be suspended or terminated.

I. Refunds and Right of Withdrawal

Without prejudice to any statutory rights you may have, you can request a refund for your orders or purchases on Steam in accordance with the terms of Valve's Refund Policy http://store.steampowered.com/steam_refunds/.

For European Union and United Kingdom consumers:

EU and UK law provides a statutory right to withdraw from certain contracts for physical merchandise and for the order of digital content. You can find more information about the extent of your statutory right to withdraw and the ways you can exercise it on this page: https://support.steampowered.com/kb_article.php?ref=8620-QYAL-4516.

4. ONLINE CONDUCT, CHEATING AND PROCESS TAMPERING ▲

Your online conduct and interaction with other Subscribers must comply with the Steam Online Conduct Rules, to be found at http://steampowered.com/index.php?area=online_conduct. Depending on terms of use imposed by third parties who host particular games or other services, additional requirements may also be provided in the Subscription Terms applicable to a particular Subscription.

Steam and the Content and Services may include functionality designed to identify software or hardware processes or functionality that may give a player an unfair competitive advantage when playing multiplayer versions of any Content and Services or modifications of

Content and Services ("Cheats"). You agree that you will not create Cheats or assist third parties in any way to create or use Cheats. You agree that you will not directly or indirectly disable, circumvent, or otherwise interfere with the operation of software designed to prevent or report the use of Cheats.

You agree that you will not tamper with the execution of Steam or Content and Services unless otherwise authorized by Valve. You acknowledge and agree that either Valve or any host of an online multiplayer game distributed through Steam ("External Host") may refuse to allow you to participate in certain online multiplayer games if you use Cheats or tamper with the execution of Steam or the Content and Services.

Further, you acknowledge and agree that External Hosts may report your use of Cheats or unauthorized process tampering to Valve, and Valve may communicate your history of use thereof to External Hosts within the boundaries of the Steam Privacy Policy.

Valve may restrict or terminate your Account or a particular Subscription for any conduct or activity that is illegal, constitutes a Cheat, or breaches the Steam Online Conduct Rules. You acknowledge that Valve is not required to provide you notice before terminating your Subscription(s) and/or Account.

You may not use Cheats, automation software (bots), mods, hacks, or any other unauthorized third-party software, to modify or automate any Subscription Marketplace process, the process of Steam account creation or otherwise in interacting with or controlling the processes or user interface of Steam, except to the degree expressly permitted.

5. THIRD-PARTY CONTENT ▲

In regard to all Subscriptions, Content and Services that are not authored by Valve, Valve does not screen such third-party content available on Steam or through other sources. Valve assumes no responsibility or liability for such third party content, unless to the extent provided by mandatory law. Some third-party application software is capable of being used by businesses for business purposes - however, you may only acquire such software via Steam for private personal use.

6. USER GENERATED CONTENT ▲

A. General Provisions

Steam provides interfaces and tools for you to be able to generate content and make it available to other users and/or to Valve at your sole discretion. "User Generated Content" means any content you make available to other users through your use of multi-user features of Steam, or to Valve or its affiliates through your use of the Content and Services or otherwise.

When you upload your content to Steam to make it available to other users and/or to Valve, you grant Valve and its affiliates the worldwide, non-exclusive right to use, reproduce, modify, create derivative works from, distribute, transmit, transcode, translate, broadcast, and otherwise communicate, and publicly display and publicly perform, your User Generated Content, and derivative works of your User Generated Content, for the purpose of the operation, distribution, incorporation as part of and promotion of the Steam service, Steam games or other Steam offerings, including Subscriptions. This license is granted to Valve as the content is uploaded on Steam for the entire duration of the intellectual property rights. It may be terminated if Valve is in breach of the license and has not cured such breach within fourteen (14) days from receiving notice from you sent to the attention of the Valve Legal Department at the applicable Valve address noted on this Privacy Policy page. The termination of said license does not affect the rights of any sub-licensees pursuant to any sub-license granted by Valve prior to termination of the license. Valve is the sole owner of the derivative works created by Valve from your User Generated Content, and is therefore entitled to grant licenses on these derivative works. If you use Valve cloud storage, you grant us a license to store your information as part of that service. Valve may place limits on the amount of storage you may use.

If you provide Valve with any feedback or suggestions about Steam, the Content and Services, or any Valve products, Hardware or services, Valve is free to use the feedback or suggestions however it chooses, without any obligation to account to you.

You agree that the User Generated Content you upload on Steam through the interfaces and tools provided by Valve is given significant exposure and that you share it for your enjoyment and for the recognition you may receive from other Subscribers. Consequently, you grant this license to Valve and its affiliates for free, notwithstanding any other contrary terms provided in App-Specific Terms, as defined under Section 6.B below.

B. Content Uploaded to the Steam Workshop

Some games or applications available on Steam ("Workshop-Enabled Apps") allow you to create User Generated Content based on or using the Workshop-Enabled App, and to submit that User Generated Content (a "Workshop Contribution") to one or more Steam Workshop web pages. Workshop Contributions can be viewed by the Steam community, and for some categories of Workshop Contributions users may be able to interact with, download or purchase the Workshop Contribution. In some cases, Workshop Contributions may be considered for incorporation by Valve or a third-party developer into a game or into a Subscription Marketplace.

You understand and agree that Valve is not obligated to use, distribute, or continue to distribute copies of any Workshop Contribution and reserves the right, but not the obligation, to restrict or remove Workshop Contributions for any reason.

Specific Workshop-Enabled Apps or Workshop web pages may contain special terms ("App-Specific Terms") that supplement or change the terms set out in this Section to reflect the individual requirements of the Workshop-Enabled App in question.

Under Section 6.A, Workshop Contributions are in principle made available to Subscribers for free. By way of exception, they may be made available to Subscribers for a fee. In that case, the way the revenues generated may be shared, and in particular, the compensation you may receive as a result of this making available, are defined in the App-Specific Terms and not by this Agreement. Unless otherwise specified in App-Specific Terms (if any), the following general rules apply to Workshop Contributions.

- Workshop Contributions are Subscriptions, and therefore you agree that any Subscriber receiving distribution of your Workshop Contribution will have the same rights to use your Workshop Contribution (and will be subject to the same restrictions) as are set out in this Agreement for any other Subscriptions.

- Notwithstanding the license described in Section 6.A, Valve will only have the right to modify including to create derivative works from your Workshop Contribution in the following cases: (a) Valve may make modifications necessary to make your Contribution compatible with Steam and the Workshop functionality or user interface, and (b) Valve or the applicable developer may make modifications to Workshop Contributions that are accepted for in-Application distribution as it deems necessary or desirable to enhance gameplay or make it compatible with the Workshop-Enabled App. Under Section 6.A, you grant for free to Valve and its affiliates the right to modify, including to create derivative works from, your Workshop Contribution. As a result, you are not entitled to any compensation from Valve as a result of Valve's modifications.

- You may, in your sole discretion, choose to remove a Workshop Contribution from the applicable Workshop pages. If you do so, Valve will no longer have the right to use, distribute, transmit, communicate, publicly display or publicly perform the Workshop

Contribution, except that (a) Valve may continue to exercise these rights for any Workshop Contribution that is accepted for distribution in-game or distributed in a manner that allows it to be used in-game, and (b) your removal will not affect the rights of any Subscriber who has already obtained access to a copy of the Workshop Contribution.

C. Promotions and Endorsements

If you use Steam services (e.g. the Steam Curators' Lists or the Steam Broadcasting service) to promote or endorse a product, service or event in return for any kind of consideration from a third party (including non-monetary rewards such as free games), you must clearly indicate the source of such consideration to your audience.

D. Representations and Warranties

You represent and warrant to us that you have sufficient rights in all User Generated Content to grant Valve and other affected parties the licenses described under A. and B. above or in any license terms specific to the applicable Workshop-Enabled App or Workshop page. This includes, without limitation, any kind of intellectual property rights or other proprietary or personal rights affected by or included in the User Generated Content. In particular, with respect to Workshop Contributions, you represent and warrant that the Workshop Contribution was originally created by you (or, with respect to a Workshop Contribution to which others contributed besides you, by you and the other contributors, and in such case that you have the right to submit such Workshop Contribution on behalf of those other contributors).

You furthermore represent and warrant that the User Generated Content, your submission of that Content, and your granting of rights in that Content does not violate any applicable contract, law or regulation.

7. DISCLAIMERS; LIMITATION OF LIABILITY; NO GUARANTEES; LIMITED WARRANTY & AGREEMENT ▲

THIS SECTION 7 DOES NOT APPLY TO EU OR UK SUBSCRIBERS.

- FOR AUSTRALIAN SUBSCRIBERS, THIS SECTION 7 DOES NOT EXCLUDE, RESTRICT OR MODIFY THE APPLICATION OF ANY GUARANTEE, RIGHT OR REMEDY THAT CANNOT BE SO EXCLUDED, RESTRICTED OR MODIFIED, INCLUDING THOSE CONFERRED BY THE AUSTRALIAN CONSUMER LAW (ACL). UNDER THE ACL, GOODS COME WITH GUARANTEES INCLUDING A GUARANTEE THAT GOODS ARE OF ACCEPTABLE QUALITY. IF THERE IS A FAILURE OF THIS GUARANTEE, YOU ARE ENTITLED TO A REMEDY (WHICH MAY INCLUDE HAVING THE GOODS REPAIRED OR REPLACED OR A REFUND). IF A REPAIR OR REPLACEMENT CANNOT BE PROVIDED OR THERE IS A MAJOR FAILURE, YOU ARE ENTITLED TO A REFUND.

- FOR NEW ZEALAND SUBSCRIBERS, THIS SECTION 7 DOES NOT EXCLUDE, RESTRICT OR MODIFY THE APPLICATION OF ANY RIGHT OR REMEDY THAT CANNOT BE SO EXCLUDED, RESTRICTED OR MODIFIED INCLUDING THOSE CONFERRED BY THE NEW ZEALAND CONSUMER GUARANTEES ACT 1993. UNDER THIS ACT ARE GUARANTEES WHICH INCLUDE THAT GOODS AND SERVICES ARE OF ACCEPTABLE QUALITY. IF THIS GUARANTEE IS NOT MET THERE ARE ENTITLEMENTS TO HAVE THE SOFTWARE REMEDIED (WHICH MAY INCLUDE REPAIR, REPLACEMENT OR REFUND). IF A REMEDY CANNOT BE PROVIDED OR THE FAILURE IS OF A SUBSTANTIAL CHARACTER, THE ACT PROVIDES FOR A REFUND.

Prior to acquiring a Subscription, you should consult the product information made available on Steam, including Subscription description, minimum technical requirements, and user reviews.

A. DISCLAIMERS

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, VALVE AND ITS AFFILIATES AND SERVICE PROVIDERS EXPRESSLY DISCLAIM (I) ANY WARRANTY FOR STEAM, THE CONTENT AND SERVICES, AND THE SUBSCRIPTIONS, AND (II) ANY COMMON LAW DUTIES WITH REGARD TO STEAM, THE CONTENT AND SERVICES, AND THE SUBSCRIPTIONS, INCLUDING DUTIES OF LACK OF NEGLIGENCE AND LACK OF WORKMANLIKE EFFORT. STEAM, THE CONTENT AND SERVICES, THE SUBSCRIPTIONS, AND ANY INFORMATION AVAILABLE IN CONNECTION THEREWITH ARE PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS, "WITH ALL FAULTS" AND WITHOUT WARRANTY OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NONINFRINGEMENT. ANY WARRANTY AGAINST INFRINGEMENT THAT MAY BE PROVIDED IN SECTION 2-312 OF THE UNITED STATES UNIFORM COMMERCIAL CODE AND/OR IN ANY OTHER COMPARABLE STATE STATUTE IS EXPRESSLY DISCLAIMED. ALSO, THERE IS NO WARRANTY OF TITLE, NON-INTERFERENCE WITH YOUR ENJOYMENT, OR AUTHORITY IN CONNECTION WITH STEAM, THE CONTENT AND SERVICES, THE SUBSCRIPTIONS, OR INFORMATION AVAILABLE IN CONNECTION THEREWITH.

ANY WARRANTY AGAINST INFRINGEMENT THAT MAY BE PROVIDED IN SECTION 2-312 OF THE UNITED STATES UNIFORM COMMERCIAL CODE IS EXPRESSLY DISCLAIMED.

B. LIMITATION OF LIABILITY

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NEITHER VALVE, ITS LICENSORS, NOR THEIR AFFILIATES, NOR ANY OF VALVE'S SERVICE PROVIDERS, SHALL BE LIABLE IN ANY WAY FOR LOSS OR DAMAGE OF ANY KIND RESULTING FROM THE USE OR INABILITY TO USE STEAM, YOUR ACCOUNT, YOUR SUBSCRIPTIONS AND THE CONTENT AND SERVICES INCLUDING, BUT NOT LIMITED TO, LOSS OF GOODWILL, WORK STOPPAGE, COMPUTER FAILURE OR MALFUNCTION, OR ANY AND ALL OTHER COMMERCIAL DAMAGES OR LOSSES. IN NO EVENT WILL VALVE BE LIABLE FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES, OR ANY OTHER DAMAGES ARISING OUT OF OR IN ANY WAY CONNECTED WITH STEAM, THE CONTENT AND SERVICES, THE SUBSCRIPTIONS, AND ANY INFORMATION AVAILABLE IN CONNECTION THEREWITH, OR THE DELAY OR INABILITY TO USE THE CONTENT AND SERVICES, SUBSCRIPTIONS OR ANY INFORMATION, EVEN IN THE EVENT OF VALVE'S OR ITS AFFILIATES' FAULT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, OR BREACH OF VALVE'S WARRANTY AND EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THESE LIMITATIONS AND LIABILITY EXCLUSIONS APPLY EVEN IF ANY REMEDY FAILS TO PROVIDE ADEQUATE RECOMPENSE.

BECAUSE SOME STATES OR JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR THE LIMITATION OF LIABILITY FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES, IN SUCH STATES OR JURISDICTIONS, EACH OF VALVE, ITS LICENSORS, AND ITS AFFILIATES' LIABILITY SHALL BE LIMITED TO THE FULL EXTENT PERMITTED BY LAW.

C. NO GUARANTEES

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NEITHER VALVE NOR ITS AFFILIATES GUARANTEE CONTINUOUS, ERROR-FREE, VIRUS-FREE OR SECURE OPERATION AND ACCESS TO STEAM, THE CONTENT AND SERVICES, YOUR ACCOUNT AND/OR YOUR SUBSCRIPTION(S) OR ANY INFORMATION AVAILABLE IN CONNECTION THEREWITH.

D. LIMITED WARRANTY & AGREEMENT

CERTAIN HARDWARE PURCHASED FROM VALVE IS SUBJECT TO A LIMITED WARRANTY & AGREEMENT, [OR DEPENDING ON YOUR LOCATION, A STATUTORY WARRANTY] WHICH IS DESCRIBED IN DETAIL HERE.

8. AMENDMENTS TO THIS AGREEMENT ▲

PLEASE NOTE: If you are a consumer with place of residence in Germany, a different version of Section 8 applies to you, which is available here.

A. Mutual Amendment

This Agreement may at any time be mutually amended by your explicit consent to changes proposed by Valve.

B. Unilateral Amendment

Furthermore, Valve may amend this Agreement (including any Subscription Terms or Rules of Use) unilaterally at any time in its sole discretion. In this case, you will be notified by e-mail of any amendment to this Agreement made by Valve at least 30 (30) days before the effective date of the amendment. You can view the Agreement at any time at http://www.steampowered.com/. Your failure to cancel your Account prior to the effective date of the amendment will constitute your acceptance of the amended terms. If you don't agree to the amendments or any of the terms in this Agreement, your only remedy is to cancel your Account or to cease use of the affected Subscription(s). Valve shall not have any obligation to refund any fees that may have accrued to your Account before cancellation of your Account or cessation of use of any Subscription, nor shall Valve have any obligation to prorate any fees in such circumstances.

9. TERM AND TERMINATION ▲

A. Term

The term of this Agreement (the "Term") commences on the date you first indicate your acceptance of these terms, and will continue in effect until otherwise terminated in accordance with this Agreement.

B. Termination by You

You may cancel your Account at any time. You may cease use of a Subscription at any time or, if you choose, you may request that Valve terminate your access to a Subscription. However, Subscriptions are not transferable, and even if your access to a Subscription for a particular game or application is terminated, the original activation key will not be able to be registered to any other account, even if the Subscription was obtained in a retail store. Access to Subscriptions ordered as a part of a pack or bundle cannot be terminated individually, termination of access to one game within the bundle will result in termination of access to all games ordered in the pack. Your cancellation of an Account, or your cessation of use of any Subscription or request that access to a Subscription be terminated, will not entitle you to any refund, including of any Subscription fees. Valve reserves the right to collect fees, surcharges or costs incurred prior to the cancellation of your Account or termination of your access to a particular Subscription. In addition, you are responsible for any charges incurred to third-party vendors or content providers before your cancellation.

C. Termination by Valve

Valve may restrict or cancel your Account or any particular Subscription(s) at any time in the event that (a) Valve ceases providing such Subscriptions to similarly situated Subscribers generally, or (b) you breach any terms of this Agreement (including any Subscription Terms or Rules of Use). In the event that your Account or a particular Subscription is restricted or terminated or cancelled by Valve for a violation of this Agreement or improper or illegal activity, no refund, including of any Subscription fees or of any unused funds in your Steam Wallet, will be granted.

D. Survival of Terms

Sections 2.C., 2.D., 2.F., 2.G., 3.A., 3.B., 3.D., 3.H., and 5 - 12 will survive any expiration or termination of this Agreement.

10. APPLICABLE LAW/MEDIATION/JURISDICTION/ATTORNEYS' FEES ▲

For All Subscribers Outside the European Union and United Kingdom:

You and Valve agree that this Agreement shall be deemed to have been made and executed in the State of Washington, U.S.A., and Washington law, excluding conflict of laws principles and the Convention on Contracts for the International Sale of Goods, governs all claims arising out of or relating to: (i) any aspect of the relationship between us; (ii) this Agreement; or (iii) your use of Steam, your Account or the Content and Services; except that the U.S. Federal Arbitration Act governs arbitration as far as your country's laws permit. Subject to Section 11 (Dispute Resolution/Binding Arbitration/Class Action Waiver) below, you and Valve agree that any claim asserted in any legal proceeding shall be commenced and maintained exclusively in any state or federal court located in King County, Washington, having subject matter jurisdiction. You and Valve hereby consent to the exclusive jurisdiction of such courts. In any dispute arising out of or relating to this Agreement, your use of Steam, your account, or the Content and Services, the prevailing party will be entitled to attorneys' fees and expenses (except arbitration -- see Section 11.C.)

For EU and UK Subscribers:

This Agreement is governed by the law of the country where you have your habitual residence.

In the event of a dispute relating to the interpretation, the performance or the validity of the Subscriber Agreement, an amicable solution may be sought before any legal action. You can file your complaint at http://help.steampowered.com. The European Commission provides an Online Dispute Resolution website for EU consumers at https://ec.europa.eu/consumers/odr. Participation in this website is not available to US companies, which is why Valve is not registered there. However, insofar as your complaint concerns the behavior of Valve's data protection representative Valve GmbH you can file your complaint there.

In the event that an Alternative Dispute Resolution Procedure fails, or if either Valve or you prefer not to resort to Alternative Dispute Resolution, you may bring proceedings in the courts of the place where you are domiciled.

11. DISPUTE RESOLUTION/BINDING ARBITRATION/CLASS ACTION WAIVER ▲

This Section 11 shall apply to the maximum extent permitted by applicable law. IN PARTICULAR, IF YOU ARE A CONSUMER WHO LIVES IN A EUROPEAN UNION MEMBER COUNTRY, THE UNITED KINGDOM, THE PROVINCE OF QUEBEC (CANADA), AUSTRALIA, OR NEW ZEALAND, THIS SECTION 11 DOES NOT APPLY TO YOU. IF YOU ARE A CONSUMER WHO LIVES IN RUSSIA,YOU MAY UTILIZE THE ARBITRATION PROCESS IDENTIFIED IN THIS SECTION 11 OR YOU MAY USE LOCAL RUSSIAN STATE COURTS TO RESOLVE YOUR DISPUTE.

Most user concerns can be resolved by use of our Steam support site at https://support.steampowered.com/. If Valve is unable to resolve your concerns and a dispute remains between you and Valve, this Section explains how the parties have agreed to resolve it.

A. Must Arbitrate All Claims Except Intellectual Property, Unauthorized Use, Piracy, or Theft

YOU AND VALVE AGREE TO RESOLVE ALL DISPUTES AND CLAIMS BETWEEN US IN INDIVIDUAL BINDING ARBITRATION. THAT INCLUDES, BUT IS NOT LIMITED TO, ANY CLAIMS ARISING OUT OF OR RELATING TO: (i) ANY ASPECT OF THE RELATIONSHIP BETWEEN US; (ii) THIS AGREEMENT; OR (iii) YOUR USE OF STEAM, YOUR ACCOUNT, HARDWARE OR THE CONTENT AND SERVICES. IT APPLIES REGARDLESS OF WHETHER SUCH CLAIMS ARE BASED IN CONTRACT, TORT, STATUTE, FRAUD, UNFAIR COMPETITION, MISREPRESENTATION OR ANY OTHER LEGAL THEORY, AND INCLUDES ALL CLAIMS BROUGHT ON BEHALF OF ANOTHER PARTY.

However, this Section 11 does not apply to the following types of claims or disputes, which you or Valve may bring in any court with jurisdiction: (i) claims of infringement or other misuse of intellectual property rights, including such claims seeking injunctive relief; and (ii) claims related to or arising from any alleged unauthorized use, piracy, or theft.

This Section 11 does not prevent you from bringing your dispute to the attention of any federal, state, or local government agencies that can, if the law allows, seek relief from us for you.

An arbitration is a proceeding before a neutral arbitrator, instead of before a judge or jury. Arbitration is less formal than a lawsuit in court, and provides more limited discovery. It follows different rules than court proceedings, and is subject to very limited review by courts. The arbitrator will issue a written decision and provide a statement of reasons if requested by either party. YOU UNDERSTAND THAT YOU AND VALVE ARE GIVING UP THE RIGHT TO SUE IN COURT AND TO HAVE A TRIAL BEFORE A JUDGE OR JURY.

B. Try to Resolve Dispute Informally First

You and Valve agree to make reasonable, good faith efforts to informally resolve any dispute before initiating arbitration. A party who intends to seek arbitration must first send the other a written notice that describes the nature and basis of the claim or dispute and sets forth the relief sought. If you and Valve do not reach an agreement to resolve that claim or dispute within thirty (30) calendar days after the notice is received, you or Valve may commence an arbitration. Written notice to Valve must be sent via postal mail to: ATTN: Arbitration Notice, Valve Corporation, P.O. Box 1688, Bellevue, WA 98004.

C. Arbitration Rules and Fees

The U.S. Federal Arbitration Act applies to this Section 11 as far as your country's laws permit. The arbitration will be governed by the Consumer Arbitration Rules (or the Commercial Arbitration Rules, if the Consumer Arbitration rules are inapplicable) of the American Arbitration Association ("AAA") as modified by this Agreement. Rules are available at http://www.adr.org. The arbitrator is bound by the terms of this Agreement.

The AAA will administer the arbitration. Outside the U.S., Valve will select a neutral arbitration provider that uses these or similar rules. It may be conducted through the submission of documents, by phone, or in person in the county where you live or at another mutually agreed location.

If you seek $10,000 or less, Valve agrees to promptly reimburse your filing fee and your share if any of AAA's arbitration costs, including arbitrator compensation, unless the arbitrator determines your claims are frivolous or were filed for harassment. Valve agrees not to seek its attorneys' fees or costs unless the arbitrator determines your claims are frivolous or were filed for harassment. If you seek more than $10,000 and the AAA Consumer Arbitration Rules do not apply, the AAA's arbitration costs, including arbitrator compensation, will be split between you and Valve according to the AAA Commercial Arbitration Rules.

D. Individual Binding Arbitration Only

YOU AND VALVE AGREE NOT TO BRING OR PARTICIPATE IN A CLASS OR REPRESENTATIVE ACTION, PRIVATE ATTORNEY GENERAL ACTION, WHISTLE BLOWER ACTION, OR CLASS, COLLECTIVE, OR REPRESENTATIVE ARBITRATION, EVEN IF AAA's RULES WOULD OTHERWISE ALLOW ONE. THE ARBITRATOR MAY AWARD RELIEF ONLY IN FAVOR OF THE INDIVIDUAL PARTY SEEKING RELIEF AND ONLY TO THE EXTENT OF THAT PARTY'S INDIVIDUAL CLAIM. You and Valve also agree not to seek to combine any action or arbitration with any other action or arbitration without the consent of all parties to this Agreement and all other actions or arbitrations.

This Agreement does not permit class, collective, or representative arbitration. A court has exclusive authority to rule on any assertion that it does.

E. What Happens if Part of Section 11 Is Found Illegal or Unenforceable

If any part of Section 11 (Dispute Resolution/Binding Arbitration/Class Action Waiver) is found to be illegal or unenforceable, the rest will remain in effect (with an arbitration award issued before any court proceeding begins), except that if a finding of partial illegality or unenforceability would allow class, collective, or representative arbitration, all of Section 11 will be unenforceable and the claim or dispute will be resolved in court.

12. MISCELLANEOUS ▲

Except as otherwise expressly set forth in this Agreement, in the event that any provision of this Agreement shall be held by an arbitrator, court, or other tribunal of competent jurisdiction to be illegal or unenforceable, such provision will be enforced to the maximum extent permissible and the remaining portions of this Agreement shall remain in full force and effect. Section 11.E. governs if some parts of Section 11 (Dispute Resolution/Binding Arbitration/Class Action Waiver) are held to be illegal or unenforceable. This Agreement, including any Subscription Terms, Rules of Use, the Valve Privacy Policy, and the Valve Hardware Limited Warranty Policy, constitutes and contains the entire agreement between the parties with respect to the subject matter hereof and supersedes any prior oral or written agreements. You agree that this Agreement is not intended to confer and does not confer any rights or remedies upon any person other than the parties to this Agreement.

Valve's obligations are subject to existing laws and legal process and Valve may comply with law enforcement or regulatory requests or requirements notwithstanding any contrary term.

You agree to comply with all applicable import/export laws and regulations. You agree not to export the Content and Services or Hardware or allow use of your Account by individuals of any terrorist supporting countries to which encryption exports are at the time of exportation restricted by the U.S. Bureau of Export Administration. You represent and warrant that you are not located in, under the control of, or a national or resident of any such prohibited country.

This Agreement was last updated on April 25, 2023 ("Revision Date"). If you were a Subscriber before the Revision Date, it replaces your existing agreement with Valve or Valve SARL on the day that it becomes effective according to Section 8 above.

Privacy Feedback

 © 2023 Valve Corporation. All rights reserved. All trademarks are property of their respective owners in the US and other countries. VAT included in all prices where applicable.   Privacy Policy   |   Legal   |   Steam Subscriber Agreement   |   Refunds   |   Cookies     

About Valve  |  Jobs  |  Steamworks  |  Steam Distribution  |  Support  |  Recycling  |  Gift Cards  |  ☐ Steam  |  ☐ @steam