1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9  VALVE CORPORATION,

10                    Plaintiff,

11            v.

12  THOMAS ABBRUZZESE *et al.*,

13                    Defendants.

No. 2:24-CV-1717-JNW

**MOTION FOR PRELIMINARY
INJUNCTION**

**NOTE ON MOTION CALENDAR:
SEPTEMBER 26, 2025**

**ORAL ARGUMENT REQUESTED**

14

15

16

17

18

19

20

21

22

23

24

25

26

MOTION FOR PRELIMINARY INJUNCTION
No. 2:24-CV-1717-JNW

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ..........................................................................III

I.    INTRODUCTION AND RELIEF REQUESTED ......................................1

II.   STATEMENT OF FACTS ......................................................................4

    A.   Valve and Steam Users Agree to the SSA, Which at One Time
        Included an Arbitration Provision.......................................................4

    B.   Plaintiffs in *Wolfire* Commence Consumer Antitrust Class Action
        Against Valve......................................................................................4

    C.   Bucher Law Commences Mass Arbitration Under the Superseded
        SSA ....................................................................................................5

    D.   Bucher Law Seeks and Obtains Arbitrator Rulings that the
        Arbitration Agreement in the Superseded SSA Is Unenforceable...5

    E.   Bucher Law Files Consumer Antitrust Class Action in This Court.6

    F.   Valve Removes the Arbitration Agreement from the SSA..............6

    G.   Bucher Law Represents to This Court that the Current SSA
        Applies to All Defendants...................................................................7

    H.   Bucher Law Continues To Prosecute Arbitrations .........................8

    I.   Valve Files This Petition....................................................................8

III.   THE MOTION FOR PRELIMINARY INJUNCTION SHOULD BE
      GRANTED ...........................................................................................9

    A.   Valve Is Likely To Succeed on the Merits: The Parties Have No
        Agreement To Arbitrate....................................................................10

        1.   Supreme Court Authority Requires That the Court Decide
            Which Agreement Is Controlling..........................................10

        2.   The Current SSA Is Valid and Fully Enforceable as to each
            Defendant ...............................................................................11

            (a)   Valve Properly Provided Widespread and Repeated
                Notice of the Current SSA ......................................11

            (b)   Defendants Agreed to the Current SSA .................14

        3.   Under the Current SSA, Disputes Between Defendants and
            Valve Must Be Resolved in Court ......................................15

        4.   Valve Does Not Seek Mid-Arbitration Judicial Review—It
            Seeks To Stop Unauthorized Arbitrations ..........................17

    B.   Valve Will Face Irreparable Harm If Forced To Arbitrate ............18

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98101-1001
Tel (206) 625-8600
Fax (206) 625-0900

C.      The Parties' Interests Favor An Injunction....................................21

D.      The Public Interest Favors An Injunction.......................................23

E.      The Court Should Not Require a Bond...........................................24

IV.     CONCLUSION..........................................................................................24

MOTION FOR PRELIMINARY INJUNCTION – ii
No. 2:24-CV-1717-JNW

**Corr Cronin LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>CASES</u> <u>Page(s)</u>

3

4

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ......................................................................9

5

*Allstate Insurance Co. v. Tvildiani*,
    2015 WL 13048729 (E.D.N.Y. Apr. 14, 2015) ..............................................20

6

7

*American Pipe & Construction Co. v. Utah*,
    414 U.S. 538 (1974)......................................................................................22

8

*AT&T Mobility LLC v. Smith*,
    2011 WL 5924460 (E.D. Pa. Oct. 7, 2011) ..................................................21

9

10

*AT&T Mobility LLC v. Bernardi*,
    2011 WL 5079549 (N.D. Cal. Oct. 26, 2011) ..............................................21

11

*Blue Cross Blue Shield of Massachusetts, Inc. v. BCS Insurance Co.*,
    671 F.3d 635 (7th Cir. 2011) ................................................................17, 18

12

13

*Briggs v. Service Corp. International*,
    2023 WL 2075958 (W.D. Wash. Feb. 17, 2023) ..........................................14

14

*Coinbase, Inc. v. Suski*,
    602 U.S. 143 (2024)....................................................................3, 10, 11, 17

15

16

*Dasher v. RBC Bank (USA)*,
    745 F.3d 1111 (11th Cir. 2014) ............................................................15, 16

17

*Dlugolecki v. PeopleConnect, Inc.*,
    2020 WL 13587803 (C.D. Cal. Nov. 9, 2020)..............................................14

18

19

*Enderlin v. XM Satellite Radio Holdings, Inc.*,
    2008 WL 830262 (E.D. Ark. Mar. 25, 2008) ..............................................16

20

*GEICO v. Mayzenberg*,
    2018 WL 6031156 (E.D.N.Y. Nov. 16, 2018)..............................................21

21

22

*Goetsch v. Shell Oil Co.*,
    197 F.R.D. 574 (W.D.N.C. 2000)..................................................................16

23

*Goldman, Sachs & Co. v. City of Reno*,
    747 F.3d 733 (9th Cir. 2014) ........................................................................9

24

25

*Grant v. T-Mobile USA, Inc.*,
    2024 WL 3510937 (W.D. Wash. July 23, 2024)..........................................11

26

*Ingram Micro Inc. v. Signeo International, Ltd.*,
    2014 WL 3721197 (C.D. Cal. July 22, 2014)..............................................16

MOTION FOR PRELIMINARY INJUNCTION – iii

No. 2:24-CV-1717-JNW

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

*Laster v. T-Mobile USA, Inc.,*
  2008 WL 5216255 (S.D. Cal. Aug. 11, 2008) ............................................................16

*LAWI/CSA Consolidators, Inc. v. Wholesale & Retail Food Distribution, Teamsters Local 63,*
  849 F.2d 1236 (9th Cir. 1988) ...............................................................................18

*Microsoft Corp. v. Motorola, Inc.,*
  696 F.3d 872 (9th Cir. 2012) .................................................................................22

*Morgan Keegan & Co. v. McPoland,*
  829 F. Supp. 2d 1031 (W.D. Wash. 2011)..................................................... passim

*Morgan Stanley & Co., LLC v. Couch*, 134 F. Supp. 3d 1215 (E.D. Cal. 2015),
  *aff'd*, 659 F. App'x 402 (9th Cir. 2016)......................................................... passim

*In re National Football League's Sunday Ticket Antitrust Litigation,*
  2021 WL 2350814 (C.D. Cal. Apr. 20, 2021) ............................................................16

*Open Book Theatre Co. v. Brown Paper Tickets, LLC,*
  2024 WL 4230479 (S.D. Cal. Sept. 18, 2024)...................................................12, 14

*Oppenheimer & Co. v. Mitchell,*
  2023 WL 2428404 (W.D. Wash. Mar. 9, 2023) ............................................... passim

*Pilon v. Discovery Communications, LLC,*
  769 F. Supp. 3d 273 (S.D.N.Y. 2025) ...............................................11, 14, 15, 16

*Resource Group International Ltd. v. Chishti,*
  91 F.4th 107 (2d Cir. 2024) ...................................................................................19

*Sadlock v. Walt Disney Co.,*
  2023 WL 4869245 (N.D. Cal. July 31, 2023)..............................................11, 12, 14

*Savers Property & Casualty Insurance Co. v. National Union Fire Insurance Co. of Pittsburg, PA,*
  748 F.3d 708 (6th Cir. 2014) ...........................................................................17, 18

*In re Sussex,*
  781 F.3d 1065 (9th Cir. 2015) .........................................................................17, 18

*Textile Unlimited, Inc. v. A..BMH & Co., Inc.,*
  240 F.3d 781 (9th Cir. 2001) ...................................................................................9

*Trudeau v. Google LLC,*
  349 F. Supp. 3d 869 (N.D. Cal. 2018), *aff'd*, 816 F. App'x 68 (9th Cir. 2020) .........15

*United Financial Casualty Co. v. Coleman,*
  173 Wash. App. 463 (2012).....................................................................................11

MOTION FOR PRELIMINARY INJUNCTION – iv

No. 2:24-CV-1717-JNW

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

*West v. Uber Technologies*,
   2018 WL 5848903 (C.D. Cal. Sept. 5, 2018) ............................................................................14

*Williams v. Experian Information Solutions Inc.*,
   2024 WL 3876171 (D. Ariz. Aug. 20, 2024)............................................................................11

*Winter v. Natural Resources Defense Council, Inc.*,
   555 U.S. 7 (2008)........................................................................................................................9

*Wolfire Games, LLC v. Valve Corp.*,
   2021 WL 4952220 (W.D. Wash. Oct. 25, 2021) ........................................................................4

MOTION FOR PRELIMINARY INJUNCTION – v
No. 2:24-CV-1717-JNW

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1    **I.    INTRODUCTION AND RELIEF REQUESTED**

2    Valve brings this motion for preliminary injunction pursuant to Rule 65 of the Federal

3    Rules of Civil Procedure to enjoin Defendants from continuing to pursue arbitrations before the

4    American Arbitration Association ("AAA") because there is no agreement to arbitrate between the

5    parties.

6    The 572 Defendants are users of Valve's video game platform, Steam. Valve is forced to

7    bring this case by the actions of Bucher Law PLLC ("Bucher Law"), a small law firm founded by

8    William Ward Bucher IV.[1] Looking to build his business, Mr. Bucher engaged in a widespread

9    marketing campaign to convince Steam users to bring antitrust claims against Valve related to

10   Steam. As Mr. Bucher told an investor he was recruiting to fund his scheme, his strategy was to

11   "weaponize[]" an arbitration provision in the user agreement between Valve and Steam users to

12   leverage a settlement from Valve. (Ex. 1 at 3.)[2] Mr. Bucher claimed that bringing thousands of

13   arbitrations on behalf of Steam users would force Valve into a settlement without ever reaching

14   the merits of any claims because "[a]ggregating claims makes [Valve's] entrance fee to just defend

15   [arbitrations] prohibitively expensive." (*Id.*)

16   Steam users were merely pawns in this scheme; Mr. Bucher promised huge returns for a

17   litigation funder willing to front the costs of convincing users to bring claims against Valve,

18   reducing each Steam user to an "acquisition" cost. (Ex. 1 at 5.) Mr. Bucher estimated a "spend of

19   $3.75 million to recruit 75,000 clients at $50 an acquisition" and a "1874% ROI on $6.5 million

20   investment." (*Id.* at 5, 9.) The plan was simple: Convince tens of thousands of Steam users to bring

21   claims against Valve, then use their numbers to extort a windfall settlement by threatening Valve

---

22   [1] Mr. Bucher founded Bucher Law after he was terminated by another law firm, Zaiger LLC.
23   Zaiger LLC is now suing Mr. Bucher, claiming among other things that he aided and abetted fraud,
     committed misappropriation, and tortiously interfered with client relationships. *See* Complaint,
24   *Zaiger LLC v. Bucher Law PLLC*, No. 154124-2023 (N.Y. Sup. Ct. May 9, 2023).

25   [2] All references to "Ex." followed by a numbered exhibit refer to exhibits filed in connection with
     the Declaration of Andrew J. Fuchs, dated August 21, 2025 ("Fuchs Decl."). All references to
26   "Ex." followed by a lettered exhibit refer to exhibits filed in connection with the Declaration of
     Scott Lynch, dated August 21, 2025 ("Lynch Decl.").

MOTION FOR PRELIMINARY INJUNCTION – 1
No. 2:24-CV-1717-JNW

with thousands of arbitrations that would cause Valve to incur substantial arbitration fees. Some Steam users noted on public posts that Mr. Bucher was engaged in a "scam." Others appear to have been misled about what they had signed up for, believing it was a class action or class action settlement that didn't exist. And some Steam users who were induced to sign up after being bombarded with harassing advertising later tried to rescind their participation.

After tens of thousands of Steam users apparently (and perhaps unwittingly) retained Bucher Law to bring claims against Valve, Bucher Law launched several thousand arbitrations against Valve, invoking the arbitration agreement in the Steam Subscriber Agreement ("SSA") between Valve and Steam users that was in effect at the time.[3] An arbitrator in four of those arbitrations ruled that the SSA's arbitration agreement was not enforceable. Bucher Law then filed a putative nationwide class action against Valve in this Court based on the premise that Valve's arbitration agreement was unenforceable as to the entire class of all Steam users in the United States, *including Defendants here*. *See* Complaint, *Elliott v. Valve Corporation*, No. 2:24-cv-01218 (W.D. Wash. filed Aug. 9, 2024).

In light of all of the circumstances, Valve removed the arbitration agreement and class action waiver from the SSA.[4] Now, the current SSA (the "Current SSA") provides that all claims and disputes between Valve and Steam users must proceed exclusively in court, including claims and disputes that arose before Valve implemented the Current SSA.

Defendants have agreed to the Current SSA, which does not contain an agreement to arbitrate and applies to accrued and pending claims. Yet despite its clients' agreement to resolve all disputes exclusively in court, and despite basing a nationwide class action on the argument that the arbitration agreement in Valve's prior SSA was not enforceable, Bucher Law is continuing to push forward with Defendants' arbitrations. Bucher Law argued in those arbitrations that the old

---

[3] When an individual creates a Steam account, the individual and Valve enter into a Steam Subscriber Agreement governing the customer relationship between them. (Lynch Decl. ¶ 3.)

[4] The prior version of the SSA that included an arbitration agreement and class action waiver is referred to herein as the "Superseded SSA."

MOTION FOR PRELIMINARY INJUNCTION – 2
No. 2:24-CV-1717-JNW

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

arbitration agreement from the Superseded SSA remains enforceable and asked arbitrators to rule those claimants[5] may proceed in arbitration on that basis.

The Court should grant Valve's motion for a preliminary injunction because Valve meets each requirement for this relief:

*First*, Valve is likely to succeed on the merits. (*Infra* Part III.A.) Under controlling Supreme Court precedent, whether the Superseded SSA (with its arbitration agreement) or the Current SSA (without an arbitration agreement) governs is a decision for this Court. *See Coinbase, Inc. v. Suski*, 602 U.S. 143 (2024). All Defendants received notice of and assented to the Current SSA. The Current SSA provides that all claims, including accrued claims, must proceed in court in Washington. Under well-settled law, a new forum provision that expressly provides for retroactive application is enforceable and governs pending disputes.

*Second*, Valve is suffering and will continue to suffer irreparable harm. (*Infra* Part III.B.) Forcing a party to arbitrate a dispute that it did not agree to arbitrate constitutes *per se* irreparable harm. Many arbitrators have agreed to proceed over Valve's objection. Valve must commit significant time and resources to attending pre-hearing conferences, engaging in information exchange revealing large amounts of confidential company information, briefing pre-trial disputes, and preparing for and attending final merits hearings in unauthorized arbitrations.

*Third*, the parties' interests favor an injunction. (*Infra* Part III.C.) The parties did not agree to arbitrate; forcing them to do so would serve no purpose—other than to potentially benefit Bucher Law and its funder—and would cause Defendants no prejudice. A number of Defendants did not even know Bucher Law had filed an arbitration on their behalf before Valve commenced this action. And all Defendants are free to pursue their claims in court, in the putative class action, *In re Valve Antitrust Litigation*, No. 2:21-cv-00563-JNW ("*Wolfire*"), or otherwise. Bucher Law

---

[5] References to "claimants" are to the individuals on whose behalf Bucher Law has asserted claims in arbitration with the AAA against Valve. Some claimants do not have pending arbitrations before arbitrators (or are deceased) and are therefore not Defendants in this action.

MOTION FOR PRELIMINARY INJUNCTION – 3
No. 2:24-CV-1717-JNW

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1    has described *Wolfire* as "overlapping" with its arbitrations, and *Wolfire* includes among the

2    putative class all Defendants.

3         *Lastly*, the public interest favors an injunction. (*Infra* Part III.D.) The public interest is not

4    served by compelling parties to arbitrate in the absence of an agreement to arbitrate, where any

5    award may be vacated. That is all the more true where there is an "overlapping" putative class

6    action already pending.

7    **II.    STATEMENT OF FACTS**

8        **A.    Valve and Steam Users Agree to the SSA,
             Which at One Time Included an Arbitration Provision**

9
10        When individuals create a Steam account, they must agree to the SSA. (Lynch Decl. ¶ 3.)

11   Valve periodically updated the SSA since it was first implemented in 2003. In 2012, Valve added

     to the SSA a class action waiver and an arbitration agreement providing that, with limited
12
     exceptions, "you and Valve agree to resolve all disputes and claims between us in individual
13
     binding arbitration" with the AAA. (Lynch Decl. ¶ 5, Ex. A § 11(A).)
14
         **B.    Plaintiffs in *Wolfire* Commence
15              Consumer Antitrust Class Action Against Valve**

16        In 2021, a video game developer and seven consumer plaintiffs brought a putative class

17   action in this Court against Valve asserting violations of the federal antitrust laws, *Wolfire Games*

18   *LLC v. Valve Corp.*, No 2:21-cv-00563 (W.D. Wash. filed Apr. 27, 2021). Valve moved to compel

19   arbitration of the consumer claims under the Superseded SSA. In response, the consumer plaintiffs

20   in that action challenged the enforceability of the arbitration agreement on unconscionability

21   grounds. The Court granted the motion but declined to address the unconscionability challenge.

22   The Court explained that "the question of unconscionability should be determined in arbitration."

23   *See Wolfire Games, LLC v. Valve Corp.*, 2021 WL 4952220, at *2 (W.D. Wash. Oct. 25, 2021).

24   *Wolfire* was stayed as to the seven individual consumer plaintiffs. *Id.* They are not Defendants in

25   this action.

26

---

MOTION FOR PRELIMINARY INJUNCTION – 4
No. 2:24-CV-1717-JNW

### C.    Bucher Law Commences Mass Arbitration Under the Superseded SSA

In 2023, Bucher Law commenced its mass arbitration strategy against Valve, which was designed—in Mr. Bucher's own words—to "weaponize[]" an arbitration agreement between Valve and Defendants. (Ex. 1 at 3.) In a video used as part of his online marketing blitz to recruit claimants, Mr. Bucher stated that arbitration was preferable to a class action. Mr. Bucher tried to convince Steam users to join his arbitration plan by stating that it was "good news" that Valve had an arbitration agreement because "on average consumers in arbitration recover hundreds of times more than in a class action." (Crack, "hi its will from bucher law," *YouTube* (July 12, 2023), *available at* https://www.youtube.com/watch?v=3w_PbejgGn8.)

On July 12, 2023, Bucher Law sent Valve a letter threatening to bring purported antitrust claims on behalf of 44,903 individuals. (Fuchs Decl. ¶ 2.) The allegations contained in Bucher Law's letter were apparently modeled on those made in *Wolfire*. After threatening arbitrations asserting antitrust claims on behalf of thousands of claimants, Bucher Law made an outrageous settlement demand to Valve that far exceeded any conceivable recovery. (*Id.*) Valve did not acquiesce to Bucher Law's demand, and on October 2, 2023, Bucher Law submitted 997 demands for arbitration against Valve to the AAA and threatened Valve with filing 18,204 more such demands. (Fuchs Decl. ¶ 4.) In November and December 2023, Bucher Law submitted thousands of additional demands for arbitration against Valve to the AAA. (Fuchs Decl. ¶ 5.)

Bucher Law is currently pursuing 4,991 arbitrations against Valve before the AAA. (Fuchs Decl. ¶ 6.) The 572 Defendants in this action are among the claimants in those arbitrations, comprising (i) 548 claimants whose arbitrations are pending and assigned to merits arbitrators (excluding four deceased claimants) and (ii) 24 claimants whose arbitrations were assigned to a merits arbitrator who was disqualified. (*Id.* ¶ 7.)

### D.    Bucher Law Seeks and Obtains Arbitrator Rulings that the Arbitration Agreement in the Superseded SSA Is Unenforceable

On July 8, 2024, in four of the arbitrations Bucher Law initiated (not involving Defendants

---

MOTION FOR PRELIMINARY INJUNCTION – 5
No. 2:24-CV-1717-JNW

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1  here), the arbitrator concluded, at Bucher Law's urging, that the arbitration provision in the

2  Superseded SSA was not enforceable. (Fuchs Decl. ¶¶ 10-12.) The arbitrator dismissed those

3  arbitrations. (*Id.* ¶ 12.) This is the first and only arbitrator who has ruled on the enforceability of

4  the Superseded SSA. (*Id.*)

5       **E.    Bucher Law Files Consumer Antitrust Class Action in This Court**

6       On August 9, 2024, Bucher Law and another law firm, Hagens Berman Sobol Shapiro LLP

7  ("Hagens"), filed a putative antitrust class action against Valve in federal court, naming the four

8  dismissed claimants as plaintiffs. *Elliott v. Valve Corporation*, No. 2:24-cv-01218 (W.D. Wash.

9  filed Aug. 9, 2024). *Elliott* purported to be brought on behalf of a putative class of all Valve

10 consumers, including Defendants. (*Elliott* Dkt. 1 ¶167.) Substantively, it asserted claims identical

11 to those Bucher Law is asserting purportedly on behalf of Defendants in arbitration. (*See generally*

12 *id.*) Even though the Superseded SSA in effect at the time *Elliott* was filed included an arbitration

13 agreement, Bucher Law and Hagens alleged in *Elliott* that they could pursue a class action on

14 behalf of a nationwide class in court because they had "won binding decisions from arbitrators

15 rendering Valve's arbitration provision unenforceable." (*Id.* ¶ 13.) Those "binding decisions" are

16 the decisions rendered on July 8, 2024. In short, the *Elliott* case is entirely premised on the

17 Superseded SSA's arbitration agreement being unenforceable as to all Steam users. (*Id.*)

18      On December 6, 2024, this Court consolidated several related consumer putative class

19 actions, including *Elliott*, into *Wolfire*. (*Wolfire* Dkt. 394.)

20      **F.    Valve Removes the Arbitration Agreement from the SSA**

21      Accepting the arbitrator's finding that the arbitration provision was unenforceable, on

22 September 26, 2024, Valve removed the arbitration provision from the SSA. The dispute

23 resolution section of the Current SSA now provides:

24          You and Valve agree that all disputes and claims between you and
            Valve (including any dispute or claim that arose before the existence
25          of this or any prior agreement) shall be commenced and maintained
            exclusively in any state or federal court located in King County,
26          Washington, having subject matter jurisdiction.

---

MOTION FOR PRELIMINARY INJUNCTION – 6
No. 2:24-CV-1717-JNW

1    (Ex. B § 10.) The Current SSA includes a merger clause providing that it supersedes and replaces

2    the parties' prior agreement. (*Id.* § 11.) The notice Valve provided to Steam users about the

3    amendments to the SSA is described in detail below.

4        Out of the 572 Defendants, 454 affirmatively accepted the Current SSA by November 1,

5    2024, by (i) checking a box next to the text "I agree to the Updated Steam Subscriber Agreement"

6    then clicking a button labeled "Accept Updated SSA" under a notification regarding the updates;

7    (ii) checking a box stating their agreement to the new SSA when making a purchase on Steam; or

8    (iii) performing both of those actions. (Lynch Decl. ¶¶ 24-26; Ex. C.) The remaining 118

9    Defendants accepted the Current SSA because they did not delete or discontinue use of their

10   account before November 1, 2024. (Lynch Decl. ¶¶ 27-28.) All of these Defendants have logged

11   into their Steam accounts on or after November 1, 2024. (*Id.* ¶ 29.) Among these Defendants, 76

12   also affirmatively accepted the Current SSA by making a purchase after November 1, 2024.

13   (*Id.* ¶ 28.)

14       **G.    Bucher Law Represents to This Court
                that the Current SSA Applies to All Defendants**

15
16       On October 2, 2024, Bucher Law and Hagens ("Proposed Class Counsel") moved to be

17   appointed interim co-lead class counsel in *Elliott*. In doing so, they represented that Valve had

18   "remove[d] the arbitration provision from its terms of use, along with the associated class action

19   waiver." (*Elliott* Dkt. 25 at 5.) In the next sentence, Proposed Class Counsel represented: "As a

20   result, Valve consumers are authorized to proceed in federal court and seek collective relief

21   through the class action vehicle." (*Id.*)

22       On December 20, 2024, Proposed Class Counsel and several other plaintiffs' firms filed

23   motions or renewed motions to be appointed interim class counsel.

24       On May 2, 2025, this Court denied Proposed Class Counsel's motion to be appointed

25   interim lead class counsel and granted Cohen Milstein Sellers & Toll PLLC's motion. (*Wolfire*

26   Dkt. 441.) This Court concluded that "Bucher's continued representation of individual consumers

MOTION FOR PRELIMINARY INJUNCTION – 7
No. 2:24-CV-1717-JNW

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1    in arbitration against Valve creates concerns about divided interests." (*Id.* at 7.) This Court also

2    stated that "Bucher's proposed partnership with Hagens Berman does not put the Court's mind at

3    ease." (*Id.* at 8.) As the Court explained: "[Hagens'] recent conduct in an unrelated class action

4    gives the Court pause." (*Id.*) Hagens remains involved as plaintiffs' counsel in the case (and

5    Bucher Law is still listed as counsel to four plaintiffs on the docket and may remain involved

6    behind the scenes). (Compl. ¶ 23.)

7         **H.     Bucher Law Continues To Prosecute Arbitrations**

8         Notwithstanding its admission that Defendants no longer have an agreement to arbitrate

9    with Valve (and that the previous arbitration agreement was unenforceable), Bucher Law has

10   refused to withdraw Defendants' arbitrations, contending that the Superseded SSA is still operative.

11   (Fuchs Decl. ¶¶ 19-22.) Reiterating its administrative role, the AAA declined to administratively

12   close the arbitrations absent a court order. (Ex. 2.)

13        **I.     Valve Files This Petition**

14        On October 18, 2024, Valve commenced this action by filing a petition to enjoin

15   Defendants' arbitrations under Section 4 of the Federal Arbitration Act ("FAA"). (Dkt. 1.) Valve

16   sought immediate relief and explained that "absent an order enjoining [Defendants'] arbitrations,"

17   Valve will "suffer irreparable harm." (*Id.* ¶ 186.)

18        After filing the petition, Valve asked Bucher Law if it would accept service of process on

19   behalf of Defendants. (Dkt. 39 at 3.) Although Bucher Law claimed to represent all Defendants

20   but one in this action, it refused to accept service. (*Id.*)

21        Shortly after commencing service of process, numerous Defendants reached out to Valve

22   expressing that they were confused, did not know they had filed an arbitration, or wanted to end

23   their arbitration. (Dkt. 40; Compl. ¶¶ 42-44.) Some Defendants also stated that Bucher Law told

24   them that they must pay Bucher Law (or another firm) substantial legal fees to terminate their

25

26

---

MOTION FOR PRELIMINARY INJUNCTION – 8
No. 2:24-CV-1717-JNW

1  arbitration and end their involvement in this action.[6] (Dkt. 40; Compl. ¶¶ 42-44.) That was false.

2  (Compl. ¶ 44.)

3         On August 1, 2025, this Court issued an order holding that the Court has subject matter

4  jurisdiction and denying the request of five Defendants to dismiss this action. (Dkt. 76 at 1.) The

5  Court further held as a procedural matter that Valve must file a complaint rather than a petition,

6  struck the petition, and directed Valve to file a complaint within 21 days. (*Id.* at 10-11.)

7  **III.    THE MOTION FOR PRELIMINARY INJUNCTION SHOULD BE GRANTED**

8         A party is entitled to a preliminary injunction where it shows "that [it] is likely to succeed

9  on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that

10  the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v.*

11  *Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The Ninth Circuit applies a "sliding scale"

12  approach to preliminary injunctions: "the elements of the preliminary injunction test are balanced,

13  so that a stronger showing of one element may offset a weaker showing of another." *Alliance for*

14  *the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011); *see also Goldman, Sachs & Co.*

15  *v. City of Reno*, 747 F.3d 733, 735 (9th Cir. 2014) (applying these standards to motion to enjoin

16  arbitration); *Textile Unlimited, Inc. v. A..BMH & Co., Inc.*, 240 F.3d 781, 786 (9th Cir. 2001)

17  (same).

18         A court "has the authority to enjoin arbitration proceedings where there is no valid,

19  enforceable arbitration agreement between the parties." *Morgan Stanley & Co., LLC v. Couch*, 134

20  F. Supp. 3d 1215, 1234 (E.D. Cal. 2015), *aff'd*, 659 F. App'x 402 (9th Cir. 2016); *see also*

21  *Oppenheimer & Co. v. Mitchell*, 2023 WL 2428404, at *6 (W.D. Wash. Mar. 9, 2023) (granting

22  motion for preliminary injunction enjoining arbitrations where movant made showing that the

23  parties had no agreement to arbitrate). "Given that federal courts sometimes must determine

24

25  ───────────────

26  [6] Valve did not respond to any of the communications it received, but filed a motion seeking leave to provide a court-approved statement to those Defendants informing them of the nature of the action. (Dkt. 39.) On August 1, 2025, the Court denied Valve's motion as moot. (Dkt. 76.)

───────────────

MOTION FOR PRELIMINARY INJUNCTION – 9
No. 2:24-CV-1717-JNW

whether a party has a right to arbitration (*e.g.*, in the context of a motion to compel arbitration), it follows that the federal judiciary may enjoin arbitration if necessary to enforce its orders." *Morgan Stanley*, 134 F. Supp. 3d at 1233 (discussing *Goldman*, 747 F.3d at 735). "[T]he Ninth Circuit has indicated that . . . [t]he opposing party need not wait until the initiating party moves in federal court to compel the opposing party's participation in the arbitration." *Id.*

A preliminary injunction is warranted here because: (i) Valve is likely to succeed on the merits of its claim that it is not required to arbitrate; (ii) Valve is suffering irreparable harm and will continue to suffer immediate irreparable harm by expending unrecoverable resources if forced to arbitrate without an agreement to do so; (iii) the equities weigh in Valve's favor; and (iv) the public interest favors an injunction where the parties have not agreed to arbitrate.

**A.    Valve Is Likely To Succeed on the Merits:
The Parties Have No Agreement To Arbitrate**

**1.    Supreme Court Authority Requires That the
Court Decide Which Agreement Is Controlling**

As an initial matter, whether the Current or Superseded SSA governs is a question exclusively for this Court—not the arbitrators—to decide. In *Coinbase*, the parties disagreed as to which of two agreements applied to individuals' claims. The first agreement contained a clause delegating disputes as to arbitrability to an arbitrator. The second agreement contained a forum selection clause providing that all such disputes must be decided by a court. Because the parties disputed which agreement applied, they also disputed whether arbitrability was for an arbitrator or a court to decide. *Coinbase*, 602 U.S. at 145.

The unanimous Court held that "a court, not an arbitrator, must decide whether the parties' first agreement was superseded by their second." *Coinbase*, 602 U.S. at 152. The Court explained:

> Arbitration is a matter of contract and consent, and we have long held that disputes are subject to arbitration if, and only if, the parties actually agreed to arbitrate those disputes. Here, then, before either the delegation provision or the forum selection clause can be enforced, a court needs to decide what the parties have agreed to—*i.e.*, which contract controls.

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1    *Id.* at 145; *see also Pilon v. Discovery Commc'ns, LLC*, 769 F. Supp. 3d 273, 291 (S.D.N.Y. 2025)

2    (applying *Coinbase* and holding that "a court must decide which contract governs" where

3    superseded and an updated terms of use agreement "contain conflicting forum-selection clauses

4    on the issue of arbitrability"); *Williams v. Experian Info. Sols. Inc.*, 2024 WL 3876171, at *16

5    (D. Ariz. Aug. 20, 2024) (holding that "delegation clause in [prior] [a]rbitration [a]greement does

6    not preclude the Court from determining whether that version of the arbitration agreement was

7    later superseded by the [new] [a]rbitration [a]greement").

8         Here, as in *Coinbase*, only this Court may decide which agreement controls as between the

9    Superseded SSA and the Current SSA. And this Court properly concluded it has subject matter

10    jurisdiction over this dispute. (Dkt. 76.)

11         **2.    The Current SSA Is Valid and Fully Enforceable as to each Defendant**

12         The Current SSA is valid and enforceable as to each Defendant. Parties to existing contracts

13    may freely agree to new agreements that become binding "if the offeree's actions clearly evince

14    acceptance of the offeror's modifications." *United Fin. Cas. Co. v. Coleman*, 173 Wash. App. 463,

15    473 (2012). For online transactions, "mutual assent turns on whether the consumer had reasonable

16    notice of the terms of service agreement." *Grant v. T-Mobile USA, Inc*., 2024 WL 3510937, at *3

17    (W.D. Wash. July 23, 2024). If "(1) the website provides reasonably conspicuous notice of the

18    terms to which the consumer will be bound; and (2) the consumer takes some action, such as

19    clicking a button or checking a box, that unambiguously manifests his or her assent to those terms."

20    *Id.* at *4. "[E]mails followed by continued use is [also] sufficient to establish assent." *Sadlock v.*

21    *Walt Disney Co*., 2023 WL 4869245, at *12 (N.D. Cal. July 31, 2023).

22         (a)    Valve Properly Provided Widespread
                  and Repeated Notice of the Current SSA

23

24         Valve provided conspicuous notice of the terms of the Current SSA to all users. For notice

25    to be "reasonably conspicuous," it must be "displayed in a font size and format such that the court

26    can fairly assume that a reasonably prudent Internet user would have seen it." *Grant*, 2024 WL

---

MOTION FOR PRELIMINARY INJUNCTION – 11
No. 2:24-CV-1717-JNW

3510937, at *4. "The presence of a hyperlink must be readily apparent, customarily by using of a contrasting font color (typically blue)." *Open Book Theatre Co. v. Brown Paper Tickets, LLC*, 2024 WL 4230479, at *3 (S.D. Cal. Sept. 18, 2024). Updates to dispute resolution agreements are sufficiently conspicuous when they are specifically called out and not buried or difficult to discern. *Sadlock*, 2023 WL 4869245, at *12. Valve's notice more than met these requirements in several ways:

- **Electronic Mail**. Beginning on September 26, 2024, Valve provided email notice to all U.S. customers (including all Defendants) of the change in Valve's SSA, sending the notice to the email address of record for their Steam accounts. The email, only two paragraphs long and hyperlinking in blue to the updated Steam Subscriber Agreement, specifically called out changes to the dispute resolution provision, providing: "[t]he updated dispute resolution provisions are in Section 10 and require all claims and disputes to proceed in court and not in arbitration." (Lynch Decl. ¶¶ 10-11.)

- **In-Client Pop-Up.** Beginning on September 26, 2024, Valve provided notice of the update through a pop-up that appeared when users logged into the Steam client. The pop-up contained the same text and blue hyperlinks as the email. It enabled users to agree to the Current SSA by checking a box stating: "I agree to the Updated Steam Subscriber Agreement" and then clicking, "Accept Updated SSA." (*Id.* ¶¶ 12-14.) Users who chose not to accept the Current SSA could simply "X" out of the pop-up notice without agreeing to the Current SSA. (*Id.* ¶ 15.)

- **Blog Post.** Beginning on September 26, 2024, Valve published a blog post on Steam providing notice of the amended SSA. The blog post, again hyperlinking in blue to the Current SSA, stated: "We've eliminated the requirement that disputes be resolved by individual arbitration." Instead, if informal resolution did not work, "the updated SSA now provides that any disputes are to go forward in courts instead of arbitration." (*Id.* ¶¶ 16-17.)

- **Steam Website.** The Current SSA has been available online from September 26, 2024, to

the present, in 10 languages. (*Id.* ¶ 8); *see* https://store.steampowered.com/subscriber
_agreement/.

When users clicked on the hyperlinks in any of the various notices or visited the SSA page on the

Steam website, they saw a banner at the top of the Current SSA, set apart in a box outlined in red,

prominently announcing: "Valve has updated the Steam Subscriber Agreement. The updates affect

your legal rights, including how disputes and claims between you and Valve are resolved. Among

other things, the new dispute resolution provisions in Section 10 require that all disputes and

claims proceed in court and not in arbitration. Please review carefully." (*Id.* ¶ 7.)

The notices were consistent with the modification requirements set out in the Superseded

SSA. The Superseded SSA provided: "This Agreement may at any time be mutually amended by

your explicit consent to changes proposed by Valve." (Ex. A § 8(A).) The email notice and pop-

up explained, in turn, "This updated Steam Subscriber Agreement will become effective

immediately when you agree to it, including when you make most purchases, fund your Steam

wallet, or otherwise accept it." (Lynch Decl. ¶¶ 10, 12.)

The Superseded SSA also provided for amendment through notice and continued use:

> Valve may amend this Agreement . . . unilaterally at any time in its
> sole discretion. In this case, you will be notified by e-mail of any
> amendment to this Agreement made by Valve at least [thirty] (30)
> days before the effective date of the amendment. You can view the
> Agreement at any time at http://www.steampowered.com/. Your
> failure to cancel your Account prior to the effective date of the
> amendment will constitute your acceptance of the amended terms.

(Ex. A § 8(B).) It went on to explain that if the user did not agree to the amendment, he or she

could cancel his or her Steam account or cease using the service. (*Id.*) Consistent with these terms,

the email notice and pop-up also provided: "[T]he updated [SSA] will become effective on

November 1, 2024, unless you delete or discontinue use of your Steam account before then."

(Lynch Decl. ¶¶ 10, 12.) Individually and collectively, the notices Valve provided Defendants

were more than reasonably conspicuous and made it clear that the arbitration provision and class

action waiver were being removed.

MOTION FOR PRELIMINARY INJUNCTION – 13
No. 2:24-CV-1717-JNW

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1

(b)    Defendants Agreed to the Current SSA

2    Clicking a button to indicate acceptance of terms constitutes unambiguous assent where

3   users are provided adequate notice that their click signifies assent. *See Open Book*, 2024 WL

4   4230479, at *4; *see also Briggs v. Serv. Corp. Int'l*, 2023 WL 2075958, at *4 (W.D. Wash. Feb. 17,

5   2023) ("Acceptance may be manifested expressly, such as by checking a box or clicking on a

6   button."). Assent is unambiguous under such circumstances because it involves a "forced

7   confrontation with the terms and forced decision to accept or reject them." *Open Book*, 2024 WL

8   4230479, at *4.

9    Valve's pop-up notice included two separate "forced confrontation[s]" and "forced

10   decision[s]"—one checkbox and one button that plainly indicated the user was agreeing to the

11   Current SSA. If the user did not agree, he or she could simply "X" out of the pop-up. (Lynch Decl.

12   ¶ 15.) 454 of the 572 Defendants affirmatively accepted the Current SSA by checking the box in

13   the pop-up and/or while making purchases prior to November 1, 2024. (*Id.* ¶¶ 24-26; Ex. C.)

14    All other Defendants manifested assent to the Current SSA because they did not delete

15   their accounts or discontinue use of Steam by November 1, 2024.[7] Users manifest assent if they

16   continue to use a service after receiving notice of updated terms. *See, e.g.*, *Pilon*, 769 F. Supp. 3d

17   at 289-90 (claimant assented where he "continued to subscribe to and use [service]" after receiving

18   notice of updated agreement); *Sadlock*, 2023 WL 4869245, at *12 ("emails followed by continued

19   use is sufficient to establish assent."); *Dlugolecki v. PeopleConnect, Inc.*, 2020 WL 13587803, at

20   *2 (C.D. Cal. Nov. 9, 2020) (finding users manifested assent by continuing to use an online service

21   where they received email notice that "continued use" would "constitute your acceptance of all

22   changes"); *West v. Uber Techs.*, 2018 WL 5848903, at *5 (C.D. Cal. Sept. 5, 2018) ("Courts have

23   found that when consumers receive emails such as this one, continued use of the service or product

24   constitutes assent to the updated terms."). Here, the email and pop-up notice informed users,

25

26   _____

[7] Valve will not delete any user's account unless he or she requests it.

MOTION FOR PRELIMINARY INJUNCTION – 14
No. 2:24-CV-1717-JNW

1    consistent with the terms of the Superseded SSA, that the Current SSA would become effective

2    November 1, 2024, unless they deleted or discontinued use of their account. (Lynch Decl. ¶¶ 10,

3    12.)

4    Because none of the remaining 118 Defendants deleted or discontinued use of their account,

5    they are bound by the Current SSA. (Lynch Decl. ¶¶ 27-28.) Indeed, all of these Defendants have

6    logged into their Steam accounts on or after November 1, 2024. (*Id*. ¶ 29.) *See Pilon*, 769 F. Supp.

7    3d at 290-91, 295 (rejecting argument that amendment was unilateral where petitioner assented to

8    agreement by renewing subscription to streaming service and explaining that the "implied covenant

9    of good faith and fair dealing does not prevent parties from mutually modifying their contracts in such

10   a way"); *Trudeau v. Google LLC*, 349 F. Supp. 3d 869, 881 (N.D. Cal. 2018) (amendment to terms is

11   not "unilateral" where business provides notice and requires customers "to accept or decline"), *aff'd*,

12   816 F. App'x 68 (9th Cir. 2020).

13   Among these 118 Defendants, 76 also later affirmatively accepted the Current SSA by making

14   a purchase on Steam. (Lynch Decl. ¶ 28.)

### 3.    Under the Current SSA, Disputes Between Defendants and Valve Must Be Resolved in Court

15

16   Valve is likely to prevail on its claim that, under the Current SSA, the parties no longer

17   have any agreement to arbitrate. A dispute resolution provision in an updated agreement is

18   enforceable with respect to accrued and already asserted claims so long as the provision provides

19   for retroactive effect. In *Dasher v. RBC Bank (USA)*, 745 F.3d 1111, 1127 (11th Cir. 2014), for

20   example, the court concluded that a new agreement without an arbitration clause superseded and

21   applied retroactively to foreclose arbitration under a prior agreement containing an arbitration

22   clause. Although the claim was originally asserted when the agreement had an arbitration clause,

23   the court reasoned that the parties "expressed their clear and definite intent to execute [the new

24   agreement] to supersede [the prior agreement]," and that intent controlled. *Id.* at 1117. Notably,

25   the court rejected the argument that "there is . . . no statutory authorization permitting parties to

26

---

MOTION FOR PRELIMINARY INJUNCTION – 15
No. 2:24-CV-1717-JNW

1    *remove* arbitration from an existing controversy." *Id.* at 1125. The court reasoned that, because

2    "arbitration is simply a matter of contract," courts "should simply enforce the parties' agreements,

3    whether that means adding a retroactively applicable arbitration provision *or* removing it." *Id.*

4         Similarly, in *Pilon*, the federal court denied a motion to compel arbitration under a

5    superseded arbitration agreement because the petitioner (i) unambiguously assented to a new

6    agreement that changed the arbitration forum and (ii) had inquiry notice of the retroactive

7    arbitration provisions. 769 F. Supp. 3d at 286-90, 294-98. The court enforced the new agreement

8    even though the claims accrued and were noticed before the parties entered into the new agreement.

9    *Id.* at 283.

10        And in *Ingram Micro Inc. v. Signeo Int'l, Ltd.*, 2014 WL 3721197 (C.D. Cal. July 22,

11   2014), the court enjoined an arbitration "because subsequent agreements both superseded the

12   2011 Program Agreement, the only contract containing an arbitration provision, and extinguished

13   any claims arising from the 2011 Program Agreement." *Id.* at *3.

14        Indeed, courts consistently apply amended dispute resolution provisions retroactively

15   when the agreement plainly articulates that intent. *See, e.g.*, *In re Nat'l Football League's Sunday

16   Ticket Antitrust Litig.*, 2021 WL 2350814, at *4 (C.D. Cal. Apr. 20, 2021) (enforcing agreement

17   revised two years after suit filed); *Laster v. T-Mobile USA, Inc.*, 2008 WL 5216255, at *6 (S.D.

18   Cal. Aug. 11, 2008) (holding that agreement that "retrospectively modif[ied] the original service

19   contract after the present litigation had already begun" nonetheless applied); *Enderlin v. XM

20   Satellite Radio Holdings, Inc.*, 2008 WL 830262, at *7 (E.D. Ark. Mar. 25, 2008) (collecting cases

21   applying amended agreements to on-going litigation); *Goetsch v. Shell Oil Co.*, 197 F.R.D. 574,

22   577 (W.D.N.C. 2000) (compelling individual arbitration based on terms of provision that had

23   been revised to add a class waiver after the commencement of litigation and holding that new

24   agreement applies where "[t]he agreement clearly provides for retroactive effect").

25        The Current SSA applies to "all disputes and claims between [the user] and Valve

26   (including any dispute or claim that arose before the existence of this or any prior agreement)." (Ex. B

---

MOTION FOR PRELIMINARY INJUNCTION – 16
No. 2:24-CV-1717-JNW

§ 10.) It also provides: "This Agreement . . . constitutes and contains the entire agreement between the parties with respect to the subject matter hereof and supersedes any prior oral or written agreements." (*Id.* § 11.) It specifically states: "If you were a Subscriber before [September 24, 2024], [this Agreement] replaces and supersedes your existing agreement with Valve." (*Id.*) Therefore, even though Defendants had already initiated their arbitrations at the time they agreed to the Current SSA, they agreed that the Current SSA would replace and supersede the agreement to arbitrate and apply retroactively to their claims. Bucher Law admitted as much when it asserted purported class claims on behalf of *all* Valve consumers in *Elliott* and claimed they now have the right to proceed in court under the Current SSA. (*See Elliott* Dkt. 25 at 5.)

The parties therefore no longer have any agreement to arbitrate. As "[a]rbitration is a matter of contract and consent, and . . . disputes are subject to arbitration if, and only if, the parties actually agreed to arbitrate those disputes," Valve has no obligation to arbitrate and the arbitrators have no authority to continue arbitration proceedings. *Coinbase*, 602 U.S. at 145.

### 4. Valve Does Not Seek Mid-Arbitration Judicial Review—It Seeks To Stop Unauthorized Arbitrations

Five Defendants argue that Valve seeks "judicial review prior to the rendition of a final arbitration award" that courts have permitted only in "extreme cases." (Dkt. 65 at 10-11; *see also* Dkt. 76.) That is incorrect. The cases on which the five Defendants rely involve requests for court interference with interim orders issued during arbitration where the parties indisputably agreed to arbitrate. *See In re Sussex*, 781 F.3d 1065, 1070-76 (9th Cir. 2015) (rejecting request to overturn the AAA's refusal to remove an arbitrator); *Savers Prop. & Cas. Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburg, PA*, 748 F.3d 708, 720 (6th Cir. 2014) (rejecting challenge to arbitrator "partiality" determination); *Blue Cross Blue Shield of Massachusetts, Inc. v. BCS Ins. Co.*, 671 F.3d 635, 638-39 (7th Cir. 2011) (rejecting challenge to de-consolidation). The courts concluded they could not interfere with an arbitration in process because the courts' role was generally limited to (i) determining whether an agreement to arbitrate existed; or (ii) confirming, vacating, or modifying

1    arbitral awards after arbitration was complete. *See Sussex*, 781 F.3d at 1071-72; *Savers*, 748 F.3d

2    at 717; *Blue Cross*, 671 F.3d at 639.

3          Here, Valve is not asking the court to interfere mid-arbitration with a decision delegated to

4    an arbitrator or arbitration provider. Rather, it is asking the Court to decide an issue squarely within

5    its authority: that there is no arbitration agreement between the parties. This is a proper exercise

6    of the court's authority to "prevent one party from foisting upon the other an arbitration process to

7    which the first party had no contractual right." *Morgan Stanley*, 134 F. Supp. 3d at 1234. "[I]t

8    would make little sense to empower the federal judiciary with the authority to deny a motion to

9    compel arbitration (*i.e.*, find that a party has no right to arbitrate certain claims) while stripping

10   the federal courts of the ability to enjoin arbitration that nonetheless proceeds in direct violation

11   of its orders." *Id.*

12         **B.**    **Valve Will Face Irreparable Harm If Forced To Arbitrate**

13         Valve will face irreparable injury absent injunctive relief. A party is "irreparably injured if

14   it is forced to arbitrate when it does not have to." *Oppenheimer*, 2023 WL 2428404, at *6. Indeed,

15   "forcing a party to arbitrate a dispute that it did not agree to arbitrate constitutes per se irreparable

16   harm." *Id.* (quoting *Morgan Keegan & Co. v. McPoland*, 829 F. Supp. 2d 1031, 1036 (W.D. Wash.

17   2011)); *see also, e.g.*, *LAWI/CSA Consolidators, Inc. v. Wholesale & Retail Food Distrib.,*

18   *Teamsters Local 63*, 849 F.2d 1236, 1241 n.3 (9th Cir. 1988) (concluding that plaintiff "was

19   entitled to injunctive relief once it established that it was no longer under a contractual duty to

20   arbitrate" without an additional showing of irreparable harm); *Morgan Stanley*, 134 F. Supp. 3d

21   at 1235 ("[M]ost, if not all courts hold that being required to arbitrate a dispute the parties did not

22   agree to arbitrate is *per se* irreparable harm.").

23         Absent immediate injunctive relief, Valve and Steam users will be forced to arbitrate

24   hundreds of disputes they do not agree to arbitrate. While, in an attempt to avoid this harm, Valve

25   sought to have these arbitrations stayed or closed by the AAA and merits arbitrators until a court

26   resolves any dispute over the Current SSA, this has been largely unsuccessful. (Fuchs Decl. ¶¶ 29,

45.) At the request of Bucher Law, the AAA refused to administratively close the arbitrations, concluding that it needed an order from the court or arbitrators to do so. (*Id*.) At present, 324 of Defendants' arbitrations are proceeding before 15 different arbitrators. (*Id.* ¶ 45.) Other of Defendants' arbitrations are likely to proceed in the near future. (*Id*.)

While "[t]ypically, monetary harm does not constitute irreparable harm," "time and resources spent in arbitration constitute irreparable harm where neither the arbitration agreement nor the Arbitration Act allows for monetary awards of attorneys' fees and costs." *Oppenheimer*, 2023 WL 2428404, at *6; *see also Resource Grp. Int'l Ltd. v. Chishti*, 91 F.4th 107, 115 (2d Cir. 2024) (concluding that "forced arbitration of inarbitrable claims may constitute irreparable harm when the arbitration is one 'for which any award would not be enforceable' and for which 'the time and resources . . . expend[ed] in arbitration is not compensable by any monetary award of attorneys' fees or damages."); *Morgan Keegan*, 829 F. Supp. 2d at 1036 ("A party resisting arbitration suffers irreparable harm when it is 'forced to expend time and resources arbitrating an issue that is not arbitrable, and for which any award would not be enforceable.'").

The time and expense Valve will incur will be substantial. Each arbitrator holds separate hearings—some in-person and at multiple locations throughout the country, including California, New Jersey, and Texas. Each requires the parties to brief and argue issues separately, and issues separate orders on exchange of information and myriad other procedural and substantive issues. (Fuchs Decl. ¶ 52.) Valve has already incurred significant AAA and legal fees and devoted substantial employee time to preparing for and attending arbitration hearings under a reservation of rights because there is no agreement to arbitrate. (Lynch Decl. ¶ 30.) To date, only 52 arbitrations have proceeded through final merits hearings. (Fuchs Decl. ¶ 45.) These costs and burdens will increase dramatically as the hundreds of additional arbitrations proceed to final merits hearings.

Bucher Law has amplified this harm through wasteful and at times vexatious litigation tactics. Bucher Law has sought duplicative and unnecessary testimony from Valve employees in

MOTION FOR PRELIMINARY INJUNCTION – 19
No. 2:24-CV-1717-JNW

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1    arbitration proceedings. (Fuchs Decl. ¶¶ 55-56, 59.) Bucher Law has demanded more than 60

2    subpoenas of more than a dozen Valve employees before 11 arbitrators for arbitration proceedings

3    where Defendants request on average only a few thousand dollars each. (*Id.* ¶ 55.) Although some

4    arbitrators have correctly declined to issue subpoenas, others have not. As a result, Valve's

5    employees—including its Chief Operating Officer—have been and continue to be subjected to

6    dozens of hours of duplicative testimony across multiple merits hearings. (*Id.* ¶ 56.) Bucher Law

7    has additionally sought pre-hearing depositions of multiple Valve employees and its Chief

8    Operating Officer. (*Id.* ¶ 62.)

9         Valve is also incurring significant cost and expending substantial time engaged in briefing

10   on issues arising from Bucher Law's improper vetting of arbitration claimants—and what appears

11   to be lack of authorization to proceed on their behalf. (Fuchs Decl. ¶ 63.) Bucher Law is pursuing

12   claims on behalf of deceased individuals and minors in multiple arbitrations. (*Id.* ¶ 64.) In one

13   arbitration, Bucher Law withdrew the claim of a minor on whose behalf Bucher Law could not

14   have had authorization to prosecute an arbitration just days before the start of the final merits

15   hearing. (*Id.*) Bucher Law requested this withdrawal only after Valve had incurred substantial

16   expense and devoted considerable resources preparing for the hearing. (*Id.*)

17        Mr. Bucher has also withdrawn, attempted to withdraw, or requested a "stay" of other

18   claims on the eve of final merits hearings. (Fuchs Decl. ¶ 65.) In one set of arbitrations before the

19   same arbitrator, Bucher Law attempted to withdraw the claim of one claimant **less than 24 hours**

20   before the start of the final merits hearing, and requested stays (without basis or explanation) for

21   three other claimants just **20 minutes** before this same hearing was set to commence. (*Id.*)

22        Irreparable harm is further established because the arbitrations risk duplicative or

23   inconsistent rulings with one another and the court. *See Allstate Ins. Co. v. Tvildiani*, 2015 WL

24   13048729, at *1 (E.D.N.Y. Apr. 14, 2015) ("[A]llowing a large number of proceedings to be heard

25   by a mix of arbitrators, each of whom will likely come to their own independent and potentially

26   contradictory conclusions, will result in harm to [movant] from which it cannot recover."

MOTION FOR PRELIMINARY INJUNCTION – 20
No. 2:24-CV-1717-JNW

1    (alteration in original)); *see also GEICO v. Mayzenberg*, 2018 WL 6031156, at *5 (E.D.N.Y.

2    Nov. 16, 2018) ("[I]t is the inconsistency to which hundreds of arbitrations will inevitably give

3    rise, the frustration of the declaratory judgment relief for which [plaintiff] is likely to succeed on

4    the merits, and the resources spent vacating hundreds of arbitration awards that satisfies the

5    irreparable harm prong of the preliminary injunction standard."). The risk of duplicative or

6    inconsistent rulings is not merely hypothetical: there is a parallel class action brought on behalf of

7    a purported class that includes all Defendants. Bucher Law conceded this risk in the *Elliott*

8    complaint, averring, "[t]he prosecution of separate actions by individual Class members would

9    create a risk of inconsistent or varying adjudications, establishing incompatible standards of

10   conduct for [Valve]." (Complaint ¶ 176, *Elliott* Dkt. 1.)

11          **C.    The Parties' Interests Favor An Injunction**

12          The relative interests of the parties support an injunction.

13          *First*, "[f]orcing a party to engage in arbitration where that party is not bound to arbitrate

14   serves no equitable purpose." *Oppenheimer*, 2023 WL 2428404, at *6. Likewise, a party receives

15   no "countervailing benefit . . . from proceeding with an arbitration when the award, if any, is so

16   likely to be vacated." *Morgan Keegan*, 829 F. Supp. 2d at 1036. Because the parties have not

17   agreed to arbitrate, there is no equitable reason to allow the arbitrations to continue.

18          *Second*, Defendants will suffer no prejudice from an injunction. When an arbitrating party

19   can also seek relief in court, any prejudice from an injunction is limited. *See AT&T Mobility LLC

20   v. Bernardi*, 2011 WL 5079549, at *12 (N.D. Cal. Oct. 26, 2011) (enjoining mass arbitration when

21   regulators were reviewing issues raised by arbitration and injunction "does not leave Customers

22   completely without recourse"); *AT & T Mobility LLC v. Smith*, 2011 WL 5924460, at *9 (E.D. Pa.

23   Oct. 7, 2011) (enjoining arbitration when parallel lawsuit "may very well result in the precise relief

24   [the defendant] seeks"); *Morgan Stanley*, 134 F. Supp. 3d at 1236 (finding equities balance in favor

25   of injunction when defendant could still pursue an appeal of a summary judgment order).

26          Defendants are already putative class members in a pending putative class action in this

MOTION FOR PRELIMINARY INJUNCTION – 21
No. 2:24-CV-1717-JNW

Court, *Wolfire*. Moreover, under the Current SSA, any Steam user can file his or her own individual claim in court. (Ex. B § 10.) Because the pending class action tolls the statute of limitations on their claims, Defendants need not be concerned that their claims will become time-barred. *See Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 552-53 (1974) (holding that pending class action tolls statute of limitations for absent class members). In addition, several Defendants who have sent unsolicited communications to Valve have indicated that they did not even know they had arbitrations or wanted to end their arbitrations. (Compl. ¶¶ 42-44; Dkt. 40.)

*Third*, an injunction will prevent Bucher Law from pursuing vexatious and oppressive proceedings it has no right to pursue. In balancing the equities with respect to whether to enter an injunction against another proceeding, courts properly consider whether that proceeding is "vexatious or oppressive." *See Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 886 (9th Cir. 2012). The arbitrations at issue here are both. (*See* Fuchs Decl. ¶ 54.)

Bucher Law expressly targeted Valve and Steam users, including Defendants, to "weaponize[]" their arbitration agreement, believing that "[a]ggregating claims makes [the] entrance fee to just defend prohibitively expensive," providing leverage for immediate settlements. (Ex. 1 at 3.) Based on this belief, Bucher Law commenced thousands of arbitrations, apparently without conducting any investigation: it filed arbitrations on behalf of at least 10 claimants who appear to be deceased, at least 218 claimants who are represented by other law firms asserting substantively identical arbitration claims, and at least 19 claimants who were at the time of this action's filing in active bankruptcy proceedings. (*See* Fuchs Decl. ¶ 64; Compl. ¶ 221.)

Bucher Law has conceded to arbitrators that it engaged in forum shopping by prosecuting the arbitrations and *Elliott* purportedly on behalf of the same Defendants in parallel. (Fuchs Decl. ¶ 30.) Bucher Law stated to arbitrators that Defendants may withdraw their arbitrations and proceed in court if Bucher Law is dissatisfied with any arbitral ruling at any point up until a final award. (*Id.* ¶ 31.) True to its word, Bucher Law has withdrawn or attempted to withdraw or "stay" claims on the eve of final merits hearings. (*Id.* ¶¶ 32-33.) In one arbitration, Bucher Law requested

MOTION FOR PRELIMINARY INJUNCTION – 22
No. 2:24-CV-1717-JNW

to withdraw a claim in a pre-hearing conference just three days before the start of the final merits hearing. (*Id.* ¶ 34.) During the pre-hearing conference, the arbitrator stated that she intended to sanction Bucher Law for submitting a letter brief that Mr. Bucher conceded was replete with "inaccurate" and "fictitious" citations to legal authority.[8] Moments after the arbitrator stated this intention—following more than an hour of argument regarding Valve's sanctions request—Bucher Law announced for the first time that the sole claimant whose arbitration was the subject of the conference would withdraw his claim (the claimant was a minor, and his mother had not approved the filing). (*Id.* ¶ 37.) And Bucher Law has represented to arbitrators it intended to use information obtained in the arbitrations in furtherance of *Elliott*. (*Id.* ¶ 39.)

Bucher Law commenced the arbitrations and is continuing to prosecute them to extort a settlement from Valve and a windfall for itself and its funder (Compl. ¶¶ 3, 11), not because Defendants have any real injury requiring redress, let alone redress in an arbitration. This is the very definition of vexatious and oppressive. Under such circumstances, the equities favor an injunction.

### D.    The Public Interest Favors An Injunction

Public interests also favor an injunction. "There is no public interest in compelling [the party seeking an injunction] to arbitrate if it does not have to." *Oppenheimer*, 2023 WL 2428404, at *6. Likewise, "[n]either the public interest nor the interest of judicial economy would be served by allowing the arbitration to proceed, when such arbitration could lead to further proceedings in this Court to vacate an award." *Morgan Keegan*, 829 F. Supp. 2d at 1037. Because the parties have no agreement to arbitrate, there is no public interest in allowing the arbitrations to continue.

---

[8] Bucher Law relied on fake authority to persuade an arbitrator to issue subpoenas. (Fuchs Decl. ¶¶ 34-38.) When Valve sought sanctions from the arbitrator, Mr. Bucher blamed the only other attorney then at his firm: an associate he supervised who had practiced law for just three years. (*Id.*) Despite this "serious oversight" (in Mr. Bucher's words), Mr. Bucher made further misstatements to downplay his misconduct. (*Id.*) The arbitrator sanctioned Mr. Bucher and his associate for what she described as "willful" and "shocking" misconduct. (*Id.*) She also chastised Bucher for attempting to "minimize" the misconduct. (*Id.*)

MOTION FOR PRELIMINARY INJUNCTION – 23
No. 2:24-CV-1717-JNW

**E.      The Court Should Not Require a Bond**

No bond is necessary because Defendants cannot identify any "costs or damages that they will incur by having the arbitrations delayed as to their claims." *Oppenheimer*, 2023 WL 2428404, at *7 (enjoining arbitrations and finding no bond necessary); *accord Morgan Keegan*, 829 F. Supp. 2d at 1037 (same); *see also Morgan Stanley*, 134 F. Supp. 3d 1315 (enjoining arbitrations without ordering bond).

## IV.    **CONCLUSION**

For these reasons, Valve requests that this Court enter a preliminary injunction enjoining Defendants' arbitrations.


DATED this 21st day of August 2025.

I certify that this memorandum contains 8,400 words, in compliance with the Local Civil Rules.

CORR CRONIN LLP

*s/ Blake Marks-Dias*
Blake Marks-Dias, WSBA No. 28169
1015 Second Avenue, Floor 10
Seattle, WA 98104
(206) 625-8600 Phone
(206) 625-0900 Fax
bmarksdias@corrcronin.com

Michael W. McTigue Jr., *Admitted Pro Hac Vice*
Meredith C. Slawe, *Admitted Pro Hac Vice*
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
michael.mctigue@skadden.com
meredith.slawe@skadden.com

*Attorneys for Plaintiff Valve Corporation*

MOTION FOR PRELIMINARY INJUNCTION – 24
No. 2:24-CV-1717-JNW

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900