# EXHIBIT 5

<u>AMERICAN ARBITRATION ASSOCIATION</u>

CASE NO.: 01-23-0005-3839

ALFREDO GONZALEZ,
Claimant,

vs.

VALVE CORPORATION dba STEAM,
Respondents.

## <u>AWARD OF ARBITRATOR</u>

<u>I</u>, Michael F. Saydah, Esq., the Undersigned Arbitrator, having been designated in accordance with the arbitration agreement entered into between the above-named parties, and having been duly sworn, and having duly heard the proofs and allegations of the parties, each represented by counsel, at an evidentiary hearing held December 2, 3, 4, 5, 6, 9, 10, 11, 12 and 13, 2024, does hereby issue this AWARD as follows:

Pursuant to the Petition for Consumer Rule Arbitrations between Claimant Alfredo Gonzalez ('**Claimant**') and Respondent Valve Corporation dba Steam ('**Respondent**') under the American Arbitration Association (AAA) Consumer Rules, due notice of hearing was given to the parties on May 24, 2024, by way of Pre Arbitration Order No. 1 and by way of a Notice of Hearing served by the AAA on May 29, 2024.  The hearing was held in-person at the Hyatt Regency La Jolla at Aventine Hotel, San Diego, California via videoconference.

Claimant appeared by their Counsel William Bucher, Esq., Nived Rajendran, Esq., Judson Crump, Esq., and Xinlin Morrow, Esq.

Claimant also called an expert witness, Max Theiler, of Fideres Partners, an economic consultancy.

Respondents appeared by their Counsel Scott Danner, Esq., Priyanka Timblo, Esq. and Andrew Indorf, Esq.

Respondents appeared personally by and through Jessica Painley, Esq. and Gavin Skok, Esq.

Respondent called Erik Peterson of Valve Corporation as a percipient witness.

Respondent also called an expert witness Dr. Justin McCreary, Ph.D of Columbia University School of Law.

The hearing was transcribed by Paula Pyburn from Veritext Legal Solutions, San Diego, California.

All out-of-state Counsel appearing in this arbitration have complied with and obtained a Certificate of Out-of-State Attorney Arbitration Counsel (OSAAC) pursuant to California Code of Civil Procedure Section 1282.4 and California Rules of Court, Rule 9.43.

All witnesses who testified were properly sworn.

**INTRODUCTION AND ARBITRATION AGREEMENT**

Claimant contends he is an individual account holder on the Steam platform for PC gamers. Valve Corporation is the parent of Steam, the gaming platform. The Claimant contends they suffered damages in the form of higher prices paid for individual games purchased on the Steam platform due to certain Sherman Antitrust Act violations. Valve and Steam deny the claims. The Steam Subscriber Agreement (SSA), at the time the Claimant signed up on Steam's platform provided for arbitration of all disputes between the Claimant and Steam to be resolved by way of the AAA Consumer Arbitration Rules. The claim was originally filed in the United States District Court in Seattle, Washington ('District Court'). Steam filed a petition with the District Court requesting the case be referred to arbitration in accordance with the terms of the

arbitration agreement.   The District Court judge granted the petition and referred the matter to arbitration.  After the Claimant agreed to the original SSA Steam has revised the SSA eliminating the mandatory arbitration clause and replaced it with Claimants' right to pursue their claims in court.  Steam and Valve petitioned the District Court to enjoin the presently scheduled arbitrations.  As of the time of the arbitration herein, the District Court has requested a briefing on the issue of the change of the arbitration provision and has not ordered this matter to be removed from arbitration.

Page 1 of the Steam Subscriber Agreement states:

"SECTION 11 CONTAINS A BINDING ARBITRATION AGREEMENT AND CLASS ACTION WAIVER.  IT AFFECTS HOW DISPUTES ARE RESOLVED.  PLEASE READ IT.   ..."

Section 11 of the Steam Subscriber Agreement states the following:

"DISPUTE RESOLUTION/BINDING ARBITRATION/CLASS ACTION WAIVER

This Section 11 shall apply to the maximum extent permitted by applicable law.

...

Most user concerns can be resolved by use of tour Steam support site at https://support.steampowered.com/.  If Valve is unable to resolve your concerns and a dispute remains between you and Valve, this Section explains how the parties have agreed to resolve it.

A.  Must Arbitrate All Claims Except Intellectual Property, Unauthorized Use, Piracy, or Theft

YOU AND VALVE AGREE TO RESOLVE ALL DISPUTES AND CLAIMS BETWEEN US IN INDIVIDUAL BINDING ARBITRATION.  THAT INCLUDES, BUT IS NOT LIMITED TO, ANY CLAIMS ARISING OUT OF OR RELATING TO: (i) ANY ASPECT OF THE RELATIONSHIP BETWEEN US; (ii) THIS AGREEMENT; OR (iii) YOUR USE OF STEAM, YOUR ACCOUNT, HARDWARE OR THE CONTENT AND SERVICES.  IT APPLIES REGARDLESS OF WHETHER SUCH CLAIMS ARE BASED IN CONTRACT, TORT,

STATUTE, FRAUD, UNFAIR COMPETITION, MISREPRESENTATION OR ANY OTHER
LEGAL THEORY, ...

...

An arbitration is a proceeding before a neutral arbitrator, instead of before a
judge or jury.  Arbitration is less formal than a lawsuit in court and provides more
limited discovery.  It follows different rules than court proceedings and is subject
to very limited review by courts.  The arbitrator will issue a written decision and
provide a statement of reasons if requested by either party.  YOU UNDERSTAND
THAT YOU AND VALVE ARE GIVING UP THE RIGHT TO SUE IN COURT AND TO
HAVE A TRIAL BEFORE A JUDGE OR JURY.

...

A.  Arbitration Rules and Fees

The U.S. Federal Arbitration Act applies to this Section 11 as far as your country's
laws permit.  The arbitration will be governed by the Consumer Arbitration Rules
... of the American Arbitration Association ('AAA') ... The Arbitrator is bound by
the terms of this agreement.

...

If you seek $10,000 or less, Valve agrees to promptly reimburse your filing fee
and your share, if any, of AAA's arbitration costs, including arbitrator
compensation, unless the arbitrator determines your claims are frivolous or were
filed for harassment.  If you seek more than $10,000 and the AAA Consumer
Rules do not apply, The AAA's arbitration costs including arbitrator
compensation, will be split between you and Valve according to the AAA
Commercial Arbitration Rules.

B.  Individual Binding Arbitration Only

YOU AND VALVE AGREE NOT TO BRING OR PARTICIPATE IN A CLASS OR
REPRESENTITIVE ACTION, PRIVATE ATTORNEY GENERAL ACTION,

WHISTLEBLOWER ACTION, OR CLASS, COLLECTIVE, OR REPRESENTITIVE ARBITRATION, ENVE IF AAA's RULES WOULD OTHERWISE ALLOW ONE.  THE ARBITRATOR MAY AWARD RELIEF ONLY IN FAVOR OF THE INDIVIDUAL PARTY SEEKING RELIEF AND ONLY TO THE EXTENT OF THAT PARTY'S INDIVIDUAL CLAIM.  ..."

Until the District Court orders otherwise, the parties hereto have agreed to binding arbitration.  Accordingly, the Arbitration Findings and Award herein is BINDING.

## FACTS

This summary of introductory facts comes from opening statements and the District Court in Seattle, Washington summary.

Respondent operates a PC desktop gaming platform (the "Steam Platform") and a retail electronic game store.  The Claimant herein asserts through the Demands for Arbitration Respondent forces game publishers to sell their games through the Steam Store, which results in anti-competitive injury to consumers and similarly situated game publishers.  Respondent initially created the Steam Platform to facilitate the delivery of patches and updates for its own games.  Respondent later launched the Steam Store.  At the time, it sold its own games through the Steam Store, which could only be played on the Steam Platform.  This is because PC desktop games are generally not compatible across platforms due to the "unique functionality" of each platform.  At some point, Respondent opened up the Steam Platform to third-party game publishers.  However, like Respondent's own games, those third-party games, if compatible with the Steam Platform, were generally not compatible with other platforms (console, mobile).  Also, like Respondent's own games, absent the limited use of Steam Keys, those games had to be purchased through the Steam Store.  Respondent does not charge a direct fee for consumers' use of the Steam Platform or its hosting of a third-party publishers' games.

Instead, it generates revenue through a fee it charges for each third-party game sold in the Steam Store and for in-app purchases.  Respondent initially set the fee at 30% but now provides limited discounts to high-volume games.  The initial appeal of the Steam Platform to game consumers was the ability to maintain and update their game libraries in one location, regardless of which device they use to access the game.  However, over time, Respondent added more functionality to the platform.  This included social networking features and other services, including a game achievement tracking service.  Based in part on this increased functionality, demand for the platform steadily rose.  Today, the vast majority of all PC desktop games are played on the Steam Gaming Platform.  According to the Demands for

Arbitration Respondent uses this market dominance to unlawfully tie Steam Store sales to use of its Steam Platform and to impose price controls through contractual provisions and coercion.  The Demand for Arbitration asserts these practices violate Sections 1 and 2 of the Sherman Act as well as the Washington Consumer Protection Act ("CPA") by overcharging customers with their purchases of games with a price parity requirement (setting a price across all platforms), an anti-steering requirement (not allowing game developers to notify customers of a lower price on a competing platform) and a revenue sharing agreement Claimant says is a kickback to large publishers enticing them not to compete with Steam..

Claimant is an account holder and purchaser of PC games.  Claimant alleges Respondent Valve is a monopoly, stifling competition in the PC game market, using its market power to keep game prices high.  Claimant purchases most of his games from Respondent Valve Corporation and its PC game platform Steam.  Claimant believes they were overcharged for each of the games purchased on Steam's website.  Valve's digital storefront, like that of Google's Play Store and Apple's App Store, operates on a commission structure.  Valve charges a commission of 30% of the PC game's sale price.  Competing stores like the Epic Games Store, Electronic Arts, and the Microsoft Store,

among many others, sell PC games at a far lower 12% commission of the game's sale price. But despite the far lower commissions, Claimant contends these rivals cannot compete on price because of Valve's price parity requirements. Claimant contends even if the competing stores could compete on price, Valve's anti-steering requirements prevent game developers from informing their customers about a better deal on a competing website.

Respondent contends they are not a monopoly, do not have monopoly power and have done nothing to stifle competition. The Respondent contends no Claimant has been overcharged because Valve does not set the prices for the games. The Respondent contends nothing they do is anticompetitive conduct, has not harmed competition and was always for legitimate business reasons. The Respondent contends its conduct herein was procompetitive and Claimant cannot show Valve could have accomplished its procompetitive goals through any other less restrictive means. Lastly, Respondent contends there is no evidence Valve caused any alleged overcharges to any of the Claimants herein.

### CLAIMS OF THE PARTIES

The claim against Valve, the company behind Steam, centers on allegations of anticompetitive practices impacting both game developers and consumers. Claimant argues Valve uses its dominant position in the digital game distribution market to impose high fees and pricing restrictions, preventing game publishers from offering their products at lower prices on competing platforms. This practice, known as a price parity or "most favored nation" clause, allegedly keeps game prices artificially high on Steam, limiting competitive pricing for consumers and reducing profit margins for developers.

The claim also asserts Steam's 30% commission on game sales is excessive, giving Valve monopoly-like control over the market. Claimant alleges the resulting lack of

1
2
meaningful competition in digital game sales harms consumers by driving up prices and harms developers by restricting alternative avenues for distribution.

3
4
5
Claimant contends he was overcharged on each of his game purchases due to Valve's agreements with game developers on price parity, anti-steering and revenue sharing, violations of Sections 1 and 2 of the Sherman Antitrust Act.

6
7
8
A price parity requirement is when a digital storefront (in this case Valve's Steam) requires a supplier (in this case a game developer) to set the same or higher price on every competing digital storefront they sell through.

9
10
Anti-steering provisions prohibit "links" to competing digital stores with lower prices.

11
12
A revenue sharing provision is a choice to pay competitors to incentivize those competitors not to compete vigorously in the market.

13
14
15
16
17
18
19
20
21
22
Claimant contends these acts render rivals unable to compete, stifle competition and keep prices high.  Claimant contends the price parity requirements, the anti-steering provisions, and a revenue sharing agreement between Valve and other game developers, are violations of the Sherman Antitrust Act, 15 U.S.C.A. Sections 1 and 2. Claimants also contend the same facts as violations of unfair competition law in Washington (RCW 19.86.010, *et seq.*, 19.86.040) and California (B&P 17200).  Lastly, Claimant contends Valve breached its contract with each of the Claimants herein by failing to pay for the Arbitration fees, pursuant to the Arbitration Agreement contained in the SSA.

23
24
The Respondent contends its conduct has not harmed competition and their actions were done for legitimate business reasons.

25
26
**ISSUES**

27
28
The matters placed in issue by the Petition, Response and the testimony of the parties, are the following:

1.      Whether or not there is a Sherman Antitrust Act, Section 1 violation.

2.      Whether or not there is a Sherman Antitrust Act, Section 2 violation.

3.      Whether or not there is an Unfair Business Practices Act violation.

4.      Whether or not there is a breach of contract of the arbitration agreement.

**LAW AND FINDINGS**

Claimant alleges violations of both the Sherman Act, 15 U.S.C. § 1, and the Clayton Act, 15 U.S.C. § 14.   The purpose of the antitrust laws is to preserve the free flow of commerce and trade among the states and to secure to everyone an equal right and opportunity to engage in the trade and commerce of the country.

So, any unreasonable interference, by contract, or combination, or conspiracy, with the ordinary, usual and freely competitive pricing or distribution system of the open market in interstate or foreign trade or commerce, constitutes an unreasonable restraint of that trade, and is in itself unlawful; and, if knowingly done, is a federal offense under the Sherman Antitrust Act.  15 U.S.C. § 1; Esco Corp. v. United States (9th Cir. 1965) 340 F.2d 1000, 1007-1008.

It should be noted here, possession of monopoly power, in and of itself, is not unlawful; it is an important element of the free-market system.  Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP (2003) 540 US 398. Monopoly power becomes illegal when it is improperly used to control prices, restrict output, and exclude competition in a relevant antitrust market.  Aspen Skiing C. v. Aspen Highlands Skiing Corp. (1985) 472 U.S. 585, 595-596.

A violation of the Sherman Act requires the following elements: (1) the existence of a contract, combination, or conspiracy, (2) that unreasonably restrains trade, (3) affects interstate or foreign commerce, and (4) causes Claimant to suffer an injury in fact to business or property (an injury or damages over and above the antitrust violation.) See 15 U.S.C. § 1.  Section 1 of the Sherman Act forbids contracts in restraint of trade.

Claimants must show (1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce; (3) which actually injures competition.  Bell Atl. Corp. v. Twombly (2007) 550 U.S. 544, 548.

Independent action by a single entity cannot give rise to a Sherman Act violation. See, Copperworld Corp. v. Independent Tube Corp. (1984) 467 U.S. 752.

Conduct must be found to be unreasonable.  Section 2 of the Sherman Act makes it unlawful to monopolize, attempt to monopolize, or combine or conspire to monopolize.  To prove the offense of monopoly under Section 2 of the Sherman Act, a plaintiff must show factually  three elements: (1) the relevant market defendant has monopolized; (2) possession of monopoly power in that market; and (3) willful acquisition or maintenance of that power through competitively unreasonable means (barrier to entry), rather than as a consequence of a superior product, business acumen, or historic accident. United States v. Grinnell Corp., (1966) 384 U.S. 563, 570-571.

Charges of monopolization can only be judged in the framework of the relevant market, which has two dimensions: the "relevant geographic market" and the "relevant product market".  Sections 1 and 2 of the Sherman Act require a plaintiff to prove a relevant product market affected by the alleged anticompetitive conduct.  See Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP (9th Cir. 2010) 592 F.3d 991, 996, 998.  A properly defined product market "includes the pool of goods or services that enjoy reasonable interchangeability of use and cross-elasticity of demand." Oltz v. St. Peter's Cmty. Hosp., (9th Cir. 1988) 861 F.2d 1440, 1446.

There must be a significant or substantially adverse effect on competition; a minute or de minimus impact, either before or after competitive benefits are weighed, is insufficient.  United States v Topco Associates (1972) 405 U.S. 596, 606; California Dental Association v FTC (9th Cir. 2000) 224 F.3d 942.   Harm that occurs to an individual Claimant is not sufficient, by itself to demonstrate harm to competition generally.

NYNEX v Discon, Inc.  (1998) 525 U.S. 128, 139.  Pool Water Prods. v Olin Corp. (9th Cir. 2001) 258 F.3rd 1024, 1036.

The Clayton Act 15 U.S.C. Section 12, et seq. authorizes private parties to sue for treble damages to remedy federal antitrust violations.  Successful private Claimants are entitled to recover reasonable attorney's fees.  There is no equivalent fee-shifting for prevailing Respondents, (unless under the arbitration agreement herein the claims filed are deemed frivolous.)  Section 4B of the Clayton Act creates a four-year statute of limitations for private anti-trust actions.

The Claimant challenges the Respondent with conduct of price parity, anti-steering and 'kickbacks' as violations of Section 1 of the Sherman Anti-Trust Act, 15 U.S.C. Section 1.

To establish damages, a Claimant must factually show: an injury-in-fact (over and above the antitrust violation) that is (1) concrete and particularized, as well as actual and imminent; (2) fairly traceable to the challenged action of the Respondent; and (3) redressable by a favorable ruling.  See, Monsanto Co. v. Geertson Seed Farms (2010) 561 U.S. 139, 149. "For Article III (standing) purposes, an antitrust plaintiff establishes injury-in-fact when he has suffered an injury which bears a causal connection to the alleged antitrust violation." Gerlinger v. Amazon.com Inc., (9th Cir. 2008) 526 F.3d 1253, 1255.


A.  SECTION 1 SHERMAN ACT – PRICE PARITY, RESTRAINT OF TRADE

Initially, before any of the price parity, kickbacks and anti-steering comes into play Claimant needs to show Valve has an illegal monopoly that harms competition.

Claimant alleges three main grounds for a Section 1 violation:  Price parity (Most favored nations clause), anti-steering and revenue sharing.  Under the Sherman Act, utilizing price parity, anti-steering, and revenue sharing must be to further anticompetitive goals.  There must be a significant or substantially adverse effect on competition; a minute or de *minimus* impact, either before or after competitive benefits

are weighed, is insufficient. Harm that occurs to an individual Claimant is not sufficient, by itself to demonstrate harm to competition generally.

Claimant alleges a Most Favored Nation clause is a retail parity clause in which developers of games agree to treat a particular customer no worse than all other customers. Claimant alleges a developer, or publisher must agree the price of a PC game on Steam will be the same price as on other PC platforms. Essentially, Claimant alleges Steam does not allow developers to price their games lower on other platforms. The price parity Claimant relies on comes from a 2011 Valve Distribution Agreement with ███████ and its paragraph 6.4, entitled ██████████ as well as several emails between Valve and individual developers wherein price parity is mentioned.

████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████

The Claimant argues this clause constitutes an agreement on price and sets minimum pricing on games by requiring developers to set the same or higher price on every game on every competing storefront or platform they sell through. Such requirements, the Claimant contends, harm competition by preventing price

competition resulting in higher prices for consumers.  As a result of these higher prices, the Claimant alleges they were overcharged and suffered damages.

The Respondent argues there is no agreement on price and the Claimant was not overcharged because games were available for less on other platforms.  Respondent argues when Claimant purchased his games, Claimant simply did not comparison shop to other platforms for the lesser price.  Respondent also argues the video game developers set the prices for their games and Valve has no control over the price in whatever currency and Valve will agree to any price the developer wants to charge.

The evidence was very clear from the documents produced at the arbitration and the testimony of Valve employee Erik Peterson, as well as Valve's expert, Dr. Justin McCreary, the developers, not Valve, set the prices for the games.  The facts in this case clearly show Claimants allegation Developers cannot sell games at a lower price elsewhere is simply not the case.  The facts were equally clear there was no agreement to set a particular price or any price.  In reading the 6.4 paragraph above, it does not set or require any price, low or high.  The paragraph ███████████████████████████████ ████.  The paragraph ██████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████.  There was no evidence from the testimony or from the extensive emails produced to show an illegal agreement or other anticompetitive goal to keep prices high.  In fact, the evidence was clearly to the contrary.  Valve's business justification for this paragraph in this particular distribution agreement is it has invested heavily in advertising and promoting games by other developers and it would be unfair to Steam customers if the game were sold elsewhere for less as it was being promoted on Steam and to assure its own customers of no 'buyer's remorse' for buying a game on Steam.

Even if one concludes 6.4 is a price parity requirement and considering the 107 emails from 2009 through 2017 wherein Valve employees were referencing price parity

with the developer offering the game on a competing website for a lower price, the Claimant must show the competitive harm substantially outweighs the competitive benefits. See, for example, Barry v Blue Cross (9th Cir. 1986) 805 F.2nd 866, 872-873. Here, it was very clear from Dr. McCreary, Valve has invested very heavily in its website and Steam platform to provide a satisfactory experience for all Steam users. Based on this heavy investing, the number of Steam users has increased at a geometric rate over the years. Because of this large consumer base, Steam can reach many more consumers with game promotions and advertising, specials for games, and other benefits. Of course, Steam wants to keep that large customer base and keep them happy. Dr. McCreary was very good at showing prices have decreased over the years and the market for PC games remains strong among all the players therein. I find the competitive harm from the challenged conduct does not substantially outweigh the competitive benefits.

Claimant argues Valve charges a higher commission fee (30%) than they would in a truly competitive environment (others charge 12%), and those higher-than-normal publishing costs are passed on to consumers via higher-priced games. Claimant did not produce any evidence the other platforms charging a lower commission fee actually passed the lower commission fee on to consumers as a savings. In practice, and based on the evidence, it was very clear the prices charged remained constant across all platforms, regardless of the competing platform specific revenue cut. The actual proof prices remained the same, were lower elsewhere and were higher elsewhere is from the comparison-shopping website 'Is There Any Deal' (ITAD).

A Section 1 violation requires an agreement to fix prices or other unlawful conduct. There must be an agreement or understanding to accomplish a common purpose. See, Monsanto Co. v. Spray-Rite Serv. Corp. (1984) 465 U.S. 752. It is the agreement or understanding to restrain trade in the way alleged by the Claimant with the price parity that constitutes a conspiracy. The evidence of the agreement is viewed

as a whole and not piecemeal.  United States v. General Motors Corp. (1966) 384 U.S.

127, 142-143.  Here, there was no evidence from the Claimant of an actual agreement to

fix prices at a high level.  The price parity agreement the Claimant challenges provides

for the opposite.  In the agreement, the Developer (not Valve) is free to charge whatever

price they want, high or low.  Paragraph 6.4 only requires the Developer to ███████████

███████████████████.  If the developer wants to offer a game at a lower price on their

own sale platform or other third-party platforms, the developer is free to do so but is

obligated to ██████████████████████████████████████████████

████████████████████████████████.  The evidence was very clear from the

agreement and from Erik Peterson, if the developer does not allow Valve to lower the

price as well for the Steam customers, Valve will simply not promote the game.  Mr.

Peterson testified Valve will continue to sell the game at the higher price but will not

advertise and promote the game.  I find there is nothing anticompetitive about this.

There is no evidence there is an agreement to fix prices or any other illegal

scheme between Valve and others.  In Chicago Board of Trade v United States (1918)

246 U.S. 231 the Supreme Court said the legality of an agreement cannot be determined

by a simple test as to whether it restrains competition.  Every agreement concerning

trade and every regulation of trade restrains.  The true test of legality is whether the

imposed restraint merely regulates and perhaps thereby promotes competition, or

whether it may suppress or even destroy competition.  To this question one must

consider facts peculiar to the business, its condition before the and after the restraint

was imposed the nature of the restraint and its effect, actual or probable.  The history of

the restraint, the evil believed to exist, the reason of adopting the particular remedy, the

purpose or end sought to be attained, are all relevant facts.  This is the 'Rule of Reason'

in the jury instructions.

Applying these factors to paragraph 6.4, the facts are there is no competitive harm

resulting in substantial harm to competition.  Competition in the gaming industry is

thriving.  Furthermore, Respondent did show benefits to customers with lower prices.
The burden to produce evidence then shifted to Claimant to show 6.4 was  substantial
harm to competition and not reasonably necessary to achieve the benefits of lower
prices.  See, <u>Bhan v NME Hospitals, Inc.</u> (9th Cir. 1991) 929 F.2[nd] 1404, 1413.

Valve and Developers exchanging price information does not establish an
agreement to fix prices.  There may be other legitimate reasons which lead competitors
to exchange price information.  A legitimate business reason for exchanging price
information is to enhance competition and benefit consumers.  See, <u>United States v U.S.</u>
<u>Gypsum Co.</u> (1978) 438 U.S. 422, n.16.

Here the legitimate business reason proffered by Valve is they want Steam
customers to always get the best (lowest) price for games purchased on the Steam
platform, regardless of what that price is.  Steam does not want to invest in advertising
and promotion of particular game on the Steam platform and then Steam customers get
buyers remorse if they see they could have purchased the game on some other third-
party platform for a lower price.

Claimant produced 107 exhibits of emails dating back to 2009 through 2017
wherein Valve employees wrote to Developers referencing pricing issues on selective
games in the United Kingdom and elsewhere.  I did not view the emails to indicate
anticompetitive behavior or proof of competitive harm by which Valve and the
Developers intended to harm consumers or restrain trade or commerce.  Because the
emails are so old and somewhat stale, the relevance is questionable.  I viewed the emails
as competitive behavior if the Developer wishes to reduce the price of the game on a
competing platform, Valve simply wanted the same lower price for the consumers on
the Steam platform to benefit all consumers.  There is nothing from Mr. Theiler or the
Claimant himself this is somehow irrational behavior or it suppressed competition,
excluded competition or was some other substantial harm to competition.  There was
also no testimony of facts from Mr. Theiler about how this conduct by Valve somehow

excluded other new entrants from entering the gaming industry.  Valve insisting Steam customers get comparable deals to non-Steam customers is a valid business justification and cannot, as a matter of law, represent antitrade conduct.  <u>Aerotec International, Inc. v. Honeywell International, Inc.</u> (9th Cir. 2016) 836 F.3rd 1171, 1184.  Valve's business justification for this is the extensive research and development of its platform, advertising of those very games, and its ability to reach many consumers, should allow those consumers to benefit from a lower price as well.  A harmful effect on competition, or competitive harm, refers to a reduction in competition that results in the loss of some benefits of competition, such as lower prices, increased output, or higher product quality.

Here, the Claimant's expert Mr. Theiler did not offer any factual proof of actual higher prices, decreased output or lower product quality.  The factual evidence from Dr. McCreary, Respondent's expert, was prices have decreased over the years, the game(s) purchased by Claimant was on ITAD at a lower price at the very same time the Claimant's purchased the game(s).  Based on these facts, I find the challenged conduct contained in 6.4 does not harm competition, and actually results in lower prices to consumers.

The last point to be made here is Valve may lawfully suggest resale prices to its developers.  Developers actually then set the prices.  Valve may also announce suggested resale prices publicly.  Suggesting prices is not unlawful.  All the emails of pricing suggestions, persuasions, conversations, arguments, or pressure is not sufficient to establish the coercion necessary to transgress Section 1 of the Sherman Act.  <u>Isaksen v Vermont Castings, Inc.</u> (7th Cir. 1987) 825 F.2nd 1158, 1164.


B.  SECTION 1 SHERMAN ACT – REVENUE SHARING, 'KICKBACKS', RESTRAINT OF TRADE

The Valve Distribution Agreement with ████████████ contains an Additional Revenue Share clause at paragraph 6.6.  ████████████████████████████

CONFIDENTIAL BINDING AWARD

17

█████████████████.  The sum and substance of the clause is as follows:  Valve's standard revenue share on all individual game sales is 30%.  If a particular game sells in excess of $10,000,000.00, Valve will reduce its commission to 25%.  If a particular game sells in excess of $50,000,000.00, Valve will reduce its commission further to 20%.

Claimant argues this clause is a 'kickback scheme' and serves as an incentive to ██████ and other big game developers (Epic, Electronic Arts, Amazon, *et al.*) not to compete with Steam in the PC Game market.  Respondent argues the Additional Revenue Share clause is not a secret illegal kickback scheme and does not go just to big game developers.  Respondent argues it applies to every developer from the sole proprietor and smaller company developers to the larger developers.  The revenue share applies to any successful game, not developer.  Respondent argues this is a simple volume discount on sales of an individual game, which if the game does well, Valve will lower its commission to incentivize the developer to share the lower commission with the developer's customers.  Respondent also argues this reduction in the commission is a response to competitive threats and is a 'vivid illustration' of free market competition at work.  Respondent argues this is not a secret revenue sharing deal as was found in the Google Play Store Antitrust Litigation between Google and Samsung which resulted in Google maintaining its dominant market position.

Sellers often provide discounts; like other low prices, volume discounts are not unlawful merely because smaller sellers cannot match them.  All courts addressing the issue have held volume discounts and similar purchase incentives, such as market share discounts are legal so long as they do not result in prices below cost.  <u>Western Parcel Express v United Parcel Service</u> (9th Cir. 1999) 190 F.3rd 141, 154.

The evidence is very clear in this case, the volume discount offered by Valve does not offend competition and result in prices below cost.  As stated previously, the prices of games are set by the Developers, not Valve.  The Developer is free to set the price at any level they wish.  The volume discounts revenue sharing is express in the distribution

agreement and it applies to big developers who have a successful game and to smaller and single developers who have a successful game. There are no secret payments as was the Google case. There is no threat to competition or any other Sherman Act violation.

Claimant also argues the revenue share clause is somehow a barrier to entry in the PC Game development market because, as Claimant argues, the revenue share is only for the big developers to build a wall to keep out new entrants and maintain its monopoly in the market for PC Games.

The evidence produced in this arbitration did not support this conclusion. There was one email reference out of 1000's of emails produced which referenced a "high wall" to entry. That email from Valve employee Miller is from September 26, 2018. This email is too old and stale to be relevant. Even giving it some weight, there was no evidence from Mr. Theiler or anyone else testifying, nor was other documentation, showing anyone was actually precluded from entry into the PC Game market. The evidence at this arbitration was competition is thriving, with new entrants into the business and leaving the business all the time. Since Steam opened in 2003, there have been hundreds of new entrants, big and small, into the PC Game market, including Good Old Time, Discord, Game Pass, Riot Games, Epic Games, Stadia, Oculus, WeGame, and many others. Where entry is easy, courts have declined to infer monopoly power even from high market shares, because actual or threatened entry will drive prices to competitive levels. See, for example, Tops Markets, Inc. v. Quality Markets, Inc. (2nd Cir. 1998) 142 F.3rd 90 (market share 70% is "strong evidence" of monopoly power, but rebutted by ease of entry; Los Angeles Land Co. v. Brunswick Corp. (9th Cir. 1993) 6 F.3rd 1422, (despite 100% market share, defendant lacked monopoly power due to ease of entry); and United States v. Syufy Enterprises (9th Cir. 1990) 903 F.2nd 659, (ease of entry cut defendant's market share from 100% to 75% over a 4 year period and precluded a finding of monopoly power). "The antitrust laws do not require that rivals compete in a

dead heat, only that neither is unfairly kept from doing his personal best." U.S. v. Syufy Enterprises (9th Cir. 1990) 903 F.2nd 659, 666.  Competition is essential to the effective operation of the free market because it encourages efficiency, promotes consumer satisfaction and prevents the accumulation of monopoly profits.  When a producer is shielded from competition, they are likely to provide lesser service at a higher price; the victim is the consumer who gets a raw deal.  This is the evil the antitrust laws are meant to avert.  However, when a producer deters competitors by supplying a better product at a lower price, when they eschew monopoly profits, when they operate their business so as to meet consumer demand and increase consumer satisfaction, the goals of competition are served, even if no actual competitors see fit to enter the market at a particular time.  While the successful competitor should not be raised above the law, neither should they be held down by law.

In this case, there was no evidence from Mr. Theiler other developers were precluded from entering the game market because of any conduct of Valve.  In fact, the opposite is more accurate, coming from the chart described by Dr. McCreary.  Valve launched Steam in 2003 and since that time, there have been hundreds of newcomers entering the PC Game market.  The entry requirement is only restricted by one's imagination and creativity in developing a game.  If a person is creative and has an imagination one can enter the market.  Dr. McCreary's chart of the timeline with companies entering and leaving the market shows the ease to enter.  The ease of entry takes prices to the competitive level.  Valve has no control over this.

I find the volume discount Valve offers is not an anti-trust violation because Valve cannot control prices, and because of the ease of entry into the market.

C.  SECTION 1 SHERMAN ACT – ANTI-STEERING, AND UNFAIR COMPETITION, RESTRAINT OF TRADE

Claimant alleges Valve prohibits developers of games from notifying customers/buyers the game software is available for a lower price on an alternative digital storefront.  Claimant also alleges this is a restraint of trade and is illegal under California Unfair Competition Law (Cal. Business & Professions Code Section 17200) and Epic v. Apple (9th Cir. 2023) 67 F.4th 946, 1000 – 1001.

Respondent through its employee Erik Peterson disputed the anti-steering unfair competition argument, pointing out each developer's website has a button on the Steam game site promoting the game wherein the developers store (and a potentially lower price) is available.  Furthermore, Mr. Peterson referenced the website 'Is There Any Deal' (ITAD) as the go-to website for the prices of games.

Initially, it should be noted, the arbitration agreement herein provides for the Federal Arbitration Act to control this case procedurally and the state law of Washington to apply to this case substantively.

As relevant here, the California Unfair Competition Law ('UCL') prohibits "any [1] unlawful, [2] unfair or [3] fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.  As the UCL's three-prong structure makes clear, a business practice may be "unfair," and therefore illegal under the UCL, "even if not specifically proscribed by some other law." Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co. (1999) 20 Cal.4th 163, 180, 83 Cal.Rptr.2d 548.  The unfair prong is "intentionally framed in its broad, sweeping language, precisely to enable judicial tribunals to deal with the innumerable 'new schemes which the fertility of man's invention would contrive.' " Id. (quoting Am. Philatelic Soc. v. Claibourne (1935) 3 Cal.2d 689, 698, 46 P.2d 135).

The California Supreme Court has refined this "wide standard," Cel-Tech, supra, 20 Cal.4th at 181, into two tests relevant to this litigation.  First, to support "any finding of unfairness to competitors," a court uses the "tethering" test, which asks whether the defendant's conduct "threatens an incipient violation of an antitrust law or violates the policy or spirit of one of those laws because its effects are comparable to or the same as

a violation of the law, or otherwise significantly threatens or harms competition." *Id.* at 186-87, (emphasis added).  Second, to support a finding of unfairness to consumers, a court uses the balancing test, which "weigh[s] the utility of the defendant's conduct against the gravity of the harm to the alleged victim." Progressive W. Ins. Co. v. Super. Ct. (2005) 135 Cal.App.4th 263, 285, 37 Cal.Rptr.3d 434.

In applying the balancing test here, it is very clear from the evidence Valve does not preclude, disallow or prohibit Developers from providing information to consumers of availability of a game elsewhere at a lesser price.  Respondent Erik Peterson testified very clearly Developers prepare the page to promote a game on Steam's platform and Valve simply hosts that page.  Developers have the tools, direct links and hyperlinks to the Developers website and other social media platforms (Facebook, *et al.*).  As Mr. Peterson testified, Valve allows the links on its website because it is good for the customer to get all the information they want regarding the game and the developer.  And, of course, the customer could buy the game elsewhere.  Mr. Peterson also testified of the different websites which compile gaming information including price and where to buy, 'Is There Any Deal'.   There is no unfair conduct here.  There is also no harm to any customer.  In looking at the ITAD website a consumer can learn for any particular game where it is being sold that day and for what price.  Valve does not prohibit developers from notifying consumers the game software is available for a lower price on an alternative digital storefront.  Valve encourages the links so consumers can comparison shop.  This is all in keeping the customer happy with the Steam website.

The Washington State Unfair Competition Law, WA Rev Code § 19.86.020 (2022), is similar to California.  The analysis under the California Law applies equally to the analysis under the Washington Law.

D. SECTION 2 SHERMAN ACT – MONOPOLIZATION

Claimant alleges a Sherman Act Section 2 claim that Valve unlawfully maintained a monopoly.  Section 2 makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire . . . to monopolize" a market. 15 U.S.C. § 2.  A Section 2 monopolization claim "has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  United States v. Grinnell Corp. (1966) 384 U.S. 563, 570-71, 86 S.Ct. 1698; accord, Federal Trade Commission v. Qualcomm (9th Cir. 2020) 969 F.3d 974 at 990; United States v Microsoft (D.C. Cir. 2001) 253 F.3d 34 at 50.

At step one, the Claimant must establish the Respondent possesses monopoly power, which is the substantial ability "to control prices or exclude competition." Grinnell, 384 U.S. at 571, 86 S.Ct. 1698; accord United States v. Syufy Enters. (9th Cir. 1990) 903 F.2d 659, 664.  Monopoly power differs in degree from market power, requiring "something greater."  Eastman Kodak Co. v. Image Technical Services Inc. (1992) 504 U.S. 451 at 481.

At step two, the Claimant must show the Respondent acquired or maintained its monopoly through "anticompetitive conduct."  Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP (2003) 540 US 398 at 407.  This anticompetitive-conduct requirement is "essentially the same" as the Rule of Reason inquiry applicable to Section 1 claims. Qualcomm, *supra*, 969 F.3d at 991; see also Microsoft, *supra*, 253 F.3d at 59 ("[I]t is clear . . .  the analysis under section 2 is similar to that under section 1 regardless whether the rule of reason label is applied."  Where, like here, the Claimant challenges the same conduct (price parity, revenue sharing (kickbacks) and anti-steering) pursuant to Sections 1 and 2, the trier of fact can "review claims under each section simultaneously."  Qualcomm, *supra*, 969 F.3d at 991.  Also, if "a court finds that the conduct in question is not anticompetitive under § 1, the court need not separately

analyze the conduct under § 2." <u>Id.</u>  <u>Epic Games, Inc. v. Apple, Inc.</u> (9th Cir. 2023) 67 F.4th 946, 998.

Monopoly power is the power to control prices, restrict output, and exclude competition in a relevant antitrust market.  <u>Aspen Skiing Co. v. Aspen Highlands Skiing Corp.</u> (1985) 472 U.S. 585, 595-596.   Possession of monopoly power, in and of itself, is not unlawful.  <u>Verizon</u>, <i>supra</i>, at 407.  A firm is a monopolist if it can raise prices substantially above the competitive level for a significant period of time.  <u>Microsoft</u>, <i>supra</i>, at 51.

The parties in this case appear to have agreed the relevant product market is PC Games, and the relevant geographic market is the United States.  There was a major dispute, however, over the market shares of the various platforms selling games in the US.  The Claimant's expert Mr. Theiler maintained Valve has a minimum of 70% and probably upwards of an 83% market share of PC Games sales.  Respondent's expert Dr. McCreary maintained Valve has a 22% to 23% market share.  Market shares are not synonymous with market power; they should mark the beginning of the analysis, not the end of it.  <u>Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.</u> (9th Cir. 1980) 627 F.2[nd] 919, ("Blind reliance upon market share, divorced from commercial reality, could give a misleading picture of a firm's actual ability to control prices or exclude competition.").

In this case, Mr. Theiler's opinion is Valve has a market share of 70% to 83%.   Mr. Theiler's market share opinion is based on a revenue-share-per-employee calculation, which basis has never been used before to determine market share.  This method of calculation has never before been used in economic analysis to determine market share nor has this method of calculation been peer reviewed.

Dr. McCreary's opinion of market share is 22% to 23%.   The basis for Dr. McCreary's opinion of a 22% market share was 2 publications reporting Valve's economic numbers, Newzoo, and Statista.  Mr. Theiler and Dr. McCreary agreed Newzoo and Statista are reliable sources.

The real issue is whether or not Valve has the ability to control prices or exclude competition.  See, for example, <u>Tops Markets, Inc. v. Quality Markets, Inc.</u> (2nd Cir. 1998) 142 F.3rd 90 (market share 70% is "strong evidence" of monopoly power, but rebutted by ease of entry;  <u>Los Angeles Land Co. v. Brunswick Corp.</u> (9th Cir. 1993) 6 F.3rd 1422, (despite 100% market share, defendant lacked monopoly power due to ease of entry); and <u>United States v. Syufy Enterprises</u> (9th Cir. 1990) 903 F.2nd 659, (ease of entry cut defendant's market share from 100% to 75% over a 4 year period and precluded a finding of monopoly power).  In this case, the evidence is very clear Valve does not set the prices of the games on its site.  The developers set the prices.  The developers of the games have the total discretion of how high or how low a price they wish to charge. Valve only asks the developers keep the prices consistent with what the developer is asking for the same game on Steam so there is no 'buyer's remorse' with a customer purchasing a game on Steam and then seeing the game offered at the same time for a lower price on a competing website.  The evidence from the cache of emails and testimony is Valve does not set or control the prices.

Barriers to entry, as an indicia of illegal monopoly power, were discussed, *supra*, and found not to exist in this case in the PC Game industry.  There has been massive entry into the market by large and small PC Gaming companies as testified to by Respondent expert Dr. McCreary.  Also, as Dr. McCreary testified, the market continues to grow and flourish with new entrants and new games.

Mere possession of monopoly power, if lawfully acquired, does not violate the anti-trust laws.  The acquisition or maintenance of monopoly power by supplying better products or services, possessing superior business skills or because of luck, is not unlawful.  <u>Verizon</u>, *supra*, at 407-408.  The Supreme Court in <u>Spectrum Sports v McQuillan</u> (1993) 506 U.S. 447, at 458 – 459, said it is sometimes difficult to distinguish robust competition from conduct with a long-term anticompetitive effect.  Thus, the Court defined the specific intent to accomplish monopolization as something more than

an intent to compete vigorously, and implied it is an intent to accomplish monopolization by predatory or exclusionary actions.  Valve's success can be attributed to factors such as innovation and consumer trust, with no evidence of predatory conduct.  Major competition from console gaming, mobile gaming and the other platforms of PC Gaming (Microsoft, Electronic Arts, Epic, Sony, Activision, Blizzard, Good Old Games, *et al.*) forces constant innovation to remain competitive.  Just last year Sony and Microsoft partnered together to explore cloud gaming and streaming solutions using Microsoft Cloud Azure.

There is also major competition from China with their own developers and platforms, and also competition from companies in the United States, in the race to capture the Chinese market for PC Games.

In the past, success in the gaming industry was straightforward: develop a game, generate buzz with marketing, and sell as many copies as possible.  If it does well, you make a sequel and do it all again.  The factual evidence here is Valve innovates with new features, a secure website where personal information is not sold or compromised, and new characters for the games on its platforms.  Other platforms such as Roblox innovate in other ways with more mature content like horror elements paying off.  Innovation is required with the different generations of users (baby-boomers, Gen X, Millennials, Gen Z, Gen Alpha) all demanding different genres of games to their liking (puzzles, action, adventure, strategy).  Valve pushes the limits of technology and innovation to capture sales.  Valve must do this to remain competitive.  Valve supplying a better product and service through innovation to its customers is the reason they are so successful.  The innovation window of personalized viewership and engagement is a gold-mine for gamers and advertisers.

Lastly, there are many market alternatives available to consumers like ITAD, and the other platform stores.  The fact there are market alternatives buyers may readily use for their purchase of PC Games, is fatal to Claimants Sherman Act claim because market

alternatives mean an illegal monopoly does not exist.  <u>United States v. E.I. du Pont de Nemours & Co.</u> (1956) 351 U.S. 377, 391 ("where there are market alternatives that buyers may readily use for their purposes, illegal monopoly does not exist.")

E.  ANTITRUST DAMAGES

Claimants' theory of damages  are they and other direct purchasers of PC Games have paid supracompetitive (overcharges) prices for the PC Games because Valve would have reduced the price of PC Games but for Valve's allegedly anticompetitive conduct of price parity, anti-steering and kickbacks.  <u>Tawfilis v. Allergan, Inc.</u> (C.D. Cal. 2015) 157 F.Supp.3d 853.

The typical measure of damages is the difference between the actual price paid for the PC games and the presumed competitive price, multiplied by the quantity of PC games purchased.  This is referred to as the overcharge.  See, <u>Howard Hess Dental Labs v. Dentsply, International</u> (3rd Cir. 2016) 424 F.3rd 363, 374.

The findings in this matter are; there is no antitrust violation under either Section 1 or Section 2 of the Sherman Antitrust Act for the reasons stated above.  Furthermore, the findings above are that there is no violation under the California Unfair Competition Law, nor is there a violation under the Washington State Unfair Competition Law. Claimants are not entitled to recover any antitrust violation damages or unfair competition damages.

F.  BREACH OF CONTRACT, THE ARBITRATION AGREEMENT

The facts as developed during the arbitration hearing is the agreement to fund the costs of the arbitration was breached.

At the time the Demand for Arbitration was filed in October 2023, the Claimant and Valve were bound by the Steam Subscriber Agreement (SSA) which provided for arbitration of the individual claims in paragraph 11, quoted above.  This paragraph also provides Valve will reimburse Claimant's arbitration costs (filing fees, etc.) if their claims are below $10,000.00.  If claims are above $10,000.00 and the AAA Consumer Rules do not apply, then the arbitration costs are split equally according to the AAA Commercial Rules.  That paragraph in the SSA has since been rescinded by Valve.  To continue playing games on the Steam website, the Claimant agreed to a new paragraph 11 which has eliminated arbitration and the reimbursement clause and allows Claimants to pursue their individual claims in court.

The issue is while the arbitration agreement and the agreement to fund the costs of the arbitration was in effect, was the agreement breached by Valve's failure to cover the arbitration costs.

I find the agreement was not breached.  If Respondent chose not to cover or reimburse the filing fees, the AAA gives the option to the Claimant to pay the filing fees if the Claimant wants to pursue the arbitration.  If Claimant were to decide not to cover the fees, the arbitration would be closed.

 I further find the claims filed by Claimant herein are not frivolous.


**ALLOCATION OF FEES**


The administrative fees of the American Arbitration Association (AAA) shall be borne as incurred, and the compensation of the arbitrator shall be borne as incurred.


**BINDING AWARD**

Claimant takes nothing for the alleged Sherman Act violations, takes nothing for the alleged Unfair Competition Law violations under California State Law and Washington State Law and take nothing for the alleged breach of the funding requirements of the arbitration agreement under the breach of contract theory.

Lastly, any breach of warranty claim, for damage to computer hardware caused by a game is denied pursuant to the Limitation of Liability paragraph in the SSA.

All issues submitted for decision have been decided.  This Binding Award is in full settlement of all claims and counterclaims submitted to this Arbitration.

Dated: January 7, 2025                    *Michael F. Saydah*

Michael F. Saydah, Esq.