# EXHIBIT 7

**AMERICAN ARBITRATION ASSOCIATION**
**Consumer Arbitration Rules**

In the Matter of the Arbitration between

Case Number: 01-23-0005-7459

Cody Stewart
-vs-
Valve Corporation d/b/a Steam

**AWARD OF ARBITRATOR**

I, Stacey Gilman, the undersigned arbitrator, having been designated in accordance with the arbitration agreement entered into between the above-named parties, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, each represented by counsel, at an evidentiary hearing held on May 12-15th, 2025, do hereby issue this FINAL AWARD[1] as follows:

**THE PARTIES' ARBITRATION AGREEMENT**

Before turning to the merits of the case, an initial discussion of the Parties' agreement to arbitrate is in order, because it bears on the Tribunal's jurisdiction. Claimant Cody Stewart ("Claimant") initiated this matter pursuant to the Parties' arbitration agreement within the Steam Subscriber Agreement ("SSA"), which all consumers must agree to before purchasing games on the Steam platform operated by Respondent Valve Corporation ("Valve"). On September 26, 2024, after this matter already had been proceeding with all Parties' participation, Respondent Valve Corporation ("Valve") updated the terms of the SSA, such that it no longer contains an agreement to arbitrate. May 12 Tr. 22:17-23:16 (Valve's "Reservation of Rights," which is subsequently repeated in all volumes of the hearing transcript).

Valve now asserts that this arbitration "should no longer proceed because there is no longer an agreement to arbitrate among the parties." *Id*. Claimant contests this position. The Tribunal agrees with Claimant. This Tribunal already has repeatedly ruled that it has jurisdiction over this matter under the original SSA, which Valve itself insisted must be enforced by the Arbitrator against Claimant. *See* September 12, 2024 and October 9, 2024 Orders. Moreover, while Valve has filed a federal lawsuit seeking to enjoin this and other arbitrations on the basis of its September 2024 SSA update,[2] to the best of the undersigned arbitrator's

---

[1] Per Consumer Rule R-43 (and in the absence of a contrary agreement by the parties for the form of award), this award provides concise written reasons for the decision. It is not intended as an exhaustive recitation of the Arbitrator's full findings, analysis, and reasoning with respect to all facts, law, and issues presented. The Arbitrator has carefully and fully considered all such matters, including without limitation all of the evidence, arguments, claims, and defenses submitted by the parties, as well as all relevant rules and law. Accordingly, any omissions to address any matter presented in this Award is properly understood as a product of the form of the award, and not an omission by the Arbitrator to consider the matter.
[2] *See* Reservation of Rights.

knowledge, no such injunction nor other ruling has been issued impacting this Tribunal's jurisdiction or the enforceability of the Parties' SSA. Accordingly, the Parties' arbitration agreement in the SSA remains enforceable as of the issuance of this Award, and the Tribunal has jurisdiction over this matter pursuant to that SSA, notwithstanding Valve's September 2024 SSA revisions.

## FACTUAL SUMMARY

1. **Procedural Background**

The Parties actively pursued and defended the claims asserted in this case for over a year. During that time, the Arbitrator ruled upon numerous issues and motions filed in the case. Those orders include descriptions of the case, recitations of the record, and rulings that need not be repeated here. Unless expressly altered by an explicit ruling of the Arbitrator or this Award, they remain binding as the law of the case.

The evidentiary hearing of this matter was held via videoconference May 12-15, 2025, in parallel with a separate hearing involving another individual claimant (the "Second Claimant"). Although the two matters proceeded simultaneously by agreement of Valve, Claimant, and the Second Claimant, they were not consolidated. The parties were given equal time to present their cases, and Valve, Claimant, and the Second Claimant each consented to admitting one hearing's record into the other's for purposes of these two individual cases.[3] In addition to the individual claimants, the following witnesses testified over the course of the parallel, individual hearings: Augusta Butlin (Valve employee), Kassidy Gerber (Valve employee), Tom Giardino (Valve employee), Adam Klaff (Valve employee),[4] DJ Powers (Valve employee), Dr. Philip Cross, PhD (Claimant's expert witness), and Prof. Justin McCrary, PhD (Valve's expert witness). Claimant also presented testimony from a November 30, 2023 *Wolfire* deposition transcript read by his counsel. All exhibits presented at the May hearing were admitted.

Following the evidentiary hearing, the Parties each submitted proposed findings of fact and conclusions of law ("FOF/COL"); and, subsequently, each submitted their objections/responses to the other party's proposals ("FOF/COL Objs."). The Tribunal renders this Award based on its careful consideration and evaluation of the record, applicable rules and law, and all submissions and arguments by the parties.

2. **The Parties and "Steam" Platform**

Valve develops and makes video games, manufactures hardware for use in gaming (including a gaming console called a Steam Deck), and operates Steam, an online platform where game developers can distribute their games, and customers can buy and play them, along with their "community" of fellow gamers.[5] Claimant is one such customer.

Valve launched Steam more than 20 years ago to distribute its own games so that all of its customers could be kept on the same version of the games and could play together on that version.[6] Within a couple of years after Steam's launch, Valve began allowing other developers to offer their games on Steam,[7] making it

---

[3] May 12 Tr. 13:3-16 (colloquy).
[4] The Tribunal ordered the appearance of these first four-listed witnesses at Claimant's request, over Valve's objection.
[5] May 14 Tr. 747:18-748:8 (Powers).
[6] May 14 Tr. 783:12-785:11 (Powers).
[7] May 14 Tr. 785:12-17 (Powers).

2

among the first digital distributors.[8] Steam hosts over 100,000 games made by thousands—and potentially tens of thousands—of third-parties.[9] At least a portion of these games are exclusively available on Steam. Prof. McCrary, for example, testified that 2 of the top 20 games in terms of 2023 PC revenue were only available on Steam.[10] Dr. Cross, meanwhile, estimated that 90% of the games Steam sells are only listed on Steam.[11] The relevant market that Steam competes in and its market share is disputed in this case, but Claimant presented evidence, including a 2013 email by a Valve employee, indicating that it may hold (or may have held) a majority market share, depending on how the market is defined.[12]

Claimant is a Steam customer 

Steam faces competition in multiple forms, from multiple sources, including large companies, like Amazon, Microsoft, and Google (which has decided to reenter the market with Google Play Games for PC this year), and from a variety of enduring players and recent entrants to the industry.[21] Valve competes with its rivals, including by improving its product and, on at least 1 occasion, lowering the revenue share it imposes on developers who sell their games on Steam for the most successful games.[22] With respect to product improvement, Valve invests in developing new features for Steam, aimed at attracting both developers and consumers.[23] For example, in 2017, Valve introduced Steam Direct, a feature that allowed anybody in the

---

[8] May 14 Tr. 787:3-8 (Powers).
[9] May 14 Tr. 772:22-773:13, 775:15-17 (Powers).
[10] May 14 Tr. 1123:2-12 (McCrary).
[11] May 13 Tr. 544:20-22; May 15 Tr. 1306:16-1307:1 (Cross).
[12] C0192577. *See also Epic Games, Inc. v. Apple Inc.,* 4:20CV05640 (together with related litigation/appeals between the named parties, "*Epic v. Apple*"), September 20, 2021 Rule 52 Order after Trial on the Merits ("Steam 'is a dominant player in the space and was in 2018 with 70 to 85 percent market share depending on how you define the space.'").
[13] R677; May 14 Tr. 927:8-13 (Stewart).
[14] Steam Keys are codes Valve gives to developers for free. Developers can use them to sell copies of their Steam game to users through other stores. *See* May 14 Tr. 976:22-977:16 (Powers). Valve incurs costs in relation to Steam Keys, but does not charge any royalties or fees for the sale of them. May 13 Tr. 673:2-674:12 (Giardino).
[15] *See* R677, at 11, 32, 55, 77, 80.
[16] May 14 Tr. 945:18-946:11 (Stewart).
[17] R654; R677.
[18] May 14 Tr. 933:21-934:20 (Stewart).
[19] May 14 936:5-18 (Stewart)
[20] May 14 Tr. 936:12-21 (Stewart).
[21] May 15 Tr. 1204:6-1207:9 (McCrary).
[22] May 14 Tr. 801:18-802:8, 814:19-816:1 (Powers); May 15 Tr. 1230:4-1231:10 (McCrary).
[23] May 14 Tr. 801:3-17 (Powers) (describing R002 at 8, which reflects features Steam introduced between 2009 and 2019); *see also* May 14 Tr. 793:13-796:6 (Powers); May 15 Tr. 1233:15-1234:7 (McCrary)

world to ship a game on Steam. Valve witness DJ Powers explained that the new feature was "really revolutionary"[24] and described that it led to a "flood of content" on Steam.[25] Recognizing that this "flood" could be overwhelming for consumers, Valve turned to developing yet more features to improve and personalize the user experience.[26]

As noted, Valve has also remained competitive by changing its revenue share. Valve operates Steam on a "revenue share," where it sells games and content on Steam in exchange for a share of the revenue.[27] Valve does not have another mechanism for making money other than its revenue share.[28] For instance, it does not sell advertising or monetize users' data.[29] When it first began offering third-party games, Valve ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓[30] Valve standardized its revenue share at 70% to the developer and 30% to Valve around 2008.[31] In 2018, Valve adopted lower revenue share "tiers."[32] When a game launches on Steam, the revenue share still starts at 70/30. But, under this tiered approach, as sales increase for the game, the revenue share may drop to 75/25 and then 80/20 if sales thresholds are reached.[33] Qualification for these lower revenue share tiers is based solely on a game's sales, not the size of a developer.[34] Valve introduced its tiered offerings in response to competition, including from developers who were removing games from Steam and selling them exclusively on their own stores or other platforms.[35]

3. **Claimant's Claims**

Claimant asserts three causes of action in this arbitration: (1) violation of Sherman Act § 1; (2) violation of Sherman Act § 2; and (3) violation of the Washington Consumer Protection Act ("WCPA").[36] Claimant's theories of liability and the focus of his claims in this case have evolved somewhat over the course of the arbitration, but he generally contends that Valve committed these alleged violations by acting in an anticompetitive manner, primarily by (1) imposing "price parity" requirements; (2) imposing "anti-steering" requirements in the form of in-game anti-linking; (3) imposing "post-and-hold" requirements; and (4)

---

(describing Respondent's Expert Demonstratives at 50, which depicts the introduction of Steam features over time).

[24] May 14 Tr. 790:8-791:4 (Powers).
[25] May 14 Tr. 792:12-795:2 (Powers).
[26] May 14 Tr. 793:13-796:6 (Powers).
[27] May 14 Tr. 751:1-22 (Powers).
[28] May 14 Tr. 754:6-17 (Powers).
[29] May 14 Tr. 754:6-755:3 (Powers).
[30] May 14 Tr. 813:20-814:3 (Powers).
[31] May 14 Tr. 814:4-14 (Powers).
[32] May 14 Tr. 814:15-18 (Powers).
[33] May 14 Tr. 751:9-22 (Powers).
[34] May 14 Tr. 820:14-822:4 (Powers).
[35] May 14 Tr. 814:15-817:1 (Powers); May 15 Tr. 1230:4-1231:10 (McCrary).
[36] At the hearing, Claimant's counsel referenced California's Unfair Competition Law in his opening statement. Respondent's proposed FOF/COL interpreted this to potentially inject a claim under that law, but no such claim was presented nor proved. Rather, Claimant's counsel only referenced the California law to address an anticipated argument by Respondent that Judge Gonzalez Roger's analysis of a California law claim in *Epic v. Apple* would not apply to Claimant's WCPA claim in this case. Claimant's operative demand did not assert any claim under California law, he did not present proof to substantiate such a claim at hearing, and his proposed FOF/COL did not seek any rulings on any such claim. Accordingly, there was no California state law claim submitted to the Tribunal for decision in this case.

providing "kickbacks" in the form of reduced revenue-shares for successful games. As discussed herein, Claimant did not carry his burden to prove his claims.

## DISCUSSION

In summary, Sherman Act Section 1 prohibits agreements that "unreasonably" restrain trade (15 U.S.C. § 1) and Section 2 prohibits monopolization (*Id.* § 2). The WCPA provides "state law analogues."[37] Accordingly, and given the nature of the claims asserted here, the Tribunal's "analysis of [Claimant's] federal antitrust claims extends to [his] state law claims under the WCPA, which are patterned after Sections 1 and 2 of the Sherman Antitrust Act."[38]

Claimant "must prove [his claims] by a preponderance of the evidence." Cl. FOF/COL (*citing ABA Model Ins. 2.B.1,* ABA-JI-CIVANTI 2.B.1).[39]

### 1. **No Federal Antitrust Violation**

#### a. **No '*Per Se*' Section 1 Violation**

In its April 28, 2025 Order, the Tribunal denied Claimant's motion for partial summary judgment, which argued Valve's conduct is "*per se*" illegal horizontal price fixing. April 28 Order at 3-4. Nothing in the hearing record provides a basis for departure from that ruling. Claimant has not presented evidence of a *per se* violation.

To be sure, the nature of this industry blurs the lines between horizontal and vertical relationships. Valve, like many others in the industry, acts as both game distributor and game developer. At times, Valve and the other industry players are competing with each other for sales. At times they are selling games on one another's platforms. And, often, they are doing both simultaneously. In this case, however, the challenged conduct involves either vertical or, at most, hybrid relationships.

By way of example, Claimant focuses much of his attention on Valve's dealings with ▬▬▬▬ which, like Valve, develops its own games, sells its own gaming hardware, and operates its own storefront. Claimant accuses that Valve and ▬▬▬▬ agreed to fix pricing. This claim was not sufficiently substantiated by the record presented, but, even setting that aside for the moment, the evidence Claimant relied upon all reflected interactions where the two companies were not acting in a purely horizontal capacity with each other. As discussed further in the Tribunal's April 28, 2025 Order, the provision that Claimant relies upon ▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ was specifically predicated on and addressed the assumption that Valve would be distributing ▬▬▬▬ games via Steam—*i.e.,* the vertical aspect of their relationship. Likewise, Claimant's accusation that Valve pressured ▬▬▬▬ to sell ▬▬▬▬▬▬▬ on Steam for the same price it was offering the game elsewhere inherently reflects ▬▬▬▬ and Valve's vertical relationship. Indeed, the emails Claimant relied upon on this point generally show discussions between Valve and ▬▬▬▬ employees about the extent to which Valve—as distributor—would be willing to provide special,

---

[37] *PBTM LLC v. Football Nw., LLC*, 511 F. Supp. 3d 1158, 1178 (W.D. Wash. 2021).
[38] *PBTM LLC*, 511 F. Supp. 3d at 1178.
[39] Both Parties' proposed FOF/COLs direct the Tribunal to the ABA Model Jury Instructions for Civil Antitrust Cases ("Model Ins.") for this case.

5

curated promotions of games for ▮▮▮▮▮—as developer—on Steam.[40] This relationship between distributor/storefront and developer/manufacturer is vertical, as both parties' experts agreed.[41]

Accordingly, and for reasons explained in the Tribunal's April 28, 2025 Order, the rule of reason applies to Claimant's claims.[42] Moreover, as is also explained in that Order, Claimant did not present sufficient evidence to prove the existence of a *per se* violation in any event.[43] Nothing was presented in the hearing record (or otherwise since that Order) that remedied that deficiency.

### b. <u>No Section 1 Violation Under The Rule Of Reason</u>

The applicable rule of reason analysis proceeds by three steps: First, Claimant "has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market. If [Claimant] carries its burden, then the burden shifts to [Valve] to show a procompetitive rationale for the restraint. If [Valve] makes this showing, then the burden shifts back to [Claimant] to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means."[44]

#### i. *No competitive harm in a market (Step 1).*

At Step 1, Claimant must prove that the "challenged restraint resulted in a substantial harm to competition in a relevant product and geographic market."[45] This inherently requires a showing in three parts, starting with proof of a relevant market, because "[w]ithout a definition of the market there is no way to measure" harm to competition.[46] Second, there must be "substantial harm to competition within that market;" and, third, that harm must be the result of the challenged restraint of trade.[47]

##### a. <u>No defined relevant antitrust market.</u>

Claimant bears the burden to prove both a relevant product and geographic market.[48] The relevant product market "includes the products that a consumer believes are reasonably interchangeable or reasonable substitutes," Model Ins. 3.A.4.,[49] and the "relevant geographic market is the area in which defendant faces competition … and to which customers can reasonably turn," Model Ins. 3.A.6.

Claimant's evidence of the relevant product market was insufficient. His expert, Dr. Cross, testified that the relevant product market includes PC games, but not console games.[50] But Dr. Cross admitted that he was not an expert in PC gaming distribution, and had conducted only a "cursory" examination of the industry.[51]

---

[40] *See, e.g.,* C1549441 and C2904892.
[41] *See* May 15 Tr. 1209:8-16 (McCrary); May 13 Tr. 358:12-360:16 (Cross).
[42] *See, e.g., Dimidowich v. Bell & Howell,* 803 F.2d 1473, 1481 and n. 6 (9th Cir. 1986), *modified*, 810 F.2d 1517 (9th Cir. 1987); *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,* 551 U.S. 877, 907 (2007)).
[43] April 28, 2025 Order at 4-5.
[44] *Ohio v. Am. Express Co.,* 585 U.S. 529, 541–42, 138 S. Ct. 2274, 2284, 201 L. Ed. 2d 678 (2018)("*AmEx*")(internal citations omitted). *See also* Model Ins. 1.C. Instruction 3, *et seq.*
[45] Model Ins. 1.C.1.
[46] *AmEx* at 543; *see also* Model Ins. 1.C.2.
[47] *See* Model Ins. 1.C. Instruction 3, *et seq.*
[48] *Id.*
[49] *See also* Model Ins. 1.C.2. at fn 3 (referring to Model Ins. Chap. III.A. for relevant market instructions).
[50] May 13 Tr. 404:1-407:3 (Cross).
[51] May 13 Tr. 445:13-16; 457:7-9; 457:18-458:5 (Cross); *see also id.* 404:1-407:3 (Cross).

Moreover, Dr. Cross largely relied on a class-certification Order issued in other pending litigation.[52] But, the relevant portion of that Order is not binding here, and Dr. Cross's reliance upon it is problematic for numerous reasons, including because the issues and record in that case differ from those presented here. Indeed, the plaintiff *developers* in that case, through their expert, Dr. Steven Schwartz, asserted a different, *worldwide* market than Dr. Cross advocates should be applied here.[53]

In fact, for purposes of this case, Dr. Cross expressly departed from Dr. Schwartz's assumption that the market should be global.[54] Moreover, Valve effectively rebutted Dr. Cross's market view through its expert witness, Prof. McCrary.[55] For instance, Prof. McCrary presented analyses showing the same games were available on both PC and console and a review of publications showing industry participants view both PC and console gaming as substitutes, which undermined Dr. Cross's assumption that the relevant product market would exclude console games.[56] Prof. McCrary also convincingly showed that Dr. Cross's geographic market was too narrow, including by evidence of the numbers of languages and currencies distributors offer, the world-wide uniform revenue shares platforms set, and the global reach of competing distributors.[57] Valve's witnesses similarly testified that Steam operates on a global level.[58]

In the end, Dr. Cross's explanations for the market he advanced were not convincing and were seemingly at odds with the Claimant's own testimony about his experience of the gaming industry. For instance, Dr. Cross suggested that console games should be excluded because he assumed consumers would not invest hundreds of dollars to buy a console for the sake of saving $10.00 on the purchase of a game. But, this assumption is undermined by ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇[59] Furthermore, in addition to Dr. Cross's lack of relevant expertise, Dr. Cross confessed to views that cast doubt on his neutrality, and, as such, his reliability and credibility as an expert witness in this matter.[60] Ultimately, his opinions on market definition in the video game industry were not convincing.

As such, Claimant failed to carry his initial burden of proving a relevant antitrust market.[61]

---

[52] May 13 Tr. 405:8-406:10 (Cross); *In re Valve Antitrust Litigation*, U.S. District Court, Western District of Washington, Case No. 2:21CV00563 (Docs. 391, 392, the "Whitehead Class Certification Order").
[53] *See generally In re Valve Antitrust Litigation* and Whitehead Class Certification Order.
[54] May 13 Tr. 409:21-412:14 (Cross).
[55] In his FOF/COL Obj. Claimant complains that, outside of what Prof. McCrary has learned for this case, he, too, lacks expertise on PC gaming. Even accepting this assertion for purposes of argument, though, it does not cure Claimant's omission to carry his burden to prove the relevant market.
[56] May 14 Tr. 1119:1-1121:20 (McCrary); May 15 Tr. 1169:17-1174:21 (McCrary).
[57] May 15 Tr. 1166:9-1169:9 (McCrary).
[58] May 12 Tr. 181:2-182:2 (Butlin); May 14 Tr. 769:21-771:8; 773:14-20; 774:22-775:8; 795:3-796:6; 833:22-834:18; 1051:4-15 (Powers); May 14 Tr. 901:9-20 (Klaff).
[59] *Compare* May 13 Tr. 405:20-407:3 (Cross) *with* May 14 Tr. 931:20-932:2 (Stewart).
[60] May 13 Tr. 450:5-453:4 (Cross) (a testifying expert must avoid learning facts unhelpful to the case or having "candid" discussions with counsel for "fear of having to testify" about them), 455:9-20 (Cross) (future retention by Claimant's counsel depends on the "content of his testimony" and outcome).
[61] *Coronavirus Rep. v. Apple, Inc.*, 85 F.4th 948, 957 (9th Cir. 2023) ("Failing to define a relevant market alone is fatal" to a Section 1 claim); *accord Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 628, 638 (5th Cir. 2002).

b.  No harm to competition.

But, even setting aside Claimant's failure to sufficiently prove the relevant market, his claim still would fail because he did not establish an actionable harm to competition. To prevail on his claim, Claimant needed to show "a significant or substantially adverse effect on competition; a minute or de minimis impact, either before or after competitive benefits are weighed, is insufficient."[62]

Claimant asserts a multi-step theory. *First*, he argues that Valve's conduct—principally, its alleged "price parity" requirement, but also its dispersal of Steam Keys, discounting, and other practices—prevents rivals from competing effectively.[63] *Second*, he argues that the purported absence of competition allows Valve to charge developers an inflated revenue share.[64] *Finally*, he asserts that developers "pass through" Valve's "too high" revenue share to users, including himself, through prices for games that are likewise "too high."[65] But this theory was not adequately borne out by the evidence presented.

Importantly, there was no evidence that Valve excludes competition. To the contrary, even accepting the market definition proposed by Claimant, the evidence showed that there are numerous competitors operating in this space, including new and sustained rivals in the marketplace. Indeed, ███████████████████████ ███████████████████████.[66] And Valve does not prevent developers from selling their games through competitor's storefronts or other means.

Claimant also did not show that Valve's revenue share is "too high." Rather, the record reflected that Valve's rate is in line with the rate charged by others, and has evolved over time in response to competition in the marketplace.[67] Moreover, ██████████████████████████████████████████ ██████.[68] Upon this record, even to the extent Valve may command a higher revenue share than competitors, the Tribunal cannot conclude that the price is "too high" on that basis alone, rather than a reflection of the fact that Valve offers consumers a superior experience that they are willing to pay more to enjoy.

Furthermore, the classic indicia of competitive harm are "reduced output, increased prices, or decreased quality."[69] But Claimant offered no persuasive evidence on these indicia, while Prof. McCrary provided credible evidence that the video game market has experienced increased output, decreased prices, and improved quality in the past decade.

---

[62] Model Ins. 1.C.1. (*citing United States v. Topco Assocs.*, 405 U.S. 596, 606 (1972); *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.3d 715, 728 (3d Cir. 1991); and 1 ABA SECTION OF ANTITRUST LAW, ANTITRUST LAW DEVELOPMENTS 61-63 (7th ed. 2012)).
[63] May 13 Tr. 481:1-6 (Cross); May 15 Tr. 1184:20-1186:3 (McCrary).
[64] May 13 Tr. 479:13-480:22 (Cross); Claimant's Opening Br. at 1.
[65] May 13 Tr. 476:16-477:2; 480:6-22 (Cross).
[66] May 14 Tr. 928:22-929:3 (Stewart).
[67] R009; *see also* May 14 Tr. 814:11-14 (Powers); May 15 Tr. 1228:8-1230:2 (McCrary) (industry standard); 1230:4-1231:10 (Valve responds to competition). *See also Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 985 (9th Cir. 2023) (revenue share in the PC gaming industry reflects a "vivid illustration" of competition).
[68] May 14 Tr. 933:14-937:11 (Stewart).
[69] *AmEx*, 585 U.S. at 542. Dr. Cross disclaimed that the evidence he presented about the change in prices over time was intended to support his opinion that Valve caused harm to competition. May 13 Tr. 595:20-596:9 (Cross).

Accordingly, no competitive harm was proved, and Claimant's claims fail at the rule of reason's first step.[70] Since Claimant did not prove that Valve harmed competition, it is unnecessary to separately analyze whether any of Valve's challenged conduct was the cause of competitive harm. Nevertheless, the Arbitrator was not persuaded by the evidence presented that the challenged conduct harmed competition.

        c.        No actionable restraint of trade

                a.        Price parity was not proved.

Claimant claimed Valve "enforces a price parity rule that prevents developers from selling their games for lower [prices] on other stores."[71] The evidence did not prove this claim.

Claimant did not present persuasive evidence or analysis to prove Valve has or consistently enforces a "price parity rule," to such an extent that it suppresses price competition among platforms. Notably, although the website "IsThereAnyDeal" ("ITAD") publishes daily game prices, Dr. Cross did not conduct any analysis of ITAD data in support of his affirmative opinions.[72] Instead, he again turned to work done by Dr. Schwartz for a different case.[73] But Dr. Cross did not testify to any analysis he conducted to test Dr. Schwartz's conclusions, and admitted he did not consider Valve's expert reports in response to Dr. Schwartz—because he "went out looking for evidence to support the theory that there's a price parity requirement[.]"[74] These circumstances undermine the value and reliability of Dr. Cross's price parity conclusion.[75]

Moreover, as with his market testimony, Dr. Cross's opinions were rebutted by Prof. McCrary, who used ITAD data to evaluate whether Valve consistently enforces a price parity requirement.[76] Doing so, he found pricing variation, not parity in the real world.[77]

Ultimately, as with his market opinions, Dr. Cross's opinions on price parity cannot carry Claimant's burden of proof. In the face of empirical, market-wide evidence refuting the allegation that Valve caused prices to mostly be the same, Claimant relied on an array of emails sent by Steam business team members over the course of time, requesting competitive prices for games sold on Steam.[78] These emails involved

---

[70] *See Gorlick Distribution Centers, LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1027 (9th Cir. 2013).
[71] May 13 Tr. 481:1-6 (Cross).
[72] May 13 Tr. 467:4-9; 527:1-17 (Cross). Further, the Tribunal has already ruled that none of the ITAD analyses discussed on Dr. Cross's rebuttal examination could be used as affirmative evidence. May 15 Tr. 1320:13-22 (colloquy).
[73] May 13 Tr. 365:1-367:4; 519:11-520:1 (Cross).
[74] May 13 Tr. 520:2-521:15 (Cross).
[75] "[E]xpert testimony based solely or primarily on the opinions of other experts is inherently unreliable." Furthermore, experts cannot "cherry-pick" data and "ignore[e] … evidence that contradicts [their] conclusions," *In re Bextra & Celebrex Mktg. Sales Pracs. & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1176 (N.D. Cal. 2007).
[76] May 15 Tr. 1186:18-1188:5; 1188:7-1190:20 (McCrary).
[77] Respondent's Expert Demonstratives at 31; *see also* May 15 Tr. 1198:18-1201:4 (McCrary); *id.* at 1202:9-1203:11 (same, excluding Steam Key resellers); *id.* at 1186:15-17 (concluding "[p]rices are lower off Steam all the time").
[78] *See, e.g.*, May 15 Tr. 1401:15-1403:6 (Claimant's closing).

9

approximately 11 developers and 50 games.[79] While emails can prove an antitrust violation, these emails do not. In fact, contrary to Claimant's theory that Valve has caused prices to be inflated, the emails generally reflect instances where Steam business team members became aware of a better price or discount being offered elsewhere, and asked the developer whether the price on Steam could also be *lowered*. Theoretically, if Valve routinely insisted upon price parity, that might cause developers to raise their prices across the board, but the evidence did not show that that occurred here.

Furthermore, the emails generally did not show that Valve and the email recipient were discussing (let alone reaching) agreements to "fix" a price for the game. And, they did not establish that Valve, as a matter of policy, refuses to sell games in the absence of price parity. Instead, the emails commonly involved situations where Valve was considering or being asked to consider whether to offer the game for a presale or featured promotion; *i.e.*, they generally did not suggest that Valve would bar the sale of any available game unless price parity was assured. It is unsurprising—and not an unreasonable restraint of trade—that Valve would not want to dedicate extra support, like a curated promotion, for a game if doing so would put Valve in the position of essentially pushing a 'bad deal' on its customers. While it does appear that sometimes Valve's employees tread close to the line of permissible business conduct, upon the record presented, there is simply not sufficient evidence of an actual, actionable violation significant enough to warrant an award for this particular Claimant against Valve. As a matter of law, "anecdotal speculation and supposition are not a substitute for evidence."[80] Furthermore, finding for Claimant on the presented record of *ad hoc* emails would be particularly unjustified in light of the lack of proof that price parity exists or that competition has been stifled by Valve, let alone that such factors caused any injury to Claimant.

                        b.  <u>No other challenged conduct harmed competition.</u>

Claimant also alleged Valve acted anticompetitively by various other conduct, including: (1) requiring "content parity" (or "material parity"); (2) prohibiting linking from within Steam games to other stores; (3) setting pricing and discounting rules; and (4) lowering its revenue share, which Claimant called "kickbacks."[81] But again, Claimant did not prove that any such conduct caused actionable harm to competition.

As discussed above, Claimant did not prove that the conduct he challenged caused the harmful effects (inflated prices) that he claimed. *First*, the evidence presented did not prove that prices were, in fact, inflated despite the "material parity" requirement in Valve's Steam Distribution Agreement ("SDA"). *Second*, there was no evidence presented that Valve's in-game linking policy meaningfully prevented consumers from learning about competing storefronts or pricing through many different channels, including by using links on Steam itself and/or ITAD.[82] As noted, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[83] This case is not like the situation in *Epic v. Apple*, upon which Claimant relies heavily. Here, consumers may view competing storefronts and pricing by simply opening a tab on the very same browser through which they would access Steam—or even pulling up the developer's page within Steam. *Third*, developers set the prices for their own games on Steam and can set them as low as $0.00.

---

[79] *See* C0252491, C2904892, C0792573, C1549441, C2905087, C0333351, C0360722, C2565882, C1168945, C0293959, C2818332, C0192577, C0861925, C1197139, C0423795, C1164564, C2846147, C0116440, C1170551, C1198639, C1187727, C2392320, C1168945, C1165817, C1608495.
[80] *Aerotec Int'l v. Honeywell Int'l*, 836 F.3d 1171, 1174 (9th Cir. 2016).
[81] *See* May 13 Tr. 355:3-18 (Cross). Claimant cited various other conduct, but offered no evidence of competitive harm for any of these theories. *See* May 14 Tr. 1056:13-22; 1081:11-1083:3 (Powers).
[82] May 14 Tr. 1010:10-1012:7 (Powers); May 15 Tr. 1215:6-1216:5 (McCrary).
[83] May 14 Tr. 928:22-929:3 (Stewart).

10

Valve's rule setting a nominal amount as the floor to cover transaction costs *if* any price is charged is not an antitrust violation, and there is no evidence it caused any harm to competition. Likewise, Valve's discounting policies generally allow developers to lower the base prices of their games except during very limited situations that are insufficient to establish a violation, and were not shown to have an effect on prices on other stores.[84]

Finally, although he did not emphasize it at the hearing, Claimant argued in this case that Valve's additional revenue share tiers, introduced in 2018, were illegal "kickbacks" that prevented competition among rival stores operated by large developers, like ▮▮▮▮▮▮▮.[85] But the availability of additional revenue share tiers—even if meant to entice successful developers to sell their products on Valve—are not "kickbacks." They are volume discounts that can be earned by any developers through the success of their games.[86] And the evidence showed the opposite of what Claimant argued, with Microsoft lowering its revenue share in a "clear bid to compete with Steam" in 2021, after Valve's revenue share tiers already had been introduced.[87]

2. *Valve has procompetitive justifications (Step 2).*

Even if Claimant had made the showings required in Step 1 (which was not the case), the Tribunal "next must determine whether the restraint also benefits competition in other ways,"[88] *i.e.*, has "procompetitive rationale[s]."[89] If Valve's conduct has these procompetitive benefits, and they could not be achieved through substantially less restrictive means, Valve's conduct does not violate the rule of reason. *See id.*

A "procompetitive justification" must be "a nonpretextual claim that [the] conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal."[90]

a. Alleged price and content parity

The alleged "parity" requirements Claimant challenges are supported by well-recognized procompetitive justifications. For example, Valve's requests that developers offer competitive prices and/or equivalent content on Steam help avoid "free-riding." Steam strives to be a high-quality store, and Valve makes significant investments in helping connect developers and customers.[91] Developers and customers can "free-ride" on these investments when they use Steam to market or learn about new games, and then steer purchases to competing stores—perhaps even to buy Steam keys that gamers can then use on Steam.[92]

Such free-riding would disincentivize Valve from continuing to invest in Steam by reducing its return on investment. Professor McCrary opined that "prevention of free riding is a procompetitive act" as a matter

---

[84] May 12 Tr. 232:2-13 (Butlin); May 14 Tr. 851:2-18 (Powers).
[85] May 13 Tr. 387:16-388:9; 490:11-491:2 (Cross).
[86] May 15 Tr. 1221:3-1222:16 (McCrary).
[87] May 15 Tr. 1230:4-1231:10 (McCrary).
[88] Model Ins. 1.C.3.
[89] *Epic Games, Inc. v. Apple, Inc.*, 559 F. Supp. 3d 898, 1034 (N.D. Cal. 2021).
[90] *United States v. Microsoft Corp.*, 253 F.3d 34, 59 (D.C. Cir. 2001).
[91] May 14 Tr. 805:3-807:1 (Powers).
[92] May 15 Tr. 1211:13-1213:3 (McCrary).

11

of economics.[93] The law is in accord.[94] Claimant's FOF/COL Obj., citing *Leegin*, suggests that, to the extent Valve is the source of the restraint, there may be "greater likelihood that the restraint facilitates a retailer cartel or supports a dominant, inefficient retailer." But the evidence did not support that Valve is a "dominant, inefficient retailer." To the contrary, the record suggests that Valve—even to the extent it may have established a potentially dominant *position*—does not act to dominate the industry and invests in efficiencies to enhance the quality of its product and experience for consumers; thus, giving its rivals motivation to innovate as well.

Further, to the extent Valve sought competitive prices from developers, doing so can also "enhance[]" Steam's "consumer appeal," and "tap[] into consumer demand," which is also procompetitive.[95] As Mr. Powers testified, Valve employees discussed prices with developers in "rare circumstances" where developers sold Steam Keys for lower prices on other stores, or where Valve lent Steam's credibility to a game by giving it free "curated" marketing, a launch promotion or a special preorder offer.[96] The documentary evidence was consistent with this testimony.[97] Mr. Powers further testified it would undermine customers' trust in Steam if Valve promoted bad deals to them in these specific circumstances.[98] This testimony was credible; it was echoed by other Valve witnesses[99] and the documentary evidence.[100]

Finally, "low prices benefit consumers, regardless of how they are set,"[101] and "cutting prices to increase business" is "often the very essence of competition."[102] "A retailer who believes its prices are not competitive must be allowed to ask the wholesaler or manufacturer to lower its prices so that the retailer can offer competitive prices."[103] Claimant argues that the record did not show that any of the emails he presented actually caused reduced prices. This is not necessarily accurate,[104] but it also does not change the fact that the accused conduct requested discounts and more favorable content and pricing for consumers. If

---

[93] May 15 Tr. 1212:1-11 (McCrary).
[94] *See Leegin*, 551 U.S. at 890–91 ("vertical price restraints" can enhance competition by ensuring a "high-service retailer" is not "force[d] to cut back its services to a lower level than consumers would otherwise prefer"); *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 43 (2d Cir. 2018) ("[e]liminating free riders" can be a valid procompetitive justification).
[95] *See U.S. v. Microsoft Corp.*, 253 F.3d 34, 59 (D.C. Cir. 2001); *Epic v. Apple*, 67 F.4th at 987.
[96] May 14 Tr. 984:14-986:21 (Steam Keys); 987:3-989:14 (marketing); 989:17-990:14 (launch); 992:2-18 (preorder) (Powers).
[97] Claimant's counsel argued that emails regarding ▇▇▇▇▇▇▇ did not implicate these concerns. May 15 Tr. 1399:18-1400:14 (closing). But the emails ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ C1549441 at -44.
[98] May 14 Tr. 984:14-986:3 (Steam Keys); 988:2-989:11 (marketing); 989:17-990:14 (launch); 992:2-18 (preorder) (Powers).
[99] May 12 Tr. 266:17-267:14 (Gerber).
[100] *See, e.g.*, C0792573 at -73 (efforts intended to "make [its] users happy").
[101] *Atl. Richfield v. USA Petroleum,* 495 U.S. 328, 340 (1990).
[102] *Matsushita Elec. Indus. v. Zenith Radio*, 475 U.S. 574, 594 (1986).
[103] *AAA Liquors v. Joseph E. Seagram & Sons*, 705 F.2d 1203, 1207 (10th Cir. 1982).
[104] *See, e.g.,* C2904892. If Claimant's theory is that Valve withheld promotional support for ▇▇▇▇▇▇ unless ▇▇▇▇▇ provided price parity, then ▇▇▇▇▇▇ January 25, 2023 email ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

it was effective, the logical consequence would be procompetitive. If it was not effective, then it could not cause harm to competition. In either event, Claimant's claim would fail.

                b.        <u>In-Game Linking Policy.</u>

Valve's SDA prohibits links to other stores from within Steam games.[105] This prevents potential free-riding, whereby developers could offer games for free or artificially reduced prices to unilaterally eliminate or reduce Valve's revenue share. Developers often monetize their games through "in game" transactions; for some games, that is the only (or primary) way the developer—and thus Valve—earns revenue.[106] If developers could direct customers from within games to a non-Steam store or payment method to complete those purchases, Valve would bear the costs of distributing these games, but would be deprived of its fair share of revenue.[107] As discussed above, Valve is permitted to prevent this free-riding.

Valve's in-game linking policy also promotes consumer safety, by preventing developers from adding links to games with malware, and creates a better user experience, by preventing users from being "shipped off to another store" from inside Steam.[108] Enhancing consumer appeal is a recognized procompetitive justification.[109]

                c.        <u>Pricing and Discounting Policies.</u>

Valve's pricing and discounting rules prevent deceptive discounts by requiring developers to establish a bona fide "base" price, consistent with FTC guidance.[110] Protecting the public from "anything that might be false or misleading" is procompetitive.[111] And, Valve's so-called "price floor" was not a true floor, inasmuch as developers are permitted to give away their games for free on Valve. The "price floor" requirement only applied *if* the developer chose to impose a charge. In that circumstance, the nominal minimum charge (under $1.00), serves the legitimate, procompetitive business purpose of covering costs and recouping Valve's investment.[112]

                d.        <u>Tiered Revenue Shares.</u>

As discussed, Valve lowered its revenue share in 2018 in response to increased competitive threats from rival platforms. The Ninth Circuit observed that its reduction and adjustments made by competitors was a "vivid illustration" of competition.[113] This Tribunal agrees.[114] Labeling a price cut as a "kickback" does not change this conclusion.

---

[105] R189 § 2.5.
[106] May 13 Tr. 617:3-18 (Giardino); May 14 Tr. 1000:19-1001:14 (Powers)
[107] *Id.*; May 15 Tr. 1213:20-1215:4 (McCrary).
[108] May 12 Tr. 284:1-14 (Gerber); May 14 Tr. 998:21-1000:18 (Powers).
[109] *Microsoft Corp.*, 253 F.3d at 59 (specifically listing "enhanced consumer appeal" as an example of a procompetitive justification).
[110] May 12 Tr. 245:18-246:5 (Gerber); May 14 Tr. 845:2-851:19 (Powers); May 15 Tr. 1217:21-1220:6 (McCrary); *see also* 16 CFR Part 233.1.
[111] *California Dental Ass'n v. F.T.C.*, 224 F.3d 942, 949 & n.5 (9th Cir. 2000).
[112] May 14 Tr. 807:2-808:5 (Powers) (infrastructure costs); 837:7-838:5 (per-transaction costs).
[113] *Epic*, 67 F.4th at 985.
[114] Dr. Cross suggested that Valve's reduction of its revenue share constituted "predatory pricing," May 13 Tr. 551:6-552:21 (Cross), but prices are predatory only when they are too low to cover costs. *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 910 (9th Cir. 2008). Dr. Cross's suggestion that Valve's revenue share was predatory was irreconcilable with his claim that Valve's revenue share was "too high."

3. *No less restrictive alternatives (Step 3).*

Because Valve has shown procompetitive justifications for the challenged conduct, Claimant must prove "the same benefits could have been readily achieved by other, reasonably available alternative means that create substantially less harm to competition."[115] Lawyer arguments are not a substitute for evidence on this point, because a "skilled lawyer" will "have little difficulty imagining possible less restrictive alternatives to most joint arrangements."[116]

No doubt, Claimant's counsel are such "skilled lawyers." But, many of the "less restrictive alternatives" Claimant offered were presented as arguments by his lawyers, predominantly made during closing, and not through actual evidence.[117] Mere arguments are insufficient. Meanwhile, the alternatives suggested with witnesses were not fleshed out sufficiently to meet Claimant's burden.[118] And, they could not realistically do so given that Claimant did not show that Valve's conduct created harm to competition in the first instance. In addition, much of the supposed 'misconduct' challenged by Claimant already was tailored to its goal. For instance, Valve's pricing and discounting policies offer vast discretion to the developer, with very limited exceptions; and its anti-linking policy applies within the game, whereas Valve allows links and other means of access to its customers elsewhere within its storefront operations. The evidence did not show that "the same benefits could have been readily achieved by other, reasonably available alternative means that create substantially less harm to competition."

### a. No Section 2 Violation Under The Rule Of Reason

For a Section 2 claim, Claimant must prove, among other elements, that Valve (1) has "monopoly power," (2) got or maintained that power through "anticompetitive conduct," and (3) caused injury to Claimant as a result of that "anticompetitive conduct." Model Ins. 3.A.1.

1. *Claimant did not prove that Valve has monopoly power.*

Monopoly power is "the power to control prices, restrict output, and exclude competition in a relevant antitrust market." Model Ins. 3.A.2. Having heard the evidence, the Tribunal is persuaded that there is room for debate as to whether Valve has monopoly power. But, in the end, Claimant did not make the necessary showings by a preponderance of the evidence. On the one hand, there was evidence presented that Respondent enjoys a large share of at least some markets[119] and commands a revenue share rate that, while perhaps standard, likely produces substantial profits for Valve.

On the other hand, though, the evidence showed that the video game industry is competitive, with numerous well-heeled distributors entering and selling video games in competition with Steam. In addition, Valve presented credible evidence that its 30% default revenue share is industry standard, and

---

[115] Model Ins. 1.C.3.
[116] 11 Areeda & Hovenkamp ¶1913b, p. 398.
[117] Claimant's counsel argued Valve could (i) apply its discounting policies regionally, *see* May 15 Tr. 1403:17-1404:2 (Claimant's closing); (ii) automate price reviews, *id.* at 1404:3-12; and (iii) apply its in-game linking policy only to free games, *id.* at 1404:13-22.
[118] *See, e.g.,* May 12 Tr. 311:5-314:22 (Gerber); May 13 Tr. 389:18-391:16 (Cross). *And see Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1159–1160 (9th Cir. 2001) (less restrictive alternative must not cause "significantly increased cost").
[119] May 13 Tr. 397:6-403:22 (Cross).

that Valve adopted reduced revenue share tiers in response to competition. Claimant also did not show that Valve's revenue share is above the competitive level. Claimant relied on Dr. Cross's estimates that the purportedly "competitive" revenue share rate would be 12% or 4%.[120] But Dr. Cross testified he could not "square the circle" between his claim and a court finding that EGS's 12% revenue share is "below cost;"[121] even though he relied on other portions of the same court decision in support of his opinions.[122] Dr. Cross also did not present persuasive support for his proposed 4% revenue share figure, which he based on his estimation that ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆[123]

Upon the record presented, the Tribunal cannot and does not conclude that Valve has the power to control prices, restrict output, and exclude competition. Also, Claimant's omission to prove a defined antitrust market also, at a minimum, substantially compromises his Section 2 claims.[124]

   2. *No anticompetitive conduct.*

The second element of a Section 2 claim requires Claimant to prove Valve engaged in "anticompetitive conduct." That analysis is governed by the rule of reason, which applies "essentially the same" under Sections 1 and 2.[125] Here, Claimant challenges the same conduct under Section 2 as they do under Section 1. Thus, for the same reasons Claimant's theory failed the rule of reason under Section 1, it fails under Section 2 as well. Nothing about Valve's market power changes the Tribunal's analysis.

   3. *No Antitrust Injury or Damages.*

Even if Claimant had proven a violation of Section 1 or Section 2, he did not prove "antitrust injury," which is required even for nominal damages or attorney's fees. *See U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1377–79 (2d Cir. 1988). Notably, the evidence did not establish that developers would have "passed through" a lower revenue share to reduce prices to customers, as Claimant's theory requires.[126] ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆, and there was insufficient corroborating evidence to show that Claimant actually paid any unduly inflated price for his Steam purchases. Dr. Cross "assume[d] … the pass through rate is 1"[127] (*i.e.*, 100%), without stating "an economic principle that would justify [that] assumption[.]."[128] Conversely, Prof. McCrary testified that "the assumption of one-for-one pass-through" is not appropriate, based on industry evidence and empirical analysis of prices on competing storefronts.[129] Moreover, the evidence showed that ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

---

[120] May 13 Tr. 429:20-433:16 (Cross).
[121] May 13 Tr. 497:17-498:19 (Cross)
[122] May 13 Tr. 400:7-402:11; 494:6-498:19 (Cross).
[123] May 13 Tr. 432:6-433:16; 506:8-507:4 (Cross).
[124] *See Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997).
[125] *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020).
[126] May 13 Tr. 476:16-477:2; 480:6-22 (Cross).
[127] May 13 Tr. 509:6-22 (Cross); *see also id.* at 429:5-7 ("I'm going to assume in my damages calculation . . . that we have what's called a pass-through rate of one.") (Cross); May 15 Tr. 1236:16-1837:1 (McCrary).
[128] May 13 Tr. 510:20-511:2 (Cross).
[129] May 15 Tr. 1243:4-9 (McCrary); *see also id.* at 1235:19-1243:2 (McCrary).

███████████████████████████████████.[130] This suggests that Claimant elected to purchase from Valve because it has developed a superior product in Steam, for which Claimant may have been willing to pay a higher price point; *i.e.,* not because of any alleged antitrust violation.

On balance, because Claimant bore the burden of proof on this issue, the Tribunal cannot find that he carried it. Moreover, given that Claimant did not show an antitrust violation to begin with, it necessarily follows that he did not show any resulting, compensable injury.

### 4. No State Law Violation

Claimant pleaded a violation of the Washington Consumer Protection Act.[131] Since this tracks the Sherman Act, Claimant's state law claims fail for the same reasons as his Sherman Act claims.[132] Claimant relies heavily on an analogy to *Epic v. Apple*. But this situation is factually distinct from the one presented in that litigation in numerous respects, including that the Court there found that Apple's iOS platform is "a black box," and that Apple—which controlled the hardware and operating system on which its app store operated and permitted only its own app store to run—"enforced silence to control information and actively impede users from obtaining the knowledge to obtain digital goods on other platforms." *Id.* at 1056. Here, Valve does not control the operating systems and competing game stores are available on them. This is true both for PCs generally and the Steam Deck.[133]

Moreover, Valve realistically cannot block information in the manner Apple was found to have done. Competing platforms are widely known, and Steam users can use ITAD (among other sources) to learn about game availability and prices, while developers can direct Steam users to their own websites via links on their Steam pages.[134] ████████████████████████████████
████[135] Unlike the iPhone app market, the video game distribution industry is open and competitive.

### FINAL MERITS AWARD

Claimant's claims are hereby DENIED.
The administrative fees of the American Arbitration Association shall be borne as incurred, and the compensation of the arbitrator shall be borne as incurred.[136]

This Final Award is in full settlement of all claims submitted to this arbitration. All claims not expressly granted herein are hereby denied.[137]

---

[130] *See, e.g.,* May 15 Tr. 1186:15-17 (McCrary); May 14 Tr. 928:22-929:3 and 933:14-937:11 (Stewart).
[131] *See* May 12 Tr. 43:18-46:12 (Claimant's Opening).
[132] *See PBTM LLC v. Football Nw., LLC*, 511 F. Supp. 3d 1158, 1178 (W.D. Wash. 2021).
[133] May 14 Tr. 1018:18-1020:13 (Powers); *contra* May 15 Tr. 1411:5-1412:4 (closing).
[134] *See* May 14 Tr. 1010:10-1012:7 (Powers) (demonstrating Steam links to websites and alternative stores).
[135] R677, at 11, 32, 55, 77, 80.
[136] The Tribunal may allocate expenses to "any party" upon its finding that a party's claim "was filed for purposes of harassment or is patently frivolous." R-44(c). The Steam Subscriber Agreement Claimant relies on to bring his arbitration contains similar language. *See* R008, at 8. However, the Tribunal finds that Claimant's claims were neither patently frivolous nor filed for purposes of harassment.
[137] At the hearing, the Tribunal deferred briefing on fees and expenses. Given the findings and conclusions herein, this Tribunal finds that such briefing is unnecessary.

I, Stacey Gilman, do hereby affirm upon my oath as arbitrator that I am the individual described in and who executed this instrument, which is my Award.

\_\_07/22/2025\_\_  
Date

_____*Stacey Gilman*_____  
Stacey Gilman, Arbitrator