# Exhibit A

AMERICAN
ARBITRATION
ASSOCIATION·    | INTERNATIONAL CENTRE
FOR DISPUTE RESOLUTION

**AMERICAN ARBITRATION ASSOCIATION**
**Consumer Arbitration Rules**

In the Matter of the Arbitration between

Case Number: 01-23-0005-3288

Greg Fish, Claimant
-vs-
Valve Corporation d/b/a Steam, Respondent

### INTERIM AWARD OF ARBITRATOR

I, Frances Floriano Goins, the undersigned Arbitrator, having been designated in accordance with the arbitration agreement entered into between the above-named Parties, having been duly sworn, and having duly heard the proofs and allegations of the Parties, each represented by counsel, at the virtual evidentiary hearing held on March 6, March 7, and March 10, 2025, and, by agreement of the Parties, including additional testimony and evidence presented at subsequent virtual hearings during March 2025 in other individual cases in this mass arbitration before this same Arbitrator, do hereby issue this INTERIM AWARD as follows:

Claimant alleges that Respondent Steam violated Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§1 and 2, by exercising monopoly power to fix prices and decrease competition in the "market for digital distribution of PC games in the U.S." Claimant's Post-Hearing Brief ("C. Post-Hrg. Brief"), p. 29, fn. 6. On balance, the evidence supported this description as to the product, but I find that the geographic market is worldwide. See Ex. R587, p. 84 of 464. Consistent with the decision of the court that most recently addressed the matter, I find that Steam does "hold[] and maintain[] monopoly power in the PC video game digital distribution market." *In re Valve Antitrust Lit.,* 2024 WL 4893373 *8 (W.D. Wash. Nov. 26 2024); *Epic Games, Inc., v. Apple, Inc.,* 67 F.4ᵗʰ 946 (9ᵗʰ Cir. 2023) ("Steam is a 'dominant player in the space . . . with 70 to 85 percent market share depending on how you define the space.'").[1]

As Respondent notes, "Section 1 of the Sherman Act prohibits agreements that "unreasonably" restrain trade. Section 2 prohibits monopolization." Respondent's Post-Hearing Brief ("R. Post-Hrg. Brief"), p. 3. Under Section 1, agreements relating to pricing between competitors - horizontal agreements - are generally considered to be *per se* illegal, while other agreements not between competitors - vertical agreements - are analyzed applying a rule of reason. See *U.S. v. Socony-Vacuum Oil Co*., 310 U.S. 150, at 222-223 (1940) (the *per se* rule applies to horizontal agreements whether the effect is to "rais[e], depress[], fix[], peg[], or stabiliz[e] the price"); *Leegin Creative Leather Prods. v. PSKS, Inc*., 551 U.S. 877, 907 (2007) ("Vertical price restraints are to be judged according to the rule of reason."). Claimants failed to prove that Respondent formed agreements or conspired with competitors; rather, all of the agreements identified were between Respondent and developers or publishers (notwithstanding that some of these firms also have divisions that competed with Respondent as a distributor). Therefore, I find that the rule of reason applies to the agreements at issue here.

The evidence showed that through its agreements with developers and publishers, Respondent had the power to, and did enforce "price parity" restrictions, "post and hold" restrictions, and discounting rules by forcing the said

---

[1] Max Theiler, Claimant's expert, showed estimates of Respondent's market share from various sources ranging from 70% (as estimated by a Respondent witness in 2013) to 92%. Testimony of Respondent's witnesses reflected that Steam's market share has continued to grow through the present. See Transcript citations in C.Post-Hrg. Brief, p. 33.

developers and publishers to adjust the prices of their games on other distribution platforms. ("If a firm can influence market prices, that firm possesses *market power*." Ex. R587, p. 84 of 464 (emphasis original)). That Respondent's market power enabled it to enforce its agreements to influence market prices supports the testimony of Claimant's expert as to Respondent's dominant position in the market. The evidence demonstrated that if persuasion failed, Respondent's threats to cease distributing a particular game would effectively coerce developers to comply with its demands, because "most consumers are on Steam" (Theiler Slide Deck, #31), and therefore that is where most developers and publishers want their games to be available. *E.g.*, Ex. C356, p. 2; Ex. C12; see also *In re Valve Antitrust Lit., supra*, at *3-5.

Respondent alleged that its actions were justified to enable it to compete; *i.e.*, that they were "procompetitive." A "procompetitive justification [is] a nonpretextual claim that [a defendant's] conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal." *U.S. v. Microsoft*, 253 F.3d 34, 47 (D. C. Cir. 2001). Respondent's allegedly "procompetitive justifications" for their conduct and agreements, however, failed to meet this standard. Respondent's witnesses uniformly presented what appeared to be rehearsed explanations for the company's conduct that were at odds with the anticompetitive goals and effects expressed in their written communications. I will not discuss every alleged justification in detail, but suffice to say that they were not persuasive.

Much of the reasoning above also applies to Claimant's Section 2 claim. That claim requires, among other things, that the defendant have monopoly power in a "valid antitrust market;" have acquired or maintained that power through "anticompetitive conduct;" and that the plaintiff was injured as a result. R. Post-Hrg. Brief, p. 28, Ex. 5 Model Ins. A-102. As reflected above, I find that Respondent does have the requisite monopoly power and has maintained and grown that power through the anticompetitive conduct discussed herein. "Conduct that might otherwise be lawful may be impermissibly exclusionary under antitrust law when practiced by a monopolist." *E.I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 441 (4ᵗʰ Cir. 2011). The record reflects Respondent's actual control of PC game prices charged by competitors through its manipulation of, and agreements with developers and publishers, its efforts to exclude competitors, and its control of competitors' output and supply through its ability to grant or deny Steam Keys. This anticompetitive conduct, combined with Respondent's monopoly power, is sufficient to establish the second element of Claimant's Section 2 claim.

A Sherman Act plaintiff must also demonstrate "*antitrust injury*, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990). Claimant's theory, as explained by Claimant's expert Mr. Theiler, is that Claimant paid inflated prices for PC games purchased on Steam as a result of the impact on the market as a whole of Steam's anticompetitive conduct.[2] If proven, this allegation would demonstrate a quintessential antitrust injury. Based on the evidence presented, including but not limited to the analysis of Claimant's expert Mr. Theiler, I find Claimant did, in fact, pay inflated prices for PC games purchased on Steam, and did suffer antitrust injury flowing from Respondent's anticompetitive conduct. See generally, *inter alia*, Tr. March 12, 2025 (passim); Tr. March 13, 2025, pp. 8-190; and exhibits discussed therein.

Claimant further alleges that Respondent's anti-steering contract provisions violate Washington State unfair competition law. Contrary to Claimant's assertions, however, the evidence reflects that a developer can, in fact, link to his/her own website through his/her unique Steam Store page (Tr., March 10, 2025, p. 625), notwithstanding Respondent's contracts which prohibit links to other facilities in "applications distributed via Steam." See Ex. C300. This situation is factually distinguishable from that in *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898 (N.D. Cal. 2021, *aff'd*, 67 F.4ᵗʰ 946 (9ᵗʰ Cir. 2023), and therefore that decision does not require a different outcome. Claimant's state law claims are denied.

Based on the findings and conclusions stated above, I find that Respondent's actions violated Sections 1 and 2 of

---

[2] Contrary to Respondent's description (R. Post-Hrg. Brief, p. 36), I did not understand Claimant's theory to require that video game makers *always* pass through Steam's 30% revenue share to consumers.

the Sherman Act. Claimant's actual damages of $1,016.18 are accordingly trebled, and he is awarded the sum of $3,048.54 plus costs of this arbitration and attorney fees in an amount to be determined.

Claimant is ordered to submit his application for costs and attorney fees no later than 14 days from the date of this Interim Award. Respondent may submit any objections to the amounts requested within 14 days of receiving Claimant's submission. The Arbitrator will issue a Final Award promptly after receiving Respondent's objections.

This Interim Award is in full resolution of the merits of all claims submitted to this arbitration, except for the determination of reasonable attorney fees and costs in favor of Claimant as set forth above. The Arbitrator retains jurisdiction to address Claimant's claims for reasonable attorney fees and costs. The matter shall be deemed submitted to the Arbitrator for determination in a Final Award upon and after such submissions.

This Interim Award shall remain in full force and effect until the arbitrator renders a Final Award.


May 29, 2025
_____
Date

_____
Frances Floriano Goins, Arbitrator


I, Frances Floriano Goins, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.

May 29, 2025
_____
Date

_____
Frances Floriano Goins, Arbitrator