# Exhibit A

**SKADDEN, ARPS, SLATE,**
   **MEAGHER & FLOM LLP**
Michael W. McTigue Jr.
Meredith C. Slawe
One Manhattan West
New York, New York 10001
(212) 735-3000
michael.mctigue@skadden.com
meredith.slawe@skadden.com

*Counsel for Respondent Valve Corporation*

## AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| Individual Claimants,<br><br>      v.<br><br>Valve Corporation,<br><br>                    Respondent. | Case No. 01-23-0005-3288<br>Case No. 01-23-0005-3702<br>Case No. 01-23-0005-3823<br>Case No. 01-23-0005-7452<br><br>**RESPONDENT'S AMENDED MOTION TO DISMISS FOR FAILURE TO FOLLOW FILING REQUIREMENTS AND LACK OF JURISDICTION UNDER R-14, AND FOR REIMBURSEMENT OF COSTS** |

**PRELIMINARY STATEMENT**

This arbitration should be stayed for the reasons set forth in Respondent Valve Corporation's ("Valve") letters to the arbitrator dated August 27, 2024, and September 6, 2024. As explained in Valve's letter, on August 9, 2024, Claimants' counsel Bucher Law PLLC filed a putative class action in the U.S. District Court for the Western District of Washington captioned *Elliott v. Valve Corporation*, No. 2:24-cv-01218, (Ex. A), on behalf of a putative class of consumers asserting federal antitrust and related state law claims (the "Duplicative Class Action"). The plaintiffs in the Duplicative Class Action are pursuing all of the claims and relief sought in this arbitration, and the Duplicative Class Action is brought on behalf of a putative class of consumers that specifically includes these Claimants.

In any event, Section 11.B of the Steam Subscriber Agreement ("SSA") requires subscribers to "describe the nature and basis of the claim or dispute" and engage in "reasonable, good faith efforts" to resolve disputes before they file arbitrations. Because Claimants failed to meet these minimal pre-arbitration duties, the SSA did not permit filing the claims, and so the claims must be dismissed for lack of jurisdiction.

## BRIEF FACTUAL BACKGROUND

### A. *Valve makes video games and operates Steam.*

Valve is a highly successful and widely acclaimed maker of video games. Valve also operates Steam, a digital distribution and online gaming platform that allows consumers to purchase and play games. Use of the Steam platform is free to subscribers. Over 80,000 games are available on Steam, and over 99% of them are made by game developers other than Valve. Game developers on Steam range from one-person shops to such well-known corporations such as Microsoft, Sony, and Ubisoft (many of whom run their own competing distribution platforms).

Valve does not set the prices that developers charge for their games on Steam. Developers set whatever prices they think will be best for their games and businesses. To compensate Valve for selling and hosting developers' games on Steam and providing customer support to the players who purchase them, Valve and developers agree to a revenue share. For most games, Valve's revenue share starts at 30%, but drops to 25% or 20% once a game's sales reach certain levels.

Valve also offers developers a generous number of free "Steam Keys," which are digital activation codes. These Steam Keys allow developers to sell their "Steam-enabled" games—games made to be activated and played on Steam—in other stores or on their own websites. Developers can also give Steam Keys to journalists who review games, or to influencers who can help boost sales. Valve charges no revenue share to developers for games they sell or give away with Steam

Keys, even though consumers using Steam Keys can play these games indefinitely on Steam at Valve's expense and at no charge to the developer.

Through creativity and hard work, Valve has developed one of the most prolific and loyal subscriber bases in the world, comprising millions of subscribers who use Steam to purchase and play games. Each subscriber brings his or her own unique gaming interests. Some subscribers purchase games that Valve developed; others purchase games manufactured by other developers. Some purchase the most popular titles; others buy niche offerings. And they purchase these games in different ways. Some buy directly on Steam; others buy (or use) Steam Keys. Some use their own money; others use gift cards they were given. The only way to determine whether and to what extent Valve received any revenue from any particular subscriber is to examine their unique purchase histories, one at a time.

> B. *The Steam Subscriber Agreement requires subscribers to pursue a pre-arbitration informal dispute resolution process before filing an arbitration demand.*

When a subscriber enters into the SSA with Valve, both parties agree to participate in a good faith attempt to informally resolve any dispute before initiating an individual arbitration:

> You and Valve agree to make reasonable, good faith efforts to informally resolve any dispute before initiating arbitration. A party who intends to seek arbitration must first send the other a written notice that describes the nature and basis of the claim or dispute and sets forth the relief sought. If you and Valve do not reach an agreement to resolve that claim or dispute within thirty (30) calendar days after the notice is received, you or Valve may commence an arbitration.

(Ex. B, SSA § 11.B.)[1] That protocol is straightforward: first, the subscriber must provide Steam with adequate notice of the issue and the relief sought; second, the subscriber must engage in a

---

[1] The SSA is online at https://store.steampowered.com/subscriber_agreement/#11.

good-faith attempt at informal resolution; and only then, if that effort at resolution does not succeed, may the subscriber pursue arbitration.

      C.     *Claimants' counsel uses a slapdash client-recruitment process to sign up Claimants en masse.*

Claimants' counsel's client recruitment process made it impossible for Claimants' counsel to learn enough about the particular facts underlying each Claimant's dispute so that they could engage in the good-faith informal resolution effort required by Section 11.B.

Claimant's counsel recruited these Claimants—and more than 44,000 others[2]—through a series of ads. Here is one such ad:

> **Steam: Potential Money Back - Mass Arbitration Against Steam**
> **Ad** https://www.bucherlawfirm.com
> If you use Steam, you may be legally entitled to a partial refund on your purchases. If you play PC games on Steam, you may be eligible to file for compensation. Valve Arbitration.

Thus, a consumer who simply purchases or plays a game on Steam is told he can "file for compensation," regardless of the facts surrounding the consumer's actual purchases or interactions with the platform. According to counsel's website, here is "how it works":

---

[2]     *See* Section D, pp. 8-9, regarding Claimants' July 12, 2023 letter claiming to represent 44,903 consumers.



(Ex. C, May 4, 2023 Bucher Law website screenshot.) All the user has to do is sign up, and they may be one of the "many consumers" who "get settlement offers without doing anything" else.

As Claimants' counsel promises, the form does "only take[] a couple of minutes" to complete. The user fills out their contact information, then answers the following five questions, none of which asks about the facts, let alone the merits of any claims or damages:



(Ex. C.) Even though the user provides no information about their individual claims—and *nothing* about their purchase history—once they complete this form, they receive a message letting them know they are "eligible to file a claim for compensation."

In short, to "file a claim for compensation" through counsel's website, a potential client need not provide any facts showing that they are actually "qualified" to bring an antitrust claim. Rather, the only information requested about the client's activity on Steam is their Steam Account Name. The form does not ask basic questions like (1) whether the individual ever made a purchase on Steam; (2) if so, whether they purchased non-Valve games, or any games at all (there are plenty of other things to buy in Steam); (3) how much they spent on these purchases; or (4) the dates of their purchases. Those details might be the starting point for any good faith discussions to resolve a dispute, but are conspicuously absent here.

Counsel then purports to uses this minimal information (*i.e.*, the person's name and Steam Account Name) to "check" whether the user is qualified to bring a claim. If the client "qualifies," Counsel sends an onboarding email. This email describes the participation in the mass arbitration

as a way to earn passive income. Claimants' counsel never even *mention* in the email the SSA's good-faith informal dispute resolution mandate. (*See* Ex. D, May 4, 2023 onboarding email.)

This onboarding process was designed to be as quick as possible because that is counsel's business model. As Claimants' counsel himself explained in a PowerPoint presentation presented to a prospective litigation funder,[3] the plan is to "weaponize" the AAA's non-refundable, administrative costs by gathering as many claimants as possible and forcing Valve to face massive fees just to have the dispute arbitrated:

> **Use of Mass Arbitration**
> - Over the past few years, a handful of firms — led by Keller Lenkner (now Keller Postman) — have weaponized consumer and employer arbitration clauses with favorable terms by aggregating thousands of claims through targeted advertising campaigns.
> - Aggregating claims makes entrance fee to just defend prohibitively expensive and the vast majority of such fees are non-refundable under recent precedent.
> - For example, if 75,000 demands for arbitration are filed with the AAA, the Company has 30-days to pay a largely non-refundable fee of $225 million as the cost of admission.
> - Claimants' counsel will offer a settlement slightly less than the AAA charge — $2,900 per claim or so — attempting to induce a quick resolution.

(Ex. E, Slide Deck at Slide 3.)

Valve was the only target that Claimants' counsel identified:

---

[3] The slides were filed as an exhibit in a lawsuit Claimants' counsel brought against his former law firm. *See Zaiger LLC v. Bucher Law PLLC*, Index No. 154124/2023 (N.Y. Cnty. Sup. Ct., N.Y.); *William W. Bucher IV v. Zaiger LLC*, Case 3:23-cv-00452-AWT (D. Conn). The purpose of the slide deck was to recruit a third-party litigation funding investor. Bucher calculated that the investor would see massive returns. (Ex. E, PowerPoint at Slide 9.)

> **Example Target: Valve Corporation**
>
> - Valve is an $11 billion company that dominates the market for digital PC game sales. Valve has over a billion customers with accounts. Valve's arbitration is administered by the AAA and specifies all filing fees will be reimbursed for claims under $10,000.
>
> - In April 2021, game developers and consumers filed a putative class action claiming antitrust violations against Valve in the U.S District Court for the Western District of Washington.
>
> - On October 25, 2021, Judge John Coughenor compelled the consumer claims to arbitration while retaining the developer claims. On May 5, 2022, Judge Coughenor denied (in part) Valve's motion to dismiss the developer plaintiffs' antitrust claims.
>
> - If the proposed infrastructure were in place, today, we could immediately begin recruiting claimants to pursue the claims a federal judge has now ruled are well plead and potentially viable but for which *a billion* customers have been compelled to arbitration.

(*Id.* at Slide 7.) As this Slide explains, Claimants' counsel targeted Valve because (1) Valve uses AAA arbitration and agreed to refund claimant filing fees for good-faith claims under $10,000, (*id.*); (2) Valve moved to compel consumers to comply with the SSA's arbitration provision while a developer putative class action remains in federal court, which allowed Bucher to copy that lawsuit and save money (*id.*); and (3) Valve is an "$11 billion company." In counsel's view, that valuation was ideal: it was "high enough so they aren't judgment proof," but "low enough that $200 million+ in arbitration fees creates an existential crisis forcing a quick settlement." (*See Ex. E* at Slide 6.)

Claimant's counsel's minimal scrutiny of his clients and their claims resulted in a deficient claimant pool. Valve's preliminary review of the claimants indicates that there are (i) at least seven claimants who appear to be deceased; (ii) claimants who are represented by other law firms; (iii) claimants who have been convicted of fraud-related criminal offenses; and (iv) claimants who are in active bankruptcy proceedings. But the merits of the claims are irrelevant to counsel's business

model: the point was always to create a long list of claimants, not to identify and pursue meritorious claims.

>   D.  *Claimants' counsel provided next to no information about the "nature and basis of" Claimants' claims or disputes nor did he permit Claimants to engage in informal discussions with Valve about the dispute.*

Against that backdrop, it is unsurprising that Claimants' communications with Valve fell far short of providing the information necessary for the parties to engage in the informal dispute resolution process. On July 12, 2023, Claimants' counsel sent Valve a single, two-page letter purportedly on behalf of 44,903 consumers, including these Claimants. The only information about these individuals provided by the communication was an Excel spreadsheet stating their first and last names. The Claimants before Arbitrator Sperow were just lines on that spreadsheet. The spreadsheet did not provide enough information to enable Valve to determine whether the Claimants were Steam subscribers, much less identify their accounts or understand their claims.

The letter included just three paragraphs of conclusory assertions to the effect that Valve was engaging in anticompetitive conduct involving its revenue share. (*See* Ex. F, Correspondence at A1–A2.)[4] Claimants' counsel also stated that he "was prepared to engage in good faith discussions for 30 days before … initiat[ing] arbitration against Valve." (*Id.* at A2.) But the letter clarified that "good faith discussions" did not mean an informal discussion between Valve or (any) Claimant—whether or not with Valve's counsel and Claimants' counsel—about any individual subscriber's claim. Rather, Claimants' counsel proceeded as though he was engaging in a class action settlement discussion, and merely stated that he estimated an "average settlement of $2,400 a case" and added $1,600 for attorneys' fees (or 66% of the settlement value), resulting in an offer

---

[4] For the arbitrator's convenience, Exhibit F comprises correspondences between Valve's counsel and Claimants' counsel leading up to Claimants' counsel filing of these Demands in chronological order.

of $4,000 per case. (*Id.*) For a mere $179,612,000, Valve could resolve all 44,903 claims—without knowing what any one of those claims was based on.

On July 25, 2023, Valve explained why Counsel's letter did not comply with his clients' agreements with Valve as set forth in the SSA: among other things, a list of first and last names was insufficient for Valve to identify individual client accounts. (Ex. F at A5.)

Weeks went by without a word from Claimants' counsel. Then, on August 30, 2023, Counsel began sending over 34,000 individual emails, putatively one on behalf of each of his individual clients, to Valve's outside counsel. They did not come in all at once; rather, the emails came in over 17 days, at an average of 2,467 per day, flooding Valve's counsel's servers. The emails suddenly stopped on September 15, even though Valve did not receive emails for more than ten thousand clients whom Claimants' counsel had claimed he represented.

These emails were automatically generated, largely copying one of four templates, and once again failed to provide the individualized information that would be necessary for Valve to move forward in an informal dispute resolution process. (*See* Ex. G, Email Templates (example of each template).) A huge number—13,817—did not even provide a settlement number, allegedly because "there was simply no way, absent extensive discovery into Valve's operations, to provide an accurate total of how much [his] clients have spent." (*Id.* at A3, A7.) That is simply wrong; all users can access their entire Steam purchase history in just a couple clicks. Claimants' counsel likely did not provide this data because he never asked his clients about their purchase history or the relief they sought. If counsel's assertion that his clients could not know what they had spent on Steam were true, it is unclear how he provided specific settlement offers for the other 21,000+ clients that were "reasonable in light of [his client's] purchases and spending on the Steam platform." (*Id.* at A1, A5.)  But even if Claimants' counsel had provided fact-based settlement

offers, automatically-generated emails reciting generalities are no substitute for setting forth the basis of an individual's claim and the relief sought, as the SSA requires. (*See* Ex. B, SSA § 11.B.)

On September 20, 2023—only five days after the emails stopped coming in—Valve notified Claimants' counsel that it was working on providing individual responses to the more-than 34,000 emails and that he would receive them by October 31, 2023.[5] (Ex. F, correspondence at A10.) Instead of responding to that email, or engaging with Valve on behalf of Claimants, Claimants' counsel raced to the AAA. On October 2, in defiance of the requirements of SSA § 11.B, Claimants' counsel filed these Demands, thereby withdrawing from the reasonable, good faith discussions that the SSA required. (*Id.* at A11–A18.)

## ARGUMENT

**I.   CLAIMANTS' DEMANDS ARE NOT RIPE BECAUSE CLAIMANTS DID NOT ENGAGE IN THE SSA'S REQUIRED GOOD FAITH INFORMAL DISPUTE RESOLUTION PROCESS BEFORE COMMENCING THIS ARBITRATION.**

Claimants' demands should be rejected because Claimants did not comply with the informal dispute resolution requirements in the SSA that are a condition precedent to commencing arbitration. *See, e.g., Kemiron Atl., Inc. v. Aguakem Int'l, Inc.*, 290 F.3d 1287, 1291 (11th Cir. 2002) (arbitration provision in a commercial contract "ha[d] not been activated" because parties failed to comply with a required "condition precedent").

When Claimants created their Steam accounts, and every time that Claimants bought a game on Steam, Claimants agreed that they would try, reasonably and in good faith, to informally resolve any claim or dispute with Valve before proceeding with any arbitration. (*See* Ex. B, § 11.B.) That is not an onerous requirement, but it is an important one. It allows both Valve and

---

[5]  Because of the mass emailing, Valve had to hire vendors to cull information from the emails and organize responses addressing each one. *Id.*

the subscriber the opportunity to quickly and inexpensively determine if the problem is one that can be resolved quickly or one that must be formally addressed in arbitration. Claimants' arbitration Demands were premature because Claimants filed them before providing Valve with basic facts about their putative claims and before they had engaged in informal claim discussions. Thus, the arbitration Demands should be dismissed as unripe.

To ensure that Valve has sufficient information to engage with any subscriber regarding a particular dispute, the SSA requires that the subscriber explain their problem in a written notice. That written notice must include the sort of information that the AAA Consumer Rules require each claimant to describe in his or her demand: each claimant "must" "explain the dispute," "specify the amount of money in dispute," and "[s]tate what the claimant wants." AAA Consumer Rules R-2. Simple pre-arbitration requirements like this are enforceable.

A "notice" that provides only generic information about a legal theory prevents the parties from engaging in the required informal discussions so that they can get to the heart of a matter quickly and efficiently. While several subscribers may have disputes based on the same legal theory, they will have different purchase histories and experiences on Steam, and they may have different approaches to informal resolution. That is why the SSA requires each subscriber to provide specific notice about the "nature and basis" of his or her claims as well as the individual relief he or she seeks.

The process is particularly useful in situations like this one, where application of Claimants' counsel's generic legal theory depends on individual facts. For example, a subscriber's standing to assert an antitrust claim—and the availability of any potential remedy—turns on, among other things, (i) how many games the subscriber purchased, if any; (ii) the prices paid, including whether the games were discounted; (iii) when the games were purchased, because

antitrust claims have a four-year statute of limitations; and (iv) the revenue share between Valve and the game's publisher associated with each game—including whether the game qualified for additional revenue share—which depends on which game the subscriber purchased. Some might be games created by Valve, or games purchased outside of Steam via Steam Keys. and thus may not have been subject to any revenue share at all. That basic information is critical to understanding any subscriber's claims and Valve's potential defenses, and thus critical to a good faith discussion about resolving the dispute.

Claimants did not provide Valve any of this information, thus short-circuiting any reasonable, good-faith efforts to informally discuss (much less resolve) these disputes before arbitration. The wholly generic "notice" included in Claimants' counsel's over 34,000 mail-merged emails did not provide the purchase information necessary for Valve to even start investigating the generic antitrust claims that Claimants sought to raise.[6] Claimants were the only persons with access to their complete histories on and off Steam, but they didn't provide them. Nor did Claimants provide their Steam Key purchase history, to which only Claimants have access: Steam Key sales all occur outside of Steam, so Valve has no record of them. None of that information, which uniquely affects the merits and alleged value of each Claimants' dispute, was included in any of the notices.

Most fundamentally, the purported value of each claim also depends on which of Claimants' purchases are part of this arbitration—*i.e.*, on which purchases a claimant believes he or she was overcharged because of Valve's allegedly anticompetitive conduct. None of the

---

[6] In addition to the substantive deficiencies that render the emails insufficient notice, they were not the "postal mail" notice required the SSA. (*See, e.g.*, Ex. B, SSA § 11.B ("notice to Valve must be sent via postal mail") .)

"notices" contains this information, which is not something that Valve can discern by looking at raw purchase history data.

Nor did Claimant's counsel's process of making these demands permit good faith negotiation. The initial requests for dispute resolution, some of which did not even include a cognizable settlement offer, came in a 17-day (August 30-September 15, 2023) onslaught of over 34,000 emails. A mass mailing without basis, individualized details and in many cases without even a cognizable offer, is not a good faith effort to open informal discussions about any individual claimant's claim or dispute. It is an attempted end-run around the SSA's dispute resolution procedures. Subsequent conduct confirms the lack of good faith: even as Valve tried to organize a response to facilitate these negotiations, Claimants' counsel precipitously filed these arbitrations.

Claimants' counsel has approached the informal dispute resolution process, ostensibly on behalf of Claimants, as if it were the opening move in class litigation (or as if he were filing a federal complaint); that is, start with generalities and only get to the specifics later—and only if necessary. That approach is antithetical to the individualized dispute resolution process embodied in the SSA. This is not a class action. Claimants' Demands violate the SSA because the individualized dispute resolution process that they agreed to engage in never occurred. Accordingly, their Demands should be dismissed.

A court has already held that Claimants' counsel's conduct in this regard provided a sufficient basis for a claim of tortious interference with the dispute resolution provisions of the SSA. In an action pending in Washington state court, Valve alleged that Claimants' counsel tortiously interfered with Valve's contractual relationships with subscribers by intentionally causing them to breach the SSA's dispute resolution provisions. *See* Complaint, *Valve Corp. v. Bucher Law,* Case No. 23-2-20447-6 SEA (Wash. Super. Ct. filed Oct. 20, 2023). The court denied

Claimants' counsel's motion to dismiss this claim, holding that "Valve has alleged sufficient facts to establish a plausible claim of tortious interference." *See Valve Corp. v. Bucher Law PLLC*, No. 23-2-20447-6 SEA, slip op. at 2 (Wash. Super. Ct. Mar. 15, 2024).[7]

## II. THE AAA AND ATTORNEYS' FEES THAT VALVE HAS PAID SHOULD BE REIMBURSED.

Valve requests that the arbitrator enter an order reimbursing Valve for all AAA fees, as well as attorneys' fees it incurred for responding to these Demands. Both the SSA and Consumer Rules allow for such reimbursement. The SSA states that Valve will not seek attorneys' fees or costs for arbitration except if an "arbitrator determines your claims are frivolous or were filed for harassment." (Ex. B, SSA § 11.C.) This mirrors the Consumer Rules' standards. *See* AAA Consumer Rules R-44(c). Courts defer to arbitrators when they impose such sanctions. *See First Preservation Capital v. Smith-Barney*, 939 F. Supp. 1559 (S.D. Fla. 1996) (confirming award that dismissed case based on "abhorrent behavior" during discovery).

For the reasons set forth above, Claimants'—and their counsel's—conduct is as egregious as those standards require. Claimants have intentionally ignored the SSA's core obligations. Because they filed these Demands without following the SSA's clear process, Claimants have violated the SSA. Valve has now paid the AAA's fees, even though Claimants' Demands, as filed by their counsel, are frivolous and intended to harass. Accordingly, Valve should be reimbursed for the AAA fees it has paid in this arbitration, as well as for Valve's attorneys' fees. At a minimum, the arbitrator should enter an order requiring Valve to be repaid for all AAA fees it has had to pay for this arbitration if Claimants withdraw these Demands or otherwise voluntarily dismisses the arbitration for any reason other than settlement before it reaches a hearing.

---

[7] That court also held that Valve adequately alleged a claim for abuse of process based on Claimants' counsel's mass arbitration scheme. *Id.*

**III.   CONCLUSION.**

  The SSA governs Valve's relationships with Claimants and is enforceable. It requires that the Claimants engage in a reasonable, good-faith informal dispute resolution process before arbitration is authorized. Valve has fully performed, having stood ready to discuss—reasonably and in good faith—a potential informal resolution of this dispute. The SSA does not permit the Claimants to file for arbitration without having taken that step first. Therefore, the Claims should not have been filed, and these Demands should be dismissed.

                Respectfully submitted,

Dated: September 10, 2024        */s/ Michael W. McTigue Jr.*
                **SKADDEN, ARPS, SLATE**
                  **MEAGHER & FLOM LLP**
                Michael W. McTigue Jr.
                Meredith C. Slawe
                One Manhattan West
                New York, New York 10001
                (212) 735-3000
                michael.mctigue@skadden.com
                meredith.slawe@skadden.com

                *Counsel for Valve Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on this September 10, 2024, I caused a true and correct copy of Respondent's Motion to Dismiss to be served by email on Claimants through Claimants' counsel of record.

>  */s/ Michael W. McTigue Jr.*
> Michael W. McTigue Jr.
>
> *Counsel for Valve Corporation*