# Exhibit B

 AMERICAN
ARBITRATION
ASSOCIATION®

INTERNATIONAL CENTRE
FOR DISPUTE RESOLUTION®

## Order Re: Request to Place This Matter in Abeyance

Case Number: 01-23-0005-3374, 3375, 3376, 3377, 3378, 3379, 3381, 3382, 3384, 3385, 3386, 3387, 3388, 3389, 3390, 3391, 3364, 3365, 3366, 3367, 3369, 3370, 3371, 3372, 3373:

25 Individual Claimants

-vs-

Valve Corporation dba Steam

Pursuant to the Commercial Arbitration Rules of the American Arbitration Association (the AAA), the Arbitrator makes the following Order.

On August 27, 2024, Respondent requested the matter be placed in Abeyance. On September 5, 2024, Claimant filed a Response to that Request, objecting to placing the matter in Abeyance.

The request is DENIED. Without an agreement by the parties or a court order, it would not be appropriate to place this matter in abeyance.

September 9, 2024

Ruth Astle Samas, Arbitrator

## AMERICAN ARBITRATION ASSOCIATION

### Ruling and Order Regarding Respondent's Motion to Dismiss for Lack of Jurisdiction

Case Numbers: 01-23-0005-3625 et al.

25 Individual Claimants (List of Cases Attached)
-vs-
Valve Corp. d/b/a Steam

On September 27, 2024, Respondent submitted to various American Arbitration Association (AAA) administrators a request for dismissal on the grounds of lack of AAA jurisdiction. The administrators have now referred that request to be decided by the various merits arbitrators assigned to the Valve cases. This Tribunal has received and reviewed Respondent's request to dismiss these proceedings, along with Claimants' opposition dated October 7, 2024, and Respondent's additional filings dated October 4 and October 7, 2024. Having reviewed the parties' briefs and extensive exhibits, the Tribunal Rules as follows:

In a Ruling and Order dated September 12, 2024, the Tribunal denied Respondent's request for a stay. That Ruling provides some background to the Respondent's instant request to dismiss, and the Tribunal will incorporate that Ruling here without repeating its content. Suffice it to say, the Tribunal concluded in that Ruling, *inter alia,* that both Respondent and the 25 named Claimants herein were obligated to arbitrate their disputes as required by the parties' contract despite the existence of another, and parallel, litigation proceeding. A stay was, accordingly, denied.

Respondent now argues that it has revised its contractual provisions (contained in its Steam Subscriber Agreement ('SSA')) to eliminate arbitration as an option for consumers. Valve asserts that the new SSA provides that all consumer disputes must proceed only in court. Respondent further argues that the new SSA applies retroactively to all consumer claims already pending in arbitration, including those whose contractual relationship with Valve was formed before the new SSA came into existence. Respondent asserts that this state of affairs deprives the AAA of jurisdiction over the instant 25 claims. It appears that Valve adopted the new SSA on or about September 26, 2024, and then promptly requested that the AAA dismiss all pending Valve cases for lack of jurisdiction.

As Respondent has repeatedly stated, and as the Supreme Court only recently confirmed in *Coinbase v. Suski*, 602 U.S.___ (2024), Slip Opinion at 4 (*Coinbase*), arbitration is a matter of contract and consent. The record shows that Respondent itself invoked the arbitration clause in the original SSA to send these 25 cases to AAA arbitration and the 25 Claimants have, accordingly, filed—and proceeded with-- their claims before the AAA. There is no indication in the record that the 25 Claimants have withdrawn their consent to arbitrate before the AAA. Equally as problematic, Respondent has cited no authority for the proposition that it can either unilaterally change the parties' contract terms or apply those terms retroactively without mutual assent. Such assent is lacking here. As with Respondent's earlier stay motion, there are no grounds to ignore the parties' contractual election to arbitrate these 25 claims.

Respondent also asserts that the recent *Coinbase* decision demands that the question of arbitrability is exclusively for the courts to decide when two contracts take contradictory positions on arbitrability. Putting aside for the moment that the contradiction here, if any, was created by the unilateral act of only

one party, the *Coinbase* decision does not support Respondent's position. In *Coinbase*, the parties had *mutually* entered into two contracts for two different purposes (a User Agreement and a Sweepstakes Agreement) and had *mutually* agreed to arbitration in one agreement and litigation in the other. The Court determined that if the parties thereafter disputed which agreement applied to the plaintiffs' substantive claims, the issue of arbitration versus litigation would have to be decided in the first instance by a court. Here, to the contrary, there was only one agreement applicable when the parties' dispute arose, and that agreement contained an arbitration clause—a clause embraced and enforced by the Respondent itself. On this record, there is only one agreement in which all parties mutually assented to arbitration. There is no conflict between two *mutually* agreed upon contracts, as there was in *Coinbase*.

Accordingly, on this record, the Tribunal DENIES Respondent's request to dismiss for lack of jurisdiction.

October 9, 2024

Robert G. Badal, Arbitrator

AMERICAN
ARBITRATION
ASSOCIATION®    |    INTERNATIONAL CENTRE
FOR DISPUTE RESOLUTION®

## OCTOBER 9, 2024 ORDER ON RESPONDENT'S REQUEST FOR CASE CLOSURE AND WITHDRAWAL FROM DIRECT COMMUNICATION

AAA Case No. 01-23-0005-7451

Tyler Kemp
-vs-
Valve Corporation d/b/a Steam

On October 8, 2024, AAA provided the Arbitrator with correspondence and submissions from:

(1) Respondent dated September 27, October 4 and October 7, 2024; and
(2) Claimant dated October 7, 2024.

The Arbitrator has carefully reviewed these materials and the authorities and materials cited therein. Upon careful consideration of the foregoing, the Arbitrator issues the following ruling:

## FACTUAL BACKGROUND

The parties' correspondence and submissions speak for themselves and need not be recounted in detail. In summary, Respondent contends that this case should be closed for lack of jurisdiction "because an AAA arbitrator ruled the arbitration agreement in Valve's Steam Subscriber Agreement ('SSA') under which these cases were brought is unenforceable, and Valve then removed the arbitration agreement from the SSA." September 27, 2024 Letter from Michael McTigue Jr. to AAA at 1. Claimant opposes this position and disputes Valve's assertions and arguments.

According to AAA's transmittal email:

As there is no agreement between the parties regarding whether these cases should be closed, the AAA has made an administrative determination that the parties should address their positions to the merits arbitrator for determination.

Additionally, the Respondent has requested to withdraw from direct communication in matters where it was previously authorized by the arbitrator. The AAA has made an administrative decision, that this is also subject to arbitrator determination, if applicable.

Consistent with AAA's decisions, and having carefully reviewed and considered all submissions, assertions, and arguments of the parties, the Arbitrator takes these two issues up and rules as follows.

## DISCUSSION AND RULINGS

**A.  Respondent's Assertion That The Case Must Be Closed Is Meritless And Denied.**

Respondent generally asserts two arguments that this tribunal lacks jurisdiction to proceed. First, it contends that the parties' arbitration agreement in their SSA is necessarily unenforceable because another arbitrator concluded that its terms were unenforceable, as between Respondent and one or more other consumers. This argument is unavailing. Another arbitrator's ruling about the enforceability of the SSA's arbitration agreement terms is not binding in this case. Moreover, the fact of this other ruling has no persuasive value here. In this case, the parties have commenced arbitration proceedings pursuant to the terms of the SSA; there is no pending claim that the SSA's arbitration agreement is unconscionable or unenforceable between them (other than Respondent's bald assertion that the other arbitrator's ruling necessarily makes it so); and – to the contrary – Claimant has *ratified* his agreement to the SSA's arbitration provisions and expressly *reaffirmed* his intention and desire to have his dispute with Respondent resolved through this proceeding. *See* Order Following September 11, 2024 Telephonic Hearing at 1 (expressly recounting Claimant's representations on these issues). For its part, too, Respondent's participation and positions in this proceeding have been inconsistent with its current argument that the SSA's arbitration provision is unenforceable. Accordingly, the Arbitrator rejects Respondent's argument that another arbitrator's unenforceability ruling defeats jurisdiction in this arbitration.

Respondent's position that it unilaterally destroyed AAA jurisdiction by removing the arbitration provision from its SSA is also without merit. Put simply, this is not how arbitration agreements (or contracts generally) work. Respondent required its customers to enter into the SSA, including its arbitration provision. Claimant did so. He submitted his dispute to this arbitration under the SSA. And both parties participated in this proceeding in reliance upon the SSA's terms. Indeed, Respondent previously sought to *affirmatively* enforce the SSA's provisions against Claimant by a motion to dismiss that contended (but failed to prove) that Claimant ostensibly had not abided strictly enough by the requirements of the SSA's arbitration provision. Respondent also voluntarily availed itself of the arbitration process in other respects, including by pursuing discovery from Claimant, participating in hearings, and requesting relief from the Arbitrator. Against this record, Claimant cannot now, midstream, unilaterally amend the agreement to revoke its arbitration provision. As Claimant's submission suggests, any number of well-established doctrines, including basic tenets of contract formation, bilateral performance, waiver, and estoppel, prevent this result. *See* October 7, 2024 letter from William Bucher to AAA at 3; *see also* FAA § 2 (arbitration agreements are "valid, **irrevocable**, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract or as otherwise provided in chapter 4.")(emphasis supplied).

Respondent's assertions about representations and positions taken by Claimant's counsel in other proceedings do not change this result. The Arbitrator is not persuaded that any of these matters defeat *Claimant's* entitlement to proceed in arbitration. Rather, Claimant has affirmatively represented that he is not participating in the *Elliott* Class Action that is the source of much of Respondent's argument on this point; and that he instead "wishes to proceed with his claims against Valve in this tribunal and to have those claims resolved on the merits through this individual arbitration, in accord with the terms of his Arbitration Agreement." *See* Order Following September 11, 2024 Telephonic Hearing at 1.

Finally, Respondent's reliance on *Coinbase, Inc. v. Suski*, 144 S. Ct. 1186, 218 L. Ed. 2d 615 (2024) is misplaced. As aptly framed by Justice Gorsuch's concurrence, *Coinbase* addressed the question

2

"What happens when . . . the parties have two contracts, one with a delegation clause, a second without, and a dispute later arises?" *Coinbase, Inc.*, 144 S. Ct. at 1195. But that question is not relevant here. In this case, the parties have only one contract: an SSA that calls for this arbitration proceeding, of which both sides have availed themselves. Respondent's unilateral declaration that it "removed the arbitration agreement from the SSA" does not create a second contract. To the contrary, Claimant explicitly opposes and disagrees with Respondent's position on this issue. As such, there is no second contract and *Coinbase* cannot apply to strip this tribunal of its authority to decide the issues addressed herein, and to proceed with this arbitration.

Accordingly, Respondent's position that this arbitration must be closed and/or dismissed for lack of jurisdiction is denied. If Respondent elects to stop participating in this arbitration and/or does not defend against Claimant's claims or comply with the Arbitrator's rulings here, it does so at its own peril.

## B. Respondent's Withdrawal from Direct Communication

Having consented and voluntarily participated in direct communication in this arbitration, Respondent arguably has waived its right to now withdraw from that procedure. Nevertheless, the Arbitrator grants Respondent's request to withdraw from direct communication. Given Respondent's request and the developments over the course of this matter, the Arbitrator concludes that discontinuing direct communication is in the interest of maintaining a complete record and ensuring that all parties, the AAA, and the Arbitrator receive timely and appropriate notice of case activity and communications.

Any and all other requests for relief not expressly granted herein are hereby denied.

**So ordered.**

Dated: October 9, 2024          Arbitrator Signature: _____

                                           Stacey Gilman, Arbitrator

Michael F. Saydah, Esq.
Mediator – Arbitrator – Referee – Umpire
9984 Scripps Ranch Blvd., #323
San Diego, Cal. 92131
Telephone: 858-547-0123
Email: msaydah@saydahmediation.com

BEFORE THE AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| NOE ROSALES & 22 OTHER INDIVIDUALS,<br><br>       Claimants,<br><br>vs.<br><br>VALVE CORP.,<br><br>       Respondents. | Case Nos.: 01-23-0005-3828; 01-23-0005-3829; 01-23-0005-3830; 01-23-0005-3831; 01-23-0005-3832; 01-23-0005-3833; 01-23-0005-3834; 01-23-0005-3835; 01-23-0005-3837; 01-23-0005-3839; 01-23-0005-3840; 01-23-0005-3841; 01-23-0005-3842; 01-23-0005-3843; 01-23-0005-3844; 01-23-0005-3845; 01-23-0005-7443; 01-23-0005-7444; 01-23-0005-7445; 01-23-0005-7448; 01-23-0005-7463; 01-23-0005-7464.<br><br>PRE-ARBITRATION ORDER 3 ON RESPONDENT OBJECTION TO AAA JURISDICTION; AND, CLAIMANT RULE 22 DOCUMENT PRODUCTION REQUEST. |

RESPONDENT OBJECTION TO AAA JURISDICTION

Respondent, by way of a letter dated September 27, 2024, to management of the American Arbitration Association, the case manager and the arbitrator herein, contends the American Arbitration Association no longer has jurisdiction to manage and maintain authority over this matter because an arbitrator in another matter ruled the arbitration agreement in Valve's terms of Service subscriber agreement is unenforceable. Respondent contends based on that arbitrator's ruling, the Respondent changed its Terms of Service completely eliminating the mandatory arbitration process clauses leaving the Claimants herein to pursue their claims in court and the AAA with no further jurisdiction.

.PRE-ARBITRATION ORDER 3 ON RESPONDENT OBJECTION TO AAA JURISDICTION; AND, CLAIMANT RULE 22 DOCUMENT PRODUCTION REQUEST. - 1

Claimants responded with a letter dated October 6, 2024, the issue of jurisdiction must be decided by the merits arbitrators, not management of the AAA.

Respondent responded to Claimant's letter stating Claimant conceded in court October 2, 2024, the new Steam Subscriber Agreement is applicable to the named parties in this arbitration.  The new SSA removed the mandatory arbitration agreement.  Respondent also filed another letter dated October 7, 2024, with management of the AAA arguing the recent USSC case Coinbase v Suski established the rule the court (not the merits arbitrators) must decide which SSA agreement applies to the claimants herein, the original one with the arbitration agreement, from which the district court in Seattle referred this case to the AAA, or the later SSA which has the arbitration agreement removed.

Until the trial court in Seattle rules differently, or until the parties agree differently, the law of the case presently is the matter is in arbitration pursuant the original court order pursuant to the original arbitration agreement and the agreement of the parties herein.

IT IS ORDERED:  Presently, there is jurisdiction for this arbitration to go forward.  The schedule in this case, per Pre-Arb Order 1 and Pre Arb Order 2 remain in effect.  All parties should be timely disclosing the documents they intend to use at the December 2, 2024, arbitration, as they previously agreed to do.

CLAIMANT RULE 22 DOCUMENT REQUEST

Claimants herein, 23 individuals, filed a request to compel the production of certain documents.

.PRE-ARBITRATION ORDER 3 ON RESPONDENT OBJECTION TO AAA JURISDICTION; AND, CLAIMANT RULE 22 DOCUMENT PRODUCTION REQUEST. - 2

Claimants contend the documents are relevant to their anti-trust allegations for the 23 Claimants herein.  Furthermore, Claimants contend the District Court Judge in the parallel putative class action with the same or similar issues filed in Seattle has previously ordered the production of the same documents.

Respondents contend the production is burdensome and not in keeping with the efficiency of AAA Rule 22 production.  Respondents also contend in their September 23, 2024, letter they are preparing to disclose on October 1, 2024, all documents they intend to use at the arbitration beginning December 2, 2024.

Relevance is not seriously disputed.  According to Claimant, relevance and privilege have been resolved by the Federal Court in Washington before ordering production of the very same documents.  For purposes of resolving the instant discovery matter, I find the instant arbitration and the Federal Court Putative Class Action cases are substantially similar.

The following is the Claimants Document Production Requests:

1. Documents and data evidencing the dates on which Claimant purchased or otherwise obtained each game in their Steam library, the identity of the game, the identity of the entity from which Claimant acquired the game, the price paid for each game, the price the game was listed for in the Steam store on the date of purchase or activation, the name on the credit or debit card that was used to purchase the game, any in-game or DLC purchases Claimant made associated with that game, and Valve's commission on each game purchased and each in-game transaction that occurred.

2. Declarations, affidavits, transcripts of depositions, transcripts of testimony from, and documents produced in, In re: Valve

.PRE-ARBITRATION ORDER 3 ON RESPONDENT OBJECTION TO AAA JURISDICTION; AND, CLAIMANT RULE 22 DOCUMENT PRODUCTION REQUEST. - 3

Antitrust Litigation (formerly captioned Wolfire Games and William Herbert et al v. Valve Corporation).

3. Expert reports in your possession concerning, addressing, or in any way related to Valve's business, market position, allegations of anticompetitive conduct and/or monopoly power, including but not limited to the reports prepared by Dr. Steven Schwartz and Prof. Joost Rietveld.

4. Documents evidencing that Valve regularly confirmed to publishers that its pricing parity policy applies in equal force regardless of whether Steam Keys are involved, including but not limited to MSFT_VALVE_000000555, VALVE_ANT_2602243, Kroll Ex. 304, Giardino Ex. 178, Newell Ex. 353, Powers 30(b)(6) Ex. 55, Butlin Ex. 120, and Giardino Ex. 195 from In re: Valve Antitrust Litigation (formerly captioned Wolfire Games and William Herbert et al v. Valve Corporation).

5. Reminders sent to game developers and publishers concerning Valve's pricing policies, including but not limited to Butlin Ex. 131 from In re: Valve Antitrust Litigation (formerly captioned Wolfire Games and William Herbert et al v. Valve Corporation).

6. Communications where Valve threatened game publishers with delisting their games or other consequences if they did not comply with Valve's PMFN Policy or other pricing policies, including but not limited to Malone Ex. 248, Gerber Ex. 107, Blue Ex. 86, Schenck Ex. 385, Ruymen Ex. 1, Giardino Ex. 196, VALVE_ANT_0048944, VALVE_ANT_1207052, Malone Ex. 249, VALVE_ANT_0340706, VALVE_ANT_0051718, Gerber Ex. 101, Giardino Ex. 191, Powers 30(b)(6) Ex. 60, Malone Ex. 245, Ruymen Ex. 9, VALVE_ANT_1193238, Newell Ex. 346, from In re: Valve Antitrust Litigation (formerly captioned Wolfire Games and William Herbert et al v. Valve Corporation).

7. Communications in which Valve uses the phrase "Most Favored Nations," "MFN," "PMFN," or "price parity."

.PRE-ARBITRATION ORDER 3 ON RESPONDENT OBJECTION TO AAA JURISDICTION; AND, CLAIMANT RULE 22 DOCUMENT PRODUCTION REQUEST. - 4

8. Emails in which a Valve principal, employee, or agent enforces a requirement of price parity, whether or not Valve contends such requirement was "official" Valve policy, including but not limited to Powers Ex. 45, Giardino Ex. 194, Kroll Ex. 305, VALVE_ANT_0262762, VALVE_ANT_1220449, and Giardino Ex. 189 from In re: Valve Antitrust Litigation (formerly captioned Wolfire Games and William Herbert et al v. Valve Corporation).

9. Emails with game developers or publishers concerning any price parity policy or any other restrictions on the pricing of PC games sold on Steam.

10. Records of any communications which might be perceived as threats or coercive tactics used by Valve Corporation or its employees against game developers who considered or did sell their games at lower prices on other platforms, regardless of whether Valve Corporation intended or believes them to actually be threatening or coercive.

11. Documents evidencing that Valve required in-game purchases be made using Steam's payment system and were subject to Steam's 30% commission, including but not limited to Lynch Ex. 138.

12. Documents evidencing Valve's blocking of competitive threats, including but not limited to Malone Tr., Malone Ex. 263, Lynch Ex. 141, and Malone Ex. 261 from In re: Valve Antitrust Litigation (formerly captioned Wolfire Games and William Herbert et al v. Valve Corporation).

13. Market reports or internal research about Valve's position relative to the market/competitors.

14. Template standard agreements Steam uses to propose to game developers and publishers who want to sell their games on Steam.

15. Agreements, correspondence, and other documents concerning the acquisition or absorption of the Bethesda Launcher into Steam.

.PRE-ARBITRATION ORDER 3 ON RESPONDENT OBJECTION TO AAA JURISDICTION; AND, CLAIMANT RULE 22 DOCUMENT PRODUCTION REQUEST. - 5

16. Agreements, correspondence, and other documents concerning the inclusion of Blizzard games on the Steam platform following the acquisition of Activision Blizzard by Microsoft.

17. Agreements with PC games publishers who receive or have in the past received kickbacks or modifications to Valve's 30% commission on the Steam platform.

18. Communications with Microsoft, Electronic Arts, Take-Two Interactive and others who qualify for volume based financial incentives regarding those incentives and the conditions to qualify for those incentives.

19. Internal communications concerning providing kickbacks, incentives, or discounts to Valve's standard 30% commission.

20. The Epic Games Store Presentation from 2019 (EPIC_VALVE_0000013-057, at EPIC_VALVE_0000021).

21. Documents evidencing Valve and its competitor's digital distribution costs for PC games, including but not limited to EPIC_VALVE_0000004, VALVE_ANT_0019722, VALVE_ANT_0042738, VALVE_ANT_0038381, VALVE_ANT_0019732, VALVE_ANT_0040316, EPIC_VALVE_0000001, EPIC_VALVE_0000391, EPIC_VALVE_0000058, Lynch Ex. 135, and VALVE_ANT_1244411.

22. Publications and communications with game publishers regarding PC game pricing recommendations or requirements.

23. Communications and agreements with Valve's potential competitor GOG.com or GOG.com's parent company CD Projekt Red concerning Valve's commission, Valve or GOG.com market share, requirements or requests for price parity, or GOG.com itself.

24. Filings made to any regulatory authorities, specifically with respect to compliance with the Sherman Act.

.PRE-ARBITRATION ORDER 3 ON RESPONDENT OBJECTION TO AAA JURISDICTION; AND, CLAIMANT RULE 22 DOCUMENT PRODUCTION REQUEST. - 6

25. Filings made before other tribunals adjudicating questions of whether Valve violates antitrust law.

Order of Production:

Category 1: Documents should be produced but limited to the named Claimants herein.

Category 2: Documents should be produced.

Category 3: Documents should be produced.

Category 4: Documents should be produced.

Category 5: Documents should be produced.

Category 6: Documents should be produced.

Category 7: Documents do not need to be produced.

Category 8: Documents should be produced.

Category 9: Documents should be produced but limited to the named Claimants herein.

Category 10: Documents do not need to be produced.

Category 11: Documents should be produced but limited to the named Claimants herein.

Category 12: Documents should be produced.

Category 13: Documents do not need to be produced.

Category 14: Documents should be produced but limited to the named Claimants herein.

Category 15: Documents do not need to be produced.

Category 16: Documents do not need to be produced.

Category 17: Documents should be produced.

Category 18: Documents do not need to be produced.

Category 19: Documents should be produced.

Category 20: Documents do not need to be produced.

Category 21: Documents do not need to be produced.

.PRE-ARBITRATION ORDER 3 ON RESPONDENT OBJECTION TO AAA JURISDICTION; AND, CLAIMANT RULE 22 DOCUMENT PRODUCTION REQUEST. - 7

1          Category 22: Documents do not need to be produced.

2          Category 23: Documents do not need to be produced.

3          Category 24: Documents do not need to be produced.

4          Category 25: Documents do not need to be produced.

5          IT IS ORDERED In those categories wherein production is ordered,

6    the production should be done within 15 days of this order since the

7    documents have already been produced in the parallel Federal Court matter.

8          The schedule in this case, per Pre-Arb Order 1 and Pre Arb Order

9    2 remain in effect.  All parties should be timely disclosing the documents

10   they intend to use at the December 2, 2024, arbitration.

11

12        IT IS SO ORDERED.

13

14        Date: October 11, 2024.      *Michael F. Saydah_____*

15

16                                    _____

17

18

19

20

21

22

23

24

25

26

27

28   .PRE-ARBITRATION ORDER 3 ON RESPONDENT OBJECTION TO AAA JURISDICTION; AND,
     CLAIMANT RULE 22 DOCUMENT PRODUCTION REQUEST. - 8

**REQUEST TO CLOSE ARBITRTIONS, CHALLENGE TO JURISDICTION**

**ORDER NO. 2**

24 Individual Claimants v. Valve Corporation d/b/a/ Steam Case Numbers:

| | |
|---|---|
| 012300053392 | Samuel Stevens |
| 012300053393 | Broderick Hebert |
| 012300053394 | Logan Doose |
| 012300053395 | Taylor Edwards |
| 012300053396 | Joshua Roberts |
| 012300053397 | Mason Wright |
| 012300053398 | Sacha Haghighi |
| 012300053399 | Abraham Duman |
| 012300053400 | Jacob Deegan |
| 012300053401 | Max Johnson |
| 012300053402 | Roger Maricle |
| 012300053403 | Jodee Lynn Molina |
| 012300053404 | Michael Linares |
| 012300053405 | Dominique Ward |
| 012300053406 | Rudolph Romano |
| 012300053408 | Jason Smith |
| 012300053410 | Justin Jones |
| 012300053411 | Devon Musto |
| 012300053412 | Kaleb Swaim |
| 012300053413 | Nathan Engols |
| 012300053414 | Gregory Kain |
| 012300053416 | Kyle Jackson |
| 012300053417 | Cody Barker |
| 012300053418 | Seth Lewis |

In its letter to AAA Administrators dated September 27, 2024, Respondent requests that the above-referenced arbitration proceedings be closed stating that AAA no longer has jurisdiction over these cases ("Cases"). Respondent reason that the arbitration agreement between the Parties in the Steamer Subscription Agreement ("SSA") is unenforceable, was removed from the SSA, and that the updated agreement calls for disputes to be handled in state or federal courts in King County, Washington. Respondent further reason that because Claimants

had filed a putative class action complaint on August 9, 2024 that includes all of the Claimants in these arbitrations, Claimants' claims are still being pursued, just in a different forum.

By letter to AAA Administrators dated October 4, 2024, Respondent update their September 27th request that the Cases be administratively closed emphasizing that Claimants conceded that the updated SSA applies to all Claimants and stated as much in a court filing in its putative class action case for Claimants' counsel to be appointed interim co-lead class counsel.

By letter dated October 6, 2024 to AAA Administrators, Claimants argue that Respondent's request to administratively close the Cases has no foundation in AAA Consumer Rules and that jurisdiction matters are decided by merit arbitrators, not AAA administrators. Claimants also point out that in response to Respondent's motion to compel arbitration in these Cases, the court held in their favor.

In response to Claimants' October 6th letter, on October 7, 2024, Respondent by letter to AAA Administrators, argues that in instances where parties are in dispute regarding what agreement applies, the courts not an arbitrator, must decide which of the agreements apply citing recently decided supreme court case, *Coinbase, Inc. v. Suski,* 144 S. Ct. 1186 (2024). Respondent further argues that courts have held that the dispute resolution provision in an updated agreement is enforceable as to claims already asserted provided the dispute resolution provision is retroactive in effect. Respondent also raises ethical arguments about representation by Claimants' counsel of individuals in arbitration and in a putative class in court.

The AAA Case Manager forwarded the Parties' submissions to the Arbitrator and stated that the jurisdiction matter is to be decided by the Arbitrator. That is done with this order.

Subsequently, Claimant submitted on October 15, 2024 its letter response to Respondent's final October 7th letter. Claimants leave no doubt that they object to application of the amended SSA that would result in a termination of these arbitrations. Claimants point out that the amendment to the SSA was unilateral and without their prior agreement, that a court has already confirmed the jurisdiction of these cases in arbitration, and from the beginning, Respondent has submitted to the jurisdiction of this arbitral tribunal in multiple ways. Claimants distinguish these arbitrations from the facts and findings of the court in *Coinbase*. Most compelling, in *Coinbase* the parties had already entered into two different agreements when the dispute arose, unlike these cases where the dispute arose and claims were filed before the SSA was amended.

The Parties are in agreement that they entered into a legally binding contract, the SSA, that included an arbitration agreement. Accordingly, these Cases were submitted to AAA for arbitration and the Parties have been engaging in the proceedings, albeit, including challenges to jurisdiction on various grounds by Respondent in its Motion to Dismiss, that have not been decided yet. Here, Respondent seeks termination of the arbitrations based on the fact that arbitrators in some cases have found the SSA arbitration agreement to be unenforceable, and accordingly, Respondent has amended the SSA to remove the arbitration clause and made it retroactive to include these cases. The problem is that the SSA was amended without approval by the Claimant Parties to the SSA, and Respondent submitted no proof that the SSA allows a

unilateral amendment that is retroactive without consent. To allow otherwise, would violate the most basic element of contract law – mutual agreement.

The unamended SSA is still in effect for purposes of these arbitrations. It does not matter that other arbitrators have determined in certain cases that the arbitration agreement is unenforceable because those holdings are binding only as to those respective cases. Respondent's application of the Coinbase case is over expansive and fails. In these Cases, there are no two agreements because Claimants did not agree to the amendment. Even if one were to accept somehow that there were two contracts in these arbitrations, Claimants filed their claims in compliance with and reliance on the arbitration agreement in the original SSA before the SSA was amended. Respondent has offered to cover Claimants expenses related to the arbitration filings, but that offer is for each Claimant to accept or reject. Respondent raises ethical concerns regarding these arbitrations taking place simultaneously with the putitive class action in federal court. That assertion is not one that needs to be addressed in these arbitrations because Claimants first filed in this forum as they were legally bound by contract. Claimants did not bring this challenge to jurisdiction, and Respondent's reasons submitted to the AAA administrators to closed the cases fail for the reasons discussed above.

It is ordered that these Cases shall not be closed based on alleged lack of jurisdiction due to the unilateral amendment of the SSA removing the arbitration agreement.

October 20, 2024                    *Carol M. Kingsley*, Arbitrator



**AMERICAN ARBITRATION ASSOCIATION®** | INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®

## ORDER ON RESPONDENT'S MOTION TO DISMISS

Four Individual Claimants

-vs-

Valve Corporation d/b/a Steam


This matter comes before me to determine Respondent's motion in the listed arbitration cases through a series of letters dated September 27, October 4, and October 7, 2024, to dismiss these arbitrations on the basis that this tribunal lacks jurisdiction due to Respondent's unilateral amendment of the parties' Steam Subscriber Agreement ("SSA") on September 26, 2024, removing the arbitration provision. I find that I have authority to determine my jurisdiction to address Respondent's motion pursuant to AAA Consumer R-14 (a). *See also, e.g., Blanton v. Domino's Pizza Franchising LLC*, 962 F.3d 842, 846 (6th Cir. 2020) (listing cases and agreeing with "every one of our sister circuits to address the question – eleven out of twelve by our count – [finding] that the incorporation of the AAA Rules . . . provides 'clear and unmistakable' evidence that the parties agreed to arbitrate 'arbitrability.'"), and the parties' arbitration agreement dictating application of the AAA rules.

In my October 11 Order, I instructed the parties to submit briefs in support of their respective positions no later than Friday, October 18, 2024. I specifically ordered the parties to address "(1) any legal bases for finding that the Respondent's recent amendment to the SSA removing the arbitration clause applies to these arbitrations; and (2) whether Claimants agreed to the retroactive application of the amended SSA." Claimants timely submitted their brief. Respondent did not, although on October 21, 2024 I received a copy of Respondent's Petition to Enjoin Arbitrations that appears to have been filed in the federal district court in Seattle on October 18 and a request for a conference to address the motion. I convened a telephonic hearing on October 23, 2024 at which counsel Judson Crump, on behalf of the four Claimants, and Andrew Fuchs and Shaud Tavakoli, on behalf of Respondent, appeared and argued. In making this ruling, I have considered all the submissions and arguments of the parties relating to the motion.

As an initial matter, I do not agree that *Coinbase, Inc. v. Suski*, 144 S. Ct. 1186 (2024), is controlling here. In *Coinbase*, the issue was which of two contracts, one a User Agreement and the second the Official Rules applying to sweepstakes promotions, governed with respect to a dispute relating to the sweepstakes promotion. The parties apparently agreed that both contracts were currently effective at the time the dispute arose. The issue was which of the two extant contracts governed jurisdiction, and the Court held that preliminary issue of which contact applied should be decided by the court. The resulting decision – that a specific contract term controls over a general – applied a venerable, long-standing rule of contract construction.




Here, even according to Respondent's analysis, there were not two extant contracts when the dispute arose and these arbitrations were filed. Moreover, the parties do not agree that there are two extant contracts now. Instead, the only agreement acknowledged by all parties mandates arbitration; that agreement (the "original SSA") enabled Respondent to secure a court order compelling these arbitrations to begin with. The question here is not which of two extant contracts controls jurisdiction, but rather whether the purported "amended SSA" has become effective as to the Claimants here pursuant to the terms of the original SSA. Section 8 of the original SSA provides that Respondent's right to amend unilaterally is subject to certain pre-conditions clearly intended to validate Claimants' agreement, or at least their waiver of objection, to the amendment. Respondent alleges that those conditions were met here as to three of the Claimants – Messrs. Fish, Lefebvre, and Lucas, and that the conditions "will be met by November 1, 2024" as to Claimant Christian Graber. Claimants disagree. On the record before me, I conclude that Respondent, which bears the burden of proof on its motion, has not shown that the purported amended SSA was accepted by Claimants.

Moreover, AAA Consumer R-14 (c) provides that a "party must object to the jurisdiction of the arbitrator . . . no later than the filing of the answering statement to the claim or counterclaim that gives rise to the objection." These arbitrations were filed in December 2023, more than 10 months ago. Respondent did not observe this deadline. Instead Respondent filed a motion to dismiss on other grounds almost immediately, before an arbitrator was even appointed, and simultaneously filed its Answer and Affirmative Defenses, all on December 26, 2023. Respondent did not attempt to exercise what it now claims was its unilateral right to amend the SSA and object to this tribunal's jurisdiction until September 26, 2024, matters wholly within its control. Instead, in the interim, as recited in my September 10, 2024 and October 11 Orders, Respondent filed a series of unsuccessful motions on other grounds aimed at dismissing or staying these arbitrations. Respondent's current motion to dismiss on jurisdictional grounds is therefore also untimely.

For all of the reasons stated herein, Respondent's motion to dismiss these arbitrations is denied. The AAA administrator is directed to schedule a telephonic hearing to discuss a discovery and hearing schedule for these arbitrations.

Date: October 24, 2024

Frances Floriano Goins, Arbitrator



## JURISDICTION ORDER

24 individual claimants

v.

Valve Corporation d/b/a Steam, respondent

This order applies to: Case Nos. 01-23-0005-3478, 01-23-0005-3479, 01-23-0005-3480 (stayed), 01-23-0005-3481, 01-23-0005-3483, 01-23-0005-3484, 01-23-0005-3485, 01-23-0005-3487, 01-23-0005-3488, 01-23-0005-3489, 01-23-0005-3490, 01-23-0005-3491, 01-23-0005-3492, 01-23-0005-3493, 01-23-0005-3494 (stayed), 01-23-0005-3496, 01-23-0005-3498, 01-23-0005-3499, 01-23-0005-3500, 01-23-0005-3501, 01-23-0005-3502, 01-23-0005-3503, 01-23-0005-3504, and 01-23-0005-3505 before Arbitrator Janice L. Sperow.

The parties dispute the tribunal's jurisdiction. This Order adjudicates their dispute.

## PROCEDURAL HISTORY

### THE CLAIMS

Claimants assert four causes of action: (1) Monopolization of the PC Game Transaction Platforms Market in violation of the Sherman Act Section 2, 15 U.S.C. § 2; (2) Attempted Monopolization of the PC Desktop Game Transaction Platforms Market in violation of the Sherman Act Section 2, 15 U.S.C. § 2; (3) Anticompetitive Course of Conduct in violation of the Sherman Act Section 1, 15 U.S.C. § 1); and (4) violation of the Washington State Consumer Protection Act, RCW 19.86, for which they seek damages, treble damages, injunctive relief, divestiture, attorneys' fees, and costs. See 24 Amended Demands and Statement of Claims (SOC). Respondent denies the claims and asserts twenty-one affirmative defenses. See 24 Amended Answers.

### CONTROLLING AGREEMENT

The parties previously agreed that the February 24, 2022 Steam Subscriber Agreement (SSA1) constitutes their controlling arbitration agreement. See CMC1 Order, dated 06/12/24. Since then, respondent amended the SSA on September 26, 2024, removing the class action waiver and arbitration provision. See Steam Subscriber Agreement, dated 09/26/24 (SSA2). The parties now dispute which version controls.

### ORIGINAL LAWSUIT

PC game consumers and a game distributor filed a putative class action on April 27, 2021 in the United States District Court for the Western District of Washington, alleging that respondent uses anticompetitive practices and monopoly power to inflate prices on games sold and distributed through the Steam platform and store. See Wolfire Games LLC v. Valve Corp., No 2:21-cv-00563-JCC (W.D. Wash. filed Apr. 27, 2021). On June 23, 2021, respondent moved to compel the consumer plaintiffs to arbitrate their claims pursuant to the SSA1's arbitration

agreement and to stay the distributor litigation pending arbitration. Claimants objected on the grounds of the arbitration agreement's unconscionability. The District Court granted respondent's motion to compel the consumers to arbitration and denied its motion to stay the distributor litigation pending arbitration. See Wolfire Games, LLC v. Valve Corp., No. C21-0563, 2021 WL 4952220, at *1 (W.D. Wash. Oct. 25, 2021); In re Value Antitrust Litigation Order, dated 10/25/21.

The Court deferred the enforceability of SSA1's arbitration agreement to the arbitrator for adjudication, explaining "the Court must enforce the parties' agreement to have an arbitrator decide the broader question of whether the arbitration clause itself is unconscionable." See Wolfire, 2021 WL 4952220, at *2. "Accordingly, the question of unconscionability should be determined in arbitration." Id. The Court then stayed the consumer claims pending arbitration. Id. at *3. On July 22, 2022, the Court consolidated Wolfire with a related action, Dark Catt Studios et al. v. Valve Corporation, No. 2:21-cv-00872-JCC (W.D. Wash.), and recaptioned the consolidated action In re Valve Antitrust Litigation.

**ARBITRATION DEMANDS**

Claimants initiated these 24 arbitrations, along with 973 others, before the American Arbitration Association (AAA) on October 2, 2023. Claimants' counsel has pending a total of approximately 5,028 arbitration demands.

**FIRST OBJECTION TO JURISDICTION & MOTION TO DISMISS**

On December 23, 2023, before the appointment of merits arbitrators, respondent moved to dismiss for lack of jurisdiction to preserve its objection. See Respondent's Motion to Dismiss for Failure to Follow Filing Requirements and Lack of Jurisdiction Under Rule 14, and for Reimbursement of Costs, dated 12/23/23.

**SECOND OBJECTION TO JURISDICTION**

After disclosures and an opportunity for objections, the AAA appointed the undersigned to serve as the merits arbitrator for 25 individual consumer arbitrations, one of whom has since withdrawn his demand. See Bucher Email, dated 07/02/24. The Arbitrator held a Preliminary Hearing and Initial Arbitration Case Management Conference (CMC1) via telephone conference on June 12, 2024 pursuant to Rule 21 of the AAA Consumer Arbitration Rules. See CMC1 Order, dated 06/12/24.

At the CMC1, the parties disputed, *inter alia*, the applicable substantive law and the forum's jurisdiction. See id. The parties continued to dispute jurisdiction even though the District Court granted respondent's motion to compel arbitration. The Arbitrator requested that the parties provide a copy of the motion to compel and corresponding order. See id. Claimants provided the briefs and order on August 8, 2024. See Bucher Email, dated 08/08/24.

Respondent agreed that the claims are arbitrable but argued that the tribunal lacks jurisdiction due to claimants' alleged failure to satisfy the contract's conditions precedent to arbitration, whereas claimants posited that they satisfied all conditions precedent but reserved the right to argue for the court's jurisdiction should respondent challenge this forum's jurisdiction. See id. During the conference, both parties confirmed that the claims are arbitrable, subject to binding

2

arbitration, and properly before the AAA. See id. The parties also agreed that the arbitration raised no gateway issues other than jurisdiction and choice of law. See id.

## SECOND MOTION TO DISMISS

At the CMC1, the Arbitrator ruled that claimants may file their existing written oppositions and that respondent may seek leave to move to dismiss in response to claimants' SOCs. See id. After the CMC1, respondent filed a motion to dismiss to which claimants objected as premature and filed without leave.

## UNCONSCIONABILITY RULING

On July 8, 2024, an arbitrator, in different but related proceedings between respondent and four other claimants represented by claimants' counsel, held respondent's SSA1 arbitration agreement unconscionable and dismissed those four arbitrations. See Jurisdictional Award, dated 07/08/24 (ruling arbitration clause unenforceable in violation of McGill).

## AMENDED PLEADINGS

The Arbitrator also required claimants to file a statement of claim, setting forth their causes of action with specificity, after which respondent could respond by July 12, 2024. See CMC1 Order, dated 06/12/24. Claimants filed their amended demands on June 30, 2024, and respondent filed its amended answer on July 12, 2024. See 24 Amended Answers, dated 07/12/24. Respondent did not seek leave to move to dismiss the claims by the July 12, 2024 deadline. However, it preserved its jurisdictional challenges in its Amended Answers. See id. Therefore, the Arbitrator requested clarification from respondent by August 2, 2024 on the following issues: (1) did respondent continue to object to the tribunal's jurisdiction; and (2) if so, did respondent intend to rely on its original motion to dismiss, seek leave to file a dipositive motion by the November 1, 2024 deadline, adjudicate the issue at the merits hearing, or propose an alternative procedure for adjudication of the jurisdictional issues. See CMC2 Order, dated 07/27/24.

## THIRD OBJECTION TO JURISDICTION & DISCOVERY DISPUTES

The Arbitrator held a second Case Management Conference (CMC2) on July 26, 2024 to resolve the parties' disputes over the initial exchange of information in these proceedings, which the parties should have completed on July 2, 2024. See id.; CMC2 Order, dated 07/27/24. At the CMC2, the parties continued to dispute, *inter alia*, jurisdiction. See id.; Goldman Letter, dated 08/02/24. After the CMC2, the Arbitrator continued to rule on discovery disputes throughout these arbitrations. See, e.g., Wishlist Discovery Order, dated 09/04/24; Second Wishlist Discovery Order, dated 09/08/24.

## FOURTH OBJECTION TO JURISDICTION

On August 2, 2024, respondent clarified that it continued to object to jurisdiction and proposed a briefing schedule. See Letter, dated 08/02/24. The Arbitrator took the request under advisement and awaited claimants' position. See Sperow Email, dated 08/03/24. Claimants did not respond to the request within 24 hours as required by protocol. See CMC1 Order, dated 06/12/24. Claimants later objected to any continuances but never specifically addressed respondent's

3

proposed briefing schedule on its jurisdictional challenge. <u>See</u> Bucher Email, dated 08/08/24.

Claimants argued that they had assumed that respondent no longer planned to challenge jurisdiction given that it had filed amended answers on July 12, 2024 in lieu of a motion to dismiss on jurisdictional grounds. Respondent's amended answers, however, specifically reserved its jurisdictional objection and its August 2, 2024 letter requested leave to move to dismiss for lack of jurisdiction. <u>See</u> 24 Amended Answers, dated 07/12/24; Letter, dated 08/02/24.

## FIRST STAY REQUEST

Respondent appointed new lead counsel for these cases on August 6, 2024. <u>See</u> Day Email, dated 08/08/24. New counsel requested a stay or postponement of the third Case Management Conference (CMC3) scheduled for August 9, 2024 and continuation of several due dates to permit it to get up to speed on the cases. <u>See</u> McTigue Email, dated 08/08/24; Day Email, dated 08/08/24. Claimants objected to any continuance. <u>See</u> Bucher Email, dated 08/08/24. The Arbitrator denied the request to vacate the CMC3 and instead held it to discuss the schedule. The Arbitrator held the CMC3 via telephone conference on August 9, 2024. <u>See</u> CMC3 Order, dated 08/11/24. The Arbitrator set new deadlines and afforded new counsel additional time to, *inter alia*, challenge jurisdiction. <u>See</u> id.

Given the change in counsel, respondent's request of August 2, 2024, and its reservation of its objection, the Arbitrator granted new counsel until August 16, 2024 to clarify if respondent wishes to challenge jurisdiction. On August 16, 2024, respondent sought leave to move to dismiss for lack of jurisdiction. <u>See</u> CMC3 Order, dated 08/11/24; Day Letter, dated 08/16/24. The Arbitrator granted the request and ordered the parties to file simultaneous opening briefs on the jurisdictional issues on August 23, 2024 and responsive briefs on August 30, 2024. <u>See</u> Sperow Email, dated 08/19/24. The Arbitrator also permitted claimants to challenge the arbitration agreement as unconscionable, an issue the District Court had reserved to the arbitrator. <u>See</u> Sperow Email, dated 08/19/24; <u>In re Value Antitrust Litigation</u> Order, dated 10/25/21. To save costs, the Arbitrator also permitted the parties to resubmit their prior briefing on the jurisdictional issues, at their option.

## PROTECTIVE ORDER

At the CMC1, CMC2, and again at the CMC3, the Arbitrator granted respondent's request for a protective order in these cases and invited the parties to meet and confer on its terms. <u>See</u> CMC2 Order, dated 07/27/24; CMC3 Order, dated 08/11/24. When the parties could not agree on terms, each submitted their proposals to the Arbitrator for consideration. <u>See</u> Day Letter, dated 08/16/24; Goldman Email, dated 08/16/24; Bucher Email, dated 08/20/24. The Arbitrator issued a protective order on August 20, 2024. <u>See</u> PO, dated 08/20/24. Respondent thereafter produced claimant specific data; third-party aggregator data; and the standard Steam Distribution Agreement in effect during the applicable statute of limitations period, through secure online, password protected link on August 21, 2024 subject to the protective order. The Arbitrator also conducted two *in camera* reviews of disputed redactions and withheld documents. <u>See</u> Order on *In Camera* Production, dated 09/04/24; Second Order for *In Camera* Production, dated 09/07/24; *In Camera* Report, dated 09/09/24; *In Camera* Report 2, dated 10/29/24. Since the issuance of the protective order, respondent requested modifications to which claimants object. The Arbitrator has taken the issue under submission and will rule on

4

respondent's request by separate order.

## THIRD-PARTY HEARING SUBPOENAS

On August 8, 2024, claimants requested three third-party hearing subpoenas for Microsoft, Epic, and Wolfire. See Bucher Email, dated 08/08/24. The parties and the Arbitrator discussed the request at the CMC3. See CMC3 Order, dated 08/11/24. The Arbitrator set a deadline for comments and objections. Id. Pursuant to that order, respondent submitted its objections to claimants' request on August 23, 2024. See Tavakoli Email, dated 08/26/24. Claimants filed their response to respondent's objections on August 30, 2024. See Bucher Email, dated 08/30/24; Paul Response, dated 08/30/24. The parties disputed both the content of the requests and the format of the hearings. On September 4, 2024, the Arbitrator granted claimants' request for the third-party subpoenas and ordered in person hearings subject to the third-party's right to request a videoconference hearing for its convenience. See Order on Claimants' Request for Third-Party Subpoenas, dated 09/04/24; Order on Third-Party Hearing Format, dated 09/10/24. The Arbitrator issued the three requested subpoenas on October 22, 2024. See Subpoena Duces Tecum (Wolfire), dated 10/22/24; Subpoena Duces Tecum (Epic), dated 10/22/24; Subpoena Duces Tecum (Microsoft), dated 10/22/24.

## SECOND FEDERAL CLASS ACTION

On August 9, 2024, claimants' counsel filed a federal putative class action in the U.S. District Court for the Western District of Washington captioned Elliott v. Valve Corporation. See McTigue Letter, dated 08/27/24; Comp., Elliott v. Valve Corporation, No. 2:24-cv-01218 (W.D. Wash. filed Aug. 9, 2024). Claimants' counsel brought the action in the name of the four claimants whose arbitrations had been dismissed based upon the unconscionability finding but defined a proposed class of all domestic Steam users, which would include these 24 claimants. See Elliott v. Valve Corporation, No. 2:24-cv-01218.

## THIRD MOTION TO DISMISS

On August 23, 2024, respondent moved to dismiss, filing amended briefing. See Respondent's Amended Motion to Dismiss for Failure to Follow Filing Requirements and Lack of Jurisdiction under R-14, and for Reimbursement of Costs, dated 08/23/24, submitted with Ex. A-C. Claimants requested, and the Arbitrator granted, an extension to file its opposition given the amended brief. See Bucher Email, dated 08/23/24; Sperow Email, dated 08/24/24. Claimants originally requested a four-week extension, which respondent did not oppose if all deadlines slid four weeks. See Bucher Email, dated 08/23/24; Notaristefano Email, dated 08/23/24. Claimants opposed any further delay in the information exchange. See Bucher Email, dated 08/23/23. The Arbitrator granted claimants a one-week extension and respondent an optional short reply brief. See Sperow Email, dated 08/24/23.

The Arbitrator issued a tentative ruling on August 31, 2024 based solely upon respondent's motion to provide the parties with an opportunity to (1) review the preliminary analysis; (2) submit on the tentative; (3) avoid the costs of preparing an opposition, if appropriate; and (4) argue against the tentative at the CMC scheduled for September 4, 2024, if desired. After argument, the parties accepted the tentative at the CMC4 on the September 4, 2024. See CMC4 Order, dated 09/04/24. The Arbitrator thereafter denied respondent's motion, finding that, (1) the parties "clearly and unmistakenly" delegated arbitrability issues to the arbitrator when

5

they delegated "all disputes and claims" between them (except for intellectual property, piracy, and theft) to the arbitrator and incorporated the AAA rules delegating gateway issues to arbitrators to the "maximum extent permitted by applicable law," see SSA1 at § 11.A; (2) the AAA Consumer Rule 14 authorized the Arbitrator to determine jurisdiction, the contracts' validity, the contracts' scope, the contracts' enforceability, and the parties' related disputes, see AAA Con. Arb. Rules, R-14(a)-(c); see also In re Value Antitrust Litigation Order, dated 10/25/21; (3) Section 11.B of the SSA1 is non-jurisdictional and that failure to comply with its requirements does not strip the AAA or the tribunal of jurisdiction, see SSA1 at § 11.B; (4) at a minimum, claimants raised disputed issues of material fact regarding their satisfaction of Section 11.B – issues wholly inappropriate for resolution on a motion to dismiss; (5) at a maximum, claimants satisfied their contractual prerequisites; (6) claimants' original demands satisfied R-2's requirements, see 24 Demands; and that (7) the sufficiency of claimants' demands was moot as claimants had since filed their amended demands describing their claims in detail and incorporating by reference the Second Amended Consolidated Class Action Complaint in the related federal action, which claimants attached as an exhibit to their amended demands. See 24 SOC; Order on Motion to Dismiss, dated 09/04/24.

**SECOND STAY REQUEST**

On August 27, 2024, respondent moved for a stay of these arbitrations due to the overlapping federal putative class action filed by claimants' counsel in the U.S. District Court for the Western District of Washington captioned Elliott v. Valve Corporation, No. 2:24-cv-01218. See McTigue Letter, dated 08/27/24. Respondent requested all hearings and deadlines be held in abeyance, with the parties to provide a status report in thirty days. Id. Claimants opposed the motion as another delay tactic prejudicial to their rights to proceed to the merits of their cases. See Bucher Email, dated 08/28/24. Respondent renewed its request on August 29, 2024 and September 6, 2024 with supporting authorities. See McTigue Letter, dated 08/29/24; McTigue Letter, dated 09/06/24.

The Arbitrator held a fourth Case Management Conference (CMC4) via telephone conference on September 4, 2024 pursuant to Rule 21 of the AAA Consumer Arbitration Rules to resolve several outstanding discovery disputes and permit oral argument on multiple motions. During the CMC4, the parties argued at length the need for and propriety of a 30-day stay. Although normally against delay, the Arbitrator took the motion under submission to deliberate further on the best course of action to protect both sides' rights under these unique circumstances. In the meantime, the Arbitrator invited the parties to submit any argument, authorities, or position papers they wished on the issue by September 6, 2024. See CMC4 Order, dated 09/04/24.

On September 4, 2024, claimants submitted In re Par, 81 F.4th 403 (5th Cir. 2023) for consideration. Respondent submitted a letter brief on September 6, 2024 in addition to their letters of August 27 and 29, 2024. Claimants also submitted a letter brief on September 6, 2024. Thereafter, the Arbitrator denied respondent's stay request and ruled that (1) the putative consumer class action overlaps with these 24 individual arbitrations with respect to counsel, proposed claimant class, respondent, causes of action, and relief sought; (2) claimants must commit in writing under penalty of perjury by September 13, 2024 that they will not seek to recover in both fora and that nothing disclosed in these arbitrations will be disclosed in the federal action; and (3) respondent would face some judicially recognized hardship or inequity by proceeding with these arbitrations at the same time as the federal court action, but not to an extent warranting a stay when weighed against claimants' countervailing equities. See Order on

6

Motion for Stay, dated 09/07/24.

## CONFIRMATIONS

Thereafter, claimants confirmed both that they will not seek to recover in both these arbitrations and the class action and that they waived their right to challenge the SSA1 as unconscionable in these 24 proceedings.

## SSA1 AMENDMENT

On September 26, 2024, respondent amended the SSA1 to remove the arbitration agreement and the class action waiver. With certain exceptions, the SSA1 requires binding individual arbitration before the AAA. See SSA1 at § 11.A. The SSA2 provides that all claims and disputes between respondent and Steam users must proceed in court, including claims and disputes that arose before respondent amended the SSA1. See SSA2 at § 10. The SSA2 also includes an integration clause, providing that it supersedes any prior oral or written agreement. Id. at § 11. Respondent notified all its domestic users by email and an in-app pop-up notification upon opening the Steam client. Respondent also posted the SSA2 on its public website in several languages and asked users to accept the SSA2 since September 26, 2024 whenever they purchased a game on Steam or funded their Steam Wallet. The email and notice advised users that the SSA2 would become effective on November 1, 2024 unless they deleted or discontinued use of their account. Respondent also provided users with a box to check to accept the updated SSA2.

## FIFTH OBJECTION TO JURISDICTION & ADMINISTRATIVE CLOSURE REQUEST

On September 27, 2024, respondent notified the Court that it had removed the arbitration clause from the SSA1. The same day, respondent notified the AAA and the Arbitrator that (i) an arbitrator had found the SSA1's arbitration agreement unenforceable and (ii) it had since removed the arbitration agreement from the SSA1. See McTigue Letter, dated 09/27/24 to Sperow. Respondent requested that the AAA administratively close the arbitrations for lack of jurisdiction. See McTigue Letter, dated 09/27/24 to AAA; McTigue Letter, dated 10/04/24; McTigue Letter, dated 10/07/24. Also, that same day, claimants' counsel opposed respondent's request and filed 42,000 additional consumer arbitrations with the AAA.

## THIRD STAY REQUEST

The Arbitrator granted respondent's request for a stay pending the AAA's determination on its request for administrative closure. The Arbitrator granted a two-week stay and extended it an additional week. The stay expired October 13, 2024.

## ARBITRATIONS REMAIN ADMINISTRATIVELY OPEN

On October 7, 2024, the AAA notified the parties that it would not administratively close the pending arbitration proceedings. The AAA explained:

> The AAA serves as a neutral administrative agency. Issues of arbitrability and disputes surrounding the applicable contract should be provided to the arbitrators for review and determination. Accordingly, in the absence of an

agreement by the parties or a court order staying or closing these matters, we will proceed with administration.

As there is no agreement between the parties regarding whether these arbitration proceedings should be closed, the parties should address their positions to the merits arbitrators for determination on the 600 individual cases where a merits arbitrator is currently appointed.

See AAA Letter, dated 10/07/24. The AAA separately declined to administer the 42,000 arbitration claims filed on September 27, 2024.

## FOURTH STAY REQUEST & SIXTH OBJECTION TO JURISDICTION

On October 14 and 21, 2024, the parties and the Arbitrator held case management conferences to revisit the outstanding issues upon the lifting of the stay. At the CMC5, respondent asserted that its amended SSA2, which eliminated the arbitration provision, strips the tribunal of jurisdiction. After argument, the Arbitrator granted respondent's request for briefing on the issue but denied its request for a stay of the proceedings pending determination of the jurisdictional issue. See CMC5 Order, dated 10/14/24. The Arbitrator held that respondent reserved all rights and did not waive its jurisdictional challenge by proceeding to comply with the deadlines and submissions in these arbitrations.

## CLAIMANTS' ELECTION

Given respondent's amended SSA2, the Arbitrator ordered claimants to confirm whether they wish to proceed with arbitration. See id. The Arbitrator ruled that any claimant who wishes not to proceed may instead elect to join the putative class action filed in federal court on behalf of other subscribers. See id. The Arbitrator further ordered claimants' counsel to report the results of claimants' election by October 28, 2024 by listing three groups of claimants: (1) claimants wishing to proceed with arbitration; (2) claimants not wishing to proceed with arbitration; and (3) claimants who did not respond by the deadline. See id. The Arbitrator ruled that she would deem non-responsive claimants to wish to proceed with the *status quo* of pending arbitration. See id. The Arbitrator ruled that she would stay the arbitration of any claimant who elected to proceed in the putative class action. See id. Thereafter, two claimants elected not to proceed with arbitration, eleven claimants elected to proceed with arbitration, and eleven claimants did not respond. See id.  The Arbitrator stayed cases 01-23-0005-3480 and 01-23-0005-3494 without objection.

## PETITION TO ENJOIN ARBITRATIONS

After the CMC5, on October 18, 2024, respondent filed a petition in the United States District Court for the Western District of Washington against all claimants in the AAA arbitrations, including these 24 claimants, to enjoin them from continuing their arbitrations given its removal of the arbitration agreement from the SSA1. See McTigue Letter, dated 10/19/24; Petition to Enjoin Arbitrations, dated 10/18/24; Memorandum of Points and Authorities in Support of Petition to Enjoin Arbitrations, dated 10/18/24.

## FIFTH STAY REQUEST & SEVENTH OBJECTION TO JURISDICTION

On October 19, 2024, respondent requested an immediate stay of these proceedings pending

court action on its petition to enjoin these arbitrations or, in the alternative, leave to brief jurisdiction. <u>See</u> McTigue Letter, dated 10/19/24. After argument, the Arbitrator granted respondent leave to file briefing on the issue but denied its request for a stay of the proceedings. <u>See</u> CMC6 Order, dated 10/21/24. The parties and the Arbitrator also addressed several outstanding discovery disputes. <u>See</u> <u>id.</u>

## EX PARTE APPLICATION

After respondent began to personally serve claimants with its summons and petition to enjoin them from continuing their arbitrations, respondent received communications from some claimants, which alternately expressed confusion, a desire to withdraw their involvement, or agreement with the SSA2 terms. Respondent did not respond to these represented claimants. Instead, on November 4, 2024, respondent filed in the Western District of Washington an emergency *Ex Parte* Motion Seeking Leave to Provide Communication to Respondents. On November 8, 2024, the Court *sua sponte* denied the motion. <u>See</u> Order Denying Ex Parte Motion, dated 11/08/24.

## CURRENT JURISDICTIONAL SUBMISSIONS

Respondent filed its brief challenging jurisdiction on October 21, 2024, which claimants opposed on November 4, 2024. Respondent replied on November 8, 2024.

## <u>LEGAL ANALYSIS</u>

## APPLICABLE LAW

The parties agreed that the Federal Arbitration Act (FAA) and the AAA Consumer Rules apply to these arbitrations in addition to the terms of the parties' arbitration agreement. <u>See</u> CMC1 Order, dated 06/12/24; SSA1 at § 11.C. The parties disputed the applicable choice of substantive law. Respondent maintained that the SSA1 provides for Washington law to apply, while claimants argued that the SSA1 excludes arbitration from the choice of law provision. After initial briefing on the issue and claimants' subsequent assertion of Washington claims, the Arbitrator held that Washington law applies to these arbitrations. <u>See</u> Choice of Law Order, dated 07/01/24; <u>see</u> SSA1 at § 10. Under the SSA2, Washington law still applies but without reference to the FAA and the AAA Consumer Rules applicable to the now removed arbitration clause. <u>See</u> SSA2 at § 10.

## DECISIONMAKER: DELEGATION

The Arbitrator must first consider who determines the current gateway arbitrability issue: the Court or the arbitrator. <u>Pinela v. Neiman Marcus Grp., Inc.</u>, 238 Cal. App. 4th 227, 239 (2015). Under federal law, courts presumptively decide arbitrability issues unless the parties have "clearly and unmistakably" delegated them to the arbitrator. <u>Henry Schein, Inc. v. Archer & White Sales, Inc.</u>, 586 U.S. _, 139 S. Ct. 524, 527, 530 (2019); <u>First Options of Chicago, Inc. v. Kaplan</u>, 514 U.S. 938, 944-46 (1995); <u>Sanquist v. Lebo Automotive Inc.</u>, 1 Cal. 5th 233, 243 (2016) (parties may delegate gateway issues to arbitrator); <u>Tiri v. Lucky Chances, Inc.</u>, 226 Cal. App. 4th 231, 241 (2014). To determine if the parties clearly and unmistakably delegated gateway issues to the arbitrator, the tribunal must interpret the terms of the arbitration agreement according to an objective standard, focusing on the parties' objective intent, as

9

evidenced by the words of the contract, rather than the subjective intent of one of the parties. DiCarlo v. MoneyLion, Inc., 988 F.3d 1148, 1152 (9th Cir. 2021); Casa del Caffe Vergnano S.P.A. v. ItalFlavors, LLC, 816 F.3d 1208, 1212 (9th Cir. 2016); B.D. v. Blizzard Entertainment, Inc., 76 Cal. App. 5th 931, 943 (2022).

Under the FAA, the parties clearly and unmistakably delegate gateway arbitrability issues to the arbitrator either by expressly so stating in their contract or by incorporating by reference into their agreement arbitral rules empowering arbitrators to adjudicate such issues. See Field Intelligence Inc. v. Xylem Dewatering Solutions Inc., 49 F.4th 351, 356 n.1 (3d Cir. 2022); Communications Workers v. AT&T Inc., 6 F.4th 1344, 1347-48 (D.C. Cir. 2021); In re Checking Acct. Overdraft Litig., 856 F. App'x 238, 243 (11th Cir. 2021); Richardson v. Coverall N. Am., Inc., 811 Fed. Appx. 100 (3d Cir. 2020), cert. denied, 141 S. Ct. 1685 (2021); Blanton v. Domino's Pizza Franchising, LLC, 962 F.3d 842, 845-46 (6th Cir. 2020); McGee v. Armstrong, 941 F.3d 859, 863, 865–66 (6th Cir. 2019); Dish Network, LLC v. Ray, 900 F.3d 1240 (10th Cir. 2018); Arnold v. Homeaway, Inc., 890 F.3d 546, 548– 49, 551–52 (5th Cir. 2018); Simply Wireless, Inc. v. T-Mobile US, Inc., 877 F.3d 522, 527-28 (4th Cir. 2017), abrogated on other grounds by Henry Schein, 139 S. Ct. 524; Mohamed v. Uber Techs, Inc., 848 F.3d 1201, 1207-09 (9th Cir. 2016); Chesapeake Appalachia, LLC v. Scott Petroleum, LLC, 809 F.3d 746, 763-64 (3d Cir. 2016); Brennan v. Opus Bank, 796 F.3d 1125, 1130 (9th Cir. 2015); Petrofac, Inc. v. DynMcDermott Petroleum Operations Co., 687 F.3d 671, 675 (5th Cir. 2012); Green v. SuperShuttle Int'l, Inc., 653 F.3d 766, 767–69 (8th Cir. 2011); Fallo v. High-Tech Institute, 559 F.3d 874, 878 (8th Cir. 2009); Awuah v. Coverall N. Am., Inc., 554 F.3d 7, 11 (1st Cir. 2009); Qualcomm Inc. v. Nokia Corp., 466 F.3d 1366, 1373 (Fed. Cir. 2006), abrogated on other grounds by Henry Schein, 139 S. Ct. 524; Terminix Int'l Co. v. Palmer Ranch Ltd. Partnership, 432 F.3d 1327, 1332 (11th Cir. 2005); Contec Corp. v. Remote Solution Co., 398 F.3d 205, 208 (2d Cir. 2005); Commonwealth Edison Co. v. Gulf Oil Corp., 541 F.2d 1263, 1272-1273 (7th Cir. 1976); Ramirez v. Electronic Arts, Inc., 2021 WL 843184, at *4 (N.D. Cal. Mar. 5, 2021); Wilcosky v. Amazon, Inc., 517 F. Supp. 3d 751, 768 (N.D. Ill. 2021); accord Blizzard, 76 Cal. App. 5th at 958; Greenspan v. LADT, LLC, 185 Cal. App. 4th 1413, 1442 (2010); Gilbert Street Developers, LLC v. La Quinta Homes, LLC, 174 Cal. App. 4th 1185, 1190, 1194 (2009); see, e.g., Rent-A-Center, West, Inc. v. Jackson, 561 U.S. 63, 72-75 (2010) (unconscionability threshold arbitrability question).

Here, the parties originally did both: they delegated "all disputes and claims" between them (except for intellectual property, piracy, and theft) to the arbitrator and incorporated the AAA rules delegating gateway issues to arbitrators to the "maximum extent permitted by applicable law." See SSA1 at § 11.A. Under the FAA, the parties thus clearly and unmistakenly delegated arbitrability issues to the arbitrator in the SSA1. Indeed, virtually every circuit agrees that the parties' incorporation of the AAA's arbitration rules constitutes clear and unmistakable evidence that they agreed to arbitrate arbitrability. See, e.g., Oracle Am., Inc. v. Myriad Grp. A.G., 724 F.3d 1069, 1074 (9th Cir. 2013). Further, the District Court held that the parties' SSA1 valid delegation clause delegated these gateway issues to the arbitrator. In re Value Antitrust Litigation Order, dated 10/25/21.

## DECISIONMAKER: JURISDICTION TO DETERMINE JURISDICTION

The Arbitrator finds that she has jurisdiction to determine the current jurisdictional dispute as appointed by the AAA and as accepted by the parties because Rule 14 and the parties' SSA1 vest her with the authority to rule on her own jurisdiction. See AAA Con. Arb. Rules, R-14. Rule

14 provides:

> R-14. Jurisdiction
> (a) The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim, without any need to refer such matters first to a court.
> (b) The arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part. Such an arbitration clause shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitrator that the contract is null and void shall not for that reason alone render invalid the arbitration clause.
> (c) A party must object to the jurisdiction of the arbitrator or to the arbitrability of a claim or counterclaim no later than the filing of the answering statement to the claim or counterclaim that gives rise to the objection. The arbitrator may rule on such objections as a preliminary matter or as part of the final award.

Id. at R-14(a)-(c).

Rule 14 severs the arbitration provision from the overall contract and treats it as a separate agreement for enforcement purposes. Consequently, the Arbitrator has jurisdiction under Rule 14 to determine jurisdiction, the contracts' validity, the contracts' scope, the contracts' enforceability, and the parties' related disputes. See also In re Value Antitrust Litigation Order, dated 10/25/21.

## DECISIONMAKER: SSA2 AMENDMENT

Though the parties clearly and unmistakably delegated gateway arbitrability issues to the arbitrator in their SSA1 both by expressly so stating in their contract and by incorporating by reference the AAA's Consumer Arbitration Rules, the amended SSA2 does neither. See SSA2. It neither incorporates the AAA Arbitration Rules nor an express delegation clause. See id. On the contrary, it does not reference arbitration at all except where required by law, see id. at § 10, and in the banner advising users that all disputes will now proceed in court and not arbitration. See id. at Red-Outlined Boxed Banner.

Nonetheless, the Arbitrator concludes that the SSA1's scope encompasses the present dispute over the applicable contract version. The SSA1's arbitration clause extended to all disputes and claims in any way related to or arising out of any aspect respondent's relationship with its user, including the agreement itself. See SSA1 at § 11. The current dispute questions the SSA1's continued enforceability and viability after respondent's SSA2 amendment. Thus, the parties' jurisdictional debate over which contract version governs directly triggers the SSA1's delegation clause because the SSA1 expressly delegated to an arbitrator its own enforceability and validity. See id.; see also RCW 7.04A.060 (under Washington law, arbitrator decides enforceability of contract containing arbitration clause).

Under the FAA, if the parties formed an agreement to arbitrate containing an enforceable delegation clause, "all arguments going to the scope or enforceability of the arbitration provision are for the arbitrator to decide in the first instance." Caremark, LLC v. Chickasaw Nation, 43

F.4th 1021, 1030 (9th Cir. 2022); see Henry Schein, 139 S. Ct. at 527. Here, the District Court already held that the parties agreed to arbitrate their disputes and to delegate gateway issues to the arbitrator: "the Court must enforce the parties' agreement to have an arbitrator decide the broader question of whether the arbitration clause itself is unconscionable." See Wolfire, 2021 WL 4952220, at *2. "Accordingly, the question of unconscionability should be determined in arbitration." Id. In short, the District Court already found SSA1's delegation clause enforceable. Further, the delegation clause survives the SSA1's termination or expiration. See SSA1 at § 9.D. Accordingly, an arbitrator must adjudicate all disputes regarding its enforceability in the first instance.

## DECISIONMAKER: <u>COINBASE v. SUSKI</u>

Respondent maintains that, under the United States Supreme Court's recent Coinbase v. Suski decision, only the court can decide the parties' jurisdictional dispute.  According to respondent, under Coinbase, the Court, and not an arbitrator, must decide whether the SSA2 superseded the SSA1. In Coinbase, the parties entered two separate contracts. First, users agreed to Coinbase's User Agreement when they created their accounts. The User Agreement contained both an arbitration and delegation clause. Second, sweepstakes-participating users agreed to the sweepstakes' Official Rules. The Official Rules contained a forum selection clause selecting California courts as the exclusive venue for dispute resolution. The Court held that "where the parties have agreed to two contracts"—one sending arbitrability disputes to arbitration, and the other sending arbitrability disputes to the courts—"a court must decide which contract governs."

The Arbitrator agrees that Coinbase shares similarities with the parties' current dispute. Both Coinbase and the cases here have conflicting dispute resolution clauses: the SSA1, like the Coinbase User Agreement, contains both arbitration and delegation clauses; while the SSA2, like the Official Rules, contains a forum selection clause selecting the Courts in Washington as the exclusive dispute resolution venue. But the similarities end there.

## Same Contract

Coinbase involved a conflict between two fundamentally different contracts governing two different relationships and two different subject matters between the parties: Coinbase's User Agreement governed the terms and conditions for using Coinbase's services and Coinbase's Official Rules governed the terms and conditions for participating in Coinbase's sweepstakes. Here, these arbitrations involve a conflict between two versions, an earlier version and a later version, of the same agreement governing the same relationship and same subject matter between the same parties – both the SSA1 and SSA2 govern the terms and conditions for using respondent's services and both explain the "rights and obligations" of respondent's same subscribers. Compare SSA1 at first sentence with SSA2 at first sentence; see Lynch Dec. at ¶3 (when an individual creates a Steam account, the individual and Valve enter a Steam Subscriber Agreement governing the customer relationship between them). The Supreme Court held that, unlike in Coinbase where the parties entered two different contracts, in cases where parties have agreed to only one contract, and that contract contains an arbitration clause with a delegation provision, then, absent a successful challenge to the delegation provision, courts must send all arbitrability disputes to arbitration. The Court cautioned:

> Respondents each agreed to the User Agreement, complete with the above-quoted arbitration language. *If that were the only contract at issue*, we would

> not be deciding this case, since the Arbitration Agreement quite clearly
> sends to arbitration disputes between Coinbase and its users, including
> disputes about arbitrability.
> These parties, though, agreed to a second contract.

(emphasis added). Here, claimants dispute they agreed to a second contract. On a motion to dismiss, the tribunal must accept that allegation as true. See Foley v. Wells Fargo Bank, N.A., 772 F.3d 63, 71 (1st Cir. 2014); al-Kidd v. Ashcroft, 580 F.3d 949, 956 (9th Cir. 2009); Keniston v. Roberts, 717 F.2d 1295, 1301 (9th Cir. 1983). Further, even under respondent's interpretation, the parties entered one contract – the SSA; they simply dispute which version of that one contract applies.

**Same Subject Matter**

Respondent argues that Coinbase's logic nevertheless applies here because only a court can decide whether a subsequent contract supersedes an earlier arbitration agreement that contains a delegation clause. The Arbitrator agrees that courts must resolve initial contract formation disputes to determine if the parties agreed to arbitrate. See RCW 7.04A.060(2) (court shall decide whether an agreement to arbitrate exists). However, here, the parties unquestionably formed a contract to arbitrate – the SSA1, which the District Court already found. The only remaining question is whether respondent may and did properly amend that contract when it unilaterally posted the SSA2. See id. at 7.04A.060(3) (arbitrator shall decide if a contract containing a valid arbitration agreement is enforceable).

The contracts' subject matter illustrates the important distinction between Coinbase and these cases because in Coinbase, the parties entered two contracts covering the resolution of different disputes between the parties, whereas here, the parties entered a single contract covering the resolution of the same disputes, which respondent then updated through amendment. In Coinbase, the Court considered the subject matter of the two contracts. The Court noted that, if the parties had intended the User Agreement "to govern all agreements moving forward, then the parties agreed to arbitrate all subsequent arbitrability disputes." The Court then explained that, on the other hand, "if the parties meant to send sweepstakes disputes" to California courts, then the Official Rules superseded the User Agreement as to those disputes. The Court had to determine "whether the parties agreed to send the *given* dispute to arbitration." (emphasis added). The Court held that "the parties had agreed to send sweepstakes disputes to court, not arbitration." Significantly, respondents' class action complaint alleged that the sweepstakes violated California's False Advertising Law, Unfair Competition Law, and Consumer Legal Remedies Act.  By including the forum selection clause, the Official Rules evinced the parties' intent not to be governed by the User Agreement's arbitration clause when addressing controversies about the sweepstakes. Accordingly, the Court found the parties' "sweepstakes-related dispute" not subject to arbitration.

By contrast, here, the parties intended to send *all* disputes and claims (other than piracy, theft, and intellectual property) to arbitration to the maximum extent legally permissible. See SSA1 at § 11.A. The parties also intended their arbitration agreement to survive the SSA1's expiration or termination. See id. at § 9.D. Under Coinbase's logic then, "the parties agreed to arbitrate all subsequent arbitrability disputes." The Arbitrator therefore concludes that, under Coinbase, an arbitrator may decide the jurisdictional dispute posed by two different versions of the same agreement already before the tribunal.

13

**Different Timing & Procedural Posture**

Coinbase also differs procedurally and temporally from these proceedings. In Coinbase, the plaintiffs filed a class action based upon the sweepstakes' legality. The Official Rules governed the sweepstakes and required resolution of sweepstakes-related disputes before the courts. *After* plaintiffs filed the class action, Coinbase moved to compel arbitration invoking the more general User Agreement's arbitration agreement. The District Court denied the motion, the Ninth Circuit affirmed, and then the Supreme Court granted certiorari to determine whether the court or the arbitrator should decide arbitrability when the parties agreed in their first contract to arbitrate, agreed in their second contract to litigate, and then *later* a dispute arose between them. Coinbase did not halt an arbitration two months before the merits hearing; it ruled on a motion to compel arbitration at the *litigation's* outset before any arbitration's initiation.

Here, the events unfolded in reverse: first, the parties agreed to arbitrate, then second, a dispute arose between them, which they are currently arbitrating; and then third, only after the parties have been arbitrating their dispute for over a year, did respondent unilaterally modify its service terms. Unlike in Coinbase, the disputes here did not commence *after* the parties had already entered two conflicting contracts which required the Court to ascertain whether the parties had agreed to arbitrate their sweepstakes-related as opposed to user-related disputes before compelling the matter to arbitration. Instead, respondent here already compelled arbitration of the parties' disputes; the parties have already been arbitrating them in respondent's chosen forum for over a year; and then respondent strategically manufactured the current conflict when it created new terms designed to remove the AAA's arbitral jurisdiction. The Arbitrator finds these procedural and temporal differences critical and therefore concludes that, under Coinbase, an arbitrator may decide the jurisdictional dispute in a proceeding already pending before the tribunal when a party alleges that the tribunal no longer has the jurisdiction it previously conferred upon it. Of course, the Arbitrator will defer to the Court should it disagree.

## JURISDICTION ARGUMENTS

Having determined the tribunal's ability to decide jurisdiction, the Arbitrator now turns to the heart of the parties' dispute. The parties assert a legion of grounds in support of and in opposition to the AAA's jurisdiction, including waiver, judicial estoppel, voluntary submission to arbitral jurisdiction, collateral estoppel, the Court's "bookend" authority, the timing of jurisdictional findings, consent, unenforceability, good faith and fair dealing, equitable estoppel, the FAA's mandate, and delay, among others. The Arbitrator examines each of the parties' main arguments below.

## WAIVER

### Untimeliness

Claimants argue that respondent waived its objection by failing to timely raise it. See Conn Tech Dev. Co. v. Univ. of Conn. Educ. Props., 102 F.3d 677, 685 (2d Cir. 1996) (objection must be timely raised or it is waived). The AAA Consumer Arbitration Rule 14(c) captures this principle:

> A party must object to the jurisdiction of the arbitrator or to the arbitrability of a claim no later than the filing of the answering statement to the claim or

14

counterclaim that gives rise to the objection.

AAA Con. Arb. Rules, R-14(c). Claimants maintain that respondent had several opportunities to object to jurisdiction yet failed to do so based upon the absence of a binding arbitration agreement.

The Arbitrator only partially agrees. Respondent has had many opportunities to challenge the AAA's jurisdiction and indeed availed itself of those many opportunities as detailed in the procedural history above. Respondent objected to jurisdiction before the AAA appointed the merits arbitrators to these cases. As noted in the CMC1 Order, respondent preserved its jurisdictional objections at the very first case management conference in these proceedings and continued to raise them continually thereafter. See, e.g., CMC1 Order, dated 06/12/24; CMC2 Order, dated 07/27/24; CMC3 Order, dated 08/11/24; CMC5 Order, dated 10/21/24; CMC6 Order, dated 10/21/24; 24 Amended Answers, dated 07/12/24; Letter, dated 08/02/24; Order on Motion to Dismiss, dated 09/04/24. In truth, respondent rarely missed an opportunity to reassert its jurisdictional objections. As the Arbitrator has repeatedly held throughout these proceedings, respondent has steadfastly preserved and never waived its objections to the forum's jurisdiction. The Arbitrator now reconfirms these prior rulings and holds that respondent timely objected to the forum's jurisdiction.

### Waiver by Conduct

Separately, claimants argue that respondent waived its jurisdictional challenges by availing itself of the tribunal's authority. Specifically, claimants emphasize that on October 30, 2024, respondent sought and succeed in compelling compliance with an order issued on October 21, after respondent asserted that the SSA2 deprived this tribunal of authority. See Fortune, Alsweet & Eldridge, Inc. v. Daniel, 724 F.2d 1355, 1357 (9th Cir. 1983) (finding unjust to permit arbitration challenge after voluntary participation for several months). According to claimants, if respondent believed this tribunal lacked jurisdiction to issue that order, then it should not have sought its issuance since it would be unenforceable; instead, respondent did the opposite: it affirmatively invoked this tribunal's authority to obtain information it desired by ratifying this tribunal's order—and by extension, this tribunal's jurisdiction. Having done so, claimants argue, respondent again waived its right to object to this tribunal's authority. While the Arbitrator agrees that the parties cannot simultaneously avail themselves of the benefits of a forum while shunning its burdens, the Arbitrator specifically ruled that respondent's compliance with the tribunal's orders and submissions in these proceedings after the SSA1's amendment would not operate as a waiver of its objections and that respondent reserved all rights to contest jurisdiction. In short, the Arbitrator will not hold respondent's compliance and professionalism against it.

### Waiver of Substantive Ground

Claimants also maintain that respondent waived the specific basis for its current objection by failing to raise it in its prior motions to dismiss. Claimants point out that respondent persistently asserted the enforceability of the SSA1's arbitration agreement in these cases (as well as dozens of others). In fact, in its Motion to Dismiss for Lack of Jurisdiction filed on August 23, 2024 after the unconscionability rulings by Arbitrator Dasteel and the filing of the Elliott case, respondent argued, the SSA1 governs its relationships with claimants and "should be enforced as a matter of law" and "arbitration requirements like this are enforceable." By so doing, claimants insist, respondent waived its current objection to the AAA's jurisdiction.

15

Technically, the Arbitrator agrees with claimants that respondent waived the specific basis for the lack of jurisdiction it now advances. Respondent argues that the tribunal cannot enforce the SSA1's arbitration agreement because another arbitrator found it unconscionable, thereby prompting respondent to remove it in the SSA2. Yet, Arbitrator Dasteel issued his unconscionability rulings on July 8, 2024, over a month before respondent moved to dismiss these arbitrations for lack of jurisdiction on August 23, 2024. Hence, the Arbitrator agrees that respondent could and should have raised all its objections to jurisdiction at that time. Accordingly, the Arbitrator rules that respondent waived the unconscionability rulings as basis for its objections to jurisdiction. Despite this waiver, the Arbitrator will not uphold the forum's jurisdiction on this procedural basis alone for two reasons: (1) respondent had not amended the SSA1 at the time it moved to dismiss for lack of jurisdiction on August 23, 2024; it did so on September 26, 2024, a month later; and more importantly, (2) the Arbitrator has an independent duty to assess jurisdiction, even if respondent waived its current argument. As noted at the CMC5, the Arbitrator will not proceed unless she finds that the AAA continues to have jurisdiction over these arbitrations. Accordingly, the Arbitrator finds waiver but declines to rely on waiver alone to support this forum's jurisdiction.

**JUDICIAL ESTOPPEL**

Claimants also maintain that the tribunal should judicially estop respondent from reversing course. Essentially, claimants argue, respondent repeatedly conceded the tribunal's jurisdiction and may not now contradict its judicial admission. The judicial estoppel doctrine precludes a party from asserting one position in a court proceeding and later seeking an advantage by taking a clearly inconsistent position. See Bartley-Williams v. Kendall, 134 Wash. App. 95, 98, 138 P.3d 1103 (2006). The doctrine seeks "to preserve respect for judicial proceedings," and "to avoid inconsistency, duplicity, and ... waste of time." Cunningham v. Reliable Concrete Pumping, Inc., 126 Wash. App. 222, 225, 108 P.3d 147 (2005); Johnson v. Si-Cor, Inc., 107 Wash. App. 902, 906, 28 P.3d 832 (2001). Tribunals examine three core factors to determine whether to apply the judicial estoppel doctrine: (1) whether "a party's later position" is "clearly inconsistent with its earlier position"; (2) whether "judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled"; and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."

The Arbitrator notes the irony of claimants' counsel invoking the judicial estoppel doctrine given its own many inconsistent representations before the Court and this tribunal. Nevertheless, claimants properly recite the doctrine. Respondent has presented inconsistent positions to the Court, the AAA, and this tribunal. First, it told the Court that claimants had to vindicate their rights in binding individual arbitration given its enforceable SSA1 arbitration agreement. The Court agreed and compelled arbitration of the consumers' claims. Claimants commenced these arbitration cases because respondent represented to the Court that they had to. Now, respondent claims its SSA1 arbitration agreement is unenforceable, a position clearly inconsistent with its earlier position that "all consumer signatories of the SSA must assert their claims individually in arbitration."

The inconsistency undermines confidence in the accuracy of respondent's current position. The District Court ruled the arbitration agreement enforceable and valid. Granted, the Court reserved the unconscionability ruling to the arbitrator but it first had to find a valid agreement to arbitrate

the parties' disputes before it could have compelled claimants to arbitration. For this tribunal to now find that same SSA1 unenforceable seems contrary to the law of the case. The Arbitrator also finds that dismissal for lack of jurisdiction would significantly disadvantage claimants at this late date, especially with the merits hearing scheduled for January 27, 2025. In sum, the Arbitrator finds that the present dispute qualifies for judicial estoppel. But, as with waiver, the Arbitrator will not uphold the forum's jurisdiction on procedural grounds alone.

## VOLUNTARY SUBMISSION TO ARBITRAL JURISDICTION

Claimants assert that respondent already voluntarily submitted itself to this tribunal's jurisdiction on the question of arbitrability and may not now rescind its submission. Claimants correctly point out that this tribunal already denied respondent's Motion to Dismiss for lack of jurisdiction just two months ago. See Order on Motion to Dismiss, dated 09/04/24. According to claimants, once a party submits a question to an arbitrator for adjudication, it cannot later claim the arbitrator lacks authority to resolve that same question. The Arbitrator agrees buts find this argument essentially another formation of claimants' judicial estoppel theory. The Arbitrator holds that respondent submitted the question of arbitrability to this tribunal for adjudication and may not now claim it lacks such authority.

## COLLATERAL ESTOPPEL

Claimants invoke collateral estoppel because the Court already determined that the parties delegated arbitrability issues to the arbitrator for resolution. Again, the Arbitrator agrees in principle but will not rely upon this procedural argument alone. In compelling these consumer antitrust claims to arbitration, the District Court held:

> [T]he question is whether Plaintiffs' unconscionability challenge should be determined by the Court or by an arbitrator. According to the SSA, the arbitrator must resolve any "disputes" regarding "this agreement" in conformity with AAA rules (See Dkt. No. 364 at 12, 65, 78, 92, 106, 120.) AAA rules give an arbitrator "'the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.'" Oracle Am., Inc. v. Myriad Group A.G., 724 F.3d 1069, 1074 n.1 (9th Cir. 2013) (citing AAA Commercial Arbitration Rule 7(a)). Therefore, unless Plaintiffs challenge the SSA's delegation provision, specifically, as unconscionable, the Court must enforce the parties' agreement to have an arbitrator decide the broader question of whether the arbitration clause itself is unconscionable.

In re Value Antitrust Litigation Order, dated 10/25/21.

According to claimants, therefore, the Court has already satisfied respondent's theory that Coinbase necessitates a court ruling on the delegation of arbitrability of disputes before a claim can be adjudicated in arbitration because it already so ruled. Put another way, the District Court's prior ruling constitutes binding law of the case, which respondent is collaterally estopped from relitigating.

The Arbitrator only partially agrees. The District Court's prior ruling certainly controls the issues before it. But the Court did not address and could not have addressed the current issues posed

by the later 2024 SSA2 amendment. The Court also did not have the benefit of the Supreme Court's 2024 Coinbase decision when it ruled on arbitrability in 2021. Thus, while the Arbitrator agrees that the District Court Order constitutes binding law of the case in these proceedings, it does not necessarily encompass all aspects of the parties' current dispute given the intervening events of 2024. Accordingly, the Arbitrator will uphold, enforce, and apply the District Court's Order but will not collaterally estop respondent from raising new arguments based upon later events.

## THE COURT'S "BOOKEND" AUTHORITY

Claimants assert that district courts may not interrupt an ongoing arbitration because the Ninth Circuit has ruled that their authority must "bookend" the arbitral proceeding. Generally, the District Court has authority at the beginning and at the end of the arbitral process. Under the FAA, the Court determines at the beginning of the process if the parties agreed to arbitrate, unless the parties delegated the issue to the arbitrator. Similarly, under the FAA, the Court determines at the end of the process if it should confirm, modify, or vacate the arbitral award. In this sense, the District Court's authority "bookends" the arbitral process. See Priast v. Neiman Marcus Grp., Inc., 2020 U.S. Dist. LEXIS 19208, at *7 n.1 (N.D. Cal. Feb. 5, 2020) (explaining Ninth Circuit jurisprudence). The FAA does not suggest that courts may intervene before the arbitrator renders a final award. See id. As the Seventh Circuit agreed, to allow a party to bring an independent suit to enjoin the arbitration "is inconsistent with fundamental procedural principles that apply with even greater force to arbitration than to conventional litigation." See Smith v. American Arbitration Ass'n, 233 F.3d 502, 506 (7th Cir. 2000). The Arbitrator agrees that the Courts generally assert their authority at the beginning and at the end of the arbitral process but disagrees that they may not do so at any other time. Under the FAA and federal law, the District Court will determine its own authority and jurisdiction. The Arbitrator defers to the Court's exclusive jurisdiction to rule on its own jurisdiction and declines to accept claimants' invitation to do so here.

## JURISDICTION DETERMINED AT THE TIME OF FILING

Claimants rely on diversity jurisdiction jurisprudence to aver that tribunals determine jurisdiction at the time of filing, not upon later changed circumstances and events. "It has long been the case that the jurisdiction of the Court depends upon the state of things at the time of the action brought." Grupo Dataflux v. Atlas Glob. Grp., L.P., 541 U.S. 567, 570 (2004). At the time claimants commenced these arbitrations, only one SSA existed and that SSA1 required arbitration. Indeed, respondent concedes that claimants filed these arbitrations "invoking the arbitration agreement in the SSA between Valve and Steam users" "in effect at the time."

Respondent relies on Oppenheimer & Co. v. Mitchell to support its argument that the Court can enjoin an already seated arbitration based upon later events. See Oppenheimer & Co. v. Mitchell, C23-67 MJP (W.D. Wash. Apr. 5, 2024) and 2023 WL 2428404, at *6 (W.D. Wash. Mar. 9, 2023). Yet, Oppenheimer looked to the facts controlling at the time of filing: "the Court must examine whether the FINRA proceeding was properly *commenced*." Oppenheimer enjoined the arbitration by analyzing whether the party was a "customer," thereby conferring FINRA jurisdiction at the time the arbitration commenced. Applying this analysis, the Arbitrator agrees that the AAA properly had jurisdiction under the SSA1 at the time claimants began these arbitrations, even if subscribers could not file arbitration before the AAA under the SSA2 today.

18

As both an AAA and FINRA arbitrator, the Arbitrator finds <u>Oppenheimer</u> distinguishable in two crucial respects. First, unlike the AAA Consumer Arbitration Rules which explicitly delegate arbitrability and jurisdictional questions to the arbitrator, the FINRA arbitration rules do not. FINRA Rule 12206 authorizes the arbitrator or panel to determine eligibility and statute of limitations issues but not arbitrability issues, which if challenged, must be decided by the Court. Further, FINRA arbitration parties do not enter an arbitration agreement in which they can expressly delegate arbitrability to an arbitrator. Instead, they arbitrate their disputes by statutory authorization applicable to FINRA "members" (securities industry professionals) and their "customers" and employees, as overseen by the SEC which approves FINRA's rules and procedures. Thus, in <u>Oppenheimer</u>, unlike in these cases, the parties only had one forum in which to challenge FINRA jurisdiction – the Court. Second, in <u>Oppenheimer</u>, the impacted party turned out never to have been a securities industry "customer" as defined by the FINRA Rules at the time of the arbitration's filing or at any time. Thus, the SEC-approved FINRA Rules could not apply to him and FINRA had no jurisdiction to arbitrate against a non-customer as a matter of statute. Of course, the Court there enjoined the arbitration.

In contrast, here, the parties agreed to arbitrate and delegated arbitrability and jurisdiction issues to the arbitrator for resolution. The tribunal's jurisdiction stems therefore from the parties' agreement, the AAA Consumer Rules, and the FAA, not statutory authority alone. Claimants were undisputedly respondent subscribers at the time of filing. Thus, unlike in <u>Oppenheimer</u>, in which the FINRA arbitration was extra-jurisdictional when commenced, the arbitrations here all fell within the AAA's jurisdiction under the SSA1 at the time of filing. Accordingly, the Arbitrator rules that jurisdiction properly existed at the time claimants began these arbitrations.

## CONSENT

Respondent argues that the tribunal cannot force it to arbitrate when it no longer consents to arbitration. The Arbitrator agrees that arbitration rests upon the parties' consent, for arbitration is matter of contract between the parties. <u>See</u> <u>Lamps Plus, Inc. v. Varela</u>, 587 U. S. 176, 184 (2019); <u>Granite Rock Co. v. Teamsters</u>, 561 U. S. 287, 299 (2010); <u>First Options of Chicago, Inc. v. Kaplan</u>, 514 U. S. 938, 943 (1995). The Arbitrator disagrees, however, that respondent did not agree to arbitrate these disputes. Respondent explicitly consented to – indeed dictated – arbitration in the SSA1. The issue now is not whether respondent consented to arbitration, for it certainly did; the issue is whether it may later unilaterally revoke its consent after a subscriber commences arbitration in reliance on that consent. Claimants also assert that respondent cannot revoke the arbitration agreement because it survives termination of the SSA1. <u>See</u> SSA1 at § 9.D. The Arbitrator rules that, while the parties may always jointly and mutually agree to litigate rather than arbitrate, a party may not unilaterally and retroactively rescind its consent to arbitrate once the other party initiates the agreed upon arbitration. Certainly, when claimants tried to revoke their consent retroactively by initially filing their claims in the District Court in 2021, respondent did not hesitate to force them to live up to their promised consent by moving to compel those claims to arbitration. By the same logic, the Arbitrator concludes that respondent must now stand by its prior consent.

## UNENFORCEABLE UNILATERAL MODIFICATION

Unilateral-modification clauses give one party the unfettered right to amend the underlying contract without the other party's consent. <u>See, e.g.</u>, <u>Floss v. Ryan's Family Steak Houses, Inc</u>., 211 F.3d 306, 310 (6th Cir. 2000) (noting that the arbitration agreement gave the employer the

unlimited right to modify the rules of arbitration without the employee's consent). Here, respondent relied upon such a unilateral modification clause in its SSA1 to amend the agreement and remove its arbitration provision. Both the SSA1 and the SSA2 permit unrestricted unilateral modification upon notice:

> B. Unilateral Amendment
>
> Furthermore, Valve may amend this Agreement (including any Subscription Terms or Rules of Use) unilaterally at any time in its sole discretion. In this case, you will be notified by e-mail of any amendment to this Agreement made by Valve at least 30 (30) days before the effective date of the amendment. You can view the Agreement at any time at http://www.steampowered.com/.
> Your failure to cancel your Account prior to the effective date of the amendment will constitute your acceptance of the amended terms. If you don't agree to the amendments or to any of the terms in this Agreement, your only remedy is to cancel your Account or to cease use of the affected Subscription(s). Valve shall not have any obligation to refund any fees that may have accrued to your Account before cancellation of your Account or cessation of use of any Subscription, nor shall Valve have any obligation to prorate any fees in such circumstances.

See SSA1 at § 8.B; SSA2 at § 8.B.

Most courts refuse to enforce adhesion arbitration agreements with such clauses or sever their unilateral modification clauses on a variety of grounds, such as lack of consideration, illusory promise, indefiniteness, or unconscionability. See, e.g., Al-Safin v. Circuit City Stores, Inc., 394 F.3d 1254, 1262 (9th Cir. 2005); Dumais v. Am. Golf Corp., 299 F.3d 1216, 1220 (10th Cir. 2002); Floss, 211 F.3d at 316; Hooters of Am., Inc. v. Phillips, 173 F.3d 933, 939 (4th Cir. 1999). The Arbitrator agrees that the retroactive application of this clause to claimants with pending arbitrations is unenforceable.

A subscriber could only reject the SSA2's new terms if it deleted its account or discontinued its use. Neither affords a consumer a realistic option when they have already purchased licenses for games housed on the Steam platform for which respondent will not refund their fees. Under these circumstances, the Arbitrator finds the unilateral modification clause unconscionable as applied retroactively to claimants with pending arbitrations. See Heckman v. Life Nation Entertainment Inc., No. 23-55770, D.C. No. 2:22-cv00047-GW-GJS, at *18-19 (9th Cir. Oct. 28, 2024) (finding retroactive unilateral modification of arbitration agreement unconscionable). Accordingly, the Arbitrator will not enforce SSA1 Section 8.B as to claimants.

## GOOD FAITH & FAIR DEALING

All contracts, including arbitration agreements, contain an implied covenant of good faith and fair dealing prohibiting the parties from denying the other party the benefit of their agreement in bad faith. The Arbitrator finds Cobb v Ironwood Country Club persuasive. See 233 Cal. App. 4th 960 (2015). In Cobb, the defendant added an arbitration provision to its bylaws four months *after* the plaintiffs filed their complaint in superior court. Id. at 962. The defendant then moved to compel arbitration based upon the new amendment. Id. at 964. Much like respondent here, the

20

defendant relied on its right to amend the contract and then apply it both prospectively and retroactively to current and former members. Id. Again like respondent, the defendant argued that the members' agreement to the original bylaw provision allowing for future amendments meant that the plaintiffs had accepted and agreed to defendant's right to amend the bylaws. Id. at 963. The Court disagreed.

The trial court denied the motion to compel arbitration, concluding that the motion represented an improper effort to apply the new bylaw retroactively to a pending case. Id. at 964. The court reasoned that the subsequent bylaws amendment did not reflect any agreement by these plaintiffs to arbitrate the already pending lawsuit. Id. at 964-65. The appellate court agreed and held that the defendant violated the implied covenant of good faith and fair dealing and exceeded its amendment power to the extent it attempted to enact an arbitration amendment to cover the pending dispute, a dispute not only accrued but actively litigated in court when the amendment became effective. Id. at 966. The Court held that the implied covenant of good faith and fair dealing prohibits a party from unilaterally changing an agreement to apply retroactively to known or accrued claims because it would interfere unreasonably with the other party's expectations of how the parties would resolve their dispute. Id.; see also Avery v Integrated Healthcare Holdings, Inc., 218 Cal. App. 4th 50, 61 (2013); Peng v First Republic Bank, 219 Cal. App. 4th 1462, 1474 (2013); Serpa v. Cal. Sur. Investigations, Inc., 215 Cal. App. 4th 695, 706 (2013); Peleg v. Neiman Marcus Grp., Inc., 204 Cal. App. 4th 1425, 1465 (2012); see generally Kim v. Allison, 87 F.4th 994, 1001 n.7 (9th Cir. 2023) (citing Cobb).

The current dispute mirrors Cobb. The Cobb defendant added an arbitration provision to its contract four months after the plaintiffs filed litigation; respondent here removed the arbitration provision more than a year after claimants initiated arbitration. See id. at 962. While the Cobb defendant hoped to use the new amendment to compel arbitration, respondent here seeks to use the new amendment to stop arbitration. See id. at 964. Under these circumstances, the Arbitrator agrees with the Cobb court that respondent would violate the implied covenant of good faith and fair dealing and unreasonably exceed its amendment power by applying the newly minted SSA2 to the pending disputes, disputes not only accrued but actively arbitrated before the AAA for over a year because the covenant of good faith and fair dealing prohibits respondent's unfettered exercise of its contractual rights in a manner that would deny claimants the benefit of their arbitration agreement. See id. at 966.

Washington law agrees. Under Washington law, every contract imposes an obligation of good faith in its performance and enforcement. RCW 64.34.090. This duty requires "the parties to cooperate with each other so that each may obtain the full benefit of performance." WPI 302.11; Badgett v. Sec. State Bank, 116 Wn.2d 563, 569, 807 P.2d 356 (1991). The duty does not, however, require the party to accept a material change in the terms of the contract. WPI 302.11; Betchard-Clayton, Inc. v. King, 41 Wn.App. 887, 890, 707 P.2d 1361 (1985). Washington courts base the covenant of good faith and fair dealing on the idea that parties should be honest and faithful to the spirit of the contract and not act in a way that would harm the other party's rights or expectations. Metro. Park Dist. v. Griffith, 106 Wn.2d 425, 437, 723 P.2d 1093 (1986); Restatement (Second) of Contracts § 205 (1981). For example, in Nova Contracting, Inc. v. City of Olympia, the court rejected the defendant's argument that it could refuse the plaintiff's submissions because the contract afforded it the final decision to accept or reject a submittal. Looking to the Restatement for guidance, the court held that the defendant had to exercise its contract authority reasonably and that, even though the contract gave it the final decision, it did not have "unlimited discretion." See No. 48644-0-II (Wash. Ct. App. Apr. 18, 2017).

21

The Arbitrator finds respondent's contrary authority inapposite. For example, respondent cited In re Nat'l Football League's Sunday Ticket Antitrust Litig., 2021 WL 2350814, at *4 (C.D. Cal. Apr. 20, 2021) to support its position that courts routinely apply amended dispute resolution provisions retroactively. In the NFL case, DirectTV moved to compel arbitration immediately at the outset of the case but due to procedural motions, appeals, and other procedures, the parties did not brief the motion until two years later. In ruling on the motion at long last, the court compared the pre- and post-litigation contracts, *both* of which contained arbitration agreements. The court applied the principle of good faith and fair dealing to determine if it could compel arbitration under the newer agreement. The court concluded that the newer agreement did not violate the covenant of good faith and fair dealing because (1) the two contracts' the arbitration provisions did not materially differ; and (2) the consumers had other ways to view the NFL games they wanted to see without agreeing to the new terms.

Here, unlike in the NFL case where the parties had not moved past procedural motions for two years, respondent amended the SSA1 over a year after the claimants began their arbitrations and only a few months before the merits hearing. Also, unlike in the NFL case, respondent materially changed the terms and conditions: it removed the provisions related to arbitration, mediation, class action waiver, reimbursement of filing fees, and its agreement not to seek its fees and costs and substituted exclusive court jurisdiction over all disputes, including those pre-dating the SSA2. Compare SSA1 at § 11 with SSA1 at § 10. Significantly, unlike the consumers in the NFL case, who had other ways to view the NFL games even if they did not agree to the revised arbitration agreement, respondent's subscribers have no other way to access their Steam platform, games, and wallet unless they agree to the SSA2. And, if they do not agree, they must delete or discontinue use of their accounts and all the games and licenses contained in them. Faced with these critical differences, the Arbitrator holds that respondent would violate the implied covenant of good faith and fair dealing if it applied the SSA1's unilateral modification clause retroactively to these pending arbitrations.

## EQUITABLE ESTOPPEL

Claimants also invoke equitable estoppel. "Equitable estoppel precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes." See Mundi v. Union Sec. Life Ins. Co., 555 F.3d 1042 (9th Cir. 2009). Not unlike judicial estoppel, equitable estoppel has three elements:

> (1) an admission, statement, or act inconsistent with the claim afterwards asserted, (2) action by the other party on the faith of such admission, statement, or act, and (3) injury to such other party resulting from allowing the first party to contradict or repudiate such admission, statement, or act.

See Saunders v. Lloyd's of London, 779 P. 2d 249 (Wash. 1989). The Arbitrator finds all three elements present here.

## Inconsistency

As explained above, the Arbitrator finds respondent's positions inconsistent. From 2013 to 2024, the SSA1 dictated individual binding arbitration as the exclusive dispute resolution for all domestic subscribers, with minor exceptions. See SSA1 at § 11. In the Wolfire lawsuit, relying on

the SSA1's arbitration provision, respondent moved to compel arbitration of Steam subscribers asserting the very same antitrust claims asserted by the claimants in these arbitrations. It submitted multiple briefs extolling arbitration as the sole lawful avenue for resolution of these consumer claims. See, e.g., Doc. 35, Wolfire Games and William Herbert et al. v. Valve Corporation, 2:21-cv-563-JCC. After the District Court granted respondent's motion, respondent continued to pursue arbitration. See, e.g., C. Casper Letter, dated 07/25/23 ("Valve is fully prepared to resolve the dispute in arbitration" and "Valve will arbitrate the dispute individually if the subscriber wishes"). After the claimants brought their claims in arbitration, respondent advised this tribunal that when "subscribers agree to the SSA, they and Valve agree to submit disputes to individual arbitration." See Respondent's Motion to Dismiss for Lack of Jurisdiction at 4. In its August 23, 2024 jurisdiction briefing, respondent insisted that the "SSA governs Valve's relationships with Claimants and should be enforced as a matter of law." Respondent's message to its subscribers, the District Court, the AAA, claimants' counsel, and this tribunal was singular: these cases and all subscriber disputes belong in arbitration. Now, respondent insists that the AAA has no jurisdiction over these arbitrations, and claimants must return to the District Court where they began three years ago.

**Reasonable Reliance**

The Arbitrator finds that claimants relied on the SSA1's arbitration provision and respondent's representations in bringing these claims. Claimants began their claims in Court – where respondent now wishes them to return – only to be told by respondent that they had to individually arbitrate each of their claims. Claimants did exactly what respondent told them to do: they filed individual arbitrations before the AAA. They submitted their filing fees, expended their resources, filed their motions, sought their discovery, and arbitrated these cases *with* respondent for 14 months. During that entire time, both parties treated the AAA as the forum for their consumer disputes.

**Injury**

The Arbitrator finds that claimants will suffer significant injury should respondent now be allowed to insist they return to Court. Claimants will essentially have wasted over a year's worth of work, attorney time, case preparation, and arbitration strategy. Claimants would incur new court costs simply to file their suits. They would lack the SSA1's fee shifting provision, which guaranteed attorneys' fees for consumers but severely limited Valve's ability to collect them against the consumer. They would have to relitigate all the motions and rulings already adjudicated in these proceedings, which include no less than six CMC orders, multiple stay requests, choice of law disputes, several jurisdictional challenges, at least eight discovery rulings, two *in camera* reviews, and three disputed third-party hearing subpoenas, just to list the more significant case rulings to date. The Arbitrator finds that unfair and inefficient outcome to be precisely the reason Courts created the equitable estoppel doctrine in the first instance. The Arbitrator equitably estops respondent from retroactively applying the SSA2 to these claimants and their pending arbitrations.

**FACTUAL DISPUTES**

Factual disputes preclude dismissal. The Arbitrator neither resolves facts nor weighs credibility on a motion to dismiss. Instead, the tribunal accepts the pleadings as true, including their reasonable inferences, and determines if the claimants have stated a claim as a matter of law.

23

See al-Kidd v. Ashcroft, 580 F.3d 949, 956 (9th Cir. 2009); Keniston v. Roberts, 717 F.2d 1295, 1301 (9th Cir. 1983); accord Dennis v. Heggen, 35 Wn. App. 432, 667 P.2d 131 (1983); Blank v. Kirwan, 39 Cal. 3d 311, 318 (1985); Contreras v. Crown Zellerbach Corp., 88 Wn. 2d 735, 742 (Wash. 1977); Carloss v. County of Alameda, 242 Cal. App. 4th 116, 123 (2015); Czajkowski v. Haskell & White, LLP, 208 Cal. App. 4th 166, 173 (2012); Brown v. MacPherson's Inc., 86 Wash. 2d 293, 298 (1975). Indeed, Washington considers dismissal a drastic remedy to be used sparingly. Accordingly, Washington courts will only dismiss if, beyond a doubt, claimants can prove no set of facts consistent with their demands, entitling them to relief. See, e.g., Collins v. Lomas & Nettleton Co., 29 Wn. App. 415, 419 (1981); see Bravo v. Dolsen Co., 125 Wn.2d 745, 750 (1995); Orwick v. City of Seattle, 103 Wn.2d 249 (1984). For courts freely grant leave to amend when justice requires and prefer decisions on the merits over technical dismissals. See Lopez v. Smith, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc). Indeed, tribunals should grant leave to amend even if the party did not request it, unless the allegation of other facts could not possibly cure the demand. Id. at 1130.

Here, the parties each have raised several factual disputes, including whether claimants have agreed to the SSA2's terms, whether claimants understand the Court and arbitral proceedings, whether claimants have been intimidated by personal service of the summons and petition against them, whether respondent properly notified claimants of the changes, whether claimants understood that they were forfeiting their arbitration claims by clicking accept or continuing to use their accounts, and whether counsel have engaged in professional and ethical behavior in communicating with claimants/their clients, just to list a few raised by the parties. Given these disputed facts, the Arbitrator separately holds that dismissal would be improper as a procedural matter.

## CONTRACTS MAY NOT BE ILLUSORY

Respondent's tactic would render arbitration agreements illusory. If respondent may unilaterally retroactively change its agreement to arbitrate at any time at its discretion, without regard to claimants' accrued and pending arbitration rights, then consumer contracts would become an ever shifting playing field, changeable at the drafter's whim. Under respondent's position, it could arguably amend the parties' arbitration agreement after the close of an arbitration merit hearing before issuance of the award if it believed it might lose and force the consumer to start anew in court. Or, respondent could arguably amend and require arbitration years into a lawsuit and then force the plaintiff to start all over again in the arbitral forum. Under respondent's position, all consumer arbitration contracts would become meaningless because the companies could simply change them at will.

Indeed, respondent's argument contradicts the very foundation of contract law. Contract law exists to enforce voluntary promises between parties to ensure predictability and fairness in every day transactions. Consumers enter them everyday when they buy a new phone, lease a car, sign up for service, or purchase a computer game. In simple terms, a contract expresses promises that justifies the parties in reasonably believing that they have committed to undertake or forgo specific action in the future – such as arbitrate their disputes. See WPI 301.02; Hansen v. Virginia Mason Med. Ctr., 113 Wn.App. 199, 207, 53 P.3d 60 (2002); see, e.g., Grovier v. N. Sound Bank, 957 P.2d 811, 815 (Wash. Ct. App. 1998) (each party's promise acts as consideration supporting the other's); Ebling v. Gove's Cove, Inc., 663 P.2d 132 (Wash. Ct. App. 1983) (same).

24

But if the contract's drafter can change its promise retroactively at will at any time, then its contractual promise means nothing, it becomes an illusion, not a promise, and certainly not a contract. An unrestricted right to remove the arbitration obligation gives respondent the freedom to choose the nature of its performance while simultaneously binding the consumer. Washington law defines an unenforceable illusory promise as "a purported promise that actually promises nothing because it leaves to the speaker the choice of performance or nonperformance." See Interchange Assocs. v. Interchange, Inc., 16 Wn.App. 359, 360–61, 557 P.2d 357 (1976).  A supposed promise becomes illusory when the agreement makes performance optional or "entirely discretionary by the promisor." Goodpaster v. Pfizer, Inc., 35 Wn.App. 199, 203, 665 P.2d 414 (1983); see also Asmus v. Pacific Bell, 23 Cal. 4th 1, 15 (2000) (contract illusory and unenforceable when a party retains the unfettered right to modify it). To avoid illusory, unconscionable, or unenforceable contracts, tribunals may refuse to enforce the contract, may enforce the remainder of the contract without the unconscionable clause, or may so limit the application of any unconscionable clause as to avoid any unconscionable result. See RCW 62.A.2-302.

Here, the Arbitrator upholds the SSA1's and the SSA2's unilateral modification provisions to the extent they apply prospectively; respondent offers consumers a service and remains free to offer its service to prospective customers on the terms and conditions of its choosing. Conversely, the Arbitrator refuses to enforce as illusory and unconscionable the SSA1's and/or SSA2's unilateral modification clauses and other provisions, if any, to the extent respondent seeks to enforce them retroactively to claims already accrued and pending.

## INCONSISTENCY WITH THE FAA

In the context of a promise to arbitrate disputes, respondent's interpretation would nullify the FAA. Congress enacted the FAA to reverse judicial hostility toward arbitration agreements and place them upon equal footing as other contracts. See AT&T Mobility, LLC v. Concepcion, 563 U.S. 333, 339 (2011); Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 24 (1991). The FAA manifests "a liberal federal policy favoring arbitration agreements." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983). When a valid agreement to arbitrate exists between parties and covers the matter in dispute, the FAA commands courts to stay any ongoing judicial proceedings and compel arbitration, precisely as the District Court did here. See 9 U.S.C. § 3. Further, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," as a matter of federal law. Moses H. Cone Mem'l Hosp., 460 U.S. at 24-25.

Although common and generally enforceable, contracts of adhesion further the federal policy favoring arbitration, when they adequately preserve consumers' substantive rights. See Gilmer, 500 U.S. at 25-26 (employment context). Retroactive application of an unrestricted unilateral modification clause to thwart a pending arbitration does not put arbitration upon "equal footing" with other contracts but instead allows the drafter to not just "forum shop" but to "forum hop." The Arbitrator therefore finds that, consistent with the FAA's strong federal policy favoring arbitration, respondent's unilateral changes can only apply to claims filed after its effective date because to do otherwise would destroy arbitration envisioned by the FAA as a meaningful, genuine, and non-illusory alternative dispute resolution process. Respondent, of course, retains the ability to unilaterally modify its arbitration agreements so long as it provides (1) adequate notice of the changes (which the record suggests it did here), (2) sufficient consideration to support the change, (3) conscionable, legally valid terms, and (4) prospective application. Of

course, the parties may mutually agree to amend their contract at any time.

## DELAY

In addition to the substantive and procedural legal reasons set forth above, the Arbitrator considers further delay prejudicial under the facts of these cases. The individual claimants, as absentee class members, first sought relief in 2021 when named plaintiffs filed a putative class action on their behalf. By the end of that year, the District Court had compelled their claims to arbitration. See In re Value Antitrust Litigation Order, dated 10/25/21. Nearly three years later, the parties are still fighting over jurisdiction. The Arbitrator finds that further delay in these proceedings will prejudice claimants, now two months away from the merits hearing and jeopardize that date's viability. The Arbitrator has warned from this arbitration's inception, however, that she would not delay the arbitration on the merits:

> The Arbitrator will strictly enforce all deadlines and dates stated herein to avoid unnecessary delay and to ensure an expeditious and fair resolution of this matter. The deadlines in this Order are inviolate – not aspirational.

See CMC1 Order, dated 06/12/24. Despite this admonition, delays have occurred, some understandably, such as necessitated by changes in counsel, others unnecessary, caused by counsels' inability to work effectively together. Whatever the cause, whatever the tactics involved, the parties deserve to be heard on the merits of their respective claims and defenses without further delay.

Expeditious resolution is the hallmark of arbitration, one that distinguishes it from litigation. Here, the parties, through their counsel, have imported the delays, protocols, tactics, and tools from litigation into these arbitrations, threatening to turn them into thousands of individual trials in all but name. As the procedural history reveals, the Arbitrator has indulged motion upon motion, letter brief upon letter brief, discovery dispute upon discovery dispute in her effort to ensure fairness for all sides. However, at some point, justice too oft delayed becomes justice denied. That point is now: the cases will proceed to hearing.

## WASHINGTON LAW WOULD CONTINUE ARBITRATION

Finally, under Washington law, if a party to a judicial proceeding challenges the existence of an agreement to arbitrate, as respondent does here, "the arbitration proceeding may continue pending final resolution of the issue by the court, unless the court otherwise orders." RCW 7.04A.060(4). Accordingly, the Arbitrator rules that the arbitrations shall continue pursuant to Washington statute unless the Court orders otherwise.

## ORDER

The Arbitrator denies respondent's motion to dismiss or stay these proceedings for lack of jurisdiction. To the extent the Court disagrees with this analysis or to the extent it can rule on a more fulsome record, the Arbitrator defers to its greater authority and jurisdiction.

November 13, 2024
*/s/ Janice L. Sperow*

26

*Janice Sperow*

Janice L. Sperow, Arbitrator

**AMERICAN ARBITRATION ASSOCIATION**
**COMMERCIAL ARBITRATION TRIBUNAL**

**25 INDIVIDUAL CLAIMANTS V. VALVE CORPORATION D/B/A STEAM**

**ORDER NO. 4**
**RULING ON VALVE'S MOTION TO DISMISS FOR LACK OF JURISDICTION**

This Order is applicable to the following cases:
AAA Case No. 01-23-0005-2929
AAA Case No. 01-23-0005-2930
AAA Case No. 01-23-0005-2931
AAA Case No. 01-23-0005-2932
AAA Case No. 01-23-0005-2933
AAA Case No. 01-23-0005-2934
AAA Case No. 01-23-0005-2935
AAA Case No. 01-23-0005-2937
AAA Case No. 01-23-0005-2938
AAA Case No. 01-23-0005-2939
AAA Case No. 01-23-0005-2940
AAA Case No. 01-23-0005-2941
AAA Case No. 01-23-0005-2942
AAA Case No. 01-23-0005-2943
AAA Case No. 01-23-0005-2944
AAA Case No. 01-23-0005-2945
AAA Case No. 01-23-0005-2946
AAA Case No. 01-23-0005-2947
AAA Case No. 01-23-0005-2948
AAA Case No. 01-23-0005-2949
AAA Case No. 01-23-0005-2950
AAA Case No. 01-23-0005-2951
AAA Case No. 01-23-0005-2952
AAA Case No. 01-23-0005-2953
AAA Case No. 01-23-0005-2954

The above twenty-five arbitrations against Valve brought under the Mass Arbitration Supplementary Rules effective August 1, 2023, in conjunction with the Consumer Arbitration Rules of the American Arbitration Association (AAA), all with identical or near identical Demands for Arbitration except for particulars of the claimant and the amount of money in dispute, have been assigned to the undersigned Arbitrator. These twenty-five cases are among a larger number of similar consumer cases against Valve pending in the AAA, 624 (or more) in all.

**BACKGROUND**
Valve and Claimant entered into a Subscription Services Agreement ("Original SSA") which contained a provision in ¶ 11 that most disputes would be resolved by binding arbitration before the AAA.

1

11.  DISPUTE RESOLUTION, BINDING ARBITRATION, CLASS ACTION WAVIER

A,  Must Arbitrate all Claims Except Intellectual Property, Unauthorized Use, Piracy or Theft

              \*              \*              \*

YOU AND VALVE AGREE TO RESOLVE ALL DISPUTES AND CLAIMS BETWEEN US IN INDIVIDUAL BINDING ARBITRATION.  THAT INCLUDES, BUT IS NOT LIMITED TO, ANY CLAIMS ARISING OUT OF OR RELATING TO:  (i) ANY ASPECT OF THE RELATIONSHIP BETWEEN US;  (ii) THIS AGREEMENT;  OR (iii) YOUR USE OF STEAM, YOUR ACCOUNT, HARDWARE OR THE CONTENT AND SERVICES.  IT APPLIES WHETHER SUCH CLAIMS ARE BASED IN CONTRACT, TORT, STATUTE, FRAUD, UNFAIR COMPETITION, MISREPRESENTATION OR ANY OTHER LEGAL THEORY, AND INCLUDES ALL CLAIMS BROUGHT ON BEHALF OF ANOTHER PARTY.

              \*              \*              \*

The 25 arbitrations assigned to this Arbitrator were brought under Original SSA ⁋ 11 above.

The Original SSA also contained a provision in ⁋ 8 which allowed Valve to unilaterally amend the SSA.

8.  AMENDMENTS TO THIS AGREEMENT

              \*              \*              \*

B.  Unilateral Amendment

Furthermore, Valve may amend this Agreement (including any subscription terms and rules of use) unilaterally at any time in its sole discretion.  In this case, you will be notified by e-mail of any amendment to this Agreement made by Valve at least [thirty] (30) days before the effective date of the amendment. You can view the Agreement at any time at http://www.steampowered.com/.  Your failure to cancel your Account prior to the effective date of the amendment will constitute your acceptance of the amended terms.

Valve unilaterally amended the SSA on September 26, 2024, removing the agreement to arbitrate and inserting the following language into ⁋ 10:

2

You and Valve agree that all disputes and claims between you and Valve (including any dispute or claim that arose before the existence of this or any prior agreement) shall be commenced and maintained exclusively in any state or federal court located in King County, Washington, having subject matter jurisdiction. You and Valve hereby consent to the exclusive jurisdiction of such courts and waive any objections as to personal jurisdiction or venue in such courts.

After its unilateral amendment, Valve asked the AAA by counsel's letter dated September 27, 2024 to administratively close the pending arbitration as it no longer had jurisdiction, since there was no longer an agreement to arbitrate the disputes. The AAA declined to do so, stating that the parties should address their questions on these issues to the merits arbitrator for determination. This Arbitrator informed counsel on October 11 that Valve's request for administrative closure would be treated as a dispositive motion to dismiss, inviting further briefing on the issue if the parties wished to submit it.

On October 18, Valve filed a petition with the U. S. District Court in for the Western District of Washington, *Valve Corporation v. 624 Individual Claimants*, No. 2:24-cv-1717, seeking to enjoin the 624 claimants (including those assigned to this Arbitrator) from continuing to pursue their arbitrations, and on October 19 Valve's counsel wrote asking this Arbitrator to stay the arbitrations assigned to him pending action by the District Court, since it had exclusive jurisdiction over the threshold issue of whether there was an agreement to arbitrate.

## DISCUSSION

### WHO DECIDES THE EFFECT OF THE UNILATERAL AMENDMENT?

The demand for arbitration in this case was submitted on October 2, 2023 after Valve successfully argued before the U. S. District Court for the Western District of Washington that the claims belonged in arbitration, not in court. *See In re: Valve Antitrust Litigation,* No. C21-0563-JCC, 2021 U.S. Dist. LEXIS 206045 at *7 (W.D. Wash. Oct. 25, 2021.

The role of Federal courts in arbitration was summarized in *Priast v. Neiman Marcus Grp. Inc.* 2020 U.S. Dist. LEXIS 19208, at *7 n. 1 (N.D. Cal. Feb. 5, 2020):

In interpreting the Federal Arbitration Act, the Ninth Circuit has stated that "a district court's authority is generally limited to decisions that bookend the arbitration itself. Before arbitration begins, the district court has the authority to determine whether there is a valid arbitration agreement between the parties, and if so, whether the current dispute is within its scope." *In re Sussex*, 781 F.3d 1065, 1071 (9th Cir. 2015). The Act "does not suggest that a court could otherwise intervene before a final award is made," id. at 1071-72, at which point, "the parties may petition the district court to affirm the award, or to vacate, modify, or correct it," id. at 1072. (citing 9 U.S.C. §§ 9-11). Thus, "judicial review prior to the rendition of a final arbitration award should be indulged, if at all, only in the most extreme cases." *Aerojet-Gen. Corp. v. Am. Arbitration Ass'n*, 478 F.2d 248,

3

251 (9th Cir. 1973). The Ninth Circuit has also observed that "[t]he majority of our sister circuits expressly preclude any mid-arbitration intervention." In re Sussex, 781 F.3d at 1073.

Valve argues that mid-arbitration intervention is needed here because, under *Coinbase, Inc. v. Suski*, 144 S.Ct. 1186 (2024), a Federal Court, not this Arbitrator, must resolve the dispute as to whether the Original or Amended SSA rules this arbitration. The facts in *Coinbase*, however, are quite different. In *Coinbase,* there were two agreements between the parties in existence *before* the arbitration commenced, one with an arbitration clause, and one without. There was no mid-arbitration intervention.

Here, only the Original SSA with its arbitration clause existed when the arbitration was brought. The Amended SSA did not come into existence until almost a year later. And here, the Western District of Washington in the *Valve Antitrust Litigation* has already found that this case should proceed in arbitration under the Original SSA.

This ongoing arbitration commenced at Valve's insistence in District Court that arbitration is the proper forum to adjudicate this dispute. Nothing in *Coinbase* or the other cases cited by Valve suggests that a court should intervene in an ongoing arbitration because of a unilateral amendment. While Valve cites several cases holding that an arbitration provision may be retroactively added to or removed from a contract, in none of those cases did a court interfere with an ongoing arbitration instituted after a court had determined that the dispute was subject to arbitration.

### Did the Unilateral Amendment Extinguish Claimant's Right to Arbitration?

Valve argues that the unilateral amendment effectively pulled the rug out from under this arbitration, as it gave adequate notice and otherwise complied with the requirements of the SSA for unilateral amendments. It points out that users had an option – if they did not accept the unilateral amendment, they could cancel their Steam account, or simply quit using Steam.

Claimant argues that under established law, an objection to jurisdiction is waived if not timely made. That precept is incorporated into AAA Consumer Rule R-14(c), "A party must object to the jurisdiction of the arbitrator or to the arbitrability of a claim or counterclaim no later than the filing of the answering statement to the claim or counterclaim that gives rise to the objection," which Valve did not do, although it challenged jurisdiction early in the case on other grounds. The Arbitrator agrees with Claimant that Valve's present objection to jurisdiction was waived months ago.

Of course, when Valve submitted its answering statement, it had not yet wiped out the right to arbitrate by making the unilateral amendment it now relies on, and so it did not contest jurisdiction on that basis. But when it answered Claimant's claim Valve could have made the present jurisdictional objection if it first made a unilateral amendment to eliminate arbitration. The SSA was carefully drafted by Valve to include a unilateral escape hatch should anything in its SSA prove inconvenient to Valve. It was known to Valve, or should have been known, that it

4

could simply unilaterally abolish the arbitration agreement when it answered the demand on December 26, 2023, over 9 months ago.  Valve chose not to do so, but waited to see how the arbitration progressed, and the parties and arbitrator devoted time and resources preparing for the hearing which is scheduled for September, 2025.  Having failed to timely make its unilateral amendment and challenge jurisdiction, Valve may not do so now.

To rule otherwise would create a strange world where Valve might again unilaterally amend the SSA to reinstate arbitration at some point in the future and, according to Valve's logic, have the Federal case again dismissed in favor of arbitration.  This would create an absurd situation and points up the wisdom of the rule providing for waiver of jurisdictional objections unless timely made.  The Arbitrator concludes that Valve waived its right to make the unilateral amendment and object to jurisdiction by failing to within the time limit of Rule R-14(c).

Accordingly, Valve's motion to dismiss is denied and its objections to jurisdiction in light of its unilateral amendment of the SSA are overruled.

**SO ORDERED.**

Dated:  November 19, 2024

Robert B. Morrill
Arbitrator

ORDER
(Request to Stay Arbitrations)

25 Individual Claimants -vs- Valve Corporation d/b/a Steam

Case Numbers:

01-23-0005-3015
01-23-0005-3016
01-23-0005-3017
01-23-0005-3018
01-23-0005-3019
01-23-0005-3020
01-23-0005-3021
01-23-0005-3022
01-23-0005-3023
01-23-0005-3024
01-23-0005-3025
01-23-0005-3026
01-23-0005-3027
01-23-0005-3028
01-23-0005-3029
01-23-0005-3030
01-23-0005-3031
01-23-0005-3032
01-23-0005-3033
01-23-0005-3034
01-23-0005-3035
01-23-0005-3036
01-23-0005-3037
01-23-0005-3038
01-23-0005-3039

The parties have submitted the following briefs:

Claimant's Objection to Valve's Second Motion to Dismiss for Lack of Jurisdiction dated October 21, 2024

Respondent's Reply Brief to Arbitrator Ohashi dated November 4, 2024

**By Order of the Arbitrator**:

Respondent asserts that: (1) Claimants consented to an updated Steam Subscriber Agreement ("Updated SSA") that eliminated the agreement to arbitrate and class action waiver provisions that were contained in a prior version of the Steam Subscriber Agreement ("Prior

SSA"); and (2) this arbitration should be stayed because there is no longer an agreement to arbitrate.

Respondent relies substantially on *Coinbase* as authority for its position. The facts and circumstances underlying *Coinbase* are materially distinguishable from this arbitration. *Coinbase* involves a fourth-order question of arbitration dispute: "What happens if parties have multiple agreements that conflict as to the third-order question of who decides arbitrability?" Unlike *Coinbase*, the arbitrability of this dispute may have been a threshold issue, but arbitrability was resolved by a court ordered arbitration that Respondent sought and which now has an extensive procedural history, including the parties' prosecution of their cases within the arbitration process. Further distinguishing *Coinbase*, Respondent does not assert that the parties have existing agreements with conflicting arbitration provisions involving a delegation clause. Rather, Respondent asserts that the Updated SSA superseded the Prior SSA in whole and is the only operative agreement. There are no currently conflicting agreements for a *Coinbase* analysis.

Respondent's arguments in support of its request for a stay of arbitrations are not persuasive. **Respondent's request for a stay of arbitrations is DENIED.**

The parties shall notify AAA by December 4, 2024, which of the following dates are acceptable for a telephone scheduling conference with the parties and the Arbitrator to discuss relevant dates, including evidentiary hearing dates (whether in-person, video conference, by documents, or combination thereof), discovery deadlines, exchange of witness lists, exhibits, and briefing: December 9, 12, 16, 17, and 18, 2024. If none of the foregoing dates are acceptable, then AAA shall coordinate a telephone scheduling conference with the parties and Arbitrator. The Arbitrator reserves the right to schedule additional status reports and/or scheduling conferences.

This Order shall continue in effect unless and until amended by subsequent Order of the Arbitrator.

Dated: November 22, 2024             /s/ John E. Ohashi, Arbitrator

# AMERICAN ARBITRATION ASSOCIATION
## Consumer Arbitration Rules

---

In the Matter of the Arbitration between

**25 Individuals**
**-vs-**
**Valve Corporation d/b/a Steam**

---

### ARBITRATOR'S RULING ON VALVE CORPORATION'S REQUEST TO DISMISS OR STAY ARBITRATION [S] IN THE ABOVE CAPTIONED MATTERS

I, Sanford Jossen, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the Arbitration Agreement entered into between the above-named parties, and having been duly sworn, and having duly heard the allegations of the Parties, each represented by Counsel, at a Hearing held on October 15, 2024, via Zoom, regarding Valve Corporation's Request to Dismiss or Stay Arbitration[s] in the Above Captioned Matters do hereby, provide this *Interim Ruling*, as follows:

**THE PARTIES:**

This Ruling shall apply to the cases of the following individuals:

| Case Number: | Claimant Name: |
| --- | --- |
| 01-23-0005-3067 | Wright; |
| 01-23-0005-3068 | Guger; |
| 01-23-0005-3069 | Rosson; |
| 01-23-0005-3070 | Taylor; |
| 01-23-0005-3071 | Dingman; |
| 01-23-0005-3072 | Jurado; |
| 01-23-0005-3073 | Tollefson; |
| 01-23-0005-3074 | Bishop; |
| 01-23-0005-3075 | Ford; |
| 01-23-0005-3076 | Gentry; |
| 01-23-0005-3077 | Lutes; |
| 01-23-0005-3078 | Pena; |
| 01-23-0005-3079 | Yi; |

| 01-23-0005-3081 | Heath; |
| 01-23-0005-3082 | Nieto; |
| 01-23-0005-3083 | Noble; |
| 01-23-0005-3085 | Zwick; |
| 01-23-0005-3086 | Schau; |
| 01-23-0005-3087 | Shelley; |
| 01-23-0005-3088 | Sanders; |
| 01-23-0005-3089 | Gibbs; |
| 01-23-0005-3090 | Howell; |
| 01-23-0005-3091 | Parmer; |
| 01-23-0005-3092 | Cleri; and, |
| 01-23-0005-3093 | Henche. |

This is a Ruling on Respondent Valve Corporation's Request to Stay Arbitration in the above-captioned matters. During the October 15, 2024 hearing, Respondent Valve Corporation withdrew its *Request to Dismiss the Arbitration* of the above-captioned matters.

A full Hearing took place in the matter. Will Bucher appeared on behalf of Claimants. Shaud Tavakoli and Andrew Fuchs of the Law Firm of Skadden, Arps, Slate, Meagher & Form, LLP appeared on behalf of Respondents.

The Arbitrator reviewed the following:

1.    October 15, 2024, Hearing Transcript in this matter;

2.    Respondent Valve Corporation's Brief Requesting Stay dated November 15, 2024;

3.    Letter from Will Bucher dated November 20, 2024;

4.    Letter dated November 20, 2024, from Michael W. McTigue Jr.;

5.    Letter dated November 6, 2024, from Michael W McTigue Jr. along with exhibits;

6.    Email dated January 7, 2025, from William Bucher regarding "statement of additional facts";

7.     (Claimant's) Reply In Opposition To Respondent's Motion to Stay Arbitration filed with the AAA December 10, 2024 along with exhibits including Respondent Luke Ninemire's Motion to Stay This Action Under the Servicemember's Civil Relief Act; Respondent's Motion for Extension of Time To Respond and for a Case Management Conference in the matter of Valve Corporation v. Jennifer A. Nelson; Respondent's Reply to Motion for Extension of Time to Respond and for a Case management Conference in the matter of Valve Corporation v. Jennifer A. Nelson; October 9, 2024 Order on Respondent's Request for Case Closure and Withdrawal from direct communications in the matter of Kemp v. Valve Corporation dated October 9, 2024; Ruling and Order Regarding Respondent's Motion to Dismiss for Lack of Jurisdiction dated October 9, 2024; Jurisdiction Order in the matter of 24 Individual Claimants v. Valve Corporation dated November 13, 2024;

8.     Respondent Valve Corporation's Reply in Further Support of Its Request to Dismiss or Stay dated January 6, 2025 along with exhibits including Ruling and Order regarding Respondent's Motion to Stay these proceedings pending a Ruling by the District Court for the Western District of Washington on Respondent's October 18, 2024 Petition to Enjoin Arbitrations Preventing Claimants From Proceeding with their Arbitrations dated October 28, 2024; Order Suspending Proceedings pending Court determination of jurisdictional issues dated November 7, 2024; Order Staying Proceedings pending judicial determination of the effect of Amended Steam Subscriber Agreement dated November 11, 2024; Order Granting Respondent's Application for Stay of Arbitration Proceedings dated November 14, 2024; Transcript in the matter of the Stucker and 6 other Individual Claimants v. Valve Corporation; Transcript in the matter of Paul v. Valve Corporation; Petitioner's renewed Ex Parte Motion seeking leave to provide communications to certain Respondents in the matter of Valve Corporation v. Abbruzzese; Petitioner's Opposition to Respondent's Seth Weber's and Griffin Buyers Motion to Extend Time to Respond and for a Case Management Conference in the matter of Valve Corporation v. Abbruzzese; Declaration of Blake Marks – Diaz in support of Petitioner's Opposition to Respondent's regarding Arbitrator Brooks – Joshua Sayles Weber's and Griffin Biers Motion to Extend Time to respond and for a Case Management Conference in the matter of Valve Corporation v. Abbruzzese; Petitioner's Opposition to former Respondent Luke Ninemire's Motion to Stay this Arbitration under the Servicemember Civil Relief Act in the matter of Valve Corporation v. Abbruzzese; Declaration of Blake Marks – Diaz in Opposition to former Respondent Luke Ninemire's Motion to Stay this action under the Servicemember's Civil Relief Act in the matter of Valve Corporation v.Abbruzzese; Email from William Bucher to American Arbitration Association regarding Arbitrator Brooks – Joshua Sayles and 21 Other Individual Claimants v. Valve Corporation and related emails; Valve Corporation's LCR 7 (1) Notice of Withdrawal of Petition as to Respondent Luke Ninemire; Ruling Request for Stay in the matter of 25 Individual Claimants v. Valve Corporation [Case number 01 – 23 dated 0005 – 3536 dated December 20, 2024].

## INTRODUCTION:

Claimants are 25 individual and unrelated persons who were subscribers to an Internet website created, developed, promoted and administered by Respondent Valve Corporation. The subject of the website is computer games which are purchased and played by the individual Claimants. In order to obtain and engage in these computer games, Claimants are required to acknowledge and agree to a "Subscriber Agreement" drafted and provided by Respondent Valve Corporation. The subject "Subscriber Agreement" at issue in this case provided for arbitration for any aggrieved subscriber.

By virtue of this action, Claimants allege that Valve Corporation has engaged in and perpetrated antitrust violations in that it is the exclusive provider of these games and controls all prices for them. Unfortunately, neither party to this action has provided the Arbitrator with a complete chronology of the litigation and arbitration history in this case. It appears that there are at least 19 separate Arbitrations pending or stayed, as the case may be, by as many individual Arbitrators and at least 3 Federal Court actions pending in the United States District Court in Washington State (Elliott v. Valve Corporation (Case number 2:24 – CV – 01218 (W. D. Washington filed August 9, 2024)) and Wolffire Games LLC v. Valve Corporation (Case number 2:21 – CV – 00563 (W. D. Washington filed April 27, 2021)) and Wolfire Games, LLC v. Valve Corporation (Case Number 2021 WL 495-2220 (W. D. Washington October 25, 2021)).

The full history of Valve Corporation's "Subscriber Agreement" has not been provided to the Arbitrator. It appears from the pleadings that Valve has periodically updated the "Subscriber Agreement" which it first implemented in 2003. In 2012 Valve added a class action waiver and an arbitration agreement providing that, with limited exceptions, "you and valve agree to resolve all disputes and claims between us in individual binding arbitration" with the AAA.

In 2021, a videogame developer and 7 consumer Plaintiffs brought a putative class action encaptioned Wolfire Games LLC v. Valve Corporation (case number 2:21 – CV 00563 filed April 27, 2021 in which *Valve moved to Compel Arbitration* of the consumer claims under the "Subscriber Agreement". The Court granted the Motion.

The cases encaptioned by this matter were commenced in 2023. Claimant's counsel, Bucher law, is currently pursuing 5,028 arbitrations before the AAA. On September 26, 2024, after Demands for Arbitration we initiated in this specific action, Valve Corporation unilaterally removed the Arbitration provision from the "Subscriber Agreement" and amended it to read as follows:

"You and Valve agree that all disputes and claims between you and Valve (including any dispute or claim that arose before the existence of this or any prior agreement) *shall be commenced and maintained exclusively in any state or federal court* located in King County, Washington, having subject matter jurisdiction." [Emphasis Added.]

This superseded dispute resolution provision ["Superseded Subscriber Agreement] included a merger clause which provided that it superseded and replaced the party's prior agreement to arbitrate. It is significant to note that if a subscriber declined to agree to the amended or superseded Subscriber Agreement which now provided for dispute resolution by Court-based litigation, that the subject subscriber could no longer participate in the Valve website, obtain games and would lose any funds that were on deposit.

Valve Corporation seeks to stay this Arbitration on the basis that the "Subscriber Agreement" has now been "amended" and the individual Claimants have agreed to the "amended" [superseded] "Subscriber Agreement" which provides for dispute resolution through Court-based litigation, rather than Arbitration, as originally initiated by these Claimants. It goes without saying that Valve Corporation disputes the claims of any antitrust activity, engagement or violations, but this Ruling is not intended to provide any Ruling on the merits of Claimant's claim in that regard [or on Respondent's defenses] and is solely limited to Respondent Valve Corporation's Motion to Stay these Arbitrations. [The Arbitrator makes no Findings on the merits of Claimant's claim at this time.]

On October 18, 2024, based on the "Superseded Subscriber Agreement" Respondent Valve Corporation filed a Petition to Enjoin Arbitration *(including these 25 individual Claimants)* in the Federal District Court case pending in Washington. Valve Corporation's Petition to Enjoin Arbitration including the individual claims encaptioned above continues to pend before the Court and has not been decided at this time. Hence, it is up to this Arbitrator to evaluate and determine the merits of Respondent Valve Corporation's Motion to Stay the Arbitrations sought by the above-named Claimants.

## DISCUSSION:

Unfortunately, in a case where there are thousands of Claimants and numerous proceedings involving individual traunches of Claimants and numerous Arbitrators and triers of fact, there will naturally be inconsistencies. Additionally any litigation can involve obfuscation. The question to be determined as to whether the Arbitration of the above captioned claimants should be stayed is a simple one when the chronology is viewed as it is.

There is no question that the "Subscriber Agreement", whether in the original form which called for Arbitration, or in the superseded form now advanced by Respondent Valve Corporation, is an adhesion contract in the classic sense. Valve Corporation created its website, drafted the Arbitration provision and initially asserted [and required] that the Claimant subscribers agree to it and originally sought to compel arbitration based upon its Subscriber Agreement. Now, Valve Corporation alleges and wants this trier of fact to accept that it can *unilaterally* change the terms of its agreement midstream and that the new terms should be applied retroactively and control the determination of the forum for dispute resolution. Such a concept appears inherently unfair. A contract of adhesion is one imposed and drafted by the party of superior bargaining strength, and relegates to the subscribing party only the opportunity to adhere to the contract or reject it. Substantively adhesion contracts may take various forms, but may generally be described as unfairly one-sided. An adhesion contract is "a standardized contract … imposed upon the subscribing party without an opportunity to negotiate the terms." That is exactly the case here. It is illogical and unfair for Respondent Valve Corporation to require that its subscribers accede to an arbitration clause, and when the subscribers initiate arbitration, that Valve Corporation unilaterally change the Subscriber Agreement, contend that it is retroactive and subsequently require the litigants to proceed in Court. Valve can't have it both ways or change its terms at a whim retroactively.

The correct analysis here is that the dispute resolution clause and the process it requires, whether it be litigation or arbitration, should be analyzed and determined based on the dispute resolution clause provided by Valve, which was specifically in effect *at the time the alleged tort occurred or accrued.*

One can examine and debate whether Valve Corporation's Subscriber Agreement equates to "clickwrap" or "browse-wrap". For guidance on this issue the parties can review <u>Chabolla v. Classpass</u> [Case Number 23-15999, decided February 27, 2025], but this Arbitrator prefers to view the dispute resolution clause calling for arbitration which was in effect at the time the alleged torts occurred as determinative, whether the clause was contained in "clickwrap" or "browse-wrap".

These cases have seen enough obfuscation, misdirection and inconsistency. As stated in <u>Chabolla v. Classpass</u>, "The Federal Arbitration Act ("FAA") requires [*6] federal district courts to stay judicial proceedings and compel arbitration of claims covered by a written and enforceable arbitration agreement. 9 U.S.C. § 3. "The FAA reflects 'both a 'liberal federal policy favoring arbitration' and the 'fundamental principle that arbitration is a matter of contract.'" *Berman v. Freedom Fin. Network, LLC*, Case. No. 18-cv-0160-YGR, 2020 U.S. Dist. LEXIS 160406, 2020 WL 5210912 (N.D. Cal. Sept. 1, 2020) (*quoting AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339, 131 S. Ct. 1740, 179 L. Ed. 2d 742 (2011) (additional citation omitted). (<u>Chabolla v. Classpass Inc.</u> (N.D.Cal. June 22, 2023, No. 4:23-cv-00429-YGR) 2023 U.S.Dist.LEXIS 122616, at *5-6.)

In this case, Valve indisputably drafted and in fact, required its subscribers to agree to arbitration as its preferred method or process of dispute resolution. Claimants are entitled to have their disputes determined and resolved in an expedited manner. Valve's claim that it's unilateral amended Subscriber Agreement controls and now deprives these Claimants of their opportunity to arbitrate their claims and deprives the American Arbitration of jurisdiction of these matters is without merit. Although a Petition to Stay Arbitration filed by Valve remains pending in Federal Court, this case has been kicked down the road enough and while other Arbitrators have differed to the Trial Court rather than determine the core issue, this Arbitrator will not do so at this time. If the Trial Court should stay the Arbitrations, that will take precedence at that time. With respect to claims that accrued at the time the arbitration provision was in effect, arbitration should proceed as to the claims of these Claimants. Arbitration should proceed in these matters.

## RULING AND ORDER:

1.  Arbitration of those claims presented by the above-named claimants should proceed forthwith.

2.  The American Arbitration Association shall maintain and retain jurisdiction in this matter pursuant to the original Subscriber's Agreement provided and required by Valve Corporation, which provided for Arbitration;

3.  The parties shall provide dates within 30 days of the date of this Ruling and Order to the American Arbitration Association and the Arbitrator's office inorder to schedule a telephonic hearing for purposes of setting a discovery and evidentiary hearing schedule;

4.  Should the Federal District Court rule inopposite and stay all Arbitrations, the parties shall notify the American Arbitration Association and this Arbitrator forthwith.

Date

Sanford Jossen, Arbitrator



## <u>ORDER ON RESPONDENT'S REQUEST FOR STAY</u>

***25 Individuals***
***-vs-***
***Valve Corporation d/b/a Steam***

Case No. 01-23-0005-3333 Case No. 01-23-0005-3334 Case No. 01-23-0005-3335
Case No. 01-23-0005-3336 Case No. 01-23-0005-3337 Case No. 01-23-0005-3338
Case No. 01-23-0005-3339 Case No. 01-23-0005-3340 Case No. 01-23-0005-3341
Case No. 01-23-0005-3342 Case No. 01-23-0005-3343 Case No. 01-23-0005-3345
Case No. 01-23-0005-3346 Case No. 01-23-0005-3347 Case No. 01-23-0005-3349
Case No. 01-23-0005-3353 Case No. 01-23-0005-3354 Case No. 01-23-0005-3355
Case No. 01-23-0005-3356 Case No. 01-23-0005-3357 Case No. 01-23-0005-3358
Case No. 01-23-0005-3359 Case No. 01-23-0005-3360 Case No. 01-23-0005-3362
Case No. 01-23-0005-3363


Respondent Valve Corporation has requested a stay on the 25 arbitrations before this Tribunal because a petition to enjoin the arbitrations is pending in the United States District Court for the Western District of Washington in *Valve Corporation v. Abbruzzese,* No. 2:24-cv-1717-JNW (W.D. Wash. filed Oct. 18, 2024) (the "Petition"). While the petition was filed six months ago, it is unknown to this Tribunal when the court will rule on it.

Demands for Arbitration in the cases at issue were filed on behalf of Claimants on December 19, 2023 and Respondent's Answers were filed on December 26, 2023. A Preliminary Hearing was held on August 6, 2024 and at the time, the first case was scheduled for arbitration to commence on May 5, 2025.

On September 13, 2024, this Tribunal denied the Respondent's Request to Stay these arbitration proceedings. After additional requests to stay the proceedings were made by Respondent's counsel, the Arbitrator wrote "At this time, I believe it is prudent to maintain the status of the 25 cases assigned to me for arbitration until the District Court in Washington issues an Order addressing whether these arbitrations may proceed or not. Of course, if AAA administratively closes these cases or a Federal Judge orders us not to proceed, this Arbitrator will follow those

instructions.  Otherwise, these cases should proceed in accordance with Scheduling Order #1 issued on August 9, 2024."

Counsel for Respondent continues to assert that a stay of these arbitration proceedings is necessary. This Tribunal held a status conference with counsel on March 31, 2025, in which the parties argued their positions on a stay, in addition to two other issues (a Motion to Compel and  objections to subpoenas).  The parties subsequently submitted their arguments in writing with briefs due on April 4 and 10, 2025. The motions were expedited due to the pending arbitration hearing date of May 5, 2025 in the case of *Ann Hefner v. Valve Corporation*.  The Arbitrator has been engaged in another arbitration hearing, but is now prepared to rule on this complex issue.

The difficulty in ruling on this motion is that the litigation between Claimants and the Respondent involves numerous cases in both AAA arbitration proceedings and court with different outcomes and, at times, parties taking what appear to be conflicting positions.  Counsel on both sides of the cases assigned to this Arbitrator have filed decisions of other Arbitrators in support of their positions.  While these decisions are not binding here, this practice of sharing decisions of other Arbitrators is problematic because it violates the confidentiality and privacy of the parties in the other cases.  Unfortunately, this practice of filing decisions of other Arbitrators is becoming commonplace in mass arbitrations.  Nonetheless, Arbitrators are expected to decide each case on its own facts.

As for the facts of the *Hefner* case and the 24 other claims assigned to this Arbitrator, it appears that there was a Steam Subscriber Agreement ("SSA") between each Claimant and Respondent Valve Corporation which included an arbitration provision before the claims were filed.  The SSA attached to the Demands for Arbitration in these cases is a 2022 form which appears to be printed from "The Wayback Machine." It is unclear if the SSA on file was the actual agreement between the parties in effect at the time the Demand for Arbitration was filed on December 19, 2023.  As noted above, counsel for Respondent filed an Answer on December 26, 2023 and then participated in a Preliminary Hearing on August 6, 2024, at which time the arbitration hearing in the first case (later designated as *Hefner*) was scheduled to commence on May 5, 2025.  Respondent's counsel argues that the Respondent later amended the SSA to delete the arbitration provision; making the first agreement a "Superseded SSA" and the second agreement the "Controlling SSA." Respondent again seeks to stay all arbitration proceedings, arguing that AAA no longer has jurisdiction.

2

Respondent's counsel cites the case of *Coinbase, Inc. v. Suski* 602 U.S. 143, 152 (2024) for the proposition that "a court, not an arbitrator, must decide whether the parties' first agreement was superseded by their second." In *Coinbase*, a dispute between the parties arose *after* a second agreement between the parties, which makes the case factually distinguishable from the present litigation in which the Demands for Arbitration and Answers were already filed before the agreements between the parties were modified by Respondent to delete the arbitration provision.

While Respondent's counsel makes other arguments in support of the request for stay, the Arbitrator finds that it would be unfair to Ann Hefner and the other 24 Claimants to indefinitely stay the proceedings under the facts presented here. Again, only after the Claimants filed Demands for Arbitration and Answers were filed on behalf of Respondent was the SSA modified to delete the arbitration provision. Allowing a business to modify an arbitration agreement after its consumers had already filed claims seems patently unfair and could lead to a denial of due process. If the second SSA was in fact now the controlling agreement and the consumers moved their claims to the courts, what would stop the business from again modifying the agreement to require arbitration?

Having reviewed the parties' arguments and written submissions, this Tribunal concludes that the Claimants have waited long enough and are entitled to have their cases heard, absent a ruling to the contrary from the District Court in Washington. **However, in order to give the parties some additional time to seek a ruling from the District Court on Respondent's petition to enjoin the arbitrations, the May 5-9, 2025 hearing date in the *Hefner* case will be continued to <u>June 16-20, 2025</u>.** As previously requested by Claimant's counsel, the arbitration will be held at a location to be determined in Dallas, Texas; but the parties or witnesses may appear by videoconference. **Hearing exhibits are due by June 2, 2025 and arbitration briefs are due by June 9, 2025.** All other dates in prior scheduling orders remain in effect.

In conclusion, the request to stay the arbitrations is **granted in part and denied in part** as noted above.

<u>April 17, 2025</u>                */s/ Robert J. Gaglione*
     Date                         Robert J. Gaglione
                               Arbitrator