Exhibit B

# THE FAILING FAITH IN CLASS ACTIONS: *WAL-MART V. DUKES* AND *AT&T MOBILITY V. CONCEPCION*

CATHERINE FISK\* & ERWIN CHEMERINSKY\*\*

In *Wal-Mart v. Dukes*[1] and *AT&T Mobility v. Concepcion*,[2] the Supreme Court revamped the law concerning the Federal Arbitration Act[3] and Rule 23 of the Federal Rules of Civil Procedure,[4] allowing businesses to insulate themselves from class action suits by employees and consumers. In *Wal-Mart*, the Court held that under Rule 23, a class action case for intentional employment discrimination could not proceed when the allegedly discriminatory decisions were made by individual supervisors at different stores.[5] The Court's majority rejected the lower courts' determination that Wal-Mart's nationally uniform personnel policies could be challenged on a class basis, instead holding that the discrimination was the result of individual supervisors' exercise of discretion and needed to be proven on an individual basis.[6] In *AT&T*, the Court further limited class actions by upholding the ability of companies to include waivers of the right to proceed as a class action in a form arbitration agreement.[7]

Each decision has significant implications within its field (employment discrimination law and consumer law, respectively). Together, the two decisions allow companies to opt out of class action liability through contract and make it more difficult to bring class actions against corporations that do not use such contracts.

\* Chancellor's Professor of Law, University of California, Irvine Law School.
\*\* Dean and Distinguished Professor of Law, University of California, Irvine Law School.

1. 131 S. Ct. 2541 (2011).
2. 131 S. Ct. 1740 (2011).
3. 9 U.S.C.A. § 2 (West 2011).
4. FED. R. CIV. P. 23.
5. *Wal-Mart*, 131 S. Ct. at 2557.
6. Dukes v. Wal-Mart Stores, Inc., 603 F.3d 571, 612 (9th Cir. 2010); Dukes v. Wal-Mart Stores, Inc., 222 F.R.D. 137, 153 (N.D. Cal. 2004).
7. *AT&T*, 131 S. Ct. at 1752–53.

Collectively, they reflect the belief of the five conservative Justices in the majority that companies must be protected from litigation that is large simply because companies are large. Rarely has the Court been more explicit in its desire to protect big business than in its statement in *AT&T* that corporations need to be protected from the "in terrorem" effect of class actions resulting in settlement of even non-meritorious suits.[8] Implicitly, the conservative majority indicated that courts cannot be trusted to manage large litigation, even if it means that the state and federal laws protecting consumers and employees will go unenforced.

Big companies, like Wal-Mart and AT&T Mobility, that deal with thousands or millions of consumers and employees enjoy certain strategic advantages because of their size. Similarly, class actions pose certain strategic advantages because of *their* size. The current Court majority has used its power to protect companies from big litigation. In so doing, the Court has abdicated its responsibility to interpret federal laws on employment, arbitration, and class actions consistently with Congress's intent to balance the interests of employees and consumers with those of large corporations.

This article has three main parts. Part I discusses the importance of class action suits in ensuring redress when numerous individuals suffer relatively small injuries. Part II examines what *Wal-Mart* likely will mean for future employment discrimination class actions. Finally, Part III focuses on *AT&T* and its likely impact on class actions involving arbitration clauses. Our central point is that although the cases arise in different contexts and involve different legal issues, they must be read together because both are premised on the same desire to protect big business from class action suits and because together they substantially limit the ability of consumers and employees to use the class action to remedy illegal corporate actions.

## I. Class Actions and the Problem of Aggregate Harms

With the rise of the large business corporation in the early twentieth century, courts and legislatures developed the class action as a procedural device to protect individuals from exploitation by large entities.[9] Courts and legislatures realized that large entities have

---

8.  *Id.* at 1752.

9.  Robert G. Bone, *Personal and Impersonal Litigative Forms: Reconceiving the History of Adjudicative Representation*, 70 B.U. L. Rev. 213, 222–26 (1990). *See generally* Stephen C. Yeazell, From Medieval Group Litigation to the Modern Class Action (1987)

incentives to engage in widespread but small violations of law because their lawyers know that most people cannot afford to sue over a small transgression.[10] When individual litigation is not economically rational, the threat of suit is not an effective deterrent to illegal behavior. Reliance on enforcement by government agencies is not an adequate substitute for private litigation, as even dedicated and aggressive government agencies, such as the Equal Employment Opportunity Commission or state departments of labor or consumer protection, do not have the staff or financial resources to handle millions of small individual claims.[11] Absent a robust bureaucracy dedicated to effectuating the consumer and employee protection laws, class actions are an essential aspect of law enforcement.

Large entities, including employers and sellers of consumer goods and services, face both costs and benefits as a result of the market power that comes from being large. First, large entities have access to legal expertise and have market power to use that expertise to craft company-favorable standardized terms on which to contract with employees and consumers (including arbitration agreements or forum selection clauses, choice-of-law provisions, and limitations on warranties). Second, large entities benefit from economies of scale. A company has every reason to think and act in the aggregate—squeezing a few extra cents of profit from each of its millions of consumers and employees (including by legally questionable methods) hurts each individual slightly but benefits the company hugely. Thus, if the company wants to sell mobile phone service contracts by giving away phones but does not want to pay the sales tax, it will say the phones are free when in fact it is shifting the thirty dollar sales tax to consumers, knowing that it will save millions of dollars across tens of thousands of individuals. Similarly, if a company adopts personnel policies that result in employees being paid a few cents less per hour than required by law, in the aggregate it will save

---

(describing the history of class actions).

10. On the purpose of the class action, see generally 7A WRIGHT, MILLER, KANE & MARCUS, FEDERAL PRACTICE & PROCEDURE § 1751 (3d ed. 2005). Sophisticated accounts of the role of large-scale class actions in contemporary law include William B. Rubenstein, *A Transactional Model of Adjudication*, 89 GEO. L.J. 371 (2001); David L. Shapiro, *Class Actions: The Class As Party and Client*, 73 NOTRE DAME L. REV. 913 (1998).

11. As Chief Justice Burger stated, "[t]he aggregation of individual claims in the context of a classwide suit is an evolutionary response to the existence of injuries unremedied by the regulatory action of government." Deposit Guar. Nat. Bank v. Roper, 445 U.S. 326, 339 (1980). An example of a government agency calling for private class action as a supplement to insufficient government enforcement resources is described *infra* text accompanying note 103.

millions of dollars in labor costs.

Even if it is illegal to fail to disclose the full cost of the sales gimmick or to misclassify an employee as ineligible for overtime, most consumers and employees will not sue for three reasons. First, most do not know it is illegal, and even those who suspect it is illegal will not bother to find and consult a lawyer because it is stressful and time-consuming. Second, most employees will not sue their current employer for fear of retaliation. And third, assuming they pass those obstacles, no lawyer will take a case worth $30 or $300 or even $3,000. A company may thus find it economically rational to cheat a consumer or employee. In short, large corporations have the market power and legal expertise to shade the law to their benefit, and they have the incentive to do it in a million small transactions that add up to big profits.

The risk, of course, that comes with size and uniformity of contract relations is that when employees and consumers discover that they have all been the victims of a similar wrongful practice they will hire a lawyer to file a class action alleging that the practice is illegal. Damages in a class action can be substantial, and the larger the company, the greater the damages.

Just as the bigness of the aggregated profits from illegalities in millions of small transactions tempts some companies, so too does the bigness of class action damages tempt some lawyers. Some will file a suit for the settlement value rather than to obtain meaningful relief for every class member. Even those lawyers determined to recover relief to benefit every member of the plaintiff class know that class actions are sufficiently large and expensive to litigate that it may be in the company's interest to settle rather than to try to win it all. The reality is that a consumer class action typically yields relatively little for each consumer; after all, each member of the *AT&T* class lost only $30.22 to begin with, and a successful class action will return only a fraction of the original loss. Comparatively, the plaintiffs' lawyers' fees are substantial. The image of lawyers being greatly enriched while consumers get relatively little makes class actions an easy target for political opponents. If, however, such class actions are conceptualized as being about enforcing the law and deterring future wrongdoing, then the lawyers are being fairly rewarded for protecting consumers and preventing violations.

Large class actions have drawn criticism from conservative courts and commentators that tend to worry more about the harms of large

class actions to companies than the harms those companies can inflict on consumers and employees.[12] Progressive courts and commentators, by contrast, tend to worry more about the harms of large companies' policies on consumers and employees than on the harms that class actions can impose on companies.[13] The weight of scholarly opinion strikes a middle ground, focusing on preserving the deterrent effects of class actions to curb the incentives of large companies to act improperly, while reforming the treatment of settlement class actions to reduce the incentives for plaintiffs' lawyers to act improperly.[14] But in *Wal-Mart* and *AT&T* the Supreme Court abandoned any pretense of equilibration and handed large companies huge victories. The significance, of course, is not simply that Wal-Mart's employees who suffered sex discrimination are unlikely ever to recover damages or that AT&T has been unjustly enriched by millions of dollars. The larger concern is that big companies know that it will be much harder to sue them in class actions, and the unscrupulous ones will more often make the choice to enrich themselves at the expense of consumers and employees.

## II. *WAL-MART V. DUKES*: AGGREGATE HARMS AND EMPLOYMENT CLASS ACTIONS

*Wal-Mart* offered the Court a choice about whether to allow class actions that challenge the discriminatory employment practices of huge companies. The evidence showed that Wal-Mart allowed supervisors to set pay within a range of about two dollars per hour and that supervisors nationwide exercised their discretion to pay women less than similarly situated men.[15] The evidence also showed

---

12. *E.g.* Louis W. Hensler III, *Class Counsel, Self-Interest and Other People's Money*, 35 U. MEM. L. REV. 53, 54 (2004); James P. Feeney & Richard E. Gottlieb, *Taming Class Actions: Keeping Best Practices in Mind*, RISK MGMT. MAG., Feb. 2005, at 10.

13. *E.g.* Jay M. Feinman, *Incentives for Litigation or Settlement in Large Tort Cases: Responding to Insurance Company Intransigence*, 13 ROGER WILLIAMS U. L. REV. 189, 193 (2008); Melissa Hart, *Will Employment Discrimination Class Actions Survive?*, 37 AKRON L. REV. 813, 835 (2004).

14. The scholarship on class actions is so voluminous that it is perhaps unwise to hazard any statement about the weight of the authority. Readers interested in the debates over the use and abuse of class actions might consult 7A WRIGHT, MILLER, KANE & MARCUS, *supra* note 10 § 1754 (noting empirical studies showing that some criticisms of class actions were overblown in that they were based on a few unrepresentative cases rather than the mass of class actions in courts across the country) and § 1797.2 (on the advantages and disadvantages of settlement class actions and the efforts to reform Rule 23 to minimize the disadvantages while retaining the advantages).

15. Dukes v. Wal-Mart Stores, Inc., 222 F.R.D. 137, 146–49 (N.D. Cal. 2004). Women were paid less than men in every region, compensation disparities existed in the majority of job

that Wal-Mart gave store managers discretion about which employees to promote, and promotions were often the result of a supervisor tapping an employee rather than a uniform process equally urging all employees to apply.[16] In the aggregate, controlling for all other factors, men were promoted more than women.[17] In some cases, men were promoted over women with better credentials and stronger personnel records.[18] Quite importantly, the procedural posture of the case (review of class certification prior to discovery or trial) meant that the Court majority was not charged with finding the existence of this discriminatory pattern; the issue was solely whether a class action could be brought to challenge it.

Because, in the aggregate, supervisors setting pay for Wal-Mart's women employees chose a number at the low end of the permissible range, Wal-Mart gained huge labor cost savings at the expense of millions of women. But individual cases of wage discrimination are expensive to bring, and the gendered pay differential (say, between $10 and $10.50 per hour) for each employee over the statutory limitations period is only a few thousand dollars—not enough to justify the costs of suit. Similarly, it is expensive to litigate an individual discriminatory-promotion decision, and the backpay awards (the difference between what the plaintiff earned at the lower-level job and what she would have earned if she had properly been promoted) are often too low to justify suit. As such, if the 1.5 million women employed by the nation's largest employer have suffered unlawful discrimination in pay and promotions, in the aggregate, Wal-Mart has saved millions of dollars in labor costs by violating Title VII. But without a class action, it is not economically rational for Wal-Mart employees to risk their jobs and happiness to file a lawsuit or for hundreds of plaintiffs' lawyers to take these cases. This is the classic situation where a large corporation can benefit tremendously from illegal activity and where only a class action is likely to provide a meaningful deterrent or remedy.

---

categories, and as time passed, women earned less than the male coworkers who were hired at the same time. *Id.* at 155. In total, women earned between five and fifteen percent less than similarly situated men every year of the class period. *Id.* at 156.

16. *Id.* at 148–49.

17. *Id.* at 160–61. On average, women had to wait 1.52 years longer than men to be promoted to assistant manager, and 1.48 years longer than men to be promoted to store manager. *Id.* at 161.

18. *Id.*

The *Wal-Mart* majority opinion is stunning in its activism and impact on numerous features of employment discrimination and class actions. First, it increased the difficulty of proving a common question of law or fact under Rule 23(a) by requiring "significant proof" to which the trial court must extend a "rigorous analysis."[19] This essentially will require a determination of the merits at the time of class certification. Second, it redefined the common issue of law or fact under Rule 23(a)(2) to demand a higher level of specificity than previously required.[20] Third, it rejected the social framework analysis, a dominant contemporary social science approach to understanding how employment practices of corporations operate, as a legitimate method of proving discrimination.[21] In the process, the Court suggested that the *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[22] standard for introduction of scientific proof at trial also will apply at the class certification stage of the litigation, which will greatly increase the complexity of class certification determinations and again make the decision of whether to allow a class action essentially a determination of the merits.[23] Fourth, it suggested that a company-wide policy of allowing discretion resulting in statistical pay and promotion disparities cannot be challenged under the disparate treatment framework.[24] Fifth, it treated a company's announced policy prohibiting unlawful discrimination as significant evidence that the company is not in fact discriminating.[25] Sixth, it held that company-

---

19.    Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551–53 (2011). *Cf. Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1172 (9th Cir. 2010) ("Commonality exists where class members' 'situations share a common issue of law or fact, and are sufficiently parallel to insure a vigorous and full presentation of all claims for relief.'" (quoting Cal. Rural Legal Assistance, Inc. v. Legal Servs. Corp., 917 F.2d 1171, 1175 (9th Cir. 1990))).

20.    *Wal-Mart*, 131 S. Ct. at 2541, 2550–52. *Cf. Wolin*, 617 F.3d at 1172 ("'The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class.'" (quoting Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998))).

21.    *Wal-Mart*, 131 S. Ct. at 2543–54. *Cf.* Tuli v. Brigham & Women's Hosp., Inc., 592 F. Supp. 2d 208, 214–16 (D. Mass. 2009) (admitting the testimony of a psychologist with expertise in social framework analysis to prove workplace discrimination).

22.    509 U.S. 579 (1993).

23.    *See Wal-Mart*, 131 S. Ct. at 2554.

24.    *Id.* at 2555–56. *Cf.* Emanuel v. Marsh, 897 F.2d 1435, 1439 (8th Cir. 1990) (allowing an employee to establish a prima facie case of disparate impact by proving statistical disparities within the workplace and a causal connection between these disparities and the use of subjective performance awards).

25.    *Wal-Mart*, 131 S. Ct. at 2541, 2545. *Cf.* Ridley v. Costco Wholesale Corp., 217 F. App'x 130, 138 (3d Cir. 2007) (affirming denial of employer's motion for judgment as a matter of law, despite the fact that it "maintained policies against discrimination and harassment and an Open Door policy for reporting complaints of discrimination or harassment").

wide statistical evidence, including regression analyses showing that pay and promotion disparities were caused by gender, was insufficient to show class-wide discrimination. Plaintiffs would need to provide evidence showing gender disparities at each individual unit based on the managers whose decisions were the cause of the disparity.[26] Seventh, it held that to certify a class, plaintiffs must present anecdotal evidence of discrimination by a significant but undefined number of allegedly discriminatory decision-makers.[27] Eighth, it held that a suit seeking backpay under Title VII and, more broadly, a suit seeking monetary relief in general, cannot be certified under Rule 23(b)(2).[28] Finally, and somewhat enigmatically, it stated that the Rules Enabling Act prohibits Congress from amending Rule 23 to allow certification of a class in any fashion that would deprive the defendant of the opportunity to prove statutory defenses to individual claims,[29] although precisely what this means for the future of class action litigation is uncertain.

Each of these nine holdings or statements reflects a potentially significant change in the law; many are a rejection of decades of judicial precedent or respected scholarly argument about employment discrimination and class actions. Although each merits a law-review length analysis of its own, this article proceeds more narrowly.[30] We examine the implications of the portion of the Court's

---

26.  *Wal-Mart*, 131 S. Ct. at 2555. *Cf.* Conti v. Am. Axle & Mfg., 326 F. App'x 900, 909 (6th Cir. 2009) (reversing summary judgment for defendant-corporation when plaintiff-employee offered "statistical evidence showing that [the corporation] ha[d] never had a female executive director or vice president, and that only a small percentage of its executives, all at the lowest salary bands, [were] female").

27.  *Wal-Mart*, 131 S. Ct. at 2556. *Cf.* Carpenter v. Stephen F. Austin State Univ., 706 F.2d 608, 613 (5th Cir. 1983) (affirming judgment for plaintiffs when they "presented anecdotal evidence of specific instances of discriminatory policies and practices," making no mention of requiring evidence of a significant number of discriminatory decision-makers).

28.  *Wal-Mart*, 131 S. Ct. at 2557. *Cf. In re* Monumental Life Ins. Co., 365 F.3d 408, 418 (5th Cir. 2004) (holding that "[e]quitable monetary relief is compatible with a rule 23(b)(2) class" and that such a rule is "limited to the context of title VII backpay, a remedy designated by statute as 'equitable'").

29.  *Wal-Mart*, 131 S. Ct. at 2561.

30.  *Wal-Mart* has generated a mountain of scholarly commentary in the years it spent wending its way through the federal courts. *See, e.g.*, Kathryn Smith, Comment, *What Do 1.5 Million Wal-Mart Women Have in Common?:* Dukes v. Wal-Mart *Class Action Certification*, 52 B.C. L. REV. E. SUPP. 149 (2011), http://www.bc.edu/bclr/esupp_2011/12_smith.pdf; Lesley Wexler, *Wal-Mart Matters*, 46 WAKE FOREST L. REV. 95 (2011); Bejan D. Fanibanda, Dukes v. Wal-Mart*: The Expansion of Class Certification as a Mechanism for Reconciling Employee Conflicts*, 28 BERKELEY J. EMP. & LAB. L. 591 (2007); Melissa Hart, *Learning from Wal-Mart*, 10 EMP. RTS. & EMP. POL'Y J. 355 (2006); Aaron B. Lauchheimer, Note, *A Classless Act: The Ninth Circuit's Erroneous Class Certification in* Dukes v. Wal-Mart, Inc., 71 BROOK. L. REV. 519 (2005); Brad Seligman, *Patriarchy at the Check-Out Counter: The* Dukes v. Wal-Mart Stores,

ruling that increases the difficulty of challenging patterns of discrimination under Rule 23(a), which provides that a class action may be brought only when the class shares a common question of law or fact.[31]

## A. The Court's New Rules for Employment Discrimination Class Actions

Rule 23(a) requires that a court find four elements to certify a class action: (1) that the class is "so numerous that joinder of all members is impracticable"; (2) that "there are questions of law or fact common to the class"; (3) that the claims or defenses of the class representative are "typical of" those of the class; and (4) that the representative "will fairly and adequately protect the interests of the class."[32] Traditionally, all that has been required for commonality is some issue of law or fact that is shared among the members of the class; distinct issues can then be tried separately.[33] The trial court found a number of common issues. First, it found that Wal-Mart had "company-wide corporate practices and policies, which include[d] (a) excessive subjectivity in personnel decisions, (b) gender stereotyping, and (c) maintenance of a strong corporate culture."[34] Second, it found that Wal-Mart had company-wide gender disparities in pay and promotions that were caused by discrimination. This finding was based on statistical evidence that women were paid less and promoted less frequently than men, even when they had better credentials and performance reviews.[35] Third, it found company-wide gender bias based on anecdotal evidence from Wal-Mart stores across the country that supported the finding that discrimination, rather than the alleged preferences of female employees to work for less money and decline promotional opportunities, explained the disparities.[36] The court of appeals, *en banc*, likewise held that Wal-Mart had a national corporate culture and general management policies that discriminated against women. The court rejected Wal-Mart's argument that the company-wide gender disparities were simply the results of individual low-level

---

Inc. *Class-Action Suit*, in WAL-MART: THE FACE OF TWENTY-FIRST CENTURY CAPITALISM 231 (Nelson Lichtenstein, ed., 2006).

31.    *Wal-Mart*, 131 S. Ct. at 2550–52.

32.    FED. R. CIV. P. 23.

33.    1-14A MOORE'S MANUAL OF FEDERAL PRACTICE AND PROCEDURE § 14A.23.

34.    Dukes v. Wal-Mart Stores, Inc., 222 F.R.D. 137, 166 (N.D. Cal. 2004).

35.    *Id.*

36.    *Id.*

managers' decisions, each of which must be proven and litigated separately.[37]

Ignoring the abuse of discretion standard of review normally applicable to class certification decisions,[38] the Supreme Court rejected the evidence on which the lower courts relied. First, it found that the plaintiffs' statistical evidence of nationwide gender disparities was "insufficient"[39] and speculated that the pay disparities between men and women "may be attributable to only a small set of Wal-Mart stores."[40] Second, it found the plaintiffs' expert witness not worthy of belief and "disregard[ed]"[41] his testimony about the ways in which Wal-Mart's personnel policies and corporate culture allowed gender bias to infect thousands of pay and promotion decisions.[42] Third, it dismissed the 120 affidavits recounting evidence of discriminatory statements and decisions as insufficient given Wal-Mart's size and the size of the plaintiff class. Having brushed aside the evidence of bias and twice pointed out that Wal-Mart has a written policy prohibiting sex discrimination,[43] the majority found that the gender disparities were the result of individual supervisors' decisions and needed to be litigated individually.

Apart from the majority's selective parsing and weighing of the evidence, its crucial analytic move was to define the nature of a common issue of law or fact much more narrowly than the lower courts. Early in the opinion, the Court rejected two exceedingly abstract characterizations of the common question issue, neither of which had been offered by the parties or any lower court: that all plaintiffs "have suffered a Title VII injury" or "a disparate impact Title VII injury."[44] Without discussing the merits of the intermediate positions (which the plaintiffs argued and on which the lower courts relied), the majority immediately posited an extremely narrow definition of commonality: that the plaintiffs' "claims must depend upon a common contention—for example, the assertion of discriminatory bias on the part of the same supervisor."[45] Later in the

---

37. Dukes v. Wal-Mart Stores, Inc., 603 F.3d 571, 612 (9th Cir. 2010).
38. 1-14A MOORE'S MANUAL OF FEDERAL PRACTICE AND PROCEDURE § 14A.44.
39. Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2555 (2011).
40. *Id.*
41. *Id.* at 2554.
42. *Id.* at 2555.
43. *Id.* at 2545, 2553.
44. *Id.* at 2551.
45. *Id.* at 2545.

opinion, the majority framed the common question issue slightly differently, stating "that Wal-Mart operated under a general policy of discrimination," which the majority rejected in the next sentence because "Wal-Mart's announced policy forbids sex discrimination."[46] Subsequently, the majority rejected the lower court's finding that common issues of law and fact were presented by Wal-Mart's strong corporate control regarding employment and its nationwide corporate culture, which led individual supervisors to pay women less and to prefer men for promotion. The majority speculated that individual supervisors might have exercised their discretion differently.[47] Elsewhere, the majority invented an alternate theory of the common question issue: plaintiffs must establish "a uniform, store-by-store disparity" to show a common issue, and statistical evidence of regional and national disparities did not suffice.[48] In the next paragraph, the majority concluded that, because the plaintiffs "have identified 'no specific employment practice'" that caused the gender disparity in pay and promotions, there was no common question of law or fact.[49] As the majority put it, "the crucial question" in any discrimination case is "why was I disfavored," which the majority imagined as an individualized decision provable only by evidence of individual supervisors' motives.[50]

## B. The Problems with the New Rules

The Court's analysis was flawed on four important levels. First, by focusing on the existence of a "specific employment practice," the Court conflated the disparate impact analysis (which requires proof of an employment practice having a discriminatory impact) and disparate treatment analysis (which does not).[51] Second, the Court failed to appreciate that it was not a coincidence that throughout the country, Wal-Mart's women employees were subject to discrimination in pay and promotion; the Court ignored or did not believe all of the evidence indicating that decisions by individual managers were influenced by a common corporate culture. Third, the Court failed to

---

46.  *Id.* at 2553.
47.  *Id.* at 2555.
48.  *Id.*
49.  *Id.*
50.  *Id.* at 2552.
51.  Aida M. Alaka, *Corporate Reorganizations, Job Layoffs, and Age Discrimination: Has* Smith v. City of Jackson *Substantially Expanded the Rights of Older Workers Under the ADEA?*, 70 ALB. L. REV. 143, 148–51 (2006).

recognize the importance of the class action in providing a remedy and deterrent against future discrimination by large corporations, where, for a host of reasons, it is unlikely that individual women will bring lawsuits. Fourth, the Court essentially ignored the standard of review. As mentioned above, class certification decisions are reviewed on appeal under the deferential abuse of discretion standard. In his majority opinion, Justice Scalia substituted his own findings of fact, granted no deference to the lower courts, and effectively engaged in a *de novo* review.

The essence of the majority's reasoning is obscured by the meandering path of the opinion. Laid bare, the reasoning depends on two debatable factual assumptions about the nature and prevalence of employment discrimination in large organizations. First, Justice Scalia said that, "left to their own devices, most managers in any corporation—and surely most managers in a corporation that forbids sex discrimination—would select sex-neutral, performance-based criteria for hiring and promotion that produce no actionable disparity at all."[52] Second, "[i]n a company of Wal-Mart's size and geographical scope, it is quite unbelievable that all managers would exercise their discretion in a common way without some common direction."[53] Both of these are factual findings that the Court has no business making. Decades of employment discrimination law are premised on contrary assumptions, such as the idea that a pattern of inequality may be the result of discrimination rather than preferences of women or people of color to be paid less and forgo promotion. From these two factual assumptions, the majority reached the conclusion that unless there is an explicitly discriminatory policy, plaintiffs must prove individual managers' reasons for setting their pay or choosing which employees to promote.

Because the overwhelming majority of companies now have formal policies that prohibit discrimination, the result is plain: class action intentional employment discrimination cases will be very difficult to bring. If there is a small workplace where one or two people make the hiring, promotion, and pay decisions, it will not have the numerosity required for a class action. But if there is a large workplace where many people make the employment decisions, the Court said that there is not the commonality required for a class

---

52. *Wal-Mart*, 131 S. Ct. at 2554.
53. *Id.* at 2555.

action. It is hard to imagine the Goldilocks situation where the corporation has just the right number of decision-makers for both numerosity and commonality. The opinion thus sends a clear message to big businesses that they do not need to worry about employment discrimination class actions of this type so long as they have an official policy forbidding employment discrimination.

Because of Wal-Mart's size and notoriety, we know a great deal about the effect of its corporate culture on its labor practices. As part of its relentless money-saving policies, store managers faced constant pressure to reduce labor costs. In general, regional managers turned a blind eye to how store managers did so.[54] Individual litigation would predictably prove of limited effect to change this corporate culture. Wal-Mart would simply pay the damages and discipline the store manager if necessary, but nothing else would change as long as the aggregate cost savings from marginally legal practices were greater than the damages paid to an individual woman. Taking away the class action leaves the asymmetric incentives untouched: Wal-Mart has an incentive to pay women as little as possible, and individual women working at Wal-Mart have little incentive to sue it.

## III. *AT&T MOBILITY V. CONCEPCION*: AGGREGATE HARMS AND CLASS ARBITRATION

The problem of asymmetric incentives is even greater for class action waivers in form arbitration agreements. State supreme courts, state legislatures, and federal courts have attempted to protect employees and consumers by holding that especially onerous waivers and agreements are unconscionable and invalid because they effectively exculpate a defendant from liability.[55] Corporations have argued that the Federal Arbitration Act (FAA) preempts such applications of state contract law.[56] In general, the question is when

---

54. *See* NELSON LICHTENSTEIN, THE RETAIL REVOLUTION: HOW WAL-MART CREATED A BRAVE NEW WORLD OF BUSINESS (2009); *Wal-Mart*, 131 S. Ct. at 2550–52; DON SODERQUIST, THE WAL-MART WAY: THE INSIDE STORY OF THE SUCCESS OF THE WORLD'S LARGEST COMPANY (2005); LIZA FEATHERSTONE, SELLING WOMEN SHORT: THE LANDMARK BATTLE FOR WOMEN'S RIGHTS AT WAL-MART (2004); *Wal-Mart: The High Cost of Low Price* (2005) (documentary film available online at http://topdocumentaryfilms.com/wal-mart-the-high-cost-of-low-price/).

55. *See, e.g.*, Mansker v. Farmers Ins. Co., 2010 U.S. Dist. LEXIS 95638 n.3 (W.D. Wash. Sept. 14, 2010) ("[U]nder Washington law, class action waivers are substantively unconscionable if they operate to exculpate a defendant from liability for widespread wrongdoing.").

56. *See, e.g.*, David S. Schwartz, *Mandatory Arbitration and Fairness*, 84 NOTRE DAME L. REV. 1247 (2008–2009); David S. Schwartz, *Claim-Suppressing Arbitration: The New Rules*, 87

arbitration agreements merely provide alternative forums and when the procedural differences between arbitration and litigation amount to waivers of substantive rights.

In *AT&T v. Concepcion*, the Supreme Court held that the FAA preempted the California law invalidating the class action waivers in form arbitration agreements.[57] Vincent and Liza Concepcion purchased cellular telephone service from AT&T Mobility LCC under a form contract providing for arbitration of all disputes between the parties. AT&T had advertised the phones as free but charged the Concepcions $30.22 in taxes.[58] Their suit was consolidated with other similar claims in a federal class action alleging that AT&T had engaged in false advertising and fraud by charging sales tax on phones it advertised as free.

AT&T moved to compel individual arbitration under the terms of its contract with the Concepcions. The federal district court and Ninth Circuit rejected arbitration, finding California law made such contractual provisions unenforceable on the grounds that the class action waiver was an exculpation of AT&T because individual arbitration of a dispute was no substitute for a class action remedy.[59] The FAA requires enforcement of contractual arbitration clauses but specifies that such clauses are not enforceable where state law provides for revocation.[60] The California law on which the lower courts relied was the rule stated in *Discover Bank v. Superior Court*,[61] in which the California Supreme Court specifically held that class action waivers in consumer arbitration clauses were not enforceable under state law.[62] *Discover Bank* was one of a series of California Supreme Court decisions finding certain terms in mandatory, pre-dispute adhesion arbitration agreements to be unconscionable or contrary to public policy because they exculpate corporations from liability under state statute or common law.[63]

In *Gilmer v. Interstate/Johnson Lane Corp.*,[64] the Court held that the FAA makes enforceable an agreement mandating arbitration of

---

IND. L.J. (forthcoming 2012).
    57.  AT&T Mobility LLC v. Concepcion, 131 S. Ct. 1740, 1753 (2011).
    58.  *Id.* at 1744.
    59.  *Id.* at 1744–45.
    60.  9 U.S.C.A. § 2 (West 1947).
    61.  113 P.3d 1100 (Cal. 2005).
    62.  *Id.* at 1118.
    63.  *See supra* text accompanying notes 56–60, 62, 64.
    64.  500 U.S. 20 (1991).

statutory claims because an arbitration agreement is not a waiver of substantive rights, but only a submission of their resolution to "an arbitral, rather than a judicial, forum."[65] Courts and legislatures have held that arbitration agreements that limit remedies or operate as waivers of substantive rights are therefore a violation of due process,[66] state substantive statutes,[67] or general state contract doctrine, including the law of unconscionability or the law declaring contracts that exculpate parties to be contrary to public policy.[68] But courts also have held that the FAA preempts state laws that restrict the enforceability of arbitration agreements unless the state law is a principle of general contract law rather than expressly about arbitration.[69]

The issue in *AT&T* was whether the *Discover Bank* rule was a principle of general contract law immune from FAA preemption. A generally applicable principle of California contract law is that a contract is void if it exculpates "the party from responsibility for its own fraud, or willful injury to the person or property of another."[70] *Discover Bank* held that a class action waiver "found in a consumer contract of adhesion in a setting in which disputes between the contracting parties predictably involve small amounts of damages" is an unenforceable exculpatory provision in a suit alleging "that the party with the superior bargaining power has carried out a scheme to deliberately cheat large numbers of consumers out of individually small sums of money."[71] In that setting, the California Supreme Court reasoned that the class action waiver was not a procedural difference, permissible under *Gilmer*, but an invalid prospective waiver of substantive rights. In *Gentry v. Superior Court*,[72] the California Supreme Court extended the *Discover Bank* rule to cases in which employees allege wage and hour law violations, reasoning that employment agreements are also contracts of adhesion drafted by the

---

65. *Id.* at 26.

66. Cole v. Burns Int'l Sec. Servs., 105 F.3d 1465, 1482 (D.C. Cir. 1997).

67. Armendariz v. Found. Health Psychcare Servs., Inc., 6 P.3d 669, 694 (Cal. 2000).

68. Hooters of America, Inc. v. Phillips, 173 F.3d 933 (4th Cir. 1999) (invalidating an arbitration agreement that imposed onerous procedures on the plaintiff but not the company, that allowed the company but not the plaintiff to choose eligible arbitrators, and that allowed the company but not the plaintiff to obtain judicial review).

69. 9 U.S.C.A. § 2 (West 2011); David S. Schwartz, *Correcting Federalism Mistakes in Statutory Interpretation: The Supreme Court and the Federal Arbitration Act*, 67 LAW & CONTEMP. PROBS. 5, 52 (2004).

70. Discover Bank v. Superior Court, 113 P.3d 1100, 1110 (Cal. 2005).

71. *Id.*

72. Gentry v. Superior Court, 165 P.3d 556 (Cal. 2007).

party with superior bargaining power, also involve a small amount of individual damages, and also involve a scheme by which the employer saves a great deal of money by cheating large numbers of employees out of small sums of unpaid overtime or minimum wages.[73]

In other cases, the California Supreme Court has similarly found that particularly onerous terms in arbitration agreements drafted by employers or consumer product companies are unconscionable or invalid exculpatory clauses that waive substantive rights. In *Armendariz v. Foundation Health Psychcare Services, Inc.*,[74] the California Supreme Court held that terms in mandatory pre-dispute arbitration agreements are unenforceable for claims under the California Fair Employment and Housing Act if they limit damages normally available under the statute, fail to allow discovery adequate to arbitrate the claim, do not require a written decision of the arbitrator, limit judicial review sufficient to ensure that the arbitrator complied with the statute, or impose on employees costs unique to arbitration such that the employee would have to pay more to invoke statutory rights in arbitration than she would to invoke her rights in court.[75] The California Supreme Court later extended the *Armendariz* rule to common-law claims of wrongful employment termination.[76]

### A. The Court's New Rules for Class Action Waivers in Form Contracts

The impact of *AT&T* on this body of law in California and other states is unclear. In *AT&T*, the Supreme Court, five to four, found that the FAA preempted the California law.[77] Justice Scalia's majority opinion gave three reasons for preempting the prohibition on class arbitration waivers. "First, the switch from bilateral to class arbitration sacrifices the principal advantage of arbitration—its informality—and makes the process slower, more costly, and more likely to generate procedural morass."[78] Second, because "class arbitration *requires* procedural formality,"[79] a class action is inconsistent with the whole concept of arbitration. "Third, class arbitration greatly increases risks to defendants."[80] The Court spoke of the "in terrorem" effect of class

---

73.  *Id.*
74.  6 P.3d 669 (Cal. 2000).
75.  *Id.* at 682, 684, 689.
76.  Little v. Auto Stiegler, Inc., 63 P.3d 979, 990 (Cal. 2003).
77.  AT&T Mobility LLC v. Concepcion, 131 S. Ct. 1740, 1756 (2011).
78.  *Id.* at 1751.
79.  *Id.*
80.  *Id.* at 1752.

action suits that pressure corporations to settle even non-meritorious claims.[81] This logic is faulty and its implications are problematic.

The majority's first two reasons suggest that the FAA preempts state laws regulating the process of arbitration in any way that increases the litigants' procedural protections, at least up to the point at which an arbitration agreement so streamlines procedure as to alter substantive rights. The contention is that arbitration is informal and therefore that the FAA preempts a state law that requires any particular procedural protections. This statement is an argument from definition and, like all such arguments, is unpersuasive. What if the arbitration agreement provided that arbitrators must resolve a case by flipping a coin? What if the arbitration agreement eliminated pretrial discovery? Simply saying that arbitration is informal tells us nothing about why the FAA preempts state laws prohibiting excessive informality. What Justice Scalia failed to explain is how to draw the line between a streamlined procedure and a waiver of substantive rights. Given that the opinion never addressed the *Discover Bank* reasons for finding that class action waivers actually operate as exculpatory clauses in certain cases, the opinion offers no reasons for finding that the FAA preempts laws against class action waivers.

The third rationale is the most logically unsatisfying and politically objectionable. First, its reasoning—that class arbitration waivers are necessary to protect innocent defendants[82]—is inconsistent with the first two rationales, which were all about the necessity to streamline procedure. The majority found prohibitions on class action waivers to be preempted *precisely because* arbitration fails to offer defendants sufficient procedural protections in conducting high-stakes class litigation: there is no interlocutory appeal of the arbitrator's class certification, and there is insufficient judicial review of the arbitrator's ultimate decision.[83] As the Court candidly admitted, "[w]e find it hard to believe that defendants would bet the company with no effective means of review, and even harder to believe that Congress would have intended to allow state courts to force such a decision."[84] Yet the Court has no trouble in allowing defendants to force plaintiffs to sacrifice the protections of the federal rules of evidence,[85] the right to

---

81. *Id.*
82. *Id.*
83. *Id.*
84. *Id.*
85. *Id.* at 1747.

a trial by jury,[86] the right to a hearing in a public tribunal, the right to proceed as a class, or the right to judicial review of arbitrator error.[87] Why is procedural informality acceptable when it forces the costs and risks of litigation on plaintiffs but not on defendants? Because of the bigness principle: the loss of an individual employee's or consumer's claim—a claim worth perhaps a few hundred or thousand dollars—is small potatoes (to the Court at least). But the loss of a class action is worth millions. To the Court, it is irrelevant that a thousand dollars to an individual may be a proportionally larger sum than ten million dollars to AT&T.

Not only is the majority opinion inconsistent about procedural formality, it is also grossly one-sided. The Court could not have been more explicit that its goal was to protect corporations against consumers who wish to vindicate statutory or common-law claims for fraud or false advertising. Class arbitration is unacceptable because the process "increases risks to defendants," inasmuch as the aggregated damages might constitute "a devastating loss" that would "pressure[]" them "into settling questionable claims."[88] This assertion of the need for federal preemption is outrageous as a statement of values and deeply troubling as an indication of the future trend in the law. Parties settle "questionable claims" all the time, sometimes to the defendant's financial advantage and sometimes to the plaintiff's. The whole point of arbitration agreements is to induce plaintiffs' lawyers to decline to bring cases because the risks and costs of arbitration are greater for plaintiffs than the risks and costs of litigation when balanced against the prospect of a recovery. Giving up the benefits of a jury trial very likely causes plaintiffs' lawyers to settle or abandon meritorious causes because the chance of a substantial recovery is greatly reduced; why should defendants force that choice on plaintiffs but not be subject to a rule that forces the risk of class action litigation on them? The whole purpose of the *Discover Bank* rule and its application in *Gentry* is to protect plaintiffs from corporations' use of arbitration agreements as exculpatory agreements. The Court offered no reason, other than straightforward favoritism for large companies, why the FAA would preempt state laws intending to protect plaintiffs rather than defendants. The Court reads into the FAA a desire to avoid class-based remedies and a desire to protect

86. *Id.* at 1748.
87. *Id.* at 1752.
88. *Id.*

businesses from class actions, neither of which is expressed or implied by the statute.

## B. *The Future of State Limits on Exculpatory Clauses in Arbitration Agreements*

The impact of *AT&T* on *Gentry*—or even on the continued viability of the *Discover Bank* rule—remains uncertain because of the particular facts of the case. The Concepcions' adhesion agreement did contain a number of provisions to protect the consumer in arbitrating small claims. In rejecting the Concepcions' arguments, the majority noted that the arbitration agreement was not likely to operate as a complete exculpation of AT&T.[89] One question is whether this portion of the opinion is dicta or a limitation on the holding. The larger question is which other state laws restricting the enforceability of class action waivers and similarly onerous arbitration agreement terms are preempted.

The arbitration agreement contained a number of procedural protections to enable consumers to arbitrate even small claims. First, it required the company to pay the costs of arbitrating nonfrivolous claims.[90] Second, it required the arbitration to occur in the county in which the consumer was billed.[91] Third, it denied the company the ability to recover attorney's fees.[92] And fourth, it provided that if the consumer received an award greater than AT&T's last written settlement offer, AT&T must pay a minimum of $7,500 plus twice the plaintiff's attorney's fees.[93] In rejecting the lower court's and dissent's concerns that denial of class arbitration in small claims operates as an exculpatory clause because no one will sue for thirty dollars, the Court pointed out that the $7,500 minimum recovery plus double fees provision provided an incentive for plaintiffs to bring small claims.[94] The majority overlooked the fact that the minimum recovery would apply only in some cases. On the other hand, the Court explicitly did not frame its holding as depending on this feature of the contract. Instead, in response to the assertion that class actions are necessary to prosecute small claims, the Court simply said, "States cannot require a procedure that is inconsistent with the FAA, even if it is desirable for

---

89.  *Id.* at 1753.
90.  *Id.* at 1744.
91.  *Id.*
92.  *Id.*
93.  *Id.*
94.  *Id.* at 1753.

unrelated reasons."[95] It *then* went on the say that "[m]oreover, here the claim was most unlikely to go unresolved" because of the minimum recovery provision.[96] Although the Court extolled the existence of these other procedures, never did the Court discuss whether they actually were used or how many arbitrations ever occurred under them.

What the opinion left unresolved is the enforceability of an arbitration agreement that waives class actions and contains no minimum recovery provision in circumstances where the potential award is too small to enable individuals to arbitrate their claims. This is where the murkiness of *AT&T* causes trouble. The crux of the reasoning in *Discover Bank* and *Gentry* was that a class action waiver actually operates as an exculpatory provision where a class of plaintiffs suffers damages that are too small to make an individual suit feasible and where the defendant has an incentive to violate the law precisely because it knows that individuals will rarely, if ever, sue. Justice Scalia never directly addressed this analysis but did make three points about it. First, he dismissed the "predictably small" rule as "toothless and malleable," noting that the Ninth Circuit held that $4,000 in damages met the standard.[97] Yet the fact that the standard is malleable, and that reasonable minds can differ about the minimum amount necessary to enable a plaintiff to find a lawyer to take an individual claim, does not mean that most plaintiffs will be able to arbitrate individual small claims and that a class action waiver will not operate as an exculpatory clause. This is the logical fallacy of composition: the fact that some applications of the *Discover Bank* rule might be problematic does not mean that all are.

Second, Justice Scalia observed that the AT&T contract provided a $7,500 minimum recovery plus double attorney's fees if the plaintiffs recovered more than AT&T's final settlement offer, which he believed would provide sufficient incentive for a lawyer to arbitrate the case individually and would make it "most unlikely" that any claims would go unresolved.[98] Without this provision, claims likely would go unresolved, and the class action waiver would in fact operate as an exculpatory clause. But as noted above, it is unclear whether this fact is necessary to the holding. As presented by Justice

---

95. *Id.*
96. *Id.*
97. *Id.* at 1750.
98. *Id.* at 1753.

Scalia, this fact seems incidental, though it certainly provides a basis for lower courts to distinguish arbitration clauses in consumer or employment contracts that do not have such provisions.

Third, Justice Scalia reasoned that the *Discover Bank* rule—that a class action waiver is unenforceable when the plaintiff alleges a scheme to cheat consumers—was not a limit on when a court could find an agreement invalid because "all that is required is an allegation."[99] The opinion never explained, however, why the perceived inadequacy of the limits in the *Discover Bank* rule means that it is preempted by the FAA. Implicitly, the majority seemed to think that in *some* cases the class action waiver would not operate as an exculpatory clause because some lawyers might be willing to arbitrate individual claims. But that conclusion rests on the same logical fallacy of composition: the fact that some lawyers might be willing to arbitrate some claims for $30 or $300 or $3,000 does not mean that many would or that enough would to enable individuals to enforce their legal rights. Data show that of seventy million AT&T customers subject to the arbitration agreement, only 200 have initiated arbitrations. As the Seventh Circuit said when invalidating a class action waiver, absent unusual circumstances, "only a lunatic or a fanatic" would litigate a case worth only a few hundred dollars.[100] The overwhelming majority of lawyers are neither fanatics nor lunatics, and because AT&T presumably knew that when it included the class action waiver in its agreement, the class action waiver does operate as an exculpatory clause.

Imagine that AT&T decided the fastest and cheapest way to process millions of small claims by disgruntled consumers was an in-person, face-to-face meeting between the consumer and an AT&T claims manager. At such a meeting the consumer could present his claim and have it assessed and perhaps settled *before* either AT&T or the consumer went to the difficulty and expense of hiring a lawyer and initiating arbitration. Imagine, therefore, that AT&T's lawyers drafted a mandatory pre-dispute arbitration agreement requiring that arbitration be initiated by the plaintiff in person at the company's headquarters. From AT&T's standpoint, this is a legitimate cost-saving measure that allows the fastest claim resolution. Consumers

---

99.  *Id.* at 1750.

100.  Carnegie v. Household Int'l, Inc., 376 F.3d 656, 661 (7th Cir. 2004) ("The realistic alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30.").

will, of course, find the requirement an insuperable barrier to presenting the claim any time that the travel costs exceed the likely recovery. If the likely recovery is small in most cases, under the *Discover Bank* rule, the in-person meeting requirement would be an invalid exculpatory provision. Would the FAA preempt *Discover Bank* on those facts? What if AT&T required claimants to do 150 one-armed push-ups before initiating arbitration? Nothing in *AT&T* explains when or why the FAA preempts a state rule of general applicability—a prohibition on exculpatory provisions in contracts—that prohibits arbitration agreements from imposing procedural requirements or restrictions that will have the predictable effect of discouraging some or most claimants from asserting a claim.

Against that backdrop, consider whether the FAA preempts class action waivers in the context of a specific statutory remedial scheme that depends upon collective actions, such as those found in the federal Fair Labor Standards Act and state wage and hour laws.[101] In *Gentry*, the California Supreme Court applied the *Discover Bank* rule to class action waivers contained in employment agreements that affected claims for unpaid overtime or minimum wage.[102] Individual wage claims are typically relatively small; a claim for failure to pay the minimum wage could be as little as fifty cents an hour, which, over the two-year statute of limitations period, would add up to only $2,000 to $4,000 per worker.[103] Many employees do not know what the wage laws require, or cannot find a lawyer to handle the case even when they know the company's payroll practices are illegal. Moreover,

---

101.  *See, e.g.*, Nicholson v. CPC Int'l, Inc., 877 F.2d 221, 227 (3d Cir. 1989) (affirming refusal to compel the plaintiff employee to arbitrate his Age Discrimination in Employment Act claim because "the ADEA is one of the statutory schemes that present [an] inherent conflict with arbitration"), *abrogated by* Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20 (1991). The court reasoned that Congress intended the Equal Employment Opportunity Commission to eliminate discrimination by maintaining a collective action, something that arbitration could not effectively do.

102.  Gentry v. Superior Court, 165 P.3d 556, 563–64 (Cal. 2007). Under California law, "notwithstanding any agreement to work for a lesser wage, any employee receiving less than the legal minimum wage or the legal overtime compensation applicable to the employee is entitled to recover in a civil action the unpaid balance of the full amount of this minimum wage or overtime compensation, including interest thereon, reasonable attorney's fees, and costs of suit." Cal. Lab. Code § 1194(a). The federal Fair Labor Standards Act contains similar nonwaivable protections. 29 U.S.C.A. § 206 (West 2011).

103.  *Gentry*, 165 P.3d at 564. As the California Supreme Court observed in *Gentry*, citing data from the California Division of Labor Standards Enforcement, the average award from the DLSE wage adjudication unit between 2000 and 2005 was $6,038. *Id.* According to another 2005 report, the average wage claim submitted to DLSE ranged from $5,000 to $7,000, and the average settlement ranged from $400 to $1,600. *Id.*

these claims are difficult to prove because most employees do not keep records of the hours they worked over the course of several years.[104] They thus have to rely on their own memory and occasionally confront employers who falsify payroll data to make it appear that the employees have worked fewer hours or been paid more than they have been.[105] In addition, many employees will not sue their employers for unpaid wages for fear of retaliation.[106]

Knowing that even small-dollar wage claims are important to low-wage workers, that illegal payroll practices can produce big aggregate cost savings for employers, that bringing a wage payment suit can be expensive, and that without the threat of enforcement, scofflaw companies have strong incentives to violate the law, Congress and the California legislature provided that wage claims could be brought as class actions so that the hundreds of employees all subject to the same illegal practices could spread the litigation costs across their aggregated damages.[107] Without the collective action procedure, individual workers would not easily find lawyers willing to handle complex, document-intensive, and often difficult to prove litigation with small potential recoveries, and companies would have little incentive to comply with wage laws.

Relying on a declaration in a similar suit from the former chief counsel of the California Division of Labor Standards Enforcement (DLSE), the California Supreme Court also noted that forcing individual employees to present individual wage claims through the state agency's administrative proceedings "would obviously be extremely inefficient as compared to a single class action" and "would simply outstrip the resources of the DLSE."[108] Between 2009 and 2010, the division's Bureau of Field Enforcement issued 3,534 citations for labor law violations; its Economic Employment Enforcement Coalition issued 833.[109] With a small staff of lawyers and investigators, even a relatively well-established agency like California's DLSE cannot investigate, process, and prosecute the thousands of incidents of wage payment violations that occur every

---

104. *Id.*
105. *Id.*
106. *Id.* at 565–66.
107. *Id.* at 565.
108. *Id.* at 569.
109. 2010 BUREAU OF FIELD ENFORCEMENT ANN. REP. 2–3, *available at* http://www.dir.ca.gov/dlse/BOFE-2010.pdf.

year.[110] The number of federal wage inspectors declined by nearly a third between 1980 and 2007, even as the labor force grew by over fifty percent.[111] Wage theft—the failure to pay earned wages—is a huge problem in certain segments of the economy.[112] A 2008 national study of low-wage work in three major American cities found more than two-thirds of the 4,000 employees surveyed reported at least one wage payment violation in the previous week.[113]

The class action is an integral part of the enforcement scheme under both state and federal wage and hour law. In an area of law beset by under enforcement, especially in low-wage sectors, to remove the class action would be to eliminate the only effective mechanism for effectuating these statutes.

## IV. Conclusion

Justice Scalia's opinions for the same five-Justice majority in *Wal-Mart* and *AT&T* are premised on a frank hostility to class actions and an expressed desire to protect big business. As he stated, adopting the position urged in the amicus brief filed by the Chamber of Commerce,[114] big class actions "greatly increase[] risks to defendants."[115] The size of a class action, of course, is a function of the size of the defendant. For big companies that are alleged to have violated the law in ways that affect their thousands or millions of employees or customers, the aggregate damages are very substantial. But big is not necessarily bad. Some critics fear that unscrupulous plaintiffs' lawyers use class action suits as devices to extort a settlement that benefits class counsel but provides little benefit to individual class members. The solution to the problem of abuses of settlement class actions, however, is to increase scrutiny of the fairness of settlements rather than to impose huge barriers to class actions in

---

110. *See* Limor Bar-Cohen & Deana Carillo, *Labor Law Enforcement in California, 1979–2000*, *in* The State of California Labor (2002), *available at* http://escholarship.org/uc/item/59c025gh.

111. Ruth Milkman, Ana Gonzalez & Victor Narro, Wage Theft and Workplace Violations in Los Angeles 56 (2010).

112. *See* Kim Bobo, Wage Theft in America (2008).

113. Annette Bernhardt, et al., Broken Laws, Unprotected Workers: Violations of Employment and Labor Laws in America's Cities (2009), available at http://www.unprotectedworkers.org/index.php/broken_laws/index (last visited October 29, 2011).

114. Brief of Amicus Chamber of Commerce of the United States of America at 7, AT&T Mobility LLC v. Concepcion, 131 S. Ct. 1740 (U.S. 2011).

115. AT&T Mobility LLC v. Concepcion, 131 S. Ct. 1740, 1752 (2011).

the first place.

From the legal process perspective, the activism of these two decisions is stunning. In *Wal-Mart*, the Court interpreted a Federal Rule of Civil Procedure to virtually eliminate employment discrimination class actions notwithstanding the lack of such an intent in the Rules or by Congress. In *AT&T*, the Court effectively ignored explicit language in the Federal Arbitration Act providing that arbitration clauses are not to be enforced where state law makes them unenforceable.

The practical effect of these rulings is to protect corporations from class actions in both the employment and consumer contexts. The victors in these cases were Wal-Mart and AT&T, two of the largest corporations in the world. The losers were not just the women who work at Wal-Mart and the consumers who bought cell phone service from AT&T on the promise that the phones would be free. Ultimately, the losers will be those hurt in the future because big corporations know that they do not have to worry about class action suits if they impose a relatively small loss on a large number of people.