# EXHIBIT 2



**AMERICAN ARBITRATION ASSOCIATION**
**Consumer Arbitration Rules**

In the Matter of the Arbitration between

Case Number: 01-23-0005-3399

Abraham Duman
-vs-
Valve Corporation d/b/a Steam

## FINAL AWARD OF ARBITRATOR

I, Carol Kingsley, the undersigned arbitrator, having been designated in accordance with the arbitration agreement entered into between the above-named parties, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, each represented by counsel, at an evidentiary hearing set pursuant to Rule 26 of the AAA Consumer Rules and held from June 16, 2025 through June 27, 2025 ("Evidentiary Hearing" or "Hearing "), do hereby issue this FINAL AWARD as follows:

**Introduction: Facts, Claims and Procedures**

Claimant is a consumer of video games and a customer of Respondent. Respondent operates the online gaming platform called "Steam" (Steam"), which distributes PC and console games and develops its own video games. Since Respondent's inception, the number of game publisher suppliers ("Supplier/s") who offer their products on the Steam platform has grown to tens of thousands, involving more than 100,000 games. The Steam platform supports 29 languages, 37 currencies and has users worldwide.

Since Respondent started its online gaming platform, the number of competitors also offering online gaming platforms and consumer spending on PC games have grown significantly. Respondent aims to compete on quality, and over the years, Respondent has continuously added features to improve services on its platform Steam. As compensation for its services as an online game distributor and platform provider, Respondent contracts with game publisher developers ("Suppliers") for a share of revenues generated from the sales of the Suppliers' games (herein referred to as "Commission"). Respondent generally contracts for a 30% commission but also has a tiered structure with Commissions reduced to as low as 20% for higher performing games. The price paid by a consumer for a game is set by the Supplier. Consumers using the Steam platform are charged only the listed price of the game.

Claimant alleges that Respondent has engaged in anti-competitive practices, primarily by price-fixing, as well as other illegal restraint-on-trade and practices and operates as a monopoly, all in violation of Sections 1 and 2, respectively, of the Sherman Antitrust Act ("Sherman Act"). Claimant claims to have suffered injury as a result of the alleged anti-competitive activities by Respondent and seeks actual damages in an amount of $3,510.00 stated in the Demand for Arbitration or an amount in accordance with the factors provided by Claimant in their post-hearing submission dated August 22,

2025, as well as attorneys' fees and cost, arbitration fees and costs, interest, and punitive damages.

Prior to the Evidentiary Hearing, the Parties brought motions, engaged in telephone conferences with the Tribunal, and sought resolution on numerous issues, resulting in 18 issued Orders. The matters resolved included challenges to jurisdiction by Respondent, discovery disputes, disputes regarding the dates and structure of the Hearing, issuance of subpoenas sought by Claimant, and five pre-trial motions by Claimant primarily seeking to establish its position on certain disputed facts to be true and to strike certain anticipated defenses as being insufficient. The more salient Orders are:

Order No. 2: Respondent requests this Arbitration be closed because Respondent, during the course of this Arbitration, unilaterally changed the agreement between the Parties to eliminate the provision requiring arbitration, claiming that the Steam Subscriber Agreement that mandated arbitration first entered into by the Parties was no longer enforceable. Even though Order No. 2 denied Respondent's request, finding continued jurisdiction by this Tribunal, Respondent continued to reassert its reservation of right to challenge jurisdiction throughout the course of the arbitration, including each day of the Hearing.

Orders No. 8 and No. 9 (Amended): The Parties were in disagreement regarding whether the Hearing would take place by video conference and allow live testimony by witnesses, primarily Claimant, as Respondent asserted its right to cross examine Claimant, versus a Hearing by document submission only, as asserted by Claimant repeatedly and persistently throughout the Arbitration. The Orders were the result of multiple submissions by the Parties regarding their respective demands and lengthy telephone conference with this Tribunal. The final determinations of the structure and timing of the Hearing were found after considerable input from the Parties and an attempt to reach solutions that were reasonable and would efficiently meet the needs of both Parties. Nonetheless, Claimant continued to voice the position that the Hearing structure was unfair throughout the Arbitration, including during the Hearing. Important to note is that Claimant's counsel pressed for the consecutive two-week time period for the Hearing to take place in June as opposed to the second dates available in November, but later, after issuance of the Orders, complained of not having sufficient time. The Hearing was completed with time to spare and both Parties indicating they had no further proofs to present.

Per AAA Consumer Rule R-43, in the absence of the Parties agreeing otherwise, this Award shall provide the concise written reasons for the decision of the Tribunal as called for in Preliminary Hearing and Scheduling Order No. 1. This Award is intended to provide a summary of the highlights of the Parties' arguments and evidence and the reasons supporting the Tribunal's findings; not an exhaustive analysis of all issues and facts presented.

**Discussion and Findings**

<u>Claim of violation of Section 1 of the Sherman Act</u>:

Claimant claims that Respondent violated Section 1 of the Sherman Act by engaging in anti-competitive conduct, primarily through price parity agreements. Claimant asserts that the evidence satisfies the following requirements needed to prove a Section 1 violation:

1. "the existence of a contract, combination or conspiracy between or among at least two separate entities;
2. that the contract, combination or conspiracy unreasonably restrains trade; and
3. that the restraint caused [plaintiff] to suffer an injury to its business or property." Citing *In re Google Play Store Antitrust Litigation, Final Jury Instruction* No. 25, N.D. Cal. Case No. 03:20-cv-05671-JD. It is

2

noted that these requirements mirror ABA Model Ins. B-2 which also includes the requirement "that the restraint effects interstate or foreign commerce." This is an element, perhaps presumed, but not directly addressed by the Parties in the Arbitration.

There is no debate over the first requirement of a contract among at least two entities because Respondent had agreements with most, if not all, of its Suppliers. Claimant alleges that certain agreements that Respondent had with Suppliers were anti-competitive and resulted in injury to Claimant in the form of high prices. Claimant includes in its allegations of anti-competitive conduct a list of alleged restraints, including, price-fixing agreements with competitors, anti-steering provisions, payment of kickbacks and content parity restrictions. To support its allegations, Claimant points to email communications between Respondent and certain Suppliers, testimony from Respondent's representative witnesses regarding its business policies, and findings of other triers of fact in other cases, most of which involved distinguishing facts and issues or sided language that could be considered dicta, but also an interim award by another arbitrator who decided claims by other Claimants that closely mirror those in this Arbitration.

To determine whether a contract constitutes an unreasonable restraint on trade, courts use two tests: 1. Is the restraint so anti-competitive as to have no possible justification and therefore illegal *per se;* or 2. Does the contract have restraints with anti-competitive effects that outweigh any pro-competitive benefits of the restraint, known as the rule of reason test. *NCAA v. Alston*, 594 US 69 (2021).

Claimant asserts that Respondent entered into anti-competitive agreements with competitors, for example, Microsoft, Humble Bundle, Ubisoft and other developers who also sell their own games directly to consumers that are illegal *per se*. Claimant bases this assertion on the position that competitors with Respondents, that is, companies who, like Respondent, both develop and publish games as well as distribute games, would be considered " horizontal" in relation to Respondent. Citing In *United States v. Sealy, Inc.*, 388 U.S. 350 (1967), and *United States v. Topco Associates, Inc.*, 405 U.S. 596 (1972) ("Topco"), Claimant makes the point that an agreement between horizontal competitors is not shielded from *per se* treatment when it is executed through a vertical structure and that this is what Respondent did. Claimant also asserts that when a supplier engages in a restraint at the direction of a customer, such as Respondent as a customer to a competitor Suppliers, the restraint becomes primarily horizontal in effect when the customer seeks to suppress its competition through the power of a common supplier. *Ron Tonkin Gran Turismo v. Fiat Distributors*, 637 F. 2d 1376 (9th Cir. 1981) (quoting *Cernuto, Inc. v. United Cabinet Corp.*, 595 F. 2d 164 (3rd Cir. 1979)) ("Fiat").

Respondent refutes allegations that it engaged in conduct harmful to competition, that lacked reasonable business justification and injured Claimant. In defense of claims that it violated Section 1 of the Sherman Act, Respondent protests Claimant's application of the *per se* test to determine whether the alleged restraint on trade to agreements with competitors is reasonable, contending that the application of *per se* treatment is the exception, citing *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007), and application of the rule of reason is the default, citing *U.S. v. Brewbaker*, 87 F.4th 563 (4th Cir. 2023).  Where the parties operate at "different levels of distribution and therefore have a "vertical" relationship, for example, the one between a manufacture and a distributor, the agreement is considered vertical, and the rule of reason is applied. *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717 (1988). Respondent asserts that even where a relationship is considered hybrid having both horizontal and vertical elements, or **any** vertical elements, application of the rule of reason is appropriate. *Dimidowich v. Bell & Howell*, 803 F.2d 1473 (9th Cir. 1986), *modified*, 810 F.2d 1517 (9th Cir. 1987). Respondent likens the case in this Arbitration to the facts and holdings in *Frame-Wilson v. Amazon.com, Inc.*, 591 F. Supp. 3d 975 (W.D. Wash. 2022) wherein the court rejected plaintiff's *per ser* argument reasoning that third-party sellers who sold on Amazon and also on their own and other online retail websites were in a vertical

relationship; that Amazon as a distributor, was not competing with third-party manufacturer sellers but that the relationship of the parties' dealings were as manufacturer and distributor and therefore a vertical relationship; and accordingly, the court found that even though there was a horizontal element making the relationship hybrid, the rule of reason would apply. Finally, Respondent contends that regardless of its other defenses above described, the nature of the conduct challenged does not involve fixing revenue shares, which is the only price that Respondent can set and could compete on with other distributors, and that for the *per se* test to apply, the price-fixing agreement would need to be between competitors to fix the prices of **their** competing products (or as competing distributors, of their commissions).

Alternatively, Claimant claims that even if Respondent's anti-competitive conduct is not deemed to be illegal *per se* under Section 1, they are under the rule of reason test. Claimant provides a number of instances where Respondent has communicated with Suppliers, including Suppliers who are also competitors, regarding the pricing of their games, and on occasion, the content of their games, and after Respondent explained their policies, the Suppliers have made changes to their prices or product so that it will fit within Respondent's policy and be distributed on Steam. Among the instances of what Claimant alleges to be anti-competitive conduct, are arrangements Claimant describes as price-parity agreements with Suppliers (described above), as well as with other Suppliers, for example, ▆▆▆▆▆▆ in connection with its release of ▆▆▆▆, and ▆▆ in connection with ▆▆▆▆▆▆. Indeed, Claimant's expert, Mr. Theiler, testified that price-parity restrictions are anti-competitive and opined that the data he examined overwhelmingly tells a story of price conformity. Mr. Theiler also points to Respondent's high profits as indicative of market power. Claimant argues that Respondent has offered no proof of the pro-competitive benefits of these alleged anti-competitive agreements as a defense. Claimant claims that these agreements have caused Claimant injury in the form of higher game prices but offered little evidence beyond the testimony of Mr. Theiler which was based on theory.

Respondent maintains that Claimant has failed to prove its claim under the rule of reason because: 1. Claimant failed to prove that Respondent's alleged anti-competitive agreements with developers harmed competition; 2. that Respondent can prove pro-competitive justification for the agreements in question; and 3. that Claimant failed to provide a substantially less restrictive alternatives to achieve the same legitimate business goals, citing ABA Model Ins. C-3 and C-8.

Respondent asserts that in order to prove that the agreements in question harmed competition, Claimant must define the relevant geographic antitrust market and has failed to do so, pointing to conflicting geographic designations in Claimant's Arbitration filings (global versus US only) and Mr. Theiler's ambiguous testimony; arguing that failure to do so is dispositive, citing *Tanaka v. Univ. of S. California*, 252 F.3d 1059, 1063 (9th Cir. 2001). Respondent asserts that Claimant also failed to prove harm to competition by not substantiating that Respondent has power within the defined market. *Flaa v. Hollywood Foreign Press Assn.*, 55 F.4th 680, 693 (9th Cir. 2022). Respondent challenges Claimant's determination of market power, asserting that market power must be determined by conducting an economic analysis of market share (*Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995)) and that Claimant has failed to do so, or at least do it correctly.

Respondent makes the case that the relevant geographic market is global rather than US only and challenges Claimant's determination of market share based on PCs only contending that it should include both PC and console games. Respondent charges that Claimant's expert, Mr. Theiler, offered no evidence to support the market geographic designation as US only nor for limiting the product market to PC games, excluding console games. Professor Justin McCrary, Ph.D., Respondent's expert witness, testified that the number of languages and currencies of distributors supported a determination that competition for video game distribution is global. Professor McCrary also opined that the product market should not be limited to

just PC games but also include at least console games based his analysis that games are available on both PC and console and the industry views PC and console games as substitutes.

As discussed above, Claimant contends that Respondent holds a market share as high as 88% and thus has power in the market. Respondent discounted the testimony of Mr. Theiler stating that it was not the product of any conducted actual analysis. Instead, Respondent's expert, Professor McCrary, calculated Respondent's market share using two data sources known in the industry as reliable and that are accessible in the public domain, Newzoo and IDC. Professor McCrary calculated Respondent's share of the global game distribution market to be 22-23% when looking at PCs only and to be 9-10% for PC and console games together. Respondent cites court holdings that Market share less than 50% is presumed insufficient to prove market power (*Rebel Oil Co. v. Atl. Richfield Co.*, *supra*.) and that market share of 33% failed to constitute a "substantial share" of the relevant market *(Nicolosi Distrib., Inc. v. FinishMaster, Inc.,* 2018 WL 4904918, at \*5/\*6 (N.D. Cal. Oct. 9, 2018).

In response to Claimant's claim that Respondent has engaged in price parity agreements that prevent developers from selling their games for lower prices on other stores, Respondent's witness Erik Peterson testified that there are more than 100,000 games available on Steam and those games are priced by tens of thousands of developers, not Respondent. Mr. Theiler presented evidence from isthereadeal.com ("ITAD"), a website that provides price comparisons of games, that he argued showed price parity. However, Professor McCrary countered, testifying that Mr. Theiler's analysis was flawed and testified that he, Professor McCrary himself, compared the average price of games on Steam with at least one other platform and found that 14,615 of the 37,900 games that he analyzed, more than 10% were cheaper off Steam and that overall, more games had lower prices off Steam than were games with prices lower or the same as the price on Steam. The criticism of Mr. Theiler's ITAD data compilation and findings were many and included that his comparison of games on Steam were with only one other store, and that he ignored games on dozens of other distribution platforms at lower prices that resulted in an understatement of price disparity across the market.

Respondent counters other arguments by Claimant of competitive harm, for example, that Respondent's Commission and profits are too high. Testimony from Professor McCrary during the Hearing and testimony from DJ Powers and Erik Peterson from transcripts from other similar Arbitrations on the same issues show that Respondent's standard commission of 30% revenue share is at or below the industry standard, and that, in response to competition, Respondent has changed its commission to provide lower commissions on a tiered scale for high performing games. Respondent points out that even if Respondent's Commission was high, that alone would not in and of itself be considered anti-competitive. *Williamsburg Wax Museum, Inc. v. Hist. Figures, Inc.*, 810 F.2d 243, 252 (D.C. Cir. 1987). Respondent also points out that high profits do not prove market power. *Garnica v. HomeTeam Pest Def.*, Inc., 230 F. Supp. 3d 1155, 1159 (N.D. Cal. 2017).

Finally, Respondent argues that Claimant did not prove that the restraints alleged had a "substantial harmful effect on competition," per ABA Model Ins. C-5. Respondent's Professor McCrary presented evidence of increasing entry of competitors into the gaming market, supported by a timeline showing dozens of new rivals over the last 20 years. The existence of so many market participants suggests the existence of robust competition asserts Respondent, citing *Flaa*, 55 F.4th at 694. Professor McCrary testified that among the dozens of competitors in the marketplace only three have left, and Claimant did not prove that their exit was due to anti-competitive conduct alleged by Claimant.

To determine whether Claimant has proven its anti-competitive claim under Section 1 of the Sherman Act, requires step-by-step analysis of each of the three requirements described by Claimant above:

1. Is there the existence of a contract, combination or conspiracy between or among at least two separate entities? There is little doubt that there are instances where Respondent reached an understanding relating to certain issues such as listing price and game content with some individual Suppliers, including competitor Suppliers. While an argument can be made that the resolution of these issues took the form of enforcement of Respondent's policies or were merely requests for a better price, more likely than not, at least some of the arrangements reached between Respondent and Supplier could be considered to satisfy this requirement.

2. Does the contract, combination or conspiracy unreasonably restrain trade? To address this requirement, calls first for a determination whether the alleged restraint is (a) *per se* unreasonable, that is, so patently anticompetitive on its face that no further analysis is required; or (b) the rule of reason. The rule of reason is applied where the restraint is deemed not to be unreasonable *per se* and requires analysis of the reasonableness of the restraint or its demonstrative economic effect. Here the Parties disagree. Claimant argues that certain agreements between Respondent and a competitor Supplier are *per se* because the parties, both being competitors, is horizontal, that is, on equal footing in the downward market chain from developer-distributor-customer, as opposed to vertical where the developer is higher on the market chain and in a superior position to distributor. Respondent argues that the rule of reason applies to all the alleged anticompetitive agreements, even those with competitor Suppliers. Claimant points to the Sealy, Topco and Fiat cases as examples of where arrangements have appeared to be vertical and the court has determined otherwise. The facts in Sealy and Topco are distinguishable in that the parties to the agreement were on equal footing and at the same level in the market chain, that is, licensee to licensee in Sealy and member/shareholder member/ shareholder in Topco, whereas in this Arbitration, the arrangements at issue are between Supplier as a developer with Respondent as distributor, as opposed to developer to developer or distributor to distributor. The court in the Fiat case discusses the complexities of characterizing a restraint as vertical or horizontal and the importance of examining specific facts involved when trying to determine the application of per se or a rule of reason analysis; ultimately, the court did not make a per se determination and applied the rule of reason.

   Respondent's reasoning supported by pertinent case law is persuasive that the rule of reason is the default test, that a *per se* finding is limited to very narrow circumstances and even where a relationship or agreement has elements that are both horizontal and vertical, the rule of reason is the appropriate analysis. Additionally, in the arrangements at issue in this Arbitration between Respondent and a competitor Supplier, the Supplier continues to act under the agreement with Respondent in the capacity of Supplier and not as a distributor and the agreement does not involve the distributor division of the Supplier company.

   In general, the examples of alleged anti-competitive agreements submitted as evidence by Claimant are not convincing and do not support finding of unreasonable restraint. The agreements that Claimant characterizes as price-fixing appear more appropriately to be identified as a request for a better price to pass along to its customers, game purchasers. Respondent legally has the right to seek lower pricing from the company who sets prices. Here, Suppliers set the price of their games. Respondent only sets its Commission. While it may be true that in some instances Respondent has indicated that its policy would be not to distribute a Suppliers game unless the price was lowered, it

is Respondent's prerogative to set its own business policies, and it need not do business with all Suppliers and under all circumstances. Similarly, Respondent is not legally required to provide links to competitor sites, and Respondent has solid procompetitive reasons for not doing so: it has invested substantial resources in creating a platform for a high-quality gaming experience for customers, and it would lose the incentive to invest in this kind of infrastructure if it were to lose revenue by sending customers to other distributors. These principles are supported by caselaw cited above. Claimant's characterization of Respondent's tiered Commission structure as disguised kickbacks is not credible. Case law also is clear that neither charging high prices nor being a highly profitable business are illegal and do not equate to being anti-competitive.

Respondent asserts that Claimant has failed to prove its claim under the rule of reason, in part, because Claimant did not prove that the alleged anti-competitive agreements with Suppliers harmed competition. Respondent argues that Claimant needed to clearly define the geographic and product markets and failed to do so as discussed above. During the course of this Arbitration, while there were conflicting and ambiguous statements from Claimant, it seems clear enough that Claimant intends the geographic market to be limited to the United States and the product market to be limited to PC only. Respondent is persuasive that the relevant geographic is global, given the worldwide use, and supported languages and currencies of the product. Less clear is the relevant product market, that is, whether it is PC only as stated by Claimant, or PC and console games as argued by Respondent. Respondent's expert Professor McCrary opined that in the industry, PC and console games are considered reasonably interchangeable, supporting the argument that the relevant product market is both PC and console games. The relevancy of such a determination, rest in market share and its link equating to market power. As discussed above, Claimant's expert, Mr. Theiler, concluded that Respondent's market share is 88% for PC only in the US. And did not offer a determination of global market share. Respondent's expert, Professor McCrary, determined Respondent's global market share to be between 21.4-22.3% for the PC only market and between 9.3–10% for the global PC and console market. In either case, whether a PC only or a PC and console market, Respondent's market share would fall well below a 50% market share and would be presumptively insufficient to prove market power.

The second step under the rule of reason to prove alleged restraints are unreasonable is for Respondent to prove procompetitive justification for the agreements in question. Respondent has done so, probably most clearly through the testimony of its expert, Professor McCrary. Professor McCrary testified that the alleged price parity and alleged content parity prevent free riding, the term applied to a person who receives the benefit of a good without paying for it; the prohibition on links on Steam games minimizes free riding; revenue share tiers play a role in a competitive market and generally indicates procompetitive conduct; and discounting policies can avoid deceptive practices and support consumer confidence.

The third step under the rule of reason is for Claimant to prove substantially less restrictive alternatives to achieve the same legitimate business goals. No such less restrictive alternatives were offered by Claimant.

3. Has the restraint caused Claimant to suffer an injury to its business or property?
   Claimant claims that it suffered primarily from paying higher prices on games. While Claimant offered theories on injury and the potential harm of paying higher prices, Claimant provided no evidence of such harm nor any other harm for that matter.

Claimant has not satisfied the burden of proving by a preponderance of evidence that Respondent has violated Section 1 of the Sherman Act.

Claim of violation of Section 2 of Sherman Act:

Claimant asserts that even if the alleged restraints on trade individually are not violations under Section 1 of the Sherman Act, when practiced in combination by a monopolist, violates Section 2 of the Sherman Act. Claimant cites *Epic v. Google, Jury Instruction No. 17,* that Monopoly power is demonstrated by "the power to control prices, restrict output, or exclude competition," and asserts that Respondent has all three powers due to a 70% market share. Claimant supports his contention that Respondent has a 70% market share based on the testimony of DJ Powers, Respondent's representative, that Steam had a ▓▓▓▓▓▓ market share in 2013, Respondent's representative Kristian Miller's testimony at the Hearing that Steam's market share had grown during his 12 years with the company and statements by players in the industry and contained in judicial writings for other cases involving other parties, facts, and issues than those in this Arbitration. Max Theiler, Claimant's expert, testified at the Hearing that he estimates Respondent's market share to be 88%. Claimant contends that Respondent's expert Dr. McCrary's estimate of market share is flawed, ignoring Respondent's own data, relying on "unverified, sourceless, inaccurate public estimates," but Claimant does not provide facts or any explanation to support its criticisms. Claimant points out that a company need not control 100% of the market, but simply that the market share is above 30% (*U.S. Department of Justice and the Federal Trade Commission, Merger Guidelines (2023)*) and Claimant asserts that such is the case here.

Claimant alleges that the restraints complained of in this Arbitration has allowed Respondent to maintain monopoly power. By way of example, Claimant argues that in 2015 Respondent achieved a dominant market position, and in the ensuing nine years, as the result of price parity and other anti-competitive practices, has driven competitors Discord, Target and other brick-and-mortar, out of the market for PC games. Claimant contends that Respondent's tiered revenue share actually constitutes kickbacks, hiding illegal payments to the competition. Claimant argues in further support of allegation of kickbacks that a true volume discount is tied to units sold, not revenue. Claimant also contends that Respondent controls output and supply, mainly through the use of its Steam Keys, essentially thwarting the output of games available to its competitors in order to prevent prices from getting too low. Claimant asserts that this alleged power to restrict output constitutes monopoly power.

Respondent argues that Claimant has failed to prove the central requirements of a Section 2 claim: monopoly power and anti-competitive conduct. Specifically, monopoly power can be proven with "direct proof," that is, in this case, Respondent would need the ability to exclude competition and to raise or maintain prices above competitive levels (Model Ins. A-121), or with "indirect proof," that is, in this case, a consideration of Respondent's market share, and "barriers to entry, entry and exit by other companies, and the number and size of other competitors" (Model Ins. A-115). Respondent asserts that Claimant must prove Respondent's 20-30% tiered Commission is too high being supracompetitive, and that Claimant has failed to do so. Respondent asserts that Claimant has also failed to provide indirect proof of monopoly power due to lack of clearly defining an antitrust market, and because, according to Respondent, its market share is below 50%, and therefore presumptively insufficient to prove monopoly power, citing Model Ins. A-115. With regard to the Section 2 requirement of anti-competitive conduct, Respondent argues that the rule of reason also applies to Section 2, maintaining that the analysis of whether conduct is anti-competitive is essentially the same in Sections 1 and 2, and that for the same reasons Claimant failed to prove anti-competitive conduct under Section 1, also fails to do so again under Section 2.

As with its Section 1 claim, Claimant offers more theory than proof that Respondent's violated Section 2 of the Sherman Act. Claimant presented no convincing proof that Respondent has monopoly power either directly with the ability to exclude competition and to raise or maintain prices above competitive levels, or indirectly by market share and other indicia like barriers to other companies to enter or exit the market and size of competitors. Claimant relies mostly on guesses and assumptions, without the support of underlying data and analysis, about Respondent's market share, that loses credibility when compared to the professional data analysis by two independent companies, Newzoo and IDC, as discussed above. The evidence shows Respondent's market share to be presumptively too low for market power. Professor McCrary has also demonstrated through data that Respondent's Commissions are not supracompetitive, and in any event, Claimant has not proven their theory that lower Commissions would be passed through to lower prices to consumers. Respondent's expert has testified with supporting data and analysis that the number of distributors, number of games and revenues from PC gaming is growing, game prices show price competition – all markers that are consistent with a strong competitive market and thriving industry with game quality and gaming platforms improving and prices paid by consumers going down.

Claimant has not satisfied the burden of proving by a preponderance of evidence that Respondent has violated Section 2 of the Sherman Act.

Harm to Claimant and Damages

Having reached the conclusion that Claimant failed to prove that Respondent's actions rise to the level of anti-competitive activity under either Section 1 or 2 of the Sherman Act, there can be no harm attributed to illegal anti-competitive conduct and therefore no damages. Damages sought by Claimant are denied.

Respondent is the prevailing Party as to all claims.

Accordingly, Claimant is not entitled to the sought actual damages, attorneys' fees and costs, interest nor punitive damages.

The administrative fees of the American Arbitration Association, and the compensation of the Arbitrator shall be borne as incurred.

This Final Award is in full settlement of all claims submitted to this Arbitration. All claims not expressly granted herein are hereby denied.

September 18, 2025                         *Carol Kingsley*, Arbitrator