# EXHIBIT 1

In accordance with the Western District of Washington order dated 25 October 2021 compelling to arbitration the claims stated in this action, dismissal of which was denied in the order dated 6 May 2022, Greg Fish brings this action against Valve Corporation ("Valve" or "Defendant"), seeking damages, under Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1), Section 2 of the Sherman Antitrust Act (15 U.S.C. § 2), and the Washington Consumer Protection Act:

## OVERVIEW OF THE ACTION

1.    Personal Computer ("PC") games generate over $30 billion worldwide annually. Defendant Valve Corporation monopolizes that market, using illegal contracts and coercion to ensure more than 75% of that revenue flows through its digital Steam Store and that prices stay artificially high market wide.

2.    Valve's illegal monopoly makes it the most profitable company in the world. Per employee, Valve generates more profit than Apple, Google, or Microsoft. Even the Saudi Arabian oil cartel's ARAMCO makes less money.[1]

3.    Valve, acting as a third-party in PC game transactions, achieves this profit by charging a 30% tax on the PC games consumers like Greg Fish purchase from game developers.

4.    Valve incurs almost no cost in providing this "service," making more than ███████ percent profit on third-party games purchased through its Steam Store. Federal Court Ex. 4 (VALVE_ANT_0058963) at '963-965.

5.    This economic situation is undesirable for both consumers and game developers. It persists only through Valve's illegal restraints on developers, which make meaningful competition against Valve in the market for PC games nearly impossible.

6.    Greg Fish seeks compensation for the additional expense paid for PC games.

## The Parties

7.    Greg Fish resides at 10937 Reading Rd, Cincinnati OH 45241, United States. Greg Fish is represented by Will Bucher at Bucher Law PLLC, located at 350 Northern Blvd, STE 324 -1519, Albany, NY 12204-1000.

8.    Valve Corporation is headquartered at 10400 NE 4th St., Bellevue, Washington 98004. Valve is represented by Charles B. Casper at Montgomery McCracken Walker & Rhoads LLP, which is headquartered at 1735 Market Street, 21st Floor, Philadelphia, Pennsylvania.

9.    The parties' agreement states the arbitration "may be conducted by the submission of documents, by phone, or in person in the country where you live." Greg Fish elects to

---

[1] Pascal-Emmanuel Gobry, "The Tech Company with the Highest Profits Per Employee Isn't Apple or Google," Business Insider (2011), https://www.businessinsider.com/valve-profits-2011-2; *see* Exhibit A, *Wolfire Games LLC v. Valve Corporation*, Case No. 2:21-cv-00563-JCC Document 68, at 80 (W.D. Wash. filed Dec. 20, 2023).

have the merits hearing be conducted via a virtual hearing using videoconferencing software.

10. Greg Fish has purchased PC games which are associated with the Steam account with ID 76561198034270228. Valve has in its possession the data necessary to confirm this and can provide detail as to the price paid for each game and whether the game was acquired from Valve directly or a third-party retailer.

11. Based on the money spent to acquire those PC games, Greg Fish estimates that the actual damage suffered was in the amount of $9530. Under the Sherman Act, if Greg Fish prevails, Greg Fish is entitled to mandatory treble damages as well as a mandatory award of attorneys' fees.

<u>Procedural Posture</u>

12. On December 20, 2021, a putative class action complaint—of which Greg Fish was an absent member—was filed against Valve regarding these unlawful provisions.

13. The complaint was extensive, laying out over 100 pages of allegations against the company. Among those were plaintiffs' allegation that "[i]n the absence of the Valve PMFN, rivals in the PC Desktop Game Transaction Platforms market would charge lower prices and force Valve to compete. Such competition would in turn lower prices on Valve's own PC Desktop Game Transaction Platform, benefitting consumers and publishers that utilized Valve's PC Desktop Game Transaction Platform."[2]

14. This complaint incorporates by reference all factual allegations contained in the Second Amended Consolidated Class Action Complaint in that case, attached as Exhibit A. Because Valve has insisted on withholding many of the relevant facts in that case from the public, those facts are included in this demand in redacted format. Greg Fish will request this information as part of the information exchange in this proceeding, at which point Greg Fish will share it with this tribunal.

15. Valve moved, unsuccessfully, to dismiss the federal case complaint quoted above.

16. With respect to allegations on the Sherman Act claims Greg Fish alleges here, as well as another federal antitrust claim and a Washington State Consumer Protection Act claim, Federal Judge John C. Coughenour denied Valve's motion to dismiss, stating Valve uses its contracts "to impose conditions on how non-Steam-enabled games are sold and priced. Defendant also threatens game publishers with punitive action, including removal of their Steam-enabled games, if they sell non-Steam-enabled versions of those games at lower prices. … These allegations are sufficient to plausibly allege unlawful conduct."[3]

17. In addition to unsuccessfully moving to dismiss the case, Valve also moved to compel the consumers' claims to arbitration. At Valve's insistence, Federal Judge John C.

---

2 Ex. A at 100.
3 *Wolfire Games, LLC v. Valve Corp.*, No. C21-0563-JCC, 2022 U.S. Dist. LEXIS 82561, at *11 (W.D. Wash. May 6, 2022).

Coughenour compelled hundreds of millions of consumers who had credibly alleged antitrust harm to arbitration before the American Arbitration Association. [4]

18.    This individual arbitration concerns Greg Fish, who has chosen to pursue their antitrust claims against Valve in this arbitration, as required by Judge John C. Coughenour's order.

<u>The Market for PC Games</u>

19.    When the owner of an Android phone wants to download an application, they do so through an application store, such as Google's Play Store.

20.    Similarly, when PC owners want to download a game, they do so through a PC game software store, almost always Valve's Steam Store.

21.    In the modern PC gaming market, most games are purchased digitally and downloaded remotely onto the consumer's PC.[5]

22.    The Steam Store operates as a digital storefront in this market. Steam allows its users to purchase games from third-party developers and add them to a virtual library, from which they are downloaded and installed on the user's PC.

23.    Because Valve has significant market power, developers must choose to either list their games on the Steam Store according to Valve's terms or lose access to most of their potential customer base.

24.    Valve uses its dominance over PC game distribution to impose and anticompetitively maintain a 30% commission on nearly every sale made through its store. This commission far exceeds what would prevail in a competitive market, raises prices for consumers like Greg Fish, and reduces quality and innovation in PC games.[6]

25.    Because digital distribution takes place over the internet and does not involve the production, shipping, or physical selling of any product, digital distributors have extremely low costs.

26.    Valve's marginal cost to sell a developer's PC game on its Steam Store is less than $0.01.

---

4 For the avoidance of doubt, Claimant reserves the right to make objections to the validity or enforceability of the arbitration clause before this tribunal, pursuant to Judge Coughenour's order. Claimant is not here by choice, but at Valve's insistence.

5 J. Clement, Distribution of computer and video game sales in the United States from 2009 to 2018, by delivery format, Statista (2019), https://www.statista.com/statistics/190225/digital-and-physical-game-sales-in-the-us-since-2009/#:~:text=In%202018%2C%20a%20record%2083,were%20sold%20in %20physical%20form.

6 A federal judge recently found that a reduction in the availability of innovative applications on a software distribution platform was a compensable harm under U.S. antitrust law. Bonnie Eslinger, Google Judge Warms to $10.5B Damages Theory in 'Hot Tub', Law360 (Aug. 1, 2023), https://www.law360.com/articles/1706341.

27.  Fundamental economics and real-world experience hold that, in a lawful and competitive market, the entry of rivals to the Steam Store would have quickly exerted price pressure on Valve's high commission by competing on price (*i.e.*, by charging lower commissions for the same transaction service).

28.  Fundamental economics and real-world experience hold that, in a competitive market, marginal price will equal marginal cost.

29.  Valve's 30% commission amounts to a $18.00 surcharge on the sale of a standard $60.00 game. In a competitive market, where marginal price equals marginal cost, we would expect this commission to instead be $0.01.

30.  In a competitive market where a firm makes the extraordinarily high profit margins Valve does, new entrants typically emerge and offer the same service for cheaper.

31.  Indeed, that is exactly what multiple rivals tried to do, but they failed or continue to struggle because Valve prohibits developers from selling their games for cheaper on rival stores, pressures developers into charging higher prices, and bribes and buys out (then shuts down) potential competitors to prevent them from creating free market competition.

32.  Because of these anticompetitive policies, a former Valve employee described Steam as a "virtual printing press" that imposes a "30% tax on an entire industry."[7]

<u>Valve's Prohibition on Offering Cheaper Prices</u>

33.  Valve imposes a Platform Most-Favored-Nations Clause (the "Valve PMFN") on game developers which prohibits game developers from selling their games at lower prices to consumers through rival storefronts.

34.  Valve also mandates price parity. Valve has communicated this aspect of its PMFN Policy in various ways over time. Schwartz Rpt. ¶¶150-167.



---

7 Andrew McMahon, Former Valve Employee Says Steam Was Killing PC Gaming, Epic Games Is Saving It, TWINFINITE (Apr. 8, 2019), https://twinfinite.net/2019/04/former-valve-employee-says-steam-was-killing-pc-gaming-epic-games-is-saving-it/.

35.    Valve regularly confirmed to publishers in no uncertain terms that its PMFN Policy (including pricing parity specifically) applies in equal force regardless of whether Steam Keys are involved. ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ Federal Court Ex. 24 (Federal Court Powers 30(b)(6) Ex. 55) at '921 (emphasis added); see also, e.g., Federal Court Ex. 25 (Federal Court Butlin Ex. 120) at '353 ████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████; Federal Court Ex. 27 (MSFT_VALVE_000000555) at '555-657 (Microsoft employee asking "does Steam require price parity?" and another responding "Yes – they absolutely do. . . . Its [sic] not formally listed in documentation in Steamworks, but always addressed in-person.").

36.    Many (many) more examples abound. See, e.g., Federal Court Ex. 28 (VALVE_ANT_2602243) at '243 ████████████████████████████████ ████████████████████████████████ (emphasis added); Federal Court Ex. 21 (Federal Court Giardino Ex. 186) at '087 ██████████████████████████████████ ██████████████████████████████████████████████; Federal Court Ex. 29 (Federal Court Kroll Ex. 304) at '440 ███████████████████████████ ██████████████████████████████████████████████████████████; Federal Court Ex. 30 (Federal Court Giardino Ex. 178) at '439 ████████████████████ ████████████████████████████████████████████████ (emphasis added); Federal Court Ex. 31 (Federal Court Newell Ex. 353) at '439 █████████████ (emphasis added); Federal Court Ex. 32 (Federal Court Giardino Ex. 195) at '887 ████████████████████████████████████████████████████████████ █████████████████████████████████

37.    Valve's PMFN is anticompetitive because it prevents rivals from competing on price.

38.    For example, assume that a game publisher wants to receive $35 in revenue for each sale of a new PC game it has created. If that publisher sells on the Steam Store, it must offer the game to consumers for $50. If there were no PMFNs, and a competitor platform offered a 10% commission, the publisher could offer that game for $40 on the competitor platform and make $36 on each sale while also increasing sales volume. Instead, because of the PMFNs, the publisher must offer the new game at $50 across all platforms, or risk being excluded from Valve and its massive audience on the Steam Store.

39.    Valve has punished publishers for violating its PMFN Policy by delisting (or threatening to delist) a publisher's game from Steam altogether. ████████████████████████ ████████████████████████████████████████████████████████



Federal Court Ex. 35 (Federal Court Malone Ex. 248) at '684. *Id.* *Id.* In other words, Valve directly blocked price competition.

Federal Court Ex. 36 (Federal Court Gerber Ex. 107) at '883–84. Federal Court Ex. 37 (Federal Court Blue Ex. 86) at '912-13.

40. PMFNs deny consumers lower prices, restrict entry of new, lower-priced gaming platforms, and stifle innovation. There is no sufficient pro-competitive justification for Valve's PMFNs.

41. Because it faces virtually no competition, Valve does not significantly invest in improving the Steam platform. Federal Court Ex. 33 (Powers 30(b)(6) Tr.) at 37-38 ; Federal Court Ex. 76 (Federal Court Johnson Ex. 27) at '458

42. As the founder of Epic Games, a company that tries to compete against Valve but struggles to do so, explained: "Steam has veto power over prices, so if a multi-store developer wishes to sell their game for a lower price on the Epic Games store than Steam, then … Valve can simply say 'no.'"[8]

43. Valve's PMFN maintains Valve's monopoly position because consumers are, unsurprisingly, uninterested in switching to a new online storefront (which requires installing a new storefront's software) to purchase the same product for the same price.

44. Because fledgling rivals cannot draw in new customers by offering consumers a lower price, they have failed or continue to struggle because of Valve's anticompetitive conduct.

45. EA attempted to launch the Origin PC game store in June 2011, as a competitor to Steam. To jumpstart Origin's user base, EA began publishing its new titles on Origin and other distribution platforms, which also avoided paying Steam's commission. Rietveld Rpt. ¶¶96-97; Schwartz Rpt. ¶216. In October 2011, EA also began publishing third-party games, including games from major publishers such as Capcom. Rietveld Rpt. ¶¶92, 96-97. Schwartz Rpt. ¶¶216-217; Rietveld Rpt. ¶96-97. EA ultimately surrendered, announcing it would bring its games back to Steam in 2019.

---

8 Tim Sweeney (@TimSweeneyEpic), TWITTER (Jan. 30, 2019, 9:29 AM), https://twitter.com/timsweeneyepic/status/1090663312814157824?lang=en.

Federal Court Ex. 60 (VALVE_ANT_0059430) at '430. Origin withered and ultimately died, Rietveld Rpt. ¶¶96-97; Schwartz Rpt. ¶¶216-217.

46. Valve's competitor Epic cannot break the Steam monopoly, even though it offers a commission **less than half** of Valve's, because Valve's PMFN Policy prevents Epic from competing on prices charged to consumers for games sold on both EGS and Steam. Schwartz Rpt. ¶¶302-313.

47. ███████████████████████████████████████████

Federal Court Ex. 51 (VALVE_ANT_1193238) at '240-241. ████

██████████████████████████ Id. at '239

48. ███████████████████████████████████████████

███████████████ Federal Court Ex. 61 (Malone Tr.) at 212.

███████ Federal Court Ex. 69 (Federal Court Lynch Ex. 134) at '674

███ ; Federal Court Ex. 70 (VALVE_ANT_0471786) at '188

██████ ; Schwartz Rpt. ¶308.

███████ Federal Court Ex. 5 (Lynch Tr.) at 101-02

███████████████████████████

49. ███████████████████████████████████████████

Federal Court Ex. 61 (Malone Tr.) at 44. Ubisoft attempted to self-distribute through its own platform, Uplay, launching in 2012. Rietveld Rpt. ¶¶94-95; Schwartz Rpt. ¶¶213-214.

███ Federal Court Ex. 62 (Federal Court Malone Ex. 263) at '128.

███ Federal Court Ex. 63 (Federal Court Lynch Ex. 141) at '961-962.

████████████████ Federal Court

Ex. 64 (Federal Court Malone Ex. 261) at '197.

███████████████████ As a result, Ubisoft's attempt to sell their games on alternative platforms failed and Division 2 is now available on Steam. *See id.*

50. Because fledgling rivals have failed or continue to struggle because of Valve's anticompetitive price restrictions, Valve maintains its dominant market position,

continues to charge its supracompetitive prices, and imposes its 30% tax on PC games, harming consumers.

51.     Valve also mandates that publishers use its "Steam Wallet" for any in-game purchases. Specifically, Valve requires that: "Your product must use Steam Wallet for any in-game transactions. This means that your product cannot link to other store pages that does not offer Steam Wallet." When game developers comply and use Valve's microtransaction system, they again must pay Valve's 30% supracompetitive tax.

52.     Valve prohibits game developers from using any alternative system for in-game purchases or directing consumers to use an alternative system.[9] This means once a consumer purchases a game, they are stuck with making in-game purchases on Valve and cannot go to a competing store to make new purchases related that game, nor can the developer direct them to any cheaper store. Even if game developers could charge cheaper prices using their own or a rival store for in-game purchases, consumers would be effectively restricted from taking advantage of those lower prices because of Valve's "Steam Wallet" requirement.

<u>Valve Controls the Pricing for the Games Sold in the Steam Store</u>

53.     Not only are game developers prohibited from selling their games for less at rival stores offering far lower service fees, but Valve also insists on high prices in its own store.

54.     All prices for games sold on the Valve's Steam Store are subject to Valve's review and discretion. Their documentation states "Initial pricing as well as proposed pricing adjustments will be reviewed by Valve and are usually processed within one or two business days."

55.     Valve offers "Regional Pricing Recommendations," a list of prices by region that Valve thinks game developers should charge for their games to maximize the amount of money consumers have to pay.

56.     Valve is explicit about its effort to extinguish competition. In Valve's Steamworks documentation, Valve instructs that, when setting prices, game developers shouldn't be "trying to undercut competition with a lower price."

57.     Because Valve prohibits offering lower prices via rival stores, these efforts to keep prices high on Steam mean higher prices in rival stores, too, keeping prices higher market-wide.

<u>Valve Neutralizes, Bribes, and Buys Out Potential Competition</u>

58.     Valve works with many would-be competitors to sell "Steam Keys," digital codes that activate a PC game purchase on Steam.

---

[9] Similar anti-steering provisions in Apple's App Store were recently found to be illegal under U.S. antitrust law. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1003 (9th Cir. 2023).

59.     This creates the appearance of a competitive market where there isn't one. For example, a consumer purchasing a "Steam Key"-enabled PC game at Wal-Mart may believe Wal-Mart is competing with Valve. But in actuality, Wal-Mart is simply selling Valve's product.

60.     Like with sales on competing digital storefronts, game developers who sell Steam Keys at retailers like Wal-Mart must agree to "sell your game on other stores in a similar way to how you sell your game on Steam. It is important that you don't give Steam customers a worse deal than Steam Key purchasers."[10]

61.     Valve interprets and enforces this language to mean that retailers selling Steam Keys cannot offer consumers a lower price on the games sold. Functionally, this means would-be competitors like Wal-Mart, to the extent they are in the PC games distribution market, do not compete on price, meaning consumers pay more for games.

62.     These partnerships with Valve provide Valve with a commercial kill switch that permits Valve to disrupt or shut down any partner who starts generating meaningful sales in competition with Valve's core Steam platform, as Valve can cease providing the codes or supporting their use.

63.     Valve previously worked with an organization known as Humble Bundle to sell Steam Keys online. This included working with Humble Bundle to ensure game keys were securely delivered to customers.

64.     But after Humble Bundle's distribution of Steam-enabled games began to grow and present potential competition to Valve, Valve abruptly removed the secure integration between Humble Bundle and the Steam Gaming Platform. After Valve terminated the direct integration, Humble Bundle's sales growth declined.

65.     Valve offers millions of dollars in kickbacks to the game publishers and tech companies who are most likely to launch a competing store.

66.     While the vast majority of games sold on Steam are charged the 30% tax with no rebates, the largest gaming companies—Microsoft, Electronic Arts, and Take-Two Interactive are offered tens if not hundreds of millions of dollars a year in kickbacks, provided they continue to sell a sufficiently high volume of games on Steam and commit to charge the same or a higher price on competing platforms—even their own. This kickback system ensures prices stay high for consumers and the most viable potential competitors to Valve don't meaningfully compete.

67.     Under the U.S. Department of Justice's antitrust guidelines, the DOJ measures market concentration levels using the Herfindahl-Hirschman Index, or HHI. Those guidelines state: "Markets with an HHI greater than 1,800 are highly concentrated." Valve's HHI is more than three times what the DOJ considers problematically concentrated: 5,625.

---

10 https://partner.steamgames.com/doc/features/keys

68.     According to the DOJ, "Mergers raise a presumption of illegality when they significantly increase concentration in a highly concentrated market." Specifically, given Valve's HHI, any merger or integration with an actual or would be competitor with greater than 0.66% market share is presumptively a violation of antitrust law.

69.     A subsidiary of Microsoft, Bethesda, used to offer a competing digital store front and game launcher which sold Bethesda's games. But Valve entered into an agreement with Bethesda wherein Bethesda's competing digital store was absorbed into the Steam platform.

70.     Microsoft and its subsidiary Bethesda had more than 0.66% market share in the PC game market at the time of the merger.

71.     Because Microsoft and its subsidiary Bethesda had more than 0.66% market share in the PC game market at the time of merger, that merger was presumptively illegal under the DOJ guidelines.

<u>Valve's Conduct Illegally Raises Prices for Consumers</u>

72.     Monopolies and cartels raise prices for consumers.

73.     Monopolies and cartels are illegal under the Sherman Act.

74.     The Sherman Act doesn't define specific conduct that is an illegal restraint of trade. Rather, the Sherman Act recognizes that there is no end to the creativity of businesses looking to increase profits by reducing competition, and so makes illegal "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce."

75.     Companies in factually analogous situations to Valve have been found to have violated the Sherman Act.

76.     Courts employ the DOJ's HHI guidelines in finding mergers, like that between Valve and Microsoft's Bethesda Laucher, illegal. *Saint Alphonsus Medical Center-Nampa Inc. v. St. Luke's Health System, Ltd.* "The extremely high HHI on its own establishes the prima facie case." *Id.*

77.     Courts have found policies that prohibit linking to cheaper payments options, such as Valve's requirement that in-game transactions occur via the Steam Wallet and not any other method, illegal under the Sherman Act. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1003 (9th Cir. 2023).

78.     Courts have found that giving kickbacks or other "free money" to potential competitors, like those Valve provides Microsoft and others who sell a high volume of PC games on their platform, violates the Sherman Act—even when that money isn't explicitly conditioned on continued non-competition. *In re Google Play Store Antitrust Litigation*, Case No. 3:20-cv-05671-JD, (N.D. Cal. filed Dec. 11, 2023) (No. 606)

79. Courts regularly find price fixing and price coordination illegal, and recognize that price parity requirements like that Valve imposes can be price restraints. *Frame-Wilson et al v. Amazon.com Inc,* No. 2:20-20-cv-00424 (W.D. Wash. 2022).

80. Valve itself has already been fined in Europe for its illegal antitrust activities. *European Commission Press Release*, "Antitrust: Commission fines Valve and five publishers of PC video games € 7.8 million for 'geo-blocking' practices" (20 January 2021).

81. When a "conspiracy causes market prices to rise and thereby to injure consumers," consumers are entitled to recover damages "regardless of whether they purchased from the conspirators or from their innocent rivals." Areeda & Hovenkamp, Treatise on Antitrust Law (5th) at 347.

82. The policy of ensuring free market competition is so important that even where plaintiffs are unable to demonstrate damages, claims can still prevail under the Sherman Act. *U.S. Airways, Inc. v. Sabre Holdings Corp.*, 11 Civ. 2725 (LGS) (S.D.N.Y. June 1, 2023) (awarding attorneys' fees where jury found nominal damages of $1, trebled to $3)

<u>Pre-Dispute Negotiations</u>

83. On July 12, 2023, Bucher Law PLLC and AFN Law PLLC sent a written letter and email to Valve indicating their clients' intent to arbitrate their antitrust claims. The letter laid out the consumers' antitrust theory of the case, provided the names for all claimants including Greg Fish, proposed a settlement structure and amount that could resolve all the claims, and noted the consumers were "prepared to engage in good faith discussions for 30-days to attempt to resolve our clients' claims before we initiate arbitration against you."

84. On July 25, 2023, Valve responded. Valve took issue with the opening letter addressing all the consumers' claims in a single notice, insisting that under the terms of the Steam Subscriber Agreement, all claims must be advanced and negotiated individually.

85. Moreover, Valve stated "it is necessary to follow the procedure outlined in the Steam Subscriber Agreement. To start that process, Valve needs a written notice that identifies each individual subscriber, and that subscriber's Steam account, gives the subscriber's location, describes the nature and basis of that subscriber's claim or dispute, and sets forth the relief that subscriber seeks. Such a notice will commence the 30-day informal dispute resolution period under Section 11.B."

86. While the Steam Subscriber Agreement does not require an individual notice laying out all the information Valve demanded, Greg Fish was willing to accommodate. On 08/31/2023, Greg Fish sent an individual written notice to Valve which provided Greg Fish's Steam account, state and city of residence, described the nature of Greg Fish's antitrust claim, and opened settlement discussions with Valve regarding Greg Fish's individual claim.

87. On September 20, Valve sent an email addressing all the claimants collectively, stating they "anticipate[d] that we will respond to each of the letters on or before October 31."

This would mean waiting 60-days to even begin the good faith negotiation process that was contractually required to conclude within 30-days.

88.    While many consumers were willing to wait for Valve's response, Greg Fish opted to file their case on October 2—more than 30 days after Greg Fish sent their individualized written notice. Valve never responded to Greg Fish's individual demand, either within the required 30-days or by October 31, 2023, as Valve had indicated they would.

89.    Instead, Valve responded to the individual filings with a collective letter on October 10. In the October letter, Valve complains that the individual written notices it received were not "efficient," even though Valve's July 25 letter chastised the consumers for making a joint demand via a single letter and specifically asked for individualized written notices. Valve acknowledges that over 21,000 consumers made individual settlement offers, but then asserts the consumers "refuse to provide amounts to settle their individual claims alone." The letter states "We remain available to meet with your clients (including the 18,204 new ones) one-on-one to answer their questions," yet Valve never previously offered to meet with Greg Fish or any of the consumers one-on-one and insisted in their July 25 letter that the informal negotiations should begin with a "written" notice.

90.    Valve concluded the October 10 collective letter by stating "Valve sees little point in responding to your 35,000 near-copycat emails."

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Sherman Act Section 2—Monopolization of the PC Game Transaction Platforms Market (15 U.S.C. § 2)

91.    Valve has willfully acquired and maintained monopoly power in the market for PC Game Transaction Platforms, by means of exclusionary, and anticompetitive conduct, including but not limited to market-wide price controls and presumptively illegal mergers with competitors, as alleged herein.

92.    Through the PMFN, Valve has coerced publishers into agreeing to offer their games at the same price across all PC Game Transaction Platforms, regardless of whether competing platforms charge lower commissions or otherwise charge lower prices than Valve.

93.    In the absence of the Valve PMFN, rivals in the PC Desktop Game Transaction Platforms market would charge lower prices and force Valve to compete. Such competition would in turn lower prices on Valve's own PC Game Transaction Platform, benefiting consumers and publishers that utilized Valve's PC Game Transaction Platform.

94.    Valve's conduct is not justified, because its conduct does not enhance overall efficiency or make the relevant markets more efficient.

95.    Valve's conduct has had a substantial effect on interstate commerce.

96.    Greg Fish has been injured in their property as a result of Valve's conduct.

97.    Greg Fish has suffered and will suffer injury of the type that antitrust laws intend to prevent. Greg Fish has been and will be injured by harm to competition as a result of Valve's conduct.

98.    Greg Fish estimates that the actual damage suffered was in the amount of $9530. Under the Sherman Act, if Greg Fish prevails, Greg Fish is entitled to mandatory treble damages as well as a mandatory award of attorneys' fees.


<u>SECOND CAUSE OF ACTION</u>
<u>Sherman Act Section 2—Attempted Monopolization of the PC Desktop Game Transaction Platforms Market (15 U.S.C. § 2)</u>

99.    In the market for PC Desktop Game Transaction Platforms, Valve has engaged in exclusionary and anticompetitive conduct, including but not limited to market-wide price controls and presumptively illegal mergers, as alleged herein.

100.   Valve's conduct has had an anticompetitive effect in the alternative market for PC Game Transaction Platforms.

101.   Valve has engaged in that conduct with the specific intent of monopolizing the market for PC Desktop Game Transaction Platforms.

102.   Valve has engaged in that conduct with a dangerous probability of monopolizing the market for PC Game Transaction Platforms.

103.   In the absence of the Valve PMFN, rivals in the PC Game Transaction Platforms market would charge lower prices and force Valve to compete. Such competition would in turn lower prices on Valve's own PC Game Transaction Platform, benefiting consumers that utilized Valve's PC Game Transaction Platform.

104.   Valve's conduct has had a substantial effect on interstate commerce.

105.   Greg Fish has been or will be injured in their property as a result of Valve's conduct.

106.   Greg Fish has suffered and will suffer injury of the type that antitrust laws intend to prevent. Greg Fish has been and will be injured by harm to competition as a result of Valve's conduct.

107.   Greg Fish estimates that the actual damage suffered was in the amount of $9530. Under the Sherman Act, if Greg Fish prevails, Greg Fish is entitled to mandatory treble damages as well as a mandatory award of attorneys' fees.

## THIRD CAUSE OF ACTION
### Sherman Act Section 1—Anticompetitive Course of Conduct (15 U.S.C. § 1)

108.    As alleged above, through its contractual agreements with game publishers, Valve has induced or coerced various publishers to enter into one or more contracts, combinations, or conspiracies to unreasonably restrain trade, to control prices or exclude competition, and to willfully acquire and maintain market power in the relevant markets.

109.    Valve's conduct has had, and continues to have, substantial anticompetitive effects in the relevant markets.

110.    Valve's conduct has no legitimate business purpose or procompetitive effect.

111.    There are less restrictive alternatives to the restraints that Valve has imposed.

112.    Valve's conduct has had a substantial effect on interstate commerce.

113.    Greg Fish has been or will be injured in their property as a result of Valve's conduct.

114.    Greg Fish has suffered and will suffer injury of the type that antitrust laws intend to prevent. Greg Fish has been and will be injured by harm to competition as a result of Valve's conduct.

115.    Greg Fish estimates that the actual damage suffered was in the amount of $9530. Under the Sherman Act, if Greg Fish prevails, Greg Fish is entitled to mandatory treble damages as well as a mandatory award of attorneys' fees.

## FOURTH CAUSE OF ACTION
### Washington State Consumer Protection Act RCW 19.86

116.    The claims alleged above constitute unfair methods of competition under Washington State law provisions 19.86.020, 19.86.040, and 19.86.030.

117.    Valve is engaged in unfair and deceptive practices in commerce, which affect the public interest and cause injury to business and property.

118.    Valve's contracts, combinations, or conspiracies with game publishers are anticompetitive restraints that have the purpose and effect of fixing and inflating prices in the relevant markets.

119.    The contracts, combinations, or conspiracies at issue are in restraint of trade.

120.    Valve's monopolization and attempted monopolization have the purpose and effect of fixing and inflating prices in the relevant markets.

121. As such, Greg Fish is entitled to damages under Revised Code of Washington 19.86.090.

122. Under the Washington State Consumer Protection Act RCW 19.86, if Greg Fish prevails, Greg Fish is also entitled to an award of attorneys' fees.

# EXHIBIT 2

In accordance with the Western District of Washington order dated 25 October 2021 compelling to arbitration the claims stated in this action, dismissal of which was denied in the order dated 6 May 2022, Jeremy Lucas brings this action against Valve Corporation ("Valve" or "Defendant"), seeking damages, under Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1), Section 2 of the Sherman Antitrust Act (15 U.S.C. § 2), and the Washington Consumer Protection Act:

## OVERVIEW OF THE ACTION

1.    Personal Computer ("PC") games generate over $30 billion worldwide annually. Defendant Valve Corporation monopolizes that market, using illegal contracts and coercion to ensure more than 75% of that revenue flows through its digital Steam Store and that prices stay artificially high market wide.

2.    Valve's illegal monopoly makes it the most profitable company in the world. Per employee, Valve generates more profit than Apple, Google, or Microsoft. Even the Saudi Arabian oil cartel's ARAMCO makes less money.[1]

3.    Valve, acting as a third-party in PC game transactions, achieves this profit by charging a 30% tax on the PC games consumers like Jeremy Lucas purchase from game developers.

4.    Valve incurs almost no cost in providing this "service," making more than ███████ percent profit on third-party games purchased through its Steam Store. Federal Court Ex. 4 (VALVE_ANT_0058963) at '963-965.

5.    This economic situation is undesirable for both consumers and game developers. It persists only through Valve's illegal restraints on developers, which make meaningful competition against Valve in the market for PC games nearly impossible.

6.    Jeremy Lucas seeks compensation for the additional expense paid for PC games.

## The Parties

7.    Jeremy Lucas resides at P.o.box 131, 33 May Ave, Chauncey OH 45719, United States. Jeremy Lucas is represented by Will Bucher at Bucher Law PLLC, located at 350 Northern Blvd, STE 324 -1519, Albany, NY 12204-1000.

8.    Valve Corporation is headquartered at 10400 NE 4th St., Bellevue, Washington 98004. Valve is represented by Charles B. Casper at Montgomery McCracken Walker & Rhoads LLP, which is headquartered at 1735 Market Street, 21st Floor, Philadelphia, Pennsylvania.

9.    The parties' agreement states the arbitration "may be conducted by the submission of documents, by phone, or in person in the country where you live." Jeremy Lucas elects to

---

[1] Pascal-Emmanuel Gobry, "The Tech Company with the Highest Profits Per Employee Isn't Apple or Google," Business Insider (2011), https://www.businessinsider.com/valve-profits-2011-2; *see* Exhibit A, *Wolfire Games LLC v. Valve Corporation*, Case No. 2:21-cv-00563-JCC Document 68, at 80 (W.D. Wash. filed Dec. 20, 2023).

have the merits hearing be conducted via the submission of documents only (e.g., a desk arbitration).

10.    Jeremy Lucas has purchased PC games which are associated with the Steam account with ID 76561197976291039. Valve has in its possession the data necessary to confirm this and can provide detail as to the price paid for each game and whether the game was acquired from Valve directly or a third-party retailer.

11.    Based on the money spent to acquire those PC games, Jeremy Lucas estimates that the actual damage suffered was in the amount of $1782. Under the Sherman Act, if Jeremy Lucas prevails, Jeremy Lucas is entitled to mandatory treble damages as well as a mandatory award of attorneys' fees.

Procedural Posture

12.    On December 20, 2021, a putative class action complaint—of which Jeremy Lucas was an absent member—was filed against Valve regarding these unlawful provisions.

13.    The complaint was extensive, laying out over 100 pages of allegations against the company. Among those were plaintiffs' allegation that "[i]n the absence of the Valve PMFN, rivals in the PC Desktop Game Transaction Platforms market would charge lower prices and force Valve to compete. Such competition would in turn lower prices on Valve's own PC Desktop Game Transaction Platform, benefitting consumers and publishers that utilized Valve's PC Desktop Game Transaction Platform."[2]

14.    This complaint incorporates by reference all factual allegations contained in the Second Amended Consolidated Class Action Complaint in that case, attached as Exhibit A. Because Valve has insisted on withholding many of the relevant facts in that case from the public, those facts are included in this demand in redacted format. Jeremy Lucas will request this information as part of the information exchange in this proceeding, at which point Jeremy Lucas will share it with this tribunal.

15.    Valve moved, unsuccessfully, to dismiss the federal case complaint quoted above.

16.    With respect to allegations on the Sherman Act claims Jeremy Lucas alleges here, as well as another federal antitrust claim and a Washington State Consumer Protection Act claim, Federal Judge John C. Coughenour denied Valve's motion to dismiss, stating Valve uses its contracts "to impose conditions on how non-Steam-enabled games are sold and priced. Defendant also threatens game publishers with punitive action, including removal of their Steam-enabled games, if they sell non-Steam-enabled versions of those games at lower prices. … These allegations are sufficient to plausibly allege unlawful conduct."[3]

17.    In addition to unsuccessfully moving to dismiss the case, Valve also moved to compel the consumers' claims to arbitration. At Valve's insistence, Federal Judge John C.

---

2 Ex. A at 100.

3 *Wolfire Games, LLC v. Valve Corp.*, No. C21-0563-JCC, 2022 U.S. Dist. LEXIS 82561, at *11 (W.D. Wash. May 6, 2022).

Coughenour compelled hundreds of millions of consumers who had credibly alleged antitrust harm to arbitration before the American Arbitration Association. [4]

18.  This individual arbitration concerns Jeremy Lucas, who has chosen to pursue their antitrust claims against Valve in this arbitration, as required by Judge John C. Coughenour's order.

The Market for PC Games

19.  When the owner of an Android phone wants to download an application, they do so through an application store, such as Google's Play Store.

20.  Similarly, when PC owners want to download a game, they do so through a PC game software store, almost always Valve's Steam Store.

21.  In the modern PC gaming market, most games are purchased digitally and downloaded remotely onto the consumer's PC.[5]

22.  The Steam Store operates as a digital storefront in this market. Steam allows its users to purchase games from third-party developers and add them to a virtual library, from which they are downloaded and installed on the user's PC.

23.  Because Valve has significant market power, developers must choose to either list their games on the Steam Store according to Valve's terms or lose access to most of their potential customer base.

24.  Valve uses its dominance over PC game distribution to impose and anticompetitively maintain a 30% commission on nearly every sale made through its store. This commission far exceeds what would prevail in a competitive market, raises prices for consumers like Jeremy Lucas, and reduces quality and innovation in PC games.[6]

25.  Because digital distribution takes place over the internet and does not involve the production, shipping, or physical selling of any product, digital distributors have extremely low costs.

26.  Valve's marginal cost to sell a developer's PC game on its Steam Store is less than $0.01.

---

4 For the avoidance of doubt, Claimant reserves the right to make objections to the validity or enforceability of the arbitration clause before this tribunal, pursuant to Judge Coughenour's order. Claimant is not here by choice, but at Valve's insistence.

5 J. Clement, Distribution of computer and video game sales in the United States from 2009 to 2018, by delivery format, Statista (2019), https://www.statista.com/statistics/190225/digital-and-physical-game-sales-in-the-us-since-2009/#:~:text=In%202018%2C%20a%20record%2083,were%20sold%20in%20physical%20form.

6 A federal judge recently found that a reduction in the availability of innovative applications on a software distribution platform was a compensable harm under U.S. antitrust law. Bonnie Eslinger, Google Judge Warms to $10.5B Damages Theory in 'Hot Tub', Law360 (Aug. 1, 2023), https://www.law360.com/articles/1706341.

27.    Fundamental economics and real-world experience hold that, in a lawful and competitive market, the entry of rivals to the Steam Store would have quickly exerted price pressure on Valve's high commission by competing on price (*i.e.*, by charging lower commissions for the same transaction service).

28.    Fundamental economics and real-world experience hold that, in a competitive market, marginal price will equal marginal cost.

29.    Valve's 30% commission amounts to a $18.00 surcharge on the sale of a standard $60.00 game. In a competitive market, where marginal price equals marginal cost, we would expect this commission to instead be $0.01.

30.    In a competitive market where a firm makes the extraordinarily high profit margins Valve does, new entrants typically emerge and offer the same service for cheaper.

31.    Indeed, that is exactly what multiple rivals tried to do, but they failed or continue to struggle because Valve prohibits developers from selling their games for cheaper on rival stores, pressures developers into charging higher prices, and bribes and buys out (then shuts down) potential competitors to prevent them from creating free market competition.

32.    Because of these anticompetitive policies, a former Valve employee described Steam as a "virtual printing press" that imposes a "30% tax on an entire industry."[7]

<u>Valve's Prohibition on Offering Cheaper Prices</u>

33.    Valve imposes a Platform Most-Favored-Nations Clause (the "Valve PMFN") on game developers which prohibits game developers from selling their games at lower prices to consumers through rival storefronts.

34.    Valve also mandates price parity. Valve has communicated this aspect of its PMFN Policy in various ways over time. Schwartz Rpt. ¶¶150-167.



_____

7 Andrew McMahon, Former Valve Employee Says Steam Was Killing PC Gaming, Epic Games Is Saving It, TWINFINITE (Apr. 8, 2019), https://twinfinite.net/2019/04/former-valve-employee-says-steam-was-killing-pc-gaming-epic-games-is-saving-it/.

35.    Valve regularly confirmed to publishers in no uncertain terms that its PMFN Policy (including pricing parity specifically) applies in equal force regardless of whether Steam Keys are involved. ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ Federal Court Ex. 24 (Federal Court Powers 30(b)(6) Ex. 55) at '921 (emphasis added); see also, e.g., Federal Court Ex. 25 (Federal Court Butlin Ex. 120) at '353 ███████████████████ ███████████████████████████████████████████████████ ████████████████████████████████████; Federal Court Ex. 27 (MSFT_VALVE_000000555) at '555-657 (Microsoft employee asking "does Steam require price parity?" and another responding "Yes – they absolutely do. . . . Its [sic] not formally listed in documentation in Steamworks, but always addressed in-person.").

36.    Many (many) more examples abound. See, e.g., Federal Court Ex. 28 (VALVE_ANT_2602243) at '243 ███████████████████████████████ ███████████████████████████ (emphasis added); Federal Court Ex. 21 (Federal Court Giardino Ex. 186) at '087 ████████████████████████████████████████ ████████████████████████████████████████; Federal Court Ex. 29 (Federal Court Kroll Ex. 304) at '440 ████████████████████████████ ███████████████████████████████████████████████████; Federal Court Ex. 30 (Federal Court Giardino Ex. 178) at '439 ████████████████████ ██████████████████████████████████████████ (emphasis added); Federal Court Ex. 31 (Federal Court Newell Ex. 353) at '439 ██████████████ (emphasis added); Federal Court Ex. 32 (Federal Court Giardino Ex. 195) at '887 ███████████████████████████████████████████████████ ██████████████████████████████████

37.    Valve's PMFN is anticompetitive because it prevents rivals from competing on price.

38.    For example, assume that a game publisher wants to receive $35 in revenue for each sale of a new PC game it has created. If that publisher sells on the Steam Store, it must offer the game to consumers for $50. If there were no PMFNs, and a competitor platform offered a 10% commission, the publisher could offer that game for $40 on the competitor platform and make $36 on each sale while also increasing sales volume. Instead, because of the PMFNs, the publisher must offer the new game at $50 across all platforms, or risk being excluded from Valve and its massive audience on the Steam Store.

39.    Valve has punished publishers for violating its PMFN Policy by delisting (or threatening to delist) a publisher's game from Steam altogether. ██████████████████████ ███████████████████████████████████████████████████



████████████████████████████ Federal Court Ex. 35 (Federal Court Malone Ex. 248) at '684. ██████████ *Id.* ███████████████████████████████████████ *Id.* In other words, Valve directly blocked price competition. ███████████████

████████████████████████████████████████ Federal Court Ex. 36 (Federal Court Gerber Ex. 107) at '883–84. █████████████ Federal Court Ex. 37 (Federal Court Blue Ex. 86) at '912-13.

40.  PMFNs deny consumers lower prices, restrict entry of new, lower-priced gaming platforms, and stifle innovation. There is no sufficient pro-competitive justification for Valve's PMFNs.

41.  Because it faces virtually no competition, Valve does not significantly invest in improving the Steam platform. Federal Court Ex. 33 (Powers 30(b)(6) Tr.) at 37-38 ████████████████████████████████████████████████████████; Federal Court Ex. 76 (Federal Court Johnson Ex. 27) at '458 ████████████████████████████████████████████████████████████████████████

42.  As the founder of Epic Games, a company that tries to compete against Valve but struggles to do so, explained: "Steam has veto power over prices, so if a multi-store developer wishes to sell their game for a lower price on the Epic Games store than Steam, then … Valve can simply say 'no.'"[8]

43.  Valve's PMFN maintains Valve's monopoly position because consumers are, unsurprisingly, uninterested in switching to a new online storefront (which requires installing a new storefront's software) to purchase the same product for the same price.

44.  Because fledgling rivals cannot draw in new customers by offering consumers a lower price, they have failed or continue to struggle because of Valve's anticompetitive conduct.

45.  EA attempted to launch the Origin PC game store in June 2011, as a competitor to Steam. To jumpstart Origin's user base, EA began publishing its new titles on Origin and other distribution platforms, which also avoided paying Steam's commission. Rietveld Rpt. ¶¶96-97; Schwartz Rpt. ¶216. In October 2011, EA also began publishing third-party games, including games from major publishers such as Capcom. Rietveld Rpt. ¶¶92, 96-97. ████████████████████████████████████████████████████████ Schwartz Rpt. ¶¶216-217; Rietveld Rpt. ¶96-97. EA ultimately surrendered, announcing it would bring its games back to Steam in 2019.

---

8 Tim Sweeney (@TimSweeneyEpic), TWITTER (Jan. 30, 2019, 9:29 AM), https://twitter.com/timsweeneyepic/status/1090663312814157824?lang=en.

Federal Court Ex. 60 (VALVE_ANT_0059430) at '430. Origin withered and ultimately died, Rietveld Rpt. ¶¶96-97; Schwartz Rpt. ¶¶216-217.

46.    Valve's competitor Epic cannot break the Steam monopoly, even though it offers a commission **less than half** of Valve's, because Valve's PMFN Policy prevents Epic from competing on prices charged to consumers for games sold on both EGS and Steam. Schwartz Rpt. ¶¶302-313.

47.    ███████████████████████████████████████████████

Federal Court Ex. 51 (VALVE_ANT_1193238) at '240-241. ███████████████████████████████████████████

Id. at '239

48.    ███████████████████████████████████████████████

Federal Court Ex. 61 (Malone Tr.) at 212.
Federal Court Ex. 69 (Federal Court Lynch Ex. 134) at '674

; Federal Court Ex. 70 (VALVE_ANT_0471786) at '188
; Schwartz Rpt. ¶308.
Federal Court Ex. 5 (Lynch Tr.) at 101-02

49.    ███████████████████████████████████████████████

Federal Court Ex. 61 (Malone Tr.) at 44. Ubisoft attempted to self-distribute through its own platform, Uplay, launching in 2012. Rietveld Rpt. ¶¶94-95; Schwartz Rpt. ¶¶213-214.

Federal Court Ex. 62 (Federal Court Malone Ex. 263) at '128.

Federal Court Ex. 63 (Federal Court Lynch Ex. 141) at '961-962.

Federal Court Ex. 64 (Federal Court Malone Ex. 261) at '197.

As a result, Ubisoft's attempt to sell their games on alternative platforms failed and Division 2 is now available on Steam. *See id.*

50.    Because fledgling rivals have failed or continue to struggle because of Valve's anticompetitive price restrictions, Valve maintains its dominant market position,

continues to charge its supracompetitive prices, and imposes its 30% tax on PC games, harming consumers.

51.     Valve also mandates that publishers use its "Steam Wallet" for any in-game purchases. Specifically, Valve requires that: "Your product must use Steam Wallet for any in-game transactions. This means that your product cannot link to other store pages that does not offer Steam Wallet." When game developers comply and use Valve's microtransaction system, they again must pay Valve's 30% supracompetitive tax.

52.     Valve prohibits game developers from using any alternative system for in-game purchases or directing consumers to use an alternative system.[9] This means once a consumer purchases a game, they are stuck with making in-game purchases on Valve and cannot go to a competing store to make new purchases related that game, nor can the developer direct them to any cheaper store. Even if game developers could charge cheaper prices using their own or a rival store for in-game purchases, consumers would be effectively restricted from taking advantage of those lower prices because of Valve's "Steam Wallet" requirement.

### Valve Controls the Pricing for the Games Sold in the Steam Store

53.     Not only are game developers prohibited from selling their games for less at rival stores offering far lower service fees, but Valve also insists on high prices in its own store.

54.     All prices for games sold on the Valve's Steam Store are subject to Valve's review and discretion. Their documentation states "Initial pricing as well as proposed pricing adjustments will be reviewed by Valve and are usually processed within one or two business days."

55.     Valve offers "Regional Pricing Recommendations," a list of prices by region that Valve thinks game developers should charge for their games to maximize the amount of money consumers have to pay.

56.     Valve is explicit about its effort to extinguish competition. In Valve's Steamworks documentation, Valve instructs that, when setting prices, game developers shouldn't be "trying to undercut competition with a lower price."

57.     Because Valve prohibits offering lower prices via rival stores, these efforts to keep prices high on Steam mean higher prices in rival stores, too, keeping prices higher market-wide.

### Valve Neutralizes, Bribes, and Buys Out Potential Competition

58.     Valve works with many would-be competitors to sell "Steam Keys," digital codes that activate a PC game purchase on Steam.

---

9 Similar anti-steering provisions in Apple's App Store were recently found to be illegal under U.S. antitrust law. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1003 (9th Cir. 2023).

59.     This creates the appearance of a competitive market where there isn't one. For example, a consumer purchasing a "Steam Key"-enabled PC game at Wal-Mart may believe Wal-Mart is competing with Valve. But in actuality, Wal-Mart is simply selling Valve's product.

60.     Like with sales on competing digital storefronts, game developers who sell Steam Keys at retailers like Wal-Mart must agree to "sell your game on other stores in a similar way to how you sell your game on Steam. It is important that you don't give Steam customers a worse deal than Steam Key purchasers."[10]

61.     Valve interprets and enforces this language to mean that retailers selling Steam Keys cannot offer consumers a lower price on the games sold. Functionally, this means would-be competitors like Wal-Mart, to the extent they are in the PC games distribution market, do not compete on price, meaning consumers pay more for games.

62.     These partnerships with Valve provide Valve with a commercial kill switch that permits Valve to disrupt or shut down any partner who starts generating meaningful sales in competition with Valve's core Steam platform, as Valve can cease providing the codes or supporting their use.

63.     Valve previously worked with an organization known as Humble Bundle to sell Steam Keys online. This included working with Humble Bundle to ensure game keys were securely delivered to customers.

64.     But after Humble Bundle's distribution of Steam-enabled games began to grow and present potential competition to Valve, Valve abruptly removed the secure integration between Humble Bundle and the Steam Gaming Platform. After Valve terminated the direct integration, Humble Bundle's sales growth declined.

65.     Valve offers millions of dollars in kickbacks to the game publishers and tech companies who are most likely to launch a competing store.

66.     While the vast majority of games sold on Steam are charged the 30% tax with no rebates, the largest gaming companies—Microsoft, Electronic Arts, and Take-Two Interactive are offered tens if not hundreds of millions of dollars a year in kickbacks, provided they continue to sell a sufficiently high volume of games on Steam and commit to charge the same or a higher price on competing platforms—even their own. This kickback system ensures prices stay high for consumers and the most viable potential competitors to Valve don't meaningfully compete.

67.     Under the U.S. Department of Justice's antitrust guidelines, the DOJ measures market concentration levels using the Herfindahl-Hirschman Index, or HHI. Those guidelines state: "Markets with an HHI greater than 1,800 are highly concentrated." Valve's HHI is more than three times what the DOJ considers problematically concentrated: 5,625.

---

10 https://partner.steamgames.com/doc/features/keys

68. According to the DOJ, "Mergers raise a presumption of illegality when they significantly increase concentration in a highly concentrated market." Specifically, given Valve's HHI, any merger or integration with an actual or would be competitor with greater than 0.66% market share is presumptively a violation of antitrust law.

69. A subsidiary of Microsoft, Bethesda, used to offer a competing digital store front and game launcher which sold Bethesda's games. But Valve entered into an agreement with Bethesda wherein Bethesda's competing digital store was absorbed into the Steam platform.

70. Microsoft and its subsidiary Bethesda had more than 0.66% market share in the PC game market at the time of the merger.

71. Because Microsoft and its subsidiary Bethesda had more than 0.66% market share in the PC game market at the time of merger, that merger was presumptively illegal under the DOJ guidelines.

<u>Valve's Conduct Illegally Raises Prices for Consumers</u>

72. Monopolies and cartels raise prices for consumers.

73. Monopolies and cartels are illegal under the Sherman Act.

74. The Sherman Act doesn't define specific conduct that is an illegal restraint of trade. Rather, the Sherman Act recognizes that there is no end to the creativity of businesses looking to increase profits by reducing competition, and so makes illegal "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce."

75. Companies in factually analogous situations to Valve have been found to have violated the Sherman Act.

76. Courts employ the DOJ's HHI guidelines in finding mergers, like that between Valve and Microsoft's Bethesda Laucher, illegal. *Saint Alphonsus Medical Center-Nampa Inc. v. St. Luke's Health System, Ltd.* "The extremely high HHI on its own establishes the prima facie case." *Id.*

77. Courts have found policies that prohibit linking to cheaper payments options, such as Valve's requirement that in-game transactions occur via the Steam Wallet and not any other method, illegal under the Sherman Act. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1003 (9th Cir. 2023).

78. Courts have found that giving kickbacks or other "free money" to potential competitors, like those Valve provides Microsoft and others who sell a high volume of PC games on their platform, violates the Sherman Act—even when that money isn't explicitly conditioned on continued non-competition. *In re Google Play Store Antitrust Litigation*, Case No. 3:20-cv-05671-JD, (N.D. Cal. filed Dec. 11, 2023) (No. 606)

79. Courts regularly find price fixing and price coordination illegal, and recognize that price parity requirements like that Valve imposes can be price restraints. *Frame-Wilson et al v. Amazon.com Inc,* No. 2:20-20-cv-00424 (W.D. Wash. 2022).

80. Valve itself has already been fined in Europe for its illegal antitrust activities. *European Commission Press Release*, "Antitrust: Commission fines Valve and five publishers of PC video games € 7.8 million for 'geo-blocking' practices" (20 January 2021).

81. When a "conspiracy causes market prices to rise and thereby to injure consumers," consumers are entitled to recover damages "regardless of whether they purchased from the conspirators or from their innocent rivals." Areeda & Hovenkamp, Treatise on Antitrust Law (5th) at 347.

82. The policy of ensuring free market competition is so important that even where plaintiffs are unable to demonstrate damages, claims can still prevail under the Sherman Act. *U.S. Airways, Inc. v. Sabre Holdings Corp.*, 11 Civ. 2725 (LGS) (S.D.N.Y. June 1, 2023) (awarding attorneys' fees where jury found nominal damages of $1, trebled to $3)

<u>Pre-Dispute Negotiations</u>

83. On July 12, 2023, Bucher Law PLLC and AFN Law PLLC sent a written letter and email to Valve indicating their clients' intent to arbitrate their antitrust claims. The letter laid out the consumers' antitrust theory of the case, provided the names for all claimants including Jeremy Lucas, proposed a settlement structure and amount that could resolve all the claims, and noted the consumers were "prepared to engage in good faith discussions for 30-days to attempt to resolve our clients' claims before we initiate arbitration against you."

84. On July 25, 2023, Valve responded. Valve took issue with the opening letter addressing all the consumers' claims in a single notice, insisting that under the terms of the Steam Subscriber Agreement, all claims must be advanced and negotiated individually.

85. Moreover, Valve stated "it is necessary to follow the procedure outlined in the Steam Subscriber Agreement. To start that process, Valve needs a written notice that identifies each individual subscriber, and that subscriber's Steam account, gives the subscriber's location, describes the nature and basis of that subscriber's claim or dispute, and sets forth the relief that subscriber seeks. Such a notice will commence the 30-day informal dispute resolution period under Section 11.B."

86. While the Steam Subscriber Agreement does not require an individual notice laying out all the information Valve demanded, Jeremy Lucas was willing to accommodate. On 08/31/2023, Jeremy Lucas sent an individual written notice to Valve which provided Jeremy Lucas's Steam account, state and city of residence, described the nature of Jeremy Lucas's antitrust claim, and opened settlement discussions with Valve regarding Jeremy Lucas's individual claim.

87.    On September 20, Valve sent an email addressing all the claimants collectively, stating they "anticipate[d] that we will respond to each of the letters on or before October 31." This would mean waiting 60-days to even begin the good faith negotiation process that was contractually required to conclude within 30-days.

88.    While many consumers were willing to wait for Valve's response, Jeremy Lucas opted to file their case on October 2—more than 30 days after Jeremy Lucas sent their individualized written notice. Valve never responded to Jeremy Lucas's individual demand, either within the required 30-days or by October 31, 2023, as Valve had indicated they would.

89.    Instead, Valve responded to the individual filings with a collective letter on October 10. In the October letter, Valve complains that the individual written notices it received were not "efficient," even though Valve's July 25 letter chastised the consumers for making a joint demand via a single letter and specifically asked for individualized written notices. Valve acknowledges that over 21,000 consumers made individual settlement offers, but then asserts the consumers "refuse to provide amounts to settle their individual claims alone." The letter states "We remain available to meet with your clients (including the 18,204 new ones) one-on-one to answer their questions," yet Valve never previously offered to meet with Jeremy Lucas or any of the consumers one-on-one and insisted in their July 25 letter that the informal negotiations should begin with a "written" notice.

90.    Valve concluded the October 10 collective letter by stating "Valve sees little point in responding to your 35,000 near-copycat emails."

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Sherman Act Section 2—Monopolization of the PC Game Transaction Platforms Market (15 U.S.C. § 2)

91.    Valve has willfully acquired and maintained monopoly power in the market for PC Game Transaction Platforms, by means of exclusionary, and anticompetitive conduct, including but not limited to market-wide price controls and presumptively illegal mergers with competitors, as alleged herein.

92.    Through the PMFN, Valve has coerced publishers into agreeing to offer their games at the same price across all PC Game Transaction Platforms, regardless of whether competing platforms charge lower commissions or otherwise charge lower prices than Valve.

93.    In the absence of the Valve PMFN, rivals in the PC Desktop Game Transaction Platforms market would charge lower prices and force Valve to compete. Such competition would in turn lower prices on Valve's own PC Game Transaction Platform, benefiting consumers and publishers that utilized Valve's PC Game Transaction Platform.

94.   Valve's conduct is not justified, because its conduct does not enhance overall efficiency or make the relevant markets more efficient.

95.   Valve's conduct has had a substantial effect on interstate commerce.

96.   Jeremy Lucas has been injured in their property as a result of Valve's conduct.

97.   Jeremy Lucas has suffered and will suffer injury of the type that antitrust laws intend to prevent. Jeremy Lucas has been and will be injured by harm to competition as a result of Valve's conduct.

98.   Jeremy Lucas estimates that the actual damage suffered was in the amount of $1782. Under the Sherman Act, if Jeremy Lucas prevails, Jeremy Lucas is entitled to mandatory treble damages as well as a mandatory award of attorneys' fees.


### SECOND CAUSE OF ACTION
### Sherman Act Section 2—Attempted Monopolization of the PC Desktop Game Transaction Platforms Market (15 U.S.C. § 2)

99.   In the market for PC Desktop Game Transaction Platforms, Valve has engaged in exclusionary and anticompetitive conduct, including but not limited to market-wide price controls and presumptively illegal mergers, as alleged herein.

100.  Valve's conduct has had an anticompetitive effect in the alternative market for PC Game Transaction Platforms.

101.  Valve has engaged in that conduct with the specific intent of monopolizing the market for PC Desktop Game Transaction Platforms.

102.  Valve has engaged in that conduct with a dangerous probability of monopolizing the market for PC Game Transaction Platforms.

103.  In the absence of the Valve PMFN, rivals in the PC Game Transaction Platforms market would charge lower prices and force Valve to compete. Such competition would in turn lower prices on Valve's own PC Game Transaction Platform, benefiting consumers that utilized Valve's PC Game Transaction Platform.

104.  Valve's conduct has had a substantial effect on interstate commerce.

105.  Jeremy Lucas has been or will be injured in their property as a result of Valve's conduct.

106.  Jeremy Lucas has suffered and will suffer injury of the type that antitrust laws intend to prevent. Jeremy Lucas has been and will be injured by harm to competition as a result of Valve's conduct.

107.    Jeremy Lucas estimates that the actual damage suffered was in the amount of $1782. Under the Sherman Act, if Jeremy Lucas prevails, Jeremy Lucas is entitled to mandatory treble damages as well as a mandatory award of attorneys' fees.

THIRD CAUSE OF ACTION
Sherman Act Section 1—Anticompetitive Course of Conduct (15 U.S.C. § 1)

108.    As alleged above, through its contractual agreements with game publishers, Valve has induced or coerced various publishers to enter into one or more contracts, combinations, or conspiracies to unreasonably restrain trade, to control prices or exclude competition, and to willfully acquire and maintain market power in the relevant markets.

109.    Valve's conduct has had, and continues to have, substantial anticompetitive effects in the relevant markets.

110.    Valve's conduct has no legitimate business purpose or procompetitive effect.

111.    There are less restrictive alternatives to the restraints that Valve has imposed.

112.    Valve's conduct has had a substantial effect on interstate commerce.

113.    Jeremy Lucas has been or will be injured in their property as a result of Valve's conduct.

114.    Jeremy Lucas has suffered and will suffer injury of the type that antitrust laws intend to prevent. Jeremy Lucas has been and will be injured by harm to competition as a result of Valve's conduct.

115.    Jeremy Lucas estimates that the actual damage suffered was in the amount of $1782. Under the Sherman Act, if Jeremy Lucas prevails, Jeremy Lucas is entitled to mandatory treble damages as well as a mandatory award of attorneys' fees.

FOURTH CAUSE OF ACTION
Washington State Consumer Protection Act RCW 19.86

116.    The claims alleged above constitute unfair methods of competition under Washington State law provisions 19.86.020, 19.86.040, and 19.86.030.

117.    Valve is engaged in unfair and deceptive practices in commerce, which affect the public interest and cause injury to business and property.

118.    Valve's contracts, combinations, or conspiracies with game publishers are anticompetitive restraints that have the purpose and effect of fixing and inflating prices in the relevant markets.

119.    The contracts, combinations, or conspiracies at issue are in restraint of trade.

120.    Valve's monopolization and attempted monopolization have the purpose and effect of fixing and inflating prices in the relevant markets.

121.    As such, Jeremy Lucas is entitled to damages under Revised Code of Washington 19.86.090.

122.    Under the Washington State Consumer Protection Act RCW 19.86, if Jeremy Lucas prevails, Jeremy Lucas is also entitled to an award of attorneys' fees.

# EXHIBIT 3

In accordance with the Western District of Washington order dated 25 October 2021 compelling to arbitration the claims stated in this action, dismissal of which was denied in the order dated 6 May 2022, Ethan Lefebvre brings this action against Valve Corporation ("Valve" or "Defendant"), seeking damages, under Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1), Section 2 of the Sherman Antitrust Act (15 U.S.C. § 2), and the Washington Consumer Protection Act:

<u>OVERVIEW OF THE ACTION</u>

1.  Personal Computer ("PC") games generate over $30 billion worldwide annually. Defendant Valve Corporation monopolizes that market, using illegal contracts and coercion to ensure more than 75% of that revenue flows through its digital Steam Store and that prices stay artificially high market wide.

2.  Valve's illegal monopoly makes it the most profitable company in the world. Per employee, Valve generates more profit than Apple, Google, or Microsoft. Even the Saudi Arabian oil cartel's ARAMCO makes less money.[1]

3.  Valve, acting as a third-party in PC game transactions, achieves this profit by charging a 30% tax on the PC games consumers like Ethan Lefebvre purchase from game developers.

4.  Valve incurs almost no cost in providing this "service," making more than ███████ percent profit on third-party games purchased through its Steam Store. Federal Court Ex. 4 (VALVE_ANT_0058963) at '963-965.

5.  This economic situation is undesirable for both consumers and game developers. It persists only through Valve's illegal restraints on developers, which make meaningful competition against Valve in the market for PC games nearly impossible.

6.  Ethan Lefebvre seeks compensation for the additional expense paid for PC games.

<u>The Parties</u>

7.  Ethan Lefebvre resides at 643 Wyleswood Dr, Berea OH 44017, United States. Ethan Lefebvre is represented by Will Bucher at Bucher Law PLLC, located at 350 Northern Blvd, STE 324 -1519, Albany, NY 12204-1000.

8.  Valve Corporation is headquartered at 10400 NE 4th St., Bellevue, Washington 98004. Valve is represented by Charles B. Casper at Montgomery McCracken Walker & Rhoads LLP, which is headquartered at 1735 Market Street, 21st Floor, Philadelphia, Pennsylvania.

---

1 Pascal-Emmanuel Gobry, "The Tech Company with the Highest Profits Per Employee Isn't Apple or Google," Business Insider (2011), https://www.businessinsider.com/valve-profits-2011-2; *see* Exhibit A, *Wolfire Games LLC v. Valve Corporation*, Case No. 2:21-cv-00563-JCC Document 68, at 80 (W.D. Wash. filed Dec. 20, 2023).

9.     The parties' agreement states the arbitration "may be conducted by the submission of documents, by phone, or in person in the country where you live." Ethan Lefebvre elects to have the merits hearing be conducted via a virtual hearing using videoconferencing software.

10.    Ethan Lefebvre has purchased PC games which are associated with the Steam account with ID 76561197978153177. Valve has in its possession the data necessary to confirm this and can provide detail as to the price paid for each game and whether the game was acquired from Valve directly or a third-party retailer.

11.    Based on the money spent to acquire those PC games, Ethan Lefebvre estimates that the actual damage suffered was in the amount of $702. Under the Sherman Act, if Ethan Lefebvre prevails, Ethan Lefebvre is entitled to mandatory treble damages as well as a mandatory award of attorneys' fees.

Procedural Posture

12.    On December 20, 2021, a putative class action complaint—of which Ethan Lefebvre was an absent member—was filed against Valve regarding these unlawful provisions.

13.    The complaint was extensive, laying out over 100 pages of allegations against the company. Among those were plaintiffs' allegation that "[i]n the absence of the Valve PMFN, rivals in the PC Desktop Game Transaction Platforms market would charge lower prices and force Valve to compete. Such competition would in turn lower prices on Valve's own PC Desktop Game Transaction Platform, benefitting consumers and publishers that utilized Valve's PC Desktop Game Transaction Platform."[2]

14.    This complaint incorporates by reference all factual allegations contained in the Second Amended Consolidated Class Action Complaint in that case, attached as Exhibit A. Because Valve has insisted on withholding many of the relevant facts in that case from the public, those facts are included in this demand in redacted format. Ethan Lefebvre will request this information as part of the information exchange in this proceeding, at which point Ethan Lefebvre will share it with this tribunal.

15.    Valve moved, unsuccessfully, to dismiss the federal case complaint quoted above.

16.    With respect to allegations on the Sherman Act claims Ethan Lefebvre alleges here, as well as another federal antitrust claim and a Washington State Consumer Protection Act claim, Federal Judge John C. Coughenour denied Valve's motion to dismiss, stating Valve uses its contracts "to impose conditions on how non-Steam-enabled games are sold and priced. Defendant also threatens game publishers with punitive action, including removal of their Steam-enabled games, if they sell non-Steam-enabled versions of those games at lower prices. … These allegations are sufficient to plausibly allege unlawful conduct."[3]

---

2 Ex. A at 100.

3 *Wolfire Games, LLC v. Valve Corp.*, No. C21-0563-JCC, 2022 U.S. Dist. LEXIS 82561, at *11 (W.D. Wash. May 6, 2022).

17. In addition to unsuccessfully moving to dismiss the case, Valve also moved to compel the consumers' claims to arbitration. At Valve's insistence, Federal Judge John C. Coughenour compelled hundreds of millions of consumers who had credibly alleged antitrust harm to arbitration before the American Arbitration Association. [4]

18. This individual arbitration concerns Ethan Lefebvre, who has chosen to pursue their antitrust claims against Valve in this arbitration, as required by Judge John C. Coughenour's order.

## The Market for PC Games

19. When the owner of an Android phone wants to download an application, they do so through an application store, such as Google's Play Store.

20. Similarly, when PC owners want to download a game, they do so through a PC game software store, almost always Valve's Steam Store.

21. In the modern PC gaming market, most games are purchased digitally and downloaded remotely onto the consumer's PC.[5]

22. The Steam Store operates as a digital storefront in this market. Steam allows its users to purchase games from third-party developers and add them to a virtual library, from which they are downloaded and installed on the user's PC.

23. Because Valve has significant market power, developers must choose to either list their games on the Steam Store according to Valve's terms or lose access to most of their potential customer base.

24. Valve uses its dominance over PC game distribution to impose and anticompetitively maintain a 30% commission on nearly every sale made through its store. This commission far exceeds what would prevail in a competitive market, raises prices for consumers like Ethan Lefebvre, and reduces quality and innovation in PC games.[6]

25. Because digital distribution takes place over the internet and does not involve the production, shipping, or physical selling of any product, digital distributors have extremely low costs.

---

4 For the avoidance of doubt, Claimant reserves the right to make objections to the validity or enforceability of the arbitration clause before this tribunal, pursuant to Judge Coughenour's order. Claimant is not here by choice, but at Valve's insistence.

5 J. Clement, Distribution of computer and video game sales in the United States from 2009 to 2018, by delivery format, Statista (2019), https://www.statista.com/statistics/190225/digital-and-physical-game-sales-in-the-us-since-2009/#:~:text=In%202018%2C%20a%20record%2083,were%20sold%20in%20physical%20form.

6 A federal judge recently found that a reduction in the availability of innovative applications on a software distribution platform was a compensable harm under U.S. antitrust law. Bonnie Eslinger, Google Judge Warms to $10.5B Damages Theory in 'Hot Tub', Law360 (Aug. 1, 2023), https://www.law360.com/articles/1706341.

26.    Valve's marginal cost to sell a developer's PC game on its Steam Store is less than $0.01.

27.    Fundamental economics and real-world experience hold that, in a lawful and competitive market, the entry of rivals to the Steam Store would have quickly exerted price pressure on Valve's high commission by competing on price (*i.e.*, by charging lower commissions for the same transaction service).

28.    Fundamental economics and real-world experience hold that, in a competitive market, marginal price will equal marginal cost.

29.    Valve's 30% commission amounts to a $18.00 surcharge on the sale of a standard $60.00 game. In a competitive market, where marginal price equals marginal cost, we would expect this commission to instead be $0.01.

30.    In a competitive market where a firm makes the extraordinarily high profit margins Valve does, new entrants typically emerge and offer the same service for cheaper.

31.    Indeed, that is exactly what multiple rivals tried to do, but they failed or continue to struggle because Valve prohibits developers from selling their games for cheaper on rival stores, pressures developers into charging higher prices, and bribes and buys out (then shuts down) potential competitors to prevent them from creating free market competition.

32.    Because of these anticompetitive policies, a former Valve employee described Steam as a "virtual printing press" that imposes a "30% tax on an entire industry."[7]

### Valve's Prohibition on Offering Cheaper Prices

33.    Valve imposes a Platform Most-Favored-Nations Clause (the "Valve PMFN") on game developers which prohibits game developers from selling their games at lower prices to consumers through rival storefronts.

34.    Valve also mandates price parity. Valve has communicated this aspect of its PMFN Policy in various ways over time. Schwartz Rpt. ¶¶150-167. ████████████████████████
████████████████████████████████████████████████████████████████
████████████████████

        ██████████████████████████████████████████████████
████████████████████████████

_____

7 Andrew McMahon, *Former Valve Employee Says Steam Was Killing PC Gaming, Epic Games Is Saving It*, TWINFINITE (Apr. 8, 2019), https://twinfinite.net/2019/04/former-valve-employee-says-steam-was-killing-pc-gaming-epic-games-is-saving-it/.

35.  Valve regularly confirmed to publishers in no uncertain terms that its PMFN Policy (including pricing parity specifically) applies in equal force regardless of whether Steam Keys are involved. ███████████████████████████████████████████████ ████████████████████████████████████████████████████ Federal Court Ex. 24 (Federal Court Powers 30(b)(6) Ex. 55) at '921 (emphasis added); see also, e.g., Federal Court Ex. 25 (Federal Court Butlin Ex. 120) at '353 █████████████████████████ ████████████████████████████████████████████████████; Federal Court Ex. 27 (MSFT_VALVE_000000555) at '555-657 (Microsoft employee asking "does Steam require price parity?" and another responding "Yes – they absolutely do. . . . Its [sic] not formally listed in documentation in Steamworks, but always addressed in-person.").

36.  Many (many) more examples abound. See, e.g., Federal Court Ex. 28 (VALVE_ANT_2602243) at '243 ███████████████████████████ ████████████████████████ (emphasis added); Federal Court Ex. 21 (Federal Court Giardino Ex. 186) at '087 ████████████████████████████████████████████ ████████████████████████████████████████████████████; Federal Court Ex. 29 (Federal Court Kroll Ex. 304) at '440 ████████████████████ ████████████████████████████████████████████████████; Federal Court Ex. 30 (Federal Court Giardino Ex. 178) at '439 ███████████████ ████████████████████████████████████████████████ (emphasis added); Federal Court Ex. 31 (Federal Court Newell Ex. 353) at '439 ██████████████████████████████████████████████████ (emphasis added); Federal Court Ex. 32 (Federal Court Giardino Ex. 195) at '887 ████████████████████████████████████████████████████ ██████████████████████████████

37.  Valve's PMFN is anticompetitive because it prevents rivals from competing on price.

38.  For example, assume that a game publisher wants to receive $35 in revenue for each sale of a new PC game it has created. If that publisher sells on the Steam Store, it must offer the game to consumers for $50. If there were no PMFNs, and a competitor platform offered a 10% commission, the publisher could offer that game for $40 on the competitor platform and make $36 on each sale while also increasing sales volume. Instead, because of the PMFNs, the publisher must offer the new game at $50 across all platforms, or risk being excluded from Valve and its massive audience on the Steam Store.

39.    Valve has punished publishers for violating its PMFN Policy by delisting (or threatening to delist) a publisher's game from Steam altogether. 

Federal Court Ex. 35 (Federal Court Malone Ex. 248) at '684. *Id.* *Id.* In other words, Valve directly blocked price competition.

Federal Court Ex. 36 (Federal Court Gerber Ex. 107) at '883–84. Federal Court Ex. 37 (Federal Court Blue Ex. 86) at '912-13.

40.    PMFNs deny consumers lower prices, restrict entry of new, lower-priced gaming platforms, and stifle innovation. There is no sufficient pro-competitive justification for Valve's PMFNs.

41.    Because it faces virtually no competition, Valve does not significantly invest in improving the Steam platform. Federal Court Ex. 33 (Powers 30(b)(6) Tr.) at 37-38 ; Federal Court Ex. 76 (Federal Court Johnson Ex. 27) at '458

42.    As the founder of Epic Games, a company that tries to compete against Valve but struggles to do so, explained: "Steam has veto power over prices, so if a multi-store developer wishes to sell their game for a lower price on the Epic Games store than Steam, then … Valve can simply say 'no.'"[8]

43.    Valve's PMFN maintains Valve's monopoly position because consumers are, unsurprisingly, uninterested in switching to a new online storefront (which requires installing a new storefront's software) to purchase the same product for the same price.

44.    Because fledgling rivals cannot draw in new customers by offering consumers a lower price, they have failed or continue to struggle because of Valve's anticompetitive conduct.

45.    EA attempted to launch the Origin PC game store in June 2011, as a competitor to Steam. To jumpstart Origin's user base, EA began publishing its new titles on Origin and other distribution platforms, which also avoided paying Steam's commission. Rietveld Rpt. ¶¶96-97; Schwartz Rpt. ¶216. In October 2011, EA also began publishing third-party games, including games from major publishers such as Capcom. Rietveld Rpt. ¶¶92, 96-

8 Tim Sweeney (@TimSweeneyEpic), TWITTER (Jan. 30, 2019, 9:29 AM), https://twitter.com/timsweeneyepic/status/1090663312814157824?lang=en.



97. ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████ Schwartz Rpt. ¶¶216-217; Rietveld Rpt. ¶96-97. EA
ultimately surrendered, announcing it would bring its games back to Steam in 2019.
Federal Court Ex. 60 (VALVE_ANT_0059430) at '430. Origin withered and ultimately
died, Rietveld Rpt. ¶¶96-97; Schwartz Rpt. ¶¶216-217.

46. Valve's competitor Epic cannot break the Steam monopoly, even though it offers a
commission **less than half** of Valve's, because Valve's PMFN Policy prevents Epic from
competing on prices charged to consumers for games sold on both EGS and Steam.
Schwartz Rpt. ¶¶302-313.

47. ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
Federal Court Ex. 51 (VALVE_ANT_1193238) at '240-241. ██████
████████████████████████████████████████████
██████████████████████████ Id. at '239

48. ████████████████████████████████████████████
████████████████████ Federal Court Ex. 61 (Malone Tr.) at 212.
████████ Federal Court Ex. 69 (Federal Court Lynch Ex. 134) at '674
████████████████████████████████████████████
████ ; Federal Court Ex. 70 (VALVE_ANT_0471786) at '188
████████ ; Schwartz Rpt. ¶308. ██████████
████████████ Federal Court Ex. 5 (Lynch Tr.) at 101-02
████████████████████████████████████████████
████████████████████████████

49. ████████████████████████████████████████████
Federal Court Ex. 61 (Malone Tr.) at 44. Ubisoft attempted to self-distribute through its
own platform, Uplay, launching in 2012. Rietveld Rpt. ¶¶94-95; Schwartz Rpt. ¶¶213-
214. ██████████████████████████████████████████
████ Federal Court Ex. 62 (Federal Court Malone Ex. 263) at '128. ██
████████████████████████████████████████████
████ Federal Court Ex. 63 (Federal Court Lynch Ex. 141) at '961-962. ██
████████████████████████████████████████████
████████████████████████████████████ Federal Court
Ex. 64 (Federal Court Malone Ex. 261) at '197. ██████████████
████████████████████████████████████████████
████████████████████████ As a result, Ubisoft's attempt to sell their
games on alternative platforms failed and Division 2 is now available on Steam. *See id.*

50.    Because fledgling rivals have failed or continue to struggle because of Valve's anticompetitive price restrictions, Valve maintains its dominant market position, continues to charge its supracompetitive prices, and imposes its 30% tax on PC games, harming consumers.

51.    Valve also mandates that publishers use its "Steam Wallet" for any in-game purchases. Specifically, Valve requires that: "Your product must use Steam Wallet for any in-game transactions. This means that your product cannot link to other store pages that does not offer Steam Wallet." When game developers comply and use Valve's microtransaction system, they again must pay Valve's 30% supracompetitive tax.

52.    Valve prohibits game developers from using any alternative system for in-game purchases or directing consumers to use an alternative system.[9] This means once a consumer purchases a game, they are stuck with making in-game purchases on Valve and cannot go to a competing store to make new purchases related that game, nor can the developer direct them to any cheaper store. Even if game developers could charge cheaper prices using their own or a rival store for in-game purchases, consumers would be effectively restricted from taking advantage of those lower prices because of Valve's "Steam Wallet" requirement.

<u>Valve Controls the Pricing for the Games Sold in the Steam Store</u>

53.    Not only are game developers prohibited from selling their games for less at rival stores offering far lower service fees, but Valve also insists on high prices in its own store.

54.    All prices for games sold on the Valve's Steam Store are subject to Valve's review and discretion. Their documentation states "Initial pricing as well as proposed pricing adjustments will be reviewed by Valve and are usually processed within one or two business days."

55.    Valve offers "Regional Pricing Recommendations," a list of prices by region that Valve thinks game developers should charge for their games to maximize the amount of money consumers have to pay.

56.    Valve is explicit about its effort to extinguish competition. In Valve's Steamworks documentation, Valve instructs that, when setting prices, game developers shouldn't be "trying to undercut competition with a lower price."

57.    Because Valve prohibits offering lower prices via rival stores, these efforts to keep prices high on Steam mean higher prices in rival stores, too, keeping prices higher market-wide.

<u>Valve Neutralizes, Bribes, and Buys Out Potential Competition</u>

---

9 Similar anti-steering provisions in Apple's App Store were recently found to be illegal under U.S. antitrust law. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1003 (9th Cir. 2023).

58.  Valve works with many would-be competitors to sell "Steam Keys," digital codes that activate a PC game purchase on Steam.

59.  This creates the appearance of a competitive market where there isn't one. For example, a consumer purchasing a "Steam Key"-enabled PC game at Wal-Mart may believe Wal-Mart is competing with Valve. But in actuality, Wal-Mart is simply selling Valve's product.

60.  Like with sales on competing digital storefronts, game developers who sell Steam Keys at retailers like Wal-Mart must agree to "sell your game on other stores in a similar way to how you sell your game on Steam. It is important that you don't give Steam customers a worse deal than Steam Key purchasers."[10]

61.  Valve interprets and enforces this language to mean that retailers selling Steam Keys cannot offer consumers a lower price on the games sold. Functionally, this means would-be competitors like Wal-Mart, to the extent they are in the PC games distribution market, do not compete on price, meaning consumers pay more for games.

62.  These partnerships with Valve provide Valve with a commercial kill switch that permits Valve to disrupt or shut down any partner who starts generating meaningful sales in competition with Valve's core Steam platform, as Valve can cease providing the codes or supporting their use.

63.  Valve previously worked with an organization known as Humble Bundle to sell Steam Keys online. This included working with Humble Bundle to ensure game keys were securely delivered to customers.

64.  But after Humble Bundle's distribution of Steam-enabled games began to grow and present potential competition to Valve, Valve abruptly removed the secure integration between Humble Bundle and the Steam Gaming Platform. After Valve terminated the direct integration, Humble Bundle's sales growth declined.

65.  Valve offers millions of dollars in kickbacks to the game publishers and tech companies who are most likely to launch a competing store.

66.  While the vast majority of games sold on Steam are charged the 30% tax with no rebates, the largest gaming companies—Microsoft, Electronic Arts, and Take-Two Interactive are offered tens if not hundreds of millions of dollars a year in kickbacks, provided they continue to sell a sufficiently high volume of games on Steam and commit to charge the same or a higher price on competing platforms—even their own. This kickback system ensures prices stay high for consumers and the most viable potential competitors to Valve don't meaningfully compete.

67.  Under the U.S. Department of Justice's antitrust guidelines, the DOJ measures market concentration levels using the Herfindahl-Hirschman Index, or HHI. Those guidelines

---

10 https://partner.steamgames.com/doc/features/keys

state: "Markets with an HHI greater than 1,800 are highly concentrated." Valve's HHI is more than three times what the DOJ considers problematically concentrated: 5,625.

68.   According to the DOJ, "Mergers raise a presumption of illegality when they significantly increase concentration in a highly concentrated market." Specifically, given Valve's HHI, any merger or integration with an actual or would be competitor with greater than 0.66% market share is presumptively a violation of antitrust law.

69.   A subsidiary of Microsoft, Bethesda, used to offer a competing digital store front and game launcher which sold Bethesda's games. But Valve entered into an agreement with Bethesda wherein Bethesda's competing digital store was absorbed into the Steam platform.

70.   Microsoft and its subsidiary Bethesda had more than 0.66% market share in the PC game market at the time of the merger.

71.   Because Microsoft and its subsidiary Bethesda had more than 0.66% market share in the PC game market at the time of merger, that merger was presumptively illegal under the DOJ guidelines.

Valve's Conduct Illegally Raises Prices for Consumers

72.   Monopolies and cartels raise prices for consumers.

73.   Monopolies and cartels are illegal under the Sherman Act.

74.   The Sherman Act doesn't define specific conduct that is an illegal restraint of trade. Rather, the Sherman Act recognizes that there is no end to the creativity of businesses looking to increase profits by reducing competition, and so makes illegal "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce."

75.   Companies in factually analogous situations to Valve have been found to have violated the Sherman Act.

76.   Courts employ the DOJ's HHI guidelines in finding mergers, like that between Valve and Microsoft's Bethesda Laucher, illegal. *Saint Alphonsus Medical Center-Nampa Inc. v. St. Luke's Health System, Ltd.* "The extremely high HHI on its own establishes the prima facie case." *Id.*

77.   Courts have found policies that prohibit linking to cheaper payments options, such as Valve's requirement that in-game transactions occur via the Steam Wallet and not any other method, illegal under the Sherman Act. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1003 (9th Cir. 2023).

78.   Courts have found that giving kickbacks or other "free money" to potential competitors, like those Valve provides Microsoft and others who sell a high volume of PC games on

their platform, violates the Sherman Act—even when that money isn't explicitly conditioned on continued non-competition. *In re Google Play Store Antitrust Litigation*, Case No. 3:20-cv-05671-JD, (N.D. Cal. filed Dec. 11, 2023) (No. 606)

79. Courts regularly find price fixing and price coordination illegal, and recognize that price parity requirements like that Valve imposes can be price restraints. *Frame-Wilson et al v. Amazon.com Inc,* No. 2:20-20-cv-00424 (W.D. Wash. 2022).

80. Valve itself has already been fined in Europe for its illegal antitrust activities. *European Commission Press Release*, "Antitrust: Commission fines Valve and five publishers of PC video games € 7.8 million for 'geo-blocking' practices" (20 January 2021).

81. When a "conspiracy causes market prices to rise and thereby to injure consumers," consumers are entitled to recover damages "regardless of whether they purchased from the conspirators or from their innocent rivals." Areeda & Hovenkamp, Treatise on Antitrust Law (5th) at 347.

82. The policy of ensuring free market competition is so important that even where plaintiffs are unable to demonstrate damages, claims can still prevail under the Sherman Act. *U.S. Airways, Inc. v. Sabre Holdings Corp.*, 11 Civ. 2725 (LGS) (S.D.N.Y. June 1, 2023) (awarding attorneys' fees where jury found nominal damages of $1, trebled to $3)

<u>Pre-Dispute Negotiations</u>

83. On July 12, 2023, Bucher Law PLLC and AFN Law PLLC sent a written letter and email to Valve indicating their clients' intent to arbitrate their antitrust claims. The letter laid out the consumers' antitrust theory of the case, provided the names for all claimants including Ethan Lefebvre, proposed a settlement structure and amount that could resolve all the claims, and noted the consumers were "prepared to engage in good faith discussions for 30-days to attempt to resolve our clients' claims before we initiate arbitration against you."

84. On July 25, 2023, Valve responded. Valve took issue with the opening letter addressing all the consumers' claims in a single notice, insisting that under the terms of the Steam Subscriber Agreement, all claims must be advanced and negotiated individually.

85. Moreover, Valve stated "it is necessary to follow the procedure outlined in the Steam Subscriber Agreement. To start that process, Valve needs a written notice that identifies each individual subscriber, and that subscriber's Steam account, gives the subscriber's location, describes the nature and basis of that subscriber's claim or dispute, and sets forth the relief that subscriber seeks. Such a notice will commence the 30-day informal dispute resolution period under Section 11.B."

86. While the Steam Subscriber Agreement does not require an individual notice laying out all the information Valve demanded, Ethan Lefebvre was willing to accommodate. On 08/30/2023, Ethan Lefebvre sent an individual written notice to Valve which provided Ethan Lefebvre's Steam account, state and city of residence, described the nature of

Ethan Lefebvre's antitrust claim, and opened settlement discussions with Valve regarding Ethan Lefebvre's individual claim.

87.    On September 20, Valve sent an email addressing all the claimants collectively, stating they "anticipate[d] that we will respond to each of the letters on or before October 31." This would mean waiting 60-days to even begin the good faith negotiation process that was contractually required to conclude within 30-days.

88.    While many consumers were willing to wait for Valve's response, Ethan Lefebvre opted to file their case on October 2—more than 30 days after Ethan Lefebvre sent their individualized written notice. Valve never responded to Ethan Lefebvre's individual demand, either within the required 30-days or by October 31, 2023, as Valve had indicated they would.

89.    Instead, Valve responded to the individual filings with a collective letter on October 10. In the October letter, Valve complains that the individual written notices it received were not "efficient," even though Valve's July 25 letter chastised the consumers for making a joint demand via a single letter and specifically asked for individualized written notices. Valve acknowledges that over 21,000 consumers made individual settlement offers, but then asserts the consumers "refuse to provide amounts to settle their individual claims alone." The letter states "We remain available to meet with your clients (including the 18,204 new ones) one-on-one to answer their questions," yet Valve never previously offered to meet with Ethan Lefebvre or any of the consumers one-on-one and insisted in their July 25 letter that the informal negotiations should begin with a "written" notice.

90.    Valve concluded the October 10 collective letter by stating "Valve sees little point in responding to your 35,000 near-copycat emails."

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Sherman Act Section 2—Monopolization of the PC Game Transaction Platforms Market (15 U.S.C. § 2)

91.    Valve has willfully acquired and maintained monopoly power in the market for PC Game Transaction Platforms, by means of exclusionary, and anticompetitive conduct, including but not limited to market-wide price controls and presumptively illegal mergers with competitors, as alleged herein.

92.    Through the PMFN, Valve has coerced publishers into agreeing to offer their games at the same price across all PC Game Transaction Platforms, regardless of whether competing platforms charge lower commissions or otherwise charge lower prices than Valve.

93.    In the absence of the Valve PMFN, rivals in the PC Desktop Game Transaction Platforms market would charge lower prices and force Valve to compete. Such competition would

in turn lower prices on Valve's own PC Game Transaction Platform, benefiting consumers and publishers that utilized Valve's PC Game Transaction Platform.

94.    Valve's conduct is not justified, because its conduct does not enhance overall efficiency or make the relevant markets more efficient.

95.    Valve's conduct has had a substantial effect on interstate commerce.

96.    Ethan Lefebvre has been injured in their property as a result of Valve's conduct.

97.    Ethan Lefebvre has suffered and will suffer injury of the type that antitrust laws intend to prevent. Ethan Lefebvre has been and will be injured by harm to competition as a result of Valve's conduct.

98.    Ethan Lefebvre estimates that the actual damage suffered was in the amount of $702. Under the Sherman Act, if Ethan Lefebvre prevails, Ethan Lefebvre is entitled to mandatory treble damages as well as a mandatory award of attorneys' fees.


### SECOND CAUSE OF ACTION
Sherman Act Section 2—Attempted Monopolization of the PC Desktop Game Transaction Platforms Market (15 U.S.C. § 2)

99.    In the market for PC Desktop Game Transaction Platforms, Valve has engaged in exclusionary and anticompetitive conduct, including but not limited to market-wide price controls and presumptively illegal mergers, as alleged herein.

100.    Valve's conduct has had an anticompetitive effect in the alternative market for PC Game Transaction Platforms.

101.    Valve has engaged in that conduct with the specific intent of monopolizing the market for PC Desktop Game Transaction Platforms.

102.    Valve has engaged in that conduct with a dangerous probability of monopolizing the market for PC Game Transaction Platforms.

103.    In the absence of the Valve PMFN, rivals in the PC Game Transaction Platforms market would charge lower prices and force Valve to compete. Such competition would in turn lower prices on Valve's own PC Game Transaction Platform, benefiting consumers that utilized Valve's PC Game Transaction Platform.

104.    Valve's conduct has had a substantial effect on interstate commerce.

105.    Ethan Lefebvre has been or will be injured in their property as a result of Valve's conduct.

106. Ethan Lefebvre has suffered and will suffer injury of the type that antitrust laws intend to prevent. Ethan Lefebvre has been and will be injured by harm to competition as a result of Valve's conduct.

107. Ethan Lefebvre estimates that the actual damage suffered was in the amount of $702. Under the Sherman Act, if Ethan Lefebvre prevails, Ethan Lefebvre is entitled to mandatory treble damages as well as a mandatory award of attorneys' fees.

### THIRD CAUSE OF ACTION
### Sherman Act Section 1—Anticompetitive Course of Conduct (15 U.S.C. § 1)

108. As alleged above, through its contractual agreements with game publishers, Valve has induced or coerced various publishers to enter into one or more contracts, combinations, or conspiracies to unreasonably restrain trade, to control prices or exclude competition, and to willfully acquire and maintain market power in the relevant markets.

109. Valve's conduct has had, and continues to have, substantial anticompetitive effects in the relevant markets.

110. Valve's conduct has no legitimate business purpose or procompetitive effect.

111. There are less restrictive alternatives to the restraints that Valve has imposed.

112. Valve's conduct has had a substantial effect on interstate commerce.

113. Ethan Lefebvre has been or will be injured in their property as a result of Valve's conduct.

114. Ethan Lefebvre has suffered and will suffer injury of the type that antitrust laws intend to prevent. Ethan Lefebvre has been and will be injured by harm to competition as a result of Valve's conduct.

115. Ethan Lefebvre estimates that the actual damage suffered was in the amount of $702. Under the Sherman Act, if Ethan Lefebvre prevails, Ethan Lefebvre is entitled to mandatory treble damages as well as a mandatory award of attorneys' fees.

### FOURTH CAUSE OF ACTION
### Washington State Consumer Protection Act RCW 19.86

116. The claims alleged above constitute unfair methods of competition under Washington State law provisions 19.86.020, 19.86.040, and 19.86.030.

117. Valve is engaged in unfair and deceptive practices in commerce, which affect the public interest and cause injury to business and property.

118.    Valve's contracts, combinations, or conspiracies with game publishers are anticompetitive restraints that have the purpose and effect of fixing and inflating prices in the relevant markets.

119.    The contracts, combinations, or conspiracies at issue are in restraint of trade.

120.    Valve's monopolization and attempted monopolization have the purpose and effect of fixing and inflating prices in the relevant markets.

121.    As such, Ethan Lefebvre is entitled to damages under Revised Code of Washington 19.86.090.

122.    Under the Washington State Consumer Protection Act RCW 19.86, if Ethan Lefebvre prevails, Ethan Lefebvre is also entitled to an award of attorneys' fees.

# EXHIBIT 4

In accordance with the Western District of Washington order dated 25 October 2021 compelling to arbitration the claims stated in this action, dismissal of which was denied in the order dated 6 May 2022, Christian Graber brings this action against Valve Corporation ("Valve" or "Defendant"), seeking damages, under Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1), Section 2 of the Sherman Antitrust Act (15 U.S.C. § 2), and the Washington Consumer Protection Act:

<u>OVERVIEW OF THE ACTION</u>

1.   Personal Computer ("PC") games generate over $30 billion worldwide annually. Defendant Valve Corporation monopolizes that market, using illegal contracts and coercion to ensure more than 75% of that revenue flows through its digital Steam Store and that prices stay artificially high market wide.

2.   Valve's illegal monopoly makes it the most profitable company in the world. Per employee, Valve generates more profit than Apple, Google, or Microsoft. Even the Saudi Arabian oil cartel's ARAMCO makes less money.[1]

3.   Valve, acting as a third-party in PC game transactions, achieves this profit by charging a 30% tax on the PC games consumers like Christian Graber purchase from game developers.

4.   Valve incurs almost no cost in providing this "service," making more than ███████ percent profit on third-party games purchased through its Steam Store. Federal Court Ex. 4 (VALVE_ANT_0058963) at '963-965.

5.   This economic situation is undesirable for both consumers and game developers. It persists only through Valve's illegal restraints on developers, which make meaningful competition against Valve in the market for PC games nearly impossible.

6.   Christian Graber seeks compensation for the additional expense paid for PC games.

<u>The Parties</u>

7.   Christian Graber resides at 1060 Ledge Rd, Medina OH 44256, United States. Christian Graber is represented by Will Bucher at Bucher Law PLLC, located at 350 Northern Blvd, STE 324 -1519, Albany, NY 12204-1000.

8.   Valve Corporation is headquartered at 10400 NE 4th St., Bellevue, Washington 98004. Valve is represented by Charles B. Casper at Montgomery McCracken Walker & Rhoads LLP, which is headquartered at 1735 Market Street, 21st Floor, Philadelphia, Pennsylvania.

---

1 Pascal-Emmanuel Gobry, "The Tech Company with the Highest Profits Per Employee Isn't Apple or Google," Business Insider (2011), https://www.businessinsider.com/valve-profits-2011-2; *see* Exhibit A, *Wolfire Games LLC v. Valve Corporation*, Case No. 2:21-cv-00563-JCC Document 68, at 80 (W.D. Wash. filed Dec. 20, 2023).

9.      The parties' agreement states the arbitration "may be conducted by the submission of documents, by phone, or in person in the country where you live." Christian Graber elects to have the merits hearing be conducted via the submission of documents only (e.g., a desk arbitration).

10.     Christian Graber has purchased PC games which are associated with the Steam account with ID 76561198378108601. Valve has in its possession the data necessary to confirm this and can provide detail as to the price paid for each game and whether the game was acquired from Valve directly or a third-party retailer.

11.     Based on the money spent to acquire those PC games, Christian Graber estimates that the actual damage suffered was in the amount of $1,512. Under the Sherman Act, if Christian Graber prevails, Christian Graber is entitled to mandatory treble damages as well as a mandatory award of attorneys' fees.

Procedural Posture

12.     On December 20, 2021, a putative class action complaint—of which Christian Graber was an absent member—was filed against Valve regarding these unlawful provisions.

13.     The complaint was extensive, laying out over 100 pages of allegations against the company. Among those were plaintiffs' allegation that "[i]n the absence of the Valve PMFN, rivals in the PC Desktop Game Transaction Platforms market would charge lower prices and force Valve to compete. Such competition would in turn lower prices on Valve's own PC Desktop Game Transaction Platform, benefitting consumers and publishers that utilized Valve's PC Desktop Game Transaction Platform."[2]

14.     This complaint incorporates by reference all factual allegations contained in the Second Amended Consolidated Class Action Complaint in that case, attached as Exhibit A. Because Valve has insisted on withholding many of the relevant facts in that case from the public, those facts are included in this demand in redacted format. Christian Graber will request this information as part of the information exchange in this proceeding, at which point Christian Graber will share it with this tribunal.

15.     Valve moved, unsuccessfully, to dismiss the federal case complaint quoted above.

16.     With respect to allegations on the Sherman Act claims Christian Graber alleges here, as well as another federal antitrust claim and a Washington State Consumer Protection Act claim, Federal Judge John C. Coughenour denied Valve's motion to dismiss, stating Valve uses its contracts "to impose conditions on how non-Steam-enabled games are sold and priced. Defendant also threatens game publishers with punitive action, including removal of their Steam-enabled games, if they sell non-Steam-enabled versions of those games at lower prices. … These allegations are sufficient to plausibly allege unlawful conduct."[3]

---

2 Ex. A at 100.

3 *Wolfire Games, LLC v. Valve Corp.*, No. C21-0563-JCC, 2022 U.S. Dist. LEXIS 82561, at *11 (W.D. Wash. May 6, 2022).

17.    In addition to unsuccessfully moving to dismiss the case, Valve also moved to compel the consumers' claims to arbitration. At Valve's insistence, Federal Judge John C. Coughenour compelled hundreds of millions of consumers who had credibly alleged antitrust harm to arbitration before the American Arbitration Association. [4]

18.    This individual arbitration concerns Christian Graber, who has chosen to pursue their antitrust claims against Valve in this arbitration, as required by Judge John C. Coughenour's order.

<u>The Market for PC Games</u>

19.    When the owner of an Android phone wants to download an application, they do so through an application store, such as Google's Play Store.

20.    Similarly, when PC owners want to download a game, they do so through a PC game software store, almost always Valve's Steam Store.

21.    In the modern PC gaming market, most games are purchased digitally and downloaded remotely onto the consumer's PC.[5]

22.    The Steam Store operates as a digital storefront in this market. Steam allows its users to purchase games from third-party developers and add them to a virtual library, from which they are downloaded and installed on the user's PC.

23.    Because Valve has significant market power, developers must choose to either list their games on the Steam Store according to Valve's terms or lose access to most of their potential customer base.

24.    Valve uses its dominance over PC game distribution to impose and anticompetitively maintain a 30% commission on nearly every sale made through its store. This commission far exceeds what would prevail in a competitive market, raises prices for consumers like Christian Graber, and reduces quality and innovation in PC games.[6]

25.    Because digital distribution takes place over the internet and does not involve the production, shipping, or physical selling of any product, digital distributors have extremely low costs.

---

4 For the avoidance of doubt, Claimant reserves the right to make objections to the validity or enforceability of the arbitration clause before this tribunal, pursuant to Judge Coughenour's order. Claimant is not here by choice, but at Valve's insistence.

5 J. Clement, Distribution of computer and video game sales in the United States from 2009 to 2018, by delivery format, Statista (2019), https://www.statista.com/statistics/190225/digital-and-physical-game-sales-in-the-us-since-2009/#:~:text=In%202018%2C%20a%20record%2083,were%20sold%20in%20physical%20form.

6 A federal judge recently found that a reduction in the availability of innovative applications on a software distribution platform was a compensable harm under U.S. antitrust law. Bonnie Eslinger, Google Judge Warms to $10.5B Damages Theory in 'Hot Tub', Law360 (Aug. 1, 2023), https://www.law360.com/articles/1706341.

26.    Valve's marginal cost to sell a developer's PC game on its Steam Store is less than $0.01.

27.    Fundamental economics and real-world experience hold that, in a lawful and competitive market, the entry of rivals to the Steam Store would have quickly exerted price pressure on Valve's high commission by competing on price (*i.e.*, by charging lower commissions for the same transaction service).

28.    Fundamental economics and real-world experience hold that, in a competitive market, marginal price will equal marginal cost.

29.    Valve's 30% commission amounts to a $18.00 surcharge on the sale of a standard $60.00 game. In a competitive market, where marginal price equals marginal cost, we would expect this commission to instead be $0.01.

30.    In a competitive market where a firm makes the extraordinarily high profit margins Valve does, new entrants typically emerge and offer the same service for cheaper.

31.    Indeed, that is exactly what multiple rivals tried to do, but they failed or continue to struggle because Valve prohibits developers from selling their games for cheaper on rival stores, pressures developers into charging higher prices, and bribes and buys out (then shuts down) potential competitors to prevent them from creating free market competition.

32.    Because of these anticompetitive policies, a former Valve employee described Steam as a "virtual printing press" that imposes a "30% tax on an entire industry."[7]

<u>Valve's Prohibition on Offering Cheaper Prices</u>

33.    Valve imposes a Platform Most-Favored-Nations Clause (the "Valve PMFN") on game developers which prohibits game developers from selling their games at lower prices to consumers through rival storefronts.

34.    Valve also mandates price parity. Valve has communicated this aspect of its PMFN Policy in various ways over time. Schwartz Rpt. ¶¶150-167. ████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████
████████████████████████

---

7 Andrew McMahon, Former Valve Employee Says Steam Was Killing PC Gaming, Epic Games Is Saving It, TWINFINITE (Apr. 8, 2019), https://twinfinite.net/2019/04/former-valve-employee-says-steam-was-killing-pc-gaming-epic-games-is-saving-it/.

████████████████████████████████

35.   Valve regularly confirmed to publishers in no uncertain terms that its PMFN Policy
(including pricing parity specifically) applies in equal force regardless of whether Steam
Keys are involved. ████████████████████████████████████████████

██████████████████████████████ Federal Court Ex. 24
(Federal Court Powers 30(b)(6) Ex. 55) at '921 (emphasis added); see also, e.g., Federal
Court Ex. 25 (Federal Court Butlin Ex. 120) at '353 ████████████████████████

██████████████████████████████; Federal Court Ex. 27
(MSFT_VALVE_000000555) at '555-657 (Microsoft employee asking "does Steam
require price parity?" and another responding "Yes – they absolutely do. . . . Its [sic] not
formally listed in documentation in Steamworks, but always addressed in-person.").

36.   Many (many) more examples abound. See, e.g., Federal Court Ex. 28
(VALVE_ANT_2602243) at '243 ████████████████████████████████

██████████████████████ (emphasis added); Federal Court Ex. 21 (Federal Court
Giardino Ex. 186) at '087 ████████████████████████████████████████

██████████████████████████████; Federal Court
Ex. 29 (Federal Court Kroll Ex. 304) at '440 ████████████████████████████

████████████████████████████████████████████████████;
Federal Court Ex. 30 (Federal Court Giardino Ex. 178) at '439 ██████████████

████████████████████████████████████████████ (emphasis
added); Federal Court Ex. 31 (Federal Court Newell Ex. 353) at '439 ████████████

████████████████████████████ (emphasis added); Federal Court Ex. 32 (Federal Court Giardino Ex. 195) at '887

████████████████████████████████████████████████

37.   Valve's PMFN is anticompetitive because it prevents rivals from competing on price.

38.   For example, assume that a game publisher wants to receive $35 in revenue for each sale
of a new PC game it has created. If that publisher sells on the Steam Store, it must offer
the game to consumers for $50. If there were no PMFNs, and a competitor platform
offered a 10% commission, the publisher could offer that game for $40 on the competitor
platform and make $36 on each sale while also increasing sales volume. Instead, because
of the PMFNs, the publisher must offer the new game at $50 across all platforms, or risk
being excluded from Valve and its massive audience on the Steam Store.

39.   Valve has punished publishers for violating its PMFN Policy by delisting (or threatening to delist) a publisher's game from Steam altogether.



Federal Court Ex. 35 (Federal Court Malone Ex. 248) at '684. *Id.* *Id.* In other words, Valve directly blocked price competition.

Federal Court Ex. 36 (Federal Court Gerber Ex. 107) at '883–84. Federal Court Ex. 37 (Federal Court Blue Ex. 86) at '912-13.

40.   PMFNs deny consumers lower prices, restrict entry of new, lower-priced gaming platforms, and stifle innovation. There is no sufficient pro-competitive justification for Valve's PMFNs.

41.   Because it faces virtually no competition, Valve does not significantly invest in improving the Steam platform. Federal Court Ex. 33 (Powers 30(b)(6) Tr.) at 37-38 ; Federal Court Ex. 76 (Federal Court Johnson Ex. 27) at '458

42.   As the founder of Epic Games, a company that tries to compete against Valve but struggles to do so, explained: "Steam has veto power over prices, so if a multi-store developer wishes to sell their game for a lower price on the Epic Games store than Steam, then … Valve can simply say 'no.'"[8]

43.   Valve's PMFN maintains Valve's monopoly position because consumers are, unsurprisingly, uninterested in switching to a new online storefront (which requires installing a new storefront's software) to purchase the same product for the same price.

44.   Because fledgling rivals cannot draw in new customers by offering consumers a lower price, they have failed or continue to struggle because of Valve's anticompetitive conduct.

45.   EA attempted to launch the Origin PC game store in June 2011, as a competitor to Steam. To jumpstart Origin's user base, EA began publishing its new titles on Origin and other distribution platforms, which also avoided paying Steam's commission. Rietveld Rpt. ¶¶96-97; Schwartz Rpt. ¶216. In October 2011, EA also began publishing third-party games, including games from major publishers such as Capcom. Rietveld Rpt. ¶¶92, 96-

---

[8] Tim Sweeney (@TimSweeneyEpic), TWITTER (Jan. 30, 2019, 9:29 AM), https://twitter.com/timsweeneyepic/status/1090663312814157824?lang=en.

97. 

Schwartz Rpt. ¶¶216-217; Rietveld Rpt. ¶96-97. EA ultimately surrendered, announcing it would bring its games back to Steam in 2019. Federal Court Ex. 60 (VALVE_ANT_0059430) at '430. Origin withered and ultimately died, Rietveld Rpt. ¶¶96-97; Schwartz Rpt. ¶¶216-217.

46. Valve's competitor Epic cannot break the Steam monopoly, even though it offers a commission *less than half* of Valve's, because Valve's PMFN Policy prevents Epic from competing on prices charged to consumers for games sold on both EGS and Steam. Schwartz Rpt. ¶¶302-313.

47.

Federal Court Ex. 51 (VALVE_ANT_1193238) at '240-241.

Id. at '239

48.

Federal Court Ex. 61 (Malone Tr.) at 212.
Federal Court Ex. 69 (Federal Court Lynch Ex. 134) at '674

; Federal Court Ex. 70 (VALVE_ANT_0471786) at '188
; Schwartz Rpt. ¶308.
Federal Court Ex. 5 (Lynch Tr.) at 101-02

49.

Federal Court Ex. 61 (Malone Tr.) at 44. Ubisoft attempted to self-distribute through its own platform, Uplay, launching in 2012. Rietveld Rpt. ¶¶94-95; Schwartz Rpt. ¶¶213-214.

Federal Court Ex. 62 (Federal Court Malone Ex. 263) at '128.

Federal Court Ex. 63 (Federal Court Lynch Ex. 141) at '961-962.

Federal Court Ex. 64 (Federal Court Malone Ex. 261) at '197.

As a result, Ubisoft's attempt to sell their games on alternative platforms failed and Division 2 is now available on Steam. *See id.*

50.    Because fledgling rivals have failed or continue to struggle because of Valve's anticompetitive price restrictions, Valve maintains its dominant market position, continues to charge its supracompetitive prices, and imposes its 30% tax on PC games, harming consumers.

51.    Valve also mandates that publishers use its "Steam Wallet" for any in-game purchases. Specifically, Valve requires that: "Your product must use Steam Wallet for any in-game transactions. This means that your product cannot link to other store pages that does not offer Steam Wallet." When game developers comply and use Valve's microtransaction system, they again must pay Valve's 30% supracompetitive tax.

52.    Valve prohibits game developers from using any alternative system for in-game purchases or directing consumers to use an alternative system.[9] This means once a consumer purchases a game, they are stuck with making in-game purchases on Valve and cannot go to a competing store to make new purchases related that game, nor can the developer direct them to any cheaper store. Even if game developers could charge cheaper prices using their own or a rival store for in-game purchases, consumers would be effectively restricted from taking advantage of those lower prices because of Valve's "Steam Wallet" requirement.

<u>Valve Controls the Pricing for the Games Sold in the Steam Store</u>

53.    Not only are game developers prohibited from selling their games for less at rival stores offering far lower service fees, but Valve also insists on high prices in its own store.

54.    All prices for games sold on the Valve's Steam Store are subject to Valve's review and discretion. Their documentation states "Initial pricing as well as proposed pricing adjustments will be reviewed by Valve and are usually processed within one or two business days."

55.    Valve offers "Regional Pricing Recommendations," a list of prices by region that Valve thinks game developers should charge for their games to maximize the amount of money consumers have to pay.

56.    Valve is explicit about its effort to extinguish competition. In Valve's Steamworks documentation, Valve instructs that, when setting prices, game developers shouldn't be "trying to undercut competition with a lower price."

57.    Because Valve prohibits offering lower prices via rival stores, these efforts to keep prices high on Steam mean higher prices in rival stores, too, keeping prices higher market-wide.

<u>Valve Neutralizes, Bribes, and Buys Out Potential Competition</u>

---

9 Similar anti-steering provisions in Apple's App Store were recently found to be illegal under U.S. antitrust law. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1003 (9th Cir. 2023).

58.     Valve works with many would-be competitors to sell "Steam Keys," digital codes that activate a PC game purchase on Steam.

59.     This creates the appearance of a competitive market where there isn't one. For example, a consumer purchasing a "Steam Key"-enabled PC game at Wal-Mart may believe Wal-Mart is competing with Valve. But in actuality, Wal-Mart is simply selling Valve's product.

60.     Like with sales on competing digital storefronts, game developers who sell Steam Keys at retailers like Wal-Mart must agree to "sell your game on other stores in a similar way to how you sell your game on Steam. <u>It is important that you don't give Steam customers a worse deal than Steam Key purchasers.</u>"[10]

61.     Valve interprets and enforces this language to mean that retailers selling Steam Keys cannot offer consumers a lower price on the games sold. Functionally, this means would-be competitors like Wal-Mart, to the extent they are in the PC games distribution market, do not compete on price, meaning consumers pay more for games.

62.     These partnerships with Valve provide Valve with a commercial kill switch that permits Valve to disrupt or shut down any partner who starts generating meaningful sales in competition with Valve's core Steam platform, as Valve can cease providing the codes or supporting their use.

63.     Valve previously worked with an organization known as Humble Bundle to sell Steam Keys online. This included working with Humble Bundle to ensure game keys were securely delivered to customers.

64.     But after Humble Bundle's distribution of Steam-enabled games began to grow and present potential competition to Valve, Valve abruptly removed the secure integration between Humble Bundle and the Steam Gaming Platform. After Valve terminated the direct integration, Humble Bundle's sales growth declined.

65.     Valve offers millions of dollars in kickbacks to the game publishers and tech companies who are most likely to launch a competing store.

66.     While the vast majority of games sold on Steam are charged the 30% tax with no rebates, the largest gaming companies—Microsoft, Electronic Arts, and Take-Two Interactive are offered tens if not hundreds of millions of dollars a year in kickbacks, provided they continue to sell a sufficiently high volume of games on Steam and commit to charge the same or a higher price on competing platforms—even their own. This kickback system ensures prices stay high for consumers and the most viable potential competitors to Valve don't meaningfully compete.

67.     Under the U.S. Department of Justice's antitrust guidelines, the DOJ measures market concentration levels using the Herfindahl-Hirschman Index, or HHI. Those guidelines

---

10 https://partner.steamgames.com/doc/features/keys

state: "Markets with an HHI greater than 1,800 are highly concentrated." Valve's HHI is more than three times what the DOJ considers problematically concentrated: 5,625.

68. According to the DOJ, "Mergers raise a presumption of illegality when they significantly increase concentration in a highly concentrated market." Specifically, given Valve's HHI, any merger or integration with an actual or would be competitor with greater than 0.66% market share is presumptively a violation of antitrust law.

69. A subsidiary of Microsoft, Bethesda, used to offer a competing digital store front and game launcher which sold Bethesda's games. But Valve entered into an agreement with Bethesda wherein Bethesda's competing digital store was absorbed into the Steam platform.

70. Microsoft and its subsidiary Bethesda had more than 0.66% market share in the PC game market at the time of the merger.

71. Because Microsoft and its subsidiary Bethesda had more than 0.66% market share in the PC game market at the time of merger, that merger was presumptively illegal under the DOJ guidelines.

<u>Valve's Conduct Illegally Raises Prices for Consumers</u>

72. Monopolies and cartels raise prices for consumers.

73. Monopolies and cartels are illegal under the Sherman Act.

74. The Sherman Act doesn't define specific conduct that is an illegal restraint of trade. Rather, the Sherman Act recognizes that there is no end to the creativity of businesses looking to increase profits by reducing competition, and so makes illegal "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce."

75. Companies in factually analogous situations to Valve have been found to have violated the Sherman Act.

76. Courts employ the DOJ's HHI guidelines in finding mergers, like that between Valve and Microsoft's Bethesda Laucher, illegal. *Saint Alphonsus Medical Center-Nampa Inc. v. St. Luke's Health System, Ltd.* "The extremely high HHI on its own establishes the prima facie case." *Id.*

77. Courts have found policies that prohibit linking to cheaper payments options, such as Valve's requirement that in-game transactions occur via the Steam Wallet and not any other method, illegal under the Sherman Act. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1003 (9th Cir. 2023).

78. Courts have found that giving kickbacks or other "free money" to potential competitors, like those Valve provides Microsoft and others who sell a high volume of PC games on

their platform, violates the Sherman Act—even when that money isn't explicitly conditioned on continued non-competition. *In re Google Play Store Antitrust Litigation*, Case No. 3:20-cv-05671-JD, (N.D. Cal. filed Dec. 11, 2023) (No. 606)

79.    Courts regularly find price fixing and price coordination illegal, and recognize that price parity requirements like that Valve imposes can be price restraints. *Frame-Wilson et al v. Amazon.com Inc,* No. 2:20-20-cv-00424 (W.D. Wash. 2022).

80.    Valve itself has already been fined in Europe for its illegal antitrust activities. *European Commission Press Release*, "Antitrust: Commission fines Valve and five publishers of PC video games € 7.8 million for 'geo-blocking' practices" (20 January 2021).

81.    When a "conspiracy causes market prices to rise and thereby to injure consumers," consumers are entitled to recover damages "regardless of whether they purchased from the conspirators or from their innocent rivals." Areeda & Hovenkamp, Treatise on Antitrust Law (5th) at 347.

82.    The policy of ensuring free market competition is so important that even where plaintiffs are unable to demonstrate damages, claims can still prevail under the Sherman Act. *U.S. Airways, Inc. v. Sabre Holdings Corp.*, 11 Civ. 2725 (LGS) (S.D.N.Y. June 1, 2023) (awarding attorneys' fees where jury found nominal damages of $1, trebled to $3)

<u>Pre-Dispute Negotiations</u>

83.    On July 12, 2023, Bucher Law PLLC and AFN Law PLLC sent a written letter and email to Valve indicating their clients' intent to arbitrate their antitrust claims. The letter laid out the consumers' antitrust theory of the case, provided the names for all claimants including Christian Graber, proposed a settlement structure and amount that could resolve all the claims, and noted the consumers were "prepared to engage in good faith discussions for 30-days to attempt to resolve our clients' claims before we initiate arbitration against you."

84.    On July 25, 2023, Valve responded. Valve took issue with the opening letter addressing all the consumers' claims in a single notice, insisting that under the terms of the Steam Subscriber Agreement, all claims must be advanced and negotiated individually.

85.    Moreover, Valve stated "it is necessary to follow the procedure outlined in the Steam Subscriber Agreement. To start that process, Valve needs a written notice that identifies each individual subscriber, and that subscriber's Steam account, gives the subscriber's location, describes the nature and basis of that subscriber's claim or dispute, and sets forth the relief that subscriber seeks. Such a notice will commence the 30-day informal dispute resolution period under Section 11.B."

86.    While the Steam Subscriber Agreement does not require an individual notice laying out all the information Valve demanded, Christian Graber was willing to accommodate. On 08/31/2023, Christian Graber sent an individual written notice to Valve which provided Christian Graber's Steam account, state and city of residence, described the nature of

Christian Graber's antitrust claim, and opened settlement discussions with Valve regarding Christian Graber's individual claim.

87.     On September 20, Valve sent an email addressing all the claimants collectively, stating they "anticipate[d] that we will respond to each of the letters on or before October 31." This would mean waiting 60-days to even begin the good faith negotiation process that was contractually required to conclude within 30-days.

88.     While many consumers were willing to wait for Valve's response, Christian Graber opted to file their case on October 2—more than 30 days after Christian Graber sent their individualized written notice. Valve never responded to Christian Graber's individual demand, either within the required 30-days or by October 31, 2023, as Valve had indicated they would.

89.     Instead, Valve responded to the individual filings with a collective letter on October 10. In the October letter, Valve complains that the individual written notices it received were not "efficient," even though Valve's July 25 letter chastised the consumers for making a joint demand via a single letter and specifically asked for individualized written notices. Valve acknowledges that over 21,000 consumers made individual settlement offers, but then asserts the consumers "refuse to provide amounts to settle their individual claims alone." The letter states "We remain available to meet with your clients (including the 18,204 new ones) one-on-one to answer their questions," yet Valve never previously offered to meet with Christian Graber or any of the consumers one-on-one and insisted in their July 25 letter that the informal negotiations should begin with a "written" notice.

90.     Valve concluded the October 10 collective letter by stating "Valve sees little point in responding to your 35,000 near-copycat emails."

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Sherman Act Section 2—Monopolization of the PC Game Transaction Platforms Market (15 U.S.C. § 2)

91.     Valve has willfully acquired and maintained monopoly power in the market for PC Game Transaction Platforms, by means of exclusionary, and anticompetitive conduct, including but not limited to market-wide price controls and presumptively illegal mergers with competitors, as alleged herein.

92.     Through the PMFN, Valve has coerced publishers into agreeing to offer their games at the same price across all PC Game Transaction Platforms, regardless of whether competing platforms charge lower commissions or otherwise charge lower prices than Valve.

93.     In the absence of the Valve PMFN, rivals in the PC Desktop Game Transaction Platforms market would charge lower prices and force Valve to compete. Such competition would

in turn lower prices on Valve's own PC Game Transaction Platform, benefiting consumers and publishers that utilized Valve's PC Game Transaction Platform.

94.  Valve's conduct is not justified, because its conduct does not enhance overall efficiency or make the relevant markets more efficient.

95.  Valve's conduct has had a substantial effect on interstate commerce.

96.  Christian Graber has been injured in their property as a result of Valve's conduct.

97.  Christian Graber has suffered and will suffer injury of the type that antitrust laws intend to prevent. Christian Graber has been and will be injured by harm to competition as a result of Valve's conduct.

98.  Christian Graber estimates that the actual damage suffered was in the amount of $1,512. Under the Sherman Act, if Christian Graber prevails, Christian Graber is entitled to mandatory treble damages as well as a mandatory award of attorneys' fees.

SECOND CAUSE OF ACTION

Sherman Act Section 2—Attempted Monopolization of the PC Desktop Game Transaction Platforms Market (15 U.S.C. § 2)

99.  In the market for PC Desktop Game Transaction Platforms, Valve has engaged in exclusionary and anticompetitive conduct, including but not limited to market-wide price controls and presumptively illegal mergers, as alleged herein.

100.  Valve's conduct has had an anticompetitive effect in the alternative market for PC Game Transaction Platforms.

101.  Valve has engaged in that conduct with the specific intent of monopolizing the market for PC Desktop Game Transaction Platforms.

102.  Valve has engaged in that conduct with a dangerous probability of monopolizing the market for PC Game Transaction Platforms.

103.  In the absence of the Valve PMFN, rivals in the PC Game Transaction Platforms market would charge lower prices and force Valve to compete. Such competition would in turn lower prices on Valve's own PC Game Transaction Platform, benefiting consumers that utilized Valve's PC Game Transaction Platform.

104.  Valve's conduct has had a substantial effect on interstate commerce.

105.  Christian Graber has been or will be injured in their property as a result of Valve's conduct.

106.    Christian Graber has suffered and will suffer injury of the type that antitrust laws intend to prevent. Christian Graber has been and will be injured by harm to competition as a result of Valve's conduct.

107.    Christian Graber estimates that the actual damage suffered was in the amount of $1,512. Under the Sherman Act, if Christian Graber prevails, Christian Graber is entitled to mandatory treble damages as well as a mandatory award of attorneys' fees.

THIRD CAUSE OF ACTION

Sherman Act Section 1—Anticompetitive Course of Conduct (15 U.S.C. § 1)

108.    As alleged above, through its contractual agreements with game publishers, Valve has induced or coerced various publishers to enter into one or more contracts, combinations, or conspiracies to unreasonably restrain trade, to control prices or exclude competition, and to willfully acquire and maintain market power in the relevant markets.

109.    Valve's conduct has had, and continues to have, substantial anticompetitive effects in the relevant markets.

110.    Valve's conduct has no legitimate business purpose or procompetitive effect.

111.    There are less restrictive alternatives to the restraints that Valve has imposed.

112.    Valve's conduct has had a substantial effect on interstate commerce.

113.    Christian Graber has been or will be injured in their property as a result of Valve's conduct.

114.    Christian Graber has suffered and will suffer injury of the type that antitrust laws intend to prevent. Christian Graber has been and will be injured by harm to competition as a result of Valve's conduct.

115.    Christian Graber estimates that the actual damage suffered was in the amount of $1,512. Under the Sherman Act, if Christian Graber prevails, Christian Graber is entitled to mandatory treble damages as well as a mandatory award of attorneys' fees.

FOURTH CAUSE OF ACTION

Washington State Consumer Protection Act RCW 19.86

116.    The claims alleged above constitute unfair methods of competition under Washington State law provisions 19.86.020, 19.86.040, and 19.86.030.

117.    Valve is engaged in unfair and deceptive practices in commerce, which affect the public interest and cause injury to business and property.

118.   Valve's contracts, combinations, or conspiracies with game publishers are anticompetitive restraints that have the purpose and effect of fixing and inflating prices in the relevant markets.

119.   The contracts, combinations, or conspiracies at issue are in restraint of trade.

120.   Valve's monopolization and attempted monopolization have the purpose and effect of fixing and inflating prices in the relevant markets.

121.   As such, Christian Graber is entitled to damages under Revised Code of Washington 19.86.090.

122.   Under the Washington State Consumer Protection Act RCW 19.86, if Christian Graber prevails, Christian Graber is also entitled to an award of attorneys' fees.

# EXHIBIT 5

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

ONE MANHATTAN WEST

NEW YORK, NY 10001-8602

———

TEL: (212) 735-3000

FAX: (212) 735-2000

WWW.SKADDEN.COM

DIRECT DIAL
212-735-3529
DIRECT FAX
917-777-3529
EMAIL ADDRESS
MICHAEL.MCTIGUE@SKADDEN.COM

FIRM/AFFILIATE OFFICES

———

BOSTON
CHICAGO
HOUSTON
LOS ANGELES
PALO ALTO
WILMINGTON

BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MUNICH
PARIS
SÃO PAULO
SEOUL
SHANGHAI
SINGAPORE
TOKYO
TORONTO

<u>CONFIDENTIAL</u>

October 19, 2024

**<u>VIA ELECTRONIC MAIL</u>**

Arbitrator Frances F. Goins
UB Greensfelder
1660 West 2nd Street, Suite 1100
Cleveland, OH, 44113-1406
fgoins@ubglaw.com

> RE:    *Greg Fish & 3 Other Individual Claimants v.*
> *<u>Valve Corp.</u>*: Petition to Enjoin Arbitrations[1]

Dear Arbitrator Goins:

We write on behalf of Respondent Valve Corporation ("Valve") to inform this Tribunal that Valve filed a petition in the United States District Court for the Western District of Washington against all claimants in these arbitrations ("Claimants") to enjoin them from continuing to pursue their arbitrations because there is no agreement to arbitrate between the parties. The Petition to Enjoin Arbitrations and accompanying Memorandum of Points and Authorities in Support of Petition to Enjoin Arbitrations are attached hereto as **Exhibits 1 and 2**.

The issues this Tribunal requested briefing on in its October 11, 2024 Order are now properly before the Western District of Washington. Respectfully, this Tribunal should immediately stay these proceedings and defer to the federal court, which has exclusive jurisdiction over the threshold issue of whether there is an agreement to arbitrate. While we do not believe a conference or formal motion is necessary, to the extent this Tribunal believes one is, we ask that this letter be considered as a request for a conference and/or to be deemed such a motion. Valve's

---

[1]    The full list of 4 arbitrations is set forth in <u>Appendix A</u> hereto.

Arbitrator Goins
October 18, 2024
Page 2


submission of this letter is under a full reservation of rights as these arbitrations should be closed because there is no longer an agreement to arbitrate.

Sincerely,

/s/ *Michael W. McTigue Jr.*

Michael W. McTigue Jr.

cc:    All counsel of record

Arbitrator Goins
October 18, 2024
Page 3

**Appendix A: List Of All Cases**

| Case Number | Claimant Name |
|---|---|
| 01-23-0005-3288 | Greg Fish |
| 01-23-0005-3702 | Christian Graber |
| 01-23-0005-3823 | Jeremy Lucas |
| 01-23-0005-7452 | Ethan Lefebvre |

# EXHIBIT 6



**AMERICAN ARBITRATION ASSOCIATION**°    INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®

## ORDER ON RESPONDENT'S MOTION TO DISMISS

Four Individual Claimants

-vs-

Valve Corporation d/b/a Steam

This matter comes before me to determine Respondent's motion in the listed arbitration cases through a series of letters dated September 27, October 4, and October 7, 2024, to dismiss these arbitrations on the basis that this tribunal lacks jurisdiction due to Respondent's unilateral amendment of the parties' Steam Subscriber Agreement ("SSA") on September 26, 2024, removing the arbitration provision. I find that I have authority to determine my jurisdiction to address Respondent's motion pursuant to AAA Consumer R-14 (a). *See also, e.g., Blanton v. Domino's Pizza Franchising LLC*, 962 F.3d 842, 846 (6th Cir. 2020) (listing cases and agreeing with "every one of our sister circuits to address the question – eleven out of twelve by our count – [finding] that the incorporation of the AAA Rules . . . provides 'clear and unmistakable' evidence that the parties agreed to arbitrate 'arbitrability.'"), and the parties' arbitration agreement dictating application of the AAA rules.

In my October 11 Order, I instructed the parties to submit briefs in support of their respective positions no later than Friday, October 18, 2024. I specifically ordered the parties to address "(1) any legal bases for finding that the Respondent's recent amendment to the SSA removing the arbitration clause applies to these arbitrations; and (2) whether Claimants agreed to the retroactive application of the amended SSA." Claimants timely submitted their brief. Respondent did not, although on October 21, 2024 I received a copy of Respondent's Petition to Enjoin Arbitrations that appears to have been filed in the federal district court in Seattle on October 18 and a request for a conference to address the motion. I convened a telephonic hearing on October 23, 2024 at which counsel Judson Crump, on behalf of the four Claimants, and Andrew Fuchs and Shaud Tavakoli, on behalf of Respondent, appeared and argued. In making this ruling, I have considered all the submissions and arguments of the parties relating to the motion.

As an initial matter, I do not agree that *Coinbase, Inc. v. Suski*, 144 S. Ct. 1186 (2024), is controlling here. In *Coinbase*, the issue was which of two contracts, one a User Agreement and the second the Official Rules applying to sweepstakes promotions, governed with respect to a dispute relating to the sweepstakes promotion. The parties apparently agreed that both contracts were currently effective at the time the dispute arose. The issue was which of the two extant contracts governed jurisdiction, and the Court held that preliminary issue of which contact applied should be decided by the court. The resulting decision – that a specific contract term controls over a general – applied a venerable, long-standing rule of contract construction.



Here, even according to Respondent's analysis, there were not two extant contracts when the dispute arose and these arbitrations were filed. Moreover, the parties do not agree that there are two extant contracts now. Instead, the only agreement acknowledged by all parties mandates arbitration; that agreement (the "original SSA") enabled Respondent to secure a court order compelling these arbitrations to begin with. The question here is not which of two extant contracts controls jurisdiction, but rather whether the purported "amended SSA" has become effective as to the Claimants here pursuant to the terms of the original SSA. Section 8 of the original SSA provides that Respondent's right to amend unilaterally is subject to certain pre-conditions clearly intended to validate Claimants' agreement, or at least their waiver of objection, to the amendment. Respondent alleges that those conditions were met here as to three of the Claimants – Messrs. Fish, Lefebvre, and Lucas, and that the conditions "will be met by November 1, 2024" as to Claimant Christian Graber. Claimants disagree. On the record before me, I conclude that Respondent, which bears the burden of proof on its motion, has not shown that the purported amended SSA was accepted by Claimants.

Moreover, AAA Consumer R-14 (c) provides that a "party must object to the jurisdiction of the arbitrator . . . no later than the filing of the answering statement to the claim or counterclaim that gives rise to the objection." These arbitrations were filed in December 2023, more than 10 months ago. Respondent did not observe this deadline. Instead Respondent filed a motion to dismiss on other grounds almost immediately, before an arbitrator was even appointed, and simultaneously filed its Answer and Affirmative Defenses, all on December 26, 2023. Respondent did not attempt to exercise what it now claims was its unilateral right to amend the SSA and object to this tribunal's jurisdiction until September 26, 2024, matters wholly within its control. Instead, in the interim, as recited in my September 10, 2024 and October 11 Orders, Respondent filed a series of unsuccessful motions on other grounds aimed at dismissing or staying these arbitrations. Respondent's current motion to dismiss on jurisdictional grounds is therefore also untimely.

For all of the reasons stated herein, Respondent's motion to dismiss these arbitrations is denied. The AAA administrator is directed to schedule a telephonic hearing to discuss a discovery and hearing schedule for these arbitrations.

Date: October 24, 2024

Frances Floriano Goins, Arbitrator

# EXHIBIT 7

# Skadden, Arps, Slate, Meagher & Flom llp

### ONE MANHATTAN WEST
### NEW YORK, NY 10001

TEL: (212) 735-3000
FAX: (212) 735-2000
www.skadden.com

DIRECT DIAL
(212) 735-3529
DIRECT FAX
(917) 777-3529
EMAIL ADDRESS
MICHAEL.MCTIGUE@SKADDEN.COM

FIRM/AFFILIATE OFFICES
———
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
PALO ALTO
WASHINGTON, D.C.
WILMINGTON
———
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MUNICH
PARIS
SÃO PAULO
SEOUL
SHANGHAI
SINGAPORE
TOKYO
TORONTO

January 10, 2025

**<u>VIA ELECTRONIC MAIL</u>**

Arbitrator Frances F. Goins
UB Greensfelder
1660 West Second Street, Suite 1100
Cleveland, Ohio 44113-1406

> RE:    *Greg Fish & 3 Other Individual Claimants v. Valve*
> *Corp.:* <u>Objections to Subpoenas</u>

Dear Arbitrator Goins:

Respondent Valve Corporation submits the foregoing objections to the subpoenas proposed by Claimants Greg Fish, Christian Graber, Jeremy Lucas, and Ethan Lefebvre.  Valve objects to Claimants' proposed subpoenas on many grounds.[1]

Claimants request that this Tribunal require Valve to produce four of its Washington State employees—August Butlin, Kassidy Gerber, Tom Giardino, and Kristian Miller—in connection with the merits hearing in these matters. Additionally, Claimants request that Wolfire Games, LLC, produce thousands of documents—not limited in timeframe whatsoever—and to produce witnesses—not limited in number.  Claimants make these requests notwithstanding that each side is allocated only ten hours for its case during each merits hearing.

---

[1]    Valve contends that these arbitrations should be closed given that the current Steam Subscriber Agreement does not contain an arbitration clause.  Valve reserves all rights in that regard.

# EXHIBIT 8

AMERICAN
ARBITRATION
ASSOCIATION

INTERNATIONAL CENTRE
FOR DISPUTE RESOLUTION

**AMERICAN ARBITRATION ASSOCIATION**
**Consumer Arbitration Rules**

In the Matter of the Arbitration between

Case Number: 01-23-0005-3288

Greg Fish, Claimant
-vs-
Valve Corporation d/b/a Steam, Respondent

**INTERIM AWARD OF ARBITRATOR**

I, Frances Floriano Goins, the undersigned Arbitrator, having been designated in accordance with the arbitration agreement entered into between the above-named Parties, having been duly sworn, and having duly heard the proofs and allegations of the Parties, each represented by counsel, at the virtual evidentiary hearing held on March 6, March 7, and March 10, 2025, and, by agreement of the Parties, including additional testimony and evidence presented at subsequent virtual hearings during March 2025 in other individual cases in this mass arbitration before this same Arbitrator, do hereby issue this INTERIM AWARD as follows:

Claimant alleges that Respondent Steam violated Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§1 and 2, by exercising monopoly power to fix prices and decrease competition in the "market for digital distribution of PC games in the U.S." Claimant's Post-Hearing Brief ("C. Post-Hrg. Brief"), p. 29, fn. 6. On balance, the evidence supported this description as to the product, but I find that the geographic market is worldwide. See Ex. R587, p. 84 of 464. Consistent with the decision of the court that most recently addressed the matter, I find that Steam does "hold[] and maintain[] monopoly power in the PC video game digital distribution market." *In re Valve Antitrust Lit.*, 2024 WL 4893373 *8 (W.D. Wash. Nov. 26 2024); *Epic Games, Inc., v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023) ("Steam is a 'dominant player in the space . . . with 70 to 85 percent market share depending on how you define the space.'").[1]

As Respondent notes, "Section 1 of the Sherman Act prohibits agreements that "unreasonably" restrain trade. Section 2 prohibits monopolization." Respondent's Post-Hearing Brief ("R. Post-Hrg. Brief"), p. 3. Under Section 1, agreements relating to pricing between competitors - horizontal agreements - are generally considered to be *per se* illegal, while other agreements not between competitors - vertical agreements - are analyzed applying a rule of reason. See *U.S. v. Socony-Vacuum Oil Co.*, 310 U.S. 150, at 222-223 (1940) (the *per se* rule applies to horizontal agreements whether the effect is to "rais[e], depress[], fix[], peg[], or stabiliz[e] the price"); *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 907 (2007) ("Vertical price restraints are to be judged according to the rule of reason."). Claimants failed to prove that Respondent formed agreements or conspired with competitors; rather, all of the agreements identified were between Respondent and developers or publishers (notwithstanding that some of these firms also have divisions that competed with Respondent as a distributor). Therefore, I find that the rule of reason applies to the agreements at issue here.

The evidence showed that through its agreements with developers and publishers, Respondent had the power to, and did enforce "price parity" restrictions, "post and hold" restrictions, and discounting rules by forcing the said

---

[1] Max Theiler, Claimant's expert, showed estimates of Respondent's market share from various sources ranging from 70% (as estimated by a Respondent witness in 2013) to 92%. Testimony of Respondent's witnesses reflected that Steam's market share has continued to grow through the present. See Transcript citations in C.Post-Hrg. Brief, p. 33.

developers and publishers to adjust the prices of their games on other distribution platforms. ("If a firm can influence market prices, that firm possesses *market power*." Ex. R587, p. 84 of 464 (emphasis original)). That Respondent's market power enabled it to enforce its agreements to influence market prices supports the testimony of Claimant's expert as to Respondent's dominant position in the market. The evidence demonstrated that if persuasion failed, Respondent's threats to cease distributing a particular game would effectively coerce developers to comply with its demands, because "most consumers are on Steam" (Theiler Slide Deck, #31), and therefore that is where most developers and publishers want their games to be available. *E.g.,* Ex. C356, p. 2; Ex. C12; see also *In re Valve Antitrust Lit., supra,* at *3-5.

Respondent alleged that its actions were justified to enable it to compete; *i.e.*, that they were "procompetitive." A "procompetitive justification [is] a nonpretextual claim that [a defendant's] conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal." *U.S. v. Microsoft*, 253 F.3d 34, 47 (D. C. Cir. 2001). Respondent's allegedly "procompetitive justifications" for their conduct and agreements, however, failed to meet this standard. Respondent's witnesses uniformly presented what appeared to be rehearsed explanations for the company's conduct that were at odds with the anticompetitive goals and effects expressed in their written communications. I will not discuss every alleged justification in detail, but suffice to say that they were not persuasive.

Much of the reasoning above also applies to Claimant's Section 2 claim. That claim requires, among other things, that the defendant have monopoly power in a "valid antitrust market;" have acquired or maintained that power through "anticompetitive conduct;" and that the plaintiff was injured as a result. R. Post-Hrg. Brief, p. 28, Ex. 5 Model Ins. A-102. As reflected above, I find that Respondent does have the requisite monopoly power and has maintained and grown that power through the anticompetitive conduct discussed herein. "Conduct that might otherwise be lawful may be impermissibly exclusionary under antitrust law when practiced by a monopolist." *E.I. du Pont de Nemours & Co. v. Kolon Indus.,* 637 F.3d 435, 441 (4th Cir. 2011). The record reflects Respondent's actual control of PC game prices charged by competitors through its manipulation of, and agreements with, developers and publishers, its efforts to exclude competitors, and its control of competitors' output and supply through its ability to grant or deny Steam Keys. This anticompetitive conduct, combined with Respondent's monopoly power, is sufficient to establish the second element of Claimant's Section 2 claim.

A Sherman Act plaintiff must also demonstrate "*antitrust injury*, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328 (1990). Claimant's theory, as explained by Claimant's expert Mr. Theiler, is that Claimant paid inflated prices for PC games purchased on Steam as a result of the impact on the market as a whole of Steam's anticompetitive conduct.[2] If proven, this allegation would demonstrate a quintessential antitrust injury. Based on the evidence presented, including but not limited to the analysis of Claimant's expert Mr. Theiler, I find Claimant did, in fact, pay inflated prices for PC games purchased on Steam, and did suffer antitrust injury flowing from Respondent's anticompetitive conduct. See generally, *inter alia,* Tr. March 12, 2025 (passim); Tr. March 13, 2025, pp. 8-190; and exhibits discussed therein.

Claimant further alleges that Respondent's anti-steering contract provisions violate Washington State unfair competition law. Contrary to Claimant's assertions, however, the evidence reflects that a developer can, in fact, link to his/her own website through his/her unique Steam Store page (Tr., March 10, 2025, p. 625), notwithstanding Respondent's contracts which prohibit links to other facilities in "applications distributed via Steam." See Ex. C300. This situation is factually distinguishable from that in *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898 (N.D. Cal. 2021, *aff'd*, 67 F.4th 946 (9th Cir. 2023), and therefore that decision does not require a different outcome. Claimant's state law claims are denied.

Based on the findings and conclusions stated above, I find that Respondent's actions violated Sections 1 and 2 of

---

[2] Contrary to Respondent's description (R. Post-Hrg. Brief, p. 36), I did not understand Claimant's theory to require that video game makers *always* pass through Steam's 30% revenue share to consumers.

the Sherman Act. Claimant's actual damages of $1,016.18 are accordingly trebled, and he is awarded the sum of $3,048.54 plus costs of this arbitration and attorney fees in an amount to be determined.

Claimant is ordered to submit his application for costs and attorney fees no later than 14 days from the date of this Interim Award. Respondent may submit any objections to the amounts requested within 14 days of receiving Claimant's submission. The Arbitrator will issue a Final Award promptly after receiving Respondent's objections.

This Interim Award is in full resolution of the merits of all claims submitted to this arbitration, except for the determination of reasonable attorney fees and costs in favor of Claimant as set forth above. The Arbitrator retains jurisdiction to address Claimant's claims for reasonable attorney fees and costs. The matter shall be deemed submitted to the Arbitrator for determination in a Final Award upon and after such submissions.

This Interim Award shall remain in full force and effect until the arbitrator renders a Final Award.

_May 29, 2025_
Date

_Frances Floriano Goins_
Frances Floriano Goins, Arbitrator

I, Frances Floriano Goins, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.

_May 29, 2025_
Date

_Frances Floriano Goins_
Frances Floriano Goins, Arbitrator

3

# EXHIBIT 9

AMERICAN
ARBITRATION
ASSOCIATION

INTERNATIONAL CENTRE
FOR DISPUTE RESOLUTION

**AMERICAN ARBITRATION ASSOCIATION**
**Consumer Arbitration Rules**

In the Matter of the Arbitration between

Case Number: 01-23-0005-3823

Jeremy Lucas, Claimant
-vs-
Valve Corporation d/b/a Steam, Respondent

### INTERIM AWARD OF ARBITRATOR

I, Frances Floriano Goins, the undersigned Arbitrator, having been designated in accordance with the arbitration agreement entered into between the above-named Parties, having been duly sworn, and having duly heard the proofs and allegations of the Parties, each represented by counsel, at the virtual evidentiary hearing held on March 17 and March 18, 2025, and, by agreement of the Parties, including additional testimony and evidence presented at related virtual hearings during March 2025 in other individual cases in this mass arbitration before this same Arbitrator, does hereby issue this INTERIM AWARD as follows:

Claimant alleges that Respondent Steam violated Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§1 and 2, by exercising monopoly power to fix prices and decrease competition in the "market for digital distribution of PC games in the U.S." Claimant's Post-Hearing Brief ("C. Post-Hrg. Brief"), p. 29, fn. 6. On balance, the evidence supported this description as to the product, but I find that the geographic market is worldwide. See Ex. R587, p. 84 of 464. Consistent with the decision of the court that most recently addressed the matter, I find that Steam does "hold[] and maintain[] monopoly power in the PC video game digital distribution market." *In re Valve Antitrust Lit.,* 2024 WL 4893373 *8 (W.D. Wash. Nov. 26 2024); *Epic Games, Inc., v. Apple, Inc.,* 67 F.4th 946 (9th Cir. 2023) ("Steam is a 'dominant player in the space . . . with 70 to 85 percent market share depending on how you define the space.'").[1]

As Respondent notes, "Section 1 of the Sherman Act prohibits agreements that "unreasonably" restrain trade. Section 2 prohibits monopolization." Respondent's Post-Hearing Brief ("R. Post-Hrg. Brief"), p. 3. Under Section 1, agreements relating to pricing between competitors - horizontal agreements - are generally considered to be *per se* illegal, while other agreements not between competitors - vertical agreements - are analyzed applying a rule of reason. See *U.S. v. Socony-Vacuum Oil Co.,* 310 U.S. 150, at 222-223 (1940) (the *per se* rule applies to horizontal agreements whether the effect is to "rais[e], depress[], fix[], peg[], or stabiliz[e] the price"); *Leegin Creative Leather Prods. v. PSKS, Inc.,* 551 U.S. 877, 907 (2007) ("Vertical price restraints are to be judged according to the rule of reason."). Claimants failed to prove that Respondent formed agreements or conspired with competitors; rather, all of the agreements identified were between Respondent and developers or publishers (notwithstanding that some of these firms also have divisions that competed with Respondent as a distributor). Therefore, I find that the rule of reason applies to the agreements at issue here.

The evidence showed that through its agreements with developers and publishers, Respondent had the power to, and did enforce "price parity" restrictions, "post and hold" restrictions, and discounting rules, by forcing the said

---

[1] Max Theiler, Claimant's expert, showed estimates of Respondent's market share from various sources ranging from 70% (as estimated by a Respondent witness in 2013) to 92%. Testimony of Respondent's witnesses reflected that Steam's market share has continued to grow through the present. See Transcript citations in C.Post-Hrg. Brief, p. 33.

developers and publishers to adjust the prices of their games on other distribution platforms. ("If a firm can influence market prices, that firm possesses *market power*." Ex. R587, p. 84 of 464 (emphasis original)). That Respondent's market power enabled it to enforce its agreements to influence market prices supports the testimony of Claimant's expert as to Respondent's dominant position in the market. The evidence demonstrated that if persuasion failed, Respondent's threats to cease distributing a particular game would effectively coerce developers to comply with its demands, because "most consumers are on Steam" (Theiler Slide Deck, #31), and therefore that is where most developers and publishers want their games to be available. *E.g.*, Ex. C356, p. 2; Ex. C12; see also *In re Valve Antitrust Lit., supra,* at *3-5.

Respondent alleged that its actions were justified to enable it to effectively compete; *i.e.*, "procompetitive." A "procompetitive justification [is] a nonpretextual claim that [a defendant's] conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal." *U.S. v. Microsoft,* 253 F.3d 34, 47 (D. C. Cir. 2001). Respondent's allegedly "procompetitive justifications" for their conduct and agreements, however, failed to meet this standard. Respondent's witnesses uniformly presented what appeared to be rehearsed explanations for the company's conduct that were at odds with the anticompetitive goals and effects expressed in their written communications. I will not discuss every alleged justification in detail, but suffice to say that they were not persuasive.

Much of the reasoning above also applies to Claimant's Section 2 claim. That claim requires, among other things, that the defendant have monopoly power in a "valid antitrust market;" have acquired or maintained that power through "anticompetitive conduct;" and that the plaintiff was injured as a result. R. Post-Hrg. Brief, p. 28, Ex. 5 Model Ins. A-102. As reflected above, I find that Respondent does have the requisite monopoly power and has maintained and grown that power through the anticompetitive conduct discussed herein. "Conduct that might otherwise be lawful may be impermissibly exclusionary under antitrust law when practiced by a monopolist." *E.I. du Pont de Nemours & Co. v. Kolon Indus.,* 637 F.3d 435, 441 (4th Cir. 2011). The record reflects Respondent's actual control of PC game prices charged by competitors through its manipulation of, and agreements with developers and publishers, its efforts to exclude competitors, and its control of competitors' output and supply through its ability to grant or deny Steam Keys. This anticompetitive conduct, combined with Respondent's monopoly power, is sufficient to establish the second element of Claimant's Section 2 claim.

A Sherman Act plaintiff must also demonstrate "*antitrust injury*, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489 (1977); *Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328 (1990). Claimant's theory, as explained by Claimant's expert Mr. Theiler, is that Claimant paid inflated prices for PC games purchased on Steam as a result of the impact on the market as a whole of Steam's anticompetitive conduct.[2] If proven, this allegation would demonstrate a quintessential antitrust injury. Based on the evidence presented, including but not limited to the analysis of Claimant's expert Mr. Theiler, I find that Claimant did, in fact, pay inflated prices for PC games purchased on Steam, and did suffer antitrust injury flowing from Respondent's anticompetitive conduct. See generally, *inter alia,* Tr. March 12, 2025 (passim); Tr. March 13, 2025, pp. 8-190; and exhibits discussed therein.

Claimant further alleges that Respondent's anti-steering contract provisions violate Washington State unfair competition law. Contrary to Claimant's assertions, however, the evidence reflects that a developer can, in fact, link to his/her own website through his/her unique Steam Store page (Tr., March 10, 2025, p. 625), notwithstanding Respondent's contracts which prohibit links to other facilities in "applications distributed via Steam." See Ex. C300. This situation is factually distinguishable from that in *Epic Games, Inc. v. Apple Inc.,* 559 F. Supp. 3d 898 (N.D. Cal. 2021, *aff'd,* 67 F.4th 946 (9th Cir. 2023), and therefore that decision does not require a different outcome. Claimant's state law claims are denied.

---

[2] Contrary to Respondent's description (R. Post-Hrg. Brief, p. 36), I did not understand Claimant's theory to require that video game makers always pass through Steam's 30% revenue share to consumers.

Based on the findings and conclusions stated above, I find that Respondent's actions violated Sections 1 and 2 of the Sherman Act. Claimant's actual damages of $760.47 are accordingly trebled, and he is awarded the sum of $2,281.41, plus costs of this arbitration and attorney fees in an amount to be determined.

Claimant is ordered to submit his application for costs and attorney fees no later than 14 days from the date of this Interim Award. Respondent may submit any objections to the amounts requested within 14 days of receiving Claimant's submission. The Arbitrator will issue a Final Award promptly after receiving Respondent's objections.

This Interim Award is in full resolution of the merits of all claims submitted to this arbitration, except for the determination of reasonable attorney fees and costs in favor of Claimant as set forth above. The Arbitrator retains jurisdiction to address Claimant's claims for reasonable attorney fees and costs. The matter shall be deemed submitted to the Arbitrator for determination in a Final Award upon and after such submissions.

This Interim Award shall remain in full force and effect until the arbitrator renders a Final Award.

_May 29, 2025_
Date

_Frances Floriano Goins_
Frances Floriano Goins, Arbitrator

I, Frances Floriano Goins, do hereby affirm upon my oath as arbitrator that I am the individual described in and who executed this instrument, which is my Award.

_May 29 2025_
Date

_Frances Floriano Goins_
Frances Floriano Goins, Arbitrator

3

# EXHIBIT 10



AMERICAN
ARBITRATION
ASSOCIATION·

INTERNATIONAL CENTRE
FOR DISPUTE RESOLUTION·

**AMERICAN ARBITRATION ASSOCIATION**
**Consumer Arbitration Rules**

In the Matter of the Arbitration between

Case Number: 01-23-0005-7452

Ethan Lefebvre, Claimant
-vs-
Valve Corporation d/b/a Steam, Respondent

### INTERIM AWARD OF ARBITRATOR

I, Frances Floriano Goins, the undersigned Arbitrator, having been designated in accordance with the arbitration agreement entered into between the above-named Parties, having been duly sworn, and having duly heard the proofs and allegations of the Parties, each represented by counsel, at the virtual evidentiary hearing held on March 21, March 24, and March 26, 2025, and including, by agreement of the Parties, additional testimony and evidence presented at related virtual hearings during March 2025 in other individual cases in this mass arbitration before this same Arbitrator, do hereby issue this INTERIM AWARD as follows:

Claimant alleges that Respondent Steam violated Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§1 and 2, by exercising monopoly power to fix prices and decrease competition in the "market for digital distribution of PC games in the U.S." Claimant's Post-Hearing Brief ("C. Post-Hrg. Brief"), p. 29, fn. 6. On balance, the evidence supported this description as to the product, but I find that the geographic market is worldwide. See Ex. R587, p. 84 of 464. Consistent with the decision of the court that most recently addressed the matter, I find that Steam does "hold[] and maintain[] monopoly power in the PC video game digital distribution market." *In re Valve Antitrust Lit.*, 2024 WL 4893373 *8 (W.D. Wash. Nov. 26 2024); *Epic Games, Inc., v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023) ("Steam is a 'dominant player in the space . . . with 70 to 85 percent market share depending on how you define the space.'").[1]

As Respondent notes, "Section 1 of the Sherman Act prohibits agreements that "unreasonably" restrain trade. Section 2 prohibits monopolization." Respondent's Post-Hearing Brief ("R. Post-Hrg. Brief"), p. 3. Under Section 1, agreements relating to pricing between competitors - horizontal agreements - are generally considered to be *per se* illegal, while other agreements not between competitors - vertical agreements - are analyzed applying a rule of reason. See *U.S. v. Socony-Vacuum Oil Co.*, 310 U.S. 150, at 222-223 (1940) (the *per se* rule applies to horizontal agreements whether the effect is to "rais[e], depress[], fix[], peg[], or stabiliz[e] the price"); *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 907 (2007) ("Vertical price restraints are to be judged according to the rule of reason."). Claimants failed to prove that Respondent formed agreements or conspired with competitors; rather, all of the agreements identified were between Respondent and developers or publishers (notwithstanding that some of these firms also have divisions that competed with Respondent as a distributor). Therefore, I find that the rule of reason applies to the agreements at issue here.

The evidence showed that through its agreements with developers and publishers, Respondent had the power to, and did enforce "price parity" restrictions, "post and hold" restrictions, and discounting rules, by forcing the said

---

[1] Max Theiler, Claimant's expert, showed estimates of Respondent's market share from various sources ranging from 70% (as estimated by a Respondent witness in 2013) to 92%. Testimony of Respondent's witnesses reflected that Steam's market share has continued to grow through the present. See Transcript citations in C.Post-Hrg. Brief, p. 33.

developers and publishers to adjust the prices of their games on other distribution platforms. ("If a firm can influence market prices, that firm possesses *market power*." Ex. R587, p. 84 of 464 (emphasis original)). That Respondent's market power enabled it to enforce its agreements to influence market prices supports the testimony of Claimant's expert as to Respondent's dominant position in the market. The evidence demonstrated that if persuasion failed, Respondent's threats to cease distributing a particular game would effectively coerce developers to comply with its demands, because "most consumers are on Steam" (Theiler Slide Deck, #31), and therefore that is where most developers and publishers want their games to be available. *E.g.,* Ex. C356, p. 2; Ex. C12; see also *In re Valve Antitrust Lit., supra,* at \*3-5.

Respondent alleged that its actions were justified to enable it to compete; *i.e.,* that they were "procompetitive." A "procompetitive justification [is] a nonpretextual claim that [a defendant's] conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal." *U.S. v. Microsoft,* 253 F.3d 34, 47 (D. C. Cir. 2001). Respondent's allegedly "procompetitive justifications" for their conduct and agreements, however, failed to meet this standard. Respondent's witnesses uniformly presented what appeared to be rehearsed explanations for the company's conduct that were at odds with the anticompetitive goals and effects expressed in their written communications. I will not discuss every alleged justification in detail, but suffice to say that they were not persuasive.

Much of the reasoning above also applies to Claimant's Section 2 claim. That claim requires, among other things, that the defendant have monopoly power in a "valid antitrust market;" have acquired or maintained that power through "anticompetitive conduct;" and that the plaintiff was injured as a result. R. Post-Hrg. Brief, p. 28, Ex. 5 Model Ins. A-102. As reflected above, I find that Respondent does have the requisite monopoly power and has maintained and grown that power through the anticompetitive conduct discussed herein. "Conduct that might otherwise be lawful may be impermissibly exclusionary under antitrust law when practiced by a monopolist." *E.I. du Pont de Nemours & Co. v. Kolon Indus.,* 637 F.3d 435, 441 (4th Cir. 2011). The record reflects Respondent's actual control of PC game prices charged by competitors through its manipulation of, and agreements with developers and publishers, its efforts to exclude competitors, and its control of competitors' output and supply through its ability to grant or deny Steam Keys. This anticompetitive conduct, combined with Respondent's monopoly power, is sufficient to establish the second element of Claimant's Section 2 claim.

A Sherman Act plaintiff must also demonstrate "*antitrust injury*, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489 (1977); *Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328 (1990). Claimant's theory, as explained by Claimant's expert Mr. Theiler, is that Claimant paid inflated prices for PC games purchased on Steam as a result of the impact on the market as a whole of Steam's anticompetitive conduct.[2] If proven, this allegation would demonstrate a quintessential antitrust injury. Based on the evidence presented, including but not limited to the analysis of Claimant's expert Mr. Theiler, I find that Claimant did, in fact, pay inflated prices for PC games purchased on Steam, and did suffer antitrust injury flowing from Respondent's anticompetitive conduct. See generally, *inter alia,* Tr. March 12, 2025 (passim); Tr. March 13, 2025, pp. 8-190; and exhibits discussed therein.

Claimant further alleges that Respondent's anti-steering contract provisions violate Washington State unfair competition law. Contrary to Claimant's assertions, however, the evidence reflects that a developer can, in fact, link to his/her own website through his/her unique Steam Store page (Tr., March 10, 2025, p. 625), notwithstanding Respondent's contracts which prohibit links to other facilities in "applications distributed via Steam." See Ex. C300. This situation is factually distinguishable from that in *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898 (N.D. Cal. 2021, *aff'd,* 67 F.4th 946 (9th Cir. 2023), and therefore that decision does not require a different outcome. Claimant's state law claims are denied.

---

[2] Contrary to Respondent's description (R. Post-Hrg. Brief, p. 36), I did not understand Claimant's theory to require that video game makers *always* pass through Steam's 30% revenue share to consumers.

Based on the findings and conclusions stated above, I find that Respondent's actions violated Sections 1 and 2 of the Sherman Act. Claimant's actual damages of $669.52,[3] are accordingly trebled, and he is awarded the sum of $2,008.56 plus costs of this arbitration and attorney fees in an amount to be determined.

Claimant is ordered to submit his application for costs and attorney fees no later than 14 days from the date of this Interim Award. Respondent may submit any objections to the amounts requested within 14 days of receiving Claimant's submission. The Arbitrator will issue a Final Award promptly after receiving Respondent's objections.

This Interim Award is in full resolution of the merits of all claims submitted to this arbitration, except for the determination of reasonable attorney fees and costs in favor of Claimant as set forth above. The Arbitrator retains jurisdiction to address Claimant's claims for reasonable attorney fees and costs. The matter shall be deemed submitted to the Arbitrator for determination in a Final Award upon and after such submissions.

This Interim Award shall remain in full force and effect until the arbitrator renders a Final Award.

May 29, 2025
Date

Frances Floriano Goins, Arbitrator

I, Frances Floriano Goins, do hereby affirm upon my oath as arbitrator that I am the individual described in and who executed this instrument, which is my Award.

May 29, 2025
Date

Frances Floriano Goins, Arbitrator

---

[3] I have accepted Claimant's computation of damages at the low end of the range submitted. Although some of the purchases shown on Claimant's Steam account (Ex. J010) are listed in the name of what appears to be a Lefebvre family member, I have not factored in Respondent's otherwise unsupported objection that some of the purchases may have been made by others using Claimant's account, not the least because Respondent supplied Ex. J010 as Claimant's account statement.

# EXHIBIT 11

AMERICAN
ARBITRATION
ASSOCIATION

INTERNATIONAL CENTRE
FOR DISPUTE RESOLUTION

## AMERICAN ARBITRATION ASSOCIATION
### Consumer Arbitration Rules

In the Matter of the Arbitration between

Case Number: 01-23-0005-3702

Christian Graber, Claimant
-vs-
Valve Corporation d/b/a Steam, Respondent

## INTERIM AWARD OF ARBITRATOR

I, Frances Floriano Goins, the undersigned Arbitrator, having been designated in accordance with the arbitration agreement entered into between the above-named Parties, having been duly sworn, and having duly heard the proofs and allegations of the Parties, each represented by counsel, at the virtual evidentiary hearing held on March 12 and March 13, 2025, and including, by agreement of the Parties, additional testimony and evidence presented at related virtual hearings during March 2025 in other individual cases in this mass arbitration before this same Arbitrator, do hereby issue this INTERIM AWARD as follows:

Claimant alleges that Respondent Steam violated Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§1 and 2, by exercising monopoly power to fix prices and decrease competition in the "market for digital distribution of PC games in the U.S." Claimant's Post-Hearing Brief ("C. Post-Hrg. Brief"), p. 29, fn. 6. On balance, the evidence supported this description as to the product, but I find that the geographic market is worldwide. See Ex. R587, p. 84 of 464. Consistent with the decision of the court that most recently addressed the matter, I find that Steam does "hold[] and maintain[] monopoly power in the PC video game digital distribution market." *In re Valve Antitrust Lit.*, 2024 WL 4893373 *8 (W.D. Wash. Nov. 26 2024); *Epic Games, Inc., v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023) ("Steam is a 'dominant player in the space . . . with 70 to 85 percent market share depending on how you define the space.'").[1]

As Respondent notes, "Section 1 of the Sherman Act prohibits agreements that "unreasonably" restrain trade. Section 2 prohibits monopolization." Respondent's Post-Hearing Brief ("R. Post-Hrg. Brief"), p. 3. Under Section 1, agreements relating to pricing between competitors - horizontal agreements - are generally considered to be *per se* illegal, while other agreements not between competitors - vertical agreements - are analyzed applying a rule of reason. See *U.S. v. Socony-Vacuum Oil Co.*, 310 U.S. 150, at 222-223 (1940) (the *per se* rule applies to horizontal agreements whether the effect is to "rais[e], depress[], fix[], peg[], or stabiliz[e] the price"); *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 907 (2007) ("Vertical price restraints are to be judged according to the rule of reason."). Claimants failed to prove that Respondent formed agreements or conspired with competitors; rather, all of the agreements identified were between Respondent and developers or publishers (notwithstanding that some of these firms also have divisions that competed with Respondent as a distributor). Therefore, I find that the rule of reason applies to the agreements at issue here.

The evidence showed that through its agreements with developers and publishers, Respondent had the power to, and did enforce "price parity" restrictions, "post and hold" restrictions, and discounting rules, by forcing the said

---

[1] Max Theiler, Claimant's expert, showed estimates of Respondent's market share from various sources ranging from 70% (as estimated by a Respondent witness in 2013) to 92%. Testimony of Respondent's witnesses reflected that Steam's market share has continued to grow through the present. See Transcript citations in C.Post-Hrg. Brief, p. 33.

developers and publishers to adjust the prices of their games on other distribution platforms. ("If a firm can influence market prices, that firm possesses *market power*." Ex. R587, p. 84 of 464 (emphasis original)). That Respondent's market power enabled it to enforce its agreements to influence market prices supports the testimony of Claimant's expert as to Respondent's dominant position in the market. The evidence demonstrated that if persuasion failed, Respondent's threats to cease distributing a particular game would effectively coerce developers to comply with its demands, because "most consumers are on Steam" (Theiler Slide Deck, #31), and therefore that is where most developers and publishers want their games to be available. *E.g.,* Ex. C356, p. 2; Ex. C12; see also *In re Valve Antitrust Lit., supra,* at *3-5.

Respondent alleged that its actions were justified to enable it to compete; *i.e.,* that they were "procompetitive." A "procompetitive justification [is] a nonpretextual claim that [a defendant's] conduct is a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal." *U.S. v. Microsoft,* 253 F.3d 34, 47 (D. C. Cir. 2001). Respondent's allegedly "procompetitive justifications" for their conduct and agreements, however, failed to meet this standard. Respondent's witnesses uniformly presented what appeared to be rehearsed explanations for the company's conduct that were at odds with the anticompetitive goals and effects expressed in their written communications. I will not discuss every alleged justification in detail, but suffice to say that they were not persuasive.

Much of the reasoning above also applies to Claimant's Section 2 claim. That claim requires, among other things, that the defendant have monopoly power in a "valid antitrust market;" have acquired or maintained that power through "anticompetitive conduct;" and that the plaintiff was injured as a result. R. Post-Hrg. Brief, p. 28, Ex. 5 Model Ins. A-102. As reflected above, I find that Respondent does have the requisite monopoly power and has maintained and grown that power through the anticompetitive conduct discussed herein. "Conduct that might otherwise be lawful may be impermissibly exclusionary under antitrust law when practiced by a monopolist." *E.I. du Pont de Nemours & Co. v. Kolon Indus.,* 637 F.3d 435, 441 (4th Cir. 2011). The record reflects Respondent's actual control of PC game prices charged by competitors through its manipulation of, and agreements with developers and publishers, its efforts to exclude competitors, and its control of competitors' output and supply through its ability to grant or deny Steam Keys. This anticompetitive conduct, combined with Respondent's monopoly power, is sufficient to establish the second element of Claimant's Section 2 claim.

A Sherman Act plaintiff must also demonstrate "*antitrust injury*, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489 (1977); *Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328 (1990). Claimant's theory, as explained by Claimant's expert Mr. Theiler, is that Claimant paid inflated prices for PC games purchased on Steam as a result of the impact on the market as a whole of Steam's anticompetitive conduct.[2] If proven, this allegation would demonstrate a quintessential antitrust injury. Based on the evidence presented, including but not limited to the analysis of Claimant's expert Mr. Theiler, I find that Claimant did, in fact, pay inflated prices for PC games purchased on Steam, and did suffer antitrust injury flowing from Respondent's anticompetitive conduct. See generally, *inter alia,* Tr. March 12, 2025 (passim); Tr. March 13, 2025, pp. 8-190; and exhibits discussed therein.

Claimant further alleges that Respondent's anti-steering contract provisions violate Washington State unfair competition law. Contrary to Claimant's assertions, however, the evidence reflects that a developer can, in fact, link to his/her own website through his/her unique Steam Store page (Tr., March 10, 2025, p. 625), notwithstanding Respondent's contracts which prohibit links to other facilities in "applications distributed via Steam." See Ex. C300. This situation is factually distinguishable from that in *Epic Games, Inc. v. Apple Inc.,* 559 F. Supp. 3d 898 (N.D. Cal. 2021, *aff'd,* 67 F.4th 946 (9th Cir. 2023), and therefore that decision does not require a different outcome. Claimant's state law claims are denied.

---

[2] Contrary to Respondent's description (R. Post-Hrg. Brief, p. 36), I did not understand Claimant's theory to require that video game makers always pass through Steam's 30% revenue share to consumers.

Based on the findings and conclusions stated above, I find that Respondent's actions violated Sections 1 and 2 of the Sherman Act. Claimant's actual damages of $243.23[3] are accordingly trebled, and he is awarded the sum of $729.69, plus costs of this arbitration and attorney fees in an amount to be determined.

Claimant is ordered to submit his application for costs and attorney fees no later than 14 days from the date of this Interim Award. Respondent may submit any objections to the amounts requested within 14 days of receiving Claimant's submission. The Arbitrator will issue a Final Award promptly after receiving Respondent's objections.

This Interim Award is in full resolution of the merits of all claims submitted to this arbitration, except for the determination of reasonable attorney fees and costs in favor of Claimant as set forth above. The Arbitrator retains jurisdiction to address Claimant's claims for reasonable attorney fees and costs. The matter shall be deemed submitted to the Arbitrator for determination in a Final Award upon and after such submissions.

This Interim Award shall remain in full force and effect until the arbitrator renders a Final Award.

May 29, 2025
_____
Date

_____
Frances Floriano Goins, Arbitrator

I, Frances Floriano Goins, do hereby affirm upon my oath as arbitrator that I am the individual described in and who executed this instrument, which is my Award.

May 29, 2025
_____
Date

_____
Frances Floriano Goins, Arbitrator

---

[3] I have accepted Claimant's computation of damages at the low end of the range submitted. Although some of the purchases shown on Claimant's Steam account in the document supplied by Respondent (Ex. J008) are listed in the name of what appears to be a Graber family member, I have not factored in Respondent's otherwise unsupported conjecture that some of the purchases may have been made by others using Claimant's account.

# EXHIBIT 12

AMERICAN
ARBITRATION
ASSOCIATION® | INTERNATIONAL CENTRE
FOR DISPUTE RESOLUTION®

**AMERICAN ARBITRATION ASSOCIATION**
**Consumer Arbitration Rules**

Case Number: 01-23-0005-3288

In the Matter of the Arbitration between

Greg Fish
-vs-
Valve Corporation d/b/a Steam

## FINAL AWARD OF ARBITRATOR

I, Frances Floriano Goins, the undersigned Arbitrator, having been designated in accordance with the arbitration agreement entered into by the above-named parties, having been duly sworn, and having duly heard and carefully reviewed the proofs and allegations of the Parties and the applicable law, and having previously rendered an Interim Award dated May 29, 2025 ("Interim Award") as to liability, which is confirmed, adopted, and incorporated as if fully set forth herein, do hereby issue this FINAL AWARD as follows:

The only matter still pending is Claimant's application for Costs and Attorneys' Fees ("Application"). Claimant has been awarded $3,048.54 in damages, and now seeks an additional $2,710.11 in pre- and post-judgment interest, $46,526.07 in costs, and $721,886.77 in attorneys' fees, plus an additional $10,539.75 in attorneys' fees incurred in preparing a reply on this Application.

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue" for treble damages, prejudgment interest, and costs of suit, including attorney fees. As indicated in the Interim Award, Claimant has proven such antitrust injury here. He has substantially prevailed on his claims; the damage award set forth in the Interim Award is not "nominal," but is based on his actual loss. "An award of attorney's fees as part of the cost of a successful antitrust suit is mandatory," *Baughman v. Cooper-Jarrett, Inc*., 530 F. 2d 529 (3rd Cir.), *cert. denied*, 429 U.S. 825 (1976); 15 U.S.C. §15 (a). The purpose of the attorney's fees provision is . . . to encourage private persons to undertake enforcement of antitrust laws." *Twin City Sportservice, v. Charle O. Finley & Co.,* 676 F. 2d 1291 (9th Cir. 1982); *c.f., Preferred Wireless LLC v. T-Mobile USA Inc*., No 2:22-cv-00978 (S.D. Ohio, May 6, 2025) (affirming award of reasonable attorney fees to "prevailing party" that was not awarded damages).

The attorneys' fees must be "reasonable," which, in this context, is determined by addressing "rates for similar services in the community by attorneys with comparable skills, experience, and reputation," *Dye v. Bellsouth Telecomms., Inc*., 462 F. Supp. 2d 845, 855 (W.D. Tenn. 2006)

(internal quotations omitted).[1] I find that the lodestar rates charged by Claimant's counsel were reasonable under this standard. I further find that counsel's work and the number of hours billed were commensurate with the complexity and protracted nature of this case. I find that, although some of this work may also be of use in other related matters, the same work would have been required if this had been the only case that counsel was pursuing against this Respondent. Counsel has assured that the same fees will not be claimed in future related mass arbitration proceedings against Respondent, and I specifically order that the attorneys' and expert witness fees, costs, and expenses awarded here may not be claimed in future related proceedings in these mass arbitrations.

Claimant here is also seeking a multiplier of counsel's lodestar rates, *inter alia* because his counsel has worked on a contingency basis and advanced all expenses and as a result has experienced a delay in receipt of payment, because the issues litigated were complex, because the matter was unduly protracted due to Respondent's strategic maneuvers, and because the public policy value of the matter is high. While I agree with Claimant that these factors have been demonstrated on the record presented, I do not find that a multiplier is appropriate here. The damage award, while real and not merely nominal, is substantially smaller than the value of the attorney fees claimed. While I do not agree with Respondent that the disparity between the damage award and the fees claimed creates an "impermissible windfall" to Claimant's counsel, giving due consideration to the factor of proportionality between damages and attorney fees, I find that this disparity cuts against an increase in fees beyond the lodestar rates.

I find further that Claimant is entitled to an award of costs in the amount of $46,526.07 (including expert fees), plus additional attorneys' fees in the amount of $10,539.75 for additional time spent to reply to Respondent Valve Corporation's Objections to Claimants' Application for Costs and Attorneys' Fees.

Claimant also seeks an award of interest "accruing from the date of the injury" on the fees claimed, at a 12% rate as required by Washington law. Section 4 of the Clayton Act, 15 U.S.C. § 15 (a), however, provides in pertinent part:

> [A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee. The court may award under this section, pursuant to a motion by such person promptly made, ***simple interest on actual damages for the period beginning on the date of service of such person's pleading setting forth a claim under the antitrust laws and ending on the date of judgment***, or for any shorter period therein, if the court finds that the award of such interest for such period is just in the circumstances.

---

[1] *Corbin v. Steak 'n Shake, Inc.,* Case No. 20-3519/3553 (unpublished) (6th Cir. App. 2021), "[T]he same standards are 'generally applicable in all cases in which Congress has authorized an award of fees to a "prevailing party",'" quoting *Hensley v. Eckerhart,* 461 U.S. 424, 433 n. 7 (1983).

This statute contains the controlling law as to pre-judgment interest. The section is modified by sub-sections (a) (1), (2), and (3), which set forth the "only" criteria a court may consider in awarding pre-judgment interest. Sub-section (3) includes the situation where "the opposing party . . . engaged in conduct primarily for the purpose of delaying the litigation or increasing the cost thereof."[2] I find that Respondent did engage in such conduct in this proceeding, including but not limited to reversing its position as to the appropriate forum for resolution of this case, attempting to unilaterally amend the underlying arbitration agreement after this proceeding had been pending for many months, and filing multiple motions to dismiss.

The applicable rate of interest is determined under Ohio law, the forum and state where this Award is issued. For judgments issued in 2025 in Ohio, the applicable rate is 8%. *See* https://www.weltman.com/publication-ohio-statutory-interest-rate-for-judgments-in-2025; ORC §§ 5703.47; 1343.03 (A). I find that Claimant is entitled to simple interest on his damages awarded here for the period beginning on the date of service of Claimant's pleading setting forth a claim under the antitrust laws and ending on the date of this Final Award at the 8% rate.

I decline to award post-judgment interest, but note that Claimant may apply to the court in which it seeks to enforce this award for such additional interest.

In summary, Claimant is hereby awarded the following:

- $3,048.54 in damages, plus pre-judgment interest on such damages for the period beginning on the date of service of Claimant's pleading setting forth a claim under the antitrust laws (October 2, 2023) and ending on the date of this Final Award at a rate of 8% *per annum*; and
- $732,426.52 in attorney fees; and
- $46,526.07 in costs.

The above sums are to be paid by check on or before fifteen (15) days from the date of this Final Award, payable to Bucher Law PLLC, and delivered to

> Will Bucher
> Bucher Law PLLC
> 350 Northern Blvd.
> STE 324-1519
> Albany, NY 12204-1000

The administrative fees of the American Arbitration Association totaling $2,225.00 shall be borne as incurred, and the compensation of the Arbitrator totaling $15,642.50 shall be borne as incurred.

---

[2] Contrary to Respondent's argument, this section does not require a finding of "bad faith" on its part, and I make no such finding here.

I, Frances Floriano Goins, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.

_September 3, 2025_
Date

_Frances Floriano Goins_
Frances Floriano Goins, Arbitrator

# EXHIBIT 13



## AMERICAN ARBITRATION ASSOCIATION
### Consumer Arbitration Rules

Case Number: 01-23-0005-3823

In the Matter of the Arbitration between

Jeremy Lucas
-vs-
Valve Corporation d/b/a Steam

## FINAL AWARD OF ARBITRATOR

I, Frances Floriano Goins, the undersigned Arbitrator, having been designated in accordance with the arbitration agreement entered into by the above-named parties, having been duly sworn, and having duly heard and carefully reviewed the proofs and allegations of the Parties and the applicable law, and having previously rendered an Interim Award dated May 29, 2025 ("Interim Award") as to liability, which is confirmed, adopted, and incorporated as if fully set forth herein, do hereby issue this FINAL AWARD as follows:

The only matter still pending is Claimant's Application for Costs and Attorneys' Fees ("Application").  Claimant has been awarded $2,281.41 in damages, and now seeks an additional $1,634.36 in pre- and post-judgment interest, $46,526.07 in costs, and $721,886.77 in attorneys' fees, plus an additional $10,539.75 in attorney fees incurred in preparing a reply on this Application.

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue" for treble damages, prejudgment interest, and costs of suit, including attorney fees. As indicated in the Interim Award, Claimant has proven such antitrust injury here.  He has substantially prevailed on his claims; the damage award set forth in the Interim Award is not "nominal," but is based on his actual loss.  "An award of attorney's fees as part of the cost of a successful antitrust suit is mandatory," *Baughman v. Cooper-Jarrett, Inc.*, 530 F. 2d 529 (3rd Cir.), *cert. denied*, 429 U.S. 825 (1976); 15 U.S.C. §15 (a).  The purpose of the attorney's fees provision is . . . to encourage private persons to undertake enforcement of antitrust laws." *Twin City Sportservice, v. Charle O. Finley & Co.*, 676 F. 2d 1291 (9th Cir. 1982).

The attorneys' fees must be "reasonable," which, in this context, is determined by addressing "rates for similar services in the community by attorneys with comparable skills, experience, and reputation," *Dye v. Bellsouth Telecomms., Inc.*, 462 F. Supp. 2d 845, 855 (W.D. Tenn. 2006)

(internal quotations omitted).[1] I find that the lodestar rates charged by Claimant's counsel were reasonable under this standard. I further find that counsel's work and the number of hours billed were commensurate with the complexity and protracted nature of this case. I find that, although some of this work may also be of use in other related matters, the same work would have been required if this had been the only case that counsel was pursuing against this Respondent. Counsel has assured that the same fees will not be claimed in future related mass arbitration proceedings against Respondent, and I specifically order that the attorneys' and expert witness fees, costs, and expenses awarded here may not be claimed in future related proceedings in these mass arbitrations.

Claimant here is also seeking a multiplier of counsel's lodestar rates, *inter alia* because his counsel has worked on a contingency basis and advanced all expenses and as a result has experienced a delay in receipt of payment, because the issues litigated were complex, because the matter was unduly protracted due to Respondent's strategic maneuvers, and because the public policy value of the matter is high. While I agree with Claimant that these factors have been demonstrated on the record presented, I do not find that a multiplier is appropriate here. The damage award, while real and not merely nominal, is substantially smaller than the value of the claimed attorney fees. While I do not agree with Respondent that the disparity between the damage award and the fees claimed creates an "impermissible windfall" to Claimant's counsel, giving due consideration to the factor of proportionality between damages and attorney fees, I find that this disparity cuts against an increase in fees beyond the lodestar rates.

I find further that Claimant is entitled to an award of costs in the amount of $46,526.07 (including expert fees), plus additional attorneys' fees in the amount of $10,539.75 for additional time spent to reply to Respondent Valve Corporation's Objections to Claimants' Application for Costs and Attorneys' Fees.

Claimant also seeks an award of interest "accruing from the date of the injury" on the fees claimed, at a 12% rate as required by Washington law. Section 4 of the Clayton Act, 15 U.S.C. § 15 (a), however, provides in pertinent part:

> [A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee. The court may award under this section, pursuant to a motion by such person promptly made, **simple interest on actual damages for the period beginning on the date of service of such person's pleading setting forth a claim under the antitrust laws and ending on the date of judgment**, or for any shorter period therein, if the court finds that the award of such interest for such period is just in the circumstances.

---

[1] *Corbin v. Steak 'n Shake, Inc.,* Case No. 20-3519/3553 (unpublished) (6th Cir. App. 2021), "[T]he same standards are 'generally applicable in all cases in which Congress has authorized an award of fees to a "prevailing party",'" quoting *Hensley v. Eckerhart,* 461 U.S. 424, 433 n. 7 (1983).

This statute contains the controlling law as to pre-judgment interest. The section is modified by sub-sections (a) (1), (2), and (3), which set forth the "only" criteria a court may consider in awarding pre-judgment interest. Sub-section (3) includes the situation where "the opposing party . . . engaged in conduct primarily for the purpose of delaying the litigation or increasing the cost thereof."[2] I find that Respondent did engage in such conduct in this proceeding, including but not limited to reversing its position as to the appropriate forum for resolution of this case, attempting to unilaterally amend the underlying arbitration agreement after this proceeding had been pending for many months, and filing multiple motions to dismiss.

The applicable rate of interest is determined under Ohio law, the forum and state where this Award is issued. For judgments issued in 2025 in Ohio, the current applicable rate is 8%. *See* https://www.weltman.com/publication-ohio-statutory-interest-rate-for-judgments-in-2025; ORC §§ 5703.47; 1343.03 (A). I find that Claimant is entitled to simple interest on his damages awarded here for the period beginning on the date of service of Claimant's pleading setting forth a claim under the antitrust laws and ending on the date of this Final Award at the 8% rate.

I decline to award post-judgment interest, but note that Claimant may apply to the court in which it seeks to enforce this award for such additional interest.

In summary, Claimant is hereby awarded the following:

- $2,281.41 in damages, plus pre-judgment interest on such damages for the period beginning on the date of service of Claimant's pleading setting forth a claim under the antitrust laws (October 2, 2023) and ending on the date of this Final Award, at a rate of 8% *per annum*; and
- $732,426.52 in attorney fees; and
- $46,526.07 in costs.

The above sums are to be paid by check on or before fifteen (15) days from the date of this Final Award, payable to Bucher Law PLLC, and delivered to

> Will Bucher
> Bucher Law PLLC
> 350 Northern Blvd.
> STE 324-1519
> Albany, NY 12204-1000

The administrative fees of the American Arbitration Association totaling $2,225.00 shall be borne as incurred, and the compensation of the Arbitrator totaling $13,167.50 shall be borne as incurred.

---

[2] Contrary to Respondent's argument, this section does not require a finding of "bad faith" on its part, and I make no such finding here.

I, Frances Floriano Goins, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.

September 3, 2025
_____
Date

_____
Frances Floriano Goins, Arbitrator

# EXHIBIT 14

**AMERICAN
ARBITRATION
ASSOCIATION**  |  INTERNATIONAL CENTRE
FOR DISPUTE RESOLUTION™

**AMERICAN ARBITRATION ASSOCIATION**
**Consumer Arbitration Rules**

Case Number: 01-23-0005-7452

In the Matter of the Arbitration between

Ethan Lefebvre
-vs-
Valve Corporation d/b/a Steam

### FINAL AWARD OF ARBITRATOR

I, Frances Floriano Goins, the undersigned arbitrator, having been designated in accordance with the arbitration agreement entered into by the above-named parties, having been duly sworn, and having duly heard and carefully reviewed the proofs and allegations of the Parties and the applicable law, and having previously rendered an Interim Award dated May 29, 2025 ("Interim Award") as to liability, which is confirmed, adopted, and incorporated as if fully set forth herein, do hereby issue this FINAL AWARD as follows:

The only matter still pending is Claimant's Application for Costs and Attorneys' Fees ("Application"). Claimant has been awarded $2,008.56 in damages, and now seeks an additional $1,183.34 in pre- and post-judgment interest, $46,526.07 in costs, and $721,886.77 in attorneys' fees, plus an additional $10,539.75 in attorney fees incurred in preparing a reply on this Application.

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue" for treble damages, prejudgment interest, and costs of suit, including attorney fees. As indicated in the Interim Award, Claimant has proven such antitrust injury here. He has substantially prevailed on his claims; the damage award set forth in the Interim Award is not "nominal," but is based on his actual loss. "An award of attorney's fees as part of the cost of a successful antitrust suit is mandatory," *Baughman v. Cooper-Jarrett, Inc.*, 530 F. 2d 529 (3rd Cir.), *cert. denied*, 429 U.S. 825 (1976); 15 U.S.C. §15 (a). The purpose of the attorney's fees provision is . . . to encourage private persons to undertake enforcement of antitrust laws." *Twin City Sportservice, v. Charle O. Finley & Co.,* 676 F. 2d 1291 (9th Cir. 1982); *c.f., Preferred Wireless LLC v. I-Mobile USA Inc*., No 2:22-cv-00978 (S.D. Ohio, May 6, 2025) (affirming award of reasonable attorney fees to "prevailing party" that was not awarded damages).

The attorneys' fees must be "reasonable," which, in this context, is determined by addressing "rates for similar services in the community by attorneys with comparable skills, experience, and

reputation," *Dye v. Bellsouth Telecomms., Inc.*, 462 F. Supp. 2d 845, 855 (W.D. Tenn. 2006) (internal quotations omitted).[1] I find that the lodestar rates charged by Claimant's counsel were reasonable under this standard. I further find that counsel's work and the number of hours billed were commensurate with the complexity and protracted nature of this case. I find that, although some of this work may also be of use in other related matters, the same work would have been required if this had been the only case that counsel was pursuing against this Respondent. Counsel has assured that the same fees will not be claimed in future related mass arbitration proceedings against Respondent, and I specifically order that the attorneys' and expert witness fees, costs, and expenses awarded here may not be claimed in future related proceedings in these mass arbitrations.

Claimant here is also seeking a multiplier of counsel's lodestar rates, *inter alia* because his counsel has worked on a contingency basis and advanced all expenses and as a result has experienced a delay in receipt of payment, because the issues litigated were complex, because the matter was unduly protracted due to Respondent's strategic maneuvers, and because the public policy value of the matter is high. While I agree with Claimant that these factors have been demonstrated on the record presented, I do not find that a multiplier is appropriate here. The damage award, while real and not merely nominal, is substantially smaller than the value of the claimed attorney fees. While I do not agree with Respondent that the disparity between the damage award and the fees claimed creates an "impermissible windfall" to Claimant's counsel, giving due consideration to the factor of proportionality between damages and attorney fees, I find that this disparity cuts against an increase in fees beyond the lodestar rates.

I find further that Claimant is entitled to an award of costs in the amount of $46,526.07 (including expert fees), plus additional attorneys' fees in the amount of $10,539.75 for additional time spent to reply to Respondent Valve Corporation's Objections to Claimants' Application for Costs and Attorneys' Fees.

Claimant also seeks an award of interest "accruing from the date of the injury" on the fees claimed, at a 12% rate as required by Washington law. Section 4 of the Clayton Act, 15 U.S.C. § 15 (a), however, provides in pertinent part:

> [A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee. The court may award under this section, pursuant to a motion by such person promptly made, ***simple interest on actual damages for the period beginning on the date of service of such person's pleading setting forth a claim under the antitrust laws and ending on the date of judgment***, or for any shorter period therein, if the court finds that the award of such interest for such period is just in the circumstances.

---

[1] *Corbin v. Steak 'n Shake, Inc.,* Case No. 20-3519/3553 (unpublished) (6th Cir. App. 2021), "[T]he same standards are 'generally applicable in all cases in which Congress has authorized an award of fees to a "prevailing party",'" quoting *Hensley v. Eckerhart,* 461 U.S. 424, 433 n. 7 (1983).

This statute contains the controlling law as to pre-judgment interest. The section is modified by sub-sections (a) (1), (2), and (3), which set forth the "only" criteria a court may consider in awarding pre-judgment interest. Sub-section (3) includes the situation where "the opposing party . . . engaged in conduct primarily for the purpose of delaying the litigation or increasing the cost thereof."[2] I find that Respondent did engage in such conduct in this proceeding, including but not limited to reversing its position as to the appropriate forum for resolution of this case, attempting to unilaterally amend the underlying arbitration agreement after this proceeding had been pending for many months, and filing multiple motions to dismiss.

The applicable rate of interest is determined under Ohio law, the forum and state where this Award is issued. For judgments issued in 2025 in Ohio, the current applicable rate is 8%. *See* https://www.weltman.com/publication-ohio-statutory-interest-rate-for-judgments-in-2025; ORC §§ 5703.47; 1343.03 (A). I find that Claimant is entitled to simple interest on his damages awarded here for the period beginning on the date of service of Claimant's pleading setting forth a claim under the antitrust laws and ending on the date of this Final Award at the 8% rate.

I decline to award post-judgment interest, but note that Claimant may apply to the court in which it seeks to enforce this award for such additional interest.

In summary, Claimant is hereby awarded the following:

- $2,008.56 in damages, plus pre-judgment interest on such damages for the period beginning on the date of service of Claimant's pleading setting forth a claim under the antitrust laws (October 2, 2023) and ending on the date of this Final Award, at a rate of 8% *per annum*; and
- $732,426.52 in attorney fees; and
- $46,526.07 in costs.

The above sums are to be paid by check on or before fifteen (15) days from the date of this Final Award, payable to Bucher Law PLLC, and delivered to

Will Bucher
Bucher Law PLLC
350 Northern Blvd.
STE 324-1519
Albany, NY 12204-1000

The administrative fees of the American Arbitration Association totaling $2,275.00 shall be borne as incurred, and the compensation of the Arbitrator totaling $15,642.50 shall be borne as incurred.

---

[2] Contrary to Respondent's argument, this section does not require a finding of "bad faith" on its part, and I make no such finding here.

I, Frances Floriano Goins, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.

September 3, 2025
_____
Date

_____
Frances Floriano Goins, Arbitrator

# EXHIBIT 15



AMERICAN
ARBITRATION
ASSOCIATION®

INTERNATIONAL CENTRE
FOR DISPUTE RESOLUTION®

## AMERICAN ARBITRATION ASSOCIATION
### Consumer Arbitration Rules

Case Number: 01-23-0005-3702

In the Matter of the Arbitration between

Christian Graber
-vs-
Valve Corporation d/b/a Steam

## FINAL AWARD OF ARBITRATOR

I, Frances Floriano Goins, the undersigned arbitrator, having been designated in accordance with the arbitration agreement entered into by the above-named parties, having been duly sworn, and having duly heard and carefully reviewed the proofs and allegations of the Parties and the applicable law, and having previously rendered an Interim Award dated May 29, 2025 ("Interim Award") as to liability, which is confirmed, adopted, and incorporated as if fully set forth herein, do hereby issue this FINAL AWARD as follows:

The only matter still pending is Claimant's Application for Costs and Attorneys' Fees ("Application").  Claimant has been awarded $729.69 in damages, and now seeks an additional $348.09 in pre- and post-judgment interest, $46,526.07 in costs, and $721,886.77 in attorneys' fees, plus an additional $10,539.75 in attorneys' fees incurred in preparing a reply in support of this Application.

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue" for treble damages, prejudgment interest, and costs of suit, including attorney fees. As indicated in the Interim Award, Claimant has proven such antitrust injury here.  He has substantially prevailed on his claims; the damage award set forth in the Interim Award is not "nominal," but is based on his actual loss.  "An award of attorney's fees as part of the cost of a successful antitrust suit is mandatory," *Baughman v. Cooper-Jarrett, Inc.*, 530 F. 2d 529 (3rd Cir.), *cert. denied*, 429 U.S. 825 (1976); 15 U.S.C. §15 (a).  The purpose of the attorney's fees provision is . . . to encourage private persons to undertake enforcement of antitrust laws." *Twin City Sportservice, v. Charle O. Finley & Co.,* 676 F. 2d 1291 (9th Cir. 1982).

The attorneys' fees must be "reasonable," which, in this context, is determined by addressing "rates for similar services in the community by attorneys with comparable skills, experience, and reputation," *Dye v. Bellsouth Telecomms., Inc.*, 462 F. Supp. 2d 845, 855 (W.D. Tenn. 2006)

(internal quotations omitted).[1] I find that the lodestar rates charged by Claimant's counsel were reasonable under this standard.  I further find that counsel's work and  the number of hours billed were commensurate with the complexity and protracted nature of this case.  I find that, although some of this work may also be of use in other related matters, the same work would have been required if this had been the only case that counsel was pursuing against this Respondent. Counsel has assured that the same fees will not be claimed in future related mass arbitration proceedings against Respondent, and I specifically order that the attorneys' and expert witness fees, costs, and expenses awarded here may not be claimed in future related proceedings in these mass arbitrations.

Claimant here is also seeking a multiplier of counsel's lodestar rates, *inter alia* because his counsel has worked on a contingency basis and advanced all expenses and as a result has experienced a delay in receipt of payment, because the issues litigated were complex, because the matter was unduly protracted due to Respondent's strategic maneuvers, and because the public policy value of the matter is high.  While I agree with Claimant that these factors have been demonstrated on the record presented, I do not find that a multiplier is appropriate here.  The damage award, while real and not merely nominal, is substantially smaller than the value of the claimed attorney fees.  While I do not agree with Respondent that the disparity between the damage award and the fees claimed creates an "impermissible windfall" to Claimant's counsel, giving due consideration to the factor of proportionality between damages and attorney fees, I find that this disparity cuts against an increase in fees beyond the lodestar rates.

I find further that Claimant is entitled to an award of costs in the amount of $46,526.07 (including expert fees), plus additional attorneys' fees in the amount of $10,539.75 for additional time spent to reply to Respondent Valve Corporation's Objections to Claimants' Application for Costs and Attorneys' Fees.

Claimant also seeks an award of interest "accruing from the date of the injury" on the fees claimed, at a 12% rate as required by Washington law.  Section 4 of the Clayton Act, 15 U.S.C. § 15 (a), however, provides in pertinent part:

> [A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee. The court may award under this section, pursuant to a motion by such person promptly made, **simple interest on actual damages for the period beginning on the date of service of such person's pleading setting forth a claim under the antitrust laws and ending on the date of judgment**, or for any shorter period therein, if the court finds that the award of such interest for such period is just in the circumstances.

This statute contains the controlling law as to pre-judgment interest.  The section is modified by

---

[1] *Corbin v. Steak 'n Shake, Inc.,* Case No. 20-3519/3553 (unpublished) (6th Cir. App. 2021), "[T]he same standards are 'generally applicable in all cases in which Congress has authorized an award of fees to a "prevailing party",'" quoting *Hensley v. Eckerhart,* 461 U.S. 424, 433 n. 7 (1983).

sub-sections (a) (1), (2), and (3), which set forth the "only" criteria a court may consider in awarding pre-judgment interest. Sub-section (3) includes the situation where "the opposing party . . . engaged in conduct primarily for the purpose of delaying the litigation or increasing the cost thereof."[2] I find that Respondent did engage in such conduct in this proceeding, including but not limited to reversing its position as to the appropriate forum for resolution of this case, attempting to unilaterally amend the underlying arbitration agreement after this proceeding had been pending for many months, and filing multiple motions to dismiss.

The applicable rate of interest is determined under Ohio law, the forum and state where this Award is issued. For judgments issued in 2025 in Ohio, the current applicable rate is 8%. *See* https://www.weltman.com/publication-ohio-statutory-interest-rate-for-judgments-in-2025; ORC §§ 5703.47; 1343.03 (A). I find that Claimant is entitled to simple interest on his damages awarded here for the period beginning on the date of service of Claimant's pleading setting forth a claim under the antitrust laws and ending on the date of this Final Award at the 8% rate.

I decline to award post-judgment interest, but note that Claimant may apply to the court in which it seeks to enforce this award for such additional interest.

In summary, Claimant is hereby awarded the following:

- $729.69 in damages, plus pre-judgment interest on such damages for the period beginning on the date of service of Claimant's pleading setting forth a claim under the antitrust laws (October 2, 2023) and ending on the date of this Final Award at a rate of 8% *per annum*; and
- $732,426.52 in attorney fees; and
- $46,526.07 in costs.

The above sums are to be paid by check on or before fifteen (15) days from the date of this Final Award, payable to Bucher Law PLLC, and delivered to

> Will Bucher
> Bucher Law PLLC
> 350 Northern Blvd.
> STE 324-1519
> Albany, NY 12204-1000

The administrative fees of the American Arbitration Association totaling $2,350.00 shall be borne as incurred, and the compensation of the Arbitrator totaling $13,167.50 shall be borne as incurred.

---

[2] Contrary to Respondent's argument, this section does not require a finding of "bad faith" on its part, and I make no such finding here.

I, Frances Floriano Goins, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.

September 3, 2025
Date

_Frances Floriano Goins_
Frances Floriano Goins, Arbitrator

# EXHIBIT 16

**BEFORE THE AMERICAN ARBITRATION ASSOCIATION**
**In the Matters of:**

| | |
|---|---|
| Greg Fish v. Valve Corp. | Case No. 01-23-0005-3288 |
| Christian Graber v. Valve Corp. | Case No. 01-23-0005-3702 |
| Jeremy Lucas v. Valve Corp. | Case No. 01-23-0005-3823 |
| Ethan Lefebvre v. Valve Corp. | Case No. 01-23-0005-7452 |

## CLAIMANTS' APPLICATION FOR COSTS AND ATTORNEYS' FEES

Following ten cumulative days of trial, and an exhaustive pre-trail barrage of motion practice aimed at disrupting or dislodging these proceedings, claimants prevailed. The Sherman Act mandates fees for a prevailing plaintiff. 15 U. S. C. § 15(a). Claimants request $2,822,985.90 in fees, $186,104.29 in costs, and interest on the awards.

Valve will object, as it has done with nearly everything in these proceedings — which is in large part why so many hours were expended. Because we expect an objection, we model this request on a similar request Valve's lead trial counsel Scott Danner submitted in a proceeding less than a year ago. Some of the paragraphs in this briefing are copied word for word from that submission.

Similar to that submission, our submission follows these principles:

- Lodestar is used as an appropriate baseline;
- Applying a 1.5x multiplier for prevailing plaintiffs to account to additional risk inherent in contingency work;
- Post-trial expenses are considered;
- Interest is awarded in addition;
- Spending thousands (or even tens of thousands) of hours on a case is not inappropriate in a complex dispute;
- Local rates are not dispositive in awarding attorneys' fees; and
- The hourly rate of the prevailing plaintiffs is lower than that paid to defense counsel, which makes the rates *per se* reasonable.

1

## I.  Attorney Fees and Costs are Mandatory Under the Sherman Act

"An award of attorney's fees as part of the cost of a successful antitrust suit is mandatory, *Baughman v. Cooper-Jarrett, Inc.,* 530 F.2d 529 (3d Cir.), *cert. denied,* 429 U.S. 825, 97 S.Ct. 78, 50 L.Ed.2d 87 (1976), and the purpose of the attorney's fees provision is to insulate treble damage recovery from expenditures for legal fees, consistent with section 4's purpose to encourage private persons to undertake enforcement of antitrust laws."  *Twin City Sportservice v. Charles O. Finley & Co.,* 676 F. 2d 1291 (9th Cir. 1982).  See also *Funeral Consumers Alliance, Inc. v. Service Corp. Intern'l,* 695 F.3d 330, 336 (5th Cir. 2012) ("The Clayton Act provides any successful plaintiff a mandatory award of costs and attorneys' fees. 15 U.S.C. § 15(a).")

The decision whether or not to award the Claimants for the costs and fees associated with these cases has already been made by Congress.  *15 U. S. C. § 15(a).*  The Claimants hereby request attorneys' fees of $2,822,985.90 in fees, $186,104.29 in costs, as well as interest as stated herein.

## II.  Reasonable Fees Are Not Based on the Amount of the Award

Claimants secured awards that will make a substantial difference in their lives. Greg Fish's award for $3,048.54 in more than a month's income for him. But as detailed above, this case cost far more than that to litigate. And it is precisely because some antitrust claims would be unprofitable to prosecute without an award of reasonable fees that the Sherman Act mandates such an award, even with the barest of recoveries.

In *U.S. Airways, Inc. v. Sabre Holdings Corp.,* a jury issued a verdict of $1, trebled to $3, for defendant's antitrust violations. 11 Civ. 2725 (LGS) (S.D.N.Y. June 1, 2023). The court then adopted the magistrate's recommendation that the plaintiff's petition for $139,183,723.42 in attorneys' fees be granted, on a preliminary basis, subject to potential downward adjustment following a hearing.[1] In *Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.,* 995 F.2d 425 (3d Cir. 1993), the court reduced the amount awarded to $0 because the plaintiff had refused an offer of judgment that was higher than the jury award, but still awarded more than $1,100,000 in costs and fees to counsel. Courts do not hesitate to grant far more in fees, for far less money recovered, than in the case here.

## III. Lodestar is the starting point for calculating appropriate fees

"[T]he lodestar method forms the basis for determining reasonable attorneys' fees."

---

[1] The case settled prior to a hearing on any potential adjustment to the magistrate's recommendation.

*Lundberg*, Dkt. 271 at 32; *see also Dennings v. Clearwire Corp.*, 2013 WL 1858797, at *5 (W.D. Wash. May 3, 2013), *aff'd* (9th Cir., Sept. 9, 2013). Under this method, "a court 'multipl[ies] the total number of hours reasonably expended in the litigation by the reasonable hourly rate.'" *Id.* (alteration in original) (quoting *Clausen v. Icicle Seafoods, Inc.*, 174 Wash. 2d 70, 81 (2012)). In applying this method, the Court should consider "the time expended, the difficulty of the questions involved, the skill required, customary charges of other attorneys, the amount involved, the benefit resulting to the client, the contingency or certainty in collecting the fee and the character of the employment." *Scott Fetzer Co. v. Weeks*, 122 Wash. 2d 141, 150 (1993). The lodestar may be adjusted upward "to reflect the contingent nature of the litigation." *Bowers v. Transamerica Title Co.*, 100 Wash. 2d 581, 598, 601 (1983).

## A.  The Number of Hours Worked Is Reasonable

The hours spent by Claimants' counsel on their antitrust claims are *prima facie* reasonable, particularly as they were working entirely on a contingency basis. *See Bucher Decl.* ¶9.

As the Ninth Circuit explained, "lawyers are not likely to spend unnecessary time on contingency fee cases in the hope of inflating their fees," because "[t]he payoff is too uncertain, as to both the result and the amount of the fee." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008). Thus, "[b]y and large, the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case; after all, he won, and might not have, had he been more of a slacker." *Id.*

Counsel's judgment is also borne out by the complicated nature of this case, which reasonably necessitated substantial resources. The technical and legal issues in this case were complex. At trial, the parties put on the testimony of eight fact witnesses and two expert witnesses. This necessitated substantial pre-trial disclosure and preparation, including substantial fact and expert discovery, which included millions of pages of documents.

Valve's own actions multiplied the proceedings and made pre-trial proceedings far more drawn out than they had to be. Many hundreds of additional hours were expended in litigating Valve's attempts to dismiss, delay, and disrupt these proceedings, as well as to shield relevant information and facts from Claimants. Defeating these efforts and obtaining the documents Valve attempted to withhold, were ultimately necessary to proving Claimants' claims.

3

The result is a total number of approximately 2644.61 hours by Claimants' counsel. A detailed breakdown by employee can be found in the attached declaration, but hours were accrued as follows:

- Will Bucher: 1,030.75
- Bucher Law PLLC Associates and Counsel: 532.14
- Bucher Law PLLC Law Clerks: 189.6
- Bucher Law PLLC Paralegal: 68.5
- Judson Crump: 616.1 hours
- Erik Atzbach: 173.4 hours
- Xinlin Morrow: 31.6 hours

This is a substantial number of hours, but given the complexity of the case and the number of attorneys arrayed on Valve's side, this is a far lower number of hours than Valve would liable for if the Claimants had, like Respondent, dozens of attorneys and paralegals across multiple large firms.

### B. Counsel's Hourly Rates Are Reasonable

"[A] reasonable hourly rate is the product of a multiplicity of factors" including "the level of skill necessary, time limitations, the amount to be obtained in the litigation, the attorney's reputation, and the undesirability of the case." *Copeland v. Marshall*, 641 F. 2d 880 (D.C. Cir. 1980).

The hourly rate of Claimants' counsel is reasonable. The highest billing rate, for Claimants' lead counsel Will Bucher, is based on the actual hourly rate he was paid for thousands of hours of work on behalf of paying clients, including for large Seattle and San Francisco-based tech companies, for arbitrating cases at his prior law firm three years ago. This also matches the rate disclosed in Bucher Law PLLC's retainer agreement signed by the claimants. "Where the attorneys in question have an established rate for billing clients, that rate will likely be a reasonable rate." *Bowers*, 100 Wash. 2d at 597.

Will Bucher is an exceptionally well-credentialed litigator. He graduated from the University of Chicago with honors and has won over 100 arbitrations on behalf of his clients to date—with only a single loss in his arbitration career. A comprehensive description of the experience of each attorney is listed in the attached declaration. All other rates requested are lower than Mr. Bucher's rate. For a complex antitrust case, these lower billing rates represent a substantial savings.

4

As Mr. Danner has recognized, the Washington Supreme Court directs courts to consider whether the rate proposed by the moving party is "very high in comparison to" opposing counsel's.  Plaintiff's Motion for Post-Trial Relief, at 26, *Zunum Aero, Inc. v. The Boeing Company*, No. C21-896, 2024 WL 3822780 (W.D. Wash. Aug. 14, 2024) quoting *Boeing Co. v. Sierracin Corp*, 108 Wash. 2d 38, 64-5 (1987) .[2]  In this case, the hourly rates sought by Claimants' counsel are actually *very low* in comparison to opposing counsel's, with Claimants' counsels' rates at every level—partner, associate, and paralegal, below those charged by Valve's attorneys at Skadden and Holwell.

To illustrate, in *Zunum* ,[3] Respondent's counsel, Holwell Shuster & Goldberg, LLP ("HSG") sought $24,564,946.68[4] for "approximately 26,000 hours."[5] Plaintiff's Motion for Post Trial Relief in *Zunum*, at 25. In other words, Respondent's counsel sought an average rate of $944 per hour, for all attorneys *and* paralegals.  This rate is substantially higher than the average rate requested here of $712. According to the Declaration of Scott Danner ("Danner Declaration") in the *Zunum* case, the work was split among at least 25 individuals, including everyone from summer clerks to partners.  One law clerk billed $561,580.50.  An associate billed $2,796,588.  And a legal assistant billed $[67]

The rates here are far more reasonable.

Will Bucher: 1030.75 hours at $970 an hour for $999,828 total;

Bucher Law PLLC Associates and Counsel: 532.14 hours at $640 an hour for $340,569.60 total;

Bucher Law PLLC Law Clerks: 189.6 hours at $480 an hour for $91,008 total;

Bucher Law PLLC Paralegal: 68.5 hours at $280 an hour for $19,870 total;

Judson Crump: 616.1 hours at $525 an hour for $323,452.50 total;

Erik Atzbach: 176.4 hours at $475 an hour for $83,766 total;

---

[2]  *Zunum*, Doc. 699, p. 26.

[3] *W.D. Wash. Case No. 2:21-cv-00896*

[4] *Zunum*, Doc. 704, p. 8 (Declaration of Scott Danner)

[5]  *Zunum*, Doc. 699, p. 25.

[7] *Danner Decl.*, pp. 9-10

Xinlin Morrow: 31.6 hours at $750 an hour for $23,700 total.

## IV. Hourly Rates of Claimants' Counsel Should be Multiplied by 1.5x

The attorneys' lodestar should be multiplied by 1.5 to account for the contingent nature of success, the complexity and difficulty of the litigation, the delay in receipt of payment, and public policy concerns.[8] *Copper Liquor, Inc. v. Adolph Coors Co.*, 624 F. 2d 575 (5th Cir. 1980). This is precisely the approach Mr. Danner advocated for in *Zunum.*

Washington law permits courts to adjust fees upward in contingency matters to take account of the risks that attend contingency fees, including because "lawyers generally will not provide legal representation on a contingent basis unless they receive a premium for taking that risk." *Bowers*, 100 Wash. 2d at 601 (upholding 50% premium); *Kingston v. IBM*, 2021 WL 2662219, at *5 (W.D. Wash. June 29, 2021) (applying multiplier of 1.1 in contingency employment dispute). As stated above and during the trial, these Claimants could not afford to pay an attorney to even take up these claims. See *Bucher Decl.* ¶9. Given the complexity of the case and the risks involved in litigating an antitrust case of this nature, particularly against Valve and its highly qualified counsel, it is appropriate to apply a 50% premium to Claimant's counsel's fees.

Multiplying each attorney's hourly rates by the hours worked by that attorney yields a base fee award of $1,881,990.60. Adding a multiplier of 1.5 to that number yields the requested total attorney fee award of $2,822,985.90. This tribunal should find these fees to be reasonable, and award them to the Claimants.

### A. Contingent Nature of Success

The Claimants in this case are not wealthy people. Greg Fish drives a box truck for a food bank. *Fish Transcript, 415:7.* People like him cannot afford to pay lawyers up front, and when wronged by massive tech monopolies like Valve Corporation, must either suffer in silence or find an attorney willing to take their case on a contingency. Indeed, the Claimants' agreements with their counsel is explicit that the consumer clients do not even pay any out-of-pocket costs unless their claims are <u>won</u>. *Bucher Decl.* ¶9.

---

[8] Federal courts have, over the years, adopted or endorsed various lists of factors when assessing attorneys' fees in private attorney general statutes. See, e.g. *Copper Liquor, Inc. v. Adolph Coors Co.*, 624 F. 2d 575 (5th Cir. 1980). For the sake of simplicity, the Claimants' list of factors is not exhaustive, but is limited to those which have been recognized by multiple courts and bear relevance to this case.

The law recognizes this reality and therefore authorizes a premium to be added to the customary rate of a qualified attorney willing to take an aggrieved consumer's case. "The contingency adjustment is a percentage increase in the 'lodestar' to reflect the risk that no fee will be obtained. The contingency adjustment is *not* a percentage increase based on the amount of recovery." *Copeland*, at 893.

The inherent risk of taking on expensive, complex litigation against a multibillion-dollar tech giant represented by dozens of highly capable attorneys across multiple firms is substantial. But the risks were even starker relative to Mr. Danner's request for the same multiplier in *Zunum*. In *Zunum*, Mr. Danner requested a 1.5 multiplier for a "hybrid arrangement" in which his firm had already been paid $3.125 million in hourly fees at the time of fee request. *See Danner Declaration*. In contrast, Bucher Law PLLC has been paid no hourly rate, and Mr. Bucher has personally drawn no salary for over two years to pursue these antitrust cases against Valve on a purely contingency basis. *Bucher Decl.* ¶9. If a 1.5 multiplier is justified in a case where the prevailing counsel has *already* been paid over $3 million, it is appropriate here.

Counsel undertook the risks of this contingent, expenses-advanced representation with no promise of success and no possibility of payment without a substantial fee award. The inherent risk of taking on expensive, complex litigation against a multibillion-dollar tech giant represented by dozens of highly capable attorneys across multiple firms is substantial. The risks justify a substantial risk premium. Claimants' counsel request that their hourly rates be adjusted upward 50% to reflect the substantial risk undertaken on behalf of the Claimants.

Relative to Mr. Danner's request for the same multiplier in *Zunum*, the risks to Bucher Law PLLC were particularly acute. In *Zunum*, Mr. Danner requested a 1.5 multiplier for a "hybrid arrangement" in which his firm had already been paid $3.125 million paid in hourly fees at the time of the fee request. *See Danner Declaration*. In contrast, Bucher Law PLLC has been paid no hourly rate, and Mr. Bucher has drawn no salary for over two years to pursue these antitrust cases against Valve on a purely contingency basis. *Bucher Decl.* ¶9. If a 1.5 multiplier is justified in a case where the prevailing counsel has *already* been paid over $3 million, it is appropriate here.

## B.  Complexity and Difficulty of Case

As our courts have stated, "antitrust cases, by their nature, are highly complex." *Wal-Mart Stores, Inc. v. Visa USA, Inc.*, 396 F. 3d 96, 122 (2nd Cir. 2005). This case was no exception. "Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended

7

on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified.  In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit."  *Hensley v. Eckerhart*, 461 US 424, 435 (1983).

These cases have been long, complex, and difficult.  Valve pled 19 affirmative defenses.  Sherman Act case law imposes two different legal standards—*per se* or Rule of Reason—to the same claims, depending on which facts are proven at trial.  The evidence produced totaled over 250GB and contained millions of pages of documents.  *Bucher Decl.* ¶24.  The PC game industry itself is a complex web of interlaced business relationships among the Respondent and its suppliers and competitors, many of whom compete with Valve in some ways but not in others.  The Claimants counsel had to navigate all of those hazards for months to reach this point.  This incredible complexity supports an upward adjustment of hourly rates.

## C.  Delay in Receipt of Payment

"The delay in receipt of payment for services rendered is an additional factor that may be incorporated into a contingency adjustment. The hourly rates used in the 'lodestar' represent the prevailing rate for clients who typically pay their bills promptly. Court-awarded fees normally are received long after the legal services are rendered. That delay can present cash-flow problems for the attorneys. In any event, payment today for services rendered long in the past deprives the eventual recipient of the value of the use of the money in the meantime, which use, particularly in an inflationary era, is valuable. A percentage adjustment to reflect the delay in receipt of payment therefore may be appropriate."  *Copeland*, at 893.

Claimants' counsel has been litigating these cases since October 2, 2023, and since that time has received no payment from the Claimants, and fronted all fees and costs associated with filing and prosecuting these cases.  Furthermore, Respondent has still not refunded many of the arbitration fees that it owes.  The time value of the costs incurred and services provided by Claimants' counsel further supports the upward adjustment requested.

## D.  Public Policy Value

The final factor also strongly favors an upward adjustment of the requested hourly rates.  As the Second Circuit held:

"A claim under the antitrust laws is not merely a private matter. The Sherman

8

Act is designed to promote the national interest in a competitive economy; thus, the plaintiff asserting his rights under the Act has been likened to a private attorney-general who protects the public's interest." *American Safety Equipment Corp. v. JP Maguire & Co.*, 391 F. 2d 821, 826 (2nd Cir. 1968)

The Supreme Court later described *American Safety* as standing for "the fundamental importance to American democratic capitalism of the regime of the antitrust laws." *Mitsubishi Motors*, at 635. See also *Hawaii v. Standard Oil Co. of Cal.*, 405 US 251 (1972) ("Every violation of the antitrust laws is a blow to the free-enterprise system envisaged by Congress.") The prevailing Claimants have therefore not acted merely in their own interest but in the interest of our unique way of life. An unmultiplied fee award would undervalue the risk taken by prevailing Claimants' counsel, while rewarding the Respondent for its wrongdoing. Conversely, the clear intent of Congress is best served by encouraging attorneys like Claimants' counsel to vigorously and fearlessly prosecute antitrust cases on behalf of consumers who cannot afford their own lawyers. The benefits this action has brought to the American economy and to the PC gaming industry—where Valve holds a distribution monopoly—further support the 50% upward adjustment of counsel's rates.

The public policy implications are particularly stark here, where tens of thousands of other consumers stand in line to have their own antitrust claims against Valve adjudicated. The fee award provisions under the Sherman Act are there to incentivize attorneys to pursue antitrust claims. This is (hopefully) the beginning of the end for Mr. Fish, Mr. Graber, Mr. Lefevre, and Mr. Lucas. But for most of Bucher Law PLLC's clients, a similar hard-fought litigation awaits them. A pyrrhic victory here in which Mr. Fish, Mr. Graber, Mr. Lefevre, and Mr. Lucas win but their attorneys do not recover fees commensurate with their work has the pernicious impact of disincentivizing Valve to settle other claimants' claims in the hopes that they can simply bleed counsel dry before all the claims are adjudicated. A robust and risk-adjusted fee award, conversely, incentivizes Valve to grapple with its illegal conduct and not drag out litigation with the other Americans wronged by their illegal behavior.

## V. Claimants are Entitled to Interest on Fees Awarded

The Supreme Court has held that 'an enhancement for delay in payment is, where appropriate, part of a "reasonable attorney's fee."' *Missouri v. Jenkins*, 491 US 274 (1989). The Clayton Act itself also provides for simple interest upon actual damages, and the Claimants before you seek the same. Even without such guidance from such high authorities, Ohio law explicitly requires that interest be paid on fee awards. See *Brancatelli v. Soltesiz*, 2012-Ohio-1884, ¶ 63 (Ct. App.) ("After we reversed the prior judgment, the trial court determined the reasonable value of Mr. Brancatelli's service to be $68,301, and, appropriately, awarded post judgment interest on that amount, at the

current rate of 4 percent, pursuant to R.C. 5703.47"), *Parker v. I&F Insulation Co.*, 2000-Ohio-151, 89 Ohio St. 3d 261, 268, 730 N.E.2d 972, 979 ("We hold, therefore, that a party awarded attorney fees under R.C. 1345.09(F) is entitled to an award of post judgment interest on those fees in accordance with R.C. 1343.03(A).") Thus under both state and federal law, the Claimants are entitled to a fee award for all hours their counsel performed on this case, plus 8% interest accruing from the date such legal services were performed.  The attached Appendix A lists the accrued interest which Claimants seek.

Applying Ohio's 8% interest rate on fees, calculate with simple interest based on the days past since the work was done, the following interest is owed.

Will Bucher: $41,963.44 in interest on a $999,827.50 total;

Bucher Law PLLC Associates & Counsel: $9,313.17 in interest on a $340569.60 total;

Bucher Law PLLC Law Clerks: $1,271.71 in interest on a $91,008;

Bucher Law PLLC Paralegal: $315.80 in interest on a $19,870 total;

Judson Crump: $9,243.82 in interest on a $323,174.25 total;

Erik Atzbach: $1,989.05 in interest on a $82,365 total;

Xinlin Morrow: $464.20 in interest on a $23,700 total.

### VI.    Claimants are entitled to interest on their award accruing from the date of the injury

Under Washington, Ohio, and federal law, prejudgment interest under federal law begins accruing at the time of injury. This ensures that the claimant is compensated for the lost value of use of his money from the time he was first deprived of it. See *Walla Walla Cty. Fire Prot. Dist. No. 5 v. Wash. Auto Carriage*, 50 Wash. App. 355, 360, 745 P.2d 1332, 1335 (1987). ("The plaintiff should be compensated for the 'use value' of the money representing his damages *for the period of time from his loss to the date of judgment*" (internal citations omitted)), *West Virginia v. United States*, 479 U.S. 305, 310 n.2, 107 S. Ct. 702, 706 (1987) ("Prejudgment interest serves to compensate for the loss of use of money due as damages from the time the claim accrues until judgment is entered, thereby achieving full compensation for the injury those damages are intended to redress").

Under Washington law, both pre and post judgment interest rates are 12 percent unless a different interest rate is agreed upon by the parties (<u>Wash. Rev. Code Ann. §</u>

4.56.110 (LexisNexis, Lexis Advance through Chapter 227 of the 2025 Regular Session***), Wash. Rev. Code Ann. § 19.52.020 (LexisNexis, Lexis Advance through Chapter 227 of the 2025 Regular Session***)). Prejudgment interest is used to compensate the plaintiff for the "use value" of money he never received. *Hill v. Garda CL Nw., Inc.*, 191 Wash. 2d 553, 573, 424 P.3d 207, 217 (2018).

> "The availability of prejudgment interest does not depend on the willful intent of the employer; instead, it depends on whether the claim is liquidated. A claim is "liquidated" for purposes of triggering prejudgment interest "'where the evidence furnishes data which, if believed, makes it possible to compute the amount with exactness, without reliance on opinion or discretion.'" If a claim is liquidated, then Washington courts will treat the claim as if it were a loan made to the defendant and compensate the plaintiff for the loss of use of that money." *Hill v. Garda CL Nw., Inc.*, 191 Wash. 2d 553, 573-74, 424 P.3d 207, 217 (2018) (internal citations omitted).

Both prejudgment and exemplary damages may be awarded for the same violation, because they have different purposes. Exemplary damages are punitive while prejudgment interest is compensatory. *Id* at 553, 574.

We calculated the interest owed to the Plaintiffs using an interest rate of 12% - the default rate in Washington – beginning at the median purchase date of their (non-refunded) games, running until present day.

Mr. Fish's earliest purchase occurred on November 27, 2010. His most recent purchase occurred on January 19, 2025. His median purchase date was January 14, 2018. Thus, the total interest Mr. Fish is entitled to amounts to $2,710.11.

Mr. Graber's earliest purchase occurred on April 1, 2017. His most recent purchase occurred May 5, 2024. The median purchase date was June 21, 2021. Thus, the total interest Mr. Graber is entitled to amounts to $348.09.

Mr. Leferve's earliest purchase occurred on October 12, 2008. His most recent purchase occurred on January 1, 2021. We calculated interest using the median purchase date of non-refunded games, which was July 15, 2020. Thus, the total interest Mr. Leferve is entitled to amounts to $1,183.34.

Mr. Lucas' earliest purchase occurred on July 3, 2011. His most recent purchase occurred on December 30, 2024. The median purchase date was June 23, 2019. Thus, the total interest Mr. Lucas is entitled to amounts to $1,634.36.

### VII.    Claimants are Entitled to an Award of Costs

In addition to the award of attorneys' fees, the Claimants should be awarded $46,526.07 each in costs.  AAA Consumer Rule R- 44(a) states that: "The arbitrator may grant any remedy, relief, or outcome that the parties could have received in court, including awards of attorney's fees and costs, in accordance with the law(s) that applies to the case."

With regards to expert witness expenses, the Consumer Rules further provide that "In the final award, the arbitrator shall assess the fees, expenses, and compensation provided in Sections R-4, R-5, and R-7 in favor of any party, subject to the provisions and limitations contained in the Costs of Arbitration section."  This is in line with Ninth Circuit precedent, which allows prevailing plaintiffs to recover "reasonable out-of-pocket litigation expenses that would normally be charged to a fee-paying client." *Grove v. Wells Fargo Fin*. Cal., 606 F.3d 577, 580, 581 (9th Cir. 2010).

The testimony of experts is all but a necessity in antitrust cases like the ones before you, and the testimony of Mr. Theiler was cited in the interim award several times. *See*, e.g. *Interim Award to Greg Fish*.  Aside from expert witness fees, the Claimants' counsel had to incur several other costs in the prosecution of these cases, including eDiscovery processing fees, data storage, printing, and mailing of exhibits.

Mr. Fish, Mr. Graber, Mr. Lefevre, and Mr. Lucas request the expert costs totaling $175,375.00 attributable to their arbitrations. Bucher Decl. __. Additionally, they seek $1,855.80 in legal research costs. $781.03 in printing and mailing expenses. And *Mauss v. Nuvasive, Inc.*, 2018 WL 6421623, at *9 (S.D. Cal. Dec. 6, 2018).

### VIII.    Claimants are entitled to interest on Expert Witness fees

Expert witness fees are included in connection with attorney's fees. See <u>Kerbler v. Biltwell Contracting LLC, 2024-Ohio-5607, ¶ 100 (Ct. App.)</u> "However, this Court, and other courts, have held that some expenses, such as expert witness fees, are properly recoverable in connection with an attorney fee award in some instances. *Fortner v. Ford Motor Co.*, 1998 Ohio App. LEXIS 752, 1998 WL 172862 (5th Dist.) (trial court did not abuse its discretion in concluding litigation expenses were a reasonable portion of attorneys fees). These instances include an award to a prevailing party where punitive

12

damages and/or attorney's fees were properly awarded. *Parrish v. Machlan*, 131 Ohio App.3d 291, 722 N.E.2d 529 (1st Dist. 1997); *Spero v. Project Lighting, L.L.C.*, 2016-Ohio-1363 (11th Dist.); *Premier Therapy, LLC v. Childs*, 2016-Ohio-7934, 75 N.E.3d 692 (7th Dist.), appeal not allowed *Premier Therapy, LLC v. Childs*, 2017-Ohio-6964, 150 Ohio St. 3d 1408, 78 N.E.3d 909 (litigation expenses in the form of expert witness fees can be considered by the trial court when calculating attorney fees where there is a prior finding that punitive damages and attorney's fees were warranted)."

Interest on those costs, calculated using simply interest from the day the work was performed, amount to $6,028.32. *Bucher Decl.* ¶21.

### IX. Valve's Strategy Necessitated this Expensive and Drawn-Out Process

Defendants should not be heard to challenge the reasonableness of Claimants' fees when Defendants' own strategic choices caused much of the work that Claimants engaged in to prevail in this action.

Valve's intransigence has gone far beyond merely standing its ground against the Claimants' allegations. Valve forced consumers into individual arbitrations, and then took every opportunity to delay, dismiss, and discredit the Claimants and their counsel in hopes of stopping these arbitrations. Neither the law nor equity supports reducing counsel's fee award because these Claimants fully and successfully litigated these individual arbitrations to a final merits conclusion.

Whether viewed as obstructive or simply vigorous, Valve's defense of this case required substantial litigation of non-merits issues that increased cost.

**Valve Refused to Engage in Settlement Discussions.** Valve had the opportunity to resolve these arbitrations before they were even filed. As required by the Steam Subscriber Agreement ("SSA"), Claimants' counsel made a settlement offer, both global and individually for each claimant, to settle these claims for "between 54% and 69%" of what they'd paid Steam for PC games. Valve never responded to any of these Claimants' settlement offers, and to date, has still not offered a single claimant a single dollar to resolve their claim.

**In October of 2023, Valve sued the undersigned counsel in Washington state court for bringing "frivolous" claims on the claimants' behalf.** Claimants counsel does not seek fees for the time spent in defending this case, nor its cost in retaining counsel to defend it, in these proceedings. *Bucher Decl.* ¶25. However, the tribunal should note that Claimants' counsel vigorously prosecuted these arbitrations while defending against

13

Valve's lawsuit.

**In December of 2023** Valve filed its first "Motion to Dismiss for Lack of Jurisdiction" was premised on the allegation that the Claimants' pre-litigation efforts at negotiating a settlement of their claims were "insufficient," despite having never responded with a counteroffer. Substantial time was invested in preparing a successful rebuttal to this claim.

**Valve answer denied every one of Claimants' allegations and raised a host of boilerplate "affirmative defenses" that bore little application to the case at hand**. *Respondent's Answer, Dec. 26, 2023.*

Valve's answer to Claimants Amended Demand for Arbitration likewise denied all 122 of those detailed allegations.  *Respondent's Amended Answer, Aug. 27, 2024.*

In August 2024, Valve filed a "Motion to Stay" these arbitrations due to the filing of a class action by 4 individuals who, in a parallel arbitration, were found to have not consented to arbitration in the first place.  That motion was brief and duly denied by this tribunal.

On September 27, 2024, Valve filed a Second Motion to Dismiss, this time after unilaterally amending its SSA to delete the arbitration provision.  *Sept. 27 Ltr. from M. McTigue to Arb. Goins.* That motion was brief and duly denied by this tribunal.

On October 2, 2024, Mr. McTigue requested that this proceeding be closed due to its unilateral SSA Amendment.  Two days later, he wrote the AAA as well, asking it to administratively close these proceedings on the same basis.  Then again on October 7, 2024, he sent another, more detailed letter to the AAA requesting the same relief.  Both requests were denied, but not before the Claimants' counsel had to brief that issue for the AAA as well.  *Oct. 2, 2024 Ltr. From M. McTigue to AAA.*

On October 18, 2024, Valve sued Mr. Fish, Mr. Graber, Mr. Lefevre, and Mr. Lucas, to enjoin these proceedings. While there is a good argument to be made the fees from that proceeding should be recovered here, counsel does not seek fees from that proceeding in this award.

On October 23, 2024, this tribunal heard Valve's various arguments in support of its *Coinbase*/SSA Amendment theory.  As a result, that Motion was finally denied on October 24, 2024. *Transcript of October 23, 2024 Hearing*

14

In accordance with the Amended Scheduling Order, we served Respondent with 10 interrogatories and 10 requests for production on December 13, 2024. Responses were due January 13, 2025, but Valve didn't produce anything in these cases until February 10, 2025, after ordered to do so by this tribunal. The Claimants therefore had to request a hearing and move to compel production of the evidence, which resulted in yet another round of briefing and argument. *2025.02.01 Eml Order from Arb. Goins*.

Similarly, on January 2, 2025, we requested that a few subpoenas be issued to secure the testimony of some of Respondent's employees who had participated in the anticompetitive acts at issue in these cases. *Valve* had requested a live hearing, even though the SSA that it wrote allowed the parties to resolve these cases using a documents-only format. On January 10, 2025, Valve objected to the attendance of its employees, even though—as the tribunal saw during trial—the only 'burden' on those employees was having to walk down the stairs to a conference room in Valve headquarters. This necessitated another round of briefing and oral argument over multiple teleconferences. *2025.01.10 Ltr. from M. McTigue*.

After opening briefs were filed, Valve objected to the Claimants being allowed to present claims under Sherman Act § 1, even though price-fixing was clearly included in the original single-paragraph demand for arbitration that initiated these cases, and had been fully briefed in a previous arbitration three months before. *2025.03.05 Eml. from A. Indorf; 2023.10.23 Greg Fish Demand for Arbitration*.

Much of the work of this done for Mr. Fish was able to be reused for Mr. Graber, Mr. Lefevre, and Mr. Lucas. Counsel does not seek a double recovery, but rather that its fee request for $2,887,547.09 be distributed into four equal awards of $721,886.77 for Mr. Fish and Mr. Graber, Mr. Lefevre, and Mr. Lucas. This means that Valve is paying far less than it would, had it been held to obligation to individually litigate each of these claims. Any further reduction would be particularly inappropriate given this context.

## X.  Conclusion

Though the costs and fees sought in this Application are substantial, they are far less than what Valve chose to spend in obstruction. Claimants' counsel can produce for *in camera* review their receipts for all claimed expenses and time sheets for all attorneys and staff who performed the work which was necessary to successfully litigate these cases. Should Valve allege the fees sought are unreasonable, Claimants urge this tribunal to compel Valve to produce its complete and total costs across all seven law firms it has hired to defend these antitrust claims.

In addition to the award of the foregoing fees, this Tribunal should allow Claimants to submit a request for additional fees, should the Respondent create the need for further attorney work in enforcing these awards or this fee Application.

As the vast majority of the work performed was equally attributable to all 4 of these Claimants' cases, judicial economy and simplicity would be served best by simply dividing the total award among the Claimants equally, resulting in a final award of $721,886.77 in attorneys' fees for each of the four successful Claimants. Costs should be similarly apportioned among all four Claimants. The tribunal should enter a final award to the Claimants for the following:

A) An award to Greg Fish for $3,048.54 plus $2,710.11 in interest, $46,526.07 in costs and $721,886.77 in attorneys' fees;

B) An award to Christian Graber for $729.69 plus $348.09 in interest, $46,526.07 in costs and $721,886.77 in attorneys' fees;

C) An award to Jeremy Lucas for $2,281.41 plus $1,634.36 in interest, $46,526.07 in costs and $721,886.77 in attorneys' fees;

D) An award to Ethan Lefebvre for $2,008.56 plus $1,183.34 in interest, $46,526.07 in costs and $721,886.77 in attorneys' fees;

E) An Order authorizing the Claimants to seek additional fees in the event that Respondent takes any action which necessitates additional litigation in order to enforce these awards.

Mr. Fish, Mr. Graber, Mr. Lefevre, and Mr. Lucas request that the Tribunal order Valve to send four separate checks in the amounts set forth above payable to Bucher Law PLLC to:

Will Bucher
Bucher Law PLLC
350 Northern Blvd
STE 324-1519
Albany, NY 12204-1000

RESPECTFULLY SUBMITTED this 12th Day of June, 2025.

BUCHER LAW PLLC

By: /s/ Will Bucher

Will Bucher

16

350 Northern Blvd
STE 324 -1519
Albany, NY 12204-1000
202-997-3029
will@bucherlawfirm.com

17

**<u>Declaration of Will Bucher in Support of Fee Application</u>**

1. I am principal and lead counsel at Bucher Law PLLC. I submit this declaration in support of Mr. Fish, Mr. Graber, Mr. Lefevre, and Mr. Lucas's post-hearing submission on an award of fees, costs, and interest under the mandatory fee award provisions of the Sherman Act.

2. I have personal knowledge of the matters stated in this declaration and, if called as a witness, would testify competently to such matters under oath.

3. Bucher Law PLLC is a litigation boutique specializing in complex cases in which consumers have previously been compelled to arbitration. Because of the dual complexity involved in trying complex cases through the complex—and often contested—procedural posture of individual arbitrations, Bucher Law PLLC is one of only a few firms in the country who represents individual consumers pursing antitrust claims through consumer arbitration. Because antitrust cases are complex whether or not pursued in court or in arbitration, we hire attorneys and staff who are able to grapple with these issues. That often means hiring those with economics backgrounds, degrees from elite law schools, or pre-existing antitrust experience.

4. The trial team that worked on these cases consisted principally of six lawyers, myself, Xinlin Morrow, Judson Crump, Erik Atzbach, Doug Quzack, and Nived Rajendran.

5. I am lead counsel at Bucher Law PLLC and its principal. I graduated *summa cum laude* from Washington University in St. Louis with a degree in economics. I was one of only handful of people to score a perfect LSAT score in 2011, which earned me a scholarship to attend the University of Chicago School of Law. The University of Chicago is the third ranked law school in country. I graduated from the University of Chicago with honors (the school's equivalent of *cum laude*), after which I spent the first five years of my career at Debevoise & Plimpton in New York City.

6. In 2020, I joined Fenwick & West as an associate in the firm's litigation practice. I successfully litigated a large number of arbitrations to a merits decision while at the firm.

7. I have litigated before over 100 different arbitrators. To date, I have secured favorable merits-based awards in my clients' favor before all but one of those arbitrators, meaning my win percentage exceeds 99%. There are only a handful of litigators in the country with more experience actually litigating consumer arbitrations—and fewer still with my track record of success in them.

8. While at Fenwick & West, I worked for large tech companies in Seattle and San Francisco who paid an hourly rate for my time of $970 an hour. I left Fenwick & West in 2022 to switch to plaintiffs' side work. Had I remained employed at Fenwick & West, my billing rate today would be $1,185 an hour if I remained an associate, or $1,355 an hour if I was promoted to partner. *See Yua Labs, Inc. v. Ripps, No.* 222CV04355JFWJEMX, 2024 WL 489248 (C.D. Cal. Jan. 11, 2024).

9. Bucher Law PLLC is a plaintiffs' side litigation boutique serving everyday Americans, many of whom live near or below the poverty line. I do not bill most of my clients directly, but my retainer agreements with Mr. Fish, Mr. Graber, Mr. Lefevre, and Mr. Lucas note my hourly rate is $970 an hour. My billing rate has increased since that time, but I do not request that higher rate in these proceedings. My clients' agreements explicitly note that they do not pay any out-of-pocket costs unless they win their claims. Because of Bucher Law PLLC's contingency fee structure, we have not been paid an hourly rate to date, and I have personally not drawn a salary in over two years in order to pursue this litigation.

10. I request a base lodestar rate of $970 an hour in these proceedings. This rate reflects what actual clients have been willing to pay for my arbitration work in the past. Although my rate is higher today and would have been higher if I stayed at a large law firm, the $970 hourly figure represents—at a minimum—what my work is worth in the marketplace.

11. Bucher Law PLLC requests $640 an hour for its associates. This is the rate charged by my prior law firm Fenwick & West for *first year associates* litigating arbitrations. All members of my team have considerably more experience than a first-year associate. For example, Doug Quzack, who worked 131 hours on these arbitrations, has more than a decade of experience litigating antitrust class actions, including successfully litigating an antitrust class action over Carfax's alleged monopoly in the car reports market. Our firm wins against the likes of Skadden, the highest revenue firm in the world. The associates whose work enables those victories are justified in charging *at least* what those caliber of firms bill for a new attorney with no experience at all.

12. Our firm requests fees of $480 an hour for our law clerks (not yet admitted law students and recent graduates). This rate is *significantly less* than what is charged and has been approved by a court for law clerk work at my prior law firm Fenwick & West. *See Yua Labs* (approving $640 an hour for work done by law clerks)*.* Like the law clerks at Fenwick & West, my law clerks hail from highly ranked law schools than those at Fenwick & West. The law clerk who worked on this case through trial, Robert Kim, attends Harvard. My current summer class, who assisted with research for this fee submission, attend Stanford, Harvard, Yale, and NYU. This rate is justified for their skills and high-quality work.

13. Our firm requests fees of $290 an hour for our paralegals. This rate is, again, *significantly less* than what is charged and has been approved by a court for work done by paralegals at my prior lawfirm Fenwick & West. *See Yua Labs* (reducing a $610 an hour fee request to $450 an hour for paralegal work)*.*

14. Xinlin Li Morrow charges $750 an hour. She is a strategic trial lawyer with 15 years of experience in complex business and IP disputes. She graduated from Columbia Law School in 2010 as a Harlan Fiske Stone Scholar. Before co-founding Morrow Ni LLP, Ms. Morrow practiced law at national litigation powerhouses Irell & Manella and Hueston Hennigan. Prior to private practice, Ms. Morrow spent a year as an attorney

fellow at the Los Angeles County District Attorney's Office, where she helped prosecute gang-related murders. Ms. Morrow also served as a special prosecutor at the Anaheim City Attorney's Office and successfully obtained guilty verdicts in two misdemeanor trials as lead counsel. Each year since 2015, Super Lawyers Magazine has recognized Ms. Morrow as a "Rising Star." In 2023, Super Lawyers Magazine also named Ms. Morrow as "Up-and-Coming 25" in Orange County and "Up-and-Coming 50 Women" in Southern California. Ms. Morrow charges $750 an hour. That is Ms. Morrow's actual billing rate, and her firm, which does both contingency and non-contingency cases, charges and is paid that amount by non-contingency clients.

15. Judson Eric Crump graduated from the University of Alabama School of Law in 2009 and has been litigating on behalf of consumers for over 15 years, is a member of the National Association of Consumer Advocates, and is admitted to practice before the courts of Alabama, Texas, federal district courts in both states, and the Eleventh Circuit Court of Appeals.  He has tried hundreds of cases in state and federal courts, including both bench trials and jury trials.  He served as *amicus curiae* counsel on behalf of consumer and anti-poverty organizations in successful appeals,[1] been published in the Mississippi Law Journal,[2] and has spoken at CLE seminars on consumer rights law.  Crump seeks a base hourly rate of $525/hour.

16. Erik Atzbach received a law degree from J. Reuben Clark Law School in 1996. He was admitted to the Colorado Bar in 1996, the New York Bar in 1998 and the D.C. Bar in 1999. Mr. Atzbach practiced international business law and international arbitration at Python & Peter in Geneva, Switerland from 1998 to 2009. Since 2010 Mr. Atzbach has represented consumers in the U.S. Bankruptcy Court, District of Colorado, the U.S. Bankruptcy Appellate Panel for the Tenth Circuit, the U.S. District Court, District Court of Colorado and the U.S. Tenth Circuit Court of Appeals. In 2023 Mr. Atzbach was awarded fees in the amount of $425/hour by the U.S. Bankruptcy Court, District of Colorado. Mr. Atzbach's current hourly rate is $475/hour.

17. Our firm keeps track of time via time keeping software, including the use of timers to record time spent on different cases. Because we represent numerous clients pursuing claims against Valve Corporation, our team uses our software's "projects" and "tags" features to keep track of which arbitrator and arbitration the work is attributable to.

18. While we were able to reuse some work product from a prior arbitration in these proceedings, we do not seek to recover time for work done on those other arbitrations. Nor for the work put into defending Valve's lawsuit against Mr. Fish, Mr. Graber, Mr. Lefevre, and Mr. Lucas in federal court seeking to enjoin these arbitrations.

19. As such, the total hours requested represent only a fraction of the total time and effort my team has put into litigating these antitrust claims against Valve.

---

[1] *Smith v. Renter's Realty*, 322 So.3d 1060 (Ala. Civ. App. 2020).

[2] Crump, J. & Brophy, A. (2017), *Twenty One Months a Slave: Cornelius Sinclair's Odyssey*, 86 Miss. L.J. 457 (2017)

20. We calculated interest on attorneys' fees at Ohio's 8% interest rate, as simple interest, running from the day work was done on each billing entry. The below table summarizes each billers' hours, rate, fees, multiplier, interest, and total amount requested.

| Biller | Hours | Rate | Fees | 1.5 Multiplier | Interest | Total |
|--------|------:|-----:|-----:|---------------:|---------:|------:|
| Will Bucher | 1,030.75 | 970 | 999,827.50 | 1,499,741.25 | 41,963.44 | 1,541,704.69 |
| Doug Quzack | 131 | 640 | 83,840.00 | 125,760.00 | 2,236.53 | 127,996.53 |
| Nived Rajendran | 347.24 | 640 | 222,233.60 | 333,350.40 | 6,554.85 | 339,905.25 |
| Zachary Horn | 53.9 | 640 | 34,496.00 | 51,744.00 | 521.79 | 52,265.79 |
| Xinlin Morrow | 31.7 | 750 | 23,775.00 | 35,662.50 | 464.20 | 36,126.70 |
| Judson Crump | 615.57 | 525 | 323,174.25 | 484,761.375 | 9,243.82 | 494,005.20 |
| Erik Atzbach | 176.35 | 475 | 83,776.25 | 125,649.375 | 1,989.05 | 127,638.43 |
| Robert Kim | 85.72 | 480 | 41,145.60 | 61,718.40 | 793.78 | 62,512.18 |
| Kevin Auman | 35.33 | 480 | 16,958.40 | 25,437.60 | 393.86 | 25,831.46 |
| David Jaffe | 1.99 | 480 | 955.20 | 1,432.80 | 22.13 | 1,454.93 |
| Elliot Kovnick | 10.06 | 480 | 4,828.80 | 7,243.20 | 0 | 7,243.20 |
| Isabel Skormro | 56.5 | 480 | 27,120.00 | 40,680.00 | 61.94 | 40,741.94 |
| Ariel Thatcher | 68.5 | 280 | 19,870.00 | 29,805.00 | 315.80 | 30,120.80 |
| **SUM TOTAL** | **2,644.61** | **N/A** | **1,881,990.60** | **2,822,985.90** | **64,561.19** | **2,887,547.09** |

21. Expert costs totaled $175,115.00. These costs were significantly lower than they might have otherwise been because Mr. Theiler had previously testified in another arbitration. These costs do not include, and we do not seek costs for, the time Mr. Theiler spent preparing for his prior testimony in another arbitration. Interest on those costs, calculated using simply interest from the day the work was performed, amount to $6,028.32.

22. We use Lexis as our legal research service. Legal research costs attributable to these arbitrations totaled $1,855.80. This represents the subscription cost for one seat for approximately three months.

23. We had to print and mail subpoenas and trial documents during this arbitration. Printing and mailing costs total $781.03.

24. The produced evidence in this case had a total file size greater than 250GB, representing millions of pages of documents. We use a database to store the discovery from our cases. This database charges by the gigabyte. Based on the size of the production in this case, and the amount of time it has been in the database, the prorated database expenses incurred to date are $8,352.46. This represents approximately 41% of the database cost for hosting all information exchange received by Valve Corporation in all arbitrations since November 1, 2024.

25. In October 2023, Valve sued me in Washington State alleging I was bringing "frivolous" claims on behalf of my clients. I retained counsel to defend those allegations; however, I

do not include the costs of my time or my counsel's time on that case within the fee calculations for this case.

BUCHER LAW PLLC

By: _____

Date: June 12, 2025

Will Bucher
350 Northern Blvd
STE 324 -1519
Albany, NY 12204-1000
202-997-3029
will@bucherlawfirm.com

# EXHIBIT 17

| | |
|---|---|
| **From:** | Scott M. Danner <sdanner@hsgllp.com> |
| **Sent:** | Friday, June 13, 2025 5:13 PM |
| **To:** | William Bucher; AAA Jill Roettger |
| **Cc:** | judson@judsonecrump.com; Fuchs, Andrew J (HOU); valveteam@moni.law; erik@atzbachlex.com; nived@bucherlawfirm.com; doug@bucherlawfirm.com; xinlin@moni.law; jing@moni.law; Slawe, Meredith C (NYC); Milstead, Virginia (LAC); McTigue Jr., Michael W (NYC); Tavakoli, Shaud G (NYC); McInerney, Colm P (NYC); gavins@valvesoftware.com; AAAFiling@valvesoftware.com; Valve SASMF Team DL; bmarksdias@corrcronin.com; Priyanka Timblo; Dorit Ungar Black; Andrew C. Indorf |
| **Subject:** | [Ext] RE: Fish and 3 Other Individuals v. Valve - Fee Award Submission |

Dear Ms. Roettger:

Please forward the email below to Arbitrator Goins.

Thanks very much.

***

Dear Arbitrator Goins:

We are in receipt of Claimants' Application for Costs and Attorneys' Fees, filed late last night. That application does not include any back-up documentation. For example, it does not include any contemporaneous timekeeping records, descriptions of the work performed, or documentation of the hours spent performing that work. Nor are any expenses itemized.

Such back-up documentation is necessary to justify a fee award, as parties seeking fee awards must produce documentation "of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonable expended" on the litigation in question. *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 553 (6th Cir. 2008) (quoting *United Slate, Local 307 v. G & M Roofing & Sheet Metal Co.*, 732 F.2d 495, 502 n.2 (6th Cir. 1984)); *see also id.* at 552 ("Attorneys who seek fees have an obligation to maintain billing time records that are sufficiently detailed to enable courts to review the reasonableness of the hours expended on the case") (internal citations omitted).

Without records regarding Claimants' requested fees and expenses, including detailed timekeeping records, Valve cannot adequately respond to Claimants' application because there is no adequate basis with which to test the reasonableness of Claimants' fees.

Valve therefore respectfully requests that the Tribunal order Claimants to produce the required documentation promptly, and that Valve have 14 days from the date of such production to oppose the application.

Respectfully submitted,
Scott M. Danner
Counsel for Valve

Scott M. Danner | he/him/his/himself

HOLWELL SHUSTER & GOLDBERG LLP

Office: (646) 837-8530 | Mobile: (917) 280-3293 | Bio

425 Lexington Ave | New York, New York 10017 | hsgllp.com

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

**From:** William Bucher <will@bucherlawfirm.com>
**Sent:** Thursday, June 12, 2025 11:58 PM
**To:** AAA Jill Roettger <JillRoettger@adr.org>
**Cc:** judson@judsonecrump.com; William Bucher <will@bucherlawfirm.com>; Andrew J Fuchs <Andrew.Fuchs@skadden.com>; valveteam@moni.law; erik@atzbachlex.com; nived@bucherlawfirm.com; doug@bucherlawfirm.com; xinlin@moni.law; jing@moni.law; meredith.slawe@skadden.com; virginia.milstead@skadden.com; michael.mctigue@skadden.com; Shaud.tavakoli@skadden.com; colm.mcinerney@skadden.com; gavins@valvesoftware.com; AAAFiling@valvesoftware.com; DLVALVEST@skadden.com; bmarksdias@corrcronin.com; Priyanka Timblo <ptimblo@hsgllp.com>; Dorit Ungar Black <dblack@hsgllp.com>; Scott M. Danner <sdanner@hsgllp.com>; Andrew C. Indorf <aindorf@hsgllp.com>
**Subject:** Fish and 3 Other Individuals v. Valve - Fee Award Submission

Ms. Roettger,

Please forward the attached to Arbitrator Goins.

Will Bucher
Bucher Law PLLC
202-997-3029
350 Northern Blvd
STE 324 -1519
Albany, NY 12204-1000

# EXHIBIT 18

| | |
|---|---|
| **From:** | Goins, Frances <fgoins@ubglaw.com> |
| **Sent:** | Monday, June 16, 2025 2:43 PM |
| **To:** | AAA Jill Roettger; Andrew C. Indorf |
| **Cc:** | will@bucherlawfirm.com; valveteam@moni.law; erik@atzbachlex.com; xinlin@moni.law; jing@moni.law; thomas@bucherlawfirm.com; judson@judsonecrump.com; Slawe, Meredith C (NYC); Milstead, Virginia (LAC); McTigue Jr., Michael W (NYC); Tavakoli, Shaud G (NYC); McInerney, Colm P (NYC); gavins@valvesoftware.com; AAAFiling@valvesoftware.com; Valve SASMF Team DL; Fuchs, Andrew J (HOU); bmarksdias@corrcronin.com; sdanner@hsgllp.com; ptimblo@hsgllp.com; dblack@hsgllp.com; bbomkamp@hsgllp.com |
| **Subject:** | [Ext] 4 Individuals v. Valve - Fee Award Submission - Arbitrator Goins |

Having reviewed the parties' submissions regarding Claimants' Application for Costs and Attorney Fees, including the emails exchanged today, Claimants are hereby ordered to produce *in camera*, solely for the Tribunal's review, any back-up documentation for the amounts sought in the Application, including contemporaneous timekeeping records, descriptions of the work performed, and documentation of the hours spent performing that work, as well as itemization of and receipts for any expenses that are sought in the Application.  These items are to be provided to the Tribunal by email no later than 5 p.m. EDT on June 30, 2025.  Respondent's response deadline is hereby extended, and Respondent shall have until July 7, 2025 to serve its response to the Application.

**Frances Floriano Goins, Arbitrator**
*Partner*

DIRECT:  216.583.7202
DIRECT FAX:  216.583.7001
FIRM:  216.583.7000
MOBILE:  440.476.3498
fgoins@ubglaw.com  |  bio  |  vCard

**UB Greensfelder LLP**
1660 West 2nd Street, Suite 1100
Cleveland, Ohio 44113-1406
ubglaw.com

**UB**Greensfelder®

UB GREENSFELDER LLP - CONFIDENTIAL COMMUNICATION

This email and any files transmitted with it are confidential and are intended solely for the use of the individual or entity to whom it is addressed. If you are not the intended recipient or the person responsible for delivering the email to the intended recipient, you have received this email in error and any use, dissemination, forwarding, printing, or copying of this email and any file attachments is strictly prohibited. If you have received this email in error, please immediately notify us by reply email to the sender or by telephone at 216.583.7000 or 314.345.5400. Please delete this email and its attachments from your system and do not retain any copies. You will be reimbursed for reasonable costs incurred

# EXHIBIT 19

| | |
|---|---|
| **From:** | William Bucher <will@bucherlawfirm.com> |
| **Sent:** | Monday, June 30, 2025 4:52 PM |
| **To:** | Goins, Frances |
| **Cc:** | AAA Jill Roettger; valveteam@moni.law; erik@atzbachlex.com; xinlin@moni.law; jing@moni.law; thomas@bucherlawfirm.com; judson@judsonecrump.com; Slawe, Meredith C (NYC); Milstead, Virginia (LAC); McTigue Jr., Michael W (NYC); Tavakoli, Shaud G (NYC); McInerney, Colm P (NYC); gavins@valvesoftware.com; AAAFiling@valvesoftware.com; Valve SASMF Team DL; Fuchs, Andrew J (HOU); bmarksdias@corrcronin.com; sdanner@hsgllp.com; ptimblo@hsgllp.com; dblack@hsgllp.com; bbomkamp@hsgllp.com; Andrew C. Indorf |
| **Subject:** | [Ext] In Camera Submission - Cover Letter |
| **Attachments:** | 2025-06-30 Reprinted Table of Fees.pdf |

Arbitrator Goins,

The time entries for my team, Ms. Morrow, and our experts, were submitted a few minutes ago in camera, along with an itemized expense report and a .zip file with receipts for costs, pursuant to your order.

There are two "project" codes in the time sheets: "Valve Individual Arbitrations" and "Valve Mass Arbitration." Valve Individual Arbitrations are tagged by the arbitrator or client name, and represent work done specifically on Fish, Lucas, Lefebvre or Graber's cases before your honor.

The hours submitted here under the Valve Mass Arbitration code are for work that we need to undertake for any and all arbitrations to successfully advance. This includes correspondence with the AAA administrators and legal research and drafting for common across arbitrations. For example, in early September, Valve filed identical motions to stay in all arbitrations, including Fish, Lucas, Lefebvre or Graber's. I spent time on Sept. 7 and 8 researching and drafting a general response, which was billed to Valve Mass Arbitration. Then, on Sept. 9, Mr. Crump took this draft, reviewed this tribunal's prior orders, and revised the content into a version of the argument specific to Fish, Lucas, Lefebvre or Graber, billed under the Valve Individual Arbitrations code.

The Valve Mass Arbitration work submitted here had to be done regardless of whether we had four arbitrations, or thousands, and indeed whether we ultimately end up prevailing in just these four or thousands. Put another way, Fish, Lucas, Lefebvre or Graber would not have prevailed, or even gotten to a final hearing, had we not done that work. Our position is that this work is fully compensable—once. We will not seek to recover for those hours again in another arbitration if fully awarded by this tribunal.

The Valve Mass Arbitration work presented for compensation here was also reviewed and curated with an eye to ensuring we are only seeking Valve Mass Arbitration time that benefited Fish, Lucas, Lefebvre or Graber. For example, this meant removing any time spent researching California state law, which did not apply to these cases. We also removed almost all work done before this tribunal was constituted, although that work was necessary for this arbitration to proceed. Removing time of this type resulted in us seeking fees for 884.24 "Valve Mass Arbitration" hours in these proceedings, even though to date, my firm and co-counsel have spent over 5,000 hours on Valve Mass Arbitration work—and over 13,000 hours across all our antitrust matters pending against Valve.

1

Upon review of our June 12 submission, we noticed that the line in table in my affidavit attributable to my paralegal in my affidavit had some misprints resulting in a number that was off very slightly, by $0.80. As noted elsewhere in my affidavit, Ms. Thatcher's billing rate is $290, not $280. Her hours worked were 68.52, but the chart displays those hours rounded down to 68.5. Correctly printed, Ms. Thatcher's total fees are $19,870.80—$0.80 higher than what is reflected in the chart in my affidavit. I confirmed that all other hour, rate, and fee tallies are accurate in my affidavit for the individuals listed. A reprinted table is attached for reference.

We also noticed that while my affidavit details data hosting costs of $8,352.46, and the brief cites caselaw for the proposition that data hosting costs are recoverable, the brief does not specifically itemize data hosting as a requested cost. For the avoidance of doubt, we are requesting restitution for these costs as well, receipts for which have been submitted in camera.

Will Bucher
Bucher Law PLLC
202-997-3029
350 Northern Blvd
STE 324 -1519
Albany, NY 12204-1000

| Biller | Hours | Rate | Fees | 1.5 Multiplier | Interest | Total |
|---|---|---|---|---|---|---|
| Will Bucher | 1,030.75 | 970 | $ 999,827.50 | $ 1,499,741.25 | $ 41,963.44 | $ 1,541,704.69 |
| Doug Quzack | 131 | 640 | $ 83,840.00 | $ 125,760.00 | $ 2,236.53 | $ 127,996.53 |
| Nived Rajendran | 347.24 | 640 | $ 222,233.60 | $ 333,350.40 | $ 6,554.85 | $ 339,905.25 |
| Zachary Horn | 53.9 | 640 | $ 34,496.00 | $ 51,744.00 | $ 521.79 | $ 52,265.79 |
| Xinlin Morrow | 31.7 | 750 | $ 23,775.00 | $ 35,662.50 | $ 464.20 | $ 36,126.70 |
| Judson Crump | 615.57 | 525 | $ 323,174.25 | $ 484,761.38 | $ 9,243.82 | $ 494,005.20 |
| Erik Atzbach | 176.35 | 475 | $ 83,766.25 | $ 125,649.38 | $ 1,989.05 | $ 127,638.43 |
| Robert Kim | 85.72 | 480 | $ 41,145.60 | $ 61,718.40 | $ 793.78 | $ 62,512.18 |
| Kevin Auman | 35.33 | 480 | $ 16,958.40 | $ 25,437.60 | $ 393.86 | $ 25,831.46 |
| David Jaffe | 1.99 | 480 | $ 955.20 | $ 1,432.80 | $ 22.13 | $ 1,454.93 |
| Elliot Kovnick | 10.06 | 480 | $ 4,828.80 | $ 7,243.20 | $ - | $ 7,243.20 |
| Isabel Skomro | 56.5 | 480 | $ 27,120.00 | $ 40,680.00 | $ 61.94 | $ 40,741.94 |
| Ariel Thatcher | 68.52 | 290 | $ 19,870.80 | $ 29,806.20 | $ 315.80 | $ 30,122.00 |
| SUM TOTAL | 2,644.63 | N/A | 1,881,991.40 | 2,822,987.10 | 64,561.19 | 2,887,548.29 |

# EXHIBIT 20

Frances F. Goins

AMERICAN ARBITRATION ASSOCIATION
CONSUMER RULES AND MASS ARBITRATION SUPPLEMENTARY RULES

|  |  |
|---|---|
| In the Matter of an Arbitration Between<br><br>Greg Fish & 3 Other Individual Claimants,<br><br>v.<br><br>VALVE CORPORATION,<br><br>          Respondent. | 01-23-0005-3288,<br>01-23-0005-3702,<br>01-23-0005-3823,<br>01-23-0005-7452 |

### RESPONDENT VALVE CORPORATION'S
### <u>OBJECTIONS TO CLAIMANTS' APPLICATION FOR COSTS AND ATTORNEYS' FEES</u>

# **TABLE OF CONTENTS**

I.  INTRODUCTION ................................................................................................ 1

II.  BACKGROUND .............................................................................................. 2

III.  LEGAL STANDARD ...................................................................................... 6

IV.  ARGUMENT .................................................................................................. 7

   A.  Valve does not have sufficient notice or opportunity to oppose Bucher's fee application without the backup documentation. ..................................................... 7

   B.  The hours claimed are excessive and unreasonable. ........................................ 8

   C.  The application seeks fees for work done on other cases, which the Tribunal lacks jurisdiction to compensate. ...................................................................... 11

     i.  Hours billed to the "Mass Arbitration" code is work done on other cases and can only be recovered on a *pro rata* basis, if at all. .................................... 13

     ii.  Hours billed to the "Individual Arbitrator" code also likely include work done for other cases. ............................................................................... 15

   D.  The hourly rates claimed do not reflect prevailing rates in counsel's respective communities. ............................................................................ 17

   E.  Granting the fee application would result in an impermissible windfall. ..................... 20

   F.  Claimants' request for a 1.5x multiplier is not supported or justifiable. ..................... 23

   G.  Claimants' requests for other costs must be denied. ....................................... 25

     i.  Claimants fail to meet their burden of proof because they refused to provide the backup. .......................................................................................... 25

     ii.  Pre- and post-judgment interest are unavailable. ........................................ 26

V.  CONCLUSION ............................................................................................. 27

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                      **Page(s)**

*Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.*,

    2016 WL 11784203 (C.D. Cal. Sept. 13, 2016) .......................................................................... 3

*Binta B. ex rel. S.A. v. Gordon*,

    710 F.3d 608 (6th Cir. 2013) ................................................................................................ 11

*Blum v. Stenson*,

    465 U.S. 886 (1984) ........................................................................................................ *passim*

*City of Burlington v. Dague*,

    505 U.S. 557 (1992) ................................................................................................................ 24

*Copeland v. Marshall*,

    641 F.2d 880 (1980) ................................................................................................................. 8

*Coulter v. State of Tenn.*,

    805 F.2d 146 (6th Cir. 1986), .............................................................................................. 24

*Danos v. Panel Specialists, Inc.*,

    2023 U.S. Dist. LEXIS 169409 (E.D. La. July 24, 2023) ...................................................... 20

*Dye v. Bellsouth Telecomms., Inc.*,

    462 F. Supp. 2d 845 (W.D. Tenn. 2006) .......................................................................... *passim*

*Geier v. Sundquist*,

    372 F.3d 784 (6th Cir. 2004) ................................................................................................ 24

*Gonter v. Hunt Valve Co.*,

    510 F.3d 610 (6th Cir. 2007) ........................................................................................... 6, 20

*Grant v. Lockett*,

    605 F. Supp. 3d 399 (N.D.N.Y. 2022) ................................................................................. 19

*Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*,

    995 F.2d 425 (3d Cir. 1993) ................................................................................................. 22

*Gurule v. Land Guardian, Inc.*,

    912 F.3d 252 (5th Cir. 2018) ................................................................ 21

*Heller v. D.C.*,

    832 F. Supp. 2d 32 (D.D.C. 2011) ........................................................ 18

*Hensley v. Eckerhart*,

    461 U.S. 424 (1983) ................................................................... *passim*

*Imwalle v. Reliance Med. Prods., Inc.*,

    515 F.3d 531 (6th Cir. 2008) ........................................................... 6, 16

*In re Coy Farms, Inc.*,

    417 B.R. 17 (Bankr. N.D. Ohio 2009) .................................................. 24

*In re: Cathode Ray Tube (Crt) Antitrust Litig.*,

    2016 WL 1072097 (N.D. Cal. Mar. 17, 2016) ........................................ 3

*Intel Corp. v. Terabyte Int'l, Inc.*,

    6 F.3d 614 (9th Cir. 1993) .................................................................. 17

*Isabel v. City of Memphis*,

    404 F.3d 404 (6th Cir. 2005) ............................................................. 6, 7

*Johnson v. Midland Credit Mgmt. Inc.*,

    2013 WL 12412632 (N.D. Ohio Dec. 12, 2013) .................................... 11

*Kaiser Aluminum & Chem. Corp. v. Bonjorno*,

    494 U.S. 827 (1990) ...................................................................... 27, 28

*Lamps Plus, Inc. v. Varela*,

    587 U.S. 176 (2019) ........................................................................... 12

*Law v. Nat'l Collegiate Athletic Ass'n*,

    185 F.R.D. 324 (D. Kan. 1999) .......................................................... 26

*Louisville Black Police Officers Org. v. City of Louisville*,

    700 F.2d 268 (6th Cir. 1983) .............................................................. 20

*Magill v. DIRECTV,*
    2017 WL 8894320 (C.D. Cal. June 23, 2017) ............................................................ 12, 13, 14

*McAfee v. Boczar,*
    738 F.3d 81 (4th Cir. 2013) .................................................................................................. 21

*Migis v. Pearle Vision, Inc.,*
    135 F.3d 1041 (5th Cir. 1998) .............................................................................................. 21

*Moreno v. City of Sacramento,*
    534 F.3d 1106 (9th Cir. 2008) ........................................................................................ 10, 11

*Open Source Sec., Inc. v. Perens,*
    2018 WL 2762637 (N.D. Cal. June 9, 2018) ......................................................................... 7

*Open Source Sec., Inc. v. Perens,*
    803 F. App'x 73 (9th Cir. 2020) ............................................................................................ 7

*Perkins v. Standard Oil Co. of Cal.,*
    487 F.2d 672 (9th Cir. 1973) ............................................................................................... 27

*Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC,*
    497 F.3d 133 (2d Cir. 2007) ........................................................................................... 13, 26

*Sadowski v. Urbanspotlite LLC,*
    2024 U.S. Dist. LEXIS 106703 (N.D.N.Y. June 17, 2024) .................................................. 19

*Spears v. Bay Inn & Suites Foley, LLC,*
    2024 U.S. Dist. LEXIS 171241 (S.D. Ala. Sep. 23, 2024) ................................................... 20

*Sterling v. Southlake Nautilus Health & Racquet Club, Inc.,*
    736 F. Supp. 3d 626 (N.D. Ind. 2024) .................................................................................. 12

*The Ne. Ohio Coal. for the Homeless v. Husted,*
    831 F.3d 686 (6th Cir. 2016) ................................................................................................ 24

*Thomas v. Houck,*
    2016 WL 6780095 (W. Va. Nov. 16, 2016) .......................................................................... 21

*Totem Marine Tug & Barge, Inc. v. N. Am. Towing, Inc.,*

    607 F.2d 649 (5th Cir. 1979) ........................................................................ 26

*Trout Point Lodge Ltd. v. Handshoe,*

    2013 WL 6524650 (S.D. Miss. Dec. 11, 2013) ......................................... 12

*U.S. Football League v. Nat'l Football League,*

    887 F.2d 408 (2d Cir. 1989) ........................................................................ 25

*United Slate, Local 307 v. G & M Roofing & Sheet Metal Co.,*

    732 F.2d 495 (6th Cir. 1984) ......................................................................... 6

*United States ex rel. Sheppard v. Pathway of Baldwin Cnty., LLC,*

    2025 U.S. Dist. LEXIS 52380 (S.D. Ala. Mar. 21, 2025) ........................ 20

*US Airways, Inc. for Am. Airlines, Inc. v. Sabre Holdings Corp.,*

    2023 WL 3749995 (S.D.N.Y. June 1, 2023) ............................................. 22

*US Airways, Inc. v. Sabre Holdings Corp.,*

    2023 WL 2853931 (S.D.N.Y. Apr. 10, 2023) ........................................... 22

*Van Horn v. Nationwide Prop. & Cas. Ins. Co.,*

    436 F. App'x 496 (6th Cir. 2011) .............................................................. 23

*Wells Fargo Bank, NA v. MPC Invs., LLC,*

    2011 WL 1748429 (E.D. Mich. May 3, 2011) ............................................ 7

*Williams v. R.W. Cannon, Inc.,*

    657 F. Supp. 2d 1302 (S.D. Fla. 2009) ..................................................... 6, 7

*Yamada v. Nobel Biocare Holding AG,*

    825 F.3d 536 (9th Cir. 2016) ........................................................................ 3

*Youngs v. Am. Nutrition, Inc.,*

    537 F.3d 1135 (10th Cir. 2008) .................................................................. 27

**Statutes**

15 U.S.C. § 1 ........................................................................................................ 2

15 U.S.C. § 2 ........................................................................................................ 2

15 U.S.C. § 15................................................................................................................ 1, 6, 26

28 U.S.C. § 1961.................................................................................................................... 27

**Other Authorities**

Board of Governors of the Federal Reserve System, Selected Interest Rates,

    https://www.federalreserve.gov/releases/h15/. ........................................................ 27

United States Courts, Post Judgment Interest Rate,

    https://www.uscourts.gov/court-programs/fees/post-judgment-interest-rate............................ 27

**Rules**

Fed. R. Civ. P. 58.................................................................................................................... 27

## I.    INTRODUCTION[1]

Claimants' attorneys seek nearly $3 million in fees for four arbitrations in which the total awards, *after* trebling, are $8,068.20 combined.[2] That astronomical amount of fees—about 350 times higher than the total damages award and which includes hundreds of general hours not specific to these Claimants' claims—is impermissible under a statute that only permits an award of "reasonable" attorney's fees. 15 U.S.C. § 15.

As an initial matter, Claimants do not back up their fee request with timesheets and other backup documentation, which means they cannot prove reasonableness. Valve requested that the Tribunal order Claimants to provide that back-up; the Tribunal rejected Valve's request in lieu of allowing Claimants to submit those materials *ex parte*. But providing the timesheets to the Tribunal *ex parte* does not cure this failure because it thwarts the adversarial process. Valve has been blocked from testing the reasonableness of time spent on various tasks. Valve has also been blocked from analyzing whether the work performed is fairly attributable to these Claimants specifically, rather than to the tens of thousands of other arbitrations that Claimants' attorneys are litigating simultaneously or the overlapping class action those same attorneys filed. A fee award is not authorized under such circumstances.

Indeed, Claimants' counsel now admits that he seeks compensation for work done in *unrelated* arbitrations, claiming he can recover those amounts here so long as he seeks them only once. But under the law, Claimants' counsel is entitled to no more than a *pro rata* split for his four successful claimants—among the more than 51,000 he claims to represent. Anything more

---

[1] Valve makes this submission under a full reservation of rights because there is no longer an agreement to arbitrate between the parties and therefore the AAA does not have jurisdiction. On September 26, 2024, Valve amended the Steam Subscriber Agreement to remove the arbitration agreement. The updated Steam Subscriber Agreement (the "Current SSA") provides that all claims—including accrued and pending claims—must be resolved in court. All Claimants have agreed to the Current SSA.

[2] The actual damages amount is only $2,689.40, for an attorney's fees to damages ratio of 1049:1.

would necessarily award Claimants' counsel both for arbitrations they lost and for work on behalf of claimants not before his Tribunal, which this Tribunal lacks power to do.

But even without examining the back up documentation, on its face the fee request is unreasonable and excessive. It is many multitudes greater than Claimants' counsel's own prior representations to investors of the time and money required to litigate these claims. The hourly rates being claimed are inflated by at least two to three multiples, ignoring the settled legal test for determining hourly rates for fee awards, which is based on the prevailing rates in the communities where counsel currently work and live. And the 1.5x multiplier that Claimants seek has no support in the law.

What Claimants seek here in nothing less than an impermissible windfall—a fee award nearly 350 times the amount of damages. Fee awards that are at a fraction of that ratio are routinely reversed. This Tribunal should reject that invitation into error. Deprived of a full and fair opportunity to evaluate the backup materials related to Claimants' fee petition and duly respond, Valve proceeds with this opposition under a reservation of all rights.

## II.    BACKGROUND

As the Tribunal is aware, the arbitrations brought by Mr. Fish, Mr. Graber, Mr. Lefebvre, and Mr. Lucas were heard over ten hearing days from March 6, 2025 to March 25, 2025 (the "Goins Arbitrations"). On April 25, the parties submitted post-hearing briefs. On May 29, the Tribunal issued an interim award finding in Claimants' favor on certain Sherman §§1 and 2 claims, but finding for Valve on the claims brought under the Sherman Act *per se* theory of liability and Washington State law. *See, e.g.*, Lefebvre Interim Award at 2-3. The Tribunal issued

damages awards totaling $2,689.40 for the four claimants, which was trebled to $8,068.20.[3] The next day, Claimants' counsel Will Bucher sent a settlement demand to Valve, claiming to represent more than 51,000 claimants. Ex. A, May 30, 2025 W. Bucher letter to S. Danner.

Claimants submitted their fee application on June 12, attaching no timesheets, narrative descriptions, or receipts for costs and expenses (together, the "backup documentation"). The next day, Valve requested that the Tribunal order claimants to disclose the backup documentation. Ex. B. Mr. Bucher opposed that request. *Id*. The Tribunal ultimately ordered Claimants to produce the backup documentation only for *in camera* review—such that it would remain fully inaccessible to Valve.[4] Ex. C. On June 30, 2025, Mr. Bucher purported to provide this back up documentation to the Tribunal, along with a cover email. Ex. D. To this day, Valve has never seen this *ex parte* submission and has no idea what Mr. Bucher sent to the Tribunal.

In Mr. Bucher's cover email to his June 30 submission of *ex parte* evidence, he admitted that 884.24 of the 2644.63 hours claimed in the fee application—a full third—were for work "undertake[n] for any and all arbitrations"—including the "thousands" of other arbitrations that Mr. Bucher concedes he is prosecuting against Valve.[5] *Id*. Those thousands of arbitrations involve near-identical claims. June 12, 2025 Bucher Decl. ¶¶17-18. And they are being prosecuted *at the same time* as the Goins Arbitrations. In the weeks before, during, and after the Goins Arbitrations, Mr. Bucher and his associates were actively prosecuting claims for many

---

[3] This award reflected the lower end of the damages range presented by Max Theiler, Claimants' expert in the Goins Arbitrations. Ex. E, Theiler Slide Deck, Slides 20, 22-24. Claimants sought a minimum of $8,068.52 damages for all games after trebling, and a maximum trebled damages award of $11,923.49 for all games. *Id*.

[4] Valve hereby preserves all objections and reserves all rights in relation to the denial of its due process right to view the evidence submitted against it. *See, e.g.*, *Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.*, 2016 WL 11784203, at *2 (C.D. Cal. Sept. 13, 2016); *Yamada v. Nobel Biocare Holding AG*, 825 F.3d 536, 544 (9th Cir. 2016); *In re: Cathode Ray Tube (Crt) Antitrust Litig.*, 2016 WL 1072097, at *3 (N.D. Cal. Mar. 17, 2016).

[5] Notably, Mr. Bucher provided this limited information only after Valve requested his time entries. Mr. Bucher likely would not have even provided this information had Valve not made its request.

other claimants before numerous arbitrators and had commenced thousands of others (together, "Unrelated Arbitrations").[6] Indorf Decl. at ¶¶ 5-11.

Moreover, shortly before the Goins Arbitrations, Mr. Bucher and at least three of his associates spent many hours litigating claims on behalf of 23 claimants before Arbitrator Saydah (the "Saydah Arbitrations"). This work included evidentiary hearings on the merits, Indorf Decl. at ¶ 8, as well as substantial pretrial briefing and lengthy post-hearing briefing. It also included preparing a federal lawsuit that sought to set aside the Arbitrator's award in one of the 23 arbitrations (all of which were in Valve's favor) during roughly the same time the Goins Arbitrations were occurring.[7] Claimants' fee petition tries to create the impression that counsel put thousands of hours into the Goins Arbitrations, but the reality is that during the same time period that Claimants' counsel was litigating the Goins Arbitrations, they were preparing filings, arguing motions, and attending court conferences in the Unrelated Arbitrations. Indorf Decl. at ¶¶ 5-11. Mr. Bucher concedes that he reuses work product as between the multiple arbitrations he is prosecuting against Valve. June 12, 2025 Bucher Decl. ¶18.

Meanwhile, in that same time period, Mr. Bucher brought a federal class action lawsuit against Valve alleging the same conduct as in the arbitrations. *See, e.g.*, Ex. F, *Elliot v. Valve Corp.*, 2:24-cv-01218-JNW, Dkt. 1 at ¶ 4 ("Valve's PMFN prevents any publisher that sells a game on Steam from either (a) selling that game on a rival platform for a lower price (price parity), or (b) providing additional game content or enhancements on a rival platform (content parity)."). Mr. Bucher sought to be appointed class counsel in that litigation, claiming at that time

---

[6] Each claimant represents an individual arbitration.
[7] *Lapaglia v. Valve Corporation*, 3:25-cv-00833-RBM-DDL, U.S. District Court for the Southern District of California.

to represent more than 50,000 individual claimants in litigations against Valve. Ex. G, Bucher Decl., *Elliot v. Valve Corp.*, 2:24-cv-01218-JNW, Dkt. 27, ¶ 3.

      Undisclosed to the Tribunal—but highly relevant to testing the reasonableness of the fees claimed here—are the estimates of attorney time and fees that Mr. Bucher developed for investors when he was seeking third-party funding to bring mass arbitrations.[8] In the presentation, Mr. Bucher estimated that litigating these types of cases would require at most 160 hours of attorney time per arbitration. Ex. H, Mass Arbitration Strategy at 13. He also represented that it would cost approximately $1.7 million in fees to litigate 160 cases, amounting to $10,625 in fees *per case*, and that the legal theories could be "copycat[ted]" from prior court filings. *Id* at 5-6. In the instant fee application to the Tribunal, Mr. Bucher claims that he and his team spent 2600 hours working on just these four arbitrations—more than four times his initial estimate of 160 hours each—and incurred over $1,881,991.40 in fees—some 44 times his estimate. *See* June 12, 2025 Bucher Declaration, ¶ 20.

      Nor is that the only undisclosed estimate of fees prepared by Mr. Bucher that reflects what he thinks is reasonable. In a prior demand letter, Mr. Bucher valued the attorney fees, on a per client basis, at $4,000. *See* Ex. I, Claimants' Demand Ltr. at 2. And just two weeks before Mr. Bucher submitted this fee petition, he estimated to Valve that his attorney fees and costs in the Goins Arbitrations would be around $1 million—not the $3 million he now seeks. *See* Ex. A, May 30, 2025 W. Bucher letter to S. Danner ("We are still tallying our costs and fees from Goins' proceedings, but they will likely be in excess of $1,000,000.").

---

[8] Notably, the presentation proposed mass arbitration as an "investment opportunity," with Valve Corporation as an "example target" due solely to financial position and prior litigation. Ex. H, Mass Arbitration Strategy at 7.

### III.    LEGAL STANDARD

Under the Clayton Act, successful antitrust plaintiffs may seek a "*reasonable* attorney's fee." 15 U.S.C. § 15 (emphasis added). A reasonable fee is one that is "adequately compensatory to attract competent counsel yet which ***avoids producing a windfall for lawyers***." *Gonter v. Hunt Valve Co.*, 510 F.3d 610, 616 (6th Cir. 2007) (internal quotations omitted; emphasis added). Courts use the "lodestar" method to calculate reasonable attorneys' fees, "which is the *proven* number of hours *reasonably expended* on the case by an attorney, multiplied by a *reasonable* hourly rate." *Isabel v. City of Memphis*, 404 F.3d 404, 415 (6th Cir. 2005) (emphasis added). Claimants bear the burden of proving all elements of reasonableness under the lodestar calculation. *Williams v. R.W. Cannon, Inc.*, 657 F. Supp. 2d 1302, 1307 (S.D. Fla. 2009).

Claimants' attorneys may only bill for hours that were "reasonably expended" on the case. *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983). This obligation necessitates a "good faith effort" to exclude hours that are "excessive, redundant, or otherwise unnecessary." *Id.* Claimants bear the burden of producing <u>documentation</u> "of sufficient detail and probative value to enable the court to determine with ***a high degree of certainty*** that such hours were actually and reasonably expended" on the litigation in question. *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 553 (6th Cir. 2008) (emphasis added) (quoting *United Slate, Local 307 v. G & M Roofing & Sheet Metal Co.*, 732 F.2d 495, 502 n.2 (6th Cir. 1984)).

In assessing whether the hourly rate is reasonable, courts consider "rates for similar services in the community by attorneys with reasonably comparable skills, experience, and reputation." *Dye v. Bellsouth Telecomms., Inc.*, 462 F. Supp. 2d 845, 855 (W.D. Tenn. 2006) (internal quotations omitted); *see also id.* ("The Supreme Court has recognized the community market rule as the proper method to ascertain a reasonable hourly rate.") (citing *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984)). An attorney's own affidavits are insufficient to meet their burden

of proof on the reasonableness of the hourly rate. *Dye*, 462 F. Supp. 2d at 855 ("The fee applicant

bears the burden to produce evidence, *in addition to the attorney's own affidavits*.") (quoting

*Blum*, 465 U.S. at 895 n.11); *Open Source Sec., Inc. v. Perens*, 2018 WL 2762637, at *3 (N.D.

Cal. June 9, 2018), *aff'd*, 803 F. App'x 73 (9th Cir. 2020) ("An attorney's declaration about the

reasonableness of the claimed rate is insufficient to meet the fee applicant's burden."); *Wells

Fargo Bank, NA v. MPC Invs., LLC*, 2011 WL 1748429, at *5 (E.D. Mich. May 3, 2011)

(similar).

## IV.   ARGUMENT

### A.   Valve does not have sufficient notice or opportunity to oppose Bucher's fee application without the backup documentation.

Claimants' counsel's fee application seeks a nearly $3 million award for some 2600 hours

of attorney time. But counsel has refused to disclose the backup documentation to Valve that

shows what tasks were performed, how much time was spent on each, how they do or do not

relate to these specific Claimants, and when and by whom they were performed. When Valve

requested that the Tribunal order Claimants' counsel to turn over the backup documentation, the

Tribunal refused. June 16, 2025 Fee Award Submission Order ("Claimants are hereby ordered to

produce *in camera*, solely for the Tribunal's review, any back-up documentation for the amounts

sought in the Application, including contemporaneous timekeeping records, descriptions of the

work performed, and documentation of the hours spent performing that work, as well as

itemization of and receipts for any expenses that are sought in the Application.").

Without the backup documentation, Valve has been deprived of its ability to test the

reasonableness of fees and whether Claimants have met their burden of proof. *Williams*, 657 F.

Supp. 2d at 1307. The first step of the lodestar method requires proof of the "number of hours

reasonably expended on the case." *Isabel*, 404 F.3d at 415. Valve has nothing more to go on than

7

Mr. Bucher's say-so.  June 12, 2025 Bucher Decl. ¶ 20. And Mr. Bucher admitted that a large portion of the claimed hours were not worked on *these* arbitrations.

Valve also has no way without the backup documentation to test whether the hours claimed are "excessive, redundant, or otherwise unnecessary." *Hensley*, 461 U.S. at 434. Valve cannot check, for instance, if Claimants' counsel spent 100 hours reviewing a deposition transcript, or 20 hours drafting an email, both of which would be plainly excessive. Valve cannot verify whether the lawyers on Claimants' team are billing for doing the very same tasks (which would be redundant under the *Hensley* test), or tasks that are not legal work. These would all be grounds to reduce the claimed fee award. *Id.* ("Hours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority.") (cleaned up) (quoting *Copeland v. Marshall*, 641 F.2d 880, 891 (1980) (en banc)).

The risk that the amount claimed is excessive is clearly evident here, where the fee award being claimed is astronomical on its face, and the amount of fees and time spent are several multiples higher than Mr. Bucher's own estimates to investors and even his posturing to Valve in settlement demands. *See* Exs. A, H, I.

### B.  The hours claimed are excessive and unreasonable.

Even with no visibility into the backup documentation, it is clear from the face of Mr. Bucher's fee application that the number of hours allegedly spent litigating these claims is excessive. The fee request should accordingly be rejected under the first step of the lodestar test, which is that "the proven number of hours" must be "*reasonably* expended." *Isabel*, 404 F.3d at 415 (emphasis added).

The numbers are staggering. Claimants' counsel claims to have spent more than 2600 attorney hours and approximately 70 paralegal hours. For reference, Mr. Bucher told a federal

court that as of October 2024, he spent 4000 hours litigating **all** of the arbitrations he has against Valve. Ex. J, Bucher Decl., *Elliot v. Valve Corp.*, 2:24-cv-01218-JNW, Dkt. 43, ¶ 2. That's on behalf of more than 50,000 individual claimants. Ex. G, Bucher Decl., *Elliot v. Valve Corp.*, 2:24-cv-01218-JNW, Dkt. 27, ¶ 3. His claim here of 2600 hours—65% of that time—is being made on behalf of just **four** of those 50,000 claimants.

Even if this Tribunal accepts that 884 of these hours, billed to the Mass Arbitration Code, were spent on work common to all arbitrations—and accordingly credits them *pro rata* (*see infra*)—Claimants' attorneys still implausibly assert they incurred 1760.39 hours of work on the Goins Arbitrations *alone*. This means—if Claimants' petition is to be believed—that during the four months between the time the hearing dates were set (on November 21, 2024) and the completion of those hearings in late March 2025, counsel spent over 1760 hours—or more than 400 hours per month—on the Goins Arbitrations alone.  And that is with a merits hearing in the Saydah Arbitrations intervening. *See* Indorf Decl. ¶ 8.

And this is in a matter where there was *no* "fact and expert discovery" to speak of—contrary to Claimants' counsel's representations in their fee application.  Claimants' App. at 3. No depositions were taken. The vast majority of documents—with the exception of the four claimant purchase histories—had been previously produced in other arbitrations. Even the six Valve witnesses that Mr. Bucher subpoenaed and called on hostile direct had been previously deposed in the federal court, and Mr. Bucher had their deposition transcripts. Any claim that 1760 attorney hours were spent preparing for ten hearing days, in a case with virtually no pre-trial discovery, is implausible on its face.

The claimed hours also vastly eclipse Mr. Bucher's own prior representations of how long it would take to litigate these claims. As referenced above, he previously represented to

potential investors that each arbitration hearing in his mass arbitration strategy would take about 160 hours to litigate, and that the aggregated total legal fees to litigate 160 arbitration hearings (the "most completed arbitrations seen to date," according to Bucher) would likely be around $1.7 million. Ex. H, Mass Arbitration Strategy at 13. Mr. Bucher had every incentive to *not* understate the time and expense of litigating these arbitrations, since his goal was to obtain funding to fund those expenses. Mr. Bucher now claims that *just four* arbitrations took more than 2600 attorney hours to litigate, incurring $1,881,991.40 in fees. That means Mr. Bucher claims to have spent more on four arbitrations—with common testimony across the cases, which comprised the vast majority of all testimony in the cases, proffered only once—than he represented to investors would be necessary to litigate *160 arbitrations*. *Id.* at 13.

Mr. Bucher's estimate and his actuals are not even remotely in the same ballpark, suggesting Mr. Bucher was either being not forthcoming to investors or is not being forthcoming now. If the Tribunal does not reject the fee application outright, the Tribunal should at least reduce the hours compensated to something more in line with Mr. Bucher's estimate to investors, 160 hours per arbitration, to prevent Claimants' attorneys from recovering for hours which are "excessive, redundant, or otherwise unnecessary." *Hensley*, 461 U.S. at 434.

The fee application argues that counsel's hours are "*prima facie* reasonable" because they were incurred in a contingency case, but that is unsupported by the authority they cite. Claimants' App. at 3. *Moreno* stands for the unremarkable proposition that a court's order concerning substantial reductions to an award of attorneys' fees must be supported by a reasoned explanation for the reductions in accordance with established law. *Moreno v. City of Sacramento*, 534 F.3d 1106, 1116 (9th Cir. 2008) ("[I]f the district court is going to make substantial cuts to a winning lawyer's fee request, it needs to explain why with sufficient specificity that the lawyer

can meaningfully object and we can meaningfully review the objection.").[9] Critically, the court emphasized the role of the losing party in arriving at a reasonable fee award: "the burden of producing a sufficiently cogent explanation [for reducing a fee request] can mostly be placed on the shoulders of the losing parties, who not only have the incentive, but also the knowledge of the case to point out such things as excessive or duplicative billing practices." *Id.*  Here, the losing party—Valve—was deprived of that role when it was denied access to the backup documentation, making it all the more inappropriate to assume that fees sought by Claimants' counsel are *prima facie* reasonable. Indeed, far from suggesting that contingency hours are always reasonable, *Moreno* accords with Supreme Court precedent, which provides that "[t]he number of hours to be compensated is calculated by considering whether, in light of the circumstances, the time could reasonably have been billed to a private client." *Id.* at 1111 (quoting *Hensley*, 461 U.S. at 434). No rational client would countenance spending more than $1.8 million in attorney time to prosecute claims whose maximum value could never exceed $12,000. The number of hours claimed here is irrational, and therefore unreasonable under the lodestar method.

### C.  The application seeks fees for work done on other cases, which the Tribunal lacks jurisdiction to compensate.

It is black letter law that fees cannot be awarded for work done on other cases. *See Binta B. ex rel. S.A. v. Gordon*, 710 F.3d 608, 631 (6th Cir. 2013) (awarding fees for work on other cases would create "all sorts of oddities, as illustrated by this case where counsel would be permitted to recover fees for thousands of hours of time spent litigating a case they lost."); *Johnson v. Midland Credit Mgmt. Inc.*, 2013 WL 12412632, at *5 (N.D. Ohio Dec. 12, 2013)

---

[9] Valve has been deprived of the ability to object to Claimants' counsel's claimed hours with specificity without having the backup documentation.

(denying hours claimed "for work relating to other cases"); *Sterling v. Southlake Nautilus Health & Racquet Club, Inc.*, 736 F. Supp. 3d 626, 636 (N.D. Ind. 2024) (upholding a prior decision to deny attorney fees claimed as part of a different lawsuit in state court); *Trout Point Lodge Ltd. v. Handshoe*, 2013 WL 6524650, at *7 (S.D. Miss. Dec. 11, 2013) (holding that it would "not be appropriate to award attorney's fees in this case" for work related to "a different lawsuit.").

But that is exactly what Claimants' attorneys seek here. They seek it explicitly in claiming fees for time spent on tasks that benefit the thousands of arbitrations against Valve they are prosecuting, billed to their project code "Valve Mass Arbitration." And they seek it surreptitiously in the outrageous number of hours they claim was billed to the "Individual Arbitrator" project code, spent prosecuting *only* the Goins Arbitrations—with no more than $12,000 at stake.

In either case, the Tribunal exceeds its jurisdiction when it compensates attorneys for time spent on claims and claimants not before the Tribunal. Claimants claim to be prosecuting these arbitrations under a former version of the Steam Subscriber Agreement ("Superseded SSA") that expressly limited an arbitrator's authority to award relief only to the specific claim before the arbitrator and barred any sort of collective relief:

> **D. Individual Binding Arbitration Only**
>
> YOU AND VALVE AGREE NOT TO BRING OR PARTICIPATE IN A CLASS OR REPRESENTATIVE ACTION, PRIVATE ATTORNEY GENERAL ACTION, WHISTLE BLOWER ACTION, OR CLASS, COLLECTIVE, OR REPRESENTATIVE ARBITRATION, EVEN IF AAA's RULES WOULD OTHERWISE ALLOW ONE. THE ARBITRATOR MAY AWARD RELIEF ONLY IN FAVOR OF THE INDIVIDUAL PARTY SEEKING RELIEF AND ONLY TO THE EXTENT OF THAT PARTY'S INDIVIDUAL CLAIM. You and Valve also agree not to seek to combine any action or arbitration with any other action or arbitration without the consent of all parties to this Agreement and all other actions or arbitrations.

The Superseded SSA did not authorize the Tribunal to award fees not specifically incurred for these four Claimants. *See Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 184 (2019) (an arbitrator or arbitration panel derives their power from *the consent of the parties before* them who have contracted to resolve their dispute through arbitration) (emphasis added); *Magill v. DIRECTV*

12

2017 WL 8894320 at *3 (C.D. Cal. June 23, 2017) (rejecting the claim that "work done on behalf of several different plaintiffs with individual lawsuits, some indisputably unsuccessful, can be fully recovered through the victory of one such lawsuit."); *see also Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 140 (2d Cir. 2007).

As set forth below, any fee award by this Tribunal will almost necessarily entail compensation for work done on other cases.

> i. <u>Hours billed to the "Mass Arbitration" code is work done on other cases and can only be recovered on a pro rata basis, if at all.</u>

Despite initially representing to this Tribunal that they did "not seek to recover time for work done" for other arbitrations or litigations involving Valve, *see, e.g.*, June 12, 2025 Bucher Declaration ¶¶ 18, 25, Claimants' attorneys now **admit** that they seek fees for Unrelated Arbitrations, calling into question the credibility of Claimants' submission as a whole. Ex. D. Claimants' attorneys explain that they have used a general "Valve Mass Arbitration" project code to bill work common to multiple arbitrations and are seeking full compensation for the time billed to that code. *Id.* Claimants' attorneys assert that such an approach is appropriate because the "work submitted here had to be done regardless of whether we had four arbitrations, or *thousands*," and that work is therefore "fully compensable—once." *Id.*[10]

But an almost identical argument has been rejected by the courts. In *Magill v. DIRECTV, LLC,* plaintiffs' attorneys sought fees for common work done for the benefit of twelve different plaintiffs, all of whom the attorneys represented. 2017 WL 8894320 (C.D. Cal. June 23, 2017). But only one of the plaintiffs was successful in their lawsuit. The attorneys nonetheless sought

---

[10] It is not clear whether Claimants have made contemporaneous narrative entries describing work billed to the "Valve Mass Arbitration" project code that could be used to test whether the time was reasonably attributable to the Goins Arbitrations. Without the backup documentation Valve cannot confirm this or even compare time billed on specific days to that project code with Valve's counsel's own records of case events on the same day.

fees for the billing categories that related to common work benefiting all twelve plaintiffs on the basis that "these same actions would have needed to be taken in full even if [the instant plaintiff] was the only [] lawsuit," and that they were "necessary to [the plaintiff's] recovery and should be reimbursed in full." *Id.* at *2. That is the same argument Mr. Bucher makes regarding the Valve Mass Arbitration code. Ex. D.

In *Magill*, the Court refused to compensate the attorneys in full for the common work. Instead, the court awarded the attorneys only one-twelfth of the fees sought for that work, recognizing that "courts distribute attorney's fees on a *pro rata* basis" in such circumstances. *Id.* at *2-3. As the court explained, the instant plaintiff was "the sole prevailing party and benefited as one-of-twelve plaintiffs that Plaintiff's counsel represented when [doing the common work]." *Id.* at *3. Thus, that plaintiff's "success shall be awarded with one-twelfth the fees and costs, and the future success of other plaintiffs—if any—should be awarded accordingly." *Id.*

The same result should follow here. By Claimants' counsel's own admission, he represents at least 51,000 claimants.[11] Ex. A, May 30, 2025 W. Bucher letter to S. Danner. Thus far, Arbitrator Saydah ruled against 23 claimants and Mr. Bucher has been successful in only the four claimants' cases in the Goins Arbitrations. Of the 884 hours Mr. Bucher seeks for billings to the Valve Mass Arbitration code—the work he admits is common to all arbitrations he is prosecuting—he is entitled to no more than a *pro rata* share of these hours on behalf of the four successful claimants. *Magill*, 2017 WL 8894320, at *3. That amounts to about $50 shared between the four claimants here.[12]

---

[11] In fact, Mr. Bucher has noticed claims for more than 68,000 claimants.

[12] The *pro rata* share is calculated as follows: taking the total amount of fees claimed by Mr. Bucher and his team for their work ($1,881,991.40) and dividing it by the total hours claimed (2644.63) creates an average rate of $711 per hour, notwithstanding Respondents' argument, *infra*, that this hourly rate remains impermissibly high. Taking this average rate and multiplying it by the 884 hours worked in common across *all* arbitrations yields a total of $628,524. Because this total represents work done in common for all 50,000 of Mr. Bucher's claimants, it must be divided by

14

ii. _Hours billed to the "Individual Arbitrator" code also likely include work done for other cases._

The high number of hours billed to the Individual Arbitrator code also suggest that Mr. Bucher and his team are, in all likelihood, seeking to recover fees for work performed for entirely different arbitrations and court cases. Mr. Bucher and his team were actively litigating numerous other arbitrations against Valve involving near-identical claims during _the same weeks and months_ as they litigated the Goins Arbitrations. _See_ Indorf Decl. ¶¶ 5-11. Mr. Bucher also brought a federal class action lawsuit during that same time period. Ex. F. Yet Claimants' counsel claims to have spent 1760.39 hours _only_ on the Goins Arbitrations _to the exclusion of all others_. That is implausible.

As one example, if Mr. Bucher or his team billed any time to substantive merits-related tasks in 2024, that work was almost certainly done for the Saydah Arbitrations, which took place over the first two weeks of December and involved post-hearing briefs submitted December 23, 2024.[13] _See_ Indorf Decl. ¶ 8. Mr. Bucher lost—and Valve won—the Saydah Arbitrations. He and his team are not entitled to any fees for work done on that. It makes no sense that Claimants' attorneys would do any substantive claims-related work for the Goins Arbitrations when they had to face the first full trial of their claims. Any merits-related work billed to the Individual Arbitrator code before December 23, 2024 should be immediately suspect, especially given the limited activity in the Goins Arbitrations prior to this Tribunal's issuance of an amended scheduling order on November 21, 2024.[14] Certainly, in light of these facts, this Tribunal cannot

---

that number to establish the _pro rata_ share. This calculation yields a _pro rata_ total of $12.57 per claimant, multiplied by four to arrive at $50.28.

[13] It bears repeating that the claims asserted in all the arbitrations that Mr. Bucher is prosecuting against Valve are identical for practical purposes.

[14] Prior to the issuance of an amended scheduling order, the activity in these arbitrations consisted of briefing on Valve's motion to dismiss and Valve's motion to stay.

conclude to "*a high degree of certainty* that such hours were actually and reasonably expended" on only the Goins Arbitrations. *Imwalle*, 515 F.3d at 553 (emphasis added).

Nor can all time entries in 2025 be safely assumed to be attributable to the Goins Arbitrations. The sheer number of filings and pre-hearing conferences in other arbitrations during this time, *see* Indorf Decl. ¶¶ 4-6, make clear that Mr. Bucher, Mr. Crump, and Mr. Rajendran, at least, could not have been working full-time on the Goins Arbitrations. To take just a single example, between March 10 and 27, 2025, the parties were engaged in a substantial dispute before another arbitrator regarding Claimants' counsel's use of multiple fabricated case citations generated by counsel's use of ChatGPT in briefing in support of subpoena requests. This dispute involved multiple letters, briefing, and a separate hearing with the tribunal.[15] Yet their hours claimed—1030.75 hours for Mr. Bucher, 615.57 hours for Mr. Crump; and 347.24 hours for Mr. Rajendran—necessarily imply multiple months of exclusive full-time work on the Goins Arbitrations.[16] That is implausible, given the ongoing activity in the Unrelated Arbitrations during the same period, Indorf Decl. ¶¶ 5-11, and the related class action lawsuits filed by Mr. Bucher, *see infra*. There can be no finding to "*a high degree of certainty*" here "that such hours were actually and reasonably expended" on only the Goins Arbitrations. *Imwalle*, 515 F.3d at 553 (emphasis added).

Without Valve's input, the Tribunal is ill-equipped to make a determination as to whether time billed to the Individual Arbitrator Code wasn't in fact spent on other arbitrations. This

---

[15] Mr. Bucher admitted that Mr. Rajendran had improperly used AI to draft the filing, in conflict with of the rules of professional conduct. This calls into question the accuracy of all of Mr. Rajendran's billings, and underscores the risk of a fee award based on false billings in this case, where Valve has been denied access to the backup documentation.

[16] While Mr. Bucher's cover email of June 30 suggests that at least some of his and Mr. Crump's time was not spent exclusively prosecuting the Goins Arbitrations, Ex. D, Valve does not know which timekeepers billed what amounts of time to the Mass Arbitration code versus the Individual Arbitrator code—because it has been denied the backup documentation. Accordingly, Valve cannot even undertake an accurate analysis of the implausibility of the hours claimed. This is yet another way Valve has been blocked from fully and fairly responding to the fee application.

Tribunal has no visibility into the level of activity ongoing in the other arbitrations. Only the adversarial process can effectively ferret out which of Mr. Bucher's time entries in fact reflect work done for the many other arbitrations or cases that he was actively prosecuting simultaneously. *See Intel Corp. v. Terabyte Int'l, Inc.*, 6 F.3d 614, 623 (9th Cir. 1993) ("[The opposing party] was not required to take [the fee applicant's] word that every hour was needed and all overlap had been eliminated… Under our adversary system, [the opposing] was entitled to see just what was charged and why… That, among other reasons, explains … [the losing party's] need and right to peruse and parse [the fee applicant's] fee demand."). Without the benefit of the adversarial process, awarding fees for any time billed to the Individual Arbitrator code runs a high risk of an unauthorized award of fees for time spent on other cases, as well as excessive and duplicative time entries.

### D. The hourly rates claimed do not reflect prevailing rates in counsel's respective communities.

Not only are the hours that Claimants' attorneys claim to have worked excessive, but the rates they seek are unreasonable. The proper way to determine if a claimed hourly rate is reasonable is to compare the rate provided to "rates for similar services in the community by attorneys with reasonably comparable skills, experience, and reputation." *Dye*, 462 F. Supp. 2d at 855 (internal quotations admitted). The rates of opposing counsel are irrelevant here.[17] The law explicitly directs courts to consider the "prevailing" rate in the community of the counsel who is seeking fees. *Dye*, 462 F. Supp. 2d at 855 (citing *Blum*, 465 U.S. at 895 n.11).

---

[17] Valve's counsel Holwell Shuster & Goldberg's ("HSG") application in the *Zunum* matter is not to the contrary. There, HSG established that its rates were prevailing for the community and locality where HSG was located, New York City. By contrast, Claimants' counsel is attempting to use rates in cities they do not work or live in. Moreover, the hours comparison is not an apt one, given that HSG litigated the referenced *Zunum* case for multiple years, the case involved a singular matter so there was no risk that HSG billed for other cases (as there is here), HSG submitted comprehensive billing records to the court and to opposing counsel for examination (which Claimants have not done here), and the fees sought were a fraction of the overall initial jury award in the case (as is not the case here).

Claimants' fee application completely ignores this legal standard. Mr. Bucher proposes an hourly rate based on his work at a different firm, in a different (more expensive) city where he no longer lives or works, to arrive at a rate of $970 per hour. But the rates his employers might have been able to command for Mr. Bucher's work as an associate supervised by experienced attorneys in Debevoise's New York office or one of Fenwick's offices in Silicon Valley, San Francisco, Santa Monica, Seattle, Washington DC or New York are irrelevant. Debevoise and Fenwick are large, elite law firms that charge rates commensurate with the skill, experience, and reputation of the partners who manage their matters. Mr. Bucher is no longer at Debevoise or Fenwick, was never a partner at either firm, and was not supervised by partners of those firms when prosecuting these arbitrations.[18] *Heller v. D.C.*, 832 F. Supp. 2d 32, 46–47 (D.D.C. 2011) (reducing plaintiffs' fee award and noting that "[t]he market generally accepts higher rates from attorneys at firms with more than 100 lawyers than from those at smaller firms—presumably because of their greater resources and investments, such as attorneys, librarians, researchers, support staff, information technology, and litigation services.").

Mr. Bucher is now the principal at Bucher Law PLLC, based in Albany, New York. *See e.g.*, June 12, 2025 Bucher Decl. at 5. Albany is located within the Northern District of New York. Under the "community standard" for determining prevailing rates for purposes of the lodestar method, the question for Mr. Bucher is what a similar attorney with reasonably comparable skills, experience, and reputation would charge in the relevant community of Albany. *Dye*, 462 F. Supp. 2d at 855.

---

[18]  The real world results illustrate the point. Through December 2024, Mr. Bucher touted on his website that he had won all 160 arbitrations in which he was involved that went to a merits determination. Ex. K. Even assuming that was true, those were arbitrations defended by teams of large law firm attorneys before Mr. Bucher founded his own firm. Mr. Bucher was an associate on those teams at Fenwick. Bucher Decl. ¶ 6. On his own after founding Bucher Law PLLC, Mr. Bucher lost all 23 of the first arbitrations he prosecuted against Valve through merits resolution.

The fee application provided no evidence of prevailing rates for similarly-qualified attorneys in Albany. That failure of proof is enough to deny the fee application on the basis that Claimants have failed to meet their burden. *Dye*, 462 F. Supp. 2d at 854-55. Evidence shows that a reasonable hourly rate for lawyers similarly-qualified to Mr. Bucher in Albany is between $250-$350, less than half the $970 he seeks. *See Grant v. Lockett*, 605 F. Supp. 3d 399, 404 (N.D.N.Y. 2022) (holding that "[c]ourts in this district have recently determined hourly rates of: between $250 and $350 for partners; between $165 and $200 for associates; and between $80 and $90 for paralegals, to be reasonable."); *see also Sadowski v. Urbanspotlite LLC*, 2024 U.S. Dist. LEXIS 106703, at *13 (N.D.N.Y. June 17, 2024) (confirming the rates established in *Grant* as appropriate benchmarks for partners, associates, and paralegals, rejecting a proposed rate of $450 as "considerably higher than what is usually expected in the Northern District of New York," and awarding a reduced hourly rate of $350 instead). To the extent that this Tribunal is inclined to award fees for Mr. Bucher's time even given the failure to meet his burden, it should adjust his hourly rate to something less than $350 an hour as dictated by law. This is all the more true because Mr. Bucher explained to his potential investor that these types of arbitrations could be passed off to contract attorneys who bill between $100-$125 an hour. Ex. H, Mass Arbitration Strategy at 13. The $970 hourly rate Mr. Bucher seeks is plainly excessive.

As to the associates, paralegals and law clerks working for Bucher Law PLLC, the fee application provides no detail regarding where they work, and only the barest of details regarding their skills and experience. But assuming that these employees are also based in Albany, the Tribunal should also apply the rates in *Grant* for their fees and award hourly rates of no more than $200 for associates and $90 for paralegals.

Claimants do no better for their second chair at the hearing, Mr. Crump. Claimants' attorneys request an hourly rate of $525 for Mr. Crump. June 12, 2025 Bucher Decl. ¶ 15. Mr. Crump resides in Silverhill, Alabama, which is within the Southern District of Alabama. This is the relevant "community" for determining a reasonable hourly rate. Again, Claimants failed to put forth any evidence to back up the claimed rate of $525. In fact, the hourly rate in the Southern District of Alabama is about $350 for a very experienced litigator and around $250 for a lawyer with substantial experience. *United States ex rel. Sheppard v. Pathway of Baldwin Cnty., LLC*, 2025 U.S. Dist. LEXIS 52380, at *11 (S.D. Ala. Mar. 21, 2025) (establishing $300 to $350 as a reasonable rate for an attorney with more than 30 years of experience in complex civil litigation); *Spears v. Bay Inn & Suites Foley, LLC*, 2024 U.S. Dist. LEXIS 171241, at *10-11 (S.D. Ala. Sep. 23, 2024) (awarding a rate of $241.60 to counsel with 28 and 33 years who had "extensive experience" in employment litigation). Mr. Crump, by contrast, has approximately 15 years of experience. June 12, 2025 Bucher Decl. ¶ 15. If the Tribunal awards fees for Mr. Crump's time despite his failure to meet his burden, it should reduce the hourly rate claimed by Mr. Crump to some number less than $350, which is the established hourly rate for a lawyer with twice his experience in the jurisdiction in which he practices, and still markedly higher than the contract attorney rates Mr. Bucher anticipated.

### E.  Granting the fee application would result in an impermissible windfall.

Any fee award must not result in a "windfall." *Gonter*, 510 F.3d at 616; *Louisville Black Police Officers Org. v. City of Louisville*, 700 F.2d 268, 278 (6th Cir. 1983) (holding that reasonable attorney fees should not produce "windfalls" for attorneys). To assess whether lawyers are likely to receive an impermissible "windfall," proportionality between damages received and attorney fees claimed "is an appropriate consideration." *See, e.g.*, *Danos v. Panel*

*Specialists, Inc.*, 2023 U.S. Dist. LEXIS 169409, at *15 (E.D. La. July 24, 2023) (holding that "fees should not overwhelm a case") (internal citations omitted).

Claimants recovered approximately $8000 in damages and seek roughly $2.8 million in attorney fees—a fee award 350 times more than their damages recovery. That wildly disproportionate fee request is strong evidence of a windfall. In *Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1048 (5th Cir. 1998), the Fifth Circuit held that an attorney's fee award 6.5 times the amount of damages awarded was "too large to allow the fee award to stand." In *McAfee v. Boczar*, 738 F.3d 81, 92 (4th Cir. 2013), *as amended* (Jan. 23, 2014), the Fourth Circuit rejected a fee award approximately 109 times the damages verdict, which the court held "constitute[d] a windfall." And in *Thomas v. Houck*, 2016 WL 6780095, at *6 (W. Va. Nov. 16, 2016), the court held that it "cannot turn a blind eye to the facially exorbitant attorney's fee award," which was 25 times higher than compensatory damages. The fee-to-damages ratios in those cases are dwarfed by the windfall here—the award of fees would be 350 times larger than the damages awarded.

Claimants try to argue that a reasonable fee is "not based on the amount" of damages awarded and falsely imply that courts routinely award attorney's fees that are hundreds, or even millions, of times greater than the actual amount of damages. Claimants' App. at 2. This is nonsense. Proportionality between damages awarded and the fee claimed is an "appropriate consideration," especially when the ratio between the two is particularly "eyebrow-raising." *Gurule v. Land Guardian, Inc.*, 912 F.3d 252, 259 (5th Cir. 2018). And in fact, as set forth above, courts can and do *reverse* fee awards with even smaller multiples. *Migis*, 135 F.3d at 1048; *McAfee*, 738 F.3d at 92; *Thomas*, 2016 WL 6780095, at *6.

Claimants fare no better with their citations to *US Airways* and *Gulfstream*. In *US Airways, Inc. v. Sabre Holdings Corp.*, the Court did nothing more than adopt the magistrate

judge's threshold finding that fees *could* be awarded, and said nothing about the quantum of fees that *would* be awarded. *US Airways, Inc. v. Sabre Holdings Corp.*, 2023 WL 2853931, at *1 (S.D.N.Y. Apr. 10, 2023), *report and recommendation adopted sub nom. US Airways, Inc. for Am. Airlines, Inc. v. Sabre Holdings Corp.*, 2023 WL 3749995 (S.D.N.Y. June 1, 2023) (finding plaintiff could be awarded reasonable attorneys' fees). The case was settled and no fee award was ever issued.

In *Gulfstream*, the court reduced the actual damages awarded by a jury to a nominal amount while still awarding attorney's fees, but that does not mean that the court granted more in fees than the damages recovered, as Claimants' counsel misleadingly implies. The jury in that case awarded damages that, when trebled, amounted to $2,992,500. *Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 441 (3d Cir. 1993). After the verdict, the court reduced the damages to a nominal amount "because the amounts received in [pretrial] settlement[s with codefendants]. . . in this action exceeded [the trebled amount awarded by the jury]." *Id.* The fee award was $1,100,000. It was thus ***less***—***not more***—than the trebled damages amount awarded by the jury before it was reduced (*i.e.*, $2,992,500). It was also less than the amounts received in settlement, at only slightly more than 25% of the settlement amounts. *Id.* at 443. In either case, it was a far cry from the fees-to-damages ratio being claimed here—a fee award that is 350 times the damages. And it certainly does not support the plainly false assertion that "[c]ourts do not hesitate to grant far more in fees, for far less money recovered, than in the case here." Claimants' App. at 2.

Though Claimants' attorneys try to mislead the Tribunal into thinking that a fee award that is 350 times the damages obtained is business-as-usual, it is not. It is a breathtaking windfall.

**F.  Claimants' request for a 1.5x multiplier is not supported or justifiable.**

This Tribunal's analysis of fees need not end with the two-prong lodestar analysis. As the Sixth Circuit and multiple other federal courts have acknowledged, courts also consider the 12 "Johnson Factors" endorsed by the Supreme Court in determining whether adjustment should be made to a fee application. *Van Horn v. Nationwide Prop. & Cas. Ins. Co.,* 436 F. App'x 496, 499 (6th Cir. 2011).[19] These factors assist a decisionmaker in determining "whether an upward or downward adjustment is warranted." *Id.* at 500.

The few factors Claimants focus on do not justify a multiplier of 50 percent.

First, Claimants' counsel touts the "inherent risk of taking on expensive, complex litigation" on a contingency basis where "Bucher Law PLLC has been paid no hourly rate, and Mr. Bucher has personally drawn no salary for over two years." Claimants' App. at 7. This obscures the fact that Claimants' attorneys sought and obtained up to $10,000,000 if not more from a litigation funder. Ex. L, SEC Disclosure at 4. As such, there has been no significant risk to Claimants' counsel in terms of incurring expenses, nor any substance to Claimants' attorneys' claim of delay in receipt of payment. Claimants' App. at 8 (noting that Claimants' counsel has "received no payment from the *Claimants*" and not mentioning the litigation funder) (emphasis added).

More fundamentally, under Supreme Court precedent, when fees are awarded under a fee-shifting statute "an adjustment in the lodestar method is *not permitted* for a contingency fee

---

[19] "Those factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." *Id.* at 499-500.

agreement." *In re Coy Farms, Inc.*, 417 B.R. 17, 23 (Bankr. N.D. Ohio 2009) (citing *City of Burlington v. Dague*, 505 U.S. 557 (1992)) (emphasis added).

Moreover, though Claimants' counsel asserts that these cases have been "long, complex, and difficult," Claimants' App. at 8, "the Supreme Court [has] held that neither the complexity nor novelty of the issues in a case is an appropriate factor in determining whether to increase the basic fee award." *Geier v. Sundquist*, 372 F.3d 784, 793 (6th Cir. 2004) (citing *Blum,* 465 U.S. at 898–99). And even were it an appropriate factor, it would actually support ***Valve's position***. As explained above, these cases involve hundreds of arbitrations on the same issues, with the same counsel, similar documentary evidence, and similar witnesses, not novel and complex legal issues from arbitration to arbitration. As Mr. Bucher explained to a prospective funder, he anticipated they would be handled by contract attorneys billing $125 or less an hour. Ex. H, Mass Arbitration Strategy at 13. On top of that, all of these arbitrations are a copycat of a lawsuit filed by other attorneys on behalf of other plaintiffs. *Id.* at 6 (noting that for claim identification, the strategy is to "[m]onitor court dockets for motions to compel class actions to arbitration and copycat existing legal theories"). They are not novel.

Finally, public policy—which is not a *Johnson* factor and is thus irrelevant—does not favor an increased fee award. Congress used "the words 'reasonable' fees, not 'liberal' fees" in the authorizing statute and did not intend for lawyers to receive "excess compensation or incentives beyond the amount necessary to cause competent legal work to be performed." *Coulter v. State of Tenn.*, 805 F.2d 146, 148–49 (6th Cir. 1986), *abrogated on other grounds by The Ne. Ohio Coal. for the Homeless v. Husted*, 831 F.3d 686 (6th Cir. 2016). Public policy dictates that fees be limited to *what is reasonable*, not what in Claimants' view is a "robust" award which may induce Valve to settle. Claimants' App. at 9.

Finally, Claimants were only partially successful before this Tribunal—another reason to reduce Claimants' fees. Johnson Factor 8, *supra* note 19; *see also Hensley*, 461 U.S. at 436 (holding that if a "plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount. This will be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith."). Here, Claimants' claims under Washington state law were rejected. So were their allegations based on the "*per se*" theory of harm, which each Claimant in the Goins Arbitrations identified as forming their "core allegations" against Valve. *See, e.g.* Graber Pre-Hearing Brief at 5. And Claimants were awarded damages on the low end of the awards they were seeking. Ex. E, Theiler Slide Deck at 20, 22-24. That warrants a reduction in the lodestar calculation, to account for Claimants' limited success on their claim. *U.S. Football League v. Nat'l Football League*, 887 F.2d 408, 413-14 (2d Cir. 1989).

### G. Claimants' requests for other costs must be denied.

#### i. Claimants fail to meet their burden of proof because they refused to provide the backup.

Claimants also seek expert costs and other expenses, which they claim were incurred in connection with this arbitration. Claimants' App. at 12-13. But yet again, Valve has no ability to test the validity of Claimants' expenses and expert costs and thus no way to determine if these expenses were reasonable or even incurred specifically for these arbitrations. Although Mr. Bucher claimed attorney-client privilege as a justification for not disclosing his timesheets to Valve, no such argument can be used to justify shielding his receipts and proof of expenses. Without that backup, Valve can't tell whether Mr. Bucher is seeking costs for arbitrations he lost or remain pending. As one example, he claims over $175,000 in expert fees. But his expert, Mr. Theiler, gave substantively identical testimony in the Saydah Arbitrations, even using many of

the same demonstrative slides. Without Mr. Theiler's timesheets, there is an unacceptable risk that this Tribunal is awarding costs against Valve for an arbitration that it won. That is outside the Tribunal's power. Another example is the data hosting costs that Mr. Bucher's cover letter alludes to, which is for the benefit of all of the tens of thousands of claimants he represents and would have been incurred regardless of whether the four Claimants here ever brought their claims. Any award of costs would therefore subsume costs for other arbitrations and cases, which is impermissible. *Porzig*, 497 F.3d at 140; *Totem Marine Tug & Barge, Inc. v. N. Am. Towing, Inc.,* 607 F.2d 649, 652–53 (5th Cir. 1979).

### ii. Pre- and post-judgment interest are unavailable.

Claimants seek pre-judgment interest on their claims for the Claimants, as well as interest on attorneys' and expert fees. *See generally, e.g.*, Claimants' App. at 10-14. But Claimants' cited authority is unfounded. The authorization for their fee award comes from the Clayton Act. 15 U.S.C. § 15. Under that statute, they are entitled to no pre-judgment interest because pre-judgment interest on damages, costs, and/or reasonable attorney's fees is only available when an opposing party has acted in "bad faith," in a manner that "provid[es] for sanctions," and in a manner that otherwise delays or increases the cost of litigation. 15 U.S.C. § 15(a)(1-3); *see also Law v. Nat'l Collegiate Athletic Ass'n*, 185 F.R.D. 324, 345–46 (D. Kan. 1999) (holding that in an "antitrust case involv[ing] private litigants, plaintiffs' right to prejudgment interest is limited to situations in which a litigant has acted in bad faith to delay the proceedings"). Claimants made no such allegation here—and this Tribunal made no such finding—so pre-judgment interest on fees is precluded as a matter of law.

Claimants' request for post-judgment interest on the same items as above must also be denied. Claimants cite various state and federal case law in support of their request, *see generally, e.g.*, Claimants' App. at 9-10, but where "the cause of action asserted arises from a

federal statute, questions of the allowance of post judgment interest in federal courts are governed solely by federal law." *Perkins v. Standard Oil Co. of Cal.*, 487 F.2d 672, 675 (9th Cir. 1973). Further, Supreme Court precedent is clear: "postjudgment interest properly runs from the date of the entry of judgment." *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835 (1990). Because this Tribunal has only made an *interim*, and not *final*, award—and because any such award has not been confirmed by a court—there is no "entry of judgment" upon which post-judgment interest could be awarded. *See Youngs v. Am. Nutrition, Inc.*, 537 F.3d 1135, 1146 (10th Cir. 2008) (confirming, for the purposes of confirming an award by an arbitrator and determining the start of the post-judgment interest period, that "[j]udgment was entered in this case when the court filed a separate document in accordance with [Federal Rule of Civil Procedure] 58").

Finally, even if post-judgment interest could be awarded (which it cannot), the applicable rate is set by Congress, which is not the rate Claimants' request. *Kaiser Aluminum,* 494 U.S. at 838-40 (holding that 28 U.S.C. § 1961 sets the rate of post-judgment interest for antitrust awards, and that "[w]here Congress has not seen fit to provide for a higher rate of interest with respect to antitrust suits and has set a definite interest rate that governs this litigation, the courts may not legislate to the contrary."). 28 U.S.C. § 1961 requires post-judgment interest to be awarded at a "rate equal to the weekly average 1-year constant maturity treasury yield," which is currently 4 percent. United States Courts, Post Judgment Interest Rate, https://www.uscourts.gov/court-programs/fees/post-judgment-interest-rate; Board of Governors of the Federal Reserve System, Selected Interest Rates, https://www.federalreserve.gov/releases/h15/.

## V.    CONCLUSION

Valve has been denied the full and fair opportunity to evaluate Claimants' fee application. As explained above, that fee application would result in an impermissible windfall for a variety

of reasons. It should be denied. Claimants' request for pre-judgment interest and costs should also be denied.

Valve reserves all rights based on the foregoing and on the ground that there is no jurisdiction before this Tribunal because there is no agreement to arbitrate between the parties.

DATED this 7th day of July, 2025

/s/ *Priyanka Timblo*
Scott M. Danner
Priyanka Timblo
**HOLWELL SHUSTER & GOLDBERG LLP**
425 Lexington Avenue
New York, NY 10017
(646) 837-5151
sdanner@hsgllp.com
ptimblo@hsgllp.com

# EXHIBIT 21

**From:** Goins, Frances
**Sent:** Thursday, July 10, 2025 12:24 PM
**To:** AAA Jill Roettger <JillRoettger@adr.org>
**Subject:** 4 Individuals v. Valve Corporation d/b/a Steam - Arbitrator Goins

**\*\*\* External E-Mail – Use Caution \*\*\***

Having now reviewed the parties' submissions related to Claimants' Application for Costs and Attorneys' Fees (the "Application"), it appears that I will require additional information to be able render a decision.  Therefore, Claimant is ordered to submit the following by July 31, 2025:

1. the total number of AAA arbitration cases that counsel has filed against Respondent based on the same of substantially similar claims to the four cases before me;

2. a breakdown of the attorneys' fees and costs attributable solely to each of the four cases before me, as opposed to those attributable to the other matters;

3. information sufficient to evidence the billing rates for comparable attorneys in matters of similar breadth and complexity to these cases; and

4. a reply memorandum addressing the issues raised in Respondent's Opposition to the Application

**Frances Floriano Goins, Arbitrator**
*Partner*

# EXHIBIT 22

JUDSON E. CRUMP, PC

www.judsonecrump.com

<u>VIA EMAIL</u>

Thursday July 31, 2025

Arbitrator Frances F. Goins
UB Greensfelder
1660 West 2nd Street, Ste 1100
Cleveland, OH 44113

Re:    Greg Fish, Jeremy Lucas, Christian Graber, & Ethan Lefebvre v. Valve
        Corporation – Fee Application

Dear Arbitrator Goins,

I write to address the topics you raised in your July 10th email order regarding our pending fee application for these four Claimants, and to respond to some of Valve's allegations in opposition.  **Valve does not deny** our assertion that it spent more money and time on its lawyers than the total Claimants seek in their fee application.  This alone defeats any allegations that our hours are "implausible" or "excessive," and is sufficient basis to award the Claimants everything they seek.

## I.   <u>The Claimants are "Prevailing Parties" Entitled to Full Relief</u>

Claimants achieved full success on their claims and their attorneys are entitled to full fees. Valve asserts that "Claimants' claims under Washington state law were rejected. So were their allegations based on the "per se" theory of harm." *Respondent's Objection, p. 25.*  Valve argues that this means Greg Fish, Jeremy Lucas, Christian Graber, and Ethan Lefebvre were "partially successful." Valve cites *Hensley v. Eckerhart*[1] for the proposition that when a "plaintiff has achieved only partial or limited success," the lodestar fee may not be appropriate.  But Valve omits the previous sentence in *Hensley*: "Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee. **The result is what matters**."  *Hensley*, at 435 (emphasis added).

---

[1] 461 U.S. 424 (1983)

Valve confuses the *per se* analysis that courts take when the full "rule of reason" analysis isn't necessary for an entirely new cause of action, which it is not. The "rule of reason" and per se rule are two paths to ascertaining a violation of the Sherman Act. The fact that this Tribunal applied the more rigorous standard does not detract from the Claimants' success; it bolsters it. As for the Washington state law claims, the demand for arbitration made clear that it was— just like the *per se* Sherman Act test—another path to the same remedy for the same illegal conduct. And because the Sherman Act awards—and the Claimants obtained— trebled damages, which are not available under Washington Unfair Competition law, claimants' success on the Sherman Act claims leaves them better off than they could have achieved under their alternative state law theory. Put another way, winning on a *per se* basis or on the Washington State Law claims would have left Claimants in precisely the same position with the same award. Claimants could not have not done better than they did here.

Valve incorrectly asserts that the Supreme Court has some rule against fee awards that are much higher than the prevailing party's recovery. There is no such rule. As noted in our opening brief, courts regularly award substantial attorneys' fees in Sherman Act cases, even for nominal success. *U.S. Airways, Inc. v. Sabre Holdings Corp.*, 11 Civ. 2725 (LGS) (S.D.N.Y. June 1, 2023); In *Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425 (3d Cir. 1993). The rule of Hensley, which Respondent cites multiple times, is this:

"Where the plaintiff has failed to prevail on a claim that is **distinct in all respects** from his successful claims, the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee. Where a lawsuit consists of related claims, **a plaintiff who has won substantial relief should not have his attorney's fee reduced** simply because the district court did not adopt each contention raised." *Hensley*, at 440 (emphasis added)

That is precisely the case here. While this Tribunal did not adopt every contention raised by the Claimants, they did not even raise any claims that were 'distinct in all respects' from their successful claims. Greg Fish, Christian Graber, Jeremy Lucas, and Ethan Lefebvre sued Valve for illegal anticompetitive conduct, and they won. They should not have their attorney's fee reduced.

JUDSON E. CRUMP, PC

www.judsonecrump.com

## II. **The Hours Claimed Are Reasonable and Present No Risk of an Undeserved Windfall**

Valve argues "[t]he high number of hours billed to the Individual Arbitrator code also suggest that Mr. Bucher and his team are, in all likelihood, seeking to recover fees for work performed for entirely different arbitrations and court cases." *Respondent's Objection to Claimants' Fee Application, p. 15*. This is simply false. We have been quite upfront about which hours were necessary for Claimants' cases but inured to the common benefit—the Valve Mass Arbitration hours—and which were worked specifically and directly on Claimants' cases—the Valve Individual Arbitration hours tagged for these claims. That is why our billing code model is structured this way, so that the two types of related and compensable work can be distinguished, should it be required.

The detailed time log provided shows that, as one would expect, the majority of our requested hours were billed the month prior to and during the month of trial. But for the sake of clarity, below is a chart depicting the percentage of the firm's time in each month that was devoted to hours we claim for these claimants.



JUDSON E. CRUMP, PC

www.judsonecrump.com

Green represents hours we claim.

Dark green represents our time entries that were tagged <u>specifically</u> with either the claimants' name or the arbitrator in these proceedings.  That dark green time is the individual arbitration codes for which we seek compensation.  The light green time is Valve Mass Arbitration time that was directly applicable to these four claimants' cases. Grey is other time that was spent litigating against Valve, but for which we do not seek compensation in these proceedings.

The chart lines correspond with the events that were impactful to the Claimants' cases. The first meaningful time appears in September of 2023, when their claims were being drafted and when the claimants were participating in mandatory settlement negotiations with Valve.  Then, after a period of two months when none of our time was allocated towards these cases, some time is allocated again in December of 2023, when Valve moved to dismiss (for the first time) the Claimants' claims, and when Valve disputed the AAA's initiation of the arbitrator appointment process. We did not yet know which arbitrator was assigned to which claimants, hence that time is represented in light green, but drafting the complaint and ensuring the AAA actually appointed arbitrators was necessary to ensure these Claimants' claims were heard at all.

Once this tribunal was constituted for these specific Claimants, time began to accrue again, mostly as Bucher Law PLLC was required to engage in litigation and investigation of common issues, such as Valve's recurring motions to dismiss or stay. Time picked up in late August of 2024, when Skadden first appeared in these cases, and begins filing its various disruptive motions.  Because these motions were filed in identical format before approximately two dozen arbitrators, much of this time still is coded as Valve Mass Arbitration.  Then, time dips down substantially in November and December, when our firm was litigating its first arbitration before Arbitrator Saydah. Final briefing for Arbitrator Saydah's hearings concluded on December 23, 2024.

Following a Christmas break, substantial time was worked on these four cases in January of this year.  And by February, leading into the final merits hearings, the percentage of the firm's work devoted to these specific arbitrations reaches its peak. With these Claimants' arbitrations next on the docket, and the next arbitration following these four not scheduled until May, it made sense for the firm to devote a majority of our time towards litigating the second batch of arbitrations.  As you can see, it is only in those two months–February and March–that the time claimed in these proceedings ever

occupied a majority of our time working
on the broader litigation against Valve. And even in those months, a substantial portion of our time was still being devoted to other antitrust litigation against Valve Corporation. Once final briefing concluded in April, billing fell to nearly zero until briefing of the fee award began following Claimants' success.

The narrative that we are somehow boxing all of our time into these arbitrations is simply false. Valve's assertion that "Mr. Bucher and his team were actively litigating numerous other arbitrations against Valve involving near-identical claims during the same weeks and months as they litigated the Goins Arbitrations," is intentionally misleading, as it ignores that fact that these Claimants' final merits hearings were the *only* hearings that occurred between December 14, 2024 and May 12, 2025, the dates during which the vast majority of specific hours are accrued. In the arbitration before Arbitrator Saydah, the document production—the first substantial discovery to which we had access—was delivered a mere two and half weeks before trial. As such, while some document review had been conducted in that proceeding, the first time our firm was able to engage with the documents in earnest was in preparation for the arbitrations before *this* tribunal. That the undersigned counsel may need to devote fewer hours to prepare for future arbitrations does not mean that work was not done, as it was, specifically to prepare for these Claimants' final merits hearing. Moreover, of the ten witnesses who testified in these Claimants' final merits hearings, only two overlapped with those who testified before Arbitrator Saydah. Brand new examination outlines and document review was required for these eight new witnesses.

Nor were there any new filings in the federal class action in February and March of 2025, as the class was awaiting the appointment of class counsel. No doubt, the undersigned has devoted considerable time to the class action, but not during the months in which the bulk of the hours specific to these Claimants accrued. In short, the time sheets submitted and the chart above paint a clear picture of a firm doing exactly what you would expect it to do while litigating a complicated and maximally contested antitrust case.

### III. Prorating Hours Spent on Multiple Cases

JUDSON E. CRUMP, PC

www.judsonecrump.com

Valve argues the time should be split evenly between all the arbitrations that have been filed. That is inappropriate. [Case law search]

Valve should not benefit from its refusal to litigate these claims individually, as required. Throughout this process, Valve refused to engage in individual arbitration. It refused to respond to the Claimants' individual settlement offers. It sought to stop the appointment process for all arbitrations across the board. It sought a process arbitrator to oversee all arbitrations. It demanded the AAA shut down all arbitrations no fewer than four times. It sent identical letters seeking to stay these proceedings to all tribunals. Counsel responded to these collective attacks with common and overlapping responses. Having created so much joint work, Valve cannot not be heard to complain that our response to Valve's attempts to undermine the entire procedure was not sufficiently "individual" to these arbitrations. Greg Fish', Jeremy Lucas', Christian Graber's, and Ethan Lefebvre's individual successes were necessarily tied to responding to Valve's attacks on the process writ large. And the hours spent on that success are compensable to their counsel, given their individual success.

Pro-ration will cause significant logistical problems. If only part of an hour is awarded, how would it be appropriately claimed in other proceedings? Will common benefit hours incurred after this tribunal be claimed at a different pro-ration, because they couldn't be sought here and aren't part of this tribunal's calculus? Should each hour be pro-rated based on the number of active arbitrations there were at the time the hours were worked, a number that is constantly changing as arbitrations conclude and new arbitrators get appointed? Should the compensation be further adjusted based on how much has been awarded in part for those hours by other tribunals?

Claimants' proposal—that common hours be awarded in full once—avoids double recovery and any logistical issues. Any hours awarded here will not be claimed agains before another arbitrator. This is the legally appropriate and sensible approach to take in these proceedings.

Even if some pro-ration or reduction was appropriate, context is needed about how many claims were actually proceeding at the time due to Valve's (occasionally successful) obstruction. It is true that Bucher Law PLLC represents a large number of clients who are seeking to pursue their claims in arbitration. But it's important to clarify

exactly what that means, given Valve's

obstinate resistance to any proceedings moving forward.

The arbitrations before you were filed in the first batch of 1,024 individuals. Additional claims were filed following that initial batch, but not a single arbitrator has been appointed for any of those claims beyond that initial filing, because Valve refuses to pay fees that have been invoiced to it for those later arbitrations. Of the 1,024 first batch cases, only 624 cases have appointed arbitrators. All but one arbitrator is assigned multiple claimants, with a plurality of arbitrators being assigned more than 20 cases. That meant that, as of July 2024, there were only 35 arbitrators litigating cases. And then that number shrank by more than half, as 20 of 35 arbitrators stayed their cases following Valve's serial motions to dismiss these proceedings or Valve's lawsuit against Claimants and 620 other individuals who continued their claims against Valve. Additionally, Valve asked the AAA to disqualify some arbitrators after they issued orders unfavorable to Valve, and two of those requests were granted. As a result, by Jan 1, 2025, there were only 13 arbitrators with active cases.

To the extent this tribunal applies some *pro rata* apportionment to the Valve Mass Arbitration hours, it should divide those hours by the number of active arbitrators, not by the number of filed arbitrations—the vast majority of which wait in limbo for Valve's payment of its contractually-mandated fees to the AAA.

Further, to the extent any pro ration is applied, it would be a miscarriage of justice not to apply prejudgment interest. At the current rate of adjudication, it will take decades to resolve all these claims. Without interest, there is a problematic incentive for Valve to drag out these cases further, to delay payment of these substantial fees. If the undersigned counsel must wait until all these claims are done to receive compensation for the hours worked, and that process will take decades even following a successful adjudication, interest is appropriate to compensate for the lost time value of money.

### IV. Other Firms' Pre-Filing Estimates of Litigation Costs are Irrelevant

Rather than address the factors actually relevant to the reasonableness of attorney's fees or enhancements, Valve makes numerous irrelevant mentions of a slide presentation that Mr. Bucher's former employer presented to prospective funders. That presentation was, according to Valve, "Undisclosed to the Tribunal—but highly relevant

JUDSON E. CRUMP, PC

www.judsonecrump.com

to testing the reasonableness of the fees

claimed here." For one thing, that old PowerPoint has been paraded by Valve before every forum in which it has litigated, including this one, so it certainly has been disclosed to the Tribunal. *See, e.g. Respondent's Amended Motion to Dismiss, Sept. 10, 2024, p. 7.* But beyond that, the relevance of another law firm's communications with an unrelated potential funder is unclear.

Valve cites this four-year-old slide deck as evidence that our requested compensation is too high. While the deck also contains a proposal to hire Mr. Bucher, it was not prepared by Bucher Law PLLC nor shown to Bucher Law PLLC's litigation funder. But even if it were somehow relevant, the suggestion that later cases could be litigated by attorneys *costing* $100 to $125 an hour does not suggest the fees requested are unreasonable. As that slide deck clearly lays out, the first 20 cases were to be litigated by Zaiger LLC, *after which* cases were projected to be litigated by other attorneys costing $100 to $125 an hour. Naturally, the projected cost of litigating arbitrations after a firm had already completed its first 20 trials is lower than the cost of the first few trials.

Moreover, Valve's argument here is based on two ultimately incorrect assumptions. First, Valve conflates an attorney's *salary* with an attorney's *reasonable fee.* An attorneys' billing rate is almost always substantially more than their salary—if not, law firms would go bankrupt. In fact, most attorneys bill at many multiples above their salary. At Fenwick & West, a first-year associate makes $215,000 a year, or $107.50 an hour. Yet, as noted in our initial submission, those same first year Fenwick & West associates *bill at* $640 an hour. Annualized, a first-year associate's billing rate is six times those employee's salaries. And a court has approved those rates. *See, e.g. Yuga Labs v. Ripp, et al., C.D. Cal. Case No. 2:22-cv-04355, Doc. 445 (Jan. 12, 2024).* Applying the same 6x multiplier, even had the firm employed attorneys with salaries in the range of $100 to $125 an hour, that would suggest reasonable fees of between $600 and $750—right in line with what Claimants' counsel requests here.

The second assumption in the Zaiger LLC presentation was that most arbitrations would be adjudicated on the papers. After all, that's what Valve told the federal court when it successfully compelled arbitration in the first place. At Valve's request, these arbitrations proceeded to live hearings. Valve's choice to insist upon hearings increased the time required and the expense by many multiples. To the extent

Zaiger LLC anticipated lower costs than
borne here by Bucher Law PLLC, that appears to be based on the assumption that the
defendant would cooperate in litigating the case in an efficient format. Valve adopted
the opposite litigation strategy, and now bears financial responsibility for that decision.

### V.  Claimants' Settlement Offers Are Not Appropriately Cited and Contains Language that Supports this Application

Valve's decision to cite a settlement offer made pursuant to Rule 408 is not
appropriate.  But, moreover, the contents support the amount requested. The settlement
offer letter states the amount of attorneys' fees owed was still being calculated and
"would likely be in excess of $1,000,000."  That statement was and remains accurate. The
fees requested do exceed $1,000,000.

Valve also notes that during the pre-suit settlement negotiations that Valve
mandated in its SSA, Mr. Bucher did indeed offer to resolve thousands of claims for a
flat attorney fee of $4,000 per case.  And had Valve been willing to even entertain a
resolution of these cases before they were filed, that would have been a reasonable fee at
the time given the work done as of that date.  But Valve chose a different path which
required thousands of hours of specialized attorney and litigation time over the last two
years.

Our fee application already recounted the numerous ways in which Valve did
not merely defend itself, but went out of its way to manufacture jurisdictional crises and
multiply these proceedings.  Claimants' counsel did not fully grasp the depth of Valve's
intransigence before these cases were filed.  After all, who could have predicted that a
company who told its customers they could not take it to court would object to the
jurisdiction of the American Arbitration Association, the forum it told the court was
appropriate?  Valve alone was in a position to predict how costly, vexatious, and time-
consuming these cases would be, because Valve made them so.

### VI. The Sherman Act's Mandatory Fee Shifting Enables Precisely These Sorts of David vs. Goliath Claims

JUDSON E. CRUMP, PC

www.judsonecrump.com

Valve asserts "No rational client would countenance spending more than $1.8 million in attorney time to prosecute claims whose maximum value could never exceed $12,000." *Respondent's Objection, p. 11.* Quite right. That is *why* the Sherman Act mandates an award of reasonable attorneys' fees for a prevailing plaintiff. Because without fee shifting incentive, monopolists could easily escape justice by making litigation too costly to justify for any victim of their misconduct. The Sherman Act's award of fees is *mandatory* precisely because without the assurance of a reasonable fee award, no attorney would undertake the work to vindicate low-value claims against giant monopolists.

And Valve's statement goes both ways. No rational *defendant* would have spent the many millions of dollars Valve spent defending these four arbitrations when they could have settled all four for $16,000, inclusive of fees, at the outset. It was Valve, not the Claimants', who chose to make this an enormously expensive contest. Valve lost that contest, and now they must pay what is mandated under the Sherman Act.

## VII.    The Supreme Court Authorizes Upward Adjustments to Lodestar Fees

Valve cites a local bankruptcy court opinion for the proposition that "an adjustment in the lodestar method is *not permitted* for a contingency fee agreement." *In re Coy Farms, Inc.*, 417 B.R. 17 (Bankr. N.D. Ohio 2009) (citing *City of Burlington v. Dague*, 505 U.S. 557 (1992)) (emphasis by Valve). But this is simply false. The 2010 opinion in *Perdue v. Kenny A. Ex rel. Winn,*[2] the Supreme Court made it clear that there are several circumstances where an upward adjustment is appropriate:

> First, an enhancement may be appropriate where the method used in determining the hourly rate employed in the lodestar calculation does not adequately measure the attorney's true market value, as demonstrated in part during the litigation.

> Second, an enhancement may be appropriate if the attorney's performance includes an extraordinary outlay of expenses and the litigation is exceptionally protracted.

---

[2] 130 S.Ct. 1662 (2010).

JUDSON E. CRUMP, PC

www.judsonecrump.com

Third, there may be extraordinary circumstances in which an attorney's performance involves exceptional delay in the payment of fees.

All of these factors are present in this case, as these arbitrations were filed nearly two years ago on an entirely contingent basis, and Valve has yet to pay a dollar to Claimants or their counsel—even though their own SSA required them to reimburse the Claimants' AAA filing fees over a year ago.

'"The primary concern in an attorney fee case is that the fee awarded be reasonable," that is, one that is adequately compensatory to attract competent counsel yet which avoids producing a windfall for lawyers.' *Adcock-Ladd v. Secretary of Treasury*, 227 F.3d 343, 349 (6th Cir.2000).  Though the entire antitrust bar has been aware of Valve's malfeasance since at least 2021, when the developer class action was filed, we are not aware of any case in any forum that any other attorney has brought to trial. Perhaps unsurprisingly, it thus appears quite difficult for consumers to find competent lawyers willing to take on complex antitrust litigation against well-funded, obstinate tech companies, and to take their claims to trial.  Thus, an upward adjustment is not only allowed—it is entirely appropriate in this case.

Valve's factual arguments against a fee multiplier are as unfounded as their legal ones.  Perhaps because Valve cannot deny that it has made this litigation complex, expensive, time-consuming, and difficult for everyone, it sidesteps the question by pointing out the fact that Mr. Bucher "sought and obtained up to $10,000,000 if not more from a litigation funder."  *Respondent's Objection to Claimants' Application for Fees and Costs.*  To the extent that Valve thinks that Mr. Bucher's financial condition is somehow improved by taking out $10 million in debt, they are wrong.  Debt is synonymous with risk, and the fact that Bucher Law PLLC had to incur millions in debt to competently represent the Claimants only underscores need for an upward adjustment, as well as interest to accrue on whatever fees are ultimately awarded in this case which Mr. Bucher took on an entirely contingent basis.

## VIII.    The Requested Rates Are Reasonable for Northeastern Ohio

For complex litigations such as this, requested fees and awarded fee are higher in Northeastern Ohio than requested by the undersigned counsel.  Attached as Exhibit 1 is

JUDSON E. CRUMP, PC

www.judsonecrump.com

a fee application submitted to the U.S.

District Court for the Northern District of Ohio's Eastern Division in the case of *Consumer Financial Protection Bureau v. Weltman, Weinberg, & Reis, L.P.A.*[3]  In that case, the CFPB brought an enforcement action against a Cleveland-based debt collection firm for alleged violations of the Fair Debt Collection Practices Act.  The prevailing defendant was represented by Jones Day, a large nationwide law firm also based in Cleveland.  As is typical in fee applications, the attorneys' time sheets are not part of the public record, but the fees requested were substantial, and depicted an average rate of $607 per hour—without any multiplier.

*CFPB v. Weltman, Weinberg, & Reis* was brought under the FDCPA—a statute which is simpler and more limited in scope than the Sherman Act.  The $607 per hour average in that case would, in today's dollars, amount to $776.51 per hour.[4]  This is *higher* than the average of $712 per hour that the Claimants before you seek, and suggests that if any adjustment is needed, it is an upward adjustment.

In *Preferred Wireless, LLC v. T-Mobile USA, Inc.*,[5] a case which—much like these cases—involved an Ohio arbitration applying Washington state law, the Southern District of Ohio confirmed an arbitrator's award of fees for attorneys who billed at the following rates:

---

[3] 1:17-cv-00817-DCN, Doc. 89.
[4] https://www.bls.gov/data/inflation_calculator.htm
[5] S.D. Ohio Case No. 2:22-cv-978, Doc. #28.

JUDSON E. CRUMP, PC

www.judsonecrump.com

An overview of the amounts billed by outside legal counsel is set forth below:

| ALSTON & BIRD LLP | | | | |
|---|---|---|---|---|
| **Timekeeper** | **Title** | **Rate** | **Hours** | **Amount Billed** |
| Kristy Brown | Partner | $995.00 | 181.7 | $180,791.50 |
| Scott Elder | Partner | $828.00 | 144.7 | $119,811.60 |
| Matthew Richardson | Partner | $785.00 | 161.0 | $126,385.00 |
| Alexander Brown | Partner | $730.00 | 290.4 | $211,992.00 |
| Amanda Waide | Partner | $720.00 | 313.2 | $225,504.00 |
| Jessica Smith | Partner | $981.00 | 8.2 | $8,044.20 |
| David Venderbush | Counsel | $1076.00 | 15.3 | $16,462.80 |
| Kara Kennedy | Counsel | $747.00 | 13.9 | $10,383.30 |
| Gregg Fish | Senior Associate | $896.00 | 552.1 | $494,771.20 |
| Jay Repko | Senior Associate | $819.00 | 397.7 | $325,716.30 |
| Nick Davis | Senior Associate | $810.00 | 85.1 | $68,931.00 |
| Emily Fitzgerald | Senior Associate | $779.00 | 83.6 | $65,124.40 |
| Mia Falzarano | Senior Associate | $760.00 | 22.0 | $16,720.00 |
| Matt Lawson | Senior Associate | $756.00 | 86.5 | $65,394.00 |
| Nathan Lee | Senior Associate | $750.00 | 20.6 | $15,450.00 |
| Jon Hermann | Associate | $698.00 | 5.2 | $3,629.60 |
| Brandon Abrams | Associate | $639.00 | 143.6 | $91,760.40 |
| Laura Hunt | Associate | $635.00 | 47.7 | $30,289.50 |
| Nicole Weeks | Associate | $595.00 | 10.5 | $6,247.50 |
| Milly Bartolome | Associate | $572.00 | 113.3 | $64,807.60 |
| Kamil Jamil | Associate | $572.00 | 67.4 | $38,552.80 |
| Amanda Wellen | Associate | $525.00 | 31.1 | $16,327.50 |
| Trenton Hafley | Associate | $517.50 | 133.0 | $68,827.50 |
| Peter Cornick | Associate | $482.00 | 23.5 | $11,327.00 |
| John Lex Kenerly | Associate | $482.00 | 381.6 | $183,931.20 |
| Doug Cunningham | Paralegal | $315.00 | 181.1 | $57,046.50 |

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT JANUARY 17, 2024

| | | | | |
|---|---|---|---|---|
| Ceirra Ransome | Case Clerk | $135.00 | 43.4 | $5,859.00 |
| | | **TOTALS** | 3,557.4 | $2,530,087.40 |

Most of the fees approved in *Preferred Wireless* were for rates higher than the $712 average sought by the Claimants' counsel here—and higher on a position-by-position basis—even without accounting for any multiplier.  The arbitrator in that case found them reasonable, and issued an award of fees to the prevailing party in arbitration.  The losing party moved to vacate the award in federal court, and its challenge was denied.

*Id*.   The rates requested are reasonable and appropriate in the Claimants' relevant community, and should be approved.

### IX. <u>Due Process Does Not Entitle Valve to Review Our Time Sheets</u>

In a footnote, Valve describes the Tribunal's decision to review our time sheets in camera as a "denial of its due process right to view the evidence submitted against it." *Respondent's Objection, fn. 4*.   The only reported case it cites in support of that notion is *Yamada v. Nobel Biocare Holding AG*, 825 F. 3d 536 (9th Cir. 2016).   That case involved a class action brought under California state law, so its relevance to an Ohio arbitration brought under the federal Sherman Act is questionable.   The judge in that case told the parties that his decades of experience representing insurance companies gave him sufficient expertise in billing to decide what time was reasonable.   On appeal, the 9th Circuit framed the question like this: "So the question is whether judicial efficiency may eclipse Defendants' fundamental right to inspect and challenge the documents. It may not."  *Yamada*, at 545.

In this case, there is a compelling reason **not** to show Valve's counsel our time records that was not present in *Yamada*: we know that Valve will breach privilege for still pending arbitrations and Valve will use our timesheets to gain unfair insight into our strategies for other pending arbitrations against it. It was for this reason—not judicial efficiency—that we opposed disclosing our internal records to Valve in the first place.

Even if privilege concerns were not a bar, while courts may not trade access to evidence for efficiency, arbitrators can. This difference between arbitration and court is the reason that the Claimants received substantially less discovery than they would in federal litigation—the parties agreed to a forum that limits the scope of what is exchanged. That same limited and concluded information exchange, which benefited Valve's defense by allowing them to withhold documents, now applies to Valve's desire for more detail on counsel's time entries.

As *Yamada* acknowledged, even in criminal cases, where due process concerns are at their maximum, it was not necessary to hand over the actual time sheets. 'With the accurate summaries in hand, we held that Eyraud was "able to challenge the legal basis for the court's order." *Id*. Thus, she had been "afforded adequate notice [of the

JUDSON E. CRUMP, PC

www.judsonecrump.com

facts] and a meaningful opportunity to be

heard."'  *Yamada, fn. 7*. Valve has such summaries. Valve knows well the basis of our fee request, and was fully able to state 28 pages of objections, which have now been heard. There is no due process concern here.

If the requested fees were unreasonable, Valve has precisely the data it would need to show that—the fees it paid its own attorneys. Valve conspicuously declined our invitation to share its own time sheets and billing records. Valve litigated the exact same case that we did, and spent more money doing so than we request here. As Mr. Danner has correctly argued, where the fees requested are not "very high in comparison to opposing counsel," that are presumed reasonable. Plaintiff's Motion for Post-Trial Relief, at 26, *Zunum Aero, Inc. v. The Boeing Company*, No. C21-896, 2024 WL 3822780 (W.D. Wash. Aug. 14, 2024) quoting *Boeing Co. v. Sierracin Corp*, 108 Wash. 2d 38, 64-5 (1987). To the extent time sheets need to be disclosed to the opposing side, Claimants are more prejudiced in not receiving **any** of Valve's time and payment records which would support their application than Valve is in receiving the timekeeper-by-timekeeper summaries provided without the entry level detail.

## X.  <u>The Claimants Are Also Entitled to Fees Incurred Litigating the Fee Application</u>

The general rule in federal fee-shifting statutes is that where a defendant is liable for attorneys' fees, the prevailing plaintiff is entitled to reasonable fees incurred prosecuting its fee application. "Cases in this circuit applying other fee-shifting statutes have routinely awarded reasonable fees incurred in the course of obtaining fees." *Cinciarelli v. Reagan*, 729 F. 2d 801 (D.C. Cir. 1984).  "[D]enying attorneys' fees for time spent in obtaining them would "dilute the value of a fees award by forcing attorneys into extensive, uncompensated litigation in order to gain any fees."  *Gagne v. Maher*, 594 F. 2d 336 (2nd Cir. 1979).  As Valve has chosen to contest nearly every aspect of our fee application, an additional award of fees should be added to compensate the Claimants for the extra time and expense incurred in obtaining the full relief to which they are entitled.   To that end, we have produced a supplemental post-award time sheet to support our request for an additional $42,159.  These fees are supported by the attached Declaration of William Bucher.

JUDSON E. CRUMP, PC

www.judsonecrump.com

### XI.  Conclusion

Despite hyperbolically raging against how *unreasonable* it believes the Claimants' fees to be, nowhere does Valve say a word about what it thinks a *reasonable* fee would be in these cases.  The most obvious explanation for this is the same one that we presented at the outset: that our fees pale in comparison to what Valve paid its own lawyers (and various ancillary support services) to litigate these exact same cases.  We said it before, and we now say it again: if Valve thinks our fees are too high, then let them present the Tribunal with their time sheets and bills.

Valve was happy to spend millions of dollars avoiding, delaying, and obstructing these four Claimants from having their cases heard. Now that Valve is faced with the foreseeable consequences of its own decisions, it cries foul.  Greg Fish, Christian Graber, Jeremy Lucas, and Ethan Lefebvre deserve more than partial justice for successfully litigating their claim against Valve Corporation.  Their fee application should be granted in full.

Respectfully Submitted,

/s/ Judson E. Crump
Judson E. Crump, Counsel for Claimants
Judson E. Crump, PC
PO Box 69
Silverhill, AL 36576
251.272.9148

### Declaration of Will Bucher in Support of Fee Application

1. I am principal and lead counsel at Bucher Law PLLC. I submit this declaration in support of Mr. Fish, Mr. Graber, Mr. Lefevre, and Mr. Lucas's reply post-hearing submission on an award of fees, costs, and interest under the mandatory fee award provisions of the Sherman Act.

2. I have personal knowledge of the matters stated in this declaration and, if called as a witness, would testify competently to such matters under oath.

3. Based on a query of our time keeping software conducted on July 16, 2025, the distribution our Valve time on a monthly basis relative to other codes is as follows in the graph below:



4. Green represents hours we claim in the arbitrations before Arbitrator Goins. Dark green represents our time entries that were tagged <u>specifically</u> with either the claimants' name or the arbitrator in these proceedings. That dark green time is the individual arbitration codes for which we seek compensation. The light green time is Valve Mass Arbitration time that was directly applicable to these four claimants' cases. Grey is other time that was spent litigating against Valve, but for which we do not seek compensation in these proceedings.

5. The chart lines correspond with the events that were impactful to the Claimants' cases. The first meaningful time appears in September of 2023, when their claims were being drafted and when the claimants were participating in mandatory settlement negotiations with Valve. Then, after a period of two months when none of our time was allocated towards

these cases, some time is allocated again in December of 2023, when Valve moved to dismiss (for the first time) the Claimants' claims, and when Valve disputed the AAA's initiation of the arbitrator appointment process. We did not yet know which arbitrator was assigned to which claimants, hence that time is represented in light green, but drafting the complaint and ensuring the AAA actually appointed arbitrators was necessary to ensure these Claimants' claims were heard at all.

6. Once this tribunal was constituted for these specific Claimants, time began to accrue again, mostly as Bucher Law PLLC was required to engage in litigation and investigation of common issues, such as Valve's recurring motions to dismiss or stay. Time picked up in late August of 2024, when Skadden first appeared in these cases, and begins filing its various disruptive motions. Because these motions were filed in identical format before approximately two dozen arbitrators, much of this time still is coded as Valve Mass Arbitration. Then, time dips down substantially in November and December, when our firm was litigating its first arbitration before Arbitrator Saydah. Final briefing for Arbitrator Saydah's hearings concluded on December 23, 2024.

7. Following a Christmas break, substantial time was worked on these four cases in January of this year. And by February, leading into the final merits hearings, the percentage of the firm's work devoted to these specific arbitrations reaches its peak. With these Claimants' arbitrations next on the docket, and the next arbitration following these four not scheduled until May, it made sense for the firm to devote a majority of our time towards litigating the second batch of arbitrations. As you can see, it is only in those two months–February and March–that the time claimed in these proceedings ever occupied a majority of our time working on the broader litigation against Valve. And even in those months, a substantial portion of our time was still being devoted to other antitrust litigation against Valve Corporation. Once final briefing concluded in April, billing fell to nearly zero until briefing of the fee award began following Claimants' success.

8. In preparing the reply fee submission in these arbitrations, we incurred the additional time spent, hours, and fees in preparing our reply submission as indicated in the chart below.

| Biller | Hours | Rate | Fees | 1.5 Multiplier |
|--------|-------|------|------|----------------|
| Will Bucher | 14.60 | $ 970.00 | $ 14,162.00 | $ 21,243.00 |
| Judson Crump | 23.36 | $ 525.00 | $ 12,264.00 | $ 18,396.00 |
| Zachary A. Horn | 1.50 | $ 640.00 | $ 960.00 | $ 1,440.00 |
| Isabel Skomro | 1.5 | $ 480.00 | $ 720.00 | $ 1,080.00 |
| | | | $ 28,106.00 | $ 42,159.00 |

BUCHER LAW PLLC

By: _____

2

Date: July 31, 2025

Will Bucher
350 Northern Blvd
STE 324 -1519
Albany, NY 12204-1000
202-997-3029
will@bucherlawfirm.com

# EXHIBIT 23

# MASS ARBITRATION STRATEGY AND INVESTMENT OPPORTUNITY

CONFIDENTIAL
PRESENTATION

1

# Mass Arbitration: Background

- In 2011, the Supreme Court held that contracts requiring mandatory arbitration and prohibiting class relief were permissible, provided they are not unconscionable. This ruling was reaffirmed in a 2013 decision.

- Many companies incorporated such clauses into their agreements believing it minimized exposure given the damages generally at stake for individual claimants.

- In an effort to avoid being deemed unconscionable, arbitration clauses adopted by companies seeking to avoid class actions routinely require the Company to pay all arbitration fees, limit circumstances where the Company can recover attorneys' fees, and allow the consumer to choose the manner of arbitration.

- Most arbitration providers — including the American Arbitration Association ("AAA") — charge a minimum of approximately $3,000 a case.

2

# Use of Mass Arbitration

- Over the past few years, a handful of firms — led by Keller Lenkner (now Keller Postman) — have weaponized consumer and employer arbitration clauses with favorable terms by aggregating thousands of claims through targeted advertising campaigns.

- Aggregating claims makes entrance fee to just defend prohibitively expensive and the vast majority of such fees are non-refundable under recent precedent.

- For example, if 75,000 demands for arbitration are filed with the AAA, the Company has 30-days to pay a largely non-refundable fee of $225 million as the cost of admission.

- Claimants' counsel will offer a settlement slightly less than the AAA charge — $2,900 per claim or so — attempting to induce a quick resolution.

3

# The Technique and Typical Results

- In a mass arbitration against Uber, Keller Postman brought ~60k claims claiming drivers were misclassified as contractors rather than employees.

- Uber's challenge to paying AAA fees was unsuccessful, requiring Uber to pay the ~$180 million upfront if it wished to defend the claims.

- With an upcoming IPO, Uber declined to engage in protracted litigation and settled the ~60k claims early for $146mm.

- Uber Eats was targeted in the past two years and sought to enjoin the AAA from requiring what it called "astronomical" fees. A New York appeals court recently denied the challenge finding that "[Uber] made the business decision to preclude class, collective, or representative claims in its arbitration agreement with consumers and AAA's fees are directly attributable to those decisions."

- In another case, Judge Breyer stated to Intuit "You knew what the rules of arbitration were. You knew all these things. And you elected to go to arbitration. . . . you are being hoisted by your own petard."

4

# Lifecycle of Investment

- **<u>Stage 1</u> - Infrastructure:** $500,000 for software development, advertising and agreement templates, ethics opinions, hardware, marketing and survey consultants, and claim identification.

- **<u>Stage 2</u> - Client Recruitment:** $2 to $150 advertising cost per client to recruit. Estimated spend of $3.75 million to recruit 75,000 clients at $50 an acquisition.

- **<u>Stage 3</u> - Filing Cases:** Filing cost of $25,000 plus $50.02 a case, for an estimated filing cost of $3,776,500. (Never expended if an early settlement can be reached.)

- **<u>Stage 4</u> - Active Arbitration:** Zaiger LLC litigates the first 20 cases, developing templates and models for use on additional cases. $12,000 a case after that to hire contract attorneys managed by Zaiger LLC to litigate disputes using templates and strategies. Most completed arbitrations seen to-date is 160, so total cost likely less than $1.7 million

5

# Target and Claim Identification

- **<u>Active Approach</u>:** Identifying 25 to 50 ripe targets, monitor news, and brainstorm claims.

  Identifying favorable arbitration terms including guaranteed refund of $50 filing fee, use of the AAA as an arbitration provider, application of California law, and language that suggests non-mutual collateral estoppel would apply.

  Ideal targets: (1) have valuation of ~$10 billion – high enough so they aren't judgment proof and can settle for hundreds of millions of dollars, but low enough that $200 million+ in arbitration fees creates an existential crisis forcing a quick settlement; and (2) a likely IPO or potential acquisition that will make carrying litigation risk unpalatable.

- **<u>Automated/Passive Supplemental Approach</u>:** Monitor court dockets for motions to compel class actions to arbitration, and copycat existing legal theories with potentially better advertising approach.

6

# Example Target: Valve Corporation

- Valve is an $11 billion company that dominates the market for digital PC game sales. Valve has over a billion customers with accounts. Valve's arbitration is administered by the AAA and specifies all filing fees will be reimbursed for claims under $10,000.

- In April 2021, game developers and consumers filed a putative class action claiming antitrust violations against Valve in the U.S District Court for the Western District of Washington.

- On October 25, 2021, Judge John Coughenor compelled the consumer claims to arbitration while retaining the developer claims. On May 5, 2022, Judge Coughenor denied (in part) Valve's motion to dismiss the developer plaintiffs' antitrust claims.

- If the proposed infrastructure were in place, today, we could immediately begin recruiting claimants to pursue the claims a federal judge has now ruled are well plead and potentially viable but for which *a billion* customers have been compelled to arbitration.

7

# New Merits-Based Approach

- The legal principles of non-mutual collateral estoppel prevent a company from relitigating a legal issue they have previously and unsuccessfully argued in another forum.

- This puts a company facing an arbitration in a situation where prevailing on the relevant legal issue is critical the first time it is argued, as a failure to prevail in that first case opens the door to preclusion in later cases.

- Rather than filing tens of thousands of cases at once, as is Keller's practice, a plaintiffs' firm could locate the strongest plaintiff from its pool, and file that case, and only that case, first.

- If that first, handpicked claim succeeds, all legal and factual issues that were inherent to the defendant should be resolved against them with respect to all other litigations, massively increasing the potential settlement value.

8

# Potential Returns

- Based on estimated costs of bundling claims, the initial Uber case would have cost Black Diamond ~$6.5 million and returned $43.8 million in less than a year (574% ROI).

- We believe a merits-based leverage approach — which can be implemented flexibly if a particularly strong claim presents itself — increases potential for even higher returns.

**Assumptions**:

> There is a 50% chance of winning the first case.
> The expected win, if there is one, is for a $10,000 judgment.
> A loss results in an average of a 25% reduction in claim settlement value.

- That results in an expected settlement value of $427.7 million. Black Diamond's recovery for funding at 30% would be ~$128.3 million (1874% ROI on $6.5 million investment).

9

# Stage 1 Infrastructure Calculations

- **Will Bucher Fixed Compensation:** $150,000/year.

- **Software Engineer:** Est. $20,000/month full-time cost for 3 months, followed by $10,000/month part-time cost thereafter. $150,000 first-year spend.

- **Ethics Opinion/Consulting:** Est. $25,000 first-year ($700/hour as needed thereafter).

- **Marketing Part-time Employee or Consultant:** Est. $50,000/year.

- **Survey Design Consulting:** Est. $25,000/year.

- **Paralegal Support:** Managing claims dockets and answering calls. Possible need to scale up and hire additional support as clients are recruited. Est. $50,000 first-year spend.

- **Hardware and Software**: Computer hardware, Bloomberg and PACER alerts, additional Westlaw seat(s). Est. $8,000/yearly, plus $2,000 in hardware expenses year-one.

10

# Stage 2 Client Recruitment Calculations

- Most difficult to predict because it would vary per case based on the claim and how common users of the relevant product or service were.

- Present estimates are based on the following:

  - A Partner at a Bay Area law firm specializing in plaintiffs-side mass employment litigation — who has handled more than 60,000 employment arbitrations — said costs were between $2 and $150 a case, depending on the pool of plaintiffs and the case.

  - In "Bitter End" litigation, attorneys at Keller took the position that their lawyer group would be losing money if they accepted any settlement below $675 a case. Based on their retainer agreement, Troxel LLC, who was responsible for bundling the claims, received 4% of the settlement value. That implies an acquisition cost of no more than $27 a claim.

  - Facebook advertising costs around $1.00 per click. If it takes an average of two clicked-on ads to recruit a plaintiff, that's $2.00 a claim. If it takes 150 ads, that's $150.

11

Case 2:24-cv-01717-JNW     Document 104-1     Filed 09/30/25     Page 213 of 287

# Stage 3 Filing Calculations

- **AAA Fees:** $100 a case for the first 500 cases, than $50 a case. Functional cost of $50 a case plus $25,000.

- **Zaiger LLC Server Costs:** $0.02 a client in server expenses to maintain client database and case files.

12

Case 2:24-cv-01717-JNW    Document 104-1    Filed 09/30/25    Page 214 of 287

# Stage 4 Active Arbitrations Calculations

- In the "Bitter End" litigation, 160 cases were litigated to a conclusion. That is most cases ever fully litigated in a mass arbitration based on the 9 examples we are aware of. Plaintiffs' requests for fees in those arbitrations showed that Quinn Emanuel spent between 80 and 160 hours litigating each case. That litigation was surprisingly bespoke, with every briefing including one or more new, revised, or redacted arguments.

- If a Zaiger LLC target engages in a "Bitter End" strategy, the first 20 cases could be litigated by the Firm creating templates for use on additional cases. We expect a contract attorney working off Zaiger LLC prepared templates could litigate a case in 80 hours.

- We estimate that contract attorneys of sufficient caliber to arbitrate individual cases charge $100 to $125/hour. A performance bonus of $2000 for successful arbitrations could also be used to incentivize quality and results.

- Staffing with contract attorneys comes out to between $8,000 and $12,000 a case. Given the most completed arbitrations seen to date is 160, total cost is likely less than $1.7 million. There is flexibility in how we could "staff up" if needed too.

13

# Uber Settlement Calculations

- **Costs**: $50 recruitment (assumed) and $50 filing for 60,000 claims, plus $500,000 infrastructure costs. Total costs $6.5 million
- Settlement of $146 million. Hypothetical 30% return to Black Diamond of $43.8 million. Profit of $37.3 million. (574% ROI in less than a year).
- Merits Approach Assumptions:
  - 50% chance of winning the first claim;
  - A win on the first claim increases the settlement value of each claim by $10,000;
    - For 60,000 claims, that's a $600 million increase in total settlement value.
  - A loss on the first claim reduces the settlement value of each remaining claim by 0% to 50%, depending on how the arbitrator rules and on what grounds, with an average reduction of 25%. The reduction is the result of <u>perceptions</u> by a defendant of likely liability, not due to the creation of precedent. Plaintiffs are <u>not</u> bound by outcome, so there is little, if any, formal legal risk from the loss.
- Predicted, merits based outcome: spend $6,500,000. Upon a win, settlement value would increase to $746 million. Upon a loss, the settlement value would shift to an average of $109.5 million. That results in an expected settlement value of $427.75 million.
- 30% of $427.75 million is $128.325 million. $121.825 million profit (1874% ROI).

14

# EXHIBIT 24

AMERICAN
ARBITRATION
ASSOCIATION®

INTERNATIONAL CENTRE
FOR DISPUTE RESOLUTION®

## Frances F. Goins, Esq.
Cleveland, Ohio

**Primary Areas of Expertise**

Director & Officer Liability
Privacy & Cybersecurity
Corporate Governance
Trust & Estates Litigation
Corporate Compliance

| | |
|---|---|
| **Current Employer-Title** | UB Greensfelder LLP - Partner |
| **Profession** | Attorney |
| **Work History** | Partner (Co-Chair Cybersecurity & Privacy and Financial Services & Securities Litigation Groups; Chair, Marketing Committee), UB Greensfelder LLP (formerly Ulmer & Berne LLP), 2003 − Present; Partner (Chair, Corporate Control & Securities Litigation Group; Hiring Partner), Squire Sanders & Dempsey LLP, 1978 − 2003; Law Clerk to the Honorable Frank J. Battisti Chief Judge, U.S. District Court for the Northern District of Ohio, 1977 − 1978; Summer Clerk, Squire Sanders & Dempsey LLP, 1976 − 1977. |
| **Experience** | Over four decades as a business litigator and counselor for public and private companies and individuals in matters including: M&A, securities, business torts, UCC, contracts, cybersecurity, corporate governance, fraud, financial services, antitrust, trade secret, and consumer issues. Prior experience in the public finance and environmental areas. Advised countless clients in regulatory investigations by the SEC, FDIC, OCC, and state attorneys general. Conducted internal corporate investigations relating to data breach response, director and officer liability, executive compensation, shareholder demands, accounting irregularities, the Foreign Corrupt Practices Act, securities disclosure issues, and employee embezzlement. Extensive appellate practice in state and federal courts. |
| | COMPLIANCE:<br>Advised boards of directors on fiduciary duty and corporate governance issues in connection with shareholder and corporate control issues and cybersecurity. Assisted clients in establishing policies and procedures to ensure compliance with governance, ethics, cybersecurity, ALM, FCPA, consumer law, and securities regulatory requirements; designed and conducted internal training programs for executives and employees. |
| | REGULATORY PROCEEDINGS:<br>Advised companies and individuals on SEC, CFPB, OCC, and other regulatory subpoenas. Defended regulatory investigations and court proceedings involving |

*Frances F. Goins, Esq.*
*Neutral ID : 4808094*

The AAA's Rules provide the AAA with the authority to administer an arbitration including, arbitrator appointment and challenges, general oversight, and billing. Accordingly, arbitrations that proceed without AAA administration are not considered AAA arbitrations, even when the parties select an arbitrator who is on the AAA's Roster.

The information contained in this resume has been supplied solely by the individual arbitrator and may, or may not, be a complete recitation of their experience. The AAA assumes no responsibility for the content, completeness, accuracy, or reliability of the information contained in an arbitrator's resume. If you have any questions about an arbitrator's experience or background, you are encouraged to contact your case manager.

Arbitrators on the AAA Roster are not employees or agents of the AAA.

insider trading, tipping, disclosure violations, bank safety and soundness, conflicts of interest, pump and dump schemes, sale of unregistered securities, GAAP compliance and accounting irregularities, and option pricing.

REPRESENTATIVE LITIGATION:
Secured seminal decision from the Ohio Supreme Court on question of first impression certified by the U.S. Sixth Circuit Court of Appeals on the reach of secondary liability under the Ohio Securities Act in putative class action against a financial institution. Represented a China-based tire manufacturer in a $30 million dispute with a U.S. distributor and defended $100 million counterclaim. Obtained defense jury verdict for national bank in a class action alleging aiding and abetting a $65 million Ponzi scheme, UCC violations, and conspiracy to defraud; obtained seminal Sixth Circuit CAFA jurisdiction decision on appeal. Secured dismissal in the U.S. Southern District of Indiana of national web host company in putative class action arising from hacker intrusion into bank customer's website. Successfully defended acquirer of educational software company on claims of aiding and abetting breach of fiduciary duty in shareholder class action challenging merger. Defended international petroleum company in Ohio investor litigation arising from Gulf of Mexico oil spill. Represented developer of hotels in preliminary injunction proceedings seeking to appoint a receiver for multiple properties throughout the U.S. Successfully defended banks in consumer class and individual actions alleging telemarketing fraud, TILA, FCRA, ECOA, RESPA, and FDCPA violations. Represented major stockholder in seminal Delaware cases determining validity of voting trust as takeover mechanism in relation to directors' fiduciary duty to protect stockholders. Obtained dismissal on motion of putative class action alleging violations of UCC and Retail Installment Sales Act in auto repo activities. Successfully prosecuted trade secret and breach of fiduciary duty claims against president of U.S. subsidiary of Swiss corporation. Successfully represented vacuum cleaner manufacturer in preliminary injunction proceeding involving Lanham Act claims. Successfully defended national fast-food franchisor in preliminary injunction proceedings brought by franchisees' lender, enabling continued operation of 35 restaurants in Texas. Successfully represented cellular telephone franchisor in dispute with major Ohio franchisee.

**Alternative Dispute Resolution Experience**

Served as an arbitrator on numerous AAA commercial and consumer disputes ranging in size from $1 million to $75,000.  Chaired three-member arbitration panel in AAA commercial arbitration involving allegations of breach of fiduciary duties by controlling LLC member and claims of multi-million dollar damages.

Founding member of the U.S. Northern District of Ohio Panel of Neutrals, and served for over 25 years as a mediator and early neutral evaluator in 75+ cases ranging from smaller contract cases to securities class actions as assigned by various federal District Court judges. Retained as a mediator by private parties and governmental agencies in numerous business disputes involving high-stakes issues and large dollar amounts.

*Frances F. Goins, Esq.*
*Neutral ID : 4808094*

The AAA's Rules provide the AAA with the authority to administer an arbitration including, arbitrator appointment and challenges, general oversight, and billing. Accordingly, arbitrations that proceed without AAA administration are not considered AAA arbitrations, even when the parties select an arbitrator who is on the AAA's Roster.

The information contained in this resume has been supplied solely by the individual arbitrator and may, or may not, be a complete recitation of their experience. The AAA assumes no responsibility for the content, completeness, accuracy, or reliability of the information contained in an arbitrator's resume. If you have any questions about an arbitrator's experience or background, you are encouraged to contact your case manager.

Arbitrators on the AAA Roster are not employees or agents of the AAA.

Advocated for clients in upwards of 35 business and commercial arbitration proceedings in complex business, shareholder, and securities matters conducted by various arbitral institutions. Representative matters include: obtained defense award in arbitration stemming from shareholder class action/IPO fraud litigation; successfully represented selling shareholder in arbitration proceeding on allegations of breach of contract in connection with an IPO; successfully represented purchaser in corporate sale on claims of breach of contract for failure to buy out majority shareholder of seller post-sale and $2.4 million counterclaim for fraud; successfully defended multi-million dollar contract claims by supplier of national cellular company.

**Education**

Case Western Reserve University School of Law (JD - 1977); Cleveland Institute of Music (B. Mus. - 1971; M. Mus. – 1973; awarded jointly by Case Western Reserve University).

**Professional Licenses**

Admitted to the Bar: New York (1984), Ohio (1977); U.S. District Court: Northern District of Ohio (1977), Southern District of New York (1991), Southern District of Ohio (2003), District of Colorado (2004); U.S. Court of Appeals, Sixth Circuit (1979); U.S. Supreme Court (2002).

**Professional Associations**

American Bar Association (Business Law Section – Chair Emeritus, D&O Liability Committee; Business & Corporate Litigation, Cyberspace Law, Corporate Governance, and Diversity Committees; ABA Advisory Panel) and Standing Committee on Election Law Advisory Committee (Programming Subcommittee Chair); Ohio State Bar Association (Member, Task Force on Business Courts; Corporate Counsel and Corporation Law Committees); Cleveland Metropolitan Bar Association (Securities Law Section, Past Chair; Judicial Selection Committee; Financial Institutions Section; Women in the Law Section); Federal Court Panel of Alternative Dispute Resolution Neutrals, Northern District of Ohio (Founding Member); Ohio Women's Bar Association (Founding Member); William K. Thomas Chapter of the American Inns of Court, Master of the Bench Emeritus (Past President); U.S. Sixth Circuit Judicial Conference (Life Member); Ohio Eighth District Judicial Conference (Life Member); Litigation Counsel of America (Senior Fellow).

**Recent Publications & Speaking Engagements**

Publications:
"INSIGHT: Getting Ready for Ohio's New Data Protection Act," with Michael Davis Hoenig, Bloomberg Law (October 2018)
"Privacy & Data Security," (Ohio Chapter), Bloomberg Law (January 2018)
"Cybersecurity 101 For Manufacturers: Why Should You Care?" Manufacturing Business Technology (September 2017)
"Annual Review: D&O Risk & Liability 2017," Financier Worldwide (February 2017)
"Cyber Security & Risk Management," Financier Worldwide (July 2016)
"Cybersecurity Exam by SEC Provides Insight About Focal Points for Broker-Dealers and Investment Advisers," Financial Markets Association Market

*Frances F. Goins, Esq.*
*Neutral ID : 4808094*

The AAA's Rules provide the AAA with the authority to administer an arbitration including, arbitrator appointment and challenges, general oversight, and billing. Accordingly, arbitrations that proceed without AAA administration are not considered AAA arbitrations, even when the parties select an arbitrator who is on the AAA's Roster.

The information contained in this resume has been supplied solely by the individual arbitrator and may, or may not, be a complete recitation of their experience. The AAA assumes no responsibility for the content, completeness, accuracy, or reliability of the information contained in an arbitrator's resume. If you have any questions about an arbitrator's experience or background, you are encouraged to contact your case manager.

Arbitrators on the AAA Roster are not employees or agents of the AAA.

Solutions Newsletter, Volume 24, Number 1 (March 2015)
"Defending Clients From Securities Fraud Claims," chapter author, Recent Developments in Securities Law, 2013 ed.: Leading Lawyers on Understanding Important Legislation and Complying with SEC Rules and Regulations, Thomson Reuters/Aspatore (September 2013)
"New and Noteworthy Decisions Relating to D&O Coverage," ABA Director & Officer Liability Newsletter (August 2013)
"Bank Acquisitions and Fair Lending: What You Don't Know Can Hurt You," with Richik Sarkar and Gregory Stein, Journal of the Cleveland Metropolitan Bar Association (January 2013)

Presentations:
"Governance Jigsaw Puzzles: How Complex Organizations Manage Cyber Risk," moderator, InfoSec, Legal Day@the SUMMIT (October 2018)
"The Cybersecurity Ninja's Guide to Protecting Your Clients and Your Firm," ABA Annual Meeting (August 2018)
"Hot Button Issues in SEC Enforcement," moderator, Ulmer Hot Topics in Financial Services & Securities Litigation (May 2018)
"Talking to Your Board About Cybersecurity: The Evolving Role of In-House Counsel in Managing Cyber Risk," moderator, ABA Business Law Section Spring Meeting (April 2018)
"Data Breach and Regulatory Investigations," panelist, Cleveland State University Two Days of Cyber (March 2018)
"Navigating the Data Security Litigation Minefield," Ohio State Bar Association Data Breach and Cybersecurity Summit (December 2017)
"Will Recent Data Breaches Impact the 2018 Filing Season?" panelist, Intelligize Webinar (December 2017)
"Cyber Game Plan: a tabletop exercise in defending a ransomware attack," moderator, Ulmer, TrustedSec, Wells Fargo Seminar (November 2017)
"Cybersecurity Issues for Boards of Directors," Society for Corporate Governance (September 2017)
"DOL Fiduciary Rule and the Futures and Derivatives Industry," Midland IRA and Ulmer DOL Fiduciary Rule Seminar (August 2017)
"Managing Cyber Threats and Privacy Compliance as a Global Company," Association of Corporate Counsel, Northeast Ohio Chapter CLE Seminar (September 2016)
"Director and Officer Liability & Cyber Security," presenter and moderator, ABA Business Law Section Annual Meeting (September 2016)
"Corporate Governance – Safeguarding Directors & Officers," Society of Corporate Secretaries and Governance Professionals (April 2014)
"Consumer Class Actions: Where Do We Go From Here? Ulmer Hot Topics in Financial Services & Securities Litigation (November 2015)
"Cybersecurity in the C-Suite and Boardroom," Department of Homeland Security, Office of Cybersecurity and Communications C-Cubed Voluntary Program (August 2015)

*Frances F. Goins, Esq.*
*Neutral ID : 4808094*

The AAA's Rules provide the AAA with the authority to administer an arbitration including, arbitrator appointment and challenges, general oversight, and billing. Accordingly, arbitrations that proceed without AAA administration are not considered AAA arbitrations, even when the parties select an arbitrator who is on the AAA's Roster.

The information contained in this resume has been supplied solely by the individual arbitrator and may, or may not, be a complete recitation of their experience. The AAA assumes no responsibility for the content, completeness, accuracy, or reliability of the information contained in an arbitrator's resume. If you have any questions about an arbitrator's experience or background, you are encouraged to contact your case manager.

Arbitrators on the AAA Roster are not employees or agents of the AAA.

| | |
|---|---|
| **Locations Where Parties Will Not be Charged for Travel Expenses** | Northeast Ohio |
| **Citizenship** | United States of America |
| **Languages** | English |
| **Compensation** | Cancellation Period:    0 Days |
| | Comment: |

*Frances F. Goins, Esq.*
*Neutral ID : 4808094*

The AAA's Rules provide the AAA with the authority to administer an arbitration including, arbitrator appointment and challenges, general oversight, and billing. Accordingly, arbitrations that proceed without AAA administration are not considered AAA arbitrations, even when the parties select an arbitrator who is on the AAA's Roster.

The information contained in this resume has been supplied solely by the individual arbitrator and may, or may not, be a complete recitation of their experience. The AAA assumes no responsibility for the content, completeness, accuracy, or reliability of the information contained in an arbitrator's resume. If you have any questions about an arbitrator's experience or background, you are encouraged to contact your case manager.

Arbitrators on the AAA Roster are not employees or agents of the AAA.

# EXHIBIT 25

# General Arbitrator Oath Form

## American Arbitration Association

---

Greg Fish
Vs.
Valve Corporation d/b/a Steam

Case# 01-23-0005-3288

---

**Notice of Appointment for Frances Goins**

**Disclosure Obligations**

It is most important that the parties have complete confidence in the arbitrator's impartiality. Therefore, please disclose any past or present relationship with the parties, their counsel, or potential witnesses, direct or indirect, whether financial, professional, social or of any other kind. This is a continuing obligation throughout your service on the case and should any additional direct or indirect contact arise during the course of the arbitration or if there is any change at any time in the biographical information that you have provided, it must also be disclosed. Any doubts should be resolved in favor of disclosure. If you are aware of direct or indirect contact with such individuals, please describe it below. Failure to make timely disclosures may forfeit your ability to collect compensation. All disclosures will be brought to the attention of the parties.

**Instructions**

You will not be able to serve until this duly executed Notice of Appointment has been completed and submitted. Please review the *Disclosure Guidelines* found by navigating to the *My Tasks* screen from the menu on the left, and after conducting a conflicts check, answer the following questions and complete the remainder of this Notice of Appointment.

Should the answer to any of the following questions be "Yes", or if you are aware of any other information that may lead to a justifiable doubt as to your impartiality or independence or create an appearance of partiality, then describe the nature of the potential conflict(s) in the space provided.

1. Do you or your law firm presently represent any person in a proceeding involving any party to the arbitration?

Answer : NO

2. Have you represented any person against any party to the arbitration?

Answer : NO

3. Have you had any professional or social relationship with counsel for any party in this proceeding or the firms for which they work?

Answer : NO

4. Have you had any professional or social relationship with any parties or witnesses identified to date in this proceeding or the entities for which they work?

Answer : YES

Comments : The actual answer is "possibly." My law firm appeared in matters representing parties adverse to persons with names similar to the following identified witnesses, which matters were terminated in the years

# General Arbitrator Oath Form

indicated: Charlie/Charles Brown (1990 and 2004); Chris Welch (2014); Don Holden (2017); Eddie Parker/Edmund H. Parker (1990); Eric smith (2011); John McDonald (2013).  Without additional information, it is impossible to tell whether these individuals are the same persons who were identified as potential witnesses in this proceeding, although that seems unlikely due to the geographic disparity between them (in Washington State) and our primarily Midwest practice.

5.  Have you had any professional or social relationship of which you are aware with any relative of any of the parties to this proceeding, or any relative of counsel to this proceeding, or any of the witnesses identified to date in the proceeding?

Answer : NO


6.  Have you, any member of your family, or any close social or business associate ever served as an arbitrator in a proceeding in which any of the identified witnesses or named individual parties gave testimony?

Answer : NO


7.  Have you, any member of your family, or any close social or business associate been involved in the last five years in a dispute involving the subject matter contained in the case which you are assigned?

Answer : NO


8.  Have you ever served as an expert witness or consultant to any party, attorney, witness or other arbitrator identified in this case?

Answer : NO


9.  Have any of the party representatives, law firms or parties appeared before you in past arbitration cases?

Answer : NO


10.  Are you a member of any organization that is not listed on your panel biography that may be relevant to this arbitration?

Answer : NO


11.  Have you ever sued or been sued by either party or its representative?

Answer : NO


12.  Do you or your spouse own stock in any of the companies involved in this arbitration?

Answer : NO


13.  If there is more than one arbitrator appointed to this case, have you had any professional or social relationships with any of the other arbitrators?

Answer : NO


14.  Are there any connections, direct or indirect, with any of the case participants that have not been covered by the above questions?

# General Arbitrator Oath Form

Answer : YES

Comments : I have been invited to serve as an arbitrator on three other matters involving Valve Corporation d/b/a Steam and this counsel.

15. Are you aware of any other information that may lead to a justifiable doubt as to your impartiality or independence or create an appearance of partiality?

Answer : NO

**Arbitrator's Oath**

I attest that I have reviewed my biographical information provided to the parties on this case and confirm it is current, accurate and complete.

I attest that I have diligently conducted a conflicts check, including a thorough review of the information provided to me about this case to date, and that I have performed my obligations and duties to disclose in accordance with the Rules of the American Arbitration Association, Code of Ethics for Arbitrators in Commercial Disputes, the parties' agreement, and applicable law pertaining to arbitrator disclosures.

I further affirm that consistent with the applicable Rules of the American Arbitration Association, the Code of Ethics for Arbitrators in Commercial Disputes, the parties' agreement, and applicable law:

- That I am fit to serve on the above-referenced arbitration and able to fully execute my responsibilities during all phases of the case;
- That I will keep confidential all matters relating to the above-referenced arbitration;
- That I will maintain a professional demeanor and appearance of impartiality during all phases of this case;
- That I will endeavor to effectively manage all phases of this case with a commitment to speed, economy and just resolution in a manner consistent with the parties' expectations;
- That I will bill parties responsibly and ethically and will review my bills for reasonableness relative to the nature and scope of the activity performed prior to submitting them to the AAA.
- That I meet any applicable arbitrator qualification requirements set forth in the parties' arbitration agreement;

The arbitrator being duly sworn, hereby accepts this appointment.

**Terms of Compensation**

Before proceeding, please indicate that you have reviewed the Notice of Compensation Arrangements for this case.



Once completed, please indicate your acceptance of this appointment as arbitrator by entering your initials in the space provided.

(ffg)

Frances Goins
2-May-24

# EXHIBIT 26

| | |
|---|---|
| **From:** | Goins, Frances |
| **Sent:** | Monday, September 23, 2024 8:46 AM |
| **To:** | AAA Jill Roettger |
| **Subject:** | RE: Valve Corporation Arbitrations - Request for Supplemental Disclosures |

**\*\*\* External E-Mail – Use Caution \*\*\***

Dear Ms. Roettger, I have no supplemental disclosures to make based on this list.

Thank you,

------
Frances Floriano Goins, Arbitrator

**From:** AAA Jill Roettger <JillRoettger@adr.org>
**Sent:** Friday, September 20, 2024 2:59 PM
**To:** AAA Jill Roettger <JillRoettger@adr.org>
**Subject:** Valve Corporation Arbitrations - Request for Supplemental Disclosures

Dear Arbitrator,

Please review the attached correspondence regarding the request for supplemental disclosures. We ask that you please provide your disclosures to us by **September 27, 2024**.

Thank you,
*Ryan Rumney on behalf of*
Jill Roettger



**AAA Jill Roettger**
**Manager of ADR Services**

American Arbitration Association
T: 612 509 2224F: 612 342 2334E: JillRoettger@adr.org
2355 Highway 36 West, Suite 400, Roseville, MN 55113
adr.org | icdr.org | aaamediation.org



The information in this transmittal (including attachments, if any) is privileged and/or confidential and is intended only for the recipient(s) listed above. Any review, distribution or copying of this transmittal is prohibited except by or on behalf of the intended recipient. If you have received this transmittal in error, please notify m reply email and destroy all copies of the transmittal. Thank you.

# EXHIBIT 27

**From:**               Goins, Frances
**Sent:**               Thursday, October 24, 2024 2:22 PM
**To:**                AAA Jill Roettger
**Subject:**         RE: Individual Claimants v. Valve Corporation d/b/a Steam - Request for
                     Supplemental Disclosure

**\*\*\* External E-Mail – Use Caution \*\*\***

Apologies for the delay.  I have nothing to disclose regarding this request.

------
Frances Floriano Goins

---

**From:** AAA Jill Roettger <JillRoettger@adr.org>
**Sent:** Thursday, October 24, 2024 3:03 PM
**To:** AAA Jill Roettger <JillRoettger@adr.org>
**Subject:** RE: Individual Claimants v. Valve Corporation d/b/a Steam - Request for Supplemental
Disclosure
**Importance:** High

Dear Arbitrator,

We have not received your response to our request for a supplemental disclosure. Please advise of any
disclosures you might have pertaining to the individual listed in the attached document.

Thank you,
*Ryan Rumney on behalf of*
Jill Roettger



**AAA Jill Roettger**
**Manager of ADR Services**

American Arbitration Association
T: 612 509 2224 F: 612 342 2334 E: JillRoettger@adr.org
2355 Highway 36 West, Suite 400, Roseville, MN 55113
adr.org | icdr.org | aaamediation.org



The information in this transmittal (including attachments, if any) is privileged and/or confidential and is intended only for the recipient(s) listed above. Any review, distribution or copying of this transmittal is prohibited except by or on behalf of the intended recipient. If you have received this transmittal in error, please notify m reply email and destroy all copies of the transmittal. Thank you.

**From:** AAA Jill Roettger <JillRoettger@adr.org>
**Sent:** Tuesday, October 15, 2024 3:53 PM
**To:** AAA Jill Roettger <JillRoettger@adr.org>
**Subject:** Individual Claimants v. Valve Corporation d/b/a Steam - Request for Supplemental Disclosure

Dear Arbitrator,

Please review the attached correspondence regarding the request for supplemental disclosures. We ask that you please provide your disclosures to us by **October 22, 2024**.

Thank you,
*Ryan Rumney on behalf of*
Jill Roettger

**AAA Jill Roettger**
**Manager of ADR Services**
T: 612 509 2224F: 612 342 2334E: JillRoettger@adr.org
2355 Highway 36 West, Suite 400,Roseville,MN55113

# EXHIBIT 28

| | |
|---|---|
| **From:** | AAA Jill Roettger <JillRoettger@adr.org> |
| **Sent:** | Monday, November 11, 2024 10:16 AM |
| **To:** | AAA Neve Pechacek |
| **Subject:** | FW: Individual Claimants v. Valve Corporation d/b/a Steam - Request for Supplemental Disclosure - 10/31 |

**Sent:** Thursday, November 7, 2024 10:33 AM
**To:** AAA Jill Roettger <JillRoettger@adr.org>
**Subject:** Re: Individual Claimants v. Valve Corporation d/b/a Steam - Request for Supplemental Disclosure - 10/31

**\*\*\* External E-Mail – Use Caution \*\*\***

Jill, I have no additional disclosures.

Frances Floriano Goins
UB Greensfelder, LLP
p 216.583.7202
c 440.476.3498

Sent from my iPhone

**AAA Jill Roettger**
**Manager of ADR Services**
T: 612 509 2224 F: 612 342 2334 E: JillRoettger@adr.org
2355 Highway 36 West, Suite 400, Roseville, MN 55113

On Oct 31, 2024, at 4:58 PM, AAA Jill Roettger <JillRoettger@adr.org> wrote:

Dear Arbitrator,

Please review the attached correspondence regarding the request for supplemental disclosures. We ask that you please provide your disclosures to us by **November 7, 2024**.

Thank you,
*Ryan Rumney on behalf of*
Jill Roettger

**AAA Jill Roettger**
**Manager of ADR Services**

American Arbitration Association
T: 612 509 2224 F: 612 342 2334 E: JillRoettger@adr.org
2355 Highway 36 West, Suite 400, Roseville, MN 55113

adr.org | icdr.org | aaamediation.org

The information in this transmittal (including attachments, if any) is privileged and/or confidential and is intended only for the recipient(s) listed above. Any review, distribution or copying of this transmittal is prohibited except by or on behalf of the intended recipient. If you have received this transmittal in error, please notify m reply email and destroy all copies of the transmittal. Thank you.

<2024-10-31 - AAA Request for Disclosure - Valve.pdf>

# EXHIBIT 29

| | |
|---|---|
| **From:** | Goins, Frances |
| **Sent:** | Tuesday, January 21, 2025 2:09 PM |
| **To:** | AAA Jill Roettger |
| **Subject:** | RE: Individual Claimants v. Valve Corporation d/b/a Steam - Notice of Appearance and Request for Supplemental Disclosure |

**\*\*\* External E-Mail – Use Caution \*\*\***

Dear Ryan,  I do not have any additional disclosures based on this correspondence.

Best,
------
Frances Floriano Goins

---

**From:** AAA Jill Roettger <JillRoettger@adr.org>
**Sent:** Friday, January 17, 2025 11:57 AM
**To:** AAA Jill Roettger <JillRoettger@adr.org>
**Subject:** Individual Claimants v. Valve Corporation d/b/a Steam - Notice of Appearance and Request for Supplemental Disclosure

Dear Arbitrator,

We are in receipt of the attached correspondence from Respondent's counsel regarding the appearance of Scott M. Danner, Priyanka Timblo, Dorit Ungar Black, and Andrew C. Indorf to Respondent's counsel.

Additionally, please review the attached correspondence regarding the request for supplemental disclosures. We ask that you please provide your disclosures to us by **January 24, 2024**.

Thank you,
*Ryan Rumney on behalf of*
Jill Roettger



**AAA Jill Roettger**
**Manager of ADR Services**

American Arbitration Association
T: 612 509 2224 F: 612 342 2334 E: JillRoettger@adr.org
2355 Highway 36 West, Suite 400, Roseville, MN 55113
adr.org | icdr.org | aaamediation.org



The information in this transmittal (including attachments, if any) is privileged and/or confidential and is intended only for the recipient(s) listed above. Any review, distribution or copying of this transmittal is prohibited except by or on behalf of the intended recipient. If you have received this transmittal in error, please notify me by reply email and destroy all copies of the transmittal. Thank you.

# EXHIBIT 30

**From:** AAA Madison Arendt
**Sent:** Tuesday, February 11, 2025 12:01 PM
**To:** AAA Madison Arendt
**Subject:** FW: 4 Individuals v. Valve Corporation d/b/a Steam - Arbitrator Goins

**From:** Goins, Frances
**Sent:** Monday, February 10, 2025 12:53 PM
**To:** AAA Jill Roettger <JillRoettger@adr.org>; Eaton, Tabatha
**Subject:** RE: 4 Individuals v. Valve Corporation d/b/a Steam - Arbitrator Goins

**\*\*\* External E-Mail – Use Caution \*\*\***

I have no additional disclosures regarding these appearances.

------
Frances Floriano Goins
Partner
UB Greensfelder LLP

---

**From:** AAA Jill Roettger
**Sent:** Thursday, February 6, 2025 12:45 PM
**To:** Goins, Frances ; Eaton, Tabatha ; AAA Jill Roettger
**Subject:** 4 Individuals v. Valve Corporation d/b/a Steam - Arbitrator Goins

Dear Arbitrator,

We are in receipt of the attached correspondence from Respondent's counsel regarding the appearance of Brent Bomkamp after we had sent yesterday's disclosure request. Please review the attached correspondence regarding the request for supplemental disclosures for this new appearance.

We ask that you please provide your disclosures to us by **February 13, 2024**.

Thank you,
*Ryan Rumney on behalf of*
Jill Roettger



**AAA Jill Roettger**
**Manager of ADR Services**

American Arbitration Association
T: 612 509 2224F: 612 342 2334E: JillRoettger@adr.org
2355 Highway 36 West, Suite 400, Roseville, MN 55113
adr.org | icdr.org | aaamediation.org



The information in this transmittal (including attachments, if any) is privileged and/or confidential and is intended only the recipient(s) listed above. Any review, use, disclosure, distribution or copying of this transmittal is prohibited except

1

or on behalf of the intended recipient. If you have received this transmittal in error, please notify me immediately by rep
email and destroy all copies of the transmittal. Thank you.

# EXHIBIT 31

| From: | AAA Madison Arendt |
|---|---|
| **Sent:** | Tuesday, February 11, 2025 12:02 PM |
| **To:** | AAA Madison Arendt |
| **Subject:** | FW: Individual Claimants v. Valve Corporation d/b/a Steam - Notice of Appearance and Request for Supplemental Disclosure |

**From:** Goins, Frances
**Sent:** Monday, February 10, 2025 12:54 PM
**To:** AAA Jill Roettger <JillRoettger@adr.org>
**Subject:** RE: Individual Claimants v. Valve Corporation d/b/a Steam - Notice of Appearance and Request for Supplemental Disclosure

**\*\*\* External E-Mail – Use Caution \*\*\***

I have no additional disclosures regarding these changes.

------
Frances Floriano Goins
Partner
UB Greensfelder LLP

**From:** AAA Jill Roettger
**Sent:** Wednesday, February 5, 2025 3:28 PM
**To:** AAA Jill Roettger
**Subject:** Individual Claimants v. Valve Corporation d/b/a Steam - Notice of Appearance and Request for Supplemental Disclosure

Dear Arbitrator,

We are in receipt of the attached correspondence from Claimant's counsel regarding the appearance of Doug Quzack, Xinlin Morrow, and Jing He to Claimant's counsel, and the removal of Zhener Low from Claimant's service list.

Additionally, please review the attached correspondence regarding the request for supplemental disclosures. We ask that you please provide your disclosures to us by **February 12, 2024**.

Thank you,
*Ryan Rumney on behalf of*
Jill Roettger



**AAA Jill Roettger**
**Manager of ADR Services**

American Arbitration Association
T: 612 509 2224F: 612 342 2334E: JillRoettger@adr.org
2355 Highway 36 West, Suite 400, Roseville, MN 55113
adr.org | icdr.org | aaamediation.org



The information in this transmittal (including attachments, if any) is privileged and/or confidential and is intended only
the recipient(s) listed above. Any review, use, disclosure, distribution or copying of this transmittal is prohibited except
or on behalf of the intended recipient. If you have received this transmittal in error, please notify me immediately by rep
email and destroy all copies of the transmittal. Thank you.

# EXHIBIT 32

| | |
|---|---|
| **From:** | AAA Madison Arendt |
| **Sent:** | Thursday, February 27, 2025 3:57 PM |
| **To:** | AAA Madison Arendt |
| **Subject:** | FW: 4 Individuals v. Valve - Arbitrator Goins |

**From:** Goins, Frances
**Sent:** Wednesday, February 26, 2025 4:20 PM
**To:** AAA Jill Roettger <JillRoettger@adr.org>
**Cc:** Eaton, Tabatha
**Subject:** RE: 4 Individuals v. Valve - Arbitrator Goins

**<span style="color:red">*** External E-Mail – Use Caution ***</span>**

Dear Madison, responding to your request for additional disclosures with respect to Claimant's Exhibit and Witness Lists, I have one matter to report. Erik Peterson appears as a potentially adverse party in regard to a matter involving a construction contract review that my firm is handling; he is believed to be an architect. We do not have any other information about this individual and do not know if he is the same individual on Claimant's list.

------
Frances Floriano Goins, Arbitrator
Partner
UB Greensfelder LLP

**From:** AAA Jill Roettger
**Sent:** Wednesday, February 26, 2025 12:04 PM
**To:** Goins, Frances ; AAA Jill Roettger
**Cc:** Eaton, Tabatha
**Subject:** FW: 4 Individuals v. Valve - Arbitrator Goins

Arbitrator Goins,

As the Claimants Exhibit List attached contains the list of witnesses that may be called, please inform the AAA of any disclosures you may have. If you do not have any disclosures, please confirm the same.

If you have any questions, please let me know.

Thank you,
*Madison Arendt on behalf of*
Jill Roettger



**AAA Jill Roettger**
**Manager of ADR Services**

American Arbitration Association
T: 612 509 2224F: 612 342 2334E: JillRoettger@adr.org
2355 Highway 36 West, Suite 400, Roseville, MN 55113
adr.org | icdr.org | aaaicdrfoundation.org



The information in this transmittal (including attachments, if any) is privileged and/or confidential and is intended only for the recipient(s) listed above. Any review, use, disclosure, distribution or copying of this transmittal is prohibited except by or on beha[lf of] the intended recipient. If you have received this transmittal in error, please notify me immediately by reply email and destroy all copies of the transmittal. Thank you.

# EXHIBIT 33

Cat12,Knapp,Termed

# U.S. District Court
# NORTHERN DISTRICT OF OHIO (Youngstown)
# CIVIL DOCKET FOR CASE #: 4:24-cv-00062-BYP

| | |
|---|---|
| Wilson v. World Wrestling Entertainment et al. | Date Filed: 01/10/2024 |
| Assigned to: Judge Benita Y. Pearson | Date Terminated: 10/22/2024 |
| Demand: $250,000 | Jury Demand: Both |
| Cause: 17:101 Copyright Infringement | Nature of Suit: 370 Other Fraud |
| | Jurisdiction: Federal Question |

**Plaintiff**

**Anthony Duane Wilson**                represented by    **Anthony Duane Wilson**
603 Willard Ave. SE
Apartment 3
Warren, OH 44483
330-610-2147
*PRO SE*

V.

**Defendant**

**World Wrestling Entertainment**        represented by    **Justin Anthony Markota**
Roetzel & Andress
10th Floor
One Cleveland Center
1375 East Ninth Street
Cleveland, OH 44114
216-623-0150
Fax: 216-623-0134
Email: jmarkota@ralaw.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**All Elite Wrestling**                  represented by    **Rachael L. Rodman**
Thompson Hine - Columbus
Ste. 1700
41 South High Street
Columbus, OH 43215
614-469-3225
Fax: 614-469-3361
Email: rachael.rodman@thompsonhine.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|

| 01/10/2024 | 1 | **Complaint** for a civil case with jury demand against All Elite Wrestling and World Wrestling Entertainment. Filing fee paid. 405.00. Receipt # 6624 **Plaintiff has indicated that case may be a refiling of terminated case 4:23 CV 1501**. Filed by Anthony Duane Wilson. (Attachments: # 1 Civil Cover Sheet) (G,M) (Entered: 01/10/2024) |
|---|---|---|
| 01/10/2024 | | Judge Benita Y. Pearson assigned to case. (G,M) (Entered: 01/10/2024) |
| 01/10/2024 | | Random Assignment of Magistrate Judge pursuant to Local Rule 3.1. In the event of a referral, case will be assigned to Magistrate Judge Amanda M. Knapp. (G,M) (Entered: 01/10/2024) |
| 01/10/2024 | 2 | Original Summons and Magistrate Consent Form issued to Pro Se Plaintiff, at the Youngstown Intake Counter, for service upon All Elite Wrestling, World Wrestling Entertainment. (Attachments: # 1 Magistrate Consent Form) (G,M) (Entered: 01/10/2024) |
| 01/10/2024 | | Service by Clerk. Summons and Complaint addressed to World Wrestling Entertainment placed in U.S. Mail. Type of service: Certified mail. Receipt # 9589 0710 5270 1040 1984 71. (G,M) (Entered: 01/10/2024) |
| 01/10/2024 | | Service by Clerk. Summons and Complaint addressed to All Elite Wrestling placed in U.S. Mail. Type of service: Certified mail. Receipt # 9589 0710 5270 1040 1710 78. (G,M) (Entered: 01/10/2024) |
| 01/18/2024 | 3 | Return of Service by Clerk by certified mail executed upon All Elite Wrestling on 1/12/2024, filed on behalf of Anthony Duane Wilson. Related document(s) 2 ,. (D,Ju) (Entered: 01/18/2024) |
| 01/22/2024 | 4 | Return of Service by Clerk by certified mail executed upon World Wrestling Entertainment on 1/16/2024, filed on behalf of Anthony Duane Wilson Related document(s) 2 . (G,M) (Entered: 01/22/2024) |
| 01/30/2024 | 5 | Unopposed **Motion** for extension of time until 02/23/2024 to respond to Complaint filed by Defendant All Elite Wrestling. (Attachments: # 1 Proposed Order)(Rodman, Rachael) (Entered: 01/30/2024) |
| 01/31/2024 | 6 | Attorney Appearance by Justin Anthony Markota filed by on behalf of World Wrestling Entertainment. (Markota, Justin) (Entered: 01/31/2024) |
| 01/31/2024 | 7 | Unopposed **Motion** for extension of time until March 7, 2024 to respond to *Plaintiff's Complaint* filed by Defendant World Wrestling Entertainment. (Markota, Justin) (Entered: 01/31/2024) |
| 02/06/2024 | | **Order** [non-document] granting as requested Defendant All Elite Wrestling's 5 Unopposed Motion for Extension of Time until 2/23/2024 to Respond to Complaint. Judge Benita Y. Pearson on 2/6/2024. (JLG) (Entered: 02/06/2024) |
| 02/06/2024 | | **Order** [non-document] granting as requested Defendant World Wrestling Entertainment's 7 Unopposed Motion for Extension of Time until 3/7/2024 to Respond to Plaintiff's Complaint. Judge Benita Y. Pearson on 2/6/2024. (JLG) (Entered: 02/06/2024) |
| 02/06/2024 | | Copy of NEF's for 2/6/2024 Orders [non-document] mailed to Plaintiff Anthony Duane Wilson, 6862 State Route 7, Kinsman, OH 44428 on 2/6/2024. (JLG) (Entered: 02/06/2024) |
| 02/22/2024 | 8 | **Motion** to Amend Complaint filed by Plaintiff Anthony Duane Wilson. (Attachments: # 1 Proposed Amended Complaint)(G,M) (Entered: 02/22/2024) |
| 02/23/2024 | 9 | **Answer** to 1 Complaint, with Jury Demand filed by All Elite Wrestling. (Rodman, Rachael) (Entered: 02/23/2024) |

| | | |
|---|---|---|
| 03/07/2024 | [10] | **Answer** to [1] Complaint, with Jury Demand filed by World Wrestling Entertainment. (Markota, Justin) (Entered: 03/07/2024) |
| 03/07/2024 | [11] | **Motion** to dismiss for failure to state a claim filed by Defendant World Wrestling Entertainment. Related document(s) [1] . (Attachments: # [1] Brief in Support to Motion to Dismiss)(Markota, Justin) (Entered: 03/07/2024) |
| 03/07/2024 | [12] | Corporate Disclosure Statement identifying Corporate Parent TKO PubCo, Other Affiliate Endeavor Group Holdings, Inc. for World Wrestling Entertainment filed by World Wrestling Entertainment. (Markota, Justin) (Entered: 03/07/2024) |
| 04/10/2024 | [13] | **Motion** to Stay all Further Proceedings filed by Plaintiff Anthony Duane Wilson. Related document(s) [1] . (D,Ju) (Entered: 04/10/2024) |
| 04/19/2024 | [14] | **Order** Consistent with the liberal policy favoring amendment, the Court hereby grants Plaintiff's Motion to Amend his Complaint (ECF No. [8] ). The Clerk's Office shall docket ECF No. [8] -1 as Plaintiff's Amended Complaint. Defendant World Wrestling Entertainment's Motion to Dismiss (ECF No. [11] ) is denied as moot because Plaintiff's Amended Complaint (ECF No. [8] -1) is now the operative complaint. Judge Benita Y. Pearson on 4/19/2024. (JLG) (Entered: 04/19/2024) |
| 04/19/2024 | [15] | **Amended complaint** against Defendants World Wrestling Entertainment and All Elite Wrestling filed by Plaintiff Anthony Duane Wilson (unsigned). (JLG) (Entered: 04/19/2024) |
| 04/19/2024 | | Copy of [14] Order and [15] Amended Complaint mailed to Plaintiff Anthony Duane Wilson #213463, Trumbull County Jail, 150 High Street NW, Warren, OH 44481 on 4/19/2024. Related document(s) [14] , [15] . (JLG) (Entered: 04/19/2024) |
| 04/19/2024 | [16] | **Order** Pending before the Court is Plaintiff's Motion to Stay. *See* ECF No. [13] . The Court orders Defendants to respond to Plaintiff's Motion to Stay (ECF No. [13] ) by 4/24/2024, pursuant to Local Rule 7.1. Plaintiff has until 5/1/2024 to reply. *See* Local Rule 7.1. Judge Benita Y. Pearson on 4/19/2024. (JLG) (Entered: 04/19/2024) |
| 04/19/2024 | | Copy of [16] Order mailed to Plaintiff Anthony Duane Wilson #213463, Trumbull County Jail, 150 High Street NW, Warren, OH 44481 on 4/19/2024. Related document(s) [16] . (JLG) (Entered: 04/19/2024) |
| 04/24/2024 | [17] | Memorandum in **Opposition** to [13] **Motion** to stay proceeding filed by All Elite Wrestling. (Rodman, Rachael) (Entered: 04/24/2024) |
| 04/24/2024 | [18] | **Opposition** to [13] **Motion** to stay filed by World Wrestling Entertainment. (Attachments: # [1] Exhibit 1 - Trumbull County Court Records, # [2] Exhibit 2 - Trumbull County Inmate Search)(Markota, Justin) (Entered: 04/24/2024) |
| 05/03/2024 | [19] | **Motion** to dismiss for failure to state a claim filed by Defendant All Elite Wrestling. Related document(s) [15] . (Rodman, Rachael) (Entered: 05/03/2024) |
| 05/03/2024 | [20] | **Answer** to [15] Amended complaint filed by All Elite Wrestling. (Rodman, Rachael) (Entered: 05/03/2024) |
| 05/03/2024 | [21] | **Motion** to Dismiss Amended Complaint for failure to state a claim filed by Defendant World Wrestling Entertainment. Related document(s) [15] . (Attachments: # [1] Brief in Support)(Markota, Justin) (Entered: 05/03/2024) |
| 05/03/2024 | [22] | **Answer** to [15] Amended complaint filed by World Wrestling Entertainment. (Markota, Justin) (Entered: 05/03/2024) |
| 06/25/2024 | [23] | Supplement - Attachment letter to [13] **Motion** to stay filed by Anthony Duane Wilson. Related document(s) [13] . (Attachments: # [1] envelope (no return address))(D,Ju) (Entered: |

| | | 06/25/2024) |
|---|---|---|
| 06/28/2024 | 24 | **Order** For the reasons set forth herein, the Court denies Plaintiff's Motion to stay (ECF No. 13 ). The Court orders Plaintiff to respond to Defendants' Motions to Dismiss (ECF Nos. 19 , 21 ) on or before 7/19/2024. If Plaintiff fails to respond timely, the Court will rule without Plaintiff's response. Judge Benita Y. Pearson on 6/28/2024. (JLG) (Entered: 06/28/2024) |
| 06/28/2024 | | Copy of 24 Order mailed to Plaintiff Anthony Duane Wilson #213463, Trumbull County Jail, 150 High Street NW, Warren, OH 44481 on 6/28/2024. Related document(s) 24 . (JLG) (Entered: 06/28/2024) |
| 07/12/2024 | 25 | Returned Mail addressed to Party Anthony Duane Wilson - Trumbull County Jail, 150 High Street NW, Warren, OH 44481. Return to Sender; No Such Number; Unable to Forward. Related document(s) 23 . (D,Th) (Entered: 07/12/2024) |
| 07/19/2024 | 26 | **Response** to 11 **Motion** to dismiss for failure to state a claim, 19 **Motion** to dismiss for failure to state a claim, 21 **Motion** to Dismiss Amended Complaint for failure to state a claim filed by Anthony Duane Wilson. (Attachments: # 1 envelope)(D,Ju) (Entered: 07/19/2024) |
| 08/02/2024 | 27 | **Reply** in support of 21 **Motion** to Dismiss Amended Complaint for failure to state a claim filed by World Wrestling Entertainment. (Markota, Justin) (Entered: 08/02/2024) |
| 08/02/2024 | 28 | **Reply** in support of 19 **Motion** to dismiss for failure to state a claim filed by All Elite Wrestling. (Rodman, Rachael) (Entered: 08/02/2024) |
| 10/07/2024 | 29 | Address Change Notice filed by Anthony Duane Wilson. (D,Ju) (Entered: 10/07/2024) |
| 10/22/2024 | 30 | **Memorandum of Opinion and Order** For the reasons set forth herein, the Court grants Defendant WWE's Motion to Dismiss (ECF No. 19 ) for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2). The dismissal of WWE is without prejudice to the matter being refiled in an appropriate jurisdiction. Defendant AEW's Motion to Dismiss (ECF No. 21 ) for failure to state a claim for relief pursuant to Fed. R. Civ. P. 12(b)(6) is granted. The dismissal of AEW is with prejudice. Judge Benita Y. Pearson on 10/22/2024. Related document(s 26 , 27 , 28 . (JLG) (Entered: 10/22/2024) |
| 10/22/2024 | 31 | **Order of Dismissal** Having filed its Memorandum of Opinion and Order, the Court hereby dismisses the Amended Complaint (ECF No. 15 ) against WWE without prejudice. The Amended Complaint is dismissed against AEW with prejudice. This Order of Dismissal constitutes entry of judgment pursuant to Fed. R. Civ. P. 58. Judge Benita Y. Pearson on 10/22/2024. (JLG) (Entered: 10/22/2024) |
| 10/22/2024 | | Copy of 30 Memorandum of Opinion and Order and 31 Order of Dismissal mailed to Plaintiff Anthony Duane Wilson, 603 Willard Ave. SE, Apartment 3, Warren, OH 44483 on 10/22/2024. Related document(s) 30 , 31 . (JLG) (Entered: 10/22/2024) |

# EXHIBIT 34

Query    Reports    Utilities    Help    Log Out

Cat11,Clay

# U.S. District Court
# NORTHERN DISTRICT OF OHIO (Toledo)
# CIVIL DOCKET FOR CASE #: 3:25-cv-00173-JJH

| | |
|---|---|
| Broadcast Music, Inc. et al. v. Bowstring Bar & Grill, LLC et al. | Date Filed: 01/31/2025 |
| Assigned to: Judge Jeffrey J. Helmick | Jury Demand: None |
| Cause: 17:101 Copyright Infringement | Nature of Suit: 820 Copyright |
| | Jurisdiction: Federal Question |

**Plaintiff**

**Broadcast Music, Inc.**                 represented by   **Jocelyn C. Smith**
UB Greensfelder - Columbus
Courtview Center
65 East State Street
Columbus, OH 43215
614-229-0044
Fax: 216-583-7001
Email: jcsmith@ubglaw.com
*ATTORNEY TO BE NOTICED*

**Olivia LeRoux**
UB Greensfelder - Columbus
Ste. 1100
65 East State Street
Columbus, OH 43215
216-583-7354
Email: oleroux@ubglaw.com
*ATTORNEY TO BE NOTICED*

**Rachael L. Rodman**
Thompson Hine - Columbus
Ste. 1700
41 South High Street
Columbus, OH 43215
614-469-3225
Fax: 614-469-3361
Email: rachael.rodman@thompsonhine.com
*TERMINATED: 06/25/2025*
*ATTORNEY TO BE NOTICED*

**Robert E. Chudakoff**
UB Greensfelder - Cleveland
Ste. 1100
1660 West 2nd Street
Cleveland, OH 44113
216-583-7126
Fax: 216-583-7127

Email: rchudakoff@ubglaw.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Warner-Tamerlane Publishing Corp.**    represented by    **Jocelyn C. Smith**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Olivia LeRoux**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rachael L. Rodman**
(See above for address)
*TERMINATED: 06/25/2025*
*ATTORNEY TO BE NOTICED*

**Robert E. Chudakoff**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Sony/ATV Tree Publishing**    represented by    **Jocelyn C. Smith**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Olivia LeRoux**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rachael L. Rodman**
(See above for address)
*TERMINATED: 06/25/2025*
*ATTORNEY TO BE NOTICED*

**Robert E. Chudakoff**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Beechwood Music Corporation**    represented by    **Jocelyn C. Smith**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Olivia LeRoux**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rachael L. Rodman**
(See above for address)
*TERMINATED: 06/25/2025*
*ATTORNEY TO BE NOTICED*

**Robert E. Chudakoff**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rick Springfield Music**                          represented by  **Jocelyn C. Smith**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Olivia LeRoux**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rachael L. Rodman**
(See above for address)
*TERMINATED: 06/25/2025*
*ATTORNEY TO BE NOTICED*

**Robert E. Chudakoff**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Muscle Shoals Sound Publishing Co.**             represented by  **Jocelyn C. Smith**
*A divison of Northside Partners*                                (See above for address)
*ATTORNEY TO BE NOTICED*

**Olivia LeRoux**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rachael L. Rodman**
(See above for address)
*TERMINATED: 06/25/2025*
*ATTORNEY TO BE NOTICED*

**Robert E. Chudakoff**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Peermusic III Ltd.**                             represented by  **Jocelyn C. Smith**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Olivia LeRoux**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rachael L. Rodman**
(See above for address)
*TERMINATED: 06/25/2025*
*ATTORNEY TO BE NOTICED*

**Robert E. Chudakoff**

(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Bowstring Bar & Grill, LLC**
*doing business as*
Bowstring Bar & Grill

**Defendant**

**Cindy Douds**
*individually*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/31/2025 | 1 | **Complaint** against All Defendants. Filing fee paid $ 405, Receipt number AOHNDC-12935916.. Filed by Muscle Shoals Sound Publishing Co., Warner-Tamerlane Publishing Corp., Beechwood Music Corporation, Broadcast Music, Inc., Rick Springfield Music, Peermusic III Ltd., Sony/ATV Tree Publishing. (Attachments: # 1 Exhibit 1 - Song Schedule, # 2 Civil Cover Sheet, # 3 Summons Bowstrings, Statutory Agent, # 4 Summons Douds) (Rodman, Rachael) (Entered: 01/31/2025) |
| 01/31/2025 | 2 | Report on the Filing of an Action Regarding a Copyright (AO121) filed by All Plaintiffs. (Rodman, Rachael) (Entered: 01/31/2025) |
| 01/31/2025 | 3 | Corporate Disclosure Statement with Schedule 7.1 attached filed by Broadcast Music, Inc. (Rodman, Rachael) Modified on 1/31/2025 (R,EM). (Entered: 01/31/2025) |
| 01/31/2025 | | Judge Jeffrey J. Helmick assigned to case. (R,EM) (Entered: 01/31/2025) |
| 01/31/2025 | | Random Assignment of Magistrate Judge pursuant to Local Rule 3.1. In the event of a referral, case will be assigned to Magistrate Judge Darrell A. Clay. (R,EM) (Entered: 01/31/2025) |
| 01/31/2025 | 4 | Original Summons and Magistrate Consent Form issued to counsel for service upon Bowstring Bar & Grill, LLC, Cindy Douds. (Attachments: # 1 Magistrate Consent Form) (R,EM) (Entered: 01/31/2025) |
| 01/31/2025 | | **Notice re Prompt Service.** Counsel for Plaintiff is responsible for **promptly** serving the Complaint on Defendant(s) upon receiving the issued summons from the Clerk and, after service has been perfected, electronically filing a Return of Service or an executed Waiver of Service for each Defendant. <br><br> Service is to be accomplished pursuant to Fed. R. Civ. P. 4, which includes provisions for personal service and waiver of service, and Local Rule 4.2. If you wish the Clerk to serve the Complaint on Defendant(s) (a seldom used alternative because it does not save time or money), you **must** provide the Clerk's office with copies of the Complaint along with other necessary documents, in the manner set forth in Local Rule 4.2(a). (R,EM) (Entered: 01/31/2025) |
| 02/26/2025 | 5 | Return of Service by personal service executed upon Bowstring Bar & Grill, LLC on 2/18/2025, Cindy Douds on 2/18/2025, filed on behalf of All Plaintiffs (Rodman, Rachael) Modified on 3/3/2025 (H,JL). (Entered: 02/26/2025) |

| 05/07/2025 | 6 | **Order**: Plaintiffs granted ten days from the date of this Order to show cause as to why this case should not be dismissed for want of prosecution pursuant to Rule 41(b). re 1 , 5 . Judge Jeffrey J. Helmick on 5/7/2025. (M,SM) (Entered: 05/07/2025) |
| 05/14/2025 | 7 | Status Report *(Response to May 7, 2025 Show Cause Order)* filed by All Plaintiffs. (Rodman, Rachael) (Entered: 05/14/2025) |
| 05/15/2025 | | **Order** [non-document] granting Plaintiffs' request to effectively stay this case while the parties discuss the possibility of settlement. Plaintiffs' counsel shall file a further status report within sixty (60) days of this Order updating me on the progress of those discussions. re 7 . Judge Jeffrey J. Helmick on 5/15/2025. (M,SM) (Entered: 05/15/2025) |
| 06/25/2025 | 8 | Notice of Substitution of Counsel removing attorney Rachael L. Rodman and adding attorney Robert E. Chudakoff filed by on behalf of All Plaintiffs. (Chudakoff, Robert) (Entered: 06/25/2025) |
| 07/13/2025 | 9 | Status Report filed by All Plaintiffs. (Chudakoff, Robert) (Entered: 07/13/2025) |
| 08/19/2025 | 10 | **Order**: Telephone Conference set for 9/17/2025, at 11:30 AM in Judge Helmick bridge line 419-718-0655, Meeting ID 849 763 788 before Judge Jeffrey J. Helmick. Defendant Cindy Douds of Defendant Bowstring Bar & Grill, LLC and counsel for Plaintiffs must participate in this conference by calling the Courts bridge line at 419-718-0655, Meeting ID 849 763 788. If Ms. Douds fails to attend this conference, adverse action may be taken, including entry of judgment by default. re 9 . Judge Jeffrey J. Helmick on 8/19/2025. (M,SM) (Entered: 08/19/2025) |
| 08/19/2025 | | Copy of Order mailed to Cindy Douds of Bowstring Bar & Grill LLC at 109 N. Water Street P.O. Box 126 Caledonia, OH 43314 and emailed to her at dkmamom@yahoo.com on 8/19/2025. Related document(s) 10 . (M,SM) (Entered: 08/19/2025) |

# EXHIBIT 35

Query    Reports    Utilities    Help    Log Out

ADR-Atty

# U.S. District Court
## Southern District of Ohio (Columbus)
## CIVIL DOCKET FOR CASE #: 2:24-cv-04242-JLG-EPD

Broadcast Music, Inc. et al v. Thims Lounge LLC et al          Date Filed: 12/06/2024
Assigned to: Judge James L. Graham                            Jury Demand: None
Referred to: Magistrate Judge Elizabeth Preston Deavers       Nature of Suit: 820 Copyright
Cause: 17:101 Copyright Infringement                          Jurisdiction: Federal Question

**Plaintiff**

**Broadcast Music, Inc.**                    represented by    **Rachael Leigh Rodman**
                                                               Thompson Hine LLP
                                                               41 South High Street, Suite 1700
                                                               Columbus, OH 43215
                                                               614-469-3225
                                                               Fax: 614-469-3361
                                                               Email: rachael.rodman@thompsonhine.com
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Jocelyn Cherie Smith**
                                                               UB Greensfelder LLP
                                                               65 E State St.
                                                               Suite 1100
                                                               Columbus, OH 43215
                                                               614-229-0044
                                                               Email: jcsmith@ubglaw.com
                                                               *ATTORNEY TO BE NOTICED*

**Plaintiff**

**EMI Blackwood Music, Inc.**                represented by    **Rachael Leigh Rodman**
                                                               (See above for address)
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Jocelyn Cherie Smith**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Legacy of Harlan Perry Howard LLC**        represented by    **Rachael Leigh Rodman**
                                                               (See above for address)
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Jocelyn Cherie Smith**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Mow B'Jow Music, Inc.**                    represented by   **Rachael Leigh Rodman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jocelyn Cherie Smith**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Sony/ATV Songs LLC**                       represented by   **Rachael Leigh Rodman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jocelyn Cherie Smith**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**E.O. Smith Music**                         represented by   **Rachael Leigh Rodman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jocelyn Cherie Smith**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Less Than Zero Music**                     represented by   **Rachael Leigh Rodman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jocelyn Cherie Smith**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Southfield Road Music**                    represented by   **Rachael Leigh Rodman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jocelyn Cherie Smith**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Fake and Jaded Music**                                  represented by  **Rachael Leigh Rodman**
                                                                          (See above for address)
                                                                          *LEAD ATTORNEY*
                                                                          *ATTORNEY TO BE NOTICED*

                                                                          **Jocelyn Cherie Smith**
                                                                          (See above for address)
                                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ben Peters Music**                                      represented by  **Rachael Leigh Rodman**
                                                                          (See above for address)
                                                                          *LEAD ATTORNEY*
                                                                          *ATTORNEY TO BE NOTICED*

                                                                          **Jocelyn Cherie Smith**
                                                                          (See above for address)
                                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ol' Harlan Songs LLC**                                  represented by  **Rachael Leigh Rodman**
*doing business as*                                                       (See above for address)
Good Ol' Harlan Songs                                                     *LEAD ATTORNEY*
                                                                          *ATTORNEY TO BE NOTICED*

                                                                          **Jocelyn Cherie Smith**
                                                                          (See above for address)
                                                                          *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Thims Lounge LLC**                                      represented by  **Michael T Cox**
*doing business as*                                                       Cox Law Office, LLC
Black Swan Bar & Grill                                                    4930 Reed Rd
                                                                          Suite 220
                                                                          Columbus, OH 43220
                                                                          614-562-0945
                                                                          Fax: 614-457-7878
                                                                          Email: mcoxattorney@gmail.com
                                                                          *LEAD ATTORNEY*
                                                                          *ATTORNEY TO BE NOTICED*

**Defendant**

**Chris Bethel**                                          represented by  **Michael T Cox**
                                                                          (See above for address)
                                                                          *LEAD ATTORNEY*
                                                                          *ATTORNEY TO BE NOTICED*

**Defendant**

**Dawn Bethel**                                    represented by **Michael T Cox**
                                                   (See above for address)
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/06/2024 | 1 | COMPLAINT against All Defendants ( Filing fee $ 405 paid - receipt number: AOHSDC-10280012), filed by Mow B'Jow Music, Inc., Southfield Road Music, EMI Blackwood Music, Inc., Sony/ATV Songs LLC, E.O. Smith Music, Fake and Jaded Music, Ol' Harlan Songs LLC, Broadcast Music, Inc., Less Than Zero Music, Ben Peters Music, Legacy of Harlan Perry Howard LLC. (Attachments: # 1 Exhibit 1 - Song Schedule, # 2 Civil Cover Sheet, # 3 Summons Form Thims Lounge, via Statutory Agent, # 4 Summons Form Thims Lounge, at business address, # 5 Summons Form Chris Bethel, at residence, # 6 Summons Form Chris Bethel, at business, # 7 Summons Form Dawn Bethel, at residence, # 8 Summons Form Dawn Bethel, at business) (Rodman, Rachael) (Entered: 12/06/2024) |
| 12/06/2024 | 2 | Corporate Disclosure Statement by Plaintiffs Less Than Zero Music, Southfield Road Music, Fake and Jaded Music, Ben Peters Music, Ol' Harlan Songs LLC, Broadcast Music, Inc., EMI Blackwood Music, Inc., Legacy of Harlan Perry Howard LLC, Mow B'Jow Music, Inc., Sony/ATV Songs LLC, E.O. Smith Music. (Rodman, Rachael) (Entered: 12/06/2024) |
| 12/06/2024 | 3 | STATUS REPORT *AO121 Report on the Filing of a Copyright Claim* by Plaintiffs Less Than Zero Music, Southfield Road Music, Fake and Jaded Music, Ben Peters Music, Ol' Harlan Songs LLC, Broadcast Music, Inc., EMI Blackwood Music, Inc., Legacy of Harlan Perry Howard LLC, Mow B'Jow Music, Inc., Sony/ATV Songs LLC, E.O. Smith Music. (Rodman, Rachael) (Entered: 12/06/2024) |
| 12/06/2024 | 4 | Summons Issued as to: Thims Lounge LLC d/b/a Black Swan Bar & Grill, Chris Bethel, Dawn Bethel, Thims Lounge LLC. (vb) (Entered: 12/06/2024) |
| 12/26/2024 | 6 | ANSWER to 1 Complaint,,, filed by All Defendants. (Cox, Michael) (Entered: 12/26/2024) |
| 01/06/2025 |  | Pretrial Conference set for 1/30/2025 10:30 AM in Teleconference before Magistrate Judge Elizabeth Preston Deavers. The parties are directed to call 1-551-285-1373 and enter Zoom Meeting ID 161-603-4081#. The Participant ID and Meeting Passcode are both 581746#. Signed by Magistrate Judge Elizabeth Preston Deavers on 1/6/2025. (vb) (Entered: 01/06/2025) |
| 01/07/2025 | 7 | SUMMONS Returned Executed as to Defendants Chris Bethel, Dawn Bethel, Thims Lounge LLC. All Defendants. (Rodman, Rachael) (Entered: 01/07/2025) |
| 01/22/2025 | 8 | RULE 26(f) REPORT by Plaintiffs Less Than Zero Music, Southfield Road Music, Fake and Jaded Music, Ben Peters Music, Ol' Harlan Songs LLC, Broadcast Music, Inc., EMI Blackwood Music, Inc., Legacy of Harlan Perry Howard LLC, Mow B'Jow Music, Inc., Sony/ATV Songs LLC, E.O. Smith Music. (Rodman, Rachael) (Entered: 01/22/2025) |
| 01/27/2025 |  | NOTICE VACATING Pretrial Conference set for 1/30/2025 10:30 AM in Teleconference before Magistrate Judge Elizabeth Preston Deavers per Rule 26(f) Report. (jlk) (Entered: 01/27/2025) |
| 01/28/2025 | 9 | PRELIMINARY PRETRIAL ORDER: The Court ADOPTS the following schedule: Joinder of Parties due by 2/28/2025. Motions to Amend due by 2/28/2025. Initial Disclosures due by 2/28/2025. Discovery due by 8/29/2025. **If the parties are unable to reach an agreement on any matter related to discovery, they are directed to arrange a conference with the Court.** Dispositive motions due by 9/30/2025. Settlement Demand |

| | | due by 2/28/2025. Response to Settlement Demand due by 3/14/2025. Mediation Deadline: 7/2025. Signed by Magistrate Judge Elizabeth Preston Deavers on January 28, 2025. (jlk) (Entered: 01/28/2025) |
|---|---|---|
| 05/23/2025 | 10 | NOTICE: Counsel shall confer and notify the Court at ADR@ohsd.uscourts.gov within 10 days if this case should **NOT** proceed with mediation in **July 2025**. If the case should not proceed, counsel shall indicate whether the case should be continued to another month and, if so, which one. Deadline for notifying the court is **4:00pm EST on 6/2/2025**. (kk2) (Entered: 05/23/2025) |
| 06/02/2025 | 11 | ORDER: Case reported settled. Status Report due by 7/2/2025 unless dismissal filed prior. Signed by Magistrate Judge Elizabeth Preston Deavers on 6/2/2025. (sln) (Entered: 06/02/2025) |
| 06/27/2025 | 12 | STATUS REPORT *(JOINT)* by Plaintiffs Ben Peters Music, Broadcast Music, Inc., E.O. Smith Music, EMI Blackwood Music, Inc., Fake and Jaded Music, Legacy of Harlan Perry Howard LLC, Less Than Zero Music, Mow B'Jow Music, Inc., Ol' Harlan Songs LLC, Sony/ATV Songs LLC, Southfield Road Music. (Rodman, Rachael) (Entered: 06/27/2025) |
| 07/29/2025 | 13 | ORDER: This case has been reported settled. No later than AUGUST 5, 2025, the parties are DIRECTED to file a JOINT WRITTEN STATUS REPORT detailing the status, but not the substance, of their settlement, unless an appropriate dismissal entry has been filed prior to that date. Status Report due by 8/5/2025. Signed by Magistrate Judge Elizabeth Preston Deavers on 7/29/2025. (vb) (Entered: 07/29/2025) |
| 08/05/2025 | 14 | STATUS REPORT *(JOINT)* by Plaintiffs Ben Peters Music, Broadcast Music, Inc., E.O. Smith Music, EMI Blackwood Music, Inc., Fake and Jaded Music, Legacy of Harlan Perry Howard LLC, Less Than Zero Music, Mow B'Jow Music, Inc., Ol' Harlan Songs LLC, Sony/ATV Songs LLC, Southfield Road Music. (Smith, Jocelyn) (Entered: 08/05/2025) |
| 08/05/2025 | 15 | STATUS REPORT *(Joint - corrected caption)* by Plaintiffs Ben Peters Music, Broadcast Music, Inc., E.O. Smith Music, EMI Blackwood Music, Inc., Fake and Jaded Music, Legacy of Harlan Perry Howard LLC, Less Than Zero Music, Mow B'Jow Music, Inc., Ol' Harlan Songs LLC, Sony/ATV Songs LLC, Southfield Road Music. (Smith, Jocelyn) (Entered: 08/05/2025) |
| 08/14/2025 | 16 | STIPULATION of Dismissal *of Complaint; Order of Dismissal* submitted by Plaintiffs Ben Peters Music, Broadcast Music, Inc., E.O. Smith Music, EMI Blackwood Music, Inc., Fake and Jaded Music, Legacy of Harlan Perry Howard LLC, Less Than Zero Music, Mow B'Jow Music, Inc., Ol' Harlan Songs LLC, Sony/ATV Songs LLC, Southfield Road Music. (Smith, Jocelyn) Modified docket text on 8/14/2025 (sem). (Entered: 08/14/2025) |

# EXHIBIT 36

Query    Reports    Utilities    Help    Log Out

Cat11,Sheperd,Termed

# U.S. District Court
# NORTHERN DISTRICT OF OHIO (Cleveland)
# CIVIL DOCKET FOR CASE #: 1:24-cv-01418-CEF

| | |
|---|---|
| Broadcast Music, Inc. et al. v. 130 Restaurant and Management, Corp. et al. | Date Filed: 08/20/2024 |
| Assigned to: Judge Charles Esque Fleming | Date Terminated: 11/25/2024 |
| Cause: 17:101 Copyright Infringement | Jury Demand: None |
| | Nature of Suit: 820 Copyright |
| | Jurisdiction: Federal Question |

**Plaintiff**

**Broadcast Music, Inc.**                 represented by  **Jocelyn C. Smith**
UB Greensfelder - Columbus
Courtview Center
65 East State Street
Columbus, OH 43215
614-229-0044
Fax: 216-583-7001
Email: jcsmith@ubglaw.com
*ATTORNEY TO BE NOTICED*

**Robert E. Chudakoff**
UB Greensfelder - Cleveland
Ste. 1100
1660 West 2nd Street
Cleveland, OH 44113
216-583-7126
Fax: 216-583-7127
Email: rchudakoff@ubglaw.com
*ATTORNEY TO BE NOTICED*

**Robert B. Weltman**
Weltman, Weinberg & Reis
965 Keynote Circle
Cleveland, OH 44131
216-685-1040
Email: rweltman@weltman.com
*ATTORNEY TO BE NOTICED*

**Rachael L. Rodman**
Thompson Hine - Columbus
Ste. 1700
41 South High Street
Columbus, OH 43215
614-469-3225
Fax: 614-469-3361

Email: rachael.rodman@thompsonhine.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Warner-Tamerlane Publishing Corp.**                represented by **Jocelyn C. Smith**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert E. Chudakoff**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rachael L. Rodman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Sony/ATV Songs LLC**                represented by **Jocelyn C. Smith**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert E. Chudakoff**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rachael L. Rodman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Dandelion Music Co.**                represented by **Jocelyn C. Smith**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert E. Chudakoff**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rachael L. Rodman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Stilran Music**                represented by **Jocelyn C. Smith**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert E. Chudakoff**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rachael L. Rodman**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Painted Desert Music Corporation**            represented by   **Jocelyn C. Smith**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Robert E. Chudakoff**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Rachael L. Rodman**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**130 Restaurant and Management, Corp.**        represented by   **130 Restaurant and Management, Corp.**
*doing business as*                                              7768 W 130th St.
Rock Creek Kitchen & Bar                                         Cleveland, OH 44130
                                                                 PRO SE

**Defendant**

**Anthony Grassia**                             represented by   **Anthony Grassia**
                                                                 758 E. Clearview Avenue
                                                                 Seven Hills, OH 44131
                                                                 PRO SE

| Date Filed | # | Docket Text |
|---|---|---|
| 08/20/2024 | 1 | **Complaint** against All Defendants. Filing fee paid, $405.00. Receipt number AOHNDC-12699796. Filed by Sony/ATV Songs LLC, Warner-Tamerlane Publishing Corp., Stilran Music, Broadcast Music, Inc., Dandelion Music Co., Painted Desert Music Corporation. (Attachments: # 1 Exhibit 1 - Song Schedule, # 2 Civil Cover Sheet, # 3 Summons Rock Creek Bar & Grill, Statutory Agent, # 4 Summons Rock Creek Bar & Grill, Restaurant Address, # 5 Summons Anthony Grassia, Residence, # 6 Summons Anthony Grassia, Restaurant Address) (Rodman, Rachael) (Entered: 08/20/2024) |
| 08/20/2024 | 2 | Report on the Filing of an Action Regarding a Copyright (AO121) filed by All Plaintiffs. (Rodman, Rachael) (Entered: 08/20/2024) |
| 08/20/2024 | 3 | Corporate Disclosure Statement filed by All Plaintiffs. (Rodman, Rachael) (Entered: 08/20/2024) |
| 08/20/2024 |  | Judge Charles Esque Fleming assigned to case. (R,AP) (Entered: 08/20/2024) |
| 08/20/2024 |  | Random Assignment of Magistrate Judge pursuant to Local Rule 3.1. In the event of a referral, case will be assigned to Magistrate Judge Reuben J. Sheperd. (R,AP) (Entered: 08/20/2024) |
| 08/20/2024 | 4 | Original Summons issued to counsel for service upon 130 Restaurant and Management, Corp. (2 addresses), Anthony Grassia (2 addresses). (Attachments: # 1 Magistrate Consent |

| | | |
|---|---|---|
| | | Form) (R,AP) (Entered: 08/20/2024) |
| 08/26/2024 | [5](#) | Notice of Filing of Supplemental Civil Cover Sheet filed by All Plaintiffs. (Attachments: # [1](#) Civil Cover Sheet (Amended))(Rodman, Rachael) (Entered: 08/26/2024) |
| 09/11/2024 | [6](#) | Return of Service by personal service executed upon Anthony Grassia on 8/31/2024, 130 Restaurant and Management, Corp. on 8/31/2024 filed on behalf of All Plaintiffs (Attachments: # [1](#) Proof of Service)(Rodman, Rachael) Modified text on 10/3/2024 (L,Br). (Entered: 09/11/2024) |
| 09/24/2024 | [7](#) | **Order** to Show Cause. Judge Charles Esque Fleming on 9/24/2024. (S,SR) (Entered: 09/24/2024) |
| 10/02/2024 | [8](#) | Application to Clerk for entry of default against 130 Restaurant and Management, Corp. d/b/a Rock Creek Kitchen; Anthony Grassia filed by All Plaintiffs. (Attachments: # [1](#) Exhibit 1 - Declaration of Rachael L. Rodman, # [2](#) Exhibit 2 - Proofs of Service (Dkt. 6)) (Rodman, Rachael) (Entered: 10/02/2024) |
| 10/02/2024 | [9](#) | Default Entered on 10/2/2024 against 130 Restaurant and Management, Corp. doing business as Rock Creek Kitchen & Bar and Anthony Grassia. Sandy Opacich, Clerk by Stephanie Siner, Deputy Clerk. Related document(s) [8](#) . (S,SR) (Entered: 10/02/2024) |
| 10/02/2024 | | Copy of [9](#) Default Entered mailed to 130 Restaurant and Management, Corp. doing business as Rock Creek Kitchen & Bar and Anthony Grassia at 7768 W 130th St. Cleveland, OH 44130 and 758 E. Clearview Avenue Seven Hills, OH 44131 on 10/2/2024. (2 copies sent to each address). (S,SR) (Entered: 10/02/2024) |
| 11/04/2024 | | **Order:** [non-document] The Clerk entered Default against Defendants 130 Restaurant and Management, Corp and Anthony Grassia on 10/2/2024. (ECF No. [9](#) ). Since that time, however, Plaintiffs have not filed any Motion for Default Judgment. Accordingly, within 14 days of this Order, counsel for Plaintiffs shall file an appropriate motion, affidavit, and proposed order for default judgment sufficient for resolution pursuant to Fed. R. Civ. P. 55(b). If this is not done, the Court will dismiss this action for failure to prosecute. Judge Charles Esque Fleming on 11/4/2024. (S,SR) (Entered: 11/04/2024) |
| 11/04/2024 | | Copy of Order (non document) mailed to 130 Restaurant and Management, Corp. doing business as Rock Creek Kitchen & Bar and Anthony Grassia at 7768 W 130th St. Cleveland, OH 44130 and 758 E. Clearview Avenue Seven Hills, OH 44131 on 11/4/2024. (2 copies sent to each address). (S,SR) (Entered: 11/04/2024) |
| 11/14/2024 | [10](#) | **Motion** for default judgment *against Defendants 130 Restaurant and Management, Corp. and Anthony Grassia* filed by Stilran Music, Broadcast Music, Inc., Dandelion Music Co., Painted Desert Music Corporation, Sony/ATV Songs LLC, Warner-Tamerlane Publishing Corp.. (Attachments: # [1](#) Brief in Support, # [2](#) Exhibit 1 - Adewumi Declaration, # [3](#) Exhibit 2 - Flynn Declaration, # [4](#) Exhibit 3 - Rodman Declaration, # [5](#) Proposed Order) (Rodman, Rachael) (Entered: 11/14/2024) |
| 11/25/2024 | [11](#) | **Default Judgment** in favor of Broadcast Music, Inc., Dandelion Music Co., Painted Desert Music Corporation, Sony/ATV Songs LLC, Stilran Music, Warner-Tamerlane Publishing Corp. against 130 Restaurant and Management, Corp., Anthony Grassia. Judge Charles Esque Fleming on 11/25/2024. (S,SR) (Entered: 11/25/2024) |
| 11/25/2024 | | Copy of [11](#) Default Judgment, mailed to 130 Restaurant and Management, Corp. doing business as Rock Creek Kitchen & Bar and Anthony Grassia at 7768 W 130th St. Cleveland, OH 44130 and 758 E. Clearview Avenue Seven Hills, OH 44131 (2 copies sent to each address) on 11/25/2024.. (S,SR) (Entered: 11/25/2024) |

| 12/20/2024 | 12 | Report on the Determination [Closing] of an Action Regarding a Copyright (AO121). (Attachments: # 1 Order of Default Judgment) (M,CE) (Entered: 12/20/2024) |
| 02/26/2025 | 13 | FILING ERROR: Praecipe for issuance of Certificate of Judgment Lien Upon Lands and Tenements $ 11.00 certification fee paid, receipt number AOHNDC-12975025 filed by Broadcast Music, Inc. (Weltman, Robert) Modified to mark FILING ERROR on 2/26/2025, filer to resubmit Praecipe and attach Certificate of Judgment Lien (H,Ch). (Entered: 02/26/2025) |
| 02/27/2025 | 14 | Praecipe for issuance of Certificate of Judgment Lien Upon Lands and Tenements $ 11.00 certification fee paid, receipt number AOHNDC-12976738 filed by Broadcast Music, Inc., with proposed Certificate accompanying main document (Weltman, Robert) Modified to reflect lack of attachment on 2/27/2025 (H,Ch). (Entered: 02/27/2025) |
| 02/27/2025 | 15 | Certificate of Judgment Lien Upon Lands and Tenements issued on 2/27/2024 against 130 Restaurant and Management Corp. and Anthony Grassia, jointly and severally in the amount of $20,000.00, plus $3,603.50 in attorney's fees plus interest. Related document(s) 14 . (H,Ch) (Entered: 02/27/2025) |
| 03/31/2025 | 16 | Certificate of Judgment Lien Upon Lands and Tenements received from Cuyahoga County Court, Case No. JL-25-274536, entered on 3/10/2025 against 130 Restaurant and Management Corp.; Anthony Grassia in the amount of $20,000 plus $3,603.50 in attorney's fees, plus interest. Related document(s) 15 . (M,CE) (Entered: 03/31/2025) |

# EXHIBIT 37

CLOSED

# U.S. District Court
## Southern District of Ohio (Columbus)
### CIVIL DOCKET FOR CASE #: 2:24-cv-01427-ALM-KAJ

Broadcast Music, Inc. et al v. Summit Revival LLC et al
Assigned to: Judge Algenon L. Marbley
Referred to: Magistrate Judge Kimberly A. Jolson
Cause: 17:101 Copyright Infringement

Date Filed: 03/28/2024
Date Terminated: 09/23/2024
Jury Demand: None
Nature of Suit: 820 Copyright
Jurisdiction: Federal Question

**Plaintiff**

**Broadcast Music, Inc.**          represented by   **Jocelyn Cherie Smith**
                                                   UB Greensfelder LLP
                                                   65 E State St.
                                                   Suite 1100
                                                   Columbus, OH 43215
                                                   614-229-0044
                                                   Email: jcsmith@ubglaw.com
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Robert E Chudakoff**
                                                   UB Greensfelder, LLP
                                                   1660 W. 2nd St. Ste. 1100
                                                   Cleveland, OH 44113
                                                   216-583-7126
                                                   Fax: 216-583-7127
                                                   Email: rchudakoff@ubglaw.com
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Rachael Leigh Rodman**
                                                   Thompson Hine LLP
                                                   41 South High Street, Suite 1700
                                                   Columbus, OH 43215
                                                   614-469-3225
                                                   Fax: 614-469-3361
                                                   Email: rachael.rodman@thompsonhine.com
                                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Sony/ATV Songs LLC**          represented by   **Jocelyn Cherie Smith**
                                                 (See above for address)
                                                 *ATTORNEY TO BE NOTICED*

                                                 **Robert E Chudakoff**
                                                 (See above for address)
                                                 *ATTORNEY TO BE NOTICED*

Rachael Leigh Rodman
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**The Bernard Edwards Company LLC**                 represented by    **Jocelyn Cherie Smith**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert E Chudakoff**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rachael Leigh Rodman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Two Knight Music**                 represented by    **Jocelyn Cherie Smith**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert E Chudakoff**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rachael Leigh Rodman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Peermusic III Ltd.**                 represented by    **Jocelyn Cherie Smith**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert E Chudakoff**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rachael Leigh Rodman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**House of Gaga Publishing LLC**                 represented by    **Jocelyn Cherie Smith**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert E Chudakoff**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rachael Leigh Rodman**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Redone Productions LLC**                         represented by   **Jocelyn Cherie Smith**
*doing business as*                                                (See above for address)
Songs of RedOne                                                    *ATTORNEY TO BE NOTICED*

                                                                   **Robert E Chudakoff**
                                                                   (See above for address)
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **Rachael Leigh Rodman**
                                                                   (See above for address)
                                                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**EMI Blackwood Music, Inc.**                      represented by   **Jocelyn Cherie Smith**
                                                                   (See above for address)
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **Robert E Chudakoff**
                                                                   (See above for address)
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **Rachael Leigh Rodman**
                                                                   (See above for address)
                                                                   *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Summit Revival LLC**
*doing business as*
Cafe Bourbon Street

**Defendant**

**David Fricke**

| Date Filed | # | Docket Text |
|---|---|---|
| 03/28/2024 | 1 | COMPLAINT against All Defendants ( Filing fee $ 405 paid - receipt number: AOHSDC-9891463), filed by Two Knight Music, Redone Productions LLC, Sony/ATV Songs LLC, Peermusic III Ltd., Broadcast Music, Inc., EMI Blackwood Music, Inc., House of Gaga Publishing LLC, The Bernard Edwards Company LLC. (Attachments: # 1 Exhibit 1 - Song Schedule, # 2 Civil Cover Sheet, # 3 Summons Form Summit Revival - Statutory Agent, # 4 Summons Form Summit Revival - Member, # 5 Summons Form Fricke - Business Address, # 6 Summons Form Fricke - Secondary Address) (Rodman, Rachael) (Entered: 03/28/2024) |

| 03/28/2024 | 2 | Corporate Disclosure Statement by Plaintiffs Broadcast Music, Inc., EMI Blackwood Music, Inc., House of Gaga Publishing LLC, Peermusic III Ltd., Redone Productions LLC, Sony/ATV Songs LLC, The Bernard Edwards Company LLC, Two Knight Music. (Rodman, Rachael) (Entered: 03/28/2024) |
|---|---|---|
| 03/28/2024 | 3 | Summons Issued as to David Fricke, Summit Revival LLC. (jlk) (Entered: 03/28/2024) |
| 05/01/2024 | 5 | SUMMONS Returned Executed as to Defendants David Fricke, Summit Revival LLC. All Defendants. (Attachments: # 1 Summons Form) (Rodman, Rachael) (Entered: 05/01/2024) |
| 09/19/2024 | 6 | STIPULATION of Dismissal *of Complaint; Order of Dismissal* submitted by Plaintiffs Broadcast Music, Inc., EMI Blackwood Music, Inc., House of Gaga Publishing LLC, Peermusic III Ltd., Redone Productions LLC, Sony/ATV Songs LLC, The Bernard Edwards Company LLC, Two Knight Music. (Rodman, Rachael) Modified docket text on 9/23/2024 (sem). (Entered: 09/19/2024) |
| 09/23/2024 | 7 | ORDER re: 6 Stipulation for Dismissal. DISMISSING CASE WITH PREJUDICE. Signed by District Judge Algenon L Marbley on 9/23/2024. (cw) (Entered: 09/23/2024) |

# EXHIBIT 38

CLOSED

# U.S. District Court
## Southern District of Ohio (Cincinnati)
## CIVIL DOCKET FOR CASE #: 1:23-cv-00789-MWM

Broadcast Music, Inc. et al v. Little River Bar and Grill, LLC et al
Assigned to: Judge Matthew W. McFarland
Cause: 17:101 Copyright Infringement

Date Filed: 11/30/2023
Date Terminated: 10/08/2024
Jury Demand: None
Nature of Suit: 820 Copyright
Jurisdiction: Federal Question

**Plaintiff**

**Broadcast Music, Inc.**                    represented by    **Jocelyn Cherie Smith**
UB Greensfelder LLP
65 E State St.
Suite 1100
Columbus, OH 43215
614-229-0044
Email: jcsmith@ubglaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rachael Leigh Rodman**
Thompson Hine LLP
41 South High Street, Suite 1700
Columbus, OH 43215
614-469-3225
Fax: 614-469-3361
Email: rachael.rodman@thompsonhine.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert E Chudakoff**
UB Greensfelder, LLP
1660 W. 2nd St. Ste. 1100
Cleveland, OH 44113
216-583-7126
Fax: 216-583-7127
Email: rchudakoff@ubglaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Coburn Music Inc**                    represented by    **Jocelyn Cherie Smith**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rachael Leigh Rodman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert E Chudakoff**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Bro 'n Sis Music, Inc.**      represented by    **Jocelyn Cherie Smith**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rachael Leigh Rodman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert E Chudakoff**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Kobalt Music Publishing America Inc.**      represented by    **Jocelyn Cherie Smith**
*doing business as*                                          (See above for address)
Songs of Kobalt Music Publishing             *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rachael Leigh Rodman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert E Chudakoff**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Counting Crows, LLC**      represented by    **Jocelyn Cherie Smith**
*doing business as*                                          (See above for address)
Jones Falls Music                             *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rachael Leigh Rodman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert E Chudakoff**

**Plaintiff**

**House of Bryant Publications, LLC**                represented by    **Jocelyn Cherie Smith**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Rachael Leigh Rodman**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Robert E Chudakoff**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Tremonti Stapp Music**                represented by    **Jocelyn Cherie Smith**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Rachael Leigh Rodman**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Robert E Chudakoff**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Reservoir Media Management Inc.**                represented by    **Jocelyn Cherie Smith**
*doing business as*                                                (See above for address)
Reservoir 416                                                    *LEAD ATTORNEY*
*also known as*                                                  *ATTORNEY TO BE NOTICED*
Reservoir One America

                                                                    **Rachael Leigh Rodman**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Robert E Chudakoff**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**EMI Blackwood Music Inc.**

represented by **Jocelyn Cherie Smith**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rachael Leigh Rodman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert E Chudakoff**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**All Clear Music LLC**
*doing business as*
Sheltered At Home Music

represented by **Jocelyn Cherie Smith**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rachael Leigh Rodman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert E Chudakoff**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Sony/ATV Songs LLC**
*doing business as*
Sony/ATV Tree Publishing

represented by **Jocelyn Cherie Smith**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rachael Leigh Rodman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert E Chudakoff**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Nashville Star Music**
*A Division of Reveille Music Publishing LLP*

represented by **Jocelyn Cherie Smith**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rachael Leigh Rodman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert E Chudakoff**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Warner-Tamerlane Publishing Corp.**    represented by    **Jocelyn Cherie Smith**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rachael Leigh Rodman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert E Chudakoff**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Indiana Angel Music**    represented by    **Jocelyn Cherie Smith**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rachael Leigh Rodman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert E Chudakoff**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Fame Publishing Company LLC**    represented by    **Jocelyn Cherie Smith**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rachael Leigh Rodman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert E Chudakoff**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Southeastern Publishing LLC**                      represented by   **Jocelyn Cherie Smith**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rachael Leigh Rodman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert E Chudakoff**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Carnival Music Company**                           represented by   **Jocelyn Cherie Smith**
*doing business as*                                                   (See above for address)
Tiltawhirl Music                                                     *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rachael Leigh Rodman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert E Chudakoff**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Little River Bar and Grill, LLC**                  represented by   **Dustin R. Hurley**
*doing business as*                                                   Hurley Law, LLC
Little River Bar and Grill                                           301 N. Breiel Blvd.
Middletown, OH 45042
513-878-1059
Fax: 513-705-9001
Email: hurley@hurley.law
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Dale Lusby**                                        represented by   **Dustin R. Hurley**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Tonya Lusby**                    represented by    **Dustin R. Hurley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Crystal Stewart**                    represented by    **Dustin R. Hurley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/30/2023 | 1 | COMPLAINT against All Defendants ( Filing fee $ 402 paid - receipt number: AOHSDC-9708502), filed by House of Bryant Publications, LLC, Indiana Angel Music, Broadcast Music, Inc., All Clear Music LLC, Carnival Music Company, Reservoir Media Management Inc., Nashville Star Music, A Division of Reveille Music Publishing LLP, EMI Blackwood Music Inc., Southeastern Publishing LLC, Fame Publishing Company LLC, Kobalt Music Publishing America Inc., Counting Crows, LLC, Tremonti Stapp Music, Sony/ATV Songs LLC, Coburn Music Inc, Warner-Tamerlane Publishing Corp., Bro 'n Sis Music, Inc.. (Attachments: # 1 Exhibit 1 - Song Schedule, # 2 Civil Cover Sheet, # 3 Summons Form Little River Bar and Grill, via Statutory Agent, # 4 Summons Form Little River Bar and Grill, via members at business address, # 5 Summons Form Little River Bar and Grill, via members at Lusby residence, # 6 Summons Form Little River Bar and Grill, via member at Stewart residence, # 7 Summons Form Dale Lusby, at residence, # 8 Summons Form Dale Lusby, at business, # 9 Summons Form Tonya Lusby, at residence, # 10 Summons Form Tonya Lusby, at business, # 11 Summons Form Crystal Stewart, at residence, # 12 Summons Form Crystal Stewart, at business) (Rodman, Rachael) (Entered: 11/30/2023) |
| 11/30/2023 | 2 | Corporate Disclosure Statement by Plaintiffs All Clear Music LLC, Bro 'n Sis Music, Inc., Broadcast Music, Inc., Carnival Music Company, Coburn Music Inc, Counting Crows, LLC, EMI Blackwood Music Inc., Fame Publishing Company LLC, House of Bryant Publications, LLC, Indiana Angel Music, Kobalt Music Publishing America Inc., Nashville Star Music, A Division of Reveille Music Publishing LLP, Reservoir Media Management Inc., Sony/ATV Songs LLC, Southeastern Publishing LLC, Tremonti Stapp Music, Warner-Tamerlane Publishing Corp.. (Rodman, Rachael) (Entered: 11/30/2023) |
| 11/30/2023 |  | If this case is referred, it will be to Magistrate Judge Karen L. Litkovitz. (bjc) (Entered: 11/30/2023) |
| 11/30/2023 | 3 | Summons Issued as to Little River Bar and Grill, LLC, Dale Lusby, Tonya Lusby, Crystal Stewart. (bjc) (Entered: 11/30/2023) |
| 12/28/2023 | 5 | NOTICE of Appearance by Dustin Ryan Hurley for Defendants Little River Bar and Grill, LLC, Dale Lusby, Tonya Lusby, Crystal Stewart (Hurley, Dustin) (Entered: 12/28/2023) |
| 12/28/2023 | 6 | ANSWER to 1 Complaint,,,,, filed by All Defendants. (Hurley, Dustin) (Entered: 12/28/2023) |

| 01/30/2024 | 7 | RULE 26(f) REPORT by Plaintiffs All Clear Music LLC, Bro 'n Sis Music, Inc., Broadcast Music, Inc., Carnival Music Company, Coburn Music Inc, Counting Crows, LLC, EMI Blackwood Music Inc., Fame Publishing Company LLC, House of Bryant Publications, LLC, Indiana Angel Music, Kobalt Music Publishing America Inc., Nashville Star Music, Reservoir Media Management Inc., Sony/ATV Songs LLC, Southeastern Publishing LLC, Tremonti Stapp Music, Warner-Tamerlane Publishing Corp.. (Rodman, Rachael) (Entered: 01/30/2024) |
| --- | --- | --- |
| 02/22/2024 | | Minute Entry for proceedings held before Judge Matthew W. McFarland: Preliminary Pretrial Conference held on 02/22/2024. Counsel for Plaintiffs and Defendants were present by phone. The Court discussed this matter with counsel and will file a calendar order by separate docket entry. (kaf) (Entered: 02/22/2024) |
| 02/22/2024 | 8 | CALENDAR ORDER: Initial Disclosures due by 2/15/2024. Motions to amend pleadings/add parties due by 2/29/2024. Motions related to pleadings due by 2/29/2024. Settlement Demand due by 2/29/2024. Response to Settlement Demand due by 3/15/2024. Non-Expert (Fact) Witnesses due by 7/19/2024. Discovery due by 8/30/2024. Dispositive motions due by 9/30/2024.<br>Signed by Judge Matthew W. McFarland on 02/22/2024. (kaf) (Entered: 02/22/2024) |
| 10/02/2024 | 9 | NOTICE of Settlement by Plaintiffs All Clear Music LLC, Bro 'n Sis Music, Inc., Broadcast Music, Inc., Carnival Music Company, Coburn Music Inc, Counting Crows, LLC, EMI Blackwood Music Inc., Fame Publishing Company LLC, House of Bryant Publications, LLC, Indiana Angel Music, Kobalt Music Publishing America Inc., Nashville Star Music, Reservoir Media Management Inc., Sony/ATV Songs LLC, Southeastern Publishing LLC, Tremonti Stapp Music, Warner-Tamerlane Publishing Corp. (Rodman, Rachael) (Entered: 10/02/2024) |
| 10/08/2024 | 10 | CONDITIONAL ORDER OF DISMISSAL.<br>Signed by Judge Matthew W. McFarland on 10/08/2024. (kaf) (Entered: 10/08/2024) |

# EXHIBIT 39

**Query    Reports    Utilities    Help    Log Out**

Cat11,Henderson,Termed

# U.S. District Court
## NORTHERN DISTRICT OF OHIO (Akron)
## CIVIL DOCKET FOR CASE #: 5:23-cv-01889-SL

Broadcast Music, Inc. et al. v. Whiskey Stop Bar and Grill, Inc. et al.
Assigned to: Chief District Judge Sara Lioi
Cause: 17:101 Copyright Infringement

Date Filed: 09/28/2023
Date Terminated: 03/05/2024
Jury Demand: None
Nature of Suit: 820 Copyright
Jurisdiction: Federal Question

**Plaintiff**

**Broadcast Music, Inc.**    represented by    **Rachael L. Rodman**
Thompson Hine - Columbus
Ste. 1700
41 South High Street
Columbus, OH 43215
614-469-3225
Fax: 614-469-3361
Email: rachael.rodman@thompsonhine.com
*ATTORNEY TO BE NOTICED*

**Robert E. Chudakoff**
UB Greensfelder
Ste. 1100
1660 West 2nd Street
Cleveland, OH 44113
216-583-7126
Fax: 216-583-7127
Email: rchudakoff@ubglaw.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Sony/ATV Tree Publishing**    represented by    **Rachael L. Rodman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert E. Chudakoff**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Beechwood Music Corporation**    represented by    **Rachael L. Rodman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert E. Chudakoff**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Benefit Music**        represented by **Rachael L. Rodman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert E. Chudakoff**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Sony/ATV Melody**        represented by **Rachael L. Rodman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert E. Chudakoff**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Unichappell Music, Inc.**        represented by **Rachael L. Rodman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert E. Chudakoff**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**John Farrar Music**        represented by **Rachael L. Rodman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert E. Chudakoff**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Muscle Shoals Sound Publishing Co.**        represented by **Rachael L. Rodman**
*a division of Northside Partners*        (See above for address)
*ATTORNEY TO BE NOTICED*

**Robert E. Chudakoff**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Peermusic III Ltd.**        represented by **Rachael L. Rodman**
(See above for address)
*ATTORNEY TO BE NOTICED*

Robert E. Chudakoff
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Painted Desert Music Corporation**        represented by    **Rachael L. Rodman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert E. Chudakoff**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Whiskey Stop Bar and Grill, Inc.**        represented by    **Whiskey Stop Bar and Grill, Inc.**
*doing business as*                                            6509 Columbus Rd. NE
Whiskey Stop Bar & Grill                                      Louisville, OH 44641
PRO SE

**Defendant**

**Scott Kelly**                                 represented by    **Scott Kelly**
6509 Columbus RD., NE
Louisville, OH 44641
PRO SE

**Defendant**

**Kathryn Kelly**                               represented by    **Kathryn Kelly**
*TERMINATED: 12/05/2023*                                         11460 Walnut Ave., NW
Alliance, OH 44601
PRO SE

| Date Filed | # | Docket Text |
|---|---|---|
| 09/28/2023 | 1 | **Complaint** against Kathryn Kelly, Scott Kelly, Whiskey Stop Bar and Grill, Inc. Filing fee paid $ 402, Receipt number AOHNDC-12202625. Filed by Beechwood Music Corporation, Benefit Music, Painted Desert Music Corporation, John Farrar Music, Sony/ATV Tree Publishing, Broadcast Music, Inc., Peermusic III Ltd., Unichappell Music, Inc., Muscle Shoals Sound Publishing Co., Sony/ATV Melody. (Attachments: # 1 Exhibit 1 - Song Schedule, # 2 Civil Cover Sheet, # 3 Summons - Whiskey Stop Bar and Grill, Inc via statutory agent, # 4 Summons - Whiskey Stop Bar and Grill, Inc via officers at business, # 5 Summons - Whiskey Stop Bar and Grill, Inc via officers at residence, # 6 Summons - Scott Kelly at business, # 7 Summons - Scott Kelly at residence, # 8 Summons - Kathryn Kelly at business, # 9 Summons - Kathryn Kelly at residence). (Chudakoff, Robert) (Entered: 09/28/2023) |
| 09/28/2023 | 2 | Report on the Filing of an Action Regarding a Copyright (AO121) filed by All Plaintiffs. (Chudakoff, Robert) (Entered: 09/28/2023) |
| 09/28/2023 | 3 | Corporate Disclosure Statement filed by All Plaintiffs. (Chudakoff, Robert) (Entered: 09/28/2023) |

| | | |
|---|---|---|
| 09/28/2023 | | Judge Sara Lioi assigned to case. (E,CK) (Entered: 09/28/2023) |
| 09/28/2023 | | Random Assignment of Magistrate Judge pursuant to Local Rule 3.1. In the event of a referral, case will be assigned to Magistrate Judge Carmen E. Henderson. (E,CK) (Entered: 09/28/2023) |
| 09/28/2023 | 4 | Original Summons and Magistrate Consent Form issued to counsel for service upon Whiskey Stop Bar and Grill, Inc. c/o Scott Kelly, Statutory Agent; Whiskey Stop Bar and Grill, Inc. c/o Scott Kelly or Kathryn Kelly at 6509 Columbus Rd. NE, Louisville, OH 44641; Whiskey Stop Bar and Grill, Inc. c/o Scott Kelly or Kathryn Kelly, Officers at 11460 Walnut Ave. NW, Alliance, OH 44601; Scott Kelly at 6509 Columbus Rd. NE, Louisville, OH 44641; Scott Kelly 11460 Walnut Ave. NW, Alliance, OH 44601; Kathryn Kelly at 6509 Columbus Rd. NE, Louisville, OH 44641; and Kathryn Kelly at 11460 Walnut Ave. NW, Alliance, OH 44601. (Attachments: # 1 Magistrate Consent Form) (E,CK) (Entered: 09/28/2023) |
| 09/28/2023 | 5 | Initial Standing Order. Judge Sara Lioi on 9/28/2023. (Attachments: # 1 Appendix A - Witness List, # 2 Appendix B - Exhibit List) (E,CK) (Entered: 09/28/2023) |
| 10/16/2023 | 6 | Return of Service by personal service executed upon Whiskey Stop Bar and Grill, Inc. on 10/11/2023, filed on behalf of All Plaintiffs Related document(s) 1 , 4 . (Chudakoff, Robert) (Entered: 10/16/2023) |
| 10/16/2023 | 7 | Return of Service by personal service executed upon Scott Kelly on 10/11/2023, filed on behalf of All Plaintiffs Related document(s) 1 , 4 . (Chudakoff, Robert) (Entered: 10/16/2023) |
| 10/16/2023 | 8 | Return of Service by personal service executed upon Kathryn Kelly on 10/11/2023, filed on behalf of All Plaintiffs Related document(s) 1 , 4 . (Chudakoff, Robert) (Entered: 10/16/2023) |
| 11/09/2023 | 9 | Application to Clerk for entry of default against Whiskey Stop Bar and Grill, Inc. d/b/a Whiskey Stop Bar & Grill, Scott Kelly, and Kathryn Kelly filed by All Plaintiffs. (Attachments: # 1 Exhibit 1 - Declaration of Robert E. Chudakoff, # 2 Exhibit 2 - Proofs of Service (Dkts. 6-8))(Chudakoff, Robert) (Entered: 11/09/2023) |
| 11/13/2023 | 10 | Default Entered on 11/13/2023 against Whiskey Stop Bar and Grill, Inc. d/b/a Whiskey Stop Bar & Grill, Scott Kelly, and Kathryn Kelly. Sandy Opacich, Clerk by Alex Vahlsing, Deputy Clerk. (V,A) (Entered: 11/13/2023) |
| 11/13/2023 | | Copy of 10 Default Entered mailed to Whiskey Stop Bar and Grill, Inc., Kathryn Kelly, and Scott Kelly at 6509 Columbus Rd. NE Louisville, OH 44641; and 11460 Walnut Ave., NW Alliance, OH 44601 on 11/13/2023. (V,A) (Entered: 11/13/2023) |
| 11/30/2023 | 11 | Notice of Dismissal Under FRCP 41(a)(1) *as to Defendant Kathryn Kelly, Without Prejudice* filed by All Plaintiffs. (Rodman, Rachael) (Entered: 11/30/2023) |
| 12/05/2023 | 12 | **Order.** The Court construes Doc. No. 11 as a motion pursuant to Fed. R. Civ. P. 21 to dismiss defendant Kathryn Kelly without prejudice and the same is GRANTED. Judge Sara Lioi on 12/5/2023. (V,A) (Entered: 12/05/2023) |
| 01/12/2024 | 13 | **Motion** for default judgment *against Defendants Whiskey Stop Bar And Grill, Inc. and Scott Kelly* filed by Beechwood Music Corporation, Benefit Music, Broadcast Music, Inc., John Farrar Music, Muscle Shoals Sound Publishing Co., Painted Desert Music Corporation, Peermusic III Ltd., Sony/ATV Melody, Sony/ATV Tree Publishing, Unichappell Music, Inc.. Related document(s) 10 . (Attachments: # 1 Brief in Support, # 2 Exhibit 1 - Declaration of Anthony Adewumi, # 3 Exhibit 2 - Declaration of John Flynn, # |

|  |  | 4 Exhibit 3 - Declaration of Robert E. Chudakoff, # 5 Proposed Order of Judgment) (Chudakoff, Robert) (Entered: 01/12/2024) |
|---|---|---|
| 03/05/2024 | 14 | **Memorandum Opinion and Order** granting plaintiffs' 13 motion for default judgment. The defendants are permanently enjoined from further acts of infringement of the copyrighted musical compositions licensed by the plaintiff. The plaintiffs are jointly AWARDED damages in the amount of $17,728.80, plus attorney's fees and costs in the amount of $5,210.75, for an aggregate damage award of $22,939.55, plus interest from the date of judgment. This case is closed. <span style="color:red">Attorneys are cautioned not to rely on the docket entry only. Read the attached Order for additional information and requirements.</span> Judge Sara Lioi on 3/5/2024. (V,A) (Entered: 03/05/2024) |
| 03/05/2024 | 15 | **Judgment Entry.** For the reasons set forth in the contemporaneously filed memorandum opinion and order, default judgment is GRANTED in favor of plaintiffs, Broadcast Music, Inc., Sony/ATV Tree Publishing, Beechwood Music Corporation, Benefit Music, Sony/ATV Melody, Unichappell Music, Inc., John Farrar Music, Muscle Shoals Sound Publishing Co., a division of Northside Partners, Peermusic III Ltd., and Painted Desert Music Corporation, and against defendants, Whiskey Stop Bar and Grill, Inc. d/b/a Whiskey Stop Bar and Grill, and Scott Kelly, in the aggregate amount of $22,939.55, plus statutory interest from the date of the judgment, against defendants Whiskey Stop Bar and Grill, Inc. d/b/a Whiskey Stop Bar & Grill and Scott Kelly, on a joint and several basis. Further, defendants Whiskey Stop Bar and Grill, Inc. d/b/a Whiskey Stop Bar & Grill and Scott Kelly are permanently enjoined from further acts of infringement. This case is closed. Judge Sara Lioi on 3/5/2024. (V,A) (Entered: 03/05/2024) |
| 03/05/2024 |  | Copy of 14 Memorandum Opinion and Order and 15 Judgment Entry mailed to Whiskey Stop Bar and Grill, Inc. and Scott Kelly at 6509 Columbus Rd. NE Louisville, OH 44641 on 3/5/2024. (V,A) (Entered: 03/05/2024) |
| 03/25/2024 | 16 | Report on the Determination [Closing] of an Action Regarding a Copyright (AO121). (Attachments: # 1 Memorandum Opinion and Order, # 2 Judgment) (M,CE) (Entered: 03/25/2024) |