AMERICAN ARBITRATION ASSOCIATION

Consumer Arbitration Rules

---

Case Number: 01-23-0005-3352

Lance Vicente, Claimant,

-vs-

Valve Corporation d/b/a Steam, Respondent.

---

**AWARD OF ARBITRATOR**

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties, and a hearing having been held on July 21, 22, 23, 24, 28, 29, 30 and 31, 2025 in Princeton, New Jersey, with certain witnesses appearing via video conference, and having heard the testimony of the fact and expert witnesses presented by the parties at that time, and having considered the documentary evidence offered by Claimant and by Respondent, and having considered the pleadings and the arguments of counsel, including the post-hearing briefing filed by both parties on August 26, 2025, and, further, having considered Claimants' Affidavit of Services and other supporting documentation filed on September 10, 2025; and Claimant having been represented at the time of the hearing by William Bucher, Esq. of Bucher Law PLLC and multiple affiliated attorneys, and Respondent having been represented at the time of the hearing by Priyanka Timblo, Esq. of Howell Shuster & Goldberg LLP, and multiple other attorneys from her firm, along with multiple affiliated attorneys; hereby **FIND and issue this FINAL AWARD** as follows:

I. **Introduction; Claims Asserted and Pursued at the Hearing**.

   A. Claimant is an individual, residing in the State of New Jersey, who has played games on the PC gaming platform, "Steam," provided by Respondent Valve Corporation, from at least 2005.

   B. Claimant has asserted antitrust claims under the Sherman Act, 15 U.S.C §§ 1 and 2, and claims of violation of the Washington Consumer Protection Act, RCW 19.86 et seq. More particularly, Claimant seeks damages (1) under 15 U.S.C § 1 for alleged price fixing by Respondent;[1]

---

[1] Although asked to submit Issues of Fact and Law to be decided by the Arbitrator both as part of the Pre-hearing Submissions (filed two weeks before the hearing commenced in July 2025), and, again, with certain preliminary post-hearing submissions filed at the end of the first week of August, at the same time that the parties submitted their agreed list of Exhibits admitted during the hearings, it appears that Claimant argues for the first time in his post-hearing brief, submitted on August 26, that the "post and hold" requirements Respondent imposes on game developers/distributors constitute a *per se* violation of 15 U.S.C. § 1. Since Respondent had no opportunity to respond to this apparently new legal theory of liability, I have not considered it in rendering this Award.

    (2) alternatively, under 15 U.S.C § 1, for Respondent's conduct which Claimant asserts imposes an unreasonable restraint of trade on a relevant geographic and product market under the "rule of reason; (3) under 15 U.S.C § 2 for monopolization of a relevant geographic and product market; and (4) under RCW 19.86 for alleged "anti-steering" restrictions, which Claimant alleges also violated 15 U.S.C § 1.

II. **Procedural History.** This matter is one of 24 arbitrations that were assigned to this arbitrator. The matters were not and are not consolidated. However, because the parties recognized the many issues of fact and law common to all 24 matters, these matters have been dealt with jointly in the pre-hearing process for purposes of efficiency only. The parties then agreed to identify two matters to be tried first in in-person proceedings, and, while not formally agreeing to consolidate the two matters tried first, did agree to cross-admit all testimony and documents admitted in those proceedings, except for each Claimant's Direct testimony.

    A.    Claimant filed his demand for arbitration on October 2, 2023. The undersigned was duly confirmed as the arbitrator for this matter in March 2024.

    B.    The parties participated in a preliminary hearing on June 5, 2024, but advised at the time of the preliminary hearing that they had not come to the preliminary hearing with a plan for the exchange of information related to the claims. Thus, the preliminary hearing only yielded an order directing the parties to "confer regarding the nature, scope and timing of information exchange" and to "report . . . regarding the proposed schedule for information exchange on or before . . . July 15, 2024." It also set a briefing schedule for the Respondent's anticipated motion to dismiss.

    C.    On July 15, 2024, the parties reported that they could not agree upon a plan for the exchange of information, but instead provided a schedule for the parties to address their competing positions regarding the nature and scope of information exchange, in advance of a further conference scheduled for August 21, 2024.

    D.    In the interim, on August 12, 2024, the Arbitrator denied Respondent's motion to dismiss.

    E.    At the August 21, 2024 conference, after argument, the Arbitrator indicated that the information exchange would be phased, starting with Respondent's prompt production of the information Respondent indicated it was prepared to provide. The Order contemplated that this initial production would occur no later than September 20, 2024.

    F.    In the interim, by letter dated August 27, 2024, Respondent sought to stay all proceedings in all 24 matters. That motion was denied by Order dated September 7, 2024.

    G.    Respondent nevertheless did not produce information by September 20 – or at any time in September 2024. Starting with correspondence dated September 27, 2024 directed to the AAA, and initially forwarded to this Arbitrator by the AAA on September 30, 2024, and later forwarded with Claimant's response on October 8, 2024, Respondent again sought to remove these matters from arbitration, arguing this time that Respondent's modifications to the Valve on-line Subscriber agreement, made by Valve well after the commencement of these arbitration matters, had divested the AAA and this Arbitrator of jurisdiction over these pending arbitrations. After receiving briefing from the parties, and hearing argument on this application on October 25, 2024, Respondent's motion was denied by Order entered on October 27, 2024.

H.   Given Respondent's indication during the October 25, 2024 hearing on Respondent's motion to dismiss on jurisdictional grounds that Respondent would not voluntarily participate in information exchange (because of its continuing objections to the Arbitrator's exercise of jurisdiction), on October 27, 2024, the Arbitrator also entered an Order setting a briefing schedule for an anticipated motion to compel to be filed by Claimants.

I.   In response to the entry of the October 27th Order, however, on October 30, 2024, Respondent advised that, "Valve is prepared to produce the requested documents subject to clarification and resolution of several issues related to the protective order[.]"  Accordingly, the next day the Arbitrator advised the parties, "I am treating the below . . . as a Motion on behalf of Respondent to Modify the Protective Order," and set a deadline for receipt of Claimants' briefing in response to that motion.

J.   After receipt and consideration of the parties' arguments, on November 9, 2024, the Arbitrator entered an Order Amending Protective Order and Setting Deadline for Production of Information.  In addition, the Order set November 22, 2024 as the deadline for the production of responsive information, in the absence of a showing of good cause.

K.   On November 14, 2024, Claimants requested that Respondent be required to make its production by November 19. Respondent disagreed, stating that it would be prepared make its production as ordered by November 22. The Arbitrator confirmed the requirement that production be completed by November 22, 2024.

L.   On November 23, 2024, the Arbitrator scheduled a follow-up hearing for December 2, 2024 "to address any remaining information exchange issues and to discuss the format and scheduling of hearing[.]" During the December 2 conference it emerged that both Claimants and Respondent believed that the information exchange was incomplete and, that both parties required further information exchange.  Consequently, on December 2, 2024, the Arbitrator set a schedule for further and final information requests and response, with the parties' production of responsive information to conclude by January 10, 2025, assuming the parties could work out objections to one another's requests.

M.   In the interim, by letter dated December 12, 2024, Respondent sought a ruling from the Arbitrator requiring the Claimants to appear in person, rather than through counsel, for all status or other conferences in the matters.  This Arbitrator denied Respondent's application, noting that "Respondent has provided no factual basis for its application, nor has it pointed to a basis for this application in the Consumer Rules."

N.   In addition, the Arbitrator scheduled a conference for January 14, 2025, immediately following the date by which information exchange might be concluded under Scheduling Order No. 4, in the absence of further objections and disputes regarding information exchange.

O.   At the January 14, 2025 conference, the parties reported that the information exchange was not complete but, rather, they had proceeded no further than the exchange of additional requests and objections, and had not made any productions beyond the initial production – which was already subject to contest – made by Respondent on November 22, 2024.  Accordingly, the Arbitrator set a schedule for briefing of the parties' objections.

P.   The parties thereafter filed cross-motions to compel production of documents and information in response to various requests on January 28, 2025, and responses to the motions on February 4, 2025, and this Arbitrator thereafter entered a lengthy ruling on February 17, 2025, requiring

    Respondent to produce certain information by February 24, 2025 and other information by March 9, 2025.  In addition, the February 17th Order set forth a schedule for the exchange of expert information and established certain pre-hearing submission requirements.

Q. In addition, in response to the parties' inability to agree on the format of hearings, the parties submitted briefing and argument regarding the proper form of hearings, resulting in an Order dated March 2, 2025 establishing the dates for the hearing of this matter (and a second matter to be the first tried) and setting this particular hearing as an in-person hearing, with certain witnesses permitted to testify via video conference.

R. In April 2025, Respondent raised issues of Claimant having failed to adhere to the expert information exchange deadlines set forth in the February Order and therefore required further exchange of positions and the establishment of a new order regarding the timing of expert information exchange.

S. As noted above, this matter was heard, in person, with some witnesses appearing via video conference, over eight days of live testimony on July 21-24 and July 28-31.  The parties submitted contested lists of exhibits admitted at the hearing on August 8, 2025, and the Arbitrator entered an Order dated August 9, 2025, confirming the admission into evidence of all exhibits which either party in its August 8 submission contended had been admitted.  The August 9th Order further advised parties that the post-hearing briefs, which were to be filed on or before August 26, 2025, "should address **all issues including entitlement to attorneys' fees**."

T. The parties thereafter duly submitted post-hearing briefs on August 26, 2025, and Claimant timely submitted an Application for Attorneys' Fees (and Costs) with all the supporting documents required by the August 9, 2025 Order.

III. *Per Se* **Claim of Price Fixing under Section 1 of the Sherman Act**.  I find that Claimant did not prove by a preponderance of the evidence that Respondent entered into price fixing agreements with game developers/publishers in violation of 15 U.S.C § 1.

IV. **Relevant Product and Geographic Market**.  The parties agree that, for the most part, the threshold consideration for the remainder of Claimant's claims is the identification of the relevant product and geographic markets in which the alleged restraint(s) or the alleged monopolization has occurred.

    A. Claimant and Respondent provided nearly three days' of expert testimony from economists, Dr. Philip Cross, on behalf of Claimant, and Dr. Justin McCrary, on behalf of Respondent, on these issues of market definition, and the impact, if any, of the restraints alleged, and proved, by Claimant on competition.

    B. Having reviewed and considered the product market definition evidence provided, I conclude and find that Claimant proved by a preponderance of the evidence, based on the demonstrated cross-elasticity of demand:

        1. That the relevant product market consists of the market for the online distribution of PC games;

        2. That the relevant product market does not include (a) sellers who exclusively distribute "keys" for online games or (b) game designers who self-distribute their games and do not distribute any third-party games;

SL1 3803154v3 110631.00041

    3. That the relevant product market does not include games developed and played on consoles or on mobile devices; and

    4. That the relevant product market could include games distributed through brick-and-mortar sales, but that that channel of distribution is miniscule and diminishing, and therefore is not significant enough to be considered.

  C. Further, I find that Claimant proved by a preponderance of the evidence, that the relevant geographic market is limited to the United States.

    1. Respondent argued that, to the contrary, the geographic market for the claims at issue here should be global, like the market for game developers who distribute their games on Respondent's platform. The evidence shows, however, that the player/purchaser side of the platform provided by Respondent is subject to different constraints than the developer/publisher side, including that players cannot readily switch between various country-specific storefronts and that credit card transactions "out of country" may violate the cards' terms of service. As such, as noted above, I conclude that the geographic market should be limited to the United States.

## V. Respondent's Market Power.

  A. I find that Claimant proved by a preponderance of the evidence that Respondent's market share in the relevant product market is at least 70% and is more likely in excess of 80%.

    1. In reaching this conclusion, I found Dr. Cross's testimony to be credible and persuasive. I similarly found the admitted portion of the Corrected Class Certification Expert Report of Dr. Steven Schwartz in In re Valve Antitrust Litigation, dated March 21, 2024, to be persuasive. Dr. Schwartz concluded that Steam's market share as of the date of his report was between 86.6 and 92.7%.

    2. I also found the 2013 internal Valve email correspondence estimating Steam's market share to be 70% to be persuasive and supportive of Dr. Cross's and Dr. Schwartz's conclusion (Exhibit VALVE_ANT_C0192577), as well as of my finding.

  B. I found Judge Gonzalez's decision in *Epic Games, Inc. v. Apple, Inc.,* 559 F.Supp.3d 898, 975-76 (N.D. Calif. 2021), *aff'd in part, rev'd in part,* 67 F.4th 946 (9th Cir. 2023)*,* to be interesting, but not persuasive because, at best, the mention of Valve's market share at 70-85% in that decision was not relevant to the particular question in dispute in the *Epic* litigation, and, in any event, that statement was based solely on the opinion of officers of Epic Games, one of Respondent's competitor's. I note, however, that Epic's estimate of Steam's market share, as of 2018 when Epic entered the gaming platform market, as set forth in the *Epic* Court's decision, is *entirely* consistent with the above finding of Valve's market share.

## VI. Unreasonable Restraint of Trade under Section 1 of the Sherman Act, as determined by the Rule of Reason

  A. Claimant provided both direct and indirect evidence that Respondent's various restraints challenged by Claimant caused detrimental effects on competition "such as reduced output, increased prices, or decreased quality in the relevant market." *PLS.Com, LLC v. National Association of Realtors*, 32 F.4th 824, 835 (9th Cir. 2022)(quotes omitted). When using indirect proof that restraints have harmed competition, a Claimant must show both that Respondent has

market power and "'some evidence that the challenged restraint harms competition.'" *Ohio v. American Express Co.*, 585 U.S. 529, 542 (2018). "Pursuant to this indirect-evidence route, '[t]he existence of market power is a significant finding that casts an anticompetitive shadow over a party's practices in a rule-of-reason case.'" *Hahn v. Oregon Physicians' Service*, 868 F.2d 1022, 1026 (9th Cir. 1988).  As the Ninth Circuit observed in its ruling in *Epic Games, Inc. v. Apple, Inc.,* 67 F.4th 946, 983 (9th Cir. 2023), "[t]his inquiry need not always be extensive or highly technical. It is sufficient that the plaintiff prove the defendant's conduct, as matter of economic theory, harms competition[.]"

1. Claimant's *direct* evidence of competitive harm was provided in the form of its proof, by a preponderance of the evidence, that Respondent exercises its market power to extract a supra-competitive fee from game developers, keeping the price of games high and leading game prices in fact to increase more than the rate of inflation.

    (a) Claimant's expert, Dr. Philip Cross, testified that Respondent's pricing practices "kept the price of PC games elevated above the competitive price." Testimony of Dr. Philip Cross, July 28, 2025, at 1285. Dr. Cross provided data showing that the average price of new games on Steam between 2018 and 2023 increased 36% or 6% a year, during a period when the inflation rate was only 4% per year. *Id*. at 1286-87.

    (b) To support its 30% fee to game developers, Respondent provided the testimony of Erik Peterson which included substantial qualitative evidence regarding the nature and type of expenses involved in creating, maintaining and improving the Steam platform, but Respondent did not provide any quantitative evidence to support the need for, basis for or use of its 30% fee.

    (c) Pointing to testimony from Epic's leadership at the time of the trial in the *Epic v. Apple* matter, Respondent has argued that Dr. Cross's analysis which concluded that Respondent's 30% fee is a supra-competitive revenue share, is "entirely unreliable." Respondent's Post-Hearing Brief at 37. Respondent argues that, on cross-examination, counsel had pointed out to Dr. Cross that, in *Epic v. Apple,* 559 F. Supp. 3d 898, *supra,* the District Court stated that Epic's 12% revenue share was "below cost." In response, Dr. Cross acknowledged that the cost structure of digital distribution stores like Epic and Steam were similar. Accordingly, Respondent argues, if 12% is below actual cost for Epic, it must be below cost for Steam. And certainly, if 12% is below cost for Steam, 10.65% – the "but-for" fee calculated by Dr. Cross for Respondent, as set forth below in Section IX of this Award – certainly is below cost as well.

        (i) Context however matters a great deal with this "analysis." As it turns out, the *Epic* Court later observed that the "fact" that Epic may not make a profit at a 12% fee on its gaming platform was as much the result of a *strategic* decision made by Epic regarding the nature, timing and extent of *marketing* expenses, as a result of anything having to do with the costs inherent in operating an on-line gaming platform. As the *Epic* Court observed:

            > By charging 12% commission, the Epic Games Store will not be profitable for at least several years. Current estimates indicate negative overall earnings in the hundreds of millions of dollars through at least 2027. *The anticipated loss is driven by hundreds of millions of minimum guarantees that Epic Games made to*

>> *developers to entice them to distribute exclusively through Epic Games Store.* In short, the Epic Games Store has front-loaded its marketing and user-acquisition costs to gain market share. Whether this gambit will ultimately work remains to be seen; Epic Games is currently outperforming its projected business plan by "about 15 percent," and its first-party and third-party businesses are up 113% and 100%, respectively. While Epic Games now says it expects the Epic Games Store to become profitable by 2023, the store's projected revenue from prior years has proven overly optimistic.
>
> *Epic v. Apple,* 559 F.Supp. 3d *supra* at 933-34 (emphasis added; footnotes omitted).

2.  With regard to *indirect* evidence, Claimant has shown by a preponderance of the evidence **both** that Respondent has market power, as set forth above in Section V, and as set forth below, that the restraints challenged by Claimant harm competition, as follows:

    (a)  While game developers are mostly free initially to set the price at which their games will be sold on the Steam platform (subject to the restrictions set forth in section (b) below), I find that Respondent imposes multiple different types of limitation on developers' ability to *change* their prices on Steam, requiring developers to hold their posted prices for various periods of time under various circumstances. These limitations, in fact, amount to "post and hold" requirements, which have been found to constitute a *per se* violation of § 1 of the Sherman Act under antitrust jurisprudence in the 9th Circuit. *See Costco Wholesale Corp. v. Maleng*, 522 F.3d 874 (9th Cir. 2008).

    (b)  I also find that Respondent has a practice and, with at least some developers, a contract, imposing a requirement that effectively prevents game developers from selling their games at different prices on different platforms (the so-called "price parity" requirement) and that Respondent actively enforces that requirement when there are disparities between a game price on Steam and the price for the game posted on a different platform. Dr. Cross testified, and showed in his analysis of ITAD data, that the effect of this practice and/or contractual requirement, was that the price for a game would be the same on any given day nearly 95% of the time on most platforms, thus showing that this practice prevents price competition on different platforms offering PC game for sale.

    (c)  I further find that Respondent had a practice and, with many developers a contract, imposing a requirement that effectively prevented publishers from selling different versions of their games on different platforms (the so-called "content parity" requirement) and that Respondent actively enforced that requirement.

    (d)  Finally, I find that Respondent prevents developers from communicating directly with player/purchasers about the game or other offerings from the developer from within games played on the Steam platform and requires all in-game purchases to be made through the Steam Store, ensuring that all in-game purchases yield fee income to Respondent.

B.  Given that Claimant has met its burden of proving that Respondent's various challenged restraints caused harm to competition, the burden shifts to Respondent to demonstrate that its

challenged restraints actually have pro-competitive effects that outweigh the harm caused to competition. While Respondent offered non-pre-textual rationales for each of the policies which, as set forth above, were found to harm competition, Respondent failed to meet its burden of demonstrating that the challenged restraints in fact *benefitted* competition, or at least, on balance, that they collectively do more good than damage to competition.

    (a)    First, Respondent *did* prove by a preponderance of the evidence that its requirement preventing developers from permitting players to make purchases directly from within games played on the Steam platform on platforms other than Steam and, rather, to require all in-game purchases to be made through the Steam Store, yielding fee income to Respondent prevents "free-riding" and thereby promotes competition by providing the revenue necessary to support the creation and maintenance of the fee receiving and processing portion of the Steam platform.

    (b)    With regard to the remainder of Respondent's restraints, however, the evidence failed to establish that the restraints in fact benefit competition and, rather, I find that on balance the remainder of these restraints harm competition.

        (i)    With regard to both its price parity requirements (which Respondent denies exist) and its content parity requirements, which Respondent acknowledges, Respondent again argues that these requirements somehow prevent "free riding" asserting that Respondent has the cost of providing a quality service which provides players with a premium experience which, without the price and content parity requirements, purchasers could utilize to identify games, only to purchase such games from less expensive stores. While this argument is qualitatively appealing, Respondent neither provided quantitative data showing the nature and extent of the costs of the "premium quality service" provided by Steam nor did Respondent provide any evidence that connected the restraints to their alleged pro-competitive purpose of preventing alleged "free-riding." Respondent failed to meet its burden on this issue.

        (ii)    Respondent similarly failed to meet its burden of demonstrating through evidence the pro-competitive effect of its multiple different types of limitation on developers' ability to change their prices on Steam. As noted above, there is case law supporting a finding that these restrictions constitute a *per se* violation of § 1 of the Sherman Act, requiring more than a bland defense of the requirements as protecting against "bait and switch" tactics in terms of game developer pricing.

**VII. Monopolization under Section 2 of the Sherman Act**

A.    As set forth above in Section IV, Claimant proved by a preponderance of the evidence that Respondent's share of the market for on-line distribution of PC games exceeds 70%, and therefore is quite substantial and that Claimant may have monopoly power. However, Claimant did not prove by a preponderance of the evidence that, among other things, Respondent in fact has monopoly power, in that Claimant did not prove that Respondent has the power to exclude competition within the relevant market.

SL1 3803154v3 110631.00041

VIII. **Claim of Violation of the Washington Consumer Protection Act**

  A. Claimant asserts that Respondent's restrictions on in-application communications and purchases – what Claimant has called Respondent's "anti-steering provisions" – violate the Washington Consumer Protection Act, RCW 19.86 (the "Washington CPL"). In support of this claim, however, Claimant relies *solely* on *Epic v. Apple,* 559 F.Supp.3d *supra,* in which the court applied California's consumer protection law to Epic's anti-steering claim against Apple. At no point has Claimant provided this tribunal with any authority under the Washington CPL. As such, I decline to make any finding of violation of this statute.

IX. **Compensation Awarded in Connection with Vicente's Claim**

  A. Given the findings of Section VI of this Award of violation of 15 U.S.C. § 1, Claimant has proved by a preponderance of the evidence that he is entitled to damages.

   1. Claimant's expert provided persuasive evidence regarding the calculation of plaintiff's damages, proving by a preponderance of the evidence that in a properly functioning competitive market, Respondent should have been charging developers a revenue share of 10.65% (the "but-for" fee), rather than the supra-competitive 30% fee which was in effect, resulting in higher game prices for purchasers like Claimant.

      (a) Beyond the calculation of the "but-for" fee percentage, the calculation of Claimant's damages is a simple arithmetic process of totaling Claimant's *eligible* purchases on Respondent's platform, calculating the fee assessed on those purchases – both the 30% fee and the "but-for" 10.65% fee – and making the difference between the two fee amounts the amount of Claimant's damages.

   2. Claimant's expert calculated damages based on all of Claimant's purchases on Respondent's Steam platform for the lifetime of Claimant's utilization of Steam. As Respondent has pointed out, however, the statute of limitations applicable to Claimant's claims here is four years. Therefore, Claimant's damages must be limited to purchases made from October 2019 (i.e., four years before Claimant's filing of this arbitration) to the present, then trebled in accordance with the provision of the Clayton Act, 15 U.S.C. § 15(a).

   3. Claimant is a long-standing user of Respondent's platform and, as set forth above, he has proved by a preponderance of the evidence that he has suffered an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes [Respondent's] acts unlawful."

   4. After reviewing Claimant's Valve Purchase History, Exhibit No. R-1229, I have calculated Claimant's damages as follows:

| | |
|---|---:|
| Claimant's Total Purchases 10-2019 to present: | $57.47 |
| 30% of Total Purchases | $17.24 |
| 10.65% of Total Purchases | $6.12 |
| Difference between 30% and 10.65% fee | $11.12 |
| Trebled | $33.36 |

SL1 3803154v3 110631.00041

5. Accordingly, Claimant has proved by a preponderance of the evidence that he is entitled to damages totaling **$33.36**.

6. The Clayton Act further permits an award of simple interest on actual damages, but I decline to award interest on the actual damages awarded here.

B. In addition, Claimant has proved by a preponderance of the evidence that he is entitled to attorneys' fees in accordance with the provisions of 15 U.S.C. § 15(a).

1. The Clayton Act, 15 U.S.C. § 15(a), requires the awarding of the "cost of suit, including a reasonable attorney's fee," in addition to the damages awarded pursuant to Paragraph IX.A above. Such attorneys' fees need not be limited to or by the size of the Claimant's damage award.

2. The starting point in assessing a request for attorneys' fees is determining the lodestar figure, which is calculated by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate. This lodestar provides a basis on which to make an initial estimate of the value of the legal services provided, from which hours that are not reasonably expended should be excluded because they are "excessive, redundant, or otherwise unnecessary." *Van Gerwen v. Guarantee Mut. Life Co.*, 214 F.3d 1041, 1045 (9th Cir. 2000). In this process, in reviewing a fee application, the finder of fact "has the authority to make across-the-board percentage cuts either in the number of hours claimed or in the final lodestar figure as a practical means of trimming the fat from a fee application." *Yuga Labs, Inc. v. Ripps*, 2024 WL 489248 at 1 (C.D. Cal. 2024).

3. The lodestar also depends on a finding of the reasonableness of the rates charged, which, in general, can be determined by consideration of the prevailing market rates in the relevant community. *Id*.

4. Here, Claimant's counsel has submitted an Affidavit of Services describing the role of each person providing services for whom Claimants seek an attorneys' fees award and his/her education and experience, accompanied by a detailed spreadsheet showing each timekeeper's time entries with the time devoted to the 24 matters assigned to this arbitrator, including the two matters heard in July 2025 and the specific services provided by each timekeeper on a day by day basis. The Claimant's lodestar fee request totals as follows:

| **SUMMARY** | | |
|---|---|---|
| **Biller:** | **Total Hours Sought** | **Requested Total Amount:** |
| Will Bucher | 343.18 | $332,884.60 |
| Frank Palermo | 414.00 | $264,960.00 |
| Erik Atzbach | 82.40 | $39,140.00 |
| Judson Crump | 120.05 | $63,026.25 |
| Zachary A. Horn | 18.78 | $12,019.20 |
| Tina Huang | 117.75 | $34,147.50 |
| Elliot Kovnick | 30.52 | $14,649.60 |

SL1 3803154v3 110631.00041

| SUMMARY | | |
|---|---|---|
| **Biller:** | **Total Hours Sought** | **Requested Total Amount:** |
| Thomas Matthew | 124.50 | $79,680.00 |
| Xinlin Morrow | 2.70 | $2,025.00 |
| Ellen Noteware | 194.48 | $213,928.00 |
| Isabel Skomro | 64.50 | $30,960.00 |
| Ariel Thatcher | 43.49 | $12,612.10 |
| Kent Williams | 102.00 | $116,790.00 |
| Sherry Yu | 182.30 | $113,937.50 |
| **Totals:** | 1843.65 | **$1,334,124.75** |

5. I have reviewed the Affidavit and the supporting spreadsheet and make the following findings regarding Claimant's attorney fee application:

(a) <u>Rates</u>: For the most part, I find that the rates charged by the attorneys for whom Claimant seeks an attorney's fee award are reasonable, especially in light of the prevailing market rates for attorneys handling complex commercial and antitrust matters like Claimant's matter, despite its venue in arbitration under the AAA Consumer Rules. However, I have determined to make the following adjustment to the billing rates sought by Claimant's counsel:

   (i) Claimant seeks to charge the services of law students Isabelle Skomro and Elliott Kovnick at $480/hour. The services as described in the detailed spreadsheet appear more to be paralegal services than junior associate services and therefore I have reduced the billing rate for Skomro's and Kovnick's services from $480/hour to the $290/hour charged for the paralegal-type services provided by Tina Huang.

   (ii) Claimant also seeks "attorney's fees" for services provided by legal assistant Ariel Thatcher. I have struck the fee amounts requested for Ms. Thatcher. No doubt her services have been invaluable, but such services are not and should not be separately billable; compensation for such services should be included within the hourly billing rate for the attorneys providing the services.

(b) <u>Total Hours</u>: For the most part, again, I find that the attorneys listed in Claimant's attorney fee application devoted a reasonable number of hours in managing, developing and pursuing the information exchange and otherwise prosecuting the 24 matters which have been managed collectively before me. As set forth above in Section II (and its sub-paragraphs) of this Award, these matters have been protracted, such that much of the work set forth in the detailed statements of services found in the spreadsheet was necessary either to prepare the two matters that were tried for their hearings or more generally to prepare the matters assigned to this Arbitrator generally, including the two matters that were tried first.

SL1 3803154v3 110631.00041

    (i)    Nevertheless, I find that the services provided between April 5 and April 23, 2025 were largely occasioned by Claimant's counsel's failure to pay attention to the Scheduling Order deadline regarding the identification of experts and, accordingly, I have struck from the attorney fee award all services provided by Claimant's counsel in that time period.

(c)   Adjusted Lodestar Calculation: Given the above, I have set forth below my adjusted lodestar calculation:

| | |
|---|---:|
| Total attorney fee sought by Claimant: | $1,334,124.75 |
| Less Ariel Thatcher Fee Request | ($12,612.10) |
| Less Rate Adjustment for Elliot Kovnick ($14,649.60-$8,850.80) | ($5,798.80) |
| Less Rate Adjustment for Isabel Skomro ($30,960.00-$18,705.00) | ($12,255.00) |
| Less Attorney's Fees incurred between April 5 and April 23, 2025 | ($12,019.00) |
| **Adjusted Lodestar:** | **$1,291,439.85** |

(d)   As adjusted, I find that the above lodestar is appropriate given the complexity and protracted nature of the two matters tried in July 2025. While much of the work included within the lodestar calculation is necessarily also applicable to the 22 matters which have not yet had a hearing, all of this work would have been required had the two matters which have been tried been the only matters that counsel pursued against Respondent. Accordingly, I find that the proper total lodestar fee amount for the two matters heard in July 2025, this matter and the second matter tried at the same time as this matter, is the adjusted lodestar of $1,291,439.85, one-half of which shall be awarded to Claimant in this matter, provided, however, that none of the services included in the fee application submitted in this matter, and in the second matter tried at the same time as this matter, may be submitted for compensation in any future related arbitration currently before this Arbitrator.

(e)   <u>Multiplier of Lodestar Amount</u>. Claimant also seeks a 1.5 multiplier of the lodestar here on grounds that the services provided in this matter were provided on a contingent fee basis, that counsel advanced all expenses, and that this litigation has been complex and unduly protracted. While I agree that all of these factors are present, I cannot agree that a multiplier is appropriate here. While Claimant has been awarded real damages, the amount of damages is dwarfed by the attorney's fees necessarily incurred in pursuit of those damages. Giving due consideration to the factor of proportionality between damages and attorney fees, I find that the vast disparity between the damages awarded and the attorney fees here require that that there be no increase of the attorneys' fees beyond the adjusted lodestar rates.

(f)   <u>Expenses of Litigation</u>. Finally, Claimant seeks reimbursement of the $125 AAA filing fee he has paid,[2] plus payment of the costs of litigation, which Claimant

---

[2] The Steam Subscriber Agreement, in effect at the time that Vicente paid the $125 filing fee in connection with this arbitration, provides at Section (11)(C) that, "If you seek $10,000 or less, Valve agrees to promptly reimburse your filing fee and your share if any of AAA's arbitration costs, including arbitrator compensation, unless the arbitrator determines your claims are frivolous or were filed for harassment."

detailed in a summary spreadsheet and supported with invoices. The costs sought (in addition to the AAA filing fee) are summarized as follows:

| | |
|---|---|
| Shipping & Office Supplies | $1,050.73 |
| Transportation & Lodging | $14,496.01 |
| Meals & Groceries | $2,423.08 |
| Consultation Services | $144,920.00 |
| Interest Expense | $2,313.47 |
| Total | $165,203.29 |

(i) I find that, for the most part, the above expenses are reasonable and were necessarily incurred in connection with the two separate matters which were heard in July 2025 and therefore are allocable one-half to each matter.

(ii) However, for the same reasons that I am not willing to award interest on the attorney fee lodestar amount, I do not believe that it is necessary or appropriate to award the interest sought by Claimant on the expenses of litigation. Accordingly, I find that the appropriate total amount to be awarded in connection with expenses of litigation incurred in connection with the two matters heard in July 2025 is $162,889.82 (i.e., $165,203.29-$2,313.47) that is, the amount sought less the interest sought, one-half of which shall be awarded to Claimant in this matter, provided, however, that none of the expenses included in the application for the costs of litigation submitted in connection with these two matters may be submitted for compensation in any future related arbitration currently before this Arbitrator. In addition, I find that Claimant is entitled to repayment of the $125 filing fee he paid in this matter.

C. Respondent's Objections to a Fee Award Are Untimely

1. The Order of August 9, 2025 directed the parties' post-hearing briefing to address "**all issues including entitlement to attorneys' fees.**" Further, the order directed that "[a]ny party who is seeking an award of attorneys' fees shall submit detailed affidavits of services . . . timekeeper . . . billing rate, the time devoted to the task, a description of the work performed and a general description of category of the task to which the timekeeper devoted his/her time for each time entry, with a summary certification or affidavit setting forth the specific amount of fees sought," and required that this information be filed **on or before Friday, September 5, 2025**.

2. Respondent did not object to the above ruling from the Arbitrator, nor did Respondent request at any time that it be provided with an opportunity to file a response or objections to any fee affidavits which would be submitted on or before September 5th.

3. However, Respondent's Post-hearing brief, filed weeks after the Arbitrator's August 9th Order, argues that:

> Under the law, Valve is entitled to review Claimants' request for fees and costs, including Claimants' time entries expenses, and subject it to adversarial testing. Valve cannot do so at this time because the Tribunal

       ordered the parties to address the issue of attorneys' fees in this briefing, before Valve has had a chance to examine Claimants' fee submission and time entries. Without access to Claimants' fee submissions and a subsequent opportunity to respond, Valve cannot test whether the hours claimed are "excessive, redundant, or otherwise unnecessary." Nor can Valve address fees Claimants' counsel may improperly seek for other arbitrations. Nor can Valve address any inaccuracies regarding the appropriate hourly rate, which must be adjudged in accordance with prevailing rate for the area in which the attorney practices and based on the experience of the attorney at issue.  Nor can Valve address any claims for other kinds of fees or costs that Claimants may seek. Similarly, without receiving the Tribunal's award, Valve is unable to make tailored submissions as to whether the quantum of attorneys' fees should be reduced, though there are factors that may counsel in favor of reducing an attorneys' fees application.

       Respondent's Post-Hearing Brief at 49-50 (footnotes omitted).

4. The objections set forth above and raised by Respondent to any attorney fee award to Claimants are certainly potentially reasonable, but were not only not raised in a timely fashion – but were such that Respondent *could have timely raised these objections after the Arbitrator advised the parties by the Order of August 9, 2025* that it was her intention to address all issues at one time.  Having made the strategic decision not to raise the issues *before the filing of the post-hearing* briefs, or even *before the Claimant's submission of the application for attorneys' fees and the Arbitrator's Closing of the Record,* the Respondent cannot now be heard to object to the process utilized in determining the reasonable fees to be awarded here to Claimant's counsel.

X. **Accordingly, I hereby make the following AWARD:**

1. On Claimant's Claim of violation of Sherman Act, 15 U.S.C § 1, as determined by the Rule of Reason, damages in accordance with the provisions of 15 U.S.C. § 15(a), and as set forth above in Paragraph IX.A.5, for a total of **Thirty-Three and 36/100 Dollars ($33.36)**;

2. On Claimant's claim for attorney's fees in accordance with the provisions of 15 U.S.C. § 15(a), as set forth above in Paragraph IX.B.5(d), a total of **Six Hundred Forty-Five Thousand, Seven Hundred Nineteen 93/100 Dollars ($645,719.93)**;

3. On Claimant's claim for expenses of litigation, in accordance with the provisions of the arbitration agreement in effect between the parties at the time of the filing of the arbitration demand, as set forth above in Paragraph IX.B.5(f), reimbursement of Claimant's AAA filing fee of **One Hundred Twenty-five Dollars ($125.00);**

4. On Claimant's claim for expenses of litigation in accordance with the provisions of 15 U.S.C. § 15(a), as set forth above in Paragraph IX.B.5(f)(ii), a total of **Eighty-One Thousand, Four Hundred Forty-Four and 91/100 Dollars ($81,444.91)**;

5. The administrative fees and expenses of the American Arbitration Association shall be borne as incurred and the compensation of the arbitrator shall likewise be borne as incurred.

6. Respondent shall make all payments required under this Award within twenty (20) days of the date of this Final Award.

*****

*Continued on the following page*

This AWARD is in full settlement of all claims and defenses submitted to this Arbitrator. All claims not expressly granted herein are hereby denied.

Dated: October 9, 2025

_____
Suzanne M. McSorley