# EXHIBIT 1

In accordance with the Western District of Washington order dated 25 October 2021 compelling to arbitration the claims stated in this action, dismissal of which was denied in the order dated 6 May 2022, Alec Birenbaum brings this action against Valve Corporation ("Valve" or "Defendant"), seeking injunctive relief, and damages, under Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1), Section 2 of the Sherman Antitrust Act (15 U.S.C. § 2), and the Washington Consumer Protection Act:

## OVERVIEW OF THE ACTION

1.  Personal Computer ("PC") games generate over $30 billion worldwide annually. Defendant Valve Corporation monopolizes that market, using illegal contracts and coercion to ensure more than 75% of that revenue flows through its digital Steam Store and that prices stay artificially high market wide.

2.  Valve's illegal monopoly makes it the most profitable company in the world. Per employee, Valve generates more profit than Apple, Google, or Microsoft. Even the Saudi Arabian oil cartel's ARAMCO makes less money.[1]

3.  Valve, acting as a third-party in PC game transactions, achieves this profit by charging a 30% tax on the PC games consumers like Alec Birenbaum purchase from game developers.

4.  Valve incurs almost no cost in providing this "service," making more than ███████ percent profit on third-party games purchased through its Steam Store. Federal Court Ex. 4 (VALVE_ANT_0058963) at '963-965.

5.  This economic situation is undesirable for both consumers and game developers. It persists only through Valve's illegal restraints on developers, which make meaningful competition against Valve in the market for PC games nearly impossible.

6.  Alec Birenbaum seeks compensation for the additional expense paid for PC games and injunctive relief to stop this conduct from continuing.

## The Parties

7.  Alec Birenbaum resides at 684 Ackerman Ave, Glen Rock NJ 07452, United States. Alec Birenbaum is represented by Will Bucher at Bucher Law PLLC, located at 350 Northern Blvd, STE 324 -1519, Albany, NY 12204-1000.

8.  Valve Corporation is headquartered at 10400 NE 4th St., Bellevue, Washington 98004. Valve is represented by Charles B. Casper at Montgomery McCracken Walker & Rhoads LLP, which is headquartered at 1735 Market Street, 21st Floor, Philadelphia, Pennsylvania.

---

1 Pascal-Emmanuel Gobry, "The Tech Company with the Highest Profits Per Employee Isn't Apple or Google," Business Insider (2011), https://www.businessinsider.com/valve-profits-2011-2; *see* Exhibit A, *Wolfire Games LLC v. Valve Corporation*, Case No. 2:21-cv-00563-JCC Document 127, at 14 (W.D. Wash. filed Mar. 23, 2023).

9.      The parties' agreement states the arbitration "may be conducted by the submission of documents, by phone, or in person in the country where you live." Alec Birenbaum elects to have the merits hearing be conducted via a virtual hearing using videoconferencing software.

10.     Alec Birenbaum has purchased at least 202 PC games which are associated with the Steam account with ID 76561197978465915. Valve has in its possession the data necessary to confirm this and can provide detail as to the price paid for each game and whether the game was acquired from Valve directly or a third-party retailer.

11.     Based on the money spent to acquire those 202 PC games, Alec Birenbaum estimates that the actual damage suffered was in the amount of $3,636. Under the Sherman Act, if Alec Birenbaum prevails, Alec Birenbaum is entitled to mandatory treble damages as well as a mandatory award of attorneys' fees.

Procedural Posture

12.     On December 20, 2021, a putative class action complaint—of which Alec Birenbaum was an absent member—was filed against Valve regarding these unlawful provisions.

13.     The complaint was extensive, laying out over 100 pages of allegations against the company. Among those were plaintiffs' allegation that "[i]n the absence of the Valve PMFN, rivals in the PC Desktop Game Transaction Platforms market would charge lower prices and force Valve to compete. Such competition would in turn lower prices on Valve's own PC Desktop Game Transaction Platform, benefitting consumers and publishers that utilized Valve's PC Desktop Game Transaction Platform."[2]

14.     This complaint incorporates by reference all factual allegations contained in the Second Amended Consolidated Class Action Complaint in that case, attached as Exhibit A. Because Valve has insisted on withholding many of the relevant facts in that case from the public, those facts are included in this demand in redacted format. Alec Birenbaum will request this information as part of the information exchange in this proceeding, at which point Alec Birenbaum will share it with this tribunal.

15.     Valve moved, unsuccessfully, to dismiss the federal case complaint quoted above.

16.     With respect to allegations on the Sherman Act claims Alec Birenbaum alleges here, as well as another federal antitrust claim and a Washington State Consumer Protection Act claim, Federal Judge John C. Coughenour denied Valve's motion to dismiss, stating Valve uses its contracts "to impose conditions on how non-Steam-enabled games are sold and priced. Defendant also threatens game publishers with punitive action, including removal of their Steam-enabled games, if they sell non-Steam-enabled versions of those games at lower prices. … These allegations are sufficient to plausibly allege unlawful conduct."[3]

---

2 Second Amended Consolidated Class Action Complaint at 399.
3 *Wolfire Games, LLC v. Valve Corp.*, No. C21-0563-JCC, 2022 U.S. Dist. LEXIS 82561, at *11 (W.D. Wash. May 6, 2022).

17.    In addition to unsuccessfully moving to dismiss the case, Valve also moved to compel the consumers' claims to arbitration. At Valve's insistence, Federal Judge John C. Coughenour compelled hundreds of millions of consumers who had credibly alleged antitrust harm to arbitration before the American Arbitration Association.[4]

18.    This individual arbitration concerns Alec Birenbaum, who has chosen to pursue their antitrust claims against Valve in this arbitration, as required by Judge John C. Coughenour's order.

<u>The Market for PC Games</u>

19.    The video game industry can be delineated into 3 major markets – PC gaming, console gaming, and mobile gaming – with each market targeting consumers with different gaming needs and expectations. (*i.e.*, mobile games are typically designed to be played in short bursts on cell phones/tablets when the consumer is on the go, while console games are played on dedicated hardware devices such as a Sony Playstation connected to a television in the home and are generally designed to be played for longer gaming sessions, and PC games are played on PCs and/or laptops with a wide range of hardware configurations at home or in an office).

20.    In 2023, PC gaming, console gaming, and mobile gaming together generated $183.9 billion dollars in revenue, with mobile gaming generating $89.9 billion, PC gaming generating $41.5 billion, and console gaming generating $52.4 billion.[5]

21.    PC games are typically installed on a PC hard drive, like any other PC application, and can be installed from physical media like a CD-ROM, or downloaded over the internet.

22.    When the owner of an Android phone wants to download an application, they do so through an application store, such as Google's Play Store.

23.    Similarly, when PC owners want to download a game, they do so through a PC game software store, almost always Valve's Steam Store.

24.    In the modern PC gaming market, most games are purchased digitally and downloaded remotely onto the consumer's PC.[6]

---

4 For the avoidance of doubt, Claimant reserves the right to make objections to the validity or enforceability of the arbitration clause before this tribunal, pursuant to Judge Coughenour's order. Claimant is not here by choice, but at Valve's insistence.

5 Last looks: The global games market in 2023, newzoo (May 16, 2024), https://newzoo.com/resources/blog/last-looks-the-global-games-market-in-2023

6 J. Clement, Distribution of computer and video game sales in the United States from 2009 to 2018, by delivery format, Statista (2019), https://www.statista.com/statistics/190225/digital-and-physical-game-sales-in-the-us-since-2009/#:~:text=In%202018%2C%20a%20record%202083,were%20sold%20in%20physical%20form.

25.    The Steam Store operates as a digital storefront in this market. Steam allows its users to purchase games from third-party developers and add them to a virtual library, from which they are downloaded and installed on the user's PC.

26.    Because Valve has significant market power, developers must choose to either list their games on the Steam Store according to Valve's terms or lose access to most of their potential customer base.

27.    Valve uses its dominance over PC game distribution to impose and anticompetitively maintain a 30% commission on nearly every sale made through its store. This commission far exceeds what would prevail in a competitive market, raises prices for consumers like Alec Birenbaum, and reduces quality and innovation in PC games.[7]

28.    Because digital distribution takes place over the internet and does not involve the production, shipping, or physical selling of any product, digital distributors have extremely low costs.

29.    Valve's marginal cost to sell a developer's PC game on its Steam Store is less than $0.01.

30.    Fundamental economics and real-world experience hold that, in a lawful and competitive market, the entry of rivals to the Steam Store would have quickly exerted price pressure on Valve's high commission by competing on price (*i.e.*, by charging lower commissions for the same transaction service).

31.    Fundamental economics and real-world experience hold that, in a competitive market, marginal price will equal marginal cost.

32.    Valve's 30% commission amounts to a $18.00 surcharge on the sale of a standard $60.00 game. In a competitive market, where marginal price equals marginal cost, we would expect this commission to instead be $0.01.

33.    In a competitive market where a firm makes the extraordinarily high profit margins Valve does, new entrants typically emerge and offer the same service for cheaper.

34.    Indeed, that is exactly what multiple rivals tried to do, but they failed or continue to struggle because Valve prohibits developers from selling their games for cheaper on rival stores, pressures developers into charging higher prices, and bribes and buys out (then shuts down) potential competitors to prevent them from creating free market competition.

35.    Because of these anticompetitive policies, a former Valve employee described Steam as a "virtual printing press" that imposes a "30% tax on an entire industry."[8]

---

7 A federal judge recently found that a reduction in the availability of innovative applications on a software distribution platform was a compensable harm under U.S. antitrust law. Bonnie Eslinger, Google Judge Warms to $10.5B Damages Theory in 'Hot Tub', Law360 (Aug. 1, 2023), https://www.law360.com/articles/1706341.

8 Andrew McMahon, Former Valve Employee Says Steam Was Killing PC Gaming, Epic Games Is Saving It, TWINFINITE (Apr. 8, 2019), https://twinfinite.net/2019/04/former-valve-employee-says-

<u>Valve's Prohibition on Offering Cheaper Prices</u>

36. Valve imposes a Platform Most-Favored-Nations Clause (the "Valve PMFN") on game developers which prohibits game developers from selling their games at lower prices to consumers through rival storefronts.

37. Valve also mandates price parity. Valve has communicated this aspect of its PMFN Policy in various ways over time. Schwartz Rpt. ¶¶150-167.



38. Valve regularly confirmed to publishers in no uncertain terms that its PMFN Policy (including pricing parity specifically) applies in equal force regardless of whether Steam Keys are involved. ███████████████████████████████████████████████████████ Federal Court Ex. 24 (Federal Court Powers 30(b)(6) Ex. 55) at '921 (emphasis added); see also, e.g., Federal Court Ex. 25 (Federal Court Butlin Ex. 120) at '353 ███████████████████████████████████████████████████████████ ██████████████████████████; Federal Court Ex. 27 (MSFT_VALVE_000000555) at '555-657 (Microsoft employee asking "does Steam require price parity?" and another responding "Yes – they absolutely do. . . . Its [sic] not formally listed in documentation in Steamworks, but always addressed in-person.").

39. Many (many) more examples abound. See, e.g., Federal Court Ex. 28 (VALVE_ANT_2602243) at '243 ██████████████████████████████████ ██████████████ (emphasis added); Federal Court Ex. 21 (Federal Court Giardino Ex. 186) at '087 ████████████████████████████████████████ ████████████████████████████████████████████████████; Federal Court Ex. 29 (Federal Court Kroll Ex. 304) at '440 ███████████████████████████ ████████████████████████████████████████████████████████████;

_____

steam-was-killing-pc-gaming-epic-games-is-saving-it/.

Federal Court Ex. 30 (Federal Court Giardino Ex. 178) at '439 ██████████████ ███ (emphasis added); Federal Court Ex. 31 (Federal Court Newell Ex. 353) at '439 ████████████████████████████████ (emphasis added); Federal Court Ex. 32 (Federal Court Giardino Ex. 195) at '887 ████████████████████████████████████

40.    Valve's PMFN is anticompetitive because it prevents rivals from competing on price.

41.    For example, assume that a game publisher wants to receive $35 in revenue for each sale of a new PC game it has created. If that publisher sells on the Steam Store, it must offer the game to consumers for $50. If there were no PMFNs, and a competitor platform offered a 10% commission, the publisher could offer that game for $40 on the competitor platform and make $36 on each sale while also increasing sales volume. Instead, because of the PMFNs, the publisher must offer the new game at $50 across all platforms, or risk being excluded from Valve and its massive audience on the Steam Store.

42.    Valve has punished publishers for violating its PMFN Policy by delisting (or threatening to delist) a publisher's game from Steam altogether. ████████████████████ ████████████████ Federal Court Ex. 35 (Federal Court Malone Ex. 248) at '684. ████ *Id.* ████████████████████████ *Id.* In other words, Valve directly blocked price competition. ████████████████████████████████ Federal Court Ex. 36 (Federal Court Gerber Ex. 107) at '883–84. ██████ Federal Court Ex. 37 (Federal Court Blue Ex. 86) at '912-13.

43.    PMFNs deny consumers lower prices, restrict entry of new, lower-priced gaming platforms, and stifle innovation. There is no sufficient pro-competitive justification for Valve's PMFNs.

44.    Because it faces virtually no competition, Valve does not significantly invest in improving the Steam platform. Federal Court Ex. 33 (Powers 30(b)(6) Tr.) at 37-38 ████████████████████████; Federal Court Ex. 76 (Federal Court Johnson Ex. 27) at '458 ████████████████████████████████

45.  As the founder of Epic Games, a company that tries to compete against Valve but struggles to do so, explained: "Steam has veto power over prices, so if a multi-store developer wishes to sell their game for a lower price on the Epic Games store than Steam, then … Valve can simply say 'no.'"[9]

46.  Valve's PMFN maintains Valve's monopoly position because consumers are, unsurprisingly, uninterested in switching to a new online storefront (which requires installing a new storefront's software) to purchase the same product for the same price.

47.  Because fledgling rivals cannot draw in new customers by offering consumers a lower price, they have failed or continue to struggle because of Valve's anticompetitive conduct.

48.  EA attempted to launch the Origin PC game store in June 2011, as a competitor to Steam. To jumpstart Origin's user base, EA began publishing its new titles on Origin and other distribution platforms, which also avoided paying Steam's commission. Rietveld Rpt. ¶¶96-97; Schwartz Rpt. ¶216. In October 2011, EA also began publishing third-party games, including games from major publishers such as Capcom. Rietveld Rpt. ¶¶92, 96-97. ███████████████████████████████████████████████ ████████████████████████ Schwartz Rpt. ¶¶216-217; Rietveld Rpt. ¶96-97. EA ultimately surrendered, announcing it would bring its games back to Steam in 2019. Federal Court Ex. 60 (VALVE_ANT_0059430) at '430. Origin withered and ultimately died, Rietveld Rpt. ¶¶96-97; Schwartz Rpt. ¶¶216-217.

49.  Valve's competitor Epic cannot break the Steam monopoly, even though it offers a commission *less than half* of Valve's, because Valve's PMFN Policy prevents Epic from competing on prices charged to consumers for games sold on both EGS and Steam. Schwartz Rpt. ¶¶302-313.



50.  ███████████████████████████████████████████
     ███████████████████████████████████████████
     Federal Court Ex. 51 (VALVE_ANT_1193238) at '240-241.
     ███████████████████████████████████████████
     Id. at '239

51.  ███████████████████████████████████████████
     Federal Court Ex. 61 (Malone Tr.) at 212.
     Federal Court Ex. 69 (Federal Court Lynch Ex. 134) at '674
     ███████████████████████████████████████████
     ; Federal Court Ex. 70 (VALVE_ANT_0471786) at '188
     ; Schwartz Rpt. ¶308.
     Federal Court Ex. 5 (Lynch Tr.) at 101-02

9 Tim Sweeney (@TimSweeneyEpic), TWITTER (Jan. 30, 2019, 9:29 AM), https://twitter.com/timsweeneyepic/status/1090663312814157824?lang=en.



52.

Federal Court Ex. 61 (Malone Tr.) at 44. Ubisoft attempted to self-distribute through its own platform, Uplay, launching in 2012. Rietveld Rpt. ¶¶94-95; Schwartz Rpt. ¶¶213-214. Federal Court Ex. 62 (Federal Court Malone Ex. 263) at '128.

Federal Court Ex. 63 (Federal Court Lynch Ex. 141) at '961-962.

Federal Court Ex. 64 (Federal Court Malone Ex. 261) at '197.

As a result, Ubisoft's attempt to sell their games on alternative platforms failed and Division 2 is now available on Steam. *See id.*

53. Because fledgling rivals have failed or continue to struggle because of Valve's anticompetitive price restrictions, Valve maintains its dominant market position, continues to charge its supracompetitive prices, and imposes its 30% tax on PC games, harming consumers.

54. Valve also mandates that publishers use its "Steam Wallet" for any in-game purchases. Specifically, Valve requires that: "Your product must use Steam Wallet for any in-game transactions. This means that your product cannot link to other store pages that does not offer Steam Wallet." When game developers comply and use Valve's microtransaction system, they again must pay Valve's 30% supracompetitive tax.

55. Valve prohibits game developers from using any alternative system for in-game purchases or directing consumers to use an alternative system.[10] This means once a consumer purchases a game, they are stuck with making in-game purchases on Valve and cannot go to a competing store to make new purchases related that game, nor can the developer direct them to any cheaper store. Even if game developers could charge cheaper prices using their own or a rival store for in-game purchases, consumers would be effectively restricted from taking advantage of those lower prices because of Valve's "Steam Wallet" requirement.

### Valve Controls the Pricing for the Games Sold in the Steam Store

56. Not only are game developers prohibited from selling their games for less at rival stores offering far lower service fees, but Valve also insists on high prices in its own store.

---

10 Similar anti-steering provisions in Apple's App Store were recently found to be illegal under U.S. antitrust law. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1003 (9th Cir. 2023).

57.  All prices for games sold on the Valve's Steam Store are subject to Valve's review and discretion. Their documentation states "Initial pricing as well as proposed pricing adjustments will be reviewed by Valve and are usually processed within one or two business days."

58.  Valve offers "Regional Pricing Recommendations," a list of prices by region that Valve thinks game developers should charge for their games to maximize the amount of money consumers have to pay.

59.  Valve is explicit about its effort to extinguish competition. In Valve's Steamworks documentation, Valve instructs that, when setting prices, game developers shouldn't be "trying to undercut competition with a lower price."

60.  Because Valve prohibits offering lower prices via rival stores, these efforts to keep prices high on Steam mean higher prices in rival stores, too, keeping prices higher market-wide.

### Valve Neutralizes, Bribes, and Buys Out Potential Competition

61.  Valve works with many would-be competitors to sell "Steam Keys," digital codes that activate a PC game purchase on Steam.

62.  This creates the appearance of a competitive market where there isn't one. For example, a consumer purchasing a "Steam Key"-enabled PC game at Wal-Mart may believe Wal-Mart is competing with Valve. But in actuality, Wal-Mart is simply selling Valve's product.

63.  Like with sales on competing digital storefronts, game developers who sell Steam Keys at retailers like Wal-Mart must agree to "sell your game on other stores in a similar way to how you sell your game on Steam. It is important that you don't give Steam customers a worse deal than Steam Key purchasers."[11]

64.  Valve interprets and enforces this language to mean that retailers selling Steam Keys cannot offer consumers a lower price on the games sold. Functionally, this means would-be competitors like Wal-Mart, to the extent they are in the PC games distribution market, do not compete on price, meaning consumers pay more for games.

65.  These partnerships with Valve provide Valve with a commercial kill switch that permits Valve to disrupt or shut down any partner who starts generating meaningful sales in competition with Valve's core Steam platform, as Valve can cease providing the codes or supporting their use.

66.  Valve previously worked with an organization known as Humble Bundle to sell Steam Keys online. This included working with Humble Bundle to ensure game keys were securely delivered to customers.

---

11 https://partner.steamgames.com/doc/features/keys

67.     But after Humble Bundle's distribution of Steam-enabled games began to grow and present potential competition to Valve, Valve abruptly removed the secure integration between Humble Bundle and the Steam Gaming Platform. After Valve terminated the direct integration, Humble Bundle's sales growth declined.

68.     Valve offers millions of dollars in kickbacks to the game publishers and tech companies who are most likely to launch a competing store.

69.     While the vast majority of games sold on Steam are charged the 30% tax with no rebates, the largest gaming companies—Microsoft, Electronic Arts, and Take-Two Interactive are offered tens if not hundreds of millions of dollars a year in kickbacks, provided they continue to sell a sufficiently high volume of games on Steam and commit to charge the same or a higher price on competing platforms—even their own. This kickback system ensures prices stay high for consumers and the most viable potential competitors to Valve don't meaningfully compete.

70.     Under the U.S. Department of Justice's antitrust guidelines, the DOJ measures market concentration levels using the Herfindahl-Hirschman Index, or HHI. Those guidelines state: "Markets with an HHI greater than 1,800 are highly concentrated." Valve's HHI is more than three times what the DOJ considers problematically concentrated: 5,625.

71.     According to the DOJ, "Mergers raise a presumption of illegality when they significantly increase concentration in a highly concentrated market." Specifically, given Valve's HHI, any merger or integration with an actual or would be competitor with greater than 0.66% market share is presumptively a violation of antitrust law.

72.     A subsidiary of Microsoft, Bethesda, used to offer a competing digital store front and game launcher which sold Bethesda's games. But Valve entered into an agreement with Bethesda wherein Bethesda's competing digital store was absorbed into the Steam platform.

73.     Microsoft and its subsidiary Bethesda had more than 0.66% market share in the PC game market at the time of the merger.

74.     Because Microsoft and its subsidiary Bethesda had more than 0.66% market share in the PC game market at the time of merger, that merger was presumptively illegal under the DOJ guidelines.

## Valve's Conduct Illegally Raises Prices for Consumers

75.     Monopolies and cartels raise prices for consumers.

76.     Monopolies and cartels are illegal under the Sherman Act.

77.     The Sherman Act doesn't define specific conduct that is an illegal restraint of trade. Rather, the Sherman Act recognizes that there is no end to the creativity of businesses

looking to increase profits by reducing competition, and so makes illegal "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce."

78. Companies in factually analogous situations to Valve have been found to have violated the Sherman Act.

79. Courts employ the DOJ's HHI guidelines in finding mergers, like that between Valve and Microsoft's Bethesda Laucher, illegal. *Saint Alphonsus Medical Center-Nampa Inc. v. St. Luke's Health System, Ltd.* "The extremely high HHI on its own establishes the prima facie case." *Id.*

80. Courts have found policies that prohibit linking to cheaper payments options, such as Valve's requirement that in-game transactions occur via the Steam Wallet and not any other method, illegal under the Sherman Act. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1003 (9th Cir. 2023).

81. Courts have found that giving kickbacks or other "free money" to potential competitors, like those Valve provides Microsoft and others who sell a high volume of PC games on their platform, violates the Sherman Act—even when that money isn't explicitly conditioned on continued non-competition. *In re Google Play Store Antitrust Litigation*, Case No. 3:20-cv-05671-JD, (N.D. Cal. filed Dec. 11, 2023) (No. 606)

82. Courts regularly find price fixing and price coordination illegal, and recognize that price parity requirements like that Valve imposes can be price restraints. *Frame-Wilson et al v. Amazon.com Inc,* No. 2:20-20-cv-00424 (W.D. Wash. 2022).

83. Valve itself has already been fined in Europe for its illegal antitrust activities. *European Commission Press Release*, "Antitrust: Commission fines Valve and five publishers of PC video games € 7.8 million for 'geo-blocking' practices" (20 January 2021).

84. When a "conspiracy causes market prices to rise and thereby to injure consumers," consumers are entitled to recover damages "regardless of whether they purchased from the conspirators or from their innocent rivals." Areeda & Hovenkamp, Treatise on Antitrust Law (5th) at 347.

85. The policy of ensuring free market competition is so important that even where plaintiffs are unable to demonstrate damages, claims can still prevail under the Sherman Act. *U.S. Airways, Inc. v. Sabre Holdings Corp.*, 11 Civ. 2725 (LGS) (S.D.N.Y. June 1, 2023) (awarding attorneys' fees where jury found nominal damages of $1, trebled to $3)

<u>Pre-Dispute Negotiations</u>

86. On July 12, 2023, Bucher Law PLLC and AFN Law PLLC sent a written letter and email to Valve indicating their clients' intent to arbitrate their antitrust claims. The letter laid out the consumers' antitrust theory of the case, provided the names for all claimants including Alec Birenbaum, proposed a settlement structure and amount that could resolve all the claims, and noted the consumers were "prepared to engage in good faith discussions for

30-days to attempt to resolve our clients' claims before we initiate arbitration against you."

87.    On July 25, 2023, Valve responded. Valve took issue with the opening letter addressing all the consumers' claims in a single notice, insisting that under the terms of the Steam Subscriber Agreement, all claims must be advanced and negotiated individually.

88.    Moreover, Valve stated "it is necessary to follow the procedure outlined in the Steam Subscriber Agreement. To start that process, Valve needs a written notice that identifies each individual subscriber, and that subscriber's Steam account, gives the subscriber's location, describes the nature and basis of that subscriber's claim or dispute, and sets forth the relief that subscriber seeks. Such a notice will commence the 30-day informal dispute resolution period under Section 11.B."

89.    While the Steam Subscriber Agreement does not require an individual notice laying out all the information Valve demanded, Alec Birenbaum was willing to accommodate. On 08/30/2023, Alec Birenbaum sent an individual written notice to Valve which provided Alec Birenbaum's Steam account, state and city of residence, described the nature of Alec Birenbaum's antitrust claim, and opened settlement discussions with Valve regarding Alec Birenbaum's individual claim.

90.    On September 20, Valve sent an email addressing all the claimants collectively, stating they "anticipate[d] that we will respond to each of the letters on or before October 31." This would mean waiting 60-days to even begin the good faith negotiation process that was contractually required to conclude within 30-days.

91.    While many consumers were willing to wait for Valve's response, Alec Birenbaum opted to file their case on October 2—more than 30 days after Alec Birenbaum sent their individualized written notice. Valve never responded to Alec Birenbaum's individual demand, either within the required 30-days or by October 31, 2023, as Valve had indicated they would.

92.    Instead, Valve responded to the individual filings with a collective letter on October 10. In the October letter, Valve complains that the individual written notices it received were not "efficient," even though Valve's July 25 letter chastised the consumers for making a joint demand via a single letter and specifically asked for individualized written notices. Valve acknowledges that over 21,000 consumers made individual settlement offers, but then asserts the consumers "refuse to provide amounts to settle their individual claims alone." The letter states "We remain available to meet with your clients (including the 18,204 new ones) one-on-one to answer their questions," yet Valve never previously offered to meet with Alec Birenbaum or any of the consumers one-on-one and insisted in their July 25 letter that the informal negotiations should begin with a "written" notice.

93.    Valve concluded the October 10 collective letter by stating "Valve sees little point in responding to your 35,000 near-copycat emails."

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Sherman Act Section 2—Monopolization of the PC Game Transaction Platforms Market (15 U.S.C. § 2)

94.    Valve has willfully acquired and maintained monopoly power in the market for PC Game Transaction Platforms, by means of exclusionary, and anticompetitive conduct, including but not limited to market-wide price controls and presumptively illegal mergers with competitors, as alleged herein.

95.    Through the PMFN, Valve has coerced publishers into agreeing to offer their games at the same price across all PC Game Transaction Platforms, regardless of whether competing platforms charge lower commissions or otherwise charge lower prices than Valve.

96.    In the absence of the Valve PMFN, rivals in the PC Desktop Game Transaction Platforms market would charge lower prices and force Valve to compete. Such competition would in turn lower prices on Valve's own PC Game Transaction Platform, benefiting consumers and publishers that utilized Valve's PC Game Transaction Platform.

97.    Valve's conduct is not justified, because its conduct does not enhance overall efficiency or make the relevant markets more efficient.

98.    Valve's conduct has had a substantial effect on interstate commerce.

99.    Alec Birenbaum has been injured in their property as a result of Valve's conduct.

100.    Alec Birenbaum has suffered and will suffer injury of the type that antitrust laws intend to prevent. Alec Birenbaum has been and will be injured by harm to competition as a result of Valve's conduct.

101.    Alec Birenbaum estimates that the actual damage suffered was in the amount of $3,636. Under the Sherman Act, if Alec Birenbaum prevails, Alec Birenbaum is entitled to mandatory treble damages as well as a mandatory award of attorneys' fees.

102.    Alec Birenbaum further seeks an order compelling divestiture of Valve's illegally acquired game platforms.

### SECOND CAUSE OF ACTION
### Sherman Act Section 2—Attempted Monopolization of the PC Desktop Game Transaction Platforms Market (15 U.S.C. § 2)

103.    In the market for PC Desktop Game Transaction Platforms, Valve has engaged in exclusionary and anticompetitive conduct, including but not limited to market-wide price controls and presumptively illegal mergers, as alleged herein.

104.    Valve's conduct has had an anticompetitive effect in the alternative market for PC Game Transaction Platforms.

105.    Valve has engaged in that conduct with the specific intent of monopolizing the market for PC Desktop Game Transaction Platforms.

106.    Valve has engaged in that conduct with a dangerous probability of monopolizing the market for PC Game Transaction Platforms.

107.    In the absence of the Valve PMFN, rivals in the PC Game Transaction Platforms market would charge lower prices and force Valve to compete. Such competition would in turn lower prices on Valve's own PC Game Transaction Platform, benefiting consumers that utilized Valve's PC Game Transaction Platform.

108.    Valve's conduct has had a substantial effect on interstate commerce.

109.    Alec Birenbaum has been or will be injured in their property as a result of Valve's conduct.

110.    Alec Birenbaum has suffered and will suffer injury of the type that antitrust laws intend to prevent. Alec Birenbaum has been and will be injured by harm to competition as a result of Valve's conduct.

111.    Alec Birenbaum estimates that the actual damage suffered was in the amount of $3,636. Under the Sherman Act, if Alec Birenbaum prevails, Alec Birenbaum is entitled to mandatory treble damages as well as a mandatory award of attorneys' fees.

<u>THIRD CAUSE OF ACTION</u>
<u>Sherman Act Section 1—Anticompetitive Course of Conduct (15 U.S.C. § 1)</u>

112.    As alleged above, through its contractual agreements with game publishers, Valve has induced or coerced various publishers to enter into one or more contracts, combinations, or conspiracies to unreasonably restrain trade, to control prices or exclude competition, and to willfully acquire and maintain market power in the relevant markets.

113.    Valve's conduct has had, and continues to have, substantial anticompetitive effects in the relevant markets.

114.    Valve's conduct has no legitimate business purpose or procompetitive effect.

115.    There are less restrictive alternatives to the restraints that Valve has imposed.

116.    Valve's conduct has had a substantial effect on interstate commerce.

117.    Alec Birenbaum has been or will be injured in their property as a result of Valve's conduct.

118.    Alec Birenbaum has suffered and will suffer injury of the type that antitrust laws intend to prevent. Alec Birenbaum has been and will be injured by harm to competition as a result of Valve's conduct.

119.    Alec Birenbaum estimates that the actual damage suffered was in the amount of $3,636. Under the Sherman Act, if Alec Birenbaum prevails, Alec Birenbaum is entitled to mandatory treble damages as well as a mandatory award of attorneys' fees.

FOURTH CAUSE OF ACTION
Washington State Consumer Protection Act RCW 19.86

120.    The claims alleged above constitute unfair methods of competition under Washington State law provisions 19.86.020, 19.86.040, and 19.86.030.

121.    Valve is engaged in unfair and deceptive practices in commerce, which affect the public interest and cause injury to business and property.

122.    Valve's contracts, combinations, or conspiracies with game publishers are anticompetitive restraints that have the purpose and effect of fixing and inflating prices in the relevant markets.

123.    The contracts, combinations, or conspiracies at issue are in restraint of trade.

124.    Valve's monopolization and attempted monopolization have the purpose and effect of fixing and inflating prices in the relevant markets.

125.    As such, Alec Birenbaum is entitled to damages and an injunction under Revised Code of Washington 19.86.090.

126.    Under the Washington State Consumer Protection Act RCW 19.86, if Alec Birenbaum prevails, Alec Birenbaum is also entitled to an award of attorneys' fees.

# EXHIBIT 2

In accordance with the Western District of Washington order dated 25 October 2021 compelling to arbitration the claims stated in this action, dismissal of which was denied in the order dated 6 May 2022, Lance Vicente brings this action against Valve Corporation ("Valve" or "Defendant"), seeking injunctive relief, and damages, under Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1), Section 2 of the Sherman Antitrust Act (15 U.S.C. § 2), and the Washington Consumer Protection Act:

<u>OVERVIEW OF THE ACTION</u>

1.     Personal Computer ("PC") games generate over $30 billion worldwide annually. Defendant Valve Corporation monopolizes that market, using illegal contracts and coercion to ensure more than 75% of that revenue flows through its digital Steam Store and that prices stay artificially high market wide.

2.     Valve's illegal monopoly makes it the most profitable company in the world. Per employee, Valve generates more profit than Apple, Google, or Microsoft. Even the Saudi Arabian oil cartel's ARAMCO makes less money.[1]

3.     Valve, acting as a third-party in PC game transactions, achieves this profit by charging a 30% tax on the PC games consumers like Lance Vicente purchase from game developers.

4.     Valve incurs almost no cost in providing this "service," making more than ████████ percent profit on third-party games purchased through its Steam Store. Federal Court Ex. 4 (VALVE_ANT_0058963) at '963-965.

5.     This economic situation is undesirable for both consumers and game developers. It persists only through Valve's illegal restraints on developers, which make meaningful competition against Valve in the market for PC games nearly impossible.

6.     Lance Vicente seeks compensation for the additional expense paid for PC games and injunctive relief to stop this conduct from continuing.

<u>The Parties</u>

7.     Lance Vicente resides at 94 N Spring Garden Ave, Nutley NJ 07110, United States. Lance Vicente is represented by Will Bucher at Bucher Law PLLC, located at 350 Northern Blvd, STE 324 -1519, Albany, NY 12204-1000.

8.     Valve Corporation is headquartered at 10400 NE 4th St., Bellevue, Washington 98004. Valve is represented by Charles B. Casper at Montgomery McCracken Walker & Rhoads LLP, which is headquartered at 1735 Market Street, 21st Floor, Philadelphia, Pennsylvania.

---

[1] Pascal-Emmanuel Gobry, "The Tech Company with the Highest Profits Per Employee Isn't Apple or Google," Business Insider (2011), https://www.businessinsider.com/valve-profits-2011-2; *see* Exhibit A, *Wolfire Games LLC v. Valve Corporation*, Case No. 2:21-cv-00563-JCC Document 127, at 14 (W.D. Wash. filed Mar. 23, 2023).

9.    The parties' agreement states the arbitration "may be conducted by the submission of documents, by phone, or in person in the country where you live." Lance Vicente elects to have the merits hearing be conducted via the submission of documents only (e.g., a desk arbitration).

10.   Lance Vicente has purchased at least 131 PC games which are associated with the Steam account with ID 76561197962107582. Valve has in its possession the data necessary to confirm this and can provide detail as to the price paid for each game and whether the game was acquired from Valve directly or a third-party retailer.

11.   Based on the money spent to acquire those 131 PC games, Lance Vicente estimates that the actual damage suffered was in the amount of $2,340. Under the Sherman Act, if Lance Vicente prevails, Lance Vicente is entitled to mandatory treble damages as well as a mandatory award of attorneys' fees.

Procedural Posture

12.   On December 20, 2021, a putative class action complaint—of which Lance Vicente was an absent member—was filed against Valve regarding these unlawful provisions.

13.   The complaint was extensive, laying out over 100 pages of allegations against the company. Among those were plaintiffs' allegation that "[i]n the absence of the Valve PMFN, rivals in the PC Desktop Game Transaction Platforms market would charge lower prices and force Valve to compete. Such competition would in turn lower prices on Valve's own PC Desktop Game Transaction Platform, benefitting consumers and publishers that utilized Valve's PC Desktop Game Transaction Platform."[2]

14.   This complaint incorporates by reference all factual allegations contained in the Second Amended Consolidated Class Action Complaint in that case, attached as Exhibit A. Because Valve has insisted on withholding many of the relevant facts in that case from the public, those facts are included in this demand in redacted format. Lance Vicente will request this information as part of the information exchange in this proceeding, at which point Lance Vicente will share it with this tribunal.

15.   Valve moved, unsuccessfully, to dismiss the federal case complaint quoted above.

16.   With respect to allegations on the Sherman Act claims Lance Vicente alleges here, as well as another federal antitrust claim and a Washington State Consumer Protection Act claim, Federal Judge John C. Coughenour denied Valve's motion to dismiss, stating Valve uses its contracts "to impose conditions on how non-Steam-enabled games are sold and priced. Defendant also threatens game publishers with punitive action, including removal of their Steam-enabled games, if they sell non-Steam-enabled versions of those games at lower prices. … These allegations are sufficient to plausibly allege unlawful conduct."[3]

---

2 Second Amended Consolidated Class Action Complaint at 399.
3 *Wolfire Games, LLC v. Valve Corp.*, No. C21-0563-JCC, 2022 U.S. Dist. LEXIS 82561, at *11 (W.D. Wash. May 6, 2022).

17.    In addition to unsuccessfully moving to dismiss the case, Valve also moved to compel the consumers' claims to arbitration. At Valve's insistence, Federal Judge John C. Coughenour compelled hundreds of millions of consumers who had credibly alleged antitrust harm to arbitration before the American Arbitration Association.[4]

18.    This individual arbitration concerns Lance Vicente, who has chosen to pursue their antitrust claims against Valve in this arbitration, as required by Judge John C. Coughenour's order.

<u>The Market for PC Games</u>

19.    The video game industry can be delineated into 3 major markets – PC gaming, console gaming, and mobile gaming – with each market targeting consumers with different gaming needs and expectations. (*i.e.*, mobile games are typically designed to be played in short bursts on cell phones/tablets when the consumer is on the go, while console games are played on dedicated hardware devices such as a Sony Playstation connected to a television in the home and are generally designed to be played for longer gaming sessions, and PC games are played on PCs and/or laptops with a wide range of hardware configurations at home or in an office).

20.    In 2023, PC gaming, console gaming, and mobile gaming together generated $183.9 billion dollars in revenue, with mobile gaming generating $89.9 billion, PC gaming generating $41.5 billion, and console gaming generating $52.4 billion.[5]

21.    PC games are typically installed on a PC hard drive, like any other PC application, and can be installed from physical media like a CD-ROM, or downloaded over the internet.

22.    When the owner of an Android phone wants to download an application, they do so through an application store, such as Google's Play Store.

23.    Similarly, when PC owners want to download a game, they do so through a PC game software store, almost always Valve's Steam Store.

24.    In the modern PC gaming market, most games are purchased digitally and downloaded remotely onto the consumer's PC.[6]

---

4 For the avoidance of doubt, Claimant reserves the right to make objections to the validity or enforceability of the arbitration clause before this tribunal, pursuant to Judge Coughenour's order. Claimant is not here by choice, but at Valve's insistence.
5 Last looks: The global games market in 2023, newzoo (May 16, 2024),
https://newzoo.com/resources/blog/last-looks-the-global-games-market-in-2023
6 J. Clement, Distribution of computer and video game sales in the United States from 2009 to 2018, by delivery format, Statista (2019), https://www.statista.com/statistics/190225/digital-and-physical-game-sales-in-the-us-since-2009/#:~:text=In%202018%2C%20a%20record%2083,were%20sold%20in%20physical%20form.

25.    The Steam Store operates as a digital storefront in this market. Steam allows its users to purchase games from third-party developers and add them to a virtual library, from which they are downloaded and installed on the user's PC.

26.    Because Valve has significant market power, developers must choose to either list their games on the Steam Store according to Valve's terms or lose access to most of their potential customer base.

27.    Valve uses its dominance over PC game distribution to impose and anticompetitively maintain a 30% commission on nearly every sale made through its store. This commission far exceeds what would prevail in a competitive market, raises prices for consumers like Lance Vicente, and reduces quality and innovation in PC games.[7]

28.    Because digital distribution takes place over the internet and does not involve the production, shipping, or physical selling of any product, digital distributors have extremely low costs.

29.    Valve's marginal cost to sell a developer's PC game on its Steam Store is less than $0.01.

30.    Fundamental economics and real-world experience hold that, in a lawful and competitive market, the entry of rivals to the Steam Store would have quickly exerted price pressure on Valve's high commission by competing on price (*i.e.*, by charging lower commissions for the same transaction service).

31.    Fundamental economics and real-world experience hold that, in a competitive market, marginal price will equal marginal cost.

32.    Valve's 30% commission amounts to a $18.00 surcharge on the sale of a standard $60.00 game. In a competitive market, where marginal price equals marginal cost, we would expect this commission to instead be $0.01.

33.    In a competitive market where a firm makes the extraordinarily high profit margins Valve does, new entrants typically emerge and offer the same service for cheaper.

34.    Indeed, that is exactly what multiple rivals tried to do, but they failed or continue to struggle because Valve prohibits developers from selling their games for cheaper on rival stores, pressures developers into charging higher prices, and bribes and buys out (then shuts down) potential competitors to prevent them from creating free market competition.

35.    Because of these anticompetitive policies, a former Valve employee described Steam as a "virtual printing press" that imposes a "30% tax on an entire industry."[8]

---

7 A federal judge recently found that a reduction in the availability of innovative applications on a software distribution platform was a compensable harm under U.S. antitrust law. Bonnie Eslinger, *Google Judge Warms to $10.5B Damages Theory in 'Hot Tub'*, Law360 (Aug. 1, 2023), https://www.law360.com/articles/1706341.

8 Andrew McMahon, *Former Valve Employee Says Steam Was Killing PC Gaming, Epic Games Is Saving It*, TWINFINITE (Apr. 8, 2019), https://twinfinite.net/2019/04/former-valve-employee-says-

<u>Valve's Prohibition on Offering Cheaper Prices</u>

36.    Valve imposes a Platform Most-Favored-Nations Clause (the "Valve PMFN") on game developers which prohibits game developers from selling their games at lower prices to consumers through rival storefronts.

37.    Valve also mandates price parity. Valve has communicated this aspect of its PMFN Policy in various ways over time. Schwartz Rpt. ¶¶150-167. ███████████████████████
███████████████████████████████████████████████████████

███████████████████████████████████████████
███████████████████████████████

███████████████████████████████████████████
█████████████████████████████████

38.    Valve regularly confirmed to publishers in no uncertain terms that its PMFN Policy (including pricing parity specifically) applies in equal force regardless of whether Steam Keys are involved. ███████████████████████████████████████████
███████████████████████████████████ Federal Court Ex. 24 (Federal Court Powers 30(b)(6) Ex. 55) at '921 (emphasis added); see also, e.g., Federal Court Ex. 25 (Federal Court Butlin Ex. 120) at '353 ███████████████████████████
████████████████████████████████████████████████
██████████████████████████████; Federal Court Ex. 27 (MSFT_VALVE_000000555) at '555-657 (Microsoft employee asking "does Steam require price parity?" and another responding "Yes – they absolutely do. . . . Its [sic] not formally listed in documentation in Steamworks, but always addressed in-person.").

39.    Many (many) more examples abound. See, e.g., Federal Court Ex. 28 (VALVE_ANT_2602243) at '243 ██████████████████████████████████
███████████████████████ (emphasis added); Federal Court Ex. 21 (Federal Court Giardino Ex. 186) at '087 ████████████████████████████████████
████████████████████████████████████████████; Federal Court Ex. 29 (Federal Court Kroll Ex. 304) at '440 ████████████████████████
███████████████████████████████████████████████████;

---

steam-was-killing-pc-gaming-epic-games-is-saving-it/.

Federal Court Ex. 30 (Federal Court Giardino Ex. 178) at '439 ██████████████ (emphasis added); Federal Court Ex. 31 (Federal Court Newell Ex. 353) at '439 █████████████████ (emphasis added); Federal Court Ex. 32 (Federal Court Giardino Ex. 195) at '887 ████████████████████

40.    Valve's PMFN is anticompetitive because it prevents rivals from competing on price.

41.    For example, assume that a game publisher wants to receive $35 in revenue for each sale of a new PC game it has created. If that publisher sells on the Steam Store, it must offer the game to consumers for $50. If there were no PMFNs, and a competitor platform offered a 10% commission, the publisher could offer that game for $40 on the competitor platform and make $36 on each sale while also increasing sales volume. Instead, because of the PMFNs, the publisher must offer the new game at $50 across all platforms, or risk being excluded from Valve and its massive audience on the Steam Store.

42.    Valve has punished publishers for violating its PMFN Policy by delisting (or threatening to delist) a publisher's game from Steam altogether. ██████████████ Federal Court Ex. 35 (Federal Court Malone Ex. 248) at '684. ████ *Id.* ██████████ *Id.* In other words, Valve directly blocked price competition. ████████████████ Federal Court Ex. 36 (Federal Court Gerber Ex. 107) at '883–84. ████ Federal Court Ex. 37 (Federal Court Blue Ex. 86) at '912-13.

43.    PMFNs deny consumers lower prices, restrict entry of new, lower-priced gaming platforms, and stifle innovation. There is no sufficient pro-competitive justification for Valve's PMFNs.

44.    Because it faces virtually no competition, Valve does not significantly invest in improving the Steam platform. Federal Court Ex. 33 (Powers 30(b)(6) Tr.) at 37-38 ██████████; Federal Court Ex. 76 (Federal Court Johnson Ex. 27) at '458 ████████████████████

45.    As the founder of Epic Games, a company that tries to compete against Valve but
struggles to do so, explained: "Steam has veto power over prices, so if a multi-store
developer wishes to sell their game for a lower price on the Epic Games store than Steam,
then … Valve can simply say 'no.'"[9]

46.    Valve's PMFN maintains Valve's monopoly position because consumers are,
unsurprisingly, uninterested in switching to a new online storefront (which requires
installing a new storefront's software) to purchase the same product for the same price.

47.    Because fledgling rivals cannot draw in new customers by offering consumers a lower
price, they have failed or continue to struggle because of Valve's anticompetitive conduct.

48.    EA attempted to launch the Origin PC game store in June 2011, as a competitor to Steam.
To jumpstart Origin's user base, EA began publishing its new titles on Origin and other
distribution platforms, which also avoided paying Steam's commission. Rietveld Rpt.
¶¶96-97; Schwartz Rpt. ¶216. In October 2011, EA also began publishing third-party
games, including games from major publishers such as Capcom. Rietveld Rpt. ¶¶92, 96-
97.

Schwartz Rpt. ¶¶216-217; Rietveld Rpt. ¶96-97. EA
ultimately surrendered, announcing it would bring its games back to Steam in 2019.
Federal Court Ex. 60 (VALVE_ANT_0059430) at '430. Origin withered and ultimately
died, Rietveld Rpt. ¶¶96-97; Schwartz Rpt. ¶¶216-217.

49.    Valve's competitor Epic cannot break the Steam monopoly, even though it offers a
commission ***less than half*** of Valve's, because Valve's PMFN Policy prevents Epic from
competing on prices charged to consumers for games sold on both EGS and Steam.
Schwartz Rpt. ¶¶302-313.

50.



Federal Court Ex. 51 (VALVE_ANT_1193238) at '240-241.

Id. at '239

51.

Federal Court Ex. 61 (Malone Tr.) at 212.
Federal Court Ex. 69 (Federal Court Lynch Ex. 134) at '674

; Federal Court Ex. 70 (VALVE_ANT_0471786) at '188
; Schwartz Rpt. ¶308.
Federal Court Ex. 5 (Lynch Tr.) at 101-02

9 Tim Sweeney (@TimSweeneyEpic), TWITTER (Jan. 30, 2019, 9:29 AM),
https://twitter.com/timsweeneyepic/status/1090663312814157824?lang=en.



52. ██████████████████████████████████████████████████████████
Federal Court Ex. 61 (Malone Tr.) at 44. Ubisoft attempted to self-distribute through its own platform, Uplay, launching in 2012. Rietveld Rpt. ¶¶94-95; Schwartz Rpt. ¶¶213-214. ████ Federal Court Ex. 62 (Federal Court Malone Ex. 263) at '128. ████████████████ Federal Court Ex. 63 (Federal Court Lynch Ex. 141) at '961-962. ████████████████████████ Federal Court Ex. 64 (Federal Court Malone Ex. 261) at '197. ██████████████████████████ As a result, Ubisoft's attempt to sell their games on alternative platforms failed and Division 2 is now available on Steam. *See id.*

53. Because fledgling rivals have failed or continue to struggle because of Valve's anticompetitive price restrictions, Valve maintains its dominant market position, continues to charge its supracompetitive prices, and imposes its 30% tax on PC games, harming consumers.

54. Valve also mandates that publishers use its "Steam Wallet" for any in-game purchases. Specifically, Valve requires that: "Your product must use Steam Wallet for any in-game transactions. This means that your product cannot link to other store pages that does not offer Steam Wallet." When game developers comply and use Valve's microtransaction system, they again must pay Valve's 30% supracompetitive tax.

55. Valve prohibits game developers from using any alternative system for in-game purchases or directing consumers to use an alternative system.[10] This means once a consumer purchases a game, they are stuck with making in-game purchases on Valve and cannot go to a competing store to make new purchases related that game, nor can the developer direct them to any cheaper store. Even if game developers could charge cheaper prices using their own or a rival store for in-game purchases, consumers would be effectively restricted from taking advantage of those lower prices because of Valve's "Steam Wallet" requirement.

## Valve Controls the Pricing for the Games Sold in the Steam Store

56. Not only are game developers prohibited from selling their games for less at rival stores offering far lower service fees, but Valve also insists on high prices in its own store.

---

10 Similar anti-steering provisions in Apple's App Store were recently found to be illegal under U.S. antitrust law. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1003 (9th Cir. 2023).

57.    All prices for games sold on the Valve's Steam Store are subject to Valve's review and discretion. Their documentation states "Initial pricing as well as proposed pricing adjustments will be reviewed by Valve and are usually processed within one or two business days."

58.    Valve offers "Regional Pricing Recommendations," a list of prices by region that Valve thinks game developers should charge for their games to maximize the amount of money consumers have to pay.

59.    Valve is explicit about its effort to extinguish competition. In Valve's Steamworks documentation, Valve instructs that, when setting prices, game developers shouldn't be "trying to undercut competition with a lower price."

60.    Because Valve prohibits offering lower prices via rival stores, these efforts to keep prices high on Steam mean higher prices in rival stores, too, keeping prices higher market-wide.

### Valve Neutralizes, Bribes, and Buys Out Potential Competition

61.    Valve works with many would-be competitors to sell "Steam Keys," digital codes that activate a PC game purchase on Steam.

62.    This creates the appearance of a competitive market where there isn't one. For example, a consumer purchasing a "Steam Key"-enabled PC game at Wal-Mart may believe Wal-Mart is competing with Valve. But in actuality, Wal-Mart is simply selling Valve's product.

63.    Like with sales on competing digital storefronts, game developers who sell Steam Keys at retailers like Wal-Mart must agree to "sell your game on other stores in a similar way to how you sell your game on Steam. It is important that you don't give Steam customers a worse deal than Steam Key purchasers."[11]

64.    Valve interprets and enforces this language to mean that retailers selling Steam Keys cannot offer consumers a lower price on the games sold. Functionally, this means would-be competitors like Wal-Mart, to the extent they are in the PC games distribution market, do not compete on price, meaning consumers pay more for games.

65.    These partnerships with Valve provide Valve with a commercial kill switch that permits Valve to disrupt or shut down any partner who starts generating meaningful sales in competition with Valve's core Steam platform, as Valve can cease providing the codes or supporting their use.

66.    Valve previously worked with an organization known as Humble Bundle to sell Steam Keys online. This included working with Humble Bundle to ensure game keys were securely delivered to customers.

---

11 https://partner.steamgames.com/doc/features/keys

67.    But after Humble Bundle's distribution of Steam-enabled games began to grow and present potential competition to Valve, Valve abruptly removed the secure integration between Humble Bundle and the Steam Gaming Platform. After Valve terminated the direct integration, Humble Bundle's sales growth declined.

68.    Valve offers millions of dollars in kickbacks to the game publishers and tech companies who are most likely to launch a competing store.

69.    While the vast majority of games sold on Steam are charged the 30% tax with no rebates, the largest gaming companies—Microsoft, Electronic Arts, and Take-Two Interactive are offered tens if not hundreds of millions of dollars a year in kickbacks, provided they continue to sell a sufficiently high volume of games on Steam and commit to charge the same or a higher price on competing platforms—even their own. This kickback system ensures prices stay high for consumers and the most viable potential competitors to Valve don't meaningfully compete.

70.    Under the U.S. Department of Justice's antitrust guidelines, the DOJ measures market concentration levels using the Herfindahl-Hirschman Index, or HHI. Those guidelines state: "Markets with an HHI greater than 1,800 are highly concentrated." Valve's HHI is more than three times what the DOJ considers problematically concentrated: 5,625.

71.    According to the DOJ, "Mergers raise a presumption of illegality when they significantly increase concentration in a highly concentrated market." Specifically, given Valve's HHI, any merger or integration with an actual or would be competitor with greater than 0.66% market share is presumptively a violation of antitrust law.

72.    A subsidiary of Microsoft, Bethesda, used to offer a competing digital store front and game launcher which sold Bethesda's games. But Valve entered into an agreement with Bethesda wherein Bethesda's competing digital store was absorbed into the Steam platform.

73.    Microsoft and its subsidiary Bethesda had more than 0.66% market share in the PC game market at the time of the merger.

74.    Because Microsoft and its subsidiary Bethesda had more than 0.66% market share in the PC game market at the time of merger, that merger was presumptively illegal under the DOJ guidelines.

### Valve's Conduct Illegally Raises Prices for Consumers

75.    Monopolies and cartels raise prices for consumers.

76.    Monopolies and cartels are illegal under the Sherman Act.

77.    The Sherman Act doesn't define specific conduct that is an illegal restraint of trade. Rather, the Sherman Act recognizes that there is no end to the creativity of businesses

looking to increase profits by reducing competition, and so makes illegal "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce."

78.     Companies in factually analogous situations to Valve have been found to have violated the Sherman Act.

79.     Courts employ the DOJ's HHI guidelines in finding mergers, like that between Valve and Microsoft's Bethesda Laucher, illegal. *Saint Alphonsus Medical Center-Nampa Inc. v. St. Luke's Health System, Ltd.* "The extremely high HHI on its own establishes the prima facie case." *Id.*

80.     Courts have found policies that prohibit linking to cheaper payments options, such as Valve's requirement that in-game transactions occur via the Steam Wallet and not any other method, illegal under the Sherman Act. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1003 (9th Cir. 2023).

81.     Courts have found that giving kickbacks or other "free money" to potential competitors, like those Valve provides Microsoft and others who sell a high volume of PC games on their platform, violates the Sherman Act—even when that money isn't explicitly conditioned on continued non-competition. *In re Google Play Store Antitrust Litigation*, Case No. 3:20-cv-05671-JD, (N.D. Cal. filed Dec. 11, 2023) (No. 606)

82.     Courts regularly find price fixing and price coordination illegal, and recognize that price parity requirements like that Valve imposes can be price restraints. *Frame-Wilson et al v. Amazon.com Inc,* No. 2:20-20-cv-00424 (W.D. Wash. 2022).

83.     Valve itself has already been fined in Europe for its illegal antitrust activities. *European Commission Press Release*, "Antitrust: Commission fines Valve and five publishers of PC video games € 7.8 million for 'geo-blocking' practices" (20 January 2021).

84.     When a "conspiracy causes market prices to rise and thereby to injure consumers," consumers are entitled to recover damages "regardless of whether they purchased from the conspirators or from their innocent rivals." Areeda & Hovenkamp, Treatise on Antitrust Law (5th) at 347.

85.     The policy of ensuring free market competition is so important that even where plaintiffs are unable to demonstrate damages, claims can still prevail under the Sherman Act. *U.S. Airways, Inc. v. Sabre Holdings Corp.*, 11 Civ. 2725 (LGS) (S.D.N.Y. June 1, 2023) (awarding attorneys' fees where jury found nominal damages of $1, trebled to $3)

Pre-Dispute Negotiations

86.     On July 12, 2023, Bucher Law PLLC and AFN Law PLLC sent a written letter and email to Valve indicating their clients' intent to arbitrate their antitrust claims. The letter laid out the consumers' antitrust theory of the case, provided the names for all claimants including Lance Vicente, proposed a settlement structure and amount that could resolve all the claims, and noted the consumers were "prepared to engage in good faith discussions for

30-days to attempt to resolve our clients' claims before we initiate arbitration against you."

87. On July 25, 2023, Valve responded. Valve took issue with the opening letter addressing all the consumers' claims in a single notice, insisting that under the terms of the Steam Subscriber Agreement, all claims must be advanced and negotiated individually.

88. Moreover, Valve stated "it is necessary to follow the procedure outlined in the Steam Subscriber Agreement. To start that process, Valve needs a written notice that identifies each individual subscriber, and that subscriber's Steam account, gives the subscriber's location, describes the nature and basis of that subscriber's claim or dispute, and sets forth the relief that subscriber seeks. Such a notice will commence the 30-day informal dispute resolution period under Section 11.B."

89. While the Steam Subscriber Agreement does not require an individual notice laying out all the information Valve demanded, Lance Vicente was willing to accommodate. On 08/31/2023, Lance Vicente sent an individual written notice to Valve which provided Lance Vicente's Steam account, state and city of residence, described the nature of Lance Vicente's antitrust claim, and opened settlement discussions with Valve regarding Lance Vicente's individual claim.

90. On September 20, Valve sent an email addressing all the claimants collectively, stating they "anticipate[d] that we will respond to each of the letters on or before October 31." This would mean waiting 60-days to even begin the good faith negotiation process that was contractually required to conclude within 30-days.

91. While many consumers were willing to wait for Valve's response, Lance Vicente opted to file their case on October 2—more than 30 days after Lance Vicente sent their individualized written notice. Valve never responded to Lance Vicente's individual demand, either within the required 30-days or by October 31, 2023, as Valve had indicated they would.

92. Instead, Valve responded to the individual filings with a collective letter on October 10. In the October letter, Valve complains that the individual written notices it received were not "efficient," even though Valve's July 25 letter chastised the consumers for making a joint demand via a single letter and specifically asked for individualized written notices. Valve acknowledges that over 21,000 consumers made individual settlement offers, but then asserts the consumers "refuse to provide amounts to settle their individual claims alone." The letter states "We remain available to meet with your clients (including the 18,204 new ones) one-on-one to answer their questions," yet Valve never previously offered to meet with Lance Vicente or any of the consumers one-on-one and insisted in their July 25 letter that the informal negotiations should begin with a "written" notice.

93. Valve concluded the October 10 collective letter by stating "Valve sees little point in responding to your 35,000 near-copycat emails."

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Sherman Act Section 2—Monopolization of the PC Game Transaction Platforms Market (15 U.S.C. § 2)

94. Valve has willfully acquired and maintained monopoly power in the market for PC Game Transaction Platforms, by means of exclusionary, and anticompetitive conduct, including but not limited to market-wide price controls and presumptively illegal mergers with competitors, as alleged herein.

95. Through the PMFN, Valve has coerced publishers into agreeing to offer their games at the same price across all PC Game Transaction Platforms, regardless of whether competing platforms charge lower commissions or otherwise charge lower prices than Valve.

96. In the absence of the Valve PMFN, rivals in the PC Desktop Game Transaction Platforms market would charge lower prices and force Valve to compete. Such competition would in turn lower prices on Valve's own PC Game Transaction Platform, benefiting consumers and publishers that utilized Valve's PC Game Transaction Platform.

97. Valve's conduct is not justified, because its conduct does not enhance overall efficiency or make the relevant markets more efficient.

98. Valve's conduct has had a substantial effect on interstate commerce.

99. Lance Vicente has been injured in their property as a result of Valve's conduct.

100. Lance Vicente has suffered and will suffer injury of the type that antitrust laws intend to prevent. Lance Vicente has been and will be injured by harm to competition as a result of Valve's conduct.

101. Lance Vicente estimates that the actual damage suffered was in the amount of $2,340. Under the Sherman Act, if Lance Vicente prevails, Lance Vicente is entitled to mandatory treble damages as well as a mandatory award of attorneys' fees.

102. Lance Vicente further seeks an order compelling divestiture of Valve's illegally acquired game platforms.

### SECOND CAUSE OF ACTION
### Sherman Act Section 2—Attempted Monopolization of the PC Desktop Game Transaction Platforms Market (15 U.S.C. § 2)

103. In the market for PC Desktop Game Transaction Platforms, Valve has engaged in exclusionary and anticompetitive conduct, including but not limited to market-wide price controls and presumptively illegal mergers, as alleged herein.

104.   Valve's conduct has had an anticompetitive effect in the alternative market for PC Game Transaction Platforms.

105.   Valve has engaged in that conduct with the specific intent of monopolizing the market for PC Desktop Game Transaction Platforms.

106.   Valve has engaged in that conduct with a dangerous probability of monopolizing the market for PC Game Transaction Platforms.

107.   In the absence of the Valve PMFN, rivals in the PC Game Transaction Platforms market would charge lower prices and force Valve to compete. Such competition would in turn lower prices on Valve's own PC Game Transaction Platform, benefiting consumers that utilized Valve's PC Game Transaction Platform.

108.   Valve's conduct has had a substantial effect on interstate commerce.

109.   Lance Vicente has been or will be injured in their property as a result of Valve's conduct.

110.   Lance Vicente has suffered and will suffer injury of the type that antitrust laws intend to prevent. Lance Vicente has been and will be injured by harm to competition as a result of Valve's conduct.

111.   Lance Vicente estimates that the actual damage suffered was in the amount of $2,340. Under the Sherman Act, if Lance Vicente prevails, Lance Vicente is entitled to mandatory treble damages as well as a mandatory award of attorneys' fees.

<u>THIRD CAUSE OF ACTION</u>
<u>Sherman Act Section 1—Anticompetitive Course of Conduct (15 U.S.C. § 1)</u>

112.   As alleged above, through its contractual agreements with game publishers, Valve has induced or coerced various publishers to enter into one or more contracts, combinations, or conspiracies to unreasonably restrain trade, to control prices or exclude competition, and to willfully acquire and maintain market power in the relevant markets.

113.   Valve's conduct has had, and continues to have, substantial anticompetitive effects in the relevant markets.

114.   Valve's conduct has no legitimate business purpose or procompetitive effect.

115.   There are less restrictive alternatives to the restraints that Valve has imposed.

116.   Valve's conduct has had a substantial effect on interstate commerce.

117.   Lance Vicente has been or will be injured in their property as a result of Valve's conduct.

118.    Lance Vicente has suffered and will suffer injury of the type that antitrust laws intend to prevent. Lance Vicente has been and will be injured by harm to competition as a result of Valve's conduct.

119.    Lance Vicente estimates that the actual damage suffered was in the amount of $2,340. Under the Sherman Act, if Lance Vicente prevails, Lance Vicente is entitled to mandatory treble damages as well as a mandatory award of attorneys' fees.

FOURTH CAUSE OF ACTION
Washington State Consumer Protection Act RCW 19.86

120.    The claims alleged above constitute unfair methods of competition under Washington State law provisions 19.86.020, 19.86.040, and 19.86.030.

121.    Valve is engaged in unfair and deceptive practices in commerce, which affect the public interest and cause injury to business and property.

122.    Valve's contracts, combinations, or conspiracies with game publishers are anticompetitive restraints that have the purpose and effect of fixing and inflating prices in the relevant markets.

123.    The contracts, combinations, or conspiracies at issue are in restraint of trade.

124.    Valve's monopolization and attempted monopolization have the purpose and effect of fixing and inflating prices in the relevant markets.

125.    As such, Lance Vicente is entitled to damages and an injunction under Revised Code of Washington 19.86.090.

126.    Under the Washington State Consumer Protection Act RCW 19.86, if Lance Vicente prevails, Lance Vicente is also entitled to an award of attorneys' fees.

# EXHIBIT 3

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

ONE MANHATTAN WEST

NEW YORK, NY 10001-8602

———

TEL: (212) 735-3000

FAX: (212) 735-2000

WWW.SKADDEN.COM

DIRECT DIAL
212-735-3529
DIRECT FAX
917-777-3529
EMAIL ADDRESS
MICHAEL.MCTIGUE@SKADDEN.COM

FIRM/AFFILIATE OFFICES
———
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
PALO ALTO
WILMINGTON
———
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MUNICH
PARIS
SÃO PAULO
SEOUL
SHANGHAI
SINGAPORE
TOKYO
TORONTO

<u>CONFIDENTIAL</u>

October 19, 2024

**<u>VIA ELECTRONIC MAIL</u>**

Arbitrator Suzanne M. McSorley
Stevens & Lee, PC
100 Lenox Drive, Suite 200
Lawrenceville, NJ 08648
smcs@stevenslee.com

RE:    *Kenshad Brown & 23 Other Individual Claimants v.*
       <u>*Valve Corp.*</u>: Petition to Enjoin Arbitrations[1]

Dear Arbitrator McSorley:

We write on behalf of Respondent Valve Corporation ("Valve") to inform this Tribunal that Valve filed a petition in the United States District Court for the Western District of Washington against all claimants in these arbitrations ("Claimants") to enjoin them from continuing to pursue their arbitrations because there is no agreement to arbitrate between the parties. The Petition to Enjoin Arbitrations and accompanying Memorandum of Points and Authorities in Support of Petition to Enjoin Arbitrations are attached hereto as **Exhibits 1 and 2**.

Respectfully, this Tribunal should immediately stay these proceedings and defer to the federal court, which has exclusive jurisdiction over the threshold issue of whether there is an agreement to arbitrate. While we do not believe a conference or formal motion is necessary, to the extent this Tribunal believes one is, we ask that this letter be considered as a request for a conference and/or to be deemed such a motion. Valve's submission of this letter is under a full reservation of rights as these arbitrations should be closed because there is no longer an agreement to arbitrate.

---

[1]    The full list of 24 arbitrations is set forth in <u>Appendix A</u> hereto.

Arbitrator McSorley
October 18, 2024
Page 2


Sincerely,

/s/ *Michael W. McTigue Jr.*

Michael W. McTigue Jr.

cc:     All counsel of record

Arbitrator McSorley
October 18, 2024
Page 3

**Appendix A: List Of All Cases**

| Case Number | Claimant Name |
| --- | --- |
| 01-23-0005-2886 | Kenshad Brown |
| 01-23-0005-2936 | Robert Richelson |
| 01-23-0005-2957 | Bernard Vignali |
| 01-23-0005-3105 | Gabriel Rodrigues |
| 01-23-0005-3106 | Armando Martinez |
| 01-23-0005-3145 | Alec Birenbaum |
| 01-23-0005-3173 | Brett Flinn |
| 01-23-0005-3175 | Cole Hagan |
| 01-23-0005-3219 | Jake Wuebker |
| 01-23-0005-3225 | Aleck Hernandez |
| 01-23-0005-3238 | Corbin Echevarria |
| 01-23-0005-3314 | Abed Balbaky |
| 01-23-0005-3344 | Alexander Mishkevich |
| 01-23-0005-3352 | Lance Vicente |
| 01-23-0005-3433 | Paul Mayer |
| 01-23-0005-3517 | Mark Mendel |
| 01-23-0005-3542 | Mateus Cunha |
| 01-23-0005-3590 | Robert Woolf |
| 01-23-0005-3678 | Mark Schaefer |
| 01-23-0005-3681 | Matthew Ventures |
| 01-23-0005-3696 | Ajay Dalal |
| 01-23-0005-3698 | Anthony Mittasch |
| 01-23-0005-3762 | Conor Moschella |
| 01-23-0005-3802 | Joshua DePalma |

# EXHIBIT 4

**American Arbitration Association**
**Consumer Arbitration Rules**

**Decision and Order**
**Respondent's Motion to Dismiss (*Coinbase*)**


Cases Identified on **Attachment 1**

**24 Individual Claimants,**

   **Claimants,**

**-vs-**

**Valve Corporation d/b/a Steam,**

       Respondent.

      Claimants in these matters commenced these arbitrations in or about late September and/or October of 2023.  The appointment of this Arbitrator for these matters was confirmed in April 2024.  Thereafter, Respondent participated actively and voluntarily in multiple proceedings:  there were preliminary hearings in these matters in June, 2024, after which Respondent moved to dismiss the matters on grounds, among others, that the Claimants had failed to satisfy the requirements of the arbitration clause in the Steam Subscriber Agreement ("SSA").  That motion to dismiss was denied by decision and order of this Arbitrator on or about August 12, 2024.  Respondent thereafter entered into negotiations with Claimants and this Arbitrator about the scope and timing of discovery, and about the terms of a Protective Order.  A Protective Order was entered on or about September 11, 2024.

      At some point before September 27, 2024, Respondent posted new SSA terms on the Steam platform, removing arbitration as the mode of dispute resolution and instead providing for litigation in courts located in King County, Washington.

      Despite its active participation in these arbitration proceedings, Respondent now seeks to remove these matters from arbitration, contending that there are two contracts governing its relationship with each of the Claimants with different dispute resolution clauses, and that, under *Coinbase, Inc. v. Suski,* 144 S. Ct 1186 (2024), such a conflict can only be resolved by a Court.

      These arbitrations do not present a situation to which *Coinbase* applies.  Respondent's motion is DENIED.  Unlike the situation in *Coinbase*, there is and was only one contract governing the relationship between the parties at the time the parties commenced these arbitrations and, for nearly a year, Respondent has participated actively in the arbitration proceedings.  (It is important to note that Respondent has also not provided any evidence that any of these Claimants in fact has taken any step to indicate acceptance of the terms posted by Respondent at some point before September 27, 2024, raising a question of fact as to whether there is any second contract at all).

Respondent has also sought to reverse the provision of the Initial Scheduling Order permitting direct communications with the Arbitrator, as long as all other parties and the AAA are copied on all such communications. That request is denied without prejudice to renewal if Respondent believes there is a good faith basis for renewing it.

Dated: October 27, 2024

Suzanne M. McSorley
smcs@stevenslee.com
Arbitrator

**ATTACHMENT 1**

| | | |
|---|---|---|
| 012300052886 | Kenshad Brown | Suzanne M. McSorley |
| 012300052936 | Robert Richelson | Suzanne M. McSorley |
| 012300052957 | Bernard Vignali | Suzanne M. McSorley |
| 012300053105 | Gabriel Rodrigues | Suzanne M. McSorley |
| 012300053106 | Armando Martinez | Suzanne M. McSorley |
| 012300053145 | Alec Birenbaum | Suzanne M. McSorley |
| 012300053173 | Brett Flinn | Suzanne M. McSorley |
| 012300053175 | Cole Hagan | Suzanne M. McSorley |
| 012300053219 | Jake Wuebker | Suzanne M. McSorley |
| 012300053225 | Aleck Hernandez | Suzanne M. McSorley |
| 012300053238 | Corbin Echevarria | Suzanne M. McSorley |
| 012300053314 | Abed Balbaky | Suzanne M. McSorley |
| 012300053344 | Alexander Mishkevich | Suzanne M. McSorley |
| 012300053352 | Lance Vicente | Suzanne M. McSorley |
| 012300053433 | Paul Mayer | Suzanne M. McSorley |
| 012300053517 | Mark Mendel | Suzanne M. McSorley |
| 012300053542 | Mateus Cunha | Suzanne M. McSorley |
| 012300053590 | Robert Woolf | Suzanne M. McSorley |
| 012300053678 | Mark Schaefer | Suzanne M. McSorley |
| 012300053681 | Matthew Ventures | Suzanne M. McSorley |
| 012300053696 | Ajay Dalal | Suzanne M. McSorley |
| 012300053698 | Anthony Mittasch | Suzanne M. McSorley |
| 012300053762 | Conor Moschella | Suzanne M. McSorley |
| 012300053802 | Joshua DePalma | Suzanne M. McSorley |

**EXHIBIT 5**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

ONE MANHATTAN WEST

NEW YORK, NY 10001-8602

———

TEL: (212) 735-3000

FAX: (212) 735-2000

WWW.SKADDEN.COM

FIRM/AFFILIATE OFFICES
———
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
PALO ALTO
WILMINGTON
———
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MUNICH
PARIS
SÃO PAULO
SEOUL
SHANGHAI
SINGAPORE
TOKYO
TORONTO

DIRECT DIAL
212-735-3529
DIRECT FAX
917-777-3529
EMAIL ADDRESS
MICHAEL.MCTIGUE@SKADDEN.COM

<u>CONFIDENTIAL</u>

December 20, 2024

<u>**VIA ELECTRONIC MAIL**</u>

Arbitrator Suzanne M. McSorley
Stevens & Lee, PC
510 Carnegie Center Drive, Suite 400
Princeton, NJ 08540
smcs@stevenslee.com

RE:    *Kenshad Brown & 23 Other Individual*
    *Claimants v. Valve Corp.*: Claimant Communications to Valve[1]

Dear Arbitrator McSorley:

    We write on behalf of Respondent Valve Corporation ("Valve") to briefly respond to Claimants' Counsel's letter dated December 19, 2024, submitted in opposition to Valve's letter to the Tribunal dated December 12, 2024, requesting a case management conference attended by each Claimant.

    **First**, Claimants' Counsel complains that Valve has not identified Claimants who have communicated with Valve. *See* Claimants' Response to Valve's December 12, 2024 Correspondence at 1. As Valve informed Judge Whitehead in its motion seeking leave to provide a court-approved statement to those Respondents informing them of the nature of the action, Valve has evidence that Claimants' Counsel has been intimidating Claimants and is concerned that Claimants' Counsel will retaliate against Claimants who have communicated with Valve. *See* Attachment A, Petitioner's Reply ISO Its Renewed *Ex Parte* Motion Seeking Leave To Provide Communication To Certain Respondents at 4 n.2, *Abbruzzese v. Valve Corp.*, 24-cv-1717 (W.D. Wash. 2024) (Dkt. 51) (quoting one claimant who told Valve that Bucher threatened to charge him "a bunch of money" if he withdrew his arbitration claim).  Claimants' Counsel has already requested disclosure of these Claimants in the federal court; any requests

---

[1]    The full list of 24 arbitrations is set forth in <u>Appendix A</u> hereto.

Arbitrator McSorley
December 20, 2024
Page 2

directed to individual arbitrators for such disclosure are therefore improper. *See id.* at 2-3 ("Bucher and [local counsel] would have no need to ask for the identity of the individuals who reached out to Valve if they actually represented those individuals."). Notably, two other arbitrators have nonetheless denied such improper requests. *See* Attachment B at 20:20-21. ("I'm not going to order [Valve] now here to potentially reveal that name."); *see also* Attachment C at 17:23-24. ("I don't need [Valve] to divulge the names of people who contacted [Valve.]").

**Second**, there is nothing "privileged" about whether a Claimant (i) is aware of and has authorized their own arbitration, (ii) is aware of the Petition to Enjoin these Proceedings pending in the U.S. District Court for the Western District of Washington (the "Petition"), or (iii) is aware of the putative class action Claimants' Counsel has filed on behalf of a nationwide class—including these same Claimants—seeking what Claimants' Counsel has described as "overlapping" relief and in an effort to forum shop. *See* Attachment D, Complaint ¶ 13-14, *Elliott v. Valve Corporation*, No. 2:24-cv-01218 (W.D. Wash.) (Dkt. 1) (Claimants' Counsel arguing that one arbitrator's invalidation of Valve's arbitration clause "demonstrates [Valve claimants'] ability to vigorously prosecute this action on behalf of the proposed class"). Any privilege concerns can be addressed during the case management conference. Claimants' Counsel's unsworn statement that "Bucher Law PLLC is authorized by Claimants to pursue their claims against Valve" is flatly refuted by the communication Valve received from one of these very Claimants, as set forth in our December 12, 2024 letter. The Claimant who contacted Valve did not even know Claimants' Counsel was prosecuting an arbitration on his behalf. He thought he had "signed up for some steam class action lawsuit." Moreover, he now seeks to "resolve the situation."

**Third**, Claimants' Counsel falsely claims that Valve served Claimants with the intention of "confusing and intimidating them." Before attempting to serve a single Claimant, Valve emailed Claimants' Counsel to ask whether he (i) represented Claimants and other Respondents in connection with the Petition and (ii) would agree to accept service on their behalf. By accepting service, Claimants' Counsel would have avoided personal service on any Claimant.

But Claimants' Counsel did not accept service. Nor did Claimants' Counsel confirm which, if any, Respondents he represented in connection with the Petition. Instead, Claimants' Counsel requested service waivers under Rule 4 of the Federal Rule of Civil Procedure. Yet Claimants' Counsel did not indicate that he had

Arbitrator McSorley
December 20, 2024
Page 3

**authority** to execute waiver of service forms or that any Respondent would actually execute a service waiver.[2]

It is now clear that Claimants' Counsel's request for service waivers—instead of an agreement to actually accept service—was a mere delay tactic. That is confirmed by Claimants' Counsel's now moot and improper motion to stay the entire Petition filed on behalf of a single Respondent who has since been withdrawn from the action.[3] As Claimants' Counsel knew, service waivers would have engendered an extensive and unwarranted delay: Respondents would have 30 days to return the service waivers and 60 days to respond to the Petition after receiving the waivers. Therefore, Valve commenced personal service on Respondents to ensure that the Petition was resolved expeditiously.

Valve makes this submission under a full reservation of rights, as these arbitrations should be closed because there is no longer an agreement to arbitrate between the parties.

Respectfully,

/s/ *Michael w. McTigue Jr.*

Michael W. McTigue Jr.

cc:    All counsel of record

---

[2]    Incredibly, Claimants' Counsel is also hiding the ball from the federal court. On December 2, 2024, the court ordered him to appear on behalf of all Claimants he represents or to explain why he could not do so by December 9, 2024. Claimants' Counsel did not do so. Every Claimant before you—in addition to hundreds of other Respondents in the Petition—remain unrepresented.

[3]    Claimants' Counsel filed a motion on behalf of a single Respondent, who is not a Claimant in these arbitrations, seeking to stay the Petition as to all Respondents on the ground that the Respondent is currently on active military duty. Valve has since withdrawn the Petition as to that Respondent, mooting the motion.

Arbitrator McSorley
December 20, 2024
Page 4

**Appendix A: List Of All Cases**

| Case Number | Claimant Name |
|---|---|
| 01-23-0005-2886 | Kenshad Brown |
| 01-23-0005-2936 | Robert Richelson |
| 01-23-0005-2957 | Bernard Vignali |
| 01-23-0005-3105 | Gabriel Rodrigues |
| 01-23-0005-3106 | Armando Martinez |
| 01-23-0005-3145 | Alec Birenbaum |
| 01-23-0005-3173 | Brett Flinn |
| 01-23-0005-3175 | Cole Hagan |
| 01-23-0005-3219 | Jake Wuebker |
| 01-23-0005-3225 | Aleck Hernandez |
| 01-23-0005-3238 | Corbin Echevarria |
| 01-23-0005-3314 | Abed Balbaky |
| 01-23-0005-3344 | Alexander Mishkevich |
| 01-23-0005-3352 | Lance Vicente |
| 01-23-0005-3433 | Paul Mayer |
| 01-23-0005-3517 | Mark Mendel |
| 01-23-0005-3542 | Mateus Cunha |
| 01-23-0005-3590 | Robert Woolf |
| 01-23-0005-3678 | Mark Schaefer |
| 01-23-0005-3681 | Matthew Ventures |
| 01-23-0005-3696 | Ajay Dalal |
| 01-23-0005-3698 | Anthony Mittasch |
| 01-23-0005-3762 | Conor Moschella |
| 01-23-0005-3802 | Joshua DePalma |

# EXHIBIT 6

## AMERICAN ARBITRATION ASSOCIATION

### Consumer Arbitration Rules

---

Case Number: 01-23-0005-3145

Alec Birenbaum, Claimant,

-vs-

Valve Corporation d/b/a Steam, Respondent.

---

### AWARD OF ARBITRATOR

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties, and a hearing having been held on July 21, 22, 23, 24, 28, 29, 30 and 31, 2025 in Princeton, New Jersey, with certain witnesses appearing via video conference, and having heard the testimony of the fact and expert witnesses presented by the parties at that time, and having considered the documentary evidence offered by Claimant and by Respondent, and having considered the pleadings and the arguments of counsel, including the post-hearing briefing filed by both parties on August 26, 2025, and, further, having considered Claimants' Affidavit of Services and other supporting documentation filed on September 10, 2025; and Claimant having been represented at the time of the hearing by William Bucher, Esq. of Bucher Law PLLC and multiple affiliated attorneys, and Respondent having been represented at the time of the hearing by Priyanka Timblo, Esq. of Howell Shuster & Goldberg LLP, and multiple other attorneys from her firm, along with multiple affiliated attorneys; hereby **FIND and issue this FINAL AWARD** as follows:

I.    **Introduction; Claims Asserted and Pursued at the Hearing.**

    A.    Claimant is an individual, residing in the State of New Jersey, who has played games on the PC gaming platform, "Steam," provided by Respondent Valve Corporation, from at least 2008.

    B.    Claimant has asserted antitrust claims under the Sherman Act, 15 U.S.C §§ 1 and 2, and claims of violation of the Washington Consumer Protection Act, RCW 19.86 et seq.  More particularly, Claimant seeks damages (1) under 15 U.S.C § 1 for alleged price fixing by Respondent;[1]

---

[1]  Although asked to submit Issues of Fact and Law to be decided by the Arbitrator both as part of the Pre-hearing Submissions (filed two weeks before the hearing commenced in July 2025), and, again, with certain preliminary post-hearing submissions filed at the end of the first week of August, at the same time that the parties submitted their agreed list of Exhibits admitted during the hearings, it appears that Claimant argues for the first time in his post-hearing brief, submitted on August 26, that the "post and hold" requirements Respondent imposes on game developers/distributors constitute a *per se* violation of 15 U.S.C. § 1.  Since Respondent had no opportunity to respond to this apparently new legal theory of liability, I have not considered it in rendering this Award.

(2) alternatively, under 15 U.S.C § 1, for Respondent's conduct which Claimant asserts imposes an unreasonable restraint of trade on a relevant geographic and product market under the "rule of reason; (3) under 15 U.S.C § 2 for monopolization of a relevant geographic and product market; and (4) under RCW 19.86 for alleged "anti-steering" restrictions, which Claimant alleges also violated 15 U.S.C § 1.

II.  **Procedural History.**  This matter is one of 24 arbitrations that were assigned to this arbitrator.  The matters were not and are not consolidated.  However, because the parties recognized the many issues of fact and law common to all 24 matters, these matters have been dealt with jointly in the pre-hearing process for purposes of efficiency only.  The parties then agreed to identify two matters to be tried first in in-person proceedings, and, while not formally agreeing to consolidate the two matters tried first, did agree to cross-admit all testimony and documents admitted in those proceedings, except for each Claimant's Direct testimony.

A.  Claimant filed his demand for arbitration on October 2, 2023. The undersigned was duly confirmed as the arbitrator for this matter in March 2024.

B.  The parties participated in a preliminary hearing on June 5, 2024, but advised at the time of the preliminary hearing that they had not come to the preliminary hearing with a plan for the exchange of information related to the claims.  Thus, the preliminary hearing only yielded an order directing the parties to "confer regarding the nature, scope and timing of information exchange" and to "report . . . regarding the proposed schedule for information exchange on or before . . . July 15, 2024."  It also set a briefing schedule for the Respondent's anticipated motion to dismiss.

C.  On July 15, 2024, the parties reported that they could not agree upon a plan for the exchange of information, but instead provided a schedule for the parties to address their competing positions regarding the nature and scope of information exchange, in advance of a further conference scheduled for August 21, 2024.

D.  In the interim, on August 12, 2024, the Arbitrator denied Respondent's motion to dismiss.

E.  At the August 21, 2024 conference, after argument, the Arbitrator indicated that the information exchange would be phased, starting with Respondent's prompt production of the information Respondent indicated it was prepared to provide. The Order contemplated that this initial production would occur no later than September 20, 2024.

F.  In the interim, by letter dated August 27, 2024, Respondent sought to stay all proceedings in all 24 matters.  That motion was denied by Order dated September 7, 2024.

G.  Respondent nevertheless did not produce information by September 20 – or at any time in September 2024.  Starting with correspondence dated September 27, 2024 directed to the AAA, and initially forwarded to this Arbitrator by AAA on September 30, 2024, and later forwarded with Claimant's response on October 8, 2024, Respondent again sought to remove these matters from arbitration, arguing this time that Respondent's modifications to the Valve on-line Subscriber agreement, made by Valve well after the commencement of these arbitration matters, had divested the AAA and this Arbitrator of jurisdiction over these pending arbitrations.  After receiving briefing from the parties, and hearing argument on this application on October 25, 2024, Respondent's motion was denied by Order entered on October 27, 2024.

H.  Given Respondent's indication during the October 25, 2024 hearing on Respondent's motion to dismiss on jurisdictional grounds that Respondent would not voluntarily participate in information exchange (because of its continuing objections to the Arbitrator's exercise of jurisdiction), on October 27, 2024, the Arbitrator also entered an Order setting a briefing schedule for an anticipated motion to compel to be filed by Claimants.

I.  In response to the entry of the October 27th Order, however, on October 30, 2024, Respondent advised that, "Valve is prepared to produce the requested documents subject to clarification and resolution of several issues related to the protective order[.]"  Accordingly, the next day the Arbitrator advised the parties, "I am treating the below . . . as a Motion on behalf of Respondent to Modify the Protective Order," and set a deadline for receipt of Claimants' briefing in response to that motion.

J.  After receipt and consideration of the parties' arguments, on November 9, 2024, the Arbitrator entered an Order Amending Protective Order and Setting Deadline for Production of Information.  In addition, the Order set November 22, 2024 as the deadline for the production of responsive information, in the absence of a showing of good cause.

K.  On November 14, 2024, Claimants requested that Respondent be required to make its production by November 19. Respondent disagreed, stating that it would be prepared make its production as ordered by November 22. The Arbitrator confirmed the requirement that production be completed by November 22, 2024.

L.  On November 23, 2024, the Arbitrator scheduled a follow-up hearing for December 2, 2024 "to address any remaining information exchange issues and to discuss the format and scheduling of hearing[.]" During the December 2 conference it emerged that both Claimants and Respondent believed that the information exchange was incomplete and, that both parties required further information exchange.  Consequently, on December 2, 2024, the Arbitrator set a schedule for further and final information requests and response, with the parties' production of responsive information to conclude by January 10, 2025, assuming the parties could work out objections to one another's requests.

M.  In the interim, by letter dated December 12, 2024, Respondent sought a ruling from the Arbitrator requiring the Claimants to appear in person, rather than through counsel, for all status or other conferences in the matters.  This Arbitrator denied Respondent's application, noting that "Respondent has provided no factual basis for its application, nor has it pointed to a basis for this application in the Consumer Rules."

N.  In addition, the Arbitrator scheduled a conference for January 14, 2025, immediately following the date by which information exchange might be concluded under Scheduling Order No. 4, in the absence of further objections and disputes regarding information exchange.

O.  At the January 14, 2025 conference, the parties reported that the information exchange was not complete but, rather, they had proceeded no further than the exchange of additional requests and objections, and had not made any productions beyond the initial production – which was already subject to contest – made by Respondent on November 22, 2024.  Accordingly, the Arbitrator set a schedule for briefing of the parties' objections.

P.  The parties thereafter filed cross-motions to compel production of documents and information in response to various requests on January 28, 2025, and responses to the motions on February 4, 2025, and this Arbitrator thereafter entered a lengthy ruling on February 17, 2025, requiring

Respondent to produce certain information by February 24, 2025 and other information by March 9, 2025.  In addition, the February 17th Order set forth a schedule for the exchange of expert information and established certain pre-hearing submission requirements.

Q.    In addition, in response to the parties' inability to agree on the format of hearings, the parties submitted briefing and argument regarding the proper form of hearings, resulting in an Order dated March 2, 2025 establishing the dates for the hearing of this matter (and a second matter to be first tried) and setting this particular hearing as an in-person hearing, with certain witnesses permitted to testify via video conference.

R.    In April 2025, Respondent raised issues of Claimant having failed to adhere to the expert information exchange deadlines set forth in the February Order and therefore required further exchange of positions and the establishment of a new order regarding the timing of expert information exchange.

S.    As noted above, this matter was heard, in person, with some witnesses appearing via video conference, over eight days of live testimony on July 21-24 and July 28-31.  The parties submitted contested lists of exhibits admitted at the hearing on August 8, 2025, and the Arbitrator entered an Order dated August 9, 2025, confirming the admission into evidence of all exhibits which either party in its August 8 submission contended had been admitted.  The August 9th Order further advised parties that the post-hearing briefs, which were to be filed on or before August 26, 2025, "should address **all issues including entitlement to attorneys' fees**."

T.    The parties thereafter duly submitted post-hearing briefs on August 26, 2025, and Claimant timely submitted an Application for Attorneys' Fees (and Costs) with all the supporting documents required by the August 9, 2025 Order.

III.  ***Per Se* Claim of Price Fixing under Section 1 of the Sherman Act.**  I find that Claimant did not prove by a preponderance of the evidence that Respondent entered into price fixing agreements with game developers/publishers in violation of 15 U.S.C § 1.

IV.  **Relevant Product and Geographic Market.**  The parties agree that, for the most part, the threshold consideration for the remainder of Claimant's claims is the identification of the relevant product and geographic markets in which the alleged restraint(s) or the alleged monopolization has occurred.

A.    Claimant and Respondent provided nearly three days' of expert testimony from economists, Dr. Philip Cross, on behalf of Claimant, and Dr. Justin McCrary, on behalf of Respondent, on these issues of market definition, and the impact, if any, of the restraints alleged, and proved, by Claimant on competition.

B.    Having reviewed and considered the product market definition evidence provided, I conclude and find that Claimant proved by a preponderance of the evidence, based on the demonstrated cross-elasticity of demand:

1.    That the relevant product market consists of the market for the online distribution of PC games;

2.    That the relevant product market does not include (a) sellers who exclusively distribute "keys" for online games or (b) game designers who self-distribute their games and do not distribute any third-party games;

3.    That the relevant product market does not include games developed and played on consoles or on mobile devices; and

4.    That the relevant product market could include games distributed through brick-and-mortar sales, but that that channel of distribution is miniscule and diminishing, and therefore is not significant enough to be considered.

C.    Further, I find that Claimant proved by a preponderance of the evidence, that the relevant geographic market is limited to the United States.

1.    Respondent argued that, to the contrary, the geographic market for the claims at issue here should be global, like the market for game developers who distribute their games on Respondent's platform. The evidence shows, however, that the player/purchaser side of the platform provided by Respondent is subject to different constraints than the developer/publisher side, including that players cannot readily switch between various country-specific storefronts and that credit card transactions "out of country" may violate the cards' terms of service. As such, as noted above, I conclude that the geographic market should be limited to the United States.

## V.  Respondent's Market Power.

A.    I find that Claimant proved by a preponderance of the evidence that Respondent's market share in the relevant product market is at least 70% and is more likely in excess of 80%.

1.    In reaching this conclusion, I found Dr. Cross's testimony to be credible and persuasive. I similarly found the admitted portion of the Corrected Class Certification Expert Report of Dr. Steven Schwartz in In re Valve Antitrust Litigation, dated March 21, 2024, to be persuasive. Dr. Schwartz concluded that Steam's market share as of the date of his report was between ███ and ███.

2.    I also found the 2013 internal Valve email correspondence estimating Steam's market share to be ███ to be persuasive and supportive of Dr. Cross's and Dr. Schwartz's conclusion (Exhibit VALVE_ANT_C0192577), as well as of my finding.

B.    I found Judge Gonzalez's decision in *Epic Games, Inc. v. Apple, Inc.*, 559 F.Supp.3d 898, 975-76 (N.D. Calif. 2021), *aff'd in part, rev'd in part*, 67 F.4th 946 (9th Cir. 2023), to be interesting, but not persuasive because, at best, the mention of Valve's market share at 70-85% in that decision was not relevant to the particular question in dispute in the *Epic* litigation and, in any event, that statement was based solely on the opinion of officers of Epic Games, one of Respondent's competitor's. I note, however, that Epic's estimate of Steam's market share, as of 2018 when Epic entered the gaming platform market, as set forth in the Epic Court's decision, is entirely consistent with the above finding of Valve's market share.

## VI.  Unreasonable Restraint of Trade under Section 1 of the Sherman Act, as determined by the Rule of Reason

A.    Claimant provided both direct and indirect evidence that Respondent's various restraints challenged by Claimant caused detrimental effects on competition "such as reduced output, increased prices, or decreased quality in the relevant market." *PLS.Com, LLC v. National Association of Realtors*, 32 F.4th 824, 835 (9th Cir. 2022)(quotes omitted). When using indirect proof that restraints have harmed competition, a Claimant must show both that Respondent has

market power and "'some evidence that the challenged restraint harms competition.'" *Ohio v. American Express Co.*, 585 U.S. 529, 542 (2018). "Pursuant to this indirect-evidence route, '[t]he existence of market power is a significant finding that casts an anticompetitive shadow over a party's practices in a rule-of-reason case.'" *Hahn v. Oregon Physicians' Service*, 868 F.2d 1022, 1026 (9th Cir. 1988). As the Ninth Circuit observed in its ruling in *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 983 (9th Cir. 2023), "[t]his inquiry need not always be extensive or highly technical. It is sufficient that the plaintiff prove the defendant's conduct, as matter of economic theory, harms competition[.]"

1. Claimant's *direct* evidence of competitive harm was provided in the form of its proof, by a preponderance of the evidence, that Respondent exercises its market power to extract a supra-competitive fee from game developers, keeping the price of games high and leading game prices in fact to increase more than the rate of inflation.

    (a) Claimant's expert, Dr. Philip Cross, testified that Respondent's pricing practices "kept the price of PC games elevated above the competitive price." Testimony of Dr. Philip Cross, July 28, 2025, at 1285. Dr. Cross provided data showing that the average price of new games on Steam between 2018 and 2023 increased 36% or 6% a year, during a period when the inflation rate was only 4% per year. *Id*. at 1286-87.

    (b) To support its 30% fee to game developers, Respondent provided the testimony of Erik Peterson which included substantial qualitative evidence regarding the nature and type of expenses involved in creating, maintaining and improving the Steam platform, but Respondent did not provide any quantitative evidence to support the need for, basis for or use of its 30% fee.

    (c) Pointing to testimony from Epic's leadership at the time of the trial in the *Epic v. Apple* matter, Respondent has argued that Dr. Cross's analysis which concluded that Respondent's 30% fee is a supra-competitive revenue share, is "entirely unreliable." Respondent's Post-Hearing Brief at 37. Respondent argues that, on cross-examination, counsel had pointed out to Dr. Cross that, in *Epic v. Apple*, 559 F. Supp. 3d 898, *supra,* the District Court stated that Epic's 12% revenue share was "below cost." In response, Dr. Cross acknowledged that the cost structure of digital distribution stores like Epic and Steam were similar. Accordingly, Respondent argues, if 12% is below actual cost for Epic, it must be below cost for Steam. And certainly, if 12% is below cost for Steam, 10.65% -- the "but-for" fee calculated by Dr. Cross for Respondent, as set forth below in Section IX of this Award -- certainly is below cost as well.

        (i) Context however matters a great deal with this "analysis." As it turns out, the *Epic* Court later observed that the "fact" that Epic may not make a profit at a 12% fee on its gaming platform was as much the result of a *strategic* decision made by Epic regarding the nature, timing and extent of *marketing* expenses, as a result of anything having to do with the costs inherent in operating an on-line gaming platform. As the *Epic* Court observed:

> By charging 12% commission, the Epic Games Store will not be profitable for at least several years. Current estimates indicate negative overall earnings in the hundreds of millions of dollars through at least 2027. The anticipated loss is driven by hundreds of millions of minimum guarantees that Epic Games made to

Page 6 of 15

developers to entice them to distribute exclusively through Epic Games Store. In short, the Epic Games Store has front-loaded its marketing and user-acquisition costs to gain market share. Whether this gambit will ultimately work remains to be seen; Epic Games is currently outperforming its projected business plan by "about 15 percent," and its first-party and third-party businesses are up 113% and 100%, respectively. While Epic Games now says it expects the Epic Games Store to become profitable by 2023, the store's projected revenue from prior years has proven overly optimistic.

*Epic v. Apple,* 559 F.Supp. 3d *supra* at 933-34 (emphasis added; footnotes omitted).

2.    With regard to *indirect* evidence, Claimant has shown by a preponderance of the evidence both that Respondent has market power, as set forth above in Section V, and as set forth below, that the restraints challenged by Claimant harm competition, as follows:

(a)    While game developers are mostly free initially to set the price at which their games will be sold on the Steam platform (subject to the restrictions set forth in section (b) below), I find that Respondent imposes multiple different types of limitation on developers' ability to *change* their prices on Steam, requiring developers to hold their posted prices for various periods of time under various circumstances. These limitations, in fact, amount to "post and hold" requirements, which have been found to constitute a *per se* violation of § 1 of the Sherman Act under antitrust jurisprudence in the 9th Circuit. *See Costco Wholesale Corp. v. Maleng*, 522 F.3d 874 (9th Cir. 2008).

(b)    I also find that Respondent has a practice and, with at least some developers, a contract, imposing a requirement that effectively prevents game developers from selling their games at different prices on different platforms (the so-called "price parity" requirement) and that Respondent actively enforces that requirement when there are disparities between a game price on Steam and the price for the game posted on a different platform. Dr. Cross testified, and showed in his analysis of ITAD data, that the effect of this practice and/or contractual requirement, was that the price for a game would be the same on any given day nearly 95% of the time on most platforms, thus showing that this practice prevents price competition on different platforms offering PC game for sale.

(c)    I further find that Respondent had a practice and, with many developers a contract, imposing a requirement that effectively prevented publishers from selling different versions of their games on different platforms (the so-called "content parity" requirement) and that Respondent actively enforced that requirement.

(d)    Finally, I find that Respondent prevents developers from communicating directly with player/purchasers about the game or other offerings from the developer from within games played on the Steam platform and requires all in-game purchases to be made through the Steam Store, ensuring that all in-game purchases yield fee income to Respondent.

B.    Given that Claimant has met its burden of proving that Respondent's various challenged restraints caused harm to competition, the burden shifts to Respondent to demonstrate that its challenged restraints actually have pro-competitive effects that outweigh the harm caused to competition. While Respondent offered non-pre-textual rationales for each of the policies which, as set forth above, were found to harm competition, Respondent failed to meet its burden of demonstrating that the challenged restraints in fact *benefitted* competition, or at least, on balance, that they collectively do more good than damage to competition.

    1.    First, Respondent *did* prove by a preponderance of the evidence that its requirement preventing developers from permitting players to make purchases directly from within games played on the Steam platform on platforms other than Steam and, rather, to require all in-game purchases to be made through the Steam Store, yielding fee income to Respondent prevents "free-riding" and thereby promotes competition by providing the revenue necessary to support the creation and maintenance of the fee receiving and processing portion of the Steam platform.

    2.    With regard to the remainder of Respondent's restraints, however, the evidence failed to establish that the restraints in fact benefit competition and, rather, I find that on balance the remainder of these restraints harm competition.

        (a)    With regard to both its price parity requirements (which Respondent denies exist) and its content parity requirements, which Respondent acknowledges, Respondent again argues that these requirements somehow prevent "free riding" asserting that Respondent has the cost of providing a quality service which provides players with a premium experience which, without the price and content parity requirements, purchasers could utilize to identify games, only to purchase such games from less expensive stores. While this argument is qualitatively appealing, Respondent neither provided quantitative data showing the nature and extent of the costs of the "premium quality service" provided by Steam nor did Respondent provide any evidence that connected the restraints to their alleged pro-competitive purpose of preventing alleged "free-riding." Respondent failed to meet its burden on this issue.

        (b)    Respondent similarly failed to meet its burden of demonstrating through evidence the pro-competitive effect of its multiple different types of limitation on developers' ability to change their prices on Steam. As noted above, there is case law supporting a finding that these restrictions constitute a *per se* violation of § 1 of the Sherman Act, requiring more than a bland defense of the requirements as protecting against "bait and switch" tactics in terms of game developer pricing.

## VII. Monopolization under Section 2 of the Sherman Act

A.    As set forth above in Section IV, Claimant proved by a preponderance of the evidence that Respondent's share of the market for on-line distribution of PC games exceeds 70%, and therefore is quite substantial and that Claimant may have monopoly power. However, Claimant did not prove by a preponderance of the evidence that, among other things, Respondent in fact has monopoly power, in that Claimant did not prove that Respondent has the power to exclude competition within the relevant market.

VIII.    **Claim of Violation of the Washington Consumer Protection Act**

    A.    Claimant asserts that Respondent's restrictions on in-application communications and purchases – what Claimant has called Respondent's "anti-steering provisions" – violate the Washington Consumer Protection Act, RCW 19.86 (the "Washington CPL"). In support of this claim, however, Claimant relies *solely* on *Epic v. Apple,* 559 F.Supp.3d *supra,* in which the court applied California's consumer protection law to Epic's anti-steering claim against Apple. At no point has Claimant provided this tribunal with any authority under the Washington CPL. As such, I decline to make any finding of violation of this statute.

IX.    **Compensation Awarded in Connection with Birenbaum's Claim**

    A.    Given the findings of Section VI of this Award of violation of 15 U.S.C. § 1, Claimant has proved by a preponderance of the evidence that he is entitled to damages.

        1.    Claimant's expert provided persuasive evidence regarding the calculation of plaintiff's damages, proving by a preponderance of the evidence that in a properly functioning competitive market, Respondent should have been charging developers a revenue share of 10.65% (the "but-for" fee), rather than the supra-competitive 30% fee which was in effect, resulting in higher game prices for purchasers like Claimant.

            (a)    Beyond the calculation of the "but-for" fee percentage, the calculation of Claimant's damages is a simple arithmetic process of totaling Claimant's eligible purchases on Respondent's platform, calculating the fee assessed on those purchases – both the 30% fee and the "but-for" 10.65% fee – and making the difference between the two fee amounts the amount of Claimant's damages.

        2.    Claimant's expert calculated damages based on all of Claimant's purchases on Respondent's Steam platform for the lifetime of Claimant's utilization of Steam. As Respondent has pointed out, however, the statute of limitations applicable to Claimant's claims here is four years. Therefore, Claimant's damages must be limited to purchases made from October 2019 (i.e., four years before Claimant's filing of this arbitration) to the present, then trebled in accordance with the provision of the Clayton Act, 15 U.S.C. § 15(a).

        3.    Claimant is a long-standing user of Respondent's platform and, as set forth above, he has proved by a preponderance of the evidence that he has suffered an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes [Respondent's] acts unlawful."

        4.    After reviewing Claimant's Valve Purchase History, Exhibit R-1227, I have calculated Claimant's damages as follows:

| | |
|---|---|
| Claimant's Total Purchases from 10-2019 to present: | $114.28 |
| 30% of Total Purchases | $34.28 |
| 10.65% of Total Purchases | $12.17 |
| Difference between 30% and 10.65% fee | $22.11 |
| Trebled | **$66.33** |

5.     Accordingly, Claimant has proved by a preponderance of the evidence that he is entitled to damages totaling $66.33.

6.     The Clayton Act further permits an award of simple interest on actual damages, but I decline to award interest on the actual damages awarded here.

B.     In addition, Claimant has proved by a preponderance of the evidence that he is entitled to attorneys' fees in accordance with the provisions of 15 U.S.C. § 15(a).

1.     The Clayton Act, 15 U.S.C. § 15(a), requires the awarding of the "cost of suit, including a reasonable attorney's fee," in addition to the damages awarded pursuant to Paragraph IX.A above. Such attorneys' fees need not be limited to or by the size of the Claimant's damage award.

2.     The starting point in assessing a request for attorneys' fees is determining the lodestar figure, which is calculated by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate. This lodestar provides a basis on which to make an initial estimate of the value of the legal services provided, from which hours that are not reasonably expended should be excluded because they are "excessive, redundant, or otherwise unnecessary." *Van Gerwen v. Guarantee Mut. Life Co*., 214 F.3d 1041, 1045 (9th Cir. 2000). In this process, in reviewing a fee application, the finder of fact "has the authority to make across-the-board percentage cuts either in the number of hours claimed or in the final lodestar figure as a practical means of trimming the fat from a fee application." *Yuga Labs, Inc. v. Ripps*, 2024 WL 489248 at 1 (C.D. Cal. 2024).

3.     The lodestar also depends on a finding of the reasonableness of the rates charged, which, in general, can be determined by consideration of the prevailing market rates in the relevant community. *Id.*

4.     Here, Claimant's counsel has submitted an Affidavit of Services describing the role of each person providing services for whom Claimants seek an attorneys' fees award and his/her education and experience, accompanied by a detailed spreadsheet showing each timekeeper's time entries with the time devoted to the 24 matters assigned to this arbitrator, including the two matters heard in July 2025 and the specific services provided by each timekeeper on a day by day basis. The Claimant's lodestar fee request totals as follows:

| SUMMARY | | |
|---|---|---|
| **Biller:** | **Total Hours Sought** | **Requested Total Amount:** |
| Will Bucher | 343.18 | $332,884.60 |
| Frank Palermo | 414.00 | $264,960.00 |
| Erik Atzbach | 82.40 | $39,140.00 |
| Judson Crump | 120.05 | $63,026.25 |
| Zachary A. Horn | 18.78 | $12,019.20 |
| Tina Huang | 117.75 | $34,147.50 |
| Elliot Kovnick | 30.52 | $14,649.60 |

| SUMMARY | | |
|---|---|---|
| **Biller:** | **Total Hours Sought** | **Requested Total Amount:** |
| Thomas Matthew | 124.50 | $79,680.00 |
| Xinlin Morrow | 2.70 | $2,025.00 |
| Ellen Noteware | 194.48 | $213,928.00 |
| Isabel Skomro | 64.50 | $30,960.00 |
| Ariel Thatcher | 43.49 | $12,612.10 |
| Kent Williams | 102.00 | $116,790.00 |
| Sherry Yu | 182.30 | $113,937.50 |
| **Totals:** | 1843.65 | **$1,334,124.75** |

5.    I have reviewed the Affidavit and the supporting spreadsheet and make the following findings regarding Claimant's attorney fee application:

(a)    <u>Rates</u>:  For the most part, I find that the rates charged by the attorneys for whom Claimant seeks an attorney's fee award are reasonable, especially in light of the prevailing market rates for attorneys handling complex commercial and antitrust matters like Claimant's matter, despite its venue in arbitration under the AAA Consumer Rules.  However, I have determined to make the following adjustment to the billing rates sought by Claimant's counsel:

(i)    Claimant seeks to charge the services of law students Isabelle Skomro and Elliott Kovnick at $480/hour.  The services as described in the detailed spreadsheet appear more to be paralegal services than junior associate services and therefore I have reduced the billing rate for Skomro's and Kovnick's services from $480/hour to the $290/hour charged for the paralegal-type services provided by Tina Huang.

(ii)    Claimant also seeks "attorney's fees" for services provided by legal assistant Ariel Thatcher.  I have struck the fee amounts requested for Ms. Thatcher. No doubt her services have been invaluable, but such services are not and should not be separately billable; compensation for such services should be included within the hourly billing rate for the attorneys providing the services.

(b)    <u>Total Hours</u>: For the most part, again, I find that the attorneys listed in Claimant's attorney fee application devoted a reasonable number of hours in managing, developing and pursuing the information exchange and otherwise prosecuting the 24 matters which have been managed collectively before me.  As set forth above in Section II (and its sub-paragraphs) of this Award, these matters have been protracted, such that much of the work set forth in the detailed statements of services found in the spreadsheet was necessary either to prepare the two matters that were tried for their hearings or more generally to prepare the matters assigned to this Arbitrator generally, including the two matters that were tried first.

(i)   Nevertheless, I find that the services provided between April 5 and April 23, 2025 were largely occasioned by Claimant's counsel's failure to pay attention to the Scheduling Order deadline regarding the identification of experts and, accordingly, I have struck from the attorney fee award all services provided by Claimant's counsel in that time period.

(c)   <u>Adjusted Lodestar Calculation</u>:  Given the above, I have set forth below my adjusted lodestar calculation:

| | |
|---|---|
| Total attorney fee sought by Claimant: | $1,334,124.75 |
| Less Ariel Thatcher Fee Request | ($12,612.10) |
| Less Rate Adjustment for Elliot Kovnick ($14,649.60-$8,850.80) | ($5,798.80) |
| Less Rate Adjustment for Isabel Skomro ($30,960.00-$18,705.00) | ($12,255.00) |
| Less Attorney's Fees incurred between April 5 and April 23, 2025 | ($12,019.00) |
| Adjusted Lodestar: | **$1,291,439.85** |

(d)   As adjusted, I find that the above lodestar is appropriate given the complexity and protracted nature of the two matters tried in July 2025. While much of the work included within the lodestar calculation is necessarily also applicable to the 22 matters which have not yet had a hearing, all of this work would have been required had the two matters which have been tried been the only matters that counsel pursued against Respondent.  Accordingly, I find that the proper total lodestar fee amount for the two matters heard in July 2025, this matter and the second matter tried at the same time as this matter, is the adjusted lodestar of $1,291,439.85, one-half of which shall be awarded to Claimant in this matter, provided, however, that none of the services included in the fee application submitted in this matter (and in the second matter tried at the same time as this matter) may be submitted for compensation in any future related arbitration currently before the Arbitrator.

(e)   <u>Multiplier of Lodestar Amount</u>.  Claimant also seeks a 1.5 multiplier of the lodestar here on grounds that the services provided in this matter were provided on a contingent fee basis, that counsel advanced all expenses, and that this litigation has been complex and unduly protracted.  While I agree that all of these factors are present, I cannot agree that a multiplier is appropriate here. While Claimant has been awarded real damages, the amount of damages is dwarfed by the attorney's fees necessarily incurred in pursuit of those damages. Giving due consideration to the factor of proportionality between damages and attorney fees, I find that the vast disparity between the damages awarded and the attorney fees here require that that there be no increase of the attorneys' fees beyond the adjusted lodestar rates.

(f)   <u>Expenses of Litigation</u>.  Finally, Claimant seeks the costs of litigation, which Claimant detailed in a summary spreadsheet and supported with invoices.  The costs sought are summarized as follows:

(g)

| | |
|---|---|
| Shipping & Office Supplies | $1,050.73 |
| Transportation & Lodging | $14,496.01 |
| Meals & Groceries | $2,423.08 |
| Consultation Services | $144,920.00 |
| Interest Expense | $2,313.47 |
| Total | $165,203.29 |

(i)     I find that, for the most part, the above expenses are reasonable and were necessarily incurred in connection with the two separate matters which were heard in July 2025 and therefore are allocable one-half to each matter.

(ii)    However, for the same reasons that I am not willing to award interest on the attorney fee lodestar amount, I do not believe that it is necessary or appropriate to award the interest sought by Claimant on the expenses of litigation. Accordingly, I find that the appropriate total amount to be awarded in connection with expenses of litigation incurred in connection with the two matters heard in July 2025 is $162,889.82 (i.e., $165,203.29-$2,313.47), that is, the amount sought less the interest sought, one-half of which shall be awarded to Claimant in this matter, provided, however, that none of the expenses included in the application for the costs of litigation submitted in connection with these two matters may be submitted for compensation in any future related arbitration currently before this Arbitrator.

C.    Respondent's Objections to a Fee Award Are Untimely

1.    The Order of August 9, 2025 directed the parties' post-hearing briefing to address "**all issues including entitlement to attorneys' fees.**" Further, the order directed that "[a]ny party who is seeking an award of attorneys' fees shall submit detailed affidavits of services . . . timekeeper . . . billing rate, the time devoted to the task, a description of the work performed and a general description of category of the task to which the timekeeper devoted his/her time for each time entry, with a summary certification or affidavit setting forth the specific amount of fees sought," and required that this information be filed **on or before Friday, September 5, 2025**.

2.    Respondent did not object to the above ruling from the Arbitrator, nor did Respondent request at any time that it be provided with an opportunity to file a response or objections to any fee affidavits which would be submitted on or before September 5th.

3.    However, Respondent's Post-hearing brief, filed weeks after the Arbitrator's August 9th Order, argues that:

> Under the law, Valve is entitled to review Claimants' request for fees and costs, including Claimants' time entries expenses, and subject it to adversarial testing. Valve cannot do so at this time because the Tribunal ordered the parties to address the issue of attorneys' fees in this briefing, before Valve has had a chance to examine Claimants' fee submission and

time entries. Without access to Claimants' fee submissions and a subsequent opportunity to respond, Valve cannot test whether the hours claimed are "excessive, redundant, or otherwise unnecessary." Nor can Valve address fees Claimants' counsel may improperly seek for other arbitrations. Nor can Valve address any inaccuracies regarding the appropriate hourly rate, which must be adjudged in accordance with prevailing rate for the area in which the attorney practices and based on the experience of the attorney at issue. Nor can Valve address any claims for other kinds of fees or costs that Claimants may seek. Similarly, without receiving the Tribunal's award, Valve is unable to make tailored submissions as to whether the quantum of attorneys' fees should be reduced, though there are factors that may counsel in favor of reducing an attorneys' fees application.

Respondent's Post-Hearing Brief at 49-50 (footnotes omitted).

4. The objections set forth above and raised by Respondent to any attorney fee award to Claimants are certainly potentially reasonable, but were not only not raised in a timely fashion – but were such that Respondent *could have timely raised these objections after the Arbitrator advised the parties by the Order of August 9, 2025* that it was her intention to address all issues at one time. Having made the strategic decision not to raise the issues *before the filing of the post-hearing* briefs, or even *before the Claimant's submission of the application for attorneys' fees and the Arbitrator's Closing of the Record,* the Respondent cannot now be heard to object to the process utilized in determining the reasonable fees to be awarded here to Claimant's counsel.

## X.  Accordingly, I hereby make the following AWARD:

1. On Claimant's Claim of violation of Sherman Act, 15 U.S.C § 1, as determined by the Rule of Reason, damages in accordance with the provisions of 15 U.S.C. § 15(a), and as set forth above in Paragraph IX.A.4, for a total of **Sixty-Six and 33/100 Dollars ($66.33)**;

2. On Claimant's claim for attorney's fees in accordance with the provisions of 15 U.S.C. § 15(a), as set forth above in Paragraph IX.B.5(d)(ii), a total of **Six Hundred Forty-Five Thousand, Seven Hundred Nineteen 93/100 Dollars ($645,719.93)**;

3. On Claimant's claim for expenses of litigation in accordance with the provisions of 15 U.S.C. § 15(a), as set forth above in Paragraph IX.B.5(f)(ii), a total of **Eighty-One Thousand, Four Hundred Forty-Four and 91/100 Dollars ($81,444.91)**;

4. The administrative fees and expenses of the American Arbitration Association shall be borne as incurred and the compensation of the arbitrator shall likewise be borne as incurred.

5. Respondent shall make all payments required under this Award within twenty (20) days of the date of this Final Award.

\* \* \* \* \*

*Continued on the following page*

Page 14 of 15

This AWARD is in full settlement of all claims and defenses submitted to this Arbitrator.  All claims not expressly granted herein are hereby denied.

Dated: October 9, 2025

_____
Suzanne M. McSorley

SL1 3794660v5 110631.00041

# EXHIBIT 7

# AMERICAN ARBITRATION ASSOCIATION

## Consumer Arbitration Rules

---

Case Number: 01-23-0005-3352

Lance Vicente, Claimant,

-vs-

Valve Corporation d/b/a Steam, Respondent.

---

## AWARD OF ARBITRATOR

     I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties, and a hearing having been held on July 21, 22, 23, 24, 28, 29, 30 and 31, 2025 in Princeton, New Jersey, with certain witnesses appearing via video conference, and having heard the testimony of the fact and expert witnesses presented by the parties at that time, and having considered the documentary evidence offered by Claimant and by Respondent, and having considered the pleadings and the arguments of counsel, including the post-hearing briefing filed by both parties on August 26, 2025, and, further, having considered Claimants' Affidavit of Services and other supporting documentation filed on September 10, 2025; and Claimant having been represented at the time of the hearing by William Bucher, Esq. of Bucher Law PLLC and multiple affiliated attorneys, and Respondent having been represented at the time of the hearing by Priyanka Timblo, Esq. of Howell Shuster & Goldberg LLP, and multiple other attorneys from her firm, along with multiple affiliated attorneys; hereby **FIND and issue this FINAL AWARD** as follows:

I.    **Introduction; Claims Asserted and Pursued at the Hearing**.

    A.    Claimant is an individual, residing in the State of New Jersey, who has played games on the PC gaming platform, "Steam," provided by Respondent Valve Corporation, from at least 2005.

    B.    Claimant has asserted antitrust claims under the Sherman Act, 15 U.S.C §§ 1 and 2, and claims of violation of the Washington Consumer Protection Act, RCW 19.86 et seq.  More particularly, Claimant seeks damages (1) under 15 U.S.C § 1 for alleged price fixing by Respondent;1

---

[1] Although asked to submit Issues of Fact and Law to be decided by the Arbitrator both as part of the Pre-hearing Submissions (filed two weeks before the hearing commenced in July 2025), and, again, with certain preliminary post-hearing submissions filed at the end of the first week of August, at the same time that the parties submitted their agreed list of Exhibits admitted during the hearings, it appears that Claimant argues for the first time in his post-hearing brief, submitted on August 26, that the "post and hold" requirements Respondent imposes on game developers/distributors constitute a *per se* violation of 15 U.S.C. § 1.  Since Respondent had no opportunity to respond to this apparently new legal theory of liability, I have not considered it in rendering this Award.

(2) alternatively, under 15 U.S.C § 1, for Respondent's conduct which Claimant asserts imposes an unreasonable restraint of trade on a relevant geographic and product market under the "rule of reason; (3) under 15 U.S.C § 2 for monopolization of a relevant geographic and product market; and (4) under RCW 19.86 for alleged "anti-steering" restrictions, which Claimant alleges also violated 15 U.S.C § 1.

II.  **Procedural History.**  This matter is one of 24 arbitrations that were assigned to this arbitrator.  The matters were not and are not consolidated.  However, because the parties recognized the many issues of fact and law common to all 24 matters, these matters have been dealt with jointly in the pre-hearing process for purposes of efficiency only.  The parties then agreed to identify two matters to be tried first in in-person proceedings, and, while not formally agreeing to consolidate the two matters tried first, did agree to cross-admit all testimony and documents admitted in those proceedings, except for each Claimant's Direct testimony.

A.  Claimant filed his demand for arbitration on October 2, 2023. The undersigned was duly confirmed as the arbitrator for this matter in March 2024.

B.  The parties participated in a preliminary hearing on June 5, 2024, but advised at the time of the preliminary hearing that they had not come to the preliminary hearing with a plan for the exchange of information related to the claims.  Thus, the preliminary hearing only yielded an order directing the parties to "confer regarding the nature, scope and timing of information exchange" and to "report . . . regarding the proposed schedule for information exchange on or before . . . July 15, 2024."  It also set a briefing schedule for the Respondent's anticipated motion to dismiss.

C.  On July 15, 2024, the parties reported that they could not agree upon a plan for the exchange of information, but instead provided a schedule for the parties to address their competing positions regarding the nature and scope of information exchange, in advance of a further conference scheduled for August 21, 2024.

D.  In the interim, on August 12, 2024, the Arbitrator denied Respondent's motion to dismiss.

E.  At the August 21, 2024 conference, after argument, the Arbitrator indicated that the information exchange would be phased, starting with Respondent's prompt production of the information Respondent indicated it was prepared to provide. The Order contemplated that this initial production would occur no later than September 20, 2024.

F.  In the interim, by letter dated August 27, 2024, Respondent sought to stay all proceedings in all 24 matters.  That motion was denied by Order dated September 7, 2024.

G.  Respondent nevertheless did not produce information by September 20 – or at any time in September 2024.  Starting with correspondence dated September 27, 2024 directed to the AAA, and initially forwarded to this Arbitrator by the AAA on September 30, 2024, and later forwarded with Claimant's response on October 8, 2024, Respondent again sought to remove these matters from arbitration, arguing this time that Respondent's modifications to the Valve on-line Subscriber agreement, made by Valve well after the commencement of these arbitration matters, had divested the AAA and this Arbitrator of jurisdiction over these pending arbitrations.  After receiving briefing from the parties, and hearing argument on this application on October 25, 2024, Respondent's motion was denied by Order entered on October 27, 2024.

H.    Given Respondent's indication during the October 25, 2024 hearing on Respondent's motion to dismiss on jurisdictional grounds that Respondent would not voluntarily participate in information exchange (because of its continuing objections to the Arbitrator's exercise of jurisdiction), on October 27, 2024, the Arbitrator also entered an Order setting a briefing schedule for an anticipated motion to compel to be filed by Claimants.

I.    In response to the entry of the October 27th Order, however, on October 30, 2024, Respondent advised that, "Valve is prepared to produce the requested documents subject to clarification and resolution of several issues related to the protective order[.]"  Accordingly, the next day the Arbitrator advised the parties, "I am treating the below . . . as a Motion on behalf of Respondent to Modify the Protective Order," and set a deadline for receipt of Claimants' briefing in response to that motion.

J.    After receipt and consideration of the parties' arguments, on November 9, 2024, the Arbitrator entered an Order Amending Protective Order and Setting Deadline for Production of Information.  In addition, the Order set November 22, 2024 as the deadline for the production of responsive information, in the absence of a showing of good cause.

K.    On November 14, 2024, Claimants requested that Respondent be required to make its production by November 19. Respondent disagreed, stating that it would be prepared make its production as ordered by November 22. The Arbitrator confirmed the requirement that production be completed by November 22, 2024.

L.    On November 23, 2024, the Arbitrator scheduled a follow-up hearing for December 2, 2024 "to address any remaining information exchange issues and to discuss the format and scheduling of hearing[.]" During the December 2 conference it emerged that both Claimants and Respondent believed that the information exchange was incomplete and, that both parties required further information exchange.  Consequently, on December 2, 2024, the Arbitrator set a schedule for further and final information requests and response, with the parties' production of responsive information to conclude by January 10, 2025, assuming the parties could work out objections to one another's requests.

M.    In the interim, by letter dated December 12, 2024, Respondent sought a ruling from the Arbitrator requiring the Claimants to appear in person, rather than through counsel, for all status or other conferences in the matters.  This Arbitrator denied Respondent's application, noting that "Respondent has provided no factual basis for its application, nor has it pointed to a basis for this application in the Consumer Rules."

N.    In addition, the Arbitrator scheduled a conference for January 14, 2025, immediately following the date by which information exchange might be concluded under Scheduling Order No. 4, in the absence of further objections and disputes regarding information exchange.

O.    At the January 14, 2025 conference, the parties reported that the information exchange was not complete but, rather, they had proceeded no further than the exchange of additional requests and objections, and had not made any productions beyond the initial production – which was already subject to contest – made by Respondent on November 22, 2024.  Accordingly, the Arbitrator set a schedule for briefing of the parties' objections.

P.    The parties thereafter filed cross-motions to compel production of documents and information in response to various requests on January 28, 2025, and responses to the motions on February 4, 2025, and this Arbitrator thereafter entered a lengthy ruling on February 17, 2025, requiring

Respondent to produce certain information by February 24, 2025 and other information by March 9, 2025. In addition, the February 17th Order set forth a schedule for the exchange of expert information and established certain pre-hearing submission requirements.

Q.   In addition, in response to the parties' inability to agree on the format of hearings, the parties submitted briefing and argument regarding the proper form of hearings, resulting in an Order dated March 2, 2025 establishing the dates for the hearing of this matter (and a second matter to be first tried) and setting this particular hearing as an in-person hearing, with certain witnesses permitted to testify via video conference.

R.   In April 2025, Respondent raised issues of Claimant having failed to adhere to the expert information exchange deadlines set forth in the February Order and therefore required further exchange of positions and the establishment of a new order regarding the timing of expert information exchange.

S.   As noted above, this matter was heard, in person, with some witnesses appearing via video conference, over eight days of live testimony on July 21-24 and July 28-31. The parties submitted contested lists of exhibits admitted at the hearing on August 8, 2025, and the Arbitrator entered an Order dated August 9, 2025, confirming the admission into evidence of all exhibits which either party in its August 8 submission contended had been admitted. The August 9th Order further advised parties that the post-hearing briefs, which were to be filed on or before August 26, 2025, "should address **all issues including entitlement to attorneys' fees**."

T.   The parties thereafter duly submitted post-hearing briefs on August 26, 2025, and Claimant timely submitted an Application for Attorneys' Fees (and Costs) with all the supporting documents required by the August 9, 2025 Order.

III.   *Per Se* **Claim of Price Fixing under Section 1 of the Sherman Act**. I find that Claimant did not prove by a preponderance of the evidence that Respondent entered into price fixing agreements with game developers/publishers in violation of 15 U.S.C § 1.

IV.   **Relevant Product and Geographic Market**. The parties agree that, for the most part, the threshold consideration for the remainder of Claimant's claims is the identification of the relevant product and geographic markets in which the alleged restraint(s) or the alleged monopolization has occurred.

A.   Claimant and Respondent provided nearly three days' of expert testimony from economists, Dr. Philip Cross, on behalf of Claimant, and Dr. Justin McCrary, on behalf of Respondent, on these issues of market definition, and the impact, if any, of the restraints alleged, and proved, by Claimant on competition.

B.   Having reviewed and considered the product market definition evidence provided, I conclude and find that Claimant proved by a preponderance of the evidence, based on the demonstrated cross-elasticity of demand:

1.   That the relevant product market consists of the market for the online distribution of PC games;

2.   That the relevant product market does not include (a) sellers who exclusively distribute "keys" for online games or (b) game designers who self-distribute their games and do not distribute any third-party games;

3. That the relevant product market does not include games developed and played on consoles or on  mobile devices; and

4. That the relevant product market could include games distributed through brick-and-mortar sales, but that that channel of distribution is miniscule and diminishing, and therefore is not significant enough to be considered.

C. Further, I find that Claimant proved by a preponderance of the evidence, that the relevant geographic market is limited to the United States.

1. Respondent argued that, to the contrary, the geographic market for the claims at issue here should be global, like the market for game developers who distribute their games on Respondent's platform.  The evidence shows, however, that the player/purchaser side of the platform provided by Respondent is subject to different constraints than the developer/publisher side, including that players cannot readily switch between various country-specific storefronts and that credit card transactions "out of country" may violate the cards' terms of service.  As such, as noted above, I conclude that the geographic market should be limited to the United States.

## V.   Respondent's Market Power.

A. I find that Claimant proved by a preponderance of the evidence that Respondent's market share in the relevant product market is at least 70% and is more likely in excess of 80%.

1. In reaching this conclusion, I found Dr. Cross's testimony to be credible and persuasive.  I similarly found the admitted portion of the Corrected Class Certification Expert Report of Dr. Steven Schwartz in In re Valve Antitrust Litigation, dated March 21, 2024, to be persuasive.  Dr. Schwartz concluded that Steam's market share as of the date of his report was between ███ and ███.

2. I also found the 2013 internal Valve email correspondence estimating Steam's market share to be ███ to be persuasive and supportive of Dr. Cross's and Dr. Schwartz's conclusion (Exhibit VALVE_ANT_C0192577), as well as of my finding.

B. I found Judge Gonzalez's decision in *Epic Games, Inc. v. Apple, Inc.,* 559 F.Supp.3d 898, 975-76 (N.D. Calif. 2021), *aff'd in part, rev'd in part,* 67 F.4th 946 (9th Cir. 2023)*,* to be interesting, but not persuasive because, at best, the mention of Valve's market share at 70-85% in that decision was not relevant to the particular question in dispute in the *Epic* litigation and, in any event, that statement was based solely on the opinion of officers of Epic Games, one of Respondent's competitor's.  I note, however, that Epic's estimate of Steam's market share, as of 2018 when Epic entered the gaming platform market, as set forth in the *Epic* Court's decision, is *entirely* consistent with the above finding of Valve's market share.

## VI.   Unreasonable Restraint of Trade under Section 1
##       of the Sherman Act, as determined by the Rule of Reason

A. Claimant provided both direct and indirect evidence that Respondent's various restraints challenged by Claimant caused detrimental effects on competition "such as reduced output, increased prices, or decreased quality in the relevant market."  *PLS.Com, LLC v. National Association of Realtors*, 32 F.4th 824, 835 (9th Cir. 2022)(quotes omitted). When using indirect proof that restraints have harmed competition, a Claimant must show both that Respondent has

market power and "'some evidence that the challenged restraint harms competition.'" *Ohio v. American Express Co.*, 585 U.S. 529, 542 (2018). "Pursuant to this indirect-evidence route, '[t]he existence of market power is a significant finding that casts an anticompetitive shadow over a party's practices in a rule-of-reason case.'" *Hahn v. Oregon Physicians' Service*, 868 F.2d 1022, 1026 (9th Cir. 1988). As the Ninth Circuit observed in its ruling in *Epic Games, Inc. v. Apple, Inc.,* 67 F.4th 946, 983 (9th Cir. 2023), "[t]his inquiry need not always be extensive or highly technical. It is sufficient that the plaintiff prove the defendant's conduct, as matter of economic theory, harms competition[.]"

1.  Claimant's *direct* evidence of competitive harm was provided in the form of its proof, by a preponderance of the evidence, that Respondent exercises its market power to extract a supra-competitive fee from game developers, keeping the price of games high and leading game prices in fact to increase more than the rate of inflation.

    (a)  Claimant's expert, Dr. Philip Cross, testified that Respondent's pricing practices "kept the price of PC games elevated above the competitive price."  Testimony of Dr. Philip Cross, July 28, 2025, at 1285.  Dr. Cross provided data showing that the average price of new games on Steam between 2018 and 2023 increased 36% or 6% a year, during a period when the inflation rate was only 4% per year.  *Id*. at 1286-87.

    (b)  To support its 30% fee to game developers, Respondent provided the testimony of Erik Peterson which included substantial qualitative evidence regarding the nature and type of expenses involved in creating, maintaining and improving the Steam platform, but Respondent did not provide any quantitative evidence to support the need for, basis for or use of its 30% fee.

    (c)  Pointing to testimony from Epic's leadership at the time of the trial in the *Epic v. Apple* matter, Respondent has argued that Dr. Cross's analysis which concluded that Respondent's 30% fee is a supra-competitive revenue share, is "entirely unreliable."  Respondent's Post-Hearing Brief at 37.  Respondent argues that, on cross-examination, counsel had pointed out to Dr. Cross that, in *Epic v. Apple,* 559 F. Supp. 3d 898, *supra,* the District Court stated that Epic's 12% revenue share was "below cost."  In response, Dr. Cross acknowledged that the cost structure of digital distribution stores like Epic and Steam were similar.  Accordingly, Respondent argues, if 12% is below actual cost for Epic, it must be below cost for Steam. And certainly, if 12% is below cost for Steam, 10.65% – the "but-for" fee calculated by Dr. Cross for Respondent, as set forth below in Section IX of this Award – certainly is below cost as well.

        (i)  Context however matters a great deal with this "analysis."  As it turns out, the *Epic* Court later observed that the "fact" that Epic may not make a profit at a 12% fee on its gaming platform was as much the result of a *strategic* decision made by Epic regarding the nature, timing and extent of *marketing* expenses, as a result of anything having to do with the costs inherent in operating an on-line gaming platform.  As the *Epic* Court observed:

            By charging 12% commission, the Epic Games Store will not be profitable for at least several years. Current estimates indicate negative overall earnings in the hundreds of millions of dollars through at least 2027. *The anticipated loss is driven by hundreds of millions of minimum guarantees that Epic Games made to*

*developers to entice them to distribute exclusively through Epic Games Store.* In short, the Epic Games Store has front-loaded its marketing and user-acquisition costs to gain market share. Whether this gambit will ultimately work remains to be seen; Epic Games is currently outperforming its projected business plan by "about 15 percent," and its first-party and third-party businesses are up 113% and 100%, respectively. While Epic Games now says it expects the Epic Games Store to become profitable by 2023, the store's projected revenue from prior years has proven overly optimistic.

*Epic v. Apple,* 559 F.Supp. 3d *supra* at 933-34 (emphasis added; footnotes omitted).

2.   With regard to *indirect* evidence, Claimant has shown by a preponderance of the evidence both that Respondent has market power, as set forth above in Section V, and as set forth below, that the restraints challenged by Claimant harm competition, as follows:

(a)   While game developers are mostly free initially to set the price at which their games will be sold on the Steam platform (subject to the restrictions set forth in section (b) below), I find that Respondent imposes multiple different types of limitation on developers' ability to *change* their prices on Steam, requiring developers to hold their posted prices for various periods of time under various circumstances. These limitations, in fact, amount to "post and hold" requirements, which have been found to constitute a *per se* violation of § 1 of the Sherman Act under antitrust jurisprudence in the 9th Circuit. *See Costco Wholesale Corp. v. Maleng*, 522 F.3d 874 (9th Cir. 2008).

(b)   I also find that Respondent has a practice and, with at least some developers, a contract, imposing a requirement that effectively prevents game developers from selling their games at different prices on different platforms (the so-called "price parity" requirement) and that Respondent actively enforces that requirement when there are disparities between a game price on Steam and the price for the game posted on a different platform. Dr. Cross testified, and showed in his analysis of ITAD data, that the effect of this practice and/or contractual requirement, was that the price for a game would be the same on any given day nearly 95% of the time on most platforms, thus showing that this practice prevents price competition on different platforms offering PC game for sale.

(c)   I further find that Respondent had a practice and, with many developers a contract, imposing a requirement that effectively prevented publishers from selling different versions of their games on different platforms (the so-called "content parity" requirement) and that Respondent actively enforced that requirement.

(d)   Finally, I find that Respondent prevents developers from communicating directly with player/purchasers about the game or other offerings from the developer from within games played on the Steam platform and requires all in-game purchases to be made through the Steam Store, ensuring that all in-game purchases yield fee income to Respondent.

B.   Given that Claimant has met its burden of proving that Respondent's various challenged restraints caused harm to competition, the burden shifts to Respondent to demonstrate that its

challenged restraints actually have pro-competitive effects that outweigh the harm caused to competition. While Respondent offered non-pre-textual rationales for each of the policies which, as set forth above, were found to harm competition, Respondent failed to meet its burden of demonstrating that the challenged restraints in fact *benefitted* competition, or at least, on balance, that they collectively do more good than damage to competition.

    (a)    First, Respondent *did* prove by a preponderance of the evidence that its requirement preventing developers from permitting players to make purchases directly from within games played on the Steam platform on platforms other than Steam and, rather, to require all in-game purchases to be made through the Steam Store, yielding fee income to Respondent prevents "free-riding" and thereby promotes competition by providing the revenue necessary to support the creation and maintenance of the fee receiving and processing portion of the Steam platform.

    (b)    With regard to the remainder of Respondent's restraints, however, the evidence failed to establish that the restraints in fact benefit competition and, rather, I find that on balance the remainder of these restraints harm competition.

        (i)    With regard to both its price parity requirements (which Respondent denies exist) and its content parity requirements, which Respondent acknowledges, Respondent again argues that these requirements somehow prevent "free riding" asserting that Respondent has the cost of providing a quality service which provides players with a premium experience which, without the price and content parity requirements, purchasers could utilize to identify games, only to purchase such games from less expensive stores. While this argument is qualitatively appealing, Respondent neither provided quantitative data showing the nature and extent of the costs of the "premium quality service" provided by Steam nor did Respondent provide any evidence that connected the restraints to their alleged pro-competitive purpose of preventing alleged "free-riding." Respondent failed to meet its burden on this issue.

        (ii)    Respondent similarly failed to meet its burden of demonstrating through evidence the pro-competitive effect of its multiple different types of limitation on developers' ability to change their prices on Steam. As noted above, there is case law supporting a finding that these restrictions constitute a *per se* violation of § 1 of the Sherman Act, requiring more than a bland defense of the requirements as protecting against "bait and switch" tactics in terms of game developer pricing.

## VII. Monopolization under Section 2 of the Sherman Act

    A.    As set forth above in Section IV, Claimant proved by a preponderance of the evidence that Respondent's share of the market for on-line distribution of PC games exceeds 70%, and therefore is quite substantial and that Claimant may have monopoly power. However, Claimant did not prove by a preponderance of the evidence that, among other things, Respondent in fact has monopoly power, in that Claimant did not prove that Respondent has the power to exclude competition within the relevant market.

SL1 3803154v3 110631.00041

VIII.    **Claim of Violation of the Washington Consumer Protection Act**

A.    Claimant asserts that Respondent's restrictions on in-application communications and purchases – what Claimant has called Respondent's "anti-steering provisions" – violate the Washington Consumer Protection Act, RCW 19.86 (the "Washington CPL"). In support of this claim, however, Claimant relies *solely* on *Epic v. Apple,* 559 F.Supp.3d *supra,* in which the court applied California's consumer protection law to Epic's anti-steering claim against Apple. At no point has Claimant provided this tribunal with any authority under the Washington CPL. As such, I decline to make any finding of violation of this statute.

IX.   **Compensation Awarded in Connection with Vicente's Claim**

A.    Given the findings of Section VI of this Award of violation of 15 U.S.C. § 1, Claimant has proved by a preponderance of the evidence that he is entitled to damages.

1.    Claimant's expert provided persuasive evidence regarding the calculation of plaintiff's damages, proving by a preponderance of the evidence that in a properly functioning competitive market, Respondent should have been charging developers a revenue share of 10.65% (the "but-for" fee), rather than the supra-competitive 30% fee which was in effect, resulting in higher game prices for purchasers like Claimant.

(a)    Beyond the calculation of the "but-for" fee percentage, the calculation of Claimant's damages is a simple arithmetic process of totaling Claimant's *eligible* purchases on Respondent's platform, calculating the fee assessed on those purchases – both the 30% fee and the "but-for" 10.65% fee – and making the difference between the two fee amounts the amount of Claimant's damages.

2.    Claimant's expert calculated damages based on all of Claimant's purchases on Respondent's Steam platform for the lifetime of Claimant's utilization of Steam. As Respondent has pointed out, however, the statute of limitations applicable to Claimant's claims here is four years. Therefore, Claimant's damages must be limited to purchases made from October 2019 (i.e., four years before Claimant's filing of this arbitration) to the present, then trebled in accordance with the provision of the Clayton Act, 15 U.S.C. § 15(a).

3.    Claimant is a long-standing user of Respondent's platform and, as set forth above, he has proved by a preponderance of the evidence that he has suffered an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes [Respondent's] acts unlawful."

4.    After reviewing Claimant's Valve Purchase History, Exhibit No. R-1229, I have calculated Claimant's damages as follows:

| | |
|---|---|
| Claimant's Total Purchases 10-2019 to present: | $57.47 |
| 30% of Total Purchases | $17.24 |
| 10.65% of Total Purchases | $6.12 |
| Difference between 30% and 10.65% fee | $11.12 |
| Trebled | $33.36 |

5. Accordingly, Claimant has proved by a preponderance of the evidence that he is entitled to damages totaling **$33.36**.

6. The Clayton Act further permits an award of simple interest on actual damages, but I decline to award interest on the actual damages awarded here.

B. In addition, Claimant has proved by a preponderance of the evidence that he is entitled to attorneys' fees in accordance with the provisions of 15 U.S.C. § 15(a).

1. The Clayton Act, 15 U.S.C. § 15(a), requires the awarding of the "cost of suit, including a reasonable attorney's fee," in addition to the damages awarded pursuant to Paragraph IX.A above. Such attorneys' fees need not be limited to or by the size of the Claimant's damage award.

2. The starting point in assessing a request for attorneys' fees is determining the lodestar figure, which is calculated by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate. This lodestar provides a basis on which to make an initial estimate of the value of the legal services provided, from which hours that are not reasonably expended should be excluded because they are "excessive, redundant, or otherwise unnecessary." *Van Gerwen v. Guarantee Mut. Life Co.*, 214 F.3d 1041, 1045 (9th Cir. 2000). In this process, in reviewing a fee application, the finder of fact "has the authority to make across-the-board percentage cuts either in the number of hours claimed or in the final lodestar figure as a practical means of trimming the fat from a fee application." *Yuga Labs, Inc. v. Ripps*, 2024 WL 489248 at 1 (C.D. Cal. 2024).

3. The lodestar also depends on a finding of the reasonableness of the rates charged, which, in general, can be determined by consideration of the prevailing market rates in the relevant community. *Id.*

4. Here, Claimant's counsel has submitted an Affidavit of Services describing the role of each person providing services for whom Claimants seek an attorneys' fees award and his/her education and experience, accompanied by a detailed spreadsheet showing each timekeeper's time entries with the time devoted to the 24 matters assigned to this arbitrator, including the two matters heard in July 2025 and the specific services provided by each timekeeper on a day by day basis. The Claimant's lodestar fee request totals as follows:

| SUMMARY | | |
|---|---|---|
| **Biller:** | **Total Hours Sought** | **Requested Total Amount:** |
| Will Bucher | 343.18 | $332,884.60 |
| Frank Palermo | 414.00 | $264,960.00 |
| Erik Atzbach | 82.40 | $39,140.00 |
| Judson Crump | 120.05 | $63,026.25 |
| Zachary A. Horn | 18.78 | $12,019.20 |
| Tina Huang | 117.75 | $34,147.50 |
| Elliot Kovnick | 30.52 | $14,649.60 |

| SUMMARY | | |
|---|---|---|
| **Biller:** | **Total Hours Sought** | **Requested Total Amount:** |
| Thomas Matthew | 124.50 | $79,680.00 |
| Xinlin Morrow | 2.70 | $2,025.00 |
| Ellen Noteware | 194.48 | $213,928.00 |
| Isabel Skomro | 64.50 | $30,960.00 |
| Ariel Thatcher | 43.49 | $12,612.10 |
| Kent Williams | 102.00 | $116,790.00 |
| Sherry Yu | 182.30 | $113,937.50 |
| **Totals:** | 1843.65 | **$1,334,124.75** |

5.    I have reviewed the Affidavit and the supporting spreadsheet and make the following findings regarding Claimant's attorney fee application:

(a)    <u>Rates</u>:  For the most part, I find that the rates charged by the attorneys for whom Claimant seeks an attorney's fee award are reasonable, especially in light of the prevailing market rates for attorneys handling complex commercial and antitrust matters like Claimant's matter, despite its venue in arbitration under the AAA Consumer Rules.  However, I have determined to make the following adjustment to the billing rates sought by Claimant's counsel:

(i)    Claimant seeks to charge the services of law students Isabelle Skomro and Elliott Kovnick at $480/hour.  The services as described in the detailed spreadsheet appear more to be paralegal services than junior associate services and therefore I have reduced the billing rate for Skomro's and Kovnick's services from $480/hour to the $290/hour charged for the paralegal-type services provided by Tina Huang.

(ii)    Claimant also seeks "attorney's fees" for services provided by legal assistant Ariel Thatcher.  I have struck the fee amounts requested for Ms. Thatcher. No doubt her services have been invaluable, but such services are not and should not be separately billable; compensation for such services should be included within the hourly billing rate for the attorneys providing the services.

(b)    <u>Total Hours</u>: For the most part, again, I find that the attorneys listed in Claimant's attorney fee application devoted a reasonable number of hours in managing, developing and pursuing the information exchange and otherwise prosecuting the 24 matters which have been managed collectively before me.  As set forth above in Section II (and its sub-paragraphs) of this Award, these matters have been protracted, such that much of the work set forth in the detailed statements of services found in the spreadsheet was necessary either to prepare the two matters that were tried for their hearings or more generally to prepare the matters assigned to this Arbitrator generally, including the two matters that were tried first.

(i) Nevertheless, I find that the services provided between April 5 and April 23, 2025 were largely occasioned by Claimant's counsel's failure to pay attention to the Scheduling Order deadline regarding the identification of experts and, accordingly, I have struck from the attorney fee award all services provided by Claimant's counsel in that time period.

(c) <u>Adjusted Lodestar Calculation</u>:  Given the above, I have set forth below my adjusted lodestar calculation:

| | |
|---|---|
| Total attorney fee sought by Claimant: | $1,334,124.75 |
| Less Ariel Thatcher Fee Request | ($12,612.10) |
| Less Rate Adjustment for Elliot Kovnick ($14,649.60-$8,850.80) | ($5,798.80) |
| Less Rate Adjustment for Isabel Skomro ($30,960.00-$18,705.00) | ($12,255.00) |
| Less Attorney's Fees incurred between April 5 and April 23, 2025 | ($12,019.00) |
| Adjusted Lodestar: | **$1,291,439.85** |

(d) As adjusted, I find that the above lodestar is appropriate given the complexity and protracted nature of the two matters tried in July 2025. While much of the work included within the lodestar calculation is necessarily also applicable to the 22 matters which have not yet had a hearing, all of this work would have been required had the two matters which have been tried been the only matters that counsel pursued against Respondent.  Accordingly, I find that the proper total lodestar fee amount for the two matters heard in July 2025, this matter and the second matter tried at the same time as this matter, is the adjusted lodestar of $1,291,439.85, one-half of which shall be awarded to Claimant in this matter, provided, however, that none of the services included in the fee application submitted in this matter, and in the second matter tried at the same time as this matter, may be submitted for compensation in any future related arbitration currently before this Arbitrator.

(e) <u>Multiplier of Lodestar Amount</u>.  Claimant also seeks a 1.5 multiplier of the lodestar here on grounds that the services provided in this matter were provided on a contingent fee basis, that counsel advanced all expenses, and that this litigation has been complex and unduly protracted. While I agree that all of these factors are present, I cannot agree that a multiplier is appropriate here. While Claimant has been awarded real damages, the amount of damages is dwarfed by the attorney's fees necessarily incurred in pursuit of those damages. Giving due consideration to the factor of proportionality between damages and attorney fees, I find that the vast disparity between the damages awarded and the attorney fees here require that there be no increase of the attorneys' fees beyond the adjusted lodestar rates.

(f) <u>Expenses of Litigation</u>.  Finally, Claimant seeks reimbursement of the $125 AAA filing fee he has paid,[2] plus payment of the costs of litigation, which Claimant

---

[2] The Steam Subscriber Agreement, in effect at the time that Vicente paid the $125 filing fee in connection with this arbitration, provides at Section (11)(C) that, "If you seek $10,000 or less, Valve agrees to promptly reimburse your filing fee and your share if any of AAA's arbitration costs, including arbitrator compensation, unless the arbitrator determines your claims are frivolous or were filed for harassment."

detailed in a summary spreadsheet and supported with invoices. The costs sought (in addition to the AAA filing fee) are summarized as follows:

| | |
|---|---:|
| Shipping & Office Supplies | $1,050.73 |
| Transportation & Lodging | $14,496.01 |
| Meals & Groceries | $2,423.08 |
| Consultation Services | $144,920.00 |
| Interest Expense | $2,313.47 |
| Total | $165,203.29 |

    (i)     I find that, for the most part, the above expenses are reasonable and were necessarily incurred in connection with the two separate matters which were heard in July 2025 and therefore are allocable one-half to each matter.

    (ii)    However, for the same reasons that I am not willing to award interest on the attorney fee lodestar amount, I do not believe that it is necessary or appropriate to award the interest sought by Claimant on the expenses of litigation. Accordingly, I find that the appropriate total amount to be awarded in connection with expenses of litigation incurred in connection with the two matters heard in July 2025 is $162,889.82 (i.e., $165,203.29-$2,313.47) that is, the amount sought less the interest sought, one-half of which shall be awarded to Claimant in this matter, provided, however, that none of the expenses included in the application for the costs of litigation submitted in connection with these two matters may be submitted for compensation in any future related arbitration currently before this Arbitrator. In addition, I find that Claimant is entitled to repayment of the $125 filing fee he paid in this matter.

C.    Respondent's Objections to a Fee Award Are Untimely

    1.    The Order of August 9, 2025 directed the parties' post-hearing briefing to address "**all issues including entitlement to attorneys' fees.**" Further, the order directed that "[a]ny party who is seeking an award of attorneys' fees shall submit detailed affidavits of services . . . timekeeper . . . billing rate, the time devoted to the task, a description of the work performed and a general description of category of the task to which the timekeeper devoted his/her time for each time entry, with a summary certification or affidavit setting forth the specific amount of fees sought," and required that this information be filed **on or before Friday, September 5, 2025**.

    2.    Respondent did not object to the above ruling from the Arbitrator, nor did Respondent request at any time that it be provided with an opportunity to file a response or objections to any fee affidavits which would be submitted on or before September 5th.

    3.    However, Respondent's Post-hearing brief, filed weeks after the Arbitrator's August 9th Order, argues that:

            Under the law, Valve is entitled to review Claimants' request for fees and costs, including Claimants' time entries expenses, and subject it to adversarial testing. Valve cannot do so at this time because the Tribunal

ordered the parties to address the issue of attorneys' fees in this briefing, before Valve has had a chance to examine Claimants' fee submission and time entries. Without access to Claimants' fee submissions and a subsequent opportunity to respond, Valve cannot test whether the hours claimed are "excessive, redundant, or otherwise unnecessary." Nor can Valve address fees Claimants' counsel may improperly seek for other arbitrations. Nor can Valve address any inaccuracies regarding the appropriate hourly rate, which must be adjudged in accordance with prevailing rate for the area in which the attorney practices and based on the experience of the attorney at issue.  Nor can Valve address any claims for other kinds of fees or costs that Claimants may seek. Similarly, without receiving the Tribunal's award, Valve is unable to make tailored submissions as to whether the quantum of attorneys' fees should be reduced, though there are factors that may counsel in favor of reducing an attorneys' fees application.

Respondent's Post-Hearing Brief at 49-50 (footnotes omitted).

4.    The objections set forth above and raised by Respondent to any attorney fee award to Claimants are certainly potentially reasonable, but were not only not raised in a timely fashion – but were such that Respondent *could have timely raised these objections after the Arbitrator advised the parties by the Order of August 9, 2025* that it was her intention to address all issues at one time.  Having made the strategic decision not to raise the issues *before the filing of the post-hearing* briefs, or even *before the Claimant's submission of the application for attorneys' fees and the Arbitrator's Closing of the Record,* the Respondent cannot now be heard to object to the process utilized in determining the reasonable fees to be awarded here to Claimant's counsel.

## X.    Accordingly, I hereby make the following AWARD:

1.    On Claimant's Claim of violation of Sherman Act, 15 U.S.C § 1, as determined by the Rule of Reason, damages in accordance with the provisions of 15 U.S.C. § 15(a), and as set forth above in Paragraph IX.A.5, for a total of **Thirty-Three and 36/100 Dollars ($33.36)**;

2.    On Claimant's claim for attorney's fees in accordance with the provisions of 15 U.S.C. § 15(a), as set forth above in Paragraph IX.B.5(d), a total of **Six Hundred Forty-Five Thousand, Seven Hundred Nineteen 93/100 Dollars ($645,719.93)**;

3.    On Claimant's claim for expenses of litigation, in accordance with the provisions of the arbitration agreement in effect between the parties at the time of the filing of the arbitration demand, as set forth above in Paragraph IX.B.5(f), reimbursement of Claimant's AAA filing fee of **One Hundred Twenty-five Dollars ($125.00);**

4.    On Claimant's claim for expenses of litigation in accordance with the provisions of 15 U.S.C. § 15(a), as set forth above in Paragraph IX.B.5(f)(ii), a total of **Eighty-One Thousand, Four Hundred Forty-Four and 91/100 Dollars ($81,444.91)**;

5.    The administrative fees and expenses of the American Arbitration Association shall be borne as incurred and the compensation of the arbitrator shall likewise be borne as incurred.

6.  Respondent shall make all payments required under this Award within twenty (20) days of the date of this Final Award.

\* \* \* \* \*

*Continued on the following page*

This AWARD is in full settlement of all claims and defenses submitted to this Arbitrator. All claims not expressly granted herein are hereby denied.

Dated: October 9, 2025

_____
Suzanne M. McSorley

# EXHIBIT 8

**From:** Lauren Cole <lcole@hsgllp.com>
**Sent:** Thursday, August 7, 2025 10:29 AM
**To:** William Bucher <will@bucherlawfirm.com>
**Cc:** McSorley, Suzanne <smcs@stevenslee.com>; Jing He <Jing@moni.law>; Erik Atzbach <erik@atzbachlex.com>; Frank Palermo <frank@fjpcounsel.com>; Thomas Matthew <thomas@bucherlawfirm.com>; valveteam@moni.law; Xinlin Li Morrow <xinlin@moni.law>; AAAFiling@valvesoftware.com; Tavakoli, Shaud G (NYC) <Shaud.Tavakoli@skadden.com>; Andrew C. Indorf <aindorf@hsgllp.com>; Fuchs, Andrew J (HOU) <Andrew.Fuchs@skadden.com>; bmarksdias@corrcronin.com; McInerney, Colm P (NYC) <Colm.McInerney@skadden.com>; Dorit Ungar Black <dblack@hsgllp.com>; Gavin Skok <gavins@valvesoftware.com>; Slawe, Meredith C (NYC) <Meredith.Slawe@skadden.com>; McTigue Jr., Michael W (NYC) <Michael.McTigue@skadden.com>; Scott M. Danner <sdanner@hsgllp.com>; Milstead, Virginia (LAC) <Virginia.Milstead@skadden.com>; Zachary Horn <zachary@bucherlawfirm.com>; Ellen Noteware <ellen@bucherlawfirm.com>; kent.williams@sirillp.com; AAA Jill Roettger <JillRoettger@adr.org>; Judson E Crump <judson@judsonecrump.com>; Priyanka Timblo <ptimblo@hsgllp.com>
**Subject:** [Ext] RE: Individual Claimants v. Valve d/b/a Steam -- Agreed Post-Hearing Submissions and Deadlines (Birenbaum and Vicente)

Arbitrator McSorley,

Valve believes it is most efficient for fee briefing (if even necessary) to be handled after the Tribunal reaches a decision on the merits. In the 25 arbitrations Valve has won, such briefing has been completely unnecessary. Postponing fee briefing until after the Tribunal reaches a merits decision would also allow any fee briefing to more accurately address the scope of fees, since that would necessarily depend on the exact nature of the Tribunal's ruling on the merits.

Respectfully submitted,
Lauren Cole
Counsel for Respondent Valve Corporation

Lauren Cole | she/her/hers/herself
HOLWELL SHUSTER & GOLDBERG LLP
Office: (646) 837-5126 | Mobile: (985) 215-0174 | Bio
425 Lexington Ave | New York, New York 10017 | hsgllp.com

# EXHIBIT 9

**From:** McSorley, Suzanne <suzanne.mcsorley@stevenslee.com>
**Sent:** Saturday, August 9, 2025 8:22 PM
**To:** Frank Palermo <frank@fjpcounsel.com>; Lauren Cole <lcole@hsgllp.com>
**Cc:** Jing He <Jing@moni.law>; Erik Atzbach <erik@atzbachlex.com>; Thomas Matthew <thomas@bucherlawfirm.com>; valveteam@moni.law; Xinlin Li Morrow <xinlin@moni.law>; William Bucher <will@bucherlawfirm.com>; AAAFiling@valvesoftware.com; Tavakoli, Shaud G (NYC) <Shaud.Tavakoli@skadden.com>; Andrew C. Indorf <aindorf@hsgllp.com>; Fuchs, Andrew J (HOU) <Andrew.Fuchs@skadden.com>; bmarksdias@corrcronin.com; McInerney, Colm P (NYC) <Colm.McInerney@skadden.com>; Dorit Ungar Black <dblack@hsgllp.com>; Gavin Skok <gavins@valvesoftware.com>; Slawe, Meredith C (NYC) <Meredith.Slawe@skadden.com>; McTigue Jr., Michael W (NYC) <Michael.McTigue@skadden.com>; Scott M. Danner <sdanner@hsgllp.com>; Milstead, Virginia (LAC) <Virginia.Milstead@skadden.com>; Zachary Horn <zachary@bucherlawfirm.com>; Ellen Noteware <ellen@bucherlawfirm.com>; kent.williams@sirillp.com; AAA Jill Roettger <JillRoettger@adr.org>; Judson E Crump <judson@judsonecrump.com>; Priyanka Timblo <ptimblo@hsgllp.com>
**Subject:** [Ext] RE: Individual Claimants v. Valve d/b/a Steam -- Order re (1)Documents in Evidence; (2) Briefing and Proof re Attorney's Fees (Birenbaum and Vicente)

Counsel,

1. I have received and reviewed your multiple email messages regarding your differing views regarding which documents identified and/or mentioned at various points during the Birenbaum/Vicente hearings are or are not in evidence. I have decided that, with the exception of the specific ruling made during the hearing with regard to the admission of only certain portions of the expert report of Dr. Schwartz, any document which any party has asserted in its filings on Friday, August 8, should be admitted into evidence hereby **is admitted into evidence**.

2. The parties' post-hearing briefing should address **all issues including entitlement to attorneys' fees**.

3. Any party who is seeking an award of attorneys' fees shall submit detailed affidavits of services in excel format (live Excel spreadsheet, not a PDF), showing, in separate cells, the timekeeper name/initials, the billing rate, the time devoted to the task, a description of the work performed and a general description of category of the task to which the timekeeper devoted his/her time for each time entry, with a summary certification or affidavit setting forth the specific amount of fees sought in the Birenbaum and Vicente matters and the basis for the amount sought, **on or before Friday, September 5, 2025**. The summary affidavit may include differing summaries of the amount of fees sought depending upon differing potential outcomes, if the party seeking fees believes that the fees to be awarded should differ depending upon the basis of the Arbitrator's Award. The affidavit of services should include all services up to and including post-hearing briefing.

It is SO ORDERED.
Sue McSorley
Arbitrator

**Suzanne M. McSorley**
**Stevens & Lee**
**A PA Professional Corporation**
510 Carnegie Center Drive, Suite 400
Princeton, NJ  08540
T: 609-987-6663
F: 610-371-7927
M: 609-468-5881
suzanne.mcsorley@stevenslee.com

---

This email may contain privileged and confidential information and is solely for the use of the sender's intended recipient(s). If you received this email in error, please notify the sender by reply email and delete all copies and attachments. Thank you.

# EXHIBIT 10

Highly Confidential – Attorney's Eyes Only

Suzanne M. McSorley

AMERICAN ARBITRATION ASSOCIATION

CONSUMER RULES AND MASS ARBITRATION SUPPLEMENTARY RULES

| | |
|---|---|
| In the Matters of Arbitrations Between | |
| ALEC BIRENBAUM, LANCE VICENTE, | |
| Claimants, | Case Nos. 012300053145; 012300053352 |
| v. | |
| VALVE CORPORATION, | |
| Respondent. | |

**RESPONDENT VALVE CORPORATION'S**
**POST-HEARING BRIEF**

Highly Confidential – Attorney's Eyes Only

they purchased off of Steam.[252] Unlike the iPhone app market, the video game distribution industry is markedly open and competitive.[253]

## VI.    THE STATUTE OF LIMITATIONS BARS DAMAGES FOR PURCHASES BEFORE OCTOBER 2019

Claimants filed their arbitration demands on October 2, 2023.  They assert federal antitrust claims under the Sherman Act as well as claims under the Washington CPA, which both impose a four-year statute of limitations.[254] Thus the four-year limitations period for Claimants' claims begins on October 3, 2019. Accordingly, Claimants' claimed damages based on activities prior to October 3, 2019 are barred by the statute of limitations.

## VII.    CLAIMANTS ARE NOT ENTITLED TO NOMINAL DAMAGES

In other hearings, Claimants counsel has pushed for nominal damages in the event the Tribunal finds that Claimants failed to prove actual damages. But to obtain nominal damages, Claimants must still prove an antitrust violation and injury.[255] Claimants cannot do that, as demonstrated above.

## VIII.   ENTITLEMENT TO ATTORNEYS' FEES

Valve is not seeking attorneys' fees for these arbitrations. However, pursuant to the Tribunal's Order dated August 9, 2025, Valve states the following.

The statute pursuant to which Claimants may seek fees only permits seeking "reasonable"

---

[252] 7/28 Tr. at 1108:22-1109:10 (Birenbaum); *Id.* at Tr. at 966:10-967:8 (Vicente).
[253] *See* Ex D, Gilman Award at 16.
[254] *See SL-X IP S.A.R.L. v. Bank of Am. Corp., et al.*, 2021 WL 4523711, at *7 (S.D.N.Y. Sept. 30, 2021) ("Claims brought under the Sherman Act are subject to a four-year statute of limitations."); *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1059 (9th Cir. 2012) ("Antitrust actions must be commenced within four years from the date when the causes of action accrue."); *McKee v. AT & T Corp.*, 191 P.3d 845, 859 (Wash. 2008) (observing that "[t]he Washington Consumer Protection Act provides a four year statute of limitations").
[255] *See U.S. Football League v. NFL*, 842 F.2d 1335, 1376–77 (2d Cir. 1988).

Highly Confidential – Attorney's Eyes Only

attorneys' fees.[256] It is Claimants' burden to establish with sufficient documentation that the fees

sought were reasonably expended.[257] Under the law, Valve is entitled to review Claimants'

request for fees and costs, including Claimants' time entries expenses, and subject it to

adversarial testing.[258] Valve cannot do so at this time because the Tribunal ordered the parties to

address the issue of attorneys' fees in this briefing, before Valve has had a chance to examine

Claimants' fee submission and time entries. Without access to Claimants' fee submissions and a

subsequent opportunity to respond, Valve cannot test whether the hours claimed are "excessive,

redundant, or otherwise unnecessary."[259] Nor can Valve address fees Claimants' counsel may

improperly seek for other arbitrations.[260] Nor can Valve address any inaccuracies regarding the

appropriate hourly rate, which must be adjudged in accordance with prevailing rate for the area

in which the attorney practices and based on the experience of the attorney at issue.[261] Nor can

Valve address any claims for other kinds of fees or costs that Claimants may seek. Similarly,

without receiving the Tribunal's award, Valve is unable to make tailored submissions as to

whether the quantum of attorneys' fees should be reduced, though there are factors that may

---

[256] 15 U.S.C. § 15.

[257] *Johnson v. Castagnola*, 2019 WL 827640, at *2 (N.D. Cal. Feb. 21, 2019) ("The party seeking fees bears the burden of providing documentation to demonstrate the reasonableness of the hours spent on the litigation" and "must submit evidence supporting the hours worked and rates claimed, and where the documentation of hours is inadequate, the district court may reduce the award accordingly."); *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir. 1990) (similar).

[258] *See, e.g.*, *Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.*, 2016 WL 11784203, at *2 (C.D. Cal. Sept. 13, 2016); *Yamada v. Nobel Biocare Holding AG*, 825 F.3d 536, 544 (9th Cir. 2016); *In re: Cathode Ray Tube (Crt) Antitrust Litig.*, 2016 WL 1072097, at *3 (N.D. Cal. Mar. 17, 2016).

[259] *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983).

[260] *Magill v. DIRECTV*, 2017 WL 8894320 at *3 (C.D. Cal. June 23, 2017) (rejecting the claim that "work done on behalf of several different plaintiffs with individual lawsuits, some indisputably unsuccessful, can be fully recovered through the victory of one such lawsuit.").

[261] *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir. 1990) (citing *Blum v. Stenson*, 465 U.S. 886, 895 (1984)).

Highly Confidential – Attorney's Eyes Only

counsel in favor of reducing an attorneys' fees application.[262]

## **CONCLUSION**

The Tribunal should therefore enter an award in Valve's favor, on all claims.

DATED this 19th day of August, 2025

    */s/ Priyanka Timblo*    

Priyanka Timblo
Scott M. Danner
**HOLWELL SHUSTER & GOLDBERG LLP**
425 Lexington Avenue
New York, NY 10017
(646) 837-5151
ptimblo@hsgllp.com
sdanner@hsgllp.com

---

[262] These factors are "(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." *Van Horn v. Nationwide Prop. & Cas. Ins. Co.,* 436 F. App'x 496, 499-500 (6th Cir. 2011).

# EXHIBIT 11

**BEFORE THE AMERICAN ARBITRATION ASSOCIATION**

**In the Matter of:**

| | |
|---|---|
| Alec Birenbaum v. Valve Corporation | Case No. 01-23-0005-3145 |
| Lance Vicente v. Valve Corporation | Case No. 01-23-0005-3352 |

**DECLARATION OF WILLIAM BUCHER IN SUPPORT OF CLAIMANTS'
PETITION FOR FEES AND COSTS PURSUANT TO 15 U.S.C. § 15(a)**

I, William Bucher, respectfully submit this declaration pursuant to Arbitrator McSorley's August 9, 2025 Order in this matter in support of Claimants' request for mandatory attorneys' fees and costs of litigation under the Clayton Act, 15 U.S.C. § 15(a), should Claimants substantially prevail in their claims:

1.     I am the founder and principal of Bucher Law PLLC ("Bucher Law") counsel for Claimants Mr. Birenbaum and Dr. Vicente. I have served as lead supervising attorney on this case since these Claimants retained Bucher Law at the outset of this litigation in 2023. Accordingly, I have personal knowledge of the proceedings in this matter and the work of the Bucher Law attorneys and staff as well as the work of co-counsel in this matter discussed in this declaration. If called as a witness, I could testify competently to such matters under oath.

2.     Bucher Law is a litigation boutique specializing in complex cases in which corporations compel consumers to arbitrate disputes. Because of the complexity involved in handling such cases, Bucher Law is one of only a handful of firms in the United States that represents individual consumers pursuing antitrust claims against corporations through consumer arbitration. Antitrust cases are complex and require attorneys and expert witnesses to master

complicated economic concepts in addition to understanding the intimate details of the corporation and industry at issue. Bucher Law hires, and partners with, attorneys and staff who are able to handle the complicated legal, economic and procedural issues inherent in arbitration of antitrust proceedings. Often the attorneys handling our cases have economics backgrounds, degrees from elite law schools, and/or pre-existing antitrust experience.

3.      In zealously litigating this case from inception through the conclusion of the hearing, Bucher Law committed substantial time, money and resources with no guarantee of recovery. Following eight days of trial, and an exhaustive pre-trial barrage of motion practice aimed at disrupting or dislodging these proceedings, Claimants hope that they have largely prevailed on their claims. If this tribunal finds that Claimants have proven their case, the Clayton Act mandates that, as prevailing claimants, Claimants are entitled to recover attorney fees, costs of suit and prejudgment interest in addition to treble damages. 15 U.S.C. § 15(a).

4.      In fact, in litigating Mr. Birenbaum and Dr. Vicente's claims Bucher Law incurred a total of $162,889.82 in out-of-pocket expenses that they laid paid without assurance that they would be reimbursed for these expenses if they were not successful. Additionally, Bucher Law and its partner firms worked 1,843.7 hours on a contingent basis. Applying reasonable billing rates for the lawyers and other litigation professionals who worked on this case, the total lodestar for this case totals $1,334,124.75. Given the complex nature of this case, Claimants respectfully request a 1.5x multiplier to its reasonable fee requests and prejudgment interest on the attorneys' fees from the date the work at issue took place until the time of payment. This multiplier is appropriate to account for the risk counsel has undertaken, but to ensure that average compensation is commensurate with opposing counsel. Valve has retained elite—and expensive—opposing counsel who are paid regardless of outcome. Bucher Law PLLC's attorneys are not. Applying a reasonable

multiplier to account for risk places the effective rate of Bucher Law PLLC's attorneys on par with the counsel they prevail against at trial. Applying the requested multiplier and interest, Claimants request $2,001,187.13.

5.    On September 8, 2025, Arbitrator Goins rendered an interim award dated May 29, 2025 as to liability against Valve for the same anticompetitive and monopolistic practices that are at issue in this case, finding that Valve violated Sherman Act Sections 1 & 2 in arbitration cases filed by four claimants. On September 8, 2025, Arbitrator Goins issued Final Awards in four cases. In one of the cases, Arbitrator Goins awarded interest on the $729.69 damages award, awarded $732,426.52 in attorneys' fees and $46,526.07 in costs and an additional $10,539.75 in attorneys' fees incurred in preparing a reply concerning attorneys' fees. *See, e.g., Graber v. Valve Corp. d/b/a/ Steam,* Case No. 01-23-0005-3702 (Attached hereto as Exhibit A).[1] For the four arbitrations over which Arbitrator Goins presided, the arbitrator awarded a total of $3,157,969.36 in fees and for reimbursement of out-of-pocket costs. (*See*, Goins Final awards attached hereto as Exhibits A-D). The total amount requested here is in line with, and indeed less than, that total.

6.    As in the Goins matter, Bucher Law models its fee and cost request on a similar fee request that Valve's lead trial counsel firm submitted in a proceeding last year. Similar to that submission, our fee and cost request follows these principles:[2]

   •    Lodestar is the appropriate baseline for awarding fees.

_____

[1] In *Fish v. Valve Corp. D/b/a Steam,* Case No. 01-23-0005-3288, Arbitrator Goins awarded pre-judgment interest on a $3,048.54 damage award, and the same amount of attorneys' fees ($732,426.52) and costs (46, 526.07) plus the additional $10,539.75 relating to the fee petition reply. (Attached hereto as Exhibit B). Arbitrator Goins awarded the same attorneys' fees and costs and ordered prejudgment interest on the damage awards issued in *Lefebvre v. Valve,* Case No. 01-23-0005-7452 (on damages of 2,008.56) and in *Lucas v. Valve,* No. 01-23-0005-3823 (on damages of $2,281.41).
[2] Plaintiff's Motion for Post-Trial Relief, *Zunum Aero. Inc.,* No. C21-896, 2024 WL 3822780 (W.D. Wash Aug. 14, 2024).

- Applying a 1.5x multiplier for prevailing plaintiffs to account for additional risk inherent in contingency work;

- Post-trial expenses are compensable;

- Interest should be awarded

- Spending thousands of hours on a case is appropriate in a complex dispute;

- Local rates are not dispositive in awarding attorneys' fees; and

- When the hourly rate of the prevailing plaintiffs is lower than that paid to defense counsel, those rates are *per se* reasonable.

7.    Bucher Law invested significant resources into prosecuting this case, which has taken more than two years to resolve following successive rounds of briefing motions to dismiss and stay the proceeding; litigation of numerous discovery issues; the review of voluminous materials and data; the preparation of detailed economic testimony; a multi-day evidentiary hearing, including hostile cross-examinations of multiple fact and expert witnesses; and the submission of detailed post-hearing briefing following a day of closing arguments. The considerable time it took to prosecute this case to date has been attributable to the Respondent's continuing refusal to accept responsibility for its violations of antitrust law which harmed consumers such as the Claimants.

8.    Hopefully, the amounts of damages that Dr. Cross calculated for the Claimants will be awarded to Claimants. As the detailed time and expense records that accompany this declaration make clear, the cost to litigate this case far exceeded the amount of money requested by the Claimants in this case. Because, as noted in Claimants' closing briefing submitted previously in

this case, it is usually unprofitable to prosecute antitrust claims without an award of reasonable fees, the antitrust laws require such awards even with the barest of recoveries.

### A.  The Accomplished Legal Team and Their Reasonable Hourly Rates

9.      To litigate this case, I assembled a lean team of skilled attorneys to handle tasks commensurate with their level of experience. Arbitrator Goins determined that the rates charged by myself and the team that litigated the cases before Arbitrator Goins were "reasonable" under the appropriate standard and that "counsel's work and the number of hours billed were commensurate with the complexity and protracted nature" of those cases. *See* Ex. A at 2. The rates we seek here are the same as those approved by Arbitrator Goins on September 8, 2025. The core Bucher Law attorneys and co-counsel who worked on this arbitration are as follows:

•      **William Bucher.**  I am the founder and managing partner of Bucher Law PLLC. I graduated *summa cum laude* from Washington University in St. Louis with a degree in economics. I was one of only a handful of people to score a perfect LSAT score in 2011, which earned me a scholarship to attend the University of Chicago School of Law, one of the top ranked law schools in the country. I graduated from law school with honors. After graduation from law school, I joined the Debevoise & Plimpton law firm in New York City. Five years later, I joined Fenwick & West as an associate in the firm's litigation practice. I successfully litigated a large number of arbitrations to final merits decisions while at the firm.

While at Fenwick & West, I worked for large San Francisco and Seattle-based technology companies. The hourly rate my clients paid when I left Fenwick & West in 2022 to switch to representing plaintiffs was $970/hour. Had I remained at Fenwick & West,

attorneys from my law school class are billed at $1,185 for non-partners and $1,355 for partners. *See Yua Labs, Inc. v. Ripps,* No. 222-cv-04355=JFW-JEMX, 2024 WL 489248 (C.D. Cal. Jan. 11, 2024).

Because Bucher Law is a plaintiffs' side litigation boutique serving American consumers, many of whom live at or below the poverty line, I do not bill most of my clients directly, but my retainer agreements with Dr. Vicente and Mr. Birenbaum indicate that my standard hourly rate at the time they retained me was $970 an hour. My clients' agreements explicitly note that they do not pay any out-of-pocket costs unless they win their claims. Because of Bucher Law's contingency fee structure, we have not been paid an hourly rate to date, and I have personally not drawn a salary in over two years in order to pursue this litigation.

I have litigated before 100 different arbitrators. I have secured favorable, merits-based awards in my clients' favor before the vast majority of arbitrators I have appeared before in my career; my "win" percentage exceeds 98%. There are only a handful of litigators in the country that possess more experience litigating consumer arbitrations – and fewer still with my record of success.

I worked 343.18 hours on this matter. In addition to handling the cross-examinations of Valve's fact witnesses and economic expert during the arbitration, giving the opening and closing statements at the arbitration, and preparing to handle these tasks in advance of the arbitration, I oversaw this case from initiation through post-hearing briefing.

Given my experience, and commensurate with billing rates in comparable litigation by comparable firms, I request a base lodestar rate of $970 an hour in these proceedings.

This rate reflects what actual clients have been willing to pay for my arbitration work several years ago. If I had remained at Fenwick & West, or Debevoise, my hourly rate would be far higher than $970 based on my years of experience. Conservatively, $970 represents a minimum of what my work is worth in the marketplace.

•    **Judson E. Crump.**  Mr. Crump graduated from the University of Alabama School of Law, has been litigating on behalf of consumers for more than 15 years, is a member of the National Association of Consumer Advocates, and is admitted to practice before the courts of Alabama, Texas, federal district courts in both states, and the Eleventh Circuit Court of Appeals. He has tried hundreds of cases in state and federal courts, including both bench and jury trials. He served as *amicus curiae* counsel on behalf of consumer and anti-poverty organizations in successful appeals, been published in the Mississippi Law Journal, and has spoken at CLE seminars on consumer rights law. Crumps seeks a base hourly rate of $525/hour. Mr. Crump worked 120.5 hours on this case.

•    **Thomas Matthew** Thomas Matthew received a law degree from the University of California-Berkeley-School of Law in 2019 where he was a fellow at the Haas Institute for a Fair and Inclusive Society, worked at the Death Penalty Clinic, and received a certificate in Environmental Law. Mr. Matthew previously earned a bachelor's degree from Amherst College. Following his graduation from law school and prior to becoming a litigation associate at Bucher Law, Mr. Matthew worked at the Alameda Couty Public Defender's Office, as In-House Counsel and as a litigation lawyer at Bean, Kinney & Korman, PC in Arlington, Virginia and at Crowell & Moring LLP in the District of Columbia. Mr. Thomas worked 124.5 hours on this case, and his billing rate is $640/hour. I note too that my former firm Fenwick & West charges $640 for first year associates litigating arbitrations. Mr.

Thomas and all members of my team have considerably more experience than first-year associates.

- **Sherry Yu.** Sherry Yu is a litigator with experience handling a wide array of complex commercial litigation matters in state and federal courts. They have also represented clients before government agencies and Congress. Yu graduated with honors from Georgetown University Law Center in 2020 where they competed on Georgetown's nationally ranked Trial Advocacy team. Her current billing rate is $625 an hour. Sherry Yu worked 182.3 hours on this case.

- **Frank Palermo.** Frank Palermo is an experienced litigator and the founder and managing attorney at The Law Office of Frank J. Palermo. Mr. Palermo graduated from Penn State University, Dickinson School of Law, and has been practicing law since 2019. He has represented both plaintiffs and defendants in a broad range of state and federal civil actions in New York and New Jersey, including but not limited to, catastrophic injury, construction, and employment cases. Frank also provides fractional general counsel and compliance services to small business clients typically engaged in tech services. Prior to practicing law, Frank was a small business owner for over a decade and leverages that experience in his law practice. Mr. Palermo worked 414 hours on this case and his current billing rate is $640/hour.

- **Eric Atzbach** Erik Atzbach received a law degree from J. Reuben Clark Law School in 1996. He was admitted to the Colorado Bar in 1996, the New York Bar in 1998 and the D.C. Bar in 1999. Mr. Atzbach practiced international business law and international arbitration at Python & Peter in Geneva, Switzerland from 1998 to 2009. Since 2010 Mr. Atzbach has represented consumers in the U.S. Bankruptcy Court, District

of Colorado, the U.S. Bankruptcy Appellate Panel for the Tenth Circuit, the U.S. District Court, District Court of Colorado and the U.S. Tenth Circuit Court of Appeals. In 2023 Mr. Atzbach was awarded fees in the amount of $425/hour by the U.S. Bankruptcy Court, District of Colorado. Mr. Atzbach's current hourly rate is $475/hour. Mr. Atzbach worked 82.4 hours on this case.

•    **Zachary A. Horn** has nearly 15 years of experience as a practicing attorney with a background in civil litigation, complex multi-state litigation, and in-house counsel roles. He is currently Of Counsel with Bucher Law PLLC where he represents consumers in antitrust litigation against Valve Corporation. Prior to that, he was an attorney at Keller Postman, LLC, where he worked on high-stakes litigation related to toxic water exposure at Camp Lejeune Marine Corps Base, managing Bellwether plaintiffs through discovery and deposition. Previously, he served as Managing Partner at Kirkland, Cain & Horn, PLLC, where he led a commercial litigation team handling commercial litigation matters, including successfully defending the State of Kentucky in a $100 million lawsuit brought under the Randolph Sheppard Act. Earlier roles include associate attorney at McBrayer PLLC and associate counsel at community bank.

Mr. Horn earned his J.D. from the University of Kentucky Rosenburg College of Law (2011), where he served on the Moot Court Board. He holds a B.A. in Philosophy from Transylvania University (2008), cum laude, with a minor in International Affairs. He has been recognized as a Kentucky Super Lawyers Rising Star (2018–2024) and among Best Lawyers: Ones to Watch (2020–2024). He also served on the Kentucky Bar Association's Board of Governors and led its Young Lawyers Division. He has authored legal publications and held leadership roles in civic and professional organizations. He has

been licensed in Kentucky since 2011. Mr. Horn's billing rate is $640/hour. He worked 18.78 hours on this case.

• **Xinlin Morrow.** Ms. Morrow is a strategic trial lawyer with 15 years of experience in complex business and IP disputes. She graduated from Columbia Law School in 2010 as a Harlan Fiske Stone Scholar. Before co-founding Morrow Ni LLP, Ms. Morrow practiced law at national litigation powerhouses Irell & Manella and Hueston Hennigan. Prior to private practice, Ms. Morrow spent a year as an attorney fellow at the Los Angeles County District Attorney's Office where she helped prosecute gang-related murders. Ms. Morrow also served as a special prosecutor at the Anaheim City Attorney's Office and successfully obtained guilty verdicts in two misdemeanor trials as lead counsel. Each year since 2015, Super Lawyer Magazine has recognized Ms. Morrow as a "Rising Star." In 2023, Super Lawyers Magazine named Ms. Morrow as "Up-and-Coming 25" in Orange County and "Up-and-Coming 50 Women" in Southern California. Ms. Morrow's billing rate is $750/hour for both contingency and non-contingency cases at her firm. She worked 2.7 hours on this case.

• **Ellen Noteware.** Ms. Noteware is a seasoned antitrust and consumer litigator who has secured verdicts and settlements totaling more than $4 billion on behalf of her clients. Prior to joining Bucher Law, Ms. Noteware was a shareholder at Berger Montague, PC, a prominent national complex and class action firm where she worked for more than 20 years and chaired the firm's pro bono committee. After receiving her degree from Cornell University and graduating first in her law school class at the University of Wisconsin-Madison where she was Order of the Coif and Managing Editor of the Law Review, Ms. Noteware clerked for the Hon. J. Calvitt Clarke, Jr. in the Eastern District of Virginia and

then worked as a litigation associate at Arnold & Porter in Washington D.C. and Morgan Lewis in Philadelphia before switching to a predominantly plaintiffs-side practice. Among her many notable victories, Ms. Noteware was part of the trial team in *Cook v. Rockwell, Int'l Corp.* (D. Colo.) and received the "Trial Lawyer of the Year" award in 2009 from the Public Justice Foundation for their work in that case which resulted in a jury verdict of $554 million in February 2006 after a four-month trial on behalf of thousands of property owners near the Rocky Flats nuclear weapons plant located outside of Denver, Colorado. Ms. Noteware also represented the State of New Jersey in an opt-out securities matter where she secured a $45 million settlement on their behalf.

Ms. Noteware has been selected as a Super Lawyer in Pennsylvania and a Lawdragon Leading Plaintiff Financial Lawyer and has been presented the Outstanding Antitrust Achievement Award from the American Antitrust Institute on three occasions for her work on particularly successful antitrust case, including *In re Suboxone* (D.N.J.) which settled shortly before trial for $385 million. Ms. Noteware's billing rate at Berger Montague in 2025 was $1100, an amount accepted by several federal courts, when she left to join Bucher Law. Ms. Noteware worked 194.48 hours on this case, including work with the economic expert and on economic testimony and demonstratives, working with the Claimants preparing them to testify, and crafting the post-trial submissions. Ms. Noteware's billing rate is $1,100/hour.

• **Kent Williams.** Mr. Williams has over 30 years of experience representing consumers, employees, and small businesses in antitrust, wage and hour, consumer fraud, data breach, privacy, employment discrimination, securities fraud, trespass, and product liability lawsuits. Mr. Williams received his J.D. *magna cum laude* with legal writing

honors from the University of Minnesota in 1991, where he was published in the University of Minnesota Law Review and competed against other law schools as a member of Minnesota's Jessup International Law Moot Court Competition Team.

After law school, Mr. Williams joined Dorsey & Whitney, one of the largest firms in the Midwest. Mr. Williams then moved to Opperman Heins & Paquin, a class action boutique where he was responsible for a variety of class and non-class matters. In 1994, Mr. Williams and four other attorneys formed a new class action firm, Heins Mills & Olson, P.L.C., to focus on antitrust class actions against major manufacturers of infant formula, industrial diamonds, polybutylene pipe, and other products. Among other things, Mr. Williams won one of the first-ever contested indirect purchaser class certifications in the country, as well as an appellate court victory in North Carolina that established a private right of action for indirect purchasers in that state.

In the mid-2000s, Mr. Williams opened a solo practice. Over the next twenty years, Mr. Williams served as lead and/or trial counsel in a number of behemoth class actions brought against Big Pharma, Big Tech, and other large corporations. Mr. Williams was one of the trial counsel in *Comes v. Microsoft*, an Iowa monopoly maintenance case that settled mid-trial in 2007 for $179 million. Mr. Williams also is recognized as one of the first lawyers in the country to wage mass arbitration, having led a team of attorneys who arbitrated hundreds of individual wage-and-hour claims against a nationally-known restaurant chain.

Mr. Williams is currently a partner at Siri & Glimstad LLP where, in addition to his work in the Valve arbitrations, he manages the firm's mass arbitration, antitrust litigation, and genetic information privacy litigation groups. Mr. Williams' current hourly billing rate

is $1,145.00 and he seeks payment for 102 hours of work in this case for a total of $116,790.00.

10.     In addition to the licensed attorneys who worked on this matter. Bucher Law law clerks Isabelle Skomoro (NYU law student) and Elliot Kovnick (Stanford law student) contributed to our efforts. We respectfully request only $480 an hour for our law clerks (not yet admitted law students and recent graduates) significantly less than what was charged and approved by a court for law clerk work at Fenwick and West. *See Yua Labs* (approving $640 an hour for work done by law clerks). Like the law clerks from Fenwick and West, the law clerks who assisted with this case attend the highly ranked Stanford and NYU law school. Experienced legal assistant Ariel Thatcher is billed out at $290/hour and worked 43.39 hours on this case. Likewise, Tina Huang, a rising senior at Yale University who assisted with the trial, is billed out at $290/hour, and worked 117.75 hours on this case.

11.     As noted in Claimants' previously submitted post-submission briefing, all of the proposed rates are far lower than the rates that Valve is presumably paying the attorneys defending them in this case. Valve's counsel noted in fee submissions they submitted that when the rate proposed by the moving high is lower "in comparison to" opposing counsel's rate, that suggests that the requested rates are reasonable.

## B.  Hours Worked Were Generated from Firm Time-Keeping Software

12.     Bucher Law keeps track of time through time-keeping software which tracks time for each matter. Because we represent numerous clients pursuing claims against Valve Corporation, our team uses project and tag features to keep track of which arbitrator and arbitration for which their work should be applied.

13.     To determine the amount that should be attributed to this matter by Bucher Law attorneys and other professionals, I examined all fee records that were tagged for this arbitration The results of this are shown in the spreadsheet showing Bucher Law's lodestar (Exhibit E) and the lodestar from co-counsel Moni Law and Siri Glimstad are attached as Exhibits  F and G.[3]

14.     While our work in this arbitration was informed by our work in prior arbitrations against Valve, we do not seek to recover time for work performed on those previous arbitrations. Nor are we seeking compensation for work that our firm performed defending Valve's lawsuits against any of our clients in federal court seeking to enjoin these arbitrations. Accordingly, the total hours requested in our fee petition represent only a fraction of the total time and effort my team has put into litigating these claims against Valve.

15.     In October 2023, Valve sued me personally in Washington State court alleging that I was bringing "frivolous" claims on behalf of my clients. I retained counsel to defend against those allegations. I do not seek the costs of my time or my counsel's time on that case in the fee request in this case.

16.     In the fee petition decided by Arbitrator Goins, my firm sought compensation for some work that was applicable not only to the Goins arbitration matters, but which also was necessary for this and other related matters. Consistent with Arbitrator Goins' Final Awards, Claimants are not seeking compensation at this time for attorney and expert witness fees, costs and expenses that were claimed and subsequently awarded in the Goins Final Arbitration Awards. *See* Ex. A *at 2.* However, Valve has filed petitions to vacate each of the arbitration award in the U.S.

---

[3]  I counted 100% of the fees charged for that entry as attributable to this case. We ask that time entries that were tagged for this arbitrations but also involved  tasks or meetings where other arbitrations were also discussed or were only attributable in part to this case, be billed in full to this case. Alternatively, we ask that the tribunal award 50% of the time attributable to such entries.

District Court for the Western District of Washington yesterday. Although there is no valid reason for vacatur, in the unlikely event that the fees awarded by Arbitrator Goins are amended, reduced or not paid out for any reason, Claimants reserve the right to petition this tribunal for fees for work performed that was necessary for this matter as well as Goins and other similar matters against Valve but which is currently covered by the Goins awards.

17.    Other than the work that Arbitrator Goins already ordered should be compensated by Valve (which Bucher Law is not claiming here), Bucher Law seeks its full lodestar amount expended on this case (reasonable hourly rate multiplied by hours spent). As noted in our prior briefing, fee awards are mandatory under the Sherman Act, Washington State Unfair Competition Law, and for a prevailing consumer under the parties' arbitration agreement. As noted in our post-trial briefing, courts routinely award attorneys' fees in Sherman Act cases even for nominal success.[4]

18.    Multiplying each attorneys' and attorney support staff's hourly rates by the hours worked by that attorney yields a base fee award of $1,334.124.75.

### C.  Hourly Rates Should Be Multiplied by 1.5x

19.    Given the contingent nature of the fees in this case, the complexity and difficulty of this litigation, the delay in receipt of payment, the risks of success, and the fact that Bucher Law attorneys are helping to address public policy concerns, Claimants respectfully request that Claimants' attorneys' lodestars should be multiplied by 1.5. *See Copper Liquor, Inc. v. Adolph Coors Co.,* 624 F. 2d 575 (5th Cir. 1980). Washington law permits courts to adjust fees upward in contingency matters to take account of the risks that attend contingency fees, including because

---

[4] *U.S. Airways, Inc. v. Sabre Holdings Corp.*, 11 Civ. 2725 (LGS) (S.D.N.Y. June 1, 2024); *In re Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F. 2d 425 (3d Cir. 1993).

"lawyers generally will not provide legal representation on a contingent basis unless they receive a premium for taking that risk." *Bowers v. Transamerica Title Co.,* 100 Wash 2d. 581, 601 (1983) (upholding 50% premium); *Kingston v. IBM,* 2021 WL 2662219. At *5 (W.D. Wash. June 29, 2021) (applying multiplier of 1.1 in contingency employment dispute). Given the complexity of the claims and the risks involved in litigating an antitrust case of this nature, particularly against Valve and its highly qualified counsel, it is appropriate to apply a 50% premium on attorneys' fees and award them to Claimant.

20.     Applying the 1.5 multiplier to the lodestar yields $2,001,187.13 in fees.

### D.  Claimants are Entitled to Pre-Judgment Interest on Fees Awarded

21.     Claimants also seek an award of interest accruing from the date of the injury on the fees claimed at a 7.5% interest rate.  *See*  N.J. Ct. R. 4:42-11(a)(iii). The U.S. Supreme Court has held that "an enhancement for delay in payment is, where appropriate, part of a 'reasonable attorney's fee.'" *Missouri v. Jenkins,* 491 U.S. 274 (1989). The Clayton Act also provides for simple interest upon actual damages. Accordingly, Claimants' seek interest on fee awards. We calculated interest on attorneys' fees at New Jersey's 7.5 % interest rate, as simple interest running from the day work was done on each billing entry in Exhibit E.

### E.  Claimants are Entitled to Reimbursement of Their Filing Fees and Share of Any Arbitration Costs

22.     Regardless of the outcome of these arbitrations, Claimants are entitled to reimbursement of their filing fees and share of any AAA arbitration costs. *See* April 25, 2023 Steam Subscriber Agreement, Section (11)(C)("If you seek $10,000 or less, Valve agrees to promptly

reimburse your filing fee and your share if any of AAA's arbitration costs, including arbitrator compensation, unless the arbitrator determines your claims are frivolous or were filed for harassment.") Dr. Vicente paid the initial filing fee of $125.00 to initiate his individual arbitration and is therefore entitled to reimbursement of the same, win or lose.

### F.  Claimants are Entitled to an Award of Costs

23.    Bucher Law expended out-of-pocket costs, including expert costs, of $162,889.82. *See* Exhibit H.

24.    By far, the largest category of expenses that we incurred was for expert witness and consulting fees ($144,620). *See* Exhibit I. Given the necessity of expert testimony in a Sherman Act antitrust case, these costs, particularly the expert fees, were necessary. Interest on these costs, calculated using simple interest from the day the work was performed amount to $2313.47

25.    The remaining approximately $18,000 involved charges relating mostly to the in-person hearing, including travel, shipping, office supplies, meals and lodging, which were accomplished as cheaply as possible.

26.    Valve has erroneously argued in another arbitration where Bucher Law obtained judgments on behalf of claimants against Valve that Bucher Law is not entitled to its full lodestar and expenses because the arbitrator did not grant what it argued was "full relief" to the successful claimants in those matters because, while awarding claimants damages under the Sherman Act, the arbitrator did not find that Valve violated Washington state law and did not find the *per se* analysis applied. There is no merit to their position.[5] Arbitrator Goins did not accept this argument and this

---

[5] The case Valve cited in support of its position in the Goins matters, *Hensley v. Eckerhart,* 461 U.S. 424 (1983) made clear that it was the "result that matters" and not the court's rejection or failure to reach certain grounds when deciding the proper fee.

tribunal should not either. Should this tribunal award any damages to Claimants, Bucher Law is entitled to its full lodestar and expenses expended on an entirely contingent basis to litigate this complex antitrust matter to conclusion.

BUCHER LAW PLLC

BY: /s/ Will Bucher

Dated: September 9, 2025

# EXHIBIT 12

| # | Description | User | Start Date | Duration (decimal) | Rate | Amount (USD) | ABA Code | Days Since Work | Interest |
|---|---|---|---|---|---|---|---|---|---|
| 2 | Preliminary hearing, post-hearing discussions w/ Will | Frank Palermo | 06/05/24 | 2.20 | | $1,408.00 | L230 | 492 | $142.34 |
| 3 | Review prelim hearing and scheduling order #1 | Frank Palermo | 06/05/24 | 0.20 | | $128.00 | L120 | 492 | $12.94 |
| 4 | Suzanne M. McSorley Preliminary Hearing; debrief call with F. Palermo and T. Huang following McSorley preliminary hearing; correspondence with AAA re: adding F. Palermo as counsel of record | Frank Palermo | 06/05/24 | 2.40 | | $2,328.00 | L230 | 492 | $235.35 |
| 5 | Correspondence with F. Palermo re: service list | Frank Palermo | 06/10/24 | 0.30 | $970 | $291.00 | L140 | 487 | $29.12 |
| 6 | Drafting amended demands | Frank Palermo | 06/15/24 | 3.20 | | $2,048.00 | L210 | 482 | $202.84 |
| 7 | Correspondence w/ Will re: amended demands | Frank Palermo | 06/21/24 | 0.30 | | $192.00 | L210 | 476 | $18.76 |
| 8 | Correspondence w/ Will re: amended demands | Frank Palermo | 06/20/24 | 0.60 | | $384.00 | L210 | 474 | $37.40 |
| 9 | Correspondence w/ Will re: amended demands | Frank Palermo | 06/24/24 | 1.60 | | $1,024.00 | L210 | 473 | $99.52 |
| 10 | Correspondence w/ Robert re: amended demands | Frank Palermo | 06/25/24 | 0.30 | | $192.00 | L210 | 473 | $18.66 |
| 11 | Redline R-14 brief and compare | Frank Palermo | 07/10/24 | 1.70 | | $640.00 | L210 | 457 | $102.17 |
| 12 | review Valve's amended R-14 brief | Frank Palermo | 07/10/24 | 1.30 | | $832.00 | L120 | 457 | $78.13 |
| 13 | Emailing Mr. Goldman re: meet and confer; correspondence w/ F. Palermo re: the same | Will Bucher | 07/12/24 | 0.50 | $970 | $485.00 | L390 | 455 | $45.34 |
| 14 | Review Valve's amended R-14 MtD | Frank Palermo | 07/15/24 | 0.60 | $640 | $384.00 | L440 | 454 | $35.82 |
| 15 | Review correspondence btwn Will & Goldman | Frank Palermo | 07/15/24 | 0.30 | $640 | $192.00 | L390 | 452 | $17.83 |
| 16 | Meet and confer | Frank Palermo | 07/15/24 | 0.50 | $640 | $320.00 | L390 | 452 | $29.72 |
| 17 | Meet and Confer with Goldman | Will Bucher | 07/15/24 | 0.25 | $970 | $242.50 | L390 | 452 | $22.52 |
| 18 | Gathering templates for and drafting position on discovery; correspondence with C. Offoha re: the same | Will Bucher | 07/15/24 | 1.00 | $970 | $970.00 | L390 | 452 | $90.00 |
| 19 | drafting/revising opening brief re: discovery | Frank Palermo | 07/16/24 | 2.20 | $640 | $1,408.00 | L390 | 450 | $130.48 |
| 20 | Drafting discovery proposal | Will Bucher | 07/17/24 | 1.00 | $970 | $970.00 | L3b- | 450 | $89.69 |
| 21 | Correspondence w/ Will re: opening brief | Frank Palermo | 07/18/24 | 0.70 | $640 | $448.00 | L240 | 449 | $41.33 |
| 22 | Drafting and revision of opening brief on discovery issues; correspondence with F. Palermo re: the same | Will Bucher | 07/18/24 | 2.25 | $970 | $2,182.50 | L350 | 449 | $201.36 |
| 23 | Correspondence w/ Robert re: response to Valve's MtD | Frank Palermo | 08/07/24 | 0.30 | $640 | $192.00 | L240 | 429 | $16.92 |
| 24 | Reviewing Valve's Response to Claimants' opening brief | Frank Palermo | 08/07/24 | 0.30 | $640 | $192.00 | L350 | 429 | $16.92 |
| 25 | Review correspondence btwn Will and Goldman re: Valve Response to opening brief | Frank Palermo | 08/08/24 | 0.20 | $640 | $128.00 | L240 | 429 | $11.28 |
| 26 | submit response to Valve's amended MtD | Frank Palermo | 08/08/24 | 0.30 | $640 | $192.00 | L240 | 428 | $16.89 |
| 27 | Correspondence w/ Will re: amended MtD response | Frank Palermo | 08/08/24 | 0.40 | $640 | $256.00 | L240 | 428 | $22.51 |
| 28 | Correspondence w/ Will re: MtD response | Frank Palermo | 08/08/24 | 2.00 | $640 | $1,280.00 | L240 | 428 | $112.57 |
| 29 | drafting Claimants' response to Valve's amended MtD | Frank Palermo | 08/08/24 | 3.40 | $640 | $2,176.00 | L240 | 428 | $191.37 |
| 30 | Correspondence w/ Robert re: amended MtD response | Frank Palermo | 08/08/24 | 0.20 | $640 | $128.00 | L240 | 428 | $11.26 |
| 31 | drafting reply to valve's R22 response | Frank Palermo | 08/12/24 | 4.60 | $640 | $2,944.00 | L250 | 424 | $256.49 |
| 32 | Review Decision and Order on Respondent's Motion to Dismiss | Frank Palermo | 08/13/24 | 0.10 | $640 | $64.00 | L240 | 424 | $5.56 |
| 33 | submission Claimants R22 reply | Frank Palermo | 08/13/24 | 0.10 | $640 | $64.00 | L250 | 423 | $5.56 |
| 34 | Correspondence w/ Will re: R22 reply, revising draft | Frank Palermo | 08/13/24 | 2.70 | $640 | $1,728.00 | L250 | 423 | $150.19 |
| 35 | Review and editing of reply brief on discovery | Will Bucher | 08/13/24 | 3.50 | $970 | $3,395.00 | L250 | 423 | $295.09 |
| 36 | Correspondence w/ Will re: client communication and status | Frank Palermo | 08/20/24 | 0.40 | $640 | $256.00 | L410 | 416 | $21.88 |
| 37 | Emails to Claimants re: hearing availability | Frank Palermo | 08/21/24 | 0.30 | $640 | $192.00 | L410 | 415 | $16.37 |
| 38 | McSorley follow-up prelim conference | Frank Palermo | 08/21/24 | 1.00 | $640 | $640.00 | L230 | 415 | $54.58 |
| 39 | Emails to and from Arb re: conference | Frank Palermo | 08/21/24 | 0.30 | $640 | $192.00 | L230 | 415 | $16.37 |
| 40 | McSorley - Follow-up Preliminary and Scheduling Conference | Will Bucher | 08/21/24 | 0.70 | $970 | $679.00 | L230 | 415 | $57.89 |
| 41 | Review Scheduling order #2 | Frank Palermo | 08/22/24 | 0.20 | $640 | $128.00 | L440 | 414 | $10.89 |
| 42 | Emails from Will/Arb/Goldman re: expert reports | Frank Palermo | 08/22/24 | 0.60 | $640 | $384.00 | L330 | 414 | $32.67 |
| 43 | Email to McSorley concerning expert reports | Frank Palermo | 08/22/24 | 0.50 | $970 | $485.00 | L330 | 414 | $41.26 |
| 44 | Emails from Will/Goldman re: experts | Frank Palermo | 08/29/24 | 0.20 | $640 | $128.00 | L330 | 413 | $10.86 |
| 45 | Email from Arb re: IE | Frank Palermo | 08/29/24 | 0.10 | $640 | $64.00 | L360 | 412 | $5.42 |
| 46 | Emails from Bieler/Arb/Will re: Valve request to stay | Frank Palermo | 08/29/24 | 0.40 | $640 | $256.00 | L240 | 407 | $21.41 |
| 47 | Correspondence w/ Will re: resp[onse to Valve req to stay | Frank Palermo | 09/03/24 | 0.40 | $640 | $256.00 | L240 | 402 | $21.15 |
| 48 | Emails to/from Goldman re: Claimant proposed protective order | Frank Palermo | 09/04/24 | 0.20 | $640 | $128.00 | L390 | 401 | $10.55 |
| 49 | draft proposed changed to protective order | Frank Palermo | 09/04/24 | 1.60 | $640 | $1,024.00 | L390 | 401 | $84.37 |
| 50 | Review Valve's proposed protective order | Frank Palermo | 09/04/24 | 0.40 | $640 | $256.00 | L390 | 401 | $21.09 |
| 51 | Email to/from Goldman, and Arb re: protective order | Frank Palermo | 09/04/24 | 0.30 | $640 | $192.00 | L390 | 401 | $15.82 |
| 52 | Call with Frank VGBA, Number: 6463316286 | Will Bucher | 09/04/24 | 0.20 | $970 | $194.00 | L110 | 401 | $15.99 |
| 53 | revise response to Valve's motion to stay | Frank Palermo | 09/05/24 | 1.10 | $640 | $704.00 | L240 | 400 | $57.86 |
| 54 | Email to Arb re: Claimant response to Valve motion to stay | Frank Palermo | 09/05/24 | 0.10 | $640 | $64.00 | L240 | 400 | $5.26 |
| 55 | review of Valve's letter re: further report of stay, cites, exhibits | Frank Palermo | 09/06/24 | 1.10 | $640 | $704.00 | L240 | 399 | $57.72 |
| 56 | Email from Bieler re: Valve further support for stay, | Frank Palermo | 09/06/24 | 0.10 | $640 | $64.00 | L240 | 399 | $5.25 |
| 57 | Email from Arb re: decision re: Valve motion to stay | Frank Palermo | 09/07/24 | 0.20 | $640 | $128.00 | L240 | 398 | $10.47 |
| 58 | Emails from AAA re: McSorley decision on Respondent's Motion to Stay All Proceedings | Frank Palermo | 09/09/24 | 0.20 | $640 | $128.00 | L240 | 396 | $10.42 |
| 59 | Emails from Will/Goldman re: court reporters in conferences | Frank Palermo | 09/09/24 | 0.10 | $640 | $64.00 | L190 | 395 | $5.19 |
| 60 | Email from Arb re: signed protective order, review signed order | Frank Palermo | 09/12/24 | 0.30 | $640 | $192.00 | L390 | 394 | $15.53 |
| 61 | Email from Fuchs re: court reporters in conferences | Frank Palermo | 09/13/24 | 0.10 | $640 | $64.00 | L190 | 393 | $5.16 |
| 62 | Emails from Fuchs/Arb re: proposed order | Frank Palermo | 09/20/24 | 0.10 | $640 | $64.00 | L390 | 389 | $5.12 |
| 63 | Email from Fuchs re: protective order clarification | Frank Palermo | 09/20/24 | 0.20 | $640 | $128.00 | L390 | 386 | $10.13 |
| 64 | Email from AAA re: disclosures | Frank Palermo | 09/24/24 | 0.10 | $640 | $64.00 | L190 | 381 | $5.01 |
| 65 | review McTigue letter re: communication | Frank Palermo | 09/29/24 | 0.10 | $640 | $64.00 | L390 | 376 | $4.94 |
| 66 | Email from Will re: service list | Frank Palermo | 09/29/24 | 0.10 | $640 | $64.00 | L190 | 376 | $4.94 |
| 67 | Email from Will re: SSA and compliance | Frank Palermo | 09/30/24 | 0.10 | $640 | $64.00 | L390 | 375 | $4.93 |
| 68 | Review McTigue letter re: SSA | Frank Palermo | 09/30/24 | 0.10 | $640 | $64.00 | L390 | 375 | $4.93 |
| 69 | review protective order | Frank Palermo | 10/01/24 | 0.20 | $640 | $128.00 | L390 | 374 | $9.84 |
| 70 | Correspondence w/ Will re: ethics rules | Frank Palermo | 10/01/24 | 1.00 | $640 | $640.00 | L390 | 374 | $49.18 |
| 71 | Emails from Arb re: compliance w/ scheduling order, zoom info | Frank Palermo | 10/01/24 | 0.20 | $640 | $128.00 | L390 | 374 | $9.84 |
| 72 | Correspondence with F. Palermo re: ethics rules research; reviewing his notes on the same | Will Bucher | 10/01/24 | 1.00 | $970 | $970.00 | L130 | 374 | $74.54 |
| 73 | Call w/ Will re: Arb conference | Frank Palermo | 10/02/24 | 1.00 | $640 | $640.00 | L240 | 373 | $49.05 |
| 74 | Call w/ Will re: AAA jurisdiction | Frank Palermo | 10/08/24 | 0.50 | $640 | $320.00 | L240 | 367 | $24.13 |
| 75 | Correspondence with F. Palermo re: AAA ruling on jurisdictional questions | Will Bucher | 10/08/24 | 0.25 | $970 | $242.50 | L360 | 367 | $18.29 |
| 76 | Email from Arb re: MtD | Frank Palermo | 10/09/24 | 0.10 | $640 | $64.00 | L240 | 366 | $4.81 |
| 77 | Correspondence w/ Will re: Arb case status | Frank Palermo | 10/10/24 | 0.30 | $640 | $192.00 | L240 | 365 | $14.40 |
| 78 | Correspondence with F. Palermo re: McSorley case status and plans for briefing next week | Will Bucher | 10/10/24 | 0.30 | $970 | $291.00 | L390 | 365 | $21.83 |
| 79 | Review McTigue letter re: MtD | Frank Palermo | 10/11/24 | 0.90 | $640 | $576.00 | L240 | 364 | $43.08 |
| 80 | Email from Fuchs re: MtD | Frank Palermo | 10/11/24 | 0.10 | $640 | $64.00 | L240 | 364 | $4.79 |
| 81 | researching and drafting response to Valve's 2nd MtD | Frank Palermo | 10/15/24 | 1.20 | $640 | $768.00 | L240 | 360 | $56.85 |
| 82 | Meeting w/ Will re: Arb briefing of MtD response | Frank Palermo | 10/18/24 | 1.30 | $640 | $832.00 | L240 | 357 | $61.03 |
| 83 | Email from Arb re: MtD briefing MtD | Frank Palermo | 10/18/24 | 0.20 | $640 | $128.00 | L240 | 357 | $9.39 |
| 84 | Teleconferences with F. Palermo re: McSorley briefing | Will Bucher | 10/18/24 | 1.30 | $970 | $1,261.00 | L390 | 357 | $92.50 |
| 85 | Review McTigue letter re: ergon arbs | Frank Palermo | 10/19/24 | 0.40 | $640 | $256.00 | L240 | 356 | $18.73 |
| 86 | email from Quinn re: ergon arbitrations | Frank Palermo | 10/19/24 | 0.10 | $640 | $64.00 | L240 | 356 | $4.68 |
| 87 | researching and drafting Response to Valve's MtD "Coinbase" | Frank Palermo | 10/19/24 | 3.80 | $640 | $2,432.00 | L240 | 356 | $177.90 |
| 88 | Emails to/from Will re: MtD response draft | Frank Palermo | 10/22/24 | 0.30 | $640 | $192.00 | L240 | 354 | $13.97 |
| 89 | Email from Will to Arb re: MtD | Frank Palermo | 10/22/24 | 0.10 | $640 | $64.00 | L240 | 353 | $4.64 |
| 90 | Call w/ Will re: conference | Frank Palermo | 10/22/24 | 0.20 | $640 | $128.00 | L240 | 351 | $9.20 |
| 91 | Call with Frank Palermo (VGBA), Number: +16463316286 | Will Bucher | 10/23/24 | 0.20 | $970 | $194.00 | L110 | 351 | $13.93 |
| 92 | Hearing re: Valve's MtD "coinbase" | Frank Palermo | 10/25/24 | 0.50 | $640 | $320.00 | L230 | 350 | $23.01 |
| 93 | 24 individual Claimants v. Valve d/b/a Steam -- Hearing on Respondent's Motion to Dismiss for Lack of Jurisdiction | Will Bucher | 10/25/24 | 1.00 | $970 | $970.00 | L230 | 350 | $69.76 |
| 94 | Correspondence w/ Will re: coinbase decision and order #3 | Frank Palermo | 10/27/24 | 0.10 | $640 | $64.00 | L230 | 348 | $4.58 |
| 95 | Email from Arb re: coinbase decision | Frank Palermo | 10/27/24 | 0.10 | $640 | $64.00 | L230 | 348 | $4.58 |
| 96 | drafting changes to protective order | Frank Palermo | 11/05/24 | 1.80 | $640 | $1,152.00 | L390 | 339 | $80.25 |
| 97 | Correspondence w/ Will regarding protective order changes | Frank Palermo | 11/05/24 | 0.50 | $640 | $320.00 | L390 | 339 | $26.75 |
| 98 | Correspondence w/ Will re: protective order | Frank Palermo | 11/06/24 | 0.30 | $640 | $192.00 | L390 | 338 | $15.33 |
| 99 | Correspondence w/ Will re: protective order | Frank Palermo | 11/07/24 | 0.50 | $640 | $320.00 | L390 | 337 | $22.16 |
| 100 | Correspondence w/ Will re: protective order | Frank Palermo | 11/07/24 | 0.30 | $640 | $192.00 | L390 | 337 | $13.30 |
| 101 | Editing and revising draft response to Valve Corporation's objection to entered protective order | Will Bucher | 11/07/24 | 2.25 | $970 | $2,182.50 | L390 | 337 | $151.13 |
| 102 | review Arb Order Amending Protective Order | Frank Palermo | 11/12/24 | 0.10 | $640 | $64.00 | L390 | 332 | $8.81 |
| 103 | Emails sfrom Fuchs/Arb re: document production | Frank Palermo | 11/13/24 | 0.20 | $640 | $128.00 | L390 | 330 | $17.36 |
| 104 | Teleconference and messaging with F. Palermo re: McSorley production | Will Bucher | 11/14/24 | 0.50 | $970 | $485.00 | L230 | 330 | $32.89 |
| 105 | Review McTigue letter re: IE | Frank Palermo | 11/14/24 | 0.10 | $640 | $64.00 | L390 | 330 | $4.42 |
| 106 | Email from Fuchs re: IE | Frank Palermo | 11/14/24 | 0.10 | $640 | $64.00 | L390 | 330 | $4.23 |
| 107 | Email from Arb re: follow-up prelim hearing | Frank Palermo | 11/18/24 | 0.10 | $640 | $64.00 | L390 | 327 | $4.22 |
| 108 | prepare for hearing | Erik Atzbach | 11/29/24 | 0.60 | $475 | $285.00 | L120 | 315 | $18.45 |
| 109 | prepare for hearing | Erik Atzbach | 11/30/24 | 4.60 | $475 | $2,185.00 | L120 | 314 | $140.98 |
| 110 | Download, Review, categorize information exchange documents | Erik Atzbach | 11/30/24 | 1.70 | $475 | $807.50 | L120 | 314 | $70.20 |
| 111 | review case management order | Erik Atzbach | 12/02/24 | 0.10 | $475 | $47.50 | L250 | 312 | $3.02 |
| 112 | prepare Dec 16 filing | Erik Atzbach | 12/02/24 | 1.30 | $475 | $617.50 | L250 | 312 | $39.59 |
| 113 | attend hearing | Erik Atzbach | 12/02/24 | 0.70 | $475 | $332.50 | L230 | 312 | $18.27 |
| 114 | prepare for hearing | Erik Atzbach | 12/02/24 | 0.25 | $475 | $118.75 | L230 | 312 | $6.65 |
| 115 | Att conference re: information exchange | Erik Atzbach | 12/02/24 | 0.70 | $475 | $448.00 | L120 | 312 | $28.72 |
| 116 | Call w/ Erik re: Arb hearing | Frank Palermo | 12/02/24 | 0.30 | $640 | $192.00 | L230 | 312 | $20.52 |
| 117 | Review McTigue letter re: Claimant communication | Frank Palermo | 12/02/24 | 0.10 | $640 | $64.00 | L390 | 312 | $7.94 |
| 118 | Call with F. Palermo re: discovery | Will Bucher | 12/15/24 | 0.30 | $970 | $291.00 | L390 | 299 | $17.88 |
| 119 | correspondence w/ Will re: client communication response | Frank Palermo | 12/15/24 | 0.30 | $640 | $192.00 | L390 | 299 | $11.80 |
| 120 | draft IE objections and further IE requests | Frank Palermo | 12/18/24 | 1.60 | $640 | $1,024.00 | L350 | 297 | $62.49 |
| 121 | Calendaring | Ariel Thatcher | 12/18/24 | 2.66 | $290 | $771.40 | L190 | 296 | $46.92 |
| 122 | Draft response letter re: client comm | Frank Palermo | 12/18/24 | 0.50 | $640 | $320.00 | L390 | 297 | $27.06 |
| 123 | Review McTigue letter re: client comm | Frank Palermo | 12/18/24 | 0.10 | $640 | $64.00 | L390 | 297 | $4.75 |
| 124 | correspondence w/ Will re: client comm letter | Frank Palermo | 12/18/24 | 1.50 | $640 | $960.00 | L390 | 295 | $58.19 |
| 125 | Revise a response to respond for individual appearances of employees at CMC; correspondence w/ F. Palermo re: the same | Will Bucher | 12/23/24 | 1.00 | $970 | $970.00 | L390 | 295 | $68.20 |
| 126 | Review Valve's objections to Claimants further requests | Frank Palermo | 12/23/24 | 0.30 | $640 | $320.00 | L350 | 291 | $19.13 |
| 127 | Review Fuchs emails regarding scheduling and response to modify protective order | Frank Palermo | 12/23/24 | 0.20 | $640 | $128.00 | L350 | 291 | $7.65 |
| 128 | Correspondence with F. Palermo re: McSorley document request objections | Will Bucher | 01/02/25 | 0.30 | $970 | $291.00 | L350 | 282 | $17.40 |
| 129 | McSorley: Hearing | Frank Palermo | 01/02/25 | 2.00 | $970 | $1,940.00 | L230 | 282 | $112.02 |
| 130 | drafting response to Valve's IE objections | Frank Palermo | 01/02/25 | 4.00 | $640 | $2,240.00 | L360 | 275 | $126.58 |
| 131 | correspondence w/ Will re: response to Valve EOI req | Erik Atzbach | 01/06/25 | 0.50 | $475 | $2,045.00 | L350 | 273 | $165.20 |
| 132 | correspondence w/ Will re: response to Valve EOI req | Frank Palermo | 01/09/25 | 2.00 | $640 | $448.00 | L350 | 273 | $17.96 |
| 133 | Revising letter re: Valve's objections; correspondence and teleconferences with E. Atzbach and F. Palermo re: the same | Will Bucher | 01/10/25 | 3.75 | $970 | $3,637.50 | L350 | 273 | $204.05 |
| 134 | Reviewing Valve's objections to further EOI req | Erik Atzbach | 01/10/25 | 1.00 | $475 | $704.00 | L350 | 273 | $50.54 |
| 135 | emails with Max, Frank and Will | Erik Atzbach | 01/13/25 | 0.50 | $475 | $475.00 | L190 | 270 | $10.53 |
| 136 | Call w/ Will and Erik re: Arb hearing and discovery | Frank Palermo | 01/13/25 | 1.00 | $640 | $640.00 | L390 | 270 | $35.51 |
| 137 | Correspondence w/ Will & expert re: information exchange, sending copies | Frank Palermo | 01/13/25 | 0.30 | $640 | $192.00 | L390 | 270 | $10.65 |

| | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Description | User | Start Date | Duration (decimal) | Rate | Amount (USD) | ABA Code | Days Since Work | Interest |
| 141 | Teleconferences with E. Atzbach and F. Palermo re: McSorley hearing, discovery; teleconference with E. Atzbach (only) re: discovery to date and its status; review of summaries , orders and charts to prepare for conference | Will Bucher | 01/13/25 | 3.50 | $970 | $3,395.00 | L130 | 270 | $169.35 |
| 142 | Prep call for hearing on data with M. Theiler | Will Bucher | 01/13/25 | 0.50 | $970 | $485.00 | L320 | 270 | $26.91 |
| 143 | attend hearing | Erik Atzbach | 01/14/25 | 0.50 | $475 | $237.50 | L230 | 269 | $13.13 |
| 144 | prepare for hearing | Erik Atzbach | 01/14/25 | 0.20 | $475 | $95.00 | L230 | 269 | $5.25 |
| 145 | Review expert email re IE | Frank Palermo | 01/14/25 | 0.10 | $640 | $64.00 | L390 | 269 | $3.54 |
| 146 | Arb hearing | Frank Palermo | 01/14/25 | 1.00 | $640 | $640.00 | L230 | 269 | $35.38 |
| 147 | 14 Individual Claimants v. Valve d/b/a Steam -- Status Conference and Hearing; preparing for the same; post call correspondence with M. Theiler | Will Bucher | 01/14/25 | 1.30 | $970 | $1,261.00 | L230 | 269 | $69.70 |
| 148 | Review Arb email re: production | Frank Palermo | 01/15/25 | 0.10 | $640 | $64.00 | L430 | 268 | $3.52 |
| 149 | Email to Fuchs re: meet and confer | Frank Palermo | 01/15/25 | 0.10 | $640 | $64.00 | L390 | 267 | $3.51 |
| 150 | Emails to/from Fuchs re: meet and confer | Frank Palermo | 01/17/25 | 0.20 | $640 | $128.00 | L390 | 266 | $7.00 |
| 151 | work on information exhange | Erik Atzbach | 01/21/25 | 0.70 | $475 | $332.50 | L390 | 262 | $17.90 |
| 152 | Emails to/from Fuchs re: rescheduling meet and confer | Frank Palermo | 01/21/25 | 0.20 | $640 | $128.00 | L390 | 262 | $6.89 |
| 153 | Correspondence w/ Will re: meet and confer, discovery | Frank Palermo | 01/21/25 | 0.90 | $640 | $576.00 | L390 | 261 | $30.89 |
| 154 | Meet and confer re: IE | Frank Palermo | 01/22/25 | 0.50 | $640 | $320.00 | L390 | 261 | $17.16 |
| 155 | Fw: McSorley EOI Meet and Confer | Frank Palermo | 01/22/25 | 0.50 | $970 | $485.00 | L320 | 261 | $26.01 |
| 156 | Emails to/from Fuchs re: data missing from IE | Frank Palermo | 01/24/25 | 0.20 | $640 | $128.00 | L390 | 259 | $6.81 |
| 157 | Reviewing Documents exchanged | Frank Palermo | 01/24/25 | 0.60 | $640 | $384.00 | L390 | 259 | $20.44 |
| 158 | revising draft motion to compel w/ Will, correspondence re: same | Frank Palermo | 01/27/25 | 6.10 | $640 | $3,904.00 | L390 | 256 | $205.36 |
| 159 | Correspondence w/ Fuchs re: IE | Frank Palermo | 01/27/25 | 0.20 | $640 | $128.00 | L390 | 256 | $6.73 |
| 160 | drafting motion to compel discovery, correspondence w/ Will and Erik re: same, reviewing history of case and drafting a timeline revising draft w/ Qill | Frank Palermo | 01/27/25 | 8.80 | $640 | $5,632.00 | L350 | 256 | $296.26 |
| 161 | Correspondence with F. Palermo; teleconferences with F. Palermo; piecing together history and chart of what has happened in the case; reviewing and revising brief, reviewing and revising draft affidavit | Will Bucher | 01/27/25 | 11.00 | $970 | $10,670.00 | L390 | 256 | $561.27 |
| 162 | Submission of letter re: sufficiency of IE | Frank Palermo | 01/28/25 | 0.10 | $640 | $64.00 | L390 | 256 | $3.35 |
| 163 | Email to W. re: received and requested | Frank Palermo | 01/28/25 | 0.50 | $640 | $320.00 | L390 | 255 | $16.77 |
| 164 | Review Valve's motion to compel responses to IE requests | Frank Palermo | 01/28/25 | 0.50 | $640 | $320.00 | L350 | 255 | $16.77 |
| 165 | correspondence w/ Will re: IE in case thus far and strategy | Frank Palermo | 01/28/25 | 1.50 | $640 | $960.00 | L390 | 255 | $50.30 |
| 166 | Call with Frank Palermo (VGBA), Number: +16463316286 | Will Bucher | 01/28/25 | 0.47 | $970 | $455.90 | L320 | 255 | $23.89 |
| 167 | Review and revisions to Claimant information exchange request submissions | Will Bucher | 01/28/25 | 2.50 | $970 | $2,425.00 | L320 | 255 | $127.06 |
| 168 | draft Claimants' Response to Valve's Motion to Compel Claimants' Responses to Respondent's IE Requests | Frank Palermo | 02/01/25 | 3.80 | $640 | $2,432.00 | L350 | 251 | $125.43 |
| 169 | Call w/ Will re: response motion | Frank Palermo | 02/02/25 | 0.60 | $640 | $384.00 | L350 | 250 | $19.73 |
| 170 | Call with Frank Palermo (VGBA), Number: 6463316286 | Will Bucher | 02/02/25 | 0.38 | $970 | $368.60 | L120 | 250 | $18.93 |
| 171 | Revise motion w/ Will, call w/ Will re: same | Frank Palermo | 02/04/25 | 4.40 | $640 | $2,816.00 | L350 | 248 | $143.50 |
| 172 | Drafting response to motions; Call with Frank Palermo re: the same | Will Bucher | 02/04/25 | 6.75 | $970 | $6,547.50 | L350 | 248 | $333.65 |
| 173 | Review and comment on draft response to Valve motion to compel | Frank Palermo | 02/04/25 | 1.00 | $970 | $970.00 | L120 | 248 | $49.43 |
| 174 | Call w/ Will | Frank Palermo | 02/05/25 | 0.10 | $640 | $64.00 | L120 | 247 | $3.25 |
| 175 | Review Valve's Respondent's Response to Claimants' motion regarding the nature or sufficiency of information exchange | Frank Palermo | 02/05/25 | 0.70 | $640 | $448.00 | L390 | 247 | $22.74 |
| 176 | submission of Claimants' response to Valve motion to compel | Frank Palermo | 02/05/25 | 0.10 | $640 | $64.00 | L350 | 247 | $3.25 |
| 177 | Call with Frank Palermo (VGBA), Number: 6463316286 | Will Bucher | 02/05/25 | 0.06 | $970 | $58.20 | L350 | 247 | $2.95 |
| 178 | Submit proposed order | Frank Palermo | 02/07/25 | 0.10 | $640 | $64.00 | L350 | 245 | $3.22 |
| 179 | drafting proposed IE order, correspondence w/ Will re: same | Frank Palermo | 02/07/25 | 3.00 | $640 | $1,920.00 | L390 | 245 | $96.66 |
| 180 | Drafting proposed form of order; correspondence with F. Palermo re: the same | Will Bucher | 02/07/25 | 3.30 | $970 | $3,201.00 | L120 | 245 | $161.15 |
| 181 | Review Valve's proposed order regarding motion to compel | Frank Palermo | 02/08/25 | 0.20 | $640 | $128.00 | L350 | 244 | $6.42 |
| 182 | draft proposed order re: motion to compel v2 | Frank Palermo | 02/09/25 | 1.50 | $640 | $960.00 | L350 | 243 | $48.17 |
| 183 | correspondence w/ Will re: proposed order v2 | Frank Palermo | 02/09/25 | 0.50 | $640 | $320.00 | L120 | 243 | $15.98 |
| 184 | Reviewing and revising proposed order (without opinion language) | Will Bucher | 02/09/25 | 1.00 | $970 | $970.00 | L120 | 243 | $48.43 |
| 185 | Review of order on stay; correspondence with F. Palermo re: the same | Will Bucher | 02/16/25 | 0.40 | $970 | $388.00 | L120 | 236 | $18.82 |
| 186 | Review of order on information exchange; correspondence with F. Palermo re: the same | Will Bucher | 02/17/25 | 0.60 | $970 | $582.00 | L120 | 235 | $28.10 |
| 187 | correspondence w/ Black re: meet and confer | Frank Palermo | 02/19/25 | 0.20 | $640 | $128.00 | L390 | 234 | $6.15 |
| 188 | Correspondence with F. Palermo re: upcoming meet and confer | Will Bucher | 02/19/25 | 0.30 | $970 | $291.00 | L110 | 233 | $13.93 |
| 189 | Call with Frank Palermo (VGBA), Number: 6463316286 | Will Bucher | 02/20/25 | 0.32 | $970 | $310.40 | L120 | 232 | $14.80 |
| 190 | correspondence w/ Will re: meet and confer | Frank Palermo | 02/21/25 | 0.50 | $640 | $320.00 | L390 | 231 | $15.19 |
| 191 | Meet and confer w/ Valve | Frank Palermo | 02/21/25 | 0.40 | $640 | $256.00 | L390 | 231 | $12.15 |
| 192 | Correspondence with F. Palermo re: outcome of Meet & Confer Re Evidentiary Hearing Etc. In McSorley | Frank Palermo | 02/21/25 | 0.50 | $970 | $485.00 | L120 | 231 | $23.02 |
| 193 | Correspondence w/ F. Palermo re: claimant preferences on proceeding with claims | Frank Palermo | 02/21/25 | 0.32 | $970 | $310.40 | L120 | 231 | $14.73 |
| 194 | Review Fuchs email re: declarations, and review declarations | Frank Palermo | 02/24/25 | 0.30 | $640 | $192.00 | L390 | 228 | $9.00 |
| 195 | submit email re: hearing format | Frank Palermo | 02/25/25 | 0.10 | $640 | $64.00 | L440 | 227 | $2.99 |
| 196 | draft email to Arb re: format of hearings | Frank Palermo | 02/25/25 | 1.50 | $640 | $960.00 | L440 | 227 | $44.78 |
| 197 | correspondence w/ Will re: hearing format email | Frank Palermo | 02/25/25 | 0.90 | $640 | $576.00 | L440 | 227 | $17.37 |
| 198 | draft "jury charges" and disputed questions of fact and law | Frank Palermo | 02/26/25 | 2.00 | $640 | $1,280.00 | L430 | 226 | $59.44 |
| 199 | Review Black email re: format of hearings | Frank Palermo | 02/26/25 | 0.20 | $640 | $128.00 | L440 | 226 | $5.94 |
| 200 | revise draft of jury charges brief w/ Will, correspondence and call w/ Will re: same | Frank Palermo | 02/28/25 | 1.30 | $640 | $832.00 | L430 | 224 | $38.29 |
| 201 | Drafting and revising submission on proposed jury "charges" for arbitration; correspondence and teleconferences with F. Palermo re: the same | Will Bucher | 02/28/25 | 2.75 | $970 | $2,667.50 | L120 | 224 | $122.78 |
| 202 | Review Arb decision and order re: format of hearings | Frank Palermo | 03/02/25 | 0.30 | $640 | $192.00 | L440 | 222 | $8.76 |
| 203 | Review McSorley ruling on format of the hearing; correspondence with F. Palermo re: the same; correspondence with F. Palermo re: attestation non-compliance | Will Bucher | 03/02/25 | 1.10 | $970 | $1,067.00 | L120 | 222 | $48.67 |
| 204 | Correspondence w/ Will re: format ruling and attestation non-compliance | Frank Palermo | 03/03/25 | 0.80 | $640 | $512.00 | L440 | 221 | $23.25 |
| 205 | Drafting email to D. Black re: expert witness disclosures; correspondence with F. Palermo re: the same | Will Bucher | 03/04/25 | 0.30 | $970 | $291.00 | L310 | 220 | $13.16 |
| 206 | Email from Fuchs re: logistics of IE | Frank Palermo | 03/06/25 | 0.10 | $640 | $64.00 | L440 | 218 | $2.87 |
| 207 | Correspondence with A. Fuchs re: hard drive delivery | Frank Palermo | 03/07/25 | 0.40 | $970 | $388.00 | L390 | 217 | $17.30 |
| 208 | Correspondence w/ Will regarding IE status | Frank Palermo | 03/10/25 | 0.50 | $640 | $320.00 | L120 | 214 | $14.07 |
| 209 | Correspondence w/ Black re: adjournment | Frank Palermo | 03/13/25 | 0.30 | $640 | $192.00 | L390 | 211 | $8.32 |
| 210 | document review | Erik Atzbach | 03/14/25 | 0.30 | $475 | $142.50 | L110 | 210 | $6.15 |
| 211 | Draft and submit email to Arb re: scheduling order No 7 issues/meet and confer status | Frank Palermo | 03/14/25 | 0.30 | $640 | $192.00 | L430 | 210 | $8.28 |
| 212 | Correspondence w/ Black re: hearing format | Frank Palermo | 03/15/25 | 1.00 | $640 | $640.00 | L440 | 210 | $27.62 |
| 213 | draft email to Black re: hearing format | Frank Palermo | 03/14/25 | 0.20 | $640 | $128.00 | L440 | 210 | $5.52 |
| 214 | document review | Erik Atzbach | 03/15/25 | 0.20 | $475 | $95.00 | L110 | 209 | $4.08 |
| 215 | correspondence w/ Will re: Witness selection | Frank Palermo | 03/16/25 | 0.30 | $640 | $192.00 | L120 | 208 | $8.21 |
| 216 | Correspondence with F. Palermo re: witness selection | Will Bucher | 03/16/25 | 0.30 | $970 | $291.00 | L120 | 208 | $12.44 |
| 217 | Review production in ediscovery | Frank Palermo | 03/17/25 | 0.60 | $640 | $384.00 | L390 | 207 | $16.33 |
| 218 | Meet and confer re: Claimants | Frank Palermo | 03/17/25 | 0.50 | $640 | $320.00 | L390 | 207 | $10.84 |
| 219 | Correspondence with F. Palermo re: McSorley Meet & Confer | Will Bucher | 03/18/25 | 0.30 | $970 | $291.00 | L120 | 206 | $12.32 |
| 220 | Review Black email submission re: meet and confer, production | Frank Palermo | 03/20/25 | 0.20 | $640 | $128.00 | L390 | 204 | $5.37 |
| 221 | Drafting email to Arb re: meet and confer status, Claimant selection | Frank Palermo | 03/20/25 | 0.50 | $640 | $320.00 | L250 | 204 | $13.41 |
| 222 | Review emails from Black re: hearings availability | Frank Palermo | 03/20/25 | 0.30 | $640 | $192.00 | L440 | 204 | $8.05 |
| 223 | call re: hearin availability | Frank Palermo | 03/23/25 | 0.20 | $640 | $128.00 | L440 | 201 | $5.29 |
| 224 | correspondence w/ Will re: hearing | Frank Palermo | 03/23/25 | 0.30 | $640 | $192.00 | L120 | 201 | $7.94 |
| 225 | Correspondence with F. Palermo | Frank Palermo | 04/01/25 | 0.10 | $970 | $194.00 | L390 | 192 | $8.01 |
| 226 | Call w/ Will | Frank Palermo | 04/01/25 | 0.20 | $640 | $128.00 | L120 | 192 | $5.28 |
| 227 | Call with Frank Palermo (VGBA), Number: 6463316286 | Will Bucher | 04/01/25 | 0.20 | $970 | $194.00 | L120 | 192 | $8.01 |
| 228 | Draft letter re: Respondent's Repeated Failure to Comply and Authorizing Use of Information Exchanged in Other Proceedings | Frank Palermo | 04/02/25 | 2.00 | $640 | $1,280.00 | L390 | 191 | $50.24 |
| 229 | document review | Erik Atzbach | 04/03/25 | 0.70 | $475 | $332.50 | L110 | 190 | $12.98 |
| 230 | Call with Frank Palermo (VGBA), Number: +16463316286 | Will Bucher | 04/03/25 | 0.90 | $640 | $576.00 | L120 | 190 | $22.49 |
| 231 | Call w/ Will | Frank Palermo | 04/03/25 | 0.20 | $640 | $128.00 | L120 | 190 | $5.00 |
| 232 | Call with Frank Palermo (VGBA), Number: +16463316286 | Will Bucher | 04/03/25 | 0.87 | $970 | $843.90 | L120 | 190 | $32.95 |
| 233 | Call with Frank Palermo (VGBA), Number: 6463316286 | Will Bucher | 04/03/25 | 0.30 | $970 | $194.00 | L120 | 190 | $7.57 |
| 234 | Call w/ Will | Frank Palermo | 04/04/25 | 0.50 | $640 | $320.00 | L120 | 189 | $12.44 |
| 235 | draft letter re: Respondent's Repeated Failure to Comply and Authorizing Use of Information Exchanged in Other Proceedings | Frank Palermo | 04/04/25 | 3.20 | $640 | $2,048.00 | L390 | 188 | $79.11 |
| 236 | prepare expert disclosure | Frank Palermo | 04/07/25 | 0.30 | $640 | $192.00 | L310 | 186 | $7.36 |
| 237 | Review Indorf email re: expert disclosures | Frank Palermo | 04/07/25 | 0.40 | $640 | $256.00 | L420 | 186 | $9.78 |
| 238 | email to arb re: expert disclosures | Frank Palermo | 04/07/25 | 0.20 | $640 | $128.00 | L420 | 186 | $4.82 |
| 239 | Call with Erik Atzbach, Number: +17202174779 | Frank Palermo | 04/07/25 | 0.40 | $640 | $256.00 | L110 | 186 | $7.41 |
| 240 | Correspondence re: expert disclosures; arbitrator scheduling counsel, and the arbitrator re: expert disclosures; correspondence with P. Cross re: potential retention and scope of work | Will Bucher | 04/07/25 | 2.80 | $970 | $2,716.00 | L130 | 186 | $103.80 |
| 241 | draft letter re: Respondent's Repeated Failure to Comply and Authorizing Use of Information Exchanged in Other Proceedings | Frank Palermo | 04/10/25 | 1.70 | $640 | $1,088.00 | L390 | 185 | $41.71 |
| 242 | edit letter to focus on expert disclosure | Frank Palermo | 04/11/25 | 0.75 | $640 | $2,368.00 | L420 | 182 | $88.56 |
| 243 | Reviewing, revising, and sending letter to Arbitrator McSorley concerning expert disclosure | Will Bucher | 04/11/25 | 2.25 | $970 | $2,182.50 | L130 | 182 | $81.62 |
| 244 | Review Valve's response to Claimant letter re: expert w/ Will, correspondence w/ Will re: same | Frank Palermo | 04/23/25 | 0.40 | $640 | $256.00 | L390 | 172 | $15.84 |
| 245 | review scheduling order # 9 | Frank Palermo | 04/23/25 | 0.20 | $640 | $128.00 | L440 | 170 | $4.47 |
| 246 | Correspondence w/ Will and Erik re: doc status | Frank Palermo | 04/23/25 | 0.30 | $640 | $192.00 | L390 | 170 | $6.68 |
| 247 | Review emails from Indorf and Will re: production | Frank Palermo | 04/25/25 | 0.50 | $640 | $320.00 | L390 | 165 | $10.43 |
| 248 | Call w/ Will re: deadlines | Frank Palermo | 04/25/25 | 0.60 | $640 | $384.00 | L120 | 165 | $12.51 |
| 249 | Correspondence with opposing counsel re: tax returns; correspondence w/ Palermo re: deadlines | Will Bucher | 04/28/25 | 0.80 | $970 | $776.00 | L120 | 165 | $25.12 |
| 250 | call w/ Franke re: McSorley EOI requests | Erik Atzbach | 05/02/25 | 1.00 | $475 | $475.00 | L320 | 158 | $15.71 |
| 251 | Review Valve's expert witness disclosure | Frank Palermo | 05/02/25 | 0.50 | $640 | $320.00 | L420 | 158 | $11.31 |
| 252 | Draft and submit Claimants' expert witness disclosure | Frank Palermo | 05/02/25 | 0.80 | $640 | $512.00 | L420 | 158 | $16.95 |
| 253 | Drafting subpoena requests; organizing subpoena doc list | Frank Palermo | 05/08/25 | 3.50 | $640 | $2,240.00 | L390 | 152 | $50.28 |
| 254 | Correspondence w/ Will re: subpoena requests | Frank Palermo | 05/12/25 | 0.30 | $640 | $192.00 | L390 | 151 | $5.96 |
| 255 | Email from Indorf re: Valve's responsive witness disclosure | Frank Palermo | 05/12/25 | 0.20 | $640 | $128.00 | L420 | 148 | $3.89 |
| 256 | Email to Indorf re: responsive expert disclosure | Frank Palermo | 05/19/25 | 0.10 | $640 | $64.00 | L420 | 143 | $1.89 |
| 257 | Correspondence w/ Will re: subpoena requests | Frank Palermo | 05/19/25 | 0.30 | $640 | $192.00 | L390 | 143 | $5.52 |
| 258 | Correspondence with F. Palermo and J. Crump re: subpoena requests | Will Bucher | 05/20/25 | 0.40 | $970 | $388.00 | L390 | 143 | $11.44 |
| 259 | Correspondence w/ Will & Judson re: subpoena expert disclosures | Frank Palermo | 05/20/25 | 1.00 | $640 | $640.00 | L420 | 142 | $18.90 |
| 260 | Correspondence with F. Palermo and J. Crump re: expert witness disclosures | Will Bucher | 05/20/25 | 0.75 | $970 | $727.50 | L420 | 142 | $14.15 |
| 261 | Teleconferences w/ Will and Judson re: expert disclosures and subpoena requests; correspondence with Will and Judson re: same | Will Bucher | 05/21/25 | 1.60 | $970 | $1,552.00 | L390 | 141 | $29.67 |
| 262 | Review of Client Histories for Subpoenas | Judson Crump | 05/21/25 | 0.30 | $525 | $157.50 | L390 | 141 | $3.06 |
| 263 | TC w/ Will & Frank | Judson Crump | 05/21/25 | 0.50 | $525 | $262.50 | L390 | 141 | $5.10 |
| 264 | Teleconference with J. Crump and F. Palermo re: expert disclosures and subpoena requests; correspondence with F. Palermo and J. Crump regarding the same | Will Bucher | 05/21/25 | 1.60 | $970 | $1,552.00 | L390 | 141 | $44.81 |
| 265 | drafting subpoena list and doc list; correspondence with Will Judson and Zachary re: subpoenas and doc list | Frank Palermo | 05/22/25 | 3.00 | $640 | $1,920.00 | L390 | 140 | $56.76 |
| 266 | subpoena &agenda & Goldfynch Searches | Judson Crump | 05/22/25 | 1.30 | $525 | $682.50 | L390 | 140 | $19.88 |
| 267 | Correspondence and teleconference w/ F. Palermo, Z. Horn, E. Atzbach, and J. Crump re: the same | Will Bucher | 05/23/25 | 1.70 | $970 | $1,261.00 | L120 | 140 | $36.98 |
| 268 | Teleconference with P. Cross and T. Matthew | Zachary A. Horn | 05/23/25 | 1.10 | $970 | $1,067.00 | L420 | 140 | $30.87 |
| 269 | Correspondence and teleconferences with T. Matthew re: expert preparation | Zachary A. Horn | 05/23/25 | 0.87 | $970 | $843.90 | L420 | 140 | $24.26 |
| 270 | Reviewed McSorley Subpoenas and responded to Frank with edits | Zachary A. Horn | 05/23/25 | 0.17 | $640 | $108.80 | L420 | 140 | $3.13 |
| 271 | Messages with Will and Frank about format for subpoenas | Zachary A. Horn | 05/23/25 | 0.33 | $640 | $211.20 | L440 | 140 | $6.08 |
| 272 | Drafted message to Will and Frank with language from Samas letter | Zachary A. Horn | 05/25/25 | 0.33 | $640 | $211.20 | L440 | 140 | $6.08 |
| 273 | Reviewed messages from Frank concerning subpoenas | Zachary A. Horn | 05/25/25 | 0.17 | $640 | $108.80 | L390 | 139 | $3.10 |
| 274 | correspondence w/ Will re: subpoenas | Frank Palermo | 05/25/25 | 0.33 | $640 | $211.20 | L390 | 139 | $5.10 |
| 275 | Review of updated subpoena requests; correspondence w/ Z. Horn, E. Atzbach, and J. Crump re: the same | Will Bucher | 05/25/25 | 0.70 | $970 | $679.00 | L390 | 138 | $16.50 |
| 276 | Correspondence with P. Cross and T. Matthew re: ITAD data set | Will Bucher | 05/25/25 | 0.40 | $970 | $388.00 | L390 | 138 | $11.00 |
| 277 | Correspondence w/ Will and Judson re: expert disclosures, drafting summary of expert testimony, compiling relevant docs | Frank Palermo | 05/25/25 | 3.10 | $640 | $1,984.00 | L420 | 136 | $55.44 |

| | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Description | User | Start Date | Duration (decimal) | Rate | Amount (USD) | ABA Code | Days Since Work | Interest |
| 278 | Call w/ Will | Frank Palermo | 05/27/25 | 0.20 | $640 | $128.00 | L120 | 136 | $3.58 |
| 279 | Draft cover letter for subpoena requests | Frank Palermo | 05/27/25 | 0.80 | $640 | $512.00 | L390 | 136 | $14.31 |
| 280 | Call w/ Will | Frank Palermo | 05/27/25 | 0.20 | $640 | $128.00 | L120 | 136 | $3.58 |
| 281 | Call w/ Will | Frank Palermo | 05/27/25 | 0.20 | $640 | $128.00 | L120 | 136 | $3.58 |
| 282 | Email from Arb re: final pre-hearing agenda | Frank Palermo | 05/27/25 | 0.10 | $640 | $64.00 | L430 | 136 | $1.79 |
| 283 | Call with Frank Palermo (VGBA), Number: 6463316286 | Will Bucher | 05/27/25 | 0.20 | $970 | $194.00 | L120 | 136 | $5.42 |
| 284 | Call with Frank Palermo (VGBA), Number: 6463316286 | Will Bucher | 05/27/25 | 0.20 | $970 | $194.00 | L120 | 136 | $5.42 |
| 285 | Drafting summary of expert testimony; reviewing draft compilation of list of documents to be relied on | Will Bucher | 05/27/25 | 4.00 | $970 | $3,880.00 | L130 | 136 | $108.43 |
| 286 | Call with Frank Palermo (VGBA), Number: 6463316286 | Will Bucher | 05/27/25 | 0.20 | $970 | $194.00 | L120 | 136 | $5.42 |
| 287 | Drafted message to Frank with link to Samas subpoena letter for reference | Zachary A. Horn | 05/27/25 | 0.17 | $640 | $108.80 | L440 | 136 | $3.04 |
| 288 | Submit subpoena requests to Arb | Frank Palermo | 05/28/25 | 0.10 | $640 | $64.00 | L390 | 135 | $1.78 |
| 289 | Review Valve's expert disclosures | Frank Palermo | 05/28/25 | 0.40 | $640 | $256.00 | L340 | 135 | $7.10 |
| 290 | Review Bomkamp emails re: expert production and disclosures | Frank Palermo | 05/28/25 | 0.30 | $640 | $192.00 | L340 | 135 | $5.33 |
| 291 | Review Danner email re: subpoenas | Frank Palermo | 05/28/25 | 0.10 | $640 | $64.00 | L390 | 135 | $1.78 |
| 292 | Reviewed team messages concerning subpoenas, subpoena letter, and expert disclosure | Zachary A. Horn | 05/28/25 | 0.17 | $640 | $108.80 | L440 | 135 | $3.02 |
| 293 | Ltr to Arb Re Agenda Items + Catching up on previous case history. | Frank Palermo | 05/30/25 | 0.75 | $525 | $393.75 | L430 | 133 | $10.76 |
| 294 | Review list of proposed discussion points for prehearing status conference; correspondence with J. Crump re: the same | Frank Palermo | 06/01/25 | 0.60 | $970 | $582.00 | L120 | 131 | $15.67 |
| 295 | Review Valve's pre-hearing agenda submission | Frank Palermo | 06/02/25 | 0.30 | $640 | $192.00 | L430 | 130 | $5.13 |
| 296 | Review Valve's opposition to Claimants' subpoena requests | Frank Palermo | 06/02/25 | 1.10 | $640 | $704.00 | L390 | 130 | $18.81 |
| 297 | Correspondence w/ Judson re: pre-hearing agenda | Frank Palermo | 06/02/25 | 0.70 | $640 | $448.00 | L430 | 130 | $11.97 |
| 298 | Pretrial Agenda Letter finished | Judson Crump | 06/02/25 | 0.58 | $525 | $304.50 | L430 | 130 | $8.13 |
| 299 | Review of letter to McSorley re: conference issues; forwarding the same to arbitrator McSorley | Will Bucher | 06/02/25 | 0.80 | $970 | $776.00 | L230 | 130 | $20.73 |
| 300 | Reviewed Judson's letter to Arbitrator McSorley outlining Agenda items | Zachary A. Horn | 06/02/25 | 0.30 | $640 | $192.00 | L430 | 130 | $5.13 |
| 301 | Assisting Frank w Subpoena Response | Judson Crump | 06/03/25 | 0.25 | $525 | $131.25 | L390 | 129 | $3.48 |
| 302 | Correspondence w/ Will and Judson re: subpoena objections | Frank Palermo | 06/04/25 | 2.70 | $640 | $1,728.00 | L390 | 128 | $45.45 |
| 303 | Submit responsive expert disclosure | Frank Palermo | 06/04/25 | 0.10 | $640 | $64.00 | L420 | 128 | $1.68 |
| 304 | Drafting response to Valve's subpoena objections | Frank Palermo | 06/05/25 | 4.50 | $640 | $2,880.00 | L390 | 127 | $75.16 |
| 305 | Review of letter re: subpoena objections; correspondence with F. Palermo and J. Crump re: the same | Will Bucher | 06/05/25 | 2.75 | $970 | $2,667.50 | L230 | 127 | $69.61 |
| 306 | revising response to Valve's subpoena objections; correspondence w/ Will and Judson re: same | Frank Palermo | 06/06/25 | 5.70 | $640 | $3,648.00 | L390 | 126 | $94.45 |
| 307 | VC w ballad re: Claimant Cross Video Outline | Frank Palermo | 06/06/25 | 0.33 | $525 | $173.25 | L440 | 126 | $4.49 |
| 308 | Editing Frank's Draft Letter | Judson Crump | 06/06/25 | 1.00 | $525 | $525.00 | L390 | 126 | $13.59 |
| 309 | Drafting and revising response to Valve's objections to subpoenas; correspondence with E. Atzbach, J. Crump, and F. Palermo re: the same | Will Bucher | 06/06/25 | 6.25 | $970 | $6,062.50 | L390 | 126 | $156.96 |
| 310 | trial prep - exhibits | Erik Atzbach | 06/09/25 | 4.40 | $475 | $2,090.00 | L430 | 123 | $52.82 |
| 311 | Review final pre-hearing conference order | Frank Palermo | 06/09/25 | 0.40 | $640 | $256.00 | L440 | 123 | $6.47 |
| 312 | Correspondence w/ Will re: subpoena revisions | Frank Palermo | 06/09/25 | 1.20 | $640 | $768.00 | L390 | 123 | $19.41 |
| 313 | Revising subpoenas/ doc list | Frank Palermo | 06/09/25 | 4.00 | $640 | $2,560.00 | L390 | 123 | $64.70 |
| 314 | Final pre-hearing conference | Frank Palermo | 06/09/25 | 1.10 | $640 | $704.00 | L440 | 123 | $17.79 |
| 315 | Attend hearing; legal research; PACER document pulls | Isabel Sermini | 06/09/25 | 8.50 | $480 | $4,080.00 | L440 | 123 | $103.12 |
| 316 | VC w/ Elliott re: Vertical/Horizontal Distinction & Case Updates | Frank Palermo | 06/09/25 | 1.38 | $525 | $724.50 | L440 | 123 | $18.31 |
| 317 | conf vc w/ will & Frank | Judson Crump | 06/09/25 | 0.37 | $525 | $194.25 | L440 | 123 | $4.91 |
| 318 | Pretrial Agenda VC | Judson Crump | 06/09/25 | 1.75 | $525 | $918.75 | L120 | 123 | $23.22 |
| 319 | Final Pre-hearing Conference | Will Bucher | 06/09/25 | 1.50 | $970 | $1,455.00 | L230 | 123 | $36.77 |
| 320 | Reviewed team messages concerning McSorley submission of subpoena | Zachary A. Horn | 06/09/25 | 0.20 | $640 | $128.00 | L440 | 123 | $3.24 |
| 321 | Reviewed McSorley team discussion about subpoena brief | Zachary A. Horn | 06/09/25 | 0.20 | $640 | $128.00 | L440 | 123 | $3.24 |
| 322 | trial prep - exhibits | Erik Atzbach | 06/10/25 | 0.50 | $475 | $237.50 | L430 | 122 | $5.95 |
| 323 | Review signed subpoenas | Frank Palermo | 06/10/25 | 0.30 | $640 | $192.00 | L390 | 122 | $4.81 |
| 324 | team meeting | Judson Crump | 06/10/25 | 0.75 | $525 | $393.75 | L120 | 122 | $9.87 |
| 325 | Reviewed McSorley chatter concerning submission of amended subpoenas | Zachary A. Horn | 06/10/25 | 0.20 | $640 | $128.00 | L440 | 122 | $3.21 |
| 326 | New Claimant Cross Video Outline | Judson Crump | 06/11/25 | 2.25 | $525 | $1,181.25 | L440 | 119 | $28.88 |
| 327 | Correspondence w/ Will re: Mcsorley hearing prep, virtual hearing protocol, R scripts | Frank Palermo | 06/17/25 | 1.80 | $640 | $1,152.00 | L440 | 115 | $27.22 |
| 328 | Attending Bucher Law PLLC Weekly Meeting | Frank Palermo | 06/17/25 | 0.70 | $640 | $448.00 | L120 | 115 | $10.59 |
| 329 | Prepare exhibits production + work on exhibit tracker | Elliot Kosnick | 06/20/25 | 4.37 | $480 | $2,097.60 | L440 | 112 | $48.27 |
| 330 | Correspondence w/ Will re: hearing exhibits | Frank Palermo | 06/20/25 | 0.60 | $640 | $384.00 | L440 | 112 | $8.84 |
| 331 | Review of Redline Arb Protocol | Judson Crump | 06/20/25 | 0.50 | $525 | $262.50 | L440 | 112 | $6.04 |
| 332 | Attending Bucher Law PLLC Weekly Meeting | Frank Palermo | 06/24/25 | 0.70 | $640 | $448.00 | L120 | 108 | $9.94 |
| 333 | Attend weekly team meeting | Sherry Yu | 6/24/2025 | 0.70 | $625 | $437.50 | L120 | 108 | $9.71 |
| 334 | Attending Bucher Law PLLC Weekly Meeting | Will Bucher | 06/24/25 | 0.70 | $970 | $679.00 | L440 | 108 | $15.07 |
| 335 | Call with Ariel Thatcher re: live hearing attendance | Will Bucher | 06/25/25 | 0.30 | $970 | $291.00 | L440 | 107 | $6.40 |
| 336 | Receive and reviewed entry of appearance of Lauren Cole for Valve | Frank Palermo | 06/25/25 | 0.10 | $640 | $64.00 | L440 | 107 | $1.41 |
| 337 | Research Wolfer case | Sherry Yu | 6/26/2025 | 0.50 | $625 | $312.50 | L110 | 106 | $6.79 |
| 338 | Review relevant documents for drafting Inatu cross | Sherry Yu | 6/26/2025 | 2.10 | $625 | $1,312.50 | L110 | 106 | $28.59 |
| 339 | chat w/ Sherry Yu | Judson Crump | 06/27/25 | 0.50 | $525 | $262.50 | L440 | 105 | $5.66 |
| 340 | Review documents and conducting background research re: drafting Inatu cross | Sherry Yu | 6/27/2025 | 1.20 | $625 | $750.00 | L110 | 105 | $16.18 |
| 341 | Correspondence with F. Palermo re: Princeton trial logistics | Will Bucher | 06/28/25 | 0.40 | $970 | $388.00 | L440 | 104 | $8.29 |
| 342 | Drafting pre-hearing brief; damages calc, questions of fact and law, stipulations | Frank Palermo | 06/29/25 | 2.50 | $640 | $1,600.00 | L430 | 103 | $33.86 |
| 343 | Discuss trial logistics with Will | Frank Palermo | 6/30/2025 | 0.30 | $625 | $187.50 | L440 | 102 | $3.93 |
| 344 | Teleconference with S. Yu re: trial logistics | Will Bucher | 06/30/25 | 0.30 | $970 | $291.00 | L440 | 102 | $6.10 |
| 345 | Bucher Law PLLC Weekly Meeting, discuss issues re: upcoming trials, receive assignments | Elliot Kosnick | 07/01/25 | 1.00 | $480 | $480.00 | L120 | 101 | $9.96 |
| 346 | Attend team call | Sherry Yu | 7/1/2025 | 0.80 | $625 | $500.00 | L120 | 101 | $10.38 |
| 347 | Attending Bucher Law PLLC Weekly Meeting | Will Bucher | 07/01/25 | 0.80 | $970 | $776.00 | L440 | 101 | $16.10 |
| 348 | Review documents and draft cross outline for Inatu | Sherry Yu | 7/2/2025 | 1.50 | $625 | $937.50 | L410 | 100 | $19.26 |
| 349 | drafting pre-hearing brief | Frank Palermo | 07/05/25 | 4.30 | $640 | $2,752.00 | L430 | 97 | $54.89 |
| 350 | correspondence w/ Will re: pre-hearing brief | Frank Palermo | 07/05/25 | 0.80 | $640 | $512.00 | L430 | 97 | $10.20 |
| 351 | Logistics & Do list | Judson Crump | 07/05/25 | 0.42 | $525 | $220.50 | L440 | 97 | $4.39 |
| 352 | Logistics & Do list | Judson Crump | 07/05/25 | 0.75 | $525 | $393.75 | L440 | 97 | $7.85 |
| 353 | Calls with Kent Williams re: opening briefing | Will Bucher | 07/05/25 | 0.40 | $970 | $388.00 | L440 | 97 | $7.73 |
| 354 | Received and reviewed email from Valve about logistics, format, and availability of witnesses | Zachary A. Horn | 07/05/25 | 0.20 | $640 | $128.00 | L440 | 97 | $2.55 |
| 355 | organizing core & noncore exhibit lists, drafting pre-hearing submissions | Frank Palermo | 07/06/25 | 2.50 | $640 | $1,600.00 | L430 | 96 | $31.56 |
| 356 | drafting pre-hearing brief | Frank Palermo | 07/06/25 | 2.50 | $640 | $1,600.00 | L430 | 96 | $31.56 |
| 357 | Correspondence w/ Will re: pre-hearing submissions | Frank Palermo | 07/06/25 | 0.40 | $640 | $256.00 | L430 | 96 | $5.05 |
| 358 | Teleconferences with Kent Williams and meetings with J. Crump re: pre-hearing briefing; review of draft pre-hearing briefing | Will Bucher | 07/06/25 | 2.70 | $970 | $2,619.00 | L440 | 96 | $51.66 |
| 359 | prepare exhibit list | Erik Atzbach | 07/08/25 | 8.00 | $475 | $3,800.00 | L430 | 94 | $74.18 |
| 360 | drafting pre-hearing brief, organizing core & noncore exhibit lists | Frank Palermo | 07/07/25 | 7.20 | $640 | $4,608.00 | L430 | 95 | $89.95 |
| 361 | Meeting w/ Will and Erik re: pre-hearing submissions | Frank Palermo | 07/07/25 | 2.20 | $640 | $1,408.00 | L430 | 95 | $27.48 |
| 362 | drafting pre-hearing brief, organizing core & noncore exhibit lists | Frank Palermo | 07/07/25 | 6.80 | $640 | $4,352.00 | L430 | 95 | $84.95 |
| 363 | Pre-hearing brief | Judson Crump | 07/07/25 | 5.25 | $525 | $2,756.25 | L430 | 95 | $53.80 |
| 364 | Review documents and work on Inatu cross | Sherry Yu | 7/7/2025 | 7.80 | $625 | $4,875.00 | L410 | 95 | $95.16 |
| 365 | Review and revise opening briefing; correspondence with K. Williams and F. Palermo re: the same | Will Bucher | 07/07/25 | 1.50 | $970 | $1,455.00 | L440 | 95 | $28.40 |
| 366 | Teleconferences with Frank Palermo and E. Atzbach re: trial logistics, exhibits for disclosure | Will Bucher | 07/07/25 | 2.10 | $970 | $2,037.00 | L440 | 95 | $39.76 |
| 367 | trial prep - exhibits and exhibit list | Erik Atzbach | 07/08/25 | 4.00 | $475 | $1,900.00 | L440 | 94 | $36.96 |
| 368 | Emails to Cole re: meet and confer, email contact, anticipated length of examinations | Frank Palermo | 07/08/25 | 0.90 | $640 | $384.00 | L440 | 94 | $7.42 |
| 369 | Travel to Arb | Frank Palermo | 07/08/25 | 0.10 | $640 | $64.00 | L440 | 94 | $1.24 |
| 370 | drafting pre-hearing submissions, organizing core and non-core exhibit lists | Frank Palermo | 07/08/25 | 3.40 | $640 | $2,176.00 | L430 | 94 | $42.03 |
| 371 | Prehearing Brief - McSorley | Judson Crump | 07/08/25 | 1.00 | $525 | $525.00 | L430 | 94 | $10.14 |
| 372 | Review documents and draft cross outline | Sherry Yu | 7/8/2025 | 10.40 | $625 | $6,500.00 | L410 | 94 | $125.56 |
| 373 | Teleconference with Frank re: pre-hearing submissions | Frank Palermo | 07/09/25 | 0.50 | $640 | $320.00 | L440 | 93 | $6.18 |
| 374 | Attend and observe McSorley Meet and Confer | Sherry Yu | 7/9/2025 | 0.75 | $625 | $468.75 | L440 | 93 | $9.05 |
| 375 | Call with Ted Castronova re: lessons from Gaglione and Coher to applied in McSorley hearing | Will Bucher | 07/09/25 | 0.30 | $970 | $291.00 | L440 | 93 | $5.62 |
| 376 | Correspondence w/ Will re: Claimant hearing prep | Will Bucher | 07/10/25 | 0.40 | $640 | $256.00 | L440 | 92 | $4.91 |
| 377 | Received and reviewed email with Valve's Opening Brief with Exhibits | Zachary A. Horn | 07/11/25 | 0.10 | $640 | $64.00 | L440 | 92 | $1.21 |
| 378 | Received and reviewed expert demonstratives | Zachary A. Horn | 07/11/25 | 0.30 | $640 | $192.00 | L440 | 91 | $3.67 |
| 379 | Call with Harry re driving logistics in Princeton | Will Bucher | 07/13/25 | 0.26 | $970 | $252.20 | L440 | 89 | $4.66 |
| 380 | draft claimants direct for prep | Will Bucher | 07/13/25 | 2.00 | $640 | $1,280.00 | L410 | 89 | $23.41 |
| 381 | Organizing trial plan for upcoming hearings | Frank Palermo | 07/13/25 | 2.10 | $970 | $2,037.00 | L440 | 89 | $37.25 |
| 382 | Call with Ellen Notenare re: Princeton hearing logistics | Will Bucher | 07/13/25 | 0.50 | $970 | $485.00 | L440 | 89 | $8.87 |
| 383 | Call with Tina Huang re: Princeton hearing logistics | Will Bucher | 07/13/25 | 0.50 | $970 | $485.00 | L440 | 89 | $8.87 |
| 384 | Call w/ Vicente re: hearing prep | Frank Palermo | 07/14/25 | 1.00 | $640 | $640.00 | L410 | 88 | $11.68 |
| 385 | McSorley Team Meeting & Follow Up | Judson Crump | 07/14/25 | 1.00 | $525 | $525.00 | L120 | 88 | $9.58 |
| 386 | Call with Inatu re: McSorley hearing logistics | Frank Palermo | 7/14/2025 | 0.50 | $625 | $312.50 | L440 | 88 | $5.70 |
| 387 | McSorley logistics team meeting | Thomas Matthew | 07/14/25 | 1.25 | $640 | $800.00 | L120 | 88 | $14.60 |
| 388 | Call with Xinlin Morrow re: T.G. cross examination | Will Bucher | 07/14/25 | 0.50 | $970 | $485.00 | L410 | 88 | $8.51 |
| 389 | Call with Frank Palermo re: Princeton hearing logistics | Will Bucher | 07/14/25 | 0.50 | $970 | $485.00 | L440 | 88 | $8.77 |
| 390 | Call with Judson Crump re: lessons from Gaglione hearing and applicable strategies going into McSorley hearing | Will Bucher | 07/14/25 | 1.60 | $970 | $1,552.00 | L440 | 88 | $28.06 |
| 391 | Correspondence with opposing counsel re: summaries of witness testimony and demonstratives | Will Bucher | 07/14/25 | 0.30 | $970 | $291.00 | L440 | 88 | $5.26 |
| 392 | Call with Ellen Notenare re: trial strategy | Will Bucher | 07/14/25 | 1.00 | $970 | $970.00 | L440 | 88 | $17.54 |
| 393 | Call with Thomas Matthew re: direct examination preparation | Will Bucher | 07/14/25 | 1.00 | $970 | $970.00 | L410 | 88 | $17.54 |
| 394 | train other clerk on use of ipads for mcsorley trial | Elliot Kosnick | 07/15/25 | 1.00 | $480 | $480.00 | L440 | 87 | $8.67 |
| 395 | Bucher Law PLLC Weekly Meeting | Elliot Kosnick | 07/15/25 | 0.50 | $480 | $240.00 | L120 | 87 | $4.34 |
| 396 | Prepare slides for Team Meeting, discussing takeaways for upcoming trials | Elliot Kosnick | 07/15/25 | 1.00 | $480 | $480.00 | L120 | 87 | $8.67 |
| 397 | Review email from Cole re: Witness scheduling for hearing | Frank Palermo | 07/15/25 | 0.20 | $640 | $128.00 | L440 | 87 | $2.31 |
| 398 | Discussion w/ Will re: witness scheduling; drafting schedule; email to Cole of proposed joint exhibit list and witness schedule | Frank Palermo | 07/15/25 | 1.50 | $640 | $960.00 | L410 | 87 | $17.35 |
| 399 | Emails from Roman & Priyanka re: Conference Room Logistics | Judson Crump | 07/15/25 | 0.17 | $525 | $89.25 | L440 | 87 | $1.60 |
| 400 | team meeting | Judson Crump | 07/15/25 | 0.50 | $525 | $262.50 | L120 | 87 | $4.30 |
| 401 | iPad cases | Sherry Yu | 7/15/2025 | 2.00 | $625 | $1,250.00 | L440 | 87 | $22.56 |
| 402 | Attending Bucher Law PLLC Weekly Meeting | Will Bucher | 07/15/25 | 0.50 | $970 | $485.00 | L120 | 87 | $5.16 |
| 403 | Bucher Law PLLC Weekly Meeting | Tina Huang | 07/15/25 | 1.00 | $640 | $640.00 | L120 | 87 | $11.56 |
| 404 | Call with Ellen Notenare re: hearing logistics | Will Bucher | 07/15/25 | 1.70 | $970 | $1,649.00 | L440 | 87 | $29.46 |
| 405 | Creating trial plan/outline; drafting main themes for opening statement | Frank Palermo | 07/16/25 | 6.40 | $640 | $4,096.00 | L430 | 86 | $72.89 |
| 406 | Call w/ Ellen Notenare re: case onboarding | Frank Palermo | 07/16/25 | 0.50 | $640 | $320.00 | L440 | 86 | $5.69 |
| 407 | comb through McSorley submissions to find Nathan Blue's exhibits, consolidate, and organize. Chat with Will re: assignment details, etc. | Elliot Kosnick | 07/15/25 | 4.00 | $480 | $1,920.00 | L440 | 86 | $34.17 |
| 408 | Discussion w/ Will re: witness scheduling for hearing; Email to Cole re: same | Frank Palermo | 07/16/25 | 0.90 | $640 | $576.00 | L410 | 86 | $10.25 |
| 409 | Trial Logistics Team Meeting | Frank Palermo | 07/16/25 | 1.50 | $640 | $960.00 | L120 | 86 | $17.08 |
| 410 | Call re: McSorley logistics | Sherry Yu | 7/16/2025 | 0.70 | $625 | $437.50 | L120 | 86 | $7.79 |
| 411 | Teleconference with S. Yu re: McSorley trial logistics | Sherry Yu | 7/16/2025 | 0.70 | $970 | $679.00 | L440 | 86 | $12.09 |
| 412 | Team meeting regarding McSorley Princeton hearing logistics | Will Bucher | 07/16/25 | 1.50 | $970 | $1,455.00 | L120 | 86 | $25.90 |
| 413 | Call with Thomas Matthew re: Dr. Cross analysis | Will Bucher | 07/16/25 | 0.50 | $970 | $485.00 | L410 | 86 | $8.63 |
| 414 | Call with Ellott Kosnick slide organization for opening argument | Will Bucher | 07/16/25 | 0.30 | $970 | $291.00 | L440 | 86 | $5.18 |
| 415 | Call with Tina Huang re: Princeton hearing logistics | Will Bucher | 07/16/25 | 0.20 | $970 | $194.00 | L440 | 86 | $3.45 |
| 416 | Mapping out Princeton hearing logistics and confirming team trial roles | Will Bucher | 07/16/25 | 1.10 | $970 | $1,067.00 | L440 | 86 | $18.86 |

| # | Description | User | Start Date | Duration (decimal) | Rate | Amount (USD) | ABA Code | Days Since Work | Interest |
|---|---|---|---|---|---|---|---|---|---|
| 418 | Received and reviewed email exchange between Will and Valve concerning disclosure of Expert Demonstratives | Zachary A. Horn | 07/16/25 | 0.20 | $640 | $128.00 | L420 | 85 | $2.26 |
| 419 | Received and reviewed correspondences between Valve and Frank concerning scheduling witness testimony; parties have reached and impasse | Zachary A. Horn | 07/16/25 | 0.20 | $640 | $128.00 | L440 | 85 | $2.26 |
| 420 | Work on economic testimony, exhibits, demonstratives and analysis for McSorley arbitration and review materials for same and prep for call with Dr. Cross (economic testifying expert) | Frank Palermo | 07/17/25 | 3.83 | $1,100 | $4,213.00 | L420 | 85 | $73.58 |
| 421 | Find, download, and organize Klaff-related exhibits produced for McSorley | Eliot Kovnick | 07/17/25 | 0.88 | $480 | $422.40 | L410 | 85 | $7.38 |
| 422 | Call w/ Claimant Birenbaum, hearing prep | Frank Palermo | 07/17/25 | 1.00 | $640 | $640.00 | L410 | 85 | $11.18 |
| 423 | DISCUSS WITNESS EXAMINATION OUTLINE PROJECT WITH W. BUCHER (.3); REVIEW AND SUMMARIZE KLAFF TRANSCRIPT (2.6); ATTEMPT TO ACCESS SHAREFILE LINK, EXCHANGE EMAILS REGARDING ACCESS (.3) | Thomas Matthew | 07/17/25 | 3.2 | $1,145 | $3,664.00 | L410 | 85 | $63.99 |
| 424 | Draft and revise Dr. Cross direct testimony | Thomas Matthew | 07/17/25 | 3.50 | $640 | $2,240.00 | L420 | 85 | $39.12 |
| 425 | Draft and revise Dr. Cross direct testimony | Thomas Matthew | 07/17/25 | 3.50 | $640 | $2,240.00 | L420 | 85 | $39.12 |
| 426 | Reviewing letter from L. Cole | Will Bucher | 07/17/25 | 0.70 | $970 | $679.00 | L440 | 85 | $11.86 |
| 427 | Correspondence with E. Kovnick and K. Williams re: Klaff cross examination; correspondence with F. Palermo re: letter to Arbitrator McSorley | Will Bucher | 07/17/25 | 1.50 | $970 | $1,455.00 | L410 | 85 | $25.41 |
| 428 | Received and reviewed email from Valve with a link to their demonstratives | Zachary A. Horn | 07/17/25 | 0.20 | $640 | $128.00 | L410 | 85 | $2.24 |
| 429 | Received and reviewed email from Valve concerning witness schedule; asked Valve to advise may the proposed schedule doesn't work | Zachary A. Horn | 07/17/25 | 0.10 | $640 | $64.00 | L440 | 85 | $1.12 |
| 430 | Meetings with trial team re: Dr. Cross's economic testimony, demonstratives exhibits and preparation of Dr. Cross and cross-examination of defendants' economic expert for McSorley arbitration. | Eliot Notewaere | 07/18/25 | 8.25 | $1,100 | $9,075.00 | L420 | 84 | $158.64 |
| 431 | REVIEW, DIGEST AND DESIGNATE PORTIONS OF A. KLAFF DEPOSITION FOR INCLUSION IN TRIAL WITNESS OUTLINE (2); WORK ON OUTLINE (4) | Kent Williams | 07/18/25 | 6 | $1,145 | $6,870.00 | L410 | 84 | $118.58 |
| 432 | Preparing for McSorley trial | Sherry Yu | 7/18/2025 | 2.50 | $625 | $1,562.50 | L440 | 84 | $26.97 |
| 433 | Draft and revise Dr. Cross direct testimony | Thomas Matthew | 07/18/25 | 2.50 | $640 | $1,600.00 | L420 | 84 | $27.62 |
| 434 | Witness prep with Dr. Cross | Thomas Matthew | 07/18/25 | 8.00 | $640 | $5,120.00 | L420 | 84 | $88.37 |
| 435 | Draft and revise Dr. Cross direct testimony | Will Bucher | 07/18/25 | 1.00 | $640 | $640.00 | L420 | 84 | $11.05 |
| 436 | Preparation with Dr. Cross, T. Matthew, and E. Noteware (post-lunch) | Will Bucher | 07/18/25 | 3.25 | $970 | $3,152.50 | L420 | 84 | $54.41 |
| 437 | Preparation with Dr. Cross, T. Matthew, and E. Noteware (pre-lunch) | Will Bucher | 07/18/25 | 3.75 | $970 | $3,637.50 | L420 | 84 | $62.78 |
| 438 | Drafting letter to Arbitrator McSorley on scheduling issued raised in L. Cole email | Will Bucher | 07/18/25 | 2.90 | $970 | $2,813.00 | L440 | 84 | $48.55 |
| 439 | Received email from Frank with joint Exhibit list to tribunal | Zachary A. Horn | 07/18/25 | 0.20 | $640 | $128.00 | L440 | 84 | $2.21 |
| 440 | Received and reviewed Order entered by Arbitrator McSorley on Valve and Claimant's letters concerning order of witnesses and disclosure of expert demonstratives | Zachary A. Horn | 07/18/25 | 0.20 | $640 | $128.00 | L440 | 84 | $2.21 |
| 441 | Reviewed response by Claimants to Valve's letter concerning order of witnesses and disclosure of expert demonstratives | Zachary A. Horn | 07/18/25 | 0.30 | $640 | $192.00 | L440 | 84 | $3.31 |
| 442 | Reviewed letter from Valve concerning order of witnesses and disclosure of expert demonstratives | Zachary A. Horn | 07/18/25 | 0.30 | $640 | $192.00 | L440 | 84 | $3.31 |
| 443 | Reviewed correspondence from Valve noting impasse on witness order and duration of testimony | Zachary A. Horn | 07/18/25 | 0.20 | $640 | $128.00 | L440 | 84 | $2.21 |
| 444 | Calls with trial team and Dr. Cross and work on McSorley exhibits, demonstratives and preparation of economic case, including Dr. Cross witness preparation and cross examination | Eliot Notewaere | 07/19/25 | 4.00 | $1,100 | $4,400.00 | | 83 | $75.04 |
| 445 | trial prep - help Tina prepare iPads | Erik Azzbach | 07/19/25 | 2.00 | $475 | $950.00 | L440 | 83 | $16.20 |
| 446 | trial prep - cross exam exhibits | Erik Azzbach | 07/19/25 | 3.50 | $475 | $1,662.50 | L440 | 83 | $28.35 |
| 447 | preparing accommodations as home base | Frank Palermo | 07/19/25 | 1.00 | $640 | $640.00 | L440 | 83 | $10.92 |
| 448 | Travel to pick up Will from to accommodations for hearing | Frank Palermo | 07/19/25 | 1.70 | $640 | $1,088.00 | L440 | 83 | $18.56 |
| 449 | DIGEST AND DESIGNATE A. KLAFF DEPOSITION (4.5); REVIEW EXHIBITS FOR POTENTIAL INCLUSION IN WITNESS OUTLINE (3); WORK ON TRIAL WITNESS OUTLINE FOR A. KLAFF (12) | Kent Williams | 07/19/25 | 19.5 | $1,145 | $22,327.50 | L410 | 83 | $380.79 |
| 450 | Traveling for McSorley trial | Sherry Yu | 7/19/2025 | 4.50 | $625 | $2,812.50 | L110 | 83 | $47.97 |
| 451 | Edit and organize Dr. Cross demonstratives | Thomas Matthew | 07/19/25 | 3.75 | $640 | $2,400.00 | L420 | 83 | $40.93 |
| 452 | Edit and organize Dr. Cross demonstratives | Thomas Matthew | 07/19/25 | 1.25 | $640 | $800.00 | L420 | 83 | $13.64 |
| 453 | Witness prep with Dr. Cross | Thomas Matthew | 07/19/25 | 3.00 | $640 | $1,920.00 | L420 | 83 | $32.75 |
| 454 | Preparing A. Klaff examination; teleconference with K. Williams re: the same | Will Bucher | 07/19/25 | 2.20 | $970 | $2,134.00 | L410 | 83 | $36.39 |
| 455 | Setting up forward operating base with F. Palermo and T. Huang | Will Bucher | 07/19/25 | 1.00 | $970 | $970.00 | L440 | 83 | $16.54 |
| 456 | Travel to Princeton including to and from airport, flight time, and 30-minute tarmac delay | Will Bucher | 07/19/25 | 4.20 | $970 | $4,074.00 | E110 | 83 | $69.48 |
| 457 | Teleconference re: Witness Prep - Dr. Cross (partial attendance prior to departing for flight) | Will Bucher | 07/19/25 | 4.20 | $970 | $4,074.00 | L420 | 83 | $69.48 |
| 458 | Call with Dr. Cross and work on economic case and McSorley economic testimony, demonstratives, exhibits, cross-examination and witness preparation | Eliot Notewaere | 07/20/25 | 3.50 | $1,100 | $3,850.00 | L420 | 82 | $64.87 |
| 459 | trial prep -help Tina prepare iPads | Erik Azzbach | 07/20/25 | 1.00 | $475 | $475.00 | L440 | 82 | $8.00 |
| 460 | trial prep - prepare cross exam exhibits | Erik Azzbach | 07/20/25 | 0.80 | $475 | $380.00 | L440 | 82 | $6.40 |
| 461 | trial prep - prepare cross exam exhibits | Erik Azzbach | 07/20/25 | 0.50 | $475 | $237.50 | L440 | 82 | $4.00 |
| 462 | Exhibit prep: finding, renaming, stamping, printing, preparing ipads, matching bates numbers; reviewing Valve's core exhibits | Frank Palermo | 07/20/25 | 5.80 | $640 | $3,712.00 | L440 | 82 | $62.54 |
| 463 | Email to Cole re: opening demonstratives email | Frank Palermo | 07/20/25 | 0.10 | $640 | $64.00 | L440 | 82 | $1.08 |
| 464 | Exhibit prep: finding, renaming, stamping, printing, preparing ipads, matching bates numbers; reviewing Valve's core exhibits | Frank Palermo | 07/20/25 | 6.90 | $640 | $4,416.00 | L440 | 82 | $74.41 |
| 465 | war room additional prep | Frank Palermo | 07/20/25 | 0.60 | $640 | $384.00 | L440 | 82 | $6.47 |
| 466 | Exhibit prep: finding, renaming, stamping, printing, preparing ipads, matching bates numbers; reviewing Valve's core exhibits | Frank Palermo | 07/20/25 | 2.30 | $640 | $1,472.00 | L440 | 82 | $24.80 |
| 467 | Discussion w/ Will re: exhibit prep | Frank Palermo | 07/20/25 | 0.40 | $640 | $256.00 | L440 | 82 | $4.31 |
| 468 | Mcsorley opening slide deck | Isabel Benintez | 07/20/25 | 6.00 | $480 | $2,880.00 | L440 | 82 | $48.53 |
| 469 | Nathaniel Blue Cross; Depo Review; Exhibit Searching | Judson Crump | 07/20/25 | 6.00 | $525 | $3,150.00 | L410/440 | 82 | $53.08 |
| 470 | Nat Blue Cross Outline Plan | Judson Crump | 07/20/25 | 2.50 | $525 | $1,312.50 | L410 | 82 | $22.11 |
| 471 | WORK ON OUTLINE FOR A. KLAFF DIRECT TESTIMONY | Kent Williams | 07/20/25 | 15 | $1,145 | $17,175.00 | L410 | 82 | $289.39 |
| 472 | Discuss strategy and review outline and documents for Tom Giardino cross | Sherry Yu | 7/20/2025 | 2.50 | $625 | $1,562.50 | L410 | 82 | $26.33 |
| 473 | Preparation for examination of Tom Giardino | Sherry Yu | 7/20/2025 | 12.90 | $625 | $8,062.50 | L410 | 82 | $135.85 |
| 474 | Edit and organize Dr. Cross demonstratives | Thomas Matthew | 07/20/25 | 3.75 | $640 | $2,400.00 | L420 | 82 | $40.44 |
| 475 | Review hearing and deposition transcripts in preparation for examination of A. Butlin | Thomas Matthew | 07/20/25 | 3.75 | $640 | $2,400.00 | L410 | 82 | $40.44 |
| 476 | Witness prep with Dr. Cross | Thomas Matthew | 07/20/25 | 2.50 | $640 | $1,600.00 | L420 | 82 | $26.96 |
| 477 | Accessing exhibits on Goldfynch | Thomas Matthew | 07/20/25 | 4.75 | $290 | $1,377.50 | L440 | 82 | $23.21 |
| 478 | Printing | Tina Huang | 07/20/25 | 2.00 | $290 | $580.00 | L440 | 82 | $9.77 |
| 479 | Renaming/uploading exhibits onto iPads | Tina Huang | 07/20/25 | 7.50 | $290 | $2,175.00 | L440 | 82 | $36.65 |
| 480 | Shopping for groceries | Tina Huang | 07/20/25 | 1.00 | $290 | $290.00 | L440 | 82 | $4.89 |
| 481 | Preparing for next day's hearing, including drafting and rehearsing opening statement; teleconferences with K. Williams re: A. Klaff examination; preparing slides for opening presentation; meeting with S. Yu re: T. Giardino cross examination, meeting re: A. Butlin cross examination with T. Matthew, reviewing second-half T. Giardino examination outline; meetings with T. Huang and F. Palermo re: exhibits | Will Bucher | 07/20/25 | 9.10 | | | L440 | 82 | $148.73 |
| 482 | Calls with Isabel Benintez re: slide decks | Will Bucher | 07/20/25 | 0.60 | $970 | $582.00 | L440 | 82 | $9.91 |
| 483 | Teleconference with Dr. Cross and T. Matthew re: Witness Prep | Will Bucher | 07/20/25 | 2.50 | $970 | $2,425.00 | L420 | 82 | $40.86 |
| 484 | Setting up Princeton forward operating base; meetings with T. Huang and F. Palermo re: the same | Will Bucher | 07/20/25 | 1.00 | $970 | $970.00 | L440 | 82 | $16.34 |
| 485 | Review Joint Exhibit list and proposed exhibits | Brian Monroe | 07/20/25 | 0.70 | $750 | $525.00 | L410 | 82 | $8.85 |
| 486 | Attend McSorley arbitration and work on preparation of economic evidence for McSorley Arbitration. | Eliot Notewaere | 07/21/25 | 8.50 | $1,100 | $9,350.00 | L450 | 81 | $155.62 |
| 487 | attend trial and provide support including with respect to exhibit location and cross-exam ideas | Erik Azzbach | 07/21/25 | 0.40 | $475 | $190.00 | L450 | 81 | $3.16 |
| 488 | attend trial and provide support including with respect to exhibit location and cross-exam ideas | Erik Azzbach | 07/21/25 | 4.30 | $475 | $2,042.50 | L450 | 81 | $33.99 |
| 489 | attend trial and provide support including with respect to exhibit location and cross-exam ideas | Erik Azzbach | 07/21/25 | 3.50 | $475 | $1,662.50 | L450 | 81 | $27.67 |
| 490 | attend trial and provide support including with respect to exhibit location and cross-exam ideas | Erik Azzbach | 07/21/25 | 0.50 | $475 | $237.50 | L450 | 81 | $3.95 |
| 491 | Exhibit prep and organization w/ Tina | Frank Palermo | 07/21/25 | 7.80 | $640 | $4,992.00 | L440 | 81 | $83.09 |
| 492 | Discussion re: claimant opening | Frank Palermo | 07/21/25 | 0.20 | $640 | $128.00 | L450 | 81 | $2.13 |
| 493 | Exhibit prep: finding, renaming, stamping, printing, preparing binders, preparing ipads, matching bates numbers; Claimant direct prep | Frank Palermo | 07/21/25 | 7.70 | $640 | $4,928.00 | L440 | 81 | $82.02 |
| 494 | Travel to and shopping at Staples for exhibit materials | Frank Palermo | 07/21/25 | 0.80 | $640 | $512.00 | E109 | 81 | $8.52 |
| 495 | help with Mcsorley hearing | Isabel Benintez | 07/21/25 | 6.00 | $480 | $2,880.00 | L450 | 81 | $47.93 |
| 496 | VC w/ Sherry & Elliott re: TomG Cross | Judson Crump | 07/21/25 | 1.50 | $525 | $787.50 | L410 | 81 | $13.11 |
| 497 | Nat Blue Cross Outline; Trial Team Support; Locating Exhibits for Trial Team | Judson Crump | 07/21/25 | 3.25 | $525 | $1,706.25 | L410/440 | 81 | $28.40 |
| 498 | Nat Blue Cross | Judson Crump | 07/21/25 | 1.50 | $525 | $787.50 | L410 | 81 | $13.11 |
| 499 | WORK ON WITNESS OUTLINE (6); ATTEND ARBITRATION & ANALYZE/EVALUATE TESTIMONY OF WITNESSES (7) | Kent Williams | 07/21/25 | 13 | $1,145 | $14,885.00 | L410 | 81 | $247.74 |
| 500 | Preparing for examination of Tom Giardino; attend arbitration | Sherry Yu | 7/21/2025 | 14.40 | $625 | $9,000.00 | L410 | 81 | $149.79 |
| 501 | Witness prep with Dr. Cross | Thomas Matthew | 07/21/25 | 2.50 | $640 | $1,600.00 | L420 | 81 | $26.63 |
| 502 | Review hearing and deposition transcripts in preparation for examination of A. Butlin | Thomas Matthew | 07/21/25 | 2.25 | $640 | $1,440.00 | L410 | 81 | $23.97 |
| 503 | Attend and conduct hearing before Arbitrator McSorley | Thomas Matthew | 07/21/25 | 7.00 | $640 | $4,480.00 | L450 | 81 | $74.56 |
| 504 | Document upload | Tina Huang | 07/21/25 | 5.00 | $290 | $1,450.00 | L440 | 81 | $24.13 |
| 505 | McSorley hearing | Tina Huang | 07/21/25 | 7.50 | $290 | $2,175.00 | L450 | 81 | $36.20 |
| 506 | Preparing for next day's hearing, including practicing T. Giardino cross examination with S. Yu, practicing A. Butlin cross examination with T. Matthew, reviewing second-half T. Giardino outline; meetings with T. Huang and F. Palermo re: exhibits | Will Bucher | 07/21/25 | 3.50 | $970 | $3,395.00 | L410 | 81 | $56.51 |
| 507 | Driving back from hearing | Will Bucher | 07/21/25 | 0.40 | $970 | $388.00 | E110 | 81 | $6.46 |
| 508 | Attending final merits hearing; preparing for A. Klaff cross examination during lunch break | Will Bucher | 07/21/25 | 7.00 | $970 | $6,790.00 | L450 | 81 | $113.01 |
| 509 | Preparing for opening statement in war room prior to hearing | Will Bucher | 07/21/25 | 0.50 | $970 | $485.00 | L460 | 81 | $8.07 |
| 510 | Driving to hearing location | Will Bucher | 07/21/25 | 0.60 | $970 | $582.00 | E110 | 81 | $9.69 |
| 511 | Correspond with Arbitrator McSorley and Valve re: hearing start time | Will Bucher | 07/21/25 | 0.40 | $970 | $388.00 | L450 | 81 | $6.46 |
| 512 | Received and reviewed Valve's Demonstrative Exhibits before trial | Zachary A. Horn | 07/22/25 | 0.20 | $640 | $128.00 | L440 | 80 | $2.13 |
| 513 | Received and reviewed Cross Expert Demonstrative slide deck and email submitting to tribunal and opposing counsel | Zachary A. Horn | 07/22/25 | 0.30 | $640 | $192.00 | L440 | 80 | $3.20 |
| 514 | Travel from Princeton NJ home | Eliot Notewaere | 07/22/25 | 5.00 | $1,100 | $5,500.00 | E110 | 80 | $91.37 |
| 515 | Attend McSorley hearing at Norrmouth Beach NJ | Eliot Notewaere | 07/22/25 | 9.00 | $1,100 | $9,900.00 | L450 | 80 | $164.47 |
| 516 | Travel from Princeton, NJ for hearings and Dr. Cross witness prep | Eliot Notewaere | 07/22/25 | 1.25 | $1,100 | $1,375.00 | L420 | 80 | $22.84 |
| 517 | add images of exhibits to Nat Blue cross-outline for Will | Judson Crump | 07/22/25 | 2.17 | $480 | $1,041.00 | L410 | 80 | $17.30 |
| 518 | Bucher Law PLLC Weekly Meeting | Erik Azzbach | 07/22/25 | 0.67 | $640 | $321.60 | L120 | 80 | $5.29 |
| 519 | attend trial and provide support including exhibit location and cross exam support | Erik Azzbach | 07/22/25 | 1.80 | $475 | $855.00 | L450 | 80 | $14.05 |
| 520 | attend trial and provide support including exhibit location and cross exam support | Erik Azzbach | 07/22/25 | 5.30 | $475 | $2,517.50 | L450 | 80 | $41.65 |
| 521 | attend trial and provide support including exhibit location and cross exam support | Erik Azzbach | 07/22/25 | 0.90 | $475 | $427.50 | L450 | 80 | $7.03 |
| 522 | attend trial and provide support including with respect to exhibit location and cross-exam support | Erik Azzbach | 07/22/25 | 0.50 | $475 | $237.50 | L450 | 80 | $3.90 |
| 523 | Exhibit discussion, prep, and organization w/ Tina; email to Will re: cross-exhibits; email to Arb and Cole re: Peterson testimony | Frank Palermo | 07/22/25 | 4.00 | $640 | $2,560.00 | L440 | 80 | $42.08 |
| 524 | Prep call with Claimant Vicente w/ Thomas | Frank Palermo | 07/22/25 | 1.00 | $640 | $640.00 | L420 | 80 | $10.52 |
| 525 | Exhibit and organization and prep for hearing | Frank Palermo | 07/22/25 | 2.00 | $640 | $1,280.00 | L440 | 80 | $20.94 |
| 526 | Travel to and shopping at Staples & best buy for exhibits, exhibit materials, office supplies | Frank Palermo | 07/22/25 | 0.90 | $640 | $576.00 | E109 | 80 | $9.47 |
| 527 | hearing, exhibit organization during break | Frank Palermo | 07/22/25 | 5.60 | $640 | $3,584.00 | L450 | 80 | $58.85 |
| 528 | Travel to hearing | Frank Palermo | 07/22/25 | 0.30 | $640 | $192.00 | E110 | 80 | $3.17 |
| 529 | Exhibit prep w/ Tina for hearing | Frank Palermo | 07/22/25 | 2.70 | $640 | $1,728.00 | L440 | 80 | $28.41 |
| 530 | help with Mcsorley hearing | Isabel Benintez | 07/22/25 | 9.00 | $480 | $4,320.00 | L450 | 80 | $71.08 |
| 531 | Travel to hearing | Isabel Benintez | 07/22/25 | 0.30 | $480 | $144.00 | E110 | 80 | $2.37 |
| 532 | help with Updates, Confidentiality Designations, & Nathaniel Blue | Judson Crump | 07/22/25 | 0.25 | $525 | $131.25 | L410 | 80 | $2.15 |
| 533 | Blue Outline - Adjusting for Will | Judson Crump | 07/22/25 | 1.25 | $525 | $656.25 | L410 | 80 | $10.79 |
| 534 | Blue Cross Edits | Judson Crump | 07/22/25 | 1.50 | $525 | $787.50 | L410 | 80 | $12.95 |
| 535 | Trial Team Support & Observation | Judson Crump | 07/22/25 | 7.00 | $525 | $3,675.00 | L450 | 80 | $60.45 |
| 536 | Review of Emails from OppCo; Witness School | Judson Crump | 07/22/25 | 0.50 | $525 | $262.50 | L440 | 80 | $4.32 |
| 537 | ATTEND ARBITRATION & ANALYZE/EVALUATE WITNESS TESTIMONY | Kent Williams | 07/22/25 | 7 | $1,145 | $8,015.00 | L450 | 80 | $131.75 |
| 538 | Attend arbitration; taking Tom Giardino deposition | Sherry Yu | 7/22/2025 | 13.40 | $625 | $8,375.00 | L410 | 80 | $137.67 |
| 539 | Cross examination prep A. Butlin | Thomas Matthew | 07/22/25 | 2.50 | $640 | $1,600.00 | L410 | 80 | $26.30 |
| 540 | Attend and conduct hearing before Arbitrator McSorley | Thomas Matthew | 07/22/25 | 7.50 | $640 | $4,800.00 | L450 | 80 | $78.91 |
| 541 | Cross examination prep A. Butlin | Thomas Matthew | 07/22/25 | 2.00 | $640 | $1,280.00 | L410 | 80 | $21.04 |
| 542 | McSorley hearing | Tina Huang | 07/22/25 | 9.00 | $290 | $2,610.00 | L450 | 80 | $42.90 |
| 543 | Binders | Tina Huang | 07/22/25 | 2.00 | $290 | $580.00 | L440 | 80 | $9.53 |
| 544 | Preparing for next day's hearing, including practicing A. Butlin cross examination with T. Matthew, reviewing second-half T. Giardino examination outline; meetings with T. Huang and F. Palermo re: exhibits | Will Bucher | 07/22/25 | 4.40 | $970 | $4,268.00 | L410 | 80 | $70.16 |
| 545 | Call with Ellen Noteware re: trial strategy | Will Bucher | 07/22/25 | 0.20 | $970 | $194.00 | L450 | 80 | $3.19 |
| 546 | Driving back from hearing | Will Bucher | 07/22/25 | 0.40 | $970 | $388.00 | E110 | 80 | $6.38 |
| 547 | Attending final merits hearing; preparing for T. Giardino cross examination during lunch break | Will Bucher | 07/22/25 | 7.00 | $970 | $6,790.00 | L450 | 80 | $111.62 |

| | Description | User | Start Date | Duration (decimal) | Rate | Amount (USD) | ABA Code | Days Since Work | Interest |
|---|---|---|---|---|---|---|---|---|---|
| 550 | Preparing for T. Giardino cross-examination in war room prior to hearing | Will Bucher | 07/22/25 | 0.50 | $970 | $485.00 | L410 | 80 | $7.97 |
| 551 | Driving to hearing location | Will Bucher | 07/22/25 | 0.40 | $970 | $388.00 | E110 | 80 | $6.38 |
| 552 | Participated in McSorley Arbitration remotely; observed and provided litigation support for Tom Giardino hostile direct examination | Zachary A. Horn | 07/22/25 | 5.70 | $640 | $3,648.00 | L450/L440 | 80 | $59.97 |
| 553 | McSorley prepare for attend and participate in trial; prepare claimants and Dr. Cross and for cross examination of Dr. McCreary | Ellen Noteware | 07/23/25 | 11.50 | $1,100 | $12,650.00 | L420 | 79 | $205.35 |
| 554 | Travel to Princeton NJ for prep and hearing | Ellen Noteware | 07/23/25 | 1.08 | $1,100 | $1,188.00 | E110 | 79 | $19.28 |
| 555 | prepare additional Peterson steam key docs at Will's instruction | Eliot Kosnick | 07/23/25 | 0.20 | $480 | $96.00 | L410 | 79 | $1.56 |
| 556 | Consolidate relevant steam key docs/provide thoughts on steam keys prior to Peterson's direct | Eliot Kosnick | 07/23/25 | 1.10 | $480 | $528.00 | L410 | 79 | $8.57 |
| 557 | Attend team meeting regarding the McSorley arb | Eliot Kosnick | 07/23/25 | 0.83 | $480 | $398.40 | L440 | 79 | $6.47 |
| 558 | Legal research on theory presented by Valve in opening, particularly surrounding AAA Liquors | Eliot Kosnick | 07/23/25 | 1.50 | $480 | $720.00 | A102 | 79 | $11.69 |
| 559 | witness prep | Erik Aptbach | 07/23/25 | 4.90 | $475 | $2,327.50 | L410 | 79 | $37.78 |
| 560 | attend trial and provide support including with respect to exhibit location and cross-exam ideas | Erik Aptbach | 07/23/25 | 7.20 | $475 | $3,420.00 | L450 | 79 | $55.52 |
| 561 | Exhibit prep and review w/ Tina, review of Valve exhibits, aggregation of exhibits | Frank Palermo | 07/23/25 | 4.10 | $640 | $2,624.00 | L440 | 79 | $42.60 |
| 562 | Discussion with Claimant Birenbaum regarding travel, direct testimony | Frank Palermo | 07/23/25 | 0.60 | $640 | $384.00 | L410 | 79 | $6.23 |
| 563 | Team meeting re: hearing | Frank Palermo | 07/23/25 | 0.80 | $640 | $512.00 | L440 | 79 | $8.31 |
| 564 | Travel for hearing | Frank Palermo | 07/23/25 | 0.30 | $640 | $192.00 | E109 | 79 | $3.12 |
| 565 | Hearing, case discussion and prep during break | Frank Palermo | 07/23/25 | 7.00 | $640 | $4,480.00 | L440 | 79 | $72.72 |
| 566 | Prep for hearing | Frank Palermo | 07/23/25 | 0.50 | $640 | $320.00 | L440 | 79 | $5.19 |
| 567 | Travel for hearing | Frank Palermo | 07/23/25 | 0.30 | $640 | $192.00 | E109 | 79 | $3.12 |
| 568 | Prep for hearing, exhibit organization | Frank Palermo | 07/23/25 | 0.70 | $640 | $448.00 | L440 | 79 | $7.27 |
| 569 | Mcsorley hearing | Isabel Sesmero | 07/23/25 | 7.00 | $480 | $3,360.00 | L450 | 79 | $54.54 |
| 570 | research on case law | Isabel Sesmero | 07/23/25 | 0.50 | $480 | $240.00 | A102 | 79 | $3.90 |
| 571 | McSorley Trial Support | Judson Crump | 07/23/25 | 2.75 | $525 | $1,443.75 | L440 | 79 | $23.44 |
| 572 | Chat w/ Ellen & Will re: Nat Blue Cross Updates | Judson Crump | 07/23/25 | 0.50 | $525 | $262.50 | L410 | 79 | $4.26 |
| 573 | ATTEND ARBITRATION & ANALYZE/EVALUATE WITNESS TESTIMONY | Kent Williams | 07/23/25 | 6.5 | $1,145 | $7,442.50 | L450 | 79 | $120.81 |
| 574 | Attend McSorley arbitration; draft bonis cross outline and review documents | Sherry Yu | 07/23/25 | 15.70 | $625 | $9,812.50 | L410 | 79 | $159.29 |
| 575 | Attend and conduct hearing before Arbitrator McSorley | Thomas Matthew | 07/23/25 | 7.00 | $640 | $4,480.00 | L450 | 79 | $72.72 |
| 576 | Document upload | Tina Huang | 07/23/25 | 8.00 | $290 | $1,740.00 | L440 | 79 | $28.25 |
| 577 | McSorley hearing | Tina Huang | 07/23/25 | 7.00 | $290 | $2,030.00 | L450 | 79 | $32.95 |
| 578 | Binders | Tina Huang | 07/23/25 | 2.50 | $290 | $725.00 | L440 | 79 | $11.77 |
| 579 | Preparing for E. Peterson examination; meetings with T. Huang and F. Palermo re: exhibits; meetings with S. Yu re: Izumi examination | Will Bucher | 07/23/25 | 4.50 | $970 | $4,365.00 | L410 | 79 | $70.86 |
| 580 | Call with Judson Crump re: Gerber examination | Will Bucher | 07/23/25 | 0.20 | $970 | $194.00 | L410 | 79 | $3.15 |
| 581 | Call with Judson Crump re: Peterson examination | Will Bucher | 07/23/25 | 0.30 | $970 | $291.00 | L410 | 79 | $4.72 |
| 582 | Driving back from hearing | Will Bucher | 07/23/25 | 0.40 | $970 | $388.00 | E110 | 79 | $6.30 |
| 583 | Attending final mants hearing; preparing for N. Blue cross examination during lunch break | Will Bucher | 07/23/25 | 7.00 | $970 | $6,790.00 | L450 | 79 | $110.22 |
| 584 | Preparing for T. Giardino continued cross-examination in war room prior to hearing | Will Bucher | 07/23/25 | 0.50 | $970 | $485.00 | L410 | 79 | $7.87 |
| 585 | Participated in McSorley Arbitration remotely; observed and provided litigation support for Dr. Cross hostile direct examination | Zachary A. Horn | 07/23/25 | 2.60 | $640 | $1,664.00 | L450 | 79 | $27.01 |
| 586 | mcsorley team call | Eliot Kosnick | 07/24/25 | 0.53 | $480 | $254.40 | L440 | 78 | $4.08 |
| 587 | research how to create audio files from transcripts of legal materials to ease review by expert & create audio files | Eliot Kosnick | 07/24/25 | 4.00 | $480 | $1,920.00 | L440 | 78 | $30.77 |
| 588 | attend trial and provide support including with respect to exhibit location and cross-exam ideas | Erik Aptbach | 07/24/25 | 7.30 | $475 | $3,467.50 | L450 | 78 | $55.58 |
| 589 | Team discussion re: week of trial | Frank Palermo | 07/24/25 | 0.60 | $640 | $384.00 | L440 | 78 | $6.15 |
| 590 | Demonstratives review, discussion with Thomas | Frank Palermo | 07/24/25 | 0.40 | $640 | $256.00 | L440 | 78 | $4.10 |
| 591 | Travel for hearing | Frank Palermo | 07/24/25 | 0.30 | $640 | $192.00 | E109 | 78 | $3.08 |
| 592 | Hearing, strategy discussion during break | Frank Palermo | 07/24/25 | 7.50 | $640 | $4,800.00 | L440 | 78 | $76.93 |
| 593 | Travel for hearing | Frank Palermo | 07/24/25 | 0.30 | $640 | $192.00 | E109 | 78 | $3.08 |
| 595 | team meeting re McSorley hearing | Isabel Sesmero | 07/24/25 | 0.50 | $480 | $240.00 | L440 | 78 | $3.85 |
| 596 | McSorley Hearing | Isabel Sesmero | 07/24/25 | 6.00 | $480 | $2,880.00 | L450 | 78 | $46.16 |
| 597 | TC w/ Will re Gerber Cross | Judson Crump | 07/24/25 | 0.32 | $525 | $166.00 | L410 | 78 | $2.69 |
| 598 | Team Meeting - Trial Follow UP | Judson Crump | 07/24/25 | 0.75 | $525 | $393.75 | L440 | 78 | $6.31 |
| 599 | Discovery Doc Review | Judson Crump | 07/24/25 | 2.00 | $525 | $1,050.00 | L440 | 78 | $16.83 |
| 600 | Trial Team Support; Exhibit Lookups | Judson Crump | 07/24/25 | 5.00 | $525 | $2,625.00 | L440 | 78 | $42.07 |
| 601 | ATTEND ARBITRATION & ANALYZE/EVALUATE WITNESS TESTIMONY | Kent Williams | 07/24/25 | 5.5 | $1,145 | $6,297.50 | L450 | 78 | $100.93 |
| 602 | Attend arbitration and draft Izumi outline | Sherry Yu | 7/24/2025 | 14.90 | $625 | $9,312.50 | L410 | 78 | $149.26 |
| 603 | Witness prep with Dr. Cross | Thomas Matthew | 07/24/25 | 6.25 | $640 | $4,000.00 | L420 | 78 | $64.11 |
| 604 | McSorley hearing | Tina Huang | 07/24/25 | 7.00 | $290 | $2,030.00 | L450 | 78 | $32.54 |
| 605 | Binders | Tina Huang | 07/24/25 | 2.50 | $290 | $725.00 | L440 | 78 | $11.62 |
| 606 | Call with Phil Cross | Will Bucher | 07/24/25 | 0.20 | $970 | $194.00 | L440 | 78 | $3.11 |
| 607 | Correspondence with Dr. Cross and E. Kovnick re: files and YGR decision audio recording delivery to Dr. Cross | Will Bucher | 07/24/25 | 0.50 | $970 | $485.00 | L420 | 78 | $7.77 |
| 608 | Call with Judson Crump re: McSorley hearing logistics | Will Bucher | 07/24/25 | 0.40 | $970 | $388.00 | L440 | 78 | $6.22 |
| 609 | Driving back from hearing | Will Bucher | 07/24/25 | 0.40 | $970 | $388.00 | E110 | 78 | $6.22 |
| 610 | Attending final mants hearing; preparing for E. Peterson examination during lunch break | Will Bucher | 07/24/25 | 7.30 | $970 | $7,081.00 | L450 | 78 | $113.49 |
| 611 | Preparing for E. Peterson in war room prior to hearing | Will Bucher | 07/24/25 | 0.50 | $970 | $485.00 | L440 | 78 | $7.77 |
| 612 | Driving to hearing location | Will Bucher | 07/24/25 | 0.40 | $970 | $388.00 | E110 | 78 | $6.22 |
| 613 | Review Izumi outline; correspond with S. Yu re Izumi cross strategy | Kristin Morrow | 07/24/25 | 1.40 | $760 | $1,064.00 | L410 | 78 | $16.83 |
| 614 | Received and reviewed emails between Valve and Claimants regarding witness Order and testimony of Erik Peterson | Zachary A. Horn | 07/24/25 | 0.10 | $640 | $64.00 | L410 | 78 | $1.03 |
| 615 | Received and reviewed email from Ellen to Valve with updated Exhibit list | Zachary A. Horn | 07/24/25 | 0.20 | $640 | $128.00 | L410 | 78 | $2.05 |
| 616 | Case discussion | Frank Palermo | 07/25/25 | 1.00 | $640 | $640.00 | L120 | 77 | $10.19 |
| 617 | Document review and preparation | Frank Palermo | 07/25/25 | 1.50 | $640 | $960.00 | L440 | 77 | $15.19 |
| 618 | Case discussion, exhibit prep | Frank Palermo | 07/25/25 | 1.00 | $640 | $640.00 | L440 | 77 | $10.13 |
| 619 | Discovery Doc Review: Gerber | Judson Crump | 07/25/25 | 2.00 | $525 | $1,050.00 | L440 | 77 | $20.25 |
| 620 | Draft Izumi outline | Sherry Yu | 7/25/2025 | 1.50 | $625 | $937.50 | L410 | 77 | $14.83 |
| 622 | Witness prep with Dr. Cross | Thomas Matthew | 07/25/25 | 6.25 | $640 | $4,000.00 | L420 | 77 | $63.29 |
| 623 | Trial preparation with Dr. Cross, E. Noteware, T. Huang, and F. Palermo, including preparing Dr. Cross direct examination, preparing Dr. Cross cross examination; meetings with T. Huang and F. Palermo re: exhibit organization | Will Bucher | 07/25/25 | 8.10 | $970 | $7,857.00 | L420 | 77 | $124.31 |
| 624 | Call with Tina Huang re: trial logistics | Will Bucher | 07/25/25 | 0.20 | $970 | $194.00 | L420 | 77 | $3.07 |
| 625 | Received and reviewed email from Valve with Exhibit List for today Exhibits | Frank Palermo | 07/26/25 | 0.20 | $640 | $128.00 | L440 | 76 | $2.03 |
| 626 | Coordinating w/ Judson re: travel | Frank Palermo | 07/26/25 | 0.30 | $640 | $192.00 | L440 | 76 | $3.04 |
| 627 | Document review and preparation | Frank Palermo | 07/26/25 | 2.00 | $640 | $1,280.00 | L440 | 76 | $19.99 |
| 628 | Hearing discussion and prep | Frank Palermo | 07/26/25 | 1.50 | $640 | $960.00 | L440 | 76 | $9.99 |
| 629 | Prep for direct examination of Claimants | Frank Palermo | 07/26/25 | 1.50 | $640 | $960.00 | L410 | 76 | $14.99 |
| 630 | Direct examination prep w/ Birenbaum | Frank Palermo | 07/26/25 | 2.00 | $640 | $1,280.00 | L410 | 76 | $19.99 |
| 631 | correspondence w/ Will re: exhibits | Frank Palermo | 07/26/25 | 0.10 | $640 | $64.00 | L440 | 76 | $1.00 |
| 632 | Meeting re: hearing prep & docs | Frank Palermo | 07/26/25 | 5.00 | $640 | $3,200.00 | L440 | 76 | $5.00 |
| 633 | Travel: Silverhill→Pensacola→ATL→LaGuardia→Princeton | Frank Palermo | 07/26/25 | 11.25 | $640 | $7,612.50 | L440 | 76 | $119.81 |
| 634 | Review Izumi outline | Sherry Yu | 7/26/2025 | 6.50 | $625 | $4,062.50 | L410 | 76 | $64.18 |
| 635 | Witness prep with Dr. Cross | Thomas Matthew | 07/26/25 | 3.75 | $640 | $2,400.00 | L420 | 76 | $37.48 |
| 636 | Edit and organize Dr. Cross demonstratives | Thomas Matthew | 07/26/25 | 1.50 | $640 | $960.00 | L420 | 76 | $14.99 |
| 637 | Edit and organize Dr. Cross demonstratives | Thomas Matthew | 07/26/25 | 4.50 | $640 | $2,880.00 | L420 | 76 | $44.98 |
| 638 | Trial preparation with Dr. Cross, E. Noteware, T. Huang, and F. Palermo, including preparing Dr. Cross direct examination and Dr. Cross cross examination | Will Bucher | 07/26/25 | 7.10 | $970 | $6,887.00 | L420 | 76 | $107.56 |
| 639 | Travel from Princeton home | Ellen Noteware | 07/27/25 | 1.33 | $1,100 | $1,463.00 | L440 | 75 | $22.55 |
| 640 | Meet with and prepare Dr. Cross's for examination and work on demonstratives and exhibits and cross-examination points for McCreary | Ellen Noteware | 07/27/25 | 5.17 | $1,100 | $5,687.00 | L420 | 75 | $87.64 |
| 641 | Travel from Princeton home | Ellen Noteware | 07/27/25 | 1.25 | $1,100 | $1,375.00 | L440 | 75 | $21.19 |
| 642 | Claimant direct prep | Frank Palermo | 07/27/25 | 1.60 | $640 | $1,024.00 | L410 | 75 | $15.78 |
| 643 | Discussion w/ Tina re: exhibit prep and organization | Frank Palermo | 07/27/25 | 0.60 | $640 | $384.00 | L440 | 75 | $5.92 |
| 644 | Claimant direct prep | Frank Palermo | 07/27/25 | 1.30 | $640 | $832.00 | L410 | 75 | $12.82 |
| 645 | Technical demonstration prep | Frank Palermo | 07/27/25 | 1.30 | $640 | $832.00 | L440 | 75 | $12.82 |
| 646 | Travel to Staples; Document review and preparation | Frank Palermo | 07/27/25 | 1.00 | $640 | $640.00 | L440 | 75 | $9.86 |
| 647 | Case discussion w/ team | Frank Palermo | 07/27/25 | 0.50 | $640 | $320.00 | L120 | 75 | $2.96 |
| 648 | Texting Claimants | Frank Palermo | 07/27/25 | 0.20 | $640 | $128.00 | L410 | 75 | $1.97 |
| 649 | Claimants Birenbaum and Vicente direct prep | Frank Palermo | 07/27/25 | 1.60 | $640 | $1,024.00 | L410 | 75 | $15.78 |
| 650 | Case discussion w/ team | Frank Palermo | 07/27/25 | 0.50 | $640 | $320.00 | L120 | 75 | $4.93 |
| 651 | Travel to and back from Staples to pick up printed docs | Frank Palermo | 07/27/25 | 1.00 | $640 | $640.00 | L440 | 75 | $9.86 |
| 652 | Doc review and trial exhibit prep | Frank Palermo | 07/27/25 | 1.40 | $640 | $896.00 | L440 | 75 | $13.81 |
| 653 | Doc organization and printing prep | Frank Palermo | 07/27/25 | 1.40 | $640 | $896.00 | L440 | 75 | $4.81 |
| 654 | Coordinating w/ Judson re: travel to accommodation, travel to pick up and return | Frank Palermo | 07/27/25 | 0.70 | $640 | $448.00 | L440 | 75 | $6.90 |
| 655 | Trial Prep for Week 2 | Judson Crump | 07/27/25 | 5.00 | $525 | $2,625.00 | L440 | 75 | $40.45 |
| 656 | Preparing for Izumi cross and claimants' direct | Sherry Yu | 7/27/2025 | 12.00 | $625 | $7,500.00 | L410 | 75 | $115.58 |
| 657 | Edit and organize Dr. Cross demonstratives | Thomas Matthew | 07/27/25 | 4.75 | $640 | $3,040.00 | L420 | 75 | $46.85 |
| 658 | Witness prep with Dr. Cross | Thomas Matthew | 07/27/25 | 4.50 | $640 | $2,880.00 | L420 | 75 | $44.38 |
| 659 | Trial preparation with T. Matthew, Dr. Cross, E. Noteware, T. Huang, and F. Palermo, including preparing Dr. Cross direct examination, Dr. McCrary cross examination; meeting with J. Crump re: K. Gerber cross examination | Will Bucher | 07/27/25 | 13.80 | $970 | $13,386.00 | L420 | 75 | $206.29 |
| 660 | Call with Tina Huang re: exhibits | Will Bucher | 07/27/25 | 0.20 | $970 | $194.00 | L440 | 75 | $2.99 |
| 661 | Call with Judson Crump re: travel to Princeton | Will Bucher | 07/27/25 | 0.30 | $970 | $291.00 | L440 | 75 | $4.48 |
| 662 | Travel to Princeton for Dr. Cross prep and client prep and other trial tasks and to attend hearing | Will Bucher | 07/27/25 | 1.08 | $970 | $1,048.00 | L440 | 75 | $16.15 |
| 663 | Travel from Princeton home | Will Bucher | 07/27/25 | 1.08 | $970 | $1,048.00 | L440 | 75 | $16.15 |
| 664 | Client and expert preparation, work on demonstratives and exhibits and other pretrial tasks for McSorley arbitration | Ellen Noteware | 07/28/25 | 11.17 | $1,100 | $12,287.00 | L420 | 74 | $186.83 |
| 665 | Exhibit prep for hearing | Frank Palermo | 07/28/25 | 1.30 | $640 | $832.00 | L440 | 74 | $12.65 |
| 666 | Case discussion, doc review and prep | Frank Palermo | 07/28/25 | 0.40 | $640 | $256.00 | L440 | 74 | $3.89 |
| 667 | Travel for hearing | Frank Palermo | 07/28/25 | 0.30 | $640 | $192.00 | E109 | 74 | $2.92 |
| 668 | Email to Cole of exhibit used in Claimant direct | Frank Palermo | 07/28/25 | 0.10 | $640 | $64.00 | L410 | 74 | $0.97 |
| 669 | Correspondence w/ Will re: hearing logistics | Frank Palermo | 07/28/25 | 0.50 | $640 | $320.00 | L440 | 74 | $4.87 |
| 670 | Hearing, case strategy discussion during break | Frank Palermo | 07/28/25 | 7.00 | $640 | $4,480.00 | L440 | 74 | $68.12 |
| 671 | Hearing prep | Frank Palermo | 07/28/25 | 0.50 | $640 | $320.00 | L440 | 74 | $1.95 |
| 672 | Travel to hearing | Frank Palermo | 07/28/25 | 0.30 | $640 | $192.00 | E109 | 74 | $1.95 |
| 673 | Direct prep w/ Claimant Vicente | Frank Palermo | 07/28/25 | 0.60 | $640 | $384.00 | L410 | 74 | $5.84 |
| 674 | Discussion w/ Tina re: exhibit organization and prep | Frank Palermo | 07/28/25 | 0.50 | $640 | $320.00 | L440 | 74 | $4.87 |
| 675 | Observed hearing and helped with small tasks | Isabel Sesmero | 07/28/25 | 7.00 | $480 | $3,360.00 | L450 | 74 | $51.09 |
| 676 | Trial | Judson Crump | 07/28/25 | 7.50 | $525 | $3,937.50 | L450 | 74 | $59.87 |
| 677 | ATTEND ARBITRATION HEARING & ANALYZE WITNESS TESTIMONY (6); REVIEW ARTICLES REGARDING EPIC V APPLE INJUNCTION (.5); REVIEW COURT'S POST-TRIAL OPINION RE V APPLE REGARDING INJUNCTION (.5); REVIEW EXPERT REPORT (.5) | Kent Williams | 07/28/25 | 7.5 | $1,145 | $8,587.50 | L450 | 74 | $130.58 |
| 678 | Attend arbitration and draft Izumi outline | Sherry Yu | 7/28/2025 | 10.30 | $625 | $6,437.50 | L410 | 74 | $97.88 |
| 679 | Witness prep with Dr. Cross | Thomas Matthew | 07/28/25 | 6.25 | $640 | $4,000.00 | L420 | 74 | $60.82 |
| 680 | Document upload | Tina Huang | 07/28/25 | 4.00 | $290 | $1,160.00 | L440 | 74 | $17.64 |
| 681 | McSorley hearing | Tina Huang | 07/28/25 | 7.00 | $290 | $2,030.00 | L450 | 74 | $30.87 |
| 682 | Binders | Tina Huang | 07/28/25 | 2.75 | $290 | $797.50 | L440 | 74 | $12.13 |
| 683 | Preparing for Dr. Cross for testimony; running mock cross examination | Will Bucher | 07/28/25 | 2.25 | $970 | $2,182.50 | L420 | 74 | $33.19 |
| 684 | Driving back from hearing location | Will Bucher | 07/28/25 | 0.40 | $970 | $388.00 | E110 | 74 | $5.90 |
| 685 | Attending final mants hearing | Will Bucher | 07/28/25 | 4.00 | $970 | $3,880.00 | L450 | 74 | $59.00 |
| 686 | Discussion of case strategy with J. Crump, F. Palermo, T. Huang, and S. Yu and further Gerber cross examination points during break | Will Bucher | 07/28/25 | 0.75 | $970 | $727.50 | L440 | 74 | $11.06 |

| # | Description | User | Start Date | Duration (decimal) | Rate | Amount (USD) | ABA Code | Days Since Work | Interest |
|---|---|---|---|---|---|---|---|---|---|
| 687 | Attending final merits hearing | Will Bucher | 07/28/25 | 2.25 | $970 | $2,182.50 | L460 | 74 | $33.19 |
| 688 | Preparing for hearing; driving to hearing location | Will Bucher | 07/28/25 | 1.50 | $970 | $1,455.00 | L440 | 74 | $22.12 |
| 689 | Morning preparation of L. Vincente for testimony | Will Bucher | 07/28/25 | 0.50 | $970 | $485.00 | L410 | 74 | $7.37 |
| 690 | Travel from Princeton to home | Frank Palermo | 07/29/25 | 1.42 | $1,100 | $1,562.00 | L440 | 73 | $23.43 |
| 691 | McSorley Arbitration - prepare Dr. Cross and cross of McCreary. Attend arbitration. | Ellen Noteware | 07/29/25 | 9.82 | $1,100 | $10,802.00 | L420 | 73 | $162.03 |
| 692 | Travel to Princeton for witness prep and hearing | Will Bucher | 07/28/25 | 1.08 | $1,100 | $1,188.00 | L420 | 73 | $17.82 |
| 693 | work on chunk of mccrary cross | Eliot Kownick | 07/29/25 | 0.93 | $480 | $446.40 | L420 | 73 | $6.70 |
| 694 | Doc review and trial exhibit prep | Frank Palermo | 07/29/25 | 0.10 | $640 | $64.00 | L440 | 73 | $0.96 |
| 695 | Travel to Staples, call re Exhibit prep discussion w/ team | Frank Palermo | 07/29/25 | 0.70 | $640 | $448.00 | L440 | 73 | $6.72 |
| 696 | Meeting w/ Will and Tina re: exhibit prep | Frank Palermo | 07/29/25 | 0.50 | $640 | $320.00 | L440 | 73 | $4.80 |
| 697 | Hearing | Frank Palermo | 07/29/25 | 3.70 | $640 | $2,368.00 | L460 | 73 | $35.52 |
| 698 | Case discussion | Frank Palermo | 07/29/25 | 0.50 | $640 | $320.00 | L460 | 73 | $4.80 |
| 699 | Hearing | Frank Palermo | 07/29/25 | 1.40 | $640 | $896.00 | L460 | 73 | $13.44 |
| 700 | Travel to Staples re: demonstrative materials, paper, printouts; organizing material for hearings | Frank Palermo | 07/29/25 | 1.20 | $640 | $768.00 | L440 | 73 | $11.52 |
| 701 | Exhibit discussion w/ Tina | Frank Palermo | 07/29/25 | 0.20 | $640 | $128.00 | L440 | 73 | $1.92 |
| 702 | observed hearing and helped with small tasks | Isabel Sacnmo | 07/29/25 | 5.00 | $480 | $2,400.00 | L460 | 73 | $36.00 |
| 703 | observed hearing and helped with small tasks | Isabel Sacnmo | 07/29/25 | 1.00 | $480 | $480.00 | L460 | 73 | $7.20 |
| 704 | Trial Team Support - Vicente Acct Hist | Judson Crump | 07/29/25 | 1.58 | $525 | $829.50 | L440 | 73 | $12.44 |
| 705 | Trial Prep | Judson Crump | 07/29/25 | 1.20 | $525 | $640.50 | L440 | 73 | $9.61 |
| 706 | ATTEND ARBITRATION & ANALYZE WITNESS TESTIMONY (6.5); DISCUSS SAME WITH W. BUCHER, POTENTIAL RETAINED EXPERTS (1.5); REVIEW EXPERT REPORTS (.4); REVIEW INDUSTRY ARTICLES REGARDING RELEVANT MARKET (.4) | Kent Williams | 07/29/25 | 8.8 | $1,145 | $10,076.00 | L450 | 73 | $151.14 |
| 707 | Attend arbitration; help prepping expert cross | Sherry Yu | 7/29/2025 | 12.00 | $625 | $7,500.00 | L450 | 73 | $112.50 |
| 708 | Attend and conduct hearing before Arbitrator McSorley | Thomas Matthew | 07/29/25 | 7.00 | $640 | $4,480.00 | L450 | 73 | $67.20 |
| 709 | Document upload | Tina Huang | 07/29/25 | 4.00 | $290 | $1,160.00 | L440 | 73 | $17.40 |
| 710 | McSorley | Tina Huang | 07/29/25 | 7.00 | $290 | $2,030.00 | L440 | 73 | $30.45 |
| 711 | Binders | Tina Huang | 07/29/25 | 2.75 | $290 | $797.50 | L440 | 73 | $11.96 |
| 712 | Preparing for Dr. McCrary cross examination during lunch | Will Bucher | 07/29/25 | 3.80 | $970 | $3,686.00 | L420 | 73 | $55.29 |
| 713 | Call with Tina Huang re: exhibits | Will Bucher | 07/29/25 | 0.20 | $970 | $194.00 | L440 | 73 | $2.91 |
| 714 | Meeting with F. Palermo and T. Huang re: exhibit binders and organization | Will Bucher | 07/29/25 | 0.50 | $970 | $485.00 | L440 | 73 | $7.28 |
| 715 | Driving back to accommodations from trial | Will Bucher | 07/29/25 | 0.30 | $970 | $291.00 | E110 | 73 | $4.37 |
| 716 | Attending final merits hearing | Will Bucher | 07/29/25 | 4.00 | $970 | $3,880.00 | L450 | 73 | $58.20 |
| 717 | Videoconference with M. Theiler and R. Muralidharan | Will Bucher | 07/29/25 | 0.50 | $970 | $485.00 | L420 | 73 | $7.28 |
| 718 | Attending final merits hearing | Will Bucher | 07/29/25 | 2.30 | $970 | $2,231.00 | L450 | 73 | $33.47 |
| 719 | Preparing for day's hearing in war room | Will Bucher | 07/29/25 | 0.50 | $970 | $485.00 | L440 | 73 | $7.28 |
| 720 | Call with Phil Cross and T. Matthew re: driving logistics | Will Bucher | 07/29/25 | 0.20 | $970 | $194.00 | L420 | 73 | $2.91 |
| 721 | Driving to hearing location | Will Bucher | 07/29/25 | 0.40 | $970 | $388.00 | E110 | 73 | $5.82 |
| 722 | Received and reviewed emails between Vavle and W confirming witness order for today's hearing | Zachary A. Horn | 07/29/25 | 0.20 | $640 | $128.00 | L440 | 73 | $1.92 |
| 723 | Mcsorley trial | Ariel Thatcher | 07/30/25 | 6.60 | $290 | $1,914.00 | L440 | 72 | $28.32 |
| 724 | Traveling to Trial | Ariel Thatcher | 07/30/25 | 3.93 | $290 | $1,139.70 | E110 | 72 | $16.86 |
| 725 | McSorley arbitration attend remotely and work on rebuttal examination, cross examination and closing points. | Ellen Noteware | 07/30/25 | 7.33 | $1,100 | $8,063.00 | L330 | 72 | $119.29 |
| 726 | work on closing slides | Eliot Kownick | 07/30/25 | 0.95 | $480 | $456.00 | L460 | 72 | $6.75 |
| 727 | work on closing slides, perform legal research related to steam key claims in connection with expert testimony, perform academic research related to economics in connection with expert testimony; call with team re: slides | Eliot Kownick | 07/30/25 | 3.28 | $480 | $1,574.40 | L440 | 72 | $23.29 |
| 728 | work on closing slides | Eliot Kownick | 07/30/25 | 0.58 | $480 | $278.40 | L440 | 72 | $4.12 |
| 729 | work on closing slide deck | Eliot Kownick | 07/30/25 | 0.35 | $480 | $168.00 | L440 | 72 | $2.49 |
| 730 | work on chunk of McCrary cross | Eliot Kownick | 07/30/25 | 2.63 | $480 | $1,262.40 | L420 | 72 | $18.68 |
| 731 | attend trial and provide support including with respect to exhibit location and cross-exam ideas | Erik Aizbach | 07/30/25 | 0.50 | $475 | $237.50 | L450 | 72 | $3.51 |
| 732 | attend trial and provide support including with respect to exhibit location and cross-exam ideas | Erik Aizbach | 07/30/25 | 1.20 | $475 | $570.00 | L450 | 72 | $8.43 |
| 733 | Hearing prep, exhibit organization | Frank Palermo | 07/30/25 | 1.30 | $640 | $832.00 | L440 | 72 | $12.31 |
| 734 | Case discussion and doc review | Frank Palermo | 07/30/25 | 0.50 | $640 | $320.00 | L120 | 72 | $4.73 |
| 735 | Travel for hearing to accommodations | Frank Palermo | 07/30/25 | 1.10 | $640 | $704.00 | E109 | 72 | $10.42 |
| 736 | Travel for hearing | Frank Palermo | 07/30/25 | 0.30 | $640 | $192.00 | E109 | 72 | $2.84 |
| 737 | Hearing | Frank Palermo | 07/30/25 | 7.30 | $640 | $4,672.00 | L450 | 72 | $69.12 |
| 738 | worked on closing slide deck | Isabel Sacnmo | 07/30/25 | 0.50 | $480 | $240.00 | L440 | 72 | $3.55 |
| 739 | work on closing slide deck | Isabel Sacnmo | 07/30/25 | 1.00 | $480 | $480.00 | L440 | 72 | $7.10 |
| 740 | met with Elliot and Judson re closing slide deck | Isabel Sacnmo | 07/30/25 | 0.75 | $480 | $360.00 | L440 | 72 | $5.33 |
| 741 | worked on closing slide deck | Isabel Sacnmo | 07/30/25 | 4.50 | $480 | $2,160.00 | L440 | 72 | $31.96 |
| 742 | Closing Slide Presentation | Judson Crump | 07/30/25 | 4.10 | $525 | $2,152.50 | L450 | 72 | $31.85 |
| 743 | Closing Slide Presentation | Judson Crump | 07/30/25 | 1.17 | $525 | $614.25 | L450 | 72 | $9.09 |
| 744 | Creating Closing Slides; Video Call w/ Isabel & Elliot re: Same | Judson Crump | 07/30/25 | 3.27 | $525 | $1,716.75 | L440 | 72 | $25.40 |
| 745 | McCrary Cross Writing; Ann Technica | Judson Crump | 07/30/25 | 1.55 | $525 | $813.75 | L420 | 72 | $12.04 |
| 746 | ATTEND ARBITRATION & EVALUATE/ANALYZE WITNESS TESTIMONY (6.5); DISCUSS INDUSTRY STRUCTURE WITH CO-COUNSEL (1) REVIEW INDUSTRY DOCUMENTS ANALYZING) AND REPORTING RELEVANT MARKET EVENTS DURING APPLICABLE TIME PERIOD (1.5) | Kent Williams | 07/30/25 | 9 | $1,145 | $10,305.00 | L450 | 72 | $152.46 |
| 747 | Attend arbitration; help with closing preparation | Sherry Yu | 7/30/2025 | 15.20 | $625 | $9,500.00 | L450 | 72 | $140.55 |
| 748 | Attend and conduct hearing before Arbitrator McSorley | Thomas Matthew | 07/30/25 | 7.00 | $640 | $4,480.00 | L450 | 72 | $66.28 |
| 749 | McSorley | Tina Huang | 07/30/25 | 4.00 | $290 | $1,160.00 | L190 | 72 | $17.16 |
| 750 | McSorley | Tina Huang | 07/30/25 | 7.00 | $290 | $2,030.00 | L450 | 72 | $30.03 |
| 751 | Binders | Tina Huang | 07/30/25 | 2.00 | $290 | $580.00 | L440 | 72 | $8.58 |
| 752 | Preparing for cross examination of Dr. McCrary; preparation with T. Matthew, Dr. Cross, and M. Theiler for Dr. Cross' rebuttal testimony; meeting with F. Palermo and T. Huang re: exhibits | Will Bucher | 07/30/25 | 6.50 | | $6,305.00 | L420 | 72 | $93.28 |
| 753 | Call with Kent Williams re: trial strategy | Will Bucher | 07/30/25 | 0.20 | $970 | $194.00 | L440 | 72 | $2.87 |
| 754 | Teleconference with P. Cross and M. Theiler re: data analysis for rebuttal testimony | Will Bucher | 07/30/25 | 0.50 | $970 | $485.00 | L440 | 72 | $7.18 |
| 755 | Driving back to accommodations from trial | Will Bucher | 07/30/25 | 0.30 | $970 | $291.00 | E110 | 72 | $4.31 |
| 756 | Preparing for cross examination during lunch | Will Bucher | 07/30/25 | 4.20 | $970 | $4,074.00 | L450 | 72 | $60.27 |
| 757 | Preparing for Dr. McCrary cross examination during lunch | Will Bucher | 07/30/25 | 0.50 | $970 | $485.00 | L420 | 72 | $7.18 |
| 758 | Attending final merits hearing | Will Bucher | 07/30/25 | 2.50 | $970 | $2,425.00 | L450 | 72 | $35.88 |
| 759 | Preparing for day's hearing in war room | Will Bucher | 07/30/25 | 0.50 | $970 | $485.00 | L440 | 72 | $7.18 |
| 760 | Attending final merits hearing | Will Bucher | 07/30/25 | 0.40 | $970 | $388.00 | E110 | 72 | $5.74 |
| 761 | Received and reviewed email from Valve with Exhibits for cross examination of expert | Zachary A. Horn | 07/30/25 | 0.20 | $640 | $128.00 | L440 | 72 | $1.89 |
| 762 | Trial | Ariel Thatcher | 07/31/25 | 6.59 | $290 | $1,911.10 | L440 | 71 | $27.88 |
| 763 | McSorley arbitration - Prepare for cross examination of Dr. McCreary, closing and rebuttal case and attend arbitration. | Ellen Noteware | 07/31/25 | 6.75 | $1,100 | $7,425.00 | L450 | 71 | $108.32 |
| 764 | attend trial and provide support including with respect to exhibit location and cross-exam ideas | Erik Aizbach | 07/31/25 | 2.70 | $475 | $1,282.50 | L450 | 71 | $18.71 |
| 765 | attend trial and provide support including with respect to exhibit location and cross-exam ideas | Erik Aizbach | 07/31/25 | 2.10 | $475 | $997.50 | L450 | 71 | $14.55 |
| 766 | Travel home from accommodations | Frank Palermo | 07/31/25 | 1.40 | $640 | $896.00 | L460 | 71 | $13.07 |
| 767 | Hearing, clearing out war room, travel to arb location, driving back to accommodations | Frank Palermo | 07/31/25 | 8.30 | $640 | $3,712.00 | E109 | 71 | $54.15 |
| 768 | McSorley Closings | Isabel Sacnmo | 07/31/25 | 2.25 | $480 | $1,080.00 | L450 | 71 | $15.76 |
| 769 | Trial Team Support | Isabel Sacnmo | 07/31/25 | 1.50 | $480 | $720.00 | L450 | 71 | $10.50 |
| 770 | Trial Team Support | Judson Crump | 07/31/25 | 5.50 | $525 | $2,887.50 | L440 | 71 | $42.13 |
| 771 | ATTEND ARBITRATION AND OBSERVE/EVALUATE CLOSING ARGUMENTS | Kent Williams | 07/31/25 | .4 | $1,145 | $4,580.00 | L450 | 71 | $66.82 |
| 772 | Attend arbitration | Sherry Yu | 7/31/2025 | 10.00 | $625 | $6,250.00 | L450 | 71 | $91.19 |
| 773 | Attend and conduct hearing before Arbitrator McSorley | Thomas Matthew | 07/31/25 | 3.00 | $640 | $1,920.00 | L450 | 71 | $28.01 |
| 774 | McSorley | Tina Huang | 07/31/25 | 7.00 | $290 | $2,030.00 | L440 | 71 | $29.62 |
| 775 | Binders | Tina Huang | 07/31/25 | 2.00 | $290 | $580.00 | L440 | 71 | $8.46 |
| 776 | Call with Ellen Noteware re: trial post-mortem and closing briefing | Will Bucher | 07/31/25 | 0.30 | $970 | $291.00 | L460 | 71 | $4.25 |
| 777 | Disassembling Princeton forward operating base; sorting documents to be shredded; debrief with team members | Will Bucher | 07/31/25 | 1.50 | $970 | $1,455.00 | L190 | 71 | $21.23 |
| 778 | Driving back to accommodations from trial | Will Bucher | 07/31/25 | 0.30 | $970 | $291.00 | E110 | 71 | $4.25 |
| 779 | Attending final merits hearing; clearing out war room | Will Bucher | 07/31/25 | 2.30 | $970 | $2,231.00 | L190 | 71 | $32.55 |
| 780 | Preparing for closing argument during lunch | Will Bucher | 07/31/25 | 1.00 | $970 | $970.00 | L450 | 71 | $14.15 |
| 781 | Attending final merits hearing | Will Bucher | 07/31/25 | 2.75 | $970 | $2,667.50 | L450 | 71 | $38.92 |
| 782 | Driving to hearing location | Will Bucher | 07/31/25 | 0.40 | $970 | $388.00 | E110 | 71 | $5.66 |
| 783 | Received and reviewed Valve and Claimants closing demonstratives | Zachary A. Horn | 07/31/25 | 1.00 | $640 | $640.00 | L440 | 71 | $9.34 |
| 784 | review email from Arb re: deadlines | Frank Palermo | 08/01/25 | 0.10 | $640 | $64.00 | L440 | 70 | $0.92 |
| 785 | Received and reviewed email from Arbitrator McSorley setting post-hearing Deadlines | Zachary A. Horn | 08/01/25 | 0.10 | $640 | $64.00 | L460 | 70 | $0.92 |
| 786 | Travel back home from Princeton trial (including travel to and from airport, flight time, and three hour flight delay) | Will Bucher | 08/02/25 | 4.27 | $970 | $4,141.90 | L110 | 69 | $59.64 |
| 787 | Travel back home from Princeton trial | Will Bucher | 08/02/25 | 6.80 | $970 | $6,596.00 | E110 | 69 | $93.52 |
| 788 | Travel | Judson Crump | 08/03/25 | 5.00 | $525 | $2,625.00 | L440 | 68 | $36.68 |
| 789 | Call with Ellen Noteware re: strategy for post-trial briefing | Will Bucher | 08/03/25 | 1.00 | $970 | $970.00 | L460 | 68 | $13.55 |
| 790 | Binders | Tina Huang | 08/04/25 | 1.25 | $290 | $362.50 | L440 | 67 | $4.95 |
| 791 | McSorley arbitration work on post-hearing submissions and exhibits | Ellen Noteware | 08/04/25 | 3.30 | $1,100 | $3,630.00 | L420 | 67 | $49.55 |
| 792 | Gather ITAD data related to recent McSorley trial | Eliot Kownick | 08/04/25 | 0.22 | $480 | $105.60 | L420 | 67 | $1.45 |
| 793 | Document review for final submissions | Frank Palermo | 08/04/25 | 1.10 | $640 | $704.00 | L460 | 67 | $9.69 |
| 794 | Email to Respondent | Frank Palermo | 08/04/25 | 0.20 | $640 | $128.00 | L460 | 67 | $1.76 |
| 795 | Email to Cole re: extension of deadlines | Frank Palermo | 08/04/25 | 0.10 | $640 | $64.00 | L460 | 67 | $0.88 |
| 796 | Case discussion w/ team re: exhibits | Frank Palermo | 08/04/25 | 0.90 | $640 | $576.00 | L460 | 67 | $7.93 |
| 797 | Document dispout | Frank Palermo | 08/04/25 | 1.60 | $640 | $1,024.00 | L440 | 67 | $14.10 |
| 798 | Email to Respondent | Frank Palermo | 08/04/25 | 0.20 | $640 | $128.00 | L460 | 67 | $1.76 |
| 799 | Call w/ Will and Ellen re: Document review for final submissions | Frank Palermo | 08/04/25 | 1.30 | $640 | $832.00 | L460 | 67 | $11.46 |
| 800 | Case discussion | Frank Palermo | 08/04/25 | 0.10 | $640 | $64.00 | L460 | 67 | $0.88 |
| 801 | Document review for final submissions | Frank Palermo | 08/04/25 | 0.10 | $640 | $64.00 | L440 | 67 | $0.88 |
| 802 | Confirm and organize evidence entered during final merits hearing | Sherry Yu | 8/4/2025 | 0.30 | $625 | $187.50 | L440 | 67 | $2.58 |
| 803 | Correspondence with Dr. Cross re: 22 games that hit 50 MM+ for potential discussion in the final merits briefing | Will Bucher | 08/04/25 | 0.40 | $970 | $388.00 | L420 | 67 | $5.34 |
| 804 | Call with Frank Palermo re: exhibit organization | Will Bucher | 08/04/25 | 0.30 | $970 | $291.00 | L420 | 67 | $4.01 |
| 805 | (Second) Teleconference with E. Noteware, F. Palermo, T. Huang, and team re: McSorley Exhibit Organization and Submission | Will Bucher | 08/04/25 | 1.25 | $970 | $1,164.00 | L460 | 67 | $16.53 |
| 806 | Teleconference with E. Noteware, F. Palermo, T. Huang, and team re: McSorley Exhibit Organization and Submission | Will Bucher | 08/04/25 | 1.00 | $970 | $970.00 | L460 | 67 | $13.35 |
| 807 | Call w/ Will re: exhibits | Frank Palermo | 08/05/25 | 0.20 | $640 | $128.00 | L460 | 66 | $1.74 |
| 808 | Correspondence w/ claimant Birnbaum re: reimbursement | Frank Palermo | 08/05/25 | 0.10 | $640 | $64.00 | L460 | 66 | $0.87 |
| 809 | Review emails from Arb and Cole, downloaded and reviewed transcripts of hearing | Frank Palermo | 08/05/25 | 0.30 | $640 | $192.00 | L460 | 66 | $2.60 |
| 810 | School team meeting | Sherry Yu | 4/5/2025 | 0.90 | $625 | $562.50 | L130 | 66 | $7.63 |
| 811 | Call with Ariel Thatcher re: Princeton trial expenses tallying and reimbursement | Will Bucher | 08/05/25 | 0.30 | $970 | $291.00 | L130 | 66 | $3.96 |
| 812 | Call with Frank Palermo re: exhibit organization | Will Bucher | 08/05/25 | 0.20 | $970 | $194.00 | L420 | 66 | $2.64 |
| 813 | Bucher Law PLLC Weekly Meeting | Will Bucher | 08/05/25 | 1.00 | $970 | $970.00 | L120 | 66 | $13.21 |
| 814 | Work on list of issues, exhibits and post-hearing briefing and research re: same | Ellen Noteware | 08/05/25 | 0.75 | $1,100 | $825.00 | L460 | 65 | $11.02 |
| 815 | Work on list of issues, exhibits and post-hearing briefing and research re: same | Ellen Noteware | 08/06/25 | 0.30 | $1,100 | $330.00 | L460 | 65 | $4.40 |
| 816 | Document review for final submissions | Frank Palermo | 08/06/25 | 0.70 | $640 | $448.00 | L460 | 65 | $5.96 |
| 817 | Email to Opp Counsel | Frank Palermo | 08/06/25 | 0.10 | $640 | $64.00 | L460 | 65 | $0.85 |
| 818 | Document review for final submissions | Frank Palermo | 08/06/25 | 0.70 | $640 | $448.00 | L460 | 65 | $5.98 |
| 819 | Document review for final submissions | Frank Palermo | 08/06/25 | 0.10 | $640 | $64.00 | L440 | 65 | $0.85 |
| 820 | Review and value's list of exhibits | Frank Palermo | 08/06/25 | 1.10 | $640 | $704.00 | L460 | 65 | $9.36 |
| 821 | Document review for final submissions | Frank Palermo | 08/06/25 | 1.50 | $640 | $960.00 | L440 | 65 | $12.77 |
| 822 | reviewing and replying to Cole email | Frank Palermo | 08/06/25 | 0.10 | $640 | $64.00 | L460 | 65 | $0.85 |

| # | Description | User | Start Date | Duration (decimal) | Rate | Amount (USD) | ABA Code | Days Since Work | Interest |
|---|---|---|---|---|---|---|---|---|---|
| 823 | Correspondence w/ Will re: exhibit submission | Frank Palermo | 08/06/25 | 0.30 | $640 | $192.00 | L460 | 65 | $2.56 |
| 824 | issues to be tried' doc review & edit; chat w/ team re: same | Frank Palermo | 08/06/25 | 0.83 | $525 | $435.75 | L460 | 65 | $5.82 |
| 825 | Reviewing and revising renewed issues list for Arbitrator McSorley; sending email to tribunal re: the same | Will Bucher | 08/06/25 | 1.60 | $970 | $1,552.00 | L460 | 65 | $20.73 |
| 826 | Calls with E. Noteware re: closing brief drafting | Will Bucher | 08/06/25 | 0.50 | $970 | $485.00 | L460 | 65 | $6.48 |
| 827 | Meetings with E. Noteware, T. Huang, F. Palermo, and E. Atzbach re Exhibit Tracking and Organization; correspondence with opposing counsel re: the same | Will Bucher | 08/06/25 | 3.10 | $970 | $3,007.00 | L460 | 65 | $40.16 |
| 828 | Received and reviewed email exchange between Frank and Valve regarding hearing transcripts | Zachary A. Horn | 08/06/25 | 0.20 | $640 | $128.00 | L460 | 65 | $1.71 |
| 829 | McSorley review transcripts and exhibits and work on post-hearing submissions | Ellen Noteware | 08/07/25 | 2.83 | $1,100 | $3,113.00 | L460 | 64 | $40.94 |
| 830 | Claimant expenses discussion | Frank Palermo | 08/07/25 | 0.20 | $640 | $128.00 | L460 | 64 | $1.68 |
| 831 | reviewing emails re: fee briefing, list of issues | Frank Palermo | 08/07/25 | 0.40 | $640 | $256.00 | L460 | 64 | $3.37 |
| 832 | Te w Ariel re: Receipts | Judson Crump | 08/07/25 | 0.25 | $525 | $131.25 | L460 | 64 | $1.73 |
| 833 | Reviewed email exchange between Will, Vale, and Arbitrator concerning briefing of Attorney Eyes Only issue | Zachary A. Horn | 08/07/25 | 0.20 | $640 | $128.00 | L460 | 64 | $1.68 |
| 834 | Reviewed emails between Frank and Valve concerning transcripts and Exhibit list | Zachary A. Horn | 08/07/25 | 0.20 | $640 | $128.00 | L460 | 64 | $1.68 |
| 835 | Forms and emails | Ariel Thatcher | 08/08/25 | 2.53 | $290 | $733.70 | L130 | 63 | $9.50 |
| 836 | McSorley review transcripts and exhibits and work on post-hearing submissions and research re: same | Ellen Noteware | 08/08/25 | 5.50 | $1,100 | $6,050.00 | L460 | 63 | $78.32 |
| 837 | Review email from Valve re: document submission, document review, submission to arb | Frank Palermo | 08/08/25 | 0.30 | $640 | $192.00 | L460 | 63 | $2.49 |
| 838 | Correspondence w/ team re: document submission, document review | Frank Palermo | 08/08/25 | 1.10 | $640 | $704.00 | L460 | 63 | $9.11 |
| 839 | discussion with Will re: exhibit submission | Frank Palermo | 08/08/25 | 0.20 | $640 | $128.00 | L460 | 63 | $1.66 |
| 840 | Email to Opp Counsel | Frank Palermo | 08/08/25 | 0.10 | $640 | $64.00 | L460 | 63 | $0.83 |
| 841 | Document review for final submissions, email to Valve | Frank Palermo | 08/08/25 | 0.80 | $640 | $512.00 | L460 | 63 | $6.63 |
| 842 | Document review for final submissions | Frank Palermo | 08/08/25 | 0.10 | $640 | $64.00 | L460 | 63 | $0.83 |
| 843 | Document review for final submissions | Frank Palermo | 08/08/25 | 1.70 | $640 | $1,088.00 | L460 | 63 | $14.08 |
| 844 | birenbaum expenses | Isabel Skomro | 08/08/25 | 0.50 | $480 | $240.00 | L440 | 63 | $3.11 |
| 845 | Comparing notes from trial with proposed exhibit list; review of draft correspondence to opposing counsel; telecommunications with F. Palermo re: three missing website-type exhibits and witness emails | Will Bucher | 08/08/25 | 1.30 | $970 | $1,261.00 | L460 | 63 | $16.32 |
| 846 | Virtual meeting and other correspondence with F. Palermo, T. Huang, and E. Noteware re: McSorley Roundup | Ellen Noteware | 08/09/25 | 1.50 | $970 | $1,455.00 | L460 | 63 | $18.84 |
| 847 | Reviewing Arb email re: admitted exhibits/fee app | Frank Palermo | 08/09/25 | 0.10 | $640 | $64.00 | L460 | 62 | $0.82 |
| 848 | Reimbursement | Ariel Thatcher | 08/11/25 | 0.73 | $290 | $211.70 | L130 | 61 | $2.65 |
| 849 | Teleconference with technical support to fix access to exhibit file and draft briefings | Ariel Thatcher | 08/10/25 | 2.40 | $970 | $2,328.00 | L130 | 61 | $29.18 |
| 850 | McSorley review transcripts and exhibits and work on post-hearing submissions and research for trial | Ellen Noteware | 08/11/25 | 3.75 | $1,100 | $4,125.00 | L460 | 60 | $50.06 |
| 851 | attend exhibit meeting | Erik Atzbach | 08/11/25 | 1.00 | $475 | $475.00 | L460 | 60 | $5.86 |
| 852 | Document review of Valve's exhibits for final submissions | Frank Palermo | 08/11/25 | 0.60 | $640 | $384.00 | L460 | 60 | $4.73 |
| 853 | Drafting and emailing to AAA E. Noteware case appearance | Will Bucher | 08/11/25 | 0.50 | $970 | $485.00 | L130 | 60 | $5.98 |
| 854 | Received and reviewed email from Arbitrator McSorley with Post-Hearing Briefing | Zachary A. Horn | 08/11/25 | 0.10 | $640 | $64.00 | L460 | 60 | $0.79 |
| 855 | Reviewed exchange between Valve and Frank re: Disclosure of Exhibit List | Zachary A. Horn | 08/11/25 | 0.10 | $640 | $64.00 | L460 | 60 | $0.79 |
| 856 | Meeting, reimbursements, emails, scheduling, interviewing | Ariel Thatcher | 08/12/25 | 8.10 | $290 | $2,349.00 | L130 | 59 | $28.46 |
| 857 | McSorley review transcripts and exhibits and work on post-hearing submissions | Ellen Noteware | 08/12/25 | 3.75 | $1,100 | $4,125.00 | L460 | 59 | $50.01 |
| 858 | Bucher Law PLLC Weekly Meeting | Will Bucher | 08/12/25 | 0.80 | $970 | $776.00 | L460 | 59 | $9.41 |
| 859 | McSorley review transcripts and exhibits and work on post-hearing submissions | Ellen Noteware | 08/13/25 | 4.50 | $1,100 | $4,950.00 | L460 | 58 | $58.99 |
| 860 | Scanning receipts, organizing reimbursements for hearing, email to Ariel re: same | Frank Palermo | 08/13/25 | 1.00 | $640 | $640.00 | L440 | 58 | $7.63 |
| 861 | Paralegals, reimbursement, email, scheduling | Ariel Thatcher | 08/14/25 | 5.22 | $290 | $1,513.80 | L190 | 57 | $17.73 |
| 862 | Communication w/ client Birenbaum and team re: reimbursement | Frank Palermo | 08/14/25 | 0.30 | $640 | $192.00 | L440 | 57 | $2.25 |
| 863 | Correspondence with M. Thaler re: Newzoo data | Will Bucher | 08/14/25 | 0.40 | $970 | $388.00 | L130 | 57 | $4.54 |
| 864 | Working on final briefing and review of transcripts and exhibits for same | Ellen Noteware | 08/16/25 | 3.33 | $1,100 | $3,663.00 | L460 | 55 | $41.40 |
| 865 | Emails, reimbursement, paralegal apps | Ariel Thatcher | 08/17/25 | 2.04 | $290 | $591.60 | L190 | 54 | $6.56 |
| 866 | Correspondence with A. Thatcher re: expense receipt organization for fee affidavit | Will Bucher | 08/17/25 | 1.10 | $970 | $1,067.00 | L390 | 54 | $11.84 |
| 867 | Work on McSorley closing briefing and review of transcripts for same | Ellen Noteware | 08/18/25 | 3.47 | $1,100 | $3,817.00 | L460 | 53 | $41.57 |
| 868 | Work on closing briefing on McSorley arbitration | Ellen Noteware | 08/19/25 | 3.75 | $1,100 | $4,125.00 | L460 | 52 | $44.08 |
| 869 | Work on closing briefing and fee briefing and research re: McSorley arbitration | Ellen Noteware | 08/20/25 | 4.25 | $1,100 | $4,675.00 | L460 | 51 | $48.99 |
| 870 | Correspondence with D. Slade re: draft paragraph regarding Steam Keys | Will Bucher | 08/20/25 | 0.60 | $970 | $582.00 | L460 | 51 | $6.10 |
| 871 | Correspondence with E. Noteware re: latest draft of final merits briefing | Will Bucher | 08/20/25 | 0.50 | $970 | $485.00 | L460 | 51 | $5.08 |
| 872 | Team meeting re: closing briefings in arbitrations before McSorley, Gaglione, and Coher | Will Bucher | 08/21/25 | 1.00 | $970 | $970.00 | L460 | 50 | $9.97 |
| 873 | Work on closing and fee briefing and research re: same | Ellen Noteware | 08/22/25 | 5.75 | $1,100 | $6,325.00 | L460 | 49 | $63.68 |
| 874 | Review of latest draft of final merits briefing | Will Bucher | 08/22/25 | 1.70 | $970 | $1,649.00 | L460 | 49 | $16.60 |
| 875 | Closing merits work draft fee and cost briefing | Ellen Noteware | 08/23/25 | 3.67 | $1,100 | $4,037.00 | L460 | 48 | $39.82 |
| 876 | Reviewing emails re: post-hearing brief, reviewing draft of same | Frank Palermo | 08/23/25 | 0.50 | $640 | $320.00 | L460 | 48 | $3.16 |
| 877 | Notes, Comments, Suggestions on McSorley Closing Brief | Judson Crump | 08/23/25 | 0.50 | $525 | $262.50 | L460 | 48 | $2.59 |
| 878 | Review and revisions to draft final merits briefing; correspondence with E. Noteware re: the same | Will Bucher | 08/23/25 | 3.75 | $970 | $3,637.50 | L460 | 48 | $35.88 |
| 879 | Work on draft of final merits briefing and research re: same | Ellen Noteware | 08/24/25 | 4.75 | $1,100 | $5,225.00 | L460 | 47 | $50.46 |
| 881 | drafting/editing post-hearing brief | Frank Palermo | 08/24/25 | 1.40 | $640 | $896.00 | L460 | 47 | $8.65 |
| 882 | Discussion with Will re: post-hearing brief | Frank Palermo | 08/24/25 | 0.10 | $640 | $64.00 | L460 | 47 | $0.62 |
| 883 | Reviewing and revising final merits briefing; correspondence with F. Palermo re: citation fills; email to team regarding sections/arguments to add to final merits briefing | Will Bucher | 08/24/25 | 7.70 | $970 | $7,469.00 | L460 | 47 | $72.13 |
| 884 | Work on finalizing briefing and research re: same and confer with co-counsel re: same | Ellen Noteware | 08/25/25 | 4.67 | $1,100 | $5,137.00 | L460 | 46 | $48.56 |
| 885 | drafting/editing post-hearing brief | Frank Palermo | 08/25/25 | 1.00 | $640 | $640.00 | L460 | 46 | $6.05 |
| 886 | drafting/editing post-hearing brief | Frank Palermo | 08/25/25 | 8.00 | $640 | $5,120.00 | L460 | 46 | $48.39 |
| 887 | drafting/editing post-hearing brief | Frank Palermo | 08/25/25 | 1.70 | $640 | $1,088.00 | L460 | 46 | $10.28 |
| 888 | Closing Brief Addition: Valve Denials not credible | Judson Crump | 08/25/25 | 2.33 | $525 | $1,223.25 | L460 | 46 | $11.56 |
| 889 | Reviewing and revising final briefing draft; correspondence with E. Noteware and J. Crump re: same | Will Bucher | 08/25/25 | 2.90 | $970 | $2,813.00 | L460 | 46 | $26.59 |
| 890 | Work on closing brief for McSorley arbitration, review testimony and check cites and exhibits and confer with co-counsel | Ellen Noteware | 08/26/25 | 2.50 | $1,100 | $2,750.00 | L460 | 45 | $25.43 |
| 891 | Work on closing brief for McSorley arbitration, review testimony and check cites and exhibits and confer with co-counsel | Ellen Noteware | 08/26/25 | 4.50 | $1,100 | $4,950.00 | L460 | 45 | $45.77 |
| 892 | Team meeting re: arbitrations | Ellen Noteware | 08/26/25 | 1.00 | $1,100 | $1,100.00 | L460 | 45 | $10.17 |
| 893 | Work on McSorley fee briefing and finalizing briefing and exhibits | Ellen Noteware | 08/26/25 | 4.75 | $1,100 | $5,225.00 | L460 | 45 | $48.31 |
| 894 | Work on McSorley fee and merits briefing, final submission email | Ellen Noteware | 08/26/25 | 0.70 | $640 | $448.00 | L460 | 45 | $5.52 |
| 895 | drafting/editing post-hearing brief | Frank Palermo | 08/26/25 | 1.00 | $640 | $640.00 | L460 | 45 | $5.92 |
| 896 | drafting/editing post-hearing brief | Frank Palermo | 08/26/25 | 6.40 | $640 | $4,096.00 | L460 | 45 | $37.87 |
| 897 | Closing Brief - Finalizing | Judson Crump | 08/26/25 | 6.77 | $525 | $3,554.25 | L460 | 45 | $32.86 |
| 898 | Closing Brief Edits | Judson Crump | 08/26/25 | 1.08 | $525 | $567.00 | L460 | 45 | $5.24 |
| 899 | Reviewing and revising final briefing submission | Will Bucher | 08/26/25 | 4.70 | $970 | $4,559.00 | L460 | 45 | $42.16 |
| 900 | Reviewing Valve's post-hearing brief | Frank Palermo | 08/27/25 | 1.70 | $640 | $1,088.00 | L460 | 44 | $9.84 |
| 901 | email to McSorley re: exhibits for post-hearing brief | Frank Palermo | 08/27/25 | 0.10 | $640 | $64.00 | L460 | 44 | $0.58 |
| 902 | Organizing McSorley exhibits | Frank Palermo | 08/27/25 | 1.60 | $640 | $1,024.00 | L460 | 44 | $9.26 |
| 903 | Received and reviewed email from Frank to tribunal with Post-Hearing Brief | Zachary A. Horn | 08/27/25 | 0.20 | $640 | $128.00 | L460 | 44 | $1.16 |
| 904 | Meeting re: fee affidavit | Frank Palermo | 08/29/25 | 0.50 | $640 | $320.00 | L460 | 42 | $2.16 |
| 906 | Correspondence with F. Palermo and E. Noteware re: fee affidavit | Will Bucher | 08/29/25 | 0.50 | $970 | $485.00 | L460 | 38 | $3.35 |
| 907 | prepare fee submission | Erik Atzbach | 09/02/25 | 2.40 | $475 | $1,140.00 | L460 | 38 | $8.90 |
| 908 | Bucher Law PLLC Weekly Meeting | Will Bucher | 09/02/25 | 0.70 | $970 | $679.00 | L460 | 38 | $5.13 |
| 909 | Correspondence with A. Thatcher, K. Williams, E. Noteware and F. Palermo re: bear event costs calculations and submission | Will Bucher | 09/02/25 | 0.40 | $970 | $388.00 | L460 | 38 | $3.03 |
| 910 | Correspondence with A. Thatcher, E. Noteware and F. Palermo re: fee award costs calculations and submission | Will Bucher | 09/03/25 | 0.82 | $290 | $237.80 | L460 | 37 | $1.81 |
| 911 | Teleconference with P. Clatfelter, E. Noteware, and E. Kovrick re: McSorley Fees and Expenses | Will Bucher | 09/04/25 | 1.00 | $970 | $970.00 | L460 | 36 | $7.18 |
| 913 | Correspondence with P. Clatfelter and F. Palermo re: fee award costs calculations and submission; emailing P. Clatfelter receipts from Princeton arbitration for tallying | Will Bucher | 09/04/25 | 1.40 | $970 | $1,358.00 | L460 | 36 | $9.77 |
| 914 | Work on fee and expense declaration and conversation with W. Bucher re: same | Ellen | 9/7/2025 | 2.5 | $1,100 | $2,750.00 | L460 | 33 | $18.65 |
| 915 | drafting McSorley fee app, organizing/reviewing timesheets, exhibits | Frank Palermo | 09/08/25 | 2.9 | $640 | $1,856.00 | L460 | 32 | $12.20 |
| 916 | Work on fee and expense declaration and review and integrate Goins decision into same; add ABA codes to lodestar spreadsheets | Ellen Noteware | 9/8/2025 | 3 | $1,100 | $3,300.00 | L460 | 32 | $21.70 |
| 917 | Review of draft affidavit; review of Goins fee award and incorporating into affidavit | Will Bucher | 09/08/25 | 2.10 | $970 | $2,037.00 | L460 | 32 | $13.39 |
| 918 | Received and reviewed email from Valve with proposal to Arbitrator McSorley to delay scheduling hearings for remaining claimants until after an Award has been made for Bellewether Claimants | Zachary A. Horn | 09/08/25 | 0.10 | $640 | $64.00 | L460 | 32 | $0.42 |
| 919 | Received and reviewed email from Frank requesting extension for our fee application due to COVID; request granted by Arbitrator McSorley | Zachary A. Horn | 09/08/25 | 0.10 | $640 | $64.00 | L460 | 32 | $0.42 |
| 920 | Received email from Ellen requesting a copy of my CV for fee application; drafted email forwarding response | Zachary A. Horn | 09/08/25 | 0.10 | $640 | $64.00 | L460 | 32 | $0.42 |
| 921 | Received and reviewed email from Ellen to team asking for input re: McSorley documents only hearings | Zachary A. Horn | 09/08/25 | 0.10 | $640 | $64.00 | L460 | 32 | $0.42 |
| 922 | drafting McSorley fee app, organizing/reviewing timesheets, exhibits | Frank Palermo | 09/08/25 | 0.5 | $640 | $320.00 | L460 | 32 | $2.04 |
| 923 | Organizing timesheets excel for fee app | Frank Palermo | 09/09/25 | 0.2 | $640 | $128.00 | L460 | 31 | $0.82 |
| 924 | Call w/ Ellen re: McSorley timesheet | Frank Palermo | 09/09/25 | 0.2 | $640 | $128.00 | L460 | 31 | $0.82 |
| 925 | Call w/ Ellen and Will re: McSorley timesheet | Frank Palermo | 09/09/25 | 0.3 | $640 | $192.00 | L460 | 31 | $1.23 |
| 926 | Work on fee declaration and supporting exhibits | Ellen Noteware | 09/09/25 | 5.2 | $1,100 | $5,720.00 | L460 | 31 | $36.70 |
| 927 | Getting fee affidavit and Excel summary finalized; correspondence with F. Palermo and E. Noteware re: the same: running interest calculations and formulas | Will Bucher | 09/09/25 | 2.40 | $970 | $2,328.00 | L460 | 31 | $14.83 |
| 928 | Received and reviewed email from Arbitrator McSorley re: Final Briefing and Fee Submissions | Zachary A. Horn | 09/09/25 | 0.10 | $640 | $64.00 | L460 | 31 | $0.41 |
| 929 | work on fee application | Erik Atzbach | 09/09/25 | 0.50 | $475 | $237.50 | L460 | 31 | $1.51 |

|  | K | L | M |
|---|---|---|---|
| 1 |  | SUMMARY | |
| 2 | Biller: | Total Duration: | Total Amount: |
| 3 | Will Bucher | 343.18 | $332,884.60 |
| 4 | Frank Palermo | 414.00 | $264,960.00 |
| 5 | Erik Atzbach | 82.40 | $39,140.00 |
| 6 | Judson Crump | 120.05 | $63,026.25 |
| 7 | Zachary A. Horn | 18.78 | $12,019.20 |
| 8 | Tina Huang | 117.75 | $34,147.50 |
| 9 | Elliot Kovnick | 30.52 | $14,649.60 |
| 10 | Thomas Matthew | 124.50 | $79,680.00 |
| 11 | Xinlin Morrow | 2.70 | $2,025.00 |
| 12 | Ellen Noteware | 194.48 | $213,928.00 |
| 13 | Isabel Skomro | 64.50 | $30,960.00 |
| 14 | Anel Thatcher | 43.49 | $12,612.10 |
| 15 | Kent Williams | 102.00 | $116,790.00 |
| 16 | Sherry Yu | 182.30 | $113,937.50 |
| 17 | Totals: | 1843.7 | $1,334,124.75 |
| 18 |  | | |
| 19 | Today's Date | Total Amount: | $1,334,124.75 |
| 20 | 10/10/25 | Total w/ 1.5 Multiplier: | $2,001,187.13 |
| 21 |  | Total Interest: | $29,058.63 |
| 22 |  | Grand Total: | $2,030,245.75 |

# EXHIBIT 13

|   | A | B | C | D |
|---|---|---|---|---|
| 1 | Time | Description | Date | User |
| 2 | 0.70h | Attend weekly team meeting | 6/24/2025 | Sherry Yu |
| 3 | 0.50h | Research Wolfire case | 6/26/2025 | Sherry Yu |
| 4 | 2.10h | Review relevant documents for drafting Izumi cross | 6/26/2025 | Sherry Yu |
| 5 | 1.20h | Review documents and conducting background research re: drafting Izumi cross | 6/27/2025 | Sherry Yu |
| 6 | 0.30h | Discuss trial logistics with Will | 6/30/2025 | Sherry Yu |
| 7 | 0.80h | Attend team call | 7/1/2025 | Sherry Yu |
| 8 | 1.50h | Review documents and draft cross outline for Izumi | 7/2/2025 | Sherry Yu |
| 9 | 7.80h | Review documents and work on Izumi cross | 7/7/2025 | Sherry Yu |
| 10 | 14.40h | Review documents and draft cross outline | 7/8/2025 | Sherry Yu |
| 11 | 0.80h | Call with team re: McSorley logistics | 7/14/2025 | Sherry Yu |
| 12 | 2.00h | Attend team call | 7/15/2025 | Sherry Yu |
| 13 | 0.70h | Call re: McSorley logistics | 7/16/2025 | Sherry Yu |
| 14 | 2.50h | Preparing for McSorley trial | 7/18/2025 | Sherry Yu |
| 15 | 4.50h | Traveling for McSorley trial | 7/19/2025 | Sherry Yu |
| 16 | 2.50h | Discuss strategy and review outline and documents for Tom Giardino cross | 7/20/2025 | Sherry Yu |
| 17 | 12.90h | Preparation for examination of Tom Giardino | 7/20/2025 | Sherry Yu |
| 18 | 14.40h | Preparing for examination of Tom Giardino; attend arbitration | 7/21/2025 | Sherry Yu |
| 19 | 13.40h | Attend arbitration; taking Tom Giardino deposition | 7/22/2025 | Sherry Yu |
| 20 | 15.70h | Attend McSorley arbitration; draft Izumi cross outline and review documents | 7/23/2025 | Sherry Yu |
| 21 | 14.90h | Attend arbitration and draft Izumi outline | 7/24/2025 | Sherry Yu |
| 22 | 1.50h | Draft Izumi outline | 7/25/2025 | Sherry Yu |
| 23 | 6.50h | Revise Izumi outline | 7/26/2025 | Sherry Yu |
| 24 | 12.00h | Preparing for Izumi cross and claimants' direct | 7/27/2025 | Sherry Yu |
| 25 | 10.30h | Attend arbitration and conduct Izumi cross | 7/28/2025 | Sherry Yu |
| 26 | 12.00h | Attend arbitration; help prepping expert cross | 7/29/2025 | Sherry Yu |
| 27 | 15.20h | Attend arbitration; help with closing preparation | 7/30/2025 | Sherry Yu |
| 28 | 10.00h | Attend arbitration | 7/31/2025 | Sherry Yu |
| 29 | 0.30h | Attend call organizing McSorley exhibits | 8/4/2025 | Sherry Yu |
| 30 | 0.90h | Attend team meeting | 8/5/2025 | Sherry Yu |
| 31 | 0.70h | Review Izumi outline; discuss trial examination strategy with S. Yu. | 7/20/2025 | Xinlin Morrow |
| 32 | 0.60h | Correspond with S. Yu re T. Giardino examination; review reply to motion to dismiss a | 7/21/2025 | Xinlin Morrow |
| 33 | 1.40h | Review Izumi outline; correspond with S. Yu re Izumi cross strategy. | 7/24/2025 | Xinlin Morrow |

# EXHIBIT 14

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | 7/17/2025 | DISCUSS WITNESS EXAMINATION OUTLINE PROJECT WITH W. BUCHER (.3); REVIEW AND SUMMARIZE KLAFF TRANSCRIPT (2.6); ATTEMPT TO ACCESS SHAREFILE LINK, EXCHANGE EMAILS REGARDING ACCESS (.3) | 3.2 | 1145 | 3664 | L410 |
| 2 | 7/18/2025 | REVIEW, DIGEST AND DESIGNATE PORTIONS OF A. KLAFF DEPOSITION FOR INCLUSION IN TRIAL WITNESS OUTLINE (2); WORK ON OUTLINE (4) | 6 | 1145 | 6870 | L410 |
| 3 | 7/19/2025 | DIGEST AND DESIGNATE A. KLAFF DEPOSITION (4.5); REVIEW EXHIBITS FOR POTENTIAL INCLUSION IN WITNESS OUTLINE (3); WORK ON TRIAL WITNESS OUTLINE FOR A. KLAFF (12) | 16.5 | 1145 | 18892.5 | L410 |
| 4 | 7/20/2025 | WORK ON OUTLINE FOR A. KLAFF DIRECT/CROSS TESTIMONY | 15 | 1145 | 17175 | L410 |
| 5 | 7/21/2025 | WORK ON WITNESS OUTLINE (6); ATTEND ARBITRATION & ANALYZE/EVALUATE TESTIMONY OF WITNESSES (7) | 13 | 1145 | 14885 | L410 |
| 6 | 7/22/2025 | ATTEND ARBITRATION & ANALYZE/EVALUATE WITNESS TESTIMONY | 7 | 1145 | 8015 | L450 |
| 7 | 7/23/2025 | ATTEND ARBITRATION & ANALYZE/EVALUATE WITNESS TESTIMONY | 6.5 | 1145 | 7442.5 | L450 |
| 8 | 7/24/2025 | ATTEND ARBITRATION & ANALYZE/EVALUATE WITNESS TESTIMONY | 5.5 | 1145 | 6297.5 | L450 |
| 9 | 7/28/2025 | ATTEND ARBITRATION HEARING & ANALYZE WITNESS TESTIMONY (6); REVIEW ARTICLES REGARDING EPIC V APPLE INJUNCTION (.5); REVIEW COURT'S POST-TRIAL OPINION IN EPIC V APPLE REGARDING INJUNCTION (.5); REVIEW EXPERT REPORT (.5) | 7.5 | 1145 | 8587.5 | L450 |
| 10 | 7/29/2025 | ATTEND ARBITRATION & ANALYZE WITNESS TESTIMONY (6.5); DISCUSS SAME WITH W. BUCHER, POTENTIAL RETAINED EXPERTS (1.5); REVIEW EXPERT REPORTS (.4), REVIEW INDUSTRY ARTICLES REGARDING RELEVANT MARKET (.4) | 8.8 | 1145 | 10076 | L450 |
| 11 | 7/30/2025 | ATTEND ARBITRATION & EVALUATE/ANALYZE WITNESS TESTIMONY (6.5); DISCUSS INDUSTRY STRUCTURE WITH CO-COUNSEL (1) REVIEW INDUSTRY DOCUMENTS ANALYZING AND REPORTING RELEVANT MARKET EVENTS DURING APPLICABLE TIME PERIOD (1.5) | 9 | 1145 | 10305 | L450 |
| 12 | 7/31/2025 | ATTEND ARBITRATION AND OBSERVE/EVALUATE CLOSING ARGUMENTS | 4 | 1145 | 4580 | L450 |
| 13 | | | 102.0 | | 116790 | |

# EXHIBIT 15

| | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| 1 | Date | Vendor | Description | Category | Cost | McSorley Allocation | McSorley Allocation Adjusted Costs Sought | Interest |
| 2 | 8/7/2025 | USPS | Mailing Subpoenas | Shipping | $44.00 | 100.00% | $44.00 | $0.31 |
| 3 | 8/8/2025 | UPS | Mail | Shipping | $73.54 | 100.00% | $73.54 | $0.50 |
| 4 | 7/19/2025 | Amazon | iPad Case/Keyboard | Office Supplies | $106.55 | 100.00% | $106.55 | $1.16 |
| 5 | 7/20/2025 | Staples | Printing Documents | Office Supplies | $9.85 | 100.00% | $9.85 | $0.11 |
| 6 | 7/20/2025 | Staples | Printing Documents | Office Supplies | $11.72 | 100.00% | $11.72 | $0.13 |
| 7 | 7/30/2025 | Staples | Printing Documents | Office Supplies | $72.49 | 100.00% | $72.49 | $0.63 |
| 8 | 7/20/2025 | Staples | Office Supplies | Office Supplies | $63.96 | 100.00% | $63.96 | $0.68 |
| 9 | 7/21/2025 | Walmart | Office Supplies | Office Supplies | $78.39 | 100.00% | $78.39 | $0.82 |
| 10 | 7/21/2025 | Staples | Office Supplies | Office Supplies | $118.85 | 100.00% | $118.85 | $1.25 |
| 11 | 7/22/2025 | Staples | Office Supplies | Office Supplies | $106.58 | 100.00% | $106.58 | $1.10 |
| 12 | 7/27/2025 | Staples | Office Supplies | Office Supplies | $224.31 | 100.00% | $224.31 | $2.07 |
| 13 | 7/30/2025 | Staples | Office Supplies | Office Supplies | $48.25 | 100.00% | $48.25 | $0.42 |
| 14 | | Staples | Printing Documents | Office Supplies | $92.24 | 100.00% | $92.24 | |
| 15 | 7/16/2025 | United | Plane Ticket (7/19/25) | Transportation | $226.69 | 100.00% | $226.69 | $2.61 |
| 16 | 7/18/2025 | NJ Transit | Train Ticket | Transportation | $18.95 | 100.00% | $18.95 | $0.21 |
| 17 | 7/19/2025 | United | Baggage Fee | Transportation | $40.00 | 100.00% | $40.00 | $0.44 |
| 18 | 7/19/2025 | Uber | Ride-Booking Service | Transportation | $34.24 | 100.00% | $34.24 | $0.37 |
| 19 | 7/20/2025 | Delta | Plane Ticket | Transportation | $256.96 | 100.00% | $256.96 | $2.75 |
| 20 | 7/21/2025 | Uber | Ride-Booking Service | Transportation | $14.97 | 100.00% | $14.97 | $0.16 |
| 21 | 7/24/2025 | Uber | Ride-Booking Service | Transportation | $60.70 | 100.00% | $60.70 | $0.60 |
| 22 | 7/24/2025 | Expedia/Delta | Plane Ticket | Transportation | $628.67 | 100.00% | $628.67 | $6.20 |
| 23 | 7/26/2025 | Lyft | Ride-Booking Service | Transportation | $87.56 | 100.00% | $87.56 | $0.83 |
| 24 | 7/26/2025 | Vamoose Bus | Bus Reservation | Transportation | $67.00 | 100.00% | $67.00 | $0.63 |
| 25 | 7/27/2025 | NJ Transit | Train Ticket | Transportation | $18.95 | 100.00% | $18.95 | $0.18 |
| 26 | 7/27/2025 | JetBlue | Plane Ticket | Transportation | $263.30 | 100.00% | $263.30 | $2.43 |
| 27 | 7/30/2025 | Lyft | Ride-Booking Service | Transportation | $2.74 | 100.00% | $2.74 | $0.02 |
| 28 | 8/1/2025 | NJ Transit | Train Ticket | Transportation | $18.95 | 100.00% | $18.95 | $0.16 |
| 29 | 8/2/2025 | Uber | Ride-Booking Service | Transportation | $95.72 | 100.00% | $95.72 | $0.77 |
| 30 | 8/2/2025 | Lyft | Ride-Booking Service | Transportation | $18.05 | 100.00% | $18.05 | $0.14 |
| 31 | 8/2/2025 | Lyft | Ride-Booking Service | Transportation | $52.79 | 100.00% | $52.79 | $0.42 |
| 32 | 8/3/2025 | Pensacola International Airport | Parking | Transportation | $81.00 | 100.00% | $81.00 | $0.63 |
| 33 | 8/4/2025 | Lyft | Ride-Booking Service | Transportation | $45.32 | 100.00% | $45.32 | $0.34 |
| 34 | | Uber | Ride-Booking Service | Transportation | $12.76 | 100.00% | $12.76 | |
| 35 | | Uber | Ride-Booking Service | Transportation | $55.57 | 100.00% | $55.57 | |
| 36 | | | Gas & Tolls | Transportation | $31.00 | 100.00% | $31.00 | |
| 37 | | | Frank's Mileage | Transportation | $242.52 | 100.00% | $242.52 | |
| 38 | 7/19/2025 | AirBnB | Lodging (1 night) | Lodging | $778.98 | 100.00% | $778.98 | $8.48 |
| 39 | 7/20/2025 | AirBnB | Lodging (12 nights) | Lodging | $11,342.62 | 100.00% | $11,342.62 | $121.20 |
| 40 | 7/19/2025 | DoorDash | Meal | Meal | $68.71 | 100.00% | $68.71 | $0.75 |
| 41 | 7/20/2025 | DoorDash | Meal | Meal | $121.81 | 100.00% | $121.81 | $1.30 |
| 42 | 7/21/2025 | DoorDash | Meal | Meal | $152.67 | 100.00% | $152.67 | $1.60 |
| 43 | 7/22/2025 | Chipotle | Meal | Meal | $10.29 | 100.00% | $10.29 | $0.11 |
| 44 | 7/25/2025 | DoorDash | Meal | Meal | $119.66 | 100.00% | $119.66 | $1.16 |
| 45 | 7/26/2025 | DoorDash | Meal | Meal | $54.28 | 100.00% | $54.28 | $0.51 |
| 46 | 7/27/2025 | DoorDash | Meal | Meal | $92.79 | 100.00% | $92.79 | $0.86 |
| 47 | 7/28/2025 | UberEats | Meal | Meal | $133.68 | 100.00% | $133.68 | $1.21 |
| 48 | 7/28/2025 | DoorDash | Meal | Meal | $62.52 | 100.00% | $62.52 | $0.57 |
| 49 | 7/30/2025 | DoorDash | Meal | Meal | $53.85 | 100.00% | $53.85 | $0.46 |
| 50 | 7/30/2025 | DoorDash | Meal | Meal | $98.38 | 100.00% | $98.38 | $0.85 |
| 51 | 7/30/2025 | Perish Indian Grill | Meal | Meal | $47.86 | 100.00% | $47.86 | $0.41 |
| 52 | 7/31/2025 | Harvest Restaurants | Meal | Meal | $74.70 | 100.00% | $74.70 | $0.63 |
| 53 | 7/31/2025 | Dvaraka Indian Resturant | Meal | Meal | $86.33 | 100.00% | $86.33 | $0.73 |
| 54 | 7/31/2025 | Harvest Restaurants | Meal | Meal | $212.29 | 100.00% | $212.29 | $1.79 |

| | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| 55 | 8/1/2025 | UberEats | Meal | Meal | $46.92 | 100.00% | $46.92 | $0.39 |
| 56 | 8/2/2025 | Denino's | Meal | Meal | $75.01 | 100.00% | $75.01 | $0.60 |
| 57 | 7/19/2025 | McCaffrey's Food Market | Groceries | Groceries | $289.40 | 100.00% | $289.40 | $3.15 |
| 58 | 7/20/2025 | McCaffrey's Food Market | Groceries | Groceries | $230.99 | 100.00% | $230.99 | $2.47 |
| 59 | 7/21/2025 | Walgreens | Groceries | Groceries | $20.79 | 100.00% | $20.79 | $0.22 |
| 60 | 7/21/2025 | Walgreens | Groceries | Groceries | $10.98 | 100.00% | $10.98 | $0.12 |
| 61 | 7/25/2025 | McCaffrey's Food Market | Groceries | Groceries | $185.00 | 100.00% | $185.00 | $1.79 |
| 62 | 7/25/2025 | Walgreens | Groceries | Groceries | $9.34 | 100.00% | $9.34 | $0.09 |
| 63 | 7/26/2025 | Walgreens | Groceries | Groceries | $9.99 | 100.00% | $9.99 | $0.09 |
| 64 | 7/26/2025 | Walgreens | Groceries | Groceries | $12.49 | 100.00% | $12.49 | $0.12 |
| 65 | 7/26/2025 | McCaffrey's Food Market | Groceries | Groceries | $11.69 | 100.00% | $11.69 | $0.11 |
| 66 | 7/27/2025 | Whole Foods | Groceries | Groceries | $43.68 | 100.00% | $43.68 | $0.40 |
| 67 | 7/29/2025 | Whole Foods | Groceries | Groceries | $44.35 | 100.00% | $44.35 | $0.39 |
| 68 | 7/29/2025 | ShopRite | Groceries | Groceries | $42.63 | 100.00% | $42.63 | $0.38 |
| 69 | 5/1/2025 | Fideres | General Work | Consultation Services | $455.00 | 100.00% | $455.00 | $12.34 |
| 70 | 5/1/2025 | Fideres | General Work | Consultation Services | $325.00 | 100.00% | $325.00 | $8.82 |
| 71 | 5/1/2025 | Fideres | General Work | Consultation Services | $975.00 | 100.00% | $975.00 | $26.45 |
| 72 | 5/1/2025 | Fideres | General Work | Consultation Services | $910.00 | 100.00% | $910.00 | $24.68 |
| 73 | 5/1/2025 | Fideres | General Work | Consultation Services | $910.00 | 100.00% | $910.00 | $24.68 |
| 74 | 5/1/2025 | Fideres | General Work | Consultation Services | $260.00 | 100.00% | $260.00 | $7.05 |
| 75 | 5/2/2025 | Fideres | General Work | Consultation Services | $780.00 | 100.00% | $780.00 | $21.00 |
| 76 | 5/2/2025 | Fideres | General Work | Consultation Services | $715.00 | 100.00% | $715.00 | $19.25 |
| 77 | 5/6/2025 | Fideres | General Work | Consultation Services | $520.00 | 100.00% | $520.00 | $13.57 |
| 78 | 5/6/2025 | Fideres | General Work | Consultation Services | $325.00 | 100.00% | $325.00 | $8.48 |
| 79 | 5/6/2025 | Fideres | General Work | Consultation Services | $845.00 | 100.00% | $845.00 | $22.05 |
| 80 | 5/8/2025 | Fideres | General Work | Consultation Services | $1,350.00 | 100.00% | $1,350.00 | $34.67 |
| 81 | 5/9/2025 | Fideres | General Work | Consultation Services | $1,560.00 | 100.00% | $1,560.00 | $39.75 |
| 82 | 5/9/2025 | Fideres | General Work | Consultation Services | $375.00 | 100.00% | $375.00 | $9.55 |
| 83 | 5/9/2025 | Fideres | General Work | Consultation Services | $375.00 | 100.00% | $375.00 | $9.55 |
| 84 | 5/9/2025 | Fideres | General Work | Consultation Services | $750.00 | 100.00% | $750.00 | $19.11 |
| 85 | 5/12/2025 | Fideres | General Work | Consultation Services | $130.00 | 100.00% | $130.00 | $3.23 |
| 86 | 5/12/2025 | Fideres | General Work | Consultation Services | $390.00 | 100.00% | $390.00 | $9.70 |
| 87 | 5/12/2025 | Fideres | General Work | Consultation Services | $390.00 | 100.00% | $390.00 | $9.70 |
| 88 | 5/12/2025 | Fideres | General Work | Consultation Services | $65.00 | 100.00% | $65.00 | $1.62 |
| 89 | 5/12/2025 | Fideres | General Work | Consultation Services | $1,040.00 | 100.00% | $1,040.00 | $25.86 |
| 90 | 5/12/2025 | Fideres | General Work | Consultation Services | $975.00 | 100.00% | $975.00 | $24.24 |
| 91 | 5/13/2025 | Fideres | General Work | Consultation Services | $1,430.00 | 100.00% | $1,430.00 | $35.26 |
| 92 | 5/13/2025 | Fideres | General Work | Consultation Services | $715.00 | 100.00% | $715.00 | $17.63 |
| 93 | 5/14/2025 | Fideres | General Work | Consultation Services | $1,105.00 | 100.00% | $1,105.00 | $27.02 |
| 94 | 5/14/2025 | Fideres | General Work | Consultation Services | $455.00 | 100.00% | $455.00 | $11.13 |
| 95 | 5/14/2025 | Fideres | General Work | Consultation Services | $195.00 | 100.00% | $195.00 | $4.77 |
| 96 | 5/14/2025 | Fideres | General Work | Consultation Services | $325.00 | 100.00% | $325.00 | $7.95 |
| 97 | 5/14/2025 | Fideres | General Work | Consultation Services | $845.00 | 100.00% | $845.00 | $20.66 |
| 98 | 5/15/2025 | Fideres | General Work | Consultation Services | $260.00 | 100.00% | $260.00 | $6.30 |
| 99 | 5/19/2025 | Fideres | General Work | Consultation Services | $520.00 | 100.00% | $520.00 | $12.18 |
| 100 | 5/19/2025 | Fideres | General Work | Consultation Services | $675.00 | 100.00% | $675.00 | $15.81 |
| 101 | 5/19/2025 | Fideres | General Work | Consultation Services | $780.00 | 100.00% | $780.00 | $18.27 |
| 102 | 5/19/2025 | Fideres | General Work | Consultation Services | $1,125.00 | 100.00% | $1,125.00 | $26.35 |
| 103 | 5/20/2025 | Fideres | General Work | Consultation Services | $1,105.00 | 100.00% | $1,105.00 | $25.66 |
| 104 | 5/20/2025 | Fideres | General Work | Consultation Services | $325.00 | 100.00% | $325.00 | $7.55 |
| 105 | 5/20/2025 | Fideres | General Work | Consultation Services | $1,350.00 | 100.00% | $1,350.00 | $31.35 |
| 106 | 5/21/2025 | Fideres | General Work | Consultation Services | $1,170.00 | 100.00% | $1,170.00 | $26.93 |
| 107 | 5/21/2025 | Fideres | General Work | Consultation Services | $975.00 | 100.00% | $975.00 | $22.44 |
| 108 | 5/21/2025 | Fideres | General Work | Consultation Services | $975.00 | 100.00% | $975.00 | $22.44 |

| | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| 109 | 5/21/2025 | Fideres | General Work | Consultation Services | $455.00 | 100.00% | $455.00 | $10.47 |
| 110 | 5/27/2025 | Fideres | General Work | Consultation Services | $975.00 | 100.00% | $975.00 | $21.24 |
| 111 | 5/27/2025 | Fideres | General Work | Consultation Services | $300.00 | 100.00% | $300.00 | $6.53 |
| 112 | 5/27/2025 | Fideres | General Work | Consultation Services | $650.00 | 100.00% | $650.00 | $14.16 |
| 113 | 5/27/2025 | Fideres | General Work | Consultation Services | $750.00 | 100.00% | $750.00 | $16.34 |
| 114 | 5/28/2025 | Fideres | General Work | Consultation Services | $375.00 | 100.00% | $375.00 | $8.09 |
| 115 | 5/28/2025 | Fideres | General Work | Consultation Services | $1,625.00 | 100.00% | $1,625.00 | $35.06 |
| 116 | 5/28/2025 | Fideres | General Work | Consultation Services | $600.00 | 100.00% | $600.00 | $12.95 |
| 117 | 5/28/2025 | Fideres | General Work | Consultation Services | $845.00 | 100.00% | $845.00 | $18.23 |
| 118 | 5/28/2025 | Fideres | General Work | Consultation Services | $375.00 | 100.00% | $375.00 | $8.09 |
| 119 | 5/28/2025 | Fideres | General Work | Consultation Services | $130.00 | 100.00% | $130.00 | $2.80 |
| 120 | 5/28/2025 | Fideres | General Work | Consultation Services | $1,625.00 | 100.00% | $1,625.00 | $35.06 |
| 121 | 5/28/2025 | Fideres | General Work | Consultation Services | $375.00 | 100.00% | $375.00 | $8.09 |
| 122 | 5/29/2025 | Fideres | General Work | Consultation Services | $600.00 | 100.00% | $600.00 | $12.82 |
| 123 | 5/29/2025 | Fideres | General Work | Consultation Services | $975.00 | 100.00% | $975.00 | $20.84 |
| 124 | 5/29/2025 | Fideres | General Work | Consultation Services | $1,125.00 | 100.00% | $1,125.00 | $24.04 |
| 125 | 5/29/2025 | Fideres | General Work | Consultation Services | $975.00 | 100.00% | $975.00 | $20.84 |
| 126 | 5/29/2025 | Fideres | General Work | Consultation Services | $845.00 | 100.00% | $845.00 | $18.06 |
| 127 | 5/29/2025 | Fideres | General Work | Consultation Services | $1,050.00 | 100.00% | $1,050.00 | $22.44 |
| 128 | 5/29/2025 | Fideres | General Work | Consultation Services | $585.00 | 100.00% | $585.00 | $12.50 |
| 129 | 5/29/2025 | Fideres | General Work | Consultation Services | $650.00 | 100.00% | $650.00 | $13.89 |
| 130 | 5/30/2025 | Fideres | General Work | Consultation Services | $1,125.00 | 100.00% | $1,125.00 | $23.81 |
| 131 | 5/30/2025 | Fideres | General Work | Consultation Services | $1,170.00 | 100.00% | $1,170.00 | $24.76 |
| 132 | 5/30/2025 | Fideres | General Work | Consultation Services | $780.00 | 100.00% | $780.00 | $16.51 |
| 133 | 5/30/2025 | Fideres | General Work | Consultation Services | $650.00 | 100.00% | $650.00 | $13.76 |
| 134 | 6/9/2025 | Fideres | General Work | Consultation Services | $390.00 | 100.00% | $390.00 | $7.45 |
| 135 | 6/9/2025 | Fideres | General Work | Consultation Services | $600.00 | 100.00% | $600.00 | $11.47 |
| 136 | 6/9/2025 | Fideres | General Work | Consultation Services | $600.00 | 100.00% | $600.00 | $11.47 |
| 137 | 6/13/2025 | Fideres | General Work | Consultation Services | $975.00 | 100.00% | $975.00 | $17.83 |
| 138 | 6/13/2025 | Fideres | General Work | Consultation Services | $600.00 | 100.00% | $600.00 | $10.97 |
| 139 | 6/19/2025 | Fideres | General Work | Consultation Services | $375.00 | 100.00% | $375.00 | $6.40 |
| 140 | 6/19/2025 | Fideres | General Work | Consultation Services | $325.00 | 100.00% | $325.00 | $5.54 |
| 141 | 6/19/2025 | Fideres | General Work | Consultation Services | $375.00 | 100.00% | $375.00 | $6.40 |
| 142 | 6/11/2025 | Fideres | McSorley Testimony | Consultation Services | $260.00 | 100.00% | $260.00 | $4.86 |
| 143 | 6/12/2025 | Fideres | McSorley Testimony | Consultation Services | $750.00 | 100.00% | $750.00 | $13.87 |
| 144 | 6/13/2025 | Fideres | McSorley Testimony | Consultation Services | $520.00 | 100.00% | $520.00 | $9.51 |
| 145 | 6/19/2025 | Fideres | McSorley Testimony | Consultation Services | $780.00 | 100.00% | $780.00 | $13.30 |
| 146 | 6/19/2025 | Fideres | McSorley Testimony | Consultation Services | $910.00 | 100.00% | $910.00 | $15.52 |
| 147 | 6/20/2025 | Fideres | McSorley Testimony | Consultation Services | $260.00 | 100.00% | $260.00 | $4.38 |
| 148 | 6/23/2025 | Fideres | McSorley Testimony | Consultation Services | $1,350.00 | 100.00% | $1,350.00 | $21.91 |
| 149 | 6/23/2025 | Fideres | McSorley Testimony | Consultation Services | $195.00 | 100.00% | $195.00 | $3.17 |
| 150 | 6/23/2025 | Fideres | McSorley Testimony | Consultation Services | $195.00 | 100.00% | $195.00 | $3.17 |
| 151 | 6/23/2025 | Fideres | McSorley Testimony | Consultation Services | $1,300.00 | 100.00% | $1,300.00 | $21.10 |
| 152 | 6/23/2025 | Fideres | McSorley Testimony | Consultation Services | $1,125.00 | 100.00% | $1,125.00 | $18.26 |
| 153 | 6/23/2025 | Fideres | McSorley Testimony | Consultation Services | $195.00 | 100.00% | $195.00 | $3.17 |
| 154 | 6/23/2025 | Fideres | McSorley Testimony | Consultation Services | $260.00 | 100.00% | $260.00 | $4.22 |
| 155 | 6/23/2025 | Fideres | McSorley Testimony | Consultation Services | $390.00 | 100.00% | $390.00 | $6.33 |
| 156 | 6/23/2025 | Fideres | McSorley Testimony | Consultation Services | $600.00 | 100.00% | $600.00 | $9.74 |
| 157 | 6/23/2025 | Fideres | McSorley Testimony | Consultation Services | $2,665.00 | 100.00% | $2,665.00 | $43.26 |
| 158 | 6/23/2025 | Fideres | McSorley Testimony | Consultation Services | $2,550.00 | 100.00% | $2,550.00 | $41.39 |
| 159 | 6/24/2025 | Fideres | McSorley Testimony | Consultation Services | $975.00 | 100.00% | $975.00 | $15.63 |
| 160 | 6/24/2025 | Fideres | McSorley Testimony | Consultation Services | $650.00 | 100.00% | $650.00 | $10.42 |
| 161 | 6/24/2025 | Fideres | McSorley Testimony | Consultation Services | $195.00 | 100.00% | $195.00 | $3.13 |
| 162 | 6/24/2025 | Fideres | McSorley Testimony | Consultation Services | $845.00 | 100.00% | $845.00 | $13.54 |

| | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| 163 | 7/17/2025 | Fideres | General Work | Consultation Services | $585.00 | 100.00% | $585.00 | $6.61 |
| 164 | 7/17/2025 | Fideres | General Work | Consultation Services | $750.00 | 100.00% | $750.00 | $8.48 |
| 165 | 7/18/2025 | Fideres | General Work | Consultation Services | $225.00 | 100.00% | $225.00 | $2.50 |
| 166 | 7/18/2025 | Fideres | General Work | Consultation Services | $845.00 | 100.00% | $845.00 | $9.38 |
| 167 | 7/21/2025 | Fideres | General Work | Consultation Services | $65.00 | 100.00% | $65.00 | $0.68 |
| 168 | 7/23/2025 | Fideres | General Work | Consultation Services | $975.00 | 100.00% | $975.00 | $9.82 |
| 169 | 7/23/2025 | Fideres | General Work | Consultation Services | $520.00 | 100.00% | $520.00 | $5.24 |
| 170 | 7/23/2025 | Fideres | General Work | Consultation Services | $715.00 | 100.00% | $715.00 | $7.20 |
| 171 | 7/29/2025 | Fideres | General Work | Consultation Services | $75.00 | 100.00% | $75.00 | $0.66 |
| 172 | 7/29/2025 | Fideres | McSorley Testimony | Consultation Services | $325.00 | 100.00% | $325.00 | $2.87 |
| 173 | 7/29/2025 | Fideres | McSorley Testimony | Consultation Services | $195.00 | 100.00% | $195.00 | $1.72 |
| 174 | 7/29/2025 | Fideres | McSorley Testimony | Consultation Services | $910.00 | 100.00% | $910.00 | $8.04 |
| 175 | 7/29/2025 | Fideres | McSorley Testimony | Consultation Services | $910.00 | 100.00% | $910.00 | $8.04 |
| 176 | 7/30/2025 | Fideres | McSorley Testimony | Consultation Services | $375.00 | 100.00% | $375.00 | $3.24 |
| 177 | 7/30/2025 | Fideres | McSorley Testimony | Consultation Services | $1,105.00 | 100.00% | $1,105.00 | $9.54 |
| 178 | 7/30/2025 | Fideres | McSorley Testimony | Consultation Services | $650.00 | 100.00% | $650.00 | $5.61 |
| 179 | 7/30/2025 | Fideres | McSorley Testimony | Consultation Services | $375.00 | 100.00% | $375.00 | $3.24 |
| 180 | 7/30/2025 | Fideres | McSorley Testimony | Consultation Services | $1,105.00 | 100.00% | $1,105.00 | $9.54 |
| 181 | 7/30/2025 | Fideres | McSorley Testimony | Consultation Services | $975.00 | 100.00% | $975.00 | $8.41 |
| 182 | 7/30/2025 | Fideres | McSorley Testimony | Consultation Services | $300.00 | 100.00% | $300.00 | $2.59 |
| 183 | 8/2/2025 | Kenyon Consulting | Consulting Fees | Consultation Services | $63,370.00 | 100.00% | $63,370.00 | $507.83 |
| 184 | 12/8/2023 | American Arbitration Associatio | Initial Filling Fee | AAA Fees | $125.00 | 100.00% | $125.00 | $16.49 |
| 185 | | | | | | | | |
| 186 | | | | | | Shipping & Office Supplies | $1,050.73 | |
| 187 | | | | | | Transporation & Lodging | $14,496.01 | |
| 188 | | | | | | Meals & Groceries | $2,423.08 | |
| 189 | | | | | | Consultation Services | $144,920.00 | |
| 190 | | | Interest Rate | Date: | | AAA Fees | $125.00 | |
| 191 | | | | 7.50% 09/10/2025 | | Interest Expense | $2,313.47 | |
| 192 | | | | | | Total | $162,889.82 | |
| 193 | | | | | | | | |

# EXHIBIT 16



William Bucher                                                              August 2, 2025
Bucher Law PLLC
350 Northern Blvd | Suite 324-1519
Albany, NY 12204-1000
(202) 997-3029
will@bucherlawfirm.com

Invoice # 250802
Re: Birenbaum v. Valve and Vincente v. Valve arbitrations
Client # 2503                                    Employer ID Number: 83-4601071

For Professional Services: May 23, 2025, through July 31, 2025.

| Current Charges: | Hours | Rate/hr | Amount |
|---|---|---|---|
| Philip Cross | 103.7 | $550 | $57,035.00 |
| Adam Baime | 118.2 | $50 | $5,910.00 |
| Gabe Octovio | 8.5 | $50 | $425.00 |
| **Total Hours & Billings** | **230.4** | | **$63,370.00** |
| Expenses | | | $0.00 |
| **Total Amount Due** | | | **$63,370.00** |

Please reference the invoice # noted above on any payment remittance. Thank you.

**Send check remittance to:**              **If remitting electronically:**
Kenyon Consulting LLC
430 S Davis Dr
Purcellville, VA 20132



Invoice # 250802

Re: Birenbaum v. Valve and Vincente v. Valve arbitrations

Client # 2503

| | Date | Consultant | Description of Services | Hours |
|---|---|---|---|---|
| Fri | 5/23/2025 | PC | Testimony prep | 2.0 |
| Sat | 5/24/2025 | PC | Testimony prep | 3.2 |
| Sun | 6/8/2025 | PC | Testimony prep | 5.5 |
| Mon | 6/9/2025 | PC | Draft expert report | 2.5 |
| Mon | 6/9/2025 | AB | Compile Steam dataset in Stata | 5.5 |
| Wed | 6/11/2025 | AB | Convert R scripts to Stata code | 6.0 |
| Wed | 6/11/2025 | PC | Convert R scripts to Stata code | 4.5 |
| Thu | 6/12/2025 | AB | Convert R scripts to Stata code | 9.5 |
| Fri | 6/13/2025 | AB | Convert R scripts to Stata code | 8.0 |
| Sat | 6/14/2025 | AB | Data cleaning and checking | 3.0 |
| Thu | 6/19/2025 | AB | ITAD and Steam data compilation | 7.0 |
| Fri | 6/20/2025 | AB | ITAD and Steam transaction crosswalk | 12.5 |
| Fri | 6/20/2025 | PC | ITAD and Steam transaction crosswalk | 8.0 |
| Sat | 6/21/2025 | AB | ITAD and Steam transaction crosswalk | 6.3 |
| Sat | 6/21/2025 | PC | ITAD and Steam transaction crosswalk | 1.5 |
| Mon | 6/23/2025 | AB | Ogranize Steam production data in SQL | 13.5 |
| Tue | 7/1/2025 | AB | Import Valve data from Snowflake | 8.8 |
| Tue | 7/1/2025 | PC | Import Valve data from Snowflake | 6.0 |
| Sun | 7/6/2025 | AB | Slides for Valve direct testimony | 5.0 |
| Thu | 7/10/2025 | AB | Import Valve data from Snowflake | 1.0 |
| Fri | 7/11/2025 | AB | Import Valve data from Snowflake | 8.8 |
| Fri | 7/11/2025 | PC | Import Valve data from Snowflake | 4.0 |
| Wed | 7/16/2025 | AB | Slides for Valve direct testimony | 3.5 |
| Thu | 7/17/2025 | PC | Video conference call with Bucher Law & Fideres | 0.5 |
| Thu | 7/17/2025 | AB | Slides for Valve direct testimony | 4.0 |
| Fri | 7/18/2025 | AB | Slides for Valve direct testimony | 1.0 |
| Fri | 7/18/2025 | PC | Testimony prep | 3.5 |
| Thu | 7/24/2025 | PC | Testimony prep | 2.5 |
| Fri | 7/25/2025 | PC | Testimony prep | 8.0 |
| Sat | 7/26/2025 | AB | Slides for Valve direct testimony | 1.3 |
| Sat | 7/26/2025 | PC | Testimony prep | 10.5 |
| Sun | 7/27/2025 | AB | Slides for Valve direct testimony | 1.5 |
| Sun | 7/27/2025 | GO | Slides for Valve direct testimony | 2.0 |
| Sun | 7/27/2025 | PC | Testimony prep | 8.0 |
| Mon | 7/28/2025 | PC | Testimony prep | 8.0 |
| Tue | 7/29/2025 | PC | Arbitration testimony; testimony prep | 9.0 |
| Wed | 7/30/2025 | GO | Valve rebuttal slides | 6.5 |
| Wed | 7/30/2025 | AB | Valve rebuttal slides | 11.8 |
| Wed | 7/30/2025 | PC | Arbitration testimony; testimony prep; listen to other testimony | 12.0 |
| Thu | 7/31/2025 | AB | Valve rebuttal slides | 0.3 |
| Thu | 7/31/2025 | PC | Arbitration testimony; testimony prep; listen to other testimony | 4.5 |
| | | | **Total** | 230.4 |

# INVOICE – Detailed Breakdown



## DETAILED INTERIM REPORT FOR BL/2025-03 – VALVE ARBITRATION

| Date | Fee Earner | Position | Workstream | Task | Time | USD Amount |
|---|---|---|---|---|---|---|
| 01-May-25 | Antonio Neto | | General Work | Adapt Boik and Corts model to Transaction data | 0.70 | $455.00 |
| 01-May-25 | Antonio Neto | | General Work | Adapt Boik and Corts model to Transaction data | 0.50 | $325.00 |
| 01-May-25 | Max Theiler | | General Work | Boik and Corts implementation | 1.30 | $975.00 |
| 01-May-25 | Antonio Neto | | General Work | Adapt Boik and Corts model to Transaction data | 1.40 | $910.00 |
| 01-May-25 | Antonio Neto | Director | General Work | Adapt Boik and Corts model to Transaction data | 1.40 | $910.00 |
| 01-May-25 | Antonio Neto | | General Work | Adapt Boik and Corts model to Transaction data | 0.40 | $260.00 |
| 02-May-25 | Antonio Neto | | General Work | Adapt Boik and Corts model to Transaction data | 1.20 | $780.00 |
| 02-May-25 | Antonio Neto | | General Work | Adapt Boik and Corts model to Transaction data | 1.10 | $715.00 |
| 06-May-25 | Antonio Neto | | General Work | Adapt Boik and Corts model to Transaction data | 0.80 | $520.00 |
| 06-May-25 | | | General Work | Steam Transaction data check | 0.50 | $325.00 |
| 06-May-25 | Antonio Neto | | General Work | Adapt Boik and Corts model to Transaction data | 1.30 | $845.00 |
| 08-May-25 | Max Theiler | | General Work | Graphics summarizing transaction pricing data | 1.80 | $1,350.00 |
| 09-May-25 | Antonio Neto | | General Work | Steam data exploratory analysis and summary statistics | 2.40 | $1,560.00 |
| 09-May-25 | Max Theiler | | General Work | Showrooming discussion and writeup | 0.50 | $375.00 |
| 09-May-25 | Max Theiler | | General Work | Showrooming discussion and writeup | 0.50 | $375.00 |
| 09-May-25 | Max Theiler | | General Work | Showrooming discussion and writeup | 1.00 | $750.00 |
| 12-May-25 | Antonio Neto | | General Work | Adapt Boik and Corts model to Transaction data | 0.20 | $130.00 |
| 12-May-25 | Antonio Neto | | General Work | Adapt Boik and Corts model to Transaction data | 0.60 | $390.00 |
| 12-May-25 | Antonio Neto | | General Work | Adapt Boik and Corts model to Transaction data | 0.60 | $390.00 |
| 12-May-25 | Antonio Neto | | General Work | Analysis of transactional data | 0.10 | $65.00 |
| 12-May-25 | Antonio Neto | | General Work | Analysis of transactional data | 1.60 | $1,040.00 |

Please note, that in producing this Detailed Breakdown, multiple time entries corresponding to a particular task have been aggregated if they are performed by the same consultant during the same London business day.

Page I 1

# INVOICE – Detailed Breakdown



| Date | Fee Earner | Position | Workstream | Task | Time | USD Amount |
|------|-----------|----------|-----------|------|------|-----------|
| | | | | | | |
| 12-May-25 | Antonio Neto | | General Work | Analysis of transactional data | 1.50 | $975.00 |
| | | | | | | |
| 13-May-25 | Antonio Neto | | General Work | Analysis of transactional data | 2.20 | $1,430.00 |
| 13-May-25 | Antonio Neto | | General Work | Analysis of transactional data | 1.10 | $715.00 |
| | | | | | | |
| 14-May-25 | Antonio Neto | | General Work | Analysis of game prices over time | 1.70 | $1,105.00 |
| | | | | | | |
| 14-May-25 | Antonio Neto | | General Work | Analysis of game prices over time | 0.70 | $455.00 |
| | | | | | | |
| 14-May-25 | Antonio Neto | | General Work | Analysis of game prices over time | 0.30 | $195.00 |
| 14-May-25 | Antonio Neto | | General Work | Analysis of game prices over time | 0.50 | $325.00 |
| | | | | | | |
| 14-May-25 | Antonio Neto | | General Work | Analysis of game prices over time | 1.30 | $845.00 |

Please note, that in producing this Detailed Breakdown, multiple time entries corresponding to a particular task have been aggregated if they are performed by the same consultant during the same London business day.

Page | 2

# INVOICE – Detailed Breakdown



| Date | Fee Earner | Position | Workstream | Task | Time | USD Amount |
|------|-----------|----------|-----------|------|------|------------|
| 15-May-25 | Antonio Neto | | General Work | Analysis of game prices over time | 0.40 | $260.00 |
| | | | | | | |
| 19-May-25 | | | General Work | Analysis of game prices over time | 0.80 | $520.00 |
| 19-May-25 | Max Theiler | | General Work | Follow ups on client requests | 0.90 | $675.00 |
| 19-May-25 | | | General Work | Analysis of game prices over time | 1.20 | $780.00 |
| 19-May-25 | Max Theiler | | General Work | Call with client | 1.50 | $1,125.00 |
| 20-May-25 | Antonio Neto | | General Work | Steam data analysis | 1.70 | $1,105.00 |
| 20-May-25 | | | General Work | Review of transaction data backend | 0.50 | $325.00 |
| 20-May-25 | Max Theiler | | General Work | Steam follow ups | 1.80 | $1,350.00 |
| 21-May-25 | | | General Work | Steam data analysis for Price parity | 1.80 | $1,170.00 |
| 21-May-25 | | | General Work | Steam data analysis for Price parity | 1.50 | $975.00 |
| 21-May-25 | | | General Work | Steam data analysis for Price parity | 1.50 | $975.00 |
| 21-May-25 | Antonio Neto | | General Work | Analysis of game prices over time | 0.70 | $455.00 |
| 27-May-25 | | | General Work | Price analysis for Key resellers | 1.50 | $975.00 |
| 27-May-25 | Max Theiler | | General Work | Steam pre-call discussion and analysis | 0.40 | $300.00 |
| 27-May-25 | | | General Work | Call with client | 1.00 | $650.00 |
| 27-May-25 | Max Theiler | | General Work | Call with client | 1.00 | $750.00 |
| 28-May-25 | Max Theiler | | General Work | Boik and Corts Writeup | 0.50 | $375.00 |
| 28-May-25 | | | General Work | Price analysis for Key resellers | 2.50 | $1,625.00 |
| 28-May-25 | Max Theiler | | General Work | Boik and Corts Writeup | 0.80 | $600.00 |
| 28-May-25 | | | General Work | Analysis of top 100 games price parity | 1.30 | $845.00 |
| 28-May-25 | Max Theiler | | General Work | Boik and Corts Writeup | 0.50 | $375.00 |
| 28-May-25 | | | General Work | Review of Sea of Thieves emails in data record | 0.20 | $130.00 |
| 28-May-25 | | | General Work | Price analysis for Key resellers | 2.50 | $1,625.00 |
| 28-May-25 | Max Theiler | | General Work | Review of Sea of Thieves emails in data record | 0.50 | $375.00 |
| 29-May-25 | Max Theiler | | General Work | Boik and Corts Writeup | 0.80 | $600.00 |
| 29-May-25 | | | General Work | Review of Sea of Thieves emails in data record | 1.50 | $975.00 |
| 29-May-25 | Max Theiler | | General Work | Boik and Corts Writeup | 1.50 | $1,125.00 |

Please note, that in producing this Detailed Breakdown, multiple time entries corresponding to a particular task have been aggregated if they are performed by the same consultant during the same London business day.

Page | 3

# INVOICE – Detailed Breakdown



| Date | Fee Earner | Position | Workstream | Task | Time | USD Amount |
|------|-----------|----------|------------|------|------|-----------|
| 29-May-25 | | | General Work | Review of Sea of Thieves emails in data record | 1.50 | $975.00 |
| 29-May-25 | | | General Work | Price analysis for Key resellers | 1.30 | $845.00 |
| 29-May-25 | Max Theiler | | General Work | Boik and Corts Writeup | 1.40 | $1,050.00 |
| 29-May-25 | | | General Work | Price analysis for Key resellers | 0.90 | $585.00 |
| 29-May-25 | | | General Work | Price analysis for Key resellers | 1.00 | $650.00 |
| 30-May-25 | Max Theiler | | General Work | Off platform key reseller prices | 1.50 | $1,125.00 |
| 30-May-25 | | | General Work | Steam data analysis for Key resellers | 1.80 | $1,170.00 |
| 30-May-25 | | | General Work | Steam data analysis for Key resellers | 1.20 | $780.00 |
| 30-May-25 | | | General Work | Steam data analysis for Key resellers | 1.00 | $650.00 |
| 09-Jun-25 | | | General Work | Call with client on modelling | 0.60 | $390.00 |

Please note, that in producing this Detailed Breakdown, multiple time entries corresponding to a particular task have been aggregated if they are performed by the same consultant during the same London business day.

Page | 4

# INVOICE – Detailed Breakdown



| Date | Fee Earner | Position | Workstream | Task | Time | USD Amount |
|---|---|---|---|---|---|---|
| 09-Jun-25 | Max Theiler | | General Work | Call with client on modelling | 0.80 | $600.00 |
| 09-Jun-25 | Max Theiler | | General Work | Boik and Corts Writeup edits | 0.80 | $600.00 |
| 11-Jun-25 | | | McSorley Testimony | Composing Snowflake database access query for experts | 0.40 | $260.00 |
| 12-Jun-25 | Max Theiler | | McSorley Testimony | Call with client on modelling | 1.00 | $750.00 |
| 13-Jun-25 | | | McSorley Testimony | Composing Snowflake database access query for experts | 0.80 | $520.00 |
| 13-Jun-25 | Max Theiler | | General Work | Data backend checks | 1.30 | $975.00 |
| 13-Jun-25 | Max Theiler | | General Work | Data backend checks | 0.80 | $600.00 |
| 19-Jun-25 | Max Theiler | | General Work | Steam Data Storage Discussion | 0.50 | $375.00 |
| 19-Jun-25 | | | General Work | Steam Data Storage Discussion | 0.50 | $325.00 |
| 19-Jun-25 | Max Theiler | | General Work | Steam Data Storage Discussion | 0.50 | $375.00 |
| 19-Jun-25 | | | McSorley Testimony | Troubleshooting Snowflake/Stata integration | 1.20 | $780.00 |
| 19-Jun-25 | | | McSorley Testimony | Troubleshooting Snowflake/Stata integration | 1.40 | $910.00 |
| 20-Jun-25 | | | McSorley Testimony | Setup clientshare for McCrary Produciton | 0.40 | $260.00 |

Please note, that in producing this Detailed Breakdown, multiple time entries corresponding to a particular task have been aggregated if they are performed by the same consultant during the same London business day.

Page | 5

# INVOICE – Detailed Breakdown



| Date | Fee Earner | Position | Workstream | Task | Time | USD Amount |
|------|-----------|----------|-----------|------|------|------------|
|  |  |  |  |  |  |  |
| 23-Jun-25 | Max Theiler |  | McSorley Testimony | Assisting Dr. Cross with R/Stata conversions | 1.80 | $1,350.00 |
| 23-Jun-25 |  |  | McSorley Testimony | Call discussing the price disparities in Boik and Corts | 0.30 | $195.00 |
| 23-Jun-25 | Antonio Neto |  | McSorley Testimony | Consulting on slide deck and model outputs | 0.30 | $195.00 |
| 23-Jun-25 | Antonio Neto |  | McSorley Testimony | Consulting on slide deck and model outputs | 2.00 | $1,300.00 |
| 23-Jun-25 | Max Theiler |  | McSorley Testimony | Assisting Dr. Cross with R/Stata conversions | 1.50 | $1,125.00 |
| 23-Jun-25 | Antonio Neto |  | McSorley Testimony | Consulting on slide deck and model outputs | 0.30 | $195.00 |
| 23-Jun-25 |  |  | McSorley Testimony | Call discussing the price disparity of Boik and corts | 0.40 | $260.00 |
| 23-Jun-25 |  |  | McSorley Testimony | Boik and Corts model implementation | 0.60 | $390.00 |
| 23-Jun-25 | Max Theiler |  | McSorley Testimony | Damage model script productions | 0.80 | $600.00 |
| 23-Jun-25 | Antonio Neto |  | McSorley Testimony | Consulting on slide deck and model outputs | 4.10 | $2,665.00 |
| 23-Jun-25 | Max Theiler |  | McSorley Testimony | Damage model script productions | 3.40 | $2,550.00 |
| 24-Jun-25 |  |  | McSorley Testimony | Boik and Corts model implementation | 1.50 | $975.00 |
| 24-Jun-25 |  |  | McSorley Testimony | Boik and Corts model implementation | 1.00 | $650.00 |
| 24-Jun-25 |  |  | McSorley Testimony | Boik and Corts model implementation | 0.30 | $195.00 |
| 24-Jun-25 |  |  | McSorley Testimony | Boik and Corts model implementation | 1.30 | $845.00 |

Total Amount = USD ▮

Data Recharges = ▮

Total Invoice Amount (rounded) = USD ▮

Please note, that in producing this Detailed Breakdown, multiple time entries corresponding to a particular task have been aggregated if they are performed by the same consultant during the same London business day.

Page | 6

# INVOICE – Detailed Breakdown



## DETAILED INTERIM REPORT FOR BL/2025-04 – VALVE ARBITRATION

| Date | Fee Earner | Position | Workstream | Task | Time | USD Amount |
|------|-----------|----------|-----------|------|------|-----------|
| 17-Jul-25 | Rahul Muralidharan | Associate Director | General Work | Call on > 50 million pass through | 0.90 | $585.00 |
| 17-Jul-25 | Max Theiler | Director | General Work | Call on >$50m pricing pattern | 1.00 | $750.00 |
| 18-Jul-25 | Max Theiler | Director | General Work | Reviewing slides for deposition presentation | 0.30 | $225.00 |
| 18-Jul-25 | Antonio Neto | Associate Director | General Work | Slides on Boik and Corts | 1.30 | $845.00 |
| 21-Jul-25 | Antonio Neto | Associate Director | General Work | Slides on Boik and Corts | 0.10 | $65.00 |
| 23-Jul-25 | Antonio Neto | Associate Director | General Work | Slides on Boik and Corts | 1.50 | $975.00 |
| 23-Jul-25 | Antonio Neto | Associate Director | General Work | Slides on Boik and Corts | 0.80 | $520.00 |
| 23-Jul-25 | Antonio Neto | Associate Director | General Work | Slides on Boik and Corts | 1.10 | $715.00 |
| 29-Jul-25 | Max Theiler | Director | General Work | Call with Counsel on transaction data | 0.10 | $75.00 |
| 29-Jul-25 | Rahul Muralidharan | Associate Director | McSorley Testimony | Call with Will for Pass-through and New Zoo | 0.50 | $325.00 |
| 29-Jul-25 | Rahul Muralidharan | Associate Director | McSorley Testimony | Code prep for Cross for Pass through | 0.30 | $195.00 |
| 29-Jul-25 | Rahul Muralidharan | Associate Director | McSorley Testimony | Code prep for Cross for Pass through | 1.40 | $910.00 |
| 30-Jul-25 | Rahul Muralidharan | Associate Director | McSorley Testimony | Pass through Chart prep and Ghost Recon and prey period expansion | 1.40 | $910.00 |
| 30-Jul-25 | Max Theiler | Director | McSorley Testimony | Pass-through chart | 0.50 | $375.00 |
| 30-Jul-25 | Rahul Muralidharan | Associate Director | McSorley Testimony | Pass through Chart prep and Ghost Recon and prey period expansion | 1.70 | $1,105.00 |
| 30-Jul-25 | Rahul Muralidharan | Associate Director | McSorley Testimony | Pass through Chart prep and Ghost Recon and prey period expansion | 1.00 | $650.00 |
| 30-Jul-25 | Max Theiler | Director | McSorley Testimony | Checking Slides and Backup | 0.50 | $375.00 |
| 30-Jul-25 | Rahul Muralidharan | Associate Director | McSorley Testimony | Steam call with Phil Cross | 1.70 | $1,105.00 |
| 30-Jul-25 | Max Theiler | Director | McSorley Testimony | Call with Dr. Cross on Testimony | 1.30 | $975.00 |

Please note, that in producing this Detailed Breakdown, multiple time entries corresponding to a particular task have been aggregated if they are performed by the same consultant during the same London business day.

Page | 1

# INVOICE – Detailed Breakdown



| Date | Fee Earner | Position | Workstream | Task | Time | USD Amount |
|------|-----------|----------|-----------|------|------|-----------|
| 30-Jul-25 | Max Theiler | Director | McSorley Testimony | Checking and preparing code backup | 0.40 | $300.00 |

Total Amount = USD ▮▮▮▮

Data Recharges = USD ▮▮▮▮

Total Invoice Amount (rounded) = USD ▮▮▮▮

Please note, that in producing this Detailed Breakdown, multiple time entries corresponding to a particular task have been aggregated if they are performed by the same consultant during the same London business day.

Page | 2

# INVOICE

**FIDERES**
USE KNOWLEDGE. TAKE ACTION.

Fideres USA Inc
405 Lexington Ave
Fl 26 Suite 2632
New York
NY 10174
United States

## INVOICE DETAILS

**Bill to:**
Bucher Law PLLC
Att.: Will Bucher
350 Northern Blvd
STE 324-1519
Albany, NY 12204-1000

Invoice no.: BL/2025-04

31st July 2025

| DESCRIPTION | AMOUNT |
|---|---|
| Expert Work - Economic Consulting Services in Relation to a Mass Arbitration Claim against Valve | USD |
| Total | USD |

## Payment Terms:

Payable by electronic wire transfer within 14 days from receipt according to the following payment instructions:

| | |
|---|---|
| Account bank: | Lead Bank |
| ACH Routing Number: | 101019644 |
| Wire Routing Number: | 101019644 |
| Account name: | Fideres USA Inc |
| Account number: | |
| Reference: | BL/2025-04 |

**Please Note: We do NOT accept cheques.**
**All payments must be made in US Dollars and free of all bank and other charges.**

**Beneficiary Address:**
405 Lexington Ave
Fl 26 Suite 2632
New York
NY 10174
United States

**Bank Address:**
1801 Main Street
Kansas City
64108
United States

# EXHIBIT 17

**From:** McSorley, Suzanne <suzanne.mcsorley@stevenslee.com>
**Sent:** Wednesday, September 10, 2025 2:29 PM
**To:** Frank Palermo <frank@fjpcounsel.com>
**Cc:** Lauren Cole <lcole@hsgllp.com>; William Bucher <will@bucherlawfirm.com>; Jing He <Jing@moni.law>; Erik Atzbach <erik@atzbachlex.com>; Thomas Matthew <thomas@bucherlawfirm.com>; valveteam@moni.law; Xinlin Li Morrow <xinlin@moni.law>; AAAFiling@valvesoftware.com; Tavakoli, Shaud G (NYC) <Shaud.Tavakoli@skadden.com>; Andrew C. Indorf <aindorf@hsgllp.com>; Fuchs, Andrew J (HOU) <Andrew.Fuchs@skadden.com>; bmarksdias@corrcronin.com; McInerney, Colm P (NYC) <Colm.McInerney@skadden.com>; Dorit Ungar Black <dblack@hsgllp.com>; Gavin Skok <gavins@valvesoftware.com>; Slawe, Meredith C (NYC) <Meredith.Slawe@skadden.com>; McTigue Jr., Michael W (NYC) <Michael.McTigue@skadden.com>; Scott M. Danner <sdanner@hsgllp.com>; Milstead, Virginia (LAC) <Virginia.Milstead@skadden.com>; Zachary Horn <zachary@bucherlawfirm.com>; Ellen Noteware <ellen@bucherlawfirm.com>; kent.williams@sirillp.com; AAA Jill Roettger <JillRoettger@adr.org>; Judson E Crump <judson@judsonecrump.com>; Priyanka Timblo <ptimblo@hsgllp.com>
**Subject:** [Ext] RE: Individual Claimants v. Valve d/b/a Steam -- Vicente and Birenbaum Hearings now CLOSED

Counsel,
With the receipt of the materials provided by Claimants this morning, the Birenbaum and Vicente hearings are now **CLOSED.**
Sue McSorley
Arbitrator

**Suzanne M. McSorley**
**Stevens & Lee**
**A PA Professional Corporation**
510 Carnegie Center Drive, Suite 400
Princeton, NJ  08540
T: 609-987-6663
F: 610-371-7927
M: 609-468-5881
suzanne.mcsorley@stevenslee.com

# EXHIBIT 18

# MASS ARBITRATION STRATEGY AND INVESTMENT OPPORTUNITY

CONFIDENTIAL
PRESENTATION

1

# Mass Arbitration: Background

- In 2011, the Supreme Court held that contracts requiring mandatory arbitration and prohibiting class relief were permissible, provided they are not unconscionable. This ruling was reaffirmed in a 2013 decision.

- Many companies incorporated such clauses into their agreements believing it minimized exposure given the damages generally at stake for individual claimants.

- In an effort to avoid being deemed unconscionable, arbitration clauses adopted by companies seeking to avoid class actions routinely require the Company to pay all arbitration fees, limit circumstances where the Company can recover attorneys' fees, and allow the consumer to choose the manner of arbitration.

- Most arbitration providers — including the American Arbitration Association ("AAA") — charge a minimum of approximately $3,000 a case.

2

# Use of Mass Arbitration

- Over the past few years, a handful of firms — led by Keller Lenkner (now Keller Postman) — have weaponized consumer and employer arbitration clauses with favorable terms by aggregating thousands of claims through targeted advertising campaigns.

- Aggregating claims makes entrance fee to just defend prohibitively expensive and the vast majority of such fees are non-refundable under recent precedent.

- For example, if 75,000 demands for arbitration are filed with the AAA, the Company has 30-days to pay a largely non-refundable fee of $225 million as the cost of admission.

- Claimants' counsel will offer a settlement slightly less than the AAA charge — $2,900 per claim or so — attempting to induce a quick resolution.

3

# The Technique and Typical Results

- In a mass arbitration against Uber, Keller Postman brought ~60k claims claiming drivers were misclassified as contractors rather than employees.

- Uber's challenge to paying AAA fees was unsuccessful, requiring Uber to pay the ~$180 million upfront if it wished to defend the claims.

- With an upcoming IPO, Uber declined to engage in protracted litigation and settled the ~60k claims early for $146mm.

- Uber Eats was targeted in the past two years and sought to enjoin the AAA from requiring what it called "astronomical" fees.  A New York appeals court recently denied the challenge finding that "[Uber] made the business decision to preclude class, collective, or representative claims in its arbitration agreement with consumers and AAA's fees are directly attributable to those decisions."

- In another case, Judge Breyer stated to Intuit "You knew what the rules of arbitration were. You knew all these things. And you elected to go to arbitration. . . . you are being hoisted by your own petard."

4

# Lifecycle of Investment

- **<u>Stage 1</u> - Infrastructure:** $500,000 for software development, advertising and agreement templates, ethics opinions, hardware, marketing and survey consultants, and claim identification.

- **<u>Stage 2</u> - Client Recruitment:** $2 to $150 advertising cost per client to recruit. Estimated spend of $3.75 million to recruit 75,000 clients at $50 an acquisition.

- **<u>Stage 3</u> - Filing Cases:** Filing cost of $25,000 plus $50.02 a case, for an estimated filing cost of $3,776,500. (Never expended if an early settlement can be reached.)

- **<u>Stage 4</u> - Active Arbitration:** Zaiger LLC litigates the first 20 cases, developing templates and models for use on additional cases. $12,000 a case after that to hire contract attorneys managed by Zaiger LLC to litigate disputes using templates and strategies. Most completed arbitrations seen to-date is 160, so total cost likely less than $1.7 million

5

# Target and Claim Identification

- **<u>Active Approach</u>:** Identifying 25 to 50 ripe targets, monitor news, and brainstorm claims.

  Identifying favorable arbitration terms including guaranteed refund of $50 filing fee, use of the AAA as an arbitration provider, application of California law, and language that suggests non-mutual collateral estoppel would apply.

  Ideal targets: (1) have valuation of ~$10 billion – high enough so they aren't judgment proof and can settle for hundreds of millions of dollars, but low enough that $200 million+ in arbitration fees creates an existential crisis forcing a quick settlement; and (2) a likely IPO or potential acquisition that will make carrying litigation risk unpalatable.

- **<u>Automated/Passive Supplemental Approach</u>:** Monitor court dockets for motions to compel class actions to arbitration, and copycat existing legal theories with potentially better advertising approach.

6

# Example Target: Valve Corporation

- Valve is an $11 billion company that dominates the market for digital PC game sales. Valve has over a billion customers with accounts. Valve's arbitration is administered by the AAA and specifies all filing fees will be reimbursed for claims under $10,000.

- In April 2021, game developers and consumers filed a putative class action claiming antitrust violations against Valve in the U.S District Court for the Western District of Washington.

- On October 25, 2021, Judge John Coughenor compelled the consumer claims to arbitration while retaining the developer claims. On May 5, 2022, Judge Coughenor denied (in part) Valve's motion to dismiss the developer plaintiffs' antitrust claims.

- If the proposed infrastructure were in place, today, we could immediately begin recruiting claimants to pursue the claims a federal judge has now ruled are well plead and potentially viable but for which *a billion* customers have been compelled to arbitration.

7

# New Merits-Based Approach

- The legal principles of non-mutual collateral estoppel prevent a company from relitigating a legal issue they have previously and unsuccessfully argued in another forum.

- This puts a company facing an arbitration in a situation where prevailing on the relevant legal issue is critical the first time it is argued, as a failure to prevail in that first case opens the door to preclusion in later cases.

- Rather than filing tens of thousands of cases at once, as is Keller's practice, a plaintiffs' firm could locate the strongest plaintiff from its pool, and file that case, and only that case, first.

- If that first, handpicked claim succeeds, all legal and factual issues that were inherent to the defendant should be resolved against them with respect to all other litigations, massively increasing the potential settlement value.

8

# Potential Returns

- Based on estimated costs of bundling claims, the initial Uber case would have cost Black Diamond ~$6.5 million and returned $43.8 million in less than a year (574% ROI).

- We believe a merits-based leverage approach — which can be implemented flexibly if a particularly strong claim presents itself — increases potential for even higher returns.

**Assumptions**:

  There is a 50% chance of winning the first case.
  The expected win, if there is one, is for a $10,000 judgment.
  A loss results in an average of a 25% reduction in claim settlement value.

- That results in an expected settlement value of $427.7 million. Black Diamond's recovery for funding at 30% would be ~$128.3 million (1874% ROI on $6.5 million investment).

9

# Stage 1 Infrastructure Calculations

- **Will Bucher Fixed Compensation:** $150,000/year.

- **Software Engineer:** Est. $20,000/month full-time cost for 3 months, followed by $10,000/month part-time cost thereafter. $150,000 first-year spend.

- **Ethics Opinion/Consulting:** Est. $25,000 first-year ($700/hour as needed thereafter).

- **Marketing Part-time Employee or Consultant:** Est. $50,000/year.

- **Survey Design Consulting:** Est. $25,000/year.

- **Paralegal Support:** Managing claims dockets and answering calls. Possible need to scale up and hire additional support as clients are recruited. Est. $50,000 first-year spend.

- **Hardware and Software**: Computer hardware, Bloomberg and PACER alerts, additional Westlaw seat(s). Est. $8,000/yearly, plus $2,000 in hardware expenses year-one.

10

# Stage 2 Client Recruitment Calculations

- Most difficult to predict because it would vary per case based on the claim and how common users of the relevant product or service were.

- Present estimates are based on the following:

  - A Partner at a Bay Area law firm specializing in plaintiffs-side mass employment litigation —  who has handled more than 60,000 employment arbitrations — said costs were between \$2 and \$150 a case, depending on the pool of plaintiffs and the case.

  - In "Bitter End" litigation, attorneys at Keller took the position that their lawyer group would be losing money if they accepted any settlement below \$675 a case. Based on their retainer agreement, Troxel LLC, who was responsible for bundling the claims, received 4% of the settlement value. That implies an acquisition cost of no more than \$27 a claim.

  - Facebook advertising costs around \$1.00 per click. If it takes an average of two clicked-on ads to recruit a plaintiff, that's \$2.00 a claim. If it takes 150 ads, that's \$150.

11

# Stage 3 Filing Calculations

- **AAA Fees:** $100 a case for the first 500 cases, than $50 a case. Functional cost of $50 a case plus $25,000.

- **Zaiger LLC Server Costs:** $0.02 a client in server expenses to maintain client database and case files.

# Stage 4 Active Arbitrations Calculations

- In the "Bitter End" litigation, 160 cases were litigated to a conclusion. That is most cases ever fully litigated in a mass arbitration based on the 9 examples we are aware of. Plaintiffs' requests for fees in those arbitrations showed that Quinn Emanuel spent between 80 and 160 hours litigating each case. That litigation was surprisingly bespoke, with every briefing including one or more new, revised, or redacted arguments.

- If a Zaiger LLC target engages in a "Bitter End" strategy, the first 20 cases could be litigated by the Firm creating templates for use on additional cases. We expect a contract attorney working off Zaiger LLC prepared templates could litigate a case in 80 hours.

- We estimate that contract attorneys of sufficient caliber to arbitrate individual cases charge $100 to $125/hour. A performance bonus of $2000 for successful arbitrations could also be used to incentivize quality and results.

- Staffing with contract attorneys comes out to between $8,000 and $12,000 a case. Given the most completed arbitrations seen to date is 160, total cost is likely less than $1.7 million. There is flexibility in how we could "staff up" if needed too.

13

# Uber Settlement Calculations

- **Costs**: $50 recruitment (assumed) and $50 filing for 60,000 claims, plus $500,000 infrastructure costs. Total costs $6.5 million
- Settlement of $146 million. Hypothetical 30% return to Black Diamond of $43.8 million. Profit of $37.3 million. (574% ROI in less than a year).
- Merits Approach Assumptions:
    50% chance of winning the first claim;
    A win on the first claim increases the settlement value of each claim by $10,000;
    - For 60,000 claims, that's a $600 million increase in total settlement value.
    A loss on the first claim reduces the settlement value of each remaining claim by 0% to 50%, depending on how the arbitrator rules and on what grounds, with an average reduction of 25%. The reduction is the result of perceptions by a defendant of likely liability, not due to the creation of precedent. Plaintiffs are not bound by outcome, so there is little, if any, formal legal risk from the loss.
- Predicted, merits based outcome: spend $6,500,000. Upon a win, settlement value would increase to $746 million. Upon a loss, the settlement value would shift to an average of $109.5 million. That results in an expected settlement value of $427.75 million.
- 30% of $427.75 million is $128.325 million. $121.825 million profit (1874% ROI).

14