# Exhibit A

Provisionally Redacted

**AMERICAN ARBITRATION ASSOCIATION**
**Consumer Arbitration Rules**

In the Matter of the Arbitration between

Case Number: 01-23-0005-3502

Nicholas Tynes
-vs-
Valve Corporation d/b/a Steam

**FINAL AWARD OF ARBITRATOR**

I, Jeffrey H Dasteel, the undersigned arbitrator, having been designated in accordance with the arbitration agreement entered into by the above-named parties, having been duly sworn, and having duly heard the proofs and allegations of the Parties, and having previously rendered an Interim Award dated December 15, 2025, and a second Interim Award dated February 26, 2026, which are confirmed, adopted, and incorporated as if fully set forth herein, do hereby issue this FINAL AWARD as follows:

**Procedural Posture**

In my December 15, 2025, Interim Award, all claims were dismissed except for Claimant's Section 1 price fixing claim. The Second Interim Award, dated February 26, 2026, found a violation of Section 1 of the Sherman Antitrust Act and awarded treble damages of $97.14. In addition, I found that Claimant was the prevailing party and entitled to an award of attorney's fees and costs. Claimant's submission seeks $731,490.38 in attorney's fees, $54,380.73 in costs, plus 12% prejudgment and postjudgment interest on all amounts.

Respondent opposes Claimant's request for fees and costs on several grounds. First, Respondent contends that Claimant seeks fees incurred for other matters and therefore I lack the authority to make such an award. Second, Respondent contends Claimant's fee request is unreasonable because Claimant did not prevail on most of his claims, the fee request is disproportionate to the level of success achieved in litigation and the amount at stake, the hourly rates charged by Claimant's attorneys are excessive, and the 1.5 multiplier requested by Claimant is unwarranted in this case. Third, Respondent contends that it would have been unethical to bill Claimant for the requested fees and, therefore, it should be unethical to require Respondent to pay these amounts. Fourth, Respondent contends the claim for expert witness costs and prejudgment interest is unreasonable. Finally, Respondent identifies individual time entries that it contends are either too vague or not appropriate for reimbursement.

**Jurisdiction to Award Attorney's Fees and Costs**

Pursuant to Consumer Rule 44(a), "[t]he arbitrator may grant any remedy, relief, or outcome that the parties could have received in court, including awards of attorney's fees and costs, in accordance with the law(s) that applies to the case." Section 4 of the Clayton Act provides in part that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

In the Second Interim Award, I found that Claimant suffered injury under Section 1 of the Sherman Act and, therefore, is entitled to the cost of suit and a "reasonable" attorney's fee. As mandated by the parties' arbitration agreement, the award of attorney's fees and costs is limited to the prosecution of Claimant's individual case. In that regard, Respondent contends that the claimed fees should be divided by 50,000 to account for all the other claimants represented by Claimant's counsel in virtually identical matters. Respondent notes that it has prevailed in the vast majority of the other cases and that compensating this Claimant for the work done in common with the other cases would be unfair because the Claimant's counsel is not entitled to recover fees for the cases in which Respondent prevailed.

Claimant's counsel's fees can be broken down into five categories: (1) fees incurred in the common preparation of various matters; (2) fees incurred exclusively for Claimant's matter; (3) fees incurred for another matter, but the work product was used in Claimant's matter; (4) fees incurred for another matter, where the work product was not used in Claimant's matter; and (5) time entries that cannot be segregated into any of the four preceding categories.

It is undisputed that fees incurred exclusively for this Claimant's matter are recoverable. Where work is done that is common to more than one matter, such fees also are recoverable so long as there is no duplicative recovery.  That Claimant's counsel, as a matter of efficiency, reuses work product in multiple matters, does not mean the work was not properly incurred for this Claimant in this individual matter. Indeed, to hold otherwise when the Respondent's form of arbitration agreement insisted on individual actions and prohibited class actions would multiply attorneys' fees rather than reduce them. For example, instead of hearing claimants' joint expert once in a single matter, I would have been required to hear the same testimony multiple times at a significant increased cost in attorney's fees and expert witness costs. Similarly, if attorney's fees were incurred in another matter, but the work product was used in this matter (rather than repeat the same work here), such work is recoverable here so long as there is no duplicative recovery.

Where attorney's fees were incurred in a separate matter, and the work product was not used here, Claimant cannot recover those fees. In addition, where counsel's time entries cannot be segregated into recoverable and non-recoverable fees, as the onus was on Claimant's counsel to keep clear time records, such fees are not recoverable.

**Relative Success as a Measure of Attorney's Fees**

Claimant's success in this litigation was modest, although in excess of his initial claim. He prevailed on a single claim, with all others dismissed. However, there was significant commonality among the claims so that there was no practical way to segregate his various antitrust claims.

Further, as noted in Claimant's submission, significant fees were expended in the procedural jockeying between the parties relevant to all claims. As is typical in litigation, in the absence of bad faith, such fees are recoverable even when Claimant's record of success was mixed.

Accordingly, there will be no reduction based on Claimant's relative success in achieving his litigation goals.

**Ethical Considerations**

Next, Respondent contends that because it would be unethical to bill Claimant hundreds of thousands of dollars for a claim that amounted to at most a few thousand dollars, it must be unethical to seek recovery of such fees from Respondent. Respondent's authority is weak and would eviscerate the consumer protection laws. For any modest claim, virtually any fee could be viewed as excessive in comparison to

the stakes, thereby cutting consumers off from the ability to retain competent counsel on a contingency fee basis. Further, nothing in Section 4 of the Clayton Act justifies such a restriction.

**Relationship of the Fee Request to the Amounts in Dispute**

Respondent contends a fee request that is orders of magnitude greater than the amount in dispute and success achieved is per se unreasonable. First, as noted above, in low dollar consumer cases the amount of fees awarded to a prevailing consumer often far exceeds the amount of damages recovered. Second, Claimant's counsel did not incur fees in a vacuum. Although within the bounds of a zealous defense, Respondent's counsel raised an extraordinary number of motions and procedural issues during these proceedings requiring Claimant to respond. It is safe to say that neither side treated this matter as a small claims court case. Although Respondent is free to defend itself as it sees fit within ethical constraints, if it chooses to engage in extensive litigation, it cannot then complain that Claimant's counsel incurred substantial fees in the process.

**Reasonable Hourly Rates**

Respondent contends that Claimant's counsel's hourly rates are two or three times the prevailing rates that should be permitted. However, Respondent has failed to show that the rates it is billed by its attorneys are any less than those Claimant claims here. Further, Claimant has shown that Respondent's lead counsel charged rates similar to those claimed here in another antitrust case. In the absence of a showing that Claimant's counsel's hourly rates exceed those granted for similar litigation, Respondent's objection is overruled.

**Multiplier**

Claimant seeks a 1.5 times multiplier on fees due to the complexity of the matter, the duration from time of filing to award, and the contingency fee nature of the case.  Although those are indeed factors in determining whether there should be a multiplier and, if so, how much, Claimant's relative success also is a consideration. Here, Claimant's success was low in comparison to his original claim. In addition, unlike in class actions, where Claimant's counsel has one chance to recover fees, here Claimant's counsel reportedly filed thousands of individual matters under identical theories of recovery. All the claimant's counsel needed to do was prevail in one of them to make a substantial attorney's fee recovery, thereby substantially reducing counsel's contingency risk.

Based on the foregoing, I award Claimant a multiplier of 1.1.

**Individual Time Entries**

Respondent notes a series of time entries that it considers to be too vague or merges time properly applicable to this matter with other matters for which time is not recoverable. Respondent contends these are "examples," implying there might be additional entries to challenge. However, Claimant did his part by providing detail from his counsel's time sheets. The burden then shifted to Respondent to identify which of those entries are subject to challenge.

Based on my review of the challenged time entries, I will deduct one fourth of $55,116.45 ($13,779.11) from this Claimant's fee request.

Respondent also seeks a reduction of $125,755.80 for "team meetings." Team meetings are a necessary part of any complex litigation and, therefore, generally recoverable. The problem here is that team meetings regarding other matters may not be recoverable, depending on whether the matters discussed in the meetings benefited the prosecution of Claimant's case. Without additional detail, I am constrained to

grant Respondent's application to reduce fees by that amount.[1] A one-quarter share will be deducted from this Claimant's fee request ($31,438.95).

**Claimant's supplemental fee request**

In addition to the fees claimed in the opening submission, Claimant seeks fees incurred since that date, including fees for the defense of his fee request. Although it is reasonable to recover fees for the preparation of his fee request, it is not reasonable to recover fees unrelated to that request, including time regarding any other matters. As Claimant's case has concluded, there is no basis to award fees for, e.g., considering the procedures to be used to resolve the remaining cases before me or subpoenas in those other cases. Following my review of the time entries provided in Claimant's reply briefing, I find $173,059.55 is related to this fee request. That amount is based on 217.6 hours of work, which is excessive in the context of a reply brief on fees. I am, therefore, exercising my discretion to reduce the supplemental fees approved for the reply brief to $60,000. Claimant's share is $15,000.

**Expert Witness Fees**

Claimant's expert witness, Dr. Castronova, testified in another Claimant's matter, with his testimony applicable to all other matters before me as agreed by the parties. As Claimant is entitled to a single recovery for those expenses, it is reasonable to either recover them once in this Claimant's matter or divide them among the other prevailing claimants before me. Counsel for Claimant has elected to divide the expert witness fee among the four prevailing claimants.

Claimant also seeks recovery of expert witness costs for an expert who did not appear in Claimant's case either by live testimony or transcript from another matter. It is certainly Claimant's choice as to which expert to employ in a matter. However, Respondent is only responsible for the costs incurred by testifying experts. Claimant's claim for $123,312.50 for the non-testifying expert is denied. As Claimant's counsel appears to have divided that between four claimants, I will deduct $30,828.12 from this Claimant's costs award.

**Interest**

Although Claimant cites Washington State law regarding prejudgment and postjudgment interest, Claimant's entitlement to interest is governed by Section 4 of the Clayton Act, which provides:

> "The court may award under this section, pursuant to a motion by such person promptly made, simple interest on actual damages for the period beginning on the date of service of such person's pleading setting forth a claim under the antitrust laws and ending on the date of judgment, or for any shorter period therein, if the court finds that the award of such interest is just in the circumstances. In determining whether an award of interest under this section for any period is just in the circumstances, the court shall consider only—
>
> 1. whether such person or the opposing party, or either party's representative, made motions or asserted claims or defenses so lacking in merit as to show that such party or representative acted intentionally for delay, or otherwise acted in bad faith;

---

[1] Respondent also seeks to reduce the fees for team meetings that have been the subject of a fee application in another case. As I have granted the reduction for all generic "team meetings," a further reduction would be duplicative.

2.  whether, in the course of the action involved, such person or the opposing party, or either party's representative, violated any applicable rule, statute, or court order providing for sanctions for dilatory behavior or otherwise providing for expeditious proceedings; and

3.  whether such person or the opposing party, or either party's representative, engaged in conduct primarily for the purpose of delaying the litigation or increasing the cost thereof."

Claimant seeks interest on both his damages award and attorney's fees and costs.  However, by the express language of the statute, interest is potentially awardable only on "actual damages."  The delay in recovery of attorney's fees is a consideration under the multiplier (as noted above).

Respondent's representatives vigorously defended this matter. Although Claimant contends Respondent's counsel acted intentionally for delay, in bad faith, and to increase the cost of litigation, I do not agree.  In the matters before me, Respondent's counsel has complied with all deadlines and, though providing a vigorous defense, counsel's conduct was within the bounds of zealous advocacy. Prejudgment interest is therefore denied.

Claimant also seeks postjudgment interest. As quoted above, Section 4 of the Clayton Act is limited to interest up to the date of judgment. It is outside my jurisdiction to award interest after the date of my award.

**Calculation of Fees and Expenses**

From Claimant's claim of $731,490.38 in attorney's fees in his opening submission, I have subtracted $13,779.11 for individual time challenges and $31,438.95 for team meetings.  I have added $15,000 for the reply brief on fees. The net fees awarded before the multiplier is $701,272.32. With the 1.1 multiplier, the total fee award is $771,399.55.

From Claimant's claim of $54,380.73 in costs, I have subtracted $30,828.12 for Claimant's one-quarter share of the non-testifying expert's fees. The net expense award is $23,552.61.

**FINAL AWARD**

Within thirty days after the date of this Final Award, Respondent shall pay to Claimant's counsel's client trust fund the following amounts:

Actual damages trebled in the amount of $97.14.

Attorney's fees in the amount of $771,399.55.

Costs in the amount of $23,552.61.

The administrative fees of the American Arbitration Association shall be borne as incurred, and the compensation of the arbitrator shall be borne as incurred.

This Final Award is in full settlement of all claims and counterclaims submitted to this arbitration. All claims not expressly granted herein are hereby, denied.

April 24, 2026
_____
Date

_____
Jeffrey H Dasteel, Arbitrator

I, Jeffrey H Dasteel, do hereby affirm upon my oath as arbitrator that I am the individual described in and who executed this instrument, which is my Final Award.

April 24, 2026
_____
Date

_____
Jeffrey H Dasteel, Arbitrator



**AMERICAN ARBITRATION ASSOCIATION**
**Consumer Arbitration Rules**

In the Matter of the Arbitration between

Case Number: 01-23-0005-3502

Nicholas Tynes

-vs-

Valve Corporation d/b/a Steam

## SECOND INTERIM AWARD OF ARBITRATOR

I, Jeffrey H Dasteel, the undersigned arbitrator, having been designated in accordance with the arbitration agreement entered into between the above-named parties, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, each represented by counsel, and having issued an Interim Award on December 15, 2025, do hereby issue this Second Interim Award as follows:

### Introduction

In the first Interim Award, I found that the competitive relationship between Microsoft and Steam occurs at both the developer/publisher and distribution platform levels. The "Valve Corporation Distribution Agreement" between Respondent and Microsoft concerns the distribution of games developed and published by Microsoft on the Steam platform and in its role as distributor of its own games. Generally, this is a vertical agreement and does not bear on the relationship between Microsoft and the Respondent as competitors in the distribution of video games.

However, subsection (b) of Section 6.4 of the Microsoft agreement has horizontal effects. That Section provides that if Microsoft, as the developer/publisher/distributor of games that it offers for sale on the Respondent's platform,

One effect of this section is that if Microsoft lowers the price of one of its own games for distribution on its own platform, it must also lower the price it offers that product for sale on Respondent's platform. Microsoft employees

described this provision as a "price parity" requirement. This is a horizontal price-fixing agreement and is subject to the *per se* standard.

I further found that when a price-fixing agreement is subject to the per se rule, a party's justification for entering into it is irrelevant to a finding of a violation of the Act. *Leegin Creative Leather Products, Inc. v. PSKS, Inc., 551 U.S. 877, 883 (2007)* ("*The per se rule, treating categories of restraints as necessarily illegal, eliminates the need to study the reasonableness of an individual restraint in light of the real market forces at work.*"). Accordingly, it is irrelevant whether the purpose of the provision, as Respondent contended, was to ensure its customers benefited from lower prices.[1]

The first three prongs of a Section 1 claim were satisfied for those Microsoft games sold on both the Microsoft platform and the Respondent's platform. Having found that Section 6.4(b) of the Microsoft agreement is a per se violation of Section 1 of the Sherman Act, the final element in Claimant's claim is to establish antitrust injury. Because the violation would only apply to purchases of games subject to the Microsoft price parity agreement, Claimant must prove (1) that he purchased one or more of such games, and (2) would have paid less for the game in the absence of such an agreement. Although the record of Claimant's purchases is in evidence, the parties had not had an opportunity to distinguish which purchases were subject to the Microsoft price parity agreement and, for such purchases, what the quantum of damages is, if any. Accordingly, the parties were permitted to make further submissions on this issue.

The parties completed their submissions on this issue on February 9, 2026. The matter is now ripe for determination.

## Scope of the Microsoft-Valve Distribution Agreement

Respondent contends the price-fixing agreement between Microsoft and Valve was limited to those games listed in the written agreement and its addenda. Claimant contends that although the price parity agreement initiated in 2011 was originally in writing, the parties abandoned the practice of making addenda and adhered to the "price parity" terms of the agreement for all games offered on both Microsoft and Valve's platforms. Further, Claimant contends the price-fixing agreement was applied to games produced by Microsoft's later-acquired subsidiaries.

Although Respondent provided evidence that a single game was excluded from the distribution agreement, Claimant provided persuasive evidence that Microsoft and Valve personnel applied the price parity requirements of the distribution agreement to all Microsoft games across the board, including games produced by Microsoft's subsequently acquired subsidiaries.

Respondent provided no evidence that either the written form of the price parity agreement or the practice of price parity was terminated. Accordingly, I find that the price-fixing agreement between Microsoft and Valve at the distribution level applied to all games Microsoft or its subsequently acquired subsidiaries offered for sale on both the Microsoft and Valve distribution platforms.

## Application to Non-Microsoft Games

Next, Claimant contends that the Microsoft-Valve price-fixing agreement affected all PC games across the market. The basis for this claim is that Microsoft and Valve have sufficient market power that a horizontal agreement between them would raise prices for all other PC games, regardless of distributor. In my first interim award, I found that the Claimant had failed to prove market or monopoly power. Accordingly, Claimant's attempt to apply damages to all of Claimant's PC game purchases is rejected.

## Proof that the Games were Offered on Both Platforms

A prerequisite for recovery is proof that the subject games were offered for sale on both Microsoft and Valve platforms. In its opposition submission, Respondent provided a list of games it conceded were subject to the written distribution agreement with a column labeled "Sold on Microsoft Platform." The column includes question marks for each game, as though Respondent was unable to determine whether it had an exclusive right to distribute the game on

---

[1] Even so, Respondent's justification cannot be accepted solely at face value because a probable effect of the price parity policy is to discourage Microsoft from lowering the prices of its games on its distribution platform because to do so would require it to provide an equal reduction on Respondent's platform, eliminating any potential economic advantage when competing for customers thereby putting competitive pressure on Respondent to reduce its 30% revenue share of game sales.

its platform. Claimant provided evidence that Microsoft marketed its own games on its own distribution platform. First, the original 2011 distribution agreement itself is evidence. Indeed, it would make no sense to have such an agreement if Microsoft did not offer PC games for sale on its own distribution platform. Second, the communications between Microsoft and Valve personnel concerned both specific and general statements of parity pricing between the two distribution platforms.

In the absence of a showing that Valve had an exclusive right to distribute one or more Microsoft games—something within Respondent's knowledge—I find it more likely than not that all games developed and published by Microsoft and its subsidiaries that were available on Respondent's platform also were available for purchase on Microsoft's platform.

**Claimant's Purchases**

Claimant submitted evidence that he made six successful purchases of Microsoft games on Respondent's platform. Purchases totaled $194.27 (one purchase was for zero dollars). All five purchases were made between 2021 and 2023.

**Statute of limitations**

Claimant submitted his demand for arbitration on December 19, 2023. The statute of limitations for a Section 1 price-fixing claim is four years. 15 U.S.C. § 15b. Absent tolling, the four-year statute of limitations bars claims for purchases made prior to December 19, 2019. Accordingly, all five of Claimant's purchases fall within the statute of limitations.

**Damages**

The measure of damages is what Claimant would have paid in the absence of the price-fixing agreement between Respondent and Microsoft. Although Respondent contends there are no damages, that position ignores the reality that Microsoft's sales on its own platform would not be burdened by the 30% fee Respondent charges for access to its platform. Claimant's expert estimated that using a "but for" analysis (the Boik and Cortes model), Claimant paid a 20% premium due to the price-fixing scheme. The formula to determine damages based on this model is $P(\text{actual}) \cdot (1 - 1/1.20) = P(\text{actual}) \cdot 0.2/1.20 = 16.67\%$ of $P(\text{actual}) = \$33.38$. Under antitrust law, damages are trebled. Accordingly, Claimant's total damages award is $97.14.

**Prevailing Party**

Claimant is the prevailing party in this action. Under the antitrust laws, Claimant is entitled to recover his reasonable costs and attorney's fees. The parties shall make their submissions on costs and attorney's fees as follows: Claimant's opening submission shall be due ten days from the date of this Second Interim Award. Respondent's submission shall be due ten days following Claimant's submission. Claimant's reply submission shall be due seven days following Respondent's submission.

**SECOND INTERIM AWARD**

The first Interim Award, dated December 15, 2025, is incorporated by reference as though fully set forth herein.

Claimant shall recover damages in the total amount of $97.14, plus costs and attorney's fees, which shall be the subject of a Final Award.

Except as otherwise provided above, this Second Interim Award is in full settlement of the merits of all claims submitted to this arbitration. The Arbitrator retains jurisdiction to address costs and attorneys' fees. The matter shall be deemed submitted to the Arbitrator for determination in a Final Award upon and after the submissions scheduled above. This Second Interim Award shall remain in full force and effect until the arbitrator renders a Final Award.

February 26, 2026
Date

Jeffrey H Dasteel, Arbitrator

I, Jeffrey H Dasteel, do hereby affirm upon my oath as arbitrator that I am the individual described in and who executed this instrument, which is my Award.

Februaryt 26, 2026
Date

Jeffrey H Dasteel, Arbitrator



**AMERICAN ARBITRATION ASSOCIATION**
**Consumer Arbitration Rules**

In the Matter of the Arbitration between

Case Number: 01-23-0005-3502

Nicholas Tynes
-vs-
Valve Corporation d/b/a Steam

## INTERIM AWARD OF ARBITRATOR

I, Jeffrey H Dasteel, the undersigned arbitrator, having been designated in accordance with the arbitration agreement entered into between the above-named parties, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, each represented by counsel, at an evidentiary hearing held on October 16, 2025, do hereby issue this INTERIM AWARD as follows:

Claimant alleges violations of Sections 1 and 2 of the Sherman Antitrust Act. Based on the evidence presented by the parties at the merits hearing in this matter, I make the following findings of fact.

### Respondent's Distribution of Video Games

Respondent Valve Corporation operates a website under the tradename "Steam" to distribute video games created by Respondent and other game developers/publishers. Although the parties dispute the extent of Steam's market share, there is no dispute that Steam is the largest online PC Gaming Store. It has a three-tiered revenue sharing scheme. Developers/publishers set the prices for their games on the Steam platform and on any other platform on which they participate. On the Steam platform, the first $10 million in a game's total revenues is subject to a 30% revenue share. The next $40 million is subject to a 25% revenue share. Anything over $50 million is at 20% revenue share. This applies to all developers/publishers regardless of size or total volume.  Other platforms may either charge a lower revenue share or use a different compensation method that is equivalent to a lower revenue share. There is no revenue share payable to Respondent by developers/publishers who distribute their products on their own platforms or non-Steam platforms.

The evidence established that Steam has several pricing and advertising policies designed to ensure Steam's prices are equal to or lower than the lowest prices game developers offer on other sites. If a developer or publisher offers a product for presale on any platform or outlet at a price below that offered on Steam, Steam may elect to stop preselling the product on its website. However, Steam will continue to sell the product in the ordinary course even if its price is above that available on other platforms or outlets.

Sellers/Publishers are not required by Steam's distribution agreement to be exclusive to Steam. However, due to its large customer base and the ease with which a developer can make a game available for sale on Steam, many, if not most, PC games are sold exclusively on Steam. This matter concerns only games available on multiple sites.  In that regard, the evidence supported a finding that Respondent has an intermittently enforced policy that if a developer/publisher sells its product on another site, it risks losing access to Steam's customer base if it regularly undercuts the price it offers to Steam customers.

Claimant contends that there is an agreement between Microsoft and Steam to maintain price parity for Microsoft products across the Steam and Microsoft stores. The source of Claimant's contention is Section 6.4 of the "Valve Corporation Distribution Agreement" between Respondent and Microsoft." Although subsection (a) of that

Section concerns Microsoft's role as developer/publisher of games, subsection (b) concerns Microsoft's distribution of its games on its own distribution platform, which is in direct competition with Respondent's platform.

Claimant contends that Steam enforces a price-parity scheme in connection with its distribution of so-called Steam Keys. A Steam Key is a code that permits the user to access a particular PC game on the Steam website. Steam provides the Keys to developers at no charge. Developers can then distribute the Keys on their own platforms or sell them to other platforms. Although Steam receives no revenue from the initial sale of a Steam Key, the sale of a Steam Key drives customers to use the Steam platform, where they may purchase DLC (in-game downloadable content) or MTX (in-game microtransactions for the purchase of, e.g., additional content). Steam receives a revenue share from these additional purchases.

If a developer or publisher sells Steam keys for a product at a discount from the price usually offered on Steam for the subject PC game, without providing Steam customers an equivalent discount, Steam's policy is to inform the developer/publisher that it may not receive additional keys for that product or other products. Furthermore, price-parity for Steam Keys is a written requirement in the Steam Key guidelines.  Failure to follow the Steam Key guidelines can result in no further Steam Keys being issued or the offending game being dropped from the Steam platform.

Finally, Claimant contends that Respondent engages in a practice to prevent its customers from buying in-game content from any other distributor. Although the evidence was equivocal, Respondent's practice appears to be that when a PC game offers an in-game purchase option, the default and perhaps sole purchase method is through Respondent's platform. Although it might be possible for a customer to access the developer/publisher's website from within the game and purchase the DLC or MTX there, if such an option is available, it appears that the customer would have to go through multiple steps to do so.

**Claimant's PC Game Purchases**

Claimant is a consumer of PC games. Although Claimant purchases games on multiple platforms, Claimant predominantly purchases them on Steam. Claimant offered three basic reasons. First, although Claimant sometimes searches other websites for games, discounts are rare. Second, by far the most significant number of games are available on Steam, many of which are exclusive to Steam. Third, because Claimant would lose all content on the Steam platform by moving to another platform, to maintain the investment in games, Claimant continues to purchase games on Steam. Claimant has made several thousand dollars in purchases for a large variety of games on the Steam platform. Claimant contends that but for Respondent's pricing policies, Claimant would have paid substantially less for PC games.

**The Relevant Market**

 Claimant and Respondent each offered a different definition of the relevant market. Respondent contends the market should include all distribution outlets, including console games, brick-and-mortar sales, as well as distributors like Steam and direct sales from developers/publishers. Claimant contends the relevant market is limited to distribution platforms like Steam. Claimant analogizes Steam to a "shopping mall" where individual developers/publishers sell their products in "stores." Under this theory, a standalone store operated by the developer/publisher would not be a part of the relevant market.

Although there is limited crossover between the PC game market and the console market, they are predominantly separate markets that use distinct hardware. Some games can be cross-played on both hardware platforms, but that is the exception. Furthermore, some developers/publishers sell their games on platforms that are indistinguishable from Steam's (e.g., Epic). Some platforms, like Steam, are hybrid sites where the platform operator sells third-party games as well as content from its own affiliates. The relevant market is the distribution of PC games online or in-store, regardless of whether the distribution platform is operated by the developer/publisher, a third party, or a hybrid site.

The evidence established that PC games sell at different prices across different geographic markets. The evidence established that North America is the relevant geographical market for Claimant's claims.

**Claimant's Section 1 Claim**

Claimant contends that Respondent's pricing policies constitute a per se violation of Section 1 of the Sherman Act. In the alternative, assuming the Rule of Reason applies, Claimant contends Respondent's policies are anti-competitive price-fixing in violation of the Act.

*Applicability of the Per Se or Rule of Reason Standard*

To establish a violation of Section 1 of the Sherman Act, a plaintiff must prove the following: (1) the existence of a contract, combination, or conspiracy between or among at least two separate entities; (2) that the contract, combination, or conspiracy unreasonably restrains trade; (3) that the restraint affects interstate or foreign commerce; and (4) that the restraint caused plaintiff to suffer an injury to its business or property. 15 U.S.C. §1; ABA Model Instruction 2.

Some restraints on trade are considered so pernicious that they are per se unlawful. *Leegin Creative Leather Products, Inc. v. PSKS, Inc., 551 U.S. 877, 883 (2007).* As a general rule, horizontal price-fixing agreements are per se unlawful without requiring an examination of the agreement's justifications. *Id.* On the other hand, vertical agreements typically fall under the Rule of Reason. *Id.*

Although Respondent contends that so-called hybrid relationships are examined under the Rule of Reason (citing *United States v. Brewbaker, 87 F.4th 563 (4ᵗʰ Cir. 2023)*, there is no general agreement on that standard. Instead, where the alleged participants in the subject agreement occupy multiple levels in the manufacture and means of distribution, whether an agreement among them falls within the per se or Rule of Reason standard depends on the manufacturing or distribution level engaged in by the parties that is subject to the agreement.

Here, the agreement regarding the use of Steam Keys is made between Steam, as the distributor, and the third-party developer/publisher. This is a vertical relationship and, therefore, falls under the Rule of Reason. That Respondent develops and publishes its own games is irrelevant to the agreement.

Similarly, the distribution agreement between Steam and third-party developers and publishers to offer games on Steam's platform is a vertical relationship. The Rule of Reason also applies to those agreements. Although Respondent competes with the third-party developers/publishers at that level of the distribution chain, the distribution agreement does not bear on that relationship.

The competitive relationship between Microsoft and Steam occurs at both the developer/publisher and distribution platform levels. The "Valve Corporation Distribution Agreement" between Respondent and Microsoft concerns the distribution of games developed and published by Microsoft on the Steam platform, in its role as distributor of its own games. This is a vertical agreement and does not bear on the relationship between Microsoft and the Respondent as competitors in the development and publishing of video games.

However, subsection (b) of Section 6.4 of the Microsoft agreement has horizontal effects. That Section provides that if Microsoft, as the developer/publisher of games that it offers for sale on the Respondent's platform,



.

One effect of this section is that if Microsoft lowers the price of one of its own games for distribution on its platform, it must also lower the price it offers that product for sale on Respondent's platform. Microsoft employees described this provision as a "price parity" requirement. This is a horizontal price-fixing agreement and is subject to the per se standard.

*Section 6.4(b) Is a Per Se Violation of Section 1 of the Sherman Act*

When a price-fixing agreement is subject to the per se rule, a party's justification for agreeing is irrelevant to finding a violation of the Act. *Leegin at 883* ("*The per se rule, treating categories of restraints as necessarily illegal, eliminates the need to study the reasonableness of an individual restraint in light of the real market forces at work.").* Accordingly, it is irrelevant whether the purpose of the provision, as Respondent contends, was to ensure its customers benefited from lower prices.[1]

The first three prongs of a Section 1 claim are satisfied for those Microsoft games sold on both the Microsoft platform and the Respondent's platform. The fourth prong (damages) is addressed below.

*No Violation Under the Rule of Reason for the Other Claims*

Under the Rule of Reason, there must be an analysis of the pro- and anti-competitive effects of the subject pricing policies. *Id. ("In its design and function the rule [of reason] distinguishes between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest.").* There are three policies subject to that examination: (1) the price parity policy for the sale of Steam Keys by developers/publishers, (2) the distribution agreement between Respondent and third-party developers/publishers, and (3) the so-called "free rider" policy requiring customers to make in-game purchases through Respondent.

The price parity policy for the sale of Steam Keys does not violate the Rule of Reason. The primary purposes of Steam Keys are two-fold (1) to assist a developer/publisher in the launch of and distribution of its games, and (2) to drive traffic to Respondent's platform because the Keys can only be redeemed on Respondent's platform.  Respondent's price parity policy is designed to ensure that Respondent's customers, who cannot purchase Steam Keys directly on the website, are not disadvantaged by the discounted sale of the Keys on other platforms. The Keys are provided to the developer/publisher free of charge, and the sale of which to the public on other platforms generates no revenue to Respondent. The policy's pro-competitive effects, which provide a variety of PC games to the public, outweigh any anti-competitive effects.

Claimant contends that Respondent's policies in connection with the distributor agreement between Respondent and third-party developers/publishers violate the Rule of Reason in two ways: (1) if a developer/publisher undercuts the Respondent's prices on other platforms, Respondent will not presell the subject game at an advantageous location on its webpage; and (2) if a developer/publisher sells its product on another site, it risks losing access to Steam's customer base if it regularly undercuts the price it offers on Steam. Claimant contends that, given Respondent's dominance in the marketplace, the effect of these two policies is to discourage developers/publishers from offering price discounts on other platforms.

Respondent contends that the effect of these policies is to encourage developers/publishers to offer discounts on Respondent's platform, thereby reducing the cost to consumers. Claimant argues that developers/publishers cannot reduce the price on Respondent's platform in the same manner as on other platforms because Respondent's revenue share is higher than the other platforms charge, so that the developer/publisher can make the same profit for the sale of a game on different platforms at a lower price than would be available on Respondent's platform.[2]

The problem with Claimant's contention is that it depends on Respondent having sufficient market power to coerce a developer/publisher into not lowering its prices on other platforms to maintain price parity.  Whether the Respondent has market power is a question of fact, with the Claimant bearing the burden of proof. It was undisputed that there are a variety of competing platforms in the PC game industry. Claimant presented expert testimony asserting that Respondent has an upwards of 70% market share and is by far the most dominant platform in the industry. However, Claimant's expert based his market share analysis on opaque industry magazine articles and broad assumptions of industry revenues.  It does not buttress the expert's conclusions that the Respondent's expert could have had access to reliable data. It was not the Respondent's burden to prove the absence of market share.

---

[1] Even so, Respondent's justification cannot be accepted solely at face value because a probable effect of the price parity policy is to discourage Microsoft from lowering the prices of its games on its distribution platform because to do so would require it to provide an equal reduction on Respondent's platform, eliminating any potential economic advantage when competing for customers.

[2] There was evidence that the revenue share charged by Respondent was not unique in the industry, though on the high end.

Although it very well may be that Respondent has the largest market share in the industry enough to constitute market power, it was Claimant's burden to prove that fact with reliable, admissible evidence. It did not do so.[3] Without proof of market power, the potential anti-competitive effects of Respondent's policies do not outweigh the pro-competitive effects or Respondent's right to determine whether to offer a third-party product and under what circumstances it will promote that product.

Finally, Respondent's apparent policy to direct purchases of DLC and MTX to its own platform does not violate the Rule of Reason. A core means for developers/publishers to gain revenue is from in-game purchases. Indeed, the evidence established that many developers/publishers provide their PC games free, making downloadable content their only source of revenue. Respondent's sole source of income from PC games uploaded by third-party developers is revenue sharing. Accordingly, Respondent has made its platform attractive to those developers/publishers who depend solely on in-game purchases. It is not anti-competitive for Respondent to favor its own platform for such purchases, as that is the only source of revenue it will receive for the service of making the developer/publisher's otherwise free content available to consumers. In the absence of such a policy, consumers likely would not have access to the "free" games because Respondent would have no means to recoup its costs for maintaining such games on its platform.

**Claimant's Section 2 Claim**

"There are three essential elements to a successful claim of Section 2 monopolization: (a) the possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal 'antitrust' injury." *Allied Orthopedic v. Tyco Health*, 592 F. 3d 991, 998 (9th Cir. 2010) (quoting *Cal.Computer Prods., Inc. v. Int'l Bus. Mach. Corp.,* 613 F.2d 727, 735 (9th Cir.1979).

"To prove its monopolization claim, plaintiff must prove that defendant has monopoly power in a relevant antitrust market. Monopoly power is the power to control prices, restrict output, and exclude competition in a relevant antitrust market.  More precisely, a firm is a monopolist if it can profitably raise prices substantially above the competitive level for a significant period of time." *ABA Model Instructions, A-104. "*Market power and monopoly power are related but distinct concepts. As the Supreme Court has stated: 'market power is the ability to raise prices above those that would be charged in a competitive market.' Monopoly power is 'the power to control prices or exclude competition.'" *Epic Games, Inc. v. Apple Inc., 559 F.Supp.3d 898, 1028 (2021) (internal citations omitted).*

Here, as noted above, Claimant has failed to carry its burden of proof to establish market power. Monopoly power is an extreme form of market power. *Id.* Accordingly, Claimant's Section 2 claim fails to satisfy an essential element and, therefore, is dismissed with prejudice.

**State Law Claims**

Although Claimant's demand for arbitration asserted state law claims, Claimant failed to address any such claims in closing submissions.  All state law claims are, therefore, deemed abandoned and dismissed with prejudice.

**Damages**

Having found above that Section 6.4(b) of the Microsoft agreement is a per se violation of Section 1 of the Sherman Act, the final element in Claimant's claim is to establish antitrust injury. Because the violation would only apply to purchases of games subject to the Microsoft agreement, Claimant must prove (1) that he purchased one or more of such games, and (2) would have paid less for the game in the absence of such an agreement. Although the record of Claimant's purchases is in evidence, the parties have not had an opportunity to distinguish which purchases were subject to the Microsoft agreement and, for such purchases, what the quantum of damages is, if any. Accordingly, the parties shall make further submissions pursuant to the schedule below.

Claimant shall make his opening submission by no later than December 30, 2025

Respondent shall make its opposing submission by no later than January 9, 2026

---

[3] Claimant complains that Respondent has the necessary data to determine market share, but did not provide it in discovery. However, the time to resolve discovery disputes has long passed.

Claimant shall make any reply submission by no later than January 15, 2026.

**Prevailing Party**

A prevailing party determination will be made as part of the damages Award.

Except as otherwise provided above, this Interim Award is in full settlement of the merits of all claims submitted to this arbitration. The Arbitrator retains jurisdiction to address these issues. The matter shall be deemed submitted to the Arbitrator for determination in a further Award upon and after the submissions scheduled above. This Interim Award shall remain in full force and effect until the arbitrator renders a Final Award.

December 15, 2025
Date

_____
Jeffrey H Dasteel, Arbitrator

I, Jeffrey H Dasteel, do hereby affirm upon my oath as arbitrator that I am the individual described in and who executed this instrument, which is my Interim Award.

December 15, 2025
Date

_____
Jeffrey H Dasteel, Arbitrator

**AMERICAN ARBITRATION ASSOCIATION**
**Consumer Arbitration Rules**

In the Matter of the Arbitration between

Case Number: 01-23-0005-3487

Kevin Montes
-vs-
Valve Corporation d/b/a Steam

**FINAL AWARD OF ARBITRATOR**

I, Jeffrey H Dasteel, the undersigned arbitrator, having been designated in accordance with the arbitration agreement entered into by the above-named parties, having been duly sworn, and having duly heard the proofs and allegations of the Parties, and having previously rendered an Interim Award dated December 15, 2025, and a second Interim Award dated February 26, 2026, which are confirmed, adopted, and incorporated as if fully set forth herein, do hereby issue this FINAL AWARD as follows:

**Procedural Posture**

In my December 15, 2025, Interim Award, all claims were dismissed except for Claimant's Section 1 price fixing claim. The Second Interim Award, dated February 26, 2026, found a violation of Section 1 of the Sherman Antitrust Act and awarded treble damages of $51.21. In addition, I found that Claimant was the prevailing party and entitled to an award of attorney's fees and costs. Claimant's submission seeks $715,684.13 in attorney's fees, $54,380.73 in costs, plus 12% prejudgment and postjudgment interest on all amounts. Claimant also seeks recovery of his $125 filling fee.

Respondent opposes Claimant's request for fees and costs on several grounds. First, Respondent contends that Claimant seeks fees incurred for other matters and therefore I lack the authority to make such an award. Second, Respondent contends Claimant's fee request is unreasonable because Claimant did not prevail on most of his claims, the fee request is disproportionate to the level of success achieved in litigation and the amount at stake, the hourly rates charged by Claimant's attorneys are excessive, and the 1.5 multiplier requested by Claimant is unwarranted in this case. Third, Respondent contends that it would have been unethical to bill Claimant for the requested fees and, therefore, it should be unethical to require Respondent to pay these amounts. Fourth, Respondent contends the claim for expert witness costs and prejudgment interest is unreasonable. Finally, Respondent identifies individual time entries that it contends are either too vague or not appropriate for reimbursement.

**Jurisdiction to Award Attorney's Fees and Costs**

Pursuant to Consumer Rule 44(a), "[t]he arbitrator may grant any remedy, relief, or outcome that the parties could have received in court, including awards of attorney's fees and costs, in accordance with the law(s) that applies to the case." Section 4 of the Clayton Act provides in part that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

In the Second Interim Award, I found that Claimant suffered injury under Section 1 of the Sherman Act and, therefore, is entitled to the cost of suit and a "reasonable" attorney's fee. As mandated by the parties' arbitration agreement, the award of attorney's fees and costs is limited to the prosecution of Claimant's individual case. In that regard, Respondent contends that the claimed fees should be divided by 50,000 to account for all the other claimants represented by Claimant's counsel in virtually identical matters. Respondent notes that it has prevailed in the vast majority of the other cases and that compensating this Claimant for the work done in common with the other cases would be unfair because the Claimant's counsel is not entitled to recover fees for the cases in which Respondent prevailed.

Claimant's counsel's fees can be broken down into five categories: (1) fees incurred in the common preparation of various matters; (2) fees incurred exclusively for Claimant's matter; (3) fees incurred for another matter, but the work product was used in Claimant's matter; (4) fees incurred for another matter, where the work product was not used in Claimant's matter; and (5) time entries that cannot be segregated into any of the four preceding categories.

It is undisputed that fees incurred exclusively for this Claimant's matter are recoverable. Where work is done that is common to more than one matter, such fees also are recoverable so long as there is no duplicative recovery. That Claimant's counsel, as a matter of efficiency, reuses work product in multiple matters, does not mean the work was not properly incurred for this Claimant in this individual matter. Indeed, to hold otherwise when the Respondent's form of arbitration agreement insisted on individual actions and prohibited class actions would multiply attorneys' fees rather than reduce them. For example, instead of hearing claimants' joint expert once in a single matter, I would have been required to hear the same testimony multiple times at a significant increased cost in attorney's fees and expert witness costs. Similarly, if attorney's fees were incurred in another matter, but the work product was used in this matter (rather than repeat the same work here), such work is recoverable here so long as there is no duplicative recovery.

Where attorney's fees were incurred in a separate matter, and the work product was not used here, Claimant cannot recover those fees. In addition, where counsel's time entries cannot be segregated into recoverable and non-recoverable fees, as the onus was on Claimant's counsel to keep clear time records, such fees are not recoverable.

**Relative Success as a Measure of Attorney's Fees**

Claimant's success in this litigation was modest in comparison to his initial claims. He prevailed on a single claim, with all others dismissed. However, there was significant commonality among the claims so that there was no practical way to segregate his various antitrust claims.

Further, as noted in Claimant's submission, significant fees were expended in the procedural jockeying between the parties relevant to all claims. As is typical in litigation, in the absence of bad faith, such fees are recoverable even when Claimant's record of success was mixed.

Accordingly, there will be no reduction based on Claimant's relative success in achieving his litigation goals.

### Ethical Considerations

Next, Respondent contends that because it would be unethical to bill Claimant hundreds of thousands of dollars for a claim that amounted to at most a few thousand dollars, it must be unethical to seek recovery of such fees from Respondent. Respondent's authority is weak and would eviscerate the consumer protection laws. For any modest claim, virtually any fee could be viewed as excessive in comparison to the stakes, thereby cutting consumers off from the ability to retain competent counsel on a contingency fee basis. Further, nothing in Section 4 of the Clayton Act justifies such a restriction.

### Relationship of the Fee Request to the Amounts in Dispute

Respondent contends a fee request that is orders of magnitude greater than the amount in dispute and success achieved is per se unreasonable. First, as noted above, in low dollar consumer cases the amount of fees awarded to a prevailing consumer often far exceeds the amount of damages recovered. Second, Claimant's counsel did not incur fees in a vacuum. Although within the bounds of a zealous defense, Respondent's counsel raised an extraordinary number of motions and procedural issues during these proceedings requiring Claimant to respond. It is safe to say that neither side treated this matter as a small claims court case. Although Respondent is free to defend itself as it sees fit within ethical constraints, if it chooses to engage in extensive litigation, it cannot then complain that Claimant's counsel incurred substantial fees in the process.

### Reasonable Hourly Rates

Respondent contends that Claimant's counsel's hourly rates are two or three times the prevailing rates that should be permitted. However, Respondent has failed to show that the rates it is billed by its attorneys are any less than those Claimant claims here. Further, Claimant has shown that Respondent's lead counsel charged rates similar to those claimed here in another antitrust case. In the absence of a showing that Claimant's counsel's hourly rates exceed those granted for similar litigation, Respondent's objection is overruled.

### Multiplier

Claimant seeks a 1.5 times multiplier on fees due to the complexity of the matter, the duration from time of filing to award, and the contingency fee nature of the case. Although those are indeed factors in determining whether there should be a multiplier and, if so, how much, Claimant's relative success also is a consideration. Here, Claimant's success was low in comparison to his original claim. In addition, unlike in class actions, where Claimant's counsel has one chance to recover fees, here Claimant's counsel reportedly filed thousands of individual matters under identical theories of recovery. All the claimant's counsel needed to do was prevail in one of them to make a substantial attorney's fee recovery, thereby substantially reducing counsel's contingency risk.

Based on the foregoing, I award Claimant a multiplier of 1.1.

### Individual Time Entries

Respondent notes a series of time entries that it considers to be too vague or merges time properly applicable to this matter with other matters for which time is not recoverable. Respondent contends these are "examples," implying there might be additional entries to challenge. However, Claimant did his part by providing detail from his counsel's time sheets. The burden then shifted to Respondent to identify which of those entries are subject to challenge.

Based on my review of the challenged time entries, I will deduct one fourth of $55,116.45 ($13,779.11) from this Claimant's fee request.

Respondent also seeks a reduction of $125,755.80 for "team meetings." Team meetings are a necessary part of any complex litigation and, therefore, generally recoverable. The problem here is that team meetings regarding other matters may not be recoverable, depending on whether the matters discussed in the meetings benefited the prosecution of Claimant's case. Without additional detail, I am constrained to grant Respondent's application to reduce fees by that amount.[1] A one-quarter share will be deducted from this Claimant's fee request ($31,438.95).

**Claimant's supplemental fee request**

In addition to the fees claimed in the opening submission, Claimant seeks fees incurred since that date, including fees for the defense of his fee request. Although it is reasonable to recover fees for the preparation of his fee request, it is not reasonable to recover fees unrelated to that request, including time regarding any other matters. As Claimant's case has concluded, there is no basis to award fees for, e.g., considering the procedures to be used to resolve the remaining cases before me or subpoenas in those other cases. Following my review of the time entries provided in Claimant's reply briefing, I find $$173,059.55 is related to this fee request. That amount is based on 217.6 hours of work, which is excessive in the context of a reply brief on fees. I am, therefore, exercising my discretion to reduce the supplemental fees approved for the reply brief to $60,000. Claimant's share is $15,000.

**Expert Witness Fees**

Claimant's expert witness, Dr. Castronova, testified in another Claimant's matter, with his testimony applicable to all other matters before me as agreed by the parties. As Claimant is entitled to a single recovery for those expenses, it is reasonable to either recover them once in this Claimant's matter or divide them among the other prevailing claimants before me. Counsel for Claimant has elected to divide the expert witness fee among the prevailing claimants.

Claimant also seeks recovery of expert witness costs for an expert who did not appear in Claimant's case either by live testimony or transcript from another matter. It is certainly Claimant's choice as to which expert to employ in a matter. However, Respondent is only responsible for the costs incurred by testifying experts. Claimant's claim for $123,312.50 for the non-testifying expert is denied. As Claimant's counsel appears to have divided that between four claimants, I will deduct $30,828.12 from this Claimant's costs award.

**Interest**

Although Claimant cites Washington State law regarding prejudgment and postjudgment interest, Claimant's entitlement to interest is governed by Section 4 of the Clayton Act, which provides:

> "The court may award under this section, pursuant to a motion by such person promptly made, simple interest on actual damages for the period beginning on the date of service of such person's pleading setting forth a claim under the antitrust laws and ending on the date of judgment, or for any shorter period therein, if the court finds that the award of such interest is just in the circumstances. In determining whether an award of interest

---

[1] Respondent also seeks to reduce the fees for team meetings that have been the subject of a fee application in another case. As I have granted the reduction for all generic "team meetings," a further reduction would be duplicative.

under this section for any period is just in the circumstances, the court shall consider only—

1.  whether such person or the opposing party, or either party's representative, made motions or asserted claims or defenses so lacking in merit as to show that such party or representative acted intentionally for delay, or otherwise acted in bad faith;
2.  whether, in the course of the action involved, such person or the opposing party, or either party's representative, violated any applicable rule, statute, or court order providing for sanctions for dilatory behavior or otherwise providing for expeditious proceedings; and
3.  whether such person or the opposing party, or either party's representative, engaged in conduct primarily for the purpose of delaying the litigation or increasing the cost thereof."

Claimant seeks interest on both his damages award and attorney's fees and costs. However, by the express language of the statute, interest is potentially awardable only on "actual damages." The delay in recovery of attorney's fees is a consideration under the multiplier (as noted above).

Respondent's representatives vigorously defended this matter. Although Claimant contends Respondent's counsel acted intentionally for delay, in bad faith, and to increase the cost of litigation, I do not agree. In the matters before me, Respondent's counsel has complied with all deadlines and, though providing a vigorous defense, counsel's conduct was within the bounds of zealous advocacy. Prejudgment interest is therefore denied.

Claimant also seeks post-judgment interest. As quoted above, Section 4 of the Clayton Act is limited to interest up to the date of judgment. It is outside my jurisdiction to award interest after the date of my award.

**Calculation of Fees and Expenses**

From Claimant's claim of $715,684.13 in attorney's fees in his opening submission, I have subtracted $13,779.11 for individual time challenges and $31,438.95 for team meetings. I have added $15,000 for the reply brief on fees. The net fees awarded before the multiplier is $685,466.07. With the 1.1 multiplier, the total fee award is $754,012.68.

From Claimant's claim of $54,380.73 in costs, I have subtracted $30,828.12 for Claimant's one-quarter share of the non-testifying expert's fees. The net expense award is $23,552.61.

**FINAL AWARD**

Within thirty days after the date of this Final Award, Respondent shall pay to Claimant's counsel's client trust fund the following amounts:

Actual damages trebled in the amount of $51.21.

Attorney's fees in the amount of $754,012.68.

Costs in the amount of $23,552.61.

The administrative fees of the American Arbitration Association shall be borne as incurred, except for Claimant's filing fee. Respondent shall reimburse Claimant for the $125.00 filing fee. The compensation of the arbitrator shall be borne as incurred.

This Final Award is in full settlement of all claims and counterclaims submitted to this arbitration. All claims not expressly granted herein are hereby, denied.

April 24, 2026
_____
Date

_____
Jeffrey H Dasteel, Arbitrator

I, Jeffrey H Dasteel, do hereby affirm upon my oath as arbitrator that I am the individual described in and who executed this instrument, which is my Final Award.

April 24, 2026
_____
Date

_____
Jeffrey H Dasteel, Arbitrator

**AMERICAN ARBITRATION ASSOCIATION** | INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®

---

**AMERICAN ARBITRATION ASSOCIATION**
**Consumer Arbitration Rules**

---

In the Matter of the Arbitration between

Case Number: 01-23-0005-3487

Kevin Montes

-vs-

Valve Corporation d/b/a Steam

---

**SECOND INTERIM AWARD OF ARBITRATOR**

I, Jeffrey H Dasteel, the undersigned arbitrator, having been designated in accordance with the arbitration agreement entered into between the above-named parties, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, each represented by counsel, and having issued a First Interim Award on December 15, 2025, do hereby issue this Second Interim Award as follows:

**<u>Introduction</u>**

In the first Interim Award, I found that the competitive relationship between Microsoft and Steam occurs at both the developer/publisher and distribution platform levels. The "Valve Corporation Distribution Agreement" between Respondent and Microsoft concerns the distribution of Microsoft-developed and published games on the Steam platform, and its role as distributor of its own games. Generally, this is a vertical agreement and does not bear on the relationship between Microsoft and the Respondent as competitors in the distribution of video games.

However, subsection (b) of Section 6.4 of the Microsoft agreement has horizontal effects. That Section provides that if Microsoft, as the developer/publisher/distributor of games that it offers for sale on the Respondent's platform,



One effect of this section is that if Microsoft lowers the price of one of its own games for distribution on its own platform, it must also lower the price it offers that product for sale on Respondent's platform. Microsoft employees

described this provision as a "price parity" requirement. This is a horizontal price-fixing agreement and is subject to the per se standard.

I further found that when a price-fixing agreement is subject to the per se rule, a party's justification for entering into it is irrelevant to a finding of a violation of the Act. *Leegin Creative Leather Products, Inc. v. PSKS, Inc., 551 U.S. 877, 883 (2007)* ("*The per se rule, treating categories of restraints as necessarily illegal, eliminates the need to study the reasonableness of an individual restraint in light of the real market forces at work.*"). Accordingly, it is irrelevant whether the purpose of the provision, as Respondent contended, was to ensure its customers benefited from lower prices.[1]

The first three prongs of a Section 1 claim were satisfied for those Microsoft games sold on both the Microsoft platform and the Respondent's platform. Having found that Section 6.4(b) of the Microsoft agreement is a per se violation of Section 1 of the Sherman Act, the final element in Claimant's claim is to establish antitrust injury. Because the violation would only apply to purchases of games subject to the Microsoft price parity agreement, Claimant must prove (1) that he purchased one or more of such games, and (2) would have paid less for the game in the absence of such an agreement. Although the record of Claimant's purchases is in evidence, the parties had not had an opportunity to distinguish which purchases were subject to the Microsoft price parity agreement and, for such purchases, what the quantum of damages is, if any. Accordingly, the parties were permitted to make further submissions on this issue.

The parties completed their submissions on this issue on February 9, 2026. The matter is now ripe for determination.

### Scope of the Microsoft-Valve Distribution Agreement

Respondent contends the price-fixing agreement between Microsoft and Valve was limited to those games listed in the written agreement and its addenda. Claimant contends that although the price parity agreement initiated in 2011 was originally in writing, the parties abandoned the practice of making addenda and adhered to the "price parity" terms of the agreement for all games offered on both Microsoft and Valve's platforms.  Further, Claimant contends the price-fixing agreement was applied to games produced by Microsoft's later-acquired subsidiaries.

Although Respondent provided evidence that a single game was excluded from the distribution agreement, Claimant provided persuasive evidence that Microsoft and Valve personnel applied the price parity requirements of the distribution agreement to all Microsoft games across the board, including games produced by Microsoft's subsequently acquired subsidiaries.

Respondent provided no evidence that either the written form of the price parity agreement or the practice of price parity was terminated. Accordingly, I find that the price-fixing agreement between Microsoft and Valve at the distribution level applied to all games Microsoft or its subsequently acquired subsidiaries offered for sale on both the Microsoft and Valve distribution platforms.

### Application to Non-Microsoft Games

Next, Claimant contends that the Microsoft-Valve price-fixing agreement affected all PC games across the market. The basis for this claim is that Microsoft and Valve have sufficient market power that a horizontal agreement between them would raise prices for all other PC games, regardless of distributor.  In my first interim award, I found that the Claimant had failed to prove market or monopoly power. Accordingly, Claimant's attempt to apply damages to all of Claimant's PC game purchases is rejected.

### Proof that the Games were Offered on Both Platforms

A prerequisite for recovery is proof that the subject games were offered for sale on both Microsoft and Valve platforms. In its opposition submission, Respondent provided a list of games it conceded were subject to the written distribution agreement with a column labeled "Sold on Microsoft Platform." The column includes question marks for each game, as though Respondent was unable to determine whether it had an exclusive right to distribute the game on

---

[1] Even so, Respondent's justification cannot be accepted solely at face value because a probable effect of the price parity policy is to discourage Microsoft from lowering the prices of its games on its distribution platform because to do so would require it to provide an equal reduction on Respondent's platform, eliminating any potential economic advantage when competing for customers and thereby putting competitive pressure on Respondent to reduce its 30% share of game sale revenues.

its platform. Claimant provided evidence that Microsoft marketed its own games on its own distribution platform. First, the original 2011 distribution agreement itself is evidence. Indeed, it would make no sense to have such an agreement if Microsoft did not offer PC games for sale on its own distribution platform. Second, the communications between Microsoft and Valve personnel concerned both specific and general statements of parity pricing between the two distribution platforms.

In the absence of a showing that Valve had an exclusive right to distribute one or more Microsoft games—something within Respondent's knowledge—I find it more likely than not that all games developed and published by Microsoft and its subsidiaries that were available on Respondent's platform also were available for purchase on Microsoft's platform.

## Claimant's Purchases

Claimant submitted evidence that he made 14 Microsoft game purchases from Respondent. Three of the purchases (Fallout 4: Game of the Year Edition, Doom Eternal Standard Edition, and Fallout 76) were Steam Key purchases. As I found in the First Interim Award, the price parity policy for the sale of Steam Keys does not violate the Rule of Reason applicable to vertical restraints of trade. The remaining purchases, totaling $102.39, fall within the limitations period.

## Damages

The measure of damages is what Claimant would have paid in the absence of the price-fixing agreement between Respondent and Microsoft. Although Respondent contends there are no damages, that position ignores the reality that Microsoft's sales on its own platform would not be burdened by the 30% fee Respondent charges for access to its platform.  Claimant's expert estimated that, using a "but for" analysis (the Boik and Cortes model), Claimant paid an approximately 20% premium due to the price-fixing scheme. The formula to determine damages based on this model is $P(actual) \cdot (1-1/1.20) = P(actual) \cdot 0.2/1.20 = 16.67\%$ of $P(actual) = \$17.07$. Under antitrust law, damages are trebled. Accordingly, Claimant's total damages award is $51.21.

## Prevailing Party

Claimant is the prevailing party in this action. Under the antitrust laws, Claimant is entitled to recover his reasonable costs and attorney's fees. The parties shall make their submissions on costs and attorney's fees as follows: Claimant's opening submission shall be due ten days from the date of this Second Interim Award. Respondent's submission shall be due ten days following Claimant's submission. Claimant's reply submission shall be due seven days following Respondent's submission.

**SECOND INTERIM AWARD**

The first Interim Award, dated December 15, 2025, is incorporated by reference as though fully set forth herein.

Claimant shall recover damages in the total amount of $51.21, plus costs and attorney's fees, which shall be the subject of a Final Award.

Except as otherwise provided above, this Second Interim Award is in full settlement of the merits of all claims submitted to this arbitration. The Arbitrator retains jurisdiction to address costs and attorney's fees. The matter shall be deemed submitted to the Arbitrator for determination in a Final Award upon and after the submissions scheduled above. This Second Interim Award shall remain in full force and effect until the arbitrator renders a Final Award.

February 26, 2026
_____
Date

_____
Jeffrey H Dasteel, Arbitrator

I, Jeffrey H Dasteel, do hereby affirm upon my oath as arbitrator that I am the individual described in and who executed this instrument, which is my Award.

February 26, 2026
_____
Date

_____
Jeffrey H Dasteel, Arbitrator



**AMERICAN ARBITRATION ASSOCIATION**
**Consumer Arbitration Rules**

In the Matter of the Arbitration between

Case Number: 01-23-0005-3487

Kevin Montes
-vs-
Valve Corporation d/b/a Steam

### INTERIM AWARD OF ARBITRATOR

I, Jeffrey H Dasteel, the undersigned arbitrator, having been designated in accordance with the arbitration agreement entered into between the above-named parties, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, each represented by counsel, at an evidentiary hearing held on October 13, 2025, do hereby issue this INTERIM AWARD as follows:

Claimant alleges violations of Sections 1 and 2 of the Sherman Antitrust Act. Based on the evidence presented by the parties at the merits hearing in this matter, I make the following findings of fact.

**Respondent's Distribution of Video Games**

Respondent Valve Corporation operates a website under the tradename "Steam" to distribute video games created by Respondent and other game developers/publishers. Although the parties dispute the extent of Steam's market share, there is no dispute that Steam is the largest online PC Gaming Store. It has a three-tiered revenue sharing scheme. Developers/publishers set the prices for their games on the Steam platform and on any other platform on which they participate. On the Steam platform, the first $10 million in a game's total revenues is subject to a 30% revenue share. The next $40 million is subject to a 25% revenue share. Anything over $50 million is at 20% revenue share. This applies to all developers/publishers regardless of size or total volume. Other platforms may either charge a lower revenue share or use a different compensation method that is equivalent to a lower revenue share. There is no revenue share payable to Respondent by developers/publishers who distribute their products on their own platforms or non-Steam platforms.

The evidence established that Steam has several pricing and advertising policies designed to ensure Steam's prices are equal to or lower than the lowest prices game developers offer on other sites. If a developer or publisher offers a product for presale on any platform or outlet at a price below that offered on Steam, Steam may elect to stop preselling the product on its website. However, Steam will continue to sell the product in the ordinary course even if its price is above that available on other platforms or outlets.

Sellers/Publishers are not required by Steam's distribution agreement to be exclusive to Steam. However, due to its large customer base and the ease with which a developer can make a game available for sale on Steam, many, if not most, PC games are sold exclusively on Steam. This matter concerns only games available on multiple sites. In that regard, the evidence supported a finding that Respondent has an intermittently enforced policy that if a developer/publisher sells its product on another site, it risks losing access to Steam's customer base if it regularly undercuts the price it offers to Steam customers.

Claimant contends that there is an agreement between Microsoft and Steam to maintain price parity for Microsoft products across the Steam and Microsoft stores. The source of Claimant's contention is Section 6.4 of the "Valve Corporation Distribution Agreement" between Respondent and Microsoft." Although subsection (a) of that

Section concerns Microsoft's role as developer/publisher of games, subsection (b) concerns Microsoft's distribution of its games on its own distribution platform, which is in direct competition with Respondent's platform.

Claimant contends that Steam enforces a price-parity scheme in connection with its distribution of so-called Steam Keys. A Steam Key is a code that permits the user to access a particular PC game on the Steam website. Steam provides the Keys to developers at no charge. Developers can then distribute the Keys on their own platforms or sell them to other platforms. Although Steam receives no revenue from the initial sale of a Steam Key, the sale of a Steam Key drives customers to use the Steam platform, where they may purchase DLC (in-game downloadable content) or MTX (in-game microtransactions for the purchase of, e.g., additional content). Steam receives a revenue share from these additional purchases.

If a developer or publisher sells Steam keys for a product at a discount from the price usually offered on Steam for the subject PC game, without providing Steam customers an equivalent discount, Steam's policy is to inform the developer/publisher that it may not receive additional keys for that product or other products. Furthermore, price-parity for Steam Keys is a written requirement in the Steam Key guidelines. Failure to follow the Steam Key guidelines can result in no further Steam Keys being issued or the offending game being dropped from the Steam platform.

Finally, Claimant contends that Respondent engages in a practice to prevent its customers from buying in-game content from any other distributor. Although the evidence was equivocal, Respondent's practice appears to be that when a PC game offers an in-game purchase option, the default and perhaps sole purchase method is through Respondent's platform. Although it might be possible for a customer to access the developer/publisher's website from within the game and purchase the DLC or MTX there, if such an option is available, it appears that the customer would have to go through multiple steps to do so.

**Claimant's PC Game Purchases**

Claimant is a consumer of PC games. Although Claimant purchases games on multiple platforms, Claimant predominantly purchases them on Steam. Claimant offered three basic reasons. First, although Claimant sometimes searches other websites for games, discounts are rare. Second, by far the most significant number of games are available on Steam, many of which are exclusive to Steam. Third, because Claimant would lose all content on the Steam platform by moving to another platform, to maintain the investment in games, Claimant continues to purchase games on Steam. Claimant has made several thousand dollars in purchases for a large variety of games on the Steam platform. Claimant contends that but for Respondent's pricing policies, Claimant would have paid substantially less for PC games.

**The Relevant Market**

Claimant and Respondent each offered a different definition of the relevant market. Respondent contends the market should include all distribution outlets, including console games, brick-and-mortar sales, as well as distributors like Steam and direct sales from developers/publishers. Claimant contends the relevant market is limited to distribution platforms like Steam. Claimant analogizes Steam to a "shopping mall" where individual developers/publishers sell their products in "stores." Under this theory, a standalone store operated by the developer/publisher would not be a part of the relevant market.

Although there is limited crossover between the PC game market and the console market, they are predominantly separate markets that use distinct hardware. Some games can be cross-played on both hardware platforms, but that is the exception. Furthermore, some developers/publishers sell their games on platforms that are indistinguishable from Steam's (e.g., Epic). Some platforms, like Steam, are hybrid sites where the platform operator sells third-party games as well as content from its own affiliates. The relevant market is the distribution of PC games online or in-store, regardless of whether the distribution platform is operated by the developer/publisher, a third party, or a hybrid site.

The evidence established that PC games sell at different prices across different geographic markets. The evidence established that North America is the relevant geographical market for Claimant's claims.

**Claimant's Section 1 Claim**

Claimant contends that Respondent's pricing policies constitute a per se violation of Section 1 of the Sherman Act. In the alternative, assuming the Rule of Reason applies, Claimant contends Respondent's policies are anti-competitive price-fixing in violation of the Act.

*Applicability of the Per Se or Rule of Reason Standard*

To establish a violation of Section 1 of the Sherman Act, a plaintiff must prove the following: (1) the existence of a contract, combination, or conspiracy between or among at least two separate entities; (2) that the contract, combination, or conspiracy unreasonably restrains trade; (3) that the restraint affects interstate or foreign commerce; and (4) that the restraint caused plaintiff to suffer an injury to its business or property. 15 U.S.C. §1; ABA Model Instruction 2.

Some restraints on trade are considered so pernicious that they are per se unlawful. *Leegin Creative Leather Products, Inc. v. PSKS, Inc., 551 U.S. 877, 883 (2007).* As a general rule, horizontal price-fixing agreements are per se unlawful without requiring an examination of the agreement's justifications. *Id.* On the other hand, vertical agreements typically fall under the Rule of Reason. *Id.*

Although Respondent contends that so-called hybrid relationships are examined under the Rule of Reason (citing *United States v. Brewbaker, 87 F.4th 563 (4th Cir. 2023)*, there is no general agreement on that standard. Instead, where the alleged participants in the subject agreement occupy multiple levels in the manufacture and means of distribution, whether an agreement among them falls within the per se or Rule of Reason standard depends on the manufacturing or distribution level engaged in by the parties that is subject to the agreement.

Here, the agreement regarding the use of Steam Keys is made between Steam, as the distributor, and the third-party developer/publisher. This is a vertical relationship and, therefore, falls under the Rule of Reason. That Respondent develops and publishes its own games is irrelevant to the agreement.

Similarly, the distribution agreement between Steam and third-party developers and publishers to offer games on Steam's platform is a vertical relationship. The Rule of Reason also applies to those agreements. Although Respondent competes with the third-party developers/publishers at that level of the distribution chain, the distribution agreement does not bear on that relationship.

The competitive relationship between Microsoft and Steam occurs at both the developer/publisher and distribution platform levels. The "Valve Corporation Distribution Agreement" between Respondent and Microsoft concerns the distribution of games developed and published by Microsoft on the Steam platform, in its role as distributor of its own games. This is a vertical agreement and does not bear on the relationship between Microsoft and the Respondent as competitors in the development and publishing of video games.

However, subsection (b) of Section 6.4 of the Microsoft agreement has horizontal effects. That Section provides that if Microsoft, as the developer/publisher of games that it offers for sale on the Respondent's platform,



One effect of this section is that if Microsoft lowers the price of one of its own games for distribution on its platform, it must also lower the price it offers that product for sale on Respondent's platform. Microsoft employees described this provision as a "price parity" requirement. This is a horizontal price-fixing agreement and is subject to the per se standard.

***Section 6.4(b) Is a Per Se Violation of Section 1 of the Sherman Act***

When a price-fixing agreement is subject to the per se rule, a party's justification for agreeing is irrelevant to finding a violation of the Act. *Leegin at 883* ("*The per se rule, treating categories of restraints as necessarily illegal, eliminates the need to study the reasonableness of an individual restraint in light of the real market forces at work.").* Accordingly, it is irrelevant whether the purpose of the provision, as Respondent contends, was to ensure its customers benefited from lower prices.[1]

The first three prongs of a Section 1 claim are satisfied for those Microsoft games sold on both the Microsoft platform and the Respondent's platform. The fourth prong (damages) is addressed below.

***No Violation Under the Rule of Reason for the Other Claims***

Under the Rule of Reason, there must be an analysis of the pro- and anti-competitive effects of the subject pricing policies. *Id. ("In its design and function the rule [of reason] distinguishes between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest.").* There are three policies subject to that examination: (1) the price parity policy for the sale of Steam Keys by developers/publishers, (2) the distribution agreement between Respondent and third-party developers/publishers, and (3) the so-called "free rider" policy requiring customers to make in-game purchases through Respondent.

The price parity policy for the sale of Steam Keys does not violate the Rule of Reason. The primary purposes of Steam Keys are two-fold (1) to assist a developer/publisher in the launch of and distribution of its games, and (2) to drive traffic to Respondent's platform because the Keys can only be redeemed on Respondent's platform. Respondent's price parity policy is designed to ensure that Respondent's customers, who cannot purchase Steam Keys directly on the website, are not disadvantaged by the discounted sale of the Keys on other platforms. The Keys are provided to the developer/publisher free of charge, and the sale of which to the public on other platforms generates no revenue to Respondent. The policy's pro-competitive effects, which provide a variety of PC games to the public, outweigh any anti-competitive effects.

Claimant contends that Respondent's policies in connection with the distributor agreement between Respondent and third-party developers/publishers violate the Rule of Reason in two ways: (1) if a developer/publisher undercuts the Respondent's prices on other platforms, Respondent will not presell the subject game at an advantageous location on its webpage; and (2) if a developer/publisher sells its product on another site, it risks losing access to Steam's customer base if it regularly undercuts the price it offers on Steam. Claimant contends that, given Respondent's dominance in the marketplace, the effect of these two policies is to discourage developers/publishers from offering price discounts on other platforms.

Respondent contends that the effect of these policies is to encourage developers/publishers to offer discounts on Respondent's platform, thereby reducing the cost to consumers. Claimant argues that developers/publishers cannot reduce the price on Respondent's platform in the same manner as on other platforms because Respondent's revenue share is higher than the other platforms charge, so that the developer/publisher can make the same profit for the sale of a game on different platforms at a lower price than would be available on Respondent's platform.[2]

The problem with Claimant's contention is that it depends on Respondent having sufficient market power to coerce a developer/publisher into not lowering its prices on other platforms to maintain price parity. Whether the Respondent has market power is a question of fact, with the Claimant bearing the burden of proof. It was undisputed that there are a variety of competing platforms in the PC game industry. Claimant presented expert testimony asserting that Respondent has an upwards of 70% market share and is by far the most dominant platform in the industry. However, Claimant's expert based his market share analysis on opaque industry magazine articles and broad assumptions of industry revenues. It does not buttress the expert's conclusions that the Respondent's expert could have had access to reliable data. It was not the Respondent's burden to prove the absence of market share.

---

[1] Even so, Respondent's justification cannot be accepted solely at face value because a probable effect of the price parity policy is to discourage Microsoft from lowering the prices of its games on its distribution platform because to do so would require it to provide an equal reduction on Respondent's platform, eliminating any potential economic advantage when competing for customers.

[2] There was evidence that the revenue share charged by Respondent was not unique in the industry, though on the high end.

Although it very well may be that Respondent has the largest market share in the industry enough to constitute market power, it was Claimant's burden to prove that fact with reliable, admissible evidence. It did not do so.[3] Without proof of market power, the potential anti-competitive effects of Respondent's policies do not outweigh the pro-competitive effects or Respondent's right to determine whether to offer a third-party product and under what circumstances it will promote that product.

Finally, Respondent's apparent policy to direct purchases of DLC and MTX to its own platform does not violate the Rule of Reason. A core means for developers/publishers to gain revenue is from in-game purchases. Indeed, the evidence established that many developers/publishers provide their PC games free, making downloadable content their only source of revenue. Respondent's sole source of income from PC games uploaded by third-party developers is revenue sharing. Accordingly, Respondent has made its platform attractive to those developers/publishers who depend solely on in-game purchases. It is not anti-competitive for Respondent to favor its own platform for such purchases, as that is the only source of revenue it will receive for the service of making the developer/publisher's otherwise free content available to consumers. In the absence of such a policy, consumers likely would not have access to the "free" games because Respondent would have no means to recoup its costs for maintaining such games on its platform.

### Claimant's Section 2 Claim

"There are three essential elements to a successful claim of Section 2 monopolization: (a) the possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal 'antitrust' injury." *Allied Orthopedic v. Tyco Health*, 592 F. 3d 991, 998 (9th Cir. 2010) (quoting *Cal.Computer Prods., Inc. v. Int'l Bus. Mach. Corp.,* 613 F.2d 727, 735 (9th Cir.1979).

"To prove its monopolization claim, plaintiff must prove that defendant has monopoly power in a relevant antitrust market. Monopoly power is the power to control prices, restrict output, and exclude competition in a relevant antitrust market. More precisely, a firm is a monopolist if it can profitably raise prices substantially above the competitive level for a significant period of time." *ABA Model Instructions, A-104. "*Market power and monopoly power are related but distinct concepts. As the Supreme Court has stated: 'market power is the ability to raise prices above those that would be charged in a competitive market.' Monopoly power is 'the power to control prices or exclude competition.'" *Epic Games, Inc. v. Apple Inc., 559 F.Supp.3d 898, 1028 (2021) (internal citations omitted).*

Here, as noted above, Claimant has failed to carry its burden of proof to establish market power. Monopoly power is an extreme form of market power. *Id.* Accordingly, Claimant's Section 2 claim fails to satisfy an essential element and, therefore, is dismissed with prejudice.

### Claimant's Cartwright Act Claim

Claimant contends Respondent violated California's Cartwright Act. Respondent makes two procedural arguments in opposition to Claimant's Cartwright claim. First, Respondent objects to the claim being raised because it was not pleaded. As the Claimant notes, this argument was rejected at the October 13, 2025, hearing of this matter. Respondent's counsel expressly acknowledged that the assertion of a Cartwright claim was not a surprise and had been the subject of a back-and-forth many times, including on the merits. (Tr. October 13, 2025, at 12-16.) Indeed, Respondent's counsel acknowledged that the sequential briefing process for the closing argument provided sufficient opportunity to address the issues. (Id. ("*Yeah. We're happy to respond to it, but all the more important then that we get the sequential briefs in case there is a new flavor to it.").)* Respondent's first objection is overruled.

Respondent next argues that Washington State law applies pursuant to the terms of the agreement between Claimant and Respondent. Claimant contends that application of Washington State law to Claimant's claims would violate California's fundamental antitrust policy as set forth in the Cartwright Act. Although Washington State has an analogous state antitrust law, Claimant contends California has a greater interest in enforcing its law because it purportedly applies a per se standard to vertical restraints of trade, whereas Washington State law apparently follows federal law as announced in *Leegin.*

---

[3] Claimant complains that Respondent has the necessary data to determine market share, but did not provide it in discovery. However, the time to resolve discovery disputes has long passed.

There are two issues with the Claimant's analysis. First, simply because the outcome might be different does not mean one state or the other has a greater enforcement interest. The question is whether both states have a fundamental policy prohibiting anti-competitive conduct. Because both Washington and California have similar statutes barring anti-competitive conduct, there is no violation of California's fundamental policy.

Second, it is unclear whether the California Supreme Court will decline to apply *Leegin* to vertical price restraints. Claimant cites two cases in support of its contention. The first case, *Alsheikh v. Superior Court, Ct. Appeals, Oct. 7, 2013,* was ordered not to be published and, pursuant to California Rules of Court 8.1115(a), parties are prohibited from relying on the case as precedent. The second case, *Alan Darush MD APC v. Revision LP, Not Reported in F.Supp.2d (2013),* does, as Claimant contends, apply the per se rule to a vertical restraint of trade. It does so on the theory that the California Supreme Court, though often relying on federal precedent for the interpretation of the Cartwright Act, also relies on state precedent to some degree and has not yet overruled its decision in *Mailand v. Burckle, 20 Cal.3d 367, 143 Cal.Rptr. 1, 572 P.2d 1142, 1147 (Cal.1978)*. Although the court applied a per se rule, it also stated that "*[i]t is unclear, however, whether that decision [Leegin], which interpreted the Sherman Act, applies to the Cartwright Act." Id.* Ambiguity concerning the nuanced application of state antitrust law does not arise to the level of a fundamental difference in state policy.

Based on the foregoing, Claimant has failed to establish that application of Washington State law would violate a fundamental policy of California law. Therefore, the Washington State choice of law will be confirmed, and the Cartwright claim is dismissed.

**Damages**

Having found above that Section 6.4(b) of the Microsoft agreement is a per se violation of Section 1 of the Sherman Act, the final element in Claimant's claim is to establish antitrust injury. Because the violation would only apply to purchases of games subject to the Microsoft agreement, Claimant must prove (1) that he purchased one or more of such games, and (2) would have paid less for the game in the absence of such an agreement. Although the record of Claimant's purchases is in evidence, the parties have not had an opportunity to distinguish which purchases were subject to the Microsoft agreement and, for such purchases, what the quantum of damages is, if any. Accordingly, the parties shall make further submissions pursuant to the schedule below.

Claimant shall make his opening submission by no later than December 30, 2025

Respondent shall make its opposing submission by no later than January 9, 2026

Claimant shall make any reply submission by no later than January 15, 2026

**Prevailing Party**

A prevailing party determination will be made as part of the damages Award.

Except as otherwise provided above, this Interim Award is in full settlement of the merits of all claims submitted to this arbitration. The Arbitrator retains jurisdiction to address these issues. The matter shall be deemed submitted to the Arbitrator for determination in a further Award upon and after the submissions scheduled above. This Interim Award shall remain in full force and effect until the arbitrator renders a Final Award.

December 15, 2025
        Date                                                            Jeffrey H Dasteel, Arbitrator

I, Jeffrey H Dasteel, do hereby affirm upon my oath as arbitrator that I am the individual described in and who executed this instrument, which is my Interim Award.

December 15, 2025
        Date                                                            Jeffrey H Dasteel, Arbitrator

**AMERICAN ARBITRATION ASSOCIATION**
**Consumer Arbitration Rules**

In the Matter of the Arbitration between

Case Number: 01-23-0005-3504

Vincent Keegan
-vs-
Valve Corporation d/b/a Steam

**FINAL AWARD OF ARBITRATOR**

I, Jeffrey H Dasteel, the undersigned arbitrator, having been designated in accordance with the arbitration agreement entered into by the above-named parties, having been duly sworn, and having duly heard the proofs and allegations of the Parties, and having previously rendered an Interim Award dated December 15, 2025, and a second Interim Award dated February 26, 2026, which are confirmed, adopted, and incorporated as if fully set forth herein, do hereby issue this FINAL AWARD as follows:

**Procedural Posture**

In my December 15, 2025, Interim Award, all claims were dismissed except for Claimant's Section 1 price fixing claim. The Second Interim Award, dated February 26, 2026, found a violation of Section 1 of the Sherman Antitrust Act and awarded treble damages of $181.50. In addition, I found that Claimant was the prevailing party and entitled to an award of attorney's fees and costs.  Claimant's submission seeks $704,269.13 in attorney's fees, $54,380.73 in costs, plus 12% prejudgment and postjudgment interest on all amounts.

Respondent opposes Claimant's request for fees and costs on several grounds. First, Respondent contends that Claimant seeks fees incurred for other matters and therefore I lack the authority to make such an award. Second, Respondent contends Claimant's fee request is unreasonable because Claimant did not prevail on most of his claims, the fee request is disproportionate to the level of success achieved in litigation and the amount at stake, the hourly rates charged by Claimant's attorneys are excessive, and the 1.5 multiplier requested by Claimant is unwarranted in this case. Third, Respondent contends that it would have been unethical to bill Claimant for the requested fees and, therefore, it should be unethical to require Respondent to pay these amounts. Fourth, Respondent contends the claim for expert witness costs and prejudgment interest is unreasonable. Finally, Respondent identifies individual time entries that it contends are either too vague or not appropriate for reimbursement.

**Jurisdiction to Award Attorney's Fees and Costs**

Pursuant to Consumer Rule 44(a), "[t]he arbitrator may grant any remedy, relief, or outcome that the parties could have received in court, including awards of attorney's fees and costs, in accordance with the law(s) that applies to the case."  Section 4 of the Clayton Act provides in part that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

In the Second Interim Award, I found that Claimant suffered injury under Section 1 of the Sherman Act and, therefore, is entitled to the cost of suit and a "reasonable" attorney's fee. As mandated by the parties' arbitration agreement, the award of attorney's fees and costs is limited to the prosecution of Claimant's individual case. In that regard, Respondent contends that the claimed fees should be divided by 50,000 to account for all the other claimants represented by Claimant's counsel in virtually identical matters. Respondent notes that it has prevailed in the vast majority of the other cases and that compensating this Claimant for the work done in common with the other cases would be unfair because the Claimant's counsel is not entitled to recover fees for the cases in which Respondent prevailed.

Claimant's counsel's fees can be broken down into five categories: (1) fees incurred in the common preparation of various matters; (2) fees incurred exclusively for Claimant's matter; (3) fees incurred for another matter, but the work product was used in Claimant's matter; (4) fees incurred for another matter, where the work product was not used in Claimant's matter; and (5) time entries that cannot be segregated into any of the four preceding categories.

It is undisputed that fees incurred exclusively for this Claimant's matter are recoverable. Where work is done that is common to more than one matter, such fees also are recoverable so long as there is no duplicative recovery. That Claimant's counsel, as a matter of efficiency, reuses work product in multiple matters, does not mean the work was not properly incurred for this Claimant in this individual matter. Indeed, to hold otherwise when the Respondent's form of arbitration agreement insisted on individual actions and prohibited class actions would multiply attorneys' fees rather than reduce them. For example, instead of hearing claimants' joint expert once in a single matter, I would have been required to hear the same testimony multiple times at a significant increased cost in attorney's fees and expert witness costs. Similarly, if attorney's fees were incurred in another matter, but the work product was used in this matter (rather than repeat the same work here), such work is recoverable here so long as there is no duplicative recovery.

Where attorney's fees were incurred in a separate matter, and the work product was not used here, Claimant cannot recover those fees. In addition, where counsel's time entries cannot be segregated into recoverable and non-recoverable fees, as the onus was on Claimant's counsel to keep clear time records, such fees are not recoverable.

**Relative Success as a Measure of Attorney's Fees**

Claimant's success in this litigation was modest in comparison to his initial claims. He prevailed on a single claim, with all others dismissed. However, there was significant commonality among the claims so that there was no practical way to segregate his various antitrust claims.

Further, as noted in Claimant's submission, significant fees were expended in the procedural jockeying between the parties relevant to all claims. As is typical in litigation, in the absence of bad faith, such fees are recoverable even when Claimant's record of success was mixed.

Accordingly, there will be no reduction based on Claimant's relative success in achieving his litigation goals.

**Ethical Considerations**

Next, Respondent contends that because it would be unethical to bill Claimant hundreds of thousands of dollars for a claim that amounted to at most a few thousand dollars, it must be unethical to seek recovery of such fees from Respondent. Respondent's authority is weak and would eviscerate the consumer protection laws. For any modest claim, virtually any fee could be viewed as excessive in comparison to

the stakes, thereby cutting consumers off from the ability to retain competent counsel on a contingency fee basis. Further, nothing in Section 4 of the Clayton Act justifies such a restriction.

**Relationship of the Fee Request to the Amounts in Dispute**

Respondent contends a fee request that is orders of magnitude greater than the amount in dispute and success achieved is per se unreasonable. First, as noted above, in low dollar consumer cases the amount of fees awarded to a prevailing consumer often far exceeds the amount of damages recovered. Second, Claimant's counsel did not incur fees in a vacuum. Although within the bounds of a zealous defense, Respondent's counsel raised an extraordinary number of motions and procedural issues during these proceedings requiring Claimant to respond. It is safe to say that neither side treated this matter as a small claims court case. Although Respondent is free to defend itself as it sees fit within ethical constraints, if it chooses to engage in extensive litigation, it cannot then complain that Claimant's counsel incurred substantial fees in the process.

**Reasonable Hourly Rates**

Respondent contends that Claimant's counsel's hourly rates are two or three times the prevailing rates that should be permitted. However, Respondent has failed to show that the rates it is billed by its attorneys are any less than those Claimant claims here. Further, Claimant has shown that Respondent's lead counsel charged rates similar to those claimed here in another antitrust case. In the absence of a showing that Claimant's counsel's hourly rates exceed those granted for similar litigation, Respondent's objection is overruled.

**Multiplier**

Claimant seeks a 1.5 times multiplier on fees due to the complexity of the matter, the duration from time of filing to award, and the contingency fee nature of the case. Although those are indeed factors in determining whether there should be a multiplier and, if so, how much, Claimant's relative success also is a consideration. Here, Claimant's success was low in comparison to his original claim. In addition, unlike in class actions, where Claimant's counsel has one chance to recover fees, here Claimant's counsel reportedly filed thousands of individual matters under identical theories of recovery. All that claimant's counsel needed to do was prevail in one of them to make a substantial attorney's fee recovery, thereby substantially reducing counsel's contingency risk.

Based on the foregoing, I award Claimant a multiplier of 1.1.

**Individual Time Entries**

Respondent notes a series of time entries that it considers to be too vague or merges time properly applicable to this matter with other matters for which time is not recoverable. Respondent contends these are "examples," implying there might be additional entries to challenge. However, Claimant did his part by providing detail from his counsel's time sheets. The burden then shifted to Respondent to identify which of those entries are subject to challenge.

Based on my review of the challenged time entries, I will deduct one fourth of $55,116.45 ($13,779.11) from this Claimant's fee request.

Respondent also seeks a reduction of $125,755.80 for "team meetings." Team meetings are a necessary part of any complex litigation and, therefore, generally recoverable. The problem here is that team meetings regarding other matters may not be recoverable, depending on whether the matters discussed in the meetings benefited the prosecution of Claimant's case. Without additional detail, I am constrained to

grant Respondent's application to reduce fees by that amount.[1] A one-quarter share will be deducted from this Claimant's fee request ($31,438.95).

**Claimant's supplemental fee request**

In addition to the fees claimed in the opening submission, Claimant seeks fees incurred since that date, including fees for the defense of his fee request. Although it is reasonable to recover fees for the preparation of his fee request, it is not reasonable to recover fees unrelated to that request, including time regarding any other matters. As Claimant's case has concluded, there is no basis to award fees for, e.g., considering the procedures to be used to resolve the remaining cases before me or subpoenas in those other cases. Following my review of the time entries provided in Claimant's reply briefing, I find $173,059.55 is related to this fee request. That amount is based on 217.6 hours of work, which is excessive in the context of a reply brief on fees. I am, therefore, exercising my discretion to reduce the supplemental fees approved for the reply brief to $60,000. Claimant's share is $15,000.

**Expert Witness Fees**

Claimant's expert witness, Dr. Castronova, testified in another Claimant's matter, with his testimony applicable to all other matters before me as agreed by the parties. As Claimant is entitled to a single recovery for those expenses, it is reasonable to either recover them once in this Claimant's matter or divide them among the other prevailing claimants before me. Counsel for Claimant has elected to divide the expert witness fee among the prevailing claimants.

Claimant also seeks recovery of expert witness costs for an expert who did not appear in Claimant's case either by live testimony or transcript from another matter. It is certainly Claimant's choice as to which expert to employ in a matter. However, Respondent is only responsible for the costs incurred by testifying experts. Claimant's claim for $123,312.50 for the non-testifying expert is denied. As Claimant's counsel appears to have divided that between four claimants, I will deduct $30,828.12 from this Claimant's costs award.

**Interest**

Although Claimant cites Washington State law regarding prejudgment and postjudgment interest, Claimant's entitlement to interest is governed by Section 4 of the Clayton Act, which provides:

> "The court may award under this section, pursuant to a motion by such person promptly made, simple interest on actual damages for the period beginning on the date of service of such person's pleading setting forth a claim under the antitrust laws and ending on the date of judgment, or for any shorter period therein, if the court finds that the award of such interest is just in the circumstances. In determining whether an award of interest under this section for any period is just in the circumstances, the court shall consider only—

> 1. whether such person or the opposing party, or either party's representative, made motions or asserted claims or defenses so lacking in merit as to show that such party or representative acted intentionally for delay, or otherwise acted in bad faith;

---

[1] Respondent also seeks to reduce the fees for team meetings that have been the subject of a fee application in another case. As I have granted the reduction for all generic "team meetings," a further reduction would be duplicative.

2.  whether, in the course of the action involved, such person or the opposing party, or either party's representative, violated any applicable rule, statute, or court order providing for sanctions for dilatory behavior or otherwise providing for expeditious proceedings; and

3.  whether such person or the opposing party, or either party's representative, engaged in conduct primarily for the purpose of delaying the litigation or increasing the cost thereof."

Claimant seeks interest on both his damages award and attorney's fees and costs.  However, by the express language of the statute, interest is potentially awardable only on "actual damages."  The delay in recovery of attorney's fees is a consideration under the multiplier (as noted above).

Respondent's representatives vigorously defended this matter. Although Claimant contends Respondent's counsel acted intentionally for delay, in bad faith, and to increase the cost of litigation, I do not agree.  In the matters before me, Respondent's counsel has complied with all deadlines and, though providing a vigorous defense, counsel's conduct was within the bounds of zealous advocacy. Prejudgment interest is therefore denied.

Claimant also seeks postjudgment interest. As quoted above, Section 4 of the Clayton Act is limited to interest up to the date of judgment. It is outside my jurisdiction to award interest after the date of my award.

**Calculation of Fees and Expenses**

From Claimant's claim of $704,269.13 in attorney's fees in his opening submission, I have subtracted $13,779.11 for individual time challenges and $31,438.95 for team meetings.  I have added $15,000 for the reply brief on fees. The net fees awarded before the multiplier is $674,051.07. With the 1.1 multiplier, the total fee award is $741,456.18.

From Claimant's claim of $54,380.73 in costs, I have subtracted $30,828.12 for Claimant's one-quarter share of the non-testifying expert's fees. The net expense award is $23,552.61.

## FINAL AWARD

Within thirty days after the date of this Final Award, Respondent shall pay to Claimant's counsel's client trust fund the following amounts:

Actual damages trebled in the amount of $181.50.

Attorney's fees in the amount of $741,456.18.

Costs in the amount of $23,552.61.

The administrative fees of the American Arbitration Association shall be borne as incurred, and the compensation of the arbitrator shall be borne as incurred.

This Final Award is in full settlement of all claims and counterclaims submitted to this arbitration. All claims not expressly granted herein are hereby, denied.

| April 24, 2026 | | |
|---|---|---|
| Date | | Jeffrey H Dasteel, Arbitrator |

I, Jeffrey H Dasteel, do hereby affirm upon my oath as arbitrator that I am the individual described in and who executed this instrument, which is my Final Award.

| April 24, 2026 | | |
|---|---|---|
| Date | | Jeffrey H Dasteel, Arbitrator |

**AMERICAN ARBITRATION ASSOCIATION**
**Consumer Arbitration Rules**

In the Matter of the Arbitration between

Case Number: 01-23-0005-3504

Vincent Keegan
-vs-
Valve Corporation d/b/a Steam

**SECOND INTERIM AWARD OF ARBITRATOR**

I, Jeffrey H Dasteel, the undersigned arbitrator, having been designated in accordance with the arbitration agreement entered into between the above-named parties, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, each represented by counsel, and having issued a First Interim Award on December 15, 2025, do hereby issue this Second Interim Award as follows:

## Introduction

In the first Interim Award, I found that the competitive relationship between Microsoft and Steam occurs at both the developer/publisher and distribution platform levels. The "Valve Corporation Distribution Agreement" between Respondent and Microsoft concerns the distribution of games developed and published by Microsoft on the Steam platform in its role as distributor of its own games. Generally, this is a vertical agreement and does not bear on the relationship between Microsoft and the Respondent as competitors in the distribution of video games.

However, subsection (b) of Section 6.4 of the Microsoft agreement has horizontal effects. That Section provides that if Microsoft, as the developer/publisher/distributor of games that it offers for sale on the Respondent's platform,



One effect of this section is that if Microsoft lowers the price of one of its own games for distribution on its own platform, it must also lower the price it offers that product for sale on Respondent's platform. Microsoft employees

described this provision as a "price parity" requirement. This is a horizontal price-fixing agreement and is subject to the *per se* standard.

I further found that when a price-fixing agreement is subject to the per se rule, a party's justification for entering into it is irrelevant to a finding of a violation of the Act. *Leegin Creative Leather Products, Inc. v. PSKS, Inc., 551 U.S. 877, 883 (2007)* ("*The per se rule, treating categories of restraints as necessarily illegal, eliminates the need to study the reasonableness of an individual restraint in light of the real market forces at work.*"). Accordingly, it is irrelevant whether the purpose of the provision, as Respondent contended, was to ensure its customers benefited from lower prices.[1]

The first three prongs of a Section 1 claim were satisfied for those Microsoft games sold on both the Microsoft platform and the Respondent's platform. Having found that Section 6.4(b) of the Microsoft agreement is a per se violation of Section 1 of the Sherman Act, the final element in Claimant's claim is to establish antitrust injury. Because the violation would only apply to purchases of games subject to the Microsoft price parity agreement, Claimant must prove (1) that he purchased one or more of such games, and (2) would have paid less for the game in the absence of such an agreement. Although the record of Claimant's purchases is in evidence, the parties had not had an opportunity to distinguish which purchases were subject to the Microsoft price parity agreement and, for such purchases, what the quantum of damages is, if any. Accordingly, the parties were permitted to make further submissions on this issue.

The parties completed their submissions on this issue on February 9, 2026. The matter is now ripe for determination.

## Scope of the Microsoft-Valve Distribution Agreement

Respondent contends the price-fixing agreement between Microsoft and Valve was limited to those games listed in the written agreement and its addenda. Claimant contends that although the price parity agreement initiated in 2011 was originally in writing, the parties abandoned the practice of making addenda and adhered to the "price parity" terms of the agreement for all games offered on both Microsoft and Valve's platforms. Further, Claimant contends the price-fixing agreement was applied to games produced by Microsoft's later-acquired subsidiaries.

Although Respondent provided evidence that a single game was excluded from the distribution agreement, Claimant provided persuasive evidence that Microsoft and Valve personnel applied the price parity requirements of the distribution agreement to all Microsoft games across the board, including games produced by Microsoft's subsequently acquired subsidiaries.

Respondent provided no evidence that either the written form of the price parity agreement or the practice of price parity was terminated. Accordingly, I find that the price-fixing agreement between Microsoft and Valve at the distribution level applied to all games Microsoft or its subsequently acquired subsidiaries offered for sale on both the Microsoft and Valve distribution platforms.

## Application to Non-Microsoft Games

Next, Claimant contends that the Microsoft-Valve price-fixing agreement affected all PC games across the market. The basis for this claim is that Microsoft and Valve have sufficient market power that a horizontal agreement between them would raise prices for all other PC games, regardless of distributor. In my first interim award, I found that the Claimant had failed to prove market or monopoly power. Accordingly, Claimant's attempt to apply damages to all of Claimant's PC game purchases is rejected.

## Proof that the Games were Offered on Both Platforms

A prerequisite for recovery is proof that the subject games were offered for sale on both Microsoft and Valve platforms. In its opposition submission, Respondent provided a list of games it conceded were subject to the written distribution agreement with a column labeled "Sold on Microsoft Platform." The column includes question marks for each game, as though Respondent was unable to determine whether it had an exclusive right to distribute the game on its platform. Claimant provided evidence that Microsoft marketed its own games on its own distribution platform.

---

[1] Even so, Respondent's justification cannot be accepted solely at face value because a probable effect of the price parity policy is to discourage Microsoft from lowering the prices of its games on its distribution platform because to do so would require it to provide an equal reduction on Respondent's platform, eliminating any potential economic advantage when competing for customers and thereby putting competitive pressure on Respondent to reduce its 30% share of game sale revenues.

First, the original 2011 distribution agreement itself is evidence. Indeed, it would make no sense to have such an agreement if Microsoft did not offer PC games for sale on its own distribution platform. Second, the communications between Microsoft and Valve personnel concerned both specific and general statements of parity pricing between the two distribution platforms.

In the absence of a showing that Valve had an exclusive right to distribute one or more Microsoft games—something within Respondent's knowledge—I find it more likely than not that all games developed and published by Microsoft and its subsidiaries that were available on Respondent's platform also were available for purchase on Microsoft's platform.

**Claimant's Purchases**

Claimant submitted evidence that he made fourteen Microsoft game purchases. Two of the purchases were made in 2013, and two additional purchases were made in 2015. For the reasons set forth below, claims regarding those four purchases are barred by the statute of limitations. The remaining purchases, totaling $362.90, fall within the statute of limitations.

**Statute of limitations**

Claimant submitted his demand for arbitration on December 19, 2023. The statute of limitations for a Section 1 price-fixing claim is four years. 15 U.S.C. § 15b. Absent tolling, the four-year statute of limitations bars claims for purchases made prior to December 19, 2019. Accordingly, to prevail on his damages claim, Claimant must show that a form of tolling applies to his purchase.

*The American Pipe Tolling Defense*

First, Claimant relies on the *American Pipe* tolling defense to the application of the statute of limitations. *Am. Pipe & Constr. Co. v. Utah* (1974) 414 U.S. 538). Claimant was a member of the putative class in the action *In re Valve Antitrust Litigation*, which was filed on behalf of consumers and game developers on April 27, 2021. On October 25, 2021, Claimant was ordered to arbitration. *Wolfire Games, LLC v. Valve Corp., D.C. WD Was. Case No. C21-0563-JCC (Oct. 25, 2021), slip op. at 2*. Accordingly, the statute of limitations for Claimant here was tolled from April 27, 2021, to October 25, 2021.

As of April 27, 2021, Claimant's 2013 and 2015 purchases were already time-barred. Accordingly, American Pipe does not act to resurrect that purchase.

*The Continuing Conspiracy Defense*

The price-fixing conspiracy between Microsoft and Respondent commenced in 2011. "To state a continuing violation of the antitrust laws in the Ninth Circuit, a plaintiff must allege that a defendant completed an overt act during the limitations period that meets two criteria: '1) It must be a new and independent act that is not merely a reaffirmation of a previous act; and 2) it must inflict new and accumulating injury on the plaintiff.' *Pace Industries, Inc. v. Three Phoenix Co.,* 813 F.2d 234, 238 (9th Cir.1987). This standard is meant to differentiate those cases where a continuing violation is ongoing—and an antitrust suit can therefore be maintained—from those where all the harm occurred at the time of the initial violation." *Samsung Elecs. Co. v. Panasonic Corp.,* 747 F.3d 1199 (9th Cir. 2014).

Here, the evidence established that Microsoft and Respondent continued to add new games to their price-fixing conspiracy, and each purchase by Claimant constituted a new injury. Accordingly, Claimant has established the applicability of the continuing conspiracy defense. However, where there is a continuing conspiracy, the cause of action to recover damages runs from each new purchase. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 338, 91 S. Ct. 795, 28 L.Ed.2d 77 (1971) ("In the context of a continuing conspiracy to violate the antitrust laws, ... each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act."). Accordingly, although the fact that Respondent entered into a price-fixing conspiracy in 2011 does not bar Claimant's claims, it does bar damages incurred more than four years before the *American Pipe* tolling limitations period. Therefore, the continuing conspiracy defense does nothing to resurrect Claimant's 2013 and 2015 purchases. Those purchases remain time barred.

*Fraudulent Concealment Defense*

"A statute of limitations may be tolled if the defendant fraudulently concealed the existence of a cause of action in such a way that the plaintiff, acting as a reasonable person, did not know of its existence." Hexcel Corp. v. Ineos Polymers, Inc., 681 F.3d 1055 (2012). The Claimant "must plead facts showing that [the defendant] affirmatively misled it, and that [the plaintiff] had neither actual nor constructive knowledge of the facts giving rise to its claim despite its diligence in trying to uncover those facts." Id.

"A fraudulent concealment defense requires a showing both that the defendant used fraudulent means to keep the plaintiff unaware of his cause of action, and also that the plaintiff was, in fact, ignorant of the existence of his cause of action." Id; Reveal Chat Holdco, LLC v. Facebook, Inc., 471 F.Supp.3d 981 (2020) ("Thus, "[a] fraudulent concealment defense requires a showing both that the defendant used fraudulent means to keep the plaintiff unaware of his cause of action, and also that the plaintiff was, in fact, ignorant of the existence of his cause of action." Reliance on private actions is insufficient to establish intent to defraud. Id. ("These allegations, however, do not include affirmative conduct on the part of Facebook to mislead Plaintiffs or the market, and Plaintiffs do not explain how any of these actions were affirmative acts that misled them.").

"If a defendant proves that the plaintiff had actual or constructive knowledge of the facts giving rise to the claim, the doctrine of fraudulent concealment does not apply." Id. "The plaintiff is deemed to have had constructive knowledge if it had enough information to warrant an investigation which, if reasonably diligent, would have led to the discovery of the fraud." Id. "The requirement of diligence is only meaningful, however, when facts exist that would excite the inquiry of a reasonable person." Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc., 858 F.2d 499 (1988).

Here, Claimant alleges that he meets the standard for fraudulent concealment because Respondent and Microsoft actively concealed their price parity agreement. However, as noted above, reliance on private actions between conspirators is not enough to support the requirement that the Claimant show that the Respondent affirmatively misled him about the existence of his claim. Claimant did not testify as to any representations made by Respondent concerning the price-fixing scheme. As noted by the *Reveal* court, if concealing the antitrust scheme without affirmative representations to the plaintiff were sufficient to satisfy fraudulent concealment, it would "effectively nullify the statute of limitations in these cases." Id.

This is a price-fixing case. Claimant's expert witness report declared that "Data analysis will show that game prices are largely the same across platforms in this market." Indeed, on page 39 of his report, Claimant's expert declares there is "Near Perfect Price Parity." If Claimant had conducted any investigation, according to Claimant's expert, he would have discovered the same prices for the games on both the Microsoft and Steam platforms. There was no attempt to conceal the customer-facing pricing, which is the basis of Claimant's claim.

Claimant has failed to establish the essential elements of his fraudulent concealment defense to the statute of limitations.

## Damages

The measure of damages is what Claimant would have paid in the absence of the price-fixing agreement between Respondent and Microsoft. Although Respondent contends there are no damages, that position ignores the reality that Microsoft's sales on its own platform would not be burdened by the 30% fee Respondent charges for access to its platform. Claimant's expert estimated that, using a "but for" analysis (the Boik and Cortes model Claimant paid an approximately 20% premium due to the price-fixing scheme. The formula to determine damages based on this model is $P(actual) \cdot (1-1/1.20) = P(actual) \cdot 0.2/1.20 = 16.67\%$ of $P(actual) = \$60.50$. Under antitrust law, damages are trebled. Accordingly, Claimant's total damages award is \$181.50.

## Prevailing Party

Claimant is the prevailing party in this action. Under the antitrust laws, Claimant is entitled to recover his reasonable costs and attorney's fees. The parties shall make their submissions on costs and attorney's fees as follows: Claimant's opening submission shall be due ten days from the date of this Second Interim Award. Respondent's

submission shall be due ten days following Claimant's submission. Claimant's reply submission shall be due seven days following Respondent's submission.

## SECOND INTERIM AWARD

The first Interim Award, dated December 15, 2025, is incorporated by reference as though fully set forth herein.

Claimant shall recover damages in the total amount of $181.50, plus costs and attorney's fees, which shall be the subject of a Final Award.

Except as otherwise provided above, this Second Interim Award is in full settlement of the merits of all claims submitted to this arbitration. The Arbitrator retains jurisdiction to address costs and attorneys' fees. The matter shall be deemed submitted to the Arbitrator for determination in a Final Award upon and after the submissions scheduled above. This Second Interim Award shall remain in full force and effect until the arbitrator renders a Final Award.

_____February 26, 2026_____
Date

_____
Jeffrey H Dasteel, Arbitrator

I, Jeffrey H Dasteel, do hereby affirm upon my oath as arbitrator that I am the individual described in and who executed this instrument, which is my Award.

_____February 26, 2026_____
Date

_____
Jeffrey H Dasteel, Arbitrator



**AMERICAN ARBITRATION ASSOCIATION**
**Consumer Arbitration Rules**

In the Matter of the Arbitration between

Case Number: 01-23-0005-3504

Vincent Keegan
-vs-
Valve Corporation d/b/a Steam

### INTERIM AWARD OF ARBITRATOR

I, Jeffrey H Dasteel, the undersigned arbitrator, having been designated in accordance with the arbitration agreement entered into between the above-named parties, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, each represented by counsel, at an evidentiary hearing held on October 16, 2025, do hereby issue this INTERIM AWARD as follows:

Claimant alleges violations of Sections 1 and 2 of the Sherman Antitrust Act. Based on the evidence presented by the parties at the merits hearing in this matter, I make the following findings of fact.

**Respondent's Distribution of Video Games**

Respondent Valve Corporation operates a website under the tradename "Steam" to distribute video games created by Respondent and other game developers/publishers. Although the parties dispute the extent of Steam's market share, there is no dispute that Steam is the largest online PC Gaming Store. It has a three-tiered revenue sharing scheme. Developers/publishers set the prices for their games on the Steam platform and on any other platform on which they participate. On the Steam platform, the first $10 million in a game's total revenues is subject to a 30% revenue share. The next $40 million is subject to a 25% revenue share. Anything over $50 million is at 20% revenue share. This applies to all developers/publishers regardless of size or total volume. Other platforms may either charge a lower revenue share or use a different compensation method that is equivalent to a lower revenue share. There is no revenue share payable to Respondent by developers/publishers who distribute their products on their own platforms or non-Steam platforms.

The evidence established that Steam has several pricing and advertising policies designed to ensure Steam's prices are equal to or lower than the lowest prices game developers offer on other sites. If a developer or publisher offers a product for presale on any platform or outlet at a price below that offered on Steam, Steam may elect to stop preselling the product on its website. However, Steam will continue to sell the product in the ordinary course even if its price is above that available on other platforms or outlets.

Sellers/Publishers are not required by Steam's distribution agreement to be exclusive to Steam. However, due to its large customer base and the ease with which a developer can make a game available for sale on Steam, many, if not most, PC games are sold exclusively on Steam. This matter concerns only games available on multiple sites. In that regard, the evidence supported a finding that Respondent has an intermittently enforced policy that if a developer/publisher sells its product on another site, it risks losing access to Steam's customer base if it regularly undercuts the price it offers to Steam customers.

Claimant contends that there is an agreement between Microsoft and Steam to maintain price parity for Microsoft products across the Steam and Microsoft stores. The source of Claimant's contention is Section 6.4 of the "Valve Corporation Distribution Agreement" between Respondent and Microsoft." Although subsection (a) of that

Section concerns Microsoft's role as developer/publisher of games, subsection (b) concerns Microsoft's distribution of its games on its own distribution platform, which is in direct competition with Respondent's platform.

Claimant contends that Steam enforces a price-parity scheme in connection with its distribution of so-called Steam Keys. A Steam Key is a code that permits the user to access a particular PC game on the Steam website. Steam provides the Keys to developers at no charge. Developers can then distribute the Keys on their own platforms or sell them to other platforms. Although Steam receives no revenue from the initial sale of a Steam Key, the sale of a Steam Key drives customers to use the Steam platform, where they may purchase DLC (in-game downloadable content) or MTX (in-game microtransactions for the purchase of, e.g., additional content). Steam receives a revenue share from these additional purchases.

If a developer or publisher sells Steam keys for a product at a discount from the price usually offered on Steam for the subject PC game, without providing Steam customers an equivalent discount, Steam's policy is to inform the developer/publisher that it may not receive additional keys for that product or other products. Furthermore, price-parity for Steam Keys is a written requirement in the Steam Key guidelines. Failure to follow the Steam Key guidelines can result in no further Steam Keys being issued or the offending game being dropped from the Steam platform.

Finally, Claimant contends that Respondent engages in a practice to prevent its customers from buying in-game content from any other distributor. Although the evidence was equivocal, Respondent's practice appears to be that when a PC game offers an in-game purchase option, the default and perhaps sole purchase method is through Respondent's platform. Although it might be possible for a customer to access the developer/publisher's website from within the game and purchase the DLC or MTX there, if such an option is available, it appears that the customer would have to go through multiple steps to do so.

**Claimant's PC Game Purchases**

Claimant is a consumer of PC games. Although Claimant purchases games on multiple platforms, Claimant predominantly purchases them on Steam. Claimant offered three basic reasons. First, although Claimant sometimes searches other websites for games, discounts are rare. Second, by far the most significant number of games are available on Steam, many of which are exclusive to Steam. Third, because Claimant would lose all content on the Steam platform by moving to another platform, to maintain the investment in games, Claimant continues to purchase games on Steam. Claimant has made several thousand dollars in purchases for a large variety of games on the Steam platform. Claimant contends that but for Respondent's pricing policies, Claimant would have paid substantially less for PC games.

**The Relevant Market**

Claimant and Respondent each offered a different definition of the relevant market. Respondent contends the market should include all distribution outlets, including console games, brick-and-mortar sales, as well as distributors like Steam and direct sales from developers/publishers. Claimant contends the relevant market is limited to distribution platforms like Steam. Claimant analogizes Steam to a "shopping mall" where individual developers/publishers sell their products in "stores." Under this theory, a standalone store operated by the developer/publisher would not be a part of the relevant market.

Although there is limited crossover between the PC game market and the console market, they are predominantly separate markets that use distinct hardware. Some games can be cross-played on both hardware platforms, but that is the exception. Furthermore, some developers/publishers sell their games on platforms that are indistinguishable from Steam's (e.g., Epic). Some platforms, like Steam, are hybrid sites where the platform operator sells third-party games as well as content from its own affiliates. The relevant market is the distribution of PC games online or in-store, regardless of whether the distribution platform is operated by the developer/publisher, a third party, or a hybrid site.

The evidence established that PC games sell at different prices across different geographic markets. The evidence established that North America is the relevant geographical market for Claimant's claims.

**Claimant's Section 1 Claim**

Claimant contends that Respondent's pricing policies constitute a per se violation of Section 1 of the Sherman Act. In the alternative, assuming the Rule of Reason applies, Claimant contends Respondent's policies are anti-competitive price-fixing in violation of the Act.

*Applicability of the Per Se or Rule of Reason Standard*

To establish a violation of Section 1 of the Sherman Act, a plaintiff must prove the following: (1) the existence of a contract, combination, or conspiracy between or among at least two separate entities; (2) that the contract, combination, or conspiracy unreasonably restrains trade; (3) that the restraint affects interstate or foreign commerce; and (4) that the restraint caused plaintiff to suffer an injury to its business or property. 15 U.S.C. §1; ABA Model Instruction 2.

Some restraints on trade are considered so pernicious that they are per se unlawful. *Leegin Creative Leather Products, Inc. v. PSKS, Inc., 551 U.S. 877, 883 (2007).* As a general rule, horizontal price-fixing agreements are per se unlawful without requiring an examination of the agreement's justifications. *Id.* On the other hand, vertical agreements typically fall under the Rule of Reason. *Id.*

Although Respondent contends that so-called hybrid relationships are examined under the Rule of Reason (citing *United States v. Brewbaker, 87 F.4th 563 (4th Cir. 2023)*, there is no general agreement on that standard. Instead, where the alleged participants in the subject agreement occupy multiple levels in the manufacture and means of distribution, whether an agreement among them falls within the per se or Rule of Reason standard depends on the manufacturing or distribution level engaged in by the parties that is subject to the agreement.

Here, the agreement regarding the use of Steam Keys is made between Steam, as the distributor, and the third-party developer/publisher. This is a vertical relationship and, therefore, falls under the Rule of Reason. That Respondent develops and publishes its own games is irrelevant to the agreement.

Similarly, the distribution agreement between Steam and third-party developers and publishers to offer games on Steam's platform is a vertical relationship. The Rule of Reason also applies to those agreements. Although Respondent competes with the third-party developers/publishers at that level of the distribution chain, the distribution agreement does not bear on that relationship.

The competitive relationship between Microsoft and Steam occurs at both the developer/publisher and distribution platform levels. The "Valve Corporation Distribution Agreement" between Respondent and Microsoft concerns the distribution of games developed and published by Microsoft on the Steam platform, in its role as distributor of its own games. This is a vertical agreement and does not bear on the relationship between Microsoft and the Respondent as competitors in the development and publishing of video games.

However, subsection (b) of Section 6.4 of the Microsoft agreement has horizontal effects. That Section provides that if Microsoft, as the developer/publisher of games that it offers for sale on the Respondent's platform,



One effect of this section is that if Microsoft lowers the price of one of its own games for distribution on its platform, it must also lower the price it offers that product for sale on Respondent's platform. Microsoft employees described this provision as a "price parity" requirement. This is a horizontal price-fixing agreement and is subject to the per se standard.

***Section 6.4(b) Is a Per Se Violation of Section 1 of the Sherman Act***

When a price-fixing agreement is subject to the per se rule, a party's justification for agreeing is irrelevant to finding a violation of the Act. *Leegin at 883* ("*The per se rule, treating categories of restraints as necessarily illegal, eliminates the need to study the reasonableness of an individual restraint in light of the real market forces at work."*). Accordingly, it is irrelevant whether the purpose of the provision, as Respondent contends, was to ensure its customers benefited from lower prices.[1]

The first three prongs of a Section 1 claim are satisfied for those Microsoft games sold on both the Microsoft platform and the Respondent's platform. The fourth prong (damages) is addressed below.

***No Violation Under the Rule of Reason for the Other Claims***

Under the Rule of Reason, there must be an analysis of the pro- and anti-competitive effects of the subject pricing policies. *Id. ("In its design and function the rule [of reason] distinguishes between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest."*). There are three policies subject to that examination: (1) the price parity policy for the sale of Steam Keys by developers/publishers, (2) the distribution agreement between Respondent and third-party developers/publishers, and (3) the so-called "free rider" policy requiring customers to make in-game purchases through Respondent.

The price parity policy for the sale of Steam Keys does not violate the Rule of Reason. The primary purposes of Steam Keys are two-fold (1) to assist a developer/publisher in the launch of and distribution of its games, and (2) to drive traffic to Respondent's platform because the Keys can only be redeemed on Respondent's platform. Respondent's price parity policy is designed to ensure that Respondent's customers, who cannot purchase Steam Keys directly on the website, are not disadvantaged by the discounted sale of the Keys on other platforms. The Keys are provided to the developer/publisher free of charge, and the sale of which to the public on other platforms generates no revenue to Respondent. The policy's pro-competitive effects, which provide a variety of PC games to the public, outweigh any anti-competitive effects.

Claimant contends that Respondent's policies in connection with the distributor agreement between Respondent and third-party developers/publishers violate the Rule of Reason in two ways: (1) if a developer/publisher undercuts the Respondent's prices on other platforms, Respondent will not presell the subject game at an advantageous location on its webpage; and (2) if a developer/publisher sells its product on another site, it risks losing access to Steam's customer base if it regularly undercuts the price it offers on Steam. Claimant contends that, given Respondent's dominance in the marketplace, the effect of these two policies is to discourage developers/publishers from offering price discounts on other platforms.

Respondent contends that the effect of these policies is to encourage developers/publishers to offer discounts on Respondent's platform, thereby reducing the cost to consumers. Claimant argues that developers/publishers cannot reduce the price on Respondent's platform in the same manner as on other platforms because Respondent's revenue share is higher than the other platforms charge, so that the developer/publisher can make the same profit for the sale of a game on different platforms at a lower price than would be available on Respondent's platform.[2]

The problem with Claimant's contention is that it depends on Respondent having sufficient market power to coerce a developer/publisher into not lowering its prices on other platforms to maintain price parity. Whether the Respondent has market power is a question of fact, with the Claimant bearing the burden of proof. It was undisputed that there are a variety of competing platforms in the PC game industry. Claimant presented expert testimony asserting that Respondent has an upwards of 70% market share and is by far the most dominant platform in the industry. However, Claimant's expert based his market share analysis on opaque industry magazine articles and

---

[1] Even so, Respondent's justification cannot be accepted solely at face value because a probable effect of the price parity policy is to discourage Microsoft from lowering the prices of its games on its distribution platform because to do so would require it to provide an equal reduction on Respondent's platform, eliminating any potential economic advantage when competing for customers.

[2] There was evidence that the revenue share charged by Respondent was not unique in the industry, though on the high end.

broad assumptions of industry revenues. It does not buttress the expert's conclusions that the Respondent's expert could have had access to reliable data. It was not the Respondent's burden to prove the absence of market share.

Although it very well may be that Respondent has the largest market share in the industry enough to constitute market power, it was Claimant's burden to prove that fact with reliable, admissible evidence. It did not do so.[3] Without proof of market power, the potential anti-competitive effects of Respondent's policies do not outweigh the pro-competitive effects or Respondent's right to determine whether to offer a third-party product and under what circumstances it will promote that product.

Finally, Respondent's apparent policy to direct purchases of DLC and MTX to its own platform does not violate the Rule of Reason. A core means for developers/publishers to gain revenue is from in-game purchases. Indeed, the evidence established that many developers/publishers provide their PC games free, making downloadable content their only source of revenue. Respondent's sole source of income from PC games uploaded by third-party developers is revenue sharing. Accordingly, Respondent has made its platform attractive to those developers/publishers who depend solely on in-game purchases. It is not anti-competitive for Respondent to favor its own platform for such purchases, as that is the only source of revenue it will receive for the service of making the developer/publisher's otherwise free content available to consumers. In the absence of such a policy, consumers likely would not have access to the "free" games because Respondent would have no means to recoup its costs for maintaining such games on its platform.

**Claimant's Section 2 Claim**

"There are three essential elements to a successful claim of Section 2 monopolization: (a) the possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal 'antitrust' injury." *Allied Orthopedic v. Tyco Health*, 592 F. 3d 991, 998 (9th Cir. 2010) (quoting *Cal.Computer Prods., Inc. v. Int'l Bus. Mach. Corp.,* 613 F.2d 727, 735 (9th Cir.1979).

"To prove its monopolization claim, plaintiff must prove that defendant has monopoly power in a relevant antitrust market. Monopoly power is the power to control prices, restrict output, and exclude competition in a relevant antitrust market.  More precisely, a firm is a monopolist if it can profitably raise prices substantially above the competitive level for a significant period of time." *ABA Model Instructions, A-104. "*Market power and monopoly power are related but distinct concepts. As the Supreme Court has stated: 'market power is the ability to raise prices above those that would be charged in a competitive market.' Monopoly power is 'the power to control prices or exclude competition.'" *Epic Games, Inc. v. Apple Inc., 559 F.Supp.3d 898, 1028 (2021) (internal citations omitted).*

Here, as noted above, Claimant has failed to carry its burden of proof to establish market power. Monopoly power is an extreme form of market power. *Id.* Accordingly, Claimant's Section 2 claim fails to satisfy an essential element and, therefore, is dismissed with prejudice.

**Claimant's Cartwright Act Claim**

Claimant contends Respondent violated California's Cartwright Act. Respondent makes two procedural arguments in opposition to Claimant's Cartwright claim. First, Respondent objects to the claim being raised because it was not pleaded. As the Claimant notes, this argument was rejected at the October 13, 2025, hearing of this matter. Respondent's counsel expressly acknowledged that the assertion of a Cartwright claim was not a surprise and had been the subject of a back-and-forth many times, including on the merits. (Tr. October 13, 2025, at 12-16.) Indeed, Respondent's counsel acknowledged that the sequential briefing process for the closing argument provided sufficient opportunity to address the issues. (Id. ("*Yeah. We're happy to respond to it, but all the more important then that we get the sequential briefs in case there is a new flavor to it.").)* Respondent's first objection is overruled.[4]

Respondent next argues that Washington State law applies pursuant to the terms of the agreement between Claimant and Respondent. Claimant contends that application of Washington State law to Claimant's claims would violate California's fundamental antitrust policy as set forth in the Cartwright Act. Although Washington State has an

---

[3] Claimant complains that Respondent has the necessary data to determine market share, but did not provide it in discovery. However, the time to resolve discovery disputes has long passed.

[4] As previously ordered and agreed by the parties, common orders and evidence would be cross-admissible in all other matters before me.

analogous state antitrust law, Claimant contends California has a greater interest in enforcing its law because it purportedly applies a per se standard to vertical restraints of trade, whereas Washington State law apparently follows federal law as announced in *Leegin.*

There are two issues with the Claimant's analysis. First, simply because the outcome might be different does not mean one state or the other has a greater enforcement interest. The question is whether both states have a fundamental policy prohibiting anti-competitive conduct. Because both Washington and California have similar statutes barring anti-competitive conduct, there is no violation of California's fundamental policy.

Second, it is unclear whether the California Supreme Court will decline to apply *Leegin* to vertical price restraints. Claimant cites two cases in support of its contention. The first case, *Alsheikh v. Superior Court, Ct. Appeals, Oct. 7, 2013,* was ordered not to be published and, pursuant to California Rules of Court 8.1115(a), parties are prohibited from relying on the case as precedent. The second case, *Alan Darush MD APC v. Revision LP, Not Reported in F.Supp.2d (2013),* does, as Claimant contends, apply the per se rule to a vertical restraint of trade. It does so on the theory that the California Supreme Court, though often relying on federal precedent for the interpretation of the Cartwright Act, also relies on state precedent to some degree and has not yet overruled its decision in *Mailand v. Burckle, 20 Cal.3d 367, 143 Cal.Rptr. 1, 572 P.2d 1142, 1147 (Cal.1978)*. Although the court applied a per se rule, it also stated that "*[i]t is unclear, however, whether that decision [Leegin], which interpreted the Sherman Act, applies to the Cartwright Act." Id.* Ambiguity concerning the nuanced application of state antitrust law does not arise to the level of a fundamental difference in state policy.

Based on the foregoing, Claimant has failed to establish that application of Washington State law would violate a fundamental policy of California law. Therefore, the Washington State choice of law will be confirmed, and the Cartwright claim is dismissed.

**Damages**

Having found above that Section 6.4(b) of the Microsoft agreement is a per se violation of Section 1 of the Sherman Act, the final element in Claimant's claim is to establish antitrust injury. Because the violation would only apply to purchases of games subject to the Microsoft agreement, Claimant must prove (1) that he purchased one or more of such games, and (2) would have paid less for the game in the absence of such an agreement. Although the record of Claimant's purchases is in evidence, the parties have not had an opportunity to distinguish which purchases were subject to the Microsoft agreement and, for such purchases, what the quantum of damages is, if any. Accordingly, the parties shall make further submissions pursuant to the schedule below.

Claimant shall make his opening submission by no later than December 30, 2025

Respondent shall make its opposing submission by no later than January 9, 2026

Claimant shall make any reply submission by no later than January 15, 2026.

**Prevailing Party**

A prevailing party determination will be made as part of the damages Award.

Except as otherwise provided above, this Interim Award is in full settlement of the merits of all claims submitted to this arbitration. The Arbitrator retains jurisdiction to address these issues. The matter shall be deemed submitted to the Arbitrator for determination in a further Award upon and after the submissions scheduled above.

This Interim Award shall remain in full force and effect until the arbitrator renders a Final Award.

December 15, 2025
Date

_____
Jeffrey H Dasteel, Arbitrator

I, Jeffrey H Dasteel, do hereby affirm upon my oath as arbitrator that I am the individual described in and who executed this instrument, which is my Interim Award.

December 15, 2025
Date

_____
Jeffrey H Dasteel, Arbitrator

**AMERICAN ARBITRATION ASSOCIATION**
**Consumer Arbitration Rules**

In the Matter of the Arbitration between

Case Number: 01-23-0005-3499

James Davis
-vs-
Valve Corporation d/b/a Steam

**FINAL AWARD OF ARBITRATOR**

I, Jeffrey H. Dasteel, the undersigned arbitrator, having been designated in accordance with the arbitration agreement entered into by the above-named parties, having been duly sworn, and having duly heard the proofs and allegations of the Parties, and having previously rendered an Interim Award dated December 15, 2025, and a second Interim Award dated February 26, 2026, which are confirmed, adopted, and incorporated as if fully set forth herein, do hereby issue this FINAL AWARD as follows:

**Procedural Posture**

In my December 15, 2025, Interim Award, all claims were dismissed except for Claimant's Section 1 price fixing claim. The Second Interim Award, dated February 26, 2026, found a violation of Section 1 of the Sherman Antitrust Act and awarded treble damages of $119.40. In addition, I found that Claimant was the prevailing party and entitled to an award of attorney's fees and costs.  Claimant's submission seeks $763,809.17 in attorney's fees, $54,380.73 in costs, plus 12% prejudgment and postjudgment interest on all amounts.

Respondent opposes Claimant's request for fees and costs on several grounds. First, Respondent contends that Claimant seeks fees incurred for other matters and therefore I lack the authority to make such an award. Second, Respondent contends Claimant's fee request is unreasonable because Claimant did not prevail on most of his claims, the fee request is disproportionate to the level of success achieved in litigation and the amount at stake, the hourly rates charged by Claimant's attorneys are excessive, and the 1.5 multiplier requested by Claimant is unwarranted in this case. Third, Respondent contends that it would have been unethical to bill Claimant for the requested fees and, therefore, it should be unethical to require Respondent to pay these amounts. Fourth, Respondent contends the claim for expert witness costs and prejudgment interest is unreasonable. Finally, Respondent identifies individual time entries that it contends are either too vague or not appropriate for reimbursement.

**Jurisdiction to Award Attorney's Fees and Costs**

Pursuant to Consumer Rule 44(a), "[t]he arbitrator may grant any remedy, relief, or outcome that the parties could have received in court, including awards of attorney's fees and costs, in accordance with the law(s) that applies to the case."  Section 4 of the Clayton Act provides in part that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

In the Second Interim Award, I found that Claimant suffered injury under Section 1 of the Sherman Act and, therefore, is entitled to the cost of suit and a "reasonable" attorney's fee. As mandated by the parties' arbitration agreement, the award of attorney's fees and costs is limited to the prosecution of Claimant's individual case. In that regard, Respondent contends that the claimed fees should be divided by 50,000 to account for all the other claimants represented by Claimant's counsel in virtually identical matters. Respondent notes that it has prevailed in the vast majority of the other cases and that compensating this Claimant for the work done in common with the other cases would be unfair because the Claimant's counsel is not entitled to recover fees for the cases in which Respondent prevailed.

Claimant's counsel's fees can be broken down into five categories: (1) fees incurred in the common preparation of various matters; (2) fees incurred exclusively for Claimant's matter; (3) fees incurred for another matter, but the work product was used in Claimant's matter; (4) fees incurred for another matter, where the work product was not used in Claimant's matter; and (5) time entries that cannot be segregated into any of the four preceding categories.

It is undisputed that fees incurred exclusively for this Claimant's matter are recoverable. Where work is done that is common to more than one matter, such fees also are recoverable so long as there is no duplicative recovery.  That Claimant's counsel, as a matter of efficiency, reuses work product in multiple matters, does not mean the work was not properly incurred for this Claimant in this individual matter. Indeed, to hold otherwise when the Respondent's form of arbitration agreement insisted on individual actions and prohibited class actions would multiply attorneys' fees rather than reduce them. For example, instead of hearing claimants' joint expert once in a single matter, I would have been required to hear the same testimony multiple times at a significant increased cost in attorney's fees and expert witness costs. Similarly, if attorney's fees were incurred in another matter, but the work product was used in this matter (rather than repeat the same work here), such work is recoverable here so long as there is no duplicative recovery.

Where attorney's fees were incurred in a separate matter, and the work product was not used here, Claimant cannot recover those fees. In addition, where counsel's time entries cannot be segregated into recoverable and non-recoverable fees, as the onus was on Claimant's counsel to keep clear time records, such fees are not recoverable.

**Relative Success as a Measure of Attorney's Fees**

Claimant's success in this litigation was modest in comparison to his initial claims. He prevailed on a single claim, with all others dismissed. However, there was significant commonality among the claims so that there was no practical way to segregate his various antitrust claims.

Further, as noted in Claimant's submission, significant fees were expended in the procedural jockeying between the parties relevant to all claims. As is typical in litigation, in the absence of bad faith, such fees are recoverable even when Claimant's record of success was mixed.

Accordingly, there will be no reduction based on Claimant's relative success in achieving his litigation goals.

**Ethical Considerations**

Next, Respondent contends that because it would be unethical to bill Claimant hundreds of thousands of dollars for a claim that amounted to at most a few thousand dollars, it must be unethical to seek recovery of such fees from Respondent. Respondent's authority is weak and would eviscerate the consumer protection laws. For any modest claim, virtually any fee could be viewed as excessive in comparison to

the stakes, thereby cutting consumers off from the ability to retain competent counsel on a contingency fee basis. Further, nothing in Section 4 of the Clayton Act justifies such a restriction.

**Relationship of the Fee Request to the Amounts in Dispute**

Respondent contends a fee request that is orders of magnitude greater than the amount in dispute and success achieved is per se unreasonable. First, as noted above, in low dollar consumer cases the amount of fees awarded to a prevailing consumer often far exceeds the amount of damages recovered. Second, Claimant's counsel did not incur fees in a vacuum. Although within the bounds of a zealous defense, Respondent's counsel raised an extraordinary number of motions and procedural issues during these proceedings requiring Claimant to respond. It is safe to say that neither side treated this matter as a small claims court case. Although Respondent is free to defend itself as it sees fit within ethical constraints, if it chooses to engage in extensive litigation, it cannot then complain that Claimant's counsel incurred substantial fees in the process.

**Reasonable Hourly Rates**

Respondent contends that Claimant's counsel's hourly rates are two or three times the prevailing rates that should be permitted. However, Respondent has failed to show that the rates it is billed by its attorneys are any less than those Claimant claims here. Further, Claimant has shown that Respondent's lead counsel charged rates similar to those claimed here in another antitrust case. In the absence of a showing that Claimant's counsel's hourly rates exceed those granted for similar litigation, Respondent's objection is overruled.

**Multiplier**

Claimant seeks a 1.5 times multiplier on fees due to the complexity of the matter, the duration from time of filing to award, and the contingency fee nature of the case. Although those are indeed factors in determining whether there should be a multiplier and, if so, how much, Claimant's relative success also is a consideration. Here, Claimant's success was low in comparison to his original claim. In addition, unlike in class actions, where Claimant's counsel has one chance to recover fees, here Claimant's counsel reportedly filed thousands of individual matters under identical theories of recovery. All the claimant's counsel needed to do was prevail in one of them to make a substantial attorney's fee recovery, thereby substantially reducing counsel's contingency risk.

Based on the foregoing, I award Claimant a multiplier of 1.1.

**Individual Time Entries**

Respondent notes a series of time entries that it considers to be too vague or merges time properly applicable to this matter with other matters for which time is not recoverable. Respondent contends these are "examples," implying there might be additional entries to challenge. However, Claimant did his part by providing detail from his counsel's time sheets. The burden then shifted to Respondent to identify which of those entries are subject to challenge.

Based on my review of the challenged time entries, I will deduct one fourth of $55,116.45 ($13,779.11) from this Claimant's fee request.

Respondent also seeks a reduction of $125,755.80 for "team meetings." Team meetings are a necessary part of any complex litigation and, therefore, generally recoverable. The problem here is that team meetings regarding other matters may not be recoverable, depending on whether the matters discussed in the meetings benefited the prosecution of Claimant's case. Without additional detail, I am constrained to

grant Respondent's application to reduce fees by that amount.[1] A one-quarter share will be deducted from this Claimant's fee request ($31,438.95).

**Claimant's supplemental fee request**

In addition to the fees claimed in the opening submission, Claimant seeks fees incurred since that date, including fees for the defense of his fee request. Although it is reasonable to recover fees for the preparation of his fee request, it is not reasonable to recover fees unrelated to that request, including time regarding any other matters. As Claimant's case has concluded, there is no basis to award fees for, e.g., considering the procedures to be used to resolve the remaining cases before me or subpoenas in those other cases. Following my review of the time entries provided in Claimant's reply briefing, I find $173,059.55 is related to this fee request. That amount is based on 217.6 hours of work, which is excessive in the context of a reply brief on fees. I am, therefore, exercising my discretion to reduce the supplemental fees approved for the reply brief to $60,000. Claimant's share is $15,000.

**Expert Witness Fees**

Claimant's expert witness, Dr. Castronova, testified in this Claimant's matter, with his testimony, as agreed by the parties, applicable to all other matters before me. As Claimant is entitled to a single recovery for those expenses, it is reasonable to either recover them once in this Claimant's matter or divide them among the other prevailing claimants before me. Counsel for Claimant has elected to divide the expert witness fee among the prevailing claimants before me.

Claimant also seeks recovery of expert witness costs for an expert who did not appear in Claimant's case either by live testimony or transcript from another matter. It is certainly Claimant's choice as to which expert to employ in a matter. However, Respondent is only responsible for the costs incurred by testifying experts. Claimant's claim for $123,312.50 for the non-testifying expert is denied. As Claimant's counsel appears to have divided that amount between four claimants, I will deduct $30,828.12 from this Claimant's costs award.

**Interest**

Although Claimant cites Washington State law regarding prejudgment and post judgment interest, Claimant's entitlement to interest is governed by Section 4 of the Clayton Act, which provides:

> "The court may award under this section, pursuant to a motion by such person promptly made, simple interest on actual damages for the period beginning on the date of service of such person's pleading setting forth a claim under the antitrust laws and ending on the date of judgment, or for any shorter period therein, if the court finds that the award of such interest is just in the circumstances. In determining whether an award of interest under this section for any period is just in the circumstances, the court shall consider only—

> 1. whether such person or the opposing party, or either party's representative, made motions or asserted claims or defenses so lacking in merit as to show that such party or representative acted intentionally for delay, or otherwise acted in bad faith;

---

[1] Respondent also seeks to reduce the fees for team meetings that have been the subject of a fee application in another case. As I have granted the reduction for all generic "team meetings," a further reduction would be duplicative.

2. whether, in the course of the action involved, such person or the opposing party, or either party's representative, violated any applicable rule, statute, or court order providing for sanctions for dilatory behavior or otherwise providing for expeditious proceedings; and

3. whether such person or the opposing party, or either party's representative, engaged in conduct primarily for the purpose of delaying the litigation or increasing the cost thereof."

Claimant seeks interest on both his damages award and attorney's fees and costs. However, by the express language of the statute, interest is potentially awardable only on "actual damages." The delay in recovery of attorney's fees is a consideration under the multiplier (as noted above).

Respondent's representatives vigorously defended this matter. Although Claimant contends Respondent's counsel acted intentionally for delay, in bad faith, and to increase the cost of litigation, I do not agree. In the matters before me, Respondent's counsel has complied with all deadlines and, though providing a vigorous defense, counsel's conduct was within the bounds of zealous advocacy. Prejudgment interest is therefore denied.

Claimant also seeks postjudgment interest. As quoted above, Section 4 of the Clayton Act is limited to interest up to the date of judgment. It is outside my jurisdiction to award interest after the date of my award.

**Calculation of Fees and Expenses**

From Claimant's claim of $763,809.17 in attorney's fees in his opening submission, I have subtracted $13,779.11 for individual time challenges and $31,438.95 for team meetings. I have added $15,000 for the reply brief on fees. The net fees awarded before the multiplier is $733,591.11. With the 1.1 multiplier, the total fee award is $806,950.21.

From Claimant's claim of $54,380.73 in costs, I have subtracted $30,828.12 for Claimant's one-quarter share of the non-testifying expert's fees. The net expense award is $23,552.61.

**FINAL AWARD**

Within thirty days after the date of this Final Award, Respondent shall pay to Claimant's counsel's client trust fund the following amounts:

Actual damages trebled in the amount of $119.40.

Attorney's fees in the amount of $806,950.21.

Costs in the amount of $23,552.61.

The administrative fees of the American Arbitration Association shall be borne as incurred, and the compensation of the arbitrator shall be borne as incurred.

This Final Award is in full settlement of all claims and counterclaims submitted to this arbitration. All claims not expressly granted herein are hereby denied.

Date: April 24, 2026                                          _____
                                                                    Jeffrey H Dasteel, Arbitrator


I, Jeffrey H Dasteel, do hereby affirm upon my oath as arbitrator that I am the individual described in and who executed this instrument, which is my Final Award.

Date: April 24. 2026                                          _____
                                                                    Jeffrey H Dasteel, Arbitrator

**AMERICAN ARBITRATION ASSOCIATION**
**Consumer Arbitration Rules**

In the Matter of the Arbitration between

Case Number: 01-23-0005-3499

James Davis
-vs-
Valve Corporation d/b/a Steam

**SECOND INTERIM AWARD OF ARBITRATOR**

I, Jeffrey H Dasteel, the undersigned arbitrator, having been designated in accordance with the arbitration agreement entered into between the above-named parties, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, each represented by counsel, and having issued an Interim Award on December 15, 2025, do hereby issue this Second Interim Award as follows:

**Introduction**

In the first Interim Award, I found that the competitive relationship between Microsoft and Steam occurs at both the developer/publisher and distribution platform levels. The "Valve Corporation Distribution Agreement" between Respondent and Microsoft concerns the distribution of games developed and published by Microsoft on the Steam platform in its role as distributor of its own games. Generally, this is a vertical agreement and does not bear on the relationship between Microsoft and the Respondent as competitors in the distribution of video games.

However, subsection (b) of Section 6.4 of the Microsoft agreement has horizontal effects. That Section provides that if Microsoft, as the developer/publisher/distributor of games that it offers for sale on the Respondent's platform,



One effect of this section is that if Microsoft lowers the price of one of its own games for distribution on its own platform, it must also lower the price it offers that product for sale on Respondent's platform. Microsoft employees

described this provision as a "price parity" requirement. This is a horizontal price-fixing agreement and is subject to the *per se* standard.

I further found that when a price-fixing agreement is subject to the per se rule, a party's justification for entering into it is irrelevant to a finding of a violation of the Act. *Leegin Creative Leather Products, Inc. v. PSKS, Inc., 551 U.S. 877, 883 (2007)* ("*The per se rule, treating categories of restraints as necessarily illegal, eliminates the need to study the reasonableness of an individual restraint in light of the real market forces at work.*"). Accordingly, it is irrelevant whether the purpose of the provision, as Respondent contended, was to ensure its customers benefited from lower prices.[1]

The first three prongs of a Section 1 claim were satisfied for those Microsoft games sold on both the Microsoft platform and the Respondent's platform. Having found that Section 6.4(b) of the Microsoft agreement is a per se violation of Section 1 of the Sherman Act, the final element in Claimant's claim is to establish antitrust injury. Because the violation would only apply to purchases of games subject to the Microsoft price parity agreement, Claimant must prove (1) that he purchased one or more of such games, and (2) would have paid less for the game in the absence of such an agreement. Although the record of Claimant's purchases is in evidence, the parties had not had an opportunity to distinguish which purchases were subject to the Microsoft price parity agreement and, for such purchases, what the quantum of damages is, if any. Accordingly, the parties were permitted to make further submissions on this issue.

The parties completed their submissions on this issue on February 9, 2026. The matter is now ripe for determination.

## Scope of the Microsoft-Valve Distribution Agreement

Respondent contends the price-fixing agreement between Microsoft and Valve was limited to those games listed in the written agreement and its addenda. Claimant contends that although the price parity agreement initiated in 2011 was originally in writing, the parties abandoned the practice of making addenda and adhered to the "price parity" terms of the agreement for all games offered on both Microsoft and Valve's platforms. Further, Claimant contends the price-fixing agreement was applied to games produced by Microsoft's later-acquired subsidiaries.

Although Respondent provided evidence that a single game was excluded from the distribution agreement, Claimant provided persuasive evidence that Microsoft and Valve personnel applied the price parity requirements of the distribution agreement to all Microsoft games across the board, including games produced by Microsoft's subsequently acquired subsidiaries.

Respondent provided no evidence that either the written form of the price parity agreement or the practice of price parity was terminated. Accordingly, I find that the price-fixing agreement between Microsoft and Valve at the distribution level applied to all games Microsoft or its subsequently acquired subsidiaries offered for sale on both the Microsoft and Valve distribution platforms.

## Application to Non-Microsoft Games

Next, Claimant contends that the Microsoft-Valve price-fixing agreement affected all PC games across the market. The basis for this claim is that Microsoft and Valve have sufficient market power that a horizontal agreement between them would raise prices for all other PC games, regardless of distributor. In my first interim award, I found that the Claimant had failed to prove market or monopoly power. Accordingly, Claimant's attempt to apply damages to all of Claimant's PC game purchases is rejected.

## Proof that the Games were Offered on Both Platforms

A prerequisite for recovery is proof that the subject games were offered for sale on both Microsoft and Valve platforms. In its opposition submission, Respondent provided a list of games it conceded were subject to the written distribution agreement with a column labeled "Sold on Microsoft Platform." The column includes question marks for each game, as though Respondent was unable to determine whether it had an exclusive right to distribute the game on

---

[1] Even so, Respondent's justification cannot be accepted solely at face value because a probable effect of the price parity policy is to discourage Microsoft from lowering the prices of its games on its distribution platform because to do so would require it to provide an equal reduction on Respondent's platform, eliminating any potential economic advantage when competing for customers thereby putting competitive pressure on Respondent to reduce its 30% share of game sale revenues.

its platform. Claimant provided evidence that Microsoft marketed its own games on its own distribution platform. First, the original 2011 distribution agreement itself is evidence. Indeed, it would make no sense to have such an agreement if Microsoft did not offer PC games for sale on its own distribution platform. Second, the communications between Microsoft and Valve personnel concerned both specific and general statements of parity pricing between the two distribution platforms.

In the absence of a showing that Valve had an exclusive right to distribute one or more Microsoft games—something within Respondent's knowledge—I find it more likely than not that all games developed and published by Microsoft and its subsidiaries that were available on Respondent's platform also were available for purchase on Microsoft's platform.

## Claimant's Purchases

Claimant submitted evidence that he made five successful purchases of Microsoft games. On April 11, 2020, he purchased Halo: Reach for $10.83. On July 27, 2023, he purchased Starfield for $75.85. On August 20, 2023, he purchased Cal of Duty Season 5 for $32.50. On February 22, 2024, he purchased Call of Duty for $75.85. Finally, on March 5, 2025, Clamant purchased Fallout for $43.34. Purchases totaled $238.37.

## Statute of limitations

Claimant submitted his demand for arbitration on December 19, 2023. The statute of limitations for a Section 1 price-fixing claim is four years. 15 U.S.C. § 15b. Absent tolling, the four-year statute of limitations bars claims for purchases made prior to December 19, 2019. Accordingly, all five of Claimant's purchases fall within the statute of limitations.

## Damages

The measure of damages is what Claimant would have paid in the absence of the price-fixing agreement between Respondent and Microsoft. Although Respondent contends there are no damages, that position ignores the reality that Microsoft's sales on its own platform would not be burdened by the 30% fee Respondent charges for access to its platform. Claimant's expert estimated that, using a "but for" analysis (the Boik and Cortes model), the premium Claimant paid due to the price-fixing scheme was approximately 20%. The formula to determine damages based on this model is $P(\text{actual}) \cdot (1-1/1.20) = P(\text{actual}) \cdot 0.2/1.20 = 16.67\%$ of $P(\text{actual}) = \$39.80$. Under antitrust law, damages are trebled. Accordingly, Claimant's total damages award is $119.40.

## Prevailing Party

Claimant is the prevailing party in this action. Under the antitrust laws, Claimant is entitled to recover his reasonable costs and attorney's fees. The parties shall make their submissions on costs and attorney's fees as follows: Claimant's opening submission shall be due ten days from the date of this Second Interim Award. Respondent's submission shall be due ten days following Claimant's submission. Claimant's reply submission shall be due seven days following Respondent's submission.

## SECOND INTERIM AWARD

The first Interim Award, dated December 15, 2025, is incorporated by reference as though fully set forth herein.

Claimant shall recover damages in the total amount of $119.40, plus costs and attorney's fees, which shall be the subject of a Final Award.

Except as otherwise provided above, this Second Interim Award is in full settlement of the merits of all claims submitted to this arbitration. The Arbitrator retains jurisdiction to address costs and attorneys' fees. The matter shall be deemed submitted to the Arbitrator for determination in a Final Award upon and after the submissions scheduled above. This Second Interim Award shall remain in full force and effect until the arbitrator renders a Final Award.


_____February 26, 2026_____
Date

_____
Jeffrey H Dasteel, Arbitrator


I, Jeffrey H Dasteel, do hereby affirm upon my oath as arbitrator that I am the individual described in and who executed this instrument, which is my Award.

_____February 26, 2026_____
Date

_____
Jeffrey H Dasteel, Arbitrator

AMERICAN ARBITRATION ASSOCIATION | INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®

**AMERICAN ARBITRATION ASSOCIATION**
**Consumer Arbitration Rules**

In the Matter of the Arbitration between

Case Number: 01-23-0005-3499

James Davis
-vs-
Valve Corporation d/b/a Steam

**INTERIM AWARD OF ARBITRATOR**

I, Jeffrey H Dasteel, the undersigned arbitrator, having been designated in accordance with the arbitration agreement entered into between the above-named parties, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, each represented by counsel, at an evidentiary hearing held August 25 - 28, 2025, do hereby issue this INTERIM AWARD as follows:

Claimant alleges violations of Sections 1 and 2 of the Sherman Antitrust Act. Based on the evidence presented by the parties at the merits hearing in this matter, I make the following findings of fact.

**Respondent's Distribution of Video Games**

Respondent Valve Corporation operates a website under the tradename "Steam" to distribute video games created by Respondent and other game developers/publishers. Although the parties dispute the extent of Steam's market share, there is no dispute that Steam is the largest online PC Gaming Store. It has a three-tiered revenue sharing scheme. Developers/publishers set the prices for their games on the Steam platform and on any other platform on which they participate. On the Steam platform, the first $10 million in a game's total revenues is subject to a 30% revenue share. The next $40 million is subject to a 25% revenue share. Anything over $50 million is at 20% revenue share. This applies to all developers/publishers regardless of size or total volume. Other platforms may either charge a lower revenue share or use a different compensation method that is equivalent to a lower revenue share. There is no revenue share payable to Respondent by developers/publishers who distribute their products on their own platforms or non-Steam platforms.

The evidence established that Steam has several pricing and advertising policies designed to ensure Steam's prices are equal to or lower than the lowest prices game developers offer on other sites. If a developer or publisher offers a product for presale on any platform or outlet at a price below that offered on Steam, Steam may elect to stop preselling the product on its website. However, Steam will continue to sell the product in the ordinary course even if its price is above that available on other platforms or outlets.

Sellers/Publishers are not required by Steam's distribution agreement to be exclusive to Steam. However, due to its large customer base and the ease with which a developer can make a game available for sale on Steam, many, if not most, PC games are sold exclusively on Steam. This matter concerns only games available on multiple sites. In that regard, the evidence supported a finding that Respondent has an intermittently enforced policy that if a developer/publisher sells its product on another site, it risks losing access to Steam's customer base if it regularly undercuts the price it offers to Steam customers.

Claimant contends that there is an agreement between Microsoft and Steam to maintain price parity for Microsoft products across the Steam and Microsoft stores. The source of Claimant's contention is Section 6.4 of the "Valve Corporation Distribution Agreement" between Respondent and Microsoft." Although subsection (a) of that

Section concerns Microsoft's role as developer/publisher of games, subsection (b) concerns Microsoft's distribution of its games on its own distribution platform, which is in direct competition with Respondent's platform.

Claimant contends that Steam enforces a price-parity scheme in connection with its distribution of so-called Steam Keys. A Steam Key is a code that permits the user to access a particular PC game on the Steam website. Steam provides the Keys to developers at no charge. Developers can then distribute the Keys on their own platforms or sell them to other platforms. Although Steam receives no revenue from the initial sale of a Steam Key, the sale of a Steam Key drives customers to use the Steam platform, where they may purchase DLC (in-game downloadable content) or MTX (in-game microtransactions for the purchase of, e.g., additional content). Steam receives a revenue share from these additional purchases.

If a developer or publisher sells Steam keys for a product at a discount from the price usually offered on Steam for the subject PC game, without providing Steam customers an equivalent discount, Steam's policy is to inform the developer/publisher that it may not receive additional keys for that product or other products. Furthermore, price-parity for Steam Keys is a written requirement in the Steam Key guidelines. Failure to follow the Steam Key guidelines can result in no further Steam Keys being issued or the offending game being dropped from the Steam platform.

Finally, Claimant contends that Respondent engages in a practice to prevent its customers from buying in-game content from any other distributor. Although the evidence was equivocal, Respondent's practice appears to be that when a PC game offers an in-game purchase option, the default and perhaps sole purchase method is through Respondent's platform. Although it might be possible for a customer to access the developer/publisher's website from within the game and purchase the DLC or MTX there, if such an option is available, it appears that the customer would have to go through multiple steps to do so.

**Claimant's PC Game Purchases**

Claimant is a consumer of PC games. Although Claimant purchases games on multiple platforms, Claimant predominantly purchases them on Steam. Claimant offered three basic reasons. First, although Claimant sometimes searches other websites for games, discounts are rare. Second, by far the most significant number of games are available on Steam, many of which are exclusive to Steam. Third, because Claimant would lose all content on the Steam platform by moving to another platform, to maintain the investment in games, Claimant continues to purchase games on Steam. Claimant has made several thousand dollars in purchases for a large variety of games on the Steam platform. Claimant contends that but for Respondent's pricing policies, Claimant would have paid substantially less for PC games.

**The Relevant Market**

Claimant and Respondent each offered a different definition of the relevant market. Respondent contends the market should include all distribution outlets, including console games, brick-and-mortar sales, as well as distributors like Steam and direct sales from developers/publishers. Claimant contends the relevant market is limited to distribution platforms like Steam. Claimant analogizes Steam to a "shopping mall" where individual developers/publishers sell their products in "stores." Under this theory, a standalone store operated by the developer/publisher would not be a part of the relevant market.

Although there is limited crossover between the PC game market and the console market, they are predominantly separate markets that use distinct hardware. Some games can be cross-played on both hardware platforms, but that is the exception. Furthermore, some developers/publishers sell their games on platforms that are indistinguishable from Steam's (e.g., Epic). Some platforms, like Steam, are hybrid sites where the platform operator sells third-party games as well as content from its own affiliates. The relevant market is the distribution of PC games online or in-store, regardless of whether the distribution platform is operated by the developer/publisher, a third party, or a hybrid site.

The evidence established that PC games sell at different prices across different geographic markets. The evidence established that North America is the relevant geographical market for Claimant's claims.

**Claimant's Section 1 Claim**

Claimant contends that Respondent's pricing policies constitute a per se violation of Section 1 of the Sherman Act. In the alternative, assuming the Rule of Reason applies, Claimant contends Respondent's policies are anti-competitive price-fixing in violation of the Act.

*Applicability of the Per Se or Rule of Reason Standard*

To establish a violation of Section 1 of the Sherman Act, a plaintiff must prove the following: (1) the existence of a contract, combination, or conspiracy between or among at least two separate entities; (2) that the contract, combination, or conspiracy unreasonably restrains trade; (3) that the restraint affects interstate or foreign commerce; and (4) that the restraint caused plaintiff to suffer an injury to its business or property. 15 U.S.C. §1; ABA Model Instruction 2.

Some restraints on trade are considered so pernicious that they are per se unlawful. *Leegin Creative Leather Products, Inc. v. PSKS, Inc., 551 U.S. 877, 883 (2007).* As a general rule, horizontal price-fixing agreements are per se unlawful without requiring an examination of the agreement's justifications. *Id.* On the other hand, vertical agreements typically fall under the Rule of Reason. *Id.*

Although Respondent contends that so-called hybrid relationships are examined under the Rule of Reason (citing *United States v. Brewbaker, 87 F.4th 563 (4th Cir. 2023)*, there is no general agreement on that standard. Instead, where the alleged participants in the subject agreement occupy multiple levels in the manufacture and means of distribution, whether an agreement among them falls within the per se or Rule of Reason standard depends on the manufacturing or distribution level engaged in by the parties that is subject to the agreement.

Here, the agreement regarding the use of Steam Keys is made between Steam, as the distributor, and the third-party developer/publisher. This is a vertical relationship and, therefore, falls under the Rule of Reason. That Respondent develops and publishes its own games is irrelevant to the agreement.

Similarly, the distribution agreement between Steam and third-party developers and publishers to offer games on Steam's platform is a vertical relationship. The Rule of Reason also applies to those agreements. Although Respondent competes with the third-party developers/publishers at that level of the distribution chain, the distribution agreement does not bear on that relationship.

The competitive relationship between Microsoft and Steam occurs at both the developer/publisher and distribution platform levels. The "Valve Corporation Distribution Agreement" between Respondent and Microsoft concerns the distribution of games developed and published by Microsoft on the Steam platform, in its role as distributor of its own games. This is a vertical agreement and does not bear on the relationship between Microsoft and the Respondent as competitors in the development and publishing of video games.

However, subsection (b) of Section 6.4 of the Microsoft agreement has horizontal effects. That Section provides that if Microsoft, as the developer/publisher of games that it offers for sale on the Respondent's platform,



One effect of this section is that if Microsoft lowers the price of one of its own games for distribution on its platform, it must also lower the price it offers that product for sale on Respondent's platform. Microsoft employees described this provision as a "price parity" requirement. This is a horizontal price-fixing agreement and is subject to the per se standard.

***Section 6.4(b) Is a Per Se Violation of Section 1 of the Sherman Act***

When a price-fixing agreement is subject to the per se rule, a party's justification for agreeing is irrelevant to finding a violation of the Act. *Leegin* at 883 ("*The per se rule, treating categories of restraints as necessarily illegal, eliminates the need to study the reasonableness of an individual restraint in light of the real market forces at work.*"). Accordingly, it is irrelevant whether the purpose of the provision, as Respondent contends, was to ensure its customers benefited from lower prices.[1]

The first three prongs of a Section 1 claim are satisfied for those Microsoft games sold on both the Microsoft platform and the Respondent's platform. The fourth prong (damages) is addressed below.

***No Violation Under the Rule of Reason for the Other Claims***

Under the Rule of Reason, there must be an analysis of the pro- and anti-competitive effects of the subject pricing policies. *Id. ("In its design and function the rule [of reason] distinguishes between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest.").* There are three policies subject to that examination: (1) the price parity policy for the sale of Steam Keys by developers/publishers, (2) the distribution agreement between Respondent and third-party developers/publishers, and (3) the so-called "free rider" policy requiring customers to make in-game purchases through Respondent.

The price parity policy for the sale of Steam Keys does not violate the Rule of Reason. The primary purposes of Steam Keys are two-fold (1) to assist a developer/publisher in the launch of and distribution of its games, and (2) to drive traffic to Respondent's platform because the Keys can only be redeemed on Respondent's platform. Respondent's price parity policy is designed to ensure that Respondent's customers, who cannot purchase Steam Keys directly on the website, are not disadvantaged by the discounted sale of the Keys on other platforms. The Keys are provided to the developer/publisher free of charge, and the sale of which to the public on other platforms generates no revenue to Respondent. The policy's pro-competitive effects, which provide a variety of PC games to the public, outweigh any anti-competitive effects.

Claimant contends that Respondent's policies in connection with the distributor agreement between Respondent and third-party developers/publishers violate the Rule of Reason in two ways: (1) if a developer/publisher undercuts the Respondent's prices on other platforms, Respondent will not presell the subject game at an advantageous location on its webpage; and (2) if a developer/publisher sells its product on another site, it risks losing access to Steam's customer base if it regularly undercuts the price it offers on Steam. Claimant contends that, given Respondent's dominance in the marketplace, the effect of these two policies is to discourage developers/publishers from offering price discounts on other platforms.

Respondent contends that the effect of these policies is to encourage developers/publishers to offer discounts on Respondent's platform, thereby reducing the cost to consumers. Claimant argues that developers/publishers cannot reduce the price on Respondent's platform in the same manner as on other platforms because Respondent's revenue share is higher than the other platforms charge, so that the developer/publisher can make the same profit for the sale of a game on different platforms at a lower price than would be available on Respondent's platform.[2]

The problem with Claimant's contention is that it depends on Respondent having sufficient market power to coerce a developer/publisher into not lowering its prices on other platforms to maintain price parity. Whether the Respondent has market power is a question of fact, with the Claimant bearing the burden of proof. It was undisputed that there are a variety of competing platforms in the PC game industry. Claimant presented expert testimony asserting that Respondent has an upwards of 70% market share and is by far the most dominant platform in the industry. However, Claimant's expert based his market share analysis on opaque industry magazine articles and broad assumptions of industry revenues. It does not buttress the expert's conclusions that the Respondent's expert could have had access to reliable data. It was not the Respondent's burden to prove the absence of market share.

---

[1] Even so, Respondent's justification cannot be accepted solely at face value because a probable effect of the price parity policy is to discourage Microsoft from lowering the prices of its games on its distribution platform because to do so would require it to provide an equal reduction on Respondent's platform, eliminating any potential economic advantage when competing for customers.

[2] There was evidence that the revenue share charged by Respondent was not unique in the industry, though on the high end.

Although it very well may be that Respondent has the largest market share in the industry enough to constitute market power, it was Claimant's burden to prove that fact with reliable, admissible evidence. It did not do so.[3] Without proof of market power, the potential anti-competitive effects of Respondent's policies do not outweigh the pro-competitive effects or Respondent's right to determine whether to offer a third-party product and under what circumstances it will promote that product.

Finally, Respondent's apparent policy to direct purchases of DLC and MTX to its own platform does not violate the Rule of Reason. A core means for developers/publishers to gain revenue is from in-game purchases. Indeed, the evidence established that many developers/publishers provide their PC games free, making downloadable content their only source of revenue. Respondent's sole source of income from PC games uploaded by third-party developers is revenue sharing. Accordingly, Respondent has made its platform attractive to those developers/publishers who depend solely on in-game purchases. It is not anti-competitive for Respondent to favor its own platform for such purchases, as that is the only source of revenue it will receive for the service of making the developer/publisher's otherwise free content available to consumers. In the absence of such a policy, consumers likely would not have access to the "free" games because Respondent would have no means to recoup its costs for maintaining such games on its platform.

**Claimant's Section 2 Claim**

"There are three essential elements to a successful claim of Section 2 monopolization: (a) the possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal 'antitrust' injury." *Allied Orthopedic v. Tyco Health*, 592 F. 3d 991, 998 (9th Cir. 2010) (quoting *Cal.Computer Prods., Inc. v. Int'l Bus. Mach. Corp.,* 613 F.2d 727, 735 (9th Cir.1979).

"To prove its monopolization claim, plaintiff must prove that defendant has monopoly power in a relevant antitrust market. Monopoly power is the power to control prices, restrict output, and exclude competition in a relevant antitrust market  More precisely, a firm is a monopolist if it can profitably raise prices substantially above the competitive level for a significant period of time." *ABA Model Instructions, A-104. "*Market power and monopoly power are related but distinct concepts. As the Supreme Court has stated: 'market power is the ability to raise prices above those that would be charged in a competitive market.' Monopoly power is 'the power to control prices or exclude competition.'" *Epic Games, Inc. v. Apple Inc., 559 F.Supp.3d 898, 1028 (2021) (internal citations omitted).*

Here, as noted above, Claimant has failed to carry its burden of proof to establish market power. Monopoly power is an extreme form of market power. *Id.* Accordingly, Claimant's Section 2 claim fails to satisfy an essential element and, therefore, is dismissed with prejudice.

**State Law Claims**

Although Claimant's demand for arbitration asserted state law claims, Claimant failed to address any such claims in closing submissions  All state law claims are, therefore, deemed abandoned and dismissed with prejudice.

**Damages**

Having found above that Section 6.4(b) of the Microsoft agreement is a per se violation of Section 1 of the Sherman Act, the final element in Claimant's claim is to establish antitrust injury. Because the violation would only apply to purchases of games subject to the Microsoft agreement, Claimant must prove (1) that he purchased one or more of such games, and (2) would have paid less for the game in the absence of such an agreement. Although the record of Claimant's purchases is in evidence, the parties have not had an opportunity to distinguish which purchases were subject to the Microsoft agreement and, for such purchases, what the quantum of damages is, if any. Accordingly, the parties shall make further submissions pursuant to the schedule below.

Claimant shall make his opening submission by no later than December 30, 2025

Respondent shall make its opposing submission by no later than January 9, 2026

---

[3] Claimant complains that Respondent has the necessary data to determine market share, but did not provide it in discovery. However, the time to resolve discovery disputes has long passed.

Claimant shall make any reply submission by no later than January 15, 2026.

**Prevailing Party**

A prevailing-party determination will be made as part of the damages Award.

Except as otherwise provided above, this Interim Award is in full settlement of the merits of all claims submitted to this arbitration. The Arbitrator retains jurisdiction to address these issues. The matter shall be deemed submitted to the Arbitrator for determination in a further Award upon and after the submissions scheduled above.

This Interim Award shall remain in full force and effect until the arbitrator renders a Final Award.

December 15, 2025
        Date

        Jeffrey H Dasteel, Arbitrator

I, Jeffrey H Dasteel, do hereby affirm upon my oath as arbitrator that I am the individual described in and who executed this instrument, which is my Interim Award.

December 15, 2025
        Date

        Jeffrey H Dasteel, Arbitrator