# EXHIBIT 1

AMERICAN
ARBITRATION
ASSOCIATION® | INTERNATIONAL CENTRE
FOR DISPUTE RESOLUTION®

**AMERICAN ARBITRATION ASSOCIATION**
**Consumer Arbitration Rules**

In the Matter of the Arbitration between

Case Number: 01-23-0005-3449

Jacob Barnhill
-vs-
Valve Corporation d/b/a Steam

**AWARD OF ARBITRATOR**

I, Peter Rundle, THE UNDERSIGNED ARBITRATOR ("the Arbitrator"), having been designated in accordance with the arbitration agreement entered into between the above-named parties, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, each represented by counsel, at an evidentiary hearing held on February 9-13, 16-20, 23-24, 2026, do hereby issue this FINAL AWARD as follows:

**I.     THE PARTIES, THEIR REPRESENTATIVES AND THE PLACE OF ARBITRATION.**

1.     Claimant is Jacob Barnhill ("Claimant"), an individual who purchased video games from Respondent, Valve Corporation, which does business as Steam ("Respondent"). Claimant is a resident of the State of Louisiana. Respondent maintains its principal place of business in the State of Washington. Claimant and Respondent may sometimes be referred to as "the Parties."

2.     Bucher Law, PLLC, Judson E. Crump, PC, Erik B. Atzbach, LLC and Morrow Ni, LLP represented Claimant in this arbitration. Skadden, Arps, Slate, Meagher & Flom, LLP, Holwell Shuster & Goldberg LLP and Corr Cronin, LLP represented Respondent.

3.     The evidentiary hearing in this matter was conducted in a hybrid format, with participants appearing via videoconference and in person at Los Angeles, California. The evidentiary hearing was transcribed. Claimant and Respondent each received copies of the transcript, which became the official record of the proceedings.

**FINAL AWARD**
Case No. 01-23-0005-3449
*Jacob Barnhill*
*- vs -*
*Valve Corporation d/b/a Steam*

## II.    THE PARTIES' AGREEMENT AND THE ARBITRATION PROVISION.

4.    This arbitration was commenced pursuant to the Parties' agreement to arbitrate located in their *Steam Subscriber Agreement* ("SSA"), last updated February 24, 2022, which provides the following, in relevant part:

### 10. APPLICABLE LAW/MEDIATION/JURISDICTION/ATTORNEYS' FEES

You and Valve agree that this Agreement shall be deemed to have been made and executed in the State of Washington, U.S.A., and Washington law, excluding conflict of laws principles and the Convention on Contracts for the International Sale of Goods, governs all claims arising out of or relating to: (i) any aspect of the relationship between us; (ii) this Agreement; or (iii) your use of Steam, your Account or the Content and Services; except that the U.S. Federal Arbitration Act governs arbitration as far as your country's laws permit. Subject to Section 11 (Dispute Resolution/Binding Arbitration/Class Action Waiver) below, you and Valve agree that any claim asserted in any legal proceeding shall be commenced and maintained exclusively in any state or federal court located in King County, Washington, having subject matter jurisdiction. You and Valve hereby consent to the exclusive jurisdiction of such courts. In any dispute arising out of or relating to this Agreement, your use of Steam, your account, or the Content and Services, the prevailing party will be entitled to attorneys' fees and expenses (except arbitration -- see Section 11.C.)

### 11. DISPUTE RESOLUTION/BINDING ARBITRATION/CLASS ACTION WAIVER

This Section 11 shall apply to the maximum extent permitted by applicable law. IN PARTICULAR, IF YOU ARE A CONSUMER WHO LIVES IN A EUROPEAN UNION MEMBER COUNTRY, THE UNITED KINGDOM, THE PROVINCE OF QUEBEC (CANADA), AUSTRALIA, OR NEW ZEALAND, THIS SECTION 11 DOES NOT APPLY TO YOU. IF YOU ARE A CONSUMER WHO LIVES IN RUSSIA,YOU MAY UTILIZE THE ARBITRATION PROCESS IDENTIFIED IN THIS SECTION 11 OR YOU MAY USE LOCAL RUSSIAN STATE COURTS TO RESOLVE YOUR DISPUTE.

Most user concerns can be resolved by use of our Steam support site at https://support.steampowered.com/. If Valve is unable to resolve your concerns and a dispute remains between you and Valve, this Section explains how the parties have agreed to resolve it.

**A.    Must Arbitrate All Claims Except Intellectual Property, Unauthorized Use, Piracy, or Theft**

YOU AND VALVE AGREE TO RESOLVE ALL DISPUTES AND CLAIMS BETWEEN US IN INDIVIDUAL BINDING ARBITRATION. THAT INCLUDES, BUT IS NOT LIMITED TO, ANY CLAIMS ARISING OUT OF OR RELATING TO: (i) ANY ASPECT OF THE RELATIONSHIP BETWEEN US; (ii)

THIS AGREEMENT; OR (iii) YOUR USE OF STEAM, YOUR ACCOUNT, HARDWARE OR THE CONTENT AND SERVICES. IT APPLIES REGARDLESS OF WHETHER SUCH CLAIMS ARE BASED IN CONTRACT, TORT, STATUTE, FRAUD, UNFAIR COMPETITION, MISREPRESENTATION OR ANY OTHER LEGAL THEORY, AND INCLUDES ALL CLAIMS BROUGHT ON BEHALF OF ANOTHER PARTY.

However, this Section 11 does not apply to the following types of claims or disputes, which you or Valve may bring in any court with jurisdiction: (i) claims of infringement or other misuse of intellectual property rights, including such claims seeking injunctive relief; and (ii) claims related to or arising from any alleged unauthorized use, piracy, or theft.

This Section 11 does not prevent you from bringing your dispute to the attention of any federal, state, or local government agencies that can, if the law allows, seek relief from us for you.

An arbitration is a proceeding before a neutral arbitrator, instead of before a judge or jury. Arbitration is less formal than a lawsuit in court, and provides more limited discovery. It follows different rules than court proceedings, and is subject to very limited review by courts. The arbitrator will issue a written decision and provide a statement of reasons if requested by either party. YOU UNDERSTAND THAT YOU AND VALVE ARE GIVING UP THE RIGHT TO SUE IN COURT AND TO HAVE A TRIAL BEFORE A JUDGE OR JURY.

**B. Try to Resolve Dispute Informally First**

You and Valve agree to make reasonable, good faith efforts to informally resolve any dispute before initiating arbitration. A party who intends to seek arbitration must first send the other a written notice that describes the nature and basis of the claim or dispute and sets forth the relief sought. If you and Valve do not reach an agreement to resolve that claim or dispute within thirty (30) calendar days after the notice is received, you or Valve may commence an arbitration. Written notice to Valve must be sent via postal mail to: ATTN: Arbitration Notice, Valve Corporation, P.O. Box 1688, Bellevue, WA98004.

**C. Arbitration Rules and Fees**

The U.S. Federal Arbitration Act applies to this Section 11 as far as your country's laws permit. The arbitration will be governed by the Consumer Arbitration Rules (or the Commercial Arbitration Rules, if the Consumer Arbitration rules are inapplicable) of the American Arbitration Association ("AAA") as modified by this Agreement. Rules are available at http://www.adr.org. The arbitrator is bound by the terms of this Agreement.

The AAA will administer the arbitration. Outside the U.S., Valve will select a neutral arbitration provider that uses these or similar rules. It may be conducted

**FINAL AWARD**
Case No. 01-23-0005-3449
*Jacob Barnhill*
*-vs-*
*Valve Corporation d/b/a Steam*

through the submission of documents, by phone, or in person in the country where you live or at another mutually agreed location.

If you seek $10,000 or less, Valve agrees to promptly reimburse your filing fee and your share if any of AAA's arbitration costs, including arbitrator compensation, unless the arbitrator determines your claims are frivolous or were filed for harassment. Valve agrees not to seek its attorneys' fees or costs unless the arbitrator determines your claims are frivolous or were filed for harassment. If you seek more than $10,000 and the AAA Consumer Arbitration Rules do not apply, the AAA's arbitration costs, including arbitrator compensation, will be split between you and Valve according to the AAA Commercial Arbitration Rules.

### D. Individual Binding Arbitration Only

YOU AND VALVE AGREE NOT TO BRING OR PARTICIPATE IN A CLASS OR REPRESENTATIVE ACTION, PRIVATE ATTORNEY GENERAL ACTION, WHISTLE BLOWER ACTION, OR CLASS, COLLECTIVE, OR REPRESENTATIVE ARBITRATION, EVEN IF AAA's RULES WOULD OTHERWISE ALLOW ONE. THE ARBITRATOR MAY AWARD RELIEF ONLY IN FAVOR OF THE INDIVIDUAL PARTY SEEKING RELIEF AND ONLY TO THE EXTENT OF THAT PARTY'S INDIVIDUAL CLAIM. You and Valve also agree not to seek to combine any action or arbitration with any other action or arbitration without the consent of all parties to this Agreement and all other actions or arbitrations.

This Agreement does not permit class, collective, or representative arbitration. A court has exclusive authority to rule on any assertion that it does.

### E. What Happens if Part of Section 11 Is Found Illegal or Unenforceable

If any part of Section 11 (Dispute Resolution/Binding Arbitration/Class Action Waiver) is found to be illegal or unenforceable, the rest will remain in effect (with an arbitration award issued before any court proceeding begins), except that if a finding of partial illegality or unenforceability would allow class, collective, or representative arbitration, all of Section 11 will be unenforceable and the claim or dispute will be resolved in court.

## III.    JURISDICTIONAL CHALLENGE AND ARBITRABILITY OBJECTIONS.

5.    Respondent sought dismissal and/or stay of Claimant's arbitration demand for a variety of reasons including, but not limited to, its effort to update and amend the SSA to eliminate its arbitration clause.  The Arbitrator denied Respondent's efforts to dismiss the arbitration, but did ultimately grant a stay of the arbitration to permit the U.S. District Court for the Western District of Washington ("District Court") an opportunity to rule on Respondent's Petition to Enjoin Arbitration ("Petition to Enjoin").  *See, Order Nos. 2-4 incorporated herein.*

6. After an extended stay, and in the absence of any ruling from the District Court on Respondent's Petition to Enjoin, the Arbitrator invited further written submissions concerning the validity of Respondent's Amended SSA, conducted a telephonic hearing concerning same, and issued his order holding the Amended SSA invalid and unenforceable. *See, Order Nos. 5-7 incorporated herein.*

7. In consultation with the Parties and their representatives, the Arbitrator issued further procedural and scheduling orders moving this matter forward to an evidentiary hearing. *See, Order Nos. 8-12 incorporated herein.*

## IV.    ARBITRAL DEMANDS, CLAIMS AND DEFENSES.

8. Pursuant to the Arbitrator's *Order No. 1*, in August 2024 Claimant submitted his Amended Demand, stating in part the following:

In accordance with the Western District of Washington order dated 25 October 2021 compelling to arbitration the claims stated in this action, dismissal of which was denied in the order dated 6 May 2022, Jacob Barnhill brings this action against Valve Corporation ("Valve" or "Defendant"), seeking injunctive relief, and damages, under Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1), Section 2 of the Sherman Antitrust Act (15 U.S.C. § 2), and the Washington Consumer Protection Act . . . .

Claimant further describes his claims by alleging:

FIRST CAUSE OF ACTION
Sherman Act Section 2-Monopolization of the PC Game Transaction Platforms
Market (15 U.S.C. § 2)

91. Valve has willfully acquired and maintained monopoly power in the market for PC Game Transaction Platforms, by means of exclusionary, and anticompetitive conduct, including but not limited to market-wide price controls and presumptively illegal mergers with competitors, as alleged herein.

92. Through the PMFN, Valve has coerced publishers into agreeing to offer their games at the same price across all PC Game Transaction Platforms, regardless of whether competing platforms charge lower commissions or otherwise charge lower prices than Valve.

93. In the absence of the Valve PMFN, rivals in the PC Desktop Game Transaction Platforms market would charge lower prices and force Valve to compete. Such competition would in tum lower prices on Valve's own PC Game Transaction Platform, benefiting consumers and publishers that utilized Valve's PC Game Transaction Platform.

94. Valve's conduct is not justified, because its conduct does not enhance overall efficiency or make the relevant markets more efficient.

95. Valve's conduct has had a substantial effect on interstate commerce.

96. [Claimant] . . . has been injured in their property as a result of Valve's conduct.

**FINAL AWARD**
Case No. 01-23-0005-3449
*Jacob Barnhill*
*-vs-*
*Valve Corporation d/b/a Steam*

97.    [Claimant] . . . has suffered and will suffer injury of the type that antitrust laws intend to prevent. [Claimant] . . . has been and will be injured by harm to competition as a result of Valve's conduct.

98.    [Claimant] . . . estimates that the actual damage suffered was in the amount of $2,736. Under the Sherman Act, if [Claimant] . . . prevails, [Claimant] . . . is entitled to mandatory treble damages as well as a mandatory award of attorneys' fees.

99.    [Claimant] . . . further seeks an order compelling divestiture of Valve's illegally acquired game platforms.

## SECOND CAUSE OF ACTION
### Sherman Act Section 2-Attempted Monopolization of the PC Desktop Game Transaction Platforms Market (15 U.S.C. § 2)

100.    In the market for PC Desktop Game Transaction Platforms, Valve has engaged in exclusionary and anticompetitive conduct, including but not limited to market-wide price controls and presumptively illegal mergers, as alleged herein.

101.    Valve's conduct has had an anticompetitive effect in the alternative market for PC Game Transaction Platforms.

102.    Valve has engaged in that conduct with the specific intent of monopolizing the market for PC Desktop Game Transaction Platforms.

103.    Valve has engaged in that conduct with a dangerous probability of monopolizing the market for PC Game Transaction Platforms.

104.    In the absence of the Valve PMFN, rivals in the PC Game Transaction Platforms market would charge lower prices and force Valve to compete. Such competition would in tum lower prices on Valve's own PC Game Transaction Platform, benefiting consumers that utilized Valve's PC Game Transaction Platform.

105.    Valve's conduct has had a substantial effect on interstate commerce.

106.    [Claimant] . . . has been or will be injured in their property as a result of Valve's conduct.

107.    [Claimant] . . . has suffered and will suffer injury of the type that antitrust laws intend to prevent. [Claimant] . . . has been and will be injured by harm to competition as a result of Valve's conduct.

108.    [Claimant] . . . estimates that the actual damage suffered was in the amount of $2,736. Under the Sherman Act, if [Claimant] . . . prevails, [Claimant] . . . is entitled to mandatory treble damages as well as a mandatory award of attorneys' fees.

## THIRD CAUSE OF ACTION
### Sherman Act Section I-Anticompetitive Course of Conduct (15 U.S.C. § 1)

109.    As alleged above, through its contractual agreements with game publishers, Valve has induced or coerced various publishers to enter into one or more contracts, combinations, or conspiracies to unreasonably restrain trade, to control prices or exclude competition, and to willfully acquire and maintain market power in the relevant markets.

110.    Valve's conduct has had, and continues to have, substantial anticompetitive effects in the relevant markets.

111.    Valve's conduct has no legitimate business purpose or procompetitive effect.

112.    There are less restrictive alternatives to the restraints that Valve has imposed.

113.    Valve's conduct has had a substantial effect on interstate commerce.

114.    [Claimant] . . . has been or will be injured in their property as a result of Valve's conduct.

115.    [Claimant] . . . has suffered and will suffer injury of the type that antitrust laws intend to prevent. [Claimant] . . . has been and will be injured by harm to competition as a result of Valve's conduct.

116.    [Claimant] . . . estimates that the actual damage suffered was in the amount of $2,736. Under the Sherman Act, if [Claimant] . . . prevails, [Claimant] . . . is entitled to mandatory treble damages as well as a mandatory award of attorneys' fees.

FOURTH CAUSE OF ACTION
Washington State Consumer Protection Act RCW 19.86

117.    The claims alleged above constitute unfair methods of competition under Washington State law provisions 19.86.020, 19.86.040, and 19.86.030.

118.    Valve is engaged in unfair and deceptive practices in commerce, which affect the public interest and cause injury to business and property.

119.    Valve's contracts, combinations, or conspiracies with game publishers are anticompetitive restraints that have the purpose and effect of fixing and inflating prices in the relevant markets.

120.    The contracts, combinations, or conspiracies at issue are in restraint of trade.

121.    Valve's monopolization and attempted monopolization have the purpose and effect of fixing and inflating prices in the relevant markets.

122.    As such, [Claimant] . . . is entitled to damages and an injunction under Revised Code of Washington 19.86.090.

123.    Under the Washington State Consumer Protection Act RCW 19.86, if [Claimant] . . . prevails, [Claimant] . . . is also entitled to an award of attorneys' fees.

9.    Respondent had previously submitted its Answer and Defenses, dated December 26, 2023 in which it generally denied the claims asserted and alleged nineteen affirmative defenses. Though the Arbitrator granted Respondent leave to amend or supplement its Answer in response to Claimant's Amended Demand, Respondent elected to stand on its originally filed Answer and Defenses. Respondent identified its affirmative defenses as follows:

1.    Claimant has violated the Steam Subscriber Agreement by pursuing a collective or representative action, which is prohibited as a matter of law.

2.    Claimant has violated the Steam Subscriber Agreement by failing to follow its prearbitration procedural requirements—specifically, by failing to provide Valve proper notice of the claims and failing to engage in good faith discussions about them.

3.    Claimant has failed to state a claim upon which relief can be granted.

4.    Claimant's claims are barred, in whole or in part, by the applicable four-year statutes of limitations. See 15 U.S.C. § 15b and RCW 19.86.120.

5.    Claimant's claims are barred, in whole or in part, because any alleged injury or damages that Claimant may have suffered, which Valve denies, were not caused by Valve but are losses attributable to changes in competitive conditions and the demand for games Claimant purchased.

**FINAL AWARD**
Case No. 01-23-0005-3449
*Jacob Barnhill*
*-vs-*
*Valve Corporation d/b/a Steam*

6.      Claimant is not entitled to the injunctive relief Claimant seeks because Claimant has an adequate remedy at law, because Claimant agreed under the Steam Subscriber Agreement not to seek the broad injunctive relief articulated in Claimant's demand, and because the Steam Subscriber Agreement does not allow an arbitrator to award such relief.

7.      Claimant's claims are barred, in whole or in part, insofar as Valve's freedom to contract with developers would be infringed were the arbitrator to enforce a judgment against it.

8.      Claimant's claims are barred, in whole or in part, because Valve's revenue share percentage is commensurate with Steam's value to game publishers.

9.      Claimant's claims are barred, in whole or in part, because Valve has no duty to deal when it comes to its Steam keys policies. As long as Valve has a valid business reason for the terms it attaches to its Steam keys, which it does, those terms are not unlawful.

10.      Claimant's claims and requested relief are barred in whole or in part insofar as Claimant lacks a sufficient evidentiary, legal, or constitutional basis to seek punitive damages.

11.      Claimant's claims and requested relief are barred in whole or in part insofar as Claimant is not entitled an award of costs or attorney's fees.

12.      Claimant's claims are barred because Valve acted lawfully and reasonably at all times and its actions were undertaken in good faith to advance legitimate business interests and had the effect of promoting, encouraging, and increasing competition.

13.      Claimant's claims are barred, in whole or in part, because Claimant sustained no injury in fact or antitrust injury or damages proximately caused by an act or omission by Valve.

14.      Claimant's claims are barred, in whole or in part, insofar as Claimant lacks standing to assert any or all of the claims in the Demand.

15.      Claimant's claims are barred in whole or in part to the extent that they seek or would recover damages or other relief that would duplicate in whole or part damages or relief sought or awarded in this action or any other action.

16.      Claimant is party to the Steam Subscriber Agreement with Valve that bars his claims, in whole or in part, because of applicable limitation of liability provisions contained therein.

17.      Claimant's claims are barred, in whole or part, to the extent they are frivolous or were filed for harassment.

18.      Claimant's claims are barred, in whole or in part, by the doctrines of laches, waiver, and/or estoppel.

19.      Claimant's claims are barred, in whole or in part, by the doctrine of unenforceability and/or illegality, including without limitation unenforceability as against public policy.

10.      In an email dated March 5, 2026, Respondent clarified for the Arbitrator and Claimant's counsel the affirmative defenses it continued to rely upon, as well as those it waived and/or abandoned, stating:

**FINAL AWARD**
Case No. 01-23-0005-3449
*Jacob Barnhill*
*-vs-*
*Valve Corporation d/b/a Steam*

Dear Arbitrator Rundle,

As reflected in Valve's December 23, 2023 answer to the demands filed by the Claimants before this Tribunal, Valve denies the allegations in the Claimants' demands and denies that any Claimants are entitled to any form of relief. As requested on the record during these hearings, however, we write to confirm that this Tribunal need not address Valve's First, Second, Third or Tenth Affirmative Defenses. Valve further agrees to withdraw its Sixteenth and Eighteenth Affirmative Defenses as to the specific Claimants who are continuing to pursue their claims before this Tribunal.

Respectfully submitted,
Andrew Indorf
Counsel for Valve

## V.   PROCEDURAL AND EVIDENTIARY ISSUES.

11.   This arbitration is one of several being heard by the Arbitrator, each brought by consumers against Respondent. Though each arbitration presents nearly identical claims, they have not been consolidated. Rather, each is handled on an individual basis consistent with Section 11.D of the *SSA*.

### A.   *The Evidentiary Record --*

12.   The Parties did, however, agree to streamline the presentation of evidence in the individual arbitrations by consenting to the cross-admission of fact and expert testimony, as well as the cross-admission of all exhibits. *Transcript, Volume 1, February 9, 2026, page 11, line 19 – page 13, line 4 ("Tr., Vol 1, 2/9/26, 11:19-13:4).* As a result, there is a single, unified evidentiary record applicable to each of the individual arbitrations. Mr. Barnhill's testimony forms part of that evidentiary record.

13.   During the May 18, 2026 directed closing argument, the Arbitrator inquired of counsel whether the Parties had any objection to the admission of all proffered evidence (testimony and exhibits) – noting that he did not recall having excluded any evidence during the course of the evidentiary hearing. Claimant's counsel noted his objection [lack of foundation, *etc.*] to a spreadsheet relied upon by Dr. Hunt Allcott (Respondent's expert witness), otherwise counsel agreed that all proffered evidence was properly before the Arbitrator. As discussed in Paragraphs 16-17, below, the objection(s) to the subject spreadsheet is/are overruled.

### B.   *Collateral Estoppel --*

14.   Claimant has asked the Arbitrator to "find [that] the doctrine of collateral estoppel is applicable to Valve's anticompetitive conduct. Valve has already had a full and fair opportunity to litigate these exact Sherman Act violations across multiple prior arbitrations and has lost. The prior findings in the *Dark Catt* and *Wolfire* litigations, along with the recent awards issued by Arbitrators .

**FINAL AWARD**
Case No. 01-23-0005-3449
*Jacob Barnhill*
*-vs-*
*Valve Corporation d/b/a Steam*

. ., . . ., . . ., and . . ., establish that Valve's conduct is unlawful." *Claimant's Brief on Collateral Estoppel.*

15. The use of non-mutual collateral estoppel in arbitration is improper. Here, Claimant and Respondent bargained for individualized arbitrations. If prior results in other arbitration proceedings bound the Arbitrator here, the notion of non-collective arbitration embodied in the Parties' SSA would be turned on its head. Further, it is not disputed that the results in prior arbitration proceedings have not been consistent – in some the claimants have prevailed, while in others Respondent has been successful. As Respondent rightly notes in its opposition brief concerning collateral estoppel, "No collateral estoppel may be imposed where 'the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant.' *Homaidan v. Sallie Mae, Inc.*, 3 F.4th 595, 600 n.2 (2d Cir. 2021) (internal quotation marks omitted)." *Respondent's Brief in Opposition to Claimants' Brief on Collateral Estoppel, p. 2.*

## C. *Evidentiary Standards --*

16. Claimant has made a post-hearing submission concerning the appropriate evidentiary standards that should guide the Arbitrator's decision-making, and raised some post-hearing objections to certain data upon which Dr. Allcott relied. Respondent has made an opposition submission noting, among other things, that the Parties had previously agreed to the admission of all exhibits. The Parties' debate over what evidence (written and testimonial) is properly before the Arbitrator is largely based upon a misunderstanding of the evidentiary rules applicable in arbitration. State and federal rules of evidence are not binding. AAA Rule 34 specifically provides:

> (a) The parties may offer relevant and material evidence and must produce any evidence the arbitrator decides is necessary to understand and decide the dispute. Following the legal rules of evidence shall not be necessary. […]

> (b) The arbitrator shall determine what evidence will be admitted, what evidence is relevant, and what evidence is material to the case. The arbitrator may also exclude evidence that the arbitrator decides is cumulative or not relevant.

17. All evidence offered by Claimant and Respondent in this arbitration is admitted. All evidentiary objections to exhibits offered and testimony given are overruled.

## VI. THE EVIDENTIARY HEARING.

18. Pursuant to written notice, the Evidentiary Hearing took place largely by videoconference over several days commencing on February 9, 2026. The Parties' experts, Edward Castronova, Ph.D. and Hunt Allcott, Ph.D., testified in-person in a witness conferencing format. The following witnesses, first having been duly sworn, testified:

February 9, 2026              (Tom Giardino)

**FINAL AWARD**
Case No. 01-23-0005-3449
*Jacob Barnhill*
*-vs-*
*Valve Corporation d/b/a Steam*

| | |
|---|---|
| February 10, 2026 | (Nathaniel Blue, Kassidy Gerber) |
| February 11, 2026 | (Jason Ruymen, Augusta Butlin) |
| February 12, 2026 | (Erik Peterson) |
| February 13, 2026 | (Marcus Crowley, Michael Dufour) |
| February 16, 2026 | (Jonathan Hillman, Scott Brewster, Peter Cila) |
| February 17, 2026 | (Eric Partlow, Paolo Galupo) |
| February 18, 2026 | (William Jackson) |
| February 19, 2026 | (Edward Castronova, Ph.D., Hunt Allcott, Ph.D.) |
| February 20, 2026 | (Edward Catronova, Ph.D., Hunt Allcott, Ph.D.) |
| February 23, 2026 | (Robert "Brad" Wilson, Jacob Barnhill, Morgan Rushing, Michael Calloni) |
| February 24, 2026 | (Jack Uteg, Kai Trobaugh, Ray Miller) |

## VII.    POST-HEARING PROCEEDINGS.

19.    At the conclusion of testimony on February 24, 2026, the Parties met and conferred concerning the evidentiary record.  The Parties thereafter supplemented the record in post-hearing submissions with additional exhibits, including transcripts of testimony. Without limitation the Arbitrator admitted all identified exhibits (including transcripts of prior testimony).

20.    The Parties each made oral closing arguments on March 9, 2026 and presented post-hearing opening and reply briefs on April 1, 2026 and April 22, 2026.  Additionally, on April 1, 2026, Claimant submitted briefs concerning evidentiary standards and collateral estoppel (*see,* Paragraphs 14-17, above), and Respondent submitted a request for monetary sanctions based upon Claimant's counsel's untimely submission of Dr. Castronova's expert report.  On April 22, 2026, Respondent presented its briefs responding to Claimant's evidentiary standards and collateral estoppel submissions, and Claimant's counsel timely submitted opposition to Respondent's sanctions request.

21.    Finally, the Arbitrator conducted a brief telephonic directed closing argument with counsel on May 18, 2026. The Arbitrator declared the hearing in this matter closed as of May 18, 2026.

## VIII.    STATEMENT OF FACTS & DISCUSSION.

22.    This Section of the Final Award includes statements of facts and matters found by the Arbitrator to be true and necessary to the Final Award. To the extent that this recitation differs from any Party's position, that is the result of determinations as to credibility, relevance, and the weighing of the evidence, both oral and written.

### A.  *Overview --*

23.    Respondent provides an online digital distribution platform for video games – primarily those played on personal computers. Many video games can also be played on consoles (*e.g.*, Xbox, PlayStation) and hand-held devices (*e.g.,* Nintendo Switch). Though some people who play video games (commonly known as "gamers") enjoy interacting with games on multiple platforms, most agree that the gaming experience afforded by personal computers (PC's) is the most immersive experience due to the ability to customize and upgrade PC hardware to suit a gamer's personal preferences.  Respondent caters to this PC video game market.

24.    Years ago, video games were largely purchased at physical, brick–and–mortar stores. One would purchase a packaged computer disc, take it home, insert it into the disc drive of one's computer, upload the video game program, and begin to play the game.  That process began to change with the development of online marketing, stores and cloud computing.  Instead of purchasing physical discs, software (including video games) could be purchased and downloaded online without ever acquiring a physical copy (disc) of the program or video game.  Respondent was one of the first, if not the first, business to take advantage of this new method of distributing video games.

25.    Over the years, Respondent has built its PC game distribution platform, known as Steam, with many tools and features to enhance the gaming experience of those who purchase video games on its platform.  Steam's first-to-market status allowed it to attract a very large user base, which, in turn, caused video game developers (those who conceptualize, design, code, *etc.* the games) to flock to Steam as a preferred platform through which to publish and distribute their video games.  It was, and continues to be, a symbiotic relationship.

26.    Steam is not the only distribution channel available to developers.  Some of the most successful video games are self-published through the developer's own platform, while other developers publish their games through Steam and elsewhere (*e.g.,* Epic, UbiSoft).

27.    When a gamer purchases a video game through Steam, the game is accessed and played through the Steam platform.  Steam invests significant time and resources to maintain and upgrade its platform to enhance the gamer's experience, as well as that of developers.  These efforts, in turn, maintain the loyalty of Steam's customers (both gamers and developers).  The same video game, purchased through and played on a different distribution platform, will not have access to all of Steam's unique features.

28.    Several witnesses testified that they enjoyed purchasing games through Steam, noting its convenience, trustworthiness and ease of use.  Even when the same game might be available at a

lower price through a different platform, some witnesses chose to purchase through Steam for the features and benefits they believe Steam offers over lower-priced platforms.  See, *e.g.*, *Tr., Vol 6, 2/16/26, 1718:11-1724:17 (Brewster); 1757:2-1758:10 (Cila)*.  Other witnesses testified that game price weighed more heavily in their purchasing decisions causing them to shop among various video game distributors and platforms for the best price – often using price comparison tools readily available online at no cost.

29.     The evidence showed Steam offers numerous features its competitors do not.  Kassidy Gerber described the Steam Datagram Relay, a worldwide secure, low-latency VPN available to all developers on Steam.  See, *Tr., Vol. 2, 2/10/26, 833:9–835:8 (Gerber)*. Dr. Castronova agreed Steam offers features enabling gamers to "discover new games," "talk to their friends," and "play developers' games in beta and give feedback."  See, *Tr., Vol. 10, 2/20/26, 2637:17–2638:11 (Castronova)*.  He acknowledged other features, *id., at  2637:17–2638:11,* and conceded "Steam does some things that are really nice relative to Epic, both for developers and players."  *Id. at 2592:3–7.*

30.     Steam charges game developers a 30% royalty fee to publish/distribute their games.  For example, if Alpha Games publishes its game on Steam and charges $10 for that game, Alpha receives $7, and Steam receives $3 for every game sold. For games that are hugely successful, additional revenue share tiers apply that benefit the game developer.  Most video games never achieve those alternative revenue share tiers. Other PC game distributors charge a lower revenue share than does Steam.

31.     The foregoing facts are largely undisputed. In contrast, the characterization of communications between Respondent and various game developers concerning game pricing, game content and other issues was – and is – hotly contested.  Claimant argues that the communications evidence agreements (or attempted agreements) in restraint of trade, or efforts to obtain or maintain monopoly power, in violation of Sections 1 and 2 of the Sherman Antitrust Act, and in violation of the Washington State Consumer Protection Act.

**B.  *Price & Content Parity* –**

32.     Game developers who publish on Steam set the prices for their games.  Steam provides tools and advice concerning best pricing practices, but does not insist on a given price.  Similarly, a game developer may decide to sell its game on Steam for one price, and on another platform for a different, lower or higher price.  As with pricing, a game developer may offer one version of a game on Steam, and another version of that same game – with additional content – on another platform.

33.     When a Steam customer visits the Steam platform to shop for games, based upon past purchases and interactions with the platform, an algorithm will highlight and showcase for that customer games that might interest him or her.  The algorithm is not adjusted to account for game pricing or content.

34.     Steam does not sell game advertising.  A game developer cannot pay Steam to place its new game on Steam's landing page or otherwise highlight a particular product.  Internally, Steam

**FINAL AWARD**
Case No. 01-23-0005-3449
*Jacob Barnhill*
*-vs-*
*Valve Corporation d/b/a Steam*

curates and highlights games that Steam believes will interest its customers. Some of that curated content is for new games or product launches. This curated content is extremely valuable and can often make or break the success of a new game.

35.    A relationship between curated content and game pricing and/or content does exist, though it is not as linear as Claimant would suggest. Steam does not track game pricing and/or content across various game distribution channels or platforms. When Steam does become aware of a price or content disparity – and when that disparity exists in the context of a curated promotional event – Steam may request that the game developer provide Steam with the same pricing or content deal given to the other platform. In some instances, the game developer will oblige the request, while at other times it will not. *See, e.g., Exhibits C0189171, C0403518, C1193127, C0252941.*

36.    Claimant presented a number of written communications, both internal to Steam, and between Steam and game developers, in which Steam insisted on price and/or content parity in exchange for curated promotional content, or unrestricted access to game download codes (Steam Keys). *See, e.g., Exhibits C2562700, C2796582, C0598921, C0605887 and* C2565882. The communications – at least some of them – discuss eliminating a game from Steam for non-compliance with the parity request. *See, e.g., Exhibits C0265435, C2573683.* The emails presented suggest that additional communications concerning price and/or content parity took place "off-line." Based upon the number of game developers who publish on Steam, the number of games offered on Steam, the years during which Steam has operated, and the admitted game price variability across distribution channels at any given time, it cannot be said that price/content parity is a precondition for publishing/distributing on Steam or, for that matter, an absolute precondition for curated promotion.

37.    The foregoing conclusion reflects an extremely close call.

### C. *Steam Key Use* –

38.    Steam Keys are alpha-numeric codes with which a videogame customer can download a game. The Steam Keys are redeemed on Steam to acquire the game. Steam provides the Keys to developers, who may then sell or distribute them as they see fit – often to Key Resellers – who market and sell the Keys. Steam receives no revenue share from the sale of Steam Keys. As with curated content, which cannot be purchased and is not a "right" to which a developer is entitled, Steam controls the use of Keys. Unlimited Steam Key discounting, depriving Steam of revenue with which to maintain and improve the Steam platform, could lead to customer dissatisfaction. Much of the email communication between Steam and game developers presented during the Evidentiary Hearing involved the use of Steam Keys.

### D. *In-Game Linking* –

39.    In many video games, additional content (virtual tools, weapons, clothing, *etc.*) that enhance the user experience may be purchased through links included within the game. Steam's revenue share agreement provides that such in-game purchases fall within the ambit of the revenue share. To prevent a game developer from evading the revenue share, Steam prohibits game developers from including within a Steam-published game purchase links to external sites. As Steam suggests in

**FINAL AWARD**
Case No. 01-23-0005-3449
*Jacob Barnhill*
*-vs-*
*Valve Corporation d/b/a Steam*

one submission, this prevents a developer from selling a bare-bones game on Steam cheaply, with an internal link to its own site for the higher priced full-version. If a developer could thus obtain the full benefit of Steam publishing at below-market rate, it would be "free-riding" on Steam's platform investment.

### E.  *Price Discounting* –

40.     Steam requires developers to establish a base price for games.  It is up to the developer to establish that price. It may be higher or lower on Steam than on another distribution platform. The purpose of the base price is to prevent price manipulation and customer deception. For example, if a developer were free to charge $40 for a game on Monday, raise the price to $100 on Wednesday, and then on Friday price the same game at $30 for "a 70% discount," customers would be deceived. Steam's price discounting policy maintains customer confidence and promotes the trustworthiness of its platform.

### F.  *The "Agreements"* –

41.     Claimant presented some evidence of a 2011 agreement between Respondent and Microsoft concerning revenue share for Microsoft games sold and distributed on the Steam platform. Claimant argues that because both Respondent and Microsoft distribute video games, the agreement was between competitors, thereby compelling a finding that Respondent had engaged in a *per se* antitrust violation. Claimant misapprehends the nature of the 2011 Microsoft Steam Distribution Agreement – it is an agreement between Microsoft as a game developer and Respondent as a game distributor.

42.     While the relationship between Microsoft and Respondent has both vertical (developer – distributor) and horizontal (distributor – distributor)  aspects, the 2011 SDA implicates only their vertical relationship.  At best, from Claimant's perspective, the relationship can be characterized as *hybrid.*  Beyond the 2011 Microsoft SDA, the evidence presented establishes purely vertical relationships between Respondent and game developers. As discussed further below, the nature of these relationships and Respondent's conduct requires application of a *rule of reason* analysis to Claimant's antitrust allegations.

### G.  *The Relevant Market* –

43.     Claimant has established that the relevant product market is that for the distribution of PC video games. The market does not include video games for consoles or handheld devices. The relevant market does include both first-party distributors (self-publishers) and Key Resellers.  *See, Dr. Allcott Rebuttal Report, 2/13/26, Section 2.1.3.* The relevant geographic market for PC video game distribution is worldwide.

### H.  *Market Power & Monopoly* –

44.     Steam's market share is approximately 29–31%. See, *Tr. Vol. 9, 2/19/26, 2158:1–16 (Allcott).* The evidence established that Respondent is subject to ongoing competition in the relevant

markets. Microsoft and Epic Games both compete, as do the developers of hugely successful games like Fortnite and Minecraft. Similarly, distributors such as itch.io and Good Old Games (GOG), as well as first-party distribution platforms from developers like Ubisoft and EA put competitive pressure on Respondent.  See, *Tr., Vol. 10, 2/20/26 2404:14–2406:20 (Castronova); Tr., Vol. 4, 2/12/26, 1196:5–1198:13 (Peterson); Tr., Vol. 9, 2/19/26, 2108:6–2109:1 (Allcott).*

45.   The Arbitrator heard from both Parties' experts during an in-person witness conferencing session over two days. Both experts responded to questions from counsel and the Arbitrator, and engaged in some free-flowing discussion of relevant issues with counsel and the Arbitrator. Drs. Castronova and Allcott had the benefit of one another's expert reports and analyses to prepare for their testimony and "roundtable discussion."

46.   On the whole, the Arbitrator found that Dr. Allcott's opinions were more well-founded than Dr. Castronova's, and more aligned with rigorous economic theory and the evidence presented in this arbitration. Particularly on the questions of Respondent's market power and market share, Dr. Allcott's description of how and why his opinions (*see,* Dr. Allcott Report, 2/23/26, pp. 10-27) contrasted with those of Dr. Castronova was persuasive.

47.   Competition forced Respondent to adjust its revenue share in 2018. At that time, developers of successful games began to consider self-publishing/distributing their games on their own platforms instead of through Steam. In response to that competition, Respondent established various revenue share tiers providing developers with higher revenue shares for their successful games.  See, *Tr., Vol. 4, 2/12/26, 1275:13–1278:11, 1274:16–1275:5  (Peterson).*

## I.   *Impact of Respondent's Conduct on Competition* –

48.   The evidence does not establish a correlation between Respondent's conduct and any harm to competition in the PC game distribution market. Respondent has responded to competition by lowering its revenue share for successful game developers. Tens of thousands of game developers have published more than 140,000 games on Steam. See, *Tr., Vol. 4, 2/12/26, 1233:18–1234:2, 1384:14–1385:1 (Peterson).* The evidence firmly established that the quality of Steam's platform has steadily improved over time. See, *Tr., Vol. 11, 2/23/26, 2684:5–2687:4 (Wilson); Tr., Vol. 2, 2/10/26, 833:9–835:8 (Gerber); Tr., Vol. 4, 2/12/26, 1226:9–1231:12, 1244:15–1245:4, 1293:1–1295:12 (Peterson); Tr., Vol. 6, 2/16/26, 1658:15–18 (Hillman); Tr., Vol. 6, 2/16/26, 1712:17–1713:6 (Brewster); Tr., Vol. 7, 2/17/26, 1783:17–1784:16 (Partlow).*

## IX.   ANALYSIS.

### A.   *Sherman Act, Section 1 [Claimant's Third Cause of Action]* --

49.   Section 1 of the Sherman Act prohibits agreements, combinations, and conspiracies in restraint of trade or commerce. Claimants must prove three elements to establish that such a restraint has occurred: (1) the existence of a contract, combination, or conspiracy between at least two separate entities; (2) restraining trade; (3) causing injury to Claimants' business or property. *Epic v. Google, Final Jury Instructions,* N.D. Cal. Case No. 3:20-cv-5671-JD, Doc. 592, p. 34.

50.      Courts use three tests to ascertain if a restraint is "unreasonable."  At one end of the spectrum, some agreements are unlawful *per se*.  *Northern Pacific R. Co. v. United States*, 356 US 1, (1958); *Knevelbaard Dairies v. Kraft Foods, Inc.,* 232 F. 3d 979 (9th Cir. 2000); *FTC v. Ticor Title Ins.*, 504 U.S. 621 (1992). At the other, courts apply the rule of reason, which focuses on the restraint's actual effects on competition within a defined market. *Leegin Creative Leather Products v. PSKS, Inc.*, 551 US 877 (2007). Between these poles lies the "quick look" approach, which permits a truncated analysis where the anticompetitive tendency of the conduct is sufficiently obvious to obviate the need for a detailed market inquiry absent a plausible procompetitive justification. *Epic Games, Inc. v. Apple, Inc.,* 67 F.4th 946, n.6 (9th Cir. 2023).

51.      Under the *rule of reason*, "[1] The plaintiff bears the initial burden of showing that the restraint produces significant anticompetitive effects within a relevant market. [2] If the plaintiff meets this burden, the defendant must come forward with evidence of the restraint's procompetitive effects. [3] The plaintiff must then show that any legitimate objectives can be achieved in a substantially less restrictive manner."  *O'Bannon v. National Collegiate Athletic Ass'n,* 802 F. 3d 1049 (9th Cir. 2015).

52.      Where a plaintiff fails to meet his or her initial burden under the *rule of reason,* the analysis concludes, and the court need not proceed further with its analysis of either procompetitive effects or less restrictive conduct.  *Coronavirus Reporter v. Apple, Inc.,* 85 F.4th 948, 957 (9th Cir. 2023) (if plaintiffs cannot meet their threshold showings, then the court "reject[s] their antitrust claims").

53.      To prove anticompetitive effects, the Claimant can do so directly or indirectly. "Direct evidence of anticompetitive effects would be `proof of actual detrimental effects [on competition],' such as reduced output, increased prices, or decreased quality in the relevant market. Indirect evidence would be proof of market power plus some evidence that the challenged restraint harms competition."  *Ohio v. American Express Co.*, 585 U.S. 529 (2018).

54.      Here, the context in which Respondent engaged with game developers (and in at least one instance, a developer that was also a distributor, *e.g.,* Microsoft) involved vertical relationships. Even where game developers also operate their own stores, courts would view the relationship between them to be "hybrid" (*i.e.*, having both vertical *and* horizontal elements). Such relationships remain subject to the *rule of reason* "[b]ecause of the vertical element." *See, e.g.*, *Dimidowich*, 803 F.2d at 1481; *Brewbaker*, 87 F.4th at 577–78; *AT&T Corp. v. JMC Telecom, LLC*, 470 F.3d 525, 531 (3d Cir. 2006) ("Vertical restraints are generally not *per se* violations of the Sherman Act, even where a distributor and manufacturer also compete at the distribution level . . . ."); *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 243-44 (2d Cir. 1997); *Smalley & Co. v. Emerson & Cuming, Inc.*, 13 F.3d 366, 368 (10th Cir.1993); *Int'l Logistics Grp, Ltd. v. Chrysler Corp.*, 884 F.2d 904, 906 (6th Cir. 1989). In *Frame-Wilson v. Amazon.com*, 591 F. Supp. 3d 975 (W.D. Wash. 2022), plaintiffs challenged a contract requiring Amazon's "sellers to 'maintain parity'" for the prices of their products on Amazon and other platforms. The court rejected plaintiffs' *per se* claim because "a vertical relationship" was at issue, holding even if the agreements "contained a horizontal element, such a 'hybrid arrangement' would be analyzed under the rule of reason." *Id.* at 987.

**FINAL AWARD**
Case No. 01-23-0005-3449
*Jacob Barnhill*
*-vs-*
*Valve Corporation d/b/a Steam*

### 1. The *Relevant Antitrust Market --*

55. Assuming, *arguendo*, that Claimant has established the first element of his Sherman Act, Section 1 claim – "the existence of a contract, combination, or conspiracy between at least two separate entities," Claimant must then prove, by a preponderance of the evidence, that it "produces significant anticompetitive effects within a relevant market."

56. Claimant bears the burden of proving the relevant antitrust market. Failure to do so, therefore, is fatal to his claim. Here, Claimant alleges that the relevant market is restricted to the United States and excludes console device games and first-party distributors (developers who self-publish/ distribute). Claimant has established that the relevant product market is distribution for PC games – excluding consoles. The remaining inquiry is whether Claimant has proven that first-party distributors and/or Key Resellers are properly excluded, and that the geographic market is restricted to the United States.

57. The relevant product market must consist of "reasonably close substitutes." *Areeda & Hovenkamp § 565*. Here, the Parties agree first-party distribution is widespread in the video game industry. *Tr., Vol. 4, 2/12/26, 1198:16–1200:3 (Peterson); Tr., Vol. 10, 2/20/26, 2404:14–2406:20 (Castronova)*. On the developer side, in 2021, 21% of developers collected their revenue exclusively from first-party sales. *Tr., Vol. 9, 2/19/26, 2162:6–2163:9 (Allcott)*. Other developers distribute through both first and third-party stores, and evidence shows some of the highest-grossing games are sold directly by their developers. *Tr., Vol. 4, 2/12/26, 1264:13–1266:4 (Peterson)*. On the consumer side, Claimants themselves have purchased games from first-party distributors. *Tr., Vol. 7, 2/17/26, 1788:12–1790:11 (Partlow); Tr., Vol. 6, 2/16/26, 1665:4–1666:7 (Hillman)*.

58. First-party distributors also "impose competitive pressure on Steam." *Tr., Vol. 10, 2/20/26, 2393:19–22 (Castronova)*. The evidence presented established that when Valve lowered its revenue share in 2018, it was due in part to developers threatening to substitute their own first-party distribution for third-party distribution on Steam. *Tr., Vol. 9, 2/19/26, 2172:21–2174:4 (Allcott); Tr., Vol. 10, 2/20/26, 2394:1–11 (Castronova); Tr., Vol. 4, 2/12/26, 1275:13–1278:11 (Peterson)*.

59. Dr. Castronova admitted first-party distribution offers an "alternative means of distribution[ ]" to Steam. *Tr., Vol. 10, 2/20/26, 2391:3–8 (Castronova)*. Such direct-to-consumer distribution belongs in the relevant market. See, *Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162–63 (9th Cir. 1997) (including "direct sales to end-users" in the same market as distributors). *See also FTC v. Tempur Sealy Int'l, Inc.*, 768 F. Supp. 3d 787, 850–51 (S.D. Tex. 2025) ("[A]ll methods for reaching the consumer in the alleged market must be considered, including through direct-to-consumer or vertical integration."). Claimant's exclusion of first-party distributors in its relevant market definition is improper.

60. One of the more contentious issues for which evidence was presented at the Evidentiary Hearing concerned the relevant geographic market for the *distribution* of PC games. The focus is correctly on where game developers can look to distribute their games, not necessarily where PC gamers can look to purchase those games. These two issues were often conflated during the presentation of evidence and argument.

61.     Price competition among distributors also plays out globally, not by country. The evidence showed Respondent and competing distributors set global revenue shares. As Dr. Allcott noted, if competition were country-specific, economic theory would predict differentiated revenue shares by geography. *Tr., Vol. 9, 2/19/26, 2114:19–2115:3, 2117:22–2119:12 (Allcott).* The evidence presented demonstrated the absence of country-to-country variation, suggesting a global market for distribution.

62.     Claimant argues the market is U.S.-only because gamers see only U.S. game prices, however, as noted above, that is not the relevant question. Claimant's theory of harm turns on Respondent's *revenue share for distribution*, alleging that if Respondent's revenue share were lower, developers would pass through the savings, *i.e.*, lower game prices. The Arbitrator cannot determine whether Respondent's *revenue share* is too high without considering the competition that constrains that revenue share, which is global.

63.     Dr. Castronova conceded competition *is global* on the developer side (to whom Steam charges the revenue share). *Tr., Vol. 9, 2/19/26, 2054:20–2057:5 (Castronova).* Because Steam is a two-sided transaction platform, *Tr., Vol. 10, 2/20/26, 2481:20–2482:12 (Allcott); id. at 2488:16–2489:6 (Castronova)* ("It's a two-sided market"), "only one market should be defined." *Ohio v. Am. Express Co.*, 585 U.S. 529, 546 (2018). Because Valve's revenue share is constrained globally, a U.S.-defined relevant market is not correct.

### 2.   *Anticompetitive Effects –*

64.     Both Parties agree that if Claimant establishes a contract, combination, or conspiracy that produces significant anticompetitive effects in a properly defined antitrust market, then the burden shifts to Respondent to establish pro-competitive effects. As discussed, the Arbitrator is not persuaded that Claimant has proved the relevant market. Had the Arbitrator been persuaded otherwise; however, Claimant would still have had to prove anticompetitive effects, either directly or indirectly. For the following reasons, the Arbitrator concludes that Claimant did not establish the requisite anticompetitive effects.

65.     There is no question that the number of game developers, as well as the number of games, has steadily increased over the years. Tens of thousands of game developers have published more than 140,000 games on Steam. *Tr., Vol. 4, 2/12/26, 1233:18–1234:2, 1384:14–1385:1 (Peterson).* Similarly, the number of distributors has increased. And, significantly, the quality of distribution services – and the games themselves – have steadily improved. Robert Wilson testified that since he started using Steam in 2007, Respondent has introduced cloud saving, the Steam Wallet, a mobile app, early access, family sharing, user reviews, the Steam Machine, a VR headset, remote play, and the Steam Deck. *Tr., Vol. 11, 2/23/26, 2684:5–2687:4 (Wilson)*. In addition, Respondent has introduced Steam Direct, Steam Overlay, and the Steam Datagram Relay, expanded its network of payment processing systems, and increased the number of currencies and languages Steam supports. Claimants agree video games, too, have improved. *Tr., Vol. 2,  2/10/26, 833:9–835:8 (Gerber);Tr., Vol. 4, 2/12/26, 1226:9–1231:12, 1244:15–1245:4, 1293:1–1295:12 (Peterson);Tr., Vol. 6, 2/16/26, 1658:15–18 (Hillman);Tr., Vol. 6, 2/16/26, 1712:17–1713:6 (Brewster);Tr., Vol. 7, 2/17/26, 1783:17–1784:16 (Partlow).*

66.     Additionally, the cost of video game distribution has decreased due to competition. As discussed earlier, in 2018 Respondent established revenue share tiers in the face of competitive pressure from developers considering self-distribution. Epic Games provides a distribution platform with a much lower revenue share, as do other distributors.

67.     Even if Claimant had proven a relevant antitrust market, the evidence he presented does not directly establish an anticompetitive effect tied to Respondent's conduct.

68.     Where direct evidence of anticompetitive effects is absent, a plaintiff's path forward is not necessarily closed. A plaintiff may still satisfy his or her burden of proof indirectly. As noted in *Ohio v. American Express Co.*, 585 U.S. at 542: "Indirect evidence would be proof of market power plus some evidence that the challenged restraint harms competition. See 1 Kalinowski § 12.02[2];*Tops Markets, Inc. v. Quality Markets, Inc.,* 142 F.3d 90, 97 (C.A.2 1998);*Spanish Broadcasting System of Fla. v. Clear Channel Communications, Inc.,* 376 F.3d 1065, 1073 (C.A.11 2004)."

69.     The *ABA Model Jury Instructions in Civil Antitrust Cases* state, at A-115, Inst. 7, n.1, the following, in part:

> This instruction [Existence of Monopoly Power – Indirect Proof] is designed for cases in which plaintiff attempts to prove the existence of monopoly power through indirect evidence of defendant's ability to control prices and exclude competition. *See, e.g.*, *United States v. Microsoft Corp., 253 F.3d 34, 56-57 (D.C. Cir. 2001)* (circumstantial evidence of monopoly power established through a market structure analysis, including defendant's possession of a dominant share of a relevant market protected by entry barriers). Because direct evidence of control over prices and the ability to exclude competition may not be available, the use of indirect proof is the means generally used by courts to assess the existence of monopoly power. *See generally* 1 ABA SECTION OF ANTITRUST LAW, ANTITRUST LAW DEVELOPMENTS 229 (7th ed, 2012) [hereinafter *ALD*].

70.     The instruction provides that "[a] market share below 50 percent is ordinarily not sufficient to support a conclusion that defendant has monopoly power." A number of additional factors may be relevant to ascertain whether a party has market power:  market share trends, number of competitors, barriers to entry, *etc.*

71.     Here, the Parties offered competing expert testimony and analysis concerning Respondent's market share (for PC game distribution).  Dr. Castronova suggested a market share at or above 70%. Dr. Allcott, on the other hand, suggested a market share of approximately 30%. This Arbitrator finds that Dr. Allcott's analysis of market share is more economically sound and tethered to empirical data than that of Dr. Castronova.

72.     As discussed in the Section of this Final Award concerning the alleged anticompetitive effects of Respondent's conduct, the evidence presented demonstrates a competitive market for PC game distribution. There is price competition forcing Respondent to adopt a tiered revenue     share     model     to     attract     and     retain     successful     game     developers.     First-party

publishers/distributors hold a significant market share. Other distributors have entered the market over the years and have proven successful.

73.     The Parties presented a vast amount of evidence in this arbitration. Their experts presented exhaustive analyses of that evidence and relevant data. Counsel presented briefs with hundreds of footnotes and citations. Reviewing and considering the totality of this information – and not being swayed one way or the other by one or more documents, one or more witness' statement or admission – leads the Arbitrator to conclude that Respondent does not possess market or monopoly power to unreasonably restrain trade.

74.     For the foregoing reasons, the Arbitrator finds that Claimant has failed to carry his initial burden under the *rule of reason* and, therefore, the burden has not shifted to Respondent to establish pro-competitive benefits flowing from its conduct. Though not required to do so, the evidence presented and analyzed in the preceding sections of this Final Award, would suggest such pro-competitive benefits.

75.     Claimant has not proven his Sherman Act, Section 1 claim that Respondent engaged in an anticompetitive course of conduct. Accordingly, the Arbitrator need not answer the question of whether Claimant suffered an antitrust injury. *Model Jury Instruction A-300* ("<u>If you find that defendant has violated [. . . Section 1 of the Sherman Act . . .</u>], then you must decide if plaintiff is entitled to recover damages from defendant.")

### B.  *Sherman Act, Section 2 [Claimant's First & Second Causes of Action]* –

76.     Section 2 of the Sherman Act prohibits monopolization or attempted monopolization. *15 U.S.C. § 2*. "The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).

77.     Both Claimant and Respondent cite *Epic Games, Inc. v. Apple, Inc.*, 67 F. 4th 946, 998 (9th Cir. 2023) (quoting *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 US 451 (1992)) for the proposition that "[m]onopoly power differs in degree from market power, requiring 'something greater.'"

78.     The Arbitrator need not repeat here the earlier analysis of the Sherman Act, Section 1 claim. The Arbitrator has found that Claimant did not prove the relevant antitrust market. Further, the Arbitrator concluded that Respondent does not have the requisite market power sufficient to sustain Claimant's Section 1 claim. Given that both Parties agree that "something more" than market power is required under a Section 2 claim, the Arbitrator need not proceed further.

79.     Even if the Arbitrator had found that Respondent possessed market and monopoly power, under the applicable *rule of reason* analysis of Respondent's conduct and its impact on the relevant market, Claimant's proof is lacking. *FTC v. Qualcomm, Inc.*, 969 F.3d 974, 990 (9th Cir. 2020) (" . . . [T]he possession of monopoly power will not be found unlawful [under § 2] unless it is accompanied by an element of anticompetitive conduct.").

**FINAL AWARD**
Case No. 01-23-0005-3449
*Jacob Barnhill*
*-vs-*
*Valve Corporation d/b/a Steam*

80.    Here, the conduct of which Claimant complains – and as discussed in the Statement of Facts & Discussion section of this Final Award – is rationally related to Respondent's efforts (a) to enhance its customers' gaming experience, (b) to maintain its customers' trust, (c) to prevent "free-riding" and abuse of its own substantial investment in its platform.  The testimony from several witnesses confirmed their own perceptions of Respondent having achieved these pro-competitive objectives.

81.    Claimant has not proven his Sherman Act, Section 2 claims that Respondent engaged in actual or attempted monopolization. Accordingly, there is no need to proceed to an analysis of alleged injury or damages.  *Model Jury Instruction A-300.*

### C.  *Washington State Consumer Protection Act RCW 19.86 [Fourth Cause of Action]* –

82.    Claimant alleges that Respondent's conduct not only violates Sections 1 and 2 of the Sherman Act, but also parallel Washington State consumer protection laws. Claimant does not appear to dispute Respondent's position that his Washington State claim rises or falls with his federal antitrust claims.

83.    For the proposition that Claimant's state claim is co-extensive with his federal claims, Respondent cites *PBTM LLC v. Football Nw., LLC*, 511 F.Supp.3d 1158 (W.D. Wash. 2021). In that case, plaintiff alleged that defendant's conduct concerning trademark licensing and other commercial marketing concerning the Seattle Seahawks brand violated both federal antitrust laws and corresponding Washington State laws. The Court's description of plaintiff's claims, its analytical framework in the context of defendant's motion to dismiss, and the description of its ruling support Respondent's position here that Claimant's failure to prove Sherman Act violations is fatal to his fourth cause of action.

84.    The *PBTM LLC* Court described plaintiff's claims as follows:

> In Counts 5 through 8, PBTM alleges that Defendants' anti-competitive conduct violates antitrust laws under Sections 1 and 2 of the Sherman Act and parallel state law. Dkt. #26 at ¶¶ 43-57. Specifically, PBTM claims that Defendants' actions create an unlawful monopoly or attempted monopoly that unreasonably restrain trade in violation of Section 2 of the Sherman Act, 5 U.S.C. § 2 (Count 5) and Washington state law, RCW § 19.86.040 and Wash. Const. Art. 12 § 22 (Count 6). *Id.* at ¶¶ 88-98. PBTM further alleges that Defendants intentionally conspired to take, have taken, and continue to take concerted action to unlawfully and unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (Count 7), and Washington state law, RCW 19.86.030 (Count 8).

*Id.* at 1175.

85.     The *PBTM LLC* Court went on to describe how its federal antitrust claim analysis implicated its analysis of the corresponding state claims, stating:

> Having found that Counts 5-8 are timely, the Court will consider whether PBTM has sufficiently alleged antitrust claims under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, and their state law analogues, RCW 19.86.030 and 19.86.040. To survive a motion to dismiss, an antitrust complaint "need only allege sufficient facts from which the court can discern the elements of an injury resulting from an act forbidden by the antitrust laws." *Newman v. Universal Pictures,* 813 F.2d 1519, 1522 (9th Cir.1987), *cert. denied,* 486 U.S. 1059, 108 S.Ct. 2831, 100 L.Ed.2d 931 (1988). The Court's analysis of PBTM's federal antitrust claims extends to its state law claims under the WCPA, which are patterned after Sections 1 and 2 of the Sherman Antitrust Act.

*Id.* at 1178 (emphasis added).

86.     Finally, the Court described its decision to grant defendant's motion to dismiss all four antitrust claims (both federal and state) for failure to properly plead an essential element (relevant market) of both its Section 1 and Section 2 Sherman Act claims, stating:

> Accordingly, the Court finds that PBTM has failed to adequately plead a relevant product market. Because Sections 1 and 2 of the Sherman Act both require plaintiffs to plead a relevant market, *Hicks,* 897 F.3d at 1120, PBTM's antitrust claims under Counts 5-8 [*i.e.,* both federal and state claims] are dismissed for failure to state a claim.

*Id.* at 1182.

87.     Here, just as in *PTMB*, Claimant's fourth cause of action for violation of the Washington State Consumer Protection Act fails.

88.     In light of Claimant's failure to prove the necessary elements of his four causes of action, Respondent's asserted affirmative defenses are moot and not addressed in this Final Award.

## X.     SANCTIONS.

89.     The Arbitrator has carefully reviewed and considered Respondent's submission on monetary sanctions based upon Claimant's counsel's unreasonable delay in submitting Dr. Castronova's report, as well as Claimant's counsel's opposition thereto. The Arbitrator, in the exercise of his discretion, has concluded that the harm caused by counsel's delay was cured, Respondent suffered no prejudice, and the ends of justice would not be served by awarding sanctions.

## XI.     AWARD.

90.     Claimant's Amended Demand for Arbitration, described in Paragraph 8, above, alleging violations of Sections 1 and 2 of the Sherman Antitrust Act (*Title 15, United States Code,*

*Sections 1-2*), as well as Washington State's Consumer Protection Act (*Wash. Rev. Code. Ann. §§ 19.86, et seq.*), is DENIED and dismissed with prejudice.

91. The administrative fees of the American Arbitration Association shall be borne as incurred, and the compensation of the Arbitrator shall be borne as incurred.

92. This Final Award is in full settlement of all claims and counterclaims submitted to this arbitration. All claims not expressly granted herein are hereby denied.

Digitally signed by
79c6d0da-
c9f8-4210-8e11-81f
876c7d788
Date: 2026.06.13
09:09:28 -07'00'

June 13, 2026
Date                                   Peter Rundle, Arbitrator

I, Peter Rundle, do hereby affirm upon my oath as arbitrator that I am the individual described in and who executed this instrument, which is my Final Award.

Digitally signed by
79c6d0da-
c9f8-4210-8e11-81f87
6c7d788
Date: 2026.06.13
09:09:52 -07'00'

June 13, 2026
Date                                   Peter Rundle, Arbitrator

**FINAL AWARD**
Case No. 01-23-0005-3449
*Jacob Barnhill*
*-vs-*
*Valve Corporation d/b/a Steam*

# EXHIBIT 2

AMERICAN ARBITRATION ASSOCIATION

Consumer Arbitration Rules

Case Number: 01-23-0005-3635

In the Matter of the Arbitration Between

Ryan Ardito
-vs-
Valve Corp. d/b/a Steam


**I, Robert G. Badal, the UNDERSIGNED ARBITRATOR, having been duly designated in accordance with the arbitration agreements entered into between the above named Parties, and having been duly sworn, and having heard the proofs and allegations of the Parties, each represented by counsel, at evidentiary hearings held from January 26 through February 6, 2026 and having considered the evidence and the extensive briefing of the Parties during the course of these proceedings, do hereby issue and render this FINAL AWARD as follows**:

BACKGROUND

The Respondent (sometimes referred to herein as "Valve" or "Steam") is a video game maker, hardware manufacturer and operator of Steam. Steam is an integrated online platform that allows consumers to purchase and play digitized video games on their personal computers ("PCs"). The Steam platform makes available the games of numerous game makers ("Developers"), which presently number in the thousands on the Steam platform. The legal relationship between Steam and the Developers is embodied in the Steam Developer Agreement ("SDA"), which dictates the terms upon which Steam will act as their distributor. The number of Developer games available on Steam may now exceed 140,000.  In its role as a distributor of  Developers' games, Steam charges the Developers a 30% revenue share—i.e. for each sale that is made on the platform, Steam takes as its compensation 30% (with some exceptions) of whatever the Developer charges consumers for the game. The Developers, not Steam, set the price that consumers will pay for the games. Valve evolved over time from a game maker to a distributor of other Developers' games. Valve introduced the Steam platform in 2003 and was among the first movers in digital distribution online of video games.

Ryan Ardito ("Claimant") is a consumer who purchased Developer video games through the Steam platform. The Claimant is, or has been, a dedicated gamer who has used a variety of platforms and devices to engage in video gaming. The Claimant has generally been a customer of Steam for many years and was among the early adopters of the use of PCs for digital gaming and online game purchases through Steam. Claimant also has familiarity with other methods of gaming, such as consoles, that have been popular at one time or another over the years. The record in this case does not contain a precise estimate of the number of consumers who purchase games online, but it appears to be in the millions.

LEGAL FRAMEWORK

The Claimant alleges that Valve engaged in conduct that was unlawful under the federal antitrust statues and related State laws. Claimant asserts that Valve imposed price parity, content parity, anti-steering and

1

discount restrictions on Developers and offered "kickbacks" to large Developers. Claimant alleges that this conduct violates Sections 1 and 2 of the Sherman Antitrust Act. Claimant alleges that Valve's anticompetitive conduct caused him injury by artificially increasing the prices he paid for the games he purchased on Steam.

Section 1 of the Sherman Act prohibits concerted action, rendering unlawful every contract, combination or conspiracy in restraint of trade. Section 2 of the Act proscribes unilateral or independent action, making it unlawful to monopolize or attempt to monopolize trade in interstate commerce. Under Section1, there are a small group of exceptional restraints that receive per se treatment if judicial experience with the restraint shows that it always or almost always tends to restrict competition. However, the default analysis under Section 1 requires the application of the "rule of reason", a fact-intensive inquiry into the restraint's actual effect on market competition. Section 2, by its very nature, also requires a fact-specific inquiry, which mirrors in most respects the "rule of reason" inquiry under Section 1.  Although the courts use a variety of phrases to describe the elements that are required to prove a rule of reason violation of Sections 1 or 2 of the Act, the formulations tend to coalesce around some common features. For Section 1 cases, a plaintiff must prove that he suffered injury by virtue of (1) the existence of a contract, combination or conspiracy among two or more entities that (2) unreasonably restrained trade (3) in a relevant market. For Section 2 cases, a plaintiff must prove that he suffered injury caused by a defendant (1) who possessed monopoly power (2) in a relevant market and (3) who willfully acquired or maintained that power through anticompetitive conduct (and not through "a superior product, business acumen, or historic accident"). The "relevant market" definition is identical under both sections of the Act and, as the Ninth Circuit recently confirmed in Epic Games, Inc. v. Apple, Inc. 67 F.4th 946, 977-988 (9th Cir. 2023) ("Epic"), the anticompetitive conduct elements require the same type of fact-intensive "rule of reason "analysis. Superimposed upon these basic legal elements are evidentiary proof requirements--including burden-of-proof requirements and burden-shifting mandates--that will be discussed below.

SECTION 1/PER SE LIABILITY

Claimant asserts that Valve engaged in horizontal price fixing, a potential per se violation of Section 1 of the Sherman Act. In support of this accusation, Claimant cites to a 2011 distribution agreement between Valve and Microsoft as direct evidence of a horizontal price fix. The Valve/Microsoft distribution agreement contains language that Claimant interprets to "fix" consumer prices for Microsoft's own games. Insofar as Microsoft is both a Developer of games and a distributor of games, Claimant focuses on the horizontal nature of both companies' distribution business in making out his per se case. Claimant cites a similar distribution agreement with Ubisoft. In addition, Claimant cites to paragraph 2.4 of the standard SDA, which applies to all Developers who distribute through the Steam platform. Claimant argues that the SDA's provisions and the numerous internal and external emails referencing discussions between Valve and the Developers over discounting and pricing is, at a minimum, indirect evidence that Valve organized a "horizontal" ("hub and spokes") price fix among the Developers. This, too, could be a per se violation.

The per se rule is an exception to the normal application of the rule of reason in antitrust cases. It is reserved for a "small group" of cases where the anticompetitive effects are obvious and where judicial experience with the alleged restraint is extensive. To qualify his claims for per se treatment, Claimant casts the market dynamics as essentially horizontal in nature. The record does not support this result.

2

Valve's relationship with Microsoft and Ubisoft was primarily vertical—i.e. as their distributor. Valve's relationship with other Developers is also vertical. Such relationships are classically evaluated under the rule of reason. In addition, the existence of two-sided platforms connected digitally via the internet is a relatively new phenomenon and does not yet reflect deep judicial experience in determining the antitrust consequences of various platform behaviors. The rule of reason, and not the per se rule, must apply in this case.

RULE OF REASON/SECTIONS 1 and 2 LIABILITIES

As mentioned, a case involving both Section1 and Section 2 claims will apply the rule of reason analysis to both claims. In this arbitration, and for reasons set out below, the Arbitrator could discern no meaningful difference between the quantity or quality of the proofs required under the Section 1"quick look" doctrine or the full-blown rule of reason analysis. The allocation of the burdens of proof and burdens of persuasion differs between the "quick look" and other Section1 rule of reason cases but because this case also involves Section 2 claims, no useful purpose would be served by drawing a technical distinction between "quick look" and standard rule of reason analysis.

Relevant Market. Claimant asserts that the relevant geographic market is the United States and the relevant product market is "the digital distribution of third-party PC games".  Respondent, for its part, would define the geographic market as international in nature and that the product market would include PCs as well as other means by which a consumer could acquire and play the same games. Accordingly, Respondent would include in the relevant market third-party game distributors, first-party distributors (i.e. Developers who also have distribution platforms), games on consoles and Steam Key resellers. The case law on market definition teaches that the relevant market must include alternatives that are perceived by consumers to be reasonable substitutes for Respondent's offering. In theory, such substitutes provide the potential for competition at least at the periphery of the market. Since the Respondent here is engaged primarily in the business of online digital distribution, via PCs, of video games developed by others, the market must include any other reasonably available means for online distribution of such games. That would include first-party distributors, as well as third-party distributors, regardless of their geographic location, so long as consumers have digital access to the distributors' game offerings through PC mechanisms. It would also include Steam Key resellers. But it would not include games played on consoles. There are hardware, software, and consumer-behavior attributes of consols that place them, at best, in a separate submarket for game distribution.

The evidence in the record regarding market shares is conflicting, and the data sources used by both parties to quantify competitor market shares are statistically impeachable. Moreover, as stated above, the Arbitrator has not wholly embraced either party's definition of the relevant market. At this juncture, it is not possible to affix a definitive market share percentage to Valve's share of the relevant market. The absence of a clear calculation of Valve's market share is not, however, dispositive. Certainly, if proven, a market share above 50% would create, at least, a presumption of market power but even that presumption is rebuttable and does not dispense with the obligation to prove anticompetitive conduct that has anticompetitive market effects. Accordingly, in this case, the absence of an agreed upon market share percentage will not obviate the need for a more detailed market analysis.

Market Power/ Conduct/Effects (Step One). As the Ninth Circuit recently reinforced in Epic, under the rule of reason, the initial burden is on the Claimant to prove behaviors that have anticompetitive effects in

3

the relevant market. Only if the Claimant discharges his burden in "Step One" will the analysis proceed to Step Two, where the burden shifts to the Respondent. Since the rule of reason analysis applicable under Section 1 and Section 2 overlaps to a significant extent, they will be treated together here to avoid repetition.

Although the parties vigorously dispute whether Valve's conduct violated the antitrust laws, the parties are in general agreement about the basic contours of the market. For analytical purposes, the market consists of three participants: game Developers, game distributors, and consumers. The market structure meets the classic definition of a two-sided platform market. The parties are also generally in agreement that as a distributor, Valve has a substantial network of dedicated consumers who use the Steam platform to purchase and play their games. Claimant alleges that by virtue of Valve's dominant position as a game distributor, it has become a gatekeeper between Developers and consumers. Claimant alleges that Valve has taken unlawful advantage of its dominant gatekeeper's role, and its extensive network, to unlawfully dictate the terms upon which Developers will sell, and consumers will buy their games.

As proof of both Valve's market power and its willful maintenance of its alleged monopoly status, the Claimant points to specific behaviors employed by Valve. According to Claimant, the principal tool used by Valve to suppress competition is something Claimant refers to as "price parity".  With price parity, Valve insists that any Developer who sells a game on Steam must offer that game to Steam customers at substantially the same price/same terms as the Developer charges consumers for that game through other distribution platforms. Similarly, Valve insists upon "content parity"—i.e. that the Developer provide the same or comparable features/attributes for a game sold on Steam as that game will have on other distribution platforms.  Valve enforces its price and content parity policies by refusing to make available on Steam any game where the Developer has not adhered to the price and content parity requirements. Because of the scale of Valve's consumer base and its associated network effects, the threat to deny access to a Developer's game is sufficient, according to Claimant, to compel compliance with the parity requirements.  Claimant asserts that these requirements prevent competition in both the pricing and the development of new features in games.

In addition to the parity requirements, Claimant cites to other behaviors by Valve that he believes show Valve's market power and/or prove anticompetitive effects. These behaviors include: a "post-and-hold" obligation; preventing consumers from transferring their game libraries and wallet balances to other platforms; blocking Developers from including links in their games that would take the consumer away from the Steam platform; and providing better pricing to Developers of the most popular games to disincentivize them from gravitating to another platform. Claimant contends that network effects, coupled with high barriers to entry for potential distribution rivals, allow Valve to entrench its monopoly and maintain its super-competitive pricing. He cites the durability over many years of Valve's 30% revenue share pricing as further proof of Valve's market power.

No Anticompetitive Effects/Procompetitive Rationales (Step Two).  Assuming that Claimant has met his Step One burden, the burden then shifts to Respondent to rebut Claimant's proof and/or justify its conduct with procompetitive rationales.

For its part, Respondent notes that Valve was among the early entrants into the market for digital distribution of games. At the time of its entry in 2003, games were sold primarily in retail stores. Making games available through digital download on PCs was novel and, ultimately, attractive to consumers, as

4

Claimant himself recognized. As more consumers were attracted to the Steam platform, the network of users grew. The growth and development of personal computers and the improvements in internet capacity also enhanced the attractiveness of Steam's platform. With the growth of its consumer network, the Steam platform became increasingly attractive to Developers as a must-have vehicle for reaching more consumers and selling more games. In turn, Steam became increasingly attractive to consumers as the number of popular games on Steam increased. The depth of the consumer network was, moreover, self-reinforcing as the social aspects of gaming tied consumers to the platform used by most of their friends and contacts. This mutually reinforcing cycle between gamers and Developers allowed Valve to grow its network and become a dominant presence in the online distribution of games.

 Respondent concedes that it has a substantial network of Developers and consumers, but it disputes Claimant's characterization of its conduct. Respondent notes that its extensive network of users is a product of its first-mover advantage and not due to any wrongful conduct. Valve points out that its revenue-sharing model was adopted almost from the inception of Steam, and well before there were any allegations of its supposed monopoly power. In adopting a revenue-sharing business model, it intentionally left it to the Developers to set the prices to be charged to consumers for their games. To compensate it for its services as the Developers' distribution channel--and for the enhancements it makes in technology and the consumers' gaming experience-- Valve charges the Developer a 30% revenue share for each sale. However, the sale price itself is always set by the Developer. Likewise, game content and other game features are up to the Developer. Valve does insist that the Developers provide equal treatment to Steam customers for games that are sold on other platforms as well as through the Steam platform.  In practice this means that for all intents and purposes the price and features of games sold on Steam will be substantially similar to the prices and features of the games as sold on other distribution platforms. Although the parties disputed the volume, purpose and meaning of Valve emails and argued over the definition of "parity", the record is clear that Valve would not sell a Developer's game on Steam unless the Developer offered substantially identical pricing terms and content for the same game as it is sold on another platform.

As Respondent notes, the analysis required under the rule of reason focuses on market-wide anticompetitive effects, not necessarily on the impact of Respondent's conduct on individual competitors or market participants. Respondent offered evidence that the video game market does not show signs of anticompetitive effects: Developers are free to discount their prices as they see fit; the number of games on offer for sale has increased; the number of consumers who play video games has steadily increased; the sophistication, features, and digital quality of games have been enhanced. If barriers to entry exist, they have not precluded the entry of new, and well-financed, players into various aspects of the market, including Microsoft, EPIC Games, Google Play, Amazon, Ubisoft, and Tencent. Valve, itself, responded to market forces by reducing its revenue share percentage from 40% to 30% and then again to 25%/20% for large volume games. Respondent also offered evidence that it spends considerable resources to improving its platform to make the platform attractive to both consumers and Developers. Respondent asserts that these are all evidence of a robust and competitive market and proof that Valve's conduct did not restrain market competition.

Respondent also offered evidence that its conduct was procompetitive and thereby justified. In this regard, Respondent points out that its requests for "parity" are essential to ensuring that Steam customers are treated fairly, and that they perceive that Valve will protect their interests in obtaining the best available

pricing and game features. This helps to support the users' loyalty to the platform, according to Valve. In addition, Valve devotes resources to providing promotional support for Developer games and its insistence on "parity" helps avoid free riding by Developers who offer different deals elsewhere. Likewise, Valve's restrictions on certain click-through links embedded in some games is intended to prevent Developers from free-riding by using Valve's network to reach consumers, but then having the actual sales occur elsewhere. Valve's discounting policy is intended to protect its users by preventing Developers from promoting a game as "on sale" when, in fact, the price offered is the regular price. Moreover, and as mentioned above, Valve invests in its platform in order to offer a quality product that is attractive to consumers and Developers. These investments are procompetitive, in that they provide an expanded network of opportunities for both consumers and Developers.

Less restrictive Means (Step Three). Epic makes clear that if the Respondent discharges its burden under Step Two, the burden then shifts back to the Claimant to show that Valve could have achieved its procompetitive rationales through less restrictive means. Claimant did not discharge this burden.

 Antitrust Damages.  Some cases treat antitrust damages as a part of the liability determination while others treat it as a separate item to be decided only after liability has been adjudicated. This distinction is not relevant in this arbitration.

As discussed above, the Claimant presented substantial evidence that described the market dynamics between Valve and the Developers. In that Developers are not named parties to this arbitration, the remaining question is if and how the Valve/Developer dynamic has caused antitrust injury to the consumers side of the platform and the quantification of that injury. Claimant asserts that Valve's alleged anticompetitive conduct caused prices paid by Developers to be above the "competitive" level and that Developers passed these "excess" prices on to consumers. Apple v. Pepper,139 S. Ct. 1514 (2019) ("Pepper") clarified Illinois Brick and allowed consumers in a two-sided platform market to be treated as "direct purchasers". The Court did recognize, however, that there could be a need to allocate damages when parties on both sides of that market were deemed "direct purchasers", with each seeking their own damages. Claimant's expert witness (relying on a theoretical model developed by Andre Boik and Kenneth Corts) testified that the "competitive" revenue share that Valve should have charged Developers in the "but for" world was roughly 10%, and the entire cost reduction between the putative 10% revenue share and the actual 30% revenue share would be passed on to consumers by Developers in lower game prices. The Claimant's expert testified that his damage calculations were based on a "full pass-through" premise. In essence, in the "but for" world, the Developers would have passed through to consumers as lower prices the entirety of the cost difference between a 10% and 30% revenue share. This "full pass-through" amount is the basis for the calculation of Claimant's damages.

The Claimant asserts that the Developers in setting their "but for" prices would not have considered retaining for themselves any portion of the alleged "overcharge". Claimant makes this assertion for every Developer, for every game sold, for any date over the course of several years, regardless of any external or internal economic influences; and without regard for any Developer's motivation to retain revenue for investment, development or profitability purposes.

<u>CONCLUSIONS AND AWARD</u>

On the record here, the Arbitrator finds that Claimant has met his initial burden of showing under the rule of reason that Valve's various policies and practices had a potential restraining effect in the market for the digital distribution and sale of video games for PCs. However, that does not end the inquiry. As the Supreme Court determined in State of Ohio v. American Express, 585 U.S. 529 (2018) ("Amex"), in two-sided platform markets, the anti- and pro-competitive effects on both sides of the market must be considered and balanced even if they offset each other. Valve offered evidence of a dynamic market and, much as the defendant in Epic, offered non-pretextual proof that its conduct promoted development and enhancement of a product that consumers favored, which, in turn, inured to the net benefit of Developers. Claimant thereupon had an obligation to offer evidence that less restrictive means were available to Valve but Claimant failed to offer any such evidence.

 The antitrust laws have long held that a company has a unilateral right to set the terms upon which it will trade and may refuse to deal with those who fail to assent to those terms. United States v. Colgate, 250 U.S.300 (1919) ("Colgate"). Even a putative monopolist has the right to refuse to deal and to set the terms upon which it will deal. Verizon v. Trinko, 540 U.S. 398 (2004) ("Trinko"). Claimant has not alleged an "essential facility" nor shown that any of the few exceptions to Colgate and Trinko apply to the facts of this case.

Even assuming arguendo that Claimant had prevailed on the merits, his claims would still fail. The Claimant is correct that the courts allow greater latitude in quantifying antitrust damages and that "pass-through" is a potential template for determining damages. However, that does not relieve the Claimant of his obligation to provide a non-speculative quantification of damages. Bigelow v.RKP Radio Pictures, 327 U.S.251 (1946). Here, Claimant did not prove that every Developer would pass on 100% of the alleged overcharge as lower prices to consumers and would not, under any circumstances, retain for itself any "but for" monies for its own purposes.  The Claimant did not provide adequate proof of such a blanket assertion. This case is like Pepper insofar as the parties on both sides of the Steam platform are deemed "direct purchasers" for antitrust purposes.  The fact that the Developers are themselves seeking damages as "direct purchasers" in other cases seems to be inconsistent with the 100% pass-through assumption.  Claimant's expert did not provide the Arbitrator with a non-speculative way to reconcile how the expert's damage calculations accounted for the Developers' own damages claims.

The same analysis applies to Claimant's State-law claims and is fatal to such claims.

**ACCORDINGLY**, the Arbitrator **DENIES** Claimant's claims.

Having fully participated in all aspects of these proceedings, Respondent's reservation of rights regarding the American Arbitration Association's("AAA") jurisdiction is deemed WAIVED.

The administrative fees of the AAA and the Arbitrator's compensation shall be borne as incurred. Each party shall bear its own attorneys' fees and costs. This FINAL AWARD is in full settlement of all claims and counterclaims. All claims not addressed herein are hereby denied.

June 12, 2026              /s/Robert G. Badal, Arbitrator

**I, Robert G. Badal, do hereby affirm upon my oath as arbitrator that I am the individual described in and who executed this instrument, which is my FINAL AWARD.**

**June 12, 2026**          /s/**Robert G. Badal, Arbitrator**

8